1  SILVERANG, ROSENZWEIG
2  & HALTZMAN, LLC
   Philip S. Rosenzweig (*pro hac vice* pending)
3    *prsoenzweig@sanddlwayers.com*
   595 East Lancaster Avenue, Suite 203
4  St. Davids, PA  19087
   Telephone:  (610) 263-0115
5  Facsimile:   (215) 754-4934

6  MCCORMICK, BARSTOW, SHEPPARD,
   WAYTE & CARRUTH LLP
7  Shane G. Smith, #272630
     *shane.smith@mccormickbarstow.com*
8  7647 North Fresno Street
   Fresno, California 93720
9  Telephone:  (559) 433-1300
   Facsimile:   (559) 433-2300
10
11 *Attorneys for Plaintiffs. The Weiser Law
   Firm, P.C. and Robert B. Weiser, Esquire*
12

13          **UNITED STATES DISTRICT COURT**

14   **CENTRAL DISTRICT OF CALIFORNIA, SOUTHERN DIVISION**

15

16 THE WEISER LAW FIRM, P.C.          Case No.
   Four Tower Bridge
17 200 Barr Harbor Drive, Suite 400   **COMPLAINT**
   West Conshohocken, Pennsylvania
18 19428

19          and

20 ROBERT B. WEISER, ESQUIRE
   Four Tower Bridge
21 200 Barr Harbor Drive, Suite 400
   West Conshohocken, Pennsylvania
22 19428

23                    Plaintiffs,

24          v.

25 MICHAEL HARTLEIB
   27020 Alicia Parkway, Suite G
26 Laguna Niguel, CA  92677,

27                    Defendant.

28

McCORMICK, BARSTOW,
SHEPPARD, WAYTE &
CARRUTH LLP
7647 NORTH FRESNO STREET
FRESNO, CA 93720

COMPLAINT

## COMPLAINT

Plaintiffs The Weiser Law Firm, P.C. (hereinafter the "Law Firm") and Robert B. Weiser, Esquire ("Weiser" or, together with the Law Firm, "Plaintiffs"), bring this action pursuant to 28 U.S.C. §§1651(a)) and 1332 by way of this complaint (this "Complaint") against Defendant, Michael Hartleib ("Hartleib" or "Defendant"), and allege as follows:

## PARTIES

1.      Plaintiff Law Firm is a Pennsylvania professional corporation with offices located at Four Tower Bridge, 200 Barr Harbor Drive, Suite 400, West Conshohocken, Pennsylvania 19428.

2.      The Law Firm was incorporated in the Commonwealth of Pennsylvania in 2004 under entity number 3272161.

3.      Plaintiff Weiser is an adult individual and resident of the Commonwealth of Pennsylvania.

4.      Defendant Hartleib is an adult individual and resident of the State of California.

## VENUE AND JURISDICTION

5.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332, as the parties are citizens of diverse jurisdictions and the amount in controversy exceeds $75,000; similarly, as relief is sought pursuant to the All Writs Act (28 U.S.C. §1651(a)), this Court has original jurisdiction over this matter.

6.      Defendant's residence is located within the Southern District of California; as such, venue is appropriate in the United States District Court for the Central District of California, Southern Division pursuant to 28 U.S.C. §1391(b)(1).

## FACTS

7.      The Law Firm is engaged in the provision of legal services with a focus on shareholder class actions, shareholder derivative actions, mergers and acquisitions related litigation, and whistleblower/false claims act "qui tam" cases.

8.      Weiser is a founder and principal of the Law Firm.

9.      Weiser is a licensed attorney duly admitted in the State of New Jersey and the Commonwealth of Pennsylvania.

***Plaintiffs' First Encounters with Defendant - The Sprint Securities Class Action & Shareholder Derivative Actions***

10.      On or about November 25, 2008, Hartlieb e-mailed Bruce G. Murphy, Esquire ("Murphy") of the Law Offices of Bruce G. Murphy (the "Murphy Firm"), regarding the loss in value of shares he owned in Sprint Corporation and Nextel Communications when the two companies merged to become Sprint Nextel Corporation in 2005. See November 25, 2008 e-mail string, a true and correct copy of which is attached hereto as **Exhibit 1**.

11.      Murphy had occasionally referred clients to the Law Firm in the past.

12.      Because of the Law Firm's experience and expertise in the shareholder litigation arena, Murphy forwarded Hartlieb's e-mail to Weiser and asked Weiser if he saw "a der" – meaning a stockholder derivative action that could be brought on Sprint's behalf – as a possibility in Hartlieb's case based upon the $31 billion write-down Sprint was forced to take in connection with the failed Nextel merger. Ex. 1

13.      In response to Murphy's inquiry, the Law Firm investigated the Sprint/Nextel merger and the resulting write-down, but the Law Firm's investigation did not produce sufficient information to recommend filing a derivative lawsuit on Sprint's behalf at that time.

14.      On March 10, 2009, the first securities class action lawsuit based on the Sprint/Nextel merger and the resulting write-down was filed against Sprint and certain of its officers and directors in the United States District Court for the District of Kansas (the "Kansas Federal Court"), by the law firm of Coughlin Stoia Geller Rudman & Robbins (the predecessor firm to Robbins Geller Rudman and Dowd, LLP, hereinafter "Robbins Geller").

15.      Several other substantially similar securities class action lawsuits were

McCormick, Barstow, Sheppard, Wayte & Carruth LLP
7647 North Fresno Street
Fresno, CA 93720

eventually filed against Sprint, which were subsequently consolidated in the Kansas Federal Court (the "Sprint Securities Class Action").

16.     Robbins Geller and Motley Rice LLC were appointed to serve as co-lead counsel for the plaintiff investor class in the Sprint Securities Class Action.

17.     On March 10, 2009, upon seeing that the first complaint in the Sprint Securities Class Action was filed, Murphy contacted Weiser once again regarding potential shareholder derivative claims that could be brought on behalf of Sprint.

18.     The Law Firm thereupon reviewed the allegations forming the basis of the Sprint Securities Class Action, together with new information regarding the Sprint/Nextel merger and resulting write-down, and concluded within a few days of the March 10, 2009 initiation of the Sprint Securities Class Action that Sprint may have potential claims against its then-current and/or former officers and directors.

19.     Weiser asked Murphy if Hartleib or any other potential client was interested in initiating a shareholder derivative suit on behalf of Sprint against its directors and officers.

20.     Murphy informed Weiser that Hartleib and other potential clients were still interested in bringing a shareholder derivative suit for the benefit of Sprint.

21.     The Law Firm began researching and drafting a shareholder derivative complaint.

22.     On or about March 13, 2009, Weiser provided Murphy with the draft shareholder derivative complaint for circulation among Murphy's actual or potential clients.

23.     At that time, Weiser understood that Hartleib was one of Murphy's potential clients in the contemplated Sprint derivative lawsuit; however, neither Weiser nor anyone else at the Law Firm had yet communicated with Hartleib.

24.     On March 21 or 22, 2009, Weiser became aware that Murphy sent a draft retention letter to Hartleib, even though up to that point Weiser had never directly communicated with Hartleib.

25.    Neither Weiser nor the Law Firm agreed to represent Hartleib at that time.

26.    On or about March 26, 2009, Weiser and Hartleib spoke for the first time, by telephone.

27.    During the March 26, 2009 call, Hartleib claimed to have spent "hundreds of hours" investigating Sprint, and also stated that he contacted Robbins Geller and "give[n] them" the facts and analysis necessary to prosecute the federal securities claims asserted against Sprint in the Sprint Securities Class Action.

28.    Hartleib also represented to Weiser during the March 26, 2009 call that he was interested in seeking appointment as the lead plaintiff or as a co-lead plaintiff in the Sprint Securities Class Action – a concept not particularly applicable to the shareholder derivative litigation space.

29.    Hartleib stated to Weiser that Hartleib believed he would make an ideal lead plaintiff in the Sprint Securities Class Action based upon his claimed knowledge regarding Sprint.

30.    Also during the March 26, 2009 call, Hartleib strongly implied his interest in sharing any attorneys' fees the Law Firm might recover if it represented Hartleib in connection with a potential shareholder derivative action brought on Sprint's behalf.

31.    Hartleib's apparent interest in a fee sharing agreement with the Law Firm was extremely troubling to Weiser, as neither Weiser nor the Law Firm would knowingly enter into such an agreement with a non-lawyer.

32.    Based upon Hartleib's representations and/or statements to Weiser during the March 26, 2009 call regarding the Sprint Securities Class Action, and in addition to the improper insinuation relative to a shared attorneys' fees arrangement, Weiser concluded that the Law Firm could not represent Hartleib in any derivative action brought on behalf of Sprint, as any role potentially to be played by Hartleib in launching and/or prosecuting the Sprint Securities Class Action against Sprint would

preclude his participation as a plaintiff to a derivative suit brought on behalf of Sprint.

33.    By e-mail at 7:21 a.m. on March 27, 2009, a true and correct copy of which is attached hereto as **Exhibit 2**, Weiser informed Murphy of his decision that the Law Firm could not represent Hartleib in a shareholder derivative suit brought for the benefit of Sprint.

34.    Weiser explained to Murphy that his decision was based upon Hartleib's "potential conflict in light of the other [Sprint Securities Class Action] litigation he's involved in. Thus, I don't think he would make an adequate representative for Sprint." Ex. 2.

35.    Murphy and Weiser spoke by phone shortly after 7:21 a.m. on March 27, 2009, and Weiser reiterated that the Law Firm would not represent Hartleib in a shareholder derivative action brought on behalf of Sprint under any circumstances.

36.    By e-mail at 9:55 a.m. on March 27, 2009, a true and correct copy of which is attached hereto as **Exhibit 3**, Murphy informed Hartleib that neither the Murphy Firm nor the Law Firm would represent Hartleib in a shareholder derivative action on behalf of Sprint due to Hartleib's "potential conflict of interest." Ex. 3.

37.    The Law Firm eventually chose to represent Sprint shareholder Monica Ross-Williams ("Ross-Williams") as the plaintiff to a shareholder derivative action (the "Sprint Derivative Action") filed on behalf of Sprint against certain of its current and former officers and directors in the District Court of Johnson County, Kansas (the "Kansas State Court").

38.    In July 2011, the law firm of Kahn, Swick & Foti, LLC ("Kahn Swick") filed a separate shareholder derivative action on Sprint's behalf, naming Hartleib as the representative plaintiff.

### _**Further Encounters with Hartleib - The Sirius XM Litigation**_

39.    On March 8, 2011, Hartleib and several other named plaintiffs filed a shareholder derivative action on behalf of Sirius XM Satellite Radio, Inc. ("Sirius XM") against Sirius XM's officers and directors in New York State Supreme Court

(New York County), alleging negligence, fraud, breach of fiduciary duties and self-dealing (the "Sirius XM Derivative Action").  A true and correct copy of Hartleib's Sirius XM shareholder derivative complaint is attached hereto as **Exhibit 4**.

40.     The plaintiffs in the Sirius XM Derivative Action were represented pro se by Hartleib and his fellow named plaintiff, John Sorge.  Ex. 4 pp. 1, 21.

41.     Although the Law Firm previously declined to represent Hartleib in a shareholder derivative action on behalf of Sprint, Hartleib sought to engage the Law Firm as counsel for the plaintiffs in the Sirius XM Derivative Action.

42.     To wit, Hartleib e-mailed Weiser about the Sirius XM Derivative Action multiple times, without response.  True and correct copies of e-mails from Hartleib to Weiser dated June 2, 2011, June 11, 2011 and June 20, 2011 are attached hereto as **Exhibit 5**.

43.     Weiser was wary of getting involved in the tangled and multi-faceted Sirius XM Derivative Action, and after undertaking a cursory review of the allegations and purported derivative claims asserted against Sirius XM's officers and directors, Weiser and the Law Firm determined that Hartleib's legal theories were insupportable.  Accordingly, Weiser and the Law Firm declined to represent Hartleib and his fellow shareholder plaintiffs in the Sirius XM Derivative Action.

44.     On August 31, 2011, Hartleib again e-mailed Weiser: "Rob, we need to talk about you coming in on my Sirius state case. This Federal case was taken from my case which was filed first. Khan Swick will work with us as I am providing all of the research. Call me ASAP[.]"  A true and correct copy of Hartleib's August 31, 2011 e-mail to Weiser is attached hereto as **Exhibit 6**.

45.     Weiser declined to call Hartleib, however, and the Law Firm elected not to represent Hartleib or any other plaintiff(s) in any legal action with respect to Sirius XM.

46.     On February 16, 2012, Hartleib e-mailed Weiser and copied Hartleib's colleague, David Sacks: "Rob, are we going to do some business together or what?

You never called us back after we tried six times to reach you. David and I need to make some money so that we can buy you a new phone!" A true and correct copy of Hartleib's February 16, 2012 e-mail to Weiser is attached hereto as **Exhibit 7**.

47.     Notwithstanding Hartleib's apparent persistence, the Law Firm declined to engage in any business transaction or litigation with Hartleib in 2012 or thereafter and Weiser/the Law Firm did not speak with Hartleib for several years thereafter.

### *The Sprint Derivative Settlement*

48.     Indeed it was not until after the majority of the Sprint shareholder derivative lawsuits pending in the Kansas State Court and the Kansas Federal Court based on the Sprint/Nextel merger, including the Sprint Derivative Action initiated by Ross-Williams, achieved a collective settlement in or about 2016 (the "Sprint Derivative Settlement") that Weiser/the Law Firm had any interactions with Hartleib again.

49.     Hartleib – the only Sprint derivative plaintiff in any forum who did not participate in the Sprint Derivative Settlement – was a vocal opponent of the Sprint Derivative Settlement.

50.     When the Law Firm and several other law firms representing other derivative plaintiffs sought final approval of the terms of the Sprint Derivative Settlement from the Kansas State Court, including the approval of agreed-to attorneys' fees for the plaintiffs' counsel, Hartleib filed a formal pro se objection.

51.     Weiser and Hartleib spoke by phone concerning Hartleib's objection to the Sprint Derivative Settlement on or about May 20, 2016, approximately one week prior to the Sprint Derivative Settlement's final approval hearing (the "Final Approval Hearing") in the Kansas State Court before the Honorable James Vano ("Judge Vano").

52.     During that telephone conversation, Hartleib expressed to Weiser his displeasure with the terms of the Sprint Derivative Settlement.

53.     Notwithstanding Hartleib's displeasure with the Sprint Derivative

Settlement terms, however, Hartleib proposed to withdraw his formal objection to the Sprint Derivative Settlement if Weiser would agree to enter into a "consulting agreement" with Hartleib, pursuant to which Hartleib would receive several hundred thousand dollars and would provide the Law Firm with prospective theories for derivative actions against unspecified Defendants and without specific plaintiffs attached.

54.    The Law Firm elected not to enter into any "consulting agreement" with Hartleib, and once again was roiled by the unethical request made by Hartlieb.

55.    Scorned by Plaintiffs' rebukes of his advances and perceived inappropriate proposals, and because his own shareholder derivative action was not included in the Sprint Derivative Settlement, Hartleib appeared at the May 26, 2016 Final Approval Hearing before Judge Vano in support of his objection to the Sprint Derivative Settlement.

56.    As the approval process for the Sprint Derivative Settlement advanced, Hartleib sent occasional goading and derisive e-mails to Plaintiffs.  For example in a May 24, 2016 e-mail, a true and correct copy of which is attached hereto as **Exhibit 8**, Hartleib taunted Weiser: "Rob, you are going to lose either with the honorable Vano [sic] or on appeal!" and "You really should have been more diligent."  Ex. 9.

57.    Five days after the Final Approval Hearing, on May 31, 2016, Hartleib seemed to soften, e-mailing Weiser to "discuss the current case and any forthcoming derivative [sic] on the tax issues.  I would like to see the old [Sprint] board held accountable."  A true and correct copy of Hartleib's May 31, 2016 e-mail is attached hereto as **Exhibit 9**.

58.    Less than a month later, however, on June 28, 2016, Hartleib demanded certain information regarding attorneys' fees and reimbursement of costs for plaintiffs' counsel which had been submitted to the Kansas State Court in camera, e-mailing Weiser: "please provide me with the documents in support of your fees filed yesterday. . . I will notify the clerk if I don't get them today.  Also your delay will

provide me yet another reason to appeal is [sic] the Honorable Vano approves the settlement." A true and correct copy of Hartleib's June 28, 2016 e-mail to Weiser is attached hereto as **Exhibit 10**.

### ***The Law Firm is Duped by a Disbarred Document Reviewer, and Hartleib's Harassment Continues***

59. Jeffrey M. Silow ("Silow") was hired by the Law Firm as a contract attorney on several occasions between 2008 and 2017 for the purposes of performing document review work; he was initially sourced through a Philadelphia-based legal search and placement firm, Abelson Legal Search ("Abelson"), with which the Law Firm had contracted.

60. Abelson was responsible for vetting the credentials and bar status of the attorneys it placed, and Abelson held Silow out to the Law Firm as a licensed attorney in good standing.

61. Meanwhile, in mid-2016, the Sprint Derivative Settlement was approved by the Kansas State Court, but only about ten percent of the amount of the attorneys' fees for the participating plaintiffs' counsel that was agreed to by the parties was awarded by the Court.

62. The Law Firm and the other firms that participated in the Sprint Derivative Settlement appealed the sharply discounted attorneys' fees awarded by the Kansas State Court.

63. At no time did the Law Firm receive any complaints or negative feedback regarding Silow's productivity or the quality of the work he performed from any of the firms managing the document review in the Sprint Derivative Action; to the contrary, on more than one occasion the work of Silow and the quality thereof had been praised by co-counsel.

64. However, in February 2017, for the first time, and to its utter shock and dismay, the Law Firm received notification that Silow had been disbarred in the Commonwealth of Pennsylvania decades earlier, although he had been holding

himself out as an attorney admitted in good standing to practice law.  In order to perpetrate his deception, Silow used his son's name on court submissions made by the Law Firm with respect to Silow, and represented to the Law Firm that although he went by the name "Jeffrey Silow" and wished to be called "Jeffrey," his legal name was "Alexander J. Silow."   Indeed, Silow represented himself to be Alexander J. Silow in a sworn certification filed with the Kansas State Court in the Sprint Derivative Action.

65.    After learning of this deceit, the Law Firm immediately severed ties with Silow, affirmatively notified the courts sitting in every action in which Silow's hours were included as part of an "attorney time" lodestar calculation, reported the incident to the Disciplinary Board of the Supreme Court of Pennsylvania, pressed criminal charges against Silow in Montgomery County, Pennsylvania, and instituted a pending civil case against Abelson and Silow in the Court of Common Pleas of Chester County, Pennsylvania captioned The Weiser Law Firm, P.C. v. Abelson Legal Search and Jeffrey Mark Silow, No. 2017-07778.

66.    After the Law Firm pressed criminal charges against him, Silow pled guilty to three criminal counts in Pennsylvania – unauthorized practice of law (42 Pa.C.S. § 2524), unsworn falsification to authorities (18 Pa.C.S. § 4904(b)) and securing execution of documents by deception (18 Pa.C.S. § 4114).

67.    As referenced herein, supra, over a multi-year period prior to the revelation of his disbarred status, Silow engaged in significant document review work in the Sprint Derivative Action, and the Law Firm immediately and voluntarily disclosed to Judge Vano, who reviewed and approved the Sprint Derivative Settlement, and to the Clerk of the Kansas Court of Appeals (the "Kansas Appeals Court") – which was then considering the appeal from the attorneys' fee award in the Sprint Derivative Settlement as well as Hartleib's own pro se appeal of Judge Vano's approval of the Sprint Derivative Settlement – that Silow affirmatively misrepresented himself to the Kansas State Court as a licensed attorney in good

standing.  True and correct copies of the Law Firm's February 6, 2017 letters to both the Kansas State Court (Case No. 11-cv-01688) and the Kansas Appeals Court (Appeal No. 17-117139-A) are collectively attached hereto as **Exhibit 11**.

68.    Although a billing audit conducted by the firm(s) hosting the document review on the remote review platform, Relativity, reinforced the validity of the hours Silow worked on the Sprint Derivative Action and the quality of Silow's review work, the reduced attorneys' fee award in the Sprint Derivative Settlement was affirmed on appeal.

69.    Hartleib was delighted to learn that the Law Firm had been duped by Silow, defrauded by Abelson, and awarded a vastly reduced fee in the Sprint Derivative Settlement, and he unleashed a deluge of abuse upon the Plaintiffs, and Weiser in particular; Hartleib saw the Silow revelation as his purported opportunity to continue to harass Plaintiffs in the false-name of litigation integrity, by and through many communications to the shareholder derivative bar, court filings, and improper communications with judges and represented clients.

70.    On March 6, 2017, Hartleib e-mailed Weiser and copied eleven members of the bar from five different law firms, as well as the administrative assistant for the Kansas State Court, writing in relevant portion as follows:

> Rob, I am a little confused! . . . It seems your statements to the Appellate Court were disingenuous at best.  Shocking! . . .
> I especially like the comment that you felt as though you had an ethical obligation to inform the Court, prior to briefing . . . Ethical obligation, what a Saint [sic] . . . Your attempts, [sic] to obfuscate your chicanery in this case is galvanizing my convictions, strengthening my resolve to expose all of the corrupt parties in this case!  This lawyer driven litigation must and will cease.  Your temerity, to seek leave of the Appellate Court to reinstate fees, given what I have uncovered is frankly astonishing and provoking wrath.  I will take this all the way to the Kansas Supreme

1    Court if needed, as the integrity of the judicial system is at stake!

2    A true and correct copy of Hartleib's March 6, 2017 e-mail is attached hereto

3    as **Exhibit 12** (emphasis in original).

4    71.    On March 6, 2017, Hartleib, completely unsolicited and without the

5    permission of Ross-Williams, contacted Ross-Williams, the plaintiff in the Sprint

6    Derivative Action, by telephone.  Upon information and belief, Hartleib obtained the

7    phone number for Ross-Williams through an internet search.

8    72.    During the March 6, 2017 call, Hartleib verbally harassed and threatened

9    Ross-Williams with hostile insinuations and references to Ross-Williams's personal

10    and professional life; Hartleib also told Ross-Williams that the Law Firm was a

11    "criminal enterprise" and was not serving her interests as a Sprint shareholder.

12    73.    Hartleib did not seek or obtain permission from Ross-Williams' counsel

13    or an order of the Kansas Appeals Court to contact Ross-Williams, and therefore his

14    unsolicited telephone call to her constituted a clear violation of Rule 4.2 of the Kansas

15    Rules of Professional Conduct, as the Kansas Appeals Court specifically held in its

16    March 30, 2017 order (the "Protective Order").

17    74.    Ross-Williams explicitly asked Hartleib not to contact her again, and to

18    direct all future communications to her counsel, the Law Firm.

19    75.    Ross-Williams then contacted the Law Firm, recounted Hartleib's call to

20    her, and reported that she felt shocked, disturbed, harassed and threatened by Hartleib

21    during the March 6, 2017 call.

22    76.    In a declaration filed with the Kansas Appeals Court on May 18, 2018, a

23    true and correct copy of which declaration is attached hereto as **Exhibit 13**, Ross-

24    Williams described the March 6, 2017 telephone call from Hartleib in relevant portion

25    as follows:

26    Upon answering the telephone when Hartleib called me on the evening

27    of March 6, 2017, I did not realize at first who I was speaking to.  Hartleib

28    proceeded to attempt to discuss matters related to the Appeal with me, in

McCORMICK, BARSTOW,
SHEPPARD, WAYTE &
CARRUTH LLP
7647 NORTH FRESNO STREET
FRESNO, CA 93720

13

a highly confrontational manner.  Once I realized who Hartleib was and that he had somehow found my phone number and called me directly regarding the Appeal, **I told Hartleib I did not wish to speak to him any further.  I asked Hartleib not to contact me again and to direct all future communications to my counsel**.

Hartleib, however, did not hang up the phone at that point.  Instead, he tried to continue the conversation by **making references to certain matters about me that were wholly unrelated to the Appeal; specifically, my role as an elected official in Ypsilanti Township, Michigan, where I serve on the Township Board of Trustees**.  I can only assume that Hartleib conducted an internet search and tried to learn as much as he could about me prior to calling me on March 6, 2017.

In the first instance, **I was taken aback and frightened** once I realized that Hartleib had called me directly about the Appeal, and given the tenor of the call I suspected that he did so **in an attempt to intimidate me**. But once Hartleib brought up matters about me that were completely unrelated to the Appeal, **I became certain that his purpose for calling was to harass and threaten me**.  I felt very uncomfortable and wanted to end the call with Hartleib as soon as possible, but I thought it best to try to end the conversation in a non-confrontational way.  To that end, I told Hartleib that if he wished to do so he could copy me on communications directed to my counsel, and I provided him with an email address which I seldom use.

Ex. 13 ¶¶ 3-5 (emphasis supplied).

77.    Inexplicably, Hartleib disregarded Ross-Williams' clear directive and e-mailed her directly, copying fifteen members of the bar and the Kansas State Court's

McCormick, Barstow,
Sheppard, Wayte &
Carruth LLP
7647 North Fresno Street
Fresno, CA 93720

administrative assistant, at 3:16 a.m. the following morning, March 7, 2017, a true and correct copy of which e-mail is attached hereto as **Exhibit 14**.

78.     Therein, Hartleib stated to Ross-Williams and members of the bar: Dear Ms. Williams, it was a pleasure speaking with you this evening. I am sorry that your Counsel has not kept you apprised of the details of your case. **I find it unconscionable that your attorneys failed to inform you of Judge Vano's rulings or that an Appeal was filed on your behalf. I do believe that you are a unwitting victim of their fraud committed against the Court. As we discussed they have submitted millions of dollars in fraudulent billing in your case. As I informed you that this was not just my opinion, the Judge in your case came to a similar conclusion. In fact, your attorneys have now admitted to at least 1.6 million dollars in fraudulent bills submitted to the Court. Mr. Weiser has confirmed this in two separate letters**. (See attached).  I am no expert, but **when a Firm admits criminal acts in a case** I believe they are obligated to notify you as the Plaintiff. Mr. Weiser and his Firm have already contacted their Bar associations and other Courts to **self-report their criminal acts**. I have contacted the district attorney's offices in Pennsylvania and Kansas and will be filing formal complaints. I am sorry to be the person to inform you of this, as it was your attorneys responsibility to do so. I am seeking a full evidentiary hearing where your Counsel will be forced to testify under oath and you can address the Court. As you can see by the letters from Mr. Weiser **they are in a lot of trouble**, but claim they are victims of Mr. Silow. **I will provide incontrovertible proof that Mr. Weiser et. al. is just as guilty as Mr. Silow. This is just the tip of the iceberg**. Details of our call will be submitted to the Kansas Court of Appeals in a sworn declaration and provided to Judge Vano. As per your request I

copied all of the attorneys in your case as well as Judge Vano's Clerk.

Thank you for taking the time to speak with me this evening.

Ex. 14 (emphasis supplied).

79.     Hartleib's March 7, 2017 e-mail to Ross-Williams, fifteen members of the bar and the Kansas State Court's administrative assistant was filled with gross misstatements of fact and outright lies; to wit, the Law Firm never admitted to fraudulent billing or committed any "criminal acts," Judge Vano never concluded that the Law Firm "submitted millions of dollars in fraudulent billing," nor did the Law Firm's letters to the Kansas State Court and Kansas Appeals Court regarding Silow "confirm" any misdeed.  See Ex. 14.  The Law Firm was not "in a lot of trouble" or "just as guilty as Mr. Silow," nor was the fraud Silow and Abelson committed against the Law Firm "just the tip of the iceberg."  Id.

80.     Although the Law Firm sent Hartleib a cease-and-desist letter, see Ex. 14, Hartleib paid it no mind, responding by e-mail on March 7, 2017 (and copying fifteen members of the bar and Judge Vano's administrative assistant) as follows:

Mr. Weiser, as I am preparing my sworn declaration regarding my communication with you "client", I do not have time to address all of the self-serving misrepresentations in your letter. The 15 minute consensual conversation with your "client" was very enlightening. She provided her email address and ask that I copy Counsel, so that I could forward the documents you failed to provide. **For you to characterize this as harassment is another blatant attempt to distract and obfuscate your fraudulent acts and bastardization of the judicial system. I caution you, that coercing your "client" to misstate facts regarding our call will only inflict additional damage to what little credibility you have left. You Sir, and your coconspirators are the ones that need to Cease and Desist. Your so-called "client" is representing my interest and her attorneys are corrupt, therefore I will neither Cease nor Desist**.

McCORMICK, BARSTOW,
SHEPPARD, WAYTE &
CARRUTH LLP
7647 NORTH FRESNO STREET
FRESNO, CA 93720

As far as your not so vailed threat that Ms. Williams "reserves all of her rights", **if you are threatening legal action against me, feel free, I will be happy to waive service to expedite said action. I find the prospects of discovery quite compelling. Your threats do nothing but, strengthen my resolve and galvanize my convictions. Call it a personality defect!** Instead of wasting my time, I would suggest you consult with an ethics attorney, that's right, you already have!

Ex. 14 (emphasis supplied).

81.    Of course, Hartleib lied about the consensual nature of his improper and unlawful contact with Ross-Williams, and his harassment of Ross-Williams resulted in the Kansas Appeals Court issuing its Protective Order on March 30, 2017 prohibiting Hartleib from contacting Ross-Williams.

82.    Hartleib sought twice before the Kansas Appeals Court and once before the Kansas Supreme Court to have the Protective Order lifted.  In response to one such effort, Ross-Williams wrote in a declaration submitted to the court:

I was shocked to learn that Hartleib recently filed a motion to vacate the Protective Order.  I can only assume that Hartleib intends to try to contact me again and harass me further.  I was very frightened and disturbed by Hartleib's conduct in March 2017, and I was pleased and relieved that the Protective Order was granted.  If the Protective Order were to be vacated, I would fear that Hartleib would once again attempt to intimidate, harass, and threaten me.  I see no reason why Hartleib should be permitted to direct communications to me instead of my counsel.  I respectfully request that this Court deny Hartleib's motion and keep the Protective Order in place.

Ex. 13 ¶ 9.

83.    None of Hartleib's efforts to vacate the Protective Order were successful.

84.    In fact, one year later, on April 7, 2018, when the Law Firm opposed Hartleib's unsuccessful Motion to Reconsider and Vacate the Protective Order, Hartleib e-mailed Weiser and copied eight other members of the bar, as follows:

1  **Rob, your ability to set the bar at new lows, never disappoints!**

2  Clearly, this is in retaliation to your being rightfully removed as co-lead

3  counsel in the Equifax case. **Your attempt to mislead the Appellate**

4  **Court with incomplete records might be your standard operating**

5  **procedure, but I believe it will cost you when I seek sanctions. Your**

6  **personal attacks smack of desperation, they do nothing to dissuade**

7  **me, in fact they galvanize my convictions and strengthen my resolve!**

8  Rob, you may want to contact your investigators, L. English Research

9  Services Inc. to seek a partial refund. When they pulled the records on

10  March 26th, they missed a DUI from the eighties and a fixit ticket. **Your**

11  **ill-advised actions, and ad-hominem attacks are making the Weiser**

12  **Firm radioactive!**

13  Have a wonderful weekend.

14  A true and correct copy of Hartleib's April 7, 2018 e-mail regarding the Law

15  Firm's opposition to Hartleib's Motion to Reconsider and Vacate the Protective Order

16  is attached hereto as **Exhibit 15** (emphasis supplied).

17  85.    After learning about Silow's duplicity, the Law Firm hired a public

18  relations firm, which was contacted on or about March 8, 2017 by a reporter from *The*

19  *Wall Street Journal*, a high-profile daily newspaper with international distribution.

20  86.    Upon information and belief, the reporter from *The Wall Street Journal*

21  received a "tip" from Hartleib about Silow's disbarred status and role as a document

22  reviewer in the Sprint Derivative Action.

23  87.    On March 13, 2017, *The Wall Street Journal* published the resulting

24  article: "One Lawyer, 6,905 Hours Leads to $1.5 Million Bill in Sprint Suit."  The

25  article failed to mention the fact that Silow's nearly 7,000 billable hours were billed

26  over the course of four years.

27  88.    Nearly one hundred media outlets picked up and further publicized *The*

28  *Wall Street Journal's* March 13, 2017 article.

McCormick, Barstow, Sheppard, Wayte & Carruth LLP
7647 NORTH FRESNO STREET
FRESNO, CA 93720

89.    In an April 12, 2017 e-mail to Weiser and ten other members of the bar, as well as the Kansas State Court's administrative assistant, Hartleib wrote of Weiser: "What an embarrassment to the bar!  See you in Court."  A true and correct copy of Hartleib's April 12, 2017 e-mail is attached hereto as **Exhibit 16**.

90.    Alarmingly, upon information and belief, on April 25, 2017, Hartleib mailed several copies of an "anonymous" profanity-laced letter to six judges sitting on the Court of Common Pleas of Chester County, Pennsylvania, which was forwarded to Weiser on April 26, 2017 by Loretta M. Hines, Judicial Assistant to the Hon. Anthony A. Sarcione.  True and correct copies of the April 26, 2017 forwarding e-mail, the transmitting envelope and the April 25, 2017 threatening letter are attached hereto as **Exhibit 17**.

91.    In the April 25, 2017 letter, Hartleib circles a headline referencing the Kansas State Court's reduction of the attorneys' fees for plaintiffs' counsel in the Sprint Derivative Settlement and writes in longhand: "What, if anything, do you intend to DO about this!!"  Ex. 16.  Over two typed and highlighted pages, Hartleib sets forth his negative views about class actions – which are entirely distinguishable from the shareholder derivative litigation – and recounts his version of Silow's fraud upon the Law Firm, noting "**Judge JIMMIE VANO in Kansas, God Bless His soul, caught the firm in the act and knocked out 90% of their billing  They claimed shock & surprise**."  Ex. 17 (emphasis in original).

92.    Most concerningly, Hartleib attaches a page entitled "imaginary dialogue," which ostensibly documents his imagined conversation with Weiser regarding Silow (including but not limited to his misrepresentation of his first name, Jeffrey, on a court document, which he signed "Alexander Jeffrey Silow," although Hartleib misstates this as "Andy").  Ex. 17.  The "imaginary dialogue" concludes:

> [Weiser:]    "Well I get where you are going with this line of
> questioning.  Are you saying that we knew that he was a disbarred lawyer
> and we were trying to milk the class action jackpot with his phony

billing" [sic]

[Hartleib:]    You said it better than I could.

[Weiser:]    "Well, you can *GO F\*\*K YOURSELF ASSHOLE.  I'M OUT OF HERE AND YOU CAN TALK TO MY LAWYER IF YOU WANT* [sic]

Ex. 17.

93.    In forwarding the letter to Weiser from Judge Sarcione's chambers, Ms. Hines wrote: "The attached letter was received in Chambers yesterday, 4/25/17.  Five other Judges in Chester County received the same letter.  Judge Sarcione thought you should be alerted since you are referenced in the letter.  Please feel free to contact Chambers if you feel it necessary or have any questions or concerns." Ex. 17.

94.    On May 19, 2018, Hartleib e-mailed Weiser and eight other members of the bar: "Plaintiff Counsel, and I use this term loosely, when making false allegations against a party I would suggest you at least get it right.  I am no expert, but I am pretty sure it would be libelous!  I will demonstrate its proper use posthaste!"  A true and correct copy of Hartleib's May 19, 2018 e-mail is attached hereto as **Exhibit 18**.

95.    Two weeks later, on June 2, 2018, Hartleib sent an unsolicited e-mail to Weiser, eleven other members of the bar, and Judge Vano's administrative assistant, Jill Boren, regarding media coverage of a lawsuit against State Street Bank, with which Plaintiffs had no involvement whatsoever:

Dear Ms. Boren, I thought the Honorable James Vano would find the link to the National Law Journal Article of interest. It is clear that the Plaintiff's Bar is rife with corruption, in both Class Action and Derivative cases. **Much like the fraud Weiser et.al. committed in the "Ross-Williams" case**, it appears to be standard operating procedure for many firms to submit millions in fraudulent fee requests upon the Court. This State Street case involves large well established firms and nearly 100 million in fees. **At present, it appears Weiser et.al. has not been**

**out done, as there is no mention of the unlicensed practice of law by a convicted felon using an alias.**

I will be contacting the Special Master, and filing an Amicus Brief in the State Street case to inform them of the chicanery that has taken place in the "Ross-Williams" case. Although entirely unrelated, it presents a troubling pattern of fraud and corruption in these lawyer driven cases. I will be seeking  public dissemination of the Special Master's report to show the breadth of corruption within the Plaintiffs Bar. The actions of Weiser et.al. and the Firms in the State Street case is the very definition of Racketeering, and warrants legislative reform.

https://www.law.com/nationallawjournal/2018/05/31/judge-presses-lead-plaintiff-in-state-street-bank-lawsuit-on-overbilling-questions/

Michael Hartleib 646-494-5901

A true and correct copy of Hartleib's June 2, 2018 e-mail is attached hereto as **Exhibit 19** (emphasis supplied).

### *Hartleib Inserts Himself into the Law Firm's Pending Litigations*

96.    Hartleib then began injecting himself into the Law Firm's pending litigations nationwide.

97.    Upon information and belief, Hartleib scanned federal dockets around the country for the names of the Law Firm's attorneys, in order to insert himself into the Law Firm's cases; Hartleib's principal aim was to harass Weiser and damage the Law Firm.

98.    For example, on August 17, 2018, Hartleib sent Weiser the following e-mail, a true and correct copy of which is attached hereto as **Exhibit 20**:

Rob, will you be at the Witmer v Steven hearing on the 27th? I will do my best to attend. I am very familiar with Judge Carney? [sic] **We can discuss my concerns with L.C, A 10 and several other companies in which I am a shareholder. It appears we will be forced to deal with**

**each other for the foreseeable future**. In hindsight, I should have avoided stocks, and invested more in real estate. Our interest were supposed to be aligned. Instead, I was attacked! If you have any questions, or wish to proffer an apology, you know how to reach me. That said, other action is eminent!

Ex. 20 (emphasis supplied).

99.     The "Witmer v. Steven" matter Hartleib references is actually *Witmer v. Sugarman*, a shareholder derivative suit filed in the United States District Court for the Central District of California, which was dismissed on August 23, 2018.  No. SACV 18-00246-CJC(DFMx), 2018 U.S. Dist. LEXIS 217850 (C.D. Cal. Aug. 23, 2018).  Hartleib was not a party in *Witmer v. Sugarman*, and Plaintiffs have no evidence that Hartleib was a shareholder of the underlying corporation.  No hearing was held in that case, and Hartleib never submitted any filing in that case.

100.   The *LC* and *A10* cases were other derivative actions pending in federal court in California at that time, in which Hartleib was not a named party and Plaintiffs have no evidence that Hartleib was a shareholder of the underlying corporations.

101.   Hartleib indicated in no uncertain terms that, as part of his laser-focused campaign to undermine Weiser and the Law Firm, he intended to involve himself in the Law Firm's other derivative litigations (which are unrelated to Hartleib in any way) throughout the country.  The following paragraphs offer a few examples of Hartleib's efforts.

## EQUIFAX DERIVATIVE LITIGATION

102.   On March 15, 2018, in *In re Equifax, Inc. Derivative Litigation*., No. 1:18-cv-00317-TWT (consolidated with Nos.: 1:218-cv-00477-TWT and 1:18-cv-00577-TWT) (N.D. Ga.) (the "Equifax Derivative Litigation"), during the pendency of competing motions for the appointment of lead counsel before the United States District Court for the Northern District of Georgia involving the Law Firm, Hartleib filed "Michael Hartleib, Shareholder and Concerned Citizen, Motion [sic] for

Acceptance of Amicus Curiae Brief in Opposition to the Appointment of The Weiser Firm as Co-Lead Counsel," a true and correct copy of which – together with the proposed "Amicus Curiae Brief of Concerned Citizen and Shareholder Michael Hartleib in Opposition of [sic] the Appointment of The Weiser Firm as Co-Lead Counsel" – is attached hereto as **Exhibit 21**.

103.   Therein, Hartleib expresses his purported "extreme concern" about vague "troubling actions of Weiser et.al," in the Sprint Derivative Action; Hartleib's "concern" largely pertains to the Law Firm's employment of disbarred attorney Silow as a document reviewer.  Ex. 21 p. 4.

104.   Hartleib alleges that the Law Firm "lied, misl[ed] the court," "attempt[ed] to confuse the Court [sic]," "used an **unfit plaintiff**," engaged "in fraudulent billing," made "false statements," employed another attorney who "repeatedly perjured himself" and constituted "an utter embarrassment to the Plaintiff's Bar," operates a "criminal enterprise," "sees plaintiff's [sic] as a '**necessary nuisance**,'" displayed "hubris and utter contempt for the Court," engaged in "contemptuous actions in the case" and "Self-Dealing, Unclean Hands and Shameful Violations of Public Trust," undertook a "zealous quest for reinstatement of four million dollars in unwarranted fees," "follow[ed] a different set of standards, one that sets the bar at new lows," made a "desperate attempt to unjustly enrich themselves," and "has committed criminal acts upon the Kansas Court and a multitude of others across the country."  Id. pp. 4-9 (emphasis in original).

105.   In his proposed *amicus* brief, Hartleib also grossly mischaracterizes the contents of the Law Firm's legal filings, the findings of the Kansas State Court, and certain statements from the appellate bench during oral argument before the Kansas Appeals Court, and admits to his unlawful contact with Ross Williams.  Id. pp. 4, 6-8.

106.   Hartleib concludes: "what is going on at the Weiser firm?  Either they are completely corrupt, or entirely inept, whichever is the case they are not fit to act

1   as lead on any representative suit." Id. p. 9.

2      107.   In its opposition to Hartleib's motion for leave to file his amicus curiae

3   brief, a true and correct copy of which is attached hereto as **Exhibit 22**, the Law Firm

4   notes:

5          Hartleib submits his proposed amicus filing not as a true, disinterested

6          "friend of the court" or even as a shareholder in Equifax, Inc., but purely

7          in an adversarial capacity in his continuing and openly hostile effort to

8          harass and disturb the Weiser Firm, its clients, and other law firms with

9          whom the Weiser Firm works ...

10         Hartleib is attempting to use his purported amicus filing in this Action as

11         a weapon against the Weiser Firm and its clients, and this Court should

12         not permit Hartleib's brazen abuse of the amicus mechanism to the

13         partisan detriment of plaintiffs in this Action.

14         Hartleib is not an "impartial individual" suggesting the proper

15         interpretation of any law, but rather a serial harasser of the Weiser Firm

16         and its clients.

17         Hartleib is seeking to extend his malicious campaign against the Weiser

18         Firm from the Sprint derivative action to this Action . . .

19   Ex. 22 pp. 1, 4, 6, 10 (parentheticals omitted).

20      108.   One of the attorneys at the Law Firm, James Ficaro, transmitted a copy

21   of the Law Firm's opposition, to which Hartleib responded by e-mail on March 22,

22   2018, a true and correct copy of which is attached hereto as **Exhibit 23**: "I received

23   these filings several hours ago! Let Rob know he is making a catastrophic mistake!"

24      109.   At the hearing on the competing motions for appointment of lead counsel

25   in the Equifax Derivative Litigation, prior to any ruling on Hartleib's *amicus* motion,

26   Hartleib appeared before Judge Thomas W. Thrash, Jr. ("Judge Thrash") and was

27   permitted to speak.

28      110.   Without explaining his reasoning, Judge Thrash declined the Law Firm's

McCormick, Barstow,
Sheppard, Wayte &
Carruth LLP
7647 North Fresno Street
Fresno, CA 93720

24

COMPLAINT

motion to be appointed co-lead counsel in the Equifax Derivative Litigation; Hartleib took credit for this result, e-mailing Weiser a copy of Judge Thrash's order on April 5, 2018, a true and correct copy of which e-mail is attached hereto as **Exhibit 24**, and stating: "Just got home and wanted to make sure that you have this!  Good to finally meet you Rob!  Like I said, none of this was necessary!"  Ex. 24.

## **BIG LOTS DERIVATIVE LITIGATION**

111.   *In re Big Lots, Inc. Shareholder Litigation*, No. 2:12-cv-445 (S.D. Oh.) ("Big Lots Derivative Litigation"), was a derivative suit which asserted a claim for corporate waste by certain of Big Lots' officers and directors in connection with an alleged insider stock selling scheme and stock repurchase plan.

112.   Settlement of the derivative claims received preliminary approval from the Honorable Michael H. Watson ("Judge Watson") of the United States District Court for the Southern District of Ohio on April 6, 2018.

113.   As Judge Watson noted in his August 28, 2018 Opinion and Order granting final approval to the settlement in the Big Lots Derivative Action, a true and correct copy of which Opinion and Order is attached hereto as **Exhibit 25**: "On August 24, 2018, well after the time to object and the fairness hearing took place, the Court received an email from Michael Hartleib ("Hartleib"), a shareholder who had an interest in a different case involving The Weiser Firm, P.C. ("Weiser")."  Ex. 25 p. 11 fn.2.

114.   Hartleib's e-mail to Judge Watson in the Big Lots Derivative Litigation was never provided to Plaintiffs, but Judge Watson described it as follows: "Hartleib raised concerns over Weiser's billing practices in this prior case and stated that he wanted to inform the Court so that it could scrutinize the fee request in this case."  Id.

115.   Judge Watson noted that: "Hartleib does not indicate that he is a shareholder in Big Lots or otherwise an interested party in this case.  Furthermore, the Court always scrutinizes the billing records of plaintiffs' counsel before approving fee awards."  Id.

McCormick, Barstow, Sheppard, Wayte & Carruth LLP
7647 NORTH FRESNO STREET
FRESNO, CA 93720

1      116.  Judge Watson elected "out of an abundance of caution" to re-analyze the

2  Law Firm's billing entries submitted in the Big Lots Derivative Litigation, gave the

3  Law Firm an opportunity to respond to Hartleib's scurrilous allegations, and

4  determined that "[t]he Court is fully satisfied that the hours billed by Weiser were

5  reasonable in this case."  Id.

6  **CENTURYLINK DERIVATIVE LITIGATION**

7      117.  In re *Centurylink Sales Practices and Securities Litigation*, No. 17-md-

8  2795-MJD—MM (the "Centurylink Derivative Litigation"), was initiated in 2017 in

9  the United States District Court for the District of Minnesota.  It includes a

10  consolidation of the separately-filed shareholder derivative cases captioned *Tansey v.*

11  *Perry, et al.*, No. 18-cv-02460-MJD-KMM; *Flanders v. Post, et al.*, No. 18-cv-02833-

12  MJD-KMM; *Ault v. Post, et al.*, No. 18-cv-02834-MJD-KMM; *Barbree, et al. v.*

13  *Bejar*, et al., No. 18-cv-02835-MJD-KMM; and *Palkon v. Boulet, et al.*, No. 19-cv-

14  00284-MJD-KMM.

15      118.  On March 5, 2019, one day prior to a hearing addressing competing

16  motions for appointment of lead counsel in the Centurylink Derivative Litigation,

17  Hartleib filed a self-styled "Amicus Curiae Brief of Shareholder Michael Hartleib and

18  Concerned Citizen in Opposition of [sic] the Appointment of Robbins Arroyo and the

19  Weiser Firm et. al. as Lead Counsel in the Consolidated Derivative Action," a true

20  and correct copy of which is attached hereto as **Exhibit 26**.

21      119.  The Law Firm was not seeking appointment as co-lead counsel with

22  Robbins Arroyo LLP ("Robbins Arroyo") or any other law firm in the Centurylink

23  Derivative Litigation.  Instead, the Law Firm was a part of the support structure

24  proposed by the law firm of Bragar Eagle & Squire, P.C. in its motion for appointment

25  as lead counsel in the Centurylink Derivative Litigation.

26      120.  Robbins Arroyo filed an application for its own appointment as lead

27  counsel in the Centurylink Derivative Litigation.

28      121.  Years earlier, Robbins Arroyo filed a shareholder derivative lawsuit on

behalf of Sprint, arising from the Sprint/Nextel merger, which – like the Sprint Derivative Action filed by the Law Firm – was resolved by the Sprint Derivative Settlement.

122.    As noted hereinabove, Hartleib did not participate in the Sprint Derivative Settlement, and objected vociferously to the Sprint Derivative Settlement.

123.    Furthermore, Hartleib is not a shareholder in Centurylink, nor does he claim to be a shareholder in Centurylink, thus depriving him of standing as *amici* in the Centurylink Derivative Litigation.

124.    In his brief, Hartleib claims that he seeks to "inform this Court of ongoing troubling actions by the Weiser and Robbins Arroyo et.al. [sic] Firms," pertaining to the Sprint Derivative Settlement.  Ex. 26 p. 2.

125.    Hartlieb alleges that the Law Firm and Robbins Arroyo utilized "deceased parties, friends and family members which [sic] lacked standing, and paid serial criminal Plaintiffs," and that they "generate thousands of billable hours for illusory work, submit fraudulent time logs and seek hundreds of millions in unjust fees in cases across the country."   Id.

126.    Hartleib alleges that when he objected to the Sprint Derivative Settlement, "I was subjected to vicious ad hominem attacks as Weiser and Robbins Arroyo et.al. [sic] proved they would stop at nothing to protect their criminal enterprise . . . Weiser et.al [sic] lied, misleading the court [sic] . . . Weiser et.al. [sic] committed perjury and admitted to billing fraud."  Id. pp. 6-7.

127.    Hartleib admits to contacting Ross-Williams without consent of counsel or the Kansas Appeals Court, and further admits that upon receiving the Law Firm's cease-and-desist letter, "I replied by informing them that I would neither cease nor desist as the truth is an absolute defense.  I informed them that they and their co-conspirators were the ones that needed to Cease and Desist."  Id. p. 7 (emphasis in original).

128.    Hartleib alleges that in the Centurylink Derivative Litigation, Weiser "is

now forced to initiate a new strategy, one of hiding behind another firm Bragar Eagel [sic] and Squire seeking lead in this case in an effort to manage cases behind the scene [sic].  Greed appears to be powerful [sic] motivator."  Id.

129.   Hartleib also alleges without any basis that "Mr. Jeffrey Mark Silow has worked for the Weiser and Robbins Arroyo et.al. Firms [sic] for over 10 years, billing likely more than 100 million dollars in illicit fees, in a multitude of cases across the country."  Id. p. 8.

130.   On the following day, March 6, 2019, Hartleib appeared at a hearing before the Honorable Michael J. Davis ("Judge Davis") with respect to the competing motions for appointment of lead counsel in the Centurylink Derivative Litigation.  A true and correct copy of the relevant portions of the transcript of the March 6, 2019 hearing before Judge Davis is attached hereto as **Exhibit 27**.

131.   As the Law Firm did not seek lead counsel appointment in the Centurylink Derivative Litigation, neither Weiser nor anyone else from the Law Firm attended that hearing.

132.   After counsel for each of the competing movants were heard, Hartleib was permitted to speak by Judge Davis, and did so as follows, in relevant portion:

> As your honor knows, in the amicus brief I lay things out that shows [sic] a pattern, a course of conduct over many years.  I, as a shareholder, have had to defend my interests against the likes of Robbins Arroyo and more recently the Weiser Law Firm.

Ex. 27 at 40:11-15.

> [T]he way I have gotten involved in this is I see someone that [sic] falsely purports to represent the shareholders' interests or the corporation, the shareholders derivatively, and then I see no meaningful relief or nearly illusory relief and a tremendous amount in attorneys fees.  And in the Kansas case, I mean, I was subjected, I was – my character – I mean, I ended up having to defend my character, and I wasn't the one that [sic]

1    did anything wrong.  You know, I mean, it's unbelievable the attacks that
2    I took, so – **but it does nothing to dissuade me.  It just galvanizes my**
3    **conviction and strengthens my resolve**.
4    Id. at 41:3-13 (emphasis provided).
5        With regard to the amicus brief, I didn't have a full service, the notice,
6    you know, who to serve everyone.  And I understand that it could be
7    prejudicial because they haven't had a chance to respond, but I welcome
8    a response.  That said, **if the firms would like to give me a list of their**
9    **forthcoming cases in which they are seeking leave, I could be certain**
10   **to notify everybody timely** and I wouldn't have to prepare, stay up all
11   night, all weekend long, to try to draft an amicus brief and get it to the
12   court and then, you know, fly in.
13   Id. at 41:24-42:8 (emphasis provided).
14       And, Your Honor, *I know for a fact that the Weiser firm knew who Mr.*
15   *Silow was and that will come out, you know, during the course of*
16   *litigation*.  And I am pretty certain that the Robbins Arroyo firm knew
17   who he was as well.
18       These firms, when these firms are up to no good, when they are billing
19   illusory hours – you know, if I had 30 minutes with Your Honor in
20   chambers, I could give Your Honor a lot more information . . .
21   Id. at 43:4-12.
22       133.   After bringing Hartleib's meandering comments to a close, Judge Davis
23   permitted George C. Aguilar, Esquire of Robbins Arroyo to respond to Hartleib's
24   amicus brief and remarks at the hearing.  Id. at 44:1-46:11.  The Court also gave Mr.
25   Aguilar one week to respond in writing to Hartleib's amicus brief.  Id. at 46:12-13.
26       134.   Hartleib then concluded his statements to the Court in relevant portion
27   as follows:
28       HARTLEIB:        . . . The allegations that I make against these firms are very

McCormick, Barstow,
Sheppard, Wayte &
Carruth LLP
7647 North Fresno Street
Fresno, CA 93720

29

COMPLAINT

1    serious allegations.  He says that I am libeling him, slandering him and defaming the

2    firm.  I have asked Mr. Aguilar on numerous occasions **if they would like to sue me,**

3    **I will waive service.**

4         **I am perfectly happy for you – if you want to commence an action, then I**

5    **will get the discovery** –

6         THE COURT: Speak to me.

7         HARTLEIB:        Then I will get the discovery that I need to finally put an

8    end to this, all of this, you know, unjust enrichment, you know, literally bastardizing

9    our judicial process.

10        THE COURT: Okay.

11        HARTLEIB:        Thank you.

12    Id. at 47:8-21 (emphasis supplied).

13        135.   After the Centurylink hearing, on March 14, 2019, Harteib sent an e-mail

14    to Jill Boren, administrative assistant to Judge Vano, who ruled on the Sprint

15    Derivative Settlement in the Kansas State Court.  A true and correct copy of Hartleib's

16    March 14, 2019 e-mail is attached hereto as **Exhibit 28**.

17        136.   Hartleib copied the entire attorney distribution list for the Sprint

18    Derivative Settlement on his March 14, 2019 e-mail to Ms. Boren.  Id.

19        137.   Therein, Hartleib wrote:

20        Dear Ms. Boren, I hope this email finds you well. I thought that the

21        Honorable Vano would be interested to know that my quest to expose

22        lawyer driven litigation and corruption rife throughout the Plaintiffs Bar

23        continues. Attached is an Amicus Brief filed in Minnesota, and transcript

24        of the hearing before the Honorable Michael J. Davis. In addition, I have

25        initiated legal action against Weiser and representative plaintiff Ross-

26        Williams as outlined in the attached complaint.

27        . . . **Maybe Judge Vano would be interested in setting the record**

28        **straight before the Court appoints lead Counsel in the**

McCORMICK, BARSTOW,
SHEPPARD, WAYTE &
CARRUTH LLP
7647 NORTH FRESNO STREET
FRESNO, CA 93720

30

COMPLAINT

**aforementioned [Centurylink] case**.

Interestingly, I received an anonymous letter last night which details an elaborate scheme by Weiser et.al. to procure "Relators" in Qui Tam cases. It involves the use of several LLC shell corporations set up for the sole purpose of soliciting information under false pretenses to facilitate lawyer driven Qui Tam cases. This has resulted in the DOJ filing a motion to dismiss 11 active cases, filed by Weiser et.al. including ABBVIE. The level of sinister is [sic] truly unbelievable, some of which is outlined in the attached Motion to dismiss by the Feds!

Lastly, I would like to express my gratitude to Judge Vano, I am, and remain incredible [sic] grateful for allowing me to be heard, and finding my arguments compelling. I will continue my quest to expose and reform the corruption rife throughout Derivative litigation.

With the Utmost Respect,

Michael Hartleib  (646) 494-5901

Ex. 28.

138.  The *qui tam* cases referenced by Hartleib involve whistleblower complaints brought by the National Healthcare Analysis Group ("NHCA") and related organizations accusing eleven pharmaceutical manufacturers of enticing doctors to prescribe their products using nurse educators as "kickbacks".

139.  The Law Firm was nominally involved in only three of the eleven of the NHCA's *qui tam* cases – *United States of America, et al v. OTSUKA Holdings Company, Ltd. et al*, No. 1:17-CV-00966 (N.D. Ill.) (the "Otsuka case"); *United States of America et al v. SMSF, LLC et al*, No. 1:16-CV-11379 (D. Mass.) (the "Biogen case"); and *Miller et al v. AbbVie Inc. et al*, No. 3:16-CV-02111 (N.D. Tex.) (the "AbbVie case").

140.  In the Otsuka case, the Law Firm never entered an appearance, and upon

learning that the government did not wish to proceed, the Law Firm immediately informed its clients that they would need to secure new counsel if they wished to proceed. On October 29, 2018, substitute counsel appeared for the relators, and on October 31, 2018, local counsel's motion to withdraw was granted. After the government filed a motion to dismiss the Otsuka case, the relators, through their new counsel, filed a notice of voluntary dismissal.

141. Similarly, in the Biogen case, the Law Firm never entered an appearance or sought admission *pro hac vice*, and informed its clients of the need to secure new counsel upon learning that the government did not wish to prosecute the case. On August 24, 2018, substitute counsel, GeyerGorey LLP, appeared in the case, and on December 17, 2018 the government filed a motion to dismiss; the case was closed on or about December 26, 2018.

142. Finally, in the AbbVie case, the Law Firm entered its appearance on June 22, 2018. As with the Otsuka case and the Biogen case, upon learning of the government's decision not to pursue the case, the Law Firm immediately informed its clients that they would need to secure new counsel. On September 25, 2018, GeyerGorey LLP filed a notice of substitution for the Law Firm. On December 17, 2018, the government moved to dismiss the case, and on March 13, 2019, the relators, through their new counsel, filed a notice of voluntary dismissal.

143. The Law Firm did not engage in any nefarious conduct, nor has any court or government agency suggested the Law Firm did anything improper.

144. On April 23, 2019, Judge Davis issued a Memorandum of Law & Order appointing Bragar Eagle & Squire, P.C. as lead counsel, whose proposed support structure includes the Law Firm. A true and correct copy of the April 23, 2019 Memorandum issued by Judge Davis is attached hereto as **Exhibit 29**.

145. With respect to Hartleib, Judge Davis wrote as follows: "The Court has carefully considered Hartleib's allegations, Robbins Arroyo's response, and the public record in the cases cited by Hartleib. The Court concludes that **Hartleib has**

1   **raised no legitimate questions** with regard to the ethics or expertise of the Robbins
2   Arroyo law firm. **The Court is satisfied that there are no ethical concerns** that
3   would hinder Robbins Arroyo's application for appointment as Lead Counsel." Ex.
4   29 p. 5 (emphasis supplied).

5   ### ***Hartleib's Federal Lawsuit Against Plaintiffs***

6   146.   On December 12, 2018, Kansas-based counsel for Hartleib, Andrew
7   Protzman, Esquire, provided Weiser with a draft copy of a petition alleging legal
8   malpractice/breach of fiduciary duty and violations of Kansas Consumer Protection
9   Act claims against Weiser and the Law Firm, and abuse of process and breach of
10  fiduciary duty claims against Ross-Williams.  A true and correct copy of counsel's
11  December 12, 2018 correspondence and the attached draft petition are attached hereto
12  as **Exhibit 30**.

13  147.   The petition stems from Hartleib's claim that he was a client of the Law
14  Firm for purposes of the 2009 Sprint Derivative Action, even though Hartleib filed
15  separate derivative litigation with respect to Sprint in 2011 by and through separate
16  counsel.

17  148.   In his December 12, 2018 letter, Mr. Protzman invited Weiser to
18  "explore avenues to an agreeable resolution to the matter before it is filed." Ex. 30 p.
19  1.

20  149.   The undersigned, Philip S. Rosenzweig, Esquire, corporate counsel for
21  the Law Firm and personal counsel for Weiser, responded by letter dated December
22  19, 2018, a true and correct copy of which is attached hereto as **Exhibit 31**.

23  150.   Therein Mr. Rosenzweig wrote, in part:
24  [The] causes of action [alleged against Weiser and the Law Firm in the
25  draft petition] depend, inter alia, upon a demonstrably false and absurd
26  premise: that the Weiser Firm and/or Mr. Weiser "agreed to represent
27  Mr. Hartleib" and "entered into an attorney-client relationship" with
28  Hartleib in March 2009. . . .

. . . while Hartleib may have sought my Clients' legal services, such services were certainly never provided to or received by Hartleib, because my Clients flatly declined to act as counsel (or co-counsel) to Hartleib immediately after Mr. Weiser first communicated with Hartleib.

Surely you agree that an implied attorney-client relationship is not formed simply because an individual seeking legal representation communicated with a lawyer once, and of course, as set forth above, Kansas law does not provide otherwise.

Ex. 31 p. 2 (internal citations omitted).

151.   Mr. Protzman e-mailed Mr. Rosenzweig twice more – on December 21, 2018 and January 7, 2019 (true and correct copies of which e-mail correspondence are attached hereto collectively as **Exhibit 32**) – seeking both times to initiate "pre-suit mediation of this matter." Ex. 32 p. 1.

152.   Plaintiffs herein did not wish to entertain Hartleib's overture of "pre-suit mediation," and Mr. Rosenzweig accordingly did not respond to Mr. Protzman's e-mails.

153.   On January 22, 2019, Hartleib filed a civil action in the Kansas State Court, alleging legal malpractice/breach of fiduciary duty, violation of the Kansas Consumer Protection Act and abuse of process claims against Weiser and the Law Firm (the "Hartleib Action"). Hartleib's complaint also included claims for abuse of process and breach of fiduciary duty against Ross-Williams. A true and correct copy of Hartleib's complaint against Plaintiffs and Ross-Williams in the Hartleib Action is attached hereto as **Exhibit 33**.

154.   Plaintiffs herein subsequently removed the Hartleib Action to the United States District Court for the District of Kansas, which dismissed the Hartleib Action by Memorandum and Order dated August 21, 2019. Hartleib's motion for reconsideration of the dismissal was denied on June 22, 2020. Hartleib's appeal from

that dismissal was rejected by the United States Court of Appeals for the Tenth Circuit on June 21, 2021.

155.    Plaintiffs initiated suit against Hartleib on June 24, 2019 in the United States District Court for the Eastern District of Pennsylvania (the "Pennsylvania Action"), alleging negligent misrepresentation, intentional interference with prospective contractual relations, abuse of process, tortious interference with contract, defamation and intentional infliction of emotional distress; Plaintiff also sought a vexatious litigant order against Hartleib.

156.    In a Memorandum and Order dated October 9, 2020, a true and correct copy of which is attached hereto as **Exhibit 34**, the Honorable Karen Spencer Marston, U.S.D.J., concluded, based on the facts as alleged in the original complaint filed in the Pennsylvania Action, that she lacked jurisdiction over Plaintiffs' claims for negligent misrepresentation, intentional interference with prospective contractual relations, tortious interference with contract; that she lacked specific personal jurisdiction over Hartlieb sufficient to impose a vexatious litigant order upon him in Pennsylvania; and that Pennsylvania was not the proper venue for Plaintiffs' abuse of process claim. Ex. 34 pp. 23, 26, 34-35, 40.

157.    Plaintiffs filed an amended complaint in comportment with Judge Marston's opinion, a true and correct copy of which is attached hereto as **Exhibit 35**.

158.    Although the Pennsylvania action has occupied Hartleib and provided Plaintiffs with a welcome respite from his previously unrelenting abuse, Hartleib has improperly utilized the federal judicial process to harass, intimidate and publicly disparage Plaintiffs by and through their Pennsylvania Action against him.

159.    For example, on August 23, 2022, Hartleib filed a motion for sanctions against Plaintiffs, a true and correct copy of which is attached hereto as **Exhibit 36** (the "Motion for Sanctions"). Therein, Hartleib made clear that his primary intention in filing that motion was not to progress the discovery process but rather to humiliate, malign and ultimately destroy Plaintiffs, both professionally and personally:

Plaintiffs brought the instant ill-conceived action in the Eastern District of Pennsylvania to stop Hartleib from continuing to bring attention to Plaintiffs' actual unethical conduct and other dishonest or questionable conduct. That is why Plaintiffs sought a preliminary injunction in this matter. Regardless of how Hartleib describes or characterizes what occurred in the Sprint case, Plaintiffs submitted "unbelievable!", "illusory bills for near illusory work". That happened. It is a matter of public record that Plaintiffs want to bury.

. . . It can fairly be described as criminal, corrupt, inept, reckless, an unethical level of indifference or willful ignorance or all of the above. Regardless of how Hartleib chooses to characterize what happened and Plaintiffs' level of culpability, what actually happened, regardless of any commentary or characterization, tarnishes Plaintiffs' reputation and they want it buried by any means necessary even if those means include a perversion of tort litigation. When Plaintiffs tout their reputation and accomplishments in courts across the country while seeking appointments as lead or co-lead counsel in consolidated derivative cases, they do not want anyone to draw attention to what actually happened the one time Plaintiffs' practices were subject to true scrutiny. Having to repeat their story in other jurisdictions that they lacked knowledge or lacked intent, that this was somehow a series of unfortunate events that occurred under their leadership, is worse than any adjective or characterization Hartleib has uttered or could utter. The language throughout the Kansas trial court's scathing opinion is worse than anything Hartleib has uttered or could utter because it is authoritative and beyond dispute by any illusory audit that Plaintiffs allegedly performed but will not produce despite a clear order from this Court. **Hartleib threatens to continue to draw attention to what actually**

**happened**.

It is clear from the conduct outlined below that Plaintiffs do not wish to litigate their claims on the merits and be compensated for the unsupportable losses they claim. **Plaintiffs want to cover up their actual conduct in the Sprint case so that it can be repeated**. In fact, Weiser Law Firm Co-Founder, Co-Owner, and Vice President, Patricia Weiser, does not even believe in the merits of the case and admits that it was brought for the sole purpose of stopping future action, not seeking compensation for prior torts: "This case is -- was brought with the sole purpose of stopping him…" "And there's no winning. There's no winning with this lawsuit." This case is an attempt at a de facto injunction to prevent Hartleib drawing attention to the Sprint case in the future. **This Court cannot order Hartleib to refrain from seeking permission to address another court in another jurisdiction whether it be in person or through the filing of an amicus brief**. The jurisdictional and constitutional restraints that would prevent such an order are immediately apparent.

Ex. 36 pp. 4-6 (internal citations omitted, emphasis supplied).

160. Upon information and belief, Hartleib's various communications, writings and filings have been crafted and disseminated by him while in his home state of California.

161. Hartleib's comportment and behavior during and after the Sprint Derivative Settlement approval process, his baseless interjections into the Law Firm's ongoing litigations unrelated to Hartleib, his multiple improper contacts with judges, represented plaintiffs and members of the bar, his unfounded lawsuit in Kansas against Plaintiffs and his abuse of the judicial process in the Pennsylvania Action all constitute abusive and vexatious litigation.

162.   Hartleib's Motion for Sanctions in the Pennsylvania Action exemplifies and lays bare his ceaseless and pernicious one-man campaign to ruin Plaintiffs' lives and livelihood by twisting the judicial process into a weapon, and wielding it in jurisdictions across the country to avoid liability for his abuse.

163.   Hartleib's historical actions as set forth hereinabove – including but not limited to the distribution of unsolicited missives to attorney contact lists in ongoing litigations, the multiple attempts to vacate a Protective Order preventing Hartleib from continued unlawful contact with clients of the Law Firm, the filing of amicus curiae briefs and appearances at hearings in unrelated litigations simply to insult and defame Plaintiffs and their colleagues, the threatening and profane letters to the bench of the Court of Common Pleas of Chester County, Pennsylvania, the threats to insert himself into the Law Firm's pending cases such as *Witmer, LC* and *A10*, the repeated improper written and oral requests for *ex parte* contact with a judge or for a judge to insert himself into an unrelated pending case, and the twisting of motion practice in the Pennsylvania Action into an opportunity to abuse, threaten and demean Plaintiffs – demonstrate his pattern and practice of abusing the legal process for the primary purpose of insulting, degrading, belittling, professionally denigrating, maligning and impoverishing Plaintiffs, which is not the primary purpose for which the legal processes at issue were intended or designed.

164.   Indeed, as recently as August 2022, Hartleib openly declared his intent to harass Plaintiffs in judicial jurisdictions throughout the country, "whether it be in person or through the filing of an amicus brief." Ex. 36 p. 6.

165.   By way of further example, during his deposition conducted in the Pennsylvania Action, Hartleib admitted to contacting various parties, including the Courts, to disseminate salacious allegations about Plaintiffs completely independent of any sort of requested relief; indeed, under the guise of "oversight of the [Sprint Derivative] [S]ettlement", Hartleib contacted admitted to contacting Judge Vano about Plaintiffs in connection with the aforementioned *qui tam* cases. Deposition

Transcript of Michael Hartleib dated November 16, 2022, 308:18-309:22, a true and correct copy of which is attached hereto as **Exhibit 37**.

166.   Indeed, Hartleib admits to not even expecting a response from Judge Vano in response to the above-referenced communication, testifying, "I didn't expect any response. No response. I don't believe I ever expected or received any response, whatsoever, if Jill Boren thought it might be something that the Judge would find interesting or relevant to future cases[.]" Ex. 37, 310:2-7

167.   In another example, Hartleib admits to communicating with Judge Watson in the Big Lots Litigation and repeating the salacious and false allegations regarding Plaintiffs not for any specific relief but to "… provide information that the judge may or may not deem relevant to his determination as to fairness of fees, appointment of lead counsel, any of those things, so this had to do with fees." Ex. 37, 320:24-321:5.

168.   Hartleib generally admits that his sole purpose in contacting Courts around the Country is to "bring[] information to the Court that involves the Weiser Firm [among others…] They are cuplable as well […] in the fraud that took place in Kansas[.]" Deposition Transcript of Michael Hartleib dated November 17, 2022, 22:12-18, a true and correct copy of which is attached hereto as **Exhibit 38**.

169.   Hartleib admits, despite repeatedly referencing Plaintiffs in his various amicus briefs, having no information that Plaintiffs have used "serial criminal plaintiffs" in connection with any litigation. Ex. 38, 30:8-22.

170.   Hartleib admits, despite repeatedly referencing Plaintiffs in his various amicus briefs, having no information that Plaintiffs have "fee split, interchange[d] plaintiffs, seek [compromised plaintiffs] to generate thousands of billable hours for illusory work, submit fraudulent time logs and seek hundreds of millions in unjust fees in cases across the country" as he bases such allegation only on his belief that the same is "standard operating procedure for most firms." Ex. 38, 31:4-22.

171.   Despite having referred to conduct of Plaintiffs as "perjurious" in

documents provided to various Courts and other parties, Hartleib admits that no document filed by Plaintiffs has been ruled to constitute "perjury." Ex. 38, 104:16-105:4, 105:11-17.

172.   Alarmingly, when asked as of November 17, 2022 and based upon the information Hartleib possessed on November 17, 20220 whether Hartleib intends to file amicus curiae briefs and/or other types of objections/motions in cases in which Plaintiffs are involved in or may be involved in in the future, Hartleib stated merely cryptically and non-specifically, *e.g.,* "The answer is I can't foretell the future, so I don't know. You're asking me to predict the future[,]" "As we sit here today, I don't have intentions either way[,]" "…I don't have intentions either way. I can't answer that question because  you're asking me to foretell the future which I can't do. It depends on a lot of factors[,]" "I will just leave it at what I said. You know, if, if my interests are not being properly represented and it warrants my time to protect my interests[,]" "…I can't tell the future. And as we sit here today, I can't, you know, I can't give you a definitive answer one way or the other[.]" Ex. 38, pp. 155-157.

173.   It was in the context of the aforementioned, vague answers which Hartleib asserted that he considers himself to have a protectable interest to protect "jurisprudence as a whole." Ex. 38, 156:24-157:9.

174.   Of course, "jurisprudence as a whole" is such a broad interest as it would seemingly grant any non-party standing in any proceeding nationwide and therefore is not a protectable interest.

175.   Upon information and belief, Hartleib drafted and filed his own amicus briefs and pleadings with respect to the Sprint Derivative Settlement, the Protective Order, the Equifax Derivative Litigation, the Centurylink Litigation and the Hartleib Action, as well as his email in the Big Lots Litigation and his oral argument in the Centurylink Litigation. See Ex. 13, 21, 25-27, 33. Also upon information and belief, Hartleib drafts many of his own legal pleadings in the Pennsylvania Action, which are filed by his local counsel. As such, Hartleib has breached his duty of honesty to

McCormick, Barstow,
Sheppard, Wayte &
Carruth LLP
7647 North Fresno Street
Fresno, CA 93720

40

COMPLAINT

1  the bar and violated that duty by misrepresenting material facts with respect to
2  Plaintiffs.

3      176.  Hartleib's outrageous behavior cannot be permitted in a judicial system
4  founded on the pillars of honesty, fairness and legitimacy.

5  ## COUNT I – VEXATIOUS LITIGANT ORDER

6      177.  Plaintiffs repeat and reassert each of the previous paragraphs as though
7  the same were set forth herein.

8      178.  "Federal courts can 'regulate the activities of abusive litigants by
9  imposing carefully tailored restrictions under . . . appropriate circumstances.'"
10 *Ringgold-Lockhart v. County of L.A.*, 761 F.3d 1057, 1061 (9th Cir. 2014)(citing and
11 quoting *De Long v. Hennessey*, 912 F.2d 1144, 1147 (9th Cir. 1990) (quotation marks
12 omitted)).

13     179.  Indeed, the All Writs Act, 28 U.S.C. § 1651(a), provides district courts
14 with the inherent power to enter pre-filing orders against vexatious litigants.
15 *Weissman v. Quail Lodge Inc.*, 179 F.3d 1194, 1197 (9th Cir. 1999). A court should
16 enter a pre-filing order constraining a litigant's scope of actions in future cases only
17 after a cautious review of the pertinent circumstances. *Molski v. Evergreen Dynasty*
18 *Corp.*, 500 F.3d 1047, 1057-1058 (9th Cir. 2007).

19     180.  Nevertheless, "[f]lagrant abuse of the judicial process cannot be tolerated
20 because it enables one person to preempt the use of judicial time that properly could
21 be used to consider the meritorious claims of other litigants." *De Long*, 912 F.2d at
22 1149; see also *O'Loughlin v. Doe*, 920 F.2d 614, 618 (9th Cir. 1990).

23     181.  "Frivolous litigation is not limited to cases in which a legal claim is
24 entirely without merit. It is also frivolous for a claimant who has some measure of a
25 legitimate claim to make false factual assertions. Just as bringing a completely
26 baseless claim is frivolous, so too a person with a measured legitimate claim may
27 cross the line into frivolous litigation by asserting facts that are grossly exaggerated
28 or totally false." *Molski*, 500 F.3d at 1060-1061.

McCORMICK, BARSTOW,
SHEPPARD, WAYTE &
CARRUTH LLP
7647 NORTH FRESNO STREET
FRESNO, CA 93720

41
COMPLAINT

182. "The record supporting such an order 'needs to show, in some manner, that the litigant's activities were numerous or abusive.'" *Harris v. Mangum*, 863 F.3d 1133, 1143 (9th Cir. 2017)(citing and quoting *De Long*, 912 F.2d at 1147).

183. "District courts have broad discretion in fashioning sanctions for vexatious litigation. *Leon v. IDX Sys. Corp.*, 464 F.3d 951, 961 (9th Cir. 2006); *Ritchie v. United States*, 451 F.3d 1019, 1026 (9th Cir. 2006); *Falstaff Brewing Corp. v. Miller Brewing Co.*, 702 F.2d 770, 786 (9th Cir. 1983) (Wallace, J., dissenting in part). . . [T]he district court may exercise its sound discretion under the facts presented to choose any appropriate sanction that will punish the past misconduct and prevent the future misconduct of the lawyer or party at issue." *Molski*, 500 F.3d at 1065 n.8.

184. "Among all other citizens, [the vexatious litigant] is to be restricted in his right of access to the courts. . . . We cannot predict what harm might come to him as a result, and he should not be forced to predict it either. What he does know is that a Sword of Damocles hangs over his hopes for federal access for the foreseeable future." *Ringgold-Lockhart*, 761 F.3d at 1062 (citing and quoting *Moy v. United States*, 906 F.2d 467, 470 (9th Cir. 1990)).

185. Plaintiffs seek a Vexatious Litigant Order (A) enjoining Hartleib from (1) filing any action against Weiser or the Law Firm, (2) making any filing or submission in any case, derivative suit, class action suit, qui tam suit or otherwise involving Weiser or the Law Firm, and (3) contacting any person, organization, law firm, jurist and agent or employee thereof with respect to Weiser or the Law Firm, without obtaining leave of this Court, and (B) awarding attorneys' fees and costs to Plaintiffs.

186. Hartleib's continued abuse of the judicial process justifies such a Vexatious Litigant Order. To wit, Hartleib has:

   a.   Sought to simultaneously assist with and/or participate in the prosecution of claims against Sprint in the Sprint Securities Class Action and bring a derivative suit on behalf of and for the benefit

1        of Sprint;

2      b.     Improperly sought a share of the Law Firm's attorneys' fees from any Sprint derivative action in which he might be a plaintiff represented by the Law Firm and/or the Murphy Firm;

c.     Offered to withdraw his objection to the Sprint Derivative Settlement in exchange for a "consulting agreement" with the Law Firm;

d.     Contacted Ross-Williams by telephone on March 6, 2017, despite knowing she was represented by counsel, making her feel shocked, disturbed, harassed and threatened;

e.     Contacted Ross-Williams, fifteen members of the bar and Judge Vano's administrative assistant by e-mail in the early hours of March 7, 2017 and falsely stated: "you are a unwitting victim of [the Law Firm's] fraud committed against the Court. As we discussed they have submitted millions of dollars in fraudulent billing in your case. As I informed you that this was not just my opinion, the Judge in your case came to a similar conclusion. In fact, your attorneys have now admitted to at least 1.6 million dollars in fraudulent bills submitted to the Court. Mr. Weiser has confirmed this in two separate letters. (See attached).  I am no expert, but when a Firm admits criminal acts in a case I believe they are obligated to notify you as the Plaintiff. Mr. Weiser and his Firm have already contacted their Bar associations and other Courts to self-report their criminal acts. . . they are in a lot of trouble . . . I will provide incontrovertible proof that Mr. Weiser et. al. is just as guilty as Mr. Silow. This is just the tip of the iceberg." Ex. 14;

f.     Repeatedly announced his intent to ignore any protective order

McCormick, Barstow,
Sheppard, Wayte &
Carruth LLP
7647 NORTH FRESNO STREET
FRESNO, CA 93720

43

COMPLAINT

sought by the Plaintiffs, as in a March 7, 2017 e-mail to Weiser, fifteen members of the bar and Judge Vano's administrative assistant: "You Sir, and your coconspirators are the ones that need to Cease and Desist. Your so-called "client" is representing my interest and her attorneys are corrupt, therefore I will neither Cease nor Desist." Ex. 14;

g.    Insulted and defamed the Plaintiffs in multiple e-mail missives distributed to Weiser as well as attorneys from other law firms involved in the Sprint Derivative Settlement and to the Court, for example:

i.    on March 6, 2017 ("Rob, I am a little confused! . . . It seems your statements to the Appellate Court were disingenuous at best.  Shocking! . . . I especially like the comment that you felt as though you had an ethical obligation to inform the Court, prior to briefing . . . Ethical obligation, what a Saint [sic] . . . Your attempts, [sic] to obfuscate your chicanery in this case is galvanizing my convictions, strengthening my resolve to expose all of the corrupt parties in this case!") see Ex. 12;

ii.    on March 7, 2017 ("I caution you, that coercing your "client" to misstate facts regarding our call will only inflict additional damage to what little credibility you have left. . . Instead of wasting my time, I would suggest you consult with an ethics attorney, that's right, you already have!") see Ex. 14;

iii.    on April 12, 2017 (""What an embarrassment to the bar! See you in Court.") see Ex. 16;

iv.  on April 7, 2018 ("Rob, your ability to set the bar at new lows, never disappoints! Clearly, this is in retaliation to your being rightfully removed as co-lead counsel in the Equifax case. Your attempt to mislead the Appellate Court with incomplete records might be your standard operating procedure, but I believe it will cost you when I seek sanctions. . . Your ill-advised actions, and ad-hominem attacks are making the Weiser Firm radioactive!") see Ex. 15;

v.  on May 19, 2018 ("Plaintiff Counsel, and I use this term loosely, when making false allegations against a party I would suggest you at least get it right.  I am no expert, but I am pretty sure it would be libelous!  I will demonstrate its proper use posthaste!") see Ex. 18;

vi.  on June 2, 2018 ("I thought the Honorable James Vano would find the link to the National Law Journal Article of interest. . . like the fraud Weiser et.al. committed in the "Ross-Williams" case, it appears to be standard operating procedure for many firms to submit millions in fraudulent fee requests upon the Court. . . it appears Weiser et.al. has not been out done, as there is no mention of the unlicensed practice of law by a convicted felon using an alias. . . The actions of Weiser et.al. and the Firms in the State Street case is the very definition of Racketeering, and warrants legislative reform.") see Ex. 19; and

vii.  on March 14, 2019 ("I thought that the Honorable Vano would be interested to know [about] an Amicus Brief filed in Minnesota, and transcript of the hearing before the

Honorable Michael J. Davis. In addition, I have initiated legal action against Weiser and representative plaintiff Ross-Williams as outlined in the attached complaint.. . . Maybe Judge Vano would be interested in setting the record straight before the Court appoints lead Counsel in the aforementioned [Centurylink] case. Interestingly, I received an anonymous letter last night which details an elaborate scheme by Weiser et.al. to procure "Relators" in Qui Tam cases. It involves the use of several LLC shell corporations set up for the sole purpose of soliciting information under false pretenses to facilitate lawyer driven Qui Tam cases. This has resulted in the DOJ filing a motion to dismiss 11 active cases, filed by Weiser et.al. including ABBVIE. The level of sinister is [sic] truly unbelievable, some of which is outlined in the attached Motion to dismiss by the Feds!") see Ex. 28;

h.    Threatened to appear at hearings and to file briefs in the Law Firm's unrelated pending litigation across the country ("Rob, will you be at the Witmer v Steven [sic] hearing on the 27th? I will do my best to attend. I am very familiar with Judge Carney? [sic] We can discuss my concerns with L.C, A 10 and several other companies in which I am a shareholder. It appears we will be forced to deal with each other for the foreseeable future. . . If you have any questions, or wish to proffer an apology, you know how to reach me. That said, other action is eminent!") Ex. 20;

i.    Opposed the Law Firm's application for appointment as co-lead counsel the Equifax Derivative Litigation (alleging in a proposed self-styled amicus curiae brief that the Law Firm "lied, misl[ed]

McCORMICK, BARSTOW,
SHEPPARD, WAYTE &
CARRUTH LLP
7647 NORTH FRESNO STREET
FRESNO, CA 93720

46

COMPLAINT

the court," "attempt[ed] to confuse the Court [sic]," "used an unfit plaintiff," engaged "in fraudulent billing," made "false statements," employed another attorney who "repeatedly perjured himself" and constituted "an utter embarrassment to the Plaintiff's Bar," operates a "criminal enterprise," "sees plaintiff's [sic] as a 'necessary nuisance,'" displayed "hubris and utter contempt for the Court," engaged in "contemptuous actions in the case" and "Self-Dealing, Unclean Hands and Shameful Violations of Public Trust," undertook a "zealous quest for reinstatement of four million dollars in unwarranted fees," "follow[ed] a different set of standards, one that sets the bar at new lows," made a "desperate attempt to unjustly enrich themselves," and "has committed criminal acts upon the Kansas Court and a multitude of others across the country. . . . what is going on at the Weiser firm?  Either they are completely corrupt, or entirely inept, whichever is the case they are not fit to act as lead on any representative suit.") Ex. 21 pp. 4-9 (emphasis in original);

j.  Initiated ex parte communication with Judge Watson in the Big Lots Derivative Litigation concerning the Law Firm's billing entries, and alleging past improprieties by the Law Firm (see Ex. 25 p. 11 fn.2);

k.  Submitted a self-styled amicus curiae brief in unsuccessful opposition to the Law Firm's appointment as lead counsel in the Centurylink Derivative Litigation – even though the Law Firm did not seek lead counsel status (alleging that the Law Firm utilizes "deceased parties, friends and family members which [sic] lacked standing, and paid serial criminal Plaintiffs," "generate[s] thousands of billable hours for illusory work, submit fraudulent

McCormick, Barstow,
Sheppard, Wayte &
Carruth LLP
7647 NORTH FRESNO STREET
FRESNO, CA 93720

47
COMPLAINT

time logs and seek hundreds of millions in unjust fees in cases across the country," operates a "criminal enterprise . . . Weiser et.al [sic] lied, misleading the court [sic] . . . Weiser et.al. [sic] committed perjury and admitted to billing fraud . . .   Mr. Jeffrey Mark Silow has worked for the Weiser [Firm] . . . for over 10 years, billing likely more than 100 million dollars in illicit fees, in a multitude of cases across the country.") See Ex. 26 pp. 2, 6-8;

l.   Appeared before the Court in unsuccessful opposition to the Law Firm's appointment as lead counsel in the Centurylink Derivative Litigation – even though the Law Firm did not seek lead counsel status, sought an ex parte meeting with the judge in chambers, and announced his intent to inject himself into the Law Firm's other pending cases ("you know, if I had 30 minutes with Your Honor in chambers, I could give Your Honor a lot more information . . . if the firms would like to give me a list of their forthcoming cases in which they are seeking leave [to be lead counsel], I could be certain to notify everybody timely") Ex. 27 at 41:24-42:8 & 43:4-12;

m.   Commenced an unfounded and untimely lawsuit against Plaintiffs alleging malpractice in representing Hartleib in the Sprint Derivative Action, even though Hartleib was never a Law Firm client; and

n.   Disparaged the Law Firm's qui tam practice to Judge Vano by misrepresenting the Law Firm's role in relator cases that were subsequently voluntarily dismissed after the Law Firm withdrew and new counsel appeared (see Ex. 28); and

o.   Claimed to Judge Vano that he "contacted the district attorney's offices in Pennsylvania and Kansas and . . .[was] filing formal

complaints [against the Law Firm and/or Weiser];" see Id.; and

p.   Utilized the discovery process in the Pennsylvania Action as a platform for personal tirades and insults against Plaintiffs, calling them "criminal, corrupt, inept, reckless, an unethical;" Ex. 36 pp. 5-6; and

q.   Clearly announced his intent to abuse the judicial process in the future in order to "continue to draw attention" to Plaintiffs by "address[ing] another court in another jurisdiction whether it be in person or through the filing of an amicus brief." Id.

187.   Hartleib has admitted on multiple occasions that his actions were undertaken as part of a personal "quest" to attack, malign, damage and disparage Plaintiffs.    See Ex. 12 ("Your [fee petition] is galvanizing my convictions, strengthening my resolve . . . and provoking wrath.  I will take this all the way to the Kansas Supreme Court if needed . . ."); Ex. 14 ("I find the prospects of discovery quite compelling.  Your threats do nothing but, [sic] strengthen my resolve and galvanize my convictions.  Call it a personality defect!"); Ex. 15 ("Your personal attacks smack of desperation, they do nothing to dissuade me, in fact they galvanize my convictions and strengthen my resolve!"); Ex. 18 ("when making false allegations against a party I would suggest you at least get it right . . . I will demonstrate its proper use posthaste!"); Ex. 27 ("it's unbelievable the attacks I took, so – but it does nothing to dissuade me.  It just galvanizes my conviction and strengthens my resolve.") and Ex. 28 ("my quest to expose lawyer driven litigation and corruption rife throughout the Plaintiffs Bar [sic] continues . . . I have initiated litigation against Weiser . . .").

188.   Hartleib has admitted to believing he has standing to file amicus curiae briefs in any jurisdiction based upon the interest of "jurisprudence as a whole" and has repeatedly admitted to not having requisite information to make the (false) allegations set forth in his various already of-record filings. Exs. 37 and 38.

189.   Hartleib has created the exigent circumstances that now justify a

McCORMICK, BARSTOW,
SHEPPARD, WAYTE &
CARRUTH LLP
7647 NORTH FRESNO STREET
FRESNO, CA 93720

49
COMPLAINT

Vexatious Litigant Order by relentlessly abusing the legal process between 2016 and the present, in state and federal courts nationwide – from Pennsylvania to Minnesota and from Georgia to Kansas – in an effort to harm Plaintiffs' professional reputations, business prospects, financial condition, and likelihood of success in existing and ongoing litigations.

190.   Hartleib's inappropriate appearances and improper filings, unsolicited e-mail missives to members of the bar and bench, unseemly fee-sharing proposals, ex parte contact, and efforts to manipulate legitimate legal processes to achieve his own ends demonstrate the unabashed and out-of-control nature of his continuing campaign against Plaintiffs.

191.   Pursuant to the All Writs Act, 28 U.S.C. § 1651(a), a pre-filing injunction is necessary in order "to preclude [Hartleib's] abusive, groundless and vexatious litigation" against Plaintiffs.  Brow, 994 F.2d at 1038.

192.   WHEREFORE, Plaintiffs Robert Weiser and The Weiser Law Firm, P.C. demand entry of a Vexatious Litigant Order (A) enjoining Hartleib from (1) filing any action against Weiser or the Law Firm, (2) making any filing or submission in any case, derivative suit, class action suit, qui tam suit or otherwise involving Weiser or the Law Firm, and (3) contacting any person, organization, law firm, jurist and agent or employee thereof with respect to Weiser or the Law Firm, without obtaining leave of this Court, and (B) awarding attorneys' fees and costs to Plaintiffs, and respectfully request that this Honorable Court grant them such other relief that the Court deems appropriate under the circumstances.

## **COUNT II – ABUSE OF PROCESS**

193.   Plaintiffs repeat and reassert each of the previous paragraphs as though the same were set forth herein.

194.   The Restatement (Second) of Torts § 682 defines abuse of process as the use of a legal process, civil or criminal, against another primarily to accomplish a purpose for which the process is not designed.  See *McGee v. Feege*, 517 Pa. 247,

1   256, 535 A.2d 1020 (1987).

2       195.   Under California law, a claim for abuse of process arises when a party

3 (1) for ulterior reasons (2) misuses the court's process for a purpose other than the

4 purpose for which the process was designed. *Brown v. Kennard*, 94 Cal. App. 4th 40,

5 44, 113 Cal. Rptr. 2d 891 (2001);

6       *Ramona Unified School Dist. v. Tsiknas*, 135 Cal. App. 4th 510, 520, 37 Cal.

7 Rptr. 3d 381, 388-389 (2005).

8       196.   "For purposes of abuse of process, the ulterior motive to prove is that the

9 party employing the process did so for an end not germane thereto. And, an improper

10 purpose may consist in achievement of a benefit totally extraneous to or of a result

11 not within its legitimate scope." *Drum v. Bleau, Fox & Associates*, 107 Cal. App. 4th

12 1009, 1019-1020, 132 Cal. Rptr. 2d 602, 609 (2003).

13       197.   " In *Charles J. Vacanti, M.D., Inc. v. State Comp. Ins. Fund*, 24 Cal.4th

14 800, 824, 102 Cal. Rptr. 2d 562, 14 P.3d 234 (2001), our Supreme Court held that the

15 ulterior motive or malice element of an abuse of process claim may be inferred from

16 the willful abuse of the process." Id.; see also *Tranchina v. Arcinas*, 78 Cal. App. 2d

17 522, 524, 178 P.2d 65 (1947)("it is well settled that the intention with which a party

18 did an act may be inferred from evidence of his subsequent conduct.").

19       198.   In this case, the following procedures incident to litigation have been

20 used against Plaintiffs:

21           a.     Repeated unsuccessful appeals of the Protective Order issued in

22                connection with the Sprint Derivative Settlement; see, e.g., Ex. 14;

23           b.     Threats to appear at hearings and to file briefs in the Law Firm's

24                unrelated pending litigation across the country; see Ex. 20;

25           c.     Submission of amicus curiae brief in opposition to the Law Firm's

26                application for appointment as co-lead counsel in the Equifax

27                Derivative Litigation; see Ex. 21;

28           d.     Submission of ex parte e-mail communication with Judge Watson

McCormick, Barstow,
Sheppard, Wayte &
Carruth LLP
7647 North Fresno Street
Fresno, CA 93720

51

COMPLAINT

in the Big Lots Derivative Litigation in opposition to the settlement of that litigation and the Law Firm's billing entries; see Ex. 25 p. 11 fn.2;

e. Submission of amicus curiae brief in unsuccessful opposition to the Law Firm's appointment as lead counsel in the Centurylink Derivative Litigation – even though the Law Firm did not seek lead counsel status; see Ex. 26 pp. 2, 6-8;

f. Appearance at oral argument before the Court in unsuccessful opposition to the Law Firm's appointment as lead counsel in the Centurylink Derivative Litigation – even though the Law Firm did not seek lead counsel status – where he sought an ex parte meeting with the judge in chambers and announced his intent to inject himself into the Law Firm's other pending cases; see Ex. 27 at 41:24-42:8; and

g. Commencement of an unfounded and untimely lawsuit against Plaintiffs alleging malpractice – although Hartleib was never Plaintiffs' client – after an unsuccessful attempt to extort Plaintiffs under the guise of "pre-suit mediation."  See Ex. 33;

199.    Malice has been Hartleib's primary motive in initiating each and every one of these processes.

200.    Hartleib did not use any of these tactics for their legitimate reasons – to represent his interests in litigation in which he has standing – but rather used them to harass, embarrass, extort, malign and denigrate Plaintiffs.

201.    Hartleib has admitted to believing he has standing to file amicus curiae briefs in any jurisdiction based upon the interest of "jurisprudence as a whole" and has repeatedly admitted to not having requisite information to make the (false) allegations set forth in his various already of-record filings. Exs. 37 and 38.

202.    Plaintiffs have been forced to expend enormous resources of time and

money to respond to Hartleib's numerous oppressive communications, briefs, arguments and law suit.

203. WHEREFORE, Plaintiffs Robert Weiser and The Weiser Law Firm, P.C. demand judgment in their favor and against Michael Hartleib in an amount to be determined at trial for damages attributable to Hartleib's abuse of process, and respectfully request that this Honorable Court grant them such other relief that the Court deems appropriate under the circumstances.

## JURY DEMAND

Plaintiffs demand a trial by jury on all causes of action and defenses so triable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that this Court enter judgment in its favor and against Hartleib as follows:

(1) That the Court enter a Vexatious Litigant Order (A) enjoining Hartleib from (i) filing any action against Weiser or the Law Firm, (ii) making any filing or submission in any case, derivative suit, class action suit, qui tam suit or otherwise involving Weiser or the Law Firm, and (iii) contacting any person, organization, law firm, jurist, and agent or employee thereof with respect to Weiser or the Law Firm, without obtaining leave of this Court.

(2) For a judgment against Hartleib for direct and consequential damages in an amount according to proof;

(3) For pre-judgment interest on all damages;

(4) For attorneys' fees and costs as allowed by law;

(5) For the costs of suit herein; and

(6) For such other and further relief as the court may deem just and proper.

Respectfully submitted,

///

1

Dated:  January 25, 2023

SILVERANG, ROSENZWEIG
& HALTZMAN, LLC

2

3

4

By: _____

Philip S. Rosenzweig
Attorneys for Plaintiffs.
The Weiser Law Firm, P.C. and
Robert B. Weiser, Esquire

5

6

7

8

9

Dated:  January 24, 2023

McCORMICK, BARSTOW, SHEPPARD,
WAYTE & CARRUTH LLP

10

11

12

By: _____

Shane G. Smith
Attorneys for Plaintiffs.
The Weiser Law Firm, P.C. and
Robert B. Weiser, Esquire

13

14

15

16

17

041226-000000 8857811.1

18

19

20

21

22

23

24

25

26

27

28

McCORMICK, BARSTOW,
SHEPPARD, WAYTE &
CARRUTH LLP
7647 NORTH FRESNO STREET
FRESNO, CA 93720

54
COMPLAINT

# EXHIBIT 1

EXHIBIT 1
55

**Robert Weiser**

| | |
|---|---|
| **From:** | bgm@brucemurphy.biz |
| **Sent:** | Tuesday, November 25, 2008 5:59 PM |
| **To:** | Robert Weiser |
| **Subject:** | Fw: Sprint Nextel |

Rob,

In February Sprint confirmed a staggering $29.7 billion writedown in the book value of its assets, wiping out nearly all of the value of its $35 billion merger with Nextel. And dividend payments were suspended "for the foreseeable future." To top it off, Sprint announced it has borrowed $2.5 billion from its revolving credit facility to help pay off $2.25 billion in bonds that will mature in 2008 and 2009.

Do you see a der here?

Bruce

--- On **Tue, 11/25/08, Michael Hartleib <_michaelhartleib@cox.net_>** wrote:

From: Michael Hartleib <michaelhartleib@cox.net>
Subject: Sprint Nextel
To: bgm@brucemurphy.biz
Date: Tuesday, November 25, 2008, 4:57 PM

Bruce,

I own over 10,000 shares of Sprint and held Nextel before the merger. I believe I have owned the shares since 1999 or 2000 .This was the worst merger integration in history as management eventually had to write down $31billion of a $32billion deal.  They failed to properly merge and integrate the two different technologies of their networks, one being CDMA for Sprint, the other being TDMA for Nextel. Their attempts to do so have destroyed two perfectly good companies and driven Sprint shareprice down from $30 to $1.50.

EXHIBIT 1

# EXHIBIT 2

EXHIBIT 2
57

**Robert Weiser**

---

| | |
|---|---|
| **From:** | Robert Weiser |
| **Sent:** | Friday, March 27, 2009 7:21 AM |
| **To:** | Bruce Murphy |
| **Subject:** | Re: RE: Derivative_Retention Letter   S   MHartleib |

I think he has a potential conflict in light of the other litigation he's involved in. Thus, I don't think he would make an adequate representative for sprint.

Rob

Sent from my Verizon Wireless BlackBerry

---

**From**: "bgm@brucemurphy.biz"
**Date**: Fri, 27 Mar 2009 04:33:59 -0400
**To**: Michael Hartleib<michaelhartleib@cox.net>
**Subject**: RE: RE: Derivative_Retention Letter S MHartleib
Michael,
I am working on something else right now. I will try to get back with you tomorrow, or over the weekend.
Bruce

--- On **Thu, 3/26/09, Michael Hartleib <_michaelhartleib@cox.net_>** wrote:
From: Michael Hartleib <michaelhartleib@cox.net>
Subject: RE: RE: Derivative_Retention Letter S MHartleib
To: bgm@brucemurphy.biz
Date: Thursday, March 26, 2009, 10:29 PM

call me 949-283-2441

---

**From:** bgm@brucemurphy.biz [mailto:bgm@brucemurphy.biz]
**Sent:** Monday, March 23, 2009 8:59 AM
**To:** Michael Hartleib
**Cc:** rob weiser
**Subject:** Fw: RE: Derivative_Retention Letter S MHartleib

Michael,
Can you get this back to me this am, your time?
Bruce

--- On **Sun, 3/22/09, bgm@brucemurphy.biz <_bgm@brucemurphy.biz_>** wrote:
From: bgm@brucemurphy.biz <bgm@brucemurphy.biz>
Subject: RE: Derivative_Retention Letter S MHartleib
To: "Michael Hartleib" <michaelhartleib@cox.net>
Cc: "rob weiser" <rw@weiserlawfirm.com>
Date: Sunday, March 22, 2009, 9:53 PM

1

EXHIBIT 2
58

Michael,

I sent your revised retention letter to my co-counsel, Rob Weiser, for his review and comment. We are fine with your changes. We mostly just amplified and clarified the points you made. Yes, we do work 24/7.

Please review, sign and fax to 772-231-4804.

Thanks.

Bruce

--- On **Fri, 3/20/09, Michael Hartleib <_michaelhartleib@cox.net_>** wrote:

From: Michael Hartleib <michaelhartleib@cox.net>
Subject: Derivative_Retention Letter S MHartleib
To: bgm@brucemurphy.biz
Date: Friday, March 20, 2009, 11:50 PM

Bruce, I am faxing the signed copy over now

EXHIBIT 2
59

# EXHIBIT 3

EXHIBIT 3
60

**Robert Weiser**

| | |
|---|---|
| **From:** | bgm@brucemurphy.biz |
| **Sent:** | Friday, March 27, 2009 9:55 AM |
| **To:** | Michael Hartleib |
| **Cc:** | Robert Weiser |
| **Subject:** | Sprint.der |

Good morning, Michael:
Rob Weiser and I have conferred and thought about the motion to appoint the Sprint Derivative Action Representative. We believe you may have a potential conflict in light of the other litigation in which you are involved. Defense counsel can be expected to object to you serving as the Representative on the grounds of adequacy.
Therefore, we will not be able to file the Sprint derivative suit in your name.
We appreciate the opportunity you gave us to look into this matter for you.
Bruce

**From:** "bgm@brucemurphy.biz"
**Date:** Fri, 27 Mar 2009 04:33:59 -0400
**To:** Michael Hartleib<michaelhartleib@cox.net>
**Subject:** RE: RE: Derivative_Retention Letter S MHartleib
Michael,
I am working on something else right now. I will try to get back with you tomorrow, or over the weekend.
Bruce

--- On **Thu, 3/26/09, Michael Hartleib** <*michaelhartleib@cox.net*> wrote:
From: Michael Hartleib <michaelhartleib@cox.net>
Subject: RE: RE: Derivative_Retention Letter S MHartleib
To: bgm@brucemurphy.biz
Date: Thursday, March 26, 2009, 10:29 PM

call me       **REDACTED**

**From:** bgm@brucemurphy.biz [mailto:bgm@brucemurphy.biz]
**Sent:** Monday, March 23, 2009 8:59 AM
**To:** Michael Hartleib
**Cc:** rob weiser
**Subject:** Fw: RE: Derivative_Retention Letter S MHartleib

Michael,
Can you get this back to me this am, your time?
Bruce

--- On **Sun, 3/22/09, bgm@brucemurphy.biz** <*bgm@brucemurphy.biz*> wrote:
From: bgm@brucemurphy.biz <bgm@brucemurphy.biz>
Subject: RE: Derivative_Retention Letter S MHartleib
To: "Michael Hartleib" <michaelhartleib@cox.net>
Cc: "rob weiser" <rw@weiserlawfirm.com>

1

EXHIBIT 3
61

# EXHIBIT 4

EXHIBIT 4
62

☑001/021

*866 313-5100*

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF NEW YORK**

| | |
|---|---|
| SIRIUS XM SATELLITE RADIO INC. ,and ) <br> BRIAN DAVID GOE, MICHAEL ) <br> HARTLEIB, and JACK SORGE, DOES 1 ) <br> THROUGH 47 INCLUSIVE as individuals, ) <br>     Plaintiff, ) <br>     vs. ) <br> JOAN L. AMBLE, LEON BLACK, ) <br> LAWRENCE F. GILBERTI, EDDY W. ) <br> HARTENSTEIN, JAMES P. HOLDEN, ) <br> CHESTER A. HUBER, MEL KARMAZIN, ) <br> JOHN MENDEL, JAMES F. MOONEY, ) <br> GARY M. PARSONS, JOHN C. MALONE, ) <br> JACK SHAW, GREGORY B. MAFFEI, ) <br> DAVID FLOWERS and JEFFREY D. ) <br> ZIENTS, ) <br>     Defendant ) <br> ) <br> ) | Case No.: _6506 06 |11_ <br><br> **DERIVATIVE AND DIRECT** <br> **COMPLAINT :** <br><br><br> NEW YORK <br> COUNTY CLERK'S OFFICE <br><br> MAR - 8 2011 <br><br> NOT COMPARED <br> WITH COPY FILE |

## COMPLAINT

Plaintiffs Brian David Goe, Michael Hartleib,. and John (JACK) Sorge (herein after referred to as Plaintiffs) Pro Per, submit this Complaint against the defendants named herein.

## I. SUMMARY OF THE ACTION

1.    This is a shareholder action brought by multiple plaintiffs, directly and derivatively, on behalf of Sirius XM Satellite Radio, Inc. ("Sirius XM") against Sirius XM's directors and officers, for their negligence, fraud, breach of fiduciary duties, and self dealing. The mismanagement of Sirius XM has manifested itself in numerous ways. In 2008, the misconduct of the management resulted in the second largest fine in the history of the Federal Communications Commission ("FCC"), in a consent decree that the FCC approved. In the same year, the Defendants completed the longest-delayed merger in history, only to learn at the

EXHIBIT 4
63

⌀002/021

"eleventh" hour that Sirius XM was assuming far more debt that had been previously disclosed. In order to obtain approval of the merger, Defendants made representations to the Department of Justice and to the FCC and entered into a consent decree with the FCC.  Since the time of the merger, the Defendants have engaged in antitrust misconduct, which has resulted in the actions in the United States District Court for the Southern District of New York, 1:09-cv-10035-HB-RLE.  The antitrust misconduct resulted at least in part from the Defendants violations of the representations made to the Department of Justice and the FCC and the consent decree with the FCC.  In addition, the Defendants have engaged in consumer fraud and misconduct to the extent that nearly every Attorney General in the country is now engaged in an investigation of Sirius XM.  This pattern of misconduct that threatens the on-going existence of Sirius XM has resulted from the fact that the Officers and Board of Directors has abdicated their responsibilities.  An example of this abdication is that Defendant Leon Black continues to serve on the Board despite the fact that he did not receive sufficient shareholder votes to serve on the Board and the fact that he refuses to attend meetings of the Board.

## II. PARTIES

2.     Plaintiff Brian David Goe is an individual and resident of New Jersey, and was an owner of Sirius and/or XM securities and is now a current owner of Sirius XM securities.

3.     Plaintiff Michael Hartleib is an individual and a resident of California, and was an owner of Sirius and/or XM securities and is now a current owner of Sirius XM securities.

4.     Plaintiff John Sorge is an individual and a resident of California, and was an owner of Sirius and/or XM securities and is now a current owner of Sirius XM Securities.

5.     All collectively referred to as Plaintiffs.

2

EXHIBIT 4
64

05/03/2011 TUE 16:57  FAX                                                                    ☒003/021

6.    Defendant Sirius XM is a Delaware corporation with its principal place of business at 1221 Avenue of the Americas, 36th Floor, New York, New York. Its successor entity resulting from the merger of Sirius and XM.

7.    Defendant Joan L. Amble ("Amble") is currently a member of the board of directors.

8.    Defendant Leon D. Black ("Black") is a currently a member of the board of directors.

9.    Defendant Lawrence F. Gilberti ("Gilberti") is currently a member of the board of directors.

10.    Defendant Eddy W. Hartenstein ("Hartenstein") is currently a member of    the board of directors.

11.    Defendant James P. Holden ("Holden") is currently a member of the board of directors.

12.    Defendant Chester A. Huber, Jr. ("Huber") is currently a member of the board of directors.

13.    Defendant Mel Karmazin ("Karmazin") is the Chief Executive Officer.

14.    Defendant John Mendel ("Mendel") is currently a member of the board of directors.

15.    Defendant James F. Mooney ("Mooney") is currently a member of the board of directors.

16.    Defendant Gary M. Parsons ("Parsons") is currently Chairmen of the board of directors.

17.    Defendant Jack Shaw ("Shaw") is currently a member of the board of directors.

3

EXHIBIT 4

18.     Defendant John C. Malone ("Malone") is currently a member of the board of directors.

19.     Defendant Gregory B. Maffei ("Maffei") is currently a member of the board of directors.

20.     Defendant David J.A. Flowers ("Flowers") is currently a member of the board of directors.

21.     All collectively referred to as Defendants.

### III. JURISDICTION AND VENUE

22.     This Court has jurisdiction over each defendant named herein because each defendant is either a corporation that conducts business in and maintains operations in this State, or is an individual who has sufficient minimum contacts with  so as to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

23.     Venue is proper in this Court because one of more of the defendants conducts business, a substantial portion of the transactions and wrongs complained of herein, including the defendants primary participation in the wrongful acts detailed herein, breaches of fiduciary duties, and defendants have received substantial compensation in this State by doing business here and engaging in numerous activities that had an effect in this State.

### IV. DEMANDS AND FUTILITY

24.   Shareholders have made numerous demands on the Board of Directors, and those demands have steadfastly been denied.  It would be futile to make any further demands on the Board.

25. The demands that have been made on the current and past Board members include the following:

4

EXHIBIT 4
66

    a.  Starting on November 5, 2008, and continuing as recently as September 22, 2010, plaintiff Michael Hartleib made demands that relate to much of the misconduct alleged in this Complaint.

    b.  To the extent that the Defendants have responded, they have refused to take any substantive action in response to the demands.

    c.  Plaintiff Hartleib has also made demands for books and records, which the Defendants have refused.

26.  It would be futile for any shareholder to make further demand before proceeding with this action.

## FACTS

27.  In addition to ignoring the demands recited above, Sirius XM has been grossly mismanaged by its Board and Officers. It has paid the second largest FCC fine in history. This fine exceeds the previous highest fine by more than two times. It is now under investigation by almost every Attorney General in the country based upon its abusive consumer practices.

28. The Board and Officers agreed to complete a multi-billion dollar merger without knowing the extent of the debt that it was taking on, and that debt has created huge on-going financial problems for the company. Leon Black continues to sit on the Board even though he received an inadequate number of share votes and refuses to attend Board meetings.

29. In their 2007 proxy report Risk Metrics the nation's largest independent shareholder advisory firm recommended a **"withhold"** vote on Leon Black due to attendance issues. In their 2008 proxy report Risk Metrics recommended a vote **"no"** on Leon Black. Despite repeated "Formal Demands" on the Board, the Nations largest independent shareholder advisory service (Risk Metrics) recommending a "no" vote, and Mr. Black not receiving the required votes, he

EXHIBIT 4
67

continues to serve on the Board. 1. This is another blatant breech of the Board of Directors fiduciary duties to protect, and represent the interest of their shareholders. This is an example of self-dealing at its worst. Clearly the Board is putting their interest ahead of that of their shareholders, and defying the vote of said shareholders.

*Sirius XM Business*

30. Sirius XM sells subscriptions to its satellite radio service as its main source of business revenues.

31. Satellite radio is a service in which audio programming is digitally transmitted by one or more place stations directly to fixed, mobile, and/or portable receivers. It was licensed by the Federal Communications Commission in 1997 and it became commercially available in 2001. The FCC held an auction to determine which companies would receive the two broadcasting licenses; there were four bidding companies. American Mobile Radio Corporation which was renamed XM Satellite Radio Holdings, Inc. (XM) and CD Radio, Inc. which was renamed Sirius Satellite Radio, Inc. (Sirius) won by bidding respectively $90 and $83 million.

32. Approximately two years after XM and Sirius won their broadcasting licenses they entered merger discussions. This was at a time that Dish and Direct TV tried to merge, but found that the regulatory agencies were not in favor of such Mergers. Sirius and XM called off the Merger negotiations at that time due to the unfavorable regulatory environment. XM's stock reached a high of $40 in December of 2004 and quickly dropped after subscriber growth fell short of their expected 4.8 million subscribers. Without enough subscribers, investors were concerned as to the ability of XM to repay their loans. Sirius was taking market share from XM.

|  | Votes Cast For | Votes Cast Against |
|---|---|---|
| 1. Leon D. Black | 408,528,344 | 458,481,167 |

6

EXHIBIT 4
68

and in fact when consumers were given a choice, consumers chose Sirius over XM seven out of ten times.

33. XM and Sirius began merger discussions again in 2006. The companies felt the merger would allow them to: (1) reduce costs through synergies, (2) better compete in the audio entertainment market, (3) provide superior programming, (4) advance technologically, and (5) increase value to shareholders. (6) provide consumers with more diverse programming at lower cost.

34. XM and Sirius officially merged on or about June 29, 2008 becoming Sirius XM Satellite Radio, Inc. Today the shares of the merged entity are trading at approximately $1.15 per share. Due to the malfeasance of the Sirius XM Board, and their failure to procure proper financing, shares of Sirius XM traded near bankruptcy at a mere $ .05 per share post merger. Sirius XM was driven to brink of bankruptcy, despite the Board having nearly 18 months to obtain proper financing. Prior to announcing the merger plans between Sirius and XM, shares of Sirius were trading at $5.65 per share after reaching a high of $9.49. XM shares were trading at $19.00 per share after reaching a high of $40.00.

35. The union of XM and Sirius was one of the longest merger delays in our nation's history. The merger was wrought with controversy beginning with Mel Karmazin initiating negotiations behind closed doors without the board of director's knowledge. Mr. Karmazin negotiated for nearly 18 months prior to notifying his Board of Directors of his unauthorized contact with XM executives. A review of the Proxy Statement filed by Sirius and XM with the Securities Exchange Commission ("SEC") on or about October 3, 2007 was silent as to whether Karmazin had the necessary pre-approval of the Sirius Board of Directors ("The Board") prior to

7

EXHIBIT 4
69

approaching XM. In fact it wasn't until months later that the negotiations were affirmatively disclosed. This was an egregious breach of fiduciary duty.

36.   Karmazin prevented The Board from being able to fulfill their fiduciary duties by considering other alternatives to the merger, or an independent audit of the true value of Sirius or XM; another egregious breach of their fiduciary duties. Without any other strategic alternatives or an independent audit, Sirius shareholders lacked the ability to make an informed vote on the merger. Sirius entered into a "no solicitation" clause which barred Sirius from soliciting transactions or giving suitors inside information. Sirius went further to prevent other alternative suitors when they agreed to a termination fee clause which would have caused Sirius to pay $175 million in the event Sirius determined the merger was not in the best interest of the company. Sirius would have to pay if the shareholders, the true owners of the company, voted against the deal; Although the termination fee would have been reduced to $58 million.

37.   After the Merger was complete, Sirius acquired approximately 1.25 Billion dollars of XM debt which needed to be refinanced to satisfy provisions demanding repayment when XM became a unit of Sirius XM. Karmazin publicly stated that he was unaware of $600 million dollars of XM's debt until very late in the Merger process.  In fact he stated he was unaware of this debt until the "eleventh hour". Karmazin and his Board were forced to issue 300 million shares of company stock to the financers of XM's debt for the sole purpose of being sold short on the open market, providing an arbitrage or hedge position on the bonds they issued.

38.   At the time this was done Sirius stock was on the NASDQ Regulation SHO list for failure to deliver, so there were no shares available to short on the open market. This action alone caused a sudden drop in share price costing the shareholders over one billion dollars in market cap in a period of approximately one week.  It is unclear how such an egregious error and

omission could occur, but it is clear that this was another breach of Karmazin and the Boards Duty of Diligence, Candor and Due care.

39.  Karmazin again publicly stated that he was forced to refinance XM's debt under **"ugly"** and **"toxic"** terms, which later resulted in Karmazin and the Board giving away preferred shares convertible to 40% of the outstanding common shares of Sirius XM. This was done without consideration. Mr. Malone became a super majority shareholder, controlling 40% of all vote able shares and six of eleven Board seats, for simply providing a loan.

40.  In obtaining approval for the merger, Sirius XM Board members and there predecessors had made numerous representations and commitments to the regulatory bodies, primarily the Department of Justice and the FCC.  Regulatory approval of the merger was dependent on those representations and commitments including the commitment not to increase charges to consumers for a minimum of three years.

41.  Prior to the completion of the merger, in July of 2008, Sirius XM entered into a consent decree with the FCC where, among other things, Sirius XM agreed to make a "voluntary contribution" known in common language as a fine, in the amount of $17,394,375, the second largest fine in FCC history. Officers and Directors of Sirius XM made other commitments in the consent decree that have not been met or satisfied.

42.  After wasting nearly 18 months, and with the company on the brink of bankruptcy, the Board had failed to procure the needed financing. With hundreds of millions of dollars in debt coming due, the Board began looking for investors. Charles Ergen of Dish was an interested investor. Mr. Ergen had been acquiring millions of dollars of XM debt. Published reports had Mr. Ergen making an offer of up to $1.50 per share. These reports also stated that, Mr. Karmazin and other Officers and Directors would be replaced. In fact Mr. Karmazin's (CEO) predecessor

9

EXHIBIT 4

05/03/2011 TUE 16:59 FAX                                                                    ☑010/021

Joseph Clayton was now an Officer at Dish. It was rumored that Mr. Clayton would replace Mr. Karmazin as CEO. The Board breeched their fiduciary duties by ignoring all other deals, including the Ergen deal, which would have been beneficial to their shareholders. It appears that this was done so that the Officers and Directors could control their employment destiny and unjustly enrich themselves in the process.

43. Mr. Karmazin has publicly stated the he and Mr. Malone have been friends for many years. On or about February 17, 2009, Liberty Media and Sirius XM entered into an Investment Agreement. Liberty Media provided a loan of $530 million dollars at what some would consider **"usurious"** interest rates of 15 percent. Mr. Malone was also paid an additional fee of $17,000,000 as a signing bonus. The most outrageous part of this financing agreement was that Mr. John Malone of Liberty Media was given 12,500,000 preferred shares convertible to a 40% ownership stake in Sirius XM. These shares had full voting rights and are convertible to 40% all outstanding common shares. Liberty Media was also granted six of twelve Board seats. These actions combined gave Mr. Malone of Liberty Media complete control of Sirius XM, creating a "super majority" shareholder rendering the "now minority" shareholders moot, without say, or control of their company. Karmazin and his Board of Directors gave Mr. Malone forty percent of Sirius XM without consideration, and complete control, creating a "super majority shareholder" with undue influence over the Board of Directors controlling 6 of 12 Board seats. Thereby, stealing billions of dollars from their shareholders, breaching the fiduciary duties owed them by putting their interest before that of their shareholders.

44. It should be noted that at the first Quarterly report and Conference Call after consummation of the Merger between Sirius and XM, the newly formed corporation wrote down 4.8 billion dollars in "Good Will" charges. This was nearly the entire value of the acquired

EXHIBIT 4

05/03/2011 TUE 17:00  FAX                                                      ☒011/021

company XM. Therefore, a mere five months after management completed the acquisition of XM, they wrote down nearly the entire value of said acquisition. This at .64 cents per share. This gave Mr. Malone over six billion dollars in non-operating losses to carry forward. In less than a year, after giving his "friend," Malone forty percent of Sirius XM without consideration, Mr. Karmazin was granted a contract extension by his Board (now controlled by Malone) and 128,000,000 options at .39 cents per share. Mr. Karmazin has gains of approximately *100 million dollars on these options.* This is self-dealing at its worst. All of this despite shareholders losing over 90% of their value, 40% of their company, six Board seats, a 40% dilution of their preemptive/shareholder rights, and lastly their vote.

45.  All of this was done without the rightful owners of Sirius XM the "shareholders" having a say or vote.  In fact, not only did the rightful owners not have a vote, they did not even have a seat at the table. Karmazin and his Board fired Ernst and Young their accounting firm to avoid a "Going Concern Notice", the lack of a "going Concern" was also a requirement of the Malone deal. 2

46.  Ernst and Young failed to exit with a "noisy exit" as required by law. Management then hired KPMG as their accounting firm, presents a financial scenario that includes the Malone deal, which was predicated on the absence of a "Going Concern Notice" and is granted a clean bill of financial health by KPMG.  Mr. James Rhyu Sirius XM's Senior Vice President and Chief

---

2 February 8k 2009 The closing and funding of the XM Credit Agreement is subject to several conditions, including: (i) XM's existing credit agreements being amended to extend the maturity of the loans to a date and on terms reasonably satisfactory to Liberty Media Corporation, (ii) Liberty Media Corporation purchasing assignments of loans outstanding under such existing credit facilities in an aggregate principal amount of up to $100 million, (iii) delivery of a report from our auditors in respect of fiscal year 2008 without any "going concern" or like qualification (or receipt of a waiver from certain lenders), and (iv) issuance of the preferred stock under the Investment Agreement.

EXHIBIT 4

Accounting Officer made an announcement on December 19, 2008 that he would be resigning his newly appointed position in January 2009. On information and belief, Mr. Rhyu did not want to be a party to accounting fraud; therefore, he left the company.  A mere five weeks after receiving a "clean bill of financial health," no going concern from their newly hired auditor, (KPMG) Sirius XM seeks shelter under an exemption to NASDQ Rule 4350i which  basically invokes a "Going Concern Notice."  According to the audit and report from KPMG Sirius XM was not a going concern, and in good financial health.  Five weeks later they claim a going concern and tell the NASD that they are not financially sound and they could not stay in business long enough to give their shareholders a vote on the Malone deal.  NASDQ Rule 4350i allows a company to avoid seeking shareholder approval for the issuance of securities that are convertible into 20% or more of the outstanding shares of a NASD listed company.

47.  When a company request the exemption to rule 4350i they are required by the NASD and their listing Rules and Regulations to provide written notice to all shareholders within ten days before the issuance of additional securities.   This notice is to inform and alert the shareholders that they are about to lose twenty percent or more of their company without their vote of approval. Shareholder approval would otherwise be required.  Additionally, the letter must also state that the company's audit committee or comparable body of the board of directors has expressly approved the exemption.  On information and belief, Plaintiff Michael Hartleib was the only shareholder that received this required notice.  As such, Mr. Karmazin and his Board of Directors willfully, and intentionally violated the very NASDQ Rule they used to give away forty percent of Sirius XM without consideration, as well as complete control with up to six board seats.

EXHIBIT 4

48. Despite the stock's abysmal performance and company's dire financial condition, the executives of Sirius XM unbelievably granted themselves hundreds of millions of options as they still believed they deserved a bonus. This is after the shareholders lost more than 95% percent of their value under this management's team so-called leadership.

49. Plaintiff Hartleib submitted a shareholder resolution that would have given shareholders a say on Executive compensation. The Board recommended a no vote on this resolution, even though the largest independent shareholder advisory firm in America, Risk Metrics, recommended a vote in favor of that resolution.

50. Because Malone controlled 40% of the vote and three current Board seats, this resolution was voted down. The minority shareholders have lost all say and/or control over their company.

51. Risk Metrics, the Nation's largest shareholder advisory service company, along with other shareholders were against additional compensation. In fact Sirius XM stock has continuously traded well below the premerger share price. Sirius XM shares are down approximately 75% from pre merger levels. Because of these actions the shareholders and the company, Sirius XM, have suffered damages.

52. After the merger, Sirius XM engaged in practices that violated the commitments it made in obtaining regulatory approval of the merger and in conduct that violates the antitrust laws and the consumer protection laws of practically every state in the country. As a result of the antitrust misconduct, Sirius XM faces expensive and potentially devastating antitrust litigation pending in the Southern District of New York.

53. As a result of the violations of the consumer protection laws, Sirius XM is now under investigation by nearly every Attorney General in the Country. The Attorneys General are

13

EXHIBIT 4

investigating Sirius XM's policies on billing, customer solicitation, violating no call list, and subscription cancellations and renewals.

54. The misconduct that has resulted in the litigation and investigation not only costs Sirius XM millions of dollars in legal expenses but also has created a serious danger to the survival of Sirius XM.

55. Despite demands to the contrary, Defendants have ignored their obligations to shareholders in other ways. For example, they have allowed defendant Leon Black to continue to serve on the Board of Directors despite the fact that he did not receive adequate shareholder votes and despite the fact that he has so ignored his duties that he has regularly refused to attend meetings of the Board.

## V. CAUSES OF ACTION

### COUNT ONE: NEGLIGENCE

56. Plaintiffs incorporate by reference all prior paragraphs as if fully set forth herein.

57. Defendants owed a legal duty to the plaintiffs to use ordinary care in managing the corporation's affairs. Because of their positions as directors, officers, and/or fiduciaries of the Company and because of their ability to control the business, corporate and financial affairs of the Company, each defendant owed the Company and its shareholders a duty to use ordinary care and diligence in the management and administration of the affairs of the Company.

58. Defendants breached their duty by merging with XM and not being fully aware of XM's total debt. As well as, for not having proper financing in place even thou they had nearly eighteen months to do so. Karmazin publicly admitted that he was not aware of 600 million dollars of XM's debt until it was too late. Either XM concealed this information, or Karmazin and his Board failed to carefully examine XM and its financial condition before the merger-

14

EXHIBIT 4
76

which took over a year and a half to complete. Also, they failed to have an independent audit which could have prevented this. Defendants had a duty to their shareholders to investigate all the details of the company it was merging with prior to consummation of the Merger.

59. Defendants' breach of duty proximately caused injury to the plaintiffs, which resulted in a dilution of Plaintiffs shares by 40% thereby diluting their voting power by 40%. Also, costing Plaintiffs' six of twelve Board seats, and a first rights offering. These actions have now made the minority shareholders vote moot or "meaningless".

### COUNT TWO: FRAUD

60. Plaintiffs incorporate by reference all prior paragraphs as if fully set forth herein.

61. Defendants knew or had reason to know that by Ernst and Young not issuing a going concern notice that they were representing to plaintiffs, that Sirius XM was a financially viable company that had sufficient capitol and was able to pay its debts. Because of the defendants positions in the company they had the most knowledge regarding the true financial status of the company. As such, they are responsible for disseminating true and correct information to the public and their shareholders.

62. Defendants' misrepresentations were material, because they affected the stock price of the company, the ownership interest of the plaintiffs, the voting rights of the Plaintiffs and the public's perception of its stability. These misrepresentations and breaches of fiduciary duties, combined, affected the stock price, ownership interest and voting power of the shareholders including the plaintiffs.

63. Defendants' actions were false because shortly after not being issued a going concern notice defendants relied on an exemption to NASDQ Rule 4350i to avoid a mandatory vote for

05/03/2011 TUE 17:02 FAX                                                              ☑016/021

shareholder approval on the investment agreement with Liberty Media. The exemption request basically invoked a going concern.

64. Defendants willfully made false representation. No going concern notice issued, means a company is financially sound. This is in extreme conflict with reliance on an exemption to rule 4350i that allows for a company to avoid shareholder approval because a company is in such financial despair it would not be possible to wait long enough for their shareholders to vote.

65. Defendants had reason to expect plaintiffs would act in reliance on the false representations as would the general public.

66. Plaintiffs relied on defendants false representations.

67. Defendants false representations directly and proximately caused injury to plaintiffs, which resulted in a dilution of shares by 40%, and their preemptive/ shareholder rights.

## COUNT THREE: BREACH OF FIDUCIARY DUTY

68. Plaintiffs incorporate by reference all prior paragraphs as if fully set forth herein.

69. Defendants had a fiduciary responsibility and relationship with plaintiffs. By reason of their positions as directors, officers, and/or fiduciaries of the Company and because of their ability to control the business, corporate and financial affairs of the Company, the defendants owed the Company and its shareholders the duty to exercise due care, diligence and candor in the management and administration of the affairs of the Company, and in the use and preservation of its property and assets; the duty of loyalty, to put the interests of the Company above their own financial interests; and the duty of candor, including full and candid disclosure of all material facts related thereto. The conduct of the defendants complained of herein involves knowing violations of their duties as directors of the Company, and the absence of good faith on their part,

EXHIBIT 4

05/03/2011 TUE 17:02 FAX                                                                    ☒017/021

which defendants were aware or should have been aware, posed a risk of serious injury to the company and its shareholders.

70. The defendants breached their duties in the following ways:

    a. Failing to properly disclose any and all material information a reasonable shareholder would deem important and need to make a fully informed vote on the Malone deal;

    b. By entering into the "Malone" deal without considering other viable options; such as but not limited to, the Ergen deal. This prevented alternative investors from providing financing that would not have required the 40% dilution of shares and shareholder rights. Also, this prevented a buyout of Sirius XM which may have been at more favorable terms to their shareholders.

    c. By not obtaining the needed financing for the approximately two billion dollars in XM debt which needed to be refinanced. Six hundred million dollars of which, CEO Mel Karmazin publicly stated he was not aware of. Thereby, forcing an Investment Agreement with John Malone of Liberty Media on February 17, 2009 which resulted in the giving away of 12,500,000 Sirius XM preferred shares with full voting rights convertible to 40% of the common stock. These shares were issued at a time the stock was trading at very low levels and below fair value. These shares were granted without consideration to existing shareholders, which also lost; six of twelve Board seats, a first rights offering, and complete control of Sirius XM to Mr. John Malone and Liberty Media,

    d. By not providing written notice to all shareholders after invoking the exemption to NASDQ Rule 4350(i) as required by the NASD Rules and Regulations; By not

17

EXHIBIT 4

considering other viable options from of investors, such as Charles Ergen which would have been more favorable to shareholders. Instead putting their interest and employment concerns ahead of that of their shareholders.

  e.  By allowing Leon Black to remain on the Board despite repeated demands that he be removed, and failure to obtain the necessary votes.

71.  Defendant's actions injured plaintiffs by causing a dilution in shares, loss of voting rights, loss of board seats and a first rights offering to Malone; none of which the shareholders had a vote or say in.

## COUNT FOUR: SELF-DEALING

72.  Plaintiffs incorporate by reference all prior paragraphs as if fully set forth herein.

73.  By reason of their positions with Sirius XM, the Individual Defendants are in possession of non-public information concerning the financial condition and prospects of Sirius XM, and especially, the true value and expected increased future value of Sirius XM and its assets, which they failed to disclose to the plaintiffs.

74.  The investment agreement with Liberty Media was wrongful, unfair, and harmful to plaintiffs. The terms of the agreement did not adequately value the company, or the 12,500,000 preferred shares granted Malone. As such, the agreement only benefited the defendants and was to the detriment of the plaintiffs. The defendants denied plaintiffs their right to a vote as shareholders. This caused a dilution in voting rights, replacement of up to six of twelve board members, a first rights offering, and dilution of their shares of Sirius XM.

## COUNT FIVE: BREACH OF FIDUCIARY DUTY

*ON BEHALF OF THE COMPANY*

18

EXHIBIT 4
80

05/03/2011 TUE 17:03 FAX                                                                              Ø019/021

75. Plaintiffs incorporate by reference all prior paragraphs as if fully set forth herein.

76. The defendants have violated fiduciary duties of care, loyalty, candor, and independence owed by law to the shareholders of Sirius XM. The defendants have acted in a way that put their personal interests ahead of the interests of their shareholders.

77. The defendants breached their duties in the following ways:

    a. Failing to properly disclose all material information a reasonable shareholder would deem important as to other alternatives to the Malone deal.

    b. By enacting a poison pill provision that only benefits Malone and would prevent any other suitors of Sirius XM from making an unsolicited bid for the Company at a higher price. This ensures that Malone and only Malone can Tender for the remaining shares he does not already own. Malone was granted a rights offer after completion of his financing;

    c. By allowing Malone to vote his shares on the poison pill provision, as there was a huge conflict of interest;

    d. By inheriting approximately 2 billion in XM debt, 600 million of which CEO Mel Karmazin publicly stated he did not know about;

    e. By entering into an Investment Agreement with Liberty Media on February 17,2009 which resulted in the giving away of 12,500,000 preferred shares of Sirius XM stock with full voting rights, convertible to 40% of Sirius XM common stock; and six of twelve Board seats; and

    f. By not providing written notice to all shareholders within 10 days after invoking the exemption to NASDQ Rule 4350(i). as required by the NASD Rules and Regulations

EXHIBIT 4

05/03/2011 TUE 17:04  FAX                                                    ☑020/021

78. The foregoing acts, practices, and course of conduct performed by the defendants caused the defendants to fail to exercise care, diligence, and candor in the exercise of their fiduciary obligations towards the plaintiffs.

## COUNT FIVE: SELF-DEALING

### *ON BEHALF OF THE COMPANY*

79. Plaintiffs incorporate by reference all prior paragraphs as if fully set forth herein.

80. By reason of their positions with Sirius XM, the Individual Defendants are in possession of non-public information concerning the financial condition and prospects of Sirius XM, and especially the true value and expected increased future value of Sirius XM and its assets, which they have not disclosed to the plaintiffs. The defendants have acted in ways that put their personal interests ahead of the interests of the shareholders.

81. The investment agreement with Liberty Media was wrongful, unfair, and harmful to plaintiffs. The terms of the agreement did not adequately value the company or the 12,500,000 preferred shares. As such, the agreement only benefited the defendants and was to the detriment of the plaintiffs. The defendants denied plaintiffs their right to vote as shareholders.

82. This caused a dilution in voting/preemptive rights, replacement of board members, a drop in stock price, the granting of a first rights offering, and a dilution of existing shares.

### VI. PRAYER

WHEREFORE, plaintiffs pray for relief and judgment as follows:

A.      Determining this action is a proper derivative action, Plaintiffs are adequate representatives on the Company's behalf, and demand is excused;

B.      Determining the Defendants have breached or aided and abetted the breach of their fiduciary duties to Sirius XM;

EXHIBIT 4

Michael Hartleib

Jack (John) Sorge

EXHIBIT 4

# EXHIBIT 5

EXHIBIT 5
84

**From:** Michael Hartleib
**Sent:** Thursday, June 02, 2011 6:59 PM
**To:** Robert Weiser
**Subject:** My Sirius case

Rob, give me a call so that we can talk about your thoughts on my case, as well as the
settlement in the anti-trust suit. I did make multiple demands on the board.

Michael 949-283-2441


-----Original Message-----
From: Robert Weiser [mailto:RW@Weiserlawfirm.com]
Sent: Wednesday, June 01, 2011 1:59 PM
To: Michael Hartleib
Subject: Delivered: Email check

Your message was delivered to the recipient.

1

EXHIBIT 5

**From:** Michael Hartleib
**Sent:** Tuesday, June 21, 2011 3:03 AM
**To:** Robert Weiser
**Subject:** RE: Delivered: RE: Delivered: My Sirius case

Rob that works. Old merger case withdrawn, converted to an individual claim and then dismissed. This was after they offered me 700k to go away. The case I sent you is pending. Yes they were proper. Here is one of the older demands made.

EXHIBIT 5

Rob

-----Original Message-----
From: Michael Hartleib [mailto:michaelhartleib@cox.net]
Sent: Monday, June 20, 2011 4:48 PM
To: Robert Weiser
Subject: RE: Delivered: RE: Delivered: My Sirius case

Rob, when are you available?

EXHIBIT 5

# EXHIBIT 6

EXHIBIT 6
88

**From:** Robert Weiser
**Sent:** Wednesday, August 31, 2011 7:22 PM
**To:** Michael Hartlieb
**Cc:** 'David Sacks'
**Subject:** Re: fax-sirius order

I can't tonight, I have a dinner meeting

Sent from my Verizon Wireless BlackBerry

---

**From:** Michael Hartlieb <michaelhartleib@cox.net>
**Date:** Wed, 31 Aug 2011 18:38:10 -0400
**To:** Robert Weiser<RW@Weiserlawfirm.com>
**Cc:** 'David Sacks'<david@synergyent.net>
**Subject:** FW: fax-sirius order

Rob, we need to talk about you coming in on my Sirius state case. This Federal case was taken from my case which was filed first. Khan Swick will work with us as I am providing all of the research . Call me ASAP

Congratulations, Messrs. Shenk and Hartlieb. Judge Rakoff has upheld your complaint in <u>all</u> important respects.

I am tied up this morning but can give you a call this afternoon, to discuss next steps.

1

EXHIBIT 6

# EXHIBIT 7

EXHIBIT 7
90

**From:** Michael Hartleib <michaelhartleib@cox.net>
**Date:** February 16, 2012 at 1:40:08 PM EST
**To:** Robert Weiser <rw@weiserlawfirm.com>
**Cc:** 'David Sacks' <david@synergyent.net>
**Subject: Litigation never sleeps**

Rob, are we going to do some business together or what? You never called us back after we tried six times to reach you. David and I need to make some money so that we can buy you a new phone!

1

EXHIBIT 7

# EXHIBIT 8

EXHIBIT 8
92

**From:** Michael Hartleib
**Sent:** Tuesday, May 24, 2016 2:55 AM
**To:** Robert Weiser
**Cc:** 'David Sacks'
**Subject:** I am flying in Wednesday evening so I can be rested

Rob, you are going to lose either with the honorable Vano or on appeal! You must not of thought that anyone would read these proposed "reforms", or that anyone would take a hard look at the standing issue. You really should have been more diligent.

# EXHIBIT 9

EXHIBIT 9
94

## Robert Weiser

| | |
|---|---|
| **From:** | Michael Hartleib <michaelhartleib@cox.net> |
| **Sent:** | Tuesday, May 31, 2016 5:57 PM |
| **To:** | Robert Weiser |
| **Cc:** | David Sacks |
| **Subject:** | Re call regarding current and forthcoming case |

Rob, let me know when you are available to discuss the current case and any forthcoming derivative on the tax issues. I would like to see the old board held accountable.

1

EXHIBIT 9

95

# EXHIBIT 10

EXHIBIT 10
96

-----Original Message-----
From: Michael Hartleib <michaelhartleib@cox.net>
Sent: Tuesday, June 28, 2016 1:32 PM
To: Robert Weiser <rweiser@weiserlawfirm.com>
Cc: David Sacks <david@synergyent.net>; Scott.Musoff@skadden.com
Subject: Please provide Pdf of response in support of fees

Robert, please provide me with the documents in support of your fees filed yesterday. As I have said before I do not need conformed copies pdf copies of what was submitted will be fine. I will notify the clerk if I don't get them today. Also your delay will provide me yet another reason to appeal is the Honorable Vano approves the settlement.
Thank you,
Michael
Sent from my iPhone

1

EXHIBIT 10

# EXHIBIT 11

EXHIBIT 11
98



**THE**
**WEISER**
**LAW FIRM**
WWW.WEISERLAWFIRM.COM

<u>PENNSYLVANIA</u>
22 CASSATT AVE.
BERWYN, PA 19312
TELEPHONE: (610) 225-2677
FACSIMILE: (610) 408-8062

<u>CALIFORNIA</u>
12707 HIGH BLUFF DRIVE, SUITE 200
SAN DIEGO, CA 92130
TELEPHONE: (858) 794-1441
FACSIMILE: (858) 794-1450

The Honorable James F. Vano
Johnson County Courthouse
100 N. Kansas Ave
Olathe, KS 66061-3273

     **Re:**   *Ross-Williams v. Bennett et al.*, Case No. 11-cv-01688

Dear Judge Vano –

     We write to provide promptly important information that the Weiser Law Firm, P.C. (the "Firm") has just learned with respect to a person whose time records were submitted to the Court together with a declaration in connection with the above-referenced shareholder derivative action (the "Action").

     As of February 2, 2017, the Firm learned that a person who had held himself out to us as Alexander J. Silow ("Silow"), was in actuality named Jeffrey M. Silow, and more importantly, that Mr. Silow is not a licensed Pennsylvania attorney in good standing, having been disbarred in Pennsylvania in 1987.[1] Mr. Silow regularly represented to the Firm (as he represented to this Court in the Action) that he was a duly licensed, active attorney. The Firm suspects that Mr. Silow may have misrepresented himself to numerous other law firms (including some of the largest law firms in this country) for many years, both before and after Mr. Silow began working with the Firm during the past decade. Mr. Silow has immediately been released from any ongoing projects with the Firm and we are contacting any and all Courts where Mr. Silow's time records were previously submitted by the Firm.

     Mr. Silow began working with the Firm after a very well-respected attorney recruiting agency in Philadelphia, Abelson Legal Search ("Abelson"), recommended him to us. Abelson represented to us at that time that Mr. Silow had worked on "four projects" through their service, and that Mr. Silow was "an excellent candidate…very experienced in document review projects of all types [who] works very hard and long hours." *See* attached email and resume. The Firm was informed both by Abelson and by Mr. Silow that Mr. Silow was a licensed attorney in good standing.

---

[1] Although not yet confirmed, it appears as though Mr. Silow has also been suspended from the practice of law by the District of Columbia.

EXHIBIT 11
99

On February 2, 2017, after being contacted by a third party not directly involved in the Action, the Firm learned that no "Alexander J. Silow" could be found on the Pennsylvania Disciplinary Board website. Mr. Silow was then immediately contacted via e-mail by us to present his Pennsylvania bar identification number. Within minutes, Mr. Silow provided us with a Pennsylvania attorney identification number, which we then quickly determined corresponded with an "Alexander L. Silow" practicing in Pennsylvania. In a subsequent telephone conversation that morning, Mr. Silow reiterated that he was and is a licensed attorney in Pennsylvania and the District of Columbia in good standing. Minutes after this initial phone call ended, however, Mr. Silow telephoned the Firm and during a second telephone conversation, confessed that he had been disbarred in Pennsylvania "since 1990".[2] Moreover, although he did not state this to us, the Firm has now confirmed that Mr. Silow's legal name is not "Alexander J. Silow," but rather is "Jeffrey Mark Silow."

The Firm is in contact with both ethics and legal counsel, and has already contacted the Pennsylvania Disciplinary Board and other authorities.

With respect to this Action, we believed that Mr. Silow performed the work the reported time records indicate (as supported by the Firm's additional filings with this Court showing records from the electronic document review database).[3] Nonetheless, the Firm is aware that Mr. Silow has been held out as an active attorney, and that Mr. Silow's declaration, signed under penalty of perjury, states, *inter alia,* that he is a licensed attorney in good standing that had never been the subject of any disciplinary action. His declaration is therefore false in material respects. According, the Firm will not be participating in any recovery that may result from the pending Cross-Appeal.

I am available at the Court's convenience either via telephone or in-person.

Sincerely,

Robert B. Weiser

---

[2]  As noted above, according to the Disciplinary Board of Pennsylvania, Mr. Silow was actually disbarred on December 23, 1987.

[3]  We believe this to be true because the documents reviewed in the Action were hosted by on the Relativity platform. It would not be possible for anyone outside of Relativity to manipulate the data points associated with this review.

EXHIBIT 11

**Brett Stecker**

| | |
|---|---|
| **From:** | Jessica Abelson <jabelson@abelsonlegalsearch.com> |
| **Sent:** | Friday, June 27, 2008 2:12 PM |
| **To:** | Brett D. Stecker |
| **Cc:** | Robert Weiser |
| **Subject:** | New Candidate Resumes - Document Review Project |
| **Attachments:** | JBorock Resume Logo 6-2008.doc; SJones Resume logo 6-2008.doc; JSilow Resume logo 6-2008.doc |

Dear Brett & Robb,

Under strict confidence please find the resumes for **Jacqueline Borock, Esq., Sharon L. Jones, Esq., and Jeffrey Silow, Esq.** for your review and consideration. All are excellent candidates and would like to be considered for your document review project. A little more information on the candidates are as follows:

**Jacqueline Borock, Esq.** — Although she lives in Kingston NY she has close ties to Philadelphia. She is able to come in to Philadelphia to get training and meet with you with out a problem. She is very eager to meet with you to discuss the project in more detail.

**Sharon L. Jones, Esq.** — Very pleasant, professional and articulate on the phone. She is local and can absolutely commit to the project.

**Jeffrey Silow, Esq.** — We have worked with Jeff on at least four other projects. He is VERY experienced in document review projects of all types and works very hard and long hours.

Please let me know your thoughts regarding these candidates.

Best regards,
Jessica

---

 Abelson Legal Search

**Attorneys, Paralegals & Legal Professionals**

**Jessica Abelson**
Legal Recruiter
1600 Market Street, Suite 505
Philadelphia, Pa. 19103
jabelson@abelsonlegalsearch.com
(215) 561-3010
www.abelsonlegalsearch.com

1

EXHIBIT 11

 Abelson Legal Search

**Attorneys, Paralegals & Legal Professionals**

Jeffrey Silow, Esq.
Cell phone: (215)341-1561
Email: triman1@gmail.com

**Contract Projects:** Electronic and hard copy reviews and trial preparation in finance, patent, antitrust and securities litigation, governmental investigations and acquisition/divestiture matters; supervision and quality control of other reviewers; privilege log; second request reviews; deposition digesting; and travel to perform duties.

Selected Project Examples (2000 - 2008):
McCarter & English, Newark, NJ
Reviewed documents for responsiveness, confidentiality and privilege in pharmaceutical class action litigation matter.
Milberg Weiss Bershad Hynes & Lerach LLP, New York, NY
Electronic and hard copy document reviews for issue responsiveness in class action matters.
Skadden Arps Slate Meagher & Flom, New York, NY
Electronic document reviews in antitrust matter. Authored privilege log. Prepared witness binders. Deposition digesting. 2nd request. Supervision and quality control of reviewers. Traveled to review documents.
Hogan & Hartson, Washington, DC
Electronic document reviews and authored privilege logs in securities fraud, financial, FCPA and Hart-Scott-Rodino litigation matters.
Steptoe & Johnson, Washington, D.C.
Performed substantive document reviews, including privilege logs, in response to Justice Department CID and Grand Jury and U.S. Senate subpoenas.
White & Case, Washington, D.C.
Electronic document reviews in antitrust case. Prepared witness binders and deposition digesting. Supervised creation of privilege log.
Crowell & Moring, Washington D.C.
Document review in antitrust acquisition matter. 2nd request. Traveled to perform duties.
McKesson Corporation, Philadelphia, PA/San Francisco, CA
Subpoena response in class action/patent matter where client was not a party. Supervision and quality control of reviewers. Traveled to review documents.

Other Employment:
National Association of Securities Dealers, Inc., Washington, DC
Office of General Counsel; Federal litigation, arbitrations and Board of Governors presentations as well as advice to members.
Pennsylvania Securities Commission, Harrisburg, PA
Office of General Counsel, Senior Attorney; Investigation, financial analysis and prosecution of securities regulatory filings and matters.
Tax Debt Negotiators, Inc., Los Angeles, CA
Responsible for in-house matters including tax matters, litigation, reviewing and drafting leases, contracts and regulatory filings.

**Computer Training:** Concordance, Lextranet, Summation, Ringtail, Applied Discovery, DocHunter, Microsoft Word, Microsoft Office, Microsoft Outlook, Lotus Notes
**Languages:** English, working knowledge of Spanish, French, German

**Education:**
JD, University of Miami School of Law 1974
BS (Mathematics), La Salle University 1971

**Bar Admissions:** District of Columbia

Submitted in confidence by Abelson Legal Search          www.abelsonlegalsearch.com

(215) 561-3010

EXHIBIT 11
102



THE
WEISER
LAW FIRM
WWW.WEISERLAWFIRM.COM

PENNSYLVANIA
22 CASSATT AVE.
BERWYN, PA 19312
TELEPHONE: (610) 225-2677
FACSIMILE:  (610) 408-8062

CALIFORNIA
12707 HIGH BLUFF DRIVE, SUITE 200
SAN DIEGO, CA 92130
TELEPHONE: (858) 794-1441
FACSIMILE: (858) 794-1450

February 6, 2017

Douglas T. Shima
Clerk of the Appellate Court
Kansas Court of Appeals
Appellate Clerk's Office
301 SW 10th Ave.
Topeka, KS 66612-1507

Re:    _Ross-Williams v. Bennett et al._, **Appellate Case No. 17-117139-A**

Dear Mr. Shima:

We write to bring to the Court's attention an inaccuracy in the record in the above referenced action (the "Action"), which is currently pending before the Court.    Counsel for Cross-Appellant Monica Ross-Williams, The Weiser Law Firm, P.C. (the "Firm"), recently learned that a declaration submitted to the District Court of Johnson County (the "District Court") below, by a former affiliate of the Firm, is inaccurate in material respects.    The Firm believes it is its obligation to inform the Court before briefing in this matter begins.

A central question on appeal in the Action is whether the District Court properly evaluated Plaintiff's counsel's request for fees and expenses in association with the material benefits provided to the corporation in this Action.  In connection with this request, District Court Judge James Vano ("Judge Vano") requested that the Firm submit attorney billing records for _in camera_ review. _See_ Transcript of May 26, 2016 Hearing.  The Firm submitted time on behalf of a former affiliate of the Firm who worked on an extensive, three-year document review project. _See_ Plaintiff's Supplemental Brief in Further Support of Award of Attorneys' Fees and Reimbursement of Expenses. This submission would later include a declaration, sworn under the penalty of perjury, from the document reviewer stating that he was a member in good standing of the Pennsylvania and District of Columbia bar associations and had never been accused of an ethical violation or the subject of any disciplinary action. _See_ Plaintiff's Second Motion to Alter or Amend the Court's November 22, 2016 Order.  The Firm has learned that this declaration was not true at the time it was submitted.

As of February 2, 2017, the Firm learned that a person who had held himself out to us as Alexander J. Silow ("Silow"), was in actuality named Jeffrey M. Silow, and more importantly, that Mr. Silow is not a licensed Pennsylvania attorney in good standing, having been disbarred in

EXHIBIT 11
103

Pennsylvania in 1987.[1]  Mr. Silow regularly represented to the Firm (as he represented to the District Court) that he was a duly licensed, active attorney.  The Firm suspects that Mr. Silow may have misrepresented himself to numerous other law firms (including some of the largest law firms in this country) for many years, both before and after Mr. Silow began working with the Firm during the past decade. *See* attached email and resume.  Mr. Silow has immediately been released from any ongoing projects with the Firm and we are contacting any and all courts where Mr. Silow's time records were previously submitted by the Firm.[2]

Mr. Silow began working with the Firm after a very well-respected attorney recruiting agency in Philadelphia, Abelson Legal Search ("Abelson"), recommended him to us.  Abelson represented to us at that time that Mr. Silow had worked on "four projects" through their service, and that Mr. Silow was "an excellent candidate…very experienced in document review projects of all types [who] works very hard and long hours." *See* attached email and resume.  The Firm was informed both by Abelson and by Mr. Silow that Mr. Silow was a licensed attorney in good standing.

On February 2, 2017, after being contacted by a third party not directly involved in the Action, the Firm learned that no "Alexander J. Silow" could be found on the Pennsylvania Disciplinary Board website.  Mr. Silow was then immediately contacted via e-mail by us to present his Pennsylvania bar identification number.  Within minutes, Mr. Silow provided us with a Pennsylvania attorney identification number, which we then quickly determined corresponded with an "Alexander L. Silow" practicing in Pennsylvania.  In a subsequent telephone conversation that morning, Mr. Silow reiterated that he was and is a licensed attorney in Pennsylvania and the District of Columbia in good standing.  Minutes after this initial phone call ended, however, Mr. Silow telephoned the Firm and during a second telephone conversation, confessed that he had been disbarred in Pennsylvania "since 1990."[3]  Moreover, although he did not state this to us, the Firm has now confirmed that Mr. Silow's legal name is not "Alexander J. Silow," but rather is "Jeffrey Mark Silow."

The Firm is in contact with both ethics and legal counsel, and has already contacted the Pennsylvania Disciplinary Board and other authorities.

With respect to this Action, the Firm continues to believe that the time records from Mr. Silow are accurate (as supported by the Firm's additional filings with the District Court showing records from the electronic document review database).  Nonetheless, the Firm is aware that the record before this Court is inaccurate and the Firm is actively attempting to correct the record

---

[1]  Although not yet confirmed, it appears as though Mr. Silow has also been suspended from the practice of law by the District of Columbia for non-payment of dues.

[2]  Mr. Silow's relationship with the Firm was limited to initial document review: at no time did Mr. Silow ever have any client contact, nor sign pleadings on behalf of the Firm, nor make any court appearances on behalf of the Firm.

[3]  As noted above, according to the Disciplinary Board of Pennsylvania, Mr. Silow was actually disbarred on December 23, 1987.

EXHIBIT 11
104

below.[4]  In the event the Firm is procedurally unable to do so, we felt it was our ethical obligation to ensure this matter was timely raised before the Court.

I am available at the Court's convenience either via telephone or in-person.

Sincerely,

Robert B. Weiser

---

[4] Similar correspondence has been sent to Judge Vano on February 3, 2017.

EXHIBIT 11

# EXHIBIT 12

EXHIBIT 12
106

**From:** Michael Hartleib <michaelhartleib@cox.net>
**Sent:** Monday, March 06, 2017 8:37 PM
**To:** Robert Weiser <rweiser@weiserlawfirm.com>
**Cc:** mark.mcgrory@eriseip.com; jay.kasner@skadden.com; scott.musoff@skadden.com; James M. Ficaro <jficaro@weiserlawfirm.com>; 'Tom Hershewe' <tom@dollar-law.com>; Brett Stecker <bdstecker@weiserlawfirm.com>; 'George C. Aguilar' <GAguilar@robbinsarroyo.com>; 'Boren, Jill, DCA' <Jill.Boren@jocogov.org>; 'Brian J. Robbins' <BRobbins@robbinsarroyo.com>; 'Alfred G. Yates jr.' <yateslaw@aol.com>; 'Jay N. Razzouk' <JRazzouk@robbinsarroyo.com>; 'Laura Jakubec' <lauraj@dollar-law.com>
**Subject:** Re: ROSS-WMS v. SPRINT - Appellate Case No. 17-117139-A

Rob, I am a little confused! Your opposition to the Motion to remand is in contradiction to your statements in the letter to Mr. Shima, Clerk of the Court of Appeals. Whereas you express your desire to correct the record and inaccuracies at the District Court and were actively attempting to do so! It seems your statements to the Appellate Court were disingenuous at best. Shocking! Also, equally confusing is your statement regarding Mr. Silow, that "you just found out on February 2, 2017 that Alexander Silow was not his real name, indeed it is Jeffrey". Although, in your attached email correspondence from Abelson in 2008 you hired him as Jeffery. Are you 100 % certain that you want to stick to that story? I promise you that it will not be wise!

I especially like the comment that you felt as though you had an ethical obligation to inform the Court, prior to briefing. Why, because you thought they might want to remand so that these issues can be addressed at the District Court? The Court in which the fraud was committed upon? Ethical obligation, what a Saint. The fact of the matter is that Ted Frank was holding a proverbial gun to your head, so you had no choice but to come clean, or to be clear, partially

1

EXHIBIT 12

clean prior Ted Frank informing the appropriate agencies. Your attempts, to obfuscate your chicanery in this case is galvanizing my convictions, strengthening my resolve to expose all of the corrupt parties in this case! This lawyer driven litigation must and will cease. Your temerity, to seek leave of the Appellate Court to reinstate fees, given what I have uncovered is frankly astonishing and provoking wrath. I will take this all the way to the Kansas Supreme Court if needed, as the integrity of the judicial system is at stake!


On Mar 6, 2017, at 1:59 PM, Laura Jakubec <lauraj@dollar-law.com> wrote:

    Counsel - please find a courtesy copy of the following which was e-filed today.  Thank you.



    Laura Jakubec, Legal Assistant
    lauraj@dollar-law.com


    <image001.png>

    1100 Main Street, Suite 2600
    Kansas City, MO 64105
    Phone: (816) 876-2600
    Fax: (816) 221-8763

This electronic message transmission and any files transmitted with it, are a communication from the law firm of Dollar Burns & Becker, L.C. This message contains information protected by the attorney/client privilege and is confidential or otherwise the exclusive property of the intended recipient or Dollar Burns & Becker, L.C. This information is solely for the use of the individual or entity that is the intended recipient. If you are not the designated recipient, or the person responsible for delivering the communication to its intended recipient, please be aware that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this electronic transmission in error, please notify by telephone (877-816-2600), or by electronic mail (lauraj@dollar-law.com) and promptly destroy the original transmission. Thank you for your assistance. NOTICE: The Missouri Bar and Missouri Supreme Court require all Missouri attorneys to notify e-mail recipients that e-mail is not a secure method of communication, that it may be copied and held by any computer through which it passes, and persons not participating in the communication may intercept the communication.  Should you wish to discontinue this method of communication, please advise, and no further e-mail communication will be sent.

    <Opposition to Motion to Stay Appeal and Remand Case to District Court (342096x9E2E5).pdf>

EXHIBIT 12

# EXHIBIT 13

EXHIBIT 13
109

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

| | |
|---|---|
| MONICA ROSS-WILLIAMS, derivatively, on behalf of SPRINT NEXTEL CORPORATION, | **Appellate Case No. 17-117139-A** |
| Appellees, | (District Court Case No. 11CV1688) |
| V. | |
| ROBERT R. BENNETT, ET AL., and SPRINT NEXTEL CORPORATION, a Kansas Corporation, | |
| Appellees, | |
| Objector, Michael Hartleib, | |
| Appellant. | |

**DECLARATION OF MONICA ROSS-WILLIAMS IN OPPOSITION TO APPELLANT MICHAEL HARTLIEB'S MOTION TO RECONSIDER AND VACATE THE PROTECTIVE ORDER**

I, Monica Ross-Williams, declare and state as follows:

1.    I, Monica Ross-Williams, am a party (appellee and cross-appellant) to the above-captioned appellate proceeding that is currently pending before this Court (the "Appeal"). At all times in connection with the Appeal, and the shareholder derivative litigation before the District Court for Johnson County, Kansas that is the subject of the instant Appeal, I have been and am represented by counsel.

2.    During the evening of March 6, 2017, I received an unsolicited telephone call from Appellant Michael Hartleib ("Hartleib"). I do not know how Hartleib obtained my phone

- 1 -

EXHIBIT 13
110

number, but I believe that he did so via an internet search.  I had never previously had any contact, engagement, or involvement with Hartleib.

3.    Upon answering the telephone when Hartleib called me on the evening of March 6, 2017, I did not realize at first who I was speaking to.  Hartleib proceeded to attempt to discuss matters related to the Appeal with me, in a highly confrontational manner.  Once I realized who Hartleib was and that he had somehow found my phone number and called me directly regarding the Appeal, I told Hartleib I did not wish to speak to him any further.  I asked Hartleib not to contact me again and to direct all future communications to my counsel.

4.    Hartleib, however, did not hang up the phone at that point.  Instead, he tried to continue the conversation by making references to certain matters about me that were wholly unrelated to the Appeal; specifically, my role as an elected official in Ypsilanti Township, Michigan, where I serve on the Township Board of Trustees.  I can only assume that Hartleib conducted an internet search and tried to learn as much as he could about me prior to calling me on March 6, 2017.

5.    In the first instance, I was taken aback and frightened once I realized that Hartleib had called me directly about the Appeal, and given the tenor of the call I suspected that he did so in an attempt to intimidate me.  But once Hartleib brought up matters about me that were completely unrelated to the Appeal, I became certain that his purpose for calling was to harass and threaten me.  I felt very uncomfortable and wanted to end the call with Hartleib as soon as possible, but I thought it best to try to end the conversation in a non-confrontational way.  To that end, I told Hartleib that if he wished to do so he could copy me on communications directed to my counsel, and I provided him with an email address which I seldom use.

- 2 -

EXHIBIT 13
111

6.    At that point, the call with Hartleib ended.  Immediately after I got off the phone with Hartleib on the evening of March 6, 2017, I contacted my counsel regarding the call from Hartleib.

7.    Although I had clearly instructed Hartleib that all future communications should be directed to my counsel and not to me, only a few hours later, at 3:16 a.m. central time on March 7, 2017, Hartleib sent an email directly to me regarding the Appeal.  I was very disturbed by the fact that he did so even though I had told him that all communications should be directed to my counsel.

8.    Later that same day, on March 7, 2017, my counsel sent Hartleib a letter at my request.  The letter from my counsel demanded that Hartleib cease any attempts to communicate with me.  Hartleib responded to my counsel in writing, however, by threatening that he "will neither cease nor desist."  Accordingly, at my request and with my authorization, my counsel filed a motion for a protective order on March 9, 2017.  That motion was granted, and the protective order was entered by this Court on March 30, 2017 (the "Protective Order").

9.    I was shocked to learn that Hartleib recently filed a motion to vacate the Protective Order.  I can only assume that Hartleib intends to try to contact me again and harass me further.  I was very frightened and disturbed by Hartleib's conduct in March 2017, and I was pleased and relieved when the Protective Order was granted.  If the Protective Order were to be vacated, I would fear that Hartleib would once again attempt to intimidate, harass, and threaten me.  I see no reason why Hartleib should be permitted to direct communications to me instead of my counsel.  I respectfully request that this Court deny Hartleib's motion and keep the Protective Order in place.

I declare under penalty of perjury that the above and foregoing is true and correct.

- 3 -

EXHIBIT 13

EXECUTED this ___ day of March, 2018.

Monica Ross-Williams

- 4 -

EXHIBIT 13
113

# EXHIBIT 14

EXHIBIT 14
114

**From:** michael hartleib
**Sent:** Tuesday, March 7, 2017 4:25 AM
**To:** kayla9170@yahoo.com
**Cc:** MSK@HFMLEGAL.COM; perry.brandt@bryancave.com; MARK.MCGRORY@ERISEIP.COM; DOCKETING@ERISEIP.COM; 'Chuck Schimmel' ; 'George C. Aguilar' ; 'Jay Razzouk' ; Brett Stecker ; 'Alfred G. Yates jr.' ; 'Robert Schubert' ; 'Willem F. Jonckheer' ; James M. Ficaro ; 'Dustin Schubert' ; 'Brian J. Robbins' ; 'Boren, Jill, DCA' ; 'Greg Wright' ; tom@dollar-law.com; Robert Weiser
**Subject:** Ms. William's Per our conversation here are some of the documents your Counsel failed to provide you

Dear Ms. Williams, it was a pleasure speaking with you this evening. I am sorry that your Counsel has not kept you apprised of the details of your case. I find it unconscionable that your attorneys failed to inform you of Judge Vano's rulings or that an Appeal was filed on your behalf. I do believe that you are a unwitting victim of their fraud committed against the Court. As we discussed they have submitted millions of dollars in fraudulent billing in your case. As I informed you that this was not just my opinion, the Judge in your case came to a similar conclusion. In fact, your attorneys have now admitted to at least 1.6 million dollars in fraudulent bills submitted to the Court. Mr. Weiser has confirmed this in two separate letters. *(See attached).* I am no expert, but when a Firm admits criminal acts in a case I believe they are obligated to notify you as the Plaintiff. Mr. Weiser and his Firm have already contacted their Bar associations and other Courts to self-report their criminal acts. I have contacted the district attorney's offices in Pennsylvania and Kansas and will be filing formal complaints. I am

1

EXHIBIT 14
115

sorry to be the person to inform you of this, as it was your attorneys responsibility to do so. I am seeking a full evidentiary hearing where your Counsel will be forced to testify under oath and you can address the Court. As you can see by the letters from Mr. Weiser they are in a lot of trouble, but claim they are victims of Mr. Silow. I will provide incontrovertible proof that Mr. Weiser et. al. is just as guilty as Mr. Silow. This is just the tip of the iceberg. Details of our call will be submitted to the Kansas Court of Appeals in a sworn declaration and provided to Judge Vano. As per your request I copied all of the attorneys in your case as well as Judge Vano's Clerk. Thank you for taking the time to speak with me this evening.

Michael



THE
**WEISER**
LAW FIRM
WWW.WEISERLAWFIRM.COM

<u>PENNSYLVANIA</u>
22 CASSATT AVE.
BERWYN, PA 19312
TELEPHONE: (610) 225-2677
FACSIMILE:  (610) 408-8062

<u>CALIFORNIA</u>
12707 HIGH BLUFF DRIVE, SUITE 200
SAN DIEGO, CA 92130
TELEPHONE: (858) 794-1441
FACSIMILE: (858) 794-1450

March 7, 2017

**VIA EMAIL**
Michael Hartlieb
27020 Alicia Parkway, Suite G
Laguna Niguel, CA 92677
Email: michaelhartlieb@cox.net

      Re:    ***Ross-Williams v. Bennett et al.*, Appellate Case No. 17-117139-A**

Dear Mr. Hartlieb:

    We want to caution you in the strongest of terms that your harassment of our client, Monica Ross-Williams, is highly improper.

    As you know, we are counsel for Ms. Ross-Williams in the above-referenced litigation. Ms. Ross-Williams has informed us that last night, you telephoned her directly, despite knowing that she was and is represented by counsel. This conduct violates Rule 4.2 of the Kansas Rules of Professional Conduct, as you were not and are not authorized to contact Ms. Ross-Williams by her counsel or any Court.[1]

    According to Ms. Ross-Williams, not only did you attempt to discuss the Sprint derivative litigation with her last night, you also referenced other matters pertaining to our client that are completely unrelated to the derivative litigation.  Ms. Ross-Williams was shocked and disturbed by your phone call, and she reported to us this morning that she felt harassed and threatened -- both with respect to your attempt to speak directly with her in itself, and with respect to the substance of the phone call.  Accordingly, Ms. Ross-Williams declined to speak with you, expressed to you that all future communications should be directed to her counsel, and instructed that you should not contact her directly again.

    Nonetheless, several hours later, at 3:16 a.m. central time on March 7, 2017, you committed another violation and completely disregarded our client's directive to communicate with her counsel, by sending Ms. Ross-Williams a lengthy email and related attachments.  Our

---

[1]    Pro se litigants are generally held to the same standards of procedure, evidence, and professional responsibility as attorneys.  *See Mangiaracina v. Gutierrez,* 11 Kan.App.2d 594, 595–96, 730 P.2d 1109 (1986).

EXHIBIT 14
117

client has reported to us that she also finds your email to be harassing and threatening, particularly in light of her express instruction to you only hours earlier that all communications should be directed to her counsel.

On behalf of Ms. Ross-Williams, we direct you to immediately cease and desist all attempts to communicate directly with Ms. Ross-Williams.  In addition, please be advised that with respect to those improper communications that have already taken place and any such future communications you may attempt, Ms. Ross-Williams expressly reserves all of her rights, including but not limited to her rights under Michigan, Kansas, California, and/or federal law.

Sincerely,

Robert B. Weiser

EXHIBIT 14
118

**From:** michael hartleib [mailto:michaelhartleib@cox.net]
**Sent:** Tuesday, March 7, 2017 7:21 PM
**Cc:** MSK@HFMLEGAL.COM; perry.brandt@bryancave.com; MARK.MCGRORY@ERISEIP.COM; DOCKETING@ERISEIP.COM; 'Chuck Schimmel' <chuck@wrightschimmel.com>; 'George C. Aguilar' <GAguilar@robbinsarroyo.com>; 'Jay Razzouk' <jrazzouk@robbinsarroyo.com>; Brett Stecker <bds@weiserlawfirm.com>; 'Alfred G. Yates jr.' <yateslaw@aol.com>; 'Robert Schubert' <rschubert@schubertlawfirm.com>; 'Willem F. Jonckheer' <wjonckheer@schubertlawfirm.com>; 'Dustin Schubert' <dschubert@schubertlawfirm.com>; 'Boren, Jill, DCA' <Jill.Boren@jocogov.org>; 'Greg Wright' <greg@wrightschimmel.com>; tom@dollar-law.com; Robert Weiser <rw@weiserlawfirm.com>; 'Brian J. Robbins' <BRobbins@robbinsarroyo.com>; James Ficaro <jmf@weiserlawfirm.com>
**Subject:** RE: Ross-Williams v. Bennett et al., Appellate Case No. 17-117139-A

Mr. Weiser, as I am preparing my sworn declaration regarding my communication with you "client", I do not have time to address all of the self-serving misrepresentations in your letter. The 15 minute consensual conversation with your "client" was very enlightening. She provided her email address and ask that I copy Counsel, so that I could forward the documents you failed to provide. For you to characterize this as harassment is another blatant attempt to distract and obfuscate your fraudulent acts  and bastardization of the judicial system. I caution you, that coercing your "client" to misstate facts regarding our call will only inflict additional damage to what little credibility you have left. You Sir, and your coconspirators are the ones that need to Cease and Desist. Your so-called "client" is representing my interest and her attorneys are corrupt, therefore I will neither Cease nor Desist. As far as your not so vailed threat that Ms. Williams "reserves all of her rights", if you are threatening legal action against me, feel free, I will be happy to waive service to expedite said action. I find the prospects of discovery quite compelling. Your threats do nothing but, strengthen my resolve and galvanize my convictions. Call it a personality defect! Instead of wasting my time, I would suggest you consult with an ethics attorney, that's right, you already have!

Michael

EXHIBIT 14
119

# EXHIBIT 15

EXHIBIT 15
120

**From:** Michael Hartleib
**Sent:** Saturday, April 07, 2018 12:33 AM
**To:** Robert Weiser
**Cc:** mark.mcgrory@eriseip.com; jay.kasner@skadden.com; scott.musoff@skadden.com; jennifer.berhorst@bryancave.com; sarah.holdmeyer@bryancave.com; James M. Ficaro ; Brett Stecker ; jenness.parker@skadden.com
**Subject:** RE: ROSS-WILLIAMS - Appellate Case No 17-117139-A

Rob, your ability to set the bar at new lows, never disappoints! Clearly, this is in retaliation to your being rightfully removed as co-lead counsel in the Equifax case. Your attempt to mislead the Appellate Court with incomplete records might be your standard operating procedure, but I believe it will cost you when I seek sanctions. Your personal attacks smack of desperation, they do nothing to dissuade me, in fact they galvanize my convictions and strengthen my resolve! Rob, you may want to contact your investigators, L. English Research Services Inc. to seek a partial refund. When they pulled the records on March 26th, they missed a DUI from the eighties and a fixit ticket. Your ill-advised actions, and ad-hominem attacks are making the Weiser Firm radioactive!

Have a wonderful weekend.

1

EXHIBIT 15
121

**From:** James Ficaro [mailto:jmf@weiserlawfirm.com]
**Sent:** Friday, April 6, 2018 11:29 AM
**To:** Michael Hartleib <mjhartleib@gmail.com>
**Subject:** FW: ROSS-WILLIAMS - Appellate Case No 17-117139-A

Mr. Hartleib, see attached filing.


**From:** Laura Jakubec <lauraj@dollar-law.com>
**Sent:** Friday, April 6, 2018 2:05 PM
**To:** mark.mcgrory@eriseip.com; jay.kasner@skadden.com; scott.musoff@skadden.com; jennifer.berhorst@bryancave.com; sarah.holdmeyer@bryancave.com; Marco H <mhartlieb@gmail.com>
**Cc:** Tom Hershewe <tom@dollar-law.com>; Robert Weiser <rw@weiserlawfirm.com>; Brett Stecker <bds@weiserlawfirm.com>; James Ficaro <jmf@weiserlawfirm.com>
**Subject:** Re: ROSS-WILLIAMS - Appellate Case No 17-117139-A

Counsel/Parties - attached is a courtesy copy of Opposition to Hartleib Motion to Reconsider and Vacate the Protective Order.



Laura Jakubec, Legal Assistant
lauraj@dollar-law.com



DOLLAR
BURNS &
BECKER
TRIAL ATTORNEYS

1100 Main Street, Suite 2600
Kansas City, MO 64105
Phone: (816) 876-2600
Fax: (816) 221-8763

This electronic message transmission and any files transmitted with it, are a communication from the law firm of Dollar Burns & Becker, L.C. This message contains information protected by the attorney/client privilege and is confidential or otherwise the exclusive property of the intended recipient or Dollar Burns & Becker, L.C. This information is solely for the use of the individual or entity that is the intended recipient. If you are not the designated recipient, or the person responsible for delivering the communication to its intended recipient, please be aware that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this electronic transmission in error, please notify by telephone (877-816-2600), or by electronic mail (lauraj@dollar-law.com) and promptly destroy the original transmission. Thank you for your assistance.NOTICE: The Missouri Bar and Missouri Supreme Court require all Missouri attorneys to notify e-mail recipients that e-mail is not a secure method of communication, that it may be copied and held by any computer through which it passes, and persons not participating in the communication may intercept the communication. Should you wish to discontinue this method of communication, please advise, and no further e-mail communication will be sent.

EXHIBIT 15

# EXHIBIT 16

EXHIBIT 16
123

**From:** Michael Hartleib
**Sent:** Wednesday, April 12, 2017 10:43 AM
**To:** Laura Jakubec
**Cc:** mark.mcgrory@eriseip.com; jay.kasner@skadden.com; scott.musoff@skadden.com; James M. Ficaro ; Brett Stecker ; George C. Aguilar ; Jay N. Razzouk ; Tom Hershewe ; Boren, Jill, Dca ; Robert Weiser ; Brian J. Robbins
**Subject:** Re: ROSS-WMS v. SPRINT - Appellate Case No. 17-117139-A

When your position is indefensible, attack your opponent with claptrap. What an embarrassment to the bar! See you in Court.

Sent from my iPhone

On Apr 12, 2017, at 6:22 AM, Laura Jakubec <lauraj@dollar-law.com> wrote:

> Counsel - please find a courtesy copy of the following which was e-filed today. Thank you.
>
>
>
> Laura Jakubec, Legal Assistant
> lauraj@dollar-law.com
>
>
>
> 1100 Main Street, Suite 2600
> Kansas City, MO 64105

1

EXHIBIT 16
124

Phone: (816) 876-2600
Fax: (816) 221-8763

This electronic message transmission and any files transmitted with it, are a communication from the law firm of Dollar Burns & Becker, L.C. This message contains information protected by the attorney/client privilege and is confidential or otherwise the exclusive property of the intended recipient or Dollar Burns & Becker, L.C. This information is solely for the use of the individual or entity that is the intended recipient. If you are not the designated recipient, or the person responsible for delivering the communication to its intended recipient, please be aware that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this electronic transmission in error, please notify by telephone (877-816-2600), or by electronic mail (lauraj@dollar-law.com) and promptly destroy the original transmission. Thank you for your assistance.NOTICE: The Missouri Bar and Missouri Supreme Court require all Missouri attorneys to notify e-mail recipients that e-mail is not a secure method of communication, that it may be copied and held by any computer through which it passes, and persons not participating in the communication may intercept the communication. Should you wish to discontinue this method of communication, please advise, and no further e-mail communication will be sent.

EXHIBIT 16
125

# EXHIBIT 17

EXHIBIT 17
126

**From:** Hines, Loretta M.
**Sent:** Wednesday, April 26, 2017 3:28 PM
**To:** Robert Weiser
**Subject:** Threatening Letter - rec'd 4/25/17

Mr. Weiser,

The attached letter was received in Chambers yesterday, 4/25/17. Five other Judges in Chester County received the same letter. Judge Sarcione thought you should be alerted since you are referenced in the letter. Please feel free to contact Chambers if you feel it necessary or have any questions or concerns.

*Loretta M. Hines, Judicial Assistant*

1

EXHIBIT 17

*to the Hon. Anthony A. Sarcione*
*Chester County Justice Center*
*201 W. Market Street, Suite 6213*
*PO Box 2746*
*West Chester, PA 19380-0989*
*Phone: 610.344.5900*
*FAX: 610.344.5596*

This County of Chester e-mail message, including any attachments, is intended for the sole use of the individual(s) and entity(ies) to whom it is addressed, and may contain information that is privileged, confidential and exempt from disclosure under applicable law. If you are not the intended addressee, nor authorized to receive for the intended addressee, you are hereby notified that you may not use, copy, disclose or distribute to anyone this e-mail message including any attachments, or any information contained in this e-mail message including any attachments. If you have received this e-mail message in error, please immediately notify the sender by reply e-mail and delete the message. Thank you very much.

EXHIBIT 17

A. Nonymous Esquire
105 East  Evans Street
Suite " C "
West Chester Pa  19380



Judge Anthony Scarcione
201 W. Market st. suite  4100
PO Box 2746, West Chester Pa
Zip>>>>   19380-0989

RECEIVED
APR 2 5 2017

1936282947  C007

EXHIBIT 17
129

Attorney e-Newsletter - March 2017

RECEIVED
APR 2 5 2017

**Subject:** Attorney e-Newsletter - March 2017
**From:** Disciplinary Board of the Supreme Court of Pennsylvania <news@padisciplinaryboard.org>
**Date:** 3/28/2017 3:20 PM

Click here to view this email in your browser

## Attorney News - March 2017

### Articles & Updates

- **Court Docks Pennsylvania Firm for Disbarred Lawyer Billings**

- **Annual Attorney Registration Opens in May**

- **Tip of the Month: Who Do I Call?**

- **Supreme Court Seeks Volunteers**

- **Lawyer's Pants Catch on Fire During Argument**

### Things to Remember

- **Follow the Disciplinary Board on Twitter**

*What, if anything, to do you intend to do about this ?!! ..*

*This newsletter is intended to inform and educate members of the legal profession regarding activities and initiatives of the Disciplinary Board of the Supreme Court of Pennsylvania. To ensure you receive each newsletter and announcement from the Disciplinary Board of the Supreme Court of PA, please add us to your "safe recipients" list in your email system. **Please do not reply to this email.** Send any comments or questions to comments@padisciplinaryboard.org.*

EXHIBIT 17
130

Attorney e-Newsletter - March 2017

# Court Docks Pennsylvania Firm for Disbarred Lawyer Billings

A Berwyn, Pennsylvania firm involved in a multimillion dollar shareholder lawsuit against cellphone provider Sprint was stunned when a Kansas judge **docked its attorney fees award by nearly 90%**. The action came after the Weiser Firm **advised the court** that a contract lawyer who compiled a massive number of hours on the case was in fact a disbarred former lawyer.

The firm included in its attorney fees claim a figure of 6,905 hours of service valued at $1.5 million for Alexander J. Silow, a contract attorney who reviewed discovery documents in the case.  A lawyer named Alexander J. Silow is admitted to the Pennsylvania bar in active status, but the person who performed the work for the Weiser Firm was not him. The imposter was Jeffrey M. Silow, who consented to disbarment in 1987.

A staffing agency placed Silow with the Weiser firm in 2008. The Wall Street Journal reports that despite his disbarment, Silow apparently worked for the staffing agency as a contract attorney for at least eight years prior to that.

Kansas Judge James Vano slashed the firm's requested $4.25 million to $450,000. The firm maintains that despite Jeffrey Silow's deceptions as to his licensure, its records are accurate and that the award is justified based on the results.  An appeal is pending.

# Annual Attorney Registration Opens in May

### May 8th – Online Registration Portal Opens
### July 1st – Registration Due Date

Online registration for Active and Inactive Attorneys, Attorney Participants in Defender or Legal Services Programs, In-House Counsels, and Foreign Legal Consultants will soon be open. Do not attempt to complete the annual registration process prior to May 8th. The ability to register online will not be available for attorneys who are currently on Retired status or are Administratively Suspended.

Attorneys have the option to pay their annual fee by credit card or by voucher and check. Last year, 60,790 attorneys paid with a credit card and 13,700 attorneys paid by voucher.

### License Status with the Pennsylvania Bar

| | |
|---|---|
| Active | 65,522 |
| Inactive | 10,726 |
| Retired | 17,447 |

4/22/2017 11:17 AM

EXHIBIT 17
131

### What, if anything , should the Chester County  Judiciary do about the WEISER  lawfirm located at Cassatt drive in Berwyn Pennsylvania?

**This ball has bounced into your lap because the Chester County Bar association likes to (1) plan picnics, (2) do seminars with guest speakers, (3) hold "chummy bench-bar events" where the lawyers in West Chester can snuggle up to the Judges before whom they practice and (4) other meaningless social activities .**

**When it comes to exercising discipline and control over the very profession of lawyer, so that the profession can continue on its very marginal journey toward public acceptance and respect..... well........ you know..... that's  a  troubling matter and sometimes, you know..... it's better to just let things work themselves out !!!**

**In other words, we ain't going to do shit about this !!!!**

The Weiser lawfirm is a six(6) man operation located on Cassatt drive in Berwyn , Chester County. This ugly situation involves the famous...... or should we say "INFAMOUS" class action lawsuit. Known as the pride of the Ninth Circuit Court of Appeals in Northern California. It involves a simple but very  lucrative operation. You get a friendly judge--- ------the friendlier the better--- to award class action status to your firm in order to "economically (HaHaHa)" represent a class of people who might not otherwise be able to sue the offending corporation on an individual basis. Whne the smoke clears, every member of the class gets $26.54 and you get $4.5 million dollars. In this case, Andrew Silow Esquire, who _DOES HAVE_  a license to practice law in Pennsylvania was ~~actually~~ putting in 6,905 hours of work and billing $4.5 million. But then...OMG... it wasn't Andy at all. It was Jeff Silow who had been disbarred 30 years ago in 1987 who was billing 6,905 hours for the WEISER lawfirm. Judge <u>JIMMIE VANO in Kansas, God Bless His soul, caught the firm in the act and knocked  out 90% of their billing</u> They claimed shock & surprise.

EXHIBIT 17
132

Imaginary dialogue:

"We were totally shocked to find out that he wasn't Andy after all but that he was Jeff"

Did he always answer to the name Andy so that if someone said "Hey Andy, come here and look at this?", he would automatically respond "Well...... yes, probably... I would say probably"

Did he ever take a phone call for Jeff Silow?

"Well.....I actually can't recall if he did or not. I mean it was not a thing that we paid attention to"

When he cashed office checks in his name was the name Andy Silow on each and every check. If we audited all of the checks written to him over the last 3 years, would all of them have been issued to Andrew Silow and endorseed by Andrew Silow?

"Well..... I am not sure about that. We will have to go back and check our records"

Do you have any idea what 6,905 billable hours comes to ?

"Not really"

Would you be surprised if , at 40 hours a week for every week in the year it comes to 162 weeks and that comes to over 3 consecutive years?

(No Response)

Weren't you just a little suspicious that he spent every working hour of every day in the week , for over 3 years on just one file in the office?

"Well........ YES ….. it did strike us as a little bit odd. Yes"

How could you pay him salary for over 3 years if he worked on only one file in the office? That's a little absurd isn't it?

"Well I get where you are going with this line of questioning. Are you saying that we knew that he was a disbarred lawyer and we were trying to milk the class action jackpot with his phony billing"

You said it better than I could.

"Well, you can GO FUCK YOURSELF ASSHOLE. I'M OUT OF HERE AND YOU CAN TALK TO MY LAWYER IF YOU WANT

EXHIBIT 17
133

# EXHIBIT 18

EXHIBIT 18
134

**From:** Michael Hartleib
**Sent:** Saturday, May 19, 2018 5:40 PM
**To:** 'Laura Jakubec' ; mark.mcgrory@eriseip.com; jay.kasner@skadden.com; scott.musoff@skadden.com; jennifer.berhorst@bryancave.com; sarah.holdmeyer@bryancave.com
**Cc:** 'Tom Hershewe' ; Robert Weiser ; Brett Stecker ; James M. Ficaro
**Subject:** RE: ROSS-WMS v. Spring, et al. - Appellate Case No.: 17-117139-A

Plaintiff Counsel, and I use this term loosely, when making false allegations against a party I would suggest you at least get it right. I am no expert, but I am pretty sure it would be libelous! I will demonstrate its proper use posthaste!


**From:** Laura Jakubec [mailto:lauraj@dollar-law.com]
**Sent:** Friday, May 18, 2018 2:12 PM
**To:** mark.mcgrory@eriseip.com; jay.kasner@skadden.com; scott.musoff@skadden.com; jennifer.berhorst@bryancave.com; sarah.holdmeyer@bryancave.com; Michael Hartleib <mjhartleib@gmail.com>
**Cc:** Tom Hershewe <tom@dollar-law.com>; Robert Weiser <rw@weiserlawfirm.com>; Brett Stecker <bds@weiserlawfirm.com>; James Ficaro <jmf@weiserlawfirm.com>
**Subject:** ROSS-WMS v. Spring, et al. - Appellate Case No.: 17-117139-A

Counsel - please find a courtesy copy of the pleading which was efiled this afternoon in this matter. Thank you.

Laura Jakubec, Legal Assistant
lauraj@dollar-law.com

1

EXHIBIT 18
135

# DOLLAR
# BURNS &
# BECKER
TRIAL ATTORNEYS

1100 Main Street, Suite 2600
Kansas City, MO 64105
Phone: (816) 876-2600
Fax: (816) 221-8763

This electronic message transmission and any files transmitted with it, are a communication from the law firm of Dollar Burns & Becker, L.C. This message contains information protected by the attorney/client privilege and is confidential or otherwise the exclusive property of the intended recipient or Dollar Burns & Becker, L.C. This information is solely for the use of the individual or entity that is the intended recipient. If you are not the designated recipient, or the person responsible for delivering the communication to its intended recipient, please be aware that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this electronic transmission in error, please notify by telephone (877-816-2600), or by electronic mail (lauraj@dollar-law.com) and promptly destroy the original transmission. Thank you for your assistance.NOTICE: The Missouri Bar and Missouri Supreme Court require all Missouri attorneys to notify e-mail recipients that e-mail is not a secure method of communication, that it may be copied and held by any computer through which it passes, and persons not participating in the communication may intercept the communication. Should you wish to discontinue this method of communication, please advise, and no further e-mail communication will be sent.

2

EXHIBIT 18

# EXHIBIT 19

EXHIBIT 19
137

**From:** Michael Hartleib
**Sent:** Saturday, June 02, 2018 12:12 AM
**To:** 'Boren, Jill, DCA'
**Cc:** 'Brian J. Robbins' ; James M. Ficaro ; 'George C. Aguilar' ; scott.musoff@skadden.com; jenness.parker@skadden.com; MARK.MCGRORY@ERISEIP.COM; perry.brandt@bryancave.com; sarah.holdmeyer@bryancave.com; jennifer.berhorst@bryancave.com; 'Tom Hershewe' ; Brett Stecker ; Robert Weiser
**Subject:** Judge Presses Lead Plaintiff in State Street Bank Lawsuit on Overbilling Questions | National Law Journal

Dear Ms. Boren, I thought the Honorable James Vano would find the link to the National Law Journal Article of interest. It is clear that the Plaintiff's Bar is rife with corruption, in both Class Action and Derivative cases. Much like the fraud Weiser et.al. committed in the "Ross-Williams" case, it appears to be standard operating procedure for many firms to submit millions in fraudulent fee requests upon the Court. This State Street case involves large well established firms and nearly 100 million in fees. At present, it appears Weiser et.al. has not been out done, as there is no mention of the unlicensed practice of law by a convicted felon using an alias.

I will be contacting the Special Master, and filing an Amicus Brief in the State Street case to inform them of the chicanery that has taken place in the "Ross-Williams" case. Although entirely unrelated, it presents a troubling pattern of fraud and corruption in these lawyer driven cases. I will be seeking public dissemination of the Special Master's report to show the breadth of corruption within the Plaintiffs Bar. The actions of Weiser et.al. and the Firms in the State Street case is the very definition of Racketeering, and warrants legislative reform.

1

EXHIBIT 19
138

https://www.law.com/nationallawjournal/2018/05/31/judge-presses-lead-plaintiff-in-state-street-bank-lawsuit-on-overbilling-questions/

Michael Hartleib 646-494-5901

# EXHIBIT 20

EXHIBIT 20
140

**From:** Michael Hartleib
**Sent:** Friday, August 17, 2018 10:45 PM
**To:** Robert Weiser
**Cc:** Brett Stecker
**Subject:** Forthcoming hearing

Rob, will you be at the Witmer v Steven hearing on the 27th? I will do my best to attend. I am very familiar with Judge Carney? We can discuss my concerns with L.C, A 10 and several other companies in which I am a shareholder. It appears we will be forced to deal with each other for the foreseeable future. In hindsight, I should have avoided stocks, and invested more in real estate. Our interest were supposed to be aligned. Instead, I was attacked! If you have any questions, or wish to proffer an apology, you know how to reach me. That said, other action is eminent!

EXHIBIT 20

# EXHIBIT 21

EXHIBIT 21
142

1
2

## IN THE DISTRICT COURT NORTHERN DISTRICT OF GEORGIA ATLANTA DIVISION

3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20

| | |
|---|---|
| GEORGE ASSAD, derivatively on behalf of EQUIFAX, INC., <br>           Plaintiff, <br><br> -against- <br><br> RICHARD F. SMITH, JOHN W. GAMBLE, JR., JOHN J. KELLY, III, RODOLFO O.PLODER, JOESPH M. LOUGHRAN, III, ROBERT D. DELEO, WALTER W. DRIVER, JR., MARK L.FEIDLER, G. THOMAS HOUGH, L. PHILLIP HUMANN, ROBERT D. MARCUS, SIRI S. MARSHALL, JOHN A. MCKINLEY, ELAN B. STOCK and MARK B. TEMPLETON, <br><br>           Defendants, <br>   -and- <br><br> EQUIFAX, INC., a Georgia Corporation, <br><br>           Nominal Defendant. | Case No.: 1:18-cv-00477-TWT <br><br> FILED IN CLERK'S OFFICE <br> U.S.D.C. - Atlanta <br><br> MAR 1 5 2018 <br><br> JAMES N. HATTEN, Clerk <br> By: _____ Deputy Clerk |

21
22
23
24
25

## MICHAEL HARTLEIB, SHAREHOLDER AND CONCERNED CITIZEN, MOTION FOR ACCEPTANCE OF AMICUS CURIAE BRIEF IN OPPOSITION TO THE APPOINTMENT OF THE WEISER FIRM AS CO-LEAD COUNSEL

26
27
28

EXHIBIT 21
143

**STATEMENT**

Your Honor, Michael Hartleib respectfully seeks leave of the Court, allowing the filing of his Amicus Brief to inform the Court of troubling abuse of process by Weiser et.al. Details of which, are outlined in the Amicus Brief and exhibits. Whereby, providing information germane to the Courts appointment of Weiser et.al as co-lead Counsel. The Court must know of their chicanery in order to protect the public interest and shareholders of Equifax derivatively. It appears that Weiser et.al. failed to inform the Court of the ongoing Pennsylvania Bar investigation, and criminal charges against one of their attorney's. This not surprising considering their contemptuous actions before the Kansas Courts. Their candor or lack thereof should help the Court decide whether leave should be granted.

**CONCLUSION**

Your Honor, for all of the reasons set forth in the Amicus Brief, I hereby request the Court grant leave to file said brief, and reconsider the appointment of Weiser et.al. as co-lead Counsel.

Respectfully,

Michael Hartleib
(646) 494-5901
mjhartleib@gmail.com
27020 Alicia Parkway Suite G
Laguna Niguel, CA 92677

2

EXHIBIT 21
144

# IN THE DISTRICT COURT NORTHERN DISTRICT OF GEORGIA ATLANTA DIVISION

| | |
|---|---|
| GEORGE ASSAD, derivatively on behalf of EQUIFAX, INC., | Case No.: 1:18-cv-00477-TWT |
| Plaintiff, | |
| -against- | |
| RICHARD F. SMITH, JOHN W. GAMBLE, JR., JOHN J. KELLY, III, RODOLFO O.PLODER, JOESPH M. LOUGHRAN, III, ROBERT D. DELEO, WALTER W. DRIVER, JR., MARK L.FEIDLER, G. THOMAS HOUGH, L. PHILLIP HUMANN, ROBERT D. MARCUS, SIRI S. MARSHALL, JOHN A. MCKINLEY, ELAN B. STOCK and MARK B. TEMPLETON, | |
| Defendants, | |
| -and- | |
| EQUIFAX, INC., a Georgia Corporation, | |
| Nominal Defendant. | |

**AMICUS CURIAE BRIEF OF CONCERNED CITIZEN AND SHAREHOLDER MICHAEL HARTLEIB IN OPPOSSITION OF THE APPOINTMENT OF THE WEISER FIRM AS CO-LEAD COUNSEL**

EXHIBIT 21
145

## STATEMENT

Michael Hartleib respectfully submits the following in the public interest, and preservation of jurisprudence as a whole.

## OVERVIEW

Your Honor, it is with supreme concern that I inform this Court of troubling actions of Weiser et.al, in the state of Kansas by way of a Derivative suit, captioned *Monica Ross-Williams v. Robert Bennett et.al, (11-cv-01688) Appellate (17-117139-a)*. As a shareholder of Sprint Nextel, with losses in excess of seven hundred thousand dollars, I was forced to defend my interest by objecting to a proposed settlement in the aforementioned case. I had to commence a crash course in Derivative litigation, and partake in an eighteen-month battle, which continues today, awaiting an Appellate Court ruling. The so-called reforms outlined in the settlement were illusory and misdirected, as the nominal Defendant in which the case was brought no longer exists. Sprint Nextel was acquired by Softbank. Weiser et.al lied, misleading the court to infer jurisdiction it lacked. They filed the case against Sprint Nextel, a Kansas corporation, but sought to impose reforms on Sprint, a newly formed Delaware corporation in violation of their bylaws. They failed to file a change of party notice in an attempt to confuse the Court and avoid challenges of standing, and subject matter jurisdiction. They used an **unfit plaintiff** who had little or no involvement in the case. On March 6, 2017, I called Monica Ross-Williams, whereby it became painfully clear that she was wholly uninformed. She was not aware of Judge Vano's scathing orders, or that an

1    appeal was filed on her behalf. (*See exhibit A, Orders from Judge Vano*)  She was

2    unaware that Weiser et.al. committed perjury and admitted to billing fraud. Mr. Weiser

3    failed to provide his "client" with copies of letters sent to Judge Vano, and Appellate

4    Clerk Douglas Shima, admitting to fraud upon the Court. *(See exhibit B, Weiser letters)*

5    During the call, she continually referred to herself as the Defendant, until I informed

6    her that she was in fact the plaintiff. *(See exhibit C, declaration of Michael Hartleib).*

7

8        Your Honor, the actions by these so-called officers of the Court is truly

9    unconscionable. Weiser et.al. submitted over eight thousand hours in fraudulent

10   billing, seeking 4.5 million dollars in fees, 1.6 million of which submitted by a

11   criminal and disbarred attorney using his son's name, Alexander as an alias. Mr.

12   Jeffrey Mark Silow has worked for the Weiser firm for over 10 years, billing millions

13   of dollars in illicit fees, in a multitude of cases across the country. Jeffrey Mark Silow

14   was convicted and disbarred in 1989 for insurance fraud, mail fraud, and forgery. Mr.

15   Silow was caught after forging a will, making himself the beneficiary of a million

16   dollar estate, stealing the inheritance from the rightful heirs. *(See exhibit D, WSJ*

17   *article)*

18

19       After providing information to the Class Action Fairness Center, Ted Frank

20   confronted the Weiser firm about Mr. Silow's status. With a proverbial gun to his head,

21   Mr. Weiser attempts to exonerate his firm by claiming to be a **victim** of Mr. Silow's

22   chicanery. In letters to the Court, Mr. Weiser states that he was unaware of Silow's

23   disbarred status and criminal past. Weiser claims that he had no idea that Alexander

24   was not Silow's real name. Clearly, this strategy was not well thought out. Attached to

25   the letters was a copy Mr. Silow's resume from Abelson Legal Services, proving Mr.

26   Silow was presented as Jeffrey Mark, not Alexander at the time of hire. In addition, the

27   resume shows Mr. Silow as an attorney in the District Columbia, never Pennsylvania

28   as Weiser et.al. averred under penalty of perjury. In open Court, and through pleadings,

3

EXHIBIT 21
147

1   Weiser et.al makes more false statements, by claiming Mr. Silow was a securities
2   expert, who bills at $350 dollars per hour. Mr. Stecker has made all appearances on
3   behalf of the Weiser firm; he has repeatedly perjured himself, found himself unable to
4   answer the most rudimentary of questions regarding his case. Frankly Your Honor, his
5   appearances were an utter embarrassment to the Plaintiff's Bar. During a six-hour
6   settlement hearing, Judge Vano expressed skepticism over the eight thousand hours
7   billed in the stayed case. He warned Weiser et.al. to take a careful look at their fee
8   request. Instead of heeding Judge Vano's advice, **plaintiff's counsel doubles down**,
9   filing perjuriously declarations. In Mr. Silow's declaration he admonishes Judge Vano,
10  stating "*how dare you question my hours, I have worked each and every one of these*
11  *hours, and have been an officer of the Court in good standing for over forty years,*
12  *without so-much as a disciplinary action.*" *(See exhibit E, Silow declaration)* This,
13  while knowing his status as a criminal and disbarred attorney.
14
15      Weiser et.al. would stop at nothing to protect their criminal enterprise, I was
16  subjected to vicious ad hominem attacks as I exposed their duplicitous acts and
17  conspiracies against the Court. Sadly, this is not an isolated incident; in fact, this is the
18  fourth case in which Weiser et.al has falsely purported to represent the interest of a
19  corporation in which I was a large shareholder, having lost hundreds of thousands of
20  dollars! These cases have been entirely lawyer driven, as this firm sees plaintiff's as a
21  **"necessary nuisance"**. They do not want an aggrieved party demanding tangible relief
22  on behalf of a company. At best, they seek a disinterested party who will not object to
23  a settlement providing nothing more than millions in attorney's fees. Fortunately, the
24  Honorable James Vano was not convinced by the Weiser firm's self-serving
25  arguments, or their desperate attempts proffering support for their fees. Judge Vano
26  ordered Weiser et.al. to submit their time-logs for an in-camera review. After six
27  months of careful deliberation, Judge Vano issued the first of two scathing orders,
28  wherein he excoriates Weiser et.al, finding that the time-logs submitted were not

1   credible, henceforth they were fraudulent! Although Judge Vano narrowly approved

2   the settlement, he slashed the 4.5-million-dollar fee request by **ninety percent,**

3   awarding a total of 450 thousand dollars in fees, and expenses. This was prior to the

4   Court's knowledge of Silow's criminal past and disbarred status.

5

6       Your Honor, it is unconscionable to think that after Judge Vano's highly critical

7   orders, that Weiser et.al. would not except the ruling, and quit while ahead, clearly

8   dodging a bullet. Instead, with hubris and utter contempt for the Court, they have the

9   temerity to ask Judge Vano for what is <u>tantamount to a **do-over,**</u> in the form of a

10  motion to Alter or Amend. *(See exhibit F, Objector's response to second Motion to*

11  *Alter or Amend)* They ask Judge Vano to remove all of the <u>damaging statements of</u>

12  <u>fact</u>, on the basis that it would <u>"hurt"</u> their reputations. They told Judge Vano that with

13  a few strokes of his pen he could fix everything, saving them untold amounts of

14  money, and countless hours of time trying to defend their contemptuous actions in the

15  case. Rightfully, they were concerned that the damaging orders would prejudice their

16  firm in other cases. They expressed concern, that the orders would be used to inform

17  other Courts of their <u>Self-Dealing</u>, <u>Unclean Hands</u> and <u>Shameful Violations of Public</u>

18  <u>Trust.</u> Wherefore, they confirm and acknowledge the gravity and consequence of their

19  subterfuge. *(See exhibit G, plaintiff's second Motion to Alter or Amend)*. The Motion

20  led to the second scathing order by Judge Vano, wherein he is unconvinced by their

21  absurd requests, and reaffirms his opinion in the strongest of terms. Unbelievably,

22  blinded by greed, Weiser et.al. informs Judge Vano of their intent to appeal the fee

23  reduction. Despite being admonished by Judge Vano, and caught committing billing

24  fraud, Weiser et.al. was unrelenting in their zealous quest for reinstatement of four

25  million dollars in unwarranted fees. Truly reprehensible! During the settlement

26  hearing, Mr. Stecker repeatedly informed Judge Vano that the settlement was obtained

27  through "<u>hard fought litigation</u>". Mr. Stecker apparently considers the filing of a

28  **piggyback derivative suit** with valid claims, jettisoning said claims, staying the case

5

EXHIBIT 21
149

1   for years so that enough time passes to allow one to bill thousands of fraudulent hours,

2   and millions of dollars, "Hard Fought Litigation". Pretending to review millions of

3   documents from a Class Action, led by sister firm Robbins Geller, that facilitates no

4   additional discovery, not a single document request, or deposition over a seven year

5   period is certainly not tantamount to "hard fought" by my standards. Your Honor,

6   from what I have witnessed, it appears Weiser et.al. follows a different set of

7   standards, one that sets the bar at new lows. This perspective coming from a layperson

8   with no legal background. The only thing hard fought in this case, was the Weiser

9   firm's desperate attempt to unjustly enrich themselves by four million five hundred

10  thousand dollars, on the backs of those they falsely purport to represent.

11

12       Your Honor an appeal was filed where I ask the Court to remand and rescind the

13  case with directives for punitive sanctions, and a disgorgement order forcing the

14  return of the four hundred fifty-thousand-dollar fee award. I argue that, Monica Ross-

15  Williams, by way of her Counsel has unclean hands and therefore not entitled to

16  equitable relief from the Court. Although initially set for summary calendar, I was

17  able to compel the Appellate Court to grant oral argument. I attended the hearing on 2-

18  13-18, although Robert Weiser was admitted pro hac vice, he failed to attend the

19  hearing. The Weiser firm has retained counsel from an ethics and professional liability

20  firm, likely at the request of their insurer. One could surmise that his failure to appear

21  was on the advice of counsel. Chief Justice, Karen Arnold Burger informed those in

22  attendance that the Court found this case very interesting and would not be as strict

23  with enforcement of its time limits. Wherefore, the Court granted all in attendance

24  more than double the docketed time. Mr. Stecker appeared on behalf of Weiser et.al,

25  where he informed the Court that he had nothing to say, and that the firm stands on its

26  pleadings. The Court was quick to respond, making it clear that they had questions for

27  him regarding the criminal acts of Weiser et.al. Mr. Stecker faced a litany of cross-

28  examining questions from the Appellate Court Justices, whereas he was unable to

1  provide cogent answers to most. Despite Mr. Stecker's attempts to convince the Court

2  that Weiser et.al. was an unwitting victim of Mr. Silow, the Court appeared less than

3  convinced. Mr. Stecker informed the Court that the Pennsylvania Bar was about to

4  wrap up their investigation into the Weiser firm regarding the Sprint Nextel case, and

5  find no need for disciplinary action, at which time, Justice David E. Burns stated,

6  **"good to know counselor, this Court will be certain that the Pennsylvania Bar**

7  **gets a copy of its forthcoming order"**. During my fifteen-minute rebuttal, Chief

8  Justice Karen Arnold Burger stated, we concur that fraud was committed in this case

9  with regard to the billing.

11  Your Honor, what I witnessed in this courtroom was worse than what transpired

12  before the Honorable James Vano, which led to the highly critical orders. By all

13  accounts, it was a train wreck of epic proportion for Weiser et.al. It is my belief that

14  this will be reflected in the forthcoming order, which the clerk says is expected within

15  the next thirty days!

17  Heretofore, whether Weiser et.al. knew of Mr. Silow's criminal past and

18  disbarred status, is immaterial. Judge Vano clearly states in his order that even a

19  cursory review of the time-logs would allow any reasonable person to ascertain that

20  they were not credible. This begs the question, <u>what is going on at the Weiser firm?</u>

21  <u>Either they are completely corrupt, or entirely inept</u>, whichever the case they are not

22  fit to act as lead on any representative suit. It is undisputed that the Weiser firm has

23  committed criminal acts upon the Kansas Court and a multitude of others across the

24  country.

## **CONCLUSSION**

Your Honor, given the forthcoming order from the Appellate Court, the duplicitous acts of Counsel, and active Bar investigation of the Weiser firm, I respectfully request acceptance of this brief as part of the record, and the reconsideration of the Weiser firm's appointment as lead Counsel in this case. I welcome the opportunity to appear before the Court and provide sworn testimony. I encourage the Court to demand the same of Mr. Weiser. I stand ready to provide any additional information the Court may seek.

Respectfully,

Michael Hartleib

20720 Alicia Parkway Suite, G

Laguna Niguel C.A. 92677

(646) 494-5901

EXHIBIT 21

# EXHIBIT 22

EXHIBIT 22
153

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF GEORGIA
# ATLANTA DIVISION

| | |
|---|---|
| IN RE EQUIFAX, INC. DERIVATIVE LITIGATION | Lead Case No.: 1:18-cv-00317-TWT |
| | (Consolidated with Nos.: 1:18-cv-00477-TWT and 1:18-cv-00577-TWT) |
| This Document Relates To: | (Consolidated Derivative Action) |
| ALL ACTIONS. | Judge Thomas W. Thrash, Jr. |

## OPPOSITION TO MICHAEL HARTLEIB'S MOTION FOR LEAVE TO FILE AMICUS CURIAE BRIEF

Plaintiff George Assad and his undersigned counsel, The Weiser Law Firm, P.C. (the "Weiser Firm"), respectfully submit this opposition to the Motion for Leave to Amicus Curiae Brief (the "Motion") filed on March 16, 2018 by non-party Michael Hartleib ("Hartleib").   As discussed herein, Hartleib's Motion should be denied and he should not be invited to participate in this shareholder derivative action (the "Action") because, *inter alia*: (a) Hartleib submits his proposed *amicus* filing not as a true, disinterested "friend of the court" or even as a shareholder of Equifax, Inc. ("Equifax"), but purely in an adversarial capacity in his continuing and openly hostile effort to harass and disturb the Weiser Firm, its clients, and other law firms with whom the Weiser Firm works; and (b) the

1

EXHIBIT 22
154

substance of Hartleib's proposed *amicus* filing, which is replete with falsehoods and malicious, prejudicial attacks, has no bearing on this Action and will not assist the Court in fairly, accurately, and efficiently ruling in this Action.[1]

## A.    APPLICABLE STANDARDS FOR PROPOSED *AMICUS* FILINGS

"Whether to permit a nonparty to submit a brief, as *amicus curiae*, is, with immaterial exceptions, a matter of judicial grace." *Nat'l Org. for Women, Inc. v. Scheidler*, 223 F.3d 615, 616 (7th Cir. 2000). "Historically, *amicus curiae* is an ***impartial individual*** who suggests the interpretation and status of the law, gives information concerning it, and advises the Court in order that justice may be done, rather than to advocate a point of view so that a cause may be won by one party or another." *WildEarth Guardians*, 2012 WL 10028647 at *2. Where, as here, a proposed *amicus* submission comes from an individual with a partisan view, rather than an impartial one, the motion for leave to file an *amicus* brief should be denied,

---

[1]    Moreover, all movants for lead or co-lead plaintiff in this derivative Action and their respective counsel are more than capable of advocating for their positions without Hartleib's involvement or assistance, and Hartleib does not, and cannot, argue otherwise. *See, e.g., Hughes v. White*, 388 F. Supp. 2d 805, n.3 (S.D. Ohio 2005) (motion for leave to file *amicus* brief denied where movant had not argued or demonstrated that counsel did not adequately represent their clients' interests); *WildEarth Guardians v. Lane*, No. CIV 12-118 LFG/KBM, 2012 WL 10028647, at *4 (D.N.M. June 20, 2012) (denying motion for leave to file *amicus* brief and noting that "counsel of the parties…are fully capable of representing their positions without the assistance of an *amicus*…[t]his is not a situation where a party is not represented competently or not represented at all.").

2

EXHIBIT 22
155

because in such a scenario that individual is not acting as a "friend of the Court." *Leigh v. Engle*, 535 F. Supp. 418, 420 (N.D. Ill. 1982); *see also United States v. Bd. of Cty. Commissioners of the Cty. of Otero*, 184 F. Supp. 3d 1097, 1115 (D.N.M. 2015) (listing the first factor for courts to weigh in whether to accept an *amicus* brief as "whether the proposed *amicus* is a disinterested entity"); *WildEarth Guardians*, 2012 WL 10028647, at *4 (denying motion for leave to participate as *amicus curiae* and noting that movant "Sierra Club is not a disinterested entity").

Indeed, "[c]ourts generally permit *amicus* briefs only where the brief could provide helpful analysis of the law, and the proposed *amicus* has a special interest in the subject matter of the suit, or existing counsel is in need of assistance." *Sierra Club v. Virginia Elec. and Power Co.*, No. 2:15CV112, 2016 WL 5349081, at *2 (E.D. Va. Feb. 4, 2016) (internal quotations omitted).[2]  Otherwise, leave to file an *amicus* brief should be denied.  *Ryan v. Commodity Futures Trading Comm'n*, 125 F.3d 1062, 1063 (7th Cir. 1997).  The reasons for the policy of denying or limiting *amicus* submissions, as described by Judge Posner, include that

---

[2]     It is well-settled that *amicus* submissions are only supposed to provide the Court with helpful, impartial analysis on issues of *law* – they are not supposed to present a partisan account of purported *facts*.  *See, e.g., New England Patriots Football Club, Inc. v. Univ. of Colorado*, 592 F.2d 1196, 1198 (1st Cir. 1979); *Strasser v. Dooley*, 432 F.2d 567, 569 (1st Cir. 1970). Suffice it to say, an *amicus* submission should not focus on attacks on a party's counsel on matters unrelated to the Action.

EXHIBIT 22
156

courts have heavy caseloads and, therefore, need to minimize extraneous filings; that time and other resources required for preparation and study of, and response to, *amicus* briefs drive up the cost of litigation; and that proposed filings of *amicus* briefs are frequently attempts by non-parties to inject their own partisan views into litigation matters. *Voices for Choice v. Ill. Bell Tel. Co.,* 339 F.3d 542, 544 (7th Cir. 2003). That is precisely the circumstance presented by Hartleib in this Action.

**B.    HARTLEIB'S MOTION SHOULD BE DENIED**

The term "*amicus curiae*" is old Latin which literally means "a friend of the court," but Hartleib is no "friend" of this Court and is certainly not acting as one. Instead, he acts now purely as an adversary to the Weiser Firm and its clients. Hartleib's vicious and false attacks on the Weiser Firm, submitted to the Court under the guise of a proposed *amicus* filing without notice to or the consent of any of the parties to this Action, are merely Hartleib's latest efforts in his multi-year campaign to harass the Weiser Firm and exact retribution against the Weiser Firm for its refusal to pay Hartleib's extortive requests for money in connection with an unrelated shareholder derivative action. Hartleib is attempting to use his purported *amicus* filing in this Action as a weapon against the Weiser Firm and its clients, and this Court should not permit Hartleib's brazen abuse of the *amicus* mechanism to the partisan detriment of plaintiffs in this Action.

4

EXHIBIT 22
157

The proposed *amicus* filing before this Court can only be viewed in the context of Hartleib's unique relationship and history with the Weiser Firm, and when viewed in that context, it is obvious that Hartleib is anything but "impartial." In 2009, the Weiser Firm first came into contact with Hartleib and briefly considered representing Hartleib in connection with a shareholder derivative action to be brought on behalf of the company then known as Sprint Nextel Corp. ("Sprint") arising from Sprint's merger with Nextel Corp.  The Weiser Firm ultimately elected not to represent Hartleib in connection with that matter, however, because Hartleib intimated his intention to receive material compensation for his role as a derivative plaintiff.  *See* Declaration of Robert B. Weiser ("Weiser Decl.") filed herewith at ¶¶5-8, Ex. A.[3]  The Weiser Firm would not then, and will not now, ever agree to any such improper and unethical financial proposal from a derivative client.

The Weiser Firm would later go on to represent another Sprint shareholder in connection with that derivative action and would coordinate its efforts and collaborate with several other law firms and their clients in that case.  After several years, the Sprint derivative litigation was settled for a comprehensive set of corporate governance reforms for the benefit of Sprint, negotiated with the

---

[3]    In addition, the Weiser Firm was concerned that Hartleib suffered from a conflict of interest in pursuing the derivative litigation.  *Id*. at ¶¶5-8.

EXHIBIT 22
158

assistance of The Honorable Layn Phillips, a former U.S. District Court judge acting as neutral mediator. Hartleib objected to the settlement, allegedly because he did not believe the settlement was in the best interests of Sprint, but made his true intentions clear by contacting the managing partner of the Weiser Firm days prior to the May 26, 2016 settlement hearing before the trial court and offering to withdraw his objection if the Weiser Firm was willing to enter into a lucrative "consulting agreement" with Hartleib. Weiser Decl. at ¶10. Of course, the Weiser Firm rejected Hartleib's improper and outrageous overture, just as years earlier it had refused to represent Hartleib as a derivative plaintiff in light of his improper demands for compensation. *Id*. Although the agreed-to, mediated fee for plaintiffs' counsel was ultimately reduced by the trial court in Sprint case, the settlement was eventually approved over Hartleib's objection, and Hartleib has appealed both that decision and the trial court's denial of Hartleib's application for financial compensation to the Kansas Court of Appeals.

Hartleib's proposed *amicus* filing in no way informs any issue before the Court in this Action and should not be permitted on the docket. Hartleib is not an "impartial individual" suggesting the proper interpretation of any law, but rather a serial harasser of the Weiser Firm and its clients. In March 2017, the Weiser Firm sought and obtained a protective order from the Kansas Court of Appeals in order

6

EXHIBIT 22
159

to stop Hartleib's vexatious and threatening phone calls and e-mails to its client in
the Sprint derivative action in violation of the Kansas Rules of Professional
Conduct. *See* Weiser Decl. at Ex. B. Notably, the Weiser Firm was forced to take
this drastic step and obtain the protective order for its client in the Sprint derivative
litigation because even after the Weiser Firm's client and the Weiser Firm directed
Hartleib to cease and desist, Hartleib expressly refused to do so. *Id.* at Ex. C. The
Protective Order was granted on March 30, 2017. *Id.* at Ex. D.

Hartleib has no interest in being a "friend of the Court" – but he seemingly
has limitless interest in trying to antagonize and harm the Weiser Firm. Because
Hartleib's "proffer comes from an individual with a partisan, rather than impartial
view, the motion for leave to file an *amicus* brief is to be denied, in keeping with
the principle that an *amicus* must be a friend of the court and not a friend of a party
to the cause." *Leigh*, 535 F. Supp. at 420; *see also Bd. of Cty. Commissioners of
the Cty. of Otero*, 184 F. Supp. at 1115 (listing the first factor for courts to weigh in
whether to accept an *amicus* brief as "whether the proposed *amicus* is a
disinterested entity").

Further, as if his open hostility to the Weiser Firm and its clients were not
enough to disqualify Hartleib's proposed *amicus* brief, the contents of his brief
have no "necessary bearing on this case [and] do not assist the Court in fairly,

7

EXHIBIT 22
160

accurately, and efficiently resolving this matter." *Sierra Club,* 2016 WL 5349081 at *3; *Hughes,* 388 F. Supp. 2d at 805, n.3 (denying motion for leave to file *amicus* brief where proposed brief attempted to introduce irrelevant "facts" into the record). The brief only includes Hartleib's warped recitation of purported "facts" about the Weiser Firm and contains no legal analysis whatsoever as to any issue before the Court in this Action. *See, e.g., New England Patriots Football Club,* 592 F.2d at 1198 ("While *amici* properly may provide assistance to the court on a legal question or present their view of a legal issue, they cannot properly present a partisan view of the facts."); *Strasser,* 432 F.2d at 569 ("An *amicus* who argues facts should rarely be welcomed."). Therefore, the proposed *amicus* brief must not be considered.

As to Hartleib's twisted account of the "facts," while the Weiser Firm will not address every fabricated quotation or outright lie in Hartleib's proposed *amicus* brief here,[4] the Court should be aware of certain facts pertaining to Jeffrey M. Silow, who was employed on several occasions by the Weiser Firm as a contract attorney through a legal search and placement firm, Abelson Legal Search, to perform document review work. Weiser Decl. at ¶16. In February 2017, the

---

[4]    Should the Court grant the Motion – which it should not – the Weiser Firm reserves all rights with respect to a substantive response thereto.

EXHIBIT 22
161

Weiser Firm was notified that Mr. Silow had been disbarred nearly twenty years ago and was using a fake bar identification number while holding himself out as being a member in good standing of the bars of the Commonwealth of Pennsylvania and the District of Columbia.[5] *Id.* at ¶17. The legal recruiting service was responsible for vetting the credentials of attorneys it placed and falsely held out Mr. Silow as a licensed attorney in good standing to the Weiser Firm.  *Id.* at ¶16.

After learning of this deceit, the Weiser Firm immediately: (1) severed all ties with the independent contractor Mr. Silow; (2) notified the judge in every action where Mr. Silow's hours were reported as part of a lodestar calculation as being "attorney time"; (3) self-reported the incident to the Disciplinary Board of the Supreme Court of Pennsylvania; (4) notified the Montgomery County, Pennsylvania District Attorney and pressed criminal charges against Mr. Silow; and (5) instituted a civil action against Mr. Silow and Abelson Legal Search, which is currently pending in the Pennsylvania Court of Common Pleas for Chester County. *Id.* at ¶18.  Since then, Mr. Silow has pled guilty to three criminal counts

_____

[5]     Mr. Silow would represent himself to be his son, Alexander L. Silow, an actual member in good standing of the Pennsylvania bar.  *Id.* at ¶19.

9

EXHIBIT 22
162

in Pennsylvania[6] and the Weiser Firm is unaware of any ongoing investigation by the Disciplinary Board of the Supreme Court of Pennsylvania regarding the Weiser Firm or any of its attorneys. *Id*. at ¶¶20, 22.

Hartleib's very use of the Silow scenario in his proposed *amicus* submission for this Action and his conclusory mischaracterizations thereof, by maliciously presuming the Weiser Firm's knowledge of Mr. Silow's disbarred status and false affidavit to the Court, definitively demonstrates Hartleib's lack of actual interest in the subject matter of the Action and his animus to the Weiser Firm.  Hartleib is seeking to extend his malicious campaign against the Weiser Firm from the Sprint derivative action to this Action, where the focus should be on the aggressive prosecution of the rights of Equifax.[7]  The issues raised by the Motion and the proposed *amicus* submission, apart from being demonstrably false, have no relevance to this Action and the Weiser Firm respectfully requests that the Motion be denied.

---

[6]    On December 19, 2017, Mr. Silow pled guilty to the following charges: Unauthorized Practice of Law (42 Pa.C.S. §2524), Unsworn Falsification to Authorities (18 Pa.C.S. §4904(b)) and Securing Execution of Documents by Deception (18 Pa.C.S. §4114). *Id*. at ¶20.

[7]    While Hartleib vaguely describes himself in the Motion as a "shareholder," he conspicuously never refers to himself as a shareholder of Equifax, nor has he offered any proof that he is a current Equifax stockholder.

10

EXHIBIT 22
163

Dated: March 22, 2018                   **THE WEISER LAW FIRM, P.C.**

                                         *s/ Brett D. Stecker*
                                         Brett D. Stecker
                                         Robert B. Weiser
                                         James M. Ficaro
                                         22 Cassatt Avenue
                                         Berwyn, PA 19312
                                         Telephone:  (610) 225-2677
                                         Facsimile:  (610) 408-8062
                                         bds@weiserlawfirm.com
                                         rw@weiserlawfirm.com
                                         jmf@weiserlawfirm.com

                                       *Counsel for Plaintiff George Assad*

11

EXHIBIT 22
164

## RULE 7.1(D) CERTIFICATION

The undersigned counsel certifies that this document has been prepared with one of the font and point selections approved by the Court in Local Rule 5.1(C).

Dated: March 22, 2018

/s/ Brett D. Stecker
Brett D. Stecker (admitted *pro hac vice*)
THE WEISER LAW FIRM, P.C.
22 Cassatt Avenue
Berwyn, PA 19312
Telephone:  (610) 225-2677
Facsimile:  (610) 408-8062
bds@weiserlawfirm.com

12

EXHIBIT 22
165

## CERTIFICATE OF SERVICE

I hereby certify that on this 22nd day of March 2018 I electronically filed the above and foregoing with the Clerk of the Court using the CM/ECF system, which will automatically send email notification of such filing to all attorneys of record.

*/s/ Brett D. Stecker*
Brett D. Stecker (admitted *pro hac vice*)
THE WEISER LAW FIRM, P.C.
22 Cassatt Avenue
Berwyn, PA 19312
Telephone:  (610) 225-2677
Facsimile:  (610) 408-8062
bds@weiserlawfirm.com

13

EXHIBIT 22

# EXHIBIT 23

EXHIBIT 23
167

**From:** Michael Hartleib
**Sent:** Thursday, March 22, 2018 11:41 PM
**To:** James M. Ficaro
**Cc:** michaelhartleib@cox.net; Robert Weiser
**Subject:** Re: Response to Motion

James, much appreciated, I received these filings several hours ago! Let Rob know he is making a catastrophic mistake!

Sent from my iPhone

On Mar 22, 2018, at 8:20 PM, James Ficaro <jmf@weiserlawfirm.com> wrote:

> Mr. Hartleib, attached please find the filing made in the Equifax action today.
>
> Regards,
>
> Jimmy Ficaro
> **The Weiser Law Firm, P.C.**
> office: 610.225.0206 | fax: 610.408.8062
> 22 Cassatt Avenue | Berwyn, PA 19312

1

EXHIBIT 23

# EXHIBIT 24

EXHIBIT 24
169

**From:** Michael Hartleib
**Sent:** Thursday, April 05, 2018 4:02 AM
**To:** Robert Weiser ; Brett Stecker ; James M. Ficaro
**Cc:** mjhartlieb@gmail.com
**Subject:** Order

Just got home and wanted to make sure that you have this! Good to finally meet you Rob! Like I said, none of this was necessary!

http://assets2.pacermonitor.com/filings/IN_RE_EQUIFAX_INC_DERIVATIVE_LITIGATION/IN_RE_EQUIFAX_INC_DERIVATIVE_LITIGATION__gandce-18-00317__0053.0.pdf?X-Amz-Security-Token=FQoDYXdzEHAaDHNpyxtZ9eaCSNpv5SK3A4XhVthj018cuDu654%2FExY4%2Fg9ZaCeCByPPG7i29uIPAyPVOvhytRb5DJeJniWPr8 1PBIdOSLqrsMlpJjgowrxGSlsFTbjSPqy0ZVhh3dtTJAWhUS%2FUutbLl18hwSszkR6YA35WMA4AfBS9e8711qPujeJwAugTteBi35v4BZW3 Jm3CXcZ8w%2BjDjOCTPVoiZOvgWuh4qvMkM%2BcwmH1%2Fk1AKAPOMd%2BhAO6OfXrhMvLPe2JfRxVZRvvyg8DzEEKL%2BAOihPT QZ1TlNcxSnF5vAUZHe3WNmJt1yVldlDu%2Bp60jpxLlq8oJnT9YWkBXqAliIONs45wrPt37Ng3gyZruDxrLM7MWr7TgZC%2BqtKCMrYpmy xx6m0GpKNPXoOaW0wYf7U2slUwfc1vKtqqohCFd6llK%2FQtDI%2BGy7LPpjRbagA%2BEo84Xm1jQdKnMJFk59tugzZptTcF57DPdfkR6uY R8KD0K9EmDuSzoc%2BguoKj3HGGGJgramak%2FXjfaMaKd8WpGN0ltvpQcMGKwCVz6l46lxHoFO0fEqwasa58VWyaFSAOl1il9CHL9HY 4MpxFHbS6FkVmcy%2B9kZBXOuoorJKX1gU%3D&X-Amz-Algorithm=AWS4-HMAC-SHA256&X-Amz-Date=20180405T075451Z&X-Amz-SignedHeaders=host&X-Amz-Expires=600&X-Amz-Credential=ASIAJDQHBFVWORVMWGWA%2F20180405%2Fus-east-1%2Fs3%2Faws4_request&X-Amz-Signature=0f99bf3d5f9b1d5cc8952757237f74f7b8d33ff650f0845aa10a8ddcd6c5c7c5

Sent from my iPhone

1

EXHIBIT 24
170

# EXHIBIT 25

EXHIBIT 25
171

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## EASTERN DIVISION

IN RE BIG LOTS, INC.
SHAREHOLDER LITIGATION

Case No. 2:12–cv–445

Judge Michael H. Watson

Magistrate Judge Jolson

## OPINION AND ORDER

Louisiana Municipal Police Employees' Retirement System ("LAMPERS") and City of Atlanta Firefighters' Pension Fund ("Atlanta Firefighters," and together with LAMPERS, "Lead Plaintiffs"), plaintiff Lorene Lamb ("Lamb," and together with LAMPERS and Atlanta Firefighters, the "Consolidated Plaintiffs"), and additional plaintiff Alan Brosz ("Brosz," and together with the Consolidated Plaintiffs, "Plaintiffs") move for an order granting final approval of a derivative litigation settlement ("Settlement")[1] with Defendants Jeffrey Paul Berger, Steven S. Fishman, David T. Kollat, Brenda J. Lauderback, Philip E. Mallot, Russell Solt, Dennis B. Tishkoff, Joe R. Cooper, Charles W. Haubiel II, Timothy A. Johnson, Robert Craig Claxton, John Charles Martin, Norman J. Rankin, Paul Alan Schroeder, Robert Samuel Segal, and Steven Ray Smart (the "Individual Defendants"), and nominal defendant Big Lots, Inc. ("Big Lots" or the "Company," and together with the Individual Defendants, the "Defendants"),

---

[1] The Settlement is memorialized between the parties in a Stipulation and Agreement of Settlement dated December 14, 2017. ECF No. 116-1.

EXHIBIT 25
172

acting through its Special Litigation Committee ("SLC"). ECF No. 121. Plaintiffs also move for an award of attorney's fees and expenses. ECF No. 122. Both motions are unopposed. For the following reasons, Plaintiffs' motions are **GRANTED**.

## I. BACKGROUND

The background of this case is laid out in great detail in the unopposed motion for final approval, ECF No. 121, and does not need to be repeated in-depth in this Opinion except as necessary to analyze the reasonableness of the Settlement. As an initial overview, it suffices to say that Plaintiffs' only remaining claim against Defendants is for corporate waste by some of Big Lots' current and former officers and directors in connection with an alleged insider selling scheme and stock repurchase plan. After multiple lawsuits were filed, protracted discovery, rulings on some dispositive motions, and multiple rounds of mediation, the parties agreed on the Settlement. On April 6, 2018, the Court preliminarily approved the Settlement. ECF No. 120. On July 26, 2018, the Court held a fairness hearing. The Court now considers whether final approval of the Settlement is warranted.

## A. The Proposed Settlement

The Settlement consists of two primary components: monetary relief and corporate governance reforms. First, Defendants have agreed that Big Lots' directors' and officers' insurance carriers will pay Big Lots $3.5 million. According to Plaintiffs' counsel, this payment represents a substantial percentage

EXHIBIT 25
173

of the potential damages, which were estimated to be between $8.2 million and $9.8 million.  Joint Decl. ¶ 49, ECF No. 123.  This money will be used to pay Plaintiffs' counsel's legal fees and expenses in this action as well as a portion of the settlement in a separate class action lawsuit (the "Willis Class Action"). Second, the parties have agreed that Big Lots will implement the following corporate governance reforms:

- Strengthening the Company's Insider Trading Policy, including implementing enhanced recordkeeping requirements for pre-clearance requests and a requirement that the General Counsel reports to the Nominating/Corporate Governance Committee on a semiannual basis about the Company's trading compliance program and related topics;

- Continuing to maintain a claw back policy that empowers the Compensation Committee of the Board of Directors to seek recovery of any excessive incentive-based compensation paid to any employee whose misconduct is found to have contributed to the Company's having to prepare an adverse accounting restatement;

- Engaging an outside consultant to provide continuing education to the Board of Directors on corporate governance topics including insider trading and securities laws;

- Enhancing the Company's Whistleblower Hotline procedures, including requiring the Audit Committee to receive and memorialize a report concerning any whistleblower complaint and follow-up action taken related to insider trading; and

- Amend the Company's Corporate Governance Guidelines requiring all directors to attend the Company's annual shareholder meeting in person.

**B.    Notice**

Big Lots submitted the affidavit of Robert W. Trafford ("Trafford"), one of the attorneys for the SLC.  ECF No. 126.  Trafford avers that Big Lots has complied with the notice provisions of the Preliminary Approval Order by

EXHIBIT 25
174

(a) Posting the Notice of Pendency and Proposed Settlement of Stockholder Derivative Litigation (the "Notice") and the Stipulation and Agreement of Settlement ("Stipulation") on its corporate website on April 13, 2018, where they have remained continuously since that date; and

(b) Filing the Stipulation and Notice as a Current Report on Form 8-K with the United States Securities and Exchange Commission on April 12, 2018 and posting the Form 8-K on its corporate website on April 13, 2018 where it has remained continuously since that date.

*Id.* at 1–2.  The Court finds that there was sufficient notice provided to shareholders pursuant to Federal Rule of Civil Procedure 23.1.

## II. APPROVAL OF THE PROPOSED SETTLEMENT

This derivative action may only be settled with the Court's approval.  Fed. R. Civ. P. 23.1(c).  The Court "enjoys wide discretion in evaluating the settlement of derivative actions under Rule 23.1." *McDannold v. Star Bank, N.A.*, 261 F.3d 478, 488 (6th Cir. 2001) (citing *Granada Invs., Inc. v. DWG Corp.*, 962 F.2d 1203, 1205–06 (6th Cir. 1992)).  "Settlements are welcome" in derivative actions and, "[a]bsent evidence of fraud or collusion, such settlements are not to be trifled with." *Granada*, 962 F.2d at 1205 (citations omitted).  Relevant factors in evaluating the settlement "include the likelihood of success on the merits, the risk associated with the expense and complexity of litigation, and the objections raised by class members." *Id.*  This Court has, on at least one occasion, also considered the other Rule 23(e) factors in determining whether a derivative action settlement should be approved. *McDannold v. Star Bank, N.A.*, No. C-1-94-002, 1999 U.S. Dist. LEXIS 22158, at *13 (S.D. Ohio June 2, 1999) (also

EXHIBIT 25
175

considering the amount of discovery conducted, whether the settlement was the

result of an arms-length negotiation as opposed to fraud or collusion, and the

opinion of counsel representing the parties), *vacated on other grounds*, 261 F.3d

478 (6th Cir. 2001).  Based on all of these factors, the Court determines that the

Settlement is fair, reasonable, and adequate.

## A.    Likelihood of Success on the Merits

"The most important of the factors to be considered in reviewing a

settlement is the probability of success on the merits. The likelihood of success,

in turn, provides a gauge from which the benefits of the settlement must be

measured." *Poplar Creek Dev. Co. v. Chesapeake Appalachia, L.L.C.*, 636 F.3d

235, 245 (6th Cir. 2011) (quoting *In re Gen. Tire & Rubber Co. Sec. Litig.*, 726

F.2d 1075, 1086 (6th Cir. 1984)).

Both in the motion for final approval and at the fairness hearing, Plaintiffs

asserted that they faced significant risks to successfully prosecuting their claims,

including defeating the SLC's motion to dismiss and demonstrating Defendants'

bad faith breaches of duty and resulting corporate waste. Mot. 21, ECF No. 121.

Defendants assert in their motion to dismiss that the SLC's determination that it

was not in Big Lots' best interest to pursue a corporate waste claim is entitled to

great deference.  Mot. to Dismiss 20, ECF No. 100.  Plaintiffs go so far as to

state in their motion for final approval that their corporate waste claim "would

have been exceptionally difficult to prove." Mot. 18, ECF No. 121.  Defendants

were already successful on some dispositive motions in this case and had

Case No. 2:12–cv–445                                              Page 5 of 13

EXHIBIT 25
176

winnowed down the claims brought to only corporate waste.  The likelihood of success for Plaintiffs was far from assured.  Thus, this factor weighs in favor of approval of the Settlement.

> **B.**   **Complexity, Expense, and Likely Duration of the Litigation**

As the Sixth Circuit has noted, derivative actions are "notoriously difficult and unpredictable."  *Granada*, 962 F.2d at 1205 (quoting *Maher v. Zapata Corp.*, 714 F.2d 436, 455 (5th Cir. 1983)).  "[A]voiding the delay, risks, and costs of continued litigation against a defendant is a valid reason for counsel to recommend and for the court to approve a settlement."  *In re Nationwide Fin. Servs. Litig.*, No. 2:08-cv-249, 2009 U.S. Dist. LEXIS 126962, at *10 (S.D. Ohio Aug. 18, 2009).

This litigation has already lasted several years.  Absent settlement, continued litigation of this case would likely take more than a year and result in the parties incurring significant expense.  There is a pending motion to dismiss, which would likely be followed by motions for summary judgment, expert discovery and *Daubert* motions, and a complex trial.  Additionally, the parties are represented by very sophisticated counsel that would undoubtedly vigorously prosecute and defend the claims in this case.  This supports settlement.

EXHIBIT 25
177

**C.    Objections Raised by Shareholders**

After having provided sufficient notice, no shareholder objected to the settlement.  This is strong evidence that shareholders believed the settlement to be fair, reasonable, and adequate.

**D.    The Amount of Discovery Engaged in By the Parties**

To confirm that Plaintiffs "have had access to sufficient information to evaluate their case and to assess the adequacy of the proposed Settlement," the Court considers the amount of discovery engaged in by the parties.  *In re Broadwing, Inc. ERISA Litig.*, 252 F.R.D. 369, 374 (S.D. Ohio 2006).  "In considering whether there has been sufficient discovery to permit the plaintiffs to make an informed evaluation of the merits of a possible settlement, the court should take account not only of court-refereed discovery but also informal discovery in which parties engaged both before and after litigation commenced."  *UAW v. Gen'l Motors Corp.*, No. 05-CV-73991-DT, 2006 WL 891151, at *19 (E.D. Mich. Mar. 31, 2006).  In this consideration, "the absence of formal discovery is not unusual or problematic, so long as the parties and the court have adequate information in order to evaluate the relative positions of the parties."  *Id.*

The document production in this case totaled nearly 1,000,000 pages of documents.  Mot. 17, ECF No. 121.  The discovery process was hard fought at times, requiring multiple meetings between the parties and court resolution of some of the disputes.  There has been no indication that Plaintiffs lacked

EXHIBIT 25
178

information necessary to assess the strength of their case, which supports approval of the Settlement.

### E.     Arm's-Length Negotiation

The Court finds that there is no evidence—or even a suggestion—that the settlement was the product of fraud or collusion.  *See IUE-CWA v. Gen. Motors Corp.*, 238 F.R.D. 583, 598 (E.D. Mich. 2006) ("Courts presume the absence of fraud or collusion unless there is evidence to the contrary.").  The Settlement is the result of arm's-length, well-researched, and protracted negotiations that took place over the course of multiple years and involved at least two different mediation sessions with Robert A. Meyer, Esq., an experienced mediator.  This favors approval of the Settlement.

### F.     The Opinion of Counsel

The Court gives significant weight to the opinions of Plaintiffs' counsel, who have indicated that the Settlement is fair, reasonable, and adequate.  *See, e.g.*, *Williams v. Vukovich*, 720 F.2d 909, 922–23 (6th Cir. 1983) ("The court should defer to the judgment of experienced counsel who has competently evaluated the strength of his proofs . . . . [T]he deference afforded counsel should correspond to the amount of discovery completed and the character of the evidence uncovered.").  The SLC's counsel has also expressed the opinion that the Settlement benefits the Company.  *See* Joint Decl. ¶ 55, ECF No. 123.

In this case, Class Counsel have extensive experience in complex shareholder derivative and class action litigation and corporate matters.  *See*

Case No. 2:12–cv–445                                        Page 8 of 13

EXHIBIT 25
179

*generally* ECF Nos. 123–25 (providing years of experience and background of counsel).  After significant discovery and protracted arm's-length negotiations, the parties reached the Settlement.  Equipped with extensive experience, counsel have concluded that the Settlement is a good result for Plaintiffs and the Company.  The Court therefore finds that this factor favors approval of the Settlement.

After considering the relevant factors, the Court **APPROVES** the Settlement.

### III.  ATTORNEY'S FEES AND COSTS

#### A.    Attorney's Fees

Plaintiffs' counsel has moved for an award of attorney's fees and costs.  ECF No. 122.  Defendants do not oppose the motion.  In order to assess the reasonableness of the fee request, the Court first determines the method Plaintiffs' counsel used to calculate the fee.  In this case, Plaintiffs are seeking a percentage of the fund award.  Specifically, Plaintiffs' counsel seeks $1.25 million in fees, which represents 35.7% of the $3.5 million monetary settlement.  Fee Mot. 8, ECF No. 122.

Next, the Court must analyze the factors laid out in *Ramey v. Cincinnati Enquirer, Inc.*, which include:

> 1) the value of the benefit rendered to the corporation or its stockholders, 2) society's stake in rewarding attorneys who produce such benefits in order to maintain an incentive to others, 3) whether the services were undertaken on a contingent fee basis, 4) the value of the services on an hourly basis, 5) the

EXHIBIT 25
180

complexity of the litigation, and 6) the professional skill and standing of counsel involved on both sides.

508 F.2d 1188, 1196 (6th Cir. 1974). Each of these factors favors approval of the requested attorney fee award.

First, the Court finds that the Settlement confers a substantial benefit on Plaintiffs. As discussed above, the $3.5 million payment represents a substantial percentage of the potential recovery in this case. Furthermore, as described both in the motion for final approval of the Settlement and at the fairness hearing, the corporate governance reforms that are included in the Settlement will be meaningful in preventing any future misconduct by Big Lots' officers and directors.

Second, society's stake in rewarding attorneys who produce such benefits supports an award of the requested attorney's fees. It is certainly in society's interest to have fiduciary laws and regulations enforced. If experienced counsel, such as the attorneys who represented Plaintiffs here, were unwilling to take on derivative action lawsuits for fear of not being compensated, it would be more difficult to enforce accountability for officers and directors.

Third, Plaintiffs' counsel agreed to undertake this case on a wholly contingent basis. *See* Fee Mot. 18, ECF No. 122. In doing so, Plaintiffs' counsel assumed a real risk by expending time, effort, and money over a period of approximately six years with no guarantee of recovery. This factor weighs in favor of approving the requested fee award.

EXHIBIT 25
181

The Court next considers whether the fourth factor, the value of the services on an hourly basis, favors the proposed fee award.  A cross-check using Plaintiffs' counsel's lodestar weighs in favor of granting the requested fee award. Plaintiffs' counsel has provided evidence that they devoted 6,016.06 hours to this case and incurred a total lodestar of $2,843,323.50.  Joint Decl. ¶ 60, ECF No. 123.  The Court has reviewed the declarations of Plaintiffs' counsel and finds the blended rate charged and hours incurred to be reasonable based on the location and experience of counsel.[2]  Therefore, the requested lodestar multiplier with respect to fees is approximately 0.44.  In other words, Plaintiffs' counsel is taking a substantial discount on their fees as a result of the contingent fee nature of their representation, which strongly supports approval.  *See  Kritzer v. Safelite Sols.*, LLC, No. 2:10–cv–0729, 2012 WL 1945144, at *10 (S.D. Ohio May 30, 2012) ("As for the value of the services rendered on an hourly basis, this factor

---

[2] On August 24, 2018, well after the time to object and the fairness hearing took place, the Court received an email from Michael Hartlieb ("Hartlieb"), a shareholder who had an interest in a different case involving The Weiser Law Firm, P.C. ("Weiser").  In his email, Hartlieb raised concerns over Weiser's billing practices in this prior case and stated that he wanted to inform the Court so that it could scrutinize the fee request in this case.  Hartlieb does not indicate that he is a shareholder in Big Lots or otherwise an interested party in this case.  Furthermore, the Court always scrutinizes the billing records of plaintiffs' counsel before approving fee awards.  Nevertheless, out of an abundance of caution, the Court re-reviewed Weiser's billing entries in this case and sees no similarities to the billing issues that may have occurred in the case involving Hartlieb. The Court held a teleconference with the parties on August 24, 2018, on which James Ficaro, one of the attorneys from Weiser, was afforded the opportunity to respond to Hartlieb's email.  The Court is fully satisfied that the hours billed by Weiser were reasonable in this case.

Case No. 2:12–cv–445            Page 11 of 13

EXHIBIT 25
182

strongly favors the fee requested . . . . The amount of fees requested . . . is less than what the fee would be under a lodestar calculation.").

The remaining two factors, the complexity of the litigation and the professional skill and standing of the attorneys involved, has been discussed above and also supports approval of the attorney's fee request.

For all of these reasons, the Court concludes that Plaintiffs' counsel's request for $1.25 million in attorney's fees is reasonable.

## B.    Expenses

"Under the common fund doctrine . . . counsel is entitled to reimbursement of all reasonable out-of-pocket expenses and costs in the prosecution of claims, and in obtaining settlement, including but not limited to expenses incurred in connection with document productions, consulting with and deposing experts, travel and other litigation-related expenses." *In re Cardizem CD Antitrust Litig.*, 218 F.R.D. 508, 532 (E.D. Mich. 2003).

Plaintiffs' counsel has provided documentation to support $46,740.59 in expenses in prosecuting this action.  These expenses include, among other things, mail costs, meals, lodging, transportation, legal research, copying costs, telephone expenses, and court filing fees.  *See* Joint Decl. Exs., ECF No. 123. These types of expenses are reasonable and necessary, and therefore entitled to reimbursement. *Rikos v. P&G*, No. 1:11-cv-226, 2018 U.S. Dist. LEXIS 72722, at **27–28 (S.D. Ohio April 30, 2018).

## IV.  CONCLUSION

Case No. 2:12–cv–445                                         Page 12 of 13

EXHIBIT 25
183

For the foregoing reasons, the Court **GRANTS** the unopposed motion for final approval of the settlement, ECF No. 121, **GRANTS** the unopposed motion for an award of attorney's fees and expenses, ECF No. 122, and **ORDERS** as follows:

1.    The Settlement is a fair, reasonable, and adequate resolution to this case for all parties, and is finally approved;

2.    To the extent not already done, the parties are **ORDERED** to perform under the terms of the Settlement;

3.    Plaintiffs' counsel are awarded $1,250,000 in attorney's fees and $46,740.59 in expenses, which shall be paid to lead counsel for distribution in accordance with the Settlement;

4.    The Court retains jurisdiction over this matter for purposes of enforcing the Settlement;

5.    This action is **DISMISSED with prejudice**, with each party to bear its own costs, except as described above.  The Clerk is **DIRECTED** to enter **FINAL JUDGMENT**.

    **IT IS SO ORDERED.**

_____
**MICHAEL H. WATSON, JUDGE**
**UNITED STATES DISTRICT COURT**

EXHIBIT 25
184

# EXHIBIT 26

EXHIBIT 26
185

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MINNESOTA**

IN RE: CENTURYLINK RESIDENTIAL CUSTOMER BILLING DISPUTES LITIGATION

MDL No. 17-2795 (MJD/KMM)

This Brief Relates to:

   *Tansey v. Perry, et al.*, No. 18-cv-02460-MJD-KMM;
   *Flanders v. Post, et al.*, No. 18-cv-02833-MJD-KMM;
   *Ault v. Post, et al.*, No. 18-cv-02834-MJD-KMM;
   *Barbree, et al. v. Bejar, et al.*, No. 18-cv-02835-MJD-KMM;
   *Palkon v. Boulet, et al.*,
   No. 18-cv-[TBA]-MJD-KMM

**AMICUS CURIAE BRIEF OF SHAREHOLDER MICHAEL HARTLEIB AND CONCERNED CITIZEN IN OPPOSSITION OF THE APPOINTMENT OF ROBBINS ARROYO AND THE WEISER FIRM ET. AL. AS LEAD COUNSEL IN THE CONSOLIDATED DERIVATIVE ACTION**

## STATEMENT

Michael Hartleib respectfully submits the following in the public interest, and preservation of jurisprudence as a whole.

EXHIBIT 26
186

1
2
3
4

**<u>OVERVIEW</u>**

5

6       Your Honor, it is with the utmost concern that I inform this Court of ongoing
7   troubling actions by the Weiser and Robbins Arroyo et.al. Firms, the most egregious of
8   which involves a lawyer driven Derivative case in the state of Kansas, captioned
9   *Monica Ross-Williams v. Robert Bennett et.al, (11-cv-01688) Appellate (17-117139-a)*.
10  Seeing Plaintiff's as a necessary nuisance, these firms seek parties that are disinterested
11  at best or worse something more sinister. Often soliciting a Plaintiff that is not
12  aggrieved, unqualified and willing to lend their name for nominal consideration in
13  order to facilitate their lawyer driven **"Piggyback Litigation"**. These firms collude and
14  conspire acting as one, whereby filing multiple Derivative cases on the backs of
15  Securities, or Consumer Class actions. Their past duplicitous acts have included the
16  use of the following as Plaintiffs, deceased parties, friends and family members which
17  lacked standing, and paid serial criminal Plaintiffs like that of the infamous firm,
18  Milberg Weiss. The latest and most creative use of unfit plaintiffs are those of shell
19  LLC corporations created by the law firms. They fund an LLC, instruct a co-
20  conspirator to purchase a nominal number of shares in as many publically traded
21  companies that funds will allow giving them what appears to be a legitimate Plaintiff
22  to facilitate their lawyer driven cases. The stock portfolio controlled by the LLC
23  ultimately becomes payment for the co-conspirator for facilitating said cases. These
24  firms fee split, interchange Plaintiff's, seek those that are compromised to generate
25  thousands of billable hours for illusory work, submit fraudulent time logs and seek
26  hundreds of millions in unjust fees in cases across the country. On information and
27  belief, the firms bill the same hours for Counsel on multiple cases. Given that hundreds
28  of thousands of hours have been billed in a multitude of cases that exceeds the number

2

EXHIBIT 26
187

1    of work hours in a defined period for the number of attorneys at the firm, it becomes
2    obvious that duplicative billing is taking place.

3

4    Your Honor, my initial encounter with Robbins Arroyo, formerly known as
5    Robbins Umeda was in 2006 wherein they filed a valuation suit surrounding the
6    merger of Sirius and XM Satellite Radio, allegedly on behalf of Sirius shareholders.
7    Unfortunately, their legitimate claims were jettisoned within days as they reached a
8    settlement that did nothing more than indemnify Sirius management who were unjustly
9    enriched and provide for millions in attorney fees. During this encounter, I discovered
10   what I call a **"race to the bottom"**. Firms like Robbins Arroyo and the Weiser firm get
11   a reputation for settling cases without meaning relief for those harmed, and providing
12   broad-breadth release for those Executives that have damaged the Corporation and its
13   shareholders in the first instance. Therein, these firms often do little more than
14   indemnify wrongdoers in exchange for millions in attorney fees. As a large
15   shareholder, I was forced to object to the Sirius settlement and discovered the Plaintiff
16   in the case, Gregory Brockwell lacked standing; Mr. Brockwell never owned a single
17   share of stock. He was a college friend of then partner Jeffrey P. Fink. After first
18   enduring a litany of threats and then rebuffing Mr. Finks half a million-dollar offer to
19   withdraw my objection, I contacted US attorney Richard Robinson, the FBI, and the
20   San Diego District Attorney, Bonnie Dumanis to report the illicit acts of the Firm.
21   Months later, Robbins Umeda dismissed their suit against Sirius and Mr. Fink was
22   fired from the practice.

23

24   The wrongdoing continued in a Derivative case of behalf of Red Hat. (*Egelhof v.*
25   *Szulik)* On February 4, 2008, Judge Tennille citing the solicitation of inadequate
26   plaintiffs, in a *"needless rush to file a complaint"* and criticizing the firm's *"slapdash*
27   *approach to representation"* and other professional misconduct, including inadequate
28   communications with the plaintiff and the unauthorized practice of law in North

3

EXHIBIT 26
188

Carolina by out-of-state attorneys, entered an order prohibiting the firm, and Brian Robbins individually, from appearing *pro hac vice* in the state courts of North Carolina for a period of five years.

Several months later in 2008, in yet another lawyer driven Derivative case in the United States District Court for the Southern District of New York, purportedly brought on behalf of JPMorgan, a federal judge cited similarities between the conduct addressed in the *Red Hat Egelhof* sanctions order and the proceedings in *JPMorgan.* Judge Cote exposed an unfit Plaintiff Mr. Shroff, which was removed and later replaced with a serial criminal Plaintiff Robert L. Garber. Mr. Garber was ultimately deemed unfit and removed. Being caught red handed trying to deceive the Court in violation of the *PSLRA,* former US attorney and partner of Robbins Umeda, George Aguilar informs the Court on July 15, 2008 that his firm is abandoning the Class and no longer seeks a lead position. Instead, they collude with other firms in an attempt to insulate themselves and run the case through surrogate Alfred G. Yates who used the same Plaintiff, Robert L. Garber that Judge Cote previously deemed unfit. Mr. Yates, although clearly obtuse, is likely the most corrupt lawyer in the Plaintiffs' Bar with direct connections to convicted felons William Lerach and Melvin Weiss. He has earned the reputation as the **Litigation Kennel Groomer,** whereas he has facilitated hundreds if not thousands of cases with serial criminal plaintiffs for firms across the country. Robert L. Garber being one that was most prolific. *See Exhibit, A (Opinion and Order of the Honorable Denise Cote, entered September 19, 2008,) (Case No. 08CIV9774 (DLC);*

In August of 2011, Robbins Umeda engaged in even more egregious conduct in two additional cases (*Carrigan v Solectron*) and (*Columbo v. Tara Gold*). In the Solectron case, Robbins Umeda is accused of abandoning the class to obfuscate facts surrounding illegal payments to professional plaintiffs including Steven Staehr. *See*

4

EXHIBIT 26
189

*Exhibit B, (Declaration of Richard Carrigan)*. It is clear that Robbins Umeda once again put its interest ahead of the Class, which they had a fiduciary duty to protect. It should be noted that I was an absent class member is this case having been injured. After Robbins Umeda abandoned the Class to hide their criminal acts, the Class was left without recourse. Given the mess that was made of the case, and significant loadstar Robbins Umeda claimed to have, I and other Class members were unable to obtain Counsel to seek redress of the legitimate claims outlined in the suit.

In Tara Gold, it appears that Robbins Umeda filed the case without the knowledge or consent of the plaintiff. *See Exhibit, C (Motion for Sanctions & Declaration of Chris Columbo)* This led to yet another rule eleven-sanction request on behalf of the defendants. Although it is my understanding that sanctions were not granted it shows that the case was entirely lawyer driven.

Judge Davis, Counsel will likely attempt to convince this Court that these contemptuous acts have become less relevant given the passing of time, but these acts which span more than a decade prove a course of conduct that has continued to present day. The Ross-Williams case has some of the very same player's involved in the aforementioned cases. Robbins Arroyo, Alfred G. Yates and Bruce Murphy. They have worked together for years making hundreds of millions of dollars bastardizing our judicial process for their unjust enrichment. I submit that they have gotten away with this for far too long; it is time to reform the corruption rife throughout Derivative litigation.

Further complicating things in the Ross-Williams case is the fact the lead Counsel in the related Securities Class action, Robbins Geller is the sister-firm of Robbins Arroyo, co-lead Counsel in this case along with the Weiser firm. Robert Weiser is close friends with the Robbins brothers; he has worked in concert with them in hundreds of cases in many

5

EXHIBIT 26
190

1   jurisdictions. Darren Robbins is managing partner of Robbins Geller and Brian Robbins is
2   Darren's brother, and managing partner of Robbins Arroyo. Their modus operandi is Robbins
3   Geller files the Securities Class action, whereby doing the "heavy lifting", often obtaining
4   meaningful relief; conversely, Robbins Arroyo files the "Piggy Back" Derivative case which
5   is stayed for prolonged periods of time to ensure their fraudulent hours billed do not exceed
6   the number of work hours in a defined period of time. In this case, it required a stay of more
7   than 5 years, as they submitted an astonishing 18,000 hours and a 4.5 million dollar fee
8   request on an entirely dormant case! The majority of which was for illusory document review
9   done under the supervision of Robbins Arroyo on their software platform Relativity. This
10  case was managed and run by Robbins Arroyo, along with Weiser et.al.

11

12      In May of 2016, as large shareholder of Sprint Nextel, with loses over seven
13  hundred thousand dollars, I was once again forced to defend my interest by objecting
14  to the proposed settlement. I had to commence a crash course in Derivative litigation,
15  and partake in a David vs. Goliath battle, which continued for over 18 months. I was
16  forced to single handedly take on five firms that were coordinated in their efforts to
17  stop me. Appearing at each hearing was Brent Stecker for the Weiser firm and George
18  Aguilar for Robbins Arroyo. Many other attorneys were present but I was not privy to
19  their names. I was subjected to vicious ad hominem attacks as Weiser and Robbins
20  Arroyo et.al. proved they would stop at nothing in an attempt to protect their criminal
21  enterprise. The so-called reforms outlined in the settlement were nearly illusory and
22  misdirected, as the nominal Defendant in which the case was brought no longer exists.
23  Softbank acquired Sprint Nextel. Weiser et.al lied, misleading the court, interchanging
24  names of the former Kansas Corporation Sprint Nextel with Sprint the Delaware
25  Corporation. They failed to file a change of party notice in an attempt to confuse the
26  Court and avoid challenges of standing, and subject matter jurisdiction. They used an
27  **unfit plaintiff** who had little or no involvement in the case. On March 6, 2017, I called
28  Monica Ross-Williams, whereby it became painfully clear that she was wholly

6

EXHIBIT 26
191

1  uninformed. She was not aware of Judge Vano's scathing orders, or that an appeal was
2  filed on her behalf. (*See Exhibit D, Order from Judge Vano*)  She was unaware that
3  Weiser et.al. committed perjury and admitted to billing fraud. Mr. Weiser failed to
4  provide his "<u>client</u>" with copies of letters sent to Judge Vano, and Appellate Clerk
5  Douglas Shima, admitting to fraud upon the Court. *(See Exhibit E, Weiser letters)*
6  During the call, she continually referred to herself as the Defendant, until I informed
7  her that she was in fact the Plaintiff. Ross-Williams appeared to have not spoken with
8  her Counsel for years and was devoid of any relevant facts of "her" case.  *See Exhibit*
9  *G, (Declaration of Michael Hartleib).*

10

11      Your Honor, that 15-minute affable call with Monica Ross-Williams incensed
12  Weiser and Robbins Arroyo et.al. as they immediately served me with a *Cease and*
13  *Desist* Letter, fearing I had obtained information to prove Ross-Williams was a shill
14  Plaintiff who had little or no involvement in the case. I replied by informing them that I
15  would neither cease nor desist as the truth is an absolute defense. I informed them that
16  they and their co-conspirators were the ones that needed to *Cease and Desist*. Although
17  I had no need or intention to contact Ross-Williams again, informing the Appellate
18  Court of same, Weiser et.al. was able to compel the Appellate Court under false
19  pretenses to grant a protective order using the do not contact rule, Rule 4.2. I remain
20  confused as to how a Rule addressing the Professional Conduct of attorneys applies to
21  a layperson such as myself. It is my understanding that rule 4.2 is to prevent the
22  sophistication and skill of Counsel from gaining unfair advantage over one less legally
23  savvy when represented. My scenario appears to be in violation of First Amendment,
24  wherefore it does not comport to the rule and is inapposite given the fact that I am not
25  an attorney and have no legal background. Equally confusing is how the Appellate
26  Court commends me for saving Sprint millions of dollars, exposing a conspiracy upon
27  the Court, but then forces me to communicate with Ross-Williams corrupt attorneys
28  the conspirators.

7

EXHIBIT 26
192

1

2      Judge Davis, this is of importance for multiple reasons, first Weiser and

3   Robbins Arroyo et.al. will likely use this in an attempt to attack my credibility and

4   convince this Court that I did something indecorous by making the single phone call to

5   Class representative Ross-Williams in the first instance. Weiser et.al. used this very

6   tactic in their failed opposition to a substantially similar Amicus Brief filed in the

7   Equifax data breach case in the Northern District of Georgia. The Weiser Firm, as well

8   as the firm of Johnson Fistel, (both seeking lead positions with this Court) were

9   appointed co-lead Counsel in the Equifax Derivative case, but other firms protested,

10  compelling a hearing to reconsider lead. After hearing from several firms and

11  testimony from Robert Weiser and myself, the Judge removed both firms from lead

12  position the following morning. Secondly and most importantly, I have commenced

13  litigation against Weiser et.al. and representative Plaintiff Ross-Williams for the

14  foregoing unconscionable acts that have transpired in the Kansas litigation. Weiser

15  et.al. has turned the case over to his insurer. *See Exhibit, H (Hartleib v.Wesier et.al.)*

16  This is the second active case that has arisen as a consequence of the chicanery in the

17  Ross-Williams action. Your Honor, I have read the Declarations in support of

18  appointment for lead in this case from the aforementioned firms professing their legal

19  skill, qualifications and alleged successes in prior cases, but I did not see any mention

20  of the Ross-Williams case, or other cases in which they have been admonished by the

21  Courts. Given Weiser's et.al. legal issues, it appears he is now forced to initiate a new

22  strategy, one of hiding behind another firm Bragar Eagel and Squire seeking lead in

23  this case in an effort to manage cases behind the scene. Greed appears to be powerful

24  motivator. While doing research I came upon an article that list the wealthiest

25  attorney's in the country, shockingly several of the top ten have been in prison.

26  William Lerach is number four on the list, with a net worth of nearly one billion

27  dollars. Your Honor, there is something wrong with a system that allows corrupt firms

28  to continue to violate the public trust year after year to unjustly enrich themselves.

8

EXHIBIT 26
193

1
2
3      Judge Davis, the actions by these so-called officers of the Court is truly
4  unconscionable. Robbins Arroyo and Weiser et.al. submitted over 18-thousand hours
5  in fraudulent billing, seeking 4.5 million dollars in fees, 1.6 million of which submitted
6  by a criminal and disbarred attorney using his son's name, Alexander as an alias. Mr.
7  Jeffrey Mark Silow has worked for the Weiser and Robbins Arroyo et.al. Firms for
8  over 10 years, billing likely more than 100 million dollars in illicit fees, in a multitude
9  of cases across the country. Jeffrey Mark Silow was convicted and disbarred in 1989
10 for insurance fraud, mail fraud, and forgery. Your basic Racketeer. Mr. Silow was
11 caught after forging a will, making himself the beneficiary of a million dollar estate,
   stealing the inheritance from the rightful heirs. *See Exhibit 1, (WSJ article)*

12

13     After providing information to the Class Action Fairness Center, Ted Frank
14 confronted the Weiser firm about Mr. Silow's status. With a proverbial gun to his
15 head, Mr. Weiser attempts to exonerate his firm by claiming to be a **victim** of Mr.
16 Silow's felonious acts. In letters to the Court, Mr. Weiser states that he was unaware
17 of Silow's disbarred status and criminal past. Weiser claims that he had no idea that
18 Alexander was not Silow's real name. <u>Clearly, this strategy was not well thought out.</u>
19 <u>Attached to the letters was a copy Mr. Silow's resume from Abelson Legal Services,</u>
20 <u>proving Mr. Silow was presented as Jeffrey Mark, not Alexander at the time of hire.</u> In
21 addition, the Firm Resume lists Mr. Silow as a licensed attorney to practice in
22 <u>Pennsylvania</u> and the District of Columbia proving Weiser et.al. committed perjury as
23 Mr. Silow was not licensed to practice in Pennsylvania when Weiser et.al. hired him.
24 Something Justice Burns pointed out during oral argument at the appellate hearing. In
25 the Syllabus from the Kansas Appellate Court, Judge Burn's states; *In a disturbing*
26 *development, Robert B. Weiser sent a letter to the district court— as well as a similar*
27 *letter to the Clerk of the Kansas Appellate Courts—on February 3, 2017. In his letter*
28 *to the district court, Weiser stated that he had "learned that a person who had held*

9

EXHIBIT 26
194

*himself out . . . as Alexander J. Silow ('Silow') was in actuality named Jeffrey M. Silow, and more importantly, that Mr. Silow is not a licensed Pennsylvania attorney in good standing, having been disbarred in Pennsylvania in 1987." Weiser indicated that Silow had been "of counsel" with the Weiser Law Firm for "the past decade" after being recommended to the law firm by a recruiting agency in 2008.*

*Interestingly, although the résumé of the Weiser Law Firm—which is part of the record on appeal—listed "Alexander Jeffrey Silow" as being "admitted to practice in Pennsylvania and the District of Columbia," Silow's résumé—which was attached to Weiser's letter—listed his name as "Jeffrey Silow" and did not state that he was a member of the Pennsylvania bar. Instead, Silow's résumé only listed the District of Columbia under the heading "Bar Admissions." In a footnote to his letters, Weiser stated that "it appears as though Mr. Silow has also been suspended from the practice of law by the District of Columbia." We note that the District of Columbia subsequently disbarred Silow from the practice of law on December 21, 2017. In re Jeffrey M. Silow, 175 A.3d 88 (D.C. 2017). See (Syllabus) Judge* Davis, Alexander Silow is a former Deputy District Attorney of West Chester County PA. and on information and belief knew of his father's criminal activities and is likely complicit. Mr. Jeffrey Mark Silow has seemingly gotten off lightly for his crimes, whereby pleading guilty to three misdemeanors, in record time.

Your Honor, in open Court, and through pleadings, Weiser and Robbins Arroyo et.al. makes more false statements, by claiming Mr. Silow was a securities expert, who bills at $350 dollars per hour. Mr. Stecker has made all appearances on behalf of the Weiser firm; he has repeatedly perjured himself, found himself unable to answer the most rudimentary of questions regarding his case. Frankly Your Honor, his appearances were an utter embarrassment to the Plaintiff's Bar. During a six-hour settlement hearing, Judge Vano expressed skepticism over the eighteen thousand hours billed in the stayed case. He warned Weiser et.al. to take a careful look at their fee

10

EXHIBIT 26
195

request. Instead of heeding Judge Vano's advice, **plaintiff's counsel doubles down**, filing perjurious declarations. In Mr. Silow's declaration he admonishes Judge Vano, stating "*how dare you question my hours, I have worked each and every one of these hours, and have been an officer of the Court in good standing for over forty years, without so-much as a disciplinary action.*" *See* Exhibit J, *(Silow Declaration)* This, while knowing his status as a criminal and disbarred attorney.

Weiser and Robbin Arroyo et.al. would stop at nothing to protect their criminal enterprise, I was subjected to repeated character attacks as I exposed their duplicitous acts and conspiracies against the Court. Fortunately, the Honorable James Vano was not convinced by Weiser and Robbins Arroyo et.al. and their self-serving arguments, or desperate attempts proffering support for their fees. Judge Vano ordered Weiser and Robbins Arroyo et.al. to submit their time-logs for an in-camera review. After six months of careful deliberation, Judge Vano issued the first of two scathing orders, wherein he excoriates Weiser and Robbins Arroyo et.al, finding that the time-logs submitted were not credible, **henceforth they were fraudulent**! Although Judge Vano narrowly approved the settlement, he slashed the 4.5-million-dollar fee request by **ninety percent,** awarding a total of 450 thousand dollars in fees, and expenses. This was prior to the Court's knowledge of Silow's criminal past and disbarred status.

Your Honor, it is unconscionable to think that after Judge Vano's highly critical orders, that Weiser and Robbins Arroyo et.al. would not except the ruling, and quit while ahead, clearly dodging a bullet. Instead, with hubris and utter contempt for the Court, they have the temerity to ask Judge Vano for what is <u>tantamount to a **do-over,**</u> in the form of two motions to Alter or Amend. *See* Exhibit F, *(Objector Hartleib's opposition to Motions to Amend)*

11

EXHIBIT 26
196

Judge Davis, former US attorney George Aguilar and partner of Robbins Arroyo, *(also seeking lead in this case)* introduced new evidence purporting to be a report from their Relativity software program in an attempt to affirm the fraudulent hours billed by now known racketeer Silow. Attached to the second Motion to Alter or Amend was Mr. Aguilar's sworn Declaration, which states that Robbins Arroyo was wholly responsible for the oversight of all document review in the consolidated action. Mr. Aguilar continues by declaring that Robbins Arroyo was responsible for the management and coordination of said review, which was allegedly performed on his Firms software system Relativity. In his prior Declaration dated June 23, 2016, Mr. Aguilar declares that Robbins Arroyo reached an agreement with Defense Counsel to manage the case, therefore Robbins Arroyo was acting as lead behind the scene, making his Firm fully complicit in the fraud committed upon the Court. *See Exhibit K, (Declarations form George Aguilar)*

The Motion seeks to compel Judge Vano to remove all of the <u>damaging statements of fact</u>, on the basis that it would <u>"hurt"</u> their reputations. They informed Judge Vano that with a few strokes of his pen he could fix everything, saving them untold amounts of money, and countless hours of time trying to defend their contemptuous actions in the case. Rightfully, they were concerned that the damaging orders would prejudice their firm in other cases. They expressed concern, that the orders would be used to inform other Courts of their <u>Self-Dealing</u>, <u>Unclean Hands</u> and <u>Shameful Violations of Public Trust.</u> Wherefore, they confirm and acknowledge the gravity and consequence of their subterfuge. The Motion led to the second scathing order by Judge Vano, wherein he is unconvinced by their absurd requests, and reaffirms his opinion in the strongest of terms. Judge Vano states that it was not proper for Mr. Aguilar to submit new evidence after the Courts ruling, nonetheless, he was not persuaded stating; *"Plaintiff's counsel should have expected strong criticism of Mr. Silow's billing records had [they] bothered to examine the purported time [he]*

12

EXHIBIT 26
197

*submitted as spent on document review. . . . "A cursory glance at Mr. Silow's billing*
*records appropriately casts a shadow of doubt over the veracity of the billing records*
*in their entirety. [The] affidavits documenting Mr. Silow's time spent on [document*
*review] are wholly unpersuasive. They do support that it takes merely a keystroke of*
*activity once every hour to keep [the computer program] from timing out or logging*
*off a session. (See Syllabus from the Kansas Court of Appeals)*

Unbelievably, blinded by greed, Weiser and Robbins Arroyo et.al. informs Judge Vano of their intent to appeal the fee reduction. Despite being admonished by Judge Vano, and caught committing perjury and billing fraud, Weiser and Robbins Arroyo et.al. were unrelenting in their zealous quest for reinstatement of the four million dollars in unwarranted fees. Truly reprehensible! During the settlement hearing, Mr. Stecker repeatedly informed Judge Vano that the settlement was obtained through "hard fought litigation". Mr. Stecker apparently considers the filing of a **piggyback derivative suit** with valid claims, jettisoning said claims, staying the case for years so that enough time passes to allow one to bill thousands of fraudulent hours, and millions of dollars, "Hard Fought Litigation". Pretending to review millions of documents from a Class Action, led by sister firm Robbins Geller, that facilitates no additional discovery, not a single document request, or deposition over a seven year period is certainly not tantamount to "hard fought" by my standards. Your Honor, from what I have witnessed, it appears Robbins Arroyo and Weiser et.al. follows a different set of standards, one that continually sets the bar at new lows. This perspective coming from a layperson with no legal background. The only thing hard fought in this case, was the Weiser and Robbins Arroyo et.al. Firm's desperate attempt to obfuscate their criminal acts to protect their criminal enterprise and unjustly enrich themselves by four million five hundred thousand dollars, on the backs of those they falsely purport to represent.

13

EXHIBIT 26
198

Your Honor an appeal was filed wherein I ask the Court to remand and rescind the case with directives for punitive sanctions, and a disgorgement order forcing the return of the four hundred fifty-thousand-dollar fee award. I argued that, Monica Ross-Williams, by way of her Counsel had unclean hands and therefore not entitled to equitable relief from the Court. Although initially set for summary calendar, I was able to compel the Appellate Court to grant oral argument. I attended the hearing on 2-13-18, although Robert Weiser was admitted *pro hac vice*, he failed to attend the hearing. The Weiser firm has retained counsel from an ethics and professional liability firm, likely at the request of their insurer. One could surmise that his failure to appear was on the advice of counsel. Chief Justice, Karen Arnold Burger informed those in attendance that the Court found this case very interesting and would not be as strict with enforcement of its time limits. Wherefore, the Court granted all in attendance more than double the docketed time. George Aguilar appeared on behalf of Robbins Arroyo but never addressed the Court. In fact, I do not believe he was admitted *pro hac vice* for the appellate hearing. Mr. Stecker appeared on behalf of Weiser et.al, where he informed the Court that he had nothing to say, and that the firm stands on its pleadings. The Court was quick to respond, making it clear that they had questions for him regarding the criminal acts of Weiser et.al. Mr. Stecker faced a litany of cross-examining questions from the Appellate Court Justices, whereas he was unable to provide cogent answers to most. Despite Mr. Stecker's attempts to convince the Court that Weiser et.al. was an unwitting victim of Mr. Silow, the Court appeared less than convinced. Mr. Stecker informed the Court that the Pennsylvania Bar was about to wrap up their investigation into the Weiser firm regarding the Sprint Nextel case, and find no need for disciplinary action, at which time, Justice David E. Burns stated, **"good to know counselor, this Court will be certain that the Pennsylvania Bar gets a copy of its forthcoming order"**. During my fifteen-minute rebuttal, Chief Justice Karen Arnold Burger stated, we concur that fraud was committed in this case with regard to the billing. On April 27, 2018 the Appellate Court issued its 50 page

14

EXHIBIT 26
199

published Opinion, unfortunately my standing argument failed, and I was unsuccessful in my attempt to disgorge the ill-gotten 450 thousand dollar fee award. The Court was nonetheless highly critical of the Weiser and Robbins Arroyo firms as reflected in the Syllabus from the Court, which states; *Weiser evidently continues to believe that Silow actually performed the work reported in the billing records submitted to the district court. Nevertheless, Weiser recognized in his letter "that Mr. Silow had been held out as an active attorney, and that Mr. Silow's declaration, signed under penalty of perjury, states, inter alia, that he is a licensed attorney in good standing that had never been the subject of any disciplinary action." Hence, Weiser acknowledges that Silow's "declaration is therefore false in material respects," and as a result, the Weiser Law Firm—which served as the lead counsel in this derivative action—"will not be participating in any recovery that may result from the pending Cross-Appeal." Although we will yield to the disciplinary authorities in the Commonwealth of Pennsylvania—or elsewhere—to sort out what the attorneys representing the plaintiffs in these derivative actions knew or should have known about the status of Jeffrey Silow's license to practice law, we find the information provided by Weiser to be very troubling. As indicated above, the hours billed by Silow constituted a substantial amount of the total hours allegedly worked by counsel for the plaintiffs in these derivative actions. Thus, we agree with Weiser that his law firm should not receive any of the attorney fees and expenses awarded in this case. (See Syllabus from Kansas Court of Appeals).*

Judge Davis, another deeply troubling concern involving these firms is the nexus between former Federal Judge Layn Phillips and the Robbins Gellar, Robbins Arroyo and Weiser Firms. By all accounts, Judge Phillips has been held in high esteem, but some now argue his once stellar reputation has been sullied by the duplicitous acts of Weiser and Robbins Arroyo et.al. In an attempt to proffer support for their fraudulent 4.5 million dollar fee request, Weiser et.al. attached a Declaration signed by former

15

EXHIBIT 26
200

Judge Phillips in support of the motion for final approval of the settlement. In his Declaration, he reviewed his role as mediator in the derivative actions and stated that *"the settlement was carefully reached through hard fought, arm's-length negotiations conducted by skilled counsel in good faith."* He also noted that the attorneys involved *in the mediation process were from 15 respected law firms and were experienced in handling complex litigation. Moreover, former Judge Phillips rendered the opinion that he believed an award of $4,250,000 in attorney fees and expenses in this case would be fair, just, and reasonable. (See Syllabus from Appellate Court)* Given the fraud that has transpired in the Ross-Williams case, and the fact the Judge Phillips affirmed the fraudulent fees, the bad acts of these firms has damaged the reputation of the former Federal Judge. Equally troublesome is the fact that Judge Phillips appears to be the "go to" mediator in many of the cases for the aforementioned Firms. Some believe that it is a conflict of interest for any mediator overseeing the case in question to get involved in affirming fees on behalf of Plaintiff Counsel, whether just or unjust. Making matters worse, after Judge Vano issued his scathing orders, I had reached out to the office of Judge Phillips on several occasions seeking a call or meeting to discuss what transpired in the Ross-Williams case in hopes of getting a retraction. After Mr. Silow was exposed as a criminal, I was certain Judge Phillip's would want to file an amended Declaration in the Ross-Williams case rescinding his prior support for fees, now known to be fraudulent, in an effort to protect his good name, but my requests went unanswered. Thereby, raising the question, why would a former Federal Court Judge allow his name to be associated with corrupt law firms and a conspiracy upon the Kansas Court? Some have speculated that Judge Phillips failure to act and silence surrounding the fraud in the Ross-Williams action provides the answer, albeit a troubling one! I sincerely hope they are incorrect.

Honorable Davis, the aforementioned shows a prolonged course of conduct and pattern of criminal activity of the highest order, by so-called officers of the Court. It is

16

EXHIBIT 26
201

Arroyo, Weiser or their surrogates. I am confident that this Court has qualified firms that will properly represent the interest of CenturyLink, its shareholders and not breach the fiduciary duties owed, for their unjust enrichment.

## CONCLUSION

Your Honor, I respectfully seek leave of the Court allowing this Amicus Brief to be filed on short notice and be placed in the record. I also would like to address the Court at the forthcoming hearing for the appointment of lead Counsel on 3-6-19. I have made last minute travel plans from California and stand ready to provide any additional information the Court may seek on the record.

Respectfully,



Michael Hartleib

20720 Alicia Parkway Suite, G

Laguna Niguel C.A. 92677

(646) 494-5901

17

EXHIBIT 26
202

# CERTIFICATE OF SERVICE

I hereby certify that true and correct copies of the above and forgoing the Amicus Curiae Brief and Exhibits A through K was served on the following parties by electronic mail on 03-05-19

THE WEISER LAW FIRM. P.C.
Robert E. Weiser
Brett D. Stecker
James M. Ficaro
22 Cassatt Ave., Suite 100
(610)-225-2677
rw@weiserlawfirm.com

JOHN FISTEL LLP
Michael I Fistel JR
40 Powder Springs Street
Marietta GA.

(770) 200-3104
michaelf@johnsonfistel.com

MELISSA A. FORTUNATO
885 Third Avenue Suite 3040
New York, NY. 10022
(212) 308-5858

fortunato@bespc.com

GARETT BLANCHFIELD
Reinhardt, Wendorf & Blanchfield

(651) 287-2100

E1250 First National Bank Building

ROBBINS ARROYO LLP.
George   C. Aguilar
600 B Street Suite 1900
San Diego, C.A. 92101
(619)-525-3990
gaguilar@robbinsarroyo.com

332 Minnesota Street Saint Paul MN.
Gblanchfield@rwblawfirm.com

SIGNED _____

MICHAEL HARTLEIB

27020 Alicia Parkway Suite G

Laguna Niguel C.A. 92677

646-494-5901

EXHIBIT 26
203

# EXHIBIT 27

EXHIBIT 27
204

1

```
 1                    UNITED STATES DISTRICT COURT
                         DISTRICT OF MINNESOTA
 2

 3     ------------------------------------------------------------
                                   )
 4     IN RE:  CENTURYLINK SALES    )  File No. 17-md-2795
       PRACTICES AND SECURITIES     )          (MJD/KMM)
 5     LITIGATION                   )
                                    )
 6                                  )  Courtroom 13E
                                    )  Minneapolis, Minnesota
 7                                  )  Wednesday, March 6, 2019
                                    )  9:38 a.m.
 8                                  )
       ------------------------------------------------------------

 9

10               BEFORE THE HONORABLE MICHAEL J. DAVIS
              UNITED STATES DISTRICT COURT SENIOR JUDGE

11

12         MOTIONS HEARING ON DOCKET NOS. 330, 332, 342

13

14

15

16

17

18                    RENEE A. ROGGE, RMR-CRR
           Official Court Reporter - United States District Court
19                   1005 United States Courthouse
                        300 South Fourth Street
20                   Minneapolis, Minnesota 55415
                           (612)664-5107
21

22

23

24         Proceedings recorded by mechanical stenography;
                 transcript produced by computer.
25
```

2

```
 1    APPEARANCES:

 2    For the Plaintiffs Sona      PERRY & PERRY PLLP
      Andresian, Glen Walker       SHAWN M. PERRY, ESQ.
 3    and Michael Barbree:         1660 Highway 100 South, #335
                                   Minneapolis, Minnesota 55416
 4
                                   GAINEY McKENNA & EGLESTON
 5                                 THOMAS J. McKENNA, ESQ.
                                   440 Park Avenue South
 6                                 New York, New York 10016

 7    For the Proposed Lead        FEDERMAN & SHERWOOD
      or Co-Lead Counsel for       WILLIAM B. FEDERMAN, ESQ.
 8    Shareholder Derivative       10205 North Pennsylvania
      Plaintiffs:                  Oklahoma City, Oklahoma 73120
 9
      For the Plaintiff           REINHARDT WENDORF & BLANCHFIELD
10    Edward Tansey:              GARRETT D. BLANCHFIELD, ESQ.
                                  322 Minnesota Street, #W1050
11                                St. Paul, Minnesota 55101

12                                ROBBINS ARROYO LLP
                                  GEORGE C. AGUILAR, ESQ.
13                                5040 Shoreham Place
                                  San Diego, California 92122
14
      For the Plaintiff Tim       BRAGAR EAGEL & SQUIRE, PC
15    Ault:                       LAWRENCE P. EAGEL, ESQ.
                                  885 Third Avenue, #3040
16                                New York, New York 10022

17                                LEVENTHAL PLLC
                                  SETH LEVENTHAL, ESQ.
18                                333 South Seventh Street, #1150
                                  Minneapolis, Minnesota 55402
19
      For the Defendant:          WINTHROP & WEINSTINE PA
20                                WILLIAM A. McNAB, ESQ.
                                  225 South Sixth Street, #3500
21                                Minneapolis, Minnesota 55402

22                                COOLEY LLP
                                  SARAH M. LIGHTDALE, ESQ.
23                                1114 Avenue of the Americas
                                  New York, New York 10036-7798
24

25
```

3

```
1    APPEARANCES (contd):

2    For the Defendant          COOLEY LLP
     (continued):               PATRICK E. GIBBS, ESQ.
3                               3175 Hanover Street
                                Palo Alto, California 94304
4
     For the Amicus Curiae:     MICHAEL HARTLEIB, PRO SE
5                               20720 Alicia Parkway, Ste. G
                                Laguna Niguel, California 92677
6

7                              *   *   *

8

9                      P R O C E E D I N G S

10                          IN OPEN COURT

11                             *   *   *

12          THE COURT:  Good morning.  Please be seated.

13          Let's call this matter, these matters.

14          COURTROOM DEPUTY:  In Re:  CenturyLink Residential

15   Customer Billing Disputes Litigation, MDL No. 17-2795.

16          Counsel, please state your appearances for the

17   record.

18          MR. AGUILAR:  Good morning, Your Honor.  George

19   Aguilar from the law firm of Robbins Arroyo for plaintiff

20   Edward Tansey.

21          THE COURT:  Good morning.

22          MR. BLANCHFIELD:  Good morning, Your Honor.

23   Garrett Blanchfield from Reinhardt Wendorf & Blanchfield

24   also on behalf of plaintiff Edward Tansey.

25          THE COURT:  Good morning.
```

4

```
1                MR. EAGEL:  Good morning, Your Honor.  Lawrence
2    Eagel, Bragar Eagel & Squire, for plaintiff Tim Ault.  With
3    me is Seth Leventhal for plaintiff Tim Ault.
4                THE COURT:  Good morning.
5                MR. FEDERMAN:  Good morning, Your Honor.  William
6    B. Federman, Federman & Sherwood, on behalf of plaintiff
7    Inter-Marketing Group.
8                THE COURT:  Good morning.
9                MR. PERRY:  Good morning, Your Honor.  Shawn
10   Perry.  I am local counsel from Perry & Perry on behalf of
11   Gainey McKenna & Egleston.  T.J. McKenna or Thomas J.
12   McKenna is to my right.
13               MR. MCKENNA:  Good morning, Your Honor.
14               THE COURT:  Good morning.
15               MR. MCNAB:  Good morning, Judge Davis.  Bill
16   McNab, Winthrop & Weinstine, on behalf of defendant
17   CenturyLink and the individual director defendants.
18               THE COURT:  Good morning.
19               MR. GIBBS:  Good morning, Your Honor.  Patrick
20   Gibbs from Cooley also for defendants.
21               THE COURT:  Good morning.
22               MS. LIGHTDALE:  Good morning, Your Honor.  Sarah
23   Lightdale from Cooley also for the defendants.
24               THE COURT:  Good morning.
25               Would you call the other matter too?
```

5

```
1              COURTROOM DEPUTY:  The Tansey?

2              THE COURT:  Did they give you a number on it?

3              COURTROOM DEPUTY:  Pardon me?

4              THE COURT:  Did they give you a number on it?

5     (Off-record discussion between court and courtroom deputy.)

6              COURTROOM DEPUTY:  Tansey versus Perry, et al.,

7     Civil Case No. 18-cv-2460.

8              THE COURT:  All right.  Counsel late yesterday

9     received a motion from Mr. Hartlieb.  I don't believe he's

10    here.  I think you all know him or some of you know him.

11             MR. BLANCHFIELD:  I don't see him in the

12    courtroom.

13             THE COURT:  All right.  So we will just put that

14    till the end.  So let's begin with our motions that are

15    before us.

16             Who wants to proceed?

17             MR. AGUILAR:  I can go first, Your Honor.

18             THE COURT:  Thank you.

19             MR. AGUILAR:  Would you like me at the podium,

20    Your Honor?

21             THE COURT:  Oh, most definitely.

22             MR. AGUILAR:  Thank you, Your Honor.  George

23    Aguilar, again, with Robbins Arroyo on behalf of plaintiff

24    Tansey.  We've made an application to be appointed lead

25    counsel in the matter.
```

6

```
1              Your Honor, we think the three most critical
2    factors in the court's discretion in appointing lead counsel
3    are to look at the experience and knowledge of the proposed
4    lead counsel and his firm, the record of success by that
5    firm and the resources that firm can bring to bear, and we
6    believe we compare favorably on all three points.  Our firm
7    has been a derivative litigation focused firm for over ten
8    years.  We bring a vast number of lawyers and experience --
9              THE COURT:  You talk about the numbers of lawyers
10   that are in your firm, but I need to know who is going to be
11   running this.
12             MR. AGUILAR:  Yes.  I am going to be running this,
13   the litigation, as the lead litigation partner.  Steve
14   Wedeking will be, an associate in the firm, and Ashley
15   Rifkin, also a partner at the firm, will also be assisting
16   in the litigation.  And we will have other resources to bear
17   as they are required and especially with respect to the
18   discovery that may be propounded in the case.
19             THE COURT:  All right.
20             MR. AGUILAR:  Our record of success is focused on
21   the derivative litigation.  As we lay out in our papers, the
22   success we have had in bringing necessary corporate reforms
23   where needed and to obtain financial recoveries on behalf of
24   the company and other shareholders are in the context of
25   derivative litigation.
```

RENEE A. ROGGE, RMR-CRR
(612)664-5107

EXHIBIT 27
210

7

```
 1              We do have a diversity practice within our firm.
 2    Myself, a former criminal prosecutor, also active in the
 3    antitrust practice, but primarily in the derivative space.
 4    We have other lawyers active in the 10(b) space, class
 5    action space.  Ms. Rifkin has been focused on the derivative
 6    angle for a number of years and as has Mr. Wedeking.
 7              And then, lastly, Your Honor, I can address the
 8    Hartlieb thing when it gets brought up, but we have never
 9    been denied a lead counsel as a result of any of these types
10    of allegations that have been brought forward.  In fact,
11    they have been brought by Mr. Hartlieb once before.
12              THE COURT:  Well, let's not talk about that right
13    now.  He's not here and --
14              MR. AGUILAR:  Very well.
15              THE COURT:  But I do need you to talk to me about
16    your plaintiff.
17              MR. AGUILAR:  Yes.  Mr. Tansey has been a
18    stockholder of the company since 2003.  He is a minor
19    stockholder who owns 13 shares, but, nonetheless, a
20    long-term holder, selling as the market would require, and
21    he currently holds 13 shares of the corporation.
22              THE COURT:  All right.  Anything else you wish to
23    bring forth at this time?
24              MR. AGUILAR:  Unless the court has some questions.
25              THE COURT:  Not at this time.  We will hear from
```

8

```
 1     everyone and then we will go -- I may have another round.
 2              Who is next?
 3              Let me -- no.  Come on back up.
 4              MR. AGUILAR:  Sure.
 5              THE COURT:  I need -- as you well know, I have
 6     handled a number of MDLs, and one of the things that is very
 7     important for me is coordination and cooperation, and you
 8     didn't talk about that with the other firms that are
 9     involved in this.  So I need to know, Did you meet and
10     confer?  What is your --
11              MR. AGUILAR:  We did.
12              THE COURT:  Have you had problems with -- in one
13     of the MDLs I had many, many years ago I didn't find out
14     that there were lawsuits between the lawyers in another MDL.
15     Everyone was quiet about it, because they wanted to get it
16     appointed.  And then once they got it, I'd made my
17     appointment, then I found out that there was lawsuits
18     between two of the lawyers and that caused a lot of
19     problems, so --
20              MR. AGUILAR:  No.  We certainly don't have any of
21     those issues with any of the other firms.
22              We did have discussions with a member of the firm
23     that makes up the Bragar firm.  There were discussions in
24     earnest to try to resolve a leadership or put together a
25     leadership structure.  It was our view that what was being
```

9

```
1    proposed, that we were being asked to be a part of, was just

2    too large, too diffuse.  It didn't really have a focus or a

3    sharpness that would allow the litigation to proceed

4    efficiently.  I have had recent discussions with

5    Mr. Federman and again along the same lines.

6            I believe for a case like this in an MDL

7    proceeding, which is already going to be fairly coordinated

8    and consolidated and managed by the court, we just thought

9    it was important that the top of the leadership structure be

10   as efficient and focused as possible.  So that's why we

11   proposed just a one-firm leadership structure at the top.

12           We do have experienced Minnesota counsel in

13   Reinhardt Wendorf in the representative litigation aspect.

14   But if we are appointed lead counsel, obviously, the first

15   thing we would do would be to consolidate the cases, put

16   together a consolidated complaint.  We would encourage and

17   ask the other plaintiffs to join in the case, and they

18   would, the other firms, would have an opportunity to

19   participate in the litigation, if their client decides to

20   partake in the case.  It would be -- you know, we are

21   dealing and up against very experienced and excellent

22   defense counsel, so there will be a need for significant

23   resources in this case, and we will be more than happy to

24   bring the other firms along.  We just thought at the very

25   top and there should be a very sparse and focused structure
```

```
 1   at the top, and that's what we propose.

 2            THE COURT:  Well, other than having a king at the

 3   top or a queen at the top, what's your management structure?

 4   What are you proposing?

 5            MR. AGUILAR:  No formal committee structure.  It

 6   would involve, again, based on the participation of the

 7   plaintiffs, other plaintiffs in this case, a doling out of

 8   work as it becomes available in the case, probably initially

 9   not at the pleading stage.  That will be work that will be

10   handled by our firm and the Reinhardt firm.  But once we get

11   to discovery, if we are able to do that, there will be a

12   significant amount of work to be done in that arena, and we

13   would propose to have other counsel involved in that case,

14   to the extent that they are willing to or have the resources

15   at the time to do so.  We just believe that the management

16   of the practice -- the management of the case should

17   generate and originate from the focused leadership.

18            THE COURT:  What's your position dealing with the

19   other MDL that's involved here, the consumer side?

20            MR. AGUILAR:  We would certainly -- those cases

21   are progressing.  We would reach and make contact with lead

22   counsel on the plaintiffs' side for those actions.  We would

23   be particularly interested in the 10(b) action that's

24   proceeding, the securities part of the MDL.  There may be

25   some issues in common with this case that we'll certainly
```

```
 1    work with the defense counsel and perhaps establishing an

 2    efficient way to resolve those types of issues in

 3    conjunction with what's already occurred in the securities

 4    case and what's being proposed to occur in the securities

 5    case.

 6           THE COURT:  Now, you've indicated that you have

 7    been involved in a number -- that your firm is a derivative

 8    lawsuit firm.  Have you had other cases that you can cite to

 9    me that you have dealt with the consumer side and it's

10    worked well and --

11           MR. AGUILAR:  Yeah, not so much on the derivative

12    MDL side.  I am currently part of an antitrust MDL as lead

13    counsel in one of the cases, antitrust cases that does have

14    a significant component with consumer -- with the consumer

15    cases, and we have been in very open and constant contact

16    with those lawyers.  It's the Interchange MDL case and the

17    Credit Card antitrust action in the Eastern District of New

18    York.

19           We're currently serving as associate counsel in a

20    consumer class action involving pharmacies and their

21    payments of certain usual and customary prices with respect

22    to the pharmacy benefit managers, and we have been working

23    in close contact with the consumer lawyers in that

24    particular instance.

25           So I don't anticipate any issues at all with
```

```
 1    respect to our ability to cooperate and coordination with

 2    any of those cases, with any of the cases that are currently

 3    making up the MDL, and that would involve certainly

 4    discovery, where we do think there probably will be a

 5    significant amount of overlap in terms of the documents and

 6    the discovery that's produced and would proceed and want to

 7    do it in the most efficient way possible.

 8              THE COURT:  All right.  Thank you.

 9              You have given me a list of cases where you were

10    either lead counsel or co-lead counsel, but you never

11    mentioned who the judges were.

12              No?  None?

13         (Off-record discussion between court and clerk.)

14              THE COURT:  You gave me the name of the cases, but

15    you didn't give me the name of the judges, which is --

16              MR. AGUILAR:  Sure.  In our pleading, Your Honor,

17    in our briefing, we did list -- I think it's a page and a

18    half and attached the transcripts of the judges who have

19    commented on our work, and that would include, for example,

20    District Court Judge Kinkeade in the Northern District of

21    Texas.  And we certainly can match those judges up with the

22    cases we mentioned in the early part of the brief.  So we do

23    have a listing of the judges who have proposed and stated on

24    the record complimentary things of the way we litigated the

25    case and the results that we have achieved.  And I certainly
```

13

```
 1    have no --
 2            THE COURT:  I am sure that's at the end of the
 3    case when you, when it's --
 4            MR. AGUILAR:  Right, right.
 5            THE COURT:  I'm just teasing you.
 6            MR. AGUILAR:  Yeah.  No, no, that's -- that's --
 7            THE COURT:  I have done that many times.
 8            MR. AGUILAR:  Right.
 9            THE COURT:  So, no, I've just -- time flies.  I
10    have been -- soon I will be -- this is my 25th year as a
11    federal judge, and so I know a number of the judges and
12    especially on the MDL side.  So I just wanted to make sure
13    that I got all the names; and so if I wanted to make a quick
14    call, I could do that.
15            MR. AGUILAR:  Certainly, Your Honor.
16            And to the extent that the cases that we cite in
17    our brief and in our resume aren't reflected in the comments
18    made by the judges that are within our brief, I certainly
19    can provide a correspondence to your court listing those
20    judges.
21            THE COURT:  Please.  Make it easy for me.
22            MR. AGUILAR:  I will do so.
23            THE COURT:  I am senior status now.
24            MR. AGUILAR:  I will do that.
25            THE COURT:  I am just teasing you.
```

14

```
 1                MR. AGUILAR:  All right.

 2                THE COURT:  All right.  Anything else you --

 3                MR. AGUILAR:  Not unless the court has additional

 4      questions.  Thank you.

 5                THE COURT:  All right.  We may have a second

 6      round, so --

 7                All right.  Who is next?  Good morning.

 8                MR. EAGEL:  Good morning, Your Honor.

 9                I've prepared a little graph I thought would maybe

10      be helpful to the court.  Can I approach and just hand --

11                THE COURT:  Please.  Have you given it to all

12      counsel?  I need one for my law clerk too.  Okay.  Good.

13                MR. EAGEL:  Good morning, Your Honor.

14                THE COURT:  Good morning.

15                MR. EAGEL:  May it please the court.  Lawrence

16      Eagel, Bragar Eagel & Squire.  We are here this morning

17      seeking the appointment of our client Tim Ault as lead

18      plaintiff and our firm as lead counsel.

19                First, with respect to the appointment of our

20      client as lead plaintiff, Tim Ault has been a long-time

21      shareholder of CenturyLink.  He's owned shares since 1999.

22      We have disclosed he has 235 shares.  He's submitted an

23      affidavit saying that he's committed to prosecuting the

24      action and supervising counsel or at least being a part of

25      the process.  So I think he's -- he is probably the most
```

```
 1   qualified plaintiff of all of the plaintiffs, and I will
 2   describe why in a few minutes.
 3            THE COURT:  What's his background?  Why would he
 4   want to take on that?
 5            MR. EAGEL:  I believe he's an -- he's an
 6   investment advisor, I mean, a skilled investor.  I'm not
 7   sure he's an investment advisor.  And I don't have more
 8   information for you.  I wish I did, but I don't have more
 9   information.  I have -- others in my office have been more
10   in touch with him.  And I apologize that I don't have more
11   information, but what I understand is he's an experienced
12   investor and I understand he's interested in the case and
13   willing to participate in the case and wants to participate
14   in the case.
15            So let me speak a little bit about the reasons why
16   our firm should be appointed lead counsel in this case.
17            Well, first, I would say, in terms of the lead
18   plaintiff as compared to Mr. Tansey, he has not submitted a
19   declaration saying that he will support his lead plaintiff
20   position.  And as we point out with respect to IMG, which
21   is -- and there are a few reasons why we believe
22   Inter-Marketing Group is not a proper plaintiff, one of
23   which is that they're a corporation and as a result of being
24   a corporation I don't think they're a traditional, but they
25   refer to themselves as an institutional investor, but I
```

```
 1    think in reality they're a corporate investor, and as a
 2    corporate investor they have their own fiduciary obligations
 3    to their shareholders, and, therefore, a possibility is they
 4    will be required -- they might sell their shares; and if
 5    they do sell their shares, they are, in fact, will lose
 6    standing.  I think that's something the court sort of is
 7    familiar with.  So I think that was one reason, and I will
 8    speak in a few minutes about the additional reasons and that
 9    is the vigor with which we've pursued the case.
10            I think with this what's important, I think, Your
11    Honor, is in terms of the standing of or how the cases have
12    been prosecuted, our firm has been proactive and --
13            THE COURT:  Let's back up.
14            MR. EAGEL:  Okay.
15            THE COURT:  My first question, Who is going to
16    lead the charge here from your firm?
17            MR. EAGEL:  I will, Your Honor.  I will be the
18    lead.  I will be the lead attorney from -- and we can talk a
19    little bit about the resources of our firm, but I will be
20    the lead attorney from our firm handling litigation.  With
21    me will be -- and I have been practicing litigation for
22    35 years, law for 35 years, I guess litigation probably most
23    of that time.  A few years before that I was a certified
24    public accountant.  I have spent the last 10, 15 years
25    focused more on derivative-type litigation representing
```

1   shareholders in various types of derivative litigation.

2   We've -- and so that's been my experience.

3           I was involved in several of the cases that we

4   have identified for Your Honor.  The *Activision Blizzard*

5   case was a case I was intimately involved with.  It was our

6   client.  We worked with other counsel and ultimately

7   succeeded in achieving a $275 million recovery on behalf of

8   the company, in fact, got a fee award of $72 million showing

9   that the court recognized the effort of counsel and the

10   unique effort of counsel.  In another case -- I was also

11   involved in the *El Paso* trial case, a case tried before --

12   and in terms of the judges that were involved, the judges

13   that were involved in the *Activision Blizzard* case is a vice

14   chancellor -- Vice Chancellor Laster, Travis Laster from

15   Delaware.  He's in the Court of Chancery in Delaware.  Vice

16   Chancellor Laster also was the judge in the trial in the *El*

17   *Paso* litigation.  The *El Paso* litigation was a derivative

18   case we tried through verdict and secured a verdict of -- in

19   that case a liability award of $171 million following a

20   finding of bad faith on behalf of the directors.  In fact,

21   subsequent, sort of, at the close of the trial, the trial

22   court -- the company merged, El Paso merged with the

23   subsidiary, and ultimately our client lost standing.  There

24   were posttrial proceedings involving our standing, and

25   ultimately the case on appeal.

18

```
 1              THE COURT:  Dismissed.

 2              MR. EAGEL:  Excuse me?

 3              THE COURT:  It was dismissed.

 4              MR. EAGEL:  Yes, on appeal.  And that was as a

 5    result of the loss of standing, having nothing to do with

 6    the trial.  And even in the Delaware Supreme Court decision

 7    reversing the judgment that the vice chancellor had

 8    instituted in the case, the Supreme Court said in this

 9    difficult and troubling case we have to reverse because of

10    the loss of standing.  But I think that's -- it's a lesson

11    we have learned in terms of what could happen if you don't

12    have control over the shares that you hold, because the same

13    result could happen if ultimately you sell the shares or the

14    shares are otherwise -- you are not in control of that,

15    whatever, for Inter-Marketing.

16              Another more recent case, Your Honor, is before,

17    also a derivative case, before Vice Chancellor Slights in

18    the Delaware Chancery Court in which we have -- we're

19    representing a shareholder in a suit on behalf of Enbridge

20    Energy Company.  The suit was ultimately -- recently

21    Enbridge announced a merger, a roll-up of its subsidiary.  I

22    have unique expertise in master limited partnership

23    litigation.  And as a result of the roll-up, as a result of

24    the transaction, there were merger negotiations between

25    Enbridge Energy, Inc., Enbridge, Inc., and the master
```

19

```
 1   limited partnership.  We interjected ourselves into those
 2   negotiations seeking to have the committee that was
 3   appointed value the derivative claim.  The committee that
 4   was appointed valued the derivative claim at close to a
 5   hundred million dollars, used that value in its negotiations
 6   with Enbridge, Inc., and ultimately there was an increase in
 7   the -- in the exchange ratio from about 3083 to about 3.33.
 8   Ultimately, that case, as a result of the closing of the
 9   merger, the case was dismissed to avoid a fee application by
10   our firms.  We negotiated a fee of 14 and a half million
11   dollars with the defendants on the case.
12           So we have achieved, I think, success.  We have
13   achieved success recently, and we've achieved success in
14   derivative cases.
15           In terms of -- I know I can -- I can continue.  I
16   kind of -- in terms of the consumer cases, I know Your Honor
17   mentioned consumer cases.  These cases have not
18   traditionally been consumer cases that I have just referred
19   to.  We have been in consumer cases, but not within a
20   derivative context that I can recall.  The derivative cases
21   ordinarily involved, sort of, the conduct of the board of
22   directors and their, sort of, obligations to monitor the
23   activities.  I also --
24           THE COURT:  The only reason I mention it is
25   because I have -- I have these two MDLs.
```

20

```
 1              MR. EAGEL:  Yeah, understood.

 2              THE COURT:  And the --

 3              MR. EAGEL:  Understood.

 4              THE COURT:  -- same issues.  And so I want to see

 5     if you've had that type of experience.

 6              MR. EAGEL:  Well, our firm actually did represent

 7     a class of -- this is actually a class of purchasers of

 8     Camel Cash cigarettes.  We ultimately entered into a

 9     resolution, but this involved what were called C-Notes for

10     Camel Cash cigarettes.  For years in California and

11     throughout the country there was -- there were these C-Notes

12     that were much like -- I don't know if you remember Plaid

13     Stamps back in the day.  The C-Notes they would -- people

14     would buy packs of cigarettes, get C-Notes, be encouraged to

15     collect the C-Notes.  Ultimately, R.J. Reynolds terminated

16     the program without notice, and we --

17              THE COURT:  Do you really want to talk about that

18     and your attorney fees that were cut?

19              MR. EAGEL:  No.  I really just wanted to tell

20     you that -- I'm sorry.  I wanted to just tell you that it

21     was one of the cases we had.  It was a consumer case, and

22     the attorneys fees is -- it's more, sort of, just that we've

23     had some consumer experience.  That's all.  Yes, we have

24     succeeded in obtaining attorneys fees, but that really was

25     more so -- I was trying to really just touch on the consumer
```

1    experience.

2            I think in terms of Your Honor's questions

3    regarding our ability to interact with other counsel and as

4    well as counsel for the defendants and counsel in the other

5    cases, I think that we have had experience in all of those

6    areas.

7            I think, first, with respect to counsel in the

8    other securities cases, we have worked with counsel and

9    throughout the country in a number of different securities

10   cases.  I do think there would be some overlap through

11   discovery.  There might be depositions, since some of the

12   issues are related as it relates to the disclosure claims,

13   that while they touch on similar issues that might require

14   coordinated discovery, coordinated deposition, coordinated

15   document discovery.

16           I think in terms of -- excuse me -- in terms of

17   coordination -- and I guess I spoke a little bit about

18   myself.  I didn't get to tell you anybody else who is going

19   to be on the case.  I would be on the case, leading the

20   case.  In addition, our firm would have David Stone.  He's

21   been with us for about, I would say, close to eight or

22   nine years, and he would -- he's practicing law for about

23   25 years.  He will also be involved.  Melissa Fortunato has

24   been with us.  She submitted the affidavits.  She will work

25   for about -- she's been out about six years.  She will be on

```
 1    the case.  I think we have Todd Henderson, who is also a
 2    more junior lawyer.  He will be on the case.  I expect that
 3    one of the things we're prepared to do is to devote the
 4    resources that's necessary to prosecute the case.
 5            We've also, as Your Honor knows, been supported in
 6    leadership in this case by both the Johnson Fistel firm and
 7    the Weiser firm.  Okay.  We are not seeking lead on their
 8    behalf, but we are supported by them.  And they have in
 9    fact -- and part of --
10            I know Your Honor asked about, well, any
11    leadership, how would we envision leadership amongst the
12    group of attorneys here.  We were not able to come to an
13    agreement amongst the attorneys here as to how -- a
14    leadership structure.  Often that involves who is going to
15    lead the charge, often involves economics, and certainly is
16    something I think that we concluded that we felt we could.
17    We had -- we had the right theory.  We had the right client.
18    We felt we were committed to pursuing the case.  We were
19    supported by Johnson Fistel and have nothing negative to say
20    about the other attorneys here, frankly.  It is not that the
21    attorneys here are bad attorneys.  It's just we had to
22    just -- we think these cases are effectively managed when
23    run by lead counsel who is sort of taking charge, running
24    the show, and not necessarily splitting authority amongst
25    ten or, you know, five or six different firms.  It just
```

```
1    happens.  And that was what we were planning.  We did feel

2    like we had support from the Johnson Fistel firm and the

3    other firm as well.

4              And I think that's really why we are here.  We

5    just didn't reach an agreement.  I know other counsel will

6    say they all reached out to try to come to some agreement.

7    I think we were prepared to try to come to some agreement,

8    but I think economics as well as just the desire to lead the

9    case and desire to be the one making the decisions was part

10   of what led us to where we are.

11             THE COURT:  Okay.

12             MR. EAGEL:  I think in terms of --

13                (Mr. Hartlieb entered the courtroom.)

14             THE COURT:  Mr. Hartlieb?

15             MR. HARTLIEB:  Here, Your Honor.

16             THE COURT:  Welcome.  We will get to you.  I just

17   assumed that, that you were you.  And so just have a seat.

18             MR. HARTLIEB:  Thank you, Your Honor.  Thank you.

19             THE COURT:  And we will get to you in a little

20   bit.

21             I am sorry, counsel.  Go ahead.

22             MR. EAGEL:  So I did want to just talk a little

23   bit about why we think, in addition to Mr. Ault, our firm is

24   the proper, sort of, selection in this case.  It's a

25   close -- it's a close question, and I am here trying to tell
```

```
 1    you that I think we will do the best job.  We will work hard

 2    at it.

 3              We filed -- as you can see from this little

 4    schedule, one of the things it does say is we made a demand

 5    in September 2017, the first demand made by anybody in the

 6    case.  We also have a long-time shareholder.

 7              I think one of the things we have -- and I think

 8    Your Honor may have asked a little bit about Mr. Tansey.

 9    Again, he didn't submit an affidavit.  And one of the things

10    that we did point out in our briefing was the fact that, in

11    fact, he filed --

12              THE COURT:  District of Minnesota.

13              MR. EAGEL:  Yeah, which is a district that doesn't

14    have personal jurisdiction over the defendant in this case

15    or, in fact, it's -- you know, you would have to ask -- ask

16    Tansey why they would file in the District of Minnesota,

17    other than we understand there was an MDL here, but you've

18    got to have jurisdiction, and I don't believe there's

19    jurisdiction under the Bristol-Myers case we cited and

20    discussed in our brief.  We think that's an opportunity for

21    the defendants to raise another issue in support of their

22    motion to dismiss that shouldn't be before us.

23              We do expect much of the discovery to occur in

24    Louisiana.  We have, you know, we will be --

25              THE COURT:  It's warmer here.
```

25

```
 1            MR. EAGEL:  Well, I don't know about that.  I have
 2   a feeling defendants may say differently, but I think that's
 3   where a lot of the discovery will be.
 4            Let me talk a little bit about the Inter-Marketing
 5   Group.  I mentioned the fact that they had -- they were a
 6   corporation and that they were -- that there's a risk of
 7   selling the shares.  And I think -- I think Your Honor knows
 8   that the Inter-Marketing Group originally moved to be lead
 9   as in connection with their bondholder case.  They pursued
10   that, and this was sort of the backstop, sort of, let's go
11   the second route.  And as you can see from the chart here,
12   they didn't actually file the demand until 2018.  And so
13   that's over a year after we made the demand to the special
14   litigation committee.  And they didn't file their complaint
15   until December 26, 2018.
16            So while I think they are all fine lawyers, I
17   think we've showed through the way we have prosecuted the
18   case that we have prosecuted properly, you know, and that we
19   have the resources to lead the case.
20            THE COURT:  Appreciate it.
21            MR. EAGEL:  Thank you, Your Honor.
22            THE COURT:  Thank you.
23            Good morning.
24            MR. FEDERMAN:  Good morning, Your Honor.  William
25   B. Federman, Federman & Sherwood, on behalf of the IMG
```

26

```
1    Group.
2           If I may, Your Honor, I'll address any questions
3    you have; otherwise, I would like to respond, if I might, to
4    some of the comments by other counsel.
5           The Bragar Law Firm I am not familiar with,
6    although I was told they played a role in one or two of my
7    other shareholder derivative cases.  By reputation, they
8    seem like a good firm.  The only problem, if there is one,
9    with the Bragar firm is I couldn't get a phone call returned
10   or an email responded to.  I had to call Mike Fistel, one of
11   their supporting lawyers, twice, Your Honor, to have someone
12   from their law firm return my call.  I don't know why that
13   is, but that's not a good way to present yourself, as you
14   know, if you are going to be a lead counsel.
15          In the briefing filed by the Bragar firm,
16   Document 343 at page 15 of 17, they note that they did not
17   reach out to me or my firm to try to work anything out here.
18   I did repeatedly try to get them to the table to talk about
19   a structure here.  I finally got a phone call.  I made a
20   proposal.  They were going to get back to me, which they did
21   not do.
22          Mr. Aguilar and I have known each other for a long
23   time.  We have had plenty of cases together, which, frankly,
24   surprises me in their pleadings, Your Honor, on
25   Document 358, page 6 and 7, they say that they are not
```

1    familiar with the results of any of our cases, which is odd.

2    It may have been the same associate who filed in the wrong

3    jurisdiction.

4            I was co-counsel with the Robbins firm in *Cell*

5    *Therapeutics* in the Western District of Washington, Your

6    Honor.

7            I worked closely in the *Dynavax* case, Alameda

8    County, California, where they filed in federal court, I

9    filed in state court.  We worked closely.  I presented the

10    settlement.  We had an objector.  The settlement was

11    sustained.  They asked me to make the presentation.

12            In the case of *Hemispherx*, Eastern District of

13    Pennsylvania, we were co-counsel.

14            In the *Spectrum* lawsuit, Clark County, Nevada,

15    they filed in state court, I filed in federal court.  They

16    asked me, Your Honor, to make an appearance on behalf of

17    their client in state court to present the settlement for

18    approval to the court.

19            And then there's the *SandRidge Energy* case,

20    Western District of Oklahoma, that Mr. Aguilar is very

21    familiar with.  I was part of the leadership structure of

22    that case before Judge Lee R. West, one of the finest

23    federal trial judges on the bench, now senior status.

24    Mr. Aguilar filed in state court where he was stayed after

25    initial activity.  He then pursued nothing other than his

```
1    fee application before the Western District of Oklahoma,

2    where he lost and the judge poured him out.  He then took it

3    up on appeal to get his fee.  And I spoke to him.  I asked

4    him if he wanted me to intercede on his behalf.  He said no.

5    And he wound up losing, getting no fee in the case, even

6    though he did provide services in the case.

7              So to come to the court and now say we don't know

8    anything about the Federman firm just smacks of lack of

9    candor.  I would look forward to working with these counsel.

10             T.J. McKenna.  Your Honor, his firm was part of

11   the Spectrum group of law firms.  He and I are co-counsel in

12   the case.  It's a small bar when you get into this practice

13   area.

14             Now, if you say, well, Mr. Federman, what

15   distinguishes you and your firm from these other lawsuits, I

16   would say, first and foremost, I will be the first person

17   standing for the plaintiffs at trial and I will be the last

18   to sit for the plaintiffs at trial.  I will be working with

19   other lawyers within my firm, particularly Sara Collier, who

20   George knows very, very well.  She has done nothing but --

21             THE COURT:  Please, no first names.  Please.  No

22   first names.

23             MR. FEDERMAN:  Ms. Collier.

24             THE COURT:  No first names.

25             MR. FEDERMAN:  Oh, I am sorry.  Mr. Aguilar.
```

```
 1              THE COURT:  Thanks.

 2              MR. FEDERMAN:  Excuse me.

 3         Sara Collier from my firm has been practicing

 4    shareholder derivative litigation exclusively for 13 years.

 5    She's worked very, very closely with numerous attorneys at

 6    the Robbins Arroyo Law Firm.

 7              If you say, well, Mr. Federman, what concerns do

 8    you have?  Well, obviously, his client having 13 shares, and

 9    I think I heard that right, is somewhat of a concern.  And I

10    understand now why he sought for only lawyers to be

11    appointed and not a client, but that doesn't matter to me.

12    They're a good law firm.  I would welcome them in part of a

13    structure.  Having multiple partners billing to the case may

14    or may not be necessary.  That's something that Mr. Aguilar

15    and I could discuss.

16              As far as the Bragar Law Firm goes --

17              THE COURT:  Why don't you tell me, after I denied

18    a motion, it took you six months to file.

19              MR. FEDERMAN:  Your Honor, there, frankly, was no

20    rush to file.  They talk about the vigor in pursuing the

21    case, but in fact nothing has happened to this case other

22    than more facts have come out.  A shareholder derivative

23    case is not like a class action.  It's not the first to

24    file.  Inter-Marketing Group, which they say did not pursue

25    with vigor, is in the exact same spot, except with a better
```

```
 1    drafted complaint than the Bragar Law Firm, because we had
 2    more facts on which to base the complaint.  There was no
 3    reason to file early other than to stand in front of the
 4    court and say we filed first.  I am sure if they file enough
 5    derivative cases that they were filed third or fourth in
 6    order.  Robbins Arroyo has filed six, seven months after
 7    other law firms in some of my cases, and I have welcomed
 8    them into the structure.  I spoke to Mr. Aguilar in the
 9    hallway again, after having reached out to him earlier, and
10    said do you want to work something out here.  And he said
11    no.  So, you know, I will work with him.
12            Now, you asked about the differences.  MDL
13    experience, Your Honor.  I think in this group I am the only
14    one who has been lead counsel in multiple MDL consumer
15    cases.  Judge Gwin in the Northern District of Ohio
16    appointed me over the *Sonic* data breach case as the sole
17    lead counsel with seven PSC members from around the country,
18    including New York counsel, Louisiana, South Carolina.  It's
19    a good diverse group.  And I'm lead in that case.  The
20    *Samsung* washing case, Your Honor, is a massive case.  We
21    have counsel from around the country on the PSC.  Judge
22    DeGiusti in the Western District of Oklahoma.  I am co-lead
23    counsel with a Lieff Cabraser case.
24            I have reached out to the consumer part of this
25    case in the MDL because I think particularly the arbitration
```

```
 1      issue is important to the derivative case, because if it's

 2      forced into arbitration, we lose access to a great deal of

 3      discovery.  And I know Mr. Bragar discussed how they will

 4      coordinate depositions and we could attend them, but if

 5      there are no depositions, it becomes a bigger issue.  So we

 6      have reached out to those attorneys.  We have reached out to

 7      the class action counsel.  I know Max Berger very well.

 8            But, Your Honor, where it comes down is I'll work

 9      with these other firms.  We will efficiently handle this

10      case.  If you say, well, what's the advantage of being in

11      the central part of the United States?  Cost of doing

12      business, Your Honor.  Our billing rates are very

13      competitive.  I have got a specialist in Ms. Sara Collier,

14      who they have worked with.  T.J. -- excuse me.  Mr. McKenna

15      speaks with her periodically.  We're co-counsel on a case

16      now.  I think all these firms have had good results in

17      cases.  I am not going to say otherwise.

18            Mr. Bragar's law firm has a client who literally

19      has less than a one percent investment position compared to

20      IMG in this case.  There is no commitment by any other

21      plaintiff to hold stock throughout this proceeding.  As

22      Mr. Bragar discussed with you, his client could lose

23      standing at any time.  A 13 shareholder?  A 13-share

24      shareholder could sell at any time.  Mr. Bragar's client

25      with less than 300 shares could decide to sell at any time.
```

1    IMG, who he criticizes for some perceived lack of standing,

2    where all he had to do was call me, just give me a call, I'm

3    available, and say, Bill, is there a -- or, Mr. Federman, is

4    there an investment policy for IMG that will cause this

5    company to sell?  And I would have said no, there is none.

6    Instead, he makes a fanciful argument, which has no basis.

7    And as the court knows, for a trial attorney, candor,

8    accuracy and evidentiary value matters.

9         So here we stand, Your Honor, in front of you

10   ready to serve in a capacity of either lead counsel with a

11   three-member executive committee or I will be co-counsel and

12   gladly do that.

13        As far as resources, we have dropped from 18

14   attorneys at the Robbins Arroyo firm to some number of

15   multiple partners and an associate.

16        Your Honor, we just resolved the case in front of

17   Judge Consuelo Marshall in the Central District of

18   California, a very fine judge.  It took five years to do it.

19   We had a trip to Pasadena to the Ninth Circuit.  Sullivan &

20   Cromwell was on defense.  And the case was resolved

21   favorably for the plaintiffs, a $13 million recovery.  Fees

22   were awarded at 28 percent, which is above the benchmark of

23   the Ninth Circuit, as you may be aware.  We had an

24   institutional client there, who was a corporation.  Every

25   institutional client, Your Honor, is either a trust or a

```
 1    corporation.  That's why they're an institutional client.

 2    So if you would like to call a judge that knows my firm and

 3    the quality of work we do, Judge Marshall would be a perfect

 4    one.  She approved the settlement last week.

 5            That also frees up both resources, i.e., cash, as

 6    well as attorney time.  We are committed to this case.

 7    Ms. Collier will be on this case nearly exclusively.  This

 8    is a big case.  There are a lot of moving parts in it with

 9    the investigation by the AG.  It's a large board.

10            I would welcome the assistance of these other law

11    firms, if they want to continue to participate.  I look

12    forward to working with the Bragar firm.  I have no issue

13    other than admiration for Mr. McKenna, who has been my

14    co-counsel.  He returns calls.  He responds.  He does his

15    work on time.  It doesn't take that much to work

16    cooperatively.  And we have shown we do that in other cases

17    in MDLs, and that's why we have been selected.  I am not a

18    jack of all trades.  We restrict our practice to certain

19    areas, and those areas are shareholder derivative cases,

20    securities class actions and consumer cases.

21            I have over the years practiced in other areas.

22    I'm right now co-counsel in a police shooting case out of

23    Bixby, Oklahoma, where a police officer lit up a 16-year-old

24    boy and killed him with eight shots, and I am assisting a

25    lawyer who came to me for financial backing and assistance
```

```
 1    in complexity of his case.  I am glad to help other

 2    attorneys.  And that's how I'd approach this case, Your

 3    Honor.

 4              THE COURT:  Thank you.

 5              MR. FEDERMAN:  Do you have any questions?

 6              THE COURT:  Thank you.

 7              MR. FEDERMAN:  Thank you very much.

 8              MR. MCKENNA:  Good morning, Your Honor.

 9              THE COURT:  Good morning.

10              MR. MCKENNA:  Thomas J. McKenna.  I represent

11    three individuals who are stockholders of the company.

12    Thank you for having us here today.

13              These lead plaintiff contests always make me

14    nervous too because arguments are made that could only help

15    the defense.

16              I reached out to all the firms here -- I am

17    familiar with all the firms; I have worked with all the

18    firms -- to see if we could make a structure.  We were not

19    successful.  It doesn't mean it couldn't happen.

20              I have worked with Mr. Federman, as he's told you,

21    many times.  And when I saw his papers that he represented

22    an institution, a corporation that holds 2,600 shares, that

23    the man has submitted a sworn statement that he will not

24    sell, because standing is a problem -- I have a case in

25    Chicago where my client promised me they were never going to
```

1    sell and had no intention of selling, then they sold.  I had

2    to drop him out of the case.  So I'm aware of those

3    problems, as well as probably happened to everyone.  So that

4    impressed me, a sworn statement of a corporation they're

5    going to hold the shares.  So I agreed to pull back and

6    support Mr. Federman in whatever way he needs.

7            My local counsel, Mr. Perry, has worked with me on

8    a number of cases in this district.  We have been before

9    Judge Schiltz a few times.  We have been before Judge

10   Ericksen.  We have been before Judge Tunheim and Judge Doty.

11   He also is prepared to be liaison counsel, if Your Honor

12   thinks that's appropriate, and he will serve under

13   Mr. Federman as well.

14           So I would just say one other thing too, you know,

15   not -- no one has all the answers, and often the best

16   answers come from collaboration.  I had a law professor who

17   gave us a take-home test.  The class was divided in two.

18   The other kids took their test with their professor in

19   class.  We got the take-home.  They were up in arms.  They

20   thought it was easy.  It was the hardest test I ever took.

21   And we sat in my living room, like six of us, and we came up

22   with, you know, decent answers, but by ourselves we had no

23   chance on that test because it was just too deep.  There

24   were too many levels.  And I learned from my professor that

25   the best -- the best answers come from collaboration, and I

```
 1      would like to see that happen here, judge.

 2                THE COURT:  All right.  Thank you.

 3                Anyone else?

 4                MR. EAGEL:  Your Honor, just one thing.  I just

 5      wanted to say, one, I'm Mr. Eagel.  I know that --

 6                THE COURT:  I can't hear you.  Come to the podium.

 7                MR. EAGEL:  Just, one, I really did just want to

 8      say, one, I'm Mr. Eagel as opposed to Mr. Bragar.  I think I

 9      was referred to as Mr. Bragar a few times.  I didn't want

10      there to be any misunderstanding from Mr. Federman.

11                And, two, I did want to make sure that the court

12      was aware it's not that we've never worked with anybody or

13      unwilling to work with other people.  We couldn't reach an

14      agreement based on the parameters that were being discussed

15      at the time.  We have worked with counsel many times.  I

16      have -- don't have bad words to say about the people that

17      are here.  They have all been good lawyers, and they have

18      spoken well.  It's we have -- in terms of communications,

19      there were communications that were being made by other

20      attorneys to Mr. Federman.  There were communications -- if

21      there was a breakdown, it could have been because of some

22      desire as to who was -- discussions with Robbins Arroyo.  I

23      mean, the discussions that occurred, we just couldn't reach

24      an agreement, but there's no desire not to reach an

25      agreement or not to work with people.  We have worked
```

37

```
 1     consistently with other firms and would continue to do so.

 2     I just wanted to make sure that was clear, Your Honor.

 3             Thank you.

 4             THE COURT:  Thank you.

 5             MR. AGUILAR:  One last thing, Your Honor.  I am

 6     sorry.  I just wanted to -- my co-counsel --

 7             THE COURT:  Well, you have to respond to -- I

 8     think someone said some associate misfiled the case in

 9     Minnesota.

10             MR. AGUILAR:  That wasn't us.

11             THE COURT:  Okay.

12             MR. AGUILAR:  No, we did not misfile.  We did file

13     in Minnesota.  It wasn't misfiled.

14             THE COURT:  Well, and you didn't -- maybe I didn't

15     say it right.  Counsel said that -- he was taking a dig at

16     your firm.

17             MR. AGUILAR:  Yeah.

18             THE COURT:  It's that you don't know what you are

19     doing.

20             MR. AGUILAR:  Right.

21             THE COURT:  And that you had an associate file it

22     in Minnesota.

23             MR. AGUILAR:  That's not the case.

24             THE COURT:  And so you are going to have to

25     respond to that.
```

38

1          MR. AGUILAR:  Sure.

2          At the moment there is no finding with respect to

3     jurisdiction on any of the cases, personal, general,

4     specific.  So that's not to say we couldn't establish

5     jurisdiction with the currently pending complaint.  However,

6     in the end in an MDL we are going to consolidate the cases

7     and have plaintiffs who had filed in Louisiana, filed in

8     Minnesota, and so it becomes a moot case, because if you

9     don't have jurisdiction as alleged by one of the plaintiffs,

10    there's another plaintiff who had alleged previously

11    Louisiana jurisdiction and that might arise and provide the

12    jurisdiction in this case.  So in an MDL that's not as

13    critical as you would -- as it would be in a stand-alone

14    litigation.

15         So I don't believe we've misfiled.  I approved the

16    filing.  It was here in Minnesota.  It's entirely possible

17    we can establish Minnesota jurisdiction here, but it's also

18    possible in an MDL we would be able to establish

19    jurisdiction through the filing of the Louisiana cases.  So

20    I think it's a lot less important in this context than it

21    may be otherwise.

22         And then, secondly, I just wanted to point out, as

23    my local counsel reminded me, we were involved as co-lead

24    counsel in the derivative case against Target in the data

25    breach cases.  That had an MDL, that was an MDL, and had a

```
 1    consumer case component, and Judge Magnuson presided.  So if

 2    you wanted to talk to him, that would be perfectly

 3    appropriate.

 4              And that's all I have.

 5              THE COURT:  Anyone else?

 6              MR. MCKENNA:  No, judge.

 7              THE COURT:  All right.  Let's move on to the other

 8    case, let's recall it, that was just dealing with

 9    Mr. Hartlieb.  Let's call that again.

10              COURTROOM DEPUTY:  Tansey versus Perry, et al.,

11    Case No. 18-cv-2460.

12              THE COURT:  Mr. Hartlieb, come forward.

13              MR. HARTLIEB:  Thank you.  Thank you, Your Honor.

14              THE COURT:  Good morning.

15              MR. HARTLIEB:  Good morning.

16              I would just like to say that I apologize to the

17    court for being late.  I was up bright and early and ready

18    to go, had breakfast, went to put a suit on, had no dress

19    shirt, ran to Nordstrom Rack, pounded on the door, got them

20    to open five minutes early, got the dress shirt.  And let's

21    just say one wrong turn in the skyway and you are in serious

22    trouble, especially a California guy.

23              THE COURT:  So you were in St. Paul?  No.  I

24    understand.  Don't worry about that.

25              MR. HARTLIEB:  Thank you, Your Honor.
```

```
 1              Does Your Honor have any questions?

 2              THE COURT:  I travel quite a bit and --

 3              MR. HARTLIEB:  It was a rookie mistake.

 4              THE COURT:  No.  It's amazing how many times I've

 5      forgotten a tie.

 6              MR. HARTLIEB:  Thank you, Your Honor.

 7              THE COURT:  So I understand, yes.

 8              MR. HARTLIEB:  Does Your Honor have any questions

 9      for me or -- okay.

10              THE COURT:  No.  Proceed with what you want.

11              MR. HARTLIEB:  Okay.  As Your Honor knows, in the

12      amicus brief I lay things out that shows a pattern, a course

13      of conduct over many years.  I, as a shareholder, have had

14      to defend my interests against the likes of Robbins Arroyo

15      and more recently the Weiser Law Firm.

16              I am now in litigation with the Weiser Law Firm

17      because of the chicanery that transpired in the Kansas

18      court.  That case went all the way up to the Kansas Supreme

19      Court.  We had oral arguments at the Kansas Supreme Court.

20      They were admonished, although there is no transcript of

21      that hearing, which I am very dismayed over.

22              And, also, I think that the Robbins firm and I

23      believe, you know, Weiser as well, but especially the

24      Robbins firm, given the long history I have had having to

25      defend my interests against those cases that were
```

```
 1    lawyer-driven, plaintiffs that had no shares, no standing
 2    whatsoever, representing -- I had 8, $900,000 in losses in
 3    Sirius.  So the way I have gotten involved in this is I see
 4    someone that falsely purports to represent the shareholders'
 5    interests or the corporation, the shareholders derivatively,
 6    and then I see no meaningful relief or nearly illusory
 7    relief and a tremendous amount in attorneys fees.  And in
 8    the Kansas case, I mean, I was subjected, I was -- my
 9    character -- I mean, I ended up having to defend my
10    character, and I wasn't the one that did anything wrong.
11    You know, I mean, it's unbelievable the attacks that I took,
12    so -- but it does nothing to dissuade me.  It just
13    galvanizes my convictions and strengthens my resolve.
14            I have been on a quest to expose this
15    lawyer-driven litigation and the strong-arm tactics of firms
16    like Robbins Arroyo.  And I'll tell you, I think the reason
17    that they get away with it is because of who, you know, the
18    Robbins Geller firm is.  I mean, they are a very prominent
19    firm.  And I know many, many attorneys that are very unhappy
20    with what goes on at Robbins Arroyo, but they are afraid to
21    cross them.  So I am the one that's out here.  You know, I
22    am speaking my mind, because I have been a victim of them so
23    many times, and I intend to continue.
24            And with regard to the amicus brief, I didn't have
25    a full service, the notice, you know, who to serve everyone.
```

42

```
 1    And I understand that it could be prejudicial because they
 2    haven't had a chance to respond, but I welcome a response.
 3    That said, if the firms would like to give me a list of
 4    their forthcoming cases in which they are seeking leave, I
 5    could be certain to notify everybody timely and I wouldn't
 6    have to prepare, stay up all night, all weekend long, to try
 7    to draft an amicus brief and get it to the court and then,
 8    you know, fly in.
 9              THE COURT:  Okay.  Anything else you wish to tell
10    me?
11              MR. HARTLIEB:  I mean, basically, that's it in a
12    nutshell, Your Honor.  I think that it's time that, you
13    know, the corruption that's rife throughout derivative
14    litigation needs to be cleaned up.
15              The other issue that I tread lightly on, but I
16    just don't understand why an esteemed federal court judge,
17    after fraud was committed in the case, he submitted a sworn
18    declaration affirming those fees.  I don't understand how it
19    is that a mediator who is supposed to be, you know,
20    nonbiased -- I don't think it's proper for a mediator to
21    affirm fees, you know, whether just or unjust, in my
22    opinion, because it creates at least the illusion of a
23    conflict of interest.
24              And then it's -- I'm dismayed by the fact that
25    during the course of the Kansas case that, you know, Judge
```

```
 1    Phillips did not send a declaration retracting his support
 2    for the fees because they were found to be completely
 3    fraudulent, 1.6 million of which by a convicted felon and
 4    disbarred attorney.  And, Your Honor, I know for a fact that
 5    the Weiser firm knew who Mr. Silow was and that will come
 6    out, you know, during the course of litigation.  And I am
 7    pretty certain that the Robbins Arroyo firm knew who he was
 8    as well.
 9            These firms, when these firms are up to no good,
10    when they are billing illusory hours -- you know, if I had
11    30 minutes with Your Honor in chambers, I could give Your
12    Honor a lot more information with regard to Cardinal Health,
13    an attorney by the name of Colton, things that have happened
14    at the Robbins Arroyo firm that are extremely troubling,
15    extremely troubling.
16            So I ask Your Honor to consider like the Kansas
17    court did.  I understand I am pro se.  I understand I don't
18    have a legal background.  But the Kansas court took my
19    allegations, you know, sincerely and gave me the opportunity
20    to prove what I alleged early on, that there was fraud being
21    committed in that case.
22            THE COURT:  Okay.
23            MR. HARTLIEB:  Thank you, Your Honor.
24            THE COURT:  Thank you.
25            MR. HARTLIEB:  Thank you.
```

```
 1              THE COURT:  Counsel, do you wish to be heard?
 2              MR. AGUILAR:  Yes, Your Honor.
 3              Unfortunately, this is what Mr. Hartlieb does.  He
 4    has done this before.  He filed the last-second pleading in
 5    a case before the Delaware Chancery for which I had and my
 6    firm had placed an application for lead counsel, again, last
 7    second, last minute, all sorts of parade of horribles that
 8    our firm supposedly committed.  And at the time Chancellor
 9    Strine, before his elevation to the Supreme Court, saw the
10    matter, heard the matter, he dismissed it and didn't take
11    into account any of the -- any of the allegations, any of
12    the pleadings.  They were as fanciful as they are in this
13    instance, delusionary in many instances and certainly
14    libelous and slanderous.  And he went ahead and appointed us
15    and me as lead counsel.  We obtained a $68 million default
16    judgment in the case.  We didn't apply for attorney fees and
17    won't until we are actually able to collect on the judgment.
18    But Mr. Hartlieb has no answer for the hundreds of cases
19    where we've successfully settled, where we have had
20    complimentary reviews by the judges involved.
21              The process by which these cases get resolved is
22    closely monitored by the court.  There's a reason for that.
23    And in this particular instance, and specifically I am
24    talking about the *Sprint* instance, there was a settlement in
25    the case that the court approved as reasonable, fair and
```

45

```
 1    adequate to the company and its shareholders and to the
 2    plaintiffs.  The settlement was approved.  The court had a
 3    problem with the fee application, even though the fee
 4    application was negotiated with the direct intervention of
 5    the mediator, Judge Phillips, and we had declarations from
 6    corporate governance experts who also vouched for the value
 7    of the reforms involved.  Now, again, and it's perfectly
 8    appropriate, the judge in Kansas determined, you know, that
 9    wasn't good enough, and he has asserted his discretion and
10    judgment and determined that there shouldn't be an
11    application for the fees at anywhere near the amount that we
12    applied for.  We appealed that, lost that.  We didn't --
13    there was no argument in front of the Kansas Supreme Court.
14    So, you know, the system worked.  The process worked.  The
15    court reviewed it.  Everyone presented their arguments, and
16    the court ruled.
17            In the instance of the disbarred lawyer,
18    unfortunately, the Weiser firm had retained and vetted
19    somebody who purported to be an attorney, was a prominent
20    doc reviewer in the case, and all he did was review
21    documents.  We didn't vet him.  We didn't employ him.  He
22    wasn't part of our sphere of lawyers working on the case.
23    And, unfortunately, it turned out he had misrepresented his
24    status.  He was criminally prosecuted.  He was -- and had
25    served a sentence for defrauding the court and defrauding
```

46

```
 1     the public as a purported attorney.  So, again, the process

 2     worked.

 3            And there's no, again, there's -- aside from the

 4     matters that he brought before you in the pleading that he

 5     lodged this morning, in which we received, again, late last

 6     night by email, that doesn't account for the hundreds of

 7     cases we have resolved successfully and had approved by the

 8     court, through the court's own vigorous and careful scrutiny

 9     over what had occurred in the case.  And that's a record

10     that we stand on and is appropriately before Your Honor in

11     our application for lead counsel.

12            THE COURT:  All right.  I'll give you a week to

13     respond in writing.  It will be the 13th of March.

14            MR. AGUILAR:  Thank you.

15            THE COURT:  By 12 noon.

16            All right.  Anyone else wish to be heard on this

17     issue?

18            Mr. Hartlieb, do you want to have the last word

19     here?

20            MR. HARTLIEB:  Thank you, Your Honor.

21            You know, I may be a lot of things.  Delusional is

22     not one of them.  That being said, the court should also

23     take into consideration that Mr. Aguilar would like to blame

24     the Weiser firm for what transpired, but the Robbins Arroyo

25     firm was the one -- all the fraud was committed in
```

1    fraudulent document review.  Basically, the entire

2    $4.5 million was for document review that was illusory.  All

3    of this was under Robbins Arroyo's supervision.  They were

4    running the case behind the scenes.  They negotiated the

5    case management, you know, agreement, and they were

6    controlling all of the document review.

7           The other thing is, I ask the court to consider

8    this.  The allegations that I make against these firms are

9    very serious allegations.  He says that I am libeling him,

10   slandering him and defaming the firm.  I have asked

11   Mr. Aguilar on numerous occasions if they would like to sue

12   me, I will waive service.

13          I am perfectly happy for you -- if you want to

14   commence an action, then I will get the discovery --

15          THE COURT:  Speak to me.

16          MR. HARTLIEB:  Then I will get the discovery that

17   I need to finally put an end to this, all of this, you know,

18   unjust enrichment, you know, literally bastardizing our

19   judicial process.

20          THE COURT:  Okay.

21          MR. HARTLIEB:  Thank you.

22          THE COURT:  Thank you.

23          All right.  Anyone else wish to speak on any

24   issues?  If not, I will take this matter under advisement.

25          MR. AGUILAR:  Thank you, Your Honor.

48

```
 1              MR. FEDERMAN:  Thank you, Your Honor.

 2              THE COURT:  Thank you.

 3              COURTROOM DEPUTY:  All rise.

 4         (Court adjourned at 10:42 a.m., 03-06-2019.)

 5                         *   *   *

 6         I, Renee A. Rogge, certify that the foregoing is a

 7    correct transcript from the record of proceedings in the

 8    above-entitled matter.

 9                   Certified by:   /s/Renee A. Rogge
                                     Renee A. Rogge, RMR-CRR
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

# EXHIBIT 28

EXHIBIT 28
253

Begin forwarded message:

> **From:** "Michael Hartleib" <mjhartleib@gmail.com>
> **To:** "'Boren, Jill, DCA'" <Jill.Boren@jocogov.org>
> **Cc:** "MSK@HFMLEGAL.COM" <MSK@HFMLEGAL.COM>, "PERRY.BRANDT@BRYANCAVE.COM" <PERRY.BRANDT@BRYANCAVE.COM>, "MARK.MCGRORY@ERISEIP.COM" <MARK.MCGRORY@ERISEIP.COM>, "DOCKETING@ERISEIP.COM" <DOCKETING@ERISEIP.COM>, "'Chuck Schimmel'" <chuck@wrightschimmel.com>, "'George C. Aguilar'" <GAguilar@robbinsarroyo.com>, "'Jay Razzouk'" <jrazzouk@robbinsarroyo.com>, "Robert Weiser" <rweiser@weiserlawfirm.com>, "Brett Stecker" <bdstecker@weiserlawfirm.com>, "'Alfred G. Yates jr.'" <yateslaw@aol.com>, "'Robert Schubert'" <rschubert@schubertlawfirm.com>, "'Willem F. Jonckheer'" <wjonckheer@schubertlawfirm.com>, "James M. Ficaro" <jficaro@weiserlawfirm.com>, "tom@dollar-law.com" <tom@dollar-law.com>, "'Dustin Schubert'" <dschubert@schubertlawfirm.com>, "'Brian J. Robbins'" <BRobbins@robbinsarroyo.com>
> **Subject: FW: Emailing:  Amicus Curiae Centurylink**

Dear Ms. Boren, I hope this email finds you well. I thought that the Honorable Vano would be interested to know that my quest to expose lawyer driven litigation and corruption rife throughout the Plaintiffs Bar continues. Attached is an Amicus Brief filed in Minnesota, and transcript of the hearing before the Honorable Michael J. Davis. In addition, I have initiated legal action against Weiser and representative plaintiff Ross-Williams as outlined in the attached complaint.

I am a shareholder in Centurylink, and once again forced to defend my interest against these firms. Weiser is hiding behind a New York firm in an attempt to manage cases behind the scene, and Robbins Arroyo seeks lead with a plaintiff holding 13 shares of a fourteen dollar stock. Clearly this case would become yet another that is entirely lawyer driven. Wherefore, no party would seek Counsel for redress with less than $300 dollars in damages. Once again, proving the case would be entirely lawyer driven. To hear Mr. Aguilar describe what transpired in Kansas is clearly misleading the Minnesota Court. Maybe Judge Vano would be interested in setting the record straight before the Court appoints lead Counsel in the  aforementioned case.

Interestingly, I received an anonymous letter last night which details an

elaborate scheme by Weiser et.al. to procure "Relators" in Qui Tam cases. It involves the use of several LLC shell corporations set up for the sole purpose of soliciting information under false pretenses to facilitate lawyer driven Qui Tam cases. This has resulted in the DOJ filing a motion to dismiss 11 active cases, filed by Weiser et.al. including ABBVIE. The level of sinister is truly unbelievable, some of which is outlined in the attached Motion to dismiss by the Feds!

Lastly, I would like to express my gratitude to Judge Vano, I am, and remain incredible grateful for allowing me to be heard, and finding my arguments compelling. I will continue my quest to expose and reform the corruption rife throughout Derivative litigation.

With the Utmost Respect,

Michael Hartleib  (646) 494-5901

# EXHIBIT 29

EXHIBIT 29
256

# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| IN RE: CENTURYLINK SALES PRACTICES AND SECURITIES LITIGATION | MDL No. 17-2795 (MJD/KMM) |
| This Document Relates to Civil File Nos. 18-2460, 18-2833, 18-2834, 18-2835, 19-263, 19-284 | **MEMORANDUM OF LAW & ORDER** |

Shawn M. Perry,  Perry & Perry, PLLP, and Thomas J. McKenna and Gregory M. Egleston, Gainey McKenna & Egleston, Counsel for Plaintiffs Sona Andresian, Glen Walker, and Michael Barbree.

William B. Federman, Federman & Sherwood, and Gregg M. Corwin, Gregg M. Corwin & Associate Law Office, PC, Counsel for Plaintiff Inter-Marketing Group USA, Inc.

George C. Aguilar and Brian J. Robbins, Robbins Arroyo LLP, and Garrett D. Blanchfield, Reinhardt Wendorf & Blanchfield, Counsel for Plaintiff Edward Tansey.

Lawrence P. Eagel, David J. Stone, and Melissa A. Fortunato, Bragar Eagel & Squire, P.C., Counsel for Plaintiff Tim Ault.

Michael I. Fistel, Jr., Johnson Fistel, LLP, Counsel for Plaintiff Neil T.S. Flanders.

James M. Ficaro, Robert B. Weiser, and Brett D. Stecker, The Weiser Law Firm, P.C., Counsel for Plaintiff Dennis Palkon.

## I.   INTRODUCTION

1

EXHIBIT 29
257

This matter is before the Court on Plaintiff Inter-Marketing Group USA, Inc.'s Motion to Consolidate Related Shareholder Derivative Action, Appoint Lead or Co-lead Plaintiff, and Approve Its Selection of Lead or Co-lead Counsel [Docket No. 330]; Application by Plaintiff Edward Tansey for Appointment of Lead and Liaison Counsel in Consolidated Derivative Action [Docket No. 332]; and Plaintiff Ault's Motion for Appointment of Lead Plaintiff and Lead Counsel [Docket No. 342]. Also before the Court is Michael Hartleib's Motion for Acceptance of Amicus Curiae Brief in Oppos[]ition to the Appointment of the Robbins Arroyo and Weiser Firms as Lead Counsel and Notice of Intent to Attend the Hearing on 3-6-19. [Docket No. 381]

The Court heard oral argument on March 6, 2019.

## II.    BACKGROUND

### A.    Overview of the Consolidated Derivative Action

On June 6, 2018, Plaintiff Neil Flanders filed a verified derivative complaint against Nominal Defendant CenturyLink, Inc., ("CenturyLink") and its officers and directors in the Western District of Louisiana. Later that same day, Plaintiff Tim Ault filed a similar action in the same court.

2

EXHIBIT 29
258

Plaintiffs Michael Barbree, Glen Walker, and Sona Andresian filed a similar complaint in the same court on July 3, 2018.  On August 23, 2018, Plaintiff Edward Tansey filed a similar derivative action in the District of Minnesota.

On October 3, 2018, based on an order from the Judicial Panel on Multidistrict Litigation ("JPML"), the Flanders Action, Ault Action, and Barbree Action were transferred to the District of Minnesota for inclusion in the CenturyLink MDL.  [Docket No. 285]

On December 4, 2018, this Court entered an order consolidating the four derivative actions that had been filed in or transferred to this Court: <u>Tansey v. Perry</u>, Civil File No. 18-2460, <u>Flanders v. Post</u>, Civil File No. 18-2833, <u>Ault v Post</u>, Civil File No. 18-2834, and <u>Barbree v. Bejar</u>, Civil File No. 18-2835.  [Docket No. 310]  Since that time, the JPML has transferred two additional derivative actions to this District, <u>Inter-Marketing Group USA, Inc. v. Storey</u>, Civil File No. 19-263, and <u>Palkon v. CenturyLink, Inc.</u>, Civil File No. 19-284.

### B.    Ault Action

On June 6, 2018, Ault filed a verified derivative complaint against CenturyLink and its officers and board members in the Western District of Louisiana.  Ault now moves for an order appointing him Lead Plaintiff, appointing Bragar Eagel & Squire, P.C. ("Bragar") as Lead Counsel for the

3

EXHIBIT 29
259

Consolidated Derivative Action, and entering a scheduling order for the filing of a consolidated complaint.  [Docket Nos. 342-43]  Ault's motion is joined by Plaintiffs Flanders and Palkon.  [Docket No. 342]

### C.    Tansey Action

On August 23, 2018, Tansey filed a verified shareholder derivative complaint in this District against CenturyLink and its officers and directors. Tansey now moves for an order appointing the law firm of Robbins Arroyo LLP ("Robbins Arroyo") as Lead Counsel in the Consolidated Derivative Action and appointing the law firm of Reinhardt Wendorf & Blanchfield as Liaison Counsel in the Consolidated Derivative Action.  [Docket No. 332]  Tansey does not seek to be appointed Lead Plaintiff, but states that, if the Court seeks to appoint a Lead Plaintiff, he is willing to serve.  [Docket No. 358]

### D.    Inter-Marketing Group USA, Inc. Action

On December 26, 2018, Inter-Marketing Group USA, Inc. ("IMG") filed a verified shareholder derivative complaint in the Western District of Louisiana against CenturyLink and its officers and directors.  On January 17, 2019, the JPML transferred the matter to the District of Minnesota.  [Docket No. 375]  IMG now moves to consolidate the IMG Action with the Consolidated Derivative

4

EXHIBIT 29
260

Action, to appoint IMG as Lead or Co-Lead Plaintiff, and to appoint its counsel, Federman & Sherwood, as Lead or Co-Lead Counsel.  [Docket No. 330]

## III.    DISCUSSION

### A.    Amicus Brief

On March 6, the Court heard oral argument on three motions to be appointed Lead Counsel in the CenturyLink derivative action.  The Court also allowed Michael Hartleib to argue regarding his objection to the appointment of the Robbins Arroyo firm as Lead Counsel.  The Court allowed a post-hearing brief from Robbins Arroyo regarding the allegations against it.  The Court also received an email from Hartleib, copying all counsel, responding to Robbins Arroyo's brief.

The Court grants Hartleib's motion insofar as the Court allowed Hartleib to express his opinions to the Court during the hearing and to file his proposed amicus brief.  The Court has carefully considered Hartleib's allegations, Robbins Arroyo's response, and the public record in the cases cited by Hartleib.  The Court concludes that Hartleib has raised no legitimate questions with regard to the ethics or expertise of the Robbins Arroyo law firm.  The Court is satisfied that there are no ethical concerns that would hinder Robbins Arroyo's application for appointment as Lead Counsel.

EXHIBIT 29
261

### B.    Consolidation

Under Federal Rule of Civil Procedure 42(a),

If actions before the court involve a common question of law or fact, the court may:

(1) join for hearing or trial any or all matters at issue in the actions;

(2) consolidate the actions; or

(3) issue any other orders to avoid unnecessary cost or delay.

"Consolidation can help alleviate needless duplication of time, effort, and expense on the part of the parties and the Court." Horn v. Raines, 227 F.R.D. 1, 2 (D.D.C. 2005) (citation omitted).  In derivative actions, "consolidation is appropriate where the cost of defending . . . multiple actions may well do serious harm to the very corporation in whose interest they are supposedly brought." Id. (citation omitted).

Pursuant to the Court's December 4, 2018 Order Granting Consolidation of Federal Derivative Actions, each action arising out of the same transactions and occurrences and asserting derivative claims filed in this Court or transferred here shall be consolidated into the Consolidated Derivative Action.  [Docket No. 310] Since entry of the Court's December 4 Order, the IMG and Palkon derivative actions have been transferred to this Court, and IMG has filed unopposed motion

6

EXHIBIT 29
262

to consolidate the IMG case with the Consolidated Derivative Action.  All cases arise out of the same operative facts and raise similar legal issues.  There has been no opposition to consolidation.  Failure to consolidate will increase inefficiency and duplication.  Therefore, Inter-Marketing Group USA, Inc. v. Storey, Civil File No. 19-263, and Palkon v. CenturyLink, Inc., Civil File No. 19-284 are hereby consolidated with the Consolidated Derivative Action.

## C.    Leadership

The counsel for three different Plaintiffs – Ault, Tansey, and IMG – each seek appointment as Lead Counsel.

### 1.    Standard for Appointment of Lead Counsel

The appointment of lead counsel in complex litigation is a long-standing practice in this country that has proved a great benefit to judicial economy and efficiency.  It is not open to serious question that a federal court in a complex, consolidated case may designate one attorney or set of attorneys to handle pre-trial activity on aspects of the case where the interests of all co-parties coincide.

In re Baycol Prod. Litig., No. 02-0200, 2007 WL 9717940, at *2 (D. Minn. July 13, 2007) (citations omitted).

In choosing lead counsel,

[t]he guiding principle is who will best serve the interest of the plaintiffs.  The criteria for selecting counsel when appointing a leadership structure include factors such as experience and prior

EXHIBIT 29
263

success record, the number, size, and extent of involvement of represented litigants, the advanced stage of proceedings in a particular suit, and the nature of the causes of action alleged.

Millman ex rel. Friedman's, Inc. v. Brinkley, No. 1:03-CV-0058-WSD, 2004 WL 2284505, at *3 (N.D. Ga. Oct. 1, 2004) (citations omitted). "Other factors include the quality of the pleadings, the economic interest of the plaintiffs, and the vigor with which the plaintiffs have prosecuted their lawsuits." Freeman on behalf of Tesla, Inc. v. Musk, 324 F.R.D. 73, 88 (D. Del. 2018) (citation omitted).

### 2.    Standard for Appointment of Lead Plaintiff in a Derivative Action

"In a shareholder derivative action, unlike a private securities litigation action, the Court is not required to appoint a lead plaintiff." In re Frontier Commc'ns Corp. Derivative Litig., No. 3:17-CV-1792 (VAB), 2018 WL 3553332, at *4 (D. Conn. July 23, 2018) (citations omitted). "The appointment of lead plaintiff and lead counsel in a consolidated shareholder derivative litigation is a matter of discretion." Id. at *3 (citations omitted).

Although no statutory authority exists for the appointment of a lead plaintiff in shareholder derivative actions like these, courts have the inherent authority to appoint a lead plaintiff . . . in a derivative action in order to create an efficient case-management structure.

8

EXHIBIT 29
264

KBC Asset Mgmt. NV on behalf of Chemed Corp. v. McNamara, 78 F. Supp. 3d 599, 603 (D. Del. 2015) (citation omitted).

If the Court appoints a lead plaintiff, the lead plaintiff must comply with Federal Rule of Civil Procedure 23.1, which requires that the plaintiff "fairly and adequately represent the interests of the shareholders or members similarly situated in enforcing the right of the corporation or association."

Derivative standing requires that the verified complaint allege "that the plaintiff was a shareholder or member at the time of the transaction complained of." Fed. R. Civ. P. 23.1(b)(1). Additionally, Louisiana state law provides that no shareholder may commence a derivative action until the shareholder has made a written demand on the corporation and at least 90 days have passed from the date of the demand or the demand was rejected, whichever is earlier. See La. Rev. Stat. § 12:1-742.

> In determining which plaintiff should be chosen as lead plaintiff [in a derivatives action], a number of courts have considered the following factors: (1) which plaintiff has the largest financial interest; (2) the preference for institutional investors to lead a lawsuit for shareholders; (3) the quality of the pleadings; (4) the vigor with which the plaintiff has pursued the suit; and (5) the plaintiff's arrangement on the payment of attorney's fees.

9

EXHIBIT 29
265

<u>KBC Asset Mgmt. NV on behalf of Chemed Corp.</u>, 78 F. Supp. 3d at 604 (citations omitted).

### 3.    Appointment of Lead Counsel and Lead Plaintiff

The Court concludes that appointment of both Lead Counsel and Lead Plaintiff is appropriate in this case to ensure an efficient and organized litigation that coordinates with the larger MDL, where appropriate.  Appointing a lead plaintiff will ensure the efficient management and vigorous prosecution of the derivative claims by a representative who fairly and adequately represents the shareholders, and, therefore, the company's interest and oversees Lead Counsel's efforts.

The Court concludes that all law firms vying for appointment have substantial experience in derivative and complex financial litigation.  All three have ample resources to lead this complex case.  After considering all of the factors mentioned above, the Court finds that Bragar and Ault are the most qualified for appointment as Lead Counsel and Lead Plaintiff.

First, Bragar has already taken a leading role in this litigation.  It filed one of the first derivative complaints and has demonstrated an ability to coordinate with counsel both in this MDL and in factually-related state derivative actions.

10

EXHIBIT 29
266

(Fortunato Decl. ¶¶ 7, 9.)  Also, Bragar proposes a leadership structure that is supported by Plaintiff Flanders' counsel and Plaintiff Palkon's counsel.  (Id. ¶ 8.) Bragar has aggressively and diligently pursued its client's interest, and its briefing showed attention to detail and knowledge of the case.  At oral argument, Bragar demonstrated a commitment to work cooperatively with all counsel and to communicate effectively with the entire Plaintiffs' counsel team.  Tansey's counsel and IMG's counsel are both competent, experienced counsel.  However, Tansey filed suit directly in the District of Minnesota, although no connection to Minnesota is apparent from the Complaint.  This strategic decision may have unnecessarily opened the Tansey Complaint up to attack based on lack of personal jurisdiction or improper venue.  IMG's decisions regarding the timing of its filings in this MDL, including in the securities cases, weigh against appointment.

Second, balancing a number of factors, Ault is the most qualified Plaintiff. Ault has demonstrated diligence through making a demand on CenturyLink in September 2017, and filing his derivative complaint on June 6, 2018, the first day that any federal derivative complaint was filed against CenturyLink and only two months after CenturyLink rejected Ault's derivative demand letter.  (Ault

EXHIBIT 29
267

Compl., Exs. A, D.)  (The only other Plaintiff to file a derivative complaint that day, Flanders, supports Ault's appointment as lead plaintiff.)  Ault has continuously been a CenturyLink shareholder since July 15, 1999.  He currently owns 245.506 shares of CenturyLink, valued at $3,790.  (Fortunato Decl., Ex. 1, Ault Decl. ¶ 8.)  Although Ault's financial interest in CenturyLink is not large, it is longstanding and far greater than the nominal interest of other Plaintiffs.  Finally, Ault is an experienced investor, who has been actively involved in this lawsuit, but is not a professional plaintiff, and is committed to satisfying the duties of lead plaintiff.  (Ault Decl. ¶¶ 6-12.)

In contrast, Tansey has been a shareholder of CenturyLink since 2003 and only possesses 13 shares of CenturyLink stock.  ([Docket No. 393] Mar. 6, 2019 Hearing Tr. 7.)  IMG is a business entity and possesses the greatest economic interest in among the potential lead plaintiffs.  However, no evidence has been presented that it is an institutional investor, i.e., that its "principal purpose [] is to invest money on behalf of [its] shareholders or beneficiaries."  In re FleetBoston Fin. Corp. Sec. Litig., 253 F.R.D. 315, 341 (D.N.J. 2008).  Also, IMG did not become a CenturyLink shareholder until December 6, 2012.  (Corwin Aff., Ex. D, IMG Decl. ¶ 2.)

EXHIBIT 29
268

Overall, the Court concludes that the combination of Bragar as Lead Counsel and Ault as Lead Plaintiff is the most appropriate choice for the Consolidated Derivative Action.

Accordingly, based upon the files, records, and proceedings herein, **IT IS HEREBY ORDERED**:

1. Plaintiff Inter-Marketing Group USA, Inc.'s Motion to Consolidate Related Shareholder Derivative Action, Appoint Lead or Co-lead Plaintiff, and Approve Its Selection of Lead or Co-lead Counsel [Docket No. 330] is **GRANTED IN PART** and **DENIED IN PART** as follows: the motion to consolidate is **GRANTED,** and the motion to appoint Lead Plaintiff and Lead Counsel is **DENIED**.

2. Inter-Marketing Group USA, Inc. v. Storey, Civil File No. 19-263, and Palkon v. CenturyLink, Inc., Civil File No. 19-284 are hereby consolidated with the Consolidated Derivative Action for all purposes in the above-captioned MDL.

3. The Application by Plaintiff Edward Tansey for Appointment of Lead and Liaison Counsel in Consolidated Derivative Action [Docket No. 332] is **DENIED**.

4. Plaintiff Ault's Motion for Appointment of Lead Plaintiff and Lead Counsel [Docket No. 342] is **GRANTED**.  The Court appoints Bragar Eagel & Squire, P.C. as Lead Counsel in the Consolidated Derivative Action and appoints Tim Ault as Lead Plaintiff in the Consolidated Derivative Action.  Within three weeks of the date of this Order, Lead Counsel shall submit a proposed leadership structure to this Court.

13

EXHIBIT 29
269

5.  Michael Hartleib's Motion for Acceptance of Amicus Curiae Brief in Oppos[]ition to the Appointment of the Robbins Arroyo and Weiser Firms as Lead Counsel and Notice of Intent to Attend the Hearing on 3-6-19 [Docket No. 381] is **GRANTED**.

6.  Lead Counsel and defense counsel shall meet and confer and shall submit a proposed draft case management order for the Consolidated Derivative Action within four weeks from the date of this Order.

Dated:   April 23, 2019                    s/ Michael J. Davis_____
                                           Michael J. Davis
                                           United States District Court

14

EXHIBIT 29
270

# EXHIBIT 30

EXHIBIT 30
271



December 12, 2018
*andy@protzmanlaw.com*

**VIA U.S. MAIL & Electronic Mail** (rw@weiserlawfirm.com)
Mr. Robert Weiser
The Weiser Law Firm, P.C.
22 Cassatt Avenue
Berwyn, PA 19312

RE: Hartleib v. The Weiser Law Firm, P.C., *et al.*

Dear Mr. Weiser:

I have been retained by Michael Hartleib with regard to the claims reflected in the enclosed draft petition. I have reviewed the orders from the Ross-Williams case and have spoken with Mr. Hartleib at length about the contents of this petition, and I do not take these allegations lightly. As is usually the case, it would seem in the best interest for all parties involved to explore avenues to an agreeable resolution to the matter before it is filed. And, if there are documents that prove any of these allegations false, I am willing to be educated. Please let me know if you would be interested in such a conversation on or before Friday, December 21, 2018. If I don't hear from you, my client has requested that I proceed with filing the petition.

I look forward to hearing from you.

Sincerely,

Andrew B. Protzman

Enclosure

1100 main street • suite 1930 • kansas city, missouri • 64105
816.421.5100 [p] • 816.421.5010 [f] • www.protzmanlaw.com

EXHIBIT 30
272

IN THE DISTRICT COURT FOR JOHNSON COUNTY, KANSAS

MICHAEL HARTLEIB,                          )
                                           )
          Plaintiff,                       )
                                           )
v.                                         )
                                           )        Case No. _____
THE WEISER LAW FIRM, P.C.,                 )
                                           )        Division No. _____
          Serve:                           )
                                           )
and                                        )
                                           )
ROBERT WEISER,                             )
                                           )
          Serve:                           )
                                           )
and                                        )
                                           )
MONICA ROSS-WILLIAMS,                      )
                                           )
          Serve:                           )
                                           )
          Defendants.                      )

## PETITION

    Comes now Plaintiff Michael Hartleib and, for his claims and causes of action against Defendants The Weiser Law Firm, P.C., Robert Weiser and Monica Ross-Williams, states and alleges as follows:

## PARTIES, VENUE AND JURISDICTION

1.  Plaintiff is an individual whose residence is in the state of California. He is a substantial shareholder in Sprint Nextel Corporation and is an objector to the proposed settlement in the underlying shareholder derivative litigation in Johnson County, Kansas.

2.  Defendant The Weiser Law Firm, P.C. is a Pennsylvania corporation with its principal place of business in Pennsylvania. At all pertinent times, it acted by and through its agents and employees, including but not limited to Robert Weiser, who were admitted pro hac vice to represent a group

EXHIBIT 30
273

of plaintiffs in the underlying litigation in Johnson County, Kansas. It performed the acts and omissions complained of in this petition in the underlying litigation in Johnson County, Kansas.

3. Defendant Robert Weiser is an attorney licensed and residing in the state of Pennsylvania. He is an officer, agent and/or employee of Defendant The Weiser Law Firm, P.C. At all pertinent times he was admitted pro hac vice to practice law in connection with the underlying litigation in Johnson County, Kansas, and he committed the acts and omissions complained of in the underlying litigation in Johnson County, Kansas. At all pertinent times, he was acting within the course and scope of his employment with and/or agency of Defendant The Weiser Law Firm, P.C.

4. Defendant Monica Ross-Williams is an individual residing in the state of Michigan. She is the lead named plaintiff in the underlying shareholder derivative litigation in Johnson County, Kansas, and committed the acts and omissions complained of in the underlying litigation in Johnson County, Kansas.

5. This Court is a court of general jurisdiction, so it has jurisdiction over the claims asserted herein.

6. All defendants, through their participation in the underlying litigation, committed the tortious acts and omissions that form the basis of these claims in the state of Kansas and submitted themselves to the jurisdiction of this Court, so this Court has personal jurisdiction over these defendants.

7. Venue is proper in this Court because the tortious acts and omissions that form the basis of these claims were committed in Johnson County, Kansas in and through the underlying litigation.

8. Claims under the Kansas Consumer Protection Act are properly brought in this Court pursuant to K.S.A. § 50-638 because the acts and omissions giving rise to these claims were committed in Johnson County, Kansas, in the underlying *Ross-Williams v. Sprint* litigation.

EXHIBIT 30

## BACKGROUND FACTS

9. In early 2009, Plaintiff Michael Hartleib ("Hartleib") contacted The Law Offices of Bruce G. Murphy ("the Murphy firm") about a potential shareholder derivative suit Hartleib wanted to pursue on behalf of Sprint Nextel Corporation. Hartleib was and is a substantial and vocal shareholder in Sprint and other corporations with a prior history of effecting positive corporate changes in the companies in which he holds an ownership interest.

10. On or about March 22, 2009, after a short period of negotiation of the terms of an attorney-client engagement, Plaintiff Michael Hartleib ("Hartleib") retained The Law Offices of Bruce G. Murphy ("the Murphy firm") to pursue a shareholder derivative action on behalf of Sprint Nextel Corporation arising from an unsuccessful merger between Sprint and Nextel ("the underlying litigation" or "the underlying shareholder derivative litigation"). Mr. Hartleib insisted the terms of this engagement must preclude the Murphy firm from working with the national derivative firm Robbins Arroyo due to that firm's unethical business practices witnessed by Mr. Hartleib in prior cases.

11. Prior to or on March 22, 2009, the Murphy firm entered into an agreement with Defendant The Weiser Law Firm, P.C. ("the Weiser firm") by which the Weiser firm would be co-counsel with the Murphy firm for purposes of representing Mr. Hartleib in the shareholder derivative action. Defendants Weiser and the Weiser firm agreed to the terms of the engagement with Hartleib and undertook representation of Hartleib in the underlying litigation.

12. Prior to their contact with Hartleib, on information and belief, neither the Murphy firm nor the Weiser firm was aware of the facts forming the basis for the underlying shareholder derivative suit that Hartleib alerted them to in his communications with them, nor had either firm been in contact with a potential client who knew of or had an interest in pursuing the underlying litigation.

3

EXHIBIT 30
275

13. On or shortly after March 22, 2009, Robert Weiser spoke with Mr. Hartleib.  During this conversation, Mr. Hartleib expressed that, as lead plaintiff representing the class of shareholders in Sprint Nextel, Hartleib took his duties to represent the interests of the corporation and its shareholders seriously and he would not endorse superficial and toothless corporate governance reforms in order to achieve a settlement that would consist primarily of attorney fees.

14. For Hartleib to agree to a settlement, he advised Weiser that it would have to provide meaningful relief resulting in a real and positive impact for the corporation and, by extension, its shareholders.

15. On the morning of March 27, 2009, Mr. Hartleib was notified by Murphy and Weiser via email that they were refusing to file the underlying shareholder derivative suit in Hartleib's name.

16. Their stated reason, which was false, was that they were concerned that Hartleib's history of effective and wholly unrelated shareholder derivative action somehow created a potential conflict and rendered Hartleib and inadequate shareholder representative.

17. This stated reason was pretextual.  Weiser did not want Hartleib as the named plaintiff because during their conversation Weiser learned that Hartleib is opposed to lawyer-driven derivative litigation in which the only meaningful relief obtained through a settlement is millions of dollars in attorney fees, and the substantive relief for the shareholders and the corporation is toothless or de minimis.

18. In fact, Hartleib's prior knowledge, skill and experience in shareholder matters rendered him a perfect shareholder representative.  For more than a decade, Hartleib has fought to ensure the interests of class and shareholder groups are given predominate consideration in the ultimate resolution of class action and shareholder derivative litigation, when many representative plaintiffs appear to be satisfied to accept minimal relief along with excessive attorney fee awards in what has been referred to as lawyer-driven litigation.

4

EXHIBIT 30

19. After refusing to file suit on behalf of Hartleib, Murphy used an elderly relative as a placeholder. This relative passed away during the pendency of the litigation, wherefore Murphy was forced to use yet another relative as placeholder in an attempt to maintain first to file status, while he and Weiser looked for a "legitimate" plaintiff for the case.

20. On information and belief, Weiser searched for, solicited and engaged a far less adequate shareholder representative to use as the named plaintiff in the underlying litigation, Monica Ross-Williams, who was unsophisticated in shareholder-corporate matters, corporate governance and litigation, and held a very small stake in Sprint Nextel Corporation, if any.

21. On March 6, 2017, Hartleib sought contact information for Ross-Williams via the internet and called Ross-Williams to confirm she existed in an effort to discern Ross-Williams level of involvement in the litigation and her suitability as a representative plaintiff. Hartleib was concerned about these issues because he had, on prior occasions, observed the Weiser firm, as well as other class action and shareholder derivative firms who work in concert with the Weiser firm, utilizing deceased and otherwise unqualified parties as plaintiffs in other shareholder derivative and class litigation.

22. On March 7th 2017, Hartleib placed one 15-minute call to Ross-Williams in which it became painfully clear that she had no involvement in the case and that Ross-Williams had not spoken to her Counsel in years.

23. Ross-Williams admitted she was entirely unaware of any of the details in "her" case.

24. Ross-Williams was not aware of the scathing Orders from the District Court of Johnson County, Kansas, criticizing her attorneys' use of an unlicensed disbarred "lawyer" to inflate their bill. She was unaware the Judge in "her" case drastically reduced the attorney fees by ninety percent, from $4.5 million to $450,000, finding they were not remotely accurate or credible.

5

EXHIBIT 30
277

25. Ross-Williams was not aware that an appeal had been filed on her behalf and had not been provided with pleadings in her case.

26. Ross-Williams, plaintiff in the underlying litigation, even continually referred to herself as the Defendant and appeared to completely lack understanding of her obligations as a representative plaintiff.

27. The conversation between Mr. Hartleib and Ross-Williams was pleasant and non-confrontational. Ross-Williams provided Hartleib with a private email address to send the pleadings in her case that her Counsel failed to provide.

28. Later, instead of expressing outrage by the information Hartleib provides in the 15-minute affable call, after speaking with Defendant Weiser, Ross-Williams falsely accused Mr. Hartleib of threatening and harassing her.

29. Weiser induced Ross-Williams to file false declarations against Hartleib, accusing him of threats and harassment to gain a Protective Order under false pretenses. This was done to harm Hartleib's reputation and discredit him in the Ross-Williams action before the Court of Appeals, and other unrelated cases.

30. In court filings, the Weiser defendants made inflammatory false statements and allegations about Mr. Hartleib that were hurtful, harmful and without any basis in truth or fact.

31. The Weiser defendants also made false statements to District and Appellate courts in Kansas regarding their conduct and the conduct of their unlicensed non-lawyer whom they knowingly put forth as a licensed attorney who bills $350 per hour in search of their improper and excessive fee award (which Judge Vano noted and overwhelmingly reduced), as well as the practical effect of the near toothless "corporate reforms" they negotiated in the mediation with mediator Layn Phillips, with whom the Weiser defendants and other firms in the consolidated action regularly mediate cases. In his declaration, Layn Phillips affirmed the fraudulent $4.5M fee request.

6

.

EXHIBIT 30
278

32. As a result of Defendants' acts and omissions as described herein, Mr. Hartleib has suffered damage to his good name and reputation, lost the benefits of serving as lead plaintiff in the underlying litigation and the positive result that would likely have occurred had he been lead plaintiff, was forced to expend substantial sums to oppose and expose Defendants' conduct and chicanery, and has suffered significant mental and emotional trauma from Defendants' actions.

33. Despite filing a related action years later, Hartleib was estopped from participation in the consolidated cases. In fact, all firms in the consolidated cases colluded and conspired to work as one in their effort to prevent Hartleib from seeking meaningful relief on behalf of Sprint Nextel. All other cases in the consolidated action were settled except one, Mr. Hartleib's.

34. Defendants, Robert Weiser and the Weiser Law Firm's handling of the underlying litigation is part of a regular custom, pattern and practice they have engaged in for years. This modus operandi has been to the detriment of both the classes of shareholder plaintiffs they have falsely purported to represent as well as the corporations those shareholders are seeking to protect and improve.

35. The Weiser defendants regularly handle shareholder derivative suits in concert with other firms with whom they have troubling relationships, and who file securities class action lawsuits based on the same issues or conduct. The Weiser defendants will stay the shareholder derivative suit, whereby allowing sufficient time to pass allowing for the billing of thousands of fraudulent hours, piggyback on the discovery from the class action to bill fraudulent document review, then resolve the shareholder derivative suit by negotiating soft or meaningless corporate "reforms" and very high legal fees.

36. This framework is what the Weiser defendants attempted to do in the Ross-Williams matter when they piggybacked on a securities class action filed by the national class action firm Robbins Gellar, sister firm to the Robbins Arroyo firm in the consolidated action, with whom Weiser has numerous prior dealings and close relationships, until their efforts were partially derailed by Mr. Hartleib's objection, which resulted in Judge Vano's order finding the Weiser defendants' conduct and fee request to be both troubling and excessive.

7

EXHIBIT 30
279

### COUNT I
*Legal Malpractice/Breach of Fiduciary Duty*
*Robert Weiser and The Weiser Law Firm, P.C.*

37. Plaintiff incorporates all preceding allegations as if fully set forth herein.

38. Defendants Robert Weiser and The Weiser Law Firm, P.C., entered into an attorney-client relationship with Plaintiff Michael Hartleib which was never terminated.

39. Defendants Weiser and the Weiser firm owed Mr. Hartleib the duty to provide competent and skillful representation and the duties of undivided loyalty, to act solely for Mr. Hartleib's benefit as a fiduciary for Sprint Nextel, and to avoid engaging in conflicts of interest.

40. The Weiser defendants further had the duty of honesty and candor in their communications and representations to the District Court and the Court of Appeals.

41. Defendants Weiser and the Weiser firm breached these duties by:

    a.  Refusing to file Mr. Hartleib's claim in the underlying litigation when it became apparent that he would not kowtow to Weiser's demands on a potential settlement and would not permit the underlying litigation to be lawyer-driven litigation, benefitting only the attorneys;

    b.  By taking an adverse position to a former client in their attempt to protect their criminal enterprise, defraud the Court and unjustly enrich themselves by 4.5 million dollars in fraudulent fees.

    c.  By abusing process in the case in question and using the instrumentalities of the judicial system to vex, harass and annoy in retaliation for Hartleib's filing of an Amicus Brief in the unrelated Equifax action. In the Equifax action, Weiser and the Weiser Firm was removed as co-lead counsel in said case based on their actions in the *Ross-Williams* case.

    d.  Representing Defendant Ross-Williams in her claims and requests for relief against Mr. Hartleib which presented a conflict of interest that was not waived;

8

EXHIBIT 30
280

e. Using Mr. Hartleib's communications with them, which were protected by the attorney-client privilege, against him in connection with the underlying litigation and the dispute between Defendant Ross-Williams and Mr. Hartleib. In addition, sharing privileged communications in the unrelated case in the Northern district of Georgia *In Re Equifax* and proffering falsehoods relating to said communications in a willful attempt to harm Hartleib and obfuscate their duplicitous acts.

f. Replacing Mr. Hartleib as lead plaintiff in the underlying litigation, first with a straw plaintiff, and then with a less qualified lead plaintiff who had little or no involvement in the case, in order to bill over 18,000 hours, and 4.5 million dollars in fraudulent fees;

g. Employing in the underlying litigation the services of a criminal non-attorney, who was previously disbarred, charged with racketeering, and knowingly putting forth his work-product under a fraudulent name as a basis for a grossly excessive attorney fee request;

h. Putting forth and supporting Defendant Ross-Williams' untrue statements regarding Mr. Hartleib's actions and communications with her;

i. Making false statements to the District and Appellate Courts in Kansas regarding Mr. Hartleib's prior actions:

j. In such other and further ways as may be learned through discovery.

42. Defendants' actions and inactions described herein were willful, wanton, fraudulent and malicious.

43. As a direct and proximate result of Weiser's and the Weiser firm's breach of their duties, Plaintiff Michael Hartleib was damaged as described above in paragraphs 32 and 33.

WHEREFORE, Plaintiff Michael Hartleib prays for judgment in his favor on Count I, for compensatory damages in a fair and reasonable amount, for his costs incurred herein, and for such other and further relief as the Court deems just and proper.

9

EXHIBIT 30
281

## COUNT II
*Violations of Kansas Consumer Protection Act*
*Robert Weiser and The Weiser Law Firm, P.C.*

44. Plaintiff incorporates all preceding allegations as if fully set forth herein.

45. Pursuant to K.S.A. § 50-623, *et seq.* (the "Kansas Consumer Protection Act" or the "KCPA"), Mr. Hartleib is a "consumer" and the Weiser defendants are "suppliers" for purposes of claims under the Kansas Consumer Protection Act.

46. When the Weiser defendants agreed to represent Mr. Hartleib as the shareholder representative plaintiff for the case Mr. Hartleib hired them to pursue, the Weiser defendants offered to reasonably represent Mr. Hartleib in accordance with their ethical duties of loyal, zealous representation in those claims.

47. In fact, the Weiser defendants at that time knew they did not intend to provide such reasonable, expectable legal services, and they did not disclose to Mr. Hartleib this intent.

48. Weiser, the Weiser Firm and other parties involved in this case have colluded and conspired by falsely purporting to represent the interest of Sprint, and its shareholders, including Hartleib when their true motives were to stay this case for a prolonged period, over 5 years to allow them to bill over 18,000 fraudulent hours and 4.5 million in fees. Weiser knowingly employed a criminal and disbarred attorney using an alias, Alexander Silow to bill 1.6 million dollars in this case. Mr. Silow's actions in this case have led to new criminal convictions in Montgomery County Pennsylvania, including the Unauthorized Practice of Law, *(42Pa.C.S.2524)*, Unsworn Falsification to Authorities *(18 Pa. C. S. 4904) (b)* and Securing Execution of Documents by Deception *(18 Pa. C. S. 4114)*

49. On information and belief, Weiser and the Weiser Firm knew Mr. Silow's status as disbarred attorney and criminal when they hired him from the Abelson placement agency. For over a decade, Weiser instructed Silow to fraudulently bill tens of millions of dollars in cases across the country

10

EXHIBIT 30
282

in addition to the 1.6 million in the Ross-Williams case. Weiser fraudulently put forth Mr. Silow as a Securities expert, and licensed attorney in Pennsylvania in the Ross-Williams case, when Silow's resume submitted by the Weiser firm in the case showed neither was true.

50. The Weiser defendants' "true" intent with regard to the legal services they offered Mr. Hartleib, as described above, was a material fact that was not disclosed.

51. As a direct and proximate result of the Weiser defendants' conduct set forth herein, Mr. Hartleib was damaged as described above in paragraphs 32 and 33.

52. The Weiser defendants' actions and inactions as set forth herein are in violation of the KCPA, §§ 50-626, 627.

53. This action is authorized and Plaintiff is entitled to an award of reasonable attorney fees pursuant to the KCPA, § 50-634.

WHEREFORE, Plaintiff Michael Hartleib prays for judgment in his favor on Count II, for compensatory damages in a fair and reasonable amount, for his attorney fees and costs incurred herein, and for such other and further relief as the Court deems just and proper.

## COUNT III
### *Abuse of Process*
### *Defendant Ross-Williams*

54. Plaintiff incorporates all preceding allegations as if fully set forth herein.

55. Ross-Williams knowingly made false statements against Hartleib in court documents and sought and obtained a protective order under false pretenses. Ross-William filed false declarations under oath against Hartleib at the request of Weiser in an attempt to assail his character and protect Weiser's unlawful acts. These actions amount to the knowingly or improper use of legal process.

56. Ross-Williams' actions were taken for the purposes of harassing Mr. Hartleib and causing him hardship.

11

EXHIBIT 30
283

57. Ross-Williams' actions directly and proximately resulted in damages to Mr. Hartleib as described above in paragraphs 32 and 33.

WHEREFORE, Plaintiff Michael Hartleib prays for judgment in his favor on Count III, for compensatory damages in a fair and reasonable amount, for his costs incurred herein, and for such other and further relief as the Court deems just and proper.

**COUNT IV**
*Breach of Fiduciary Duty*
*Defendant Ross-Williams*

58. Ross-Williams was an unfit plaintiff who simply allowed her name to be used to facilitate a lawyer driven case for personal financial gain.

59. When Hartleib informed her of the fraud and chicanery that was taking place in "her" case, she did nothing to stop it. In fact, she became a willing participant in the fraud upon the Court by acting on behalf of Weiser in furtherance of his fraud upon the court.

60. Ross-Williams owed a fiduciary duty to Mr. Hartleib and all Sprint shareholders to fairly and adequately represent their interests in the litigation, including the duties to ensure that lead counsel fee requests were appropriate, the duties of care and loyalty to the class, and to fairly represent the interests of the entire class.

61. Ross-Williams failed to act in good faith and breached her fiduciary duty to properly represent Mr. Hartleib and the other Sprint shareholders by failing to ensure the fee request of Weiser was commensurate with the relief obtained, by failing to ensure that the relief agreed to in the settlement was sufficiently robust as to effect meaningful corporate change, by failing to adequately monitor and remain involved in the litigation, and by acting in her own interest rather than in the interest of Sprint Nextel and absent class of shareholders.

62. As a direct and proximate result of Ross-Williams' breach of her fiduciary duties, Mr. Hartleib was damaged as described above in paragraphs 32 and 33.

12

EXHIBIT 30
284

WHEREFORE, Plaintiff Michael Hartleib prays for judgment in his favor on Count IV, for compensatory damages in a fair and reasonable amount, for his costs incurred herein, and for such other and further relief as the Court deems just and proper.

Respectfully Submitted by:

/s/ Andrew B. Protzman

Andrew B. Protzman, #18015
Ben Stelter-Embry, #25891
Protzman Law Firm LLC
1100 Main Street
Suite 2430
T: 816-421-5100
F: 816-421-5105
andy@protzmanlaw.com
ben@protzmanlaw.com

*Attorneys for Plaintiff*

13

EXHIBIT 30
285

# EXHIBIT 31

EXHIBIT 31
286

# Silverang Donohoe
# Rosenzweig Haltzman LLC

### Attorneys at Law

595 East Lancaster Avenue
Suite 203
St. Davids, PA 19087
(610) 263-0115 Telephone
(215) 754-4934 Facsimile
www.sanddlawyers.com

Philip S. Rosenzweig
(610) 263-0124 Direct Dial
(215) 754-4139 Direct Fax
Email: prosenzweig@sanddlawyers.com

December 19, 2018

*VIA EMAIL (andy@protzmanlaw.com)*
*AND FIRST CLASS MAIL*

Andrew Protzman, Esquire
Protzman Law Firm
1100 Main Street
Kansas City, MO 64105

Re:   *Hartleib v. Weiser Law Firm, P.C., et al.*

Dear Mr. Protzman:

As I indicated to you in my email of December 17, 2018 at 7:06 pm, I and my law firm are counsel to The Weiser Law Firm, P.C. (the "Weiser Firm") and Robert B. Weiser, Esquire ("Mr. Weiser") (the "Weiser Firm" and "Mr. Weiser" are collectively my "Clients"). While I am not as of yet prepared to respond to all the purported factual allegations of the draft petition ("Petition") you prepared and transmitted along with your December 12, 2018 letter on behalf of your client, the proposed plaintiff Michael Hartleib ("Hartleib"), your letter belies your own well founded skepticism as to the veracity of the allegations. Upon my cursory initial review thereof, the Petition is riddled with serious misrepresentations of fact and outright falsehoods. The claims the Petition contemplates raising against my Clients are frivolous and cannot be asserted in a signed pleading in a court of law in good faith.

In the interests of efficiency, and in an effort to timely respond to your letter, I will focus on the two utterly groundless causes of action which the Petition purports to assert on behalf of Hartleib against my Clients, who expressly reserve all rights with respect to the countless false and outrageous allegations in the Petition. This letter is not to be construed as a waiver of any kind with respect to any allegation set forth in the Petition, or any defense to the Petition, including, but not limited to, any and all defenses regarding jurisdiction, venue, the applicability of Kansas law (or lack thereof), any applicable statute(s) of limitations, or damages. Nor should this letter be construed as a waiver of my Clients' potential claims or counterclaims against Hartleib that could be asserted based on Hartleib's conduct, or against you and your law firm in the event the Petition as stated is filed by you.

{01025448;3}

EXHIBIT 31
287

Andrew Protzman, Esquire
December 19, 2018
Page 2

As you surely know, the Petition proposes two counts under Kansas law against my Clients: Count I for Legal Malpractice/Brief of Fiduciary Duty and Count II for violation of the Kansas Consumer Protection Act (the "KCPA"). Both causes of action depend, *inter alia,* upon a demonstrably false and absurd premise: that the Weiser Firm and/or Mr. Weiser "agreed to represent Mr. Hartleib" and "entered into an attorney-client relationship" with Hartleib in March 2009. Nothing could be further from the truth. As your client is well-aware, my Clients ***expressly declined*** to file a shareholder derivative action on behalf of Hartleib or otherwise serve as counsel (or co-counsel) to Hartleib in March 2009, and there exists clear, undebatable documentary evidence with respect to this explicit declination. *See* Exhibit 1 enclosed herewith. Moreover, the Petition's assertions as to why my Clients declined to serve as counsel for Hartleib are patently untrue, but nevertheless serve as an admission that Hartleib and my Clients did NOT have an attorney-client relationship. The Petition claims, *inter alia,* that Hartleib was advised on March 27, 2009 that his involvement with "effective and wholly unrelated shareholder derivative [litigation] somehow created a potential conflict and rendered Hartleib an[] inadequate shareholder representative." Aside from being nonsensical, as explained herein, that allegation is inaccurate. Rather, it was Hartleib's then involvement with, and intention to move for appointment as lead plaintiff in, the federal securities fraud class action (the "Securities Action") asserting wholly related, direct claims against Sprint Corp. ("Sprint") which presented a clear conflict for purposes of serving as a shareholder derivative plaintiff asserting claims on Sprint's behalf.

Under Kansas law, an attorney-client relationship can be explicitly formed based on the payment of a fee and/or a memorialized formal retention agreement. *Associated Wholesale Grocers, Inc. v. Americold Corp.,* 266 Kan. 1047 (1999) *citing In re Adoption of Irons,* 235 Kan. 540, 548, 684 P.2d 332 (1984). In the absence of such, an attorney-client relationship may be "implied by the conduct of the parties." *Id.* Significantly, an attorney-client relationship can be implied only when, based on the conduct of the parties, it is sufficiently established that the services of the attorney in matters pertinent to the attorney's profession ***were both sought and received***. *Id.* The Petition does not allege (nor could it) that the Weiser Firm or Mr. Weiser ever accepted any fee from Hartleib, or that Hartleib executed a formal retention agreement with the Weiser Firm or Mr. Weiser. Even assuming *arguendo,* that as the Petition alleges, Hartleib retained the Law Offices of Bruce G. Murphy (the "Murphy Firm"), my Clients were not parties to any formal representation agreement between Hartleib and the Murphy Firm. Further, the documentary evidence with respect to the "conduct of the parties" plainly demonstrates that while Hartleib may have sought my Clients' legal services, such services were certainly never provided to or received by Hartleib, because my Clients flatly declined to act as counsel (or co-counsel) to Hartleib immediately after Mr. Weiser first communicated with Hartleib. *See* Exhibit 1.

Surely you agree that an implied attorney-client relationship is not formed simply because an individual seeking legal representation communicated with a lawyer once, and of course, as set forth above, Kansas law does not provide otherwise. In late March 2009, as your Petition indicates, Mr. Weiser spoke with Hartleib one time via telephone; the two men had never spoken previously. The phone call between Mr. Weiser and Hartleib took place specifically because my Clients had not agreed to act as co-counsel to Hartleib with the Murphy Firm in a derivative action on behalf of

{01025448;3}

EXHIBIT 31

Andrew Protzman, Esquire
December 19, 2018
Page 3

Sprint, and would not agree to doing so without having first conducted their own independent due diligence regarding Hartleib's adequacy as a derivative plaintiff and after an analysis of potential conflicts of interest implicating Hartleib. My Clients are specialists in the arena of shareholder derivative litigation and are intimately familiar with the unique issues and conflicts potentially posed by shareholder derivative plaintiffs, who bring derivative actions in a fiduciary capacity on behalf of and solely for the benefit of a corporation, rather than on their own behalf for their own personal direct benefit. My Clients routinely communicate directly with shareholders in light of these issues, in order to assess whether or not to proceed with representation in a shareholder derivative action.

During the telephone call between Hartleib and Mr. Weiser in late March 2009, Hartleib represented to Mr. Weiser that he had extensively investigated alleged wrongdoing by Sprint and previously contacted the law firm of Robbins Geller Rudman & Dowd LLP ("RGRD") in order to provide RGRD facts and analysis for the purposes of initiating and prosecuting the Securities Action *against Sprint*. Hartleib further represented that he was interested in filing a motion in federal court seeking his appointment as the lead plaintiff (or a co-lead plaintiff) in the Securities Action *against Sprint*, and that he believed he would be an ideal lead plaintiff for the Securities Action based upon his purportedly vast knowledge regarding Sprint's transgressions and its liability to the investor class. Moreover, Hartlieb suggested that he wanted to receive a share of any attorneys' fees for plaintiffs' counsel which might be awarded in a derivative action to be brought on Sprint's behalf.

Mr. Weiser immediately concluded that my Clients could not and should not represent Hartleib or serve as his co-counsel in a derivative action brought for Sprint's benefit. Notwithstanding Hartleib's deeply troubling and improper suggestion that he wished to share in attorneys' fees, it is black-letter law that an investor plaintiff who simultaneously pursues both direct and derivative claims or lawsuits against and on behalf of the same corporate entity is an inadequate and conflicted plaintiff. *See Davis v. Comed, Inc.*, 619 F.2d 588, 597 (6th Cir. 1980) (derivative plaintiff found inadequate because he raised direct claims against the corporation in separate litigation, and thus "virtually admit[ted] this conflict between the derivative action and his other litigation"); *St. Clair Shores Gen. Emps. Ret. Sys. v. Eibeler*, No. 06 Civ. 688(SWK), 2006 WL 2849783, at *7 (S.D.N.Y. Oct. 4, 2006) (plaintiffs attempting to advance both derivative and direct claims "face an impermissible conflict of interest."); *Wall Street Sys., Inc. v. Lemence*, No. 04 Civ. 5299, 2005 WL 292744 (S.D.N.Y. Feb. 8, 2005) (finding that plaintiff who simultaneously brought direct and derivative actions had a conflict of interest and could not satisfy obligations pursuant to Fed. R. Civ. P. 23.1). *See also Ryan v. Aetna Life Ins. Co.*, 765 F. Supp. 133, 135 (S.D.N.Y. 1991); *Brickman v. Tyco*, 731 F. Supp. 101, 109 (S.D.N.Y. 1990).

After speaking with Hartleib, Mr. Weiser notified the Murphy Firm via email on March 27, 2009 at 7:21 a.m. that my Clients declined to serve as co-counsel to Hartleib, because my Clients had concluded that Hartleib had a conflict of interest which prevented him from serving as an adequate derivative plaintiff. *See* Exhibit 1. The Murphy Firm notified Hartleib in writing that both the Murphy Firm and my Clients declined to represent Hartleib based on the conflict of interest via email at 9:55 a.m. *Id.* Notably, the March 27, 2009 email to Hartleib from the Murphy Firm stated

{01025448;3}

EXHIBIT 31
289

Andrew Protzman, Esquire
December 19, 2018
Page 4

to Hartleib that if he were to file a derivative suit, "[d]efense counsel can be expected to object to you serving as the [derivative] Representative on the grounds of adequacy." Had Hartleib applied for appointment as lead plaintiff in the Securities Action against Sprint, as he informed Mr. Weiser via telephone that he intended to do, and had Hartleib initiated a derivative action on behalf of Sprint at that time, undoubtedly competing movants for lead plaintiff and defense counsel in the Securities Action would have attacked him as an inadequate lead plaintiff.

Thus, there is no legitimate basis upon which it can be alleged, in good faith, for purposes of Count I of the Petition, that my Clients "entered into an attorney-client relationship" with Hartleib, explicitly or implicitly, rendering Count I for legal malpractice/breach of fiduciary duty fatally flawed. Nor is there any legitimate basis upon which it can be alleged in good faith, for purposes of Count II of the Petition, that my Clients "agreed to represent Mr. Hartleib as the shareholder representative plaintiff for the case Mr. Hartleib hired them to pursue," and therefore Count II for violation of the KCPA is fatally flawed.

The "conduct of the parties" following March 27, 2009 also puts to rest any notion that an attorney-client relationship was ever formed by implication between my Clients and Hartleib, or that Hartleib was ever acting under any such impression. Neither my Clients nor Hartleib subsequently acted as if an attorney-client relationship had been formed, because of course there was never was any such relationship. Hartleib had no communications whatsoever with my Clients regarding Sprint until after over seven years had passed – and only then, in an attempt to extort money from my Clients by leveraging his objection to the settlement of the Sprint derivative litigation. The threatened litigation against my Clients set forth in the Petition merely serves as the latest iteration of Hartleib's unsuccessful extortion efforts against them. In fact, Hartleib subsequently retained another law firm in the field of shareholder litigation, Kahn, Swick & Foti, LLC ("Kahn Swick"), to serve as his counsel for purposes of bringing a derivative action on behalf of Sprint, which was filed on July 14, 2011. Interestingly, despite serving as counsel to Hartleib in his Sprint derivative action, Kahn Swick chose not to represent Hartleib in connection with his objection to the Sprint derivative settlement, his related application for a direct financial award, or his unsuccessful appeal of the orders denying his objection to the settlement and his application for a financial award.

Upon the completion of my investigation into the underlying Sprint-Nextel derivative case, I suspect I will be well prepared to address and rebut all of the outrageous and seemingly false factual allegations throughout the Petition. Moreover, although I do not represent proposed defendant Monica Ross-Williams, her status as an adequate derivative plaintiff was fully adjudicated in the Sprint-Nextel litigation, rendering any questions with respect thereto moot on the basis of collateral estoppel. Further, to suggest that Ms. Ross-Williams owes a fiduciary duty to another shareholder of a publicly traded company is patently absurd.

Should you possess any contrary evidence or information I am unaware of that would support the allegations that Hartleib retained my Clients as his counsel and that my Clients entered into an attorney-client relationship with Hartleib, I would be interested in reviewing the same. It would only be in that instance where it might make sense to engage in a dialogue with you regarding the many other deeply flawed and apparently false allegations of the Petition. I might also note that I am counsel for the Weiser Firm in a pending lawsuit against Mr. Silow and the lawyer placement

{01025448;3}

EXHIBIT 31

Andrew Protzman, Esquire
December 19, 2018
Page 5

agency responsible for Mr. Silow's placement at the Weiser Firm to perform document review work, so I am confident in assuring that your facts regarding Mr. Silow are flatly wrong in almost all instances.

I respectfully submit that the filing of the Petition would violate Kansas Rule of Professional Conduct 3.1 and/or various other ethical and professional obligations, and my Clients hereby reserve all rights to pursue all available remedies. Therefore, I suggest you carefully reconsider ever filing the Petition.

Be guided accordingly.

Very truly yours,

PHILIP S. ROSENZWEIG

PSR/mer
Enclosure

cc:    Robert B. Weiser, Esquire (via email)

{01025448;3}

EXHIBIT 31
291

# EXHIBIT 32

EXHIBIT 32
292

| | |
|---|---|
| **From:** | Andrew Protzman <andy@protzmanlaw.com> |
| **Sent:** | Monday, January 07, 2019 3:06 PM |
| **To:** | Philip Rosenzweig |
| **Subject:** | Re: Hartleib v. Weiser Law Firm, P.C., et al. |

Phil:

I have not received a response to my email, below.  Please advise before close of business Thursday if your client is interested in a pre-suit mediation of this matter.  If not, or if I don't hear from you, we will proceed with filing suit Friday.

Thank you.

Andy.

Andrew B. Protzman
Protzman Law Firm, LLC
1100 Main Street
Suite 2430
Kansas City, Missouri 64105
816.421.5100/5105(fax)
andy@protzmanlaw.com

NOTE: The Missouri Bar Disciplinary Counsel requires all Missouri lawyers to notify all recipients of e-mail that (1) e-mail communication is not a secure method of communication, (2) any e-mail that is sent to you or by you may be copied and held by various computers it passes through as it goes from me to you or vice versa, (3) persons not participating in our communication may intercept our communications by improperly accessing your computer or my computer or even some computer unconnected to either of us which the e-mail passed through. I am communicating to you via e-mail because you have consented to receive communications via this medium. If you change your mind and want future communications to be sent in a different fashion, please let me know AT ONCE. The information contained in this electronic message may be attorney-client privileged, confidential, and exempt from disclosure under applicable law and is intended only for the use of the individual(s) to whom this electronic message is addressed. If the reader of this message is not the intended recipient, or the employee or agent responsible to deliver it to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this electronic communication or any attachment thereto is strictly prohibited. If you have received this electronic communication in error, you should immediately return it to us and delete the message from your system. We would also

1

EXHIBIT 32
293

appreciate it if you would telephone us at (816) 421-5100, to advise of the misdirected communication. Thank you.


On 12/21/18, 11:23 AM, "Andrew Protzman" <andy@protzmanlaw.com> wrote:

Phil:

I write in response to your December 19, 2018 letter to me.  Please dispense with the threats to me.  They are neither well-founded, nor well-received.

Mr. Hartleib vigorously disputes virtually every statement made in your letter.  Just as an example, on March 22, 2009, Mr. Murphy communicated to Mr. Hartleib on his and Mr. Weiser's behalf that they had jointly reviewed Mr. Hartleib's requested revisions to the retainer and agreed to them.  Subsequent to that, Mr. Weiser and Mr. Hartleib spoke on multiple occasions wherein Mr. Hartleib relied on Mr. Weiser as his lawyer, provided confidential and work-product communications to him, and received legal advice.  As you well know, or should, the existence of an attorney-client relationship is not dependent upon a written agreement but is based on conduct and client expectations.  See, e.g., Matter of Hodge, 307 Kan. 170, 407 P.3d 613 (2017).  I will not belabor the additional misstatements Mr. Weiser has provided you that you repeat in your correspondence.

Regardless of these parties' factual disagreements about the course of their relationship, I did not receive an answer to the ultimate question posed:  Does your client want to follow through on his suggestion of a mediation between these parties prior to Mr. Hartleib filing suit?  If the answer is no, that is fine, we will file.  If the answer is yes, then we need to schedule it within the next 30-60 days in order than it can be given every opportunity to succeed before we must file in the absence of a tolling agreement.  Given your intimate familiarity with the Silow matter and the contents of your letter to me, I suspect that 30 days will be more than enough time for Mr. Weiser to get you up to speed.

Andy

Andrew B. Protzman
Protzman Law Firm, LLC
1100 Main Street
Suite 2430
Kansas City, Missouri 64105
816.421.5100/5105(fax)
andy@protzmanlaw.com

NOTE: The Missouri Bar Disciplinary Counsel requires all Missouri lawyers to notify all recipients of e-mail that (1) e-mail communication is not a secure method of communication, (2) any e-mail that is sent to you or by you may be copied and held by various computers it passes through as it goes from me to you or vice versa, (3) persons not participating in our communication may intercept our communications by improperly accessing your computer or my computer or even some computer unconnected to either of us which the e-mail passed through. I am communicating to you via e-mail because you have consented to receive communications via this medium. If you change your mind and want future communications to be sent in a different fashion, please let me know AT ONCE. The information contained in this electronic message may be attorney-client privileged, confidential, and exempt from disclosure under applicable law and is intended only for the use of the individual(s) to whom this electronic message is addressed. If the reader of this message is not the intended recipient, or the employee or agent responsible to deliver it to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this electronic communication or any attachment thereto is strictly prohibited. If you have received this electronic communication in error, you should immediately return it to us and delete the message from your system. We would also appreciate it if you would telephone us at (816) 421-5100, to advise of the misdirected communication. Thank you.


On 12/19/18, 4:25 PM, "MaryEllen Raynor" <MRaynor@sanddlawyers.com> wrote:

ON BEHALF OF PHILIP S. ROSENZWEIG, ESQUIRE

Mr. Protzman:

  Please see the attached correspondence.  Thank you.


Best Regards,

Phil

_____
Philip S. Rosenzweig, Esquire
Partner
Silverang, Donohoe, Rosenzweig & Haltzman, LLC
595 East Lancaster Avenue
Suite 203
St. Davids, Pa. 19087
610-263-0124 (direct)
610-263-0115 (main)

3

EXHIBIT 32
295

215-754-4139 (efax)
prosenzweig@sanddlawyers.com

4

EXHIBIT 32

# EXHIBIT 33

EXHIBIT 33
297

19CV00407
Div11

IN THE DISTRICT COURT FOR JOHNSON COUNTY, KANSAS

MICHAEL HARTLEIB,                )
                                 )
            Plaintiff,            )
                                 )
v.                               )
                                 )        Case No. _____
THE WEISER LAW FIRM, P.C.,       )
                                 )        Division No. _____
and                              )
                                 )
ROBERT WEISER,                   )
                                 )
and                              )
                                 )
MONICA ROSS-WILLIAMS,            )
                                 )
            Defendants.           )

## PETITION

Comes now Plaintiff Michael Hartleib and, for his claims and causes of action against Defendants The Weiser Law Firm, P.C., Robert Weiser and Monica Ross-Williams, states and alleges as follows:

### PARTIES, VENUE AND JURISDICTION

1. Plaintiff is an individual whose residence is in the state of California. He is a substantial shareholder in Sprint Nextel Corporation and is an objector to the proposed settlement in the underlying shareholder derivative litigation in Johnson County, Kansas, *Ross-Williams vs. Bennett et al.*, 11CV01688.

2. Defendant The Weiser Law Firm, P.C. is a Pennsylvania corporation with its principal place of business in Pennsylvania. At all pertinent times, it acted by and through its agents and employees, including but not limited to Robert Weiser, who were admitted *pro hac vice* to represent a group of plaintiffs in the underlying litigation in Johnson County, Kansas. It performed the acts and omissions complained of in this petition in the underlying litigation in Johnson County, Kansas.

*Clerk of the District Court, Johnson County Kansas*
*01/22/19  02:14pm SS*

EXHIBIT 33
298

3.  Defendant Robert Weiser is an attorney licensed and residing in the state of Pennsylvania. He is an officer, agent and/or employee of Defendant The Weiser Law Firm, P.C. At all pertinent times, he was admitted *pro hac vice* to practice law in connection with the underlying litigation in Johnson County, Kansas, and he committed the acts and omissions complained of in the underlying litigation in Johnson County, Kansas. At all pertinent times, he was acting within the course and scope of his employment with and/or agency of Defendant The Weiser Law Firm, P.C.

4.  Defendant Monica Ross-Williams is an individual residing in the state of Michigan. She is the lead named plaintiff in the underlying shareholder derivative litigation in Johnson County, Kansas, and committed the acts and omissions complained of in the underlying litigation in Johnson County, Kansas.

5.  This Court is a court of general jurisdiction, so it has jurisdiction over the claims asserted herein.

6.  All defendants, through their participation in the underlying litigation, committed the tortious acts and omissions that form the basis of these claims in the state of Kansas and submitted themselves to the jurisdiction of this Court, so this Court has personal jurisdiction over these defendants.

7.  Venue is proper in this Court because the tortious acts and omissions that form the basis of these claims were committed in Johnson County, Kansas, in and through the underlying litigation.

8.  Claims under the Kansas Consumer Protection Act are properly brought in this Court pursuant to K.S.A. § 50-638 because the acts and omissions giving rise to these claims were committed in Johnson County, Kansas, in the underlying *Ross-Williams* litigation.

<u>BACKGROUND FACTS</u>

9.  In early 2009, Plaintiff Michael Hartleib ("Hartleib") contacted The Law Offices of Bruce G. Murphy ("the Murphy firm") about a potential shareholder derivative suit Mr. Hartleib wanted to pursue on behalf of Sprint Nextel Corporation. Mr. Hartleib was and is a substantial and vocal

shareholder in Sprint and other corporations with a prior history of effecting positive corporate changes in the companies in which he holds an ownership interest.

10. On or about March 22, 2009, after a short period of negotiation of the terms of an attorney-client engagement, Mr. Hartleib retained the Murphy firm to pursue a shareholder derivative action on behalf of Sprint Nextel Corporation arising from an unsuccessful merger between Sprint and Nextel.  Mr. Hartleib insisted the terms of this engagement must preclude the Murphy firm from working with national derivative firm Robbins Arroyo due to Mr. Hartleib's witnessing of what he believed were that firm's unethical business practices in prior cases.

11. Prior to or on March 22, 2009, the Murphy firm entered into an agreement with Defendant The Weiser Law Firm, P.C. ("the Weiser firm") by which the Weiser firm would be co-counsel with the Murphy firm for purposes of representing Mr. Hartleib in the shareholder derivative action. Defendants Weiser and the Weiser firm agreed to the terms of the engagement with Mr. Hartleib and undertook representation of Mr. Hartleib in the underlying litigation.

12. Prior to their contact with Mr. Hartleib, on information and belief, neither the Murphy firm nor the Weiser firm was aware of the facts forming the basis for the underlying shareholder derivative suit that Mr. Hartleib alerted them to in his communications with them, nor had either firm been in contact with a potential client who knew of or had an interest in pursuing the underlying litigation.

13. On or shortly after March 22, 2009, Robert Weiser spoke with Mr. Hartleib.  During this conversation, Mr. Hartleib expressed that, as lead plaintiff representing the class of shareholders in Sprint Nextel, he took his duties to represent the interests of the corporation and its shareholders seriously and he would not endorse superficial and toothless corporate governance reforms in order to achieve a settlement that would consist primarily of attorney fees.

14. For Mr. Hartleib to agree to a settlement, he advised Mr. Weiser that it would have to provide meaningful relief resulting in a real and positive impact for the corporation and, by extension, its shareholders.

15. On the morning of March 27, 2009, Mr. Hartleib was notified by Messrs. Murphy and Weiser via email that they were refusing to file the underlying shareholder derivative suit in Mr. Hartleib's name.

16. Their stated reason, which was false, was that they were concerned that Mr. Hartleib's history of effective and wholly unrelated shareholder derivative action somehow created a potential conflict and rendered Mr. Hartleib an inadequate shareholder representative.

17. This stated reason was pretextual.  Mr. Weiser did not want Mr. Hartleib as the named plaintiff because during their conversation Mr. Weiser learned that Mr. Hartleib is opposed to lawyer-driven derivative litigation in which the only meaningful relief obtained through a settlement is millions of dollars in attorney fees, and the substantive relief for the shareholders and the corporation is toothless or *de minimis*.

18. In fact, Mr. Hartleib's prior knowledge, skill and experience in shareholder matters rendered him a perfect shareholder representative.  For more than a decade, Mr. Hartleib has fought to ensure the interests of class and shareholder groups and the corporations derivative actions exist to protect are given predominant consideration in the ultimate resolution of class action and shareholder derivative litigation, when many representative plaintiffs appear to be satisfied to accept minimal relief along with excessive attorney fee awards in what has been referred to as lawyer-driven litigation.

19. On information and belief, after refusing to file suit in Mr. Hartleib's name, Mr. Murphy filed a case based on the facts presented by Mr. Hartleib in the name of an unqualified relative of Mr. Murphy while Messrs. Murphy and Weiser actively searched for a new plaintiff to use for Mr.

*Clerk of the District Court, Johnson County Kansas*
*01/22/19  02:14pm SS*

4

EXHIBIT 33
301

Hartleib's case, and they ultimately engaged a far less adequate shareholder representative to use as the named plaintiff in the underlying litigation, Monica Ross-Williams, who was unsophisticated in shareholder-corporate matters, corporate governance and litigation, and held a very small stake in Sprint Nextel Corporation, if any.

20. After filing the derivative action, the Weiser defendants effectively obtained a stay of the action during which no meaningful formal discovery was done in the *Ross-Williams* case while a related class-action lawsuit based on the same conduct was allowed to progress.

21. On February 26, 2016, Defendants moved for preliminary approval of a proposed settlement, which included toothless corporate governance reforms and would provide a basis for the Weiser defendants to request exorbitant fees not commensurate with the relief obtained in the settlement nor work performed in the *Ross-Williams* case.

22. On May 6, 2016, Defendants moved for final approval of the proposed settlement and excessive fee award.

23. On May 13, 2016, Mr. Hartleib notified the District Court that he objected to the settlement and requested attorney fee award.

24. On March 6, 2017, Mr. Hartleib sought contact information for Ms. Ross-Williams via the internet and called her to confirm she actually existed in an effort to discern Ms. Ross-Williams' level of involvement in the litigation and her suitability as a representative plaintiff. Mr. Hartleib was concerned about these issues because he had, on prior occasions, observed the Weiser firm, as well as other class action and shareholder derivative firms who work in concert with the Weiser firm, utilizing deceased and otherwise unqualified parties as plaintiffs in other shareholder derivative and class litigation.

*Clerk of the District Court, Johnson County Kansas*
*01/22/19  02:14pm SS*

EXHIBIT 33
302

25. On March 7th 2017, Mr. Hartleib placed one 15-minute call to Ms. Ross-Williams in which it became painfully clear that she had no involvement in the case and that Ms. Ross-Williams had not spoken to her counsel, Mr. Weiser, in years.

26. Ms. Ross-Williams admitted she was entirely unaware of any of the details in "her" case.

27. Ms. Ross-Williams was not aware of the scathing orders from the District Court of Johnson County, Kansas, criticizing her attorneys' use of an unlicensed disbarred "lawyer" to inflate their bill. She was unaware the judge in "her" case drastically reduced the attorney fees by ninety percent, from $4.5 million to $450,000, finding they were not remotely accurate or credible.

28. Ms. Ross-Williams was not aware that an appeal had been filed on her behalf and had not been provided with pleadings in her case.

29. Ms. Ross-Williams, plaintiff in the underlying litigation, even continually referred to herself as the defendant and appeared to completely lack understanding of her obligations as a representative plaintiff.

30. The conversation between Mr. Hartleib and Ms. Ross-Williams was pleasant and non-confrontational.  Ms. Ross-Williams provided Mr. Hartleib with a private email address to send the pleadings in her case that her counsel failed to provide.

31. Later, instead of expressing outrage by the information Mr. Hartleib provided in the 15-minute affable call, after speaking with Defendant Weiser, Ms. Ross-Williams falsely accused Mr. Hartleib of threatening and harassing her.

32. After learning of the March 7, 2017 amicable phone call, Mr. Weiser induced Ms. Ross-Williams to file false declarations against Mr. Hartleib, accusing him of threats and harassment to gain a protective order under false pretenses. This was done to harm Mr. Hartleib's reputation and discredit him in the *Ross-Williams* action before the Kansas Court of Appeals and in other unrelated cases.

*Clerk of the District Court, Johnson County Kansas*
*01/22/19  02:14pm SS*

33. In court filings, the Weiser defendants made inflammatory false statements and allegations about Mr. Hartleib that were personally and professionally hurtful, harmful and without any basis in truth or fact.

34. The Weiser defendants also made false statements to the district and appellate courts in Kansas regarding their conduct and the conduct of their unlicensed non-lawyer whom they knowingly put forth as a licensed attorney who billed $350 per hour in search of their improper and excessive fee award (which Judge Vano noted and overwhelmingly reduced), as well as the practical effect of the near toothless "corporate reforms" they negotiated in the mediation.

35. As a result of Defendants' acts and omissions as described herein, Mr. Hartleib has suffered damage to his good name and reputation, lost the benefit of serving as lead plaintiff in the underlying litigation and the positive result that would likely have occurred had he been lead plaintiff, was forced to expend substantial sums and thousands of hours of personal time to oppose and expose Defendants' conduct and chicanery, and has suffered significant mental and emotional trauma from Defendants' actions.

36. Despite filing a related action years later, Mr. Hartleib was estopped from participation in the consolidated cases in the underlying litigation. In fact, all firms in the consolidated cases colluded and conspired to work as one in their effort to prevent Mr. Hartleib from seeking meaningful relief on behalf of Sprint Nextel. All other cases in the consolidated action were settled except one, Mr. Hartleib's.

37. Defendants Robert Weiser and the Weiser Law Firm's handling of the underlying litigation is part of a regular custom, pattern and practice they have engaged in for years. This modus operandi has been to the detriment of both the classes of shareholder plaintiffs they have falsely purported to represent as well as the corporations those shareholders are seeking to protect and improve.

*Clerk of the District Court, Johnson County Kansas*
*01/22/19  02:14pm SS*

EXHIBIT 33
304

38. The Weiser defendants regularly handle shareholder derivative suits in concert with other firms with whom they have relationships and who file securities class action lawsuits based on the same issues or conduct.  The Weiser defendants will stay the shareholder derivative suit, whereby allowing sufficient time to pass allowing for the billing of thousands of fraudulent hours, piggyback on the discovery from the class action to bill fraudulent document review, then resolve the shareholder derivative suit by negotiating soft or meaningless corporate "reforms" and very high legal fees.

39. This framework is what the Weiser defendants attempted to do in the *Ross-Williams* matter when they piggybacked on a securities class action filed by the national class action firm Robbins Gellar, one of the national firms with which the Weiser defendants work in concert, until their efforts were partially derailed by Mr. Hartleib's objection, which resulted in Judge Vano's order finding the Weiser defendants' conduct and fee request to be both troubling and excessive.

**COUNT I**
*Legal Malpractice/Breach of Fiduciary Duty*
*Robert Weiser and The Weiser Law Firm, P.C.*

40. Plaintiff incorporates all preceding allegations as if fully set forth herein.

41. Defendants Robert Weiser and The Weiser Law Firm, P.C., entered into an attorney-client relationship with Plaintiff Michael Hartleib which was never terminated.

42. Defendants Weiser and the Weiser firm owed Mr. Hartleib the duty to provide competent and skillful representation and the duties of undivided loyalty, to act solely for Mr. Hartleib's benefit as a shareholder and fiduciary for Sprint Nextel, and to avoid engaging in conflicts of interest.

43. The Weiser defendants further had the duty of honesty and candor in their communications and representations to the District Court and the Court of Appeals.

44. Defendants Weiser and the Weiser firm breached these duties by:

    a. Refusing to file Mr. Hartleib's claim in the underlying litigation when it became apparent that he would not kowtow to Mr. Weiser's demands on a potential settlement and would

not permit the underlying litigation to be lawyer-driven litigation, benefitting only the attorneys;

b. By taking an adverse position to a former client in their attempt to protect their fraudulent scheme, defraud the Court and unjustly enrich themselves by 4.5 million dollars in fraudulent fees;

c. By abusing process in the case in question and using the instrumentalities of the judicial system to vex, harass and annoy in retaliation for Mr. Hartleib's filing of an Amicus Brief in the unrelated *Equifax* action. In the *Equifax* action, Weiser and the Weiser Firm was removed as co-lead counsel in said case based on their actions in the *Ross-Williams* case;

d. Representing Defendant Ross-Williams in her claims and requests for relief against Mr. Hartleib which presented a conflict of interest that was not waived;

e. Using Mr. Hartleib's communications with them, which were protected by the attorney-client privilege, against him in connection with the underlying litigation and the dispute between Defendant Ross-Williams and Mr. Hartleib. In addition, sharing privileged communications in the unrelated case in the Northern district of Georgia, *In Re Equifax,* and proffering falsehoods relating to said communications in a willful attempt to harm Mr. Hartleib and obfuscate their duplicitous acts;

f. Replacing Mr. Hartleib as lead plaintiff in the underlying litigation with a less qualified lead plaintiff who had little or no involvement in the case, in order to bill over 18,000 hours, and 4.5 million dollars in fraudulent fees;

g. Employing in the underlying litigation the services of a criminal non-attorney, who was previously disbarred, charged with racketeering, and knowingly putting forth his work-product under a fraudulent name as a basis for a grossly excessive attorney fee request;

h. Putting forth and supporting Defendant Ross-Williams' untrue statements regarding Mr. Hartleib's actions and communications with her;

i. Making false statements to the District and Appellate Courts in Kansas regarding Mr. Hartleib's prior actions:

j. In such other and further ways as may be learned through discovery.

45. Defendants' actions and inactions described herein were willful, wanton, fraudulent and malicious.

46. As a direct and proximate result of Mr. Weiser's and the Weiser firm's breach of their duties, Plaintiff Michael Hartleib was damaged as described above in paragraphs 35 and 36.

WHEREFORE, Plaintiff Michael Hartleib prays for judgment in his favor on Count I, for compensatory damages in a fair and reasonable amount, for his costs incurred herein, and for such other and further relief as the Court deems just and proper.

## **COUNT II**
*Violations of Kansas Consumer Protection Act*
*Robert Weiser and The Weiser Law Firm, P.C.*

47. Plaintiff incorporates all preceding allegations as if fully set forth herein.

48. Pursuant to K.S.A. § 50-623, *et seq.* (the "Kansas Consumer Protection Act" or the "KCPA"), Mr. Hartleib is a "consumer" and the Weiser defendants are "suppliers" for purposes of claims under the Kansas Consumer Protection Act.

49. When the Weiser defendants agreed to represent Mr. Hartleib as the shareholder representative plaintiff for the case Mr. Hartleib hired them to pursue, the Weiser defendants offered to reasonably represent Mr. Hartleib and the class of shareholders in accordance with their ethical duties of loyal, zealous representation in those claims and all other ethical duties related to client representation and litigation.

*Clerk of the District Court, Johnson County Kansas*
*01/22/19  02:14pm SS*

EXHIBIT 33

50. In fact, the Weiser defendants did not intend to and did not provide such reasonable, expectable legal services, and they did not disclose to Mr. Hartleib or the class of shareholders this knowledge and intent.

51. The Weiser defendants have colluded and conspired by falsely purporting to represent the interest of Sprint and its shareholders, including Mr. Hartleib, when their true motives were to stay this case for a prolonged period (over 5 years) to allow them to bill over 18,000 fraudulent hours and 4.5 million in fees. The Weiser defendants knowingly employed a criminal and disbarred attorney using an alias, Alexander Silow, to bill 1.6 million dollars in this case. Mr. Silow's actions in this case have led to new criminal convictions in Montgomery County Pennsylvania, including the Unauthorized Practice of Law, *(42Pa.C.S.2524),* Unsworn Falsification to Authorities *(18 Pa. C. S. 4904) (b)* and Securing Execution of Documents by Deception *(18 Pa. C. S. 4114)*

52. On information and belief, Mr. Weiser and the Weiser Firm knew Mr. Silow's status as disbarred attorney and criminal when they hired him from the Abelson placement agency. For over a decade, Mr. Weiser instructed Mr. Silow to fraudulently bill tens of millions of dollars in cases across the country in addition to the 1.6 million in the Ross-Williams case. Weiser fraudulently put forth Mr. Silow as a securities expert and licensed attorney in Pennsylvania in the *Ross-Williams* case, when Mr. Silow's resume submitted by the Weiser firm in the case showed neither was true.

53. When the Weiser defendants moved the District Court for approval of a settlement that would include ineffective corporate governance reforms and fraudulent and excessive fees, they violated the terms of the KCPA insofar as their representations to the Court, Mr. Weiser and the entire class of shareholders contained knowing and intentional written exaggeration of a material fact, a willful failure to state a material fact and/or a willful concealment or omission of a material fact, and a knowing and intentional representation that their services had uses, benefits or characteristics which they did not have, all as described above.

*Clerk of the District Court, Johnson County Kansas*
*01/22/19  02:14pm SS*

11

EXHIBIT 33
308

54. The Weiser defendants' conduct described herein was unconscionable within the meaning of the KCPA in that they took advantage of Mr. Hartleib's and the shareholder class' relative ignorance and lack of sophistication in the technicalities of the legal system, because the requested fees grossly exceeded the price at which similar services could be obtained, and because Mr. Hartleib, the shareholder class was unable to receive a material benefit from the Weiser defendants' services and resulting litigation, the settlement obtained by the Weiser defendants was one-sided in favor of the Weiser defendants, and the Weiser defendants made misleading statements in connection with the litigation on which Mr. Hartleib and the shareholder class were likely to rely.

55. As a direct and proximate result of the Weiser defendants' conduct set forth herein, Mr. Hartleib was damaged as described above in paragraphs 35 and 36.

56. The Weiser defendants' actions and inactions as set forth herein are in violation of the KCPA, §§ 50-626, 627.

57. Defendants' actions and inactions described herein were willful, wanton, fraudulent and malicious.

58. This action is authorized and Plaintiff is entitled to an award of reasonable attorney fees pursuant to the KCPA, § 50-634.

WHEREFORE, Plaintiff Michael Hartleib prays for judgment in his favor on Count II, for compensatory damages in a fair and reasonable amount, for his attorney fees and costs incurred herein, and for such other and further relief as the Court deems just and proper.

### COUNT III
*Abuse of Process*
*All Defendants*

59. Plaintiff incorporates all preceding allegations as if fully set forth herein.

60. Defendants knowingly made false statements against Mr. Hartleib in court documents and sought and obtained a protective order under false pretenses. Defendant Ross-Williams filed false declarations under oath against Mr. Hartleib at the direction and request of Mr. Weiser in an

attempt to assail his character and protect Mr. Weiser's unlawful acts. Defendants further obtained a protective order so that that that it could be used by the Weiser defendants against Mr. Hartleib in other litigation in which he might challenge their qualifications and conduct. These actions amount to the knowing improper use of legal process.

61. Defendants' actions were taken for the purposes of harassing Mr. Hartleib and causing him hardship.

62. In fact, the Weiser defendants did use the protective order against Mr. Hartleib in the *Equifax* litigation.

63. Defendants' actions directly and proximately resulted in damages to Mr. Hartleib as described above in paragraphs 35 and 36.

64. Defendants' actions and inactions described herein were willful, wanton, fraudulent and malicious. WHEREFORE, Plaintiff Michael Hartleib prays for judgment in his favor on Count III, for compensatory damages in a fair and reasonable amount, for his costs incurred herein, and for such other and further relief as the Court deems just and proper.

### COUNT IV
*Breach of Fiduciary Duty*
*Defendant Ross-Williams*

65. Defendant Ross-Williams was an unfit plaintiff who simply allowed her name to be used to facilitate a lawyer driven case for personal financial gain.

66. When Mr. Hartleib informed her of the fraud and chicanery that was taking place in "her" case, she did nothing to stop it. In fact, she became a willing participant in the fraud upon the Court by acting on behalf of the Weiser defendants in furtherance of their fraud upon the court.

67. Defendant Ross-Williams owed a fiduciary duty to Mr. Hartleib and all Sprint shareholders to fairly and adequately represent their interests in the litigation, including the duties to ensure that

lead counsel fee requests were appropriate, the duties of care and loyalty to the class, and to fairly represent the interests of the entire class.

68. Defendant Ross-Williams failed to act in good faith and breached her fiduciary duty to properly represent Mr. Hartleib and the other Sprint shareholders by failing to ensure the fee request of the Weiser defendants was commensurate with the relief obtained, by failing to ensure that the relief agreed to in the settlement was sufficiently robust as to effect meaningful corporate change, by failing to adequately monitor and remain involved in the litigation, and by acting in her own interest rather than in the interest of Sprint Nextel and the absent class of shareholders.

69. As a direct and proximate result of Defendant Ross-Williams' breach of her fiduciary duties, Mr. Hartleib was damaged as described above in paragraphs 35 and 36.

WHEREFORE, Plaintiff Michael Hartleib prays for judgment in his favor on Count IV, for compensatory damages in a fair and reasonable amount, for his costs incurred herein, and for such other and further relief as the Court deems just and proper.

Respectfully Submitted by:

/s/ Andrew B. Protzman

Andrew B. Protzman, #18015
Ben Stelter-Embry, #25891
Protzman Law Firm LLC
1100 Main Street
Suite 2430
T: 816-421-5100
F: 816-421-5105
andy@protzmanlaw.com
ben@protzmanlaw.com

**Attorneys for Plaintiff**

*Clerk of the District Court, Johnson County Kansas*
*01/22/19  02:14pm SS*

EXHIBIT 33
311

# EXHIBIT 34

EXHIBIT 34
312

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **THE WEISER LAW FIRM, P.C., et al.,** | **CIVIL ACTION** |
| Plaintiffs, | |
| *v.* | **NO. 19-2728-KSM** |
| **MICHAEL HARTLEIB,** | |
| Defendant. | |

## <u>ORDER</u>

**AND NOW**, this 9th day of October, 2020, upon consideration of Defendant Michael Hartleib's Motion to Dismiss (Doc. No. 9), Plaintiffs The Weiser Law Firm, P.C. and Robert Weiser's response brief (Doc. No. 12), Hartleib's replies (Doc. No. 15, 22), Plaintiffs' sur-reply (Doc. No. 25), the parties' supplemental briefs (Doc. Nos. 32, 33), the parties' oral arguments on the motion, and for the reasons set forth in the Memorandum, it is hereby **ORDERED** that Hartleib's motion is **GRANTED in part** and Plaintiffs' Counts I, V, VI, and VII (vexatious litigant order, negligent misrepresentation, intentional interference with contractual relations, and tortious interference) are **DISMISSED** for lack of personal jurisdiction and Count II (abuse of process) is **DISMISSED** for improper venue. Hartleib's motion is **DENIED** with respect to Counts III and IV (defamation and IIED).

**IT IS FURTHER ORDERED** that in light of the Court's decision, the stay currently in place (Doc. No. 30) is lifted, and a telephone conference to discuss scheduling and other pretrial matters is **SCHEDULED** for **October 29, 2020 at 10:00 a.m.** At least seven (7) days prior to the conference, the parties should submit a joint status report with proposed scheduling deadlines.

EXHIBIT 34
313

**IT IS SO ORDERED**.

                              **/s/KAREN SPENCER MARSTON**
                              _____
                              KAREN SPENCER MARSTON, J.

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **THE WEISER LAW FIRM, et al.**, <br><br> Plaintiffs, <br><br> *v.* <br><br> **MICHAEL HARTLEIB,** <br><br> Defendant. | **CIVIL ACTION** <br><br><br> **NO. 19-2728-KSM** |

### <u>MEMORANDUM</u>

**MARSTON, J.**                                      **October 9, 2020**

This case involves over a decades' worth of history and heated disputes between Plaintiffs the Weiser Law Firm, P.C. ("the Firm") and Robert Weiser, Esquire, and Defendant Michael Hartleib.  The thrust of Plaintiffs' 325-page complaint, including exhibits, can be summarized as follows:  according to Plaintiffs, Hartleib has waged an all-out vendetta against them, in retribution for their refusal to enter into a fee-sharing or consulting arrangement with him and for the amount of attorneys' fees Plaintiffs billed in a particular shareholder derivative suit, which were deemed excessive.  (Doc. No. 1.)

Plaintiffs specialize in providing legal services in shareholder class actions and shareholder derivative actions, and they allege that Hartleib, a former potential client, has frequently (and improperly) inserted himself into litigations in which they were involved.  (*Id.*) In doing so, Hartleib has purportedly embarked on a campaign to publicly disparage and attack Plaintiffs to judges, other members of the legal community, and current and prospective clients. (*Id.*)

In their complaint, Plaintiffs assert claims for abuse of process, defamation, intentional

EXHIBIT 34
315

Case 8:23-cv-00171-CJC-JDE   Document 1   Filed 01/27/23   Page 316 of 1580   Page
ID #:316
Case 2:19-cv-02728-KSM   Document 35   Filed 10/09/20   Page 2 of 42

infliction of emotional distress (IIED), negligent misrepresentation, intentional interference with prospective contractual relations, and tortious interference with contract. (*Id.*) Plaintiffs also seek a vexatious litigant order, to enjoin Hartleib from filing any action against Plaintiffs; from making any filing or submission in any case, derivative suit, class action suit, or qui tam suit that involves Plaintiffs; and from contacting any individual or entity about Plaintiffs, without first obtaining leave of the court. (*Id.* at ¶ 170.)

On August 23, 2019, Hartleib, a California resident, moved to dismiss the complaint for lack of personal jurisdiction and improper venue. Hartleib argues that he has not engaged in any acts that were expressly aimed at Pennsylvania and that there is no evidence that a substantial part of the events or omission giving rise to Plaintiffs' claims occurred in the Eastern District of Pennsylvania. (Doc. Nos. 9, 15, 22, 32.)

In opposition, Plaintiffs contend that there are sufficient minimum contacts between Hartleib and Pennsylvania, citing a barrage of telephone calls and emails that Hartleib allegedly directed to Pennsylvania and Hartleib's sustained attacks upon Plaintiffs' Pennsylvania-based business, among others. (Doc. Nos. 12, 25.)

Pursuant to this Court's June 16, 2020 order (Doc. No. 30), the parties have engaged in limited jurisdictional discovery and filed supplemental briefs (Doc. Nos. 32, 33). The Court held oral argument on September 17, 2020.

For the reasons discussed below, we grant Hartleib's motion in part and deny it in part.

I.

The following facts are pled in the complaint or included in Plaintiffs' supplemental brief, and taken in the light most favorable to Plaintiffs.

The Weiser Law Firm is a Pennsylvania corporation with offices located in Berwyn,

Pennsylvania, and Weiser is a resident of Pennsylvania.  (Doc. No. 1 at ¶¶ 1–3.)  The Firm is a legal service provider, specializing in shareholder class actions and shareholder derivative actions, and Weiser's law practice focuses primarily on shareholder derivative litigation.  (*Id.* at ¶¶ 7, 10.)

In November 2008, Hartleib, a California resident, emailed Bruce Murphy, an attorney who had previously referred clients to the Firm.  Hartleib discussed how the shares he owned in Sprint Corporation and Nextel Communications lost value when the two companies merged to become Sprint Nextel Corporation.  (*Id.* at ¶¶ 11–12; *id.* at p. 66, Ex. 1.)  Murphy forwarded Hartleib's email to Weiser and inquired whether Weiser thought a shareholder derivative action could be brought on Sprint's behalf.  (*Id.* at ¶ 13; *id.* at p. 66, Ex. 1.)  The Firm did not recommend filing a derivative lawsuit at that time.  (*Id.* at ¶ 14.)

A few months later, in March 2009, a separate law firm filed a securities class action against Sprint, based on the Sprint/Nextel merger.  (*Id.* at ¶ 15.)  Several other substantially similar class action law suits were then filed and consolidated in Kansas Federal Court (the "Sprint Securities Class Action").  (*Id.* at ¶ 16.)

After the first suit against Sprint was filed, Murphy followed up with Weiser about potential shareholder derivative claims that could be brought on Sprint's behalf.  (*Id.* at ¶ 18.)  This time, the Firm concluded that Sprint may have potential claims against its' current and/or former officers and directors, and asked Murphy if Hartleib or any other potential client was interested in initiating the lawsuit.  (*Id.* at ¶¶ 19–20.)  Murphy responded that they were interested.  (*Id.* at ¶ 21.)  Accordingly, on March 13, 2009, Weiser sent a draft shareholder derivative complaint to Murphy, and Murphy circulated it to his actual or potential clients, which the Firm understood as including Hartleib.  (*Id.* at ¶¶ 23–24.)

Case 8:23-cv-00171-CJC-JDE     Document 1     Filed 01/27/23     Page 318 of 1580     Page
ID #:318
Case 2:19-cv-02728-KSM     Document 35     Filed 10/09/20     Page 4 of 42

On March 26, 2009, Weiser and Hartleib spoke for the first time.  During the call,

Hartleib claimed to have spent "hundreds of hours" investigating Sprint and that he had

previously provided separate counsel with the facts and analysis necessary to prosecute the

federal securities claims asserted against Sprint in the Sprint Securities Class Action.  (*Id.* at ¶¶

27–28.)  Hartleib also told Weiser that he was interested in seeking appointment as a lead

plaintiff in the Sprint Securities Class Action.  (*Id.* at ¶ 29.)  Last, Hartleib strongly implied

interest in sharing any attorneys' fees the Firm might recover if it represented Hartleib in

connection with a shareholder derivative suit brought on Sprint's behalf.  (*Id.* at ¶ 30.)  Hartleib's

interest in a fee sharing arrangement was "extremely troubling" to Weiser.  (*Id.* at ¶ 32.)

After their conversation, Weiser decided that the Firm could not represent Hartleib in a

derivative action brought on behalf of Sprint due to a potential conflict of interest.  (*Id.* at ¶ 31;

*id.* at p. 68, Ex. 2.)  Weiser reasoned that any role Hartleib played in launching or prosecuting the

Sprint Securities Class Action *against* Sprint would preclude his participation as a plaintiff to a

derivative suit brought *on behalf of* Sprint.  (*Id.*)  The following day, Weiser communicated his

decision to Murphy, and Murphy informed Hartleib that neither his firm nor the Weiser Law

Firm would represent Hartleib in a shareholder derivative action brought on behalf of Sprint.

(*Id.* at ¶¶ 33–36; *id.* at p. 71, Ex. 3.)

Thereafter, the Firm decided to represent Monica Ross-Williams on behalf of Sprint in a

shareholder derivative action filed in Kansas State Court.  (*Id.* at ¶ 37.)  In July 2011, another law

firm filed a separate shareholder derivative action on Sprint's behalf and named Hartleib as the

representative plaintiff.  (*Id.* at ¶ 38.)

Hartleib reached out to Weiser in June 2011, two years after they last spoke, this time in

connection with a *pro se* shareholder derivative action he and other named plaintiffs filed on

behalf of Sirius XM Satellite Radio, Inc.  (*Id.* at ¶¶ 39–40.)  Hartleib sought to engage the Firm as counsel for the plaintiffs in the Sirius derivative action (*id.* at ¶¶ 41–42; *id.* at pp. 95–97, Ex. 5), but Plaintiffs declined (*id.* at ¶ 43).  Hartleib reiterated his request to Weiser a few months later (*id.* at ¶ 44; *id.* at p. 99, Ex. 6), but Weiser never responded (*id.* at ¶ 45).  In February 2012, Hartleib contacted Weiser again, asking "are we going to do some business together or what?" (*Id.* at ¶¶ 46–47; *id.* at p. 101, Ex. 7.)

Weiser and Hartleib did not have contact again until 2016, when a majority of the Sprint shareholder derivative lawsuits pending in the Kansas courts (including Ross-Williams's suit) achieved a collective settlement (the "Sprint Derivative Settlement").  (*Id.* at ¶ 48.)  Hartleib was a vocal opponent of the Sprint Derivative Settlement and the only Sprint derivative plaintiff to not participate in it.  (*Id.* at ¶ 49.)

When the Firm and others sought the Kansas State Court's final approval of the terms of the Sprint Derivative Settlement, including attorneys' fees for plaintiffs' counsel, Hartleib filed a *pro se* objection.  (*Id.* at ¶ 50.)  Hartleib also expressed his displeasure to Weiser when they spoke over the phone on May 20, 2016, a week before the final approval hearing on the settlement.  (*Id.* at ¶¶ 51– 52.)  Notwithstanding his opposition to the settlement, Hartleib proposed to withdraw his formal objection if Weiser agreed to enter into a "consulting agreement" with Hartleib.  (*Id.* at ¶ 53.)  Hartleib suggested that he would provide the Firm with ideas for initiating lawsuits against corporate defendants, in exchange for receiving hundreds of thousands of dollars.  (*Id.*)  Weiser was troubled by Hartleib's proposition and declined to enter into such an arrangement.  (*Id.* at ¶ 54.)

Hartleib appeared at the final hearing on May 26 before the Honorable James Vano in support of his objection.  (*Id.* at ¶ 55.)  In mid-June 2016, Judge Vano approved the Sprint

Derivative Settlement, but only awarded approximately 10% of the attorneys' fees requested, and the parties appealed.  (*Id.* at ¶¶ 61–62.)

In February 2017, during the pendency of the appeal, the Firm discovered that Jeffrey Silow,[1] one of its' contract attorneys who had performed document review during the Sprint derivative litigation, had been disbarred in Pennsylvania decades earlier.  (*Id.* at ¶¶ 59, 63, 66.) Silow had been placed with the Firm through Abelson Legal Search, a Philadelphia-based legal recruitment and placement firm.  (*Id.* at ¶ 59.)  Abelson had been "responsible for vetting the credentials and bar status of the attorneys it placed" and "held Silow out . . . as a licensed attorney in good standing."  (*Id.* at ¶ 60; *see also* Doc. No. 33 at p. 6 n.4.)  After learning of Silow's disbarment, the Firm immediately alerted Judge Vano and the Kansas Appeals Court, which was reviewing the attorneys' fee award.  (*Id.* at ¶ 66.)  The reduced attorneys' fee award in the settlement was ultimately affirmed on appeal.  (*Id.* at ¶ 67.)

Once the Silow controversy was brought to light, Hartleib proceeded to "unleash[] a deluge of abuse upon the Plaintiffs."  (*Id.* at ¶ 68.)  For example, on March 6, 2017, Hartleib emailed Weiser and copied eleven members of the bar,[2] as well as the administrative assistant for the Kansas State Court:

> Rob!  I am a little confused! . . . It seems your statements to the Appellate Court were disingenuous at best.  Shocking! . . . Ethical obligation, what a Saint [sic] . . . Your attempts, [sic] to obfuscate your chicanery in this case is galvanizing my convictions, strengthening my resolve to expose all of the corrupt parties in this case!  This lawyer driven litigation must and will cease.  Your temerity, to seek leave of the Appellate Court to reinstate fees, given what I have uncovered is quite frankly astonishing and provoking wrath.

(*Id.* at ¶ 69; *id.* at pp. 117–18, Ex. 12.)

---

[1] Silow used his son's name, Alexander, "to perpetrate his deception."  (*Id.* at ¶ 63.)

[2] Hartleib copied Alfred Yates, who Hartleib admits is an attorney based in Pittsburgh, as well as two other employees of the Firm.  (*See id.* at p. 117, Ex. 12; Doc. No. 33 at p. 10.)

That same day, Hartleib called Ross-Williams, who Plaintiffs represented in the Sprint derivative action, and "verbally harassed and threatened" her. (*Id.* at ¶ 71.) For example, Hartleib told Ross-Williams that the Firm was a "criminal enterprise" and not serving her interests as a Sprint shareholder. (*Id.*) Ross-Williams felt "shocked, disturbed, harassed and threatened" during the call, and asked Hartleib not to contact her again. (*Id.* at ¶¶ 73–74; *see also id.* at pp. 120–23, Ex. 13.) Nonetheless, the following day, Hartleib emailed Ross-Williams, copying fifteen members of the bar[3] and the Kansas State Court's administrative assistant:

> Dear Ms. Williams, it was a pleasure speaking with you this evening . . . I find it unconscionable that your attorneys failed to inform you of Judge Vano's rulings or that an Appeal was filed on your behalf. I do believe that you are a[n] unwitting victim of their fraud committed against the Court. As we discussed they have submitted millions of dollars in fraudulent billing in your case. As I informed you that this was not just my opinion, the Judge in your case came to a similar conclusion. In fact, your attorney has now admitted to at least 1.6 million dollars in fraudulent bills submitted to the Court . . . I am no expert, but when a Firm admits criminal acts in a case I believe they are obligated to notify you as the Plaintiff. Mr. Weiser and his Firm have already contacted their Bar associations and other Courts to report their criminal acts. I have contacted the district attorney's offices in Pennsylvania and Kansas and will be filing formal complaints . . . As you can see by the letters from Mr. Weiser they are in a lot of trouble, but claim they are victims of Mr. Silow. I will provide incontrovertible proof that Mr. Weiser et. al. is just as guilty as Mr. Silow. This is just the tip of the iceberg.

(*Id.* at ¶ 77; *id.* at pp. 125–26, Ex. 14.)

In response, Plaintiffs sent Hartleib a cease-and-desist letter, which Hartleib ignored. Hartleib also emailed Weiser, fifteen members of the bar[4] and the Kansas State Court's administrative assistant:

> For you to characterize [the phone call with Ross-Williams and follow-up email] as harassment is another blatant attempt to distract and obfuscate your fraudulent

---

[3] Again, Hartleib copied Yates (located in Pittsburgh) and at least two other employees of the Firm. (*See id.* at p. 125. Ex. 14.)

[4] Hartleib again included Yates (based out of Pittsburgh) and at least two other employees of the Firm on the email. (*See id.* at p. 129, Ex. 14.)

Case 8:23-cv-00171-CJC-JDE    Document 1    Filed 01/27/23    Page 322 of 1580    Page
ID #:322
Case 2:19-cv-02728-KSM    Document 35    Filed 10/09/20    Page 8 of 42

acts and bastardization of the judicial system.  I caution you, that by coercing your
'client' to misstate facts regarding our call will only inflict additional damage to
what little credibility you have left.  You Sir, and your coconspirators are the ones
that need to Cease and Desist.  Your so-called 'client' is representing my interest
and her attorneys are corrupt, therefore I will neither Cease nor Desist.  As far as
your not so vailed [sic] threat that Ms. Williams 'reserves all of her rights', if you
are threatening legal action against me, feel free, I will be happy to waive service
to expedite said action.  I find the prospects of discovery quite compelling.  Your
threats do nothing but, strengthen my resolve and galvanize my convictions.  Call
it a personality defect!  Instead of wasting my time, I would suggest you consult
an ethics attorney, that's right, you already have!

(*Id.* at ¶ 79; *id.* at p. 129, Ex. 14.)

Because of Hartleib's harassing conduct, the Kansas Appeals Court issued a protective

order on March 30, 2017, prohibiting Hartleib from contacting Ross-Williams.  (*Id.* at ¶ 80.)  On

two separate occasions, Hartleib sought to have the protective order lifted, but those motions

were denied.  (*Id.* at ¶¶ 81–82.)  After the Firm opposed one such attempt, Hartleib emailed

Weiser and copied eight other members of the bar (including other employees of the Firm):

Rob, your ability to set the bar at new lows, never disappoints!  . . . Your attempt
to mislead the Appellate Court with incomplete records might be your standard
operating procedure, but I believe it will cost you when I seek sanctions.  Your
personal attacks smack of desperation, they do nothing to dissuade me, in fact
they galvanize my convictions and strengthen my resolve! . . . Your ill-advised
actions, and ad-hominem attacks are making the Weiser Firm radioactive!

(*Id.* at ¶ 83; *id.* at p. 131, Ex. 15.)

Plaintiffs also allege that, as part of Hartleib's campaign against Plaintiffs, Hartleib gave

a tip to the *Wall Street Journal* about Silow's disbarred status in Pennsylvania, his role as a

document reviewer in the Sprint derivative action, and that Plaintiffs received only 10% of the

requested attorneys' fees in the Sprint Derivative Settlement, leading to a highly-publicized

article.  (*Id.* at ¶¶ 85–87.)

In addition, Plaintiffs claim that on April 25, 2017, Hartleib mailed several copies of an

"anonymous" letter strewn with profanities to six Court of Common Pleas of Chester County

EXHIBIT 34

judges, which was forwarded to Weiser the following day.  (*Id.* at ¶¶ 89–92; *id.* at pp. 137–43, Ex. 17.)

Hartleib's vendetta against the Firm continued into early 2018, when he telephoned Abelson Legal Search located in Philadelphia—the organization that had placed Silow at the Firm and who the Firm had sued in the aftermath of learning about Silow's disbarment.  (Doc. No. 33.)  After the call, Hartleib emailed Cathy Abelson, explaining:

> I am the person who has exposed the fraud committed by the Weiser firm in the case that has brought Mr. Silow's criminal past and disbarred status into focus . . . Their actions in this case are truly unconscionable . . . they have filed multiple purjurious [sic] declarations and will stop at nothing to protect their duplicitous acts and criminal enterprise . . .  I am hopeful that we can work together and facilitate a cross-complaint against the Weiser firm . . . I know where the bodies are buried and intend to dig them up.

(Doc. No. 33-3 at p. 2.)  Abelson questioned Hartleib's motivation for contacting the search firm. Hartleib responded that he could help Abelson "defeat" the Firm in the Firm's suit against Abelson, and referred to the cease-and-desist letters hung on his office wall "as troph[ies] commemorating [his] accomplishments exposing corrupt firms such as (Weiser) et.al. [sic]."  (*Id.* at p. 4.)  Hartleib concluded,

> I can facilitate a cross-complaint that could lead to the demise of the Weiser Firm and damages for Abelson . . . Weiser et.al. [sic] are corrupt and inept.  After all, a layperson has defeated and humiliated them, and I am far from finished.  I predict when over certain attorneys may not be practicing law in the future.

(*Id.* at pp. 4–5.)

On February 24, Hartleib emailed the Abelson Search Firm a third time, writing:

> I just found out [Weiser's] firm was appointed lead in a huge nationwide suit.  I will be working tonight and tomorrow on an Amicus Brief, whereby I will inform the court of his criminal acts in the Sprint case, ongoing PA Bar investigation and forthcoming Order from the Kansas Court of Appeals.  His firm is unfit to be lead Counsel in any representative suit at this time.

(*Id.* at p. 3.)  Undeterred by a lack of response, on June 2, Hartleib emailed Abelson yet again,

Case 8:23-cv-00171-CJC-JDE    Document 1    Filed 01/27/23    Page 324 of 1580    Page
ID #:324
Case 2:19-cv-02728-KSM    Document 35    Filed 10/09/20    Page 10 of 42

asking "are you interested in working together to commence an action against the Weiser firm? Why won't you have your attorneys contact me?" (*Id.* at p. 6.)

Meanwhile, Hartleib simultaneously initiated contact with Thomas Goggin, a Detective Sergeant at the Chester County District Attorney's Office in Chester County, Pennsylvania. (Doc. No. 33 at p. 7.) On March 13, 2018, Hartleib told Detective Goggin "the Weiser firm is claiming to be victim of Mr. Silow, when there is irrefutable proof they knew of Mr. Silow [sic] fraud and conspiracy against the court." (Doc. No. 33-3 at p. 8.) The following day, Hartleib responded to Detective Goggin's follow-up questions, emphasizing that "the Weiser firm knew exactly who Silow was and the Weiser [sic] was lying." (*Id.* at p. 7.) A week later, on March 22, Hartleib told Detective Goggin: "Weiser knew exactly who Silow was! I was hopeful [Abelson] would want to work together but I have not heard back from there [sic] lawyers. I am going to bring a civil suit against Weiser. Were you able to find the misdemeanor charges against Silow!" (*Id.* at p. 9.) Detective Goggin informed Hartleib that he did not "have anything new to report" but would "get back to [him]." (*Id.*)

About two months later, in May 2018, Hartleib circulated the Kansas Appeals Court opinion upholding the reduced attorneys' fees award to Detective Goggin and asked: "Were you ever able to find the charges filed against Silow? I can't believe that the[y] can commit perjury and try to defraud the court and Sprint and walk away with 450k . . . Alexander Silow [Jeffrey Silow's son] knew and was likely receiving payments from Weiser." (*Id.*) Hartleib also said that he was going to file a Bar complaint and commence a civil action, though he did not specify whether such action would be taken against Weiser or Alexander Silow. (*Id.*) Six months later, Hartleib had clearly not let the subject die, emailing Detective Goggin yet again "to see if any action was taken by [Goggin's] department." (Doc. No. 33 at p. 8.)

EXHIBIT 34

At the same time, Hartleib's emails to Weiser and others about Plaintiffs continued unabated.  For example, on May 19, 2018, Hartleib emailed Weiser and eight other members of the bar:  "Plaintiff Counsel, and I use this term loosely, when making false allegations against a party I would suggest you at least get it right.  I am no expert, but I am pretty sure it would be libelous!  I will demonstrate its proper use posthaste!"  (Doc. No. 1 at ¶ 93.)  Further, on June 2, 2018, Hartleib emailed Weiser, eleven other members of the bar (including other employees of the Firm), and the Kansas State Court's administrative assistant regarding media coverage of a State Street lawsuit (which Plaintiffs were not involved in), stating:

> It is clear that the Plaintiff's Bar is rife with corruption, in both Class Action and Derivative cases.  Much like the fraud Weiser et.al. [sic] committed in the 'Ross-Williams' case, it appears to be standard operating procedure for many firms to submit millions in fraudulent fee requests upon the Court . . . At present, it appears Weiser et.al. [sic] has not been out done, as there is no mention of the unlicensed practice of law by a convicted felon using an alias.  I will be contacting the Special Master, and filing an Amicus Brief in the State Street case to inform them of the chicanery that has taken place in the 'Ross-Williams' case.  Although entirely unrelated, it presents a troubling pattern of fraud and corruption in these lawyer driven cases . . . The actions of Weiser et.al. [sic] and the Firms in the State Street case is the very definition of Racketeering[.]

(*Id.* at ¶ 94; *id.* at p. 148, Ex. 19.)

In the midst of all this, Hartleib began inserting himself into the Firm's pending litigations.  (*Id.* at ¶¶ 95–96.)  In *In re Equifax, Inc. Derivative Litigation* (N.D. Ga.), Plaintiffs sought to be appointed as Co-Lead Counsel, and Hartleib tried to thwart their appointment by filing an amicus brief.  (*Id.* at ¶ 101; *id.* at pp. 153–62, Ex. 21.)  In doing so, Hartleib unleashed a host of allegations, including that the Firm "lied, misl[ed] the court," "used an unfit plaintiff," engaged "in fraudulent billing," operated a "criminal enterprise," and displayed "hubris and utter contempt for the Court."  (*Id.* at ¶¶ 102–03.)  Hartleib posited:  "[W]hat is going on at the Weiser firm?  Either they are corrupt, or entirely inept[.]"  (*Id.* at ¶ 105.)  Ultimately, the court denied the Firm's motion to be appointed co-lead counsel, and Hartleib "took credit for this result."  (*Id.*

at ¶ 109.)

Hartleib also attempted to interject in *In re Big Lots, Inc. Shareholder Litigation* (S.D. Ohio), after settlement of the derivative claims had already received preliminary approval. The court granted final approval to the settlement on August 28, 2018, and in its opinion, noted that Hartleib had emailed the court to raise concerns about the Firm's billing practices:

> On August 24, 2018, well after the time to object and the fairness hearing took place, the Court received an email from [Hartleib], a shareholder who had an interest in a different case involving The Weiser Firm . . . Hartleib raised concerns over Weiser's billing practices in this prior case and stated that he wanted to inform the Court so that it could scrutinize the fee request in this case . . . Hartleib does not indicate that he is a shareholder in Big Lots or otherwise an interested party in this case. Furthermore, the Court always scrutinizes the billing records of plaintiffs' counsel before approving fee awards.

(*Id.* at ¶¶ 110–15; *id.* at pp. 182–94, Ex. 25.)

Hartleib allegedly targeted *In re CenturyLink Sales Practices and Securities Litigation* (D. Minn.) next, a consolidated derivative action in which the law firm of Bragar Eagle & Squire, P.C. moved to be appointed lead counsel and proposed that the Weiser Law Firm be included as part of its support structure. (*Id.* at ¶¶ 116–18.) Even though the Firm was not seeking appointment as lead counsel, Hartleib filed an amicus brief in opposition of its appointment to "inform [the] Court of ongoing troubling actions by" the Firm. (*Id.* at ¶¶ 117–18.) On March 6, 2019, he attended a hearing before the court, reiterating his accusations against the Firm, stating, "I know for a fact that the Weiser firm knew who Mr. Silow was and that will come out, you know, during the course of the litigation . . . These firms, when these firms are up to no good, when they are billing illusory hours . . ." (*Id.* at ¶¶ 129, 131; *id.*, Ex. 27.) After the hearing, Hartleib forwarded his amicus brief to the Kansas State Court's administrative assistant and copied other members of the bar who had been involved in the Sprint derivation action,[5]

---

[5] This included Yates (based out of Pittsburgh) and two other employees of the Firm. (*See id.* at p. 264,

Case 8:23-cv-00171-CJC-JDE    Document 1    Filed 01/27/23    Page 327 of 1580    Page
ID #:327
Case 2:19-cv-02728-KSM    Document 35    Filed 10/09/20    Page 13 of 42

writing: "I thought that the Honorable Vano would be interested to know that my quest to expose lawyer driven litigation and corruption rife throughout the Plaintiffs Bar continues." (*Id.* at ¶¶ 134–36; *id.* at pp. 264–65, Ex. 28.) Ultimately, the *CenturyLink* court appointed as lead counsel Bragar Eagle & Squire, whose proposed support structure included the Firm. (*Id.* at ¶ 143.)

Finally, Hartleib initiated his own lawsuit against Plaintiffs in Kansas State Court, asserting claims for legal malpractice/breach of fiduciary duty, violation of the Kansas Consumer Protection Act, and abuse of process. (*Id.* at ¶ 159; *id.* at pp. 308–21, Ex. 33.) After its removal to federal court, the District of Kansas court dismissed the case and denied reconsideration, and Hartleib appealed.

Plaintiffs argue that, taken together, the allegations and evidence proffered detailing Hartleib's actions towards Plaintiffs in Pennsylvania demonstrate that personal jurisdiction and venue are proper in this case. (Doc. Nos. 12, 25, 33.)

II.

Under Federal Rule of Civil Procedure 12(b)(2), a defendant may move to dismiss a claim for lack of personal jurisdiction. Fed. R. Civ. P. 12(b)(2). "The burden of demonstrating the facts that establish personal jurisdiction falls on the plaintiff," *Metcalfe v. Renaissance Marine, Inc.*, 566 F.3d 324, 330 (3d Cir. 2009) (internal quotation marks and citations omitted), and the plaintiff must do so with "reasonable particularity,'" *Batista v. O'Jays, Inc.*, Civil Action No. 18-0636, 2019 WL 400060, at *3 (E.D. Pa. Jan. 30, 2019) (quoting *Mellon Bank PSFS, Nat'l Ass'n v. Farino*, 960 F.3d 1217, 1223 (3d Cir. 1992)). When a court does not hold an evidentiary hearing, as is the case here, the plaintiff need only state a prima facie case of personal

---

Ex. 28.)

EXHIBIT 34

jurisdiction.  *D'Jamoos ex rel. Estate of Weingeroff v. Pilatus Aircraft Ltd.*, 566 F.3d 94, 102 (3d Cir. 2009); *Metcalfe*, 566 F.3d at 330.

In reviewing a 12(b)(2) motion, "'a court must accept all of the plaintiff's allegations as true and construe disputed facts in favor of the plaintiff.'"  *Lionti v. Dipna, Inc.*, Civil Action No. 17-01678, 2017 WL 2779576, at *1 (E.D. Pa. June 27, 2017) (quoting *Pinker v. Roche Holdings, Ltd.*, 292 F.3d 361, 368 (3d Cir. 2002)); *see also Metcalfe*, 566 F.3d at 330; *Toys "R" Us, Inc. v. Step Two, S.A.*, 318 F.3d 446, 457 (3d Cir. 2003).  Nonetheless, "once a defendant has raised a jurisdictional defense, the plaintiff must prove by affidavits or other competent evidence that jurisdiction is proper." *Metcalfe*, 566 F.3d at 330.  A plaintiff may not merely rely on the allegations in the complaint to establish that jurisdiction exists.  *See Lionti*, 2017 WL 2779576, at *1; *Pendergrass-Walker v. Guy M. Turner, Inc.*, Civil Action No. 16-5630, 2017 WL 2672634, at *3 (E.D. Pa. June 21, 2017); *Goodway Grp. v. Sklerov*, Civil Action No. 18-0900, 2018 WL 3870132, at *3 (E.D. Pa. Aug. 15, 2018); *Gutierrez v. N. Am. Cerruti Corp.*, Civil Action No. 13-3012, 2014 WL 6969579, at *2 (E.D. Pa. Dec. 9, 2014); *Yearwood v. Turner Constr. Co.*, Civil Action No. 09-5945, 2011 WL 570003, at *2 (E.D. Pa. Feb. 15, 2011).

### A.  Personal Jurisdiction Legal Standard

A district court may exercise personal jurisdiction over a non-resident defendant to the extent permitted by the law of the state in which the court sits.  *O'Connor v. Sandy Lane Hotel Co.*, 496 F.3d 312, 316 (3d Cir. 2007); *see also Mellon Bank*, 960 F.2d at 1221.  Pennsylvania's long-arm statute extends jurisdiction over a non-resident defendant who causes "harm or tortious injury in the Commonwealth by an act or omission outside the Commonwealth," *see* 42 Pa. Const. Stat. Ann. § 5322(a)(4); *see also Eubanks v. Filipovich*, Civil Action No. 12-4299, 2012 WL 6731123, at *2 (E.D. Pa. Dec. 27, 2012), or who transacts business within the

Case 8:23-cv-00171-CJC-JDE   Document 1   Filed 01/27/23   Page 329 of 1580   Page
ID #:329
Case 2:19-cv-02728-KSM   Document 35   Filed 10/09/20   Page 15 of 42

Commonwealth, *see* 42 Pa. Const. Stat. Ann. § 5322(a)(4); *Cerciello v. Canale*, Civil Action No. 12-6933, 2013 WL 3939580, at *5 (E.D. Pa. July 3, 2013). The statute also authorizes courts to assert personal jurisdiction to the fullest extent allowed under the United States Constitution. 42 Pa. Const. Stat. Ann. § 5322(b); *see also O'Connor*, 496 F.3d at 316; *D'Jamoos*, 566 F.3d at 102. Even though §§ 5322(a)(1) or (4) provide a basis for asserting personal jurisdiction over a defendant, the exercise of such jurisdiction must still comport with the requirements of due process. *See Eubanks*, 2012 WL 6731123, at *2; *Cerciello*, 2013 WL 3939580, at *6.

Under the Due Process Clause of the Fourteenth Amendment, for a court to exercise personal jurisdiction over a non-resident defendant, the *defendant*[6] must "have certain minimum contacts with [the state] such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *Int'l Shoe Co. v. State of Wash., Off. of Unemployment Compensation & Placement*, 326 U.S. 310, 316 (1945) (citation omitted); *see also O'Connor*, 496 F.3d at 316 ("[I]n determining whether personal jurisdiction exists, we ask whether, under the Due Process Clause, the defendant has 'certain minimum contacts with . . . [Pennsylvania] such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice.'" (citation omitted)); *D'Jamoos*, 566 F.3d at 102 (same).

There are two types of personal jurisdiction: general jurisdiction and specific jurisdiction. *O'Connor*, 496 F.3d at 317. "General jurisdiction is all-purpose" in that it

---

[6] Hartleib spends over half of his supplemental brief discussing *Plaintiffs'* contacts with California. (*See generally* Doc. No. 32 at pp. 1–7; *see, e.g., id.* at p. 3 ("At the time this cause of action arose, Plaintiffs were subject to jurisdiction in the state of California. It is Mr. Hartleib's position . . . that they are still subject to general jurisdiction in California[.]"); *id.* at p. 5 ("Plaintiffs' substantial ongoing activities and presence in the state of California greatly outweighs their corporeal presence in Pennsylvania."); *id.* at p. 6 ("Plaintiffs' entire argument that Mr. Hartleib's alleged actions were directed at Pennsylvania is contradicted by their overwhelming presence in California and their pleadings and exhibits."). Given Hartleib's fixation with Plaintiffs' contacts with California, we find it necessary to emphasize the rudimentary principle that the personal jurisdiction inquiry focuses on the *defendant's* contacts with the forum, *not the plaintiff's*.

"allow[s] a court to exercise jurisdiction over the defendant for any claim lodged against that party." *PPG Indus., Inc. v. Jiangsu Tie Mao Glass Co., Ltd.*, 2:15-cv-00965, 2020 WL 1526940, at *3 (W.D. Pa. Mar. 31, 2020). Because Hartleib is a citizen of California and is not at home in Pennsylvania, Plaintiffs rightly do not argue that we have general jurisdiction over him.

In contrast, specific jurisdiction exists where the claims arise from or relate to the defendant's contacts with the forum state. *IMO Indus. v. Kiekert AG*, 155 F.3d 254, 265–66 (3d Cir. 1998). "Because this analysis depends on the relationship between the claims and contacts, we generally evaluate specific jurisdiction on a claim-by-claim basis." *Marten v. Godwin*, 499 F.3d 290, 296 (3d Cir. 2007) (citation omitted); *see also Vizant Tech., LLC v. Whitchurch*, 97 F. Supp. 3d 618, 628 (E.D. Pa. 2015). Under the traditional test, to determine whether specific jurisdiction exists, courts in this Circuit consider whether (1) the defendant "purposefully directed its activities at the forum"; (2) the litigation "arise[s] out of or relate[s] to at least one of those activities"; and (3) if "the exercise of jurisdiction otherwise comports with fair play and substantial justice." *O'Connor*, 496 F.3d at 317 (internal quotation marks and citations omitted); *see also D'Jamoos*, 566 F.3d at 102.

In addition, the Supreme Court has endorsed a separate specific jurisdiction test for intentional tort claims, "which places emphasis upon the *effects* of a defendant's actions in the forum state." *Vizant Tech.*, 97 F. Supp. 3d at 628 (citing *Calder v. Jones*, 465 U.S. 783 (1984)) (emphasis added). The Third Circuit has instructed that, under the Supreme Court's *Calder v. Jones* decision, a plaintiff may demonstrate that personal jurisdiction exists if he or she shows: "(1) the defendant committed an *intentional tort*; (2) *the plaintiff felt the brunt of the harm in the forum* such that the forum can be said to be the focal point of the harm suffered by the plaintiff as a result of that tort; and (3) *the defendant expressly aimed his tortious conduct at the forum* such

that the forum can be said to be the focal point of the tortious activity." *Marten*, 499 F.3d at 297 (quoting *IMO Indus.*, 155 F.3d at 265–66) (emphasis added); *Remick v. Manfredy*, 238 F.3d 248, 258 (3d Cir. 2001). This is known as the "effects test." *Marten*, 499 F.3d at 297.

The "effects test" allows a plaintiff to "demonstrate a court's jurisdiction over a defendant even when the defendant's 'contacts with the forum alone . . . are too small to comport with the requirements of due process' under [the] traditional analysis." *Id.*; *see also IMO Indus.*, 155 F.3d at 265 (explaining that *Calder* recognized that "the unique relations among the defendant, the forum, the intentional tort, and the plaintiff may under certain circumstances render the defendant's contacts with the forum—which otherwise would not satisfy the requirements of due process—sufficient"). That said, the Third Circuit has recognized that "*Calder* did not change the fact that even in intentional tort cases the jurisdictional inquiry 'focuses on the relations among the defendant, the forum, and the litigation.'" *Id.* (citation omitted). "Nor did *Calder* carve out a special intentional torts exception to the traditional specific jurisdiction analysis, so that a plaintiff could always sue in his or her home state." *Id.*; *see also Marten*, 499 F.3d at 298 ("[T]he state of a plaintiff's residence does not on its own create jurisdiction over nonresident defendants.").

Accordingly, the mere fact that a plaintiff suffers harm in the forum state is not enough to give rise to personal jurisdiction in that state. *See, e.g.*, *id.* at 297 ("Even if a defendant's conduct would cause foreseeable harm in a given state, such conduct does not necessarily give rise to personal jurisdiction in that state."); *IMO Indus.*, 155 F.3d at 265 ("[J]urisdiction under *Calder* requires more than a finding that the harm caused by the defendant's intentional tort is primarily felt within the forum."); *Vizant Tech.*, 97 F. Supp. 3d at 629 ("*Calder*'s test . . . is not necessarily satisfied by the 'mere allegation that the plaintiff feels the effect of the defendant's

Case 8:23-cv-00171-CJC-JDE    Document 1    Filed 01/27/23    Page 332 of 1580    Page
ID #:332
Case 2:19-cv-02728-KSM    Document 35    Filed 10/09/20    Page 18 of 42

tortious conduct in the forum because the plaintiff is located there.' (citation omitted)); *Applied Tech. Int'l, Ltd. v. Goldstein*, No. Civ.A. 03-848, 2004 WL 2360388, at *3 (E.D. Pa. Oct. 20, 2004) ("[J]urisdiction in intentional tort cases will not lie automatically in the plaintiff's home state simply because the plaintiff feels the brunt of the harm there." (citation omitted)).

Rather, to establish that a defendant "expressly aimed" his conduct at the forum state, the plaintiff must show "the defendant *knew* that the defendant would suffer the brunt of the harm caused by the tortious conduct in the forum, *and point to specific activity* indicating that the defendant expressly aimed its tortious conduct at the forum." *Marten*, 499 F.3d at 297 (citation omitted); *IMO Indus.*, 155 F.3d at 266.  Thus, "[s]imply asserting that the defendant knew the plaintiff's principal place of business was located in the forum [is] insufficient in itself to meet [the expressly aimed] requirement." *Id.* at 265.

### B.  Specific Jurisdiction Analysis

As noted above, we must analyze specific jurisdiction with respect to each of Plaintiffs' seven claims.  *See Remick*, 238 F.3d at 255 ("Such a determination is claim specific because a conclusion that the District Court has personal jurisdiction over [a] defendant[] as to a particular claim . . . does not necessarily mean that it has personal jurisdiction over that same defendant as to [the plaintiff's] other claims.").  We address each claim in turn, beginning with the two non-intentional torts claims, which we analyze under the traditional test, and then the five intentional tort claims, which we analyze under the *Calder* effects test.

### *Count I: Vexatious Litigant Order*

Plaintiffs seek to enjoin Hartleib from filing any action against Plaintiffs, making any filing or submission in any case involving Plaintiffs, or contacting any person with respect to Plaintiffs.  Under 28 U.S.C. § 1651(a), a district court is permitted to enjoin vexatious litigants

Case 8:23-cv-00171-CJC-JDE    Document 1    Filed 01/27/23    Page 333 of 1580    Page
ID #:333
Case 2:19-cv-02728-KSM    Document 35    Filed 10/09/20    Page 19 of 42

"when it believes that the abusive conduct will continue if not restrained." *Whitewood v. Sec'y Pa. Dep't of Health*, 621 F. App'x 141, 144 (3d. Cir. 2015); *see also Wright v. JPMorgan Chase Bank, Nat'l Ass'n*, Civil No. 18-8311(RMB/AMD), 2019 WL 5587262, at *8 (D.N.J. Oct. 30, 2019) ("Courts in the Third Circuit have made clear that a pattern of groundless and vexatious litigation will justify an order prohibiting further filings without permission of the court.'" (quoting *Chipps v. U.S. Dist. Ct. for the Middle Dist. of Pa.*, 882 F.2d 72, 73 (3d Cir. 1989)).

Plaintiffs allege that a number of Hartleib's acts provide the basis for entry of a vexatious litigant order, including, *inter alia*, contacting and harassing Ross-Williams; sending "multiple email missives" to Weiser and attorneys from other law firms involved in the Sprint Derivative Settlement and to the Court; submitting amicus briefs and attending hearings in unrelated litigations; and suing Plaintiffs for malpractice despite the fact that Hartleib was never their client. (Doc. No. 1 at ¶ 172(a)-(o).)

Under the traditional test, we must first determine whether Hartleib purposefully directed his activities at Pennsylvania. To show that they have satisfied the purposeful availment prong, Plaintiffs rely on Hartleib's various communications with Weiser in Pennsylvania and the anonymous letter he allegedly sent to Chester County judges, among others. (Doc. No. 12 at pp. 25–26.)

Hartleib submits that he has never been to Pennsylvania (Doc. No. 9-2 at p. 2), but ignores that Plaintiffs need not show that he "physically stepped into the forum state." *PPG Indus.*, 2020 WL 1526940, at *4 (citing *Burger King v. Rudzewicz*, 471 U.S. 462, 476 (1985)). During oral argument, Hartleib also boldly maintained that "wire-type communications," such as emails and phone calls, "do not qualify as purposefully directing activities to a forum." (Oral Argument Tr. at 13:4–7.) Hartleib is mistaken. The Third Circuit has held that "mail and

telephone communications sent by the defendant into the forum may count toward the minimum contacts that support jurisdiction." *Grand Entm't Grp., Ltd. v. Star Media Sales, Inc.*, 988 F.2d 476, 482 (3d Cir. 1993); *see also PPG Indus.*, 2020 WL 1526940, at *4.

Perhaps more to Hartleib's point, "[t]he mere fact that email, phone calls, or regular mail end up in the forum state is not enough to show purposeful availment." *Id.* Rather, the plaintiff must show that the defendant "deliberately reached into Pennsylvania to target . . . its citizens." *Id.* (citing *O'Connor*, 496 F.3d at 318). Ultimately, "the contacts need not be monumental—they are called minimum contacts, after all—but they must be deliberate." *PPG Indus.*, 2020 WL 1526940, at *4 (citing *O'Connor*, 496 F.3d at 318).

In evaluating Hartleib's contacts with Pennsylvania, we do not consider the anonymous letter sent to Chester County judges, since Hartleib has submitted an affidavit, averring that he did not send the letter, and Plaintiffs do not proffer any evidence contradicting Hartleib's assertion. (*See* Doc. No. 9-2 at p. 2). *See Kurz v. Holiday Hospitality Franchising*, Civil Action No. 19-2189, 2019 WL 5068646, at *2 (E.D. Pa. Oct. 9, 2019) ("To counter opposing affidavits, plaintiffs may not repose upon their pleadings in this manner. Rather, they must counter defendant's affidavits with contrary evidence[.]" (internal quotation marks and citations omitted)).

Several of the emails Plaintiffs claim form the basis for seeking a vexatious litigant order were not directed to Pennsylvania. For example, Plaintiffs assert that Hartleib directed many emails in which he criticized and attacked Plaintiffs to the Kansas State Court's administrative assistant, other members of the bar, and Ross-Williams (a client of the Firm's located in Michigan)—*none* of whom Plaintiffs even attempt to allege lived in Pennsylvania.[7]

---

[7] We note, however, that Hartleib himself admits that Yates was copied on several of the emails, and that Yates was based out of Pittsburgh. Further, the emails show that other members of the Firm were often

In addition, Plaintiffs rely on communications between Hartleib and Weiser, in which Hartleib purportedly reached out to Weiser in Pennsylvania concerning the Sprint derivative action.  (*See* Doc. No. 1 ¶ 172(b) (Hartleib "improperly sought a share of the Law Firm's attorneys' fees from any Sprint derivative action in which he might be a plaintiff represented by the Law Firm"); ¶ 172(c) (Hartleib "offered to withdraw his objection to the Sprint Derivative Settlement in exchange for a consulting agreement with the Law Firm").)  Even if Hartleib's calls to Weiser constituted purposeful availment of Pennsylvania, Plaintiffs do not explain how any of their causes of action—let alone their vexatious litigant order claim—arose out of those two communications.  Indeed, the only argument Plaintiffs make is that Hartleib sought to enter into a fee sharing or consulting arrangement with Plaintiffs and because Plaintiffs declined, Hartleib launched a campaign of harassment against them.  Plaintiffs also rely on the fact that Hartleib sought legal representation from Weiser in Pennsylvania (Doc. No. 12 at p. 27; Doc. No. 25 at p. 8), but again Plaintiffs do not show how their vexatious litigant claim arises out of those very early communications, especially when the parties did not have contact for years afterwards—on its very face, any connection would be extremely attenuated.  We conclude that such communications are insufficient to establish personal jurisdiction.

Plaintiffs also point to Hartleib's communications with courts and his filings in other shareholder litigations (*see, e.g.*, Doc. No. 1 at ¶ 172(i) (Hartleib "opposed the Law Firm's application as co-lead counsel [sic] the Equifax Derivative Litigation" and submitted an amicus brief); ¶ 172(j) (Hartleib "initiated *ex parte* communication with Judge Watson in the *Big Lots* derivative litigation"); ¶ 172(k)-(l) (Hartleib submitted an amicus brief and appeared before the court "in unsuccessful opposition to the Law Firm's appointment as lead counsel in the

---

copied on the emails.

*CenturyLink* Derivative Litigation")), but do not allege that *any* of those courts, judges, or cases were located in Pennsylvania or otherwise explain how those communications and filings were directed at Pennsylvania. Ultimately, Plaintiffs do not show how the other litigations in which Hartleib inserted himself, or the litigation that Hartleib initiated against Plaintiffs,[8] have any nexus to Pennsylvania. Plaintiffs largely hang their hat on the fact that the Firm is a Pennsylvania-based business and Weiser is a Pennsylvania resident, so the brunt of the harm was felt in the forum. But Plaintiffs do not cite to any case holding that is enough to establish personal jurisdiction.

Last, in their supplemental brief, Plaintiffs claim that Hartleib's emails to Abelson and Detective Goggin "indicat[e] his clear intent to engage in baseless legal process against Plaintiffs solely with the aim of abusing them." (Doc. No. 33 at p. 9.) While the evidence shows that Hartleib reached out to Abelson in Pennsylvania regarding filing a cross-complaint against Plaintiffs, nothing appeared to come of it—no court filings, no new actions initiated, et cetera. Indeed, Plaintiffs admit that settlement negotiations between Abelson and Plaintiffs began in earnest in March 2018—shortly *after* Hartleib initially reached out to Abelson. (*Compare* Doc. No. 33 at p. 6 n.4 *with* Doc. No. 33-3 at p. 2.) Although Hartleib's emails to Detective Goggin suggest that he may file a bar complaint and commence a civil action, it is unclear against whom he would take such action—the Silows or Plaintiffs. Taking the facts in the light most favorable

---

[8] Plaintiffs also claim that the fact that they were served with Hartleib's Kansas lawsuit in Pennsylvania somehow establishes personal jurisdiction over Hartleib in Pennsylvania in this action but do not cite any case law to support that contention. (Doc. No. 12 at p. 26; Doc. No. 25 at p. 9.) At least one court in this Circuit has explicitly rejected such an argument. *See Farkas v. Rich Coast Corp.*, Civil Action No. 2:13-cv-00926, 2014 WL 550594, at *20 (W.D. Pa. Feb. 11, 2014) (in personal jurisdiction analysis over abuse of process claim, rejecting plaintiff's argument that the fact that she was served with process on a Replevin action at her Pittsburgh residence establishes personal jurisdiction, and reasoning that "[t]he act of serving process of the Replevin action on Plaintiff in the Western District is not sufficient to show that [that defendant] purposefully directed the Replevin action at the Western District of Pennsylvania").

Case 8:23-cv-00171-CJC-JDE   Document 1   Filed 01/27/23   Page 337 of 1580   Page
ID #:337
Case 2:19-cv-02728-KSM   Document 35   Filed 10/09/20   Page 23 of 42

to Plaintiffs, Plaintiffs have not shown that any action was actually commenced against them in Pennsylvania.

Significantly, Plaintiffs do not cite a single case in which the plaintiffs sought a vexatious litigant order as an independent cause of action and in which the court found that the exercise of personal jurisdiction was proper. Indeed, personal jurisdiction was not at issue in any of the cases cited in Plaintiffs' complaint, *see, e.g.*, *Fessler v. Sauer*, 455 F. App'x 220, 224–35 (3d Cir. 2011) (noting that the plaintiff may not "file as many lawsuits as he wants until he gets the result he wants"); *Brow v. Farrelly*, 994 F.2d 1027, 1030 (3d Cir. 1993) (vacating the district court's *sua sponte* order restraining the plaintiff from filing any subsequent lawsuits against the Virgin Islands government or its officers in their official capacities and from ever filing any document in the District Court of the Virgin Islands without prior approval); *Chipps*, 882 F.2d at 73 (involving a series of suits filed in the Middle District of Pennsylvania over the plaintiff's obligation to repay a student loan incurred while he was a student in Wilkes Barre, Pennsylvania in which the Court of Appeals concluded that the plaintiff could not file any complaint or other paper in any way concerning his attendance at college or his student loan); *Drone Techs., Inc. v. Parrot S.A.*, Civil Action No. 2:14-cv-00111-AJS, 2015 WL 4545291, at *3 (W.D. Pa. July 21, 2015) (awarding attorneys' fees where the defendants "advanced 'presumably false positions' and engaged in 'tactical and pervasive defiance' of the Court"), or in their briefs (Doc. No. 12 pp. 25-27; Doc. Nos. 25, 33.)

We dismiss Count I for lack of personal jurisdiction.

### Count V: Negligent Misrepresentation

Plaintiffs allege that Hartleib negligently misrepresented to multiple third parties—including Plaintiffs' client Ross-Williams and the *Equifax* and *Big Lots* courts—that Plaintiffs

Case 8:23-cv-00171-CJC-JDE    Document 1    Filed 01/27/23    Page 338 of 1580    Page
ID #:338
Case 2:19-cv-02728-KSM    Document 35    Filed 10/09/20    Page 24 of 42

were corrupt and inept in their legal and ethical practices.[9]  (Doc. No. 1 at ¶¶ 208–21.)  Plaintiffs

then plead that those third parties relied on these misrepresentations, and, as a result, Plaintiffs

suffered.  (*Id.* at ¶¶ 203–22.)

To state a negligent misrepresentation claim, a plaintiff must show that "(1) the defendant

made a misrepresentation of material fact, (2) with knowledge of its falsity, (3) with the intent to

induce the plaintiff to act on it, and (4) *injury must result to the plaintiff, acting in justifiable

reliance on the misrepresentation*."  *Tredennick v. Bone*, 323 F. App'x 103, 105 (3d Cir. 2008)

(citing *Bortz v. Noon*, 556 A.2d 555, 561 (Pa. 1999)) (emphasis added); *see also Med.

Consultants Network, Inc. v. Cantor & Johnston, P.C.,* No. CIV.A. 99-0528, 2001 WL 10788, at

*4 (E.D. Pa. Dec. 27, 2000).  As a preliminary matter, Plaintiffs do not explain how Hartleib's

alleged misrepresentations to *third parties*, such as the courts in the *Equifax* and *Big Lots*

derivative litigations and their client, Ross-Williams, create or otherwise support a negligent

misrepresentation cause of action for *Plaintiffs*.

Moreover, the sole case on which Plaintiffs rely to support their argument—*PJI

Distribution Corp. v. Top of the Line Office Furniture*, Civil No. 07-1551, 2007 WL 2667978

(E.D. Pa. Sept. 4, 2007)—is inapposite.  In *PJI Distribution Corp.*, two commercial entities (Top

of the Line Furniture (TOL) and National Furniture Brokers (NFB)) and their officers formed a

joint venture to acquire and resell Ernst & Young furniture.  *Id.* at *1.  One of their officers,

Doug Smith, contacted Tony Guhr to assist in finding a buyer for the furniture, and Guhr in turn

contacted potential buyer Ira Pressman in Pennsylvania.  *Id.*  Ultimately, Pressman, an officer for

---

[9] During oral argument, Plaintiffs' counsel stated that "the misrepresentations that are made by Mr.
Hartleib related to whether Weiser was his lawyer and what occurred in the context of that purported
representation."  (Oral Argument Tr. 29:22–25.)  That particular allegation is nowhere in Count V of the
complaint, but even if it were, it would not change our analysis below.

EXHIBIT 34

the plaintiff, PJI, learned that the furniture was 15 years old, contrary to his belief at the time of contracting that the furniture was 10 years old.  *Id.* at *2.  Pressman demanded the return of PJI's deposit, but the sellers refused.  *Id.*

PJI claimed that the defendants committed the tort of negligent misrepresentation by way of Smith's email to Guhr, which stated that the furniture had been purchased or installed in 1997 or 1998 (10 years prior).  *Id.* at *4.  The court held that TOL purposefully directed its activities toward Pennsylvania through this email, reasoning:

> By the time TOL sent this email to Guhr, it had already established Pressman as a potential buyer through Smith's phone call.  Therefore, TOL had to know that the information in the email would reach Pressman in Pennsylvania.  *Indeed it is reasonable to assume that TOL sent the email for the specific purpose of communicating with Pressman in Pennsylvania.  Hence, the fact that TOL sent the information to Pennsylvania through an intermediary in Kansas is immaterial.*

*Id.* (emphasis added).  The court also concluded that the negligent misrepresentation claim arose out of Smith's email to Guhr, because PJI alleged it would not have entered into the contract without Smith's representation to Guhr and claimed that the age of the furniture was a dispositive factor in its decision to enter into the contract.  *Id.* at *5.

Unlike in *PJI*—where it was reasonable to assume that Smith/TOL sent the email to Guhr for the specific purpose of communicating with Pressman in Pennsylvania—Plaintiffs do not argue, and presumably cannot argue, that the same is true here (i.e., that Hartleib only reached out to the third parties for the specific purpose of communicating with Weiser and the Firm in Pennsylvania).  Thus, it is material that Hartleib directed his communications to individuals located in other states, such as Georgia (*Equifax* court), Ohio (*Big Lots* court), and Michigan (Ross-Williams), and not Pennsylvania.  Further, to the extent Plaintiffs rely on the emails Hartleib sent to third parties Abelson and Detective Goggin in Pennsylvania, they fail to explain how their claims for negligent misrepresentation arise out of Hartleib's communications with

Case 8:23-cv-00171-CJC-JDE    Document 1    Filed 01/27/23    Page 340 of 1580    Page
ID #:340
Case 2:19-cv-02728-KSM    Document 35    Filed 10/09/20    Page 26 of 42

those third parties.  Because Plaintiffs were presumably not aware of Hartleib's emails to

Abelson or Detective Goggin, they could not have been induced to rely upon the representations

in those emails (which, according to Plaintiffs, are false).  Further, Plaintiffs do not cite to a

single case finding personal jurisdiction where a negligent misrepresentation claim arises entirely

out of a defendant's contacts with third parties but where the plaintiff is injured as a result.

Accordingly, we dismiss the negligent misrepresentation claim for lack of personal jurisdiction.

***

We now turn to Plaintiffs' five intentional tort causes of action:  abuse of process,

defamation, IIED, intentional interference of prospective contractual relations, and tortious

interference with contract.

### Count II: Abuse of Process

In asserting that we have personal jurisdiction over their abuse of process claim, Plaintiffs

point to Hartleib's threats to appear at hearings in unrelated cases across the country and his

filing of amicus briefs in such cases, which they claim were done to "to harass, embarrass, extort,

malign and denigrate Plaintiffs."  (Doc. No. 1 at ¶¶ 177–86.)  In their supplemental brief,

Plaintiffs also rely on Hartleib's attempts to work together with Abelson to facilitate a cross-

complaint to lead to the demise of the Firm and his threats to file a civil action against Plaintiffs.

(Doc. No. 33 at p. 9.)

*Vizant Technologies, LLC v. Whitchurch* is instructive.  There, the court held that

personal jurisdiction existed under both the traditional test and the effects test.  Under the

traditional test, the court explained that, "[i]f, as plaintiffs plead, defendants did engage in

litigation and threats of litigation with the purpose of extorting money from Vizant, a

Pennsylvania-based company, then their conduct was 'purposefully directed' at Pennsylvania . . .

EXHIBIT 34
340

in that they targeted a company located within the forum." 97 F. Supp. 3d at 634–35; *see also*

*BTG Int'l Inc. v. Bioactive Labs.*, Civil Action No. 15-04885, 2016 WL 3519712, at *6 (E.D. Pa.

June 28, 2016) (concluding that "Defendants purposefully engaged in conduct directed at this

forum by sending letters to BTG in Pennsylvania threatening legal action and aiming 'to extort

money from BTG'"). As for the effects test, the court explained that abuse of process is an

intentional tort and the plaintiffs pleaded that they 'felt the brunt of the harm' in Pennsylvania in

that Vizant, based in Pennsylvania, has suffered reputational and financial harm as a result." *Id.*

at 635. Further, the tortious conduct was "expressly aimed" at Pennsylvania because the

plaintiffs alleged that the "defendants' actions were meant to have an impact upon Vizant, which,

as defendants were aware, is headquartered in Pennsylvania." *Id.*

     The *Vizant* court's analysis applies with equal force here. Under the traditional test, if, as

Plaintiffs plead, Hartleib engaged in litigation and threats of litigation for the purpose of

extortion, he purposefully directed his conduct at Pennsylvania. Second, the abuse of process

claim arises out of such litigation and threats of litigation. (*See, e.g.*, Doc. No. 1 at ¶ 183(a)–(g).)

Last, our exercise of personal jurisdiction over Hartleib for the abuse of process claim comports

with notions of fair play and substantial justice.[10] Under the effects test, abuse of process is an

---

[10] "Generally, '[o]nce the plaintiff has made out a prima facie case of minimum contacts . . . the defendant must present a compelling case that the presence of some other considerations would render jurisdiction unreasonable.'" *PJI Distribution Corp.*, 2007 WL 2667978, at *4 (quoting *Grand Entm't Grp.*, 988 F.2d at 483). The Supreme Court has identified several factors for courts to consider in determining whether the fair play and substantial justice prong is satisfied, including: "the burden on the defendant, the forum State's interest in adjudicating the dispute, the plaintiff's interest in obtaining convenient and effective relief, the interstate judicial system's interest in obtaining the most efficient resolution of controversies, and the procedural and substantive interests of other nations." *O'Connor*, 496 F.3d at 324 (internal quotation marks and citations omitted).

During oral argument, Hartleib only argued that it would be inconvenient for him to travel for California to Pennsylvania to litigate here, and that it would be a "a great expense to defend the case in Pennsylvania." (Oral Argument Tr. 20:15–19) Notwithstanding the fact that a defendant is not automatically entitled to defend himself in the most convenient or least burdensome forum, we observe that Hartleib's argument is, at best, weak, and, at worst, potentially disingenuous, given that he has

Case 8:23-cv-00171-CJC-JDE   Document 1   Filed 01/27/23   Page 342 of 1580   Page
ID #:342
Case 2:19-cv-02728-KSM   Document 35   Filed 10/09/20   Page 28 of 42

intentional tort and Plaintiffs plead that the Firm, a Pennsylvania-based company, suffered financial harm in that it was "forced to expend enormous resources of time and money to respond to Hartleib's numerous oppressive communications, briefs, arguments and law suit." (*Id.* at ¶ 186.)  As such, Plaintiffs have pleaded that they felt the brunt of the harm in Pennsylvania.  As in *Vizant*, Plaintiffs here allege that Harleib's actions were meant to have an impact on the Firm (*see, e.g.*, *id.* at ¶ 185 (Hartleib used litigation tactics "to harass, extort, malign, and denigrate Plaintiffs")), which Hartleib was aware was based in Pennsylvania, and therefore have met their burden of showing that Hartleib's conduct was expressly aimed at Pennsylvania.  We deny Hartleib's motion to dismiss for lack of personal jurisdiction as to the abuse of process claim.

### Count III: Defamation

Next, Plaintiffs allege that Hartleib defamed them by attacking and disparaging them in court filings in other shareholder litigations, in emails to courts and other members of the bar, in a call and email to their client Ross-Williams, and in a letter allegedly sent to Chester County judges.  (Doc. No. 1 at ¶¶ 191–92.)  In their supplemental brief, Plaintiffs also assert that Hartleib's emails to Abelson and Detective Goggin in Pennsylvania bolster their argument that we have personal jurisdiction over their defamation claim.  (Doc. No. 33 at pp. 9–10.)

The two seminal Third Circuit cases concerning personal jurisdiction over defamation claims are *Remick v. Manfredy*, 238 F.3d 248 (3d Cir. 2001) and *Marten v. Goodwin*, 499 F.3d 290 (3d Cir. 2007).  In *Remick*, the plaintiff's defamation claim arose out of two letters, both of which were sent to the plaintiff in Pennsylvania.  238 F.3d at 257.  The copies for the letters did

---

traveled to other states, such as Kansas, Minnesota, and Georgia, during the course of other litigations discussed in the complaint.  (*See, e.g.*, Doc. No. 1 at ¶¶ 55, 129, 131; *id.*, Ex. 27; Doc. No. 32 at p. 24.) We find that there is not a compelling case against exercising jurisdiction over Hartleib in Pennsylvania.

EXHIBIT 34

not show any other Pennsylvania recipient. *Id.* However, the plaintiff alleged that two others saw the letter, which was faxed to him at his office, lying in the fax machine. *Id.* at 257. The Third Circuit concluded that the plaintiff satisfied the first two parts of the effects test, because defamation is an intentional tort and the plaintiff sufficiently argued that he bore the brunt of the harm in Pennsylvania, because his professional activities were based in Pennsylvania and the allegedly defamatory letters questioned his professional ability. *Id.* at 258. However, the Third Circuit found that the plaintiff did not show that the defendant had expressly aimed his conduct at Pennsylvania and rejected the plaintiff's argument that the fact that two others saw the fax while it was lying in the machine meant that the fax was targeted at them or anyone in Pennsylvania other than the plaintiff himself. *Id.* at 259.

Likewise, in *Marten*, the Third Circuit held that the plaintiff had not satisfied the expressly aimed requirement of the effects test, reasoning that nothing in the record indicated that the defendants made defamatory statements or sent defamatory material to anyone in Pennsylvania (other than, perhaps, the plaintiff). 499 F.3d at 298; *see also Shafik*, 2010 WL 2510194, at *7 (granting motion to dismiss for lack of personal jurisdiction where the plaintiff did not indicate "where the allegedly defamatory statements were made, to whom the allegedly defamatory statements were made, . . . or how the allegedly defamatory remarks impacted [him] in the Commonwealth of Pennsylvania").

The Third Circuit's holdings illustrate that "[w]hen a district court's personal jurisdiction over a defendant for a defamation claim is in dispute, '*where defendants aimed their defamatory statements is jurisdictionally significant*.' Absent allegations of 'specific facts showing a deliberate targeting of Pennsylvania,' we cannot exercise personal jurisdiction." *Vizant Tech.*, 97 F. Supp. 3d at 632 (quoting *Marten*, 499 F.3d at 298) (emphasis added).

In *Vizant Technologies*, the plaintiffs claimed that two of their former employees defamed them. *Id.* at 623–24. One of the defendants emailed the company's employees, its leadership, and its investors to make allegedly defamatory remarks about the company, which was based in Pennsylvania. *Id.* at 632. She also mailed postcards to individuals, some of whom were located in Pennsylvania, and traveled to Pennsylvania to place defamatory statements on cars parked at the company's headquarters. *Id.* at 632–33. The other plaintiff sent an email to company leadership in which she made defamatory statements about the CEO. *Id.* at 633. Applying the effects test, the court determined that all three elements were satisfied: (1) each defendant was alleged to have committed defamation, an intentional tort; (2) the plaintiffs, both located in Pennsylvania, felt the harm there; and (3) "each defendant engaged in allegedly defamatory conduct which she knew would reach individuals in Pennsylvania and which could cause harm in Pennsylvania." *Id.* ("Indeed, the conduct was specifically calculated to cause harm in the Commonwealth.").

The facts of this case align more closely with *Vizant* than with *Remick* and *Marten*. This is not a case where Hartleib never sent allegedly defamatory statements to Pennsylvania, or where Weiser was the only recipient of such statements. Rather, Plaintiffs have shown that Hartleib sent allegedly defamatory statements to Abelson in Pennsylvania and to Detective Goggin in Pennsylvania.[11] (*See, e.g.*, Doc. No. 33-3 at p. 5 (calling Weiser "corrupt and inept"); *id.* at p. 3 (accusing Weiser of having engaged in "criminal acts in the Sprint case"); *id.* at p. 2 (stating that the Weiser firm committed "fraud," perjured themselves, and maintain a "criminal

---

[11] Hartleib admits that the evidence indicates that he reached out to Abelson and to Detective Goggin in Pennsylvania. (*See* Oral Argument Tr. 13:12–16 ("That appears to be the case from the e-mail contacts, that my client made first contact with Abelson."); *id.* at 13:19–24 (admitting that the communications available indicate that Harleib contacted Detective Goggin).

Case 8:23-cv-00171-CJC-JDE    Document 1    Filed 01/27/23    Page 345 of 1580    Page
ID #:345
Case 2:19-cv-02728-KSM    Document 35    Filed 10/09/20    Page 31 of 42

enterprise"); *id.* at p. 8 (suggesting Weiser engaged in criminal acts by stating that Weiser made

checks payable to Silow's son, "making him a willing participant to his father's crimes").)

Hartleib also sent at least some of the allegedly defamatory emails to Yates, an attorney based in

Pittsburgh.[12]   Plaintiffs also contend that Hartleib knew Plaintiffs were located in Pennsylvania,

and Hartleib does not refute this assertion.  Last, Plaintiffs pleaded that the allegedly defamatory

statements "injured Plaintiffs' business and professional reputations," and as a Pennsylvania

business and business owner respectively, they bore the brunt of the harm in the forum.  (Doc.

No. 1 at ¶ 195; Doc. No. 12 at pp. 31–32.)  Taken together, we find that Plaintiffs have met their

burden of establishing personal jurisdiction over the defamation claim by alleging Hartleib

committed an intentional tort, that Pennsylvania was the focal point of the harm, and that

Hartleib expressly aimed his tortious conduct at Pennsylvania.

### Count IV: IIED

Plaintiffs claim that "Hartleib's insults, jeers, taunts, lies, affronts and abuses" have

"intentionally caused Weiser to suffer enormous stress, anxiety, sleep deprivation, depression,

anger and torment."  (Doc. No. 1 at ¶¶ 200–01.)  To support their contention that we have

personal jurisdiction, Plaintiffs rely on *Shafik v. Curran*, Civil Action No. 1:09-cv-02469, 2010

WL 2510194 (M.D. Pa. June 17, 2010), a case in which the plaintiff, a resident of Pennsylvania,

brought an IIED claim related to actions committed by the defendant with respect to the

plaintiff's participation in the defendant's prospective senatorial campaign.  *Id.* at *1.  The

plaintiff alleged that the defendant intended to fund his own campaign with any amount

necessary and told the plaintiff that he would wire the plaintiff any necessary funds.  *Id.* at *6.

---

[12] Hartleib also copied other attorneys with the Firm.  Weiser, however, did not provide any evidence or
allegation as to where these attorneys practiced when Hartleib sent these emails.

EXHIBIT 34

The plaintiff also alleged that the defendant intended to use the plaintiff's services for the duration of the claim, all the while knowing that he had no intention of funding the campaign or reimbursing the plaintiff. *Id.* Applying the effects test, the court held that personal jurisdiction was proper in Pennsylvania, reasoning that the defendant knew the plaintiff operated from an office in Pennsylvania, "and thus would bear the brunt of any failure to reimburse him for his efforts in the forum state." *Id.* ("If [the plaintiff] failed to pay vendors he had contacted on behalf of the campaign, it is his Pennsylvania business and his Pennsylvania bank accounts that would suffer."). The court concluded that such allegations showed that the plaintiff felt the burden of the tort in Pennsylvania and that the defendant expressly aimed his tortious conduct at Pennsylvania. *Id.*

Here, Plaintiffs allege that Hartleib knew Weiser resided in Pennsylvania and thus would bear the brunt of any insults and lies broadcast to the legal community in Pennsylvania, where his business was based. Like the *Shafik* court, we find that such allegations go to both the second and third prongs of the effects test. In addition, even Hartleib acknowledges the flurry of emails he sent directly to Weiser in Pennsylvania (Doc. No. 15 at p. 7; *see, e.g.*, Doc. No. 1 at ¶ 88 ("What an embarrassment to the bar! See you in Court."); *id.* at ¶ 83 ("Rob, your ability to set the bar at new lows, never disappoints! . . . Your ill-advised actions, and ad-hominem attacks are making the Weiser Firm radioactive!"), which provides further support for the expressly aimed element as well. Therefore, we deny Hartleib's motion to dismiss Plaintiffs' IIED claim for lack of personal jurisdiction.

### Counts VI and VII: Intentional Interference with Prospective Contractual Relations and Tortious Interference with Contract

Plaintiffs assert that Hartleib has intentionally interfered with prospective contractual relations (Count VI), but *nowhere* in their complaint have Plaintiffs specified a single

EXHIBIT 34

Case 8:23-cv-00171-CJC-JDE   Document 1   Filed 01/27/23   Page 347 of 1580   Page
ID #:347
Case 2:19-cv-02728-KSM   Document 35   Filed 10/09/20   Page 33 of 42

prospective contract with which Hartleib intentionally interfered.[13]  Plaintiffs only allege that "Plaintiffs enjoy the valid ongoing expectation and reasonable likelihood of contractual relations with fellow members of the plaintiffs' bar in the securities and derivative litigation arena," that the Firm "partners with other firms in the vast majority of the cases in which it is involved," and that Hartleib has interfered with such relationships through his attacks on Plaintiffs, causing them to suffer harm in Pennsylvania.  (Doc. No. 1 at ¶¶ 228, 231–34; *see also* Doc. No. 12 at p. 36 ("Weiser lives and works in Pennsylvania, and the law Firm is a registered Pennsylvania corporation with no out-of-state office, therefore Hartleib's e-mails, letters, phone calls and publications were necessarily aimed at injuring the Plaintiffs in Pennsylvania where they live and work.").)  But merely alleging that Plaintiffs were *injured* in the forum is insufficient to establish personal jurisdiction.  *See, e.g.*, *Marten*, 499 F.3d at 297.  We cannot find that Hartleib "expressly aimed" his conduct at Pennsylvania.  *See Wolk*, 475 F. Supp. 2d at 506 (finding no personal jurisdiction over intentional interference with prospective contractual relations claim as to two of the defendants, where the plaintiff alleged that those defendants "published defamatory statements with the purpose of 'damaging plaintiff's professional reputation, thereby preventing future clients from hiring him and instead hiring some other aviation attorney who would be less successful in litigating against them'").

---

[13] Although Hartleib moved to dismiss under Rules 12(b)(2) and (3) and has not yet addressed any Rule 12(b)(6) issues for failure to state a claim—pursuant to the Honorable Mitchell S. Goldberg's Order (Doc. No. 8)—we observe that Plaintiffs' intentional interference with prospective contractual relations would likely fail under the Rule 12(b)(6) standard due to this very same defect.  *See Wolk v. Teledyne Indus., Inc.*, 475 F. Supp. 2d 491, 513 (E.D. Pa. 2007) ("Nowhere in his complaint, or in his response to these defendants' motion to dismiss, has [the plaintiff] specified one prospective contract with which these defendants intentionally interfered.  Instead, [the plaintiff] makes vague and general assertions alleging that 'the false publicity has caused potential clients, who otherwise would have sought his services, not to hire plaintiff' and . . . [that] 'others in the defense bar have used it to damage plaintiff's credibility with courts, insurers, and clients.' . . . [The plaintiff] has failed to state a cause of action against LB & B for tortious interference with prospective contract/business relations.")

EXHIBIT 34

Further, the case on which Plaintiffs rely—*Remick v. Manfredy*—is distinguishable because there, the plaintiff asserted in an affidavit that "he conducted the majority of his negotiation, consulting, and advice services for Manfredy [one of the defendants] out of his Philadelphia office."  238 F.3d at 260.  But *nowhere* in Weiser's declaration did he specifically aver that he performs the majority of his legal services for prospective clients out of his Firm's Pennsylvania office or out of his Pennsylvania residence.  (*See generally* Doc. No. 12-3, Weiser Decl.)  And although Weiser's 2019 declaration avers that the Firm's sole office is located in Pennsylvania (*id.* at ¶ 11), Hartleib has proffered evidence indicating that as recently as 2017 the Firm had an office in San Diego, California (*see* Doc. No. 32, Exs. B, C).[14]  While we must construe the evidence in the light most favorable to Plaintiffs and thus accept that at the time Weiser submitted his declaration in 2019, the Firm did not have an out-of-state office, we still find that, on the record before us, *Remick* is distinguishable for the reasons explained above.  Accordingly, we dismiss Count VI for lack of personal jurisdiction.

Relatedly, Plaintiffs claim that Hartleib interfered with their contractual relationship with Ross-Williams, the named plaintiff the Firm represented in the Sprint derivative litigation, by deriding and undermining the Firm to her.  (Doc. No. 1 at ¶¶ 238–45.)  Again, unlike the plaintiff in *Remick*, Weiser does not explicitly aver that he conducted the majority of work for Ross-Williams (whose case was filed in Kansas) out of Pennsylvania.

*Applied Technology International v. Goldstein*—the sole case on which Plaintiffs rely (Doc. No. 12 at pp. 37–38)—is inapposite.  There, the court exercised specific jurisdiction over one of the defendants who allegedly interfered with a contract between the plaintiff Applied

---

[14] In their responses to jurisdictional discovery interrogatories, Plaintiffs assert that the California office was a non-physical, virtual office.  (*Id.* at pp. 18–19.)  However, Plaintiffs also admit at one time they had an employee of their California office.  (*Id.* at p. 39.)

Case 8:23-cv-00171-CJC-JDE   Document 1   Filed 01/27/23   Page 349 of 1580   Page
ID #:349
Case 2:19-cv-02728-KSM   Document 35   Filed 10/09/20   Page 35 of 42

Technology International (ATI), a Pennsylvania corporation, and an Illinois corporation (Ferris). 2004 WL 2360388, at *3.  The court explained that defendant Kilbey had "made sufficient entries into Pennsylvania for purposes relating to the alleged tortious interference," including negotiating a consulting contract with a Pennsylvania resident and meeting with ATI customers and manufacturers in Pennsylvania, among others.  *Id.*  The court found that such contacts diverted a contract with Ferris from ATI to another entity.  *Id.*

Unlike the defendant in *Applied Technology International*, Hartleib did not meet with Ross-Williams (nor with any of the Firm's other clients or potential clients) in Pennsylvania, nor were he or Ross-Williams at any time located in Pennsylvania.  Rather, Hartleib, a California resident who avers he has never visited Pennsylvania, contacted Ross-Williams, who resides in Michigan.  Although Hartleib could have reasonably foreseen that his contacts with Ross-Williams would have caused harm to Plaintiffs in Pennsylvania, that knowledge standing alone is insufficient to support personal jurisdiction.  *See Surgical Laser Tech., Inc. v. C.R. Bard, Inc.*, 921 F. Supp. 281, 283 (E.D. Pa. 1996) (holding that Trimedyne had not directed any activity at Pennsylvania—"no negotiation, no bid, no bargain, no benefit, no breach, no betrayal"—and explaining that although Trimedyne could have "reasonably foreseen" that its activities "would cause harm to [the plaintiff] in Pennsylvania, [that] knowledge, standing alone, does not establish the minimum contacts required for a Pennsylvania court to exercise jurisdiction").  Therefore, we also dismiss Count VII for lack of personal jurisdiction.[15]

---

[15] In their attempts to bolster their argument that we may exercise personal jurisdiction over their tortious interference claim, Plaintiffs cite to Hartleib's phone calls and emails to Weiser in "2009, 2011, 2012 and 2016 in order to enter into a business relationship with Plaintiffs – first as a conflicted client, later as 'consultant' of questionable legality and propriety."  (Doc. No. 12 at p. 38.)  Plaintiffs also assert that "Hartleib's intentional entry into the Commonwealth is evident" because Hartleib "share[d] with Weiser and members of the Law Firm his vicious, snarling *ad hominem* attacks upon Plaintiffs made to third-party members of the bench, bar, and media."  (*Id.*)  But Plaintiffs' reliance on such contacts is misguided.  Plaintiffs do not explain how Hartleib's early contacts with *Weiser* are remotely relevant to

Case 8:23-cv-00171-CJC-JDE    Document 1    Filed 01/27/23    Page 350 of 1580    Page
ID #:350
Case 2:19-cv-02728-KSM    Document 35    Filed 10/09/20    Page 36 of 42

III.

In deciding a motion to dismiss for improper venue under Federal Rule of Civil

Procedure 12(b)(3), we must accept all of Plaintiffs' allegations as true, unless those allegations

are contradicted by Hartleib's declaration. *Bockman v. First Am. Mktg. Corp.*, 459 F. App'x

157, 158 n.1 (3d Cir. 2012); *N. Am. Comm'cns, Inc. v. Eclipse Acqui Inc.*, Civil Action No. 3:17-

167, 2018 WL 651795, at *4 (W.D. Pa. Jan. 31, 2018). Unlike jurisdictional challenges, when

challenging venue, the *defendant* bears the burden of showing improper venue. *Bockman*, 459 F.

App'x at 160 (3d Cir. 2012). When jurisdiction is based on diversity of citizenship, 28 U.S.C.

§ 1391 governs venue. Under § 1391, a plaintiff may bring a case in:

> (1) a judicial district where any defendant resides, if all defendants reside in the
> same State; (2) a judicial district in which a substantial part of the events or
> omissions giving rise to the claim occurred, or a substantial part of property that is
> the subject of the action is situated, or (3) a judicial district in which any
> defendant is subject to personal jurisdiction at the time the action is commenced,
> if there is no district in which the action may otherwise be brought.

28 U.S.C. § 1391(a)(1)–(3); *see also Bockman*, 459 F. App'x at 160. Here, both parties agree

that the only way venue is proper in the Eastern District is if § 1391(a)(2) applies (*i.e.*, if a

substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this

District).[16]

---

Plaintiffs' tortious interference of contract claim, which hinges entirely on Hartleib's contacts with *Ross-Williams*. Nor do Plaintiffs explain how Hartleib's disparagement of them to *other judges, attorneys, and the media* affected their contract with *Ross-Williams*. (*Compare id. with* Doc. No. 1 at ¶¶ 241–42 (citing to Hartleib's call with, and subsequent email to, Ross-Williams).)

[16] During oral argument, Hartleib conflated the personal jurisdiction and venue standards. For example, in summarizing his reasons for moving to dismiss for lack of personal jurisdiction and improper venue, his counsel stated, "I think I can sum up at this point, Your Honor, just by emphasizing again to consider whether my client's *minimal contacts* here are *substantial* within the context of this lawsuit." (Oral Argument Tr. 21:17–20.) In Plaintiffs' counsel's words, this was "game, set, match" (Oral Argument Tr. 22:21–23:12) in that Hartleib arguably conceded that this Court has personal jurisdiction. This is so because the test for specific jurisdiction is whether a defendant has sufficient *minimum* contacts with the forum so as to not offend notions of fair play and substantial justice. On the other hand, the test for venue under § 1391(a)(2) is whether a *substantial* part of the acts or omissions giving rise to the claim occurred

As the Third Circuit explained in *Cottman Transmission Systems, Inc. v. Martino*, "the statutory language of [§ 1391(a)(2)] favors the defendant in a venue dispute by requiring that the events or omissions supporting a claim be 'substantial.' Events or omissions that might only have some tangential connection with the dispute in litigation are not enough." 36 F.3d 291, 294 (3d Cir. 1994). "Substantiality is intended to preserve the element of fairness so that a defendant is not haled into a remote district having no real relationship to the dispute." *Id.* Further, in determining whether a substantial part of the events or omissions giving rise to a cause of action occurred in a particular district, "[t]he test . . . is not the defendant's 'contacts' with a particular district, but rather the location of those 'events or omissions giving rise to the claim.'" *Id.; see also Bockman*, 459 F. App'x at 160.

However, contrary to Hartleib's belief that a district in California would be a more appropriate venue[17] (*see, e.g.*, Doc. No. 32 at pp. 1–2), "Section 1391(b) does not require this Court to determine the 'best' forum, or 'the forum with the most substantial events.' In fact, venue may be proper in more than one district. It is necessary 'only that a substantial part of the

_____

in the district. While we do not give weight to this concession for purposes of our personal jurisdiction ruling, such conflation rendered it necessary for us to address this distinction.

[17] We would be remiss to not address Plaintiffs' equally controvertible belief that venue is not proper elsewhere. When questioned on where this case should be transferred if we found that venue is improper here, Plaintiffs replied,

> But then the interesting question, Your Honor, that I would raise to the Court which I think also suggests why venue is appropriate here, is where would that venue be? . . . Is it California, which I would suggest strenuously it is not just because that is where Mr. Hartleib lives? Where is an appropriate forum if it is not the Commonwealth?

(Oral Argument Tr. 36:24–37:10; *see also id.* at 38:10–16 ("[There] would be no cause whatsoever for it to be in the California District Court. So if it . . . weren't Pennsylvania, then arguably, you know, Kansas would be the only other place that would seem to have some gravity[.]") But, despite Plaintiffs' protestations to the contrary, under § 1391, venue is indisputably proper in the California district in which Hartleib resides. *See* 28 U.S.C. § 1391(a)(1).

events occurred here.'" *Lannett Co., Inc. v. Asherman*, Civil Action No. 13-2006, 2014 WL 716699, at *4 (E.D. Pa. Feb. 24, 2014) (citations omitted); *see also id.* at *3 ("Because § 1391 does not require a majority of the events take place here, nor that the challenged forum be the best forum for the lawsuit to be venued, it is irrelevant that a more substantial part of the events took place in another district, as long as a substantial part of the events took place in [this] district as well.  At bottom, the substantiality inquiry is more qualitative than quantitative." (internal quotation marks and citations omitted)); *Leone v. Cataldo*, 574 F. Supp. 2d 471, 483–84 (E.D. Pa. Aug. 11, 2008) ("'The fact that substantial activities took place in district B does not disqualify district A as proper venue as long as substantial activities took place in A, too. Indeed, district A should not be disqualified even if it is shown that the activities in district B were more substantial, or even the most substantial.'" (quoting the Commentary following the revisions to § 1391)).  When deciding venue, a court "does 'not [look] to a single triggering event prompting the action, but to the entire sequence of events underlying the claim.'" *Id.* (quoting *Uffner v. La Reunion Francaise*, 244 F.3d 38, 42 (1st Cir. 2001)).

### Count II: Abuse of Process

The crux of Plaintiffs' abuse of process claim is that Hartleib has misused the legal process by inserting himself into litigations in which they were involved throughout the country, all of which stemmed from the Sprint derivative action in Kansas, Hartleib's opposition to the settlement, and the court's ruling awarding only 10% of the attorneys' fees requested. Specifically, Plaintiffs cite to Hartleib's repeated, unsuccessful attempts to vacate the protective order entered against him in the Sprint derivative action, threats to oppose lead counsel appointment motions by the Firm, attacks on the Firm's billing practices to other courts, and decision to file a malpractice suit against Plaintiffs.  (Doc. No. 12 at pp. 29–30.)

In determining whether Plaintiffs' abuse of process claim is properly venued, we must consider out of which lawsuits or actions Plaintiffs' claim arose. For example, in *Tucker v. Interscope Records*, No. 98-4288, 1999 WL 80363 (E.D. Pa. Feb. 17, 1999), the plaintiffs asserted malicious prosecution and abuse of process claims in the Eastern District of Pennsylvania, and their claims arose out of two lawsuits that had been filed against one of the plaintiffs in the Central District of California. *Id.* at *1. The court concluded that venue was improper, reasoning that a substantial portion of the events did not take place in the Eastern District. *Id.* at *2. The court explained:

> All of the events alleged in Plaintiffs' complaint relate to the allegedly tortious prosecution of the California lawsuits instituted against Mrs. Tucker, [one of the plaintiffs]. Those lawsuits were litigated in the Central District of California and the alleged abuse of process about which Plaintiffs complain, such as the notices of deposition for Mrs. Tucker's depositions, were issued in the Central District of California. None of the discovery in those cases . . . took place within the Eastern District of Pennsylvania.

*Id.* Although the plaintiffs pointed to a few activities that occurred within the district (*e.g.*, defendants' private investigators investigating the plaintiffs; circulation of an advertisement in a paper that allegedly contained a "thinly veiled death threat" against one of the plaintiffs), the court found that those events were only tangentially connected to the instant lawsuit. *Id.*; *see also Farkas*, 2014 WL 550594, at *23 (holding that venue was improper and reasoning that "a substantial portion of the events giving rise to [the] abuse of process claim occurred in Mifflin County, as that is where the Replevin action [that provided the basis for the abuse of process claim] was brought"); *accord. Cmty. Surgical Supply of Toms River, Inc. v. Medline DiaMed, LLC*, Civil Action No. 11-00221 (GEB)(TJB), 2011 WL 3235706, at *3–4 (D.N.J. July 28, 2011) ("Neither party submitted, nor has this Court found, authority in this District regarding claims for malicious use of process filed in a different venue from where the claim has been filed . . . [A]s the events giving rise to this claim involve the use of process related to the TRO Action in Ohio,

EXHIBIT 34

New Jersey is not the proper venue[.]").

We are persuaded by these cases and observe that Plaintiffs' claims do not arise out of any lawsuit in the Eastern District of Pennsylvania—rather, they primarily arise out of the Sprint derivative action in Kansas and Hartleib's civil action against Plaintiffs in Kansas. And none of the other lawsuits (*e.g.*, *Big Lots* or *Equifax*) in which Hartleib attacked Plaintiffs' billing practices occurred in this District either. Most importantly, the parties do not identify a single act or omission that occurred in the Eastern District—let alone a substantial amount. Although we certainly appreciate Plaintiffs' argument that Hartleib should not be permitted to gallivant across the country, inserting himself into litigations in which Plaintiffs are involved, and then be immune from being haled into court here, we are constrained by the case law and, on the facts before us, simply cannot find that the substantial threshold has been reached here. Accordingly, we dismiss Count II for improper venue.

### Counts III and IV: Defamation and IIED

"[V]enue will not be proper in a district for a defamation claim if injury is the only event occurring in that district." *Lomanno v. Black*, 285 F. Supp. 2d 637, 642 (E.D. Pa. 2003) (citing *DaimlerChrysler Corp. v. Askinazi*, No. CIV.A. 99-5581, 2000 WL 822449, at *6 (E.D. Pa. June 26, 2000)). "Injury in conjunction with another event, however, may make" venue proper. *DaimlerChrysle*r, 2000 WL 822449, at *6. In defamation cases, "courts have repeatedly held that venue is proper in a district in which the allegedly defamatory statement was published, particularly if the injury was suffered in the same district." *Id.* (collecting cases).

For example, in *DaimlerChrysler Corp. v. Askinazki*, the court held that a substantial portion of events giving rise to the counterclaims occurred in the Eastern District of Pennsylvania and that venue was proper, reasoning that although the allegedly defamatory

statements were made in Michigan, they were published in the Eastern District of Pennsylvania and the publication caused injury to the counterclaimant's reputation there. *Id.* at *7; *see also Emekekwue v. Agwuegbo*, Civil Action No. 1:12-cv-1503, 2012 WL 5386279, at *6 (M.D. Pa. Nov. 1, 2012) ("[V]enue is proper in this district. [The plaintiff] resided in the Middle District of Pennsylvania when [the defendant] allegedly sent the defamatory email. The brunt of [the plaintiff's] alleged harm likely has been felt in this district because this is where he . . . reside[s] . . . Further, the email directly discusses actions alleged to have taken place in Pennsylvania."); *cf. Lomanno*, 285 F. Supp. 2d at 642–43 (finding that venue was improperly laid within the Eastern District of Pennsylvania for the defamation claim, where the allegedly defamatory statements were made in Virginia and no party asserted that those statements were published in Pennsylvania); *Dobrick-Pierce v. Open Options*, No. 2:05CV1451, 2006 WL 2089960, at *6 (W.D. Pa. July 25, 2006) (holding that venue was improper in the Western District of Pennsylvania for the defamation claim, where the plaintiff failed to allege any facts indicating that the allegedly defamatory statements were published in Pennsylvania and only identified communications between Texas and Illinois, and Texas and Virginia).

Here, it is undisputed at least some of the allegedly defamatory statements were published in Pennsylvania—the emails Hartleib sent to Abelson and Detective Goggin, both of whom he knew were located in Pennsylvania, and to attorney Yates. Further, Plaintiffs allege that as a Pennsylvania based-business and business owner, respectively, the Firm and Weiser have suffered injury within Pennsylvania. Accordingly, we find that a substantial portion of events giving rise to Plaintiffs' defamation claim occurred in Pennsylvania and that venue is proper here.[18]

---

[18] In addition, Plaintiffs allege that after receiving a "tip" from Hartleib "about Silow's disbarred status and role as a document reviewer in the Sprint Derivative Action," the *Wall Street Journal* published an

For similar reasons, we find that a substantial part of the events giving rise to Weiser's IIED claim occurred in the Eastern District of Pennsylvania in light of the fact that Hartleib directed so many of his email diatribes to Weiser here, where then Weiser allegedly suffered emotional distress.  Therefore, we find venue is also proper on the IIED claim.

VI.

For the foregoing reasons, we dismiss Counts I, V, VI, and VII (vexatious litigant order, negligent misrepresentation, intentional interference with contractual relations, and tortious interference) for lack of personal jurisdiction and Count II (abuse of process) for improper venue.  We deny Hartleib's motion as to Counts III (defamation) and IV (IIED).

An appropriate order follows.

---

article entitled, "One Lawyer, 6,905 Hours Leads to $1.5 Million Bill in Sprint Suit," which was then picked up by nearly one hundred media outlets.  (Doc. No. 1 at ¶¶ 85–87.)  Hartleib does not refute this in his affidavit.  Viewing the Plaintiffs' allegations in the light most favorable to them, the *Wall Street Journal* article also provides further support to our holding that venue is proper over the defamation claim.  *See DaimlerChrysler*, 2000 WL 822449, at *7 ("There is no dispute that although Goldfarb's statements were actually made in Michigan, they were published in this district in the form of articles based on the press release, the *Wall Street Journal* article, and the *American Lawyer* article.  Goldfarb argues that this publication is tangential in nature . . . because he participated in the interviews that formed the basis of the *Wall Street Journal* . . . . article[] . . . We find Goldfarb's reasoning unpersuasive.").  Notably, even Hartleib states that such an at-issue, widely-published article (which he refers to as a *New York Post* article) would "obviously" be a "big deal" and substantial "if, in fact, it is defamatory."  (Oral Argument Tr. 17:4–6; *see also id.* at 17:19–25 ("An article that was published in the *New York Post* or one of their publications, I don't know if it was the actual periodical, off the top of my head.  Those are really the three many [sic] things I would call the substantial pieces and nuggets of the Plaintiffs' claim.").)

EXHIBIT 34

# EXHIBIT 35

EXHIBIT 35
357

## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| THE WEISER LAW FIRM, P.C. | : | |
| 22 Cassatt Avenue | : | |
| Berwyn, Pennsylvania 19312 | : | CIVIL ACTION |
| | : | |
| and | : | Case No. 2:19-CV-02728-KSM |
| | : | |
| ROBERT B. WEISER, ESQUIRE | : | |
| 22 Cassatt Avenue | : | |
| Berwyn, Pennsylvania 19312 | : | |
| | : | |
| Plaintiffs, | : | |
| v. | : | |
| | : | |
| MICHAEL HARTLEIB | : | |
| 27020 Alicia Parkway, Suite G | : | |
| Laguna Niguel, CA 92677 | : | |
| | : | |
| Defendant. | : | |

## <u>VERIFIED AMENDED COMPLAINT</u>

Plaintiffs The Weiser Law Firm, P.C. (hereinafter the "Law Firm") and Robert B. Weiser,

Esquire ("Weiser" or, together with the Law Firm, "Plaintiffs") bring this action by way of this

amended complaint (this "Amended Complaint") against Michael Hartleib ("Hartleib" or

"Defendant") and allege as follows:

### <u>Parties</u>

1.      Plaintiff Law Firm is a Pennsylvania professional corporation with offices located

at 22 Cassatt Avenue, Berwyn, Pennsylvania 19312.

2.      The Law Firm was originally incorporated in the Commonwealth of Pennsylvania

in 2004 under entity number 3272161.

3.      Plaintiff Weiser is an adult individual and resident of the Commonwealth of

Pennsylvania.

{01292774;5}

4.      Defendant Hartleib is an adult individual and resident of the State of California.

**Venue and Jurisdiction**

5.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332, as the parties are citizens of diverse jurisdictions and the amount in controversy exceeds $75,000.

6.      Plaintiffs' principal place of business is located within the Eastern District of Pennsylvania.   As such, venue is appropriate within the Eastern District of Pennsylvania pursuant to 28 U.S.C.§ 1391(b)(1).

**Facts**

7.      The Law Firm is engaged in the provision of legal services with a focus on shareholder class actions, shareholder derivative actions, mergers and acquisitions related litigation, and whistleblower "qui tam" cases.

8.      Weiser is a founder and principal of the Law Firm.

9.      Weiser is a licensed attorney duly admitted in the State of New Jersey and the Commonwealth of Pennsylvania.

10.      Weiser's law practice is focused primarily on shareholder derivative litigation.

*The Sprint Securities Class Action & Shareholder Derivative Actions*

11.      On or about November 25, 2008, Hartleib e-mailed Bruce G. Murphy, Esquire ("Murphy") of the Law Offices of Bruce G. Murphy (the "Murphy Firm"), regarding the loss in value of shares he owned in Sprint Corporation and Nextel Communications when the two companies merged to become Sprint Nextel Corporation in 2005.  See November 25, 2008 e-mail string, a true and correct copy of which is attached hereto as **Exhibit 1**.

12.      Murphy is an attorney who had occasionally referred clients to the Law Firm.

13.    Because of the Law Firm's experience and expertise in the shareholder litigation arena, Murphy forwarded Hartleib's e-mail to Weiser and asked Weiser if he saw "a der" – meaning a stockholder derivative action that could be brought on Sprint's behalf – as a possibility in Hartleib's case based upon the $31 billion write-down Sprint was forced to take in connection with the failed Nextel merger.  Ex. 1

14.    In response to Murphy's inquiry, the Law Firm investigated the Sprint/Nextel merger and the resulting write-down, but the Law Firm's investigation did not produce sufficient information to recommend filing a derivative lawsuit on Sprint's behalf at that time.

15.    On March 10, 2009, the first securities class action lawsuit based on the Sprint/Nextel merger and the resulting write-down was filed against Sprint and certain of its officers and directors in the United States District Court for the District of Kansas (the "Kansas Federal Court"), by the law firm of Coughlin Stoia Geller Rudman & Robbins (the predecessor firm to Robbins Geller Rudman and Dowd, LLP, hereinafter "Robbins Geller").

16.    Several other substantially similar securities class action lawsuits were eventually filed against Sprint, which were subsequently consolidated in the Kansas Federal Court (the "Sprint Securities Class Action").

17.    Robbins Geller and Motley Rice LLC were appointed to serve as co-lead counsel for the plaintiff investor class in the Sprint Securities Class Action.

18.    On March 10, 2009, upon seeing that the first complaint in the Sprint Securities Class Action had been filed, Murphy contacted Weiser once again regarding potential shareholder derivative claims that could be brought on behalf of Sprint.

19.    The Law Firm thereupon reviewed the allegations forming the basis of the Sprint Securities Class Action, together with new information regarding the Sprint/Nextel merger and

resulting write-down, and concluded within a few days of the March 10, 2009 initiation of the Sprint Securities Class Action that Sprint may have potential claims against its then-current and/or former officers and directors.

20.    Weiser asked Murphy if Hartleib or any other potential client was interested in initialing a shareholder derivative suit on behalf of Sprint against its directors and officers.

21.    Murphy informed Weiser that Hartleib and other potential clients were still interested in bringing a shareholder derivative suit for the benefit of Sprint.

22.    The Law Firm began researching and drafting a shareholder derivative complaint.

23.    On or about March 13, 2009, Weiser provided Murphy with the draft shareholder derivative complaint for circulation among Murphy's actual or potential clients.

24.    At that time, Weiser understood that Hartleib was one of Murphy's potential clients in the contemplated Sprint derivative lawsuit; however, neither Weiser nor anyone else at the Law Firm had yet communicated with Hartleib.

25.    On March 21 or 22, 2009, Weiser became aware that Murphy sent a draft retention letter to Hartleib, even though up to that point Weiser had never directly communicated with Hartleib.

26.    Neither Weiser nor the Law Firm agreed to represent Hartleib at that time.

27.    On or about March 26, 2009, Weiser and Hartleib spoke for the first time, by telephone.

28.    During the March 26, 2009 call, Hartleib claimed to have spent "hundreds of hours" investigating Sprint, and also stated that he previously contacted Robbins Geller and "give[n] them" the facts and analysis necessary to prosecute the federal securities claims asserted against Sprint in the Sprint Securities Class Action.

{01292774;5}

29.     Hartleib also represented to Weiser during the March 26, 2009 call that he was interested in seeking appointment as the lead plaintiff or as a co-lead plaintiff in the Sprint Securities Class Action.  Hartleib stated to Weiser that Hartleib believed he would make an ideal lead plaintiff in the Sprint Securities Class Action based upon his claimed knowledge regarding Sprint.

30.     Also during the March 26, 2009 call, Hartleib strongly implied his interest in sharing any attorneys' fees the Law Firm might recover if it represented Hartleib in connection with a potential shareholder derivative action brought on Sprint's behalf.

31.     Based upon Hartleib's representations and/or statements to Weiser during the March 26, 2009 call regarding the Sprint Securities Class Action, Weiser concluded that the Law Firm could not represent Hartleib in any derivative action brought on behalf of Sprint, as any role potentially to be played by Hartleib in launching and/or prosecuting the Sprint Securities Class Action *against* Sprint would preclude his participation as a plaintiff to a derivative suit brought *on behalf of* Sprint.

32.     Furthermore, Hartleib's apparent interest in a fee sharing agreement with the Law Firm was extremely troubling to Weiser, as neither Weiser nor the Law Firm had ever or would ever agree to enter into such an agreement.

33.     By e-mail at 7:21 a.m. on March 27, 2009, a true and correct copy of which is attached hereto as **Exhibit 2**, Weiser informed Murphy of his decision that the Law Firm could not represent Hartleib in a shareholder derivative suit brought for the benefit of Sprint.

34.     Weiser explained to Murphy that his decision was based upon Hartleib's "potential conflict in light of the other [Sprint Securities Class Action] litigation he's involved in. Thus, I don't think he would make an adequate representative for Sprint."  Ex. 2.

{01292774;5}

35.     Murphy and Weiser spoke by phone shortly after 7:21 a.m. on March 27, 2009, and Weiser reiterated that the Law Firm would not represent Hartleib in a shareholder derivative action brought on behalf of Sprint under any circumstances.

36.     By e-mail at 9:55 a.m. on March 27, 2009, a true and correct copy of which is attached hereto as **Exhibit 3**, Murphy informed Hartleib that neither the Murphy Firm nor the Law Firm would represent Hartleib in a shareholder derivative action on behalf of Sprint due to Hartleib's "potential conflict of interest."  Ex. 3.

37.     The Law Firm eventually chose to represent Sprint shareholder Monica Ross-Williams ("Ross-Williams") as the plaintiff to a shareholder derivative action (the "Sprint Derivative Action") filed on behalf of Sprint against certain of its current and former officers and directors in the District Court of Johnson County, Kansas (the "Kansas State Court").

38.     In July 2011, the law firm of Kahn, Swick & Foti, LLC ("Kahn Swick") filed a separate shareholder derivative action on Sprint's behalf, naming Hartleib as the representative plaintiff.

### *The Sirius XM Litigation*

39.     On March 8, 2011, Hartleib and several other named plaintiffs filed a shareholder derivative action on behalf of Sirius XM Satellite Radio, Inc. ("Sirius XM") against Sirius XM's officers and directors in New York State Supreme Court (New York County), alleging negligence, fraud, breach of fiduciary duties and self-dealing (the "Sirius XM Derivative Action").  A true and correct copy of Hartleib's Sirius XM shareholder derivative complaint is attached hereto as **Exhibit 4**.

40.     The plaintiffs in the Sirius XM Derivative Action were represented *pro se* by Hartleib and his fellow named plaintiff, John Sorge.  Ex. 4 pp. 1, 21.

{01292774;5}

41.    Although the Law Firm previously declined to represent Hartlieb in a shareholder derivative action on behalf of Sprint, Hartlieb sought to engage the Law Firm as counsel for the plaintiffs in the Sirius XM Derivative Action.

42.    To wit, Hartlieb e-mailed Weiser about the Sirius XM Derivative Action multiple times, without response.  True and correct copies of e-mails from Hartlieb to Weiser dated June 2, 2011, June 11, 2011 and June 20, 2011 are attached hereto as **Exhibit 5**.

43.    Weiser was wary of getting involved in the tangled and multi-faceted Sirius XM Derivative Action, and after undertaking a cursory review of the allegations and purported derivative claims asserted against Sirius XM's officers and directors, Weiser and the Law Firm determined that Hartlieb's legal theories were insupportable.  Accordingly, Weiser and the Law Firm declined to represent Hartlieb and his fellow shareholder plaintiffs in the Sirius XM Derivative Action.

44.    On August 31, 2011, Hartlieb again e-mailed Weiser: "Rob, we need to talk about you coming in on my Sirius state case. This Federal case was taken from my case which was filed first. Khan Swick will work with us as I am providing all of the research. Call me ASAP[.]"  A true and correct copy of Hartlieb's August 31, 2011 e-mail to Weiser is attached hereto as **Exhibit 6**.

45.    Weiser declined to call Hartlieb, however, and the Law Firm elected not to represent Hartlieb or any other plaintiff(s) in any legal action with respect to Sirius XM.

46.    On February 16, 2012, Hartlieb e-mailed Weiser and copied Hartlieb's colleague, David Sacks: "Rob, are we going to do some business together or what? You never called us back after we tried six times to reach you. David and I need to make some money so that we can

buy you a new phone!"  A true and correct copy of Hartleib's February 16, 2012 e-mail to Weiser is attached hereto as **Exhibit 7**.

47.    The Law Firm declined to engage in any business transaction or litigation with Hartleib in 2012 or thereafter.

### *The Sprint Derivative Settlement*

48.    Weiser did not speak with Hartleib for several years thereafter, until after the majority of the Sprint shareholder derivative lawsuits pending in the Kansas State Court and the Kansas Federal Court based on the Sprint/Nextel merger, including the Sprint Derivative Action initiated by Ross-Williams, achieved a collective settlement in or about 2016 (the "Sprint Derivative Settlement").

49.    Hartleib – the only Sprint derivative plaintiff in any forum who did not participate in the Sprint Derivative Settlement – was a vocal opponent of the Sprint Derivative Settlement.

50.    When the Law Firm and several other law firms representing other derivative plaintiffs sought final approval of the terms of the Sprint Derivative Settlement from the Kansas State Court, including the approval of agreed-to attorneys' fees for the plaintiffs' counsel, Hartleib filed a formal *pro se* objection.

51.    Weiser and Hartleib spoke by phone concerning Hartleib's objection to the Sprint Derivative Settlement on or about May 20, 2016, approximately one week prior to the Sprint Derivative Settlement's final approval hearing (the "Final Approval Hearing") in the Kansas State Court before the Honorable James Vano ("Judge Vano").

52.    During that telephone conversation, Hartleib expressed to Weiser his displeasure with the terms of the Sprint Derivative Settlement.

53.    Notwithstanding Hartleib's displeasure with the Sprint Derivative Settlement terms, however, Hartleib proposed to withdraw his formal objection to the Sprint Derivative Settlement if Weiser would agree to enter into a "consulting agreement" with Hartleib, pursuant to which Hartleib would receive several hundred thousand dollars and would provide the Law Firm with ideas for initiating lawsuits against unspecified corporate defendants.

54.    The Law Firm elected not to enter into any "consulting agreement" with Hartleib, and once again was roiled by the unethical request made by Hartleib.

55.    In retribution against the Law Firm, and because his own shareholder derivative action was not included in the Sprint Derivative Settlement, Hartleib appeared at the May 26, 2016 Final Approval Hearing before Judge Vano in support of his objection to the Sprint Derivative Settlement.

56.    As the approval process for the Sprint Derivative Settlement advanced, Hartleib sent occasional goading and derisive e-mails to Plaintiffs.  For example in a May 24, 2016 e-mail, a true and correct copy of which is attached hereto as **Exhibit 8**, Hartleib taunted Weiser: "Rob, you are going to lose either with the honorable Vano [sic] or on appeal!" and "You really should have been more diligent."  Ex. 9.

57.    Five days after the Final Approval Hearing, on May 31, 2016, Hartleib seemed to soften, e-mailing Weiser to "discuss the current case and any forthcoming derivative [sic] on the tax issues.  I would like to see the old [Sprint] board held accountable."  A true and correct copy of Hartleib's May 31, 2016 e-mail is attached hereto as **Exhibit 9**.

58.    Less than a month later, however, on June 28, 2016, Hartleib demanded certain information regarding attorneys' fees and reimbursement of costs for plaintiffs' counsel which had been submitted to the Kansas State Court *in camera*, e-mailing Weiser: "please provide me

with the documents in support of your fees filed yesterday. . . I will notify the clerk if I don't get

them today.  Also your delay will provide me yet another reason to appeal is [sic] the Honorable

Vano approves the settlement."  A true and correct copy of Hartleib's June 28, 2016 e-mail to

Weiser is attached hereto as **Exhibit 10**.

*The Law Firm is Duped by a Disbarred Document Reviewer,*
*and Hartleib's Harassment Campaign Begins in Earnest*

59.    Jeffrey M. Silow ("Silow") was hired by the Law Firm as a contract attorney on

several occasions between 2008 and 2017 for the purposes of performing document review

work; he was initially sourced through a Philadelphia-based legal search and placement firm,

Abelson Legal Search ("Abelson"), with which the Law Firm had contracted.

60.    Abelson was responsible for vetting the credentials and bar status of the attorneys

it placed, and Abelson held Silow out to the Law Firm as a licensed attorney in good standing.

61.    Meanwhile, in mid-2016, the Sprint Derivative Settlement was approved by the

Kansas State Court, but only about ten percent of the amount of the attorneys' fees for the

participating plaintiffs' counsel that was agreed to by the parties was awarded by the Court.

62.    The Law Firm and the other firms that participated in the Sprint Derivative

Settlement appealed the sharply discounted attorneys' fees awarded by the Kansas State Court.

63.    In February 2017, for the first time, and to its utter shock and dismay, the Law

Firm received notification that Silow had been disbarred in the Commonwealth of Pennsylvania

decades earlier,[1] although he had been holding himself out as an attorney admitted in good

standing to practice law.  In order to perpetrate his deception, Silow used his son's name on court

submissions made by the Law Firm with respect to Silow, and represented to the Law Firm that

although he went by the name "Jeffrey Silow" and wished to be called "Jeffrey," his legal name

_____

[1] Silow was also admitted to practice law in the District of Columbia until 2000.

{01292774;5}

was "Alexander J. Silow."   Indeed, Silow represented himself to be Alexander J. Silow in a sworn certification filed with the Kansas State Court in the Sprint Derivative Action.

64.     After learning of this deceit, the Law Firm immediately severed ties with Silow, affirmatively notified the courts sitting in every action in which Silow's hours were included as part of an "attorney time" lodestar calculation, reported the incident to the Disciplinary Board of the Supreme Court of Pennsylvania, pressed criminal charges against Silow in Montgomery County, Pennsylvania, and instituted a pending civil case against Abelson and Silow in the Court of Common Pleas of Chester County, Pennsylvania captioned *The Weiser Law Firm, P.C. v. Abelson Legal Search and Jeffrey Mark Silow,* No. 2017-07778.

65.     After the Law Firm pressed criminal charges against him, Silow pled guilty to three criminal counts in Pennsylvania – unauthorized practice of law (42 Pa.C.S. § 2524), unsworn falsification to authorities (18 Pa.C.S. § 4904(b) and securing execution of documents by deception (18 Pa.C.S. § 4114).

66.     Over a multi-year period, Silow engaged in significant document review work in the Sprint Derivative Action, and the Law Firm immediately and voluntarily disclosed to Judge Vano, who reviewed and approved the Sprint Derivative Settlement, and to the Clerk of the Kansas Court of Appeals (the "Kansas Appeals Court") – which was then considering the appeal from the attorneys' fee award in the Sprint Derivative Settlement as well as Hartleib's own *pro se* appeal of Judge Vano's approval of the Sprint Derivative Settlement – that Silow affirmatively misrepresented himself to the Kansas State Court as a licensed attorney in good standing.   True and correct copies of the Law Firm's February 6, 2017 letters to both the Kansas State Court (Case No. 11-cv-01688) and the Kansas Appeals Court (Appeal No. 17-117139-A) are collectively attached hereto as **__Exhibit 11__**.

{01292774;5}

67.    Although a billing audit reinforced the validity of the hours Silow worked on the Sprint Derivative Action and the quality of Silow's review work, the reduced attorneys' fee award in the Sprint Derivative Settlement was affirmed on appeal.

68.    Hartleib was delighted to learn that the Law Firm had been duped by Silow, defrauded by Abelson, and awarded a vastly reduced fee in the Sprint Derivative Settlement, and he unleashed a deluge of abuse upon the Plaintiffs, and Weiser in particular.

69.    On March 6, 2017, Hartleib e-mailed Weiser and copied eleven members of the bar from five different law firms, as well as the administrative assistant for the Kansas State Court, writing in relevant portion as follows:

> Rob, I am a little confused!  . . . It seems your statements to the Appellate Court were disingenuous at best.  Shocking! . . .
>
> I especially like the comment that you felt as though you had an ethical obligation to inform the Court, prior to briefing . . . Ethical obligation, what a Saint [sic] . . . Your attempts, [sic] to obfuscate your chicanery in this case is galvanizing my convictions, strengthening my resolve to expose all of the corrupt parties in this case!  This lawyer driven litigation must and will cease.  Your temerity, to seek leave of the Appellate Court to reinstate fees, given what I have uncovered is frankly astonishing and provoking wrath.  I will take this all the way to the Kansas Supreme Court if needed, as the integrity of the judicial system is at stake!

A true and correct copy of Hartleib's March 6, 2017 e-mail is attached hereto as **Exhibit 12** (emphasis in original).

70.    On March 6, 2017, Hartleib contacted Ross-Williams, the plaintiff in the Sprint Derivative Action, by telephone.  Upon information and belief, Hartleib obtained the phone number for Ross-Williams through an internet search.

71.    During the March 6, 2017 call, Hartleib verbally harassed and threatened Ross-Williams; Hartleib also told Ross-Williams that the Law Firm was a "criminal enterprise" and was not serving her interests as a Sprint shareholder.

72.     Hartleib did not seek or obtain permission from Ross-Williams' counsel or an order of the Kansas Appeals Court to contact Ross-Williams, and therefore his unsolicited telephone call to her constituted a clear violation of Rule 4.2 of the Kansas Rules of Professional Conduct, asthe Kansas Appeals Court specifically held in its March 30, 2017 order (the "Protective Order").

73.     Ross-Williams explicitly asked Hartleib not to contact her again, and to direct all future communications to her counsel, the Law Firm.

74.     Ross-Williams then contacted the Law Firm, recounted Hartleib's call to her, and reported that she felt shocked, disturbed, harassed and threatened by Hartleib during the call.

75.     In a declaration filed with the Kansas Appeals Court on May 18, 2018, a true and correct copy of which declaration is attached hereto as **Exhibit 13**, Ross-Williams described the March 6, 2017 telephone call from Hartleib in relevant portion as follows:

> Upon answering the telephone when Hartleib called me on the evening of March 6, 2017, I did not realize at first who I was speaking to. Hartleib proceeded to attempt to discuss matters related to the Appeal with me, in a highly confrontational manner. Once I realized who Hartleib was and that he had somehow found my phone number and called me directly regarding the Appeal, I told Hartleib I did not wish to speak to him any further. I asked Hartleib not to contact me again and to direct all future communications to my counsel.

> Hartleib, however, did not hang up the phone at that point. Instead, he tried to continue the conversation by making references to certain matters about me that were wholly unrelated to the Appeal; specifically, my role as an elected official in Ypsilanti Township, Michigan, where I serve on the Township Board of Trustees. I can only assume that Hartleib conducted an internet search and tried to learn as much as he could about me prior to calling me on March 6, 2017.

> In the first instance, I was taken aback and frightened once I realized that Hartleib had called me directly about the Appeal, and given the tenor of the call I suspected that he did so in an attempt to intimidate me. But once Hartleib brought up matters about me that were completely unrelated to the Appeal, I became certain that his purpose for calling was to harass and threaten me. I felt very uncomfortable and wanted to end the call with Hartleib as soon as possible, but I thought it best to try to end the conversation in a non-confrontational way. To

that end, I told Hartleib that if he wished to do so he could copy me on communications directed to my counsel, and I provided him with an e-mail address which I seldom use.

Ex. 13 ¶¶ 3-5.

76.     Inexplicably, Hartleib disregarded Ross-Williams' clear directive and e-mailed her directly, copying fifteen members of the bar and the Kansas State Court's administrative assistant, at 3:16 a.m. the following morning, March 7, 2017, a true and correct copy of which e-mail is attached hereto as **Exhibit 14**.

77.     Therein, Hartleib stated to Ross-Williams and members of the bar:

Dear Ms. Williams, it was a pleasure speaking with you this evening. I am sorry that your Counsel has not kept you apprised of the details of your case. **I find it unconscionable that your attorneys failed to inform you of Judge Vano's rulings or that an Appeal was filed on your behalf. I do believe that you are a unwitting victim of their fraud committed against the Court. As we discussed they have submitted millions of dollars in fraudulent billing in your case. As I informed you that this was not just my opinion, the Judge in your case came to a similar conclusion. In fact, your attorneys have now admitted to at least 1.6 million dollars in fraudulent bills submitted to the Court. Mr. Weiser has confirmed this in two separate letters.** (See attached).  I am no expert, but **when a Firm admits criminal acts in a case** I believe they are obligated to notify you as the Plaintiff. Mr. Weiser and his Firm have already contacted their Bar associations and other Courts to **self-report their criminal acts.** I have contacted the district attorney's offices in Pennsylvania and Kansas and will be filing formal complaints. I am sorry to be the person to inform you of this, as it was your attorneys responsibility to do so. I am seeking a full evidentiary hearing where your Counsel will be forced to testify under oath and you can address the Court. As you can see by the letters from Mr. Weiser **they are in a lot of trouble,** but claim they are victims of Mr. Silow**. I will provide incontrovertible proof that Mr. Weiser et. al. is just as guilty as Mr. Silow. This is just the tip of the iceberg.** Details of our call will be submitted to the Kansas Court of Appeals in a sworn declaration and provided to Judge Vano. As per your request I copied all of the attorneys in your case as well as Judge Vano's Clerk. Thank you for taking the time to speak with me this evening.

Ex. 14 (emphasis supplied).

78.     Hartleib's March 7, 2017 e-mail to Ross-Williams, fifteen members of the bar and the Kansas State Court's administrative assistant was filled with gross misstatements of fact and

outright lies; to wit, the Law Firm *never* admitted to fraudulent billing or committed any
"criminal acts," Judge Vano never concluded that the Law Firm "submitted millions of dollars in
fraudulent billing," nor did the Law Firm's letters to the Kansas State Court and Kansas Appeals
Court regarding Silow "confirm" any misdeed.  See Ex. 14.  The Law Firm was not "in a lot of
trouble" or "just as guilty as Mr. Silow," nor was the fraud Silow and Abelson committed against
the Law Firm "just the tip of the iceberg." Id.

79.    Although the Law Firm sent Hartleib a cease-and-desist letter, see Ex. 14,
Hartleib paid it no mind, responding by e-mail on March 7, 2017 (and copying fifteen members
of the bar and Judge Vano's administrative assistant) as follows:

> Mr. Weiser, as I am preparing my sworn declaration regarding my
> communication with you "client", I do not have time to address all of the self-
> serving misrepresentations in your letter. The 15 minute consensual conversation
> with your "client" was very enlightening. She provided her e-mail address and ask
> that I copy Counsel, so that I could forward the documents you failed to provide.
> **For you to characterize this as harassment is another blatant attempt to
> distract and obfuscate your fraudulent acts and bastardization of the judicial
> system. I caution you, that coercing your "client" to misstate facts regarding
> our call will only inflict additional damage to what little credibility you have
> left. You Sir, and your coconspirators are the ones that need to Cease and
> Desist. Your so-called "client" is representing my interest and her attorneys
> are corrupt, therefore I will neither Cease nor Desist.** As far as your not so
> vailed threat that Ms. Williams "reserves all of her rights", **if you are threatening
> legal action against me, feel free, I will be happy to waive service to expedite
> said action. I find the prospects of discovery quite compelling. Your threats
> do nothing but, strengthen my resolve and galvanize my convictions. Call it a
> personality defect!** Instead of wasting my time, I would suggest you consult with
> an ethics attorney, that's right, you already have!

Ex. 14 (emphasis supplied).

80.    Of course, Hartleib lied about the consensual nature of his improper and unlawful
contact with Ross-Williams, and his harassment of Ross-Williams resulted in the Kansas
Appeals Court issuing its Protective Order on March 30, 2017 prohibiting Hartleib from
contacting Ross-Williams.

{01292774;5}

81.    Hartleib sought twice before the Kansas Appeals Court and once before the Kansas Supreme Court to have the Protective Order lifted.  In response to one such effort, Ross-Williams wrote in a declaration submitted to the court:

> I was shocked to learn that Hartleib recently filed a motion to vacate the Protective Order.  I can only assume that Hartleib intends to try to contact me again and harass me further.  I was very frightened and disturbed by Hartleib's conduct in March 2017, and I was pleased and relieved that the Protective Order was granted.  If the Protective Order were to be vacated, I would fear that Hartleib would once again attempt to intimidate, harass, and threaten me.  I see no reason why Hartleib should be permitted to direct communications to me instead of my counsel.  I respectfully request that this Court deny Hartleib's motion and keep the Protective Order in place.

Ex. 13 ¶ 9.

82.    None of Hartleib's efforts to vacate the Protective Order were successful.

83.    In fact, one year later, on April 7, 2018, when the Law Firm opposed Hartleib's unsuccessful Motion to Reconsider and Vacate the Protective Order, Hartleib e-mailed Weiser and copied eight other members of the bar, as follows:

> **Rob, your ability to set the bar at new lows, never disappoints!** Clearly, this is in retaliation to your being rightfully removed as co-lead counsel in the Equifax case. **Your attempt to mislead the Appellate Court with incomplete records might be your standard operating procedure, but I believe it will cost you when I seek sanctions. Your personal attacks smack of desperation, they do nothing to dissuade me, in fact they galvanize my convictions and strengthen my resolve!** Rob, you may want to contact your investigators, L. English Research Services Inc. to seek a partial refund. When they pulled the records on March 26th, they missed a DUI from the eighties and a fixit ticket. **Your ill-advised actions, and ad-hominem attacks are making the Weiser Firm radioactive!**

> Have a wonderful weekend.

A true and correct copy of Hartleib's April 7, 2018 e-mail regarding the Law Firm's opposition to Hartleib's Motion to Reconsider and Vacate the Protective Order is attached hereto as **Exhibit 15** (emphasis supplied).

84.    After learning about Silow's duplicity, the Law Firm hired a public relations firm, which was contacted on or about March 8, 2017 by a reporter from *The Wall Street Journal,* a high-profile daily newspaper with international distribution.

85.    Upon information and belief, the reporter from *The Wall Street Journal* received a "tip" from Hartleib about Silow's disbarred status and role as a document reviewer in the Sprint Derivative Action.

86.    On March 13, 2017, *The Wall Street Journal* published the resulting article: "One Lawyer, 6,905 Hours Leads to $1.5 Million Bill in Sprint Suit."  The article failed to mention the fact that Silow's nearly 7,000 billable hours were billed over the course of four years.

87.    Nearly one hundred media outlets picked up and further publicized *The Wall Street Journal*'s March 13, 2017 article.

88.    In an April 12, 2017 e-mail to Weiser and ten other members of the bar, as well as the Kansas State Court's administrative assistant, Hartleib wrote of Weiser: "What an embarrassment to the bar!  See you in Court."  A true and correct copy of Hartleib's April 12, 2017 e-mail is attached hereto as **Exhibit 16**.

89.    Alarmingly, upon information and belief, on April 25, 2017, Hartleib mailed several copies of an "anonymous" profanity-laced letter to six judges sitting on the Court of Common Pleas of Chester County, Pennsylvania, which was forwarded to Weiser on April 26, 2017 by Loretta M. Hines, Judicial Assistant to the Hon. Anthony A. Sarcione.  True and correct copies of the April 26, 2017 forwarding e-mail, the transmitting envelope and the April 25, 2017 threatening letter are attached hereto as **Exhibit 17**.

90.    In the April 25, 2017 letter, Hartleib circles a headline referencing the Kansas State Court's reduction of the attorneys' fees for plaintiffs' counsel in the Sprint Derivative

Settlement and writes in longhand: "What, if anything, do you intend to <u>DO</u> about this!!"  Ex.

16.  Over two typed and highlighted pages, Hartleib sets forth his negative views about class

actions – which are entirely distinguishable from the shareholder derivative litigation in which

the Law Firm and Weiser focus their practice – and recounts his version of Silow's fraud upon

the Law Firm, noting "**Judge <u>JIMMIE VANO in Kansas, God Bless His soul, caught the</u>**

**<u>firm in the act and knocked out 90% of their billing</u>  They claimed shock & surprise.**"  Ex.

17 (emphasis in original).

91.    Most concerningly, Hartleib attaches a page entitled "imaginary dialogue," which

ostensibly documents his imagined conversation with Weiser regarding Silow (including but not

limited to his misrepresentation of his first name, Jeffrey, on a court document, which he signed

"Alexander Jeffrey Silow," although Hartleib misstates this as "Andy").  Ex. 17.  The "imaginary

dialogue" concludes:

| | |
|---|---|
| [Weiser:] | "Well I get where you are going with this line of questioning.  Are you saying that we knew that he was a disbarred lawyer and we were trying to milk the class action jackpot with his phony billing" [sic] |
| [Hartleib:] | You said it better than I could. |
| [Weiser:] | "Well, you can ***GO F\*\*K YOURSELF ASSHOLE.  I'M OUT OF HERE  AND  YOU  CAN  TALK  TO  MY  LAWYER  IF  YOU WANT*** [sic] |

Ex. 17.

92.    In forwarding the letter to Weiser from Judge Sarcione's chambers, Ms. Hines

wrote: "The attached letter was received in Chambers yesterday, 4/25/17.  Five other Judges in

Chester County received the same letter.  Judge Sarcione thought you should be alerted since you

are referenced in the letter.  Please feel free to contact Chambers if you feel it necessary or have

any questions or concerns."  Ex. 17.

{01292774;5}

Case 8:23-cv-00171-CJC-JDE   Document 1   Filed 01/27/23   Page 376 of 1580   Page
Case 2:19-cv-02728-KSM   Document 67   Filed 01/21/21   Page 19 of 61
ID #:376

93.     On May 19, 2018, Hartleib e-mailed Weiser and eight other members of the bar: "Plaintiff Counsel, and I use this term loosely, when making false allegations against a party I would suggest you at least get it right.  I am no expert, but I am pretty sure it would be libelous! I will demonstrate its proper use posthaste!"  A true and correct copy of Hartleib's May 19, 2018 e-mail is attached hereto as **Exhibit 18**.

94.     Two weeks later, on June 2, 2018, Hartleib sent an unsolicited e-mail to Weiser, eleven other members of the bar, and Judge Vano's administrative assistant, Jill Boren, regarding media coverage of a lawsuit against State Street Bank, with which Plaintiffs had no involvement whatsoever:

> Dear Ms. Boren, I thought the Honorable James Vano would find the link to the National Law Journal Article of interest. It is clear that the Plaintiff's Bar is rife with corruption, in both Class Action and Derivative cases. **Much like the fraud Weiser et.al. committed in the "Ross-Williams" case,** it appears to be standard operating procedure for many firms to submit millions in fraudulent fee requests upon the Court. This State Street case involves large well established firms and nearly 100 million in fees. **At present, it appears Weiser et.al. has not been out done, as there is no mention of the unlicensed practice of law by a convicted felon using an alias.**
>
> **I will be contacting the Special Master, and filing an Amicus Brief in the State Street case to inform them of the chicanery that has taken place in the "Ross-Williams" case. Although entirely unrelated, it presents a troubling pattern of fraud and corruption in these lawyer driven cases.** I will be seeking public dissemination of the Special Master's report to show the breadth of corruption within the Plaintiffs Bar. **The actions of Weiser et.al. and the Firms in the State Street case is the very definition of Racketeering**, and warrants legislative reform.
>
> https://www.law.com/nationallawjournal/2018/05/31/judge-presses-lead-plaintiff-in-state-street-bank-lawsuit-on-overbilling-questions/
>
> Michael Hartleib 646-494-5901

A true and correct copy of Hartleib's June 2, 2018 e-mail is attached hereto as **Exhibit 19** (emphasis supplied).

<u>*Hartleib Inserts Himself into the Law Firm's Pending Litigations*</u>

95.    Hartleib then began injecting himself into the Law Firm's pending litigations nationwide.

96.    Upon information and belief, Hartleib scanned federal dockets around the country for the names of the Law Firm's attorneys, in order to insert himself into the Law Firm's cases; Hartleib's principal aim was to harass Weiser and damage the Law Firm.

97.    For example, on August 17, 2018, Hartleib sent Weiser the following e-mail, a true and correct copy of which is attached hereto as **Exhibit 20**:

> Rob, will you be at the Witmer v Steven hearing on the 27th? I will do my best to attend. I am very familiar with Judge Carney? [sic] **We can discuss my concerns with L.C, A 10 and several other companies in which I am a shareholder. It appears we will be forced to deal with each other for the foreseeable future.** In hindsight, I should have avoided stocks, and invested more in real estate. Our interest were supposed to be aligned. Instead, I was attacked! If you have any questions, or wish to proffer an apology, you know how to reach me. That said, **other action is eminent!**

Ex. 20 (emphasis supplied).

98.    The "Witmer v. Steven" matter Hartleib references is actually *Witmer v. Sugarman,* a shareholder derivative suit filed in the United States District Court for the Central District of California, which was dismissed on August 23, 2018.  No. SACV 18-00246-CJC(DFMx), 2018 U.S. Dist. LEXIS 217850 (C.D. Cal. Aug. 23, 2018).  Hartleib was not a party in *Witmer v. Sugarman,* and Plaintiffs have no evidence that Hartleib was a shareholder of the underlying corporation.  No hearing was held in that case, and Hartleib never submitted any filing in that case.

99.    The *LC* and *A10* cases were other derivative actions pending in federal court in California at that time, in which Hartleib was not a named party and Plaintiffs have no evidence that Hartleib was a shareholder of the underlying corporations.

100.    Hartleib indicated in no uncertain terms that, as part of his laser-focused campaign to undermine Weiser and the Law Firm, he intended to involve himself in the Law Firm's other derivative litigations (which are unrelated to Hartleib in any way) throughout the country.  The following paragraphs offer a few examples of Hartleib's efforts.

<u>EQUIFAX DERIVATIVE LITIGATION</u>

101.    On March 15, 2018, in *In re Equifax, Inc. Derivative Litigation.,* No. 1:18-cv-00317-TWT (consolidated with Nos.: 1:218-cv-00477-TWT and 1:18-cv-00577-TWT) (N.D. Ga.) (the "Equifax Derivative Litigation"), during the pendency of competing motions for the appointment of lead counsel before the United States District Court for the Northern District of Georgia involving the Law Firm, Hartleib filed "Michael Hartleib, Shareholder and Concerned Citizen, Motion [sic] for Acceptance of Amicus Curiae Brief in Opposition to the Appointment of The Weiser Firm as Co-Lead Counsel," a true and correct copy of which – together with the proposed "Amicus Curiae Brief of Concerned Citizen and Shareholder Michael Hartleib in Opposition of [sic] the Appointment of The Weiser Firm as Co-Lead Counsel" – is attached hereto as **Exhibit 21**.

102.    Therein, Hartleib expresses his purported "extreme concern" about vague "troubling actions of Weiser et.al," in the Sprint Derivative Action; Hartleib's "concern" largely pertains to the Law Firm's employment of disbarred attorney Silow as a document reviewer.  Ex. 21 p. 4.

103.    Hartleib alleges that the Law Firm "lied, misl[ed] the court," "attempt[ed] to confuse the Court [sic]," "used an **unfit plaintiff**," engaged "in fraudulent billing," made "false statements," employed another attorney who "repeatedly perjured himself" and constituted "an utter embarrassment to the Plaintiff's Bar," operates a "criminal enterprise," "sees plaintiff's

[sic] as a '**necessary nuisance,**'" displayed "hubris and utter contempt for the Court," engaged in "contemptuous actions in the case" and "<u>Self-Dealing</u>, <u>Unclean Hands</u> and <u>Shameful Violations of Public Trust</u>," undertook a "zealous quest for reinstatement of four million dollars in unwarranted fees," "<u>follow[ed] a different set of standards, one that sets the bar at new lows</u>," made a "desperate attempt to unjustly enrich themselves," and "has committed criminal acts upon the Kansas Court and a multitude of others across the country." <u>Id</u>. pp. 4-9 (emphasis in original).

104.    In his proposed *amicus* brief, Hartleib also grossly mischaracterizes the contents of the Law Firm's legal filings, the findings of the Kansas State Court, and certain statements from the appellate bench during oral argument before the Kansas Appeals Court, and admits to his unlawful contact with Ross Williams. <u>Id</u>. pp. 4, 6-8.

105.    Hartleib concludes: "<u>what is going on at the Weiser firm?  Either they are completely corrupt, or entirely inept</u>, whichever is the case they are not fit to act as lead on any representative suit." <u>Id</u>. p. 9.

106.    In its opposition to Hartleib's motion for leave to file his *amicus curiae* brief, a true and correct copy of which is attached hereto as **Exhibit 22**, the Law Firm notes:

> Hartleib submits his proposed *amicus* filing not as a true, disinterested "friend of the court" or even as a shareholder in Equifax, Inc., but purely in an adversarial capacity in his continuing and openly hostile effort to harass and disturb the Weiser Firm, its clients, and other law firms with whom the Weiser Firm works ...

> Hartleib is attempting to use his purported *amicus* filing in this Action as a weapon against the Weiser Firm and its clients, and this Court should not permit Hartleib's brazen abuse of the *amicus* mechanism to the partisan detriment of plaintiffs in this Action.

> Hartleib is not an "impartial individual" suggesting the proper interpretation of any law, but rather a serial harasser of the Weiser Firm and its clients.

Case 8:23-cv-00171-CJC-JDE    Document 1    Filed 01/27/23    Page 380 of 1580    Page
Case 2:19-cv-02728-KSM    Document 68    Filed 01/21/21    Page 23 of 61
ID #:380

> Hartleib is seeking to extend his malicious campaign against the Weiser Firm
> from the Sprint derivative action to this Action . . .

Ex. 22 pp. 1, 4, 6, 10 (parentheticals omitted).

107.    One of the attorneys at the Law Firm, James Ficaro, transmitted a copy of the

Law Firm's opposition, to which Hartleib responded by e-mail on March 22, 2018, a true and

correct copy of which is attached hereto as **Exhibit 23**: "I received these filings several hours

ago!  Let Rob know he is making a catastrophic mistake!"

108.    At the hearing on the competing motions for appointment of lead counsel in the

Equifax Derivative Litigation, prior to any ruling on Hartleib's *amicus* motion, Hartleib appeared

before Judge Thomas W. Thrash, Jr. ("Judge Thrash") and was permitted to speak.[2]

109.    Without explaining his reasoning, Judge Thrash declined the Law Firm's motion

to be appointed co-lead counsel in the Equifax Derivative Litigation. Hartleib took credit for this

result, e-mailing Weiser a copy of Judge Thrash's order on April 5, 2018, a true and correct copy

of which e-mail is attached hereto as **Exhibit 24**, and stating: "Just got home and wanted to make

sure that you have this!  Good to finally meet you Rob!  Like I said, none of this was necessary!"

Ex. 24.

### BIG LOTS DERIVATIVE LITIGATION

110.    *In re Big Lots, Inc. Shareholder Litigation*, No. 2:12-cv-445 (S.D. Oh.) ("Big Lots

Derivative Litigation"), was a derivative suit which asserted a claim for corporate waste by

certain of Big Lots' officers and directors in connection with an alleged insider stock selling

scheme and stock repurchase plan.

---

[2] A copy of the transcript of the hearing before Judge Thrash was not made available to Plaintiffs.
{01292774;5}

111.    Settlement of the derivative claims received preliminary approval from the Honorable Michael H. Watson ("Judge Watson") of the United States District Court for the Southern District of Ohio on April 6, 2018.

112.    As Judge Watson noted in his August 28, 2018 Opinion and Order granting final approval to the settlement in the Big Lots Derivative Action, a true and correct copy of which Opinion and Order is attached hereto as **Exhibit 25**: "On August 24, 2018, well after the time to object and the fairness hearing took place, the Court received an e-mail from Michael Hartleib ("Hartleib"), a shareholder who had an interest in a different case involving The Weiser Firm, P.C. ("Weiser")." Ex. 25 p. 11 fn.2.

113.    Hartleib's e-mail to Judge Watson in the Big Lots Derivative Litigation was never provided to Plaintiffs, but Judge Watson described it as follows: "Hartleib raised concerns over Weiser's billing practices in this prior case and stated that he wanted to inform the Court so that it could scrutinize the fee request in this case." Id.

114.    Judge Watson noted that: "Hartleib does not indicate that he is a shareholder in Big Lots or otherwise an interested party in this case.  Furthermore, the Court always scrutinizes the billing records of plaintiffs' counsel before approving fee awards." Id.

115.    Judge Watson elected "out of an abundance of caution" to re-analyze the Law Firm's billing entries submitted in the Big Lots Derivative Litigation, gave the Law Firm an opportunity to respond to Hartleib's scurrilous allegations, and determined that "[t]he Court is fully satisfied that the hours billed by Weiser were reasonable in this case." Id.

CENTURYLINK DERIVATIVE LITIGATION

116.    *In re Centurylink Sales Practices and Securities Litigation,* No. 17-md-2795-MJD—MM (the "Centurylink Derivative Litigation"), was initiated in 2017 in the United States

Case 8:23-cv-00171-CJC-JDE   Document 1   Filed 01/27/23   Page 382 of 1580   Page
Case 2:19-cv-02728-KSM   Document 68   Filed 01/21/21   Page 25 of 61
ID #:382

District Court for the District of Minnesota. It includes a consolidation of the separately-filed shareholder derivative cases captioned *Tansey v. Perry, et al.,* No. 18-cv-02460-MJD-KMM; *Flanders v. Post, et al.,* No. 18-cv-02833-MJD-KMM; *Ault v. Post, et al.,* No. 18-cv-02834-MJD-KMM; *Barbree, et al. v. Bejar, et al.,* No. 18-cv-02835-MJD-KMM; and *Palkon v. Boulet, et al.,* No. 19-cv-00284-MJD-KMM.

117.    On March 5, 2019, one day prior to a hearing addressing competing motions for appointment of lead counsel in the Centurylink Derivative Litigation, Hartleib filed a self-styled "Amicus Curiae Brief of Shareholder Michael Hartleib and Concerned Citizen in Opposition of [sic] the Appointment of Robbins Arroyo and the Weiser Firm et. al. as Lead Counsel in the Consolidated Derivative Action," a true and correct copy of which is attached hereto as **Exhibit 26**.

118.    The Law Firm was not seeking appointment as co-lead counsel with Robbins Arroyo LLP ("Robbins Arroyo") or any other law firm in the Centurylink Derivative Litigation. Instead, the Law Firm was a part of the support structure proposed by the law firm of Bragar Eagle & Squire, P.C. in *its* motion for appointment as lead counsel in the Centurylink Derivative Litigation.

119.    Robbins Arroyo filed an application for *its own* appointment as lead counsel in the Centurylink Derivative Litigation.

120.    Years earlier, Robbins Arroyo filed a shareholder derivative lawsuit on behalf of Sprint, arising from the Sprint/Nextel merger, which – like the Sprint Derivative Action filed by the Law Firm – was resolved by the Sprint Derivative Settlement.

121.    As noted hereinabove, Hartleib did not participate in the Sprint Derivative Settlement, and objected vociferously to the Sprint Derivative Settlement.

122.   Furthermore, Hartleib is not a shareholder in Centurylink, nor does he claim to be a shareholder in Centurylink, thus depriving him of standing as *amici* in the Centurylink Derivative Litigation.

123.   In his brief, Hartleib claims that he seeks to "inform this Court of ongoing troubling actions by the Weiser and Robbins Arroyo et.al. [sic] Firms," pertaining to the Sprint Derivative Settlement.  Ex. 26 p. 2.

124.   Hartleib alleges that the Law Firm and Robbins Arroyo utilized "deceased parties, friends and family members which [sic] lacked standing, and paid serial criminal Plaintiffs," and that they "generate thousands of billable hours for illusory work, submit fraudulent time logs and seek hundreds of millions in unjust fees in cases across the country."  Id.

125.   Hartleib alleges that when he objected to the Sprint Derivative Settlement, "I was subjected to vicious ad hominem attacks as Weiser and Robbins Arroyo et.al. [sic] proved they would stop at nothing to protect their criminal enterprise . . . Weiser et.al [sic] lied, misleading the court [sic] . . . Weiser et.al. [sic] committed perjury and admitted to billing fraud."  Id. pp. 6-7.

126.   Hartleib admits to contacting Ross-Williams without consent of counsel or the Kansas Appeals Court, and further admits that upon receiving the Law Firm's cease-and-desist letter, "I replied by informing them that I would neither cease nor desist as the truth is an absolute defense.  I informed them that they and their co-conspirators were the ones that needed to *Cease and Desist*."  Id. p. 7 (emphasis in original).

127.   Hartleib alleges that in the Centurylink Derivative Litigation, Weiser "is now forced to initiate a new strategy, one of hiding behind another firm Bragar Eagel [sic] and Squire

seeking lead in this case in an effort to manage cases behind the scene [sic].  Greed appears to be powerful [sic] motivator." Id.

128.    Hartleib also alleges without any basis that "Mr. Jeffrey Mark Silow has worked for the Weiser and Robbins Arroyo et.al. Firms [sic] for over 10 years, billing likely more than 100 million dollars in illicit fees, in a multitude of cases across the country." Id. p. 8.

129.    On the following day, March 6, 2019, Hartleib appeared at a hearing before the Honorable Michael J. Davis ("Judge Davis") with respect to the competing motions for appointment of lead counsel in the Centurylink Derivative Litigation.  A true and correct copy of the relevant portions of the transcript of the March 6, 2019 hearing before Judge Davis is attached hereto as **Exhibit 27**.

130.    As the Law Firm did not seek lead counsel appointment in the Centurylink Derivative Litigation, neither Weiser nor anyone else from the Law Firm attended that hearing.

131.    After counsel for each of the competing movants were heard, Hartleib was permitted to speak by Judge Davis, and did so as follows, in relevant portion:

> As your honor knows, in the amicus brief I lay things out that shows [sic] a pattern, a course of conduct over many years.  I, as a shareholder, have had to defend my interests against the likes of Robbins Arroyo and more recently the Weiser Law Firm.

Ex. 27 at 40:11-15.

> [T]he way I have gotten involved in this is I see someone that [sic] falsely purports to represent the shareholders' interests or the corporation, the shareholders derivatively, and then I see no meaningful relief or nearly illusory relief and a tremendous amount in attorneys fees.  And in the Kansas case, I mean, I was subjected, I was – my character – I mean, I ended up having to defend my character, and I wasn't the one that [sic] did anything wrong.  You know, I mean, it's unbelievable the attacks that I took, so – **but it does nothing to dissuade me.  It just galvanizes my conviction and strengthens my resolve**.

Id. at 41:3-13 (emphasis provided).

With regard to the amicus brief, I didn't have a full service, the notice, you know, who to serve everyone.  And I understand that it could be prejudicial because they haven't had a chance to respond, but I welcome a response.  That said, **if the firms would like to give me a list of their forthcoming cases in which they are seeking leave, I could be certain to notify everybody timely** and I wouldn't have to prepare, stay up all night, all weekend long, to try to draft an amicus brief and get it to the court and then, you know, fly in.

Id. at 41:24-42:8 (emphasis provided).

And, Your Honor, *I know for a fact that the Weiser firm knew who Mr. Silow was and that will come out, you know, during the course of litigation.*  And I am pretty certain that the Robbins Arroyo firm knew who he was as well.

These firms, when these firms are up to no good, when they are billing illusory hours – you know, if I had 30 minutes with Your Honor in chambers, I could give Your Honor a lot more information . . .

Id. at 43:4-12.

132.     After bringing Hartleib's meandering comments to a close, Judge Davis permitted George C. Aguilar, Esquire of Robbins Arroyo to respond to Hartleib's *amicus* brief and remarks at the hearing.   Id. at 44:1-46:11.  The Court also gave Mr. Aguilar one week to respond in writing to Hartleib's *amicus* brief.  Id. at 46:12-13.

133.     Hartleib then concluded his statements to the Court in relevant portion as follows:

HARTLEIB:   . . . The allegations that I make against these firms are very serious allegations.  He says that I am libeling him, slandering him and defaming the firm.   I have asked Mr. Aguilar on numerous occasions **if they would like to sue me, I will waive service. I am perfectly happy for you – if you want to commence an action, then I will get the discovery** –
THE COURT: Speak to me.
HARTLEIB:  Then I will get the discovery that I need to finally put an end to this, all of this, you know, unjust enrichment, you know, literally bastardizing our judicial process.
THE COURT: Okay.
HARTLEIB:  Thank you.

Id. at 47:8-21 (emphasis supplied).

134.    After the Centurylink hearing, on March 14, 2019, Harteib sent an e-mail to Jill

Boren, administrative assistant to Judge Vano, who ruled on the Sprint Derivative Settlement in

the Kansas State Court.  A true and correct copy of Hartlieb's March 14, 2019 e-mail is attached

hereto as **Exhibit 28**.

135.    Hartlieb copied the entire attorney distribution list for the Sprint Derivative

Settlement on his March 14, 2019 e-mail to Ms. Boren.  *Id*.

136.    Therein, Hartlieb wrote:

Dear Ms. Boren, I hope this e-mail finds you well. I thought that the Honorable
Vano would be interested to know that my quest to expose lawyer driven
litigation and corruption rife throughout the Plaintiffs Bar continues. Attached is
an Amicus Brief filed in Minnesota, and transcript of the hearing before the
Honorable Michael J. Davis. In addition, I have initiated legal action against
Weiser and representative plaintiff Ross-Williams as outlined in the attached
complaint.

. . .    **Maybe Judge Vano would be interested in setting the record straight
before the Court appoints lead Counsel in the aforementioned [Centurylink]
case**.

Interestingly, I received an anonymous letter last night which details an elaborate
scheme by Weiser et.al. to procure "Relators" in Qui Tam cases. It involves the
use of several LLC shell corporations set up for the sole purpose of soliciting
information under false pretenses to facilitate lawyer driven Qui Tam cases. This
has resulted in the DOJ filing a motion to dismiss 11 active cases, filed by Weiser
et.al. including ABBVIE. The level of sinister is [sic] truly unbelievable, some of
which is outlined in the attached Motion to dismiss by the Feds!

Lastly, I would like to express my gratitude to Judge Vano, I am, and remain
incredible [sic] grateful for allowing me to be heard, and finding my arguments
compelling. I will continue my quest to expose and reform the corruption rife
throughout Derivative litigation.

With the Utmost Respect,
Michael Hartlieb  (646) 494-5901

Ex. 28.

{01292774;5}

137.    The *qui tam* cases referenced by Hartleib involve whistleblower complaints brought by the National Healthcare Analysis Group ("NHCA") and related organizations accusing eleven pharmaceutical manufacturers of enticing doctors to prescribe their products using nurse educators as "kickbacks".

138.    The Law Firm was nominally involved in only three of the eleven of the NHCA's *qui tam* cases – *United States of America, et al v. OTSUKA Holdings Company, Ltd. et al,* No. 1:17-CV-00966 (N.D. Ill.) (the "Otsuka case"); *United States of America et al v. SMSF, LLC et al,* No. 1:16-CV-11379 (D. Mass.) (the "Biogen case"); and *Miller et al v. AbbVie Inc. et al,* No. 3:16-CV-02111 (N.D. Tex.) (the "AbbVie case").

139.    In the Otsuka case, the Law Firm never entered an appearance, and upon learning that the government did not wish to proceed, the Law Firm immediately informed its clients that they would need to secure new counsel if they wished to proceed.  On October 29, 2018, substitute counsel appeared for the relators, and on October 31, 2018, local counsel's motion to withdraw was granted.  After the government filed a motion to dismiss the Otsuka case, the relators, through their new counsel, filed a notice of voluntary dismissal.

140.    Similarly, in the Biogen case, the Law Firm never entered an appearance or sought admission *pro hac vice,* and informed its clients of the need to secure new counsel upon learning that the government did not wish to prosecute the case.  On August 24, 2018, substitute counsel, GeyerGorey LLP, appeared in the case, and on December 17, 2018 the government filed a motion to dismiss; the case was closed on or about December 26, 2018.

141.    Finally, in the AbbVie case, the Law Firm entered its appearance on June 22, 2018.  As with the Otsuka case and the Biogen case, upon learning of the government's decision not to pursue the case, the Law Firm immediately informed its clients that they would need to

secure new counsel.  On September 25, 2018, GeyerGorey LLP filed a notice of substitution for the Law Firm.  On December 17, 2018, the government moved to dismiss the case, and on March 13, 2019, the relators, through their new counsel, filed a notice of voluntary dismissal.

142.    The Law Firm did not engage in any nefarious conduct, nor has any court or government agency suggested the Law Firm did anything improper.

143.    On April 23, 2019, Judge Davis issued a Memorandum of Law & Order appointing Bragar Eagle & Squire, P.C. as lead counsel, whose proposed support structure includes the Law Firm.  A true and correct copy of the April 23, 2019 Memorandum issued by Judge Davis is attached hereto as **Exhibit 29**.

144.    With respect to Hartleib, Judge Davis wrote as follows: "The Court has carefully considered Hartleib's allegations, Robbins Arroyo's response, and the public record in the cases cited by Hartleib. The Court concludes that **Hartleib has raised no legitimate questions** with regard to the ethics or expertise of the Robbins Arroyo law firm. **The Court is satisfied that there are no ethical concerns** that would hinder Robbins Arroyo's application for appointment as Lead Counsel." Ex. 29 p. 5 (emphasis supplied).

### *Hartleib's Federal Lawsuit Against Plaintiffs*

145.    On December 12, 2018, Kansas-based counsel for Hartleib, Andrew Protzman, Esquire, provided Weiser with a draft copy of a petition alleging legal malpractice/breach of fiduciary duty and violations of Kansas Consumer Protection Act claims against Weiser and the Law Firm, and abuse of process and breach of fiduciary duty claims against Ross-Williams.  A true and correct copy of counsel's December 12, 2018 correspondence and the attached draft petition are attached hereto as **Exhibit 30**.

146.    The petition stems from Hartleib's claim that he was a client of the Law Firm for purposes of the 2009 Sprint Derivative Action, even though Hartleib filed separate derivative litigation with respect to Sprint in 2011 by and through separate counsel.

147.    In his December 12, 2018 letter, Mr. Protzman invited Weiser to "explore avenues to an agreeable resolution to the matter before it is filed." Ex. 30 p. 1.

148.    The undersigned, Philip S. Rosenzweig, Esquire, corporate counsel for the Law Firm and personal counsel for Weiser, responded by letter dated December 19, 2018, a true and correct copy of which is attached hereto as **Exhibit 31**.

149.    Therein Mr. Rosenzweig wrote, in part:

[The] causes of action [alleged against Weiser and the Law Firm in the draft petition] depend, inter alia, upon a demonstrably false and absurd premise: that the Weiser Firm and/or Mr. Weiser "agreed to represent Mr. Hartleib" and "entered into an attorney-client relationship" with Hartleib in March 2009. . . .

. . . while Hartleib may have sought my Clients' legal services, such services were certainly never provided to or received by Hartleib, because my Clients flatly declined to act as counsel (or co-counsel) to Hartleib immediately after Mr. Weiser first communicated with Hartleib.

Surely you agree that an implied attorney-client relationship is not formed simply because an individual seeking legal representation communicated with a lawyer once, and of course, as set forth above, Kansas law does not provide otherwise.

Ex. 31 p. 2 (internal citations omitted).

150.    Mr. Protzman e-mailed Mr. Rosenzweig twice more – on December 21, 2018 and January 7, 2019 (true and correct copies of which e-mail correspondence are attached hereto collectively as **Exhibit 32**) – seeking both times to initiate "pre-suit mediation of this matter." Ex. 32 p. 1.

151.    Plaintiffs herein did not wish to entertain Hartleib's overture of "pre-suit mediation," and Mr. Rosenzweig accordingly did not respond to Mr. Protzman's e-mails.

{01292774;5}

152.    On January 22, 2019, Hartleib filed a civil action in the Kansas State Court, alleging legal malpractice/breach of fiduciary duty, violation of the Kansas Consumer Protection Act and abuse of process claims against Weiser and the Law Firm (the "Hartleib Action"). Hartleib's complaint also includes claims for abuse of process and breach of fiduciary duty against Ross-Williams.  A true and correct copy of Hartleib's complaint against Plaintiffs and Ross-Williams in the Hartleib Action is attached hereto as **Exhibit 33**.

153.    Plaintiffs herein subsequently removed the Hartleib Action to the Kansas Federal Court, and moved to dismiss Hartleib's complaint on February 27, 2019, which motion was granted by Memorandum and Order dated August 21, 2019.

154.    On September 18, 2019, Hartleib moved for reconsideration of the dismissal of the Hartleib Action, which motion was denied by Memorandum and Order dated June 22, 2020.

155.    Shortly thereafter, Hartleib filed an appeal of the dismissal of the Hartleib Action, which appeal remains pending.

### *Hartleib Contacts Abelson and Detective Thomas J. Goggin in Pennsylvania*

156.    Hartleib intentionally contacted certain individuals in Pennsylvania seeking help in his efforts to harm the Plaintiffs there.

157.    For example, in February of 2018, Hartleib called Abelson at its sole office located in Philadelphia, Pennsylvania and spoke with Joyce A. Feinstein ("Feinstein").  Hartleib had no previous relationship with Abelson or Feinstein.

158.    Feinstein is the recruiter who first placed Silow with the Law Firm a decade earlier.

159.    After the call, Feinstein e-mailed Hartleib: "[I] told Cathy [Abelson] what I could about your and our phone call. I was confused about the motivation of your call to Abelson. Also

confused if you were an attorney or a plaintiff yourself. I found out through more digging, you

are a professional plaintiff." A true and correct copy of Feinstein's e-mail is attached hereto as

**Exhibit 34**.

160.    Hartleib responded by e-mail:

I understand that I am on a rant, but you hit a nerve. . . . I tell people all the time
that I have a personality disorder . . . I cannot [sic] only help you defeat their suit,
I can facilitate a cross-complaint that could lead to the demise of the Weiser Firm
and damages for Abelson.  If you are still not convinced, I can provide contacts,
or more from the current case to convince you. . . . Weiser et.al. [sic] are corrupt
and inept.  After all, a layperson has defeated and humiliated them, and I am far
from finished.  I predict when over certain attorneys may not be practicing law in
the future.  I am hopeful that we can work together.

A true and correct copy of Hartleib's e-mail is attached hereto as **Exhibit 35**.

161.    Neither Abelson nor Feinstein responded to Hartleib.

162.    Undeterred, Hartleib called and e-mailed Abelson *again* on February 22, 2018:

. . . My name is Michael Hartleib, I am the person who has exposed the fraud
committed by the Weiser firm in the case that has brought Mr. Silow's criminal
past and disbarred status into focus. . . Their actions in this case are truly
unconscionable . . . they have filed multiple purjurious [sic] declaration and will
stop at nothing to protect their duplicitous acts and criminal enterprise. . . . I am
hopeful that we can work together and facilitate a cross-complaint against the
Weiser firm. . . . I know where the bodies are buried and intend to dig them up.  I
look forward to speaking with you.

A true and correct copy of Hartleib's February 22, 2018 e-mail is attached hereto as

**Exhibit 36**.

163.    Hartleib e-mailed Feinstein a *third* time on February 24, 2018:

. . . I just found out [Weiser's] firm was appointed lead in a huge nationwide suit.
I will be working tonight and tomorrow on an Amicus Brief [sic], whereby I will
inform the court of his criminal acts in the Sprint case, ongoing PA Bar
investigation and forthcoming Order from the Kansas Court of Appeals.  His firm
is unfit to be lead Counsel [sic] in any representative suit at this time. . . . My goal
will be to have him removed as lead plaintiff counsel in said case.  You are in a
fantastic position with regard to the Weiser suit, this could end up being a huge

win for Abelson.  Tell Cathy not to worry about it.  They have dug themselves a
hole that will be impossible to escape from.

A true and correct copy of Hartleib's February 24, 2018 e-mail is attached hereto as **Exhibit 37**.

164.    Months later, on June 2, 2018, Hartleib e-mailed Abelson yet *again*, stating:
"Cathy, are you interested in working together to commence an action against the Weiser firm?
Why won't you have your attorney's contact me." A true and correct copy of the June 2, 2018 e-
mail is attached hereto as **Exhibit 38**.

165.    Seeking assistance throughout Pennsylvania in his campaign of destruction
against Plaintiffs, Hartleib was simultaneously contacting Thomas J. Goggin, Detective Sergeant
at the Chester County District Attorney's Office in Chester County, Pennsylvania ("Detective
Goggin").

166.    On March 13, 2018, Hartleib wrote to Detective Goggin: "the Weiser firm is
claiming to be a victim of Mr. Silow, when there is irrefutable proof they knew of Mr. Silow
[sic] fraud and conspiracy against the court." A true and correct copy of the March 13, 2018 e-
mail is attached hereto as **Exhibit 39**.

167.    Hartleib sent a second e-mail to Detective Goggin the following day, stating:
"Hey Thomas . . . [Silow] was presented as an attorney in good standing, and securities expert . .
. the Weiser firm knew exactly who Silow was and the Weiser [sic] is lying." A true and correct
copy of the March 14, 2018 e-mail is attached hereto as **Exhibit 40**.

168.    A week later, on March 22, 2018, Hartleib sent a third e-mail:

Mr. Goggin's [sic] . . . Weiser knew exactly who Silow was!  I was hopeful
[Abelson] would want to work together but I have not heard back from there [sic]
lawyers. I am going to bring a civil suit against Weiser.  Were you able to find the
misdemeanor charges against Silow?  Were you able to find the suit Vs [sic]
Abelson?  Any information could be helpful!

A true and correct copy of the March 22, 2018 e-mail is attached hereto as **Exhibit 41**.

169.    Approximately two months later, on May 14, 2018, Hartleib e-mailed Detective Goggin *again*, attaching the opinion of the Kansas Appeals Court upholding the reduced attorneys' fee award in the Sprint Derivative Litigation and writing: "Were you ever able to find charges filed against Silow? I can't believe that the[y] can commit perjury and try to defraud the court and Sprint and walk away with 450k . . . I am going to file a Bar complaint and commence a civil action." A true and correct copy of the May 14, 2018 e-mail is attached hereto as **Exhibit 42**.

170.    By providing the aforementioned opinion to Detective Goggin, Hartleib clearly intended to mischaracterize the Kansas Appeals Court opinion as the product of the frauds he alleged against Weiser and the Firm, without basis.

171.    On November 6, 2018, Hartleib reached out to Detective Goggin a final time, "following up to see if any action was taken by [Detective Goggin's] department" and describing an attached document Hartleib received from Weiser as an "attempt to impugn [Hartleib's] integrity" and "[c]ompletely inconsistent with what [Weiser] told the appellate court." A true and correct copy of the November 6, 2018 e-mail is attached hereto as **Exhibit 43**.

172.    Hartleib's communications with each of Abelson and Detective Goggin demonstrate Hartleib's knowing and intentional injection into Pennsylvania in order to solicit the assistance of and collaboration with Abelson and Detective Goggins in harming Plaintiffs.

173.    Hartleib's actions as set forth hereinabove – including but not limited to the distribution of unsolicited missives to attorney contact lists in ongoing litigations, the multiple applications to vacate a Protective Order preventing Hartleib from continued unlawful contact with clients of the Law Firm, the filing of *amicus curiae* briefs and appearances at hearings in unrelated litigations simply to insult, defame, and disparage Plaintiffs and their colleagues, the

threatening and profane letters to the bench of the Court of Common Pleas of Chester County, Pennsylvania, the threats to insert himself into the Law Firm's pending cases such as *Witmer, LC* and *A10*, and the repeated improper written and oral requests for *ex parte* contact with a judge or for a judge to insert himself into an unrelated pending case – demonstrate Hartleib's campaign to insult, degrade, belittle, harass, annoy, denigrate, malign, harm, embarrass and destroy the reputations of Plaintiffs.

174.    Hartleib's various communications to Plaintiffs' colleagues, to judges, to clients, to Abelson, and to Detective Goggins is defamatory insofar as it maligns Plaintiffs by name to third parties, thereby injuring Plaintiffs' professional reputations and profitability.

175.    Hartleib's various communications directly attacking the quality of the services provided by Plaintiffs to judges, clients, and Detective Goggins are disparaging insofar as they directly undermine the legal services provided by Plaintiffs.

176.    Hartleib has intentionally caused Weiser to suffer emotional distress as a result of Hartleib's outrageously cruel, indecent, inflammatory and/or false personal attacks upon Weiser's abilities, character, actions, relationships, legal ethics, beyond all possible bounds of decency.  Hartleib's targeted and personal affronts and intentional deceits, fabrications, slurs and smears have directly resulted in Weiser suffering great distress, anxiety and upset, and the primary interests of the Law Firm suffering severe harm.

177.    Not only has Hartleib caused Weiser to suffer personal emotional distress, but he has selectively published and mischaracterized matters related to Weiser in such a way that they cast Weiser in a false, negative light.

178.    Hartleib's outrageous behavior cannot be permitted in a judicial system founded on the pillars of honesty, fairness and legitimacy.

## Count I-- Defamation

179.    Plaintiffs repeat and reassert each of the previous paragraphs as though the same were set forth herein.

180.    "A prima facie case for defamation requires the plaintiff to plead the following: (1) the defamatory character of the communication; (2) publication of the communication to a third party; (3) the communication refers to the plaintiff; (4) the third party's understanding of the communication's defamatory character; and (5) injury." *Brown v. Blaine,* 833 A.2d 1166, 1173 n. 14 (Pa. Commw. 2003)(citing 42 Pa. C.S.A. § 8343).

181.    "Pennsylvania, like many other jurisdictions, recognizes a judicial litigation privilege providing immunity for communications which are made in the regular course of judicial proceedings and are material to the relief sought." *Schanne v. Addis,* 121 A.3d 942, 947 (Pa. 2015).  The privilege covers statements made by parties, witnesses, attorneys, or judges. *Id.* "[T]he privilege is absolute, meaning that, where it attaches, the declarant's intent is immaterial even if the statement is false and made with malice." *Id.* at 947 (citing *Bochetto v. Gibson,* 580 Pa. 245, 860 A.2d 67, 71 (Pa. 2004)).  The judicial privilege is not limited to statements made in open court, but encompasses pleadings as well.  *Grey v. Johansson,* No. 15-2479 2016 U.S. Dist. LEXIS 53931 *14-*15, 2016 WL 1613804 (E.D. Pa. April 22, 2016)(citing *Post v. Mendel,* 510 Pa. 213, 507 A.2d 351, 353 (Pa. 1986); *Stein v. City of Philadelphia,* 2013 U.S. Dist. LEXIS 172172, 2013 WL 6408384, at *6 (E.D. Pa. Dec. 5, 2013) ("Parties in litigation are given an absolute privilege with regard to statements that relate to a judicial proceeding if the communications are preliminary to, instituting, or part of the proceeding.")).

182.    "[I]t is well-settled law that a communication which ascribes to another conduct, character, or a condition that would adversely affect his fitness for the proper conduct of his

{01292774;5}

Case 8:23-cv-00171-CJC-JDE   Document 1   Filed 01/27/23   Page 396 of 1580   Page
ID #:396
Case 2:19-cv-02728-KSM   Document 69   Filed 01/21/21   Page 39 of 61

business, trade, or profession, is defamatory per se.   Where there is any doubt that the

communication disparages or harms the complainant in his business or profession, that doubt

must be resolved in favor of the complainant; even where a plausible innocent interpretation of

the communication exists, if there is an alternative defamatory interpretation, it is for the jury to

determine if the defamatory meaning was understood by the recipient." Pelagatti v. Cohen, 370

Pa. Super. 422, 438-39, 536 A.2d 1337 (Pa. Super. 1987)(internal citations omitted).

183.   Hartleib made several defamatory statements about Plaintiffs to members of the

bench and the bar who were involved in the Sprint Derivative Settlement, to wit:

a.  On March 6, 2017, Hartleib wrote to eleven members of the bar at five

different law firms, as well as Judge Vano's administrative assistant, that

Weiser made "statements to the Appellate Court [which] were

disingenuous at best.  Shocking!" Ex. 12.  Hartleib implied that Weiser

did not honor any "ethical obligation," and accused Weiser of

"attempt[ing] to obfuscate your chicanery in this case," and being one of

"the corrupt parties in this case!" who was threatening "the integrity of the

judicial system . . ." Id.

b.  Also on March 6, 2017, Hartleib contacted the Law Firm's client, Ross-

Williams, the lead plaintiff in the Sprint Derivative Action.   Ex. 13.

Therein Hartleib told Ross-Williams that the Law Firm was a "criminal

enterprise" and was not serving her interests as a Sprint shareholder.

c.  On March 7, 2017, Hartleib e-mailed Ross-Williams, fifteen members of

the bar and Judge Vano's administrative assistant and falsely stated: "you

are a unwitting victim of [the Law Firm's] fraud committed against the

Case 8:23-cv-00171-CJC-JDE   Document 1   Filed 01/27/23   Page 397 of 1580   Page
Case 2:19-cv-02728-KSM   Document 697   Filed 01/21/21   Page 40 of 61
ID #:397

Court. As we discussed they have submitted millions of dollars in
fraudulent billing in your case. As I informed you that this was not  just
my opinion, the Judge in your case came to a similar conclusion. In fact,
your attorneys have now admitted to at least 1.6 million dollars in
fraudulent bills submitted to the Court. Mr. Weiser has confirmed this in
two separate letters. (See attached).  I am no expert, but when a Firm
admits criminal acts in a case I believe they are obligated to notify you as
the Plaintiff. Mr. Weiser and his Firm have already contacted their Bar
associations and other Courts to self-report their criminal acts. . . they are
in a lot of trouble . . . I will provide incontrovertible proof that Mr. Weiser
et. al. is just as guilty as Mr. Silow. This is just the tip of the iceberg." Ex.
14.

d. In a second March 7, 2017 e-mail to fifteen members of the bar and Judge
Vano's administrative assistant, Hartleib accused Weiser of making "self-
serving misrepresentations" in correspondence, of "fail[ing] to provide"
documents to his client; of committing "fraudulent acts and bastardization
[sic] of the judicial system," of "coercing your 'client' to misstate facts,"
of having "little credibility," of making a "not so vailed [sic] threat" to
reserve Ross-Williams' rights, and of needing to "consult with an ethics
attorney, that's right you already have!" Ex. 14.

e. After Hartleib tipped *The Wall Street Journal* about the Law Firm's
victimization by Silow and Abelson, Hartleib e-mailed eleven members of

Case 8:23-cv-00171-CJC-JDE    Document 1    Filed 01/27/23    Page 398 of 1580    Page
ID#:598
Case 2:19-cv-02728-KSM    Document 59    Filed 01/21/21    Page 41 of 61

the bar and Judge Vano's assistant regarding Weiser: "What an embarrassment to the bar!  See you in Court."  Ex. 16.

f.  In an April 7, 2018 e-mail to Weiser and eight other members of the bar, Hartleib accused Weiser of "attempt[ing] to mislead the Appellate Court with incomplete records," of making "personal attacks [that] smack of desperation," and of making "ill-advised actions, [sic] and ad-hominem attacks [which] are making the Weiser Firm radioactive!"  Ex. 15.

g.  On May 19, 2018, Hartleib admitted in writing in an e-mail to numerous attorneys that he intended to make false allegations against the Law Firm, stating: "Plaintiff Counsel, and I use this term loosely, when making false allegations against a party I would suggest you at least get it right. I am no expert, but I am pretty sure it would be libelous! I will demonstrate its proper use posthaste!"  Ex. 18.

h.  On June 2, 2018, Hartleib sent an e-mail to a host of members of the bar in which he referred to the Law Firm's work in the Sprint Derivative Action as "fraud" and "the very definition of [r]acketeering."  Ex. 19.  Hartleib implied that the Law Firm's "standard operating procedure" is "to submit millions in fraudulent fee requests upon the Court" which "prevents a troubling pattern of fraud and corruption in these lawyer-driven cases." Id.

i.  Finally, in a March 14, 2019 e-mail to Judge Vano's chambers, Hartleib asked Judge Vano to interject himself into the Centurylink Derivative Action in opposition to the Law Firm's role in the support structure of

proposed (and ultimately approved) lead counsel Bragar, Eagle & Squire, P.C. ("Maybe Judge Vano would be interested in setting the record straight before the Court appoints lead counsel in the aforementioned case."); and accused the Law Firm and Weiser of "sinister" behavior in an "elaborate scheme" involving "the use of LLC shell corporations set up for the sole purpose of soliciting information under false pretenses to facilitate lawyer driven Qui Tam cases." Ex. 28.

184.    Hartleib also made defamatory statements about Plaintiffs to members of the bench and bar outside of the Sprint Derivative Settlement context, for example:

a.    On April 25, 2017, Hartleib mailed a letter to sitting members of the Court of Common Pleas of Chester County, Pennsylvania – where the Law Firm is located – about Weiser and the Law Firm, stating that Judge Vano "caught the firm in the act" of falsifying their billings in the Sprint Derivative Settlement, and implying that Weiser was a profane bully and incompetent lawyer and firm manager.  Ex. 17.

b.    On August 24, 2018, Hartleib e-mailed Judge Watson in the Big Lots Derivative Action, even though he was not "a shareholder in Big lots or otherwise an interested party in this case" raising "concerns over Weiser's billing practices in [a] prior case and stat[ing] that he wanted to inform the Court so it would scrutinize the fee request in this case."  Ex. 25 p. 11 fn.2.

c.    Similarly, in the Centurylink Derivative Litigation, Hartleib submitted an *amicus curiae* brief on March 5, 2019 opposing the Law Firm's role in the

Case 8:23-cv-00171-CJC-JDE   Document 1   Filed 01/27/23   Page 400 of 1580   Page
Case 2:19-cv-02728-KSM   Document 390   Filed 01/21/21   Page 43 of 61
ID #:400

case, purportedly to "inform the Court of ongoing troubling actions by the Weiser [Firm] . . ." Ex. 26.  Hartleib specifically alleged that the Law firm utilized "deceased parties, friends and family members which [sic] lacked standing, and paid serial criminal Plaintiffs," and "generate thousands of billable hours for illusory work, submit fraudulent time logs and seek hundreds of millions in unjust fees in cases across the country."  Id. According to Hartleib, the Law Firm "would stop at nothing to protect their criminal enterprise . . . Weiser et.al [sic] lied, misleading the court [sic] . . . Weiser et.al. [sic] committed perjury and admitted to billing fraud . . . likely more than 100 million dollars in illicit fees, in a multitude of cases across the country."  Id.

d.  Hartleib appeared at a hearing in the Centurylink Derivative Action on March 6, 2019, stating to the Court and everyone present in the courtroom: "I lay things out that shows [sic] a pattern, a course of conduct over many years . . . I see no meaningful relief or nearly illusory relief and a tremendous amount in attorneys fees . . . And, Your Honor, I know for a fact that the Weiser firm knew who Mr Silow was and that will come out, you know, during the course of litigation . . . These firms, when these firms are up to no good, when they are billing illusory house – you know, if I had 30 minutes with Your Honor in chambers, I could give Your Honor a lot more information . . . The allegations that I make against these firms are very serious allegations."  Ex. 27.

185.    Hartleib also made defamatory statements about Plaintiffs to other third parties

located in Pennsylvania, such as Abelson and Detective Goggins, for example:

      a.   In an e-mail to Abelson on February 22, 2018, Hartleib indicated that he

had "exposed the fraud committed by the Weiser firm" and that the

alleged actions of the Firm were "unconscionable" and that the Firm had

filed "multiple purjurious [sic] declaration [sic]" to "protect their

duplicitous acts and criminal enterprise. Ex. 36.

      b.   In an e-mail to Feinstein on February 24, 2018, Hartleib stated his interests

in facilitating the "demise of the Weiser Firm" and that "Weiser et.al. [sic]

are corrupt and inept" because a "layperson . . . defeated and humiliated

them" and concluding that, based on his actions, "certain attorneys may

not be practicing law in the future. Ex. 35.

      c.   E-mailing Feinstein again on February 24, 2018, writing that Hartleib

intended to inform "the court of his criminal acts in the Sprint case [and]

ongoing Pa Bar investigation" and that the Firm was "unfit to be lead

Counsel [sic] in any representative suit[.]" Ex. 37.

      d.   In contacting Detective Goggin, Hartleib stated that the Law Firm "knew

of Mr. Silow [sic] fraud and conspiracy[,]" that "Weiser [sic] is lying" and

"knew exactly who Silow was[,]" that Hartleib could not "believe that

the[y] can commit perjury and try to defraud the court and Sprint and walk

away[,]" and implicitly mischaracterizing the reduction of attorneys' fees

in the Sprint Derivative Action as the product of the frauds baselessly

alleged by Hartleib. Exs. 39, 40, 41, and 42.

186.    Upon information and belief, in each of the eighteen instances detailed hereinabove in which Hartleib made a defamatory statement to multiple third parties about Plaintiffs, the third parties hearing or reading the statement(s) understood the nature of those statements as disparaging Plaintiffs with respect to the practice of law.  Therefore, they constitute defamation *per se.*

187.    None of these defamatory statements could be excused by judicial privilege, as none were relevant to the "relief sought" by Hartleib as a Sprint shareholder in the derivative case brought on behalf of Sprint.

188.    The effect of Hartleib's defamatory statements to third parties has been to injure Plaintiffs' business and professional reputations.

189.    Plaintiffs have been compelled to defend and repair their professional reputations against Hartleib's baseless allegations.

WHEREFORE, Plaintiffs Robert Weiser and The Weiser Law Firm, P.C. demand judgment in their favor and against Michael Hartleib in an amount to be determined at trial for damages due to defamation, and respectfully request that this Honorable Court grant them such other relief that the Court deems appropriate under the circumstances.

### Count II – Intentional Infliction of Emotional Distress

190.    Plaintiffs repeat and reassert each of the previous paragraphs as though the same were set forth herein.

191.    "One who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress, and if bodily harm to the other results from it, for such bodily harm." *Hoy v. Angelone,* 554 Pa. 134,

150-151, 720 A.2d 745 (Pa. 1998)(citing and quoting Restatement (Second) of Torts § 46(1) (1965)).

192. To establish a claim for intentional infliction of emotional distress, a plaintiff must show that the defendant's conduct was "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized society." *Hoy,* 720 A.2d at 754 (internal citations omitted).

193. Hartleib's insults, jeers, slurs, taunts, lies, affronts and abuses aimed at Weiser and at the Law Firm that he founded and operates with his spouse, and broadcast to judges and colleagues and to the legal community at large via publicly-available pleadings and to the international population via *The Wall Street Journal*'s article are indecent, dishonest, outrageous, malicious, atrocious and should not be tolerated by this Honorable Court.

194. Hartleib's conduct as described hereinabove has intentionally caused Weiser to suffer enormous stress, anxiety, sleep deprivation, depression, anger and torment.

WHEREFORE, Plaintiff Robert Weiser demands judgment in his favor and against Michael Hartleib in an amount to be determined at trial for damages from intentional infliction of emotional distress, and respectfully request that this Honorable Court grant him such other relief that the Court deems appropriate under the circumstances.

## Count III – Commercial Disparagement

195. Plaintiffs repeat and reassert each of the previous paragraphs as though the same were set forth herein.

196. Hartleib viciously leveled false claims directed at the legal services provided by Weiser and the Law Firm, disparaging both their quality and the ethics of Plaintiffs' practice.

{01292774;5}

197.    "Regardless of the label, the publication of a disparaging statement concerning the business of another is actionable where: (1) the statement is false; (2) the publisher intends the publication to cause pecuniary loss or reasonably should recognize that publication will result in pecuniary loss; (3) pecuniary loss does in fact result; and (4) the publisher either knows that the statement is false or acts in reckless disregard of its truth or falsity." *Neurotron Inc. v. Med. Serv. Ass'n of Pa.*, 254 F.3d 444, 448 (3d Cir. 2001) (quoting *Pro Golf Manufacturing, Inc. v. Tribune Review Newspaper Company*, 2000 Pa Super 273, 761 A.2d 553 (2000) (internal citations omitted)).

198.    Hartleib, through his false and disparaging statements regarding events in the Sprint Derivative Litigation and the demonstrably false characterizations thereof, commercially disparaged Weiser and the Law Firm, to wit:

   a.   On March 6, 2017, Hartleib wrote to eleven members of the bar at five different law firms, as well as Judge Vano's administrative assistant, that Weiser made "statements to the Appellate Court [which] were disingenuous at best.  Shocking!"  Ex. 12.  Hartleib implied that Weiser did not honor any "ethical obligation," and accused Weiser of "attempt[ing] to obfuscate your chicanery in this case," and being one of "the corrupt parties in this case!" who was threatening "the integrity of the judicial system . . ." Id.

   b.   Also on March 6, 2017, Hartleib contacted the Law Firm's client, Ross-Williams, the lead plaintiff in the Sprint Derivative Action.  Ex. 13.  Therein Hartleib told Ross-Williams that the Law Firm was a "criminal enterprise" and was not serving her interests as a Sprint shareholder.

c.  On March 7, 2017, Hartleib e-mailed Ross-Williams, fifteen members of
the bar and Judge Vano's administrative assistant and falsely stated: "you
are a unwitting victim of [the Law Firm's] fraud committed against the
Court. As we discussed they have submitted millions of dollars in
fraudulent billing in your case. As I informed you that this was not  just
my opinion, the Judge in your case came to a similar conclusion. In fact,
your attorneys have now admitted to at least 1.6 million dollars in
fraudulent bills submitted to the Court. Mr. Weiser has confirmed this in
two separate letters. (See attached).  I am no expert, but when a Firm
admits criminal acts in a case I believe they are obligated to notify you as
the Plaintiff. Mr. Weiser and his Firm have already contacted their Bar
associations and other Courts to self-report their criminal acts. . . they are
in a lot of trouble . . . I will provide incontrovertible proof that Mr. Weiser
et. al. is just as guilty as Mr. Silow. This is just the tip of the iceberg." Ex.
14.

d.  In a second March 7, 2017 e-mail to fifteen members of the bar and Judge
Vano's administrative assistant, Hartleib accused Weiser of making "self-
serving misrepresentations" in correspondence, of "fail[ing] to provide"
documents to his client; of committing "fraudulent acts and bastardization
[sic] of the judicial system," of "coercing your 'client' to misstate facts,"
of having "little credibility," of making a "not so vailed [sic] threat" to
reserve Ross-Williams' rights, and of needing to "consult with an ethics
attorney, that's right you already have!" Ex. 14.

Case 8:23-cv-00171-CJC-JDE   Document 1   Filed 01/27/23   Page 406 of 1580   Page
ID #:406
Case 2:19-cv-02728-KSM   Document 80   Filed 01/21/21   Page 49 of 61

e.  After Hartleib tipped *The Wall Street Journal* about the Law Firm's
victimization by Silow and Abelson, Hartleib e-mailed eleven members of
the bar and Judge Vano's assistant regarding Weiser: "What an
embarrassment to the bar!  See you in Court."  Ex. 16.

f.  In an April 7, 2018 e-mail to Weiser and eight other members of the bar,
Hartleib accused Weiser of "attempt[ing] to mislead the Appellate Court
with incomplete records," of making "personal attacks [that] smack of
desperation," and of making "ill-advised actions, [sic] and ad-hominem
attacks [which] are making the Weiser Firm radioactive!"  Ex. 15.

g.  On May 19, 2018, Hartleib admitted in writing in an e-mail to numerous
attorneys that he intended to make false allegations against the Law Firm,
stating: "Plaintiff Counsel, and I use this term loosely, when making false
allegations against a party I would suggest you at least get it right. I am no
expert, but I am pretty sure it would be libelous! I will demonstrate its
proper use posthaste!"  Ex. 18.

h.  On June 2, 2018, Hartleib sent an e-mail to a host of members of the bar in
which he referred to the Law Firm's work in the Sprint Derivative Action
as "fraud" and "the very definition of [r]acketeering."  Ex. 19.  Hartleib
implied that the Law Firm's "standard operating procedure" is "to submit
millions in fraudulent fee requests upon the Court" which "prevents a
troubling pattern of fraud and corruption in these lawyer-driven cases."
Id.

    i.    Finally, in a March 14, 2019 e-mail to Judge Vano's chambers, Hartleib asked Judge Vano to interject himself into the Centurylink Derivative Action in opposition to the Law Firm's role in the support structure of proposed (and ultimately approved) lead counsel Bragar, Eagle & Squire, P.C. ("Maybe Judge Vano would be interested in setting the record straight before the Court appoints lead counsel in the aforementioned case."); and accused the Law Firm and Weiser of "sinister" behavior in an "elaborate scheme" involving "the use of LLC shell corporations set up for the sole purpose of soliciting information under false pretenses to facilitate lawyer driven Qui Tam cases." Ex. 28.

199.    Hartleib also made disparaging statements regarding events outside the Sprint Derivative Litigation, for example:

    a.    On April 25, 2017, Hartleib mailed a letter to sitting members of the Court of Common Pleas of Chester County, Pennsylvania – where the Law Firm is located – about Weiser and the Law Firm, stating that Judge Vano "caught the firm in the act" of falsifying their billings in the Sprint Derivative Settlement, and implying that Weiser was a profane bully and incompetent lawyer and firm manager. Ex. 17.

    b.    On August 24, 2018, Hartleib e-mailed Judge Watson in the Big Lots Derivative Action, even though he was not "a shareholder in Big lots or otherwise an interested party in this case" raising "concerns over Weiser's billing practices in [a] prior case and stat[ing] that he wanted to inform the

Case 8:23-cv-00171-CJC-JDE    Document 1    Filed 01/27/23    Page 408 of 1580    Page
Case 2:19-cv-02728-KSM    Document 398    Filed 01/21/21    Page 51 of 61
ID #:408

Court so it would scrutinize the fee request in this case."  Ex. 25 p. 11

fn.2.

c.  Similarly, in the Centurylink Derivative Litigation, Hartleib submitted an

*amicus curiae* brief on March 5, 2019 opposing the Law Firm's role in the

case, purportedly to "inform the Court of ongoing troubling actions by the

Weiser [Firm] . . ." Ex. 26.  Hartleib specifically alleged that the Law firm

utilized "deceased parties, friends and family members which [sic] lacked

standing, and paid serial criminal Plaintiffs," and "generate thousands of

billable hours for illusory work, submit fraudulent time logs and seek

hundreds of millions in unjust fees in cases across the country."    Id.

According to Hartleib, the Law Firm "would stop at nothing to protect

their criminal enterprise . . . Weiser et.al [sic] lied, misleading the court

[sic] . . . Weiser et.al. [sic] committed perjury and admitted to billing fraud

. . . likely more than 100 million dollars in illicit fees, in a multitude of

cases across the country." Id.

d.  Hartleib appeared at a hearing in the Centurylink Derivative Action on

March 6, 2019, stating to the Court and everyone present in the courtroom:

"I lay things out that shows [sic] a pattern, a course of conduct over many

years . . . I see no meaningful relief or nearly illusory relief and a

tremendous amount in attorneys fees . . . And, Your Honor, I know for a

fact that the Weiser firm knew who Mr, Silow was and that will come out,

you know, during the course of litigation . . . These firms, when these

firms are up to no good, when they are billing illusory house – you know,

if I had 30 minutes with Your Honor in chambers, I could give Your

Honor a lot more information . . . The allegations that I make against these

firms are very serious allegations."  Ex. 27.

200.    Hartleib also made disparaging statements about Plaintiffs and their services to

other third parties located in Pennsylvania, such as Abelson and Detective Goggins, for example:

    a.  In an e-mail to Abelson on February 22, 2018, Hartleib indicated that he

        had "exposed the fraud committed by the Weiser firm" and that the

        alleged actions of the Law Firm were "unconscionable" and that the Firm

        had filed "multiple purjurious [sic] declaration [sic]" to "protect their

        duplicitous acts and criminal enterprise. Ex. 36.

    b.  In an e-mail to Feinstein on February 24, 2018, Hartleib stated his interests

        in facilitating the "demise of the Weiser Firm" and that "Weiser et.al. [sic]

        are corrupt and inept" because a "layperson . . . defeated and humiliated

        them" and concluding that, based on his actions, "certain attorneys may

        not be practicing law in the future. Ex. 35.

    c.  E-mailing Feinstein again on February 24, 2018, writing that Hartleib

        intended to inform "the court of his criminal acts in the Sprint case [and]

        ongoing Pa Bar investigation" and that the Law Firm was "unfit to be lead

        Counsel [sic] in any representative suit[.]" Ex. 37.

    d.  In contacting Detective Goggin, Hartleib stated that the Law Firm "knew

        of Mr. Silow [sic] fraud and conspiracy[,]" that "Weiser [sic] is lying" and

        "knew exactly who Silow was[,]" that Hartleib could not "believe that

        the[y] can commit perjury and try to defraud the court and Sprint and walk

away[,]" and implicitly mischaracterizing the reduction of attorneys' fees in the Sprint Derivative Action as the product of the frauds baselessly alleged by Hartleib. Exs. 39, 40, 41, and 42.

201.    None of these disparaging statements could be excused by judicial privilege, as none were relevant to the "relief sought" by Hartleib as a Sprint shareholder in the derivative case brought on behalf of Sprint.

202.    The effect of Hartleib's disparaging statements to third parties has been to injure Plaintiffs' business and professional reputations – Hartleib specifically targeted the services provided by Plaintiffs, characterizing the Law Firm and Weiser as "incompetent" and that the Weiser was running the firm as a "criminal enterprise[.]" *See* Exs. 13 & 17.

203.    The statements and characterizations made by Hartleib regarding the services of the Law Firm and Weiser are categorically false.

204.    Hartleib, appreciating the falsity of his characterizations, published them anyway with the intention of causing harm to the Law Firm and to Weiser.

205.    As a result of Hartleib's actions, Plaintiffs have suffered pecuniary loss through the loss of referrals and reduced prestige among the derivative action bar, a critical component for a successful derivative litigation practice.

206.    Upon information and belief, Plaintiffs are less likely to be selected to be lead counsel in derivative actions, less likely to be included in the support structures in such litigations, and less likely to be retained overall.

207.    Furthermore, Plaintiffs have been damaged insofar as they are compelled to defend and repair their professional reputations against Hartleib's baseless allegations.

208.    Hartleib acted in complete and utter reckless disregard for the falsity of his statements against Plaintiffs – characterizing an attorney as an incompetent individual who committed frauds upon the court, who failed to adhere to ethics standards, who operated a criminal enterprise are serious accusations in the legal profession.

WHEREFORE, Plaintiffs Robert Weiser and The Weiser Law Firm, P.C. demand judgment in their favor and against Michael Hartleib in an amount to be determined at trial for damages from commercial disparagement, and respectfully request that this Honorable Court grant them such other relief that the Court deems appropriate under the circumstances.

### Count IV – False Light

209.    Plaintiffs repeat and reassert each of the previous paragraphs as though the same were set forth herein.

210.    Hartleib deliberately and misleadingly published certain material regarding Weiser containing outright false statements in order to cast a negative light upon Weiser's professional reputation.

211.    "One who gives publicity to a matter concerning another that places the other before the public in a false light is subject to liability to the other for invasion of his privacy, if (a) the false light in which the other was placed would be highly offensive to a  reasonable person, and (b) the actor had knowledge of or acted in reckless disregard as to the falsity of the publicized matter and the false light in which the other would be placed. Unlike the law of defamation, false light invasion of privacy offers redress not merely for the publication of matters that are provably false, but also for those that, although true, are selectively publicized in a manner creating a false impression." *Meyers v. Certified Guar. Co., LLC*, 2019 PA Super 316, 221 A.3d 662, 674 (Pa. Super. 2019) (citations omitted).

Case 8:23-cv-00171-CJC-JDE    Document 1    Filed 01/27/23    Page 412 of 1580    Page
Case 2:19-cv-02728-KSM    Document 89-2 Filed 01/21/21    Page 55 of 61
ID #:412

212.    Hartleib, through his selective references to events in the Sprint Derivative Litigation and incendiary characterizations thereof, cast false light on Weiser, to wit:

a.    On March 6, 2017, Hartleib wrote to eleven members of the bar at five different law firms, as well as Judge Vano's administrative assistant, that Weiser made "statements to the Appellate Court [which] were disingenuous at best. Shocking!" Ex. 12. Hartleib implied that Weiser did not honor any "ethical obligation," and accused Weiser of "attempt[ing] to obfuscate your chicanery in this case," and being one of "the corrupt parties in this case!" who was threatening "the integrity of the judicial system . . ." Id.

b.    Also on March 6, 2017, Hartleib contacted the Law Firm's client, Ross-Williams, the lead plaintiff in the Sprint Derivative Action. Ex. 13. Therein Hartleib told Ross-Williams that the Law Firm was a "criminal enterprise" and was not serving her interests as a Sprint shareholder.

c.    On March 7, 2017, Hartleib e-mailed Ross-Williams, fifteen members of the bar and Judge Vano's administrative assistant and falsely stated: "you are a unwitting victim of [the Law Firm's] fraud committed against the Court. As we discussed they have submitted millions of dollars in fraudulent billing in your case. As I informed you that this was not just my opinion, the Judge in your case came to a similar conclusion. In fact, your attorneys have now admitted to at least 1.6 million dollars in fraudulent bills submitted to the Court. Mr. Weiser has confirmed this in two separate letters. (See attached). I am no expert, but when a Firm

admits criminal acts in a case I believe they are obligated to notify you as the Plaintiff. Mr. Weiser and his Firm have already contacted their Bar associations and other Courts to self-report their criminal acts. . . they are in a lot of trouble . . . I will provide incontrovertible proof that Mr. Weiser et. al. is just as guilty as Mr. Silow. This is just the tip of the iceberg." Ex. 14.

d.  In a second March 7, 2017 e-mail to fifteen members of the bar and Judge Vano's administrative assistant, Hartleib accused Weiser of making "self-serving misrepresentations" in correspondence, of "fail[ing] to provide" documents to his client; of committing "fraudulent acts and bastardization [sic] of the judicial system," of "coercing your 'client' to misstate facts," of having "little credibility," of making a "not so vailed [sic] threat" to reserve Ross-Williams' rights, and of needing to "consult with an ethics attorney, that's right you already have!" Ex. 14.

e.  After Hartleib tipped *The Wall Street Journal* about the Law Firm's victimization by Silow and Abelson, Hartleib e-mailed eleven members of the bar and Judge Vano's assistant regarding Weiser: "What an embarrassment to the bar!  See you in Court." Ex. 16.

f.  In an April 7, 2018 e-mail to Weiser and eight other members of the bar, Hartleib accused Weiser of "attempt[ing] to mislead the Appellate Court with incomplete records," of making "personal attacks [that] smack of desperation," and of making "ill-advised actions, [sic] and ad-hominem attacks [which] are making the Weiser Firm radioactive!" Ex. 15.

g.  On May 19, 2018, Hartleib admitted in writing in an e-mail to numerous attorneys that he intended to make false allegations against the Law Firm, stating: "Plaintiff Counsel, and I use this term loosely, when making false allegations against a party I would suggest you at least get it right. I am no expert, but I am pretty sure it would be libelous! I will demonstrate its proper use posthaste!"  Ex. 18.

h.  On June 2, 2018, Hartleib sent an e-mail to a host of members of the bar in which he referred to the Law Firm's work in the Sprint Derivative Action as "fraud" and "the very definition of [r]acketeering."  Ex. 19.  Hartleib implied that the Law Firm's "standard operating procedure" is "to submit millions in fraudulent fee requests upon the Court" which "prevents a troubling pattern of fraud and corruption in these lawyer-driven cases." Id.

i.  Finally, in a March 14, 2019 e-mail to Judge Vano's chambers, Hartleib asked Judge Vano to interject himself into the Centurylink Derivative Action in opposition to the Law Firm's role in the support structure of proposed (and ultimately approved) lead counsel Bragar, Eagle & Squire, P.C. ("Maybe Judge Vano would be interested in setting the record straight before the Court appoints lead counsel in the aforementioned case."); and accused the Law Firm and Weiser of "sinister" behavior in an "elaborate scheme" involving "the use of LLC shell corporations set up for the sole purpose of soliciting information under false pretenses to facilitate lawyer driven Qui Tam cases."  Ex. 28.

213.    Hartleib also cast false light on Weiser outside of the Sprint Derivative Settlement

context, selectively and inaccurately detailing events in various litigations and leveling insidious

mischaracterizations thereof, for example:

   a.    On April 25, 2017, Hartleib mailed a letter to sitting members of the Court

         of Common Pleas of Chester County, Pennsylvania – where the Law Firm

         is located – about Weiser and the Law Firm, stating that Judge Vano

         "caught the firm in the act" of falsifying their billings in the Sprint

         Derivative Settlement, and implying that Weiser was a profane bully and

         incompetent lawyer and firm manager.  Ex. 17.

   b.    On August 24, 2018, Hartleib e-mailed Judge Watson in the Big Lots

         Derivative Action, even though he was not "a shareholder in Big lots or

         otherwise an interested party in this case" raising "concerns over Weiser's

         billing practices in [a] prior case and stat[ing] that he wanted to inform the

         Court so it would scrutinize the fee request in this case."  Ex. 25 p. 11

         fn.2.

   c.    Similarly, in the Centurylink Derivative Litigation, Hartleib submitted an

         *amicus curiae* brief on March 5, 2019 opposing the Law Firm's role in the

         case, purportedly to "inform the Court of ongoing troubling actions by the

         Weiser [Firm] . . ."  Ex. 26.  Hartleib specifically alleged that the Law firm

         utilized "deceased parties, friends and family members which [sic] lacked

         standing, and paid serial criminal Plaintiffs," and "generate thousands of

         billable hours for illusory work, submit fraudulent time logs and seek

         hundreds of millions in unjust fees in cases across the country."    <u>Id</u>.

According to Hartleib, the Law Firm "would stop at nothing to protect their criminal enterprise . . . Weiser et.al [sic] lied, misleading the court [sic] . . . Weiser et.al. [sic] committed perjury and admitted to billing fraud . . . likely more than 100 million dollars in illicit fees, in a multitude of cases across the country." Id.

d. Hartleib appeared at a hearing in the Centurylink Derivative Action on March 6, 2019, stating to the Court and everyone present in the courtroom: "I lay things out that shows [sic] a pattern, a course of conduct over many years . . . I see no meaningful relief or nearly illusory relief and a tremendous amount in attorneys fees . . . And, Your Honor, I know for a fact that the Weiser firm knew who Mr, Silow was and that will come out, you know, during the course of litigation . . . These firms, when these firms are up to no good, when they are billing illusory house – you know, if I had 30 minutes with Your Honor in chambers, I could give Your Honor a lot more information . . . The allegations that I make against these firms are very serious allegations." Ex. 27.

214.   Hartleib also publicized and misrepresented matters related to Weiser, while simultaneously publishing defamatory falsities, to other third parties located in Pennsylvania, such as Abelson and Detective Goggins, for example:

a. In an e-mail to Abelson on February 22, 2018, Hartleib indicated that he had "exposed the fraud committed by the Weiser firm" and that the alleged actions of the Firm were "unconscionable" and that the Law Firm

had filed "multiple purjurious [sic] declaration [sic]" to "protect their duplicitous acts and criminal enterprise. Ex. 36.

b.  In an e-mail to Feinstein on February 24, 2018, Hartleib stated his interests in facilitating the "demise of the Weiser Firm" and that "Weiser et.al. [sic] are corrupt and inept" because a "layperson . . . defeated and humiliated them" and concluding that, based on his actions, "certain attorneys may not be practicing law in the future. Ex. 35.

c.  E-mailing Feinstein again on February 24, 2018, writing that Hartleib intended to inform "the court of his criminal acts in the Sprint case [and] ongoing Pa Bar investigation" and that the Law Firm was "unfit to be lead Counsel [sic] in any representative suit[.]" Ex. 37.

d.  In contacting Detective Goggin, Hartleib stated that the Law Firm "knew of Mr. Silow [sic] fraud and conspiracy[,]" that "Weiser [sic] is lying" and "knew exactly who Silow was[,]" that Hartleib could not "believe that the[y] can commit perjury and try to defraud the court and Sprint and walk away[,]" and implicitly mischaracterizing the reduction of attorneys' fees in the Sprint Derivative Action as the product of the frauds baselessly alleged by Hartleib. Exs. 39, 40, 41, and 42.

215.   None of these misleading publications is excused by judicial privilege, as none were relevant to the "relief sought" by Hartleib as a Sprint shareholder in the derivative case brought on behalf of Sprint.

216.   Through Hartleib's selective and incendiary characterization of events surrounding the Sprint Derivative Settlement and various other litigations, Hartleib has

deliberately cast Weiser as unethical attorney operating a criminal enterprise law practice that takes advantage of its clients.

217.    Hartleib's objective in selectively publicizing mischaracterizations was to create a false negative impression of Weiser to the bench, bar, law enforcement and the general public, and thereby to harm Weiser.

218.    Indeed, Hartleib engaged in a campaign of publicizing negative matters regarding Weiser, while contemporaneously publishing outright falsities about Weiser, in such a manner as to create a false negative impression of Weiser.

219.    Hartleib acted in complete and utter reckless disregard for the falsity of his publicized statements.

WHEREFORE, Plaintiff Robert Weiser demands judgment in his favor and against Michael Hartleib in an amount to be determined at trial for damages from false light, and respectfully request that this Honorable Court grant him such other relief that the Court deems appropriate under the circumstances.

Respectfully submitted,

**SILVERANG, ROSENZWEIG
& HALTZMAN, LLC**

By:    /s/ Philip S. Rosenzweig
Philip S. Rosenzweig, Esquire
Attorney I.D. No. 62461
Woodlands Center
900 E. 8th Avenue, Suite 300
King of Prussia, PA 19406
(phone) 610-263-0115
(fax) 610-263-0122
*Attorneys for Plaintiffs*
*The Weiser Law Firm, P.C. and*
*Robert B. Weiser, Esquire*

{01292774;5}

61
EXHIBIT 35
418

# EXHIBIT 1

EXHIBIT 35
419

**Robert Weiser**

| | |
|---|---|
| **From:** | bgm@brucemurphy.biz |
| **Sent:** | Tuesday, November 25, 2008 5:59 PM |
| **To:** | Robert Weiser |
| **Subject:** | Fw: Sprint Nextel |

Rob,

In February Sprint confirmed a staggering $29.7 billion writedown in the book value of its assets, wiping out nearly all of the value of its $35 billion merger with Nextel. And dividend payments were suspended "for the foreseeable future." To top it off, Sprint announced it has borrowed $2.5 billion from its revolving credit facility to help pay off $2.25 billion in bonds that will mature in 2008 and 2009.

Do you see a der here?

Bruce

--- On **Tue, 11/25/08, Michael Hartleib <_michaelhartleib@cox.net_>** wrote:

From: Michael Hartleib <michaelhartleib@cox.net>
Subject: Sprint Nextel
To: bgm@brucemurphy.biz
Date: Tuesday, November 25, 2008, 4:57 PM

Bruce,

I own over 10,000 shares of Sprint and held Nextel before the merger. I believe I have owned the shares since 1999 or 2000 .This was the worst merger integration in history as management eventually had to write down $31billion of a $32billion deal.  They failed to properly merge and integrate the two different technologies of their networks, one being CDMA for Sprint, the other being TDMA for Nextel. Their attempts to do so have destroyed two perfectly good companies and driven Sprint shareprice down from $30 to $1.50.

1

EXHIBIT 35
420

# EXHIBIT 2

EXHIBIT 35
421

**Robert Weiser**

| | |
|---|---|
| **From:** | Robert Weiser |
| **Sent:** | Friday, March 27, 2009 7:21 AM |
| **To:** | Bruce Murphy |
| **Subject:** | Re: RE: Derivative_Retention Letter  S   MHartleib |

I think he has a potential conflict in light of the other litigation he's involved in. Thus, I don't think he would make an adequate representative for sprint.

Rob

Sent from my Verizon Wireless BlackBerry

**From:** "bgm@brucemurphy.biz"
**Date:** Fri, 27 Mar 2009 04:33:59 -0400
**To:** Michael Hartleib<michaelhartleib@cox.net>
**Subject:** RE: RE: Derivative_Retention Letter S MHartleib
Michael,
I am working on something else right now. I will try to get back with you tomorrow, or over the weekend.
Bruce

--- On **Thu, 3/26/09, Michael Hartleib <*michaelhartleib@cox.net*>** wrote:
From: Michael Hartleib <michaelhartleib@cox.net>
Subject: RE: RE: Derivative_Retention Letter S MHartleib
To: bgm@brucemurphy.biz
Date: Thursday, March 26, 2009, 10:29 PM

call me 949-283-2441

**From:** bgm@brucemurphy.biz [mailto:bgm@brucemurphy.biz]
**Sent:** Monday, March 23, 2009 8:59 AM
**To:** Michael Hartleib
**Cc:** rob weiser
**Subject:** Fw: RE: Derivative_Retention Letter S MHartleib

Michael,
Can you get this back to me this am, your time?
Bruce

--- On **Sun, 3/22/09, bgm@brucemurphy.biz <*bgm@brucemurphy.biz*>** wrote:
From: bgm@brucemurphy.biz <bgm@brucemurphy.biz>
Subject: RE: Derivative_Retention Letter S MHartleib
To: "Michael Hartleib" <michaelhartleib@cox.net>
Cc: "rob weiser" <rw@weiserlawfirm.com>
Date: Sunday, March 22, 2009, 9:53 PM

1

EXHIBIT 35

Michael,
I sent your revised retention letter to my co-counsel, Rob Weiser, for his review and comment. We are fine with your changes. We mostly just amplified and clarified the points you made. Yes, we do work 24/7.
Please review, sign and fax to 772-231-4804.
Thanks.
Bruce

--- On **Fri, 3/20/09, Michael Hartleib** <*michaelhartleib@cox.net*> wrote:

From: Michael Hartleib <michaelhartleib@cox.net>
Subject: Derivative_Retention Letter S MHartleib
To: bgm@brucemurphy.biz
Date: Friday, March 20, 2009, 11:50 PM

Bruce, I am faxing the signed copy over now

2

EXHIBIT 35
423

# EXHIBIT 3

EXHIBIT 35
424

**Robert Weiser**

| | |
|---|---|
| **From:** | bgm@brucemurphy.biz |
| **Sent:** | Friday, March 27, 2009 9:55 AM |
| **To:** | Michael Hartleib |
| **Cc:** | Robert Weiser |
| **Subject:** | Sprint.der |

Good morning, Michael:

Rob Weiser and I have conferred and thought about the motion to appoint the Sprint Derivative Action Representative. We believe you may have a potential conflict in light of the other litigation in which you are involved. Defense counsel can be expected to object to you serving as the Representative on the grounds of adequacy.

Therefore, we will not be able to file the Sprint derivative suit in your name.

We appreciate the opportunity you gave us to look into this matter for you.

Bruce

---

**From:** "bgm@brucemurphy.biz"
**Date:** Fri, 27 Mar 2009 04:33:59 -0400
**To:** Michael Hartleib<michaelhartleib@cox.net>
**Subject:** RE: RE: Derivative_Retention Letter S MHartleib

Michael,

I am working on something else right now. I will try to get back with you tomorrow, or over the weekend.

Bruce

--- On **Thu, 3/26/09, Michael Hartleib** <*michaelhartleib@cox.net*> wrote:
From: Michael Hartleib <michaelhartleib@cox.net>
Subject: RE: RE: Derivative_Retention Letter S MHartleib
To: bgm@brucemurphy.biz
Date: Thursday, March 26, 2009, 10:29 PM

call me    **REDACTED**

---

**From:** bgm@brucemurphy.biz [mailto:bgm@brucemurphy.biz]
**Sent:** Monday, March 23, 2009 8:59 AM
**To:** Michael Hartleib
**Cc:** rob weiser
**Subject:** Fw: RE: Derivative_Retention Letter S MHartleib

Michael,

Can you get this back to me this am, your time?

Bruce

--- On **Sun, 3/22/09, bgm@brucemurphy.biz** <*bgm@brucemurphy.biz*> wrote:
From: bgm@brucemurphy.biz <bgm@brucemurphy.biz>
Subject: RE: Derivative_Retention Letter S MHartleib
To: "Michael Hartleib" <michaelhartleib@cox.net>
Cc: "rob weiser" <rw@weiserlawfirm.com>

1

**EXHIBIT 35**
425

# EXHIBIT 4

EXHIBIT 35
426

05/03/2011  TUE 16:56   FAX                                                        ☑001/021

866 313-5100

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF NEW YORK**

| | |
|---|---|
| SIRIUS XM SATELLITE RADIO INC. ,and BRIAN DAVID GOE, MICHAEL HARTLEIB, and JACK SORGE, DOES 1 THROUGH 47 INCLUSIVE as individuals, Plaintiff, vs. JOAN L. AMBLE, LEON BLACK, LAWRENCE F. GILBERTI, EDDY W. HARTENSTEIN, JAMES P. HOLDEN, CHESTER A. HUBER, MEL KARMAZIN, JOHN MENDEL, JAMES F. MOONEY, GARY M. PARSONS, JOHN C. MALONE, JACK SHAW, GREGORY B. MAFFEI, DAVID FLOWERS and JEFFREY D. ZIENTS, Defendant | Case No.: __650606|11__ **DERIVATIVE AND DIRECT COMPLAINT :** |

NEW YORK
COUNTY CLERK'S OFFICE

MAR - 8 2011

NOT COMPARED
WITH COPY FILE

## COMPLAINT

Plaintiffs Brian David Goe, Michael Hartleib,. and John (JACK) Sorge (herein after referred to as Plaintiffs) Pro Per, submit this Complaint against the defendants named herein.

### I. SUMMARY OF THE ACTION

1.     This is a shareholder action brought by multiple plaintiffs, directly and derivatively, on behalf of Sirius XM Satellite Radio, Inc. ("Sirius XM") against Sirius XM's directors and officers, for their negligence, fraud, breach of fiduciary duties, and self dealing. The mismanagement of Sirius XM has manifested itself in numerous ways.  In 2008, the misconduct of the management resulted in the second largest fine in the history of the Federal Communications Commission ("FCC"), in a consent decree that the FCC approved.  In the same year, the Defendants completed the longest-delayed merger in history, only to learn at the

1

EXHIBIT 35
427

05/03/2011  TUE 16:58   FAX                                                 ☑002/021

"eleventh" hour that Sirius XM was assuming far more debt that had been previously disclosed.

In order to obtain approval of the merger, Defendants made representations to the Department of

Justice and to the FCC and entered into a consent decree with the FCC. Since the time of the

merger, the Defendants have engaged in antitrust misconduct, which has resulted in the actions

in the United States District Court for the Southern District of New York, 1:09-cv-10035-HB-

RLE. The antitrust misconduct resulted at least in part from the Defendants violations of the

representations made to the Department of Justice and the FCC and the consent decree with the

FCC. In addition, the Defendants have engaged in consumer fraud and misconduct to the extent

that nearly every Attorney General in the country is now engaged in an investigation of Sirius

XM. This pattern of misconduct that threatens the on-going existence of Sirius XM has resulted

from the fact that the Officers and Board of Directors has abdicated their responsibilities. An

example of this abdication is that Defendant Leon Black continues to serve on the Board despite

the fact that he did not receive sufficient shareholder votes to serve on the Board and the fact that

he refuses to attend meetings of the Board.

## II. PARTIES

2.     Plaintiff Brian David Goe is an individual and resident of New Jersey, and was an

owner of Sirius and/or XM securities and is now a current owner of Sirius XM securities.

3.     Plaintiff Michael Hartleib is an individual and a resident of California, and was an

owner of Sirius and/or XM securities and is now a current owner of Sirius XM securities.

4.     Plaintiff John Sorge is an individual and a resident of California, and was an

owner of Sirius and/or XM securities and is now a current owner of Sirius XM Securities.

5.     All collectively referred to as Plaintiffs.

2

EXHIBIT 35
428

05/03/2011    TUE 16:57    FAX                                                    ☑003/021

6.    Defendant Sirius XM is a Delaware corporation with its principal place of business at 1221 Avenue of the Americas, 36th Floor, New York, New York. Its successor entity resulting from the merger of Sirius and XM.

7.    Defendant Joan L. Amble ("Amble") is currently a member of the board of directors.

8.    Defendant Leon D. Black ("Black") is a currently a member of the board of directors.

9.    Defendant Lawrence F. Gilberti ("Gilberti") is currently a member of the board of directors.

10.    Defendant Eddy W. Hartenstein ("Hartenstein") is currently a member of    the board of directors.

11.    Defendant James P. Holden ("Holden") is currently a member of the board of directors.

12.    Defendant Chester A. Huber, Jr. ("Huber") is currently a member of the board of directors.

13.    Defendant Mel Karmazin ("Karmazin") is the Chief Executive Officer.

14.    Defendant John Mendel ("Mendel") is currently a member of the board of directors.

15.    Defendant James F. Mooney ("Mooney") is currently a member of the board of directors.

16.    Defendant Gary M. Parsons ("Parsons") is currently Chairmen of the board of directors.

17.    Defendant Jack Shaw ("Shaw") is currently a member of the board of directors.

3

EXHIBIT 35
429

05/03/2011   05:57   FAX                                                           ☑ 004/021

18.     Defendant John C. Malone ("Malone") is currently a member of the board of directors.

19.     Defendant Gregory B. Maffei ("Maffei") is currently a member of the board of directors.

20.     Defendant David J.A. Flowers ("Flowers") is currently a member of the board of directors.

21.     All collectively referred to as Defendants.

### III. JURISDICTION AND VENUE

22.     This Court has jurisdiction over each defendant named herein because each defendant is either a corporation that conducts business in and maintains operations in this State, or is an individual who has sufficient minimum contacts with  so as to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

23.     Venue is proper in this Court because one of more of the defendants conducts business, a substantial portion of the transactions and wrongs complained of herein, including the defendants primary participation in the wrongful acts detailed herein, breaches of fiduciary duties, and defendants have received substantial compensation in this State by doing business here and engaging in numerous activities that had an effect in this State.

### IV. DEMANDS AND FUTILITY

24.   Shareholders have made numerous demands on the Board of Directors, and those demands have steadfastly been denied.  It would be futile to make any further demands on the Board.

25. The demands that have been made on the current and past Board members include the following:

EXHIBIT 35
430

a.  Starting on November 5, 2008, and continuing as recently as September 22, 2010, plaintiff Michael Hartleib made demands that relate to much of the misconduct alleged in this Complaint.

b.  To the extent that the Defendants have responded, they have refused to take any substantive action in response to the demands.

c.  Plaintiff Hartleib has also made demands for books and records, which the Defendants have refused.

26.  It would be futile for any shareholder to make further demand before proceeding with this action.

## FACTS

27.  In addition to ignoring the demands recited above, Sirius XM has been grossly mismanaged by its Board and Officers. It has paid the second largest FCC fine in history. This fine exceeds the previous highest fine by more than two times. It is now under investigation by almost every Attorney General in the country based upon its abusive consumer practices.

28.  The Board and Officers agreed to complete a multi-billion dollar merger without knowing the extent of the debt that it was taking on, and that debt has created huge on-going financial problems for the company. Leon Black continues to sit on the Board even though he received an inadequate number of share votes and refuses to attend Board meetings.

29. In their 2007 proxy report Risk Metrics the nation's largest independent shareholder advisory firm recommended a **"withhold"** vote on Leon Black due to attendance issues. In their 2008 proxy report Risk Metrics recommended a vote **"no"** on Leon Black. Despite repeated "Formal Demands" on the Board, the Nations largest independent shareholder advisory service (Risk Metrics) recommending a "no" vote, and Mr. Black not receiving the required votes, he

EXHIBIT 35

05/03/2011  TUE 16:50  FAX                                                    ☑006/021

continues to serve on the Board. 1.  This is another blatant breech of the Board of Directors fiduciary duties to protect, and represent the interest of their shareholders. This is an example of self-dealing at its worst. Clearly the Board is putting their interest ahead of that of their shareholders, and defying the vote of said shareholders.

*Sirius XM Business*

30. Sirius XM sells subscriptions to its satellite radio service as its main source of business revenues.

31. Satellite radio is a service in which audio programming is digitally transmitted by one or more place stations directly to fixed, mobile, and/or portable receivers. It was licensed by the Federal Communications Commission in 1997 and it became commercially available in 2001. The FCC held an auction to determine which companies would receive the two broadcasting licenses; there were four bidding companies. American Mobile Radio Corporation which was renamed XM Satellite Radio Holdings, Inc. (XM) and CD Radio, Inc. which was renamed Sirius Satellite Radio, Inc. (Sirius) won by bidding respectively $90 and $83 million.

32. Approximately two years after XM and Sirius won their broadcasting licenses they entered merger discussions. This was at a time that Dish and Direct TV tried to merge, but found that the regulatory agencies were not in favor of such Mergers. Sirius and XM called off the Merger negotiations at that time due to the unfavorable regulatory environment. XM's stock reached a high of $40 in December of 2004 and quickly dropped after subscriber growth fell short of their expected 4.8 million subscribers. Without enough subscribers, investors were concerned as to the ability of XM to repay their loans. Sirius was taking market share from XM.

|  | Votes Cast For | Votes Cast Against |
|---|---|---|
| 1. Leon D. Black | 408,528,344 | 458,481,167 |

EXHIBIT 35

and in fact when consumers were given a choice, consumers chose Sirius over XM seven out of ten times.

33. XM and Sirius began merger discussions again in 2006. The companies felt the merger would allow them to: (1) reduce costs through synergies, (2) better compete in the audio entertainment market, (3) provide superior programming, (4) advance technologically, and (5) increase value to shareholders. (6) provide consumers with more diverse programming at lower cost.

34. XM and Sirius officially merged on or about June 29, 2008 becoming Sirius XM Satellite Radio, Inc. Today the shares of the merged entity are trading at approximately $1.15 per share. Due to the malfeasance of the Sirius XM Board, and their failure to procure proper financing, shares of Sirius XM traded near bankruptcy at a mere $ .05 per share post merger. Sirius XM was driven to brink of bankruptcy, despite the Board having nearly 18 months to obtain proper financing. Prior to announcing the merger plans between Sirius and XM, shares of Sirius were trading at $5.65 per share after reaching a high of $9.49. XM shares were trading at $19.00 per share after reaching a high of $40.00.

35. The union of XM and Sirius was one of the longest merger delays in our nation's history. The merger was wrought with controversy beginning with Mel Karmazin initiating negotiations behind closed doors without the board of director's knowledge. Mr. Karmazin negotiated for nearly 18 months prior to notifying his Board of Directors of his unauthorized contact with XM executives. A review of the Proxy Statement filed by Sirius and XM with the Securities Exchange Commission ("SEC") on or about October 3, 2007 was silent as to whether Karmazin had the necessary pre-approval of the Sirius Board of Directors ("The Board") prior to

EXHIBIT 35
433

approaching XM. In fact it wasn't until months later that the negotiations were affirmatively disclosed. This was an egregious breach of fiduciary duty.

36.  Karmazin prevented The Board from being able to fulfill their fiduciary duties by considering other alternatives to the merger, or an independent audit of the true value of Sirius or XM; another egregious breach of their fiduciary duties. Without any other strategic alternatives or an independent audit, Sirius shareholders lacked the ability to make an informed vote on the merger. Sirius entered into a "no solicitation" clause which barred Sirius from soliciting transactions or giving suitors inside information. Sirius went further to prevent other alternative suitors when they agreed to a termination fee clause which would have caused Sirius to pay $175 million in the event Sirius determined the merger was not in the best interest of the company. Sirius would have to pay if the shareholders, the true owners of the company, voted against the deal; Although the termination fee would have been reduced to $58 million.

37.  After the Merger was complete, Sirius acquired approximately 1.25 Billion dollars of XM debt which needed to be refinanced to satisfy provisions demanding repayment when XM became a unit of Sirius XM. Karmazin publicly stated that he was unaware of $600 million dollars of XM's debt until very late in the Merger process. In fact he stated he was unaware of this debt until the "eleventh hour". Karmazin and his Board were forced to issue 300 million shares of company stock to the financers of XM's debt for the sole purpose of being sold short on the open market, providing an arbitrage or hedge position on the bonds they issued.

38.  At the time this was done Sirius stock was on the NASDQ Regulation SHO list for failure to deliver, so there were no shares available to short on the open market. This action alone caused a sudden drop in share price costing the shareholders over one billion dollars in market cap in a period of approximately one week.  It is unclear how such an egregious error and

EXHIBIT 35

Case 8:23-cv-00171-CJC-JDE    Document 1    Filed 01/27/23    Page 435 of 1580    Page
ID #:435
05/03/2011  Case 2:19-cv-02728-KSM    Document 69-4    Filed 01/21/21    Page 10 of 22    ☑009/021

omission could occur, but it is clear that this was another breach of Karmazin and the Boards Duty of Diligence, Candor and Due care.

39.   Karmazin again publicly stated that he was forced to refinance XM's debt under **"ugly"** and **"toxic"** terms, which later resulted in Karmazin and the Board giving away preferred shares convertible to 40% of the outstanding common shares of Sirius XM. This was done without consideration. Mr. Malone became a super majority shareholder, controlling 40% of all vote able shares and six of eleven Board seats, for simply providing a loan.

40.   In obtaining approval for the merger, Sirius XM Board members and there predecessors had made numerous representations and commitments to the regulatory bodies, primarily the Department of Justice and the FCC.   Regulatory approval of the merger was dependent on those representations and commitments including the commitment not to increase charges to consumers for a minimum of three years.

41.   Prior to the completion of the merger, in July of 2008, Sirius XM entered into a consent decree with the FCC where, among other things, Sirius XM agreed to make a "voluntary contribution" known in common language as a fine, in the amount of $17,394,375, the second largest fine in FCC history. Officers and Directors of Sirius XM made other commitments in the consent decree that have not been met or satisfied.

42.   After wasting nearly 18 months, and with the company on the brink of bankruptcy, the Board had failed to procure the needed financing. With hundreds of millions of dollars in debt coming due, the Board began looking for investors. Charles Ergen of Dish was an interested investor. Mr. Ergen had been acquiring millions of dollars of XM debt. Published reports had Mr. Ergen making an offer of up to $1.50 per share. These reports also stated that, Mr. Karmazin and other Officers and Directors would be replaced. In fact Mr. Karmazin's (CEO) predecessor

EXHIBIT 35

Joseph Clayton was now an Officer at Dish. It was rumored that Mr. Clayton would replace Mr. Karmazin as CEO. The Board breeched their fiduciary duties by ignoring all other deals, including the Ergen deal, which would have been beneficial to their shareholders. It appears that this was done so that the Officers and Directors could control their employment destiny and unjustly enrich themselves in the process.

43. Mr. Karmazin has publicly stated the he and Mr. Malone have been friends for many years. On or about February 17, 2009, Liberty Media and Sirius XM entered into an Investment Agreement. Liberty Media provided a loan of $530 million dollars at what some would consider "usurious" interest rates of 15 percent. Mr. Malone was also paid an additional fee of $17,000,000 as a signing bonus. The most outrageous part of this financing agreement was that Mr. John Malone of Liberty Media was given 12,500,000 preferred shares convertible to a 40% ownership stake in Sirius XM. These shares had full voting rights and are convertible to 40% all outstanding common shares. Liberty Media was also granted six of twelve Board seats. These actions combined gave Mr. Malone of Liberty Media complete control of Sirius XM, creating a "super majority" shareholder rendering the "now minority" shareholders moot, without say, or control of their company. Karmazin and his Board of Directors gave Mr. Malone forty percent of Sirius XM without consideration, and complete control, creating a "super majority shareholder" with undue influence over the Board of Directors controlling 6 of 12 Board seats. Thereby, stealing billions of dollars from their shareholders, breaching the fiduciary duties owed them by putting their interest before that of their shareholders.

44. It should be noted that at the first Quarterly report and Conference Call after consummation of the Merger between Sirius and XM, the newly formed corporation wrote down 4.8 billion dollars in "Good Will" charges. This was nearly the entire value of the acquired

10

EXHIBIT 35
436

company XM. Therefore, a mere five months after management completed the acquisition of XM, they wrote down nearly the entire value of said acquisition. This at .64 cents per share. This gave Mr. Malone over six billion dollars in non-operating losses to carry forward. In less than a year, after giving his "friend," Malone forty percent of Sirius XM without consideration, Mr. Karmazin was granted a contract extension by his Board (now controlled by Malone) and 128,000,000 options at .39 cents per share. Mr. Karmazin has gains of approximately *100 million dollars on these options.* This is self-dealing at its worst. All of this despite shareholders losing over 90% of their value, 40% of their company, six Board seats, a 40% dilution of their preemptive/shareholder rights, and lastly their vote.

45.   All of this was done without the rightful owners of Sirius XM the "shareholders" having a say or vote.  In fact, not only did the rightful owners not have a vote, they did not even have a seat at the table. Karmazin and his Board fired Ernst and Young their accounting firm to avoid a "Going Concern Notice", the lack of a "going Concern" was also a requirement of the Malone deal. 2

46.   Ernst and Young failed to exit with a "noisy exit" as required by law. Management then hired KPMG as their accounting firm, presents a financial scenario that includes the Malone deal, which was predicated on the absence of a "Going Concern Notice" and is granted a clean bill of financial health by KPMG.  Mr. James Rhyu Sirius XM's Senior Vice President and Chief

---

2  February 8k 2009 The closing and funding of the XM Credit Agreement is subject to several conditions, including: (i) XM's existing credit agreements being amended to extend the maturity of the loans to a date and on terms reasonably satisfactory to Liberty Media Corporation, (ii) Liberty Media Corporation purchasing assignments of loans outstanding under such existing credit facilities in an aggregate principal amount of up to $100 million, (iii) delivery of a report from our auditors in respect of fiscal year 2008 without any "going concern" or like qualification (or receipt of a waiver from certain lenders), and (iv) issuance of the preferred stock under the Investment Agreement.

EXHIBIT 35

05/03/2011    05:09 FAX    ☑012/021

Accounting Officer made an announcement on December 19, 2008 that he would be resigning his newly appointed position in January 2009. On information and belief, Mr. Rhyu did not want to be a party to accounting fraud; therefore, he left the company. A mere five weeks after receiving a "clean bill of financial health," no going concern from their newly hired auditor, (KPMG) Sirius XM seeks shelter under an exemption to NASDQ Rule 4350i which basically invokes a "Going Concern Notice." According to the audit and report from KPMG Sirius XM was not a going concern, and in good financial health. Five weeks later they claim a going concern and tell the NASD that they are not financially sound and they could not stay in business long enough to give their shareholders a vote on the Malone deal. NASDQ Rule 4350i allows a company to avoid seeking shareholder approval for the issuance of securities that are convertible into 20% or more of the outstanding shares of a NASD listed company.

47. When a company request the exemption to rule 4350i they are required by the NASD and their listing Rules and Regulations to provide written notice to all shareholders within ten days before the issuance of additional securities. This notice is to inform and alert the shareholders that they are about to lose twenty percent or more of their company without their vote of approval. Shareholder approval would otherwise be required. Additionally, the letter must also state that the company's audit committee or comparable body of the board of directors has expressly approved the exemption. On information and belief, Plaintiff Michael Hartleib was the only shareholder that received this required notice. As such, Mr. Karmazin and his Board of Directors willfully, and intentionally violated the very NASDQ Rule they used to give away forty percent of Sirius XM without consideration, as well as complete control with up to six board seats.

EXHIBIT 35
438

48. Despite the stock's abysmal performance and company's dire financial condition, the executives of Sirius XM unbelievably granted themselves hundreds of millions of options as they still believed they deserved a bonus. This is after the shareholders lost more than 95% percent of their value under this management's team so-called leadership.

49. Plaintiff Hartleib submitted a shareholder resolution that would have given shareholders a say on Executive compensation. The Board recommended a no vote on this resolution, even though the largest independent shareholder advisory firm in America, Risk Metrics, recommended a vote in favor of that resolution.

50. Because Malone controlled 40% of the vote and three current Board seats, this resolution was voted down. The minority shareholders have lost all say and/or control over their company.

51. Risk Metrics, the Nation's largest shareholder advisory service company, along with other shareholders were against additional compensation. In fact Sirius XM stock has continuously traded well below the premerger share price. Sirius XM shares are down approximately 75% from pre merger levels. Because of these actions the shareholders and the company, Sirius XM, have suffered damages.

52. After the merger, Sirius XM engaged in practices that violated the commitments it made in obtaining regulatory approval of the merger and in conduct that violates the antitrust laws and the consumer protection laws of practically every state in the country. As a result of the antitrust misconduct, Sirius XM faces expensive and potentially devastating antitrust litigation pending in the Southern District of New York.

53. As a result of the violations of the consumer protection laws, Sirius XM is now under investigation by nearly every Attorney General in the Country. The Attorneys General are

EXHIBIT 35
439

investigating Sirius XM's policies on billing, customer solicitation, violating no call list, and subscription cancellations and renewals.

54. The misconduct that has resulted in the litigation and investigation not only costs Sirius XM millions of dollars in legal expenses but also has created a serious danger to the survival of Sirius XM.

55. Despite demands to the contrary, Defendants have ignored their obligations to shareholders in other ways. For example, they have allowed defendant Leon Black to continue to serve on the Board of Directors despite the fact that he did not receive adequate shareholder votes and despite the fact that he has so ignored his duties that he has regularly refused to attend meetings of the Board.

## V. CAUSES OF ACTION

### COUNT ONE: NEGLIGENCE

56. Plaintiffs incorporate by reference all prior paragraphs as if fully set forth herein.

57. Defendants owed a legal duty to the plaintiffs to use ordinary care in managing the corporation's affairs. Because of their positions as directors, officers, and/or fiduciaries of the Company and because of their ability to control the business, corporate and financial affairs of the Company, each defendant owed the Company and its shareholders a duty to use ordinary care and diligence in the management and administration of the affairs of the Company.

58. Defendants breached their duty by merging with XM and not being fully aware of XM's total debt. As well as, for not having proper financing in place even thou they had nearly eighteen months to do so. Karmazin publicly admitted that he was not aware of 600 million dollars of XM's debt until it was too late. Either XM concealed this information, or Karmazin and his Board failed to carefully examine XM and its financial condition before the merger-

14

EXHIBIT 35
440

which took over a year and a half to complete. Also, they failed to have an independent audit which could have prevented this. Defendants had a duty to their shareholders to investigate all the details of the company it was merging with prior to consummation of the Merger.

59. Defendants' breach of duty proximately caused injury to the plaintiffs, which resulted in a dilution of Plaintiffs shares by 40% thereby diluting their voting power by 40%. Also, costing Plaintiffs' six of twelve Board seats, and a first rights offering. These actions have now made the minority shareholders vote moot or "meaningless".

## COUNT TWO: FRAUD

60. Plaintiffs incorporate by reference all prior paragraphs as if fully set forth herein.

61. Defendants knew or had reason to know that by Ernst and Young not issuing a going concern notice that they were representing to plaintiffs, that Sirius XM was a financially viable company that had sufficient capitol and was able to pay its debts. Because of the defendants positions in the company they had the most knowledge regarding the true financial status of the company. As such, they are responsible for disseminating true and correct information to the public and their shareholders.

62. Defendants' misrepresentations were material, because they affected the stock price of the company, the ownership interest of the plaintiffs, the voting rights of the Plaintiffs and the public's perception of its stability. These misrepresentations and breaches of fiduciary duties, combined, affected the stock price, ownership interest and voting power of the shareholders including the plaintiffs.

63. Defendants' actions were false because shortly after not being issued a going concern notice defendants relied on an exemption to NASDQ Rule 4350i to avoid a mandatory vote for

shareholder approval on the investment agreement with Liberty Media. The exemption request basically invoked a going concern.

64.  Defendants willfully made false representation. No going concern notice issued, means a company is financially sound. This is in extreme conflict with reliance on an exemption to rule 4350i that allows for a company to avoid shareholder approval because a company is in such financial despair it would not be possible to wait long enough for their shareholders to vote.

65.  Defendants had reason to expect plaintiffs would act in reliance on the false representations as would the general public.

66.  Plaintiffs relied on defendants false representations.

67.  Defendants false representations directly and proximately caused injury to plaintiffs, which resulted in a dilution of shares by 40%, and their preemptive/ shareholder rights.

## COUNT THREE: BREACH OF FIDUCIARY DUTY

68.  Plaintiffs incorporate by reference all prior paragraphs as if fully set forth herein.

69.  Defendants had a fiduciary responsibility and relationship with plaintiffs. By reason of their positions as directors, officers, and/or fiduciaries of the Company and because of their ability to control the business, corporate and financial affairs of the Company, the defendants owed the Company and its shareholders the duty to exercise due care, diligence and candor in the management and administration of the affairs of the Company, and in the use and preservation of its property and assets; the duty of loyalty, to put the interests of the Company above their own financial interests; and the duty of candor, including full and candid disclosure of all material facts related thereto. The conduct of the defendants complained of herein involves knowing violations of their duties as directors of the Company, and the absence of good faith on their part,

16

EXHIBIT 35
442

05/03/2011    TUE 17:42   FAX                                                                   ☒017/021

which defendants were aware or should have been aware, posed a risk of serious injury to the company and its shareholders.

70. The defendants breached their duties in the following ways:

   a. Failing to properly disclose any and all material information a reasonable shareholder would deem important and need to make a fully informed vote on the Malone deal;

   b. By entering into the "Malone" deal without considering other viable options; such as but not limited to, the Ergen deal. This prevented alternative investors from providing financing that would not have required the 40% dilution of shares and shareholder rights. Also, this prevented a buyout of Sirius XM which may have been at more favorable terms to their shareholders.

   c. By not obtaining the needed financing for the approximately two billion dollars in XM debt which needed to be refinanced. Six hundred million dollars of which, CEO Mel Karmazin publicly stated he was not aware of. Thereby, forcing an Investment Agreement with John Malone of Liberty Media on February 17, 2009 which resulted in the giving away of 12,500,000 Sirius XM preferred shares with full voting rights convertible to 40% of the common stock. These shares were issued at a time the stock was trading at very low levels and below fair value. These shares were granted without consideration to existing shareholders, which also lost; six of twelve Board seats, a first rights offering, and complete control of Sirius XM to Mr. John Malone and Liberty Media,

   d. By not providing written notice to all shareholders after invoking the exemption to NASDQ Rule 4350(i) as required by the NASD Rules and Regulations; By not

EXHIBIT 35

considering other viable options from of investors, such as Charles Ergen which would have been more favorable to shareholders. Instead putting their interest and employment concerns ahead of that of their shareholders.

e.  By allowing Leon Black to remain on the Board despite repeated demands that he be removed, and failure to obtain the necessary votes.

71.  Defendant's actions injured plaintiffs by causing a dilution in shares, loss of voting rights,  loss of board seats and a first rights offering to Malone; none of which the shareholders had a vote or say in.

### COUNT FOUR: SELF-DEALING

72.  Plaintiffs incorporate by reference all prior paragraphs as if fully set forth herein.

73.  By reason of their positions with Sirius XM, the Individual Defendants are in possession of non-public information concerning the financial condition and prospects of Sirius XM, and especially, the true value and expected increased future value of Sirius XM and its assets, which they failed to disclose to the plaintiffs.

74.  The investment agreement with Liberty Media was wrongful, unfair, and harmful to plaintiffs. The terms of the agreement did not adequately value the company, or the 12,500,000 preferred shares granted Malone. As such, the agreement only benefited the defendants and was to the detriment of the plaintiffs. The defendants denied plaintiffs their right to a vote as shareholders. This caused a dilution in voting rights, replacement of up to six of twelve board members, a first rights offering, and dilution of their shares of Sirius XM.

### COUNT FIVE: BREACH OF FIDUCIARY DUTY

*ON BEHALF OF THE COMPANY*

18

EXHIBIT 35
444

75. Plaintiffs incorporate by reference all prior paragraphs as if fully set forth herein.

76. The defendants have violated fiduciary duties of care, loyalty, candor, and independence owed by law to the shareholders of Sirius XM. The defendants have acted in a way that put their personal interests ahead of the interests of their shareholders.

77. The defendants breached their duties in the following ways:

    a.  Failing to properly disclose all material information a reasonable shareholder would deem important as to other alternatives to the Malone deal.

    b.  By enacting a poison pill provision that only benefits Malone and would prevent any other suitors of Sirius XM from making an unsolicited bid for the Company at a higher price. This ensures that Malone and only Malone can Tender for the remaining shares he does not already own. Malone was granted a rights offer after completion of his financing;

    c.  By allowing Malone to vote his shares on the poison pill provision, as there was a huge conflict of interest;

    d.  By inheriting approximately 2 billion in XM debt, 600 million of which CEO Mel Karmazin publicly stated he did not know about;

    e.  By entering into an Investment Agreement with Liberty Media on February 17,2009 which resulted in the giving away of 12,500,000 preferred shares of Sirius XM stock with full voting rights, convertible to 40% of Sirius XM common stock; and six of twelve Board seats; and

    f.  By not providing written notice to all shareholders within 10 days after invoking the exemption to NASDQ Rule 4350(i). as required by the NASD Rules and Regulations

19

EXHIBIT 35
445

78. The foregoing acts, practices, and course of conduct performed by the defendants caused the defendants to fail to exercise care, diligence, and candor in the exercise of their fiduciary obligations towards the plaintiffs.

## COUNT FIVE: SELF-DEALING

*ON BEHALF OF THE COMPANY*

79. Plaintiffs incorporate by reference all prior paragraphs as if fully set forth herein.

80. By reason of their positions with Sirius XM, the Individual Defendants are in possession of non-public information concerning the financial condition and prospects of Sirius XM, and especially the true value and expected increased future value of Sirius XM and its assets, which they have not disclosed to the plaintiffs. The defendants have acted in ways that put their personal interests ahead of the interests of the shareholders.

81. The investment agreement with Liberty Media was wrongful, unfair, and harmful to plaintiffs. The terms of the agreement did not adequately value the company or the 12,500,000 preferred shares. As such, the agreement only benefited the defendants and was to the detriment of the plaintiffs. The defendants denied plaintiffs their right to vote as shareholders.

82. This caused a dilution in voting/preemptive rights, replacement of board members, a drop in stock price, the granting of a first rights offering, and a dilution of existing shares.

## VI. PRAYER

WHEREFORE, plaintiffs pray for relief and judgment as follows:

A.    Determining this action is a proper derivative action, Plaintiffs are adequate representatives on the Company's behalf, and demand is excused;

B.    Determining the Defendants have breached or aided and abetted the breach of their fiduciary duties to Sirius XM;

20

EXHIBIT 35
446

Case 8:23-cv-00171-CJC-JDE    Document 1    Filed 01/27/23    Page 447 of 1580    Page
ID #:447
Case 2:19-cv-02728-KSM    Document 69-4    Filed 01/21/21    Page 22 of 22

05/03/2011  TUE 17:11  FAX                                                    ☑021/021

Michael Hartleib

Jack (John) Sorge

22

EXHIBIT 35
447

# EXHIBIT 5

EXHIBIT 35
448

**From:** Michael Hartleib
**Sent:** Thursday, June 02, 2011 6:59 PM
**To:** Robert Weiser
**Subject:** My Sirius case

Rob, give me a call so that we can talk about your thoughts on my case, as well as the
settlement in the anti-trust suit. I did make multiple demands on the board.

Michael 949-283-2441

-----Original Message-----
From: Robert Weiser [mailto:RW@Weiserlawfirm.com]
Sent: Wednesday, June 01, 2011 1:59 PM
To: Michael Hartleib
Subject: Delivered: Email check

Your message was delivered to the recipient.

1

EXHIBIT 35

**From:** Michael Hartleib
**Sent:** Tuesday, June 21, 2011 3:03 AM
**To:** Robert Weiser
**Subject:** RE: Delivered: RE: Delivered: My Sirius case

Rob that works. Old merger case withdrawn, converted to an individual claim and then dismissed. This was after they offered me 700k to go away. The case I sent you is pending. Yes they were proper. Here is one of the older demands made.

1

EXHIBIT 35

Rob

-----Original Message-----
From: Michael Hartleib [mailto:michaelhartleib@cox.net]
Sent: Monday, June 20, 2011 4:48 PM
To: Robert Weiser
Subject: RE: Delivered: RE: Delivered: My Sirius case

Rob, when are you available?

EXHIBIT 35

# EXHIBIT 6

EXHIBIT 35
452

**From:** Robert Weiser
**Sent:** Wednesday, August 31, 2011 7:22 PM
**To:** Michael Hartleib
**Cc:** 'David Sacks'
**Subject:** Re: fax-sirius order

I can't tonight, I have a dinner meeting

Sent from my Verizon Wireless BlackBerry

---

**From:** Michael Hartleib <michaelhartleib@cox.net>
**Date:** Wed, 31 Aug 2011 18:38:10 -0400
**To:** Robert Weiser<RW@Weiserlawfirm.com>
**Cc:** 'David Sacks'<david@synergyent.net>
**Subject:** FW: fax-sirius order

Rob, we need to talk about you coming in on my Sirius state case. This Federal case was taken from my case which was filed first. Khan Swick will work with us as I am providing all of the research . Call me ASAP

Congratulations, Messrs. Shenk and Hartleib. Judge Rakoff has upheld your complaint in **all** important respects.

I am tied up this morning but can give you a call this afternoon, to discuss next steps.

1

EXHIBIT 35
453

Case 8:23-cv-00171-CJC-JDE   Document 1   Filed 01/27/23   Page 454 of 1580   Page
Case 2:19-cv-02728-KSM   Document 69-7   Filed 01/21/21   Page 1 of 2
ID #:454

# EXHIBIT 7

EXHIBIT 35
454

**From:** Michael Hartleib <michaelhartleib@cox.net>
**Date:** February 16, 2012 at 1:40:08 PM EST
**To:** Robert Weiser <rw@weiserlawfirm.com>
**Cc:** 'David Sacks' <david@synergyent.net>
**Subject: Litigation never sleeps**

Rob, are we going to do some business together or what? You never called us back after we tried six times to reach you. David and I need to make some money so that we can buy you a new phone!

1

EXHIBIT 35
455

Case 8:23-cv-00171-CJC-JDE   Document 1   Filed 01/27/23   Page 456 of 1580   Page
Case 2:19-cv-02728-KSM   Document 69-8   Filed 01/21/21   Page 1 of 2
ID #:456

# EXHIBIT 8

EXHIBIT 35
456

**From:** Michael Hartleib
**Sent:** Tuesday, May 24, 2016 2:55 AM
**To:** Robert Weiser
**Cc:** 'David Sacks'
**Subject:** I am flying in Wednesday evening so I can be rested

Rob, you are going to lose either with the honorable Vano or on appeal! You must not of thought that anyone would read these proposed "reforms", or that anyone would take a hard look at the standing issue. You really should have been more diligent.

1

EXHIBIT 35
457

Case 8:23-cv-00171-CJC-JDE   Document 1   Filed 01/27/23   Page 458 of 1580   Page
Case 2:19-cv-02728-KSM   Document 69-9   Filed 01/21/21   Page 1 of 2
ID #:458

# EXHIBIT 9

EXHIBIT 35
458

**Robert Weiser**

| | |
|---|---|
| **From:** | Michael Hartleib <michaelhartleib@cox.net> |
| **Sent:** | Tuesday, May 31, 2016 5:57 PM |
| **To:** | Robert Weiser |
| **Cc:** | David Sacks |
| **Subject:** | Re call regarding current and forthcoming case |

Rob, let me know when you are available to discuss the current case and any forthcoming derivative on the tax issues. I would like to see the old board held accountable.

EXHIBIT 35
459

# EXHIBIT 10

EXHIBIT 35
460

-----Original Message-----
From: Michael Hartleib <michaelhartleib@cox.net>
Sent: Tuesday, June 28, 2016 1:32 PM
To: Robert Weiser <rweiser@weiserlawfirm.com>
Cc: David Sacks <david@synergyent.net>; Scott.Musoff@skadden.com
Subject: Please provide Pdf of response in support of fees

Robert, please provide me with the documents in support of your fees filed yesterday. As I have said before I do not need conformed copies pdf copies of what was submitted will be fine. I will notify the clerk if I don't get them today. Also your delay will provide me yet another reason to appeal is the Honorable Vano approves the settlement.
Thank you,
Michael
Sent from my iPhone

1

EXHIBIT 35

# EXHIBIT 11

EXHIBIT 35
462



**THE
WEISER
LAW FIRM**

WWW.WEISERLAWFIRM.COM

<u>PENNSYLVANIA</u>
22 CASSATT AVE.
BERWYN, PA 19312
TELEPHONE: (610) 225-2677
FACSIMILE:  (610) 408-8062

<u>CALIFORNIA</u>
12707 HIGH BLUFF DRIVE, SUITE 200
SAN DIEGO, CA 92130
TELEPHONE: (858) 794-1441
FACSIMILE: (858) 794-1450

The Honorable James F. Vano
Johnson County Courthouse
100 N. Kansas Ave
Olathe, KS 66061-3273

Re:    *Ross-Williams v. Bennett et al.*, Case No. 11-cv-01688

Dear Judge Vano –

　　We write to provide promptly important information that the Weiser Law Firm, P.C. (the "Firm") has just learned with respect to a person whose time records were submitted to the Court together with a declaration in connection with the above-referenced shareholder derivative action (the "Action").

　　As of February 2, 2017, the Firm learned that a person who had held himself out to us as Alexander J. Silow ("Silow"), was in actuality named Jeffrey M. Silow, and more importantly, that Mr. Silow is not a licensed Pennsylvania attorney in good standing, having been disbarred in Pennsylvania in 1987.[1]  Mr. Silow regularly represented to the Firm (as he represented to this Court in the Action) that he was a duly licensed, active attorney.  The Firm suspects that Mr. Silow may have misrepresented himself to numerous other law firms (including some of the largest law firms in this country) for many years, both before and after Mr. Silow began working with the Firm during the past decade.  Mr. Silow has immediately been released from any ongoing projects with the Firm and we are contacting any and all Courts where Mr. Silow's time records were previously submitted by the Firm.

　　Mr. Silow began working with the Firm after a very well-respected attorney recruiting agency in Philadelphia, Abelson Legal Search ("Abelson"), recommended him to us.  Abelson represented to us at that time that Mr. Silow had worked on "four projects" through their service, and that Mr. Silow was "an excellent candidate…very experienced in document review projects of all types [who] works very hard and long hours."  *See* attached email and resume.  The Firm was informed both by Abelson and by Mr. Silow that Mr. Silow was a licensed attorney in good standing.

---

[1]  Although not yet confirmed, it appears as though Mr. Silow has also been suspended from the practice of law by the District of Columbia.

EXHIBIT 35
463

On February 2, 2017, after being contacted by a third party not directly involved in the Action, the Firm learned that no "Alexander J. Silow" could be found on the Pennsylvania Disciplinary Board website. Mr. Silow was then immediately contacted via e-mail by us to present his Pennsylvania bar identification number. Within minutes, Mr. Silow provided us with a Pennsylvania attorney identification number, which we then quickly determined corresponded with an "Alexander L. Silow" practicing in Pennsylvania. In a subsequent telephone conversation that morning, Mr. Silow reiterated that he was and is a licensed attorney in Pennsylvania and the District of Columbia in good standing. Minutes after this initial phone call ended, however, Mr. Silow telephoned the Firm and during a second telephone conversation, confessed that he had been disbarred in Pennsylvania "since 1990".[2] Moreover, although he did not state this to us, the Firm has now confirmed that Mr. Silow's legal name is not "Alexander J. Silow," but rather is "Jeffrey Mark Silow."

The Firm is in contact with both ethics and legal counsel, and has already contacted the Pennsylvania Disciplinary Board and other authorities.

With respect to this Action, we believed that Mr. Silow performed the work the reported time records indicate (as supported by the Firm's additional filings with this Court showing records from the electronic document review database).[3] Nonetheless, the Firm is aware that Mr. Silow has been held out as an active attorney, and that Mr. Silow's declaration, signed under penalty of perjury, states, *inter alia,* that he is a licensed attorney in good standing that had never been the subject of any disciplinary action. His declaration is therefore false in material respects. According, the Firm will not be participating in any recovery that may result from the pending Cross-Appeal.

I am available at the Court's convenience either via telephone or in-person.

Sincerely,

Robert B. Weiser

---

[2]   As noted above, according to the Disciplinary Board of Pennsylvania, Mr. Silow was actually disbarred on December 23, 1987.

[3]   We believe this to be true because the documents reviewed in the Action were hosted by on the Relativity platform. It would not be possible for anyone outside of Relativity to manipulate the data points associated with this review.

EXHIBIT 35

464

**Brett Stecker**

| | |
|---|---|
| **From:** | Jessica Abelson <jabelson@abelsonlegalsearch.com> |
| **Sent:** | Friday, June 27, 2008 2:12 PM |
| **To:** | Brett D. Stecker |
| **Cc:** | Robert Weiser |
| **Subject:** | New Candidate Resumes – Document Review Project |
| **Attachments:** | JBorock Resume Logo 6-2008.doc; SJones Resume logo 6-2008.doc; JSilow Resume logo 6-2008.doc |

Dear Brett & Robb,

Under strict confidence please find the resumes for **Jacqueline Borock, Esq., Sharon L. Jones, Esq., and Jeffrey Silow, Esq.** for your review and consideration. All are excellent candidates and would like to be considered for your document review project. A little more information on the candidates are as follows:

**Jacqueline Borock, Esq.** – Although she lives in Kingston NY she has close ties to Philadelphia. She is able to come in to Philadelphia to get training and meet with you with out a problem. She is very eager to meet with you to discuss the project in more detail.

**Sharon L. Jones, Esq.** – Very pleasant, professional and articulate on the phone. She is local and can absolutely commit to the project.

**Jeffrey Silow, Esq.** – We have worked with Jeff on at least four other projects. He is VERY experienced in document review projects of all types and works very hard and long hours.

Please let me know your thoughts regarding these candidates.

Best regards,
Jessica



**Attorneys, Paralegals & Legal Professionals**

**Jessica Abelson**
Legal Recruiter
1600 Market Street, Suite 505
Philadelphia, Pa. 19103
jabelson@abelsonlegalsearch.com
(215) 561-3010
www.abelsonlegalsearch.com

1

EXHIBIT 35
465

**Abelson Legal Search**
**Attorneys, Paralegals & Legal Professionals**

**Jeffrey Silow, Esq.**
**Cell phone: (215)341-1561**
**Email: triman1@gmail.com**

**Contract Projects:** Electronic and hard copy reviews and trial preparation in finance, patent, antitrust and securities litigation, governmental investigations and acquisition/divestiture matters; supervision and quality control of other reviewers; privilege log; second request reviews; deposition digesting; and travel to perform duties.

**Selected Project Examples (2000 - 2008):**
McCarter & English, Newark, NJ
Reviewed documents for responsiveness, confidentiality and privilege in pharmaceutical class action litigation matter.
Milberg Weiss Bershad Hynes & Lerach LLP, New York, NY
Electronic and hard copy document reviews for issue responsiveness in class action matters.
Skadden Arps Slate Meagher & Flom, New York, NY
Electronic document reviews in antitrust matter. Authored privilege log. Prepared witness binders. Deposition digesting. 2nd request. Supervision and quality control of reviewers. Traveled to review documents.
Hogan & Hartson, Washington, DC
Electronic document reviews and authored privilege logs in securities fraud, financial, FCPA and Hart-Scott-Rodino litigation matters.
Steptoe & Johnson, Washington, D.C.
Performed substantive document reviews, including privilege logs, in response to Justice Department CID and Grand Jury and U.S. Senate subpoenas.
White & Case, Washington, D.C.
Electronic document reviews in antitrust case. Prepared witness binders and deposition digesting. Supervised creation of privilege log.
Crowell & Moring, Washington D.C.
Document review in antitrust acquisition matter. 2nd request. Traveled to perform duties.
McKesson Corporation, Philadelphia, PA/San Francisco, CA
Subpoena response in class action/patent matter where client was not a party. Supervision and quality control of reviewers. Traveled to review documents.

**Other Employment:**
National Association of Securities Dealers, Inc., Washington, DC
Office of General Counsel; Federal litigation, arbitrations and Board of Governors presentations as well as advice to members.
Pennsylvania Securities Commission, Harrisburg, PA
Office of General Counsel, Senior Attorney; Investigation, financial analysis and prosecution of securities regulatory filings and matters.
Tax Debt Negotiators, Inc., Los Angeles, CA
Responsible for in-house matters including tax matters, litigation, reviewing and drafting leases, contracts and regulatory filings.

**Computer Training:** Concordance, Lextranet, Summation, Ringtail, Applied Discovery, DocHunter, Microsoft Word, Microsoft Office, Microsoft Outlook, Lotus Notes
**Languages:** English, working knowledge of Spanish, French, German

**Education:**
JD, University of Miami School of Law 1974
BS (Mathematics), La Salle University 1971

**Bar Admissions:** District of Columbia

Submitted in confidence by Abelson Legal Search

www.abelsonlegalsearch.com

(215) 561-3010

EXHIBIT 35
466

Case 8:23-cv-00171-CJC-JDE   Document 1   Filed 01/27/23   Page 467 of 1580   Page
ID #:467
Case 2:19-cv-02728-KSM   Document 69-11   Filed 01/21/21   Page 6 of 8



**THE**
**WEISER**
LAW FIRM
WWW.WEISERLAWFIRM.COM

<u>PENNSYLVANIA</u>
22 CASSATT AVE.
BERWYN, PA 19312
TELEPHONE: (610) 225-2677
FACSIMILE:  (610) 408-8062

<u>CALIFORNIA</u>
12707 HIGH BLUFF DRIVE, SUITE 200
SAN DIEGO, CA 92130
TELEPHONE: (858) 794-1441
FACSIMILE: (858) 794-1450

February 6, 2017

Douglas T. Shima
Clerk of the Appellate Court
Kansas Court of Appeals
Appellate Clerk's Office
301 SW 10th Ave.
Topeka, KS 66612-1507

Re:    <u>*Ross-Williams v. Bennett et al.*, Appellate Case No. 17-117139-A</u>

Dear Mr. Shima:

We write to bring to the Court's attention an inaccuracy in the record in the above referenced action (the "Action"), which is currently pending before the Court.   Counsel for Cross-Appellant Monica Ross-Williams, The Weiser Law Firm, P.C. (the "Firm"), recently learned that a declaration submitted to the District Court of Johnson County (the "District Court") below, by a former affiliate of the Firm, is inaccurate in material respects.  The Firm believes it is its obligation to inform the Court before briefing in this matter begins.

A central question on appeal in the Action is whether the District Court properly evaluated Plaintiff's counsel's request for fees and expenses in association with the material benefits provided to the corporation in this Action.  In connection with this request, District Court Judge James Vano ("Judge Vano") requested that the Firm submit attorney billing records for *in camera* review. *See* Transcript of May 26, 2016 Hearing.  The Firm submitted time on behalf of a former affiliate of the Firm who worked on an extensive, three-year document review project. *See* Plaintiff's Supplemental Brief in Further Support of Award of Attorneys' Fees and Reimbursement of Expenses. This submission would later include a declaration, sworn under the penalty of perjury, from the document reviewer stating that he was a member in good standing of the Pennsylvania and District of Columbia bar associations and had never been accused of an ethical violation or the subject of any disciplinary action. *See* Plaintiff's Second Motion to Alter or Amend the Court's November 22, 2016 Order.  The Firm has learned that this declaration was not true at the time it was submitted.

As of February 2, 2017, the Firm learned that a person who had held himself out to us as Alexander J. Silow ("Silow"), was in actuality named Jeffrey M. Silow, and more importantly, that Mr. Silow is not a licensed Pennsylvania attorney in good standing, having been disbarred in

EXHIBIT 35
467

Pennsylvania in 1987.[1]  Mr. Silow regularly represented to the Firm (as he represented to the District Court) that he was a duly licensed, active attorney.  The Firm suspects that Mr. Silow may have misrepresented himself to numerous other law firms (including some of the largest law firms in this country) for many years, both before and after Mr. Silow began working with the Firm during the past decade. *See* attached email and resume.  Mr. Silow has immediately been released from any ongoing projects with the Firm and we are contacting any and all courts where Mr. Silow's time records were previously submitted by the Firm.[2]

Mr. Silow began working with the Firm after a very well-respected attorney recruiting agency in Philadelphia, Abelson Legal Search ("Abelson"), recommended him to us.  Abelson represented to us at that time that Mr. Silow had worked on "four projects" through their service, and that Mr. Silow was "an excellent candidate…very experienced in document review projects of all types [who] works very hard and long hours." *See* attached email and resume.  The Firm was informed both by Abelson and by Mr. Silow that Mr. Silow was a licensed attorney in good standing.

On February 2, 2017, after being contacted by a third party not directly involved in the Action, the Firm learned that no "Alexander J. Silow" could be found on the Pennsylvania Disciplinary Board website.  Mr. Silow was then immediately contacted via e-mail by us to present his Pennsylvania bar identification number.  Within minutes, Mr. Silow provided us with a Pennsylvania attorney identification number, which we then quickly determined corresponded with an "Alexander L. Silow" practicing in Pennsylvania.  In a subsequent telephone conversation that morning, Mr. Silow reiterated that he was and is a licensed attorney in Pennsylvania and the District of Columbia in good standing.  Minutes after this initial phone call ended, however, Mr. Silow telephoned the Firm and during a second telephone conversation, confessed that he had been disbarred in Pennsylvania "since 1990."[3]  Moreover, although he did not state this to us, the Firm has now confirmed that Mr. Silow's legal name is not "Alexander J. Silow," but rather is "Jeffrey Mark Silow."

The Firm is in contact with both ethics and legal counsel, and has already contacted the Pennsylvania Disciplinary Board and other authorities.

With respect to this Action, the Firm continues to believe that the time records from Mr. Silow are accurate (as supported by the Firm's additional filings with the District Court showing records from the electronic document review database).  Nonetheless, the Firm is aware that the record before this Court is inaccurate and the Firm is actively attempting to correct the record

---

[1]  Although not yet confirmed, it appears as though Mr. Silow has also been suspended from the practice of law by the District of Columbia for non-payment of dues.

[2]  Mr. Silow's relationship with the Firm was limited to initial document review: at no time did Mr. Silow ever have any client contact, nor sign pleadings on behalf of the Firm, nor make any court appearances on behalf of the Firm.

[3]  As noted above, according to the Disciplinary Board of Pennsylvania, Mr. Silow was actually disbarred on December 23, 1987.

EXHIBIT 35

468

Case 8:23-cv-00171-CJC-JDE    Document 1    Filed 01/27/23    Page 469 of 1580    Page
ID #:469
Case 2:19-cv-02728-KSM    Document 69-11    Filed 01/21/21    Page 8 of 8

below.[4]    In the event the Firm is procedurally unable to do so, we felt it was our ethical obligation to ensure this matter was timely raised before the Court.

I am available at the Court's convenience either via telephone or in-person.

Sincerely,

Robert B. Weiser

---

[4] Similar correspondence has been sent to Judge Vano on February 3, 2017.

EXHIBIT 35

# EXHIBIT 12

EXHIBIT 35
470

**From:** Michael Hartleib <michaelhartleib@cox.net>
**Sent:** Monday, March 06, 2017 8:37 PM
**To:** Robert Weiser <rweiser@weiserlawfirm.com>
**Cc:** mark.mcgrory@eriseip.com; jay.kasner@skadden.com; scott.musoff@skadden.com; James M. Ficaro <jficaro@weiserlawfirm.com>; 'Tom Hershewe' <tom@dollar-law.com>; Brett Stecker <bdstecker@weiserlawfirm.com>; 'George C. Aguilar' <GAguilar@robbinsarroyo.com>; 'Boren, Jill, DCA' <Jill.Boren@jocogov.org>; 'Brian J. Robbins' <BRobbins@robbinsarroyo.com>; 'Alfred G. Yates jr.' <yateslaw@aol.com>; 'Jay N. Razzouk' <JRazzouk@robbinsarroyo.com>; 'Laura Jakubec' <lauraj@dollar-law.com>
**Subject:** Re: ROSS-WMS v. SPRINT - Appellate Case No. 17-117139-A

Rob, I am a little confused! Your opposition to the Motion to remand is in contradiction to your statements in the letter to Mr. Shima, Clerk of the Court of Appeals. Whereas you express your desire to correct the record and inaccuracies at the District Court and were actively attempting to do so! It seems your statements to the Appellate Court were disingenuous at best. Shocking! Also, equally confusing is your statement regarding Mr. Silow, that "you just found out on February 2, 2017 that Alexander Silow was not his real name, indeed it is Jeffrey". Although, in your attached email correspondence from Abelson in 2008 you hired him as Jeffery. Are you 100 % certain that you want to stick to that story? I promise you that it will not be wise!

I especially like the comment that you felt as though you had an ethical obligation to inform the Court, prior to briefing. Why, because you thought they might want to remand so that these issues can be addressed at the District Court? The Court in which the fraud was committed upon? Ethical obligation, what a Saint. The fact of the matter is that Ted Frank was holding a proverbial gun to your head, so you had no choice but to come clean, or to be clear, partially

1

EXHIBIT 35

clean prior Ted Frank informing the appropriate agencies. Your attempts, to obfuscate your chicanery in this case is galvanizing my convictions, strengthening my resolve to expose all of the corrupt parties in this case! This lawyer driven litigation must and will cease. Your temerity, to seek leave of the Appellate Court to reinstate fees, given what I have uncovered is frankly astonishing and provoking wrath. I will take this all the way to the Kansas Supreme Court if needed, as the integrity of the judicial system is at stake!


On Mar 6, 2017, at 1:59 PM, Laura Jakubec <lauraj@dollar-law.com> wrote:

    Counsel - please find a courtesy copy of the following which was e-filed today.  Thank you.



    Laura Jakubec, Legal Assistant
    lauraj@dollar-law.com


    <image001.png>

    1100 Main Street, Suite 2600
    Kansas City, MO 64105
    Phone: (816) 876-2600
    Fax: (816) 221-8763

This electronic message transmission and any files transmitted with it, are a communication from the law firm of Dollar Burns & Becker, L.C. This message contains information protected by the attorney/client privilege and is confidential or otherwise the exclusive property of the intended recipient or Dollar Burns & Becker, L.C. This information is solely for the use of the individual or entity that is the intended recipient. If you are not the designated recipient, or the person responsible for delivering the communication to its intended recipient, please be aware that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this electronic transmission in error, please notify by telephone (877-816-2600), or by electronic mail (lauraj@dollar-law.com) and promptly destroy the original transmission. Thank you for your assistance.NOTICE: The Missouri Bar and Missouri Supreme Court require all Missouri attorneys to notify e-mail recipients that e-mail is not a secure method of communication, that it may be copied and held by any computer through which it passes, and persons not participating in the communication may intercept the communication.  Should you wish to discontinue this method of communication, please advise, and no further e-mail communication will be sent.

    <Opposition to Motion to Stay Appeal and Remand Case to District Court (342096x9E2E5).pdf>

EXHIBIT 35

# EXHIBIT 13

EXHIBIT 35
473

Case 8:23-cv-00171-CJC-JDE   Document 1   Filed 01/27/23   Page 474 of 1580   Page
ID #:474
Case 2:19-cv-02728-KSM   Document 69-13   Filed 01/21/21   Page 2 of 5

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

|  |  |
|---|---|
| MONICA ROSS-WILLIAMS, derivatively, on behalf of SPRINT NEXTEL CORPORATION, | **Appellate Case No. 17-117139-A** |
| Appellees, | (District Court Case No. 11CV1688) |
| V. | |
| ROBERT R. BENNETT, ET AL.,<br>and<br>SPRINT NEXTEL CORPORATION, a Kansas Corporation, | |
| Appellees, | |
| Objector, Michael Hartleib, | |
| Appellant. | |

**DECLARATION OF MONICA ROSS-WILLIAMS IN OPPOSITION TO APPELLANT MICHAEL HARTLIEB'S MOTION TO RECONSIDER AND VACATE THE PROTECTIVE ORDER**

I, Monica Ross-Williams, declare and state as follows:

1.    I, Monica Ross-Williams, am a party (appellee and cross-appellant) to the above-captioned appellate proceeding that is currently pending before this Court (the "Appeal").  At all times in connection with the Appeal, and the shareholder derivative litigation before the District Court for Johnson County, Kansas that is the subject of the instant Appeal, I have been and am represented by counsel.

2.    During the evening of March 6, 2017, I received an unsolicited telephone call from Appellant Michael Hartleib ("Hartleib").  I do not know how Hartleib obtained my phone

- 1 -

EXHIBIT 35
474

Case 8:23-cv-00171-CJC-JDE   Document 1   Filed 01/27/23   Page 475 of 1580   Page
ID #:475
Case 2:19-cv-02728-KSM   Document 69-13   Filed 01/21/21   Page 3 of 5

number, but I believe that he did so via an internet search.  I had never previously had any

contact, engagement, or involvement with Hartleib.

     3.     Upon answering the telephone when Hartleib called me on the evening of March

6, 2017, I did not realize at first who I was speaking to.  Hartleib proceeded to attempt to discuss

matters related to the Appeal with me, in a highly confrontational manner.  Once I realized who

Hartleib was and that he had somehow found my phone number and called me directly regarding

the Appeal, I told Hartleib I did not wish to speak to him any further.  I asked Hartleib not to

contact me again and to direct all future communications to my counsel.

     4.     Hartleib, however, did not hang up the phone at that point.  Instead, he tried to

continue the conversation by making references to certain matters about me that were wholly

unrelated to the Appeal; specifically, my role as an elected official in Ypsilanti Township,

Michigan, where I serve on the Township Board of Trustees.  I can only assume that Hartleib

conducted an internet search and tried to learn as much as he could about me prior to calling me

on March 6, 2017.

     5.     In the first instance, I was taken aback and frightened once I realized that Hartleib

had called me directly about the Appeal, and given the tenor of the call I suspected that he did so

in an attempt to intimidate me.  But once Hartleib brought up matters about me that were

completely unrelated to the Appeal, I became certain that his purpose for calling was to harass

and threaten me.  I felt very uncomfortable and wanted to end the call with Hartleib as soon as

possible, but I thought it best to try to end the conversation in a non-confrontational way.  To that

end, I told Hartleib that if he wished to do so he could copy me on communications directed to

my counsel, and I provided him with an email address which I seldom use.

- 2 -

EXHIBIT 35
475

Case 8:23-cv-00171-CJC-JDE    Document 1    Filed 01/27/23    Page 476 of 1580    Page
ID #:476
Case 2:19-cv-02728-KSM    Document 69-13    Filed 01/21/21    Page 4 of 5

6.      At that point, the call with Hartleib ended.  Immediately after I got off the phone with Hartleib on the evening of March 6, 2017, I contacted my counsel regarding the call from Hartleib.

7.      Although I had clearly instructed Hartleib that all future communications should be directed to my counsel and not to me, only a few hours later, at 3:16 a.m. central time on March 7, 2017, Hartleib sent an email directly to me regarding the Appeal.  I was very disturbed by the fact that he did so even though I had told him that all communications should be directed to my counsel.

8.      Later that same day, on March 7, 2017, my counsel sent Hartleib a letter at my request.  The letter from my counsel demanded that Hartleib cease any attempts to communicate with me.  Hartleib responded to my counsel in writing, however, by threatening that he "will neither cease nor desist."  Accordingly, at my request and with my authorization, my counsel filed a motion for a protective order on March 9, 2017.  That motion was granted, and the protective order was entered by this Court on March 30, 2017 (the "Protective Order").

9.      I was shocked to learn that Hartleib recently filed a motion to vacate the Protective Order.  I can only assume that Hartleib intends to try to contact me again and harass me further.  I was very frightened and disturbed by Hartleib's conduct in March 2017, and I was pleased and relieved when the Protective Order was granted.  If the Protective Order were to be vacated, I would fear that Hartleib would once again attempt to intimidate, harass, and threaten me.  I see no reason why Hartleib should be permitted to direct communications to me instead of my counsel.  I respectfully request that this Court deny Hartleib's motion and keep the Protective Order in place.

I declare under penalty of perjury that the above and foregoing is true and correct.

- 3 -

EXHIBIT 35
476

Case 8:23-cv-00171-CJC-JDE    Document 1    Filed 01/27/23    Page 477 of 1580    Page
ID #:477
Case 2:19-cv-02728-KSM    Document 69-13    Filed 01/21/21    Page 5 of 5

EXECUTED this ___ day of _March_, 2018.

_Monica Ross-Williams_
Monica Ross-Williams

- 4 -

EXHIBIT 35
477

Case 8:23-cv-00171-CJC-JDE   Document 1   Filed 01/27/23   Page 478 of 1580   Page
Case 2:19-cv-02728-KSM   Document 69-14   Filed 01/21/21   Page 1 of 6
ID #:478

# EXHIBIT 14

EXHIBIT 35
478

**From:** michael hartleib
**Sent:** Tuesday, March 7, 2017 4:25 AM
**To:** kayla9170@yahoo.com
**Cc:** MSK@HFMLEGAL.COM; perry.brandt@bryancave.com; MARK.MCGRORY@ERISEIP.COM; DOCKETING@ERISEIP.COM; 'Chuck Schimmel' ; 'George C. Aguilar' ; 'Jay Razzouk' ; Brett Stecker ; 'Alfred G. Yates jr.' ; 'Robert Schubert' ; 'Willem F. Jonckheer' ; James M. Ficaro ; 'Dustin Schubert' ; 'Brian J. Robbins' ; 'Boren, Jill, DCA' ; 'Greg Wright' ; tom@dollar-law.com; Robert Weiser
**Subject:** Ms. William's Per our conversation here are some of the documents your Counsel failed to provide you

Dear Ms. Williams, it was a pleasure speaking with you this evening. I am sorry that your Counsel has not kept you apprised of the details of your case. I find it unconscionable that your attorneys failed to inform you of Judge Vano's rulings or that an Appeal was filed on your behalf. I do believe that you are a unwitting victim of their fraud committed against the Court. As we discussed they have submitted millions of dollars in fraudulent billing in your case. As I informed you that this was not just my opinion, the Judge in your case came to a similar conclusion. In fact, your attorneys have now admitted to at least 1.6 million dollars in fraudulent bills submitted to the Court. Mr. Weiser has confirmed this in two separate letters. *(See attached).* I am no expert, but when a Firm admits criminal acts in a case I believe they are obligated to notify you as the Plaintiff. Mr. Weiser and his Firm have already contacted their Bar associations and other Courts to self-report their criminal acts. I have contacted the district attorney's offices in Pennsylvania and Kansas and will be filing formal complaints. I am

1

EXHIBIT 35

sorry to be the person to inform you of this, as it was your attorneys responsibility to do so. I am seeking a full evidentiary hearing where your Counsel will be forced to testify under oath and you can address the Court. As you can see by the letters from Mr. Weiser they are in a lot of trouble, but claim they are victims of Mr. Silow. I will provide incontrovertible proof that Mr. Weiser et. al. is just as guilty as Mr. Silow. This is just the tip of the iceberg. Details of our call will be submitted to the Kansas Court of Appeals in a sworn declaration and provided to Judge Vano. As per your request I copied all of the attorneys in your case as well as Judge Vano's Clerk. Thank you for taking the time to speak with me this evening.

Michael



THE
WEISER
LAW FIRM
WWW.WEISERLAWFIRM.COM

PENNSYLVANIA
22 CASSATT AVE.
BERWYN, PA 19312
TELEPHONE: (610) 225-2677
FACSIMILE:  (610) 408-8062

CALIFORNIA
12707 HIGH BLUFF DRIVE, SUITE 200
SAN DIEGO, CA 92130
TELEPHONE: (858) 794-1441
FACSIMILE: (858) 794-1450

March 7, 2017

**VIA EMAIL**
Michael Hartlieb
27020 Alicia Parkway, Suite G
Laguna Niguel, CA 92677
Email: michaelhartlieb@cox.net

Re:   _Ross-Williams v. Bennett et al._, **Appellate Case No. 17-117139-A**

Dear Mr. Hartlieb:

We want to caution you in the strongest of terms that your harassment of our client, Monica Ross-Williams, is highly improper.

As you know, we are counsel for Ms. Ross-Williams in the above-referenced litigation. Ms. Ross-Williams has informed us that last night, you telephoned her directly, despite knowing that she was and is represented by counsel. This conduct violates Rule 4.2 of the Kansas Rules of Professional Conduct, as you were not and are not authorized to contact Ms. Ross-Williams by her counsel or any Court.[1]

According to Ms. Ross-Williams, not only did you attempt to discuss the Sprint derivative litigation with her last night, you also referenced other matters pertaining to our client that are completely unrelated to the derivative litigation. Ms. Ross-Williams was shocked and disturbed by your phone call, and she reported to us this morning that she felt harassed and threatened -- both with respect to your attempt to speak directly with her in itself, and with respect to the substance of the phone call. Accordingly, Ms. Ross-Williams declined to speak with you, expressed to you that all future communications should be directed to her counsel, and instructed that you should not contact her directly again.

Nonetheless, several hours later, at 3:16 a.m. central time on March 7, 2017, you committed another violation and completely disregarded our client's directive to communicate with her counsel, by sending Ms. Ross-Williams a lengthy email and related attachments. Our

---

[1]    Pro se litigants are generally held to the same standards of procedure, evidence, and professional responsibility as attorneys. _See Mangiaracina v. Gutierrez_, 11 Kan.App.2d 594, 595–96, 730 P.2d 1109 (1986).

EXHIBIT 35
481

client has reported to us that she also finds your email to be harassing and threatening, particularly in light of her express instruction to you only hours earlier that all communications should be directed to her counsel.

On behalf of Ms. Ross-Williams, we direct you to immediately cease and desist all attempts to communicate directly with Ms. Ross-Williams. In addition, please be advised that with respect to those improper communications that have already taken place and any such future communications you may attempt, Ms. Ross-Williams expressly reserves all of her rights, including but not limited to her rights under Michigan, Kansas, California, and/or federal law.

Sincerely,

Robert B. Weiser

EXHIBIT 35

**From:** michael hartleib [mailto:michaelhartleib@cox.net]
**Sent:** Tuesday, March 7, 2017 7:21 PM
**Cc:** MSK@HFMLEGAL.COM; perry.brandt@bryancave.com; MARK.MCGRORY@ERISEIP.COM; DOCKETING@ERISEIP.COM; 'Chuck Schimmel' <chuck@wrightschimmel.com>; 'George C. Aguilar' <GAguilar@robbinsarroyo.com>; 'Jay Razzouk' <jrazzouk@robbinsarroyo.com>; Brett Stecker <bds@weiserlawfirm.com>; 'Alfred G. Yates jr.' <yateslaw@aol.com>; 'Robert Schubert' <rschubert@schubertlawfirm.com>; 'Willem F. Jonckheer' <wjonckheer@schubertlawfirm.com>; 'Dustin Schubert' <dschubert@schubertlawfirm.com>; 'Boren, Jill, DCA' <Jill.Boren@jocogov.org>; 'Greg Wright' <greg@wrightschimmel.com>; tom@dollar-law.com; Robert Weiser <rw@weiserlawfirm.com>; 'Brian J. Robbins' <BRobbins@robbinsarroyo.com>; James Ficaro <jmf@weiserlawfirm.com>
**Subject:** RE: Ross-Williams v. Bennett et al., Appellate Case No. 17-117139-A

Mr. Weiser, as I am preparing my sworn declaration regarding my communication with you "client", I do not have time to address all of the self-serving misrepresentations in your letter. The 15 minute consensual conversation with your "client" was very enlightening. She provided her email address and ask that I copy Counsel, so that I could forward the documents you failed to provide. For you to characterize this as harassment is another blatant attempt to distract and obfuscate your fraudulent acts  and bastardization of the judicial system. I caution you, that coercing your "client" to misstate facts regarding our call will only inflict additional damage to what little credibility you have left. You Sir, and your coconspirators are the ones that need to Cease and Desist. Your so-called "client" is representing my interest and her attorneys are corrupt, therefore I will neither Cease nor Desist. As far as your not so vailed threat that Ms. Williams "reserves all of her rights", if you are threatening legal action against me, feel free, I will be happy to waive service to expedite said action. I find the prospects of discovery quite compelling. Your threats do nothing but, strengthen my resolve and galvanize my convictions. Call it a personality defect! Instead of wasting my time, I would suggest you consult with an ethics attorney, that's right, you already have!

Michael

EXHIBIT 35
483

# EXHIBIT 15

EXHIBIT 35
484

**From:** Michael Hartleib
**Sent:** Saturday, April 07, 2018 12:33 AM
**To:** Robert Weiser
**Cc:** mark.mcgrory@eriseip.com; jay.kasner@skadden.com; scott.musoff@skadden.com; jennifer.berhorst@bryancave.com; sarah.holdmeyer@bryancave.com; James M. Ficaro ; Brett Stecker ; jenness.parker@skadden.com
**Subject:** RE: ROSS-WILLIAMS - Appellate Case No 17-117139-A

Rob, your ability to set the bar at new lows, never disappoints! Clearly, this is in retaliation to your being rightfully removed as co-lead counsel in the Equifax case. Your attempt to mislead the Appellate Court with incomplete records might be your standard operating procedure, but I believe it will cost you when I seek sanctions. Your personal attacks smack of desperation, they do nothing to dissuade me, in fact they galvanize my convictions and strengthen my resolve! Rob, you may want to contact your investigators, L. English Research Services Inc. to seek a partial refund. When they pulled the records on March 26th, they missed a DUI from the eighties and a fixit ticket. Your ill-advised actions, and ad-hominem attacks are making the Weiser Firm radioactive!

Have a wonderful weekend.

1

EXHIBIT 35

**From:** James Ficaro [mailto:jmf@weiserlawfirm.com]
**Sent:** Friday, April 6, 2018 11:29 AM
**To:** Michael Hartleib <mjhartleib@gmail.com>
**Subject:** FW: ROSS-WILLIAMS - Appellate Case No 17-117139-A

Mr. Hartleib, see attached filing.


**From:** Laura Jakubec <lauraj@dollar-law.com>
**Sent:** Friday, April 6, 2018 2:05 PM
**To:** mark.mcgrory@eriseip.com; jay.kasner@skadden.com; scott.musoff@skadden.com; jennifer.berhorst@bryancave.com; sarah.holdmeyer@bryancave.com; Marco H <mhartlieb@gmail.com>
**Cc:** Tom Hershewe <tom@dollar-law.com>; Robert Weiser <rw@weiserlawfirm.com>; Brett Stecker <bds@weiserlawfirm.com>; James Ficaro <jmf@weiserlawfirm.com>
**Subject:** Re: ROSS-WILLIAMS - Appellate Case No 17-117139-A

Counsel/Parties - attached is a courtesy copy of Opposition to Hartleib Motion to Reconsider and Vacate the Protective Order.


Laura Jakubec, Legal Assistant
lauraj@dollar-law.com



DOLLAR
BURNS &
BECKER
TRIAL ATTORNEYS

1100 Main Street, Suite 2600
Kansas City, MO 64105
Phone: (816) 876-2600
Fax: (816) 221-8763

This electronic message transmission and any files transmitted with it, are a communication from the law firm of Dollar Burns & Becker, L.C. This message contains information protected by the attorney/client privilege and is confidential or otherwise the exclusive property of the intended recipient or Dollar Burns & Becker, L.C. This information is solely for the use of the individual or entity that is the intended recipient. If you are not the designated recipient, or the person responsible for delivering the communication to its intended recipient, please be aware that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this electronic transmission in error, please notify by telephone (877-816-2600), or by electronic mail (lauraj@dollar-law.com) and promptly destroy the original transmission. Thank you for your assistance. NOTICE: The Missouri Bar and Missouri Supreme Court require all Missouri attorneys to notify e-mail recipients that e-mail is not a secure method of communication, that it may be copied and held by any computer through which it passes, and persons not participating in the communication may intercept the communication. Should you wish to discontinue this method of communication, please advise, and no further e-mail communication will be sent.

EXHIBIT 35

# EXHIBIT 16

EXHIBIT 35
487

**From:** Michael Hartleib
**Sent:** Wednesday, April 12, 2017 10:43 AM
**To:** Laura Jakubec
**Cc:** mark.mcgrory@eriseip.com; jay.kasner@skadden.com; scott.musoff@skadden.com; James M. Ficaro ; Brett Stecker ; George C. Aguilar ; Jay N. Razzouk ; Tom Hershewe ; Boren, Jill, Dca ; Robert Weiser ; Brian J. Robbins
**Subject:** Re: ROSS-WMS v. SPRINT - Appellate Case No. 17-117139-A

When your position is indefensible, attack your opponent with claptrap. What an embarrassment to the bar! See you in Court.

Sent from my iPhone

On Apr 12, 2017, at 6:22 AM, Laura Jakubec <lauraj@dollar-law.com> wrote:

> Counsel - please find a courtesy copy of the following which was e-filed today. Thank you.
>
>
>
> Laura Jakubec, Legal Assistant
> lauraj@dollar-law.com

1100 Main Street, Suite 2600
Kansas City, MO 64105

1

EXHIBIT 35
488

Phone: (816) 876-2600
Fax: (816) 221-8763

This electronic message transmission and any files transmitted with it, are a communication from the law firm of Dollar Burns & Becker, L.C. This message contains information protected by the attorney/client privilege and is confidential or otherwise the exclusive property of the intended recipient or Dollar Burns & Becker, L.C. This information is solely for the use of the individual or entity that is the intended recipient. If you are not the designated recipient, or the person responsible for delivering the communication to its intended recipient, please be aware that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this electronic transmission in error, please notify by telephone (877-816-2600), or by electronic mail (lauraj@dollar-law.com) and promptly destroy the original transmission. Thank you for your assistance.NOTICE: The Missouri Bar and Missouri Supreme Court require all Missouri attorneys to notify e-mail recipients that e-mail is not a secure method of communication, that it may be copied and held by any computer through which it passes, and persons not participating in the communication may intercept the communication. Should you wish to discontinue this method of communication, please advise, and no further e-mail communication will be sent.

EXHIBIT 35
489

# EXHIBIT 17

EXHIBIT 35
490

**From:** Hines, Loretta M.
**Sent:** Wednesday, April 26, 2017 3:28 PM
**To:** Robert Weiser
**Subject:** Threatening Letter - rec'd 4/25/17

Mr. Weiser,

The attached letter was received in Chambers yesterday, 4/25/17. Five other Judges in Chester County received the same letter. Judge Sarcione thought you should be alerted since you are referenced in the letter. Please feel free to contact Chambers if you feel it necessary or have any questions or concerns.

*Loretta M. Hines, Judicial Assistant*

1

EXHIBIT 35

*to the Hon. Anthony A. Sarcione*
*Chester County Justice Center*
*201 W. Market Street, Suite 6213*
*PO Box 2746*
*West Chester, PA 19380-0989*
*Phone: 610.344.5900*
*FAX: 610.344.5596*

This County of Chester e-mail message, including any attachments, is intended for the sole use of the individual(s) and entity(ies) to whom it is addressed, and may contain information that is privileged, confidential and exempt from disclosure under applicable law. If you are not the intended addressee, nor authorized to receive for the intended addressee, you are hereby notified that you may not use, copy, disclose or distribute to anyone this e-mail message including any attachments, or any information contained in this e-mail message including any attachments. If you have received this e-mail message in error, please immediately notify the sender by reply e-mail and delete the message. Thank you very much.

EXHIBIT 35
492

A. Nonymous Esquire
105 East  Evans Street
Suite " C "
West Chester Pa  19380



Judge Anthony Scarcione
201 W. Market st. suite  4100
PO Box 2746, West Chester Pa
Zip>>>>   19380-0989

RECEIVED
APR 2 5 2017

EXHIBIT 35
493

Case 2:19-cv-02728-KSM   Document 69-17   Filed 01/21/21   Page 4 of 8

Attorney e-Newsletter - March 2017

RECEIVED
APR 2 5 2017

**Subject:** Attorney e-Newsletter - March 2017
**From:** Disciplinary Board of the Supreme Court of Pennsylvania <news@padisciplinaryboard.org>
**Date:** 3/28/2017 3:20 PM

Click here to view this email in your browser

## Attorney News - March 2017

**Articles & Updates**

- **Court Docks Pennsylvania Firm for Disbarred Lawyer Billings**

- **Annual Attorney Registration Opens in May**

- **Tip of the Month: Who Do I Call?**

- **Supreme Court Seeks Volunteers**

- **Lawyer's Pants Catch on Fire During Argument**

**Things to Remember**

- **Follow the Disciplinary Board on Twitter**

*What, if anything, do you intend to do about this?!! Do*

*This newsletter is intended to inform and educate members of the legal profession regarding activities and initiatives of the Disciplinary Board of the Supreme Court of Pennsylvania. To ensure you receive each newsletter and announcement from the Disciplinary Board of the Supreme Court of PA, please add us to your "safe recipients" list in your email system. Please do not reply to this email. Send any comments or questions to comments@padisciplinaryboard.org.*

EXHIBIT 35
494

Attorney e-Newsletter - March 2017

## Court Docks Pennsylvania Firm for Disbarred Lawyer Billings

A Berwyn, Pennsylvania firm involved in a multimillion dollar shareholder lawsuit against cellphone provider Sprint was stunned when a Kansas judge **docked its attorney fees award by nearly 90%**. The action came after the Weiser Firm **advised the court** that a contract lawyer who compiled a massive number of hours on the case was in fact a disbarred former lawyer.

The firm included in its attorney fees claim a figure of 6,905 hours of service valued at $1.5 million for Alexander J. Silow, a contract attorney who reviewed discovery documents in the case. A lawyer named Alexander J. Silow is admitted to the Pennsylvania bar in active status, but the person who performed the work for the Weiser Firm was not him. The imposter was Jeffrey M. Silow, who consented to disbarment in 1987.

A staffing agency placed Silow with the Weiser firm in 2008. The Wall Street Journal reports that despite his disbarment, Silow apparently worked for the staffing agency as a contract attorney for at least eight years prior to that.

Kansas Judge James Vano slashed the firm's requested $4.25 million to $450,000. The firm maintains that despite Jeffrey Silow's deceptions as to his licensure, its records are accurate and that the award is justified based on the results. An appeal is pending.

## Annual Attorney Registration Opens in May

**May 8th – Online Registration Portal Opens**
**July 1st – Registration Due Date**

Online registration for Active and Inactive Attorneys, Attorney Participants in Defender or Legal Services Programs, In-House Counsels, and Foreign Legal Consultants will soon be open. Do not attempt to complete the annual registration process prior to May 8th. The ability to register online will not be available for attorneys who are currently on Retired status or are Administratively Suspended.

Attorneys have the option to pay their annual fee by credit card or by voucher and check. Last year, 60,790 attorneys paid with a credit card and 13,700 attorneys paid by voucher.

### License Status with the Pennsylvania Bar

| | |
|---|---|
| Active | 65,522 |
| Inactive | 10,726 |
| Retired | 17,447 |

2 of 6

4/22/2017 11:17 AM

EXHIBIT 35
495

## What, if anything, should the Chester County Judiciary do about the WEISER lawfirm located at Cassatt drive in Berwyn Pennsylvania?

This ball has bounced into your lap because the Chester County Bar association likes to (1) plan picnics, (2) do seminars with guest speakers, (3) hold "chummy bench-bar events" where the lawyers in West Chester can snuggle up to the Judges before whom they practice and (4) other meaningless social activities .

When it comes to exercising discipline and control over the very profession of lawyer, so that the profession can continue on its very marginal journey toward public acceptance and respect..... well........ you know..... that's a troubling matter and sometimes, you know..... it's better to just let things work themselves out !!!

In other words, we ain't going to do shit about this !!!!

The Weiser lawfirm is a six(6) man operation located on Cassatt drive in Berwyn , Chester County. This ugly situation involves the famous...... or should we say "INFAMOUS" class action lawsuit. Known as the pride of the Ninth Circuit Court of Appeals in Northern California. It involves a simple but very lucrative operation. You get a friendly judge--- ------the friendlier the better--- to award class action status to your firm in order to "economically (HaHaHa)" represent a class of people who might not otherwise be able to sue the offending corporation on an individual basis. Whne the smoke clears, every member of the class gets $26.54 and you get $4.5 million dollars. In this case, Andrew Silow Esquire, who *DOES HAVE* a license to practice law in Pennsylvania was ~~essentially~~ putting in 6,905 hours of work and billing $4.5 million. But then...OMG... it wasn't Andy at all. It was Jeff Silow who had been disbarred 30 years ago in 1987 who was billing 6,905 hours for the WEISER lawfirm. Judge <u>JIMMIE VANO in Kansas, God Bless His soul, caught the firm in the act and knocked out 90% of their billing</u> They claimed shock & surprise.

EXHIBIT 35
496

Imaginary dialogue:

"We were totally shocked to find out that he wasn't Andy after all but that he was Jeff"

Did he always answer to the name Andy so that if someone said "Hey Andy, come here and look at this?", he would automatically respond

"Well...... yes, probably... I would say probably"

Did he ever take a phone call for Jeff Silow?

"Well.....I actually can't recall if he did or not. I mean it was not a thing that we paid attention to"

When he cashed office checks in his name was the name Andy Silow on each and every check. If we audited all of the checks written to him over the last 3 years, would all of them have been issued to Andrew Silow and endorsed by Andrew Silow?

"Well..... I am not sure about that. We will have to go back and check our records"

Do you have any idea what 6,905 billable hours comes to ?

"Not really"

Would you be surprised if , at 40 hours a week for every week in the year it comes to 162 weeks and that comes to over 3 consecutive years? (No Response)

Weren't you just a little suspicious that he spent every working hour of every day in the week , for over 3 years on just one file in the office?

"Well........ YES ..... it did strike us as a little bit odd. Yes"

How could you pay him salary for over 3 years if he worked on only one file in the office? That's a little absurd isn't it?

"Well I get where you are going with this line of questioning. Are you saying that we knew that he was a disbarred lawyer and we were trying to milk the class action jackpot with his phony billing"

You said it better than I could.

"Well, you can *GO FUCK YOURSELF ASSHOLE. I'M OUT OF HERE AND YOU CAN TALK TO MY LAWYER IF YOU WANT*

EXHIBIT 35
497

# EXHIBIT 18

EXHIBIT 35
498

**From:** Michael Hartleib
**Sent:** Saturday, May 19, 2018 5:40 PM
**To:** 'Laura Jakubec' ; mark.mcgrory@eriseip.com; jay.kasner@skadden.com; scott.musoff@skadden.com; jennifer.berhorst@bryancave.com; sarah.holdmeyer@bryancave.com
**Cc:** 'Tom Hershewe' ; Robert Weiser ; Brett Stecker ; James M. Ficaro
**Subject:** RE: ROSS-WMS v. Spring, et al. - Appellate Case No.: 17-117139-A

Plaintiff Counsel, and I use this term loosely, when making false allegations against a party I would suggest you at least get it right. I am no expert, but I am pretty sure it would be libelous! I will demonstrate its proper use posthaste!

**From:** Laura Jakubec [mailto:lauraj@dollar-law.com]
**Sent:** Friday, May 18, 2018 2:12 PM
**To:** mark.mcgrory@eriseip.com; jay.kasner@skadden.com; scott.musoff@skadden.com; jennifer.berhorst@bryancave.com; sarah.holdmeyer@bryancave.com; Michael Hartleib <mjhartleib@gmail.com>
**Cc:** Tom Hershewe <tom@dollar-law.com>; Robert Weiser <rw@weiserlawfirm.com>; Brett Stecker <bds@weiserlawfirm.com>; James Ficaro <jmf@weiserlawfirm.com>
**Subject:** ROSS-WMS v. Spring, et al. - Appellate Case No.: 17-117139-A

Counsel - please find a courtesy copy of the pleading which was efiled this afternoon in this matter. Thank you.

Laura Jakubec, Legal Assistant
lauraj@dollar-law.com

1

EXHIBIT 35
499

## DOLLAR
## BURNS &
## BECKER
TRIAL ATTORNEYS

1100 Main Street, Suite 2600
Kansas City, MO 64105
Phone: (816) 876-2600
Fax: (816) 221-8763

This electronic message transmission and any files transmitted with it, are a communication from the law firm of Dollar Burns & Becker, L.C. This message contains information protected by the attorney/client privilege and is confidential or otherwise the exclusive property of the intended recipient. This message contains This information is solely for the use of the individual or entity that is the intended recipient. If you are not the designated recipient or Dollar Burns & Becker, L.C. delivering the communication to its intended recipient, please be aware that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this electronic transmission in error, please notify by telephone (877-816-2600), or by electronic mail (lauraj@dollar-law.com) and promptly destroy the original transmission. Thank you for your assistance.NOTICE: The Missouri Bar and Missouri Supreme Court require all Missouri attorneys to notify e-mail recipients that e-mail is not a secure method of communication, that it may be copied and held by any computer through which it passes, and persons not participating in the communication may intercept the communication. Should you wish to discontinue this method of communication, please advise, and no further e-mail communication will be sent.

2

EXHIBIT 35

# EXHIBIT 19

EXHIBIT 35
501

**From:** Michael Hartleib
**Sent:** Saturday, June 02, 2018 12:12 AM
**To:** 'Boren, Jill, DCA'
**Cc:** 'Brian J. Robbins' ; James M. Ficaro ; 'George C. Aguilar' ; scott.musoff@skadden.com; jenness.parker@skadden.com; MARK.MCGRORY@ERISEIP.COM; perry.brandt@bryancave.com; sarah.holdmeyer@bryancave.com; jennifer.berhorst@bryancave.com; 'Tom Hershewe' ; Brett Stecker ; Robert Weiser
**Subject:** Judge Presses Lead Plaintiff in State Street Bank Lawsuit on Overbilling Questions | National Law Journal

Dear Ms. Boren, I thought the Honorable James Vano would find the link to the National Law Journal Article of interest. It is clear that the Plaintiff's Bar is rife with corruption, in both Class Action and Derivative cases. Much like the fraud Weiser et.al. committed in the "Ross-Williams" case, it appears to be standard operating procedure for many firms to submit millions in fraudulent fee requests upon the Court. This State Street case involves large well established firms and nearly 100 million in fees. At present, it appears Weiser et.al. has not been out done, as there is no mention of the unlicensed practice of law by a convicted felon using an alias.

I will be contacting the Special Master, and filing an Amicus Brief in the State Street case to inform them of the chicanery that has taken place in the "Ross-Williams" case. Although entirely unrelated, it presents a troubling pattern of fraud and corruption in these lawyer driven cases. I will be seeking public dissemination of the Special Master's report to show the breadth of corruption within the Plaintiffs Bar. The actions of Weiser et.al. and the Firms in the State Street case is the very definition of Racketeering, and warrants legislative reform.

1

EXHIBIT 35

https://www.law.com/nationallawjournal/2018/05/31/judge-presses-lead-plaintiff-in-state-street-bank-lawsuit-on-overbilling-questions/

Michael Hartleib 646-494-5901

EXHIBIT 35
503

# EXHIBIT 20

EXHIBIT 35
504

**From:** Michael Hartleib
**Sent:** Friday, August 17, 2018 10:45 PM
**To:** Robert Weiser
**Cc:** Brett Stecker
**Subject:** Forthcoming hearing

Rob, will you be at the Witmer v Steven hearing on the 27th? I will do my best to attend. I am very familiar with Judge Carney? We can discuss my concerns with L.C, A 10 and several other companies in which I am a shareholder. It appears we will be forced to deal with each other for the foreseeable future. In hindsight, I should have avoided stocks, and invested more in real estate. Our interest were supposed to be aligned. Instead, I was attacked! If you have any questions, or wish to proffer an apology, you know how to reach me. That said, other action is eminent!

EXHIBIT 35
505

# EXHIBIT 21

EXHIBIT 35
506

1

2

# IN THE DISTRICT COURT NORTHERN DISTRICT OF GEORGIA ATLANTA DIVISION

3

4   GEORGE ASSAD, derivatively on behalf of          Case No.: 1:18-cv-00477-TWT
    EQUIFAX, INC.,
5                        Plaintiff,

6   -against-                                        FILED IN CLERK'S OFFICE
                                                         U.S.D.C. - Atlanta
7
                                                       MAR 1 5 2018
8   RICHARD F. SMITH, JOHN W.
    GAMBLE, JR., JOHN J. KELLY, III,                  JAMES N. HATTEN, Clerk
9   RODOLFO O.PLODER, JOESPH M.                      By:                 Deputy Clerk
    LOUGHRAN, III, ROBERT D. DELEO,
10  WALTER W. DRIVER, JR., MARK
    L.FEIDLER, G. THOMAS HOUGH, L.
11  PHILLIP HUMANN, ROBERT D.
    MARCUS, SIRI S. MARSHALL, JOHN A.
12  MCKINLEY, ELAN B. STOCK and
    MARK B. TEMPLETON,
13

14
                        Defendants,
15
        -and-
16
    EQUIFAX, INC., a Georgia Corporation,
17
                        Nominal Defendant.
18

19

20

21

22

23  **MICHAEL HARTLEIB, SHAREHOLDER AND CONCERNED CITIZEN,**
    **MOTION FOR ACCEPTANCE OF AMICUS CURIAE BRIEF IN**
24  **OPPOSITION TO THE APPOINTMENT OF THE WEISER FIRM AS CO-**
    **LEAD COUNSEL**
25

26

27

28

EXHIBIT 35
507

**STATEMENT**

Your Honor, Michael Hartleib respectfully seeks leave of the Court, allowing the filing of his Amicus Brief to inform the Court of troubling abuse of process by Weiser et.al. Details of which, are outlined in the Amicus Brief and exhibits. Whereby, providing information germane to the Courts appointment of Weiser et.al as co-lead Counsel. The Court must know of their chicanery in order to protect the public interest and shareholders of Equifax derivatively. It appears that Weiser et.al. failed to inform the Court of the ongoing Pennsylvania Bar investigation, and criminal charges against one of their attorney's. This not surprising considering their contemptuous actions before the Kansas Courts. Their candor or lack thereof should help the Court decide whether leave should be granted.

**CONCLUSION**

Your Honor, for all of the reasons set forth in the Amicus Brief, I hereby request the Court grant leave to file said brief, and reconsider the appointment of Weiser et.al. as co-lead Counsel.

Respectfully,

Michael Hartleib
(646) 494-5901
mjhartleib@gmail.com
27020 Alicia Parkway Suite G
Laguna Niguel, CA 92677

EXHIBIT 35
508

1
2

## IN THE DISTRICT COURT NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

3

4     GEORGE ASSAD, derivatively on behalf of      Case No.: 1:18-cv-00477-TWT
5     EQUIFAX, INC.,
                      Plaintiff,
6
      -against-
7
8     RICHARD F. SMITH, JOHN W.
      GAMBLE, JR., JOHN J. KELLY, III,
9     RODOLFO O.PLODER, JOESPH M.
      LOUGHRAN, III, ROBERT D. DELEO,
10    WALTER W. DRIVER, JR., MARK
      L.FEIDLER, G. THOMAS HOUGH, L.
11    PHILLIP HUMANN, ROBERT D.
      MARCUS, SIRI S. MARSHALL, JOHN A.
12    MCKINLEY, ELAN B. STOCK and
13    MARK B. TEMPLETON,
14
15                    Defendants,
16    -and-
17    EQUIFAX, INC., a Georgia Corporation,
18                  Nominal Defendant.
19
20

21
22
23    **AMICUS CURIAE BRIEF OF CONCERNED CITIZEN AND**
24    **SHAREHOLDER MICHAEL HARTLEIB IN OPPOSSITION OF THE**
      **APPOINTMENT OF THE WEISER FIRM AS CO-LEAD COUNSEL**
25
26
27
28

EXHIBIT 35
509

## STATEMENT

Michael Hartleib respectfully submits the following in the public interest, and preservation of jurisprudence as a whole.

## OVERVIEW

Your Honor, it is with supreme concern that I inform this Court of troubling actions of Weiser et.al, in the state of Kansas by way of a Derivative suit, captioned *Monica Ross-Williams v. Robert Bennett et.al, (11-cv-01688) Appellate (17-117139-a)*. As a shareholder of Sprint Nextel, with losses in excess of seven hundred thousand dollars, I was forced to defend my interest by objecting to a proposed settlement in the aforementioned case. I had to commence a crash course in Derivative litigation, and partake in an eighteen-month battle, which continues today, awaiting an Appellate Court ruling. The so-called reforms outlined in the settlement were illusory and misdirected, as the nominal Defendant in which the case was brought no longer exists. Sprint Nextel was acquired by Softbank. Weiser et.al lied, misleading the court to infer jurisdiction it lacked. They filed the case against Sprint Nextel, a Kansas corporation, but sought to impose reforms on Sprint, a newly formed Delaware corporation in violation of their bylaws. They failed to file a change of party notice in an attempt to confuse the Court and avoid challenges of standing, and subject matter jurisdiction. They used an **unfit plaintiff** who had little or no involvement in the case. On March 6, 2017, I called Monica Ross-Williams, whereby it became painfully clear that she was wholly uninformed. She was not aware of Judge Vano's scathing orders, or that an

2

EXHIBIT 35
510

1    appeal was filed on her behalf. (*See exhibit A, Orders from Judge Vano*)  She was

2    unaware that Weiser et.al. committed perjury and admitted to billing fraud. Mr. Weiser

3    failed to provide his "<u>client</u>" with copies of letters sent to Judge Vano, and Appellate

4    Clerk Douglas Shima, admitting to fraud upon the Court. *(See exhibit B, Weiser letters)*

5    During the call, she continually referred to herself as the Defendant, until I informed

6    her that she was in fact the plaintiff. *(See exhibit C, declaration of Michael Hartleib).*

8        Your Honor, the actions by these so-called officers of the Court is truly

9    unconscionable. Weiser et.al. submitted over eight thousand hours in fraudulent

10    billing, seeking 4.5 million dollars in fees, 1.6 million of which submitted by a

11    criminal and disbarred attorney using his son's name, Alexander as an alias. Mr.

12    Jeffrey Mark Silow has worked for the Weiser firm for over 10 years, billing millions

13    of dollars in illicit fees, in a multitude of cases across the country. Jeffrey Mark Silow

14    was convicted and disbarred in 1989 for insurance fraud, mail fraud, and forgery. Mr.

15    Silow was caught after forging a will, making himself the beneficiary of a million

16    dollar estate, stealing the inheritance from the rightful heirs. *(See exhibit D, WSJ*

17    *article)*

19        After providing information to the Class Action Fairness Center, Ted Frank

20    confronted the Weiser firm about Mr. Silow's status. With a proverbial gun to his head,

21    Mr. Weiser attempts to exonerate his firm by claiming to be a **victim** of Mr. Silow's

22    chicanery. In letters to the Court, Mr. Weiser states that he was unaware of Silow's

23    disbarred status and criminal past. Weiser claims that he had no idea that Alexander

24    was not Silow's real name. <u>Clearly, this strategy was not well thought out. Attached to</u>

25    <u>the letters was a copy Mr. Silow's resume from Abelson Legal Services, proving Mr.</u>

26    <u>Silow was presented as Jeffrey Mark, not Alexander at the time of hire</u>. In addition, the

27    resume shows Mr. Silow as an attorney in the District Columbia, never Pennsylvania

28    as Weiser et.al. averred under penalty of perjury. In open Court, and through pleadings,

1    Weiser et.al makes more false statements, by claiming Mr. Silow was a securities

2    expert, who bills at $350 dollars per hour. Mr. Stecker has made all appearances on

3    behalf of the Weiser firm; he has repeatedly perjured himself, found himself unable to

4    answer the most rudimentary of questions regarding his case. Frankly Your Honor, his

5    appearances were an utter embarrassment to the Plaintiff's Bar. During a six-hour

6    settlement hearing, Judge Vano expressed skepticism over the eight thousand hours

7    billed in the stayed case. He warned Weiser et.al. to take a careful look at their fee

8    request. Instead of heeding Judge Vano's advice, **plaintiff's counsel doubles down**,

9    filing perjuriously declarations. In Mr. Silow's declaration he admonishes Judge Vano,

10    stating *"how dare you question my hours, I have worked each and every one of these*

11    *hours, and have been an officer of the Court in good standing for over forty years,*

12    *without so-much as a disciplinary action."* *(See exhibit E, Silow declaration)* This,

13    while knowing his status as a criminal and disbarred attorney.

14

15        Weiser et.al. would stop at nothing to protect their criminal enterprise, I was

16    subjected to vicious ad hominem attacks as I exposed their duplicitous acts and

17    conspiracies against the Court. Sadly, this is not an isolated incident; in fact, this is the

18    fourth case in which Weiser et.al has falsely purported to represent the interest of a

19    corporation in which I was a large shareholder, having lost hundreds of thousands of

20    dollars! These cases have been entirely lawyer driven, as this firm sees plaintiff's as a

21    **"necessary nuisance"**. They do not want an aggrieved party demanding tangible relief

22    on behalf of a company. At best, they seek a disinterested party who will not object to

23    a settlement providing nothing more than millions in attorney's fees. Fortunately, the

24    Honorable James Vano was not convinced by the Weiser firm's self-serving

25    arguments, or their desperate attempts proffering support for their fees. Judge Vano

26    ordered Weiser et.al. to submit their time-logs for an in-camera review. After six

27    months of careful deliberation, Judge Vano issued the first of two scathing orders,

28    wherein he excoriates Weiser et.al, finding that the time-logs submitted were not

EXHIBIT 35

1  credible, henceforth they were fraudulent! Although Judge Vano narrowly approved
2  the settlement, he slashed the 4.5-million-dollar fee request by **ninety percent,**
3  awarding a total of 450 thousand dollars in fees, and expenses. This was prior to the
4  Court's knowledge of Silow's criminal past and disbarred status.
5
6      Your Honor, it is unconscionable to think that after Judge Vano's highly critical
7  orders, that Weiser et.al. would not except the ruling, and quit while ahead, clearly
8  dodging a bullet. Instead, with hubris and utter contempt for the Court, they have the
9  temerity to ask Judge Vano for what is <u>tantamount to a **do-over,**</u> in the form of a
10 motion to Alter or Amend. *(See exhibit F, Objector's response to second Motion to*
11 *Alter or Amend)* They ask Judge Vano to remove all of the <u>damaging statements of</u>
12 <u>fact</u>, on the basis that it would <u>"hurt"</u> their reputations. They told Judge Vano that with
13 a few strokes of his pen he could fix everything, saving them untold amounts of
14 money, and countless hours of time trying to defend their contemptuous actions in the
15 case. Rightfully, they were concerned that the damaging orders would prejudice their
16 firm in other cases. They expressed concern, that the orders would be used to inform
17 other Courts of their <u>Self-Dealing</u>, <u>Unclean Hands</u> and <u>Shameful Violations of Public</u>
18 <u>Trust.</u> Wherefore, they confirm and acknowledge the gravity and consequence of their
19 subterfuge. *(See exhibit G, plaintiff's second Motion to Alter or Amend).* The Motion
20 led to the second scathing order by Judge Vano, wherein he is unconvinced by their
21 absurd requests, and reaffirms his opinion in the strongest of terms. Unbelievably,
22 blinded by greed, Weiser et.al. informs Judge Vano of their intent to appeal the fee
23 reduction. Despite being admonished by Judge Vano, and caught committing billing
24 fraud, Weiser et.al. was unrelenting in their zealous quest for reinstatement of four
25 million dollars in unwarranted fees. Truly reprehensible! During the settlement
26 hearing, Mr. Stecker repeatedly informed Judge Vano that the settlement was obtained
27 through <u>"hard fought litigation"</u>. Mr. Stecker apparently considers the filing of a
28 **piggyback derivative suit** with valid claims, jettisoning said claims, staying the case

5

EXHIBIT 35
513

for years so that enough time passes to allow one to bill thousands of fraudulent hours, and millions of dollars, "Hard Fought Litigation". Pretending to review millions of documents from a Class Action, led by sister firm Robbins Geller, that facilitates no additional discovery, not a single document request, or deposition over a seven year period is certainly not tantamount to "hard fought" by my standards. Your Honor, from what I have witnessed, it appears Weiser et.al. follows a different set of standards, one that sets the bar at new lows. This perspective coming from a layperson with no legal background. The only thing hard fought in this case, was the Weiser firm's desperate attempt to unjustly enrich themselves by four million five hundred thousand dollars, on the backs of those they falsely purport to represent.

Your Honor an appeal was filed where I ask the Court to remand and rescind the case with directives for punitive sanctions, and a disgorgement order forcing the return of the four hundred fifty-thousand-dollar fee award. I argue that, Monica Ross-Williams, by way of her Counsel has unclean hands and therefore not entitled to equitable relief from the Court. Although initially set for summary calendar, I was able to compel the Appellate Court to grant oral argument. I attended the hearing on 2-13-18, although Robert Weiser was admitted pro hac vice, he failed to attend the hearing. The Weiser firm has retained counsel from an ethics and professional liability firm, likely at the request of their insurer. One could surmise that his failure to appear was on the advice of counsel. Chief Justice, Karen Arnold Burger informed those in attendance that the Court found this case very interesting and would not be as strict with enforcement of its time limits. Wherefore, the Court granted all in attendance more than double the docketed time. Mr. Stecker appeared on behalf of Weiser et.al, where he informed the Court that he had nothing to say, and that the firm stands on its pleadings. The Court was quick to respond, making it clear that they had questions for him regarding the criminal acts of Weiser et.al. Mr. Stecker faced a litany of cross-examining questions from the Appellate Court Justices, whereas he was unable to

provide cogent answers to most. Despite Mr. Stecker's attempts to convince the Court that Weiser et.al. was an unwitting victim of Mr. Silow, the Court appeared less than convinced. Mr. Stecker informed the Court that the Pennsylvania Bar was about to wrap up their investigation into the Weiser firm regarding the Sprint Nextel case, and find no need for disciplinary action, at which time, Justice David E. Burns stated, **"good to know counselor, this Court will be certain that the Pennsylvania Bar gets a copy of its forthcoming order"**. During my fifteen-minute rebuttal, Chief Justice Karen Arnold Burger stated, we concur that fraud was committed in this case with regard to the billing.

Your Honor, what I witnessed in this courtroom was worse than what transpired before the Honorable James Vano, which led to the highly critical orders. By all accounts, it was a train wreck of epic proportion for Weiser et.al. It is my belief that this will be reflected in the forthcoming order, which the clerk says is expected within the next thirty days!

Heretofore, whether Weiser et.al. knew of Mr. Silow's criminal past and disbarred status, is immaterial. Judge Vano clearly states in his order that even a cursory review of the time-logs would allow any reasonable person to ascertain that they were not credible. This begs the question, <u>what is going on at the Weiser firm? Either they are completely corrupt, or entirely inept</u>, whichever the case they are not fit to act as lead on any representative suit. It is undisputed that the Weiser firm has committed criminal acts upon the Kansas Court and a multitude of others across the country.

1

2

3

4

### **CONCLUSSION**

5    Your Honor, given the forthcoming order from the Appellate Court, the

6    duplicitous acts of Counsel, and active Bar investigation of the Weiser firm, I

7    respectfully request acceptance of this brief as part of the record, and the

8    reconsideration of the Weiser firm's appointment as lead Counsel in this case. I

9    welcome the opportunity to appear before the Court and provide sworn testimony. I

10    encourage the Court to demand the same of Mr. Weiser. I stand ready to provide any

11    additional information the Court may seek.

12

13    Respectfully,

14

15    Michael Hartleib

16    20720 Alicia Parkway Suite, G

17    Laguna Niguel C.A. 92677

18    (646) 494-5901

19

20

21

22

23

24

25

26

27

28

8

EXHIBIT 35
516

# EXHIBIT 22

EXHIBIT 35
517

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | |
|---|---|
| IN RE EQUIFAX, INC. DERIVATIVE LITIGATION | Lead Case No.: 1:18-cv-00317-TWT |
| | (Consolidated with Nos.: 1:18-cv-00477-TWT and 1:18-cv-00577-TWT) |
| This Document Relates To: | (Consolidated Derivative Action) |
| ALL ACTIONS. | Judge Thomas W. Thrash, Jr. |

## OPPOSITION TO MICHAEL HARTLEIB'S MOTION FOR LEAVE TO FILE AMICUS CURIAE BRIEF

Plaintiff George Assad and his undersigned counsel, The Weiser Law Firm, P.C. (the "Weiser Firm"), respectfully submit this opposition to the Motion for Leave to Amicus Curiae Brief (the "Motion") filed on March 16, 2018 by non-party Michael Hartleib ("Hartleib").  As discussed herein, Hartleib's Motion should be denied and he should not be invited to participate in this shareholder derivative action (the "Action") because, *inter alia*: (a) Hartleib submits his proposed *amicus* filing not as a true, disinterested "friend of the court" or even as a shareholder of Equifax, Inc. ("Equifax"), but purely in an adversarial capacity in his continuing and openly hostile effort to harass and disturb the Weiser Firm, its clients, and other law firms with whom the Weiser Firm works; and (b) the

1

EXHIBIT 35
518

substance of Hartleib's proposed *amicus* filing, which is replete with falsehoods and malicious, prejudicial attacks, has no bearing on this Action and will not assist the Court in fairly, accurately, and efficiently ruling in this Action.[1]

## A.    APPLICABLE STANDARDS FOR PROPOSED *AMICUS* FILINGS

"Whether to permit a nonparty to submit a brief, as *amicus curiae*, is, with immaterial exceptions, a matter of judicial grace." *Nat'l Org. for Women, Inc. v. Scheidler*, 223 F.3d 615, 616 (7th Cir. 2000). "Historically, *amicus curiae* is an **impartial individual** who suggests the interpretation and status of the law, gives information concerning it, and advises the Court in order that justice may be done, rather than to advocate a point of view so that a cause may be won by one party or another." *WildEarth Guardians*, 2012 WL 10028647 at *2. Where, as here, a proposed *amicus* submission comes from an individual with a partisan view, rather than an impartial one, the motion for leave to file an *amicus* brief should be denied,

---

[1]    Moreover, all movants for lead or co-lead plaintiff in this derivative Action and their respective counsel are more than capable of advocating for their positions without Hartleib's involvement or assistance, and Hartleib does not, and cannot, argue otherwise. *See, e.g., Hughes v. White*, 388 F. Supp. 2d 805, n.3 (S.D. Ohio 2005) (motion for leave to file *amicus* brief denied where movant had not argued or demonstrated that counsel did not adequately represent their clients' interests); *WildEarth Guardians v. Lane*, No. CIV 12-118 LFG/KBM, 2012 WL 10028647, at *4 (D.N.M. June 20, 2012) (denying motion for leave to file *amicus* brief and noting that "counsel of the parties…are fully capable of representing their positions without the assistance of an *amicus*…[t]his is not a situation where a party is not represented competently or not represented at all.").

EXHIBIT 35
519

because in such a scenario that individual is not acting as a "friend of the Court." *Leigh v. Engle*, 535 F. Supp. 418, 420 (N.D. Ill. 1982); *see also United States v. Bd. of Cty. Commissioners of the Cty. of Otero*, 184 F. Supp. 3d 1097, 1115 (D.N.M. 2015) (listing the first factor for courts to weigh in whether to accept an *amicus* brief as "whether the proposed *amicus* is a disinterested entity"); *WildEarth Guardians*, 2012 WL 10028647, at *4 (denying motion for leave to participate as *amicus curiae* and noting that movant "Sierra Club is not a disinterested entity").

Indeed, "[c]ourts generally permit *amicus* briefs only where the brief could provide helpful analysis of the law, and the proposed *amicus* has a special interest in the subject matter of the suit, or existing counsel is in need of assistance." *Sierra Club v. Virginia Elec. and Power Co.*, No. 2:15CV112, 2016 WL 5349081, at *2 (E.D. Va. Feb. 4, 2016) (internal quotations omitted).[2]  Otherwise, leave to file an *amicus* brief should be denied.   *Ryan v. Commodity Futures Trading Comm'n*, 125 F.3d 1062, 1063 (7th Cir. 1997).  The reasons for the policy of denying or limiting *amicus* submissions, as described by Judge Posner, include that

---

[2]   It is well-settled that *amicus* submissions are only supposed to provide the Court with helpful, impartial analysis on issues of *law* – they are not supposed to present a partisan account of purported *facts*.  *See, e.g., New England Patriots Football Club, Inc. v. Univ. of Colorado*, 592 F.2d 1196, 1198 (1st Cir. 1979); *Strasser v. Dooley*, 432 F.2d 567, 569 (1st Cir. 1970). Suffice it to say, an *amicus* submission should not focus on attacks on a party's counsel on matters unrelated to the Action.

EXHIBIT 35
520

courts have heavy caseloads and, therefore, need to minimize extraneous filings; that time and other resources required for preparation and study of, and response to, *amicus* briefs drive up the cost of litigation; and that proposed filings of *amicus* briefs are frequently attempts by non-parties to inject their own partisan views into litigation matters. *Voices for Choice v. Ill. Bell Tel. Co.,* 339 F.3d 542, 544 (7th Cir. 2003). That is precisely the circumstance presented by Hartleib in this Action.

**B.    HARTLEIB'S MOTION SHOULD BE DENIED**

The term "*amicus curiae*" is old Latin which literally means "a friend of the court," but Hartleib is no "friend" of this Court and is certainly not acting as one. Instead, he acts now purely as an adversary to the Weiser Firm and its clients. Hartleib's vicious and false attacks on the Weiser Firm, submitted to the Court under the guise of a proposed *amicus* filing without notice to or the consent of any of the parties to this Action, are merely Hartleib's latest efforts in his multi-year campaign to harass the Weiser Firm and exact retribution against the Weiser Firm for its refusal to pay Hartleib's extortive requests for money in connection with an unrelated shareholder derivative action. Hartleib is attempting to use his purported *amicus* filing in this Action as a weapon against the Weiser Firm and its clients, and this Court should not permit Hartleib's brazen abuse of the *amicus* mechanism to the partisan detriment of plaintiffs in this Action.

4

EXHIBIT 35
521

The proposed *amicus* filing before this Court can only be viewed in the context of Hartleib's unique relationship and history with the Weiser Firm, and when viewed in that context, it is obvious that Hartleib is anything but "impartial." In 2009, the Weiser Firm first came into contact with Hartleib and briefly considered representing Hartleib in connection with a shareholder derivative action to be brought on behalf of the company then known as Sprint Nextel Corp. ("Sprint") arising from Sprint's merger with Nextel Corp.    The Weiser Firm ultimately elected not to represent Hartleib in connection with that matter, however, because Hartleib intimated his intention to receive material compensation for his role as a derivative plaintiff.  *See* Declaration of Robert B. Weiser ("Weiser Decl.") filed herewith at ¶¶5-8, Ex. A.[3]  The Weiser Firm would not then, and will not now, ever agree to any such improper and unethical financial proposal from a derivative client.

The Weiser Firm would later go on to represent another Sprint shareholder in connection with that derivative action and would coordinate its efforts and collaborate with several other law firms and their clients in that case.  After several years, the Sprint derivative litigation was settled for a comprehensive set of corporate governance reforms for the benefit of Sprint, negotiated with the

---

[3]    In addition, the Weiser Firm was concerned that Hartleib suffered from a conflict of interest in pursuing the derivative litigation.  *Id*. at ¶¶5-8.

EXHIBIT 35
522

assistance of The Honorable Layn Phillips, a former U.S. District Court judge acting as neutral mediator.  Hartleib objected to the settlement, allegedly because he did not believe the settlement was in the best interests of Sprint, but made his true intentions clear by contacting the managing partner of the Weiser Firm days prior to the May 26, 2016 settlement hearing before the trial court and offering to withdraw his objection if the Weiser Firm was willing to enter into a lucrative "consulting agreement" with Hartleib.  Weiser Decl. at ¶10.  Of course, the Weiser Firm rejected Hartleib's improper and outrageous overture, just as years earlier it had refused to represent Hartleib as a derivative plaintiff in light of his improper demands for compensation.  *Id.*  Although the agreed-to, mediated fee for plaintiffs' counsel was ultimately reduced by the trial court in Sprint case, the settlement was eventually approved over Hartleib's objection, and Hartleib has appealed both that decision and the trial court's denial of Hartleib's application for financial compensation to the Kansas Court of Appeals.

Hartleib's proposed *amicus* filing in no way informs any issue before the Court in this Action and should not be permitted on the docket.  Hartleib is not an "impartial individual" suggesting the proper interpretation of any law, but rather a serial harasser of the Weiser Firm and its clients.  In March 2017, the Weiser Firm sought and obtained a protective order from the Kansas Court of Appeals in order

6

EXHIBIT 35
523

to stop Hartleib's vexatious and threatening phone calls and e-mails to its client in the Sprint derivative action in violation of the Kansas Rules of Professional Conduct.  *See* Weiser Decl. at Ex. B.  Notably, the Weiser Firm was forced to take this drastic step and obtain the protective order for its client in the Sprint derivative litigation because even after the Weiser Firm's client and the Weiser Firm directed Hartleib to cease and desist, Hartleib expressly refused to do so.  *Id.* at Ex. C.  The Protective Order was granted on March 30, 2017. *Id.* at Ex. D.

Hartleib has no interest in being a "friend of the Court" – but he seemingly has limitless interest in trying to antagonize and harm the Weiser Firm.  Because Hartleib's "proffer comes from an individual with a partisan, rather than impartial view, the motion for leave to file an *amicus* brief is to be denied, in keeping with the principle that an *amicus* must be a friend of the court and not a friend of a party to the cause."  *Leigh*, 535 F. Supp. at 420; *see also Bd. of Cty. Commissioners of the Cty. of Otero*, 184 F. Supp. at 1115 (listing the first factor for courts to weigh in whether to accept an *amicus* brief as "whether the proposed *amicus* is a disinterested entity").

Further, as if his open hostility to the Weiser Firm and its clients were not enough to disqualify Hartleib's proposed *amicus* brief, the contents of his brief have no "necessary bearing on this case [and] do not assist the Court in fairly,

7

EXHIBIT 35
524

accurately, and efficiently resolving this matter." *Sierra Club,* 2016 WL 5349081 at *3; *Hughes,* 388 F. Supp. 2d at 805, n.3 (denying motion for leave to file *amicus* brief where proposed brief attempted to introduce irrelevant "facts" into the record). The brief only includes Hartleib's warped recitation of purported "facts" about the Weiser Firm and contains no legal analysis whatsoever as to any issue before the Court in this Action. *See, e.g., New England Patriots Football Club*, 592 F.2d at 1198 ("While *amici* properly may provide assistance to the court on a legal question or present their view of a legal issue, they cannot properly present a partisan view of the facts."); *Strasser*, 432 F.2d at 569 ("An *amicus* who argues facts should rarely be welcomed."). Therefore, the proposed *amicus* brief must not be considered.

As to Hartleib's twisted account of the "facts," while the Weiser Firm will not address every fabricated quotation or outright lie in Hartleib's proposed *amicus* brief here,[4] the Court should be aware of certain facts pertaining to Jeffrey M. Silow, who was employed on several occasions by the Weiser Firm as a contract attorney through a legal search and placement firm, Abelson Legal Search, to perform document review work. Weiser Decl. at ¶16. In February 2017, the

---

[4]    Should the Court grant the Motion – which it should not – the Weiser Firm reserves all rights with respect to a substantive response thereto.

8

EXHIBIT 35
525

Weiser Firm was notified that Mr. Silow had been disbarred nearly twenty years ago and was using a fake bar identification number while holding himself out as being a member in good standing of the bars of the Commonwealth of Pennsylvania and the District of Columbia.[5] *Id*. at ¶17. The legal recruiting service was responsible for vetting the credentials of attorneys it placed and falsely held out Mr. Silow as a licensed attorney in good standing to the Weiser Firm. *Id*. at ¶16.

After learning of this deceit, the Weiser Firm immediately: (1) severed all ties with the independent contractor Mr. Silow; (2) notified the judge in every action where Mr. Silow's hours were reported as part of a lodestar calculation as being "attorney time"; (3) self-reported the incident to the Disciplinary Board of the Supreme Court of Pennsylvania; (4) notified the Montgomery County, Pennsylvania District Attorney and pressed criminal charges against Mr. Silow; and (5) instituted a civil action against Mr. Silow and Abelson Legal Search, which is currently pending in the Pennsylvania Court of Common Pleas for Chester County. *Id*. at ¶18.  Since then, Mr. Silow has pled guilty to three criminal counts

_____

[5]    Mr. Silow would represent himself to be his son, Alexander L. Silow, an actual member in good standing of the Pennsylvania bar. *Id*. at ¶19.

EXHIBIT 35
526

in Pennsylvania[6] and the Weiser Firm is unaware of any ongoing investigation by

the Disciplinary Board of the Supreme Court of Pennsylvania regarding the Weiser

Firm or any of its attorneys. *Id*. at ¶¶20, 22.

Hartleib's very use of the Silow scenario in his proposed *amicus* submission

for this Action and his conclusory mischaracterizations thereof, by maliciously

presuming the Weiser Firm's knowledge of Mr. Silow's disbarred status and false

affidavit to the Court, definitively demonstrates Hartleib's lack of actual interest in

the subject matter of the Action and his animus to the Weiser Firm.  Hartleib is

seeking to extend his malicious campaign against the Weiser Firm from the Sprint

derivative action to this Action, where the focus should be on the aggressive

prosecution of the rights of Equifax.[7]  The issues raised by the Motion and the

proposed *amicus* submission, apart from being demonstrably false, have no

relevance to this Action and the Weiser Firm respectfully requests that the Motion

be denied.

---

[6]     On December 19, 2017, Mr. Silow pled guilty to the following charges:
Unauthorized Practice of Law (42 Pa.C.S. §2524), Unsworn Falsification to
Authorities (18 Pa.C.S. §4904(b)) and Securing Execution of Documents by
Deception (18 Pa.C.S. §4114). *Id*. at ¶20.

[7]     While Hartleib vaguely describes himself in the Motion as a "shareholder,"
he conspicuously never refers to himself as a shareholder of Equifax, nor has he
offered any proof that he is a current Equifax stockholder.

10

EXHIBIT 35
527

Dated: March 22, 2018             **THE WEISER LAW FIRM, P.C.**

                                  *s/ Brett D. Stecker*
                                  _____
                                  Brett D. Stecker
                                  Robert B. Weiser
                                  James M. Ficaro
                                  22 Cassatt Avenue
                                  Berwyn, PA 19312
                                  Telephone:  (610) 225-2677
                                  Facsimile:  (610) 408-8062
                                  bds@weiserlawfirm.com
                                  rw@weiserlawfirm.com
                                  jmf@weiserlawfirm.com

                                  *Counsel for Plaintiff George Assad*

11

EXHIBIT 35

## RULE 7.1(D) CERTIFICATION

The undersigned counsel certifies that this document has been prepared with one of the font and point selections approved by the Court in Local Rule 5.1(C).

Dated: March 22, 2018

/s/ Brett D. Stecker
Brett D. Stecker (admitted *pro hac vice*)
THE WEISER LAW FIRM, P.C.
22 Cassatt Avenue
Berwyn, PA 19312
Telephone:  (610) 225-2677
Facsimile:  (610) 408-8062
bds@weiserlawfirm.com

12

EXHIBIT 35
529

## CERTIFICATE OF SERVICE

I hereby certify that on this 22nd day of March 2018 I electronically filed the above and foregoing with the Clerk of the Court using the CM/ECF system, which will automatically send email notification of such filing to all attorneys of record.

/s/ Brett D. Stecker
Brett D. Stecker (admitted *pro hac vice*)
THE WEISER LAW FIRM, P.C.
22 Cassatt Avenue
Berwyn, PA 19312
Telephone:  (610) 225-2677
Facsimile:  (610) 408-8062
bds@weiserlawfirm.com

13

EXHIBIT 35
530

# EXHIBIT 23

EXHIBIT 35
531

**From:** Michael Hartleib
**Sent:** Thursday, March 22, 2018 11:41 PM
**To:** James M. Ficaro
**Cc:** michaelhartleib@cox.net; Robert Weiser
**Subject:** Re: Response to Motion

James, much appreciated, I received these filings several hours ago! Let Rob know he is making a catastrophic mistake!

Sent from my iPhone

On Mar 22, 2018, at 8:20 PM, James Ficaro <jmf@weiserlawfirm.com> wrote:

> Mr. Hartleib, attached please find the filing made in the Equifax action today.
>
> Regards,
>
> Jimmy Ficaro
> **The Weiser Law Firm, P.C.**
> office: 610.225.0206 | fax: 610.408.8062
> 22 Cassatt Avenue | Berwyn, PA 19312

1

EXHIBIT 35
532

# EXHIBIT 24

EXHIBIT 35
533

**From:** Michael Hartleib
**Sent:** Thursday, April 05, 2018 4:02 AM
**To:** Robert Weiser ; Brett Stecker ; James M. Ficaro
**Cc:** mjhartlieb@gmail.com
**Subject:** Order

Just got home and wanted to make sure that you have this! Good to finally meet you Rob! Like I said, none of this was necessary!

http://assets2.pacermonitor.com/filings/IN_RE_EQUIFAX_INC_DERIVATIVE_LITIGATION/IN_RE_EQUIFAX_INC_DERIVATIVE_LITIGATION__gandce-18-00317__0053.0.pdf?X-Amz-Security-Token=FQoDYXdzEHAaDHNpyxtZ9eaCSNpv5SK3A4XhVthj018cuDu654%2FExY4%2Fg9ZaCeCByPPG7i29uIPAyPVOvhytRb5DJeJniWPr81PBIdOSLqrsMlpJjgowrxGSlsFTbjSPqy0ZVhh3dtTJAWhUS%2FUutbLl18hwSszkR6YA35WMA4AfBS9e8711qPujeJwAugTteBi35v4BZW3Jm3CXcZ8w%2BjDjOCTPVoiZOvgWuh4qvMkM%2BcwmH1%2Fk1AKAPOMd%2BhAO6OfXrhMvLPe2JfRxVZRvvyg8DzEEKL%2BAOihPTQZ1TlNcxSnF5vAUZHe3WNmJt1yVldIDu%2Bp60jpxLIq8oJnT9YWkBXqAliIONs45wrPt37Ng3gyZruDxrLM7MWr7TgZC%2BqtKCMrYpmyxx6m0GpKNPXoOaW0wYf7U2sIUwfc1vKtqqohCFd6llK%2FQtDI%2BGy7LPpjRbagA%2BEo84Xm1jQdKnMJFk59tugzZptTcF57DPdfkR6uYR8KD0K9EmDuSzoc%2BguoKj3HGGGJgramak%2FXJfaMaKd8WpGN0ltvpQcMGKwCVz6l46lxHoFO0fEqwasa58VWyaFSAOI1iI9CHL9HY4MpxFHbS6FkVmcy%2B9kZBXOuoorJKX1gU%3D&X-Amz-Algorithm=AWS4-HMAC-SHA256&X-Amz-Date=20180405T075451Z&X-Amz-SignedHeaders=host&X-Amz-Expires=600&X-Amz-Credential=ASIAJDQHBFVWORVMWGWA%2F20180405%2Fus-east-1%2Fs3%2Faws4_request&X-Amz-Signature=0f99bf3d5f9b1d5cc8952757237f74f7b8d33ff650f0845aa10a8ddcd6c5c7c5

Sent from my iPhone

EXHIBIT 35

# EXHIBIT 25

EXHIBIT 35
535

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

IN RE BIG LOTS, INC.                    Case No. 2:12–cv–445
SHAREHOLDER LITIGATION

                                        Judge Michael H. Watson

                                        Magistrate Judge Jolson

### OPINION AND ORDER

Louisiana Municipal Police Employees' Retirement System ("LAMPERS") and City of Atlanta Firefighters' Pension Fund ("Atlanta Firefighters," and together with LAMPERS, "Lead Plaintiffs"), plaintiff Lorene Lamb ("Lamb," and together with LAMPERS and Atlanta Firefighters, the "Consolidated Plaintiffs"), and additional plaintiff Alan Brosz ("Brosz," and together with the Consolidated Plaintiffs, "Plaintiffs") move for an order granting final approval of a derivative litigation settlement ("Settlement")[1] with Defendants Jeffrey Paul Berger, Steven S. Fishman, David T. Kollat, Brenda J. Lauderback, Philip E. Mallot, Russell Solt, Dennis B. Tishkoff, Joe R. Cooper, Charles W. Haubiel II, Timothy A. Johnson, Robert Craig Claxton, John Charles Martin, Norman J. Rankin, Paul Alan Schroeder, Robert Samuel Segal, and Steven Ray Smart (the "Individual Defendants"), and nominal defendant Big Lots, Inc. ("Big Lots" or the "Company," and together with the Individual Defendants, the "Defendants"),

---

[1] The Settlement is memorialized between the parties in a Stipulation and Agreement of Settlement dated December 14, 2017. ECF No. 116-1.

EXHIBIT 35
536

acting through its Special  Litigation Committee ("SLC").  ECF No. 121.  Plaintiffs also move for an award of attorney's fees and expenses.  ECF No. 122.  Both motions are unopposed.  For the following reasons, Plaintiffs' motions are **GRANTED**.

## I.  BACKGROUND

The background of this case is laid out in great detail in the unopposed motion for final approval, ECF No. 121, and does not need to be repeated in-depth in this Opinion except as necessary to analyze the reasonableness of the Settlement.  As an initial overview, it suffices to say that Plaintiffs' only remaining claim against Defendants is for corporate waste by some of Big Lots' current and former officers and directors in connection with an alleged insider selling scheme and stock repurchase plan.  After multiple lawsuits were filed, protracted discovery, rulings on some dispositive motions, and multiple rounds of mediation, the parties agreed on the Settlement.  On April 6, 2018, the Court preliminarily approved the Settlement.  ECF No. 120.  On July 26, 2018, the Court held a fairness hearing.  The Court now considers whether final approval of the Settlement is warranted.

## A.    The Proposed Settlement

The Settlement consists of two primary components: monetary relief and corporate governance reforms.  First, Defendants have agreed that Big Lots' directors' and officers' insurance carriers will pay Big Lots $3.5 million.  According to Plaintiffs' counsel, this payment represents a substantial percentage

EXHIBIT 35
537

of the potential damages, which were estimated to be between $8.2 million and $9.8 million.  Joint Decl. ¶ 49, ECF No. 123.  This money will be used to pay Plaintiffs' counsel's legal fees and expenses in this action as well as a portion of the settlement in a separate class action lawsuit (the "Willis Class Action"). Second, the parties have agreed that Big Lots will implement the following corporate governance reforms:

- Strengthening the Company's Insider Trading Policy, including implementing enhanced recordkeeping requirements for pre-clearance requests and a requirement that the General Counsel reports to the Nominating/Corporate Governance Committee on a semiannual basis about the Company's trading compliance program and related topics;

- Continuing to maintain a claw back policy that empowers the Compensation Committee of the Board of Directors to seek recovery of any excessive incentive-based compensation paid to any employee whose misconduct is found to have contributed to the Company's having to prepare an adverse accounting restatement;

- Engaging an outside consultant to provide continuing education to the Board of Directors on corporate governance topics including insider trading and securities laws;

- Enhancing the Company's Whistleblower Hotline procedures, including requiring the Audit Committee to receive and memorialize a report concerning any whistleblower complaint and follow-up action taken related to insider trading; and

- Amend the Company's Corporate Governance Guidelines requiring all directors to attend the Company's annual shareholder meeting in person.

**B.    Notice**

Big Lots submitted the affidavit of Robert W. Trafford ("Trafford"), one of the attorneys for the SLC.  ECF No. 126.  Trafford avers that Big Lots has complied with the notice provisions of the Preliminary Approval Order by

EXHIBIT 35
538

(a) Posting the Notice of Pendency and Proposed Settlement of Stockholder Derivative Litigation (the "Notice") and the Stipulation and Agreement of Settlement ("Stipulation") on its corporate website on April 13, 2018, where they have remained continuously since that date; and

(b) Filing the Stipulation and Notice as a Current Report on Form 8-K with the United States Securities and Exchange Commission on April 12, 2018 and posting the Form 8-K on its corporate website on April 13, 2018 where it has remained continuously since that date.

*Id.* at 1–2. The Court finds that there was sufficient notice provided to shareholders pursuant to Federal Rule of Civil Procedure 23.1.

## II. APPROVAL OF THE PROPOSED SETTLEMENT

This derivative action may only be settled with the Court's approval. Fed. R. Civ. P. 23.1(c). The Court "enjoys wide discretion in evaluating the settlement of derivative actions under Rule 23.1." *McDannold v. Star Bank, N.A.*, 261 F.3d 478, 488 (6th Cir. 2001) (citing *Granada Invs., Inc. v. DWG Corp.*, 962 F.2d 1203, 1205–06 (6th Cir. 1992)). "Settlements are welcome" in derivative actions and, "[a]bsent evidence of fraud or collusion, such settlements are not to be trifled with." *Granada*, 962 F.2d at 1205 (citations omitted). Relevant factors in evaluating the settlement "include the likelihood of success on the merits, the risk associated with the expense and complexity of litigation, and the objections raised by class members." *Id.* This Court has, on at least one occasion, also considered the other Rule 23(e) factors in determining whether a derivative action settlement should be approved. *McDannold v. Star Bank, N.A.*, No. C-1-94-002, 1999 U.S. Dist. LEXIS 22158, at *13 (S.D. Ohio June 2, 1999) (also

EXHIBIT 35
539

considering the amount of discovery conducted, whether the settlement was the result of an arms-length negotiation as opposed to fraud or collusion, and the opinion of counsel representing the parties), *vacated on other grounds*, 261 F.3d 478 (6th Cir. 2001). Based on all of these factors, the Court determines that the Settlement is fair, reasonable, and adequate.

## A.    Likelihood of Success on the Merits

"The most important of the factors to be considered in reviewing a settlement is the probability of success on the merits. The likelihood of success, in turn, provides a gauge from which the benefits of the settlement must be measured." *Poplar Creek Dev. Co. v. Chesapeake Appalachia, L.L.C.*, 636 F.3d 235, 245 (6th Cir. 2011) (quoting *In re Gen. Tire & Rubber Co. Sec. Litig.*, 726 F.2d 1075, 1086 (6th Cir. 1984)).

Both in the motion for final approval and at the fairness hearing, Plaintiffs asserted that they faced significant risks to successfully prosecuting their claims, including defeating the SLC's motion to dismiss and demonstrating Defendants' bad faith breaches of duty and resulting corporate waste. Mot. 21, ECF No. 121. Defendants assert in their motion to dismiss that the SLC's determination that it was not in Big Lots' best interest to pursue a corporate waste claim is entitled to great deference. Mot. to Dismiss 20, ECF No. 100. Plaintiffs go so far as to state in their motion for final approval that their corporate waste claim "would have been exceptionally difficult to prove." Mot. 18, ECF No. 121. Defendants were already successful on some dispositive motions in this case and had

EXHIBIT 35
540

winnowed down the claims brought to only corporate waste.  The likelihood of success for Plaintiffs was far from assured.  Thus, this factor weighs in favor of approval of the Settlement.

**B.    Complexity, Expense, and Likely Duration of the Litigation**

As the Sixth Circuit has noted, derivative actions are "notoriously difficult and unpredictable."  *Granada*, 962 F.2d at 1205 (quoting *Maher v. Zapata Corp.*, 714 F.2d 436, 455 (5th Cir. 1983)).  "[A]voiding the delay, risks, and costs of continued litigation against a defendant is a valid reason for counsel to recommend and for the court to approve a settlement."  *In re Nationwide Fin. Servs. Litig.*, No. 2:08-cv-249, 2009 U.S. Dist. LEXIS 126962, at *10 (S.D. Ohio Aug. 18, 2009).

This litigation has already lasted several years.  Absent settlement, continued litigation of this case would likely take more than a year and result in the parties incurring significant expense.  There is a pending motion to dismiss, which would likely be followed by motions for summary judgment, expert discovery and *Daubert* motions, and a complex trial.  Additionally, the parties are represented by very sophisticated counsel that would undoubtedly vigorously prosecute and defend the claims in this case.  This supports settlement.

EXHIBIT 35
541

### C.    Objections Raised by Shareholders

After having provided sufficient notice, no shareholder objected to the settlement.  This is strong evidence that shareholders believed the settlement to be fair, reasonable, and adequate.

### D.    The Amount of Discovery Engaged in By the Parties

To confirm that Plaintiffs "have had access to sufficient information to evaluate their case and to assess the adequacy of the proposed Settlement," the Court considers the amount of discovery engaged in by the parties.  *In re Broadwing, Inc. ERISA Litig.*, 252 F.R.D. 369, 374 (S.D. Ohio 2006).  "In considering whether there has been sufficient discovery to permit the plaintiffs to make an informed evaluation of the merits of a possible settlement, the court should take account not only of court-refereed discovery but also informal discovery in which parties engaged both before and after litigation commenced." *UAW v. Gen'l Motors Corp.*, No. 05-CV-73991-DT, 2006 WL 891151, at *19 (E.D. Mich. Mar. 31, 2006).  In this consideration, "the absence of formal discovery is not unusual or problematic, so long as the parties and the court have adequate information in order to evaluate the relative positions of the parties." *Id*.

The document production in this case totaled nearly 1,000,000 pages of documents.  Mot. 17, ECF No. 121.  The discovery process was hard fought at times, requiring multiple meetings between the parties and court resolution of some of the disputes.  There has been no indication that Plaintiffs lacked

EXHIBIT 35
542

information necessary to assess the strength of their case, which supports approval of the Settlement.

### E.    Arm's-Length Negotiation

The Court finds that there is no evidence—or even a suggestion—that the settlement was the product of fraud or collusion.  *See IUE-CWA v. Gen. Motors Corp.*, 238 F.R.D. 583, 598 (E.D. Mich. 2006) ("Courts presume the absence of fraud or collusion unless there is evidence to the contrary.").  The Settlement is the result of arm's-length, well-researched, and protracted negotiations that took place over the course of multiple years and involved at least two different mediation sessions with Robert A. Meyer, Esq., an experienced mediator.  This favors approval of the Settlement.

### F.    The Opinion of Counsel

The Court gives significant weight to the opinions of Plaintiffs' counsel, who have indicated that the Settlement is fair, reasonable, and adequate.  *See, e.g.*, *Williams v. Vukovich*, 720 F.2d 909, 922–23 (6th Cir. 1983) ("The court should defer to the judgment of experienced counsel who has competently evaluated the strength of his proofs . . . . [T]he deference afforded counsel should correspond to the amount of discovery completed and the character of the evidence uncovered.").  The SLC's counsel has also expressed the opinion that the Settlement benefits the Company.  *See* Joint Decl. ¶ 55, ECF No. 123.

In this case, Class Counsel have extensive experience in complex shareholder derivative and class action litigation and corporate matters.  *See*

EXHIBIT 35
543

*generally* ECF Nos. 123–25 (providing years of experience and background of counsel). After significant discovery and protracted arm's-length negotiations, the parties reached the Settlement. Equipped with extensive experience, counsel have concluded that the Settlement is a good result for Plaintiffs and the Company. The Court therefore finds that this factor favors approval of the Settlement.

After considering the relevant factors, the Court **APPROVES** the Settlement.

## III.  ATTORNEY'S FEES AND COSTS

### A.  Attorney's Fees

Plaintiffs' counsel has moved for an award of attorney's fees and costs. ECF No. 122. Defendants do not oppose the motion. In order to assess the reasonableness of the fee request, the Court first determines the method Plaintiffs' counsel used to calculate the fee. In this case, Plaintiffs are seeking a percentage of the fund award. Specifically, Plaintiffs' counsel seeks $1.25 million in fees, which represents 35.7% of the $3.5 million monetary settlement. Fee Mot. 8, ECF No. 122.

Next, the Court must analyze the factors laid out in *Ramey v. Cincinnati Enquirer, Inc.*, which include:

1) the value of the benefit rendered to the corporation or its stockholders, 2) society's stake in rewarding attorneys who produce such benefits in order to maintain an incentive to others, 3) whether the services were undertaken on a contingent fee basis, 4) the value of the services on an hourly basis, 5) the

EXHIBIT 35
544

complexity of the litigation, and 6) the professional skill and standing of counsel involved on both sides.

508 F.2d 1188, 1196 (6th Cir. 1974). Each of these factors favors approval of the requested attorney fee award.

First, the Court finds that the Settlement confers a substantial benefit on Plaintiffs. As discussed above, the $3.5 million payment represents a substantial percentage of the potential recovery in this case. Furthermore, as described both in the motion for final approval of the Settlement and at the fairness hearing, the corporate governance reforms that are included in the Settlement will be meaningful in preventing any future misconduct by Big Lots' officers and directors.

Second, society's stake in rewarding attorneys who produce such benefits supports an award of the requested attorney's fees. It is certainly in society's interest to have fiduciary laws and regulations enforced. If experienced counsel, such as the attorneys who represented Plaintiffs here, were unwilling to take on derivative action lawsuits for fear of not being compensated, it would be more difficult to enforce accountability for officers and directors.

Third, Plaintiffs' counsel agreed to undertake this case on a wholly contingent basis. *See* Fee Mot. 18, ECF No. 122. In doing so, Plaintiffs' counsel assumed a real risk by expending time, effort, and money over a period of approximately six years with no guarantee of recovery. This factor weighs in favor of approving the requested fee award.

EXHIBIT 35
545

The Court next considers whether the fourth factor, the value of the services on an hourly basis, favors the proposed fee award. A cross-check using Plaintiffs' counsel's lodestar weighs in favor of granting the requested fee award. Plaintiffs' counsel has provided evidence that they devoted 6,016.06 hours to this case and incurred a total lodestar of $2,843,323.50. Joint Decl. ¶ 60, ECF No. 123. The Court has reviewed the declarations of Plaintiffs' counsel and finds the blended rate charged and hours incurred to be reasonable based on the location and experience of counsel.[2] Therefore, the requested lodestar multiplier with respect to fees is approximately 0.44. In other words, Plaintiffs' counsel is taking a substantial discount on their fees as a result of the contingent fee nature of their representation, which strongly supports approval. *See Kritzer v. Safelite Sols.*, LLC, No. 2:10–cv–0729, 2012 WL 1945144, at *10 (S.D. Ohio May 30, 2012) ("As for the value of the services rendered on an hourly basis, this factor

---

[2] On August 24, 2018, well after the time to object and the fairness hearing took place, the Court received an email from Michael Hartlieb ("Hartlieb"), a shareholder who had an interest in a different case involving The Weiser Law Firm, P.C. ("Weiser"). In his email, Hartlieb raised concerns over Weiser's billing practices in this prior case and stated that he wanted to inform the Court so that it could scrutinize the fee request in this case. Hartlieb does not indicate that he is a shareholder in Big Lots or otherwise an interested party in this case. Furthermore, the Court always scrutinizes the billing records of plaintiffs' counsel before approving fee awards. Nevertheless, out of an abundance of caution, the Court re-reviewed Weiser's billing entries in this case and sees no similarities to the billing issues that may have occurred in the case involving Hartlieb. The Court held a teleconference with the parties on August 24, 2018, on which James Ficaro, one of the attorneys from Weiser, was afforded the opportunity to respond to Hartlieb's email. The Court is fully satisfied that the hours billed by Weiser were reasonable in this case.

Case No. 2:12–cv–445                                                Page 11 of 13

EXHIBIT 35
546

strongly favors the fee requested . . . . The amount of fees requested . . . is less than what the fee would be under a lodestar calculation.").

The remaining two factors, the complexity of the litigation and the professional skill and standing of the attorneys involved, has been discussed above and also supports approval of the attorney's fee request.

For all of these reasons, the Court concludes that Plaintiffs' counsel's request for $1.25 million in attorney's fees is reasonable.

## B.    Expenses

"Under the common fund doctrine . . . counsel is entitled to reimbursement of all reasonable out-of-pocket expenses and costs in the prosecution of claims, and in obtaining settlement, including but not limited to expenses incurred in connection with document productions, consulting with and deposing experts, travel and other litigation-related expenses." *In re Cardizem CD Antitrust Litig.*, 218 F.R.D. 508, 532 (E.D. Mich. 2003).

Plaintiffs' counsel has provided documentation to support $46,740.59 in expenses in prosecuting this action.  These expenses include, among other things, mail costs, meals, lodging, transportation, legal research, copying costs, telephone expenses, and court filing fees. *See* Joint Decl. Exs., ECF No. 123. These types of expenses are reasonable and necessary, and therefore entitled to reimbursement. *Rikos v. P&G*, No. 1:11-cv-226, 2018 U.S. Dist. LEXIS 72722, at **27–28 (S.D. Ohio April 30, 2018).

## IV.  CONCLUSION

Case No. 2:12–cv–445                                         Page 12 of 13

EXHIBIT 35
547

For the foregoing reasons, the Court **GRANTS** the unopposed motion for final approval of the settlement, ECF No. 121, **GRANTS** the unopposed motion for an award of attorney's fees and expenses, ECF No. 122, and **ORDERS** as follows:

1.     The Settlement is a fair, reasonable, and adequate resolution to this case for all parties, and is finally approved;

2.     To the extent not already done, the parties are **ORDERED** to perform under the terms of the Settlement;

3.     Plaintiffs' counsel are awarded $1,250,000 in attorney's fees and $46,740.59 in expenses, which shall be paid to lead counsel for distribution in accordance with the Settlement;

4.     The Court retains jurisdiction over this matter for purposes of enforcing the Settlement;

5.     This action is **DISMISSED with prejudice**, with each party to bear its own costs, except as described above.  The Clerk is **DIRECTED** to enter **FINAL JUDGMENT**.

     **IT IS SO ORDERED.**

**MICHAEL H. WATSON, JUDGE**
**UNITED STATES DISTRICT COURT**

EXHIBIT 35
548

# EXHIBIT 26

EXHIBIT 35
549

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF
MINNESOTA**

| | |
|---|---|
| IN RE: CENTURYLINK RESIDENTIAL CUSTOMER BILLING DISPUTES LITIGATION | MDL No. 17-2795 (MJD/KMM) |

This Brief Relates to:

    *Tansey v. Perry, et al.*, No. 18-cv-02460-MJD-KMM;
    *Flanders v. Post, et al.*, No. 18-cv-02833-MJD-KMM;
    *Ault v. Post, et al.*, No. 18-cv-02834-MJD-KMM;
    *Barbree, et al. v. Bejar, et al.*, No. 18-cv-02835-MJD-KMM;
    *Palkon v. Boulet, et al.*,
    No. 18-cv-[TBA]-MJD-KMM

**AMICUS CURIAE BRIEF OF SHAREHOLDER MICHAEL HARTLEIB AND
CONCERNED CITIZEN IN OPPOSSITION OF THE APPOINTMENT OF
ROBBINS ARROYO AND THE WEISER FIRM ET. AL. AS LEAD
COUNSEL IN THE CONSOLIDATED DERIVATIVE ACTION**

**<u>STATEMENT</u>**

Michael Hartleib respectfully submits the following in the public interest, and preservation of jurisprudence as a whole.

EXHIBIT 35
550

## OVERVIEW

Your Honor, it is with the utmost concern that I inform this Court of ongoing troubling actions by the Weiser and Robbins Arroyo et.al. Firms, the most egregious of which involves a lawyer driven Derivative case in the state of Kansas, captioned *Monica Ross-Williams v. Robert Bennett et.al, (11-cv-01688) Appellate (17-117139-a)*. Seeing Plaintiff's as a necessary nuisance, these firms seek parties that are disinterested at best or worse something more sinister. Often soliciting a Plaintiff that is not aggrieved, unqualified and willing to lend their name for nominal consideration in order to facilitate their lawyer driven **"Piggyback Litigation"**. These firms collude and conspire acting as one, whereby filing multiple Derivative cases on the backs of Securities, or Consumer Class actions. Their past duplicitous acts have included the use of the following as Plaintiffs, deceased parties, friends and family members which lacked standing, and paid serial criminal Plaintiffs like that of the infamous firm, Milberg Weiss. The latest and most creative use of unfit plaintiffs are those of shell LLC corporations created by the law firms. They fund an LLC, instruct a co-conspirator to purchase a nominal number of shares in as many publically traded companies that funds will allow giving them what appears to be a legitimate Plaintiff to facilitate their lawyer driven cases. The stock portfolio controlled by the LLC ultimately becomes payment for the co-conspirator for facilitating said cases. These firms fee split, interchange Plaintiff's, seek those that are compromised to generate thousands of billable hours for illusory work, submit fraudulent time logs and seek hundreds of millions in unjust fees in cases across the country. On information and belief, the firms bill the same hours for Counsel on multiple cases. Given that hundreds of thousands of hours have been billed in a multitude of cases that exceeds the number

2

EXHIBIT 35
551

of work hours in a defined period for the number of attorneys at the firm, it becomes obvious that duplicative billing is taking place.

Your Honor, my initial encounter with Robbins Arroyo, formerly known as Robbins Umeda was in 2006 wherein they filed a valuation suit surrounding the merger of Sirius and XM Satellite Radio, allegedly on behalf of Sirius shareholders. Unfortunately, their legitimate claims were jettisoned within days as they reached a settlement that did nothing more than indemnify Sirius management who were unjustly enriched and provide for millions in attorney fees. During this encounter, I discovered what I call a **"race to the bottom"**. Firms like Robbins Arroyo and the Weiser firm get a reputation for settling cases without meaning relief for those harmed, and providing broad-breadth release for those Executives that have damaged the Corporation and its shareholders in the first instance. Therein, these firms often do little more than indemnify wrongdoers in exchange for millions in attorney fees. As a large shareholder, I was forced to object to the Sirius settlement and discovered the Plaintiff in the case, Gregory Brockwell lacked standing; Mr. Brockwell never owned a single share of stock. He was a college friend of then partner Jeffrey P. Fink. After first enduring a litany of threats and then rebuffing Mr. Finks half a million-dollar offer to withdraw my objection, I contacted US attorney Richard Robinson, the FBI, and the San Diego District Attorney, Bonnie Dumanis to report the illicit acts of the Firm. Months later, Robbins Umeda dismissed their suit against Sirius and Mr. Fink was fired from the practice.

The wrongdoing continued in a Derivative case of behalf of Red Hat. (*Egelhof v. Szulik*) On February 4, 2008, Judge Tennille citing the solicitation of inadequate plaintiffs, in a *"needless rush to file a complaint"* and criticizing the firm's *"slapdash approach to representation"* and other professional misconduct, including inadequate communications with the plaintiff and the unauthorized practice of law in North

Carolina by out-of-state attorneys, entered an order prohibiting the firm, and Brian Robbins individually, from appearing *pro hac vice* in the state courts of North Carolina for a period of five years.

Several months later in 2008, in yet another lawyer driven Derivative case in the United States District Court for the Southern District of New York, purportedly brought on behalf of JPMorgan, a federal judge cited similarities between the conduct addressed in the *Red Hat Egelhof* sanctions order and the proceedings in *JPMorgan*. Judge Cote exposed an unfit Plaintiff Mr. Shroff, which was removed and later replaced with a serial criminal Plaintiff Robert L. Garber. Mr. Garber was ultimately deemed unfit and removed. Being caught red handed trying to deceive the Court in violation of the *PSLRA,* former US attorney and partner of Robbins Umeda, George Aguilar informs the Court on July 15, 2008 that his firm is abandoning the Class and no longer seeks a lead position. Instead, they collude with other firms in an attempt to insulate themselves and run the case through surrogate Alfred G. Yates who used the same Plaintiff, Robert L. Garber that Judge Cote previously deemed unfit. Mr. Yates, although clearly obtuse, is likely the most corrupt lawyer in the Plaintiffs' Bar with direct connections to convicted felons William Lerach and Melvin Weiss. He has earned the reputation as the **Litigation Kennel Groomer,** whereas he has facilitated hundreds if not thousands of cases with serial criminal plaintiffs for firms across the country. Robert L. Garber being one that was most prolific. *See Exhibit, A (Opinion and Order of the Honorable Denise Cote, entered September 19, 2008,) (Case No. 08CIV9774 (DLC)*;

In August of 2011, Robbins Umeda engaged in even more egregious conduct in two additional cases (*Carrigan v Solectron*) and (*Columbo v. Tara Gold*). In the Solectron case, Robbins Umeda is accused of abandoning the class to obfuscate facts surrounding illegal payments to professional plaintiffs including Steven Staehr. *See*

4

EXHIBIT 35
553

*Exhibit B, (Declaration of Richard Carrigan).* It is clear that Robbins Umeda once again put its interest ahead of the Class, which they had a fiduciary duty to protect. It should be noted that I was an absent class member is this case having been injured. After Robbins Umeda abandoned the Class to hide their criminal acts, the Class was left without recourse. Given the mess that was made of the case, and significant loadstar Robbins Umeda claimed to have, I and other Class members were unable to obtain Counsel to seek redress of the legitimate claims outlined in the suit.

In Tara Gold, it appears that Robbins Umeda filed the case without the knowledge or consent of the plaintiff. *See Exhibit, C (Motion for Sanctions & Declaration of Chris Columbo)* This led to yet another rule eleven-sanction request on behalf of the defendants. Although it is my understanding that sanctions were not granted it shows that the case was entirely lawyer driven.

Judge Davis, Counsel will likely attempt to convince this Court that these contemptuous acts have become less relevant given the passing of time, but these acts which span more than a decade prove a course of conduct that has continued to present day. The Ross-Williams case has some of the very same player's involved in the aforementioned cases. Robbins Arroyo, Alfred G. Yates and Bruce Murphy. They have worked together for years making hundreds of millions of dollars bastardizing our judicial process for their unjust enrichment. I submit that they have gotten away with this for far too long; it is time to reform the corruption rife throughout Derivative litigation.

Further complicating things in the Ross-Williams case is the fact the lead Counsel in the related Securities Class action, Robbins Geller is the sister-firm of Robbins Arroyo, co-lead Counsel in this case along with the Weiser firm. Robert Weiser is close friends with the Robbins brothers; he has worked in concert with them in hundreds of cases in many

5

EXHIBIT 35
554

1  jurisdictions. Darren Robbins is managing partner of Robbins Geller and Brian Robbins is
2  Darren's brother, and managing partner of Robbins Arroyo. Their modus operandi is Robbins
3  Geller files the Securities Class action, whereby doing the "heavy lifting", often obtaining
4  meaningful relief; conversely, Robbins Arroyo files the "Piggy Back" Derivative case which
5  is stayed for prolonged periods of time to ensure their fraudulent hours billed do not exceed
6  the number of work hours in a defined period of time. In this case, it required a stay of more
7  than 5 years, as they submitted an astonishing 18,000 hours and a 4.5 million dollar fee
8  request on an entirely dormant case! The majority of which was for illusory document review
9  done under the supervision of Robbins Arroyo on their software platform Relativity. This
10  case was managed and run by Robbins Arroyo, along with Weiser et.al.

12      In May of 2016, as large shareholder of Sprint Nextel, with loses over seven
13  hundred thousand dollars, I was once again forced to defend my interest by objecting
14  to the proposed settlement. I had to commence a crash course in Derivative litigation,
15  and partake in a David vs. Goliath battle, which continued for over 18 months. I was
16  forced to single handedly take on five firms that were coordinated in their efforts to
17  stop me. Appearing at each hearing was Brent Stecker for the Weiser firm and George
18  Aguilar for Robbins Arroyo. Many other attorneys were present but I was not privy to
19  their names. I was subjected to vicious ad hominem attacks as Weiser and Robbins
20  Arroyo et.al. proved they would stop at nothing in an attempt to protect their criminal
21  enterprise. The so-called reforms outlined in the settlement were nearly illusory and
22  misdirected, as the nominal Defendant in which the case was brought no longer exists.
23  Softbank acquired Sprint Nextel. Weiser et.al lied, misleading the court, interchanging
24  names of the former Kansas Corporation Sprint Nextel with Sprint the Delaware
25  Corporation. They failed to file a change of party notice in an attempt to confuse the
26  Court and avoid challenges of standing, and subject matter jurisdiction. They used an
27  **unfit plaintiff** who had little or no involvement in the case. On March 6, 2017, I called
28  Monica Ross-Williams, whereby it became painfully clear that she was wholly

6

EXHIBIT 33
555

uninformed. She was not aware of Judge Vano's scathing orders, or that an appeal was filed on her behalf. (*See Exhibit D, Order from Judge Vano*)  She was unaware that Weiser et.al. committed perjury and admitted to billing fraud. Mr. Weiser failed to provide his "client" with copies of letters sent to Judge Vano, and Appellate Clerk Douglas Shima, admitting to fraud upon the Court. *(See Exhibit E, Weiser letters)* During the call, she continually referred to herself as the Defendant, until I informed her that she was in fact the Plaintiff. Ross-Williams appeared to have not spoken with her Counsel for years and was devoid of any relevant facts of "her" case.  *See Exhibit G, (Declaration of Michael Hartleib).*

Your Honor, that 15-minute affable call with Monica Ross-Williams incensed Weiser and Robbins Arroyo et.al. as they immediately served me with a *Cease and Desist* Letter, fearing I had obtained information to prove Ross-Williams was a shill Plaintiff who had little or no involvement in the case. I replied by informing them that I would neither cease nor desist as the truth is an absolute defense. I informed them that they and their co-conspirators were the ones that needed to *Cease and Desist*. Although I had no need or intention to contact Ross-Williams again, informing the Appellate Court of same, Weiser et.al. was able to compel the Appellate Court under false pretenses to grant a protective order using the do not contact rule, Rule 4.2. I remain confused as to how a Rule addressing the Professional Conduct of attorneys applies to a layperson such as myself. It is my understanding that rule 4.2 is to prevent the sophistication and skill of Counsel from gaining unfair advantage over one less legally savvy when represented. My scenario appears to be in violation of First Amendment, wherefore it does not comport to the rule and is inapposite given the fact that I am not an attorney and have no legal background. Equally confusing is how the Appellate Court commends me for saving Sprint millions of dollars, exposing a conspiracy upon the Court, but then forces me to communicate with Ross-Williams corrupt attorneys the conspirators.

EXHIBIT 35
556

1

2    Judge Davis, this is of importance for multiple reasons, first Weiser and

3    Robbins Arroyo et.al. will likely use this in an attempt to attack my credibility and

4    convince this Court that I did something indecorous by making the single phone call to

5    Class representative Ross-Williams in the first instance. Weiser et.al. used this very

6    tactic in their failed opposition to a substantially similar Amicus Brief filed in the

7    Equifax data breach case in the Northern District of Georgia. The Weiser Firm, as well

8    as the firm of Johnson Fistel, (both seeking lead positions with this Court) were

9    appointed co-lead Counsel in the Equifax Derivative case, but other firms protested,

10   compelling a hearing to reconsider lead. After hearing from several firms and

11   testimony from Robert Weiser and myself, the Judge removed both firms from lead

12   position the following morning. Secondly and most importantly, I have commenced

13   litigation against Weiser et.al. and representative Plaintiff Ross-Williams for the

14   foregoing unconscionable acts that have transpired in the Kansas litigation. Weiser

15   et.al. has turned the case over to his insurer. *See Exhibit, H (Hartleib v.Wesier et.al.)*

16   This is the second active case that has arisen as a consequence of the chicanery in the

17   Ross-Williams action. Your Honor, I have read the Declarations in support of

18   appointment for lead in this case from the aforementioned firms professing their legal

19   skill, qualifications and alleged successes in prior cases, but I did not see any mention

20   of the Ross-Williams case, or other cases in which they have been admonished by the

21   Courts. Given Weiser's et.al. legal issues, it appears he is now forced to initiate a new

22   strategy, one of hiding behind another firm Bragar Eagel and Squire seeking lead in

23   this case in an effort to manage cases behind the scene. Greed appears to be powerful

24   motivator. While doing research I came upon an article that list the wealthiest

25   attorney's in the country, shockingly several of the top ten have been in prison.

26   William Lerach is number four on the list, with a net worth of nearly one billion

27   dollars. Your Honor, there is something wrong with a system that allows corrupt firms

28   to continue to violate the public trust year after year to unjustly enrich themselves.

8

EXHIBIT 35
557

Judge Davis, the actions by these so-called officers of the Court is truly unconscionable. Robbins Arroyo and Weiser et.al. submitted over 18-thousand hours in fraudulent billing, seeking 4.5 million dollars in fees, 1.6 million of which submitted by a criminal and disbarred attorney using his son's name, Alexander as an alias. Mr. Jeffrey Mark Silow has worked for the Weiser and Robbins Arroyo et.al. Firms for over 10 years, billing likely more than 100 million dollars in illicit fees, in a multitude of cases across the country. Jeffrey Mark Silow was convicted and disbarred in 1989 for insurance fraud, mail fraud, and forgery. Your basic Racketeer. Mr. Silow was caught after forging a will, making himself the beneficiary of a million dollar estate, stealing the inheritance from the rightful heirs. *See Exhibit 1, (WSJ article)*

After providing information to the Class Action Fairness Center, Ted Frank confronted the Weiser firm about Mr. Silow's status. With a proverbial gun to his head, Mr. Weiser attempts to exonerate his firm by claiming to be a **victim** of Mr. Silow's felonious acts. In letters to the Court, Mr. Weiser states that he was unaware of Silow's disbarred status and criminal past. Weiser claims that he had no idea that Alexander was not Silow's real name. Clearly, this strategy was not well thought out. Attached to the letters was a copy Mr. Silow's resume from Abelson Legal Services, proving Mr. Silow was presented as Jeffrey Mark, not Alexander at the time of hire. In addition, the Firm Resume lists Mr. Silow as a licensed attorney to practice in Pennsylvania and the District of Columbia proving Weiser et.al. committed perjury as Mr. Silow was not licensed to practice in Pennsylvania when Weiser et.al. hired him. Something Justice Burns pointed out during oral argument at the appellate hearing. In the Syllabus from the Kansas Appellate Court, Judge Burn's states; *In a disturbing development, Robert B. Weiser sent a letter to the district court— as well as a similar letter to the Clerk of the Kansas Appellate Courts—on February 3, 2017. In his letter to the district court, Weiser stated that he had "learned that a person who had held*

9

EXHIBIT 35
558

*himself out . . . as Alexander J. Silow ('Silow') was in actuality named Jeffrey M. Silow, and more importantly, that Mr. Silow is not a licensed Pennsylvania attorney in good standing, having been disbarred in Pennsylvania in 1987." Weiser indicated that Silow had been "of counsel" with the Weiser Law Firm for "the past decade" after being recommended to the law firm by a recruiting agency in 2008.*

*Interestingly, although the résumé of the Weiser Law Firm—which is part of the record on appeal—listed "Alexander Jeffrey Silow" as being "admitted to practice in Pennsylvania and the District of Columbia," Silow's résumé—which was attached to Weiser's letter—listed his name as "Jeffrey Silow" and did not state that he was a member of the Pennsylvania bar. Instead, Silow's résumé only listed the District of Columbia under the heading "Bar Admissions." In a footnote to his letters, Weiser stated that "it appears as though Mr. Silow has also been suspended from the practice of law by the District of Columbia." We note that the District of Columbia subsequently disbarred Silow from the practice of law on December 21, 2017. In re Jeffrey M. Silow, 175 A.3d 88 (D.C. 2017). See (Syllabus) Judge* Davis, Alexander Silow is a former Deputy District Attorney of West Chester County PA. and on information and belief knew of his father's criminal activities and is likely complicit. Mr. Jeffrey Mark Silow has seemingly gotten off lightly for his crimes, whereby pleading guilty to three misdemeanors, in record time.

Your Honor, in open Court, and through pleadings, Weiser and Robbins Arroyo et.al. makes more false statements, by claiming Mr. Silow was a securities expert, who bills at $350 dollars per hour. Mr. Stecker has made all appearances on behalf of the Weiser firm; he has repeatedly perjured himself, found himself unable to answer the most rudimentary of questions regarding his case. Frankly Your Honor, his appearances were an utter embarrassment to the Plaintiff's Bar. During a six-hour settlement hearing, Judge Vano expressed skepticism over the eighteen thousand hours billed in the stayed case. He warned Weiser et.al. to take a careful look at their fee

10

EXHIBIT 35
559

request. Instead of heeding Judge Vano's advice, **plaintiff's counsel doubles down**, filing perjurious declarations. In Mr. Silow's declaration he admonishes Judge Vano, stating "*how dare you question my hours, I have worked each and every one of these hours, and have been an officer of the Court in good standing for over forty years, without so-much as a disciplinary action.*" *See Exhibit J, (Silow Declaration)* This, while knowing his status as a criminal and disbarred attorney.

Weiser and Robbin Arroyo et.al. would stop at nothing to protect their criminal enterprise, I was  subjected to repeated character attacks as I exposed their duplicitous acts and conspiracies against the Court. Fortunately, the Honorable James Vano was not convinced by Weiser and Robbins Arroyo et.al. and their self-serving arguments, or desperate attempts proffering support for their fees. Judge Vano ordered Weiser and Robbins Arroyo et.al. to submit their time-logs for an in-camera review. After six months of careful deliberation, Judge Vano issued the first of two scathing orders, wherein he excoriates Weiser and Robbins Arroyo et.al, finding that the time-logs submitted were not credible, **henceforth they were fraudulent**! Although Judge Vano narrowly approved the settlement, he slashed the 4.5-million-dollar fee request by **ninety percent,** awarding a total of 450 thousand dollars in fees, and expenses. This was prior to the Court's knowledge of Silow's criminal past and disbarred status.

Your Honor, it is unconscionable to think that after Judge Vano's highly critical orders, that Weiser and Robbins Arroyo et.al. would not except the ruling, and quit while ahead, clearly dodging a bullet. Instead, with hubris and utter contempt for the Court, they have the temerity to ask Judge Vano for what is tantamount to a **do-over,** in the form of two motions to Alter or Amend. *See Exhibit F, (Objector Hartleib's opposition to Motions to Amend)*

11

EXHIBIT 35
560

Judge Davis, former US attorney George Aguilar and partner of Robbins Arroyo, *(also seeking lead in this case)* introduced new evidence purporting to be a report from their Relativity software program in an attempt to affirm the fraudulent hours billed by now known racketeer Silow. Attached to the second Motion to Alter or Amend was Mr. Aguilar's sworn Declaration, which states that Robbins Arroyo was wholly responsible for the oversight of all document review in the consolidated action. Mr. Aguilar continues by declaring that Robbins Arroyo was responsible for the management and coordination of said review, which was allegedly performed on his Firms software system Relativity. In his prior Declaration dated June 23, 2016, Mr. Aguilar declares that Robbins Arroyo reached an agreement with Defense Counsel to manage the case, therefore Robbins Arroyo was acting as lead behind the scene, making his Firm fully complicit in the fraud committed upon the Court. *See Exhibit K, (Declarations form George Aguilar)*

The Motion seeks to compel Judge Vano to remove all of the <u>damaging statements of fact</u>, on the basis that it would "<u>hurt</u>" their reputations. They informed Judge Vano that with a few strokes of his pen he could fix everything, saving them untold amounts of money, and countless hours of time trying to defend their contemptuous actions in the case. Rightfully, they were concerned that the damaging orders would prejudice their firm in other cases. They expressed concern, that the orders would be used to inform other Courts of their <u>Self-Dealing</u>, <u>Unclean Hands</u> and <u>Shameful Violations of Public Trust.</u> Wherefore, they confirm and acknowledge the gravity and consequence of their subterfuge. The Motion led to the second scathing order by Judge Vano, wherein he is unconvinced by their absurd requests, and reaffirms his opinion in the strongest of terms. Judge Vano states that it was not proper for Mr. Aguilar to submit new evidence after the Courts ruling, nonetheless, he was not persuaded stating; *"Plaintiff's counsel should have expected strong criticism of Mr. Silow's billing records had [they] bothered to examine the purported time [he]*

12

EXHIBIT 35
561

*submitted as spent on document review. . . . "A cursory glance at Mr. Silow's billing records appropriately casts a shadow of doubt over the veracity of the billing records in their entirety. [The] affidavits documenting Mr. Silow's time spent on [document review] are wholly unpersuasive. They do support that it takes merely a keystroke of activity once every hour to keep [the computer program] from timing out or logging off a session. (See Syllabus from the Kansas Court of Appeals)*

Unbelievably, blinded by greed, Weiser and Robbins Arroyo et.al. informs Judge Vano of their intent to appeal the fee reduction. Despite being admonished by Judge Vano, and caught committing perjury and billing fraud, Weiser and Robbins Arroyo et.al. were unrelenting in their zealous quest for reinstatement of the four million dollars in unwarranted fees. Truly reprehensible! During the settlement hearing, Mr. Stecker repeatedly informed Judge Vano that the settlement was obtained through "hard fought litigation". Mr. Stecker apparently considers the filing of a **piggyback derivative suit** with valid claims, jettisoning said claims, staying the case for years so that enough time passes to allow one to bill thousands of fraudulent hours, and millions of dollars, "Hard Fought Litigation". Pretending to review millions of documents from a Class Action, led by sister firm Robbins Geller, that facilitates no additional discovery, not a single document request, or deposition over a seven year period is certainly not tantamount to "hard fought" by my standards. Your Honor, from what I have witnessed, it appears Robbins Arroyo and Weiser et.al. follows a different set of standards, one that continually sets the bar at new lows. This perspective coming from a layperson with no legal background. The only thing hard fought in this case, was the Weiser and Robbins Arroyo et.al. Firm's desperate attempt to obfuscate their criminal acts to protect their criminal enterprise and unjustly enrich themselves by four million five hundred thousand dollars, on the backs of those they falsely purport to represent.

13

EXHIBIT 35
562

Your Honor an appeal was filed wherein I ask the Court to remand and rescind the case with directives for punitive sanctions, and a disgorgement order forcing the return of the four hundred fifty-thousand-dollar fee award. I argued that, Monica Ross-Williams, by way of her Counsel had unclean hands and therefore not entitled to equitable relief from the Court. Although initially set for summary calendar, I was able to compel the Appellate Court to grant oral argument. I attended the hearing on 2-13-18, although Robert Weiser was admitted *pro hac vice*, he failed to attend the hearing. The Weiser firm has retained counsel from an ethics and professional liability firm, likely at the request of their insurer. One could surmise that his failure to appear was on the advice of counsel. Chief Justice, Karen Arnold Burger informed those in attendance that the Court found this case very interesting and would not be as strict with enforcement of its time limits. Wherefore, the Court granted all in attendance more than double the docketed time. George Aguilar appeared on behalf of Robbins Arroyo but never addressed the Court. In fact, I do not believe he was admitted *pro hac vice* for the appellate hearing. Mr. Stecker appeared on behalf of Weiser et.al, where he informed the Court that he had nothing to say, and that the firm stands on its pleadings. The Court was quick to respond, making it clear that they had questions for him regarding the criminal acts of Weiser et.al. Mr. Stecker faced a litany of cross-examining questions from the Appellate Court Justices, whereas he was unable to provide cogent answers to most. Despite Mr. Stecker's attempts to convince the Court that Weiser et.al. was an unwitting victim of Mr. Silow, the Court appeared less than convinced. Mr. Stecker informed the Court that the Pennsylvania Bar was about to wrap up their investigation into the Weiser firm regarding the Sprint Nextel case, and find no need for disciplinary action, at which time, Justice David E. Burns stated, **"good to know counselor, this Court will be certain that the Pennsylvania Bar gets a copy of its forthcoming order"**. During my fifteen-minute rebuttal, Chief Justice Karen Arnold Burger stated, we concur that fraud was committed in this case with regard to the billing. On April 27, 2018 the Appellate Court issued its 50 page

14

EXHIBIT 35
563

published Opinion, unfortunately my standing argument failed, and I was unsuccessful in my attempt to disgorge the ill-gotten 450 thousand dollar fee award. The Court was nonetheless highly critical of the Weiser and Robbins Arroyo firms as reflected in the Syllabus from the Court, which states; *Weiser evidently continues to believe that Silow actually performed the work reported in the billing records submitted to the district court. Nevertheless, Weiser recognized in his letter "that Mr. Silow had been held out as an active attorney, and that Mr. Silow's declaration, signed under penalty of perjury, states, inter alia, that he is a licensed attorney in good standing that had never been the subject of any disciplinary action." Hence, Weiser acknowledges that Silow's "declaration is therefore false in material respects," and as a result, the Weiser Law Firm—which served as the lead counsel in this derivative action—"will not be participating in any recovery that may result from the pending Cross-Appeal." Although we will yield to the disciplinary authorities in the Commonwealth of Pennsylvania—or elsewhere—to sort out what the attorneys representing the plaintiffs in these derivative actions knew or should have known about the status of Jeffrey Silow's license to practice law, we find the information provided by Weiser to be very troubling. As indicated above, the hours billed by Silow constituted a substantial amount of the total hours allegedly worked by counsel for the plaintiffs in these derivative actions. Thus, we agree with Weiser that his law firm should not receive any of the attorney fees and expenses awarded in this case. (See Syllabus from Kansas Court of Appeals).*

Judge Davis, another deeply troubling concern involving these firms is the nexus between former Federal Judge Layn Phillips and the Robbins Gellar, Robbins Arroyo and Weiser Firms. By all accounts, Judge Phillips has been held in high esteem, but some now argue his once stellar reputation has been sullied by the duplicitous acts of Weiser and Robbins Arroyo et.al. In an attempt to proffer support for their fraudulent 4.5 million dollar fee request, Weiser et.al. attached a Declaration signed by former

15

EXHIBIT 35
564

Judge Phillips in support of the motion for final approval of the settlement. In his Declaration, he reviewed his role as mediator in the derivative actions and stated that *"the settlement was carefully reached through hard fought, arm's-length negotiations conducted by skilled counsel in good faith." He also noted that the attorneys involved in the mediation process were from 15 respected law firms and were experienced in handling complex litigation. Moreover, former Judge Phillips rendered the opinion that he believed an award of $4,250,000 in attorney fees and expenses in this case would be fair, just, and reasonable. (See Syllabus from Appellate Court)* Given the fraud that has transpired in the Ross-Williams case, and the fact the Judge Phillips affirmed the fraudulent fees, the bad acts of these firms has damaged the reputation of the former Federal Judge. Equally troublesome is the fact that Judge Phillips appears to be the "go to" mediator in many of the cases for the aforementioned Firms. Some believe that it is a conflict of interest for any mediator overseeing the case in question to get involved in affirming fees on behalf of Plaintiff Counsel, whether just or unjust. Making matters worse, after Judge Vano issued his scathing orders, I had reached out to the office of Judge Phillips on several occasions seeking a call or meeting to discuss what transpired in the Ross-Williams case in hopes of getting a retraction. After Mr. Silow was exposed as a criminal, I was certain Judge Phillip's would want to file an amended Declaration in the Ross-Williams case rescinding his prior support for fees, now known to be fraudulent, in an effort to protect his good name, but my requests went unanswered. Thereby, raising the question, why would a former Federal Court Judge allow his name to be associated with corrupt law firms and a conspiracy upon the Kansas Court? Some have speculated that Judge Phillips failure to act and silence surrounding the fraud in the Ross-Williams action provides the answer, albeit a troubling one! I sincerely hope they are incorrect.

Honorable Davis, the aforementioned shows a prolonged course of conduct and pattern of criminal activity of the highest order, by so-called officers of the Court. It is

16

EXHIBIT 35
565

Arroyo, Weiser or their surrogates. I am confident that this Court has qualified firms that will properly represent the interest of CenturyLink, its shareholders and not breach the fiduciary duties owed, for their unjust enrichment.

## CONCLUSION

Your Honor, I respectfully seek leave of the Court allowing this Amicus Brief to be filed on short notice and be placed in the record. I also would like to address the Court at the forthcoming hearing for the appointment of lead Counsel on 3-6-19. I have made last minute travel plans from California and stand ready to provide any additional information the Court may seek on the record.

Respectfully,



Michael Hartleib

20720 Alicia Parkway Suite, G

Laguna Niguel C.A. 92677

(646) 494-5901

17

EXHIBIT 35
566

# CERTIFICATE OF SERVICE

I hereby certify that true and correct copies of the above and forgoing the Amicus Curiae Brief and Exhibits A through K was served on the following parties by electronic mail on 03-05-19

THE WEISER LAW FIRM. P.C.
Robert E. Weiser
Brett D. Stecker
James M. Ficaro
22 Cassatt Ave., Suite 100
(610)-225-2677
rw@weiserlawfirm.com

JOHN FISTEL LLP
Michael I Fistel JR
40 Powder Springs Street
Marietta GA.

(770) 200-3104
michaelf@johnsonfistel.com

MELISSA A. FORTUNATO
885 Third Avenue Suite 3040
New York, NY. 10022
(212) 308-5858

fortunato@bespc.com

GARETT BLANCHFIELD
Reinhardt, Wendorf & Blanchfield

(651) 287-2100

E1250 First National Bank Building

ROBBINS ARROYO LLP.
George  C. Aguilar
600 B Street Suite 1900
San Diego, C.A. 92101
(619)-525-3990
gaguilar@robbinsarroyo.com

332 Minnesota Street Saint Paul MN.
Gblanchfield@rwblawfirm.com

SIGNED _____

MICHAEL HARTLEIB

27020 Alicia Parkway Suite G

Laguna Niguel C.A. 92677

646-494-5901

EXHIBIT 35
567

# EXHIBIT 27

EXHIBIT 35
568

1

1          UNITED STATES DISTRICT COURT
            DISTRICT OF MINNESOTA
2

3   ------------------------------------------------------------
                                )
4   IN RE:  CENTURYLINK SALES    ) File No. 17-md-2795
    PRACTICES AND SECURITIES     )        (MJD/KMM)
5   LITIGATION                   )
                                 )
6                                ) Courtroom 13E
                                 ) Minneapolis, Minnesota
7                                ) Wednesday, March 6, 2019
                                 ) 9:38 a.m.
8   ------------------------------------------------------------

9

10          BEFORE THE HONORABLE MICHAEL J. DAVIS
          UNITED STATES DISTRICT COURT SENIOR JUDGE

11

12      **MOTIONS HEARING ON DOCKET NOS. 330, 332, 342**

13

14

15

16

17

18              RENEE A. ROGGE, RMR-CRR
      Official Court Reporter - United States District Court
19            1005 United States Courthouse
                300 South Fourth Street
20            Minneapolis, Minnesota 55415
                  (612) 664-5107
21

22

23

24      Proceedings recorded by mechanical stenography;
            transcript produced by computer.
25

2

```
 1    APPEARANCES:

 2    For the Plaintiffs Sona      PERRY & PERRY PLLP
      Andresian, Glen Walker       SHAWN M. PERRY, ESQ.
 3    and Michael Barbree:         1660 Highway 100 South, #335
                                   Minneapolis, Minnesota 55416
 4
                                   GAINEY McKENNA & EGLESTON
 5                                 THOMAS J. McKENNA, ESQ.
                                   440 Park Avenue South
 6                                 New York, New York 10016

 7    For the Proposed Lead        FEDERMAN & SHERWOOD
      or Co-Lead Counsel for       WILLIAM B. FEDERMAN, ESQ.
 8    Shareholder Derivative       10205 North Pennsylvania
      Plaintiffs:                  Oklahoma City, Oklahoma 73120
 9
      For the Plaintiff           REINHARDT WENDORF & BLANCHFIELD
10    Edward Tansey:              GARRETT D. BLANCHFIELD, ESQ.
                                  322 Minnesota Street, #W1050
11                                St. Paul, Minnesota 55101

12                                ROBBINS ARROYO LLP
                                  GEORGE C. AGUILAR, ESQ.
13                                5040 Shoreham Place
                                  San Diego, California 92122
14
      For the Plaintiff Tim       BRAGAR EAGEL & SQUIRE, PC
15    Ault:                       LAWRENCE P. EAGEL, ESQ.
                                  885 Third Avenue, #3040
16                                New York, New York 10022

17                                LEVENTHAL PLLC
                                  SETH LEVENTHAL, ESQ.
18                                333 South Seventh Street, #1150
                                  Minneapolis, Minnesota 55402
19
      For the Defendant:          WINTHROP & WEINSTINE PA
20                                WILLIAM A. McNAB, ESQ.
                                  225 South Sixth Street, #3500
21                                Minneapolis, Minnesota 55402

22                                COOLEY LLP
                                  SARAH M. LIGHTDALE, ESQ.
23                                1114 Avenue of the Americas
                                  New York, New York 10036-7798
24

25
```

RENEE A. ROGGE, RMR-CRR
(612)664-5107

EXHIBIT 35
570

```
 1    APPEARANCES (contd):

 2    For the Defendant          COOLEY LLP
      (continued):               PATRICK E. GIBBS, ESQ.
 3                               3175 Hanover Street
                                 Palo Alto, California 94304
 4
      For the Amicus Curiae:     MICHAEL HARTLEIB, PRO SE
 5                               20720 Alicia Parkway, Ste. G
                                 Laguna Niguel, California 92677
 6

 7                        *   *   *

 8

 9                  P R O C E E D I N G S

10                    IN OPEN COURT

11                        *   *   *

12         THE COURT:  Good morning.  Please be seated.

13         Let's call this matter, these matters.

14         COURTROOM DEPUTY:  In Re:  CenturyLink Residential

15    Customer Billing Disputes Litigation, MDL No. 17-2795.

16         Counsel, please state your appearances for the

17    record.

18         MR. AGUILAR:  Good morning, Your Honor.  George

19    Aguilar from the law firm of Robbins Arroyo for plaintiff

20    Edward Tansey.

21         THE COURT:  Good morning.

22         MR. BLANCHFIELD:  Good morning, Your Honor.

23    Garrett Blanchfield from Reinhardt Wendorf & Blanchfield

24    also on behalf of plaintiff Edward Tansey.

25         THE COURT:  Good morning.
```

4

```
 1              MR. EAGEL:  Good morning, Your Honor.  Lawrence

 2    Eagel, Bragar Eagel & Squire, for plaintiff Tim Ault.  With

 3    me is Seth Leventhal for plaintiff Tim Ault.

 4              THE COURT:  Good morning.

 5              MR. FEDERMAN:  Good morning, Your Honor.  William

 6    B. Federman, Federman & Sherwood, on behalf of plaintiff

 7    Inter-Marketing Group.

 8              THE COURT:  Good morning.

 9              MR. PERRY:  Good morning, Your Honor.  Shawn

10    Perry.  I am local counsel from Perry & Perry on behalf of

11    Gainey McKenna & Egleston.  T.J. McKenna or Thomas J.

12    McKenna is to my right.

13              MR. MCKENNA:  Good morning, Your Honor.

14              THE COURT:  Good morning.

15              MR. MCNAB:  Good morning, Judge Davis.  Bill

16    McNab, Winthrop & Weinstine, on behalf of defendant

17    CenturyLink and the individual director defendants.

18              THE COURT:  Good morning.

19              MR. GIBBS:  Good morning, Your Honor.  Patrick

20    Gibbs from Cooley also for defendants.

21              THE COURT:  Good morning.

22              MS. LIGHTDALE:  Good morning, Your Honor.  Sarah

23    Lightdale from Cooley also for the defendants.

24              THE COURT:  Good morning.

25              Would you call the other matter too?
```

5

```
 1              COURTROOM DEPUTY:  The Tansey?

 2              THE COURT:  Did they give you a number on it?

 3              COURTROOM DEPUTY:  Pardon me?

 4              THE COURT:  Did they give you a number on it?

 5      (Off-record discussion between court and courtroom deputy.)

 6              COURTROOM DEPUTY:  Tansey versus Perry, et al.,

 7      Civil Case No. 18-cv-2460.

 8              THE COURT:  All right.  Counsel late yesterday

 9      received a motion from Mr. Hartlieb.  I don't believe he's

10      here.  I think you all know him or some of you know him.

11              MR. BLANCHFIELD:  I don't see him in the

12      courtroom.

13              THE COURT:  All right.  So we will just put that

14      till the end.  So let's begin with our motions that are

15      before us.

16              Who wants to proceed?

17              MR. AGUILAR:  I can go first, Your Honor.

18              THE COURT:  Thank you.

19              MR. AGUILAR:  Would you like me at the podium,

20      Your Honor?

21              THE COURT:  Oh, most definitely.

22              MR. AGUILAR:  Thank you, Your Honor.  George

23      Aguilar, again, with Robbins Arroyo on behalf of plaintiff

24      Tansey.  We've made an application to be appointed lead

25      counsel in the matter.
```

6

```
 1              Your Honor, we think the three most critical
 2     factors in the court's discretion in appointing lead counsel
 3     are to look at the experience and knowledge of the proposed
 4     lead counsel and his firm, the record of success by that
 5     firm and the resources that firm can bring to bear, and we
 6     believe we compare favorably on all three points.  Our firm
 7     has been a derivative litigation focused firm for over ten
 8     years.  We bring a vast number of lawyers and experience --
 9              THE COURT:  You talk about the numbers of lawyers
10     that are in your firm, but I need to know who is going to be
11     running this.
12              MR. AGUILAR:  Yes.  I am going to be running this,
13     the litigation, as the lead litigation partner.  Steve
14     Wedeking will be, an associate in the firm, and Ashley
15     Rifkin, also a partner at the firm, will also be assisting
16     in the litigation.  And we will have other resources to bear
17     as they are required and especially with respect to the
18     discovery that may be propounded in the case.
19              THE COURT:  All right.
20              MR. AGUILAR:  Our record of success is focused on
21     the derivative litigation.  As we lay out in our papers, the
22     success we have had in bringing necessary corporate reforms
23     where needed and to obtain financial recoveries on behalf of
24     the company and other shareholders are in the context of
25     derivative litigation.
```

7

```
 1            We do have a diversity practice within our firm.
 2    Myself, a former criminal prosecutor, also active in the
 3    antitrust practice, but primarily in the derivative space.
 4    We have other lawyers active in the 10(b) space, class
 5    action space.  Ms. Rifkin has been focused on the derivative
 6    angle for a number of years and as has Mr. Wedeking.
 7            And then, lastly, Your Honor, I can address the
 8    Hartlieb thing when it gets brought up, but we have never
 9    been denied a lead counsel as a result of any of these types
10    of allegations that have been brought forward.  In fact,
11    they have been brought by Mr. Hartlieb once before.
12            THE COURT:  Well, let's not talk about that right
13    now.  He's not here and --
14            MR. AGUILAR:  Very well.
15            THE COURT:  But I do need you to talk to me about
16    your plaintiff.
17            MR. AGUILAR:  Yes.  Mr. Tansey has been a
18    stockholder of the company since 2003.  He is a minor
19    stockholder who owns 13 shares, but, nonetheless, a
20    long-term holder, selling as the market would require, and
21    he currently holds 13 shares of the corporation.
22            THE COURT:  All right.  Anything else you wish to
23    bring forth at this time?
24            MR. AGUILAR:  Unless the court has some questions.
25            THE COURT:  Not at this time.  We will hear from
```

8

```
 1    everyone and then we will go -- I may have another round.

 2            Who is next?

 3            Let me -- no.  Come on back up.

 4            MR. AGUILAR:  Sure.

 5            THE COURT:  I need -- as you well know, I have

 6    handled a number of MDLs, and one of the things that is very

 7    important for me is coordination and cooperation, and you

 8    didn't talk about that with the other firms that are

 9    involved in this.  So I need to know, Did you meet and

10    confer?  What is your --

11            MR. AGUILAR:  We did.

12            THE COURT:  Have you had problems with -- in one

13    of the MDLs I had many, many years ago I didn't find out

14    that there were lawsuits between the lawyers in another MDL.

15    Everyone was quiet about it, because they wanted to get it

16    appointed.  And then once they got it, I'd made my

17    appointment, then I found out that there was lawsuits

18    between two of the lawyers and that caused a lot of

19    problems, so --

20            MR. AGUILAR:  No.  We certainly don't have any of

21    those issues with any of the other firms.

22            We did have discussions with a member of the firm

23    that makes up the Bragar firm.  There were discussions in

24    earnest to try to resolve a leadership or put together a

25    leadership structure.  It was our view that what was being
```

9

```
1    proposed, that we were being asked to be a part of, was just
2    too large, too diffuse.  It didn't really have a focus or a
3    sharpness that would allow the litigation to proceed
4    efficiently.  I have had recent discussions with
5    Mr. Federman and again along the same lines.
6             I believe for a case like this in an MDL
7    proceeding, which is already going to be fairly coordinated
8    and consolidated and managed by the court, we just thought
9    it was important that the top of the leadership structure be
10   as efficient and focused as possible.  So that's why we
11   proposed just a one-firm leadership structure at the top.
12            We do have experienced Minnesota counsel in
13   Reinhardt Wendorf in the representative litigation aspect.
14   But if we are appointed lead counsel, obviously, the first
15   thing we would do would be to consolidate the cases, put
16   together a consolidated complaint.  We would encourage and
17   ask the other plaintiffs to join in the case, and they
18   would, the other firms, would have an opportunity to
19   participate in the litigation, if their client decides to
20   partake in the case.  It would be -- you know, we are
21   dealing and up against very experienced and excellent
22   defense counsel, so there will be a need for significant
23   resources in this case, and we will be more than happy to
24   bring the other firms along.  We just thought at the very
25   top and there should be a very sparse and focused structure
```

```
 1    at the top, and that's what we propose.
 2             THE COURT:  Well, other than having a king at the
 3    top or a queen at the top, what's your management structure?
 4    What are you proposing?
 5             MR. AGUILAR:  No formal committee structure.  It
 6    would involve, again, based on the participation of the
 7    plaintiffs, other plaintiffs in this case, a doling out of
 8    work as it becomes available in the case, probably initially
 9    not at the pleading stage.  That will be work that will be
10    handled by our firm and the Reinhardt firm.  But once we get
11    to discovery, if we are able to do that, there will be a
12    significant amount of work to be done in that arena, and we
13    would propose to have other counsel involved in that case,
14    to the extent that they are willing to or have the resources
15    at the time to do so.  We just believe that the management
16    of the practice -- the management of the case should
17    generate and originate from the focused leadership.
18             THE COURT:  What's your position dealing with the
19    other MDL that's involved here, the consumer side?
20             MR. AGUILAR:  We would certainly -- those cases
21    are progressing.  We would reach and make contact with lead
22    counsel on the plaintiffs' side for those actions.  We would
23    be particularly interested in the 10(b) action that's
24    proceeding, the securities part of the MDL.  There may be
25    some issues in common with this case that we'll certainly
```

1    work with the defense counsel and perhaps establishing an

2    efficient way to resolve those types of issues in

3    conjunction with what's already occurred in the securities

4    case and what's being proposed to occur in the securities

5    case.

6        THE COURT:  Now, you've indicated that you have

7    been involved in a number -- that your firm is a derivative

8    lawsuit firm.  Have you had other cases that you can cite to

9    me that you have dealt with the consumer side and it's

10   worked well and --

11       MR. AGUILAR:  Yeah, not so much on the derivative

12   MDL side.  I am currently part of an antitrust MDL as lead

13   counsel in one of the cases, antitrust cases that does have

14   a significant component with consumer -- with the consumer

15   cases, and we have been in very open and constant contact

16   with those lawyers.  It's the Interchange MDL case and the

17   Credit Card antitrust action in the Eastern District of New

18   York.

19       We're currently serving as associate counsel in a

20   consumer class action involving pharmacies and their

21   payments of certain usual and customary prices with respect

22   to the pharmacy benefit managers, and we have been working

23   in close contact with the consumer lawyers in that

24   particular instance.

25       So I don't anticipate any issues at all with

12

```
 1    respect to our ability to cooperate and coordination with
 2    any of those cases, with any of the cases that are currently
 3    making up the MDL, and that would involve certainly
 4    discovery, where we do think there probably will be a
 5    significant amount of overlap in terms of the documents and
 6    the discovery that's produced and would proceed and want to
 7    do it in the most efficient way possible.
 8              THE COURT:  All right.  Thank you.
 9              You have given me a list of cases where you were
10    either lead counsel or co-lead counsel, but you never
11    mentioned who the judges were.
12              No?  None?
13         (Off-record discussion between court and clerk.)
14              THE COURT:  You gave me the name of the cases, but
15    you didn't give me the name of the judges, which is --
16              MR. AGUILAR:  Sure.  In our pleading, Your Honor,
17    in our briefing, we did list -- I think it's a page and a
18    half and attached the transcripts of the judges who have
19    commented on our work, and that would include, for example,
20    District Court Judge Kinkeade in the Northern District of
21    Texas.  And we certainly can match those judges up with the
22    cases we mentioned in the early part of the brief.  So we do
23    have a listing of the judges who have proposed and stated on
24    the record complimentary things of the way we litigated the
25    case and the results that we have achieved.  And I certainly
```

13

```
 1    have no --
 2            THE COURT:  I am sure that's at the end of the
 3    case when you, when it's --
 4            MR. AGUILAR:  Right, right.
 5            THE COURT:  I'm just teasing you.
 6            MR. AGUILAR:  Yeah.  No, no, that's -- that's --
 7            THE COURT:  I have done that many times.
 8            MR. AGUILAR:  Right.
 9            THE COURT:  So, no, I've just -- time flies.  I
10    have been -- soon I will be -- this is my 25th year as a
11    federal judge, and so I know a number of the judges and
12    especially on the MDL side.  So I just wanted to make sure
13    that I got all the names; and so if I wanted to make a quick
14    call, I could do that.
15            MR. AGUILAR:  Certainly, Your Honor.
16            And to the extent that the cases that we cite in
17    our brief and in our resume aren't reflected in the comments
18    made by the judges that are within our brief, I certainly
19    can provide a correspondence to your court listing those
20    judges.
21            THE COURT:  Please.  Make it easy for me.
22            MR. AGUILAR:  I will do so.
23            THE COURT:  I am senior status now.
24            MR. AGUILAR:  I will do that.
25            THE COURT:  I am just teasing you.
```

14

```
 1              MR. AGUILAR:  All right.

 2              THE COURT:  All right.  Anything else you --

 3              MR. AGUILAR:  Not unless the court has additional

 4    questions.  Thank you.

 5              THE COURT:  All right.  We may have a second

 6    round, so --

 7              All right.  Who is next?  Good morning.

 8              MR. EAGEL:  Good morning, Your Honor.

 9              I've prepared a little graph I thought would maybe

10    be helpful to the court.  Can I approach and just hand --

11              THE COURT:  Please.  Have you given it to all

12    counsel?  I need one for my law clerk too.  Okay.  Good.

13              MR. EAGEL:  Good morning, Your Honor.

14              THE COURT:  Good morning.

15              MR. EAGEL:  May it please the court.  Lawrence

16    Eagel, Bragar Eagel & Squire.  We are here this morning

17    seeking the appointment of our client Tim Ault as lead

18    plaintiff and our firm as lead counsel.

19              First, with respect to the appointment of our

20    client as lead plaintiff, Tim Ault has been a long-time

21    shareholder of CenturyLink.  He's owned shares since 1999.

22    We have disclosed he has 235 shares.  He's submitted an

23    affidavit saying that he's committed to prosecuting the

24    action and supervising counsel or at least being a part of

25    the process.  So I think he's -- he is probably the most
```

1    qualified plaintiff of all of the plaintiffs, and I will

2    describe why in a few minutes.

3           THE COURT:  What's his background?  Why would he

4    want to take on that?

5           MR. EAGEL:  I believe he's an -- he's an

6    investment advisor, I mean, a skilled investor.  I'm not

7    sure he's an investment advisor.  And I don't have more

8    information for you.  I wish I did, but I don't have more

9    information.  I have -- others in my office have been more

10    in touch with him.  And I apologize that I don't have more

11    information, but what I understand is he's an experienced

12    investor and I understand he's interested in the case and

13    willing to participate in the case and wants to participate

14    in the case.

15           So let me speak a little bit about the reasons why

16    our firm should be appointed lead counsel in this case.

17           Well, first, I would say, in terms of the lead

18    plaintiff as compared to Mr. Tansey, he has not submitted a

19    declaration saying that he will support his lead plaintiff

20    position.  And as we point out with respect to IMG, which

21    is -- and there are a few reasons why we believe

22    Inter-Marketing Group is not a proper plaintiff, one of

23    which is that they're a corporation and as a result of being

24    a corporation I don't think they're a traditional, but they

25    refer to themselves as an institutional investor, but I

1    think in reality they're a corporate investor, and as a

2    corporate investor they have their own fiduciary obligations

3    to their shareholders, and, therefore, a possibility is they

4    will be required -- they might sell their shares; and if

5    they do sell their shares, they are, in fact, will lose

6    standing.  I think that's something the court sort of is

7    familiar with.  So I think that was one reason, and I will

8    speak in a few minutes about the additional reasons and that

9    is the vigor with which we've pursued the case.

10        I think with this what's important, I think, Your

11   Honor, is in terms of the standing of or how the cases have

12   been prosecuted, our firm has been proactive and --

13        THE COURT:  Let's back up.

14        MR. EAGEL:  Okay.

15        THE COURT:  My first question, Who is going to

16   lead the charge here from your firm?

17        MR. EAGEL:  I will, Your Honor.  I will be the

18   lead.  I will be the lead attorney from -- and we can talk a

19   little bit about the resources of our firm, but I will be

20   the lead attorney from our firm handling litigation.  With

21   me will be -- and I have been practicing litigation for

22   35 years, law for 35 years, I guess litigation probably most

23   of that time.  A few years before that I was a certified

24   public accountant.  I have spent the last 10, 15 years

25   focused more on derivative-type litigation representing

 1     shareholders in various types of derivative litigation.

 2     We've -- and so that's been my experience.

 3              I was involved in several of the cases that we

 4     have identified for Your Honor.  The *Activision Blizzard*

 5     case was a case I was intimately involved with.  It was our

 6     client.  We worked with other counsel and ultimately

 7     succeeded in achieving a $275 million recovery on behalf of

 8     the company, in fact, got a fee award of $72 million showing

 9     that the court recognized the effort of counsel and the

10     unique effort of counsel.  In another case -- I was also

11     involved in the *El Paso* trial case, a case tried before --

12     and in terms of the judges that were involved, the judges

13     that were involved in the *Activision Blizzard* case is a vice

14     chancellor -- Vice Chancellor Laster, Travis Laster from

15     Delaware.  He's in the Court of Chancery in Delaware.  Vice

16     Chancellor Laster also was the judge in the trial in the *El*

17     *Paso* litigation.  The *El Paso* litigation was a derivative

18     case we tried through verdict and secured a verdict of -- in

19     that case a liability award of $171 million following a

20     finding of bad faith on behalf of the directors.  In fact,

21     subsequent, sort of, at the close of the trial, the trial

22     court -- the company merged, El Paso merged with the

23     subsidiary, and ultimately our client lost standing.  There

24     were posttrial proceedings involving our standing, and

25     ultimately the case on appeal.

```
 1              THE COURT:  Dismissed.

 2              MR. EAGEL:  Excuse me?

 3              THE COURT:  It was dismissed.

 4              MR. EAGEL:  Yes, on appeal.  And that was as a

 5    result of the loss of standing, having nothing to do with

 6    the trial.  And even in the Delaware Supreme Court decision

 7    reversing the judgment that the vice chancellor had

 8    instituted in the case, the Supreme Court said in this

 9    difficult and troubling case we have to reverse because of

10    the loss of standing.  But I think that's -- it's a lesson

11    we have learned in terms of what could happen if you don't

12    have control over the shares that you hold, because the same

13    result could happen if ultimately you sell the shares or the

14    shares are otherwise -- you are not in control of that,

15    whatever, for Inter-Marketing.

16              Another more recent case, Your Honor, is before,

17    also a derivative case, before Vice Chancellor Slights in

18    the Delaware Chancery Court in which we have -- we're

19    representing a shareholder in a suit on behalf of Enbridge

20    Energy Company.  The suit was ultimately -- recently

21    Enbridge announced a merger, a roll-up of its subsidiary.  I

22    have unique expertise in master limited partnership

23    litigation.  And as a result of the roll-up, as a result of

24    the transaction, there were merger negotiations between

25    Enbridge Energy, Inc., Enbridge, Inc., and the master
```

19

```
 1    limited partnership.  We interjected ourselves into those
 2    negotiations seeking to have the committee that was
 3    appointed value the derivative claim.  The committee that
 4    was appointed valued the derivative claim at close to a
 5    hundred million dollars, used that value in its negotiations
 6    with Enbridge, Inc., and ultimately there was an increase in
 7    the -- in the exchange ratio from about 3083 to about 3.33.
 8    Ultimately, that case, as a result of the closing of the
 9    merger, the case was dismissed to avoid a fee application by
10    our firms.  We negotiated a fee of 14 and a half million
11    dollars with the defendants on the case.
12            So we have achieved, I think, success.  We have
13    achieved success recently, and we've achieved success in
14    derivative cases.
15            In terms of -- I know I can -- I can continue.  I
16    kind of -- in terms of the consumer cases, I know Your Honor
17    mentioned consumer cases.  These cases have not
18    traditionally been consumer cases that I have just referred
19    to.  We have been in consumer cases, but not within a
20    derivative context that I can recall.  The derivative cases
21    ordinarily involved, sort of, the conduct of the board of
22    directors and their, sort of, obligations to monitor the
23    activities.  I also --
24            THE COURT:  The only reason I mention it is
25    because I have -- I have these two MDLs.
```

```
1              MR. EAGEL:  Yeah, understood.

2              THE COURT:  And the --

3              MR. EAGEL:  Understood.

4              THE COURT:  -- same issues.  And so I want to see

5     if you've had that type of experience.

6              MR. EAGEL:  Well, our firm actually did represent

7     a class of -- this is actually a class of purchasers of

8     Camel Cash cigarettes.  We ultimately entered into a

9     resolution, but this involved what were called C-Notes for

10    Camel Cash cigarettes.  For years in California and

11    throughout the country there was -- there were these C-Notes

12    that were much like -- I don't know if you remember Plaid

13    Stamps back in the day.  The C-Notes they would -- people

14    would buy packs of cigarettes, get C-Notes, be encouraged to

15    collect the C-Notes.  Ultimately, R.J. Reynolds terminated

16    the program without notice, and we --

17             THE COURT:  Do you really want to talk about that

18    and your attorney fees that were cut?

19             MR. EAGEL:  No.  I really just wanted to tell

20    you that -- I'm sorry.  I wanted to just tell you that it

21    was one of the cases we had.  It was a consumer case, and

22    the attorneys fees is -- it's more, sort of, just that we've

23    had some consumer experience.  That's all.  Yes, we have

24    succeeded in obtaining attorneys fees, but that really was

25    more so -- I was trying to really just touch on the consumer
```

1    experience.

2         I think in terms of Your Honor's questions

3    regarding our ability to interact with other counsel and as

4    well as counsel for the defendants and counsel in the other

5    cases, I think that we have had experience in all of those

6    areas.

7         I think, first, with respect to counsel in the

8    other securities cases, we have worked with counsel and

9    throughout the country in a number of different securities

10   cases.  I do think there would be some overlap through

11   discovery.  There might be depositions, since some of the

12   issues are related as it relates to the disclosure claims,

13   that while they touch on similar issues that might require

14   coordinated discovery, coordinated deposition, coordinated

15   document discovery.

16        I think in terms of -- excuse me -- in terms of

17   coordination -- and I guess I spoke a little bit about

18   myself.  I didn't get to tell you anybody else who is going

19   to be on the case.  I would be on the case, leading the

20   case.  In addition, our firm would have David Stone.  He's

21   been with us for about, I would say, close to eight or

22   nine years, and he would -- he's practicing law for about

23   25 years.  He will also be involved.  Melissa Fortunato has

24   been with us.  She submitted the affidavits.  She will work

25   for about -- she's been out about six years.  She will be on

```
 1    the case.  I think we have Todd Henderson, who is also a
 2    more junior lawyer.  He will be on the case.  I expect that
 3    one of the things we're prepared to do is to devote the
 4    resources that's necessary to prosecute the case.
 5            We've also, as Your Honor knows, been supported in
 6    leadership in this case by both the Johnson Fistel firm and
 7    the Weiser firm.  Okay.  We are not seeking lead on their
 8    behalf, but we are supported by them.  And they have in
 9    fact -- and part of --
10            I know Your Honor asked about, well, any
11    leadership, how would we envision leadership amongst the
12    group of attorneys here.  We were not able to come to an
13    agreement amongst the attorneys here as to how -- a
14    leadership structure.  Often that involves who is going to
15    lead the charge, often involves economics, and certainly is
16    something I think that we concluded that we felt we could.
17    We had -- we had the right theory.  We had the right client.
18    We felt we were committed to pursuing the case.  We were
19    supported by Johnson Fistel and have nothing negative to say
20    about the other attorneys here, frankly.  It is not that the
21    attorneys here are bad attorneys.  It's just we had to
22    just -- we think these cases are effectively managed when
23    run by lead counsel who is sort of taking charge, running
24    the show, and not necessarily splitting authority amongst
25    ten or, you know, five or six different firms.  It just
```

```
 1    happens.  And that was what we were planning.  We did feel

 2    like we had support from the Johnson Fistel firm and the

 3    other firm as well.

 4            And I think that's really why we are here.  We

 5    just didn't reach an agreement.  I know other counsel will

 6    say they all reached out to try to come to some agreement.

 7    I think we were prepared to try to come to some agreement,

 8    but I think economics as well as just the desire to lead the

 9    case and desire to be the one making the decisions was part

10    of what led us to where we are.

11            THE COURT:  Okay.

12            MR. EAGEL:  I think in terms of --

13               (Mr. Hartlieb entered the courtroom.)

14            THE COURT:  Mr. Hartlieb?

15            MR. HARTLIEB:  Here, Your Honor.

16            THE COURT:  Welcome.  We will get to you.  I just

17    assumed that, that you were you.  And so just have a seat.

18            MR. HARTLIEB:  Thank you, Your Honor.  Thank you.

19            THE COURT:  And we will get to you in a little

20    bit.

21            I am sorry, counsel.  Go ahead.

22            MR. EAGEL:  So I did want to just talk a little

23    bit about why we think, in addition to Mr. Ault, our firm is

24    the proper, sort of, selection in this case.  It's a

25    close -- it's a close question, and I am here trying to tell
```

24

```
 1    you that I think we will do the best job.  We will work hard

 2    at it.

 3              We filed -- as you can see from this little

 4    schedule, one of the things it does say is we made a demand

 5    in September 2017, the first demand made by anybody in the

 6    case.  We also have a long-time shareholder.

 7              I think one of the things we have -- and I think

 8    Your Honor may have asked a little bit about Mr. Tansey.

 9    Again, he didn't submit an affidavit.  And one of the things

10    that we did point out in our briefing was the fact that, in

11    fact, he filed --

12              THE COURT:  District of Minnesota.

13              MR. EAGEL:  Yeah, which is a district that doesn't

14    have personal jurisdiction over the defendant in this case

15    or, in fact, it's -- you know, you would have to ask -- ask

16    Tansey why they would file in the District of Minnesota,

17    other than we understand there was an MDL here, but you've

18    got to have jurisdiction, and I don't believe there's

19    jurisdiction under the *Bristol-Myers* case we cited and

20    discussed in our brief.  We think that's an opportunity for

21    the defendants to raise another issue in support of their

22    motion to dismiss that shouldn't be before us.

23              We do expect much of the discovery to occur in

24    Louisiana.  We have, you know, we will be --

25              THE COURT:  It's warmer here.
```

1        MR. EAGEL:  Well, I don't know about that.  I have

2    a feeling defendants may say differently, but I think that's

3    where a lot of the discovery will be.

4        Let me talk a little bit about the Inter-Marketing

5    Group.  I mentioned the fact that they had -- they were a

6    corporation and that they were -- that there's a risk of

7    selling the shares.  And I think -- I think Your Honor knows

8    that the Inter-Marketing Group originally moved to be lead

9    as in connection with their bondholder case.  They pursued

10    that, and this was sort of the backstop, sort of, let's go

11    the second route.  And as you can see from the chart here,

12    they didn't actually file the demand until 2018.  And so

13    that's over a year after we made the demand to the special

14    litigation committee.  And they didn't file their complaint

15    until December 26, 2018.

16        So while I think they are all fine lawyers, I

17    think we've showed through the way we have prosecuted the

18    case that we have prosecuted properly, you know, and that we

19    have the resources to lead the case.

20        THE COURT:  Appreciate it.

21        MR. EAGEL:  Thank you, Your Honor.

22        THE COURT:  Thank you.

23        Good morning.

24        MR. FEDERMAN:  Good morning, Your Honor.  William

25    B. Federman, Federman & Sherwood, on behalf of the IMG

EXHIBIT 35
593

26

```
 1    Group.
 2             If I may, Your Honor, I'll address any questions
 3    you have; otherwise, I would like to respond, if I might, to
 4    some of the comments by other counsel.
 5             The Bragar Law Firm I am not familiar with,
 6    although I was told they played a role in one or two of my
 7    other shareholder derivative cases.  By reputation, they
 8    seem like a good firm.  The only problem, if there is one,
 9    with the Bragar firm is I couldn't get a phone call returned
10    or an email responded to.  I had to call Mike Fistel, one of
11    their supporting lawyers, twice, Your Honor, to have someone
12    from their law firm return my call.  I don't know why that
13    is, but that's not a good way to present yourself, as you
14    know, if you are going to be a lead counsel.
15             In the briefing filed by the Bragar firm,
16    Document 343 at page 15 of 17, they note that they did not
17    reach out to me or my firm to try to work anything out here.
18    I did repeatedly try to get them to the table to talk about
19    a structure here.  I finally got a phone call.  I made a
20    proposal.  They were going to get back to me, which they did
21    not do.
22             Mr. Aguilar and I have known each other for a long
23    time.  We have had plenty of cases together, which, frankly,
24    surprises me in their pleadings, Your Honor, on
25    Document 358, page 6 and 7, they say that they are not
```

```
 1    familiar with the results of any of our cases, which is odd.

 2    It may have been the same associate who filed in the wrong

 3    jurisdiction.

 4              I was co-counsel with the Robbins firm in Cell

 5    Therapeutics in the Western District of Washington, Your

 6    Honor.

 7              I worked closely in the Dynavax case, Alameda

 8    County, California, where they filed in federal court, I

 9    filed in state court.  We worked closely.  I presented the

10    settlement.  We had an objector.  The settlement was

11    sustained.  They asked me to make the presentation.

12              In the case of Hemispherx, Eastern District of

13    Pennsylvania, we were co-counsel.

14              In the Spectrum lawsuit, Clark County, Nevada,

15    they filed in state court, I filed in federal court.  They

16    asked me, Your Honor, to make an appearance on behalf of

17    their client in state court to present the settlement for

18    approval to the court.

19              And then there's the SandRidge Energy case,

20    Western District of Oklahoma, that Mr. Aguilar is very

21    familiar with.  I was part of the leadership structure of

22    that case before Judge Lee R. West, one of the finest

23    federal trial judges on the bench, now senior status.

24    Mr. Aguilar filed in state court where he was stayed after

25    initial activity.  He then pursued nothing other than his
```

```
1    fee application before the Western District of Oklahoma,
2    where he lost and the judge poured him out.  He then took it
3    up on appeal to get his fee.  And I spoke to him.  I asked
4    him if he wanted me to intercede on his behalf.  He said no.
5    And he wound up losing, getting no fee in the case, even
6    though he did provide services in the case.
7              So to come to the court and now say we don't know
8    anything about the Federman firm just smacks of lack of
9    candor.  I would look forward to working with these counsel.
10             T.J. McKenna.  Your Honor, his firm was part of
11   the Spectrum group of law firms.  He and I are co-counsel in
12   the case.  It's a small bar when you get into this practice
13   area.
14             Now, if you say, well, Mr. Federman, what
15   distinguishes you and your firm from these other lawsuits, I
16   would say, first and foremost, I will be the first person
17   standing for the plaintiffs at trial and I will be the last
18   to sit for the plaintiffs at trial.  I will be working with
19   other lawyers within my firm, particularly Sara Collier, who
20   George knows very, very well.  She has done nothing but --
21             THE COURT:  Please, no first names.  Please.  No
22   first names.
23             MR. FEDERMAN:  Ms. Collier.
24             THE COURT:  No first names.
25             MR. FEDERMAN:  Oh, I am sorry.  Mr. Aguilar.
```

```
 1            THE COURT:  Thanks.
 2            MR. FEDERMAN:  Excuse me.
 3            Sara Collier from my firm has been practicing
 4    shareholder derivative litigation exclusively for 13 years.
 5    She's worked very, very closely with numerous attorneys at
 6    the Robbins Arroyo Law Firm.
 7            If you say, well, Mr. Federman, what concerns do
 8    you have?  Well, obviously, his client having 13 shares, and
 9    I think I heard that right, is somewhat of a concern.  And I
10    understand now why he sought for only lawyers to be
11    appointed and not a client, but that doesn't matter to me.
12    They're a good law firm.  I would welcome them in part of a
13    structure.  Having multiple partners billing to the case may
14    or may not be necessary.  That's something that Mr. Aguilar
15    and I could discuss.
16            As far as the Bragar Law Firm goes --
17            THE COURT:  Why don't you tell me, after I denied
18    a motion, it took you six months to file.
19            MR. FEDERMAN:  Your Honor, there, frankly, was no
20    rush to file.  They talk about the vigor in pursuing the
21    case, but in fact nothing has happened to this case other
22    than more facts have come out.  A shareholder derivative
23    case is not like a class action.  It's not the first to
24    file.  Inter-Marketing Group, which they say did not pursue
25    with vigor, is in the exact same spot, except with a better
```

30

```
 1    drafted complaint than the Bragar Law Firm, because we had
 2    more facts on which to base the complaint.  There was no
 3    reason to file early other than to stand in front of the
 4    court and say we filed first.  I am sure if they file enough
 5    derivative cases that they were filed third or fourth in
 6    order.  Robbins Arroyo has filed six, seven months after
 7    other law firms in some of my cases, and I have welcomed
 8    them into the structure.  I spoke to Mr. Aguilar in the
 9    hallway again, after having reached out to him earlier, and
10    said do you want to work something out here.  And he said
11    no.  So, you know, I will work with him.
12              Now, you asked about the differences.  MDL
13    experience, Your Honor.  I think in this group I am the only
14    one who has been lead counsel in multiple MDL consumer
15    cases.  Judge Gwin in the Northern District of Ohio
16    appointed me over the Sonic data breach case as the sole
17    lead counsel with seven PSC members from around the country,
18    including New York counsel, Louisiana, South Carolina.  It's
19    a good diverse group.  And I'm lead in that case.  The
20    Samsung washing case, Your Honor, is a massive case.  We
21    have counsel from around the country on the PSC.  Judge
22    DeGiusti in the Western District of Oklahoma.  I am co-lead
23    counsel with a Lieff Cabraser case.
24              I have reached out to the consumer part of this
25    case in the MDL because I think particularly the arbitration
```

```
 1      issue is important to the derivative case, because if it's
 2      forced into arbitration, we lose access to a great deal of
 3      discovery.  And I know Mr. Bragar discussed how they will
 4      coordinate depositions and we could attend them, but if
 5      there are no depositions, it becomes a bigger issue.  So we
 6      have reached out to those attorneys.  We have reached out to
 7      the class action counsel.  I know Max Berger very well.
 8              But, Your Honor, where it comes down is I'll work
 9      with these other firms.  We will efficiently handle this
10      case.  If you say, well, what's the advantage of being in
11      the central part of the United States?  Cost of doing
12      business, Your Honor.  Our billing rates are very
13      competitive.  I have got a specialist in Ms. Sara Collier,
14      who they have worked with.  T.J. -- excuse me.  Mr. McKenna
15      speaks with her periodically.  We're co-counsel on a case
16      now.  I think all these firms have had good results in
17      cases.  I am not going to say otherwise.
18              Mr. Bragar's law firm has a client who literally
19      has less than a one percent investment position compared to
20      IMG in this case.  There is no commitment by any other
21      plaintiff to hold stock throughout this proceeding.  As
22      Mr. Bragar discussed with you, his client could lose
23      standing at any time.  A 13 shareholder?  A 13-share
24      shareholder could sell at any time.  Mr. Bragar's client
25      with less than 300 shares could decide to sell at any time.
```

32

```
 1    IMG, who he criticizes for some perceived lack of standing,
 2    where all he had to do was call me, just give me a call, I'm
 3    available, and say, Bill, is there a -- or, Mr. Federman, is
 4    there an investment policy for IMG that will cause this
 5    company to sell?  And I would have said no, there is none.
 6    Instead, he makes a fanciful argument, which has no basis.
 7    And as the court knows, for a trial attorney, candor,
 8    accuracy and evidentiary value matters.
 9              So here we stand, Your Honor, in front of you
10    ready to serve in a capacity of either lead counsel with a
11    three-member executive committee or I will be co-counsel and
12    gladly do that.
13              As far as resources, we have dropped from 18
14    attorneys at the Robbins Arroyo firm to some number of
15    multiple partners and an associate.
16              Your Honor, we just resolved the case in front of
17    Judge Consuelo Marshall in the Central District of
18    California, a very fine judge.  It took five years to do it.
19    We had a trip to Pasadena to the Ninth Circuit.  Sullivan &
20    Cromwell was on defense.  And the case was resolved
21    favorably for the plaintiffs, a $13 million recovery.  Fees
22    were awarded at 28 percent, which is above the benchmark of
23    the Ninth Circuit, as you may be aware.  We had an
24    institutional client there, who was a corporation.  Every
25    institutional client, Your Honor, is either a trust or a
```

33

```
1    corporation.  That's why they're an institutional client.

2    So if you would like to call a judge that knows my firm and

3    the quality of work we do, Judge Marshall would be a perfect

4    one.  She approved the settlement last week.

5            That also frees up both resources, i.e., cash, as

6    well as attorney time.  We are committed to this case.

7    Ms. Collier will be on this case nearly exclusively.  This

8    is a big case.  There are a lot of moving parts in it with

9    the investigation by the AG.  It's a large board.

10           I would welcome the assistance of these other law

11   firms, if they want to continue to participate.  I look

12   forward to working with the Bragar firm.  I have no issue

13   other than admiration for Mr. McKenna, who has been my

14   co-counsel.  He returns calls.  He responds.  He does his

15   work on time.  It doesn't take that much to work

16   cooperatively.  And we have shown we do that in other cases

17   in MDLs, and that's why we have been selected.  I am not a

18   jack of all trades.  We restrict our practice to certain

19   areas, and those areas are shareholder derivative cases,

20   securities class actions and consumer cases.

21           I have over the years practiced in other areas.

22   I'm right now co-counsel in a police shooting case out of

23   Bixby, Oklahoma, where a police officer lit up a 16-year-old

24   boy and killed him with eight shots, and I am assisting a

25   lawyer who came to me for financial backing and assistance
```

34

```
 1    in complexity of his case.  I am glad to help other
 2    attorneys.  And that's how I'd approach this case, Your
 3    Honor.
 4              THE COURT:  Thank you.
 5              MR. FEDERMAN:  Do you have any questions?
 6              THE COURT:  Thank you.
 7              MR. FEDERMAN:  Thank you very much.
 8              MR. MCKENNA:  Good morning, Your Honor.
 9              THE COURT:  Good morning.
10              MR. MCKENNA:  Thomas J. McKenna.  I represent
11    three individuals who are stockholders of the company.
12    Thank you for having us here today.
13              These lead plaintiff contests always make me
14    nervous too because arguments are made that could only help
15    the defense.
16              I reached out to all the firms here -- I am
17    familiar with all the firms; I have worked with all the
18    firms -- to see if we could make a structure.  We were not
19    successful.  It doesn't mean it couldn't happen.
20              I have worked with Mr. Federman, as he's told you,
21    many times.  And when I saw his papers that he represented
22    an institution, a corporation that holds 2,600 shares, that
23    the man has submitted a sworn statement that he will not
24    sell, because standing is a problem -- I have a case in
25    Chicago where my client promised me they were never going to
```

35

```
 1    sell and had no intention of selling, then they sold.  I had
 2    to drop him out of the case.  So I'm aware of those
 3    problems, as well as probably happened to everyone.  So that
 4    impressed me, a sworn statement of a corporation they're
 5    going to hold the shares.  So I agreed to pull back and
 6    support Mr. Federman in whatever way he needs.
 7             My local counsel, Mr. Perry, has worked with me on
 8    a number of cases in this district.  We have been before
 9    Judge Schiltz a few times.  We have been before Judge
10    Ericksen.  We have been before Judge Tunheim and Judge Doty.
11    He also is prepared to be liaison counsel, if Your Honor
12    thinks that's appropriate, and he will serve under
13    Mr. Federman as well.
14             So I would just say one other thing too, you know,
15    not -- no one has all the answers, and often the best
16    answers come from collaboration.  I had a law professor who
17    gave us a take-home test.  The class was divided in two.
18    The other kids took their test with their professor in
19    class.  We got the take-home.  They were up in arms.  They
20    thought it was easy.  It was the hardest test I ever took.
21    And we sat in my living room, like six of us, and we came up
22    with, you know, decent answers, but by ourselves we had no
23    chance on that test because it was just too deep.  There
24    were too many levels.  And I learned from my professor that
25    the best -- the best answers come from collaboration, and I
```

```
 1    would like to see that happen here, judge.

 2              THE COURT:  All right.  Thank you.

 3              Anyone else?

 4              MR. EAGEL:  Your Honor, just one thing.  I just

 5    wanted to say, one, I'm Mr. Eagel.  I know that --

 6              THE COURT:  I can't hear you.  Come to the podium.

 7              MR. EAGEL:  Just, one, I really did just want to

 8    say, one, I'm Mr. Eagel as opposed to Mr. Bragar.  I think I

 9    was referred to as Mr. Bragar a few times.  I didn't want

10    there to be any misunderstanding from Mr. Federman.

11              And, two, I did want to make sure that the court

12    was aware it's not that we've never worked with anybody or

13    unwilling to work with other people.  We couldn't reach an

14    agreement based on the parameters that were being discussed

15    at the time.  We have worked with counsel many times.  I

16    have -- don't have bad words to say about the people that

17    are here.  They have all been good lawyers, and they have

18    spoken well.  It's we have -- in terms of communications,

19    there were communications that were being made by other

20    attorneys to Mr. Federman.  There were communications -- if

21    there was a breakdown, it could have been because of some

22    desire as to who was -- discussions with Robbins Arroyo.  I

23    mean, the discussions that occurred, we just couldn't reach

24    an agreement, but there's no desire not to reach an

25    agreement or not to work with people.  We have worked
```

37

```
 1    consistently with other firms and would continue to do so.

 2    I just wanted to make sure that was clear, Your Honor.

 3              Thank you.

 4              THE COURT:  Thank you.

 5              MR. AGUILAR:  One last thing, Your Honor.  I am

 6    sorry.  I just wanted to -- my co-counsel --

 7              THE COURT:  Well, you have to respond to -- I

 8    think someone said some associate misfiled the case in

 9    Minnesota.

10              MR. AGUILAR:  That wasn't us.

11              THE COURT:  Okay.

12              MR. AGUILAR:  No, we did not misfile.  We did file

13    in Minnesota.  It wasn't misfiled.

14              THE COURT:  Well, and you didn't -- maybe I didn't

15    say it right.  Counsel said that -- he was taking a dig at

16    your firm.

17              MR. AGUILAR:  Yeah.

18              THE COURT:  It's that you don't know what you are

19    doing.

20              MR. AGUILAR:  Right.

21              THE COURT:  And that you had an associate file it

22    in Minnesota.

23              MR. AGUILAR:  That's not the case.

24              THE COURT:  And so you are going to have to

25    respond to that.
```

```
 1              MR. AGUILAR:  Sure.

 2         At the moment there is no finding with respect to

 3    jurisdiction on any of the cases, personal, general,

 4    specific.  So that's not to say we couldn't establish

 5    jurisdiction with the currently pending complaint.  However,

 6    in the end in an MDL we are going to consolidate the cases

 7    and have plaintiffs who had filed in Louisiana, filed in

 8    Minnesota, and so it becomes a moot case, because if you

 9    don't have jurisdiction as alleged by one of the plaintiffs,

10    there's another plaintiff who had alleged previously

11    Louisiana jurisdiction and that might arise and provide the

12    jurisdiction in this case.  So in an MDL that's not as

13    critical as you would -- as it would be in a stand-alone

14    litigation.

15         So I don't believe we've misfiled.  I approved the

16    filing.  It was here in Minnesota.  It's entirely possible

17    we can establish Minnesota jurisdiction here, but it's also

18    possible in an MDL we would be able to establish

19    jurisdiction through the filing of the Louisiana cases.  So

20    I think it's a lot less important in this context than it

21    may be otherwise.

22         And then, secondly, I just wanted to point out, as

23    my local counsel reminded me, we were involved as co-lead

24    counsel in the derivative case against Target in the data

25    breach cases.  That had an MDL, that was an MDL, and had a
```

39

```
 1     consumer case component, and Judge Magnuson presided.  So if

 2     you wanted to talk to him, that would be perfectly

 3     appropriate.

 4               And that's all I have.

 5               THE COURT:  Anyone else?

 6               MR. MCKENNA:  No, judge.

 7               THE COURT:  All right.  Let's move on to the other

 8     case, let's recall it, that was just dealing with

 9     Mr. Hartlieb.  Let's call that again.

10               COURTROOM DEPUTY:  Tansey versus Perry, et al.,

11     Case No. 18-cv-2460.

12               THE COURT:  Mr. Hartlieb, come forward.

13               MR. HARTLIEB:  Thank you.  Thank you, Your Honor.

14               THE COURT:  Good morning.

15               MR. HARTLIEB:  Good morning.

16               I would just like to say that I apologize to the

17     court for being late.  I was up bright and early and ready

18     to go, had breakfast, went to put a suit on, had no dress

19     shirt, ran to Nordstrom Rack, pounded on the door, got them

20     to open five minutes early, got the dress shirt.  And let's

21     just say one wrong turn in the skyway and you are in serious

22     trouble, especially a California guy.

23               THE COURT:  So you were in St. Paul?  No.  I

24     understand.  Don't worry about that.

25               MR. HARTLIEB:  Thank you, Your Honor.
```

40

```
 1              Does Your Honor have any questions?
 2              THE COURT:  I travel quite a bit and --
 3              MR. HARTLIEB:  It was a rookie mistake.
 4              THE COURT:  No.  It's amazing how many times I've
 5    forgotten a tie.
 6              MR. HARTLIEB:  Thank you, Your Honor.
 7              THE COURT:  So I understand, yes.
 8              MR. HARTLIEB:  Does Your Honor have any questions
 9    for me or -- okay.
10              THE COURT:  No.  Proceed with what you want.
11              MR. HARTLIEB:  Okay.  As Your Honor knows, in the
12    amicus brief I lay things out that shows a pattern, a course
13    of conduct over many years.  I, as a shareholder, have had
14    to defend my interests against the likes of Robbins Arroyo
15    and more recently the Weiser Law Firm.
16              I am now in litigation with the Weiser Law Firm
17    because of the chicanery that transpired in the Kansas
18    court.  That case went all the way up to the Kansas Supreme
19    Court.  We had oral arguments at the Kansas Supreme Court.
20    They were admonished, although there is no transcript of
21    that hearing, which I am very dismayed over.
22              And, also, I think that the Robbins firm and I
23    believe, you know, Weiser as well, but especially the
24    Robbins firm, given the long history I have had having to
25    defend my interests against those cases that were
```

```
 1    lawyer-driven, plaintiffs that had no shares, no standing
 2    whatsoever, representing -- I had 8, $900,000 in losses in
 3    Sirius.  So the way I have gotten involved in this is I see
 4    someone that falsely purports to represent the shareholders'
 5    interests or the corporation, the shareholders derivatively,
 6    and then I see no meaningful relief or nearly illusory
 7    relief and a tremendous amount in attorneys fees.  And in
 8    the Kansas case, I mean, I was subjected, I was -- my
 9    character -- I mean, I ended up having to defend my
10    character, and I wasn't the one that did anything wrong.
11    You know, I mean, it's unbelievable the attacks that I took,
12    so -- but it does nothing to dissuade me.  It just
13    galvanizes my convictions and strengthens my resolve.
14            I have been on a quest to expose this
15    lawyer-driven litigation and the strong-arm tactics of firms
16    like Robbins Arroyo.  And I'll tell you, I think the reason
17    that they get away with it is because of who, you know, the
18    Robbins Geller firm is.  I mean, they are a very prominent
19    firm.  And I know many, many attorneys that are very unhappy
20    with what goes on at Robbins Arroyo, but they are afraid to
21    cross them.  So I am the one that's out here.  You know, I
22    am speaking my mind, because I have been a victim of them so
23    many times, and I intend to continue.
24            And with regard to the amicus brief, I didn't have
25    a full service, the notice, you know, who to serve everyone.
```

42

```
 1    And I understand that it could be prejudicial because they

 2    haven't had a chance to respond, but I welcome a response.

 3    That said, if the firms would like to give me a list of

 4    their forthcoming cases in which they are seeking leave, I

 5    could be certain to notify everybody timely and I wouldn't

 6    have to prepare, stay up all night, all weekend long, to try

 7    to draft an amicus brief and get it to the court and then,

 8    you know, fly in.

 9            THE COURT:  Okay.  Anything else you wish to tell

10    me?

11            MR. HARTLIEB:  I mean, basically, that's it in a

12    nutshell, Your Honor.  I think that it's time that, you

13    know, the corruption that's rife throughout derivative

14    litigation needs to be cleaned up.

15            The other issue that I tread lightly on, but I

16    just don't understand why an esteemed federal court judge,

17    after fraud was committed in the case, he submitted a sworn

18    declaration affirming those fees.  I don't understand how it

19    is that a mediator who is supposed to be, you know,

20    nonbiased -- I don't think it's proper for a mediator to

21    affirm fees, you know, whether just or unjust, in my

22    opinion, because it creates at least the illusion of a

23    conflict of interest.

24            And then it's -- I'm dismayed by the fact that

25    during the course of the Kansas case that, you know, Judge
```

43

```
 1    Phillips did not send a declaration retracting his support

 2    for the fees because they were found to be completely

 3    fraudulent, 1.6 million of which by a convicted felon and

 4    disbarred attorney.  And, Your Honor, I know for a fact that

 5    the Weiser firm knew who Mr. Silow was and that will come

 6    out, you know, during the course of litigation.  And I am

 7    pretty certain that the Robbins Arroyo firm knew who he was

 8    as well.

 9         These firms, when these firms are up to no good,

10    when they are billing illusory hours -- you know, if I had

11    30 minutes with Your Honor in chambers, I could give Your

12    Honor a lot more information with regard to Cardinal Health,

13    an attorney by the name of Colton, things that have happened

14    at the Robbins Arroyo firm that are extremely troubling,

15    extremely troubling.

16         So I ask Your Honor to consider like the Kansas

17    court did.  I understand I am pro se.  I understand I don't

18    have a legal background.  But the Kansas court took my

19    allegations, you know, sincerely and gave me the opportunity

20    to prove what I alleged early on, that there was fraud being

21    committed in that case.

22         THE COURT:  Okay.

23         MR. HARTLIEB:  Thank you, Your Honor.

24         THE COURT:  Thank you.

25         MR. HARTLIEB:  Thank you.
```

```
 1              THE COURT:  Counsel, do you wish to be heard?
 2              MR. AGUILAR:  Yes, Your Honor.
 3              Unfortunately, this is what Mr. Hartlieb does.  He
 4    has done this before.  He filed the last-second pleading in
 5    a case before the Delaware Chancery for which I had and my
 6    firm had placed an application for lead counsel, again, last
 7    second, last minute, all sorts of parade of horribles that
 8    our firm supposedly committed.  And at the time Chancellor
 9    Strine, before his elevation to the Supreme Court, saw the
10    matter, heard the matter, he dismissed it and didn't take
11    into account any of the -- any of the allegations, any of
12    the pleadings.  They were as fanciful as they are in this
13    instance, delusionary in many instances and certainly
14    libelous and slanderous.  And he went ahead and appointed us
15    and me as lead counsel.  We obtained a $68 million default
16    judgment in the case.  We didn't apply for attorney fees and
17    won't until we are actually able to collect on the judgment.
18    But Mr. Hartlieb has no answer for the hundreds of cases
19    where we've successfully settled, where we have had
20    complimentary reviews by the judges involved.
21              The process by which these cases get resolved is
22    closely monitored by the court.  There's a reason for that.
23    And in this particular instance, and specifically I am
24    talking about the *Sprint* instance, there was a settlement in
25    the case that the court approved as reasonable, fair and
```

45

```
 1     adequate to the company and its shareholders and to the

 2     plaintiffs.  The settlement was approved.  The court had a

 3     problem with the fee application, even though the fee

 4     application was negotiated with the direct intervention of

 5     the mediator, Judge Phillips, and we had declarations from

 6     corporate governance experts who also vouched for the value

 7     of the reforms involved.  Now, again, and it's perfectly

 8     appropriate, the judge in Kansas determined, you know, that

 9     wasn't good enough, and he has asserted his discretion and

10     judgment and determined that there shouldn't be an

11     application for the fees at anywhere near the amount that we

12     applied for.  We appealed that, lost that.  We didn't --

13     there was no argument in front of the Kansas Supreme Court.

14     So, you know, the system worked.  The process worked.  The

15     court reviewed it.  Everyone presented their arguments, and

16     the court ruled.

17             In the instance of the disbarred lawyer,

18     unfortunately, the Weiser firm had retained and vetted

19     somebody who purported to be an attorney, was a prominent

20     doc reviewer in the case, and all he did was review

21     documents.  We didn't vet him.  We didn't employ him.  He

22     wasn't part of our sphere of lawyers working on the case.

23     And, unfortunately, it turned out he had misrepresented his

24     status.  He was criminally prosecuted.  He was -- and had

25     served a sentence for defrauding the court and defrauding
```

46

```
 1    the public as a purported attorney.  So, again, the process
 2    worked.
 3            And there's no, again, there's -- aside from the
 4    matters that he brought before you in the pleading that he
 5    lodged this morning, in which we received, again, late last
 6    night by email, that doesn't account for the hundreds of
 7    cases we have resolved successfully and had approved by the
 8    court, through the court's own vigorous and careful scrutiny
 9    over what had occurred in the case.  And that's a record
10    that we stand on and is appropriately before Your Honor in
11    our application for lead counsel.
12            THE COURT:  All right.  I'll give you a week to
13    respond in writing.  It will be the 13th of March.
14            MR. AGUILAR:  Thank you.
15            THE COURT:  By 12 noon.
16            All right.  Anyone else wish to be heard on this
17    issue?
18            Mr. Hartlieb, do you want to have the last word
19    here?
20            MR. HARTLIEB:  Thank you, Your Honor.
21            You know, I may be a lot of things.  Delusional is
22    not one of them.  That being said, the court should also
23    take into consideration that Mr. Aguilar would like to blame
24    the Weiser firm for what transpired, but the Robbins Arroyo
25    firm was the one -- all the fraud was committed in
```

```
 1    fraudulent document review.  Basically, the entire
 2    $4.5 million was for document review that was illusory.  All
 3    of this was under Robbins Arroyo's supervision.  They were
 4    running the case behind the scenes.  They negotiated the
 5    case management, you know, agreement, and they were
 6    controlling all of the document review.
 7            The other thing is, I ask the court to consider
 8    this.  The allegations that I make against these firms are
 9    very serious allegations.  He says that I am libeling him,
10    slandering him and defaming the firm.  I have asked
11    Mr. Aguilar on numerous occasions if they would like to sue
12    me, I will waive service.
13            I am perfectly happy for you -- if you want to
14    commence an action, then I will get the discovery --
15            THE COURT:  Speak to me.
16            MR. HARTLIEB:  Then I will get the discovery that
17    I need to finally put an end to this, all of this, you know,
18    unjust enrichment, you know, literally bastardizing our
19    judicial process.
20            THE COURT:  Okay.
21            MR. HARTLIEB:  Thank you.
22            THE COURT:  Thank you.
23            All right.  Anyone else wish to speak on any
24    issues?  If not, I will take this matter under advisement.
25            MR. AGUILAR:  Thank you, Your Honor.
```

48

1          MR. FEDERMAN:  Thank you, Your Honor.

2          THE COURT:  Thank you.

3          COURTROOM DEPUTY:  All rise.

4       (Court adjourned at 10:42 a.m., 03-06-2019.)

5                      *   *   *

6       I, Renee A. Rogge, certify that the foregoing is a

7    correct transcript from the record of proceedings in the

8    above-entitled matter.

9                   Certified by:   /s/Renee A. Rogge
                                    Renee A. Rogge, RMR-CRR
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

# EXHIBIT 28

EXHIBIT 35
617

Begin forwarded message:

**From:** "Michael Hartleib" <mjhartleib@gmail.com>
**To:** "'Boren, Jill, DCA'" <Jill.Boren@jocogov.org>
**Cc:** "MSK@HFMLEGAL.COM" <MSK@HFMLEGAL.COM>,
"PERRY.BRANDT@BRYANCAVE.COM" <PERRY.BRANDT@BRYANCAVE.COM>,
"MARK.MCGRORY@ERISEIP.COM" <MARK.MCGRORY@ERISEIP.COM>,
"DOCKETING@ERISEIP.COM" <DOCKETING@ERISEIP.COM>, "'Chuck Schimmel'"
<chuck@wrightschimmel.com>, "'George C. Aguilar'" <GAguilar@robbinsarroyo.com>, "'Jay
Razzouk'" <jrazzouk@robbinsarroyo.com>, "Robert Weiser" <rweiser@weiserlawfirm.com>,
"Brett Stecker" <bdstecker@weiserlawfirm.com>, "'Alfred G. Yates jr.'" <yateslaw@aol.com>,
"'Robert Schubert'" <rschubert@schubertlawfirm.com>, "'Willem F. Jonckheer'"
<wjonckheer@schubertlawfirm.com>, "James M. Ficaro" <jficaro@weiserlawfirm.com>,
"tom@dollar-law.com" <tom@dollar-law.com>, "'Dustin Schubert'"
<dschubert@schubertlawfirm.com>, "'Brian J. Robbins'" <BRobbins@robbinsarroyo.com>
**Subject: FW: Emailing:  Amicus Curiae Centurylink**

Dear Ms. Boren, I hope this email finds you well. I thought that the
Honorable Vano would be interested to know that my quest to expose lawyer
driven litigation and corruption rife throughout the Plaintiffs Bar
continues. Attached is an Amicus Brief filed in Minnesota, and transcript of
the hearing before the Honorable Michael J. Davis. In addition, I have
initiated legal action against Weiser and representative plaintiff
Ross-Williams as outlined in the attached complaint.

I am a shareholder in Centurylink, and once again forced to defend my
interest against these firms. Weiser is hiding behind a New York firm in an
attempt to manage cases behind the scene, and Robbins Arroyo seeks lead with
a plaintiff holding 13 shares of a fourteen dollar stock. Clearly this case
would become yet another that is entirely lawyer driven. Wherefore, no party
would seek Counsel for redress with less than $300 dollars in damages. Once
again, proving the case would be entirely lawyer driven. To hear Mr. Aguilar
describe what transpired in Kansas is clearly misleading the Minnesota
Court. Maybe Judge Vano would be interested in setting the record straight
before the Court appoints lead Counsel in the  aforementioned case.

Interestingly, I received an anonymous letter last night which details an

1

EXHIBIT 35

elaborate scheme by Weiser et.al. to procure "Relators" in Qui Tam cases. It involves the use of several LLC shell corporations set up for the sole purpose of soliciting information under false pretenses to facilitate lawyer driven Qui Tam cases. This has resulted in the DOJ filing a motion to dismiss 11 active cases, filed by Weiser et.al. including ABBVIE. The level of sinister is truly unbelievable, some of which is outlined in the attached Motion to dismiss by the Feds!

Lastly, I would like to express my gratitude to Judge Vano, I am, and remain incredible grateful for allowing me to be heard, and finding my arguments compelling. I will continue my quest to expose and reform the corruption rife throughout Derivative litigation.

With the Utmost Respect,

Michael Hartleib  (646) 494-5901

# EXHIBIT 29

EXHIBIT 35
620

# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| IN RE: CENTURYLINK SALES PRACTICES AND SECURITIES LITIGATION | MDL No. 17-2795 (MJD/KMM) |

| | |
|---|---|
| This Document Relates to Civil File Nos. 18-2460, 18-2833, 18-2834, 18-2835, 19-263, 19-284 | **MEMORANDUM OF LAW & ORDER** |

Shawn M. Perry,  Perry & Perry, PLLP, and Thomas J. McKenna and Gregory M. Egleston, Gainey McKenna & Egleston, Counsel for Plaintiffs Sona Andresian, Glen Walker, and Michael Barbree.

William B. Federman, Federman & Sherwood, and Gregg M. Corwin, Gregg M. Corwin & Associate Law Office, PC, Counsel for Plaintiff Inter-Marketing Group USA, Inc.

George C. Aguilar and Brian J. Robbins, Robbins Arroyo LLP, and Garrett D. Blanchfield, Reinhardt Wendorf & Blanchfield, Counsel for Plaintiff Edward Tansey.

Lawrence P. Eagel, David J. Stone, and Melissa A. Fortunato, Bragar Eagel & Squire, P.C., Counsel for Plaintiff Tim Ault.

Michael I. Fistel, Jr., Johnson Fistel, LLP, Counsel for Plaintiff Neil T.S. Flanders.

James M. Ficaro, Robert B. Weiser, and Brett D. Stecker, The Weiser Law Firm, P.C., Counsel for Plaintiff Dennis Palkon.

## I.    INTRODUCTION

1

EXHIBIT 35
621

This matter is before the Court on Plaintiff Inter-Marketing Group USA, Inc.'s Motion to Consolidate Related Shareholder Derivative Action, Appoint Lead or Co-lead Plaintiff, and Approve Its Selection of Lead or Co-lead Counsel [Docket No. 330]; Application by Plaintiff Edward Tansey for Appointment of Lead and Liaison Counsel in Consolidated Derivative Action [Docket No. 332]; and Plaintiff Ault's Motion for Appointment of Lead Plaintiff and Lead Counsel [Docket No. 342].  Also before the Court is Michael Hartleib's Motion for Acceptance of Amicus Curiae Brief in Oppos[]ition to the Appointment of the Robbins Arroyo and Weiser Firms as Lead Counsel and Notice of Intent to Attend the Hearing on 3-6-19.  [Docket No. 381]

The Court heard oral argument on March 6, 2019.

## II.   BACKGROUND

### A.   Overview of the Consolidated Derivative Action

On June 6, 2018, Plaintiff Neil Flanders filed a verified derivative complaint against Nominal Defendant CenturyLink, Inc., ("CenturyLink") and its officers and directors in the Western District of Louisiana.  Later that same day, Plaintiff Tim Ault filed a similar action in the same court.

EXHIBIT 35
622

Plaintiffs Michael Barbree, Glen Walker, and Sona Andresian filed a similar complaint in the same court on July 3, 2018.  On August 23, 2018, Plaintiff Edward Tansey filed a similar derivative action in the District of Minnesota.

On October 3, 2018, based on an order from the Judicial Panel on Multidistrict Litigation ("JPML"), the Flanders Action, Ault Action, and Barbree Action were transferred to the District of Minnesota for inclusion in the CenturyLink MDL.  [Docket No. 285]

On December 4, 2018, this Court entered an order consolidating the four derivative actions that had been filed in or transferred to this Court: Tansey v. Perry, Civil File No. 18-2460, Flanders v. Post, Civil File No. 18-2833, Ault v Post, Civil File No. 18-2834, and Barbree v. Bejar, Civil File No. 18-2835.  [Docket No. 310]  Since that time, the JPML has transferred two additional derivative actions to this District, Inter-Marketing Group USA, Inc. v. Storey, Civil File No. 19-263, and Palkon v. CenturyLink, Inc., Civil File No. 19-284.

**B.    Ault Action**

On June 6, 2018, Ault filed a verified derivative complaint against CenturyLink and its officers and board members in the Western District of Louisiana.  Ault now moves for an order appointing him Lead Plaintiff, appointing Bragar Eagel & Squire, P.C. ("Bragar") as Lead Counsel for the

3

EXHIBIT 35
623

Consolidated Derivative Action, and entering a scheduling order for the filing of a consolidated complaint.  [Docket Nos. 342-43]  Ault's motion is joined by Plaintiffs Flanders and Palkon.  [Docket No. 342]

### C.    Tansey Action

On August 23, 2018, Tansey filed a verified shareholder derivative complaint in this District against CenturyLink and its officers and directors. Tansey now moves for an order appointing the law firm of Robbins Arroyo LLP ("Robbins Arroyo") as Lead Counsel in the Consolidated Derivative Action and appointing the law firm of Reinhardt Wendorf & Blanchfield as Liaison Counsel in the Consolidated Derivative Action.  [Docket No. 332]  Tansey does not seek to be appointed Lead Plaintiff, but states that, if the Court seeks to appoint a Lead Plaintiff, he is willing to serve.  [Docket No. 358]

### D.    Inter-Marketing Group USA, Inc. Action

On December 26, 2018, Inter-Marketing Group USA, Inc. ("IMG") filed a verified shareholder derivative complaint in the Western District of Louisiana against CenturyLink and its officers and directors.  On January 17, 2019, the JPML transferred the matter to the District of Minnesota.  [Docket No. 375]  IMG now moves to consolidate the IMG Action with the Consolidated Derivative

EXHIBIT 35
624

Action, to appoint IMG as Lead or Co-Lead Plaintiff, and to appoint its counsel, Federman & Sherwood, as Lead or Co-Lead Counsel.  [Docket No. 330]

## III.  DISCUSSION

### A.  Amicus Brief

On March 6, the Court heard oral argument on three motions to be appointed Lead Counsel in the CenturyLink derivative action.  The Court also allowed Michael Hartleib to argue regarding his objection to the appointment of the Robbins Arroyo firm as Lead Counsel.  The Court allowed a post-hearing brief from Robbins Arroyo regarding the allegations against it.  The Court also received an email from Hartleib, copying all counsel, responding to Robbins Arroyo's brief.

The Court grants Hartleib's motion insofar as the Court allowed Hartleib to express his opinions to the Court during the hearing and to file his proposed amicus brief.  The Court has carefully considered Hartleib's allegations, Robbins Arroyo's response, and the public record in the cases cited by Hartleib.  The Court concludes that Hartleib has raised no legitimate questions with regard to the ethics or expertise of the Robbins Arroyo law firm.  The Court is satisfied that there are no ethical concerns that would hinder Robbins Arroyo's application for appointment as Lead Counsel.

EXHIBIT 35
625

### B.    Consolidation

Under Federal Rule of Civil Procedure 42(a),

If actions before the court involve a common question of law or fact, the court may:

(1) join for hearing or trial any or all matters at issue in the actions;

(2) consolidate the actions; or

(3) issue any other orders to avoid unnecessary cost or delay.

"Consolidation can help alleviate needless duplication of time, effort, and expense on the part of the parties and the Court." Horn v. Raines, 227 F.R.D. 1, 2 (D.D.C. 2005) (citation omitted).  In derivative actions, "consolidation is appropriate where the cost of defending . . . multiple actions may well do serious harm to the very corporation in whose interest they are supposedly brought." Id. (citation omitted).

Pursuant to the Court's December 4, 2018 Order Granting Consolidation of Federal Derivative Actions, each action arising out of the same transactions and occurrences and asserting derivative claims filed in this Court or transferred here shall be consolidated into the Consolidated Derivative Action.  [Docket No. 310] Since entry of the Court's December 4 Order, the IMG and Palkon derivative actions have been transferred to this Court, and IMG has filed unopposed motion

6

EXHIBIT 35
626

to consolidate the IMG case with the Consolidated Derivative Action.  All cases arise out of the same operative facts and raise similar legal issues.  There has been no opposition to consolidation.  Failure to consolidate will increase inefficiency and duplication.  Therefore, Inter-Marketing Group USA, Inc. v. Storey, Civil File No. 19-263, and Palkon v. CenturyLink, Inc., Civil File No. 19-284 are hereby consolidated with the Consolidated Derivative Action.

## C.    Leadership

The counsel for three different Plaintiffs – Ault, Tansey, and IMG – each seek appointment as Lead Counsel.

### 1.    Standard for Appointment of Lead Counsel

The appointment of lead counsel in complex litigation is a long-standing practice in this country that has proved a great benefit to judicial economy and efficiency.  It is not open to serious question that a federal court in a complex, consolidated case may designate one attorney or set of attorneys to handle pre-trial activity on aspects of the case where the interests of all co-parties coincide.

In re Baycol Prod. Litig., No. 02-0200, 2007 WL 9717940, at *2 (D. Minn. July 13, 2007) (citations omitted).

In choosing lead counsel,

[t]he guiding principle is who will best serve the interest of the plaintiffs.  The criteria for selecting counsel when appointing a leadership structure include factors such as experience and prior

EXHIBIT 35
627

> success record, the number, size, and extent of involvement of
> represented litigants, the advanced stage of proceedings in a
> particular suit, and the nature of the causes of action alleged.

Millman ex rel. Friedman's, Inc. v. Brinkley, No. 1:03-CV-0058-WSD, 2004 WL

2284505, at *3 (N.D. Ga. Oct. 1, 2004) (citations omitted).  "Other factors include

the quality of the pleadings, the economic interest of the plaintiffs, and the vigor

with which the plaintiffs have prosecuted their lawsuits."  Freeman on behalf of

Tesla, Inc. v. Musk, 324 F.R.D. 73, 88 (D. Del. 2018) (citation omitted).

### 2.    Standard for Appointment of Lead Plaintiff in a Derivative Action

"In a shareholder derivative action, unlike a private securities litigation

action, the Court is not required to appoint a lead plaintiff."  In re Frontier

Commc'ns Corp. Derivative Litig., No. 3:17-CV-1792 (VAB), 2018 WL 3553332, at

*4 (D. Conn. July 23, 2018) (citations omitted).  "The appointment of lead plaintiff

and lead counsel in a consolidated shareholder derivative litigation is a matter of

discretion."  Id. at *3 (citations omitted).

> Although no statutory authority exists for the appointment of a lead
> plaintiff in shareholder derivative actions like these, courts have the
> inherent authority to appoint a lead plaintiff . . . in a derivative
> action in order to create an efficient case-management structure.

8

EXHIBIT 35
628

KBC Asset Mgmt. NV on behalf of Chemed Corp. v. McNamara, 78 F. Supp. 3d 599, 603 (D. Del. 2015) (citation omitted).

If the Court appoints a lead plaintiff, the lead plaintiff must comply with Federal Rule of Civil Procedure 23.1, which requires that the plaintiff "fairly and adequately represent the interests of the shareholders or members similarly situated in enforcing the right of the corporation or association."

Derivative standing requires that the verified complaint allege "that the plaintiff was a shareholder or member at the time of the transaction complained of." Fed. R. Civ. P. 23.1(b)(1). Additionally, Louisiana state law provides that no shareholder may commence a derivative action until the shareholder has made a written demand on the corporation and at least 90 days have passed from the date of the demand or the demand was rejected, whichever is earlier. See La. Rev. Stat. § 12:1-742.

> In determining which plaintiff should be chosen as lead plaintiff [in a derivatives action], a number of courts have considered the following factors: (1) which plaintiff has the largest financial interest; (2) the preference for institutional investors to lead a lawsuit for shareholders; (3) the quality of the pleadings; (4) the vigor with which the plaintiff has pursued the suit; and (5) the plaintiff's arrangement on the payment of attorney's fees.

9

EXHIBIT 35
629

<u>KBC Asset Mgmt. NV on behalf of Chemed Corp.</u>, 78 F. Supp. 3d at 604 (citations omitted).

### 3.    Appointment of Lead Counsel and Lead Plaintiff

The Court concludes that appointment of both Lead Counsel and Lead Plaintiff is appropriate in this case to ensure an efficient and organized litigation that coordinates with the larger MDL, where appropriate.  Appointing a lead plaintiff will ensure the efficient management and vigorous prosecution of the derivative claims by a representative who fairly and adequately represents the shareholders, and, therefore, the company's interest and oversees Lead Counsel's efforts.

The Court concludes that all law firms vying for appointment have substantial experience in derivative and complex financial litigation.  All three have ample resources to lead this complex case.  After considering all of the factors mentioned above, the Court finds that Bragar and Ault are the most qualified for appointment as Lead Counsel and Lead Plaintiff.

First, Bragar has already taken a leading role in this litigation.  It filed one of the first derivative complaints and has demonstrated an ability to coordinate with counsel both in this MDL and in factually-related state derivative actions.

10

EXHIBIT 35
630

(Fortunato Decl. ¶¶ 7, 9.)  Also, Bragar proposes a leadership structure that is supported by Plaintiff Flanders' counsel and Plaintiff Palkon's counsel.  (Id. ¶ 8.) Bragar has aggressively and diligently pursued its client's interest, and its briefing showed attention to detail and knowledge of the case.  At oral argument, Bragar demonstrated a commitment to work cooperatively with all counsel and to communicate effectively with the entire Plaintiffs' counsel team.  Tansey's counsel and IMG's counsel are both competent, experienced counsel.  However, Tansey filed suit directly in the District of Minnesota, although no connection to Minnesota is apparent from the Complaint.  This strategic decision may have unnecessarily opened the Tansey Complaint up to attack based on lack of personal jurisdiction or improper venue.  IMG's decisions regarding the timing of its filings in this MDL, including in the securities cases, weigh against appointment.

Second, balancing a number of factors, Ault is the most qualified Plaintiff. Ault has demonstrated diligence through making a demand on CenturyLink in September 2017, and filing his derivative complaint on June 6, 2018, the first day that any federal derivative complaint was filed against CenturyLink and only two months after CenturyLink rejected Ault's derivative demand letter.  (Ault

11

EXHIBIT 35
631

Compl., Exs. A, D.)  (The only other Plaintiff to file a derivative complaint that day, Flanders, supports Ault's appointment as lead plaintiff.)  Ault has continuously been a CenturyLink shareholder since July 15, 1999.  He currently owns 245.506 shares of CenturyLink, valued at $3,790.  (Fortunato Decl., Ex. 1, Ault Decl. ¶ 8.)  Although Ault's financial interest in CenturyLink is not large, it is longstanding and far greater than the nominal interest of other Plaintiffs.  Finally, Ault is an experienced investor, who has been actively involved in this lawsuit, but is not a professional plaintiff, and is committed to satisfying the duties of lead plaintiff.  (Ault Decl. ¶¶ 6-12.)

In contrast, Tansey has been a shareholder of CenturyLink since 2003 and only possesses 13 shares of CenturyLink stock.  ([Docket No. 393] Mar. 6, 2019 Hearing Tr. 7.)  IMG is a business entity and possesses the greatest economic interest in among the potential lead plaintiffs.  However, no evidence has been presented that it is an institutional investor, i.e., that its "principal purpose [] is to invest money on behalf of [its] shareholders or beneficiaries."  In re FleetBoston Fin. Corp. Sec. Litig., 253 F.R.D. 315, 341 (D.N.J. 2008).  Also, IMG did not become a CenturyLink shareholder until December 6, 2012.  (Corwin Aff., Ex. D, IMG Decl. ¶ 2.)

12

EXHIBIT 35
632

Overall, the Court concludes that the combination of Bragar as Lead Counsel and Ault as Lead Plaintiff is the most appropriate choice for the Consolidated Derivative Action.

Accordingly, based upon the files, records, and proceedings herein, **IT IS HEREBY ORDERED**:

1. Plaintiff Inter-Marketing Group USA, Inc.'s Motion to Consolidate Related Shareholder Derivative Action, Appoint Lead or Co-lead Plaintiff, and Approve Its Selection of Lead or Co-lead Counsel [Docket No. 330] is **GRANTED IN PART** and **DENIED IN PART** as follows: the motion to consolidate is **GRANTED,** and the motion to appoint Lead Plaintiff and Lead Counsel is **DENIED**.

2. <u>Inter-Marketing Group USA, Inc. v. Storey</u>, Civil File No. 19-263, and <u>Palkon v. CenturyLink, Inc.</u>, Civil File No. 19-284 are hereby consolidated with the Consolidated Derivative Action for all purposes in the above-captioned MDL.

3. The Application by Plaintiff Edward Tansey for Appointment of Lead and Liaison Counsel in Consolidated Derivative Action [Docket No. 332] is **DENIED**.

4. Plaintiff Ault's Motion for Appointment of Lead Plaintiff and Lead Counsel [Docket No. 342] is **GRANTED**.  The Court appoints Bragar Eagel & Squire, P.C. as Lead Counsel in the Consolidated Derivative Action and appoints Tim Ault as Lead Plaintiff in the Consolidated Derivative Action.  Within three weeks of the date of this Order, Lead Counsel shall submit a proposed leadership structure to this Court.

13

EXHIBIT 35
633

5.  Michael Hartleib's Motion for Acceptance of Amicus Curiae Brief in Oppos[]ition to the Appointment of the Robbins Arroyo and Weiser Firms as Lead Counsel and Notice of Intent to Attend the Hearing on 3-6-19 [Docket No. 381] is **GRANTED**.

6.  Lead Counsel and defense counsel shall meet and confer and shall submit a proposed draft case management order for the Consolidated Derivative Action within four weeks from the date of this Order.

Dated:  April 23, 2019          s/ Michael J. Davis
                                Michael J. Davis
                                United States District Court

EXHIBIT 35

# EXHIBIT 30

EXHIBIT 35
635



December 12, 2018
*andy@protzmanlaw.com*

**VIA U.S. MAIL & Electronic Mail** (rw@weiserlawfirm.com)
Mr. Robert Weiser
The Weiser Law Firm, P.C.
22 Cassatt Avenue
Berwyn, PA 19312

RE:  Hartleib v. The Weiser Law Firm, P.C., *et al.*

Dear Mr. Weiser:

I have been retained by Michael Hartleib with regard to the claims reflected in the enclosed draft petition. I have reviewed the orders from the Ross-Williams case and have spoken with Mr. Hartleib at length about the contents of this petition, and I do not take these allegations lightly. As is usually the case, it would seem in the best interest for all parties involved to explore avenues to an agreeable resolution to the matter before it is filed. And, if there are documents that prove any of these allegations false, I am willing to be educated. Please let me know if you would be interested in such a conversation on or before Friday, December 21, 2018. If I don't hear from you, my client has requested that I proceed with filing the petition.

I look forward to hearing from you.

Sincerely,

Andrew B. Protzman

Enclosure

EXHIBIT 35
636

IN THE DISTRICT COURT FOR JOHNSON COUNTY, KANSAS

MICHAEL HARTLEIB,                    )
                                     )
              Plaintiff,             )
                                     )
v.                                   )
                                     )        Case No. _____
THE WEISER LAW FIRM, P.C.,           )
                                     )        Division No. _____
       Serve:                        )
                                     )
and                                  )
                                     )
ROBERT WEISER,                       )
                                     )
       Serve:                        )
                                     )
and                                  )
                                     )
MONICA ROSS-WILLIAMS,                )
                                     )
       Serve:                        )
                                     )
              Defendants.            )

PETITION

        Comes now Plaintiff Michael Hartleib and, for his claims and causes of action against Defendants The Weiser Law Firm, P.C., Robert Weiser and Monica Ross-Williams, states and alleges as follows:

PARTIES, VENUE AND JURISDICTION

1.   Plaintiff is an individual whose residence is in the state of California.   He is a substantial shareholder in Sprint Nextel Corporation and is an objector to the proposed settlement in the underlying shareholder derivative litigation in Johnson County, Kansas.

2.   Defendant The Weiser Law Firm, P.C. is a Pennsylvania corporation with its principal place of business in Pennsylvania.   At all pertinent times, it acted by and through its agents and employees, including but not limited to Robert Weiser, who were admitted pro hac vice to represent a group

EXHIBIT 35
637

of plaintiffs in the underlying litigation in Johnson County, Kansas.  It performed the acts and omissions complained of in this petition in the underlying litigation in Johnson County, Kansas.

3. Defendant Robert Weiser is an attorney licensed and residing in the state of Pennsylvania.  He is an officer, agent and/or employee of Defendant The Weiser Law Firm, P.C.  At all pertinent times he was admitted pro hac vice to practice law in connection with the underlying litigation in Johnson County, Kansas, and he committed the acts and omissions complained of in the underlying litigation in Johnson County, Kansas.  At all pertinent times, he was acting within the course and scope of his employment with and/or agency of Defendant The Weiser Law Firm, P.C.

4. Defendant Monica Ross-Williams is an individual residing in the state of Michigan.  She is the lead named plaintiff in the underlying shareholder derivative litigation in Johnson County, Kansas, and committed the acts and omissions complained of in the underlying litigation in Johnson County, Kansas.

5. This Court is a court of general jurisdiction, so it has jurisdiction over the claims asserted herein.

6. All defendants, through their participation in the underlying litigation, committed the tortious acts and omissions that form the basis of these claims in the state of Kansas and submitted themselves to the jurisdiction of this Court, so this Court has personal jurisdiction over these defendants.

7. Venue is proper in this Court because the tortious acts and omissions that form the basis of these claims were committed in Johnson County, Kansas in and through the underlying litigation.

8. Claims under the Kansas Consumer Protection Act are properly brought in this Court pursuant to K.S.A. § 50-638 because the acts and omissions giving rise to these claims were committed in Johnson County, Kansas, in the underlying *Ross-Williams v. Sprint* litigation.

2

EXHIBIT 35
638

## BACKGROUND FACTS

9. In early 2009, Plaintiff Michael Hartleib ("Hartleib") contacted The Law Offices of Bruce G. Murphy ("the Murphy firm") about a potential shareholder derivative suit Hartleib wanted to pursue on behalf of Sprint Nextel Corporation. Hartleib was and is a substantial and vocal shareholder in Sprint and other corporations with a prior history of effecting positive corporate changes in the companies in which he holds an ownership interest.

10. On or about March 22, 2009, after a short period of negotiation of the terms of an attorney-client engagement, Plaintiff Michael Hartleib ("Hartleib") retained The Law Offices of Bruce G. Murphy ("the Murphy firm") to pursue a shareholder derivative action on behalf of Sprint Nextel Corporation arising from an unsuccessful merger between Sprint and Nextel ("the underlying litigation" or "the underlying shareholder derivative litigation"). Mr. Hartleib insisted the terms of this engagement must preclude the Murphy firm from working with the national derivative firm Robbins Arroyo due to that firm's unethical business practices witnessed by Mr. Hartleib in prior cases.

11. Prior to or on March 22, 2009, the Murphy firm entered into an agreement with Defendant The Weiser Law Firm, P.C. ("the Weiser firm") by which the Weiser firm would be co-counsel with the Murphy firm for purposes of representing Mr. Hartleib in the shareholder derivative action. Defendants Weiser and the Weiser firm agreed to the terms of the engagement with Hartleib and undertook representation of Hartleib in the underlying litigation.

12. Prior to their contact with Hartleib, on information and belief, neither the Murphy firm nor the Weiser firm was aware of the facts forming the basis for the underlying shareholder derivative suit that Hartleib alerted them to in his communications with them, nor had either firm been in contact with a potential client who knew of or had an interest in pursuing the underlying litigation.

3

EXHIBIT 35
639

13. On or shortly after March 22, 2009, Robert Weiser spoke with Mr. Hartleib.  During this conversation, Mr. Hartleib expressed that, as lead plaintiff representing the class of shareholders in Sprint Nextel, Hartleib took his duties to represent the interests of the corporation and its shareholders seriously and he would not endorse superficial and toothless corporate governance reforms in order to achieve a settlement that would consist primarily of attorney fees.

14. For Hartleib to agree to a settlement, he advised Weiser that it would have to provide meaningful relief resulting in a real and positive impact for the corporation and, by extension, its shareholders.

15. On the morning of March 27, 2009, Mr. Hartleib was notified by Murphy and Weiser via email that they were refusing to file the underlying shareholder derivative suit in Hartleib's name.

16. Their stated reason, which was false, was that they were concerned that Hartleib's history of effective and wholly unrelated shareholder derivative action somehow created a potential conflict and rendered Hartleib and inadequate shareholder representative.

17. This stated reason was pretextual.  Weiser did not want Hartleib as the named plaintiff because during their conversation Weiser learned that Hartleib is opposed to lawyer-driven derivative litigation in which the only meaningful relief obtained through a settlement is millions of dollars in attorney fees, and the substantive relief for the shareholders and the corporation is toothless or de minimis.

18. In fact, Hartleib's prior knowledge, skill and experience in shareholder matters rendered him a perfect shareholder representative.  For more than a decade, Hartleib has fought to ensure the interests of class and shareholder groups are given predominate consideration in the ultimate resolution of class action and shareholder derivative litigation, when many representative plaintiffs appear to be satisfied to accept minimal relief along with excessive attorney fee awards in what has been referred to as lawyer-driven litigation.

4

EXHIBIT 35
640

19. After refusing to file suit on behalf of Hartleib, Murphy used an elderly relative as a placeholder. This relative passed away during the pendency of the litigation, wherefore Murphy was forced to use yet another relative as placeholder in an attempt to maintain first to file status, while he and Weiser looked for a "legitimate" plaintiff for the case.

20. On information and belief, Weiser searched for, solicited and engaged a far less adequate shareholder representative to use as the named plaintiff in the underlying litigation, Monica Ross-Williams, who was unsophisticated in shareholder-corporate matters, corporate governance and litigation, and held a very small stake in Sprint Nextel Corporation, if any.

21. On March 6, 2017, Hartleib sought contact information for Ross-Williams via the internet and called Ross-Williams to confirm she existed in an effort to discern Ross-Williams level of involvement in the litigation and her suitability as a representative plaintiff. Hartleib was concerned about these issues because he had, on prior occasions, observed the Weiser firm, as well as other class action and shareholder derivative firms who work in concert with the Weiser firm, utilizing deceased and otherwise unqualified parties as plaintiffs in other shareholder derivative and class litigation.

22. On March 7th 2017, Hartleib placed one 15-minute call to Ross-Williams in which it became painfully clear that she had no involvement in the case and that Ross-Williams had not spoken to her Counsel in years.

23. Ross-Williams admitted she was entirely unaware of any of the details in "her" case.

24. Ross-Williams was not aware of the scathing Orders from the District Court of Johnson County, Kansas, criticizing her attorneys' use of an unlicensed disbarred "lawyer" to inflate their bill. She was unaware the Judge in "her" case drastically reduced the attorney fees by ninety percent, from $4.5 million to $450,000, finding they were not remotely accurate or credible.

5

EXHIBIT 35
641

25. Ross-Williams was not aware that an appeal had been filed on her behalf and had not been provided with pleadings in her case.

26. Ross-Williams, plaintiff in the underlying litigation, even continually referred to herself as the Defendant and appeared to completely lack understanding of her obligations as a representative plaintiff.

27. The conversation between Mr. Hartleib and Ross-Williams was pleasant and non-confrontational. Ross-Williams provided Hartleib with a private email address to send the pleadings in her case that her Counsel failed to provide.

28. Later, instead of expressing outrage by the information Hartleib provides in the 15-minute affable call, after speaking with Defendant Weiser, Ross-Williams falsely accused Mr. Hartleib of threatening and harassing her.

29. Weiser induced Ross-Williams to file false declarations against Hartleib, accusing him of threats and harassment to gain a Protective Order under false pretenses. This was done to harm Hartleib's reputation and discredit him in the Ross-Williams action before the Court of Appeals, and other unrelated cases.

30. In court filings, the Weiser defendants made inflammatory false statements and allegations about Mr. Hartleib that were hurtful, harmful and without any basis in truth or fact.

31. The Weiser defendants also made false statements to District and Appellate courts in Kansas regarding their conduct and the conduct of their unlicensed non-lawyer whom they knowingly put forth as a licensed attorney who bills $350 per hour in search of their improper and excessive fee award (which Judge Vano noted and overwhelmingly reduced), as well as the practical effect of the near toothless "corporate reforms" they negotiated in the mediation with mediator Layn Phillips, with whom the Weiser defendants and other firms in the consolidated action regularly mediate cases. In his declaration, Layn Phillips affirmed the fraudulent $4.5M fee request.

6

EXHIBIT 35
642

32. As a result of Defendants' acts and omissions as described herein, Mr. Hartleib has suffered damage to his good name and reputation, lost the benefits of serving as lead plaintiff in the underlying litigation and the positive result that would likely have occurred had he been lead plaintiff, was forced to expend substantial sums to oppose and expose Defendants' conduct and chicanery, and has suffered significant mental and emotional trauma from Defendants' actions.

33. Despite filing a related action years later, Hartleib was estopped from participation in the consolidated cases. In fact, all firms in the consolidated cases colluded and conspired to work as one in their effort to prevent Hartleib from seeking meaningful relief on behalf of Sprint Nextel. All other cases in the consolidated action were settled except one, Mr. Hartleib's.

34. Defendants, Robert Weiser and the Weiser Law Firm's handling of the underlying litigation is part of a regular custom, pattern and practice they have engaged in for years. This modus operandi has been to the detriment of both the classes of shareholder plaintiffs they have falsely purported to represent as well as the corporations those shareholders are seeking to protect and improve.

35. The Weiser defendants regularly handle shareholder derivative suits in concert with other firms with whom they have troubling relationships, and who file securities class action lawsuits based on the same issues or conduct. The Weiser defendants will stay the shareholder derivative suit, whereby allowing sufficient time to pass allowing for the billing of thousands of fraudulent hours, piggyback on the discovery from the class action to bill fraudulent document review, then resolve the shareholder derivative suit by negotiating soft or meaningless corporate "reforms" and very high legal fees.

36. This framework is what the Weiser defendants attempted to do in the Ross-Williams matter when they piggybacked on a securities class action filed by the national class action firm Robbins Gellar, sister firm to the Robbins Arroyo firm in the consolidated action, with whom Weiser has numerous prior dealings and close relationships, until their efforts were partially derailed by Mr. Hartleib's objection, which resulted in Judge Vano's order finding the Weiser defendants' conduct and fee request to be both troubling and excessive.

7

EXHIBIT 35
643

<u>**COUNT I**</u>
*Legal Malpractice/Breach of Fiduciary Duty*
*Robert Weiser and The Weiser Law Firm, P.C.*

37. Plaintiff incorporates all preceding allegations as if fully set forth herein.

38. Defendants Robert Weiser and The Weiser Law Firm, P.C., entered into an attorney-client relationship with Plaintiff Michael Hartleib which was never terminated.

39. Defendants Weiser and the Weiser firm owed Mr. Hartleib the duty to provide competent and skillful representation and the duties of undivided loyalty, to act solely for Mr. Hartleib's benefit as a fiduciary for Sprint Nextel, and to avoid engaging in conflicts of interest.

40. The Weiser defendants further had the duty of honesty and candor in their communications and representations to the District Court and the Court of Appeals.

41. Defendants Weiser and the Weiser firm breached these duties by:

    a.  Refusing to file Mr. Hartleib's claim in the underlying litigation when it became apparent that he would not kowtow to Weiser's demands on a potential settlement and would not permit the underlying litigation to be lawyer-driven litigation, benefitting only the attorneys;

    b.  By taking an adverse position to a former client in their attempt to protect their criminal enterprise, defraud the Court and unjustly enrich themselves by 4.5 million dollars in fraudulent fees.

    c.  By abusing process in the case in question and using the instrumentalities of the judicial system to vex, harass and annoy in retaliation for Hartleib's filing of an Amicus Brief in the unrelated Equifax action. In the Equifax action, Weiser and the Weiser Firm was removed as co-lead counsel in said case based on their actions in the *Ross-Williams* case.

    d.  Representing Defendant Ross-Williams in her claims and requests for relief against Mr. Hartleib which presented a conflict of interest that was not waived;

8

EXHIBIT 35
644

e. Using Mr. Hartleib's communications with them, which were protected by the attorney-client privilege, against him in connection with the underlying litigation and the dispute between Defendant Ross-Williams and Mr. Hartleib. In addition, sharing privileged communications in the unrelated case in the Northern district of Georgia *In Re Equifax* and proffering falsehoods relating to said communications in a willful attempt to harm Hartleib and obfuscate their duplicitous acts.

f. Replacing Mr. Hartleib as lead plaintiff in the underlying litigation, first with a straw plaintiff, and then with a less qualified lead plaintiff who had little or no involvement in the case, in order to bill over 18,000 hours, and 4.5 million dollars in fraudulent fees;

g. Employing in the underlying litigation the services of a criminal non-attorney, who was previously disbarred, charged with racketeering, and knowingly putting forth his work-product under a fraudulent name as a basis for a grossly excessive attorney fee request;

h. Putting forth and supporting Defendant Ross-Williams' untrue statements regarding Mr. Hartleib's actions and communications with her;

i. Making false statements to the District and Appellate Courts in Kansas regarding Mr. Hartleib's prior actions:

j. In such other and further ways as may be learned through discovery.

42. Defendants' actions and inactions described herein were willful, wanton, fraudulent and malicious.

43. As a direct and proximate result of Weiser's and the Weiser firm's breach of their duties, Plaintiff Michael Hartleib was damaged as described above in paragraphs 32 and 33.

WHEREFORE, Plaintiff Michael Hartleib prays for judgment in his favor on Count I, for compensatory damages in a fair and reasonable amount, for his costs incurred herein, and for such other and further relief as the Court deems just and proper.

9

EXHIBIT 35
645

## COUNT II
*Violations of Kansas Consumer Protection Act*
*Robert Weiser and The Weiser Law Firm, P.C.*

44. Plaintiff incorporates all preceding allegations as if fully set forth herein.

45. Pursuant to K.S.A. § 50-623, *et seq.* (the "Kansas Consumer Protection Act" or the "KCPA"), Mr. Hartleib is a "consumer" and the Weiser defendants are "suppliers" for purposes of claims under the Kansas Consumer Protection Act.

46. When the Weiser defendants agreed to represent Mr. Hartleib as the shareholder representative plaintiff for the case Mr. Hartleib hired them to pursue, the Weiser defendants offered to reasonably represent Mr. Hartleib in accordance with their ethical duties of loyal, zealous representation in those claims.

47. In fact, the Weiser defendants at that time knew they did not intend to provide such reasonable, expectable legal services, and they did not disclose to Mr. Hartleib this intent.

48. Weiser, the Weiser Firm and other parties involved in this case have colluded and conspired by falsely purporting to represent the interest of Sprint, and its shareholders, including Hartleib when their true motives were to stay this case for a prolonged period, over 5 years to allow them to bill over 18,000 fraudulent hours and 4.5 million in fees. Weiser knowingly employed a criminal and disbarred attorney using an alias, Alexander Silow to bill 1.6 million dollars in this case. Mr. Silow's actions in this case have led to new criminal convictions in Montgomery County Pennsylvania, including the Unauthorized Practice of Law, *(42Pa.C.S.2524),* Unsworn Falsification to Authorities *(18 Pa. C. S. 4904) (b)* and Securing Execution of Documents by Deception *(18 Pa. C. S. 4114)*

49. On information and belief, Weiser and the Weiser Firm knew Mr. Silow's status as disbarred attorney and criminal when they hired him from the Abelson placement agency. For over a decade, Weiser instructed Silow to fraudulently bill tens of millions of dollars in cases across the country

10

EXHIBIT 35
646

in addition to the 1.6 million in the Ross-Williams case. Weiser fraudulently put forth Mr. Silow as a Securities expert, and licensed attorney in Pennsylvania in the Ross-Williams case, when Silow's resume submitted by the Weiser firm in the case showed neither was true.

50. The Weiser defendants' "true" intent with regard to the legal services they offered Mr. Hartleib, as described above, was a material fact that was not disclosed.

51. As a direct and proximate result of the Weiser defendants' conduct set forth herein, Mr. Hartleib was damaged as described above in paragraphs 32 and 33.

52. The Weiser defendants' actions and inactions as set forth herein are in violation of the KCPA, §§ 50-626, 627.

53. This action is authorized and Plaintiff is entitled to an award of reasonable attorney fees pursuant to the KCPA, § 50-634.

WHEREFORE, Plaintiff Michael Hartleib prays for judgment in his favor on Count II, for compensatory damages in a fair and reasonable amount, for his attorney fees and costs incurred herein, and for such other and further relief as the Court deems just and proper.

## COUNT III
### Abuse of Process
### Defendant Ross-Williams

54. Plaintiff incorporates all preceding allegations as if fully set forth herein.

55. Ross-Williams knowingly made false statements against Hartleib in court documents and sought and obtained a protective order under false pretenses. Ross-William filed false declarations under oath against Hartleib at the request of Weiser in an attempt to assail his character and protect Weiser's unlawful acts. These actions amount to the knowingly or improper use of legal process.

56. Ross-Williams' actions were taken for the purposes of harassing Mr. Hartleib and causing him hardship.

11

EXHIBIT 35
647

57. Ross-Williams' actions directly and proximately resulted in damages to Mr. Hartleib as described above in paragraphs 32 and 33.

WHEREFORE, Plaintiff Michael Hartleib prays for judgment in his favor on Count III, for compensatory damages in a fair and reasonable amount, for his costs incurred herein, and for such other and further relief as the Court deems just and proper.

### COUNT IV
*Breach of Fiduciary Duty*
*Defendant Ross-Williams*

58. Ross-Williams was an unfit plaintiff who simply allowed her name to be used to facilitate a lawyer driven case for personal financial gain.

59. When Hartleib informed her of the fraud and chicanery that was taking place in "her" case, she did nothing to stop it. In fact, she became a willing participant in the fraud upon the Court by acting on behalf of Weiser in furtherance of his fraud upon the court.

60. Ross-Williams owed a fiduciary duty to Mr. Hartleib and all Sprint shareholders to fairly and adequately represent their interests in the litigation, including the duties to ensure that lead counsel fee requests were appropriate, the duties of care and loyalty to the class, and to fairly represent the interests of the entire class.

61. Ross-Williams failed to act in good faith and breached her fiduciary duty to properly represent Mr. Hartleib and the other Sprint shareholders by failing to ensure the fee request of Weiser was commensurate with the relief obtained, by failing to ensure that the relief agreed to in the settlement was sufficiently robust as to effect meaningful corporate change, by failing to adequately monitor and remain involved in the litigation, and by acting in her own interest rather than in the interest of Sprint Nextel and absent class of shareholders.

62. As a direct and proximate result of Ross-Williams' breach of her fiduciary duties, Mr. Hartleib was damaged as described above in paragraphs 32 and 33.

EXHIBIT 35
648

WHEREFORE, Plaintiff Michael Hartleib prays for judgment in his favor on Count IV, for compensatory damages in a fair and reasonable amount, for his costs incurred herein, and for such other and further relief as the Court deems just and proper.

Respectfully Submitted by:

/s/ Andrew B. Protzman

Andrew B. Protzman, #18015
Ben Stelter-Embry, #25891
Protzman Law Firm LLC
1100 Main Street
Suite 2430
T: 816-421-5100
F: 816-421-5105
andy@protzmanlaw.com
ben@protzmanlaw.com

*Attorneys for Plaintiff*

13

EXHIBIT 35
649

# EXHIBIT 31

EXHIBIT 35
650

# Silverang Donohoe
# Rosenzweig Haltzman LLC

### Attorneys at Law

595 East Lancaster Avenue
Suite 203
St. Davids, PA 19087
(610) 263-0115 Telephone
(215) 754-4934 Facsimile
www.sanddlawyers.com

Philip S. Rosenzweig
(610) 263-0124 Direct Dial
(215) 754-4139 Direct Fax
Email: prosenzweig@sanddlawyers.com

December 19, 2018

*VIA EMAIL (andy@protzmanlaw.com)*
*AND FIRST CLASS MAIL*

Andrew Protzman, Esquire
Protzman Law Firm
1100 Main Street
Kansas City, MO 64105

Re:  *Hartleib v. Weiser Law Firm, P.C., et al.*

Dear Mr. Protzman:

As I indicated to you in my email of December 17, 2018 at 7:06 pm, I and my law firm are counsel to The Weiser Law Firm, P.C. (the "Weiser Firm") and Robert B. Weiser, Esquire ("Mr. Weiser") (the "Weiser Firm" and "Mr. Weiser" are collectively my "Clients"). While I am not as of yet prepared to respond to all the purported factual allegations of the draft petition ("Petition") you prepared and transmitted along with your December 12, 2018 letter on behalf of your client, the proposed plaintiff Michael Hartleib ("Hartleib"), your letter belies your own well founded skepticism as to the veracity of the allegations. Upon my cursory initial review thereof, the Petition is riddled with serious misrepresentations of fact and outright falsehoods. The claims the Petition contemplates raising against my Clients are frivolous and cannot be asserted in a signed pleading in a court of law in good faith.

In the interests of efficiency, and in an effort to timely respond to your letter, I will focus on the two utterly groundless causes of action which the Petition purports to assert on behalf of Hartleib against my Clients, who expressly reserve all rights with respect to the countless false and outrageous allegations in the Petition. This letter is not to be construed as a waiver of any kind with respect to any allegation set forth in the Petition, or any defense to the Petition, including, but not limited to, any and all defenses regarding jurisdiction, venue, the applicability of Kansas law (or lack thereof), any applicable statute(s) of limitations, or damages. Nor should this letter be construed as a waiver of my Clients' potential claims or counterclaims against Hartleib that could be asserted based on Hartleib's conduct, or against you and your law firm in the event the Petition as stated is filed by you.

{01025448;3}

EXHIBIT 35

Andrew Protzman, Esquire
December 19, 2018
Page 2

As you surely know, the Petition proposes two counts under Kansas law against my Clients: Count I for Legal Malpractice/Brief of Fiduciary Duty and Count II for violation of the Kansas Consumer Protection Act (the "KCPA"). Both causes of action depend, *inter alia,* upon a demonstrably false and absurd premise: that the Weiser Firm and/or Mr. Weiser "agreed to represent Mr. Hartleib" and "entered into an attorney-client relationship" with Hartleib in March 2009. Nothing could be further from the truth. As your client is well-aware, my Clients ***expressly declined*** to file a shareholder derivative action on behalf of Hartleib or otherwise serve as counsel (or co-counsel) to Hartleib in March 2009, and there exists clear, undebatable documentary evidence with respect to this explicit declination. *See* Exhibit 1 enclosed herewith. Moreover, the Petition's assertions as to why my Clients declined to serve as counsel for Hartleib are patently untrue, but nevertheless serve as an admission that Hartleib and my Clients did NOT have an attorney-client relationship. The Petition claims, *inter alia,* that Hartleib was advised on March 27, 2009 that his involvement with "effective and wholly unrelated shareholder derivative [litigation] somehow created a potential conflict and rendered Hartleib an[] inadequate shareholder representative." Aside from being nonsensical, as explained herein, that allegation is inaccurate. Rather, it was Hartleib's then involvement with, and intention to move for appointment as lead plaintiff in, the federal securities fraud class action (the "Securities Action") asserting wholly related, direct claims against Sprint Corp. ("Sprint") which presented a clear conflict for purposes of serving as a shareholder derivative plaintiff asserting claims on Sprint's behalf.

Under Kansas law, an attorney-client relationship can be explicitly formed based on the payment of a fee and/or a memorialized formal retention agreement. *Associated Wholesale Grocers, Inc. v. Americold Corp.,* 266 Kan. 1047 (1999) *citing In re Adoption of Irons,* 235 Kan. 540, 548, 684 P.2d 332 (1984). In the absence of such, an attorney-client relationship may be "implied by the conduct of the parties." *Id.* Significantly, an attorney-client relationship can be implied only when, based on the conduct of the parties, it is sufficiently established that the services of the attorney in matters pertinent to the attorney's profession ***were both sought and received****. Id.* The Petition does not allege (nor could it) that the Weiser Firm or Mr. Weiser ever accepted any fee from Hartleib, or that Hartleib executed a formal retention agreement with the Weiser Firm or Mr. Weiser. Even assuming *arguendo,* that as the Petition alleges, Hartleib retained the Law Offices of Bruce G. Murphy (the "Murphy Firm"), my Clients were not parties to any formal representation agreement between Hartleib and the Murphy Firm. Further, the documentary evidence with respect to the "conduct of the parties" plainly demonstrates that while Hartleib may have sought my Clients' legal services, such services were certainly never provided to or received by Hartleib, because my Clients flatly declined to act as counsel (or co-counsel) to Hartleib immediately after Mr. Weiser first communicated with Hartleib. *See* Exhibit 1.

Surely you agree that an implied attorney-client relationship is not formed simply because an individual seeking legal representation communicated with a lawyer once, and of course, as set forth above, Kansas law does not provide otherwise. In late March 2009, as your Petition indicates, Mr. Weiser spoke with Hartleib one time via telephone; the two men had never spoken previously. The phone call between Mr. Weiser and Hartleib took place specifically because my Clients had not agreed to act as co-counsel to Hartleib with the Murphy Firm in a derivative action on behalf of

{01025448;3}

EXHIBIT 35
652

Andrew Protzman, Esquire
December 19, 2018
Page 3

Sprint, and would not agree to doing so without having first conducted their own independent due diligence regarding Hartleib's adequacy as a derivative plaintiff and after an analysis of potential conflicts of interest implicating Hartleib. My Clients are specialists in the arena of shareholder derivative litigation and are intimately familiar with the unique issues and conflicts potentially posed by shareholder derivative plaintiffs, who bring derivative actions in a fiduciary capacity on behalf of and solely for the benefit of a corporation, rather than on their own behalf for their own personal direct benefit. My Clients routinely communicate directly with shareholders in light of these issues, in order to assess whether or not to proceed with representation in a shareholder derivative action.

During the telephone call between Hartleib and Mr. Weiser in late March 2009, Hartleib represented to Mr. Weiser that he had extensively investigated alleged wrongdoing by Sprint and previously contacted the law firm of Robbins Geller Rudman & Dowd LLP ("RGRD") in order to provide RGRD facts and analysis for the purposes of initiating and prosecuting the Securities Action *against Sprint*. Hartleib further represented that he was interested in filing a motion in federal court seeking his appointment as the lead plaintiff (or a co-lead plaintiff) in the Securities Action *against Sprint*, and that he believed he would be an ideal lead plaintiff for the Securities Action based upon his purportedly vast knowledge regarding Sprint's transgressions and its liability to the investor class. Moreover, Hartlieb suggested that he wanted to receive a share of any attorneys' fees for plaintiffs' counsel which might be awarded in a derivative action to be brought on Sprint's behalf.

Mr. Weiser immediately concluded that my Clients could not and should not represent Hartleib or serve as his co-counsel in a derivative action brought for Sprint's benefit. Notwithstanding Hartleib's deeply troubling and improper suggestion that he wished to share in attorneys' fees, it is black-letter law that an investor plaintiff who simultaneously pursues both direct and derivative claims or lawsuits against and on behalf of the same corporate entity is an inadequate and conflicted plaintiff. *See Davis v. Comed, Inc.*, 619 F.2d 588, 597 (6th Cir. 1980) (derivative plaintiff found inadequate because he raised direct claims against the corporation in separate litigation, and thus "virtually admit[ted] this conflict between the derivative action and his other litigation"); *St. Clair Shores Gen. Emps. Ret. Sys. v. Eibeler*, No. 06 Civ. 688(SWK), 2006 WL 2849783, at *7 (S.D.N.Y. Oct. 4, 2006) (plaintiffs attempting to advance both derivative and direct claims "face an impermissible conflict of interest."); *Wall Street Sys., Inc. v. Lemence*, No. 04 Civ. 5299, 2005 WL 292744 (S.D.N.Y. Feb. 8, 2005) (finding that plaintiff who simultaneously brought direct and derivative actions had a conflict of interest and could not satisfy obligations pursuant to Fed. R. Civ. P. 23.1). *See also Ryan v. Aetna Life Ins. Co.*, 765 F. Supp. 133, 135 (S.D.N.Y. 1991); *Brickman v. Tyco*, 731 F. Supp. 101, 109 (S.D.N.Y. 1990).

After speaking with Hartleib, Mr. Weiser notified the Murphy Firm via email on March 27, 2009 at 7:21 a.m. that my Clients declined to serve as co-counsel to Hartleib, because my Clients had concluded that Hartleib had a conflict of interest which prevented him from serving as an adequate derivative plaintiff. *See* Exhibit 1. The Murphy Firm notified Hartleib in writing that both the Murphy Firm and my Clients declined to represent Hartleib based on the conflict of interest via email at 9:55 a.m. *Id.* Notably, the March 27, 2009 email to Hartleib from the Murphy Firm stated

{01025448;3}

EXHIBIT 35
653

Andrew Protzman, Esquire
December 19, 2018
Page 4

to Hartleib that if he were to file a derivative suit, "[d]efense counsel can be expected to object to you serving as the [derivative] Representative on the grounds of adequacy." Had Hartleib applied for appointment as lead plaintiff in the Securities Action against Sprint, as he informed Mr. Weiser via telephone that he intended to do, and had Hartleib initiated a derivative action on behalf of Sprint at that time, undoubtedly competing movants for lead plaintiff and defense counsel in the Securities Action would have attacked him as an inadequate lead plaintiff.

Thus, there is no legitimate basis upon which it can be alleged, in good faith, for purposes of Count I of the Petition, that my Clients "entered into an attorney-client relationship" with Hartleib, explicitly or implicitly, rendering Count I for legal malpractice/breach of fiduciary duty fatally flawed. Nor is there any legitimate basis upon which it can be alleged in good faith, for purposes of Count II of the Petition, that my Clients "agreed to represent Mr. Hartleib as the shareholder representative plaintiff for the case Mr. Hartleib hired them to pursue," and therefore Count II for violation of the KCPA is fatally flawed.

The "conduct of the parties" following March 27, 2009 also puts to rest any notion that an attorney-client relationship was ever formed by implication between my Clients and Hartleib, or that Hartleib was ever acting under any such impression. Neither my Clients nor Hartleib subsequently acted as if an attorney-client relationship had been formed, because of course there was never was any such relationship. Hartleib had no communications whatsoever with my Clients regarding Sprint until after over seven years had passed – and only then, in an attempt to extort money from my Clients by leveraging his objection to the settlement of the Sprint derivative litigation. The threatened litigation against my Clients set forth in the Petition merely serves as the latest iteration of Hartleib's unsuccessful extortion efforts against them. In fact, Hartleib subsequently retained another law firm in the field of shareholder litigation, Kahn, Swick & Foti, LLC ("Kahn Swick"), to serve as his counsel for purposes of bringing a derivative action on behalf of Sprint, which was filed on July 14, 2011. Interestingly, despite serving as counsel to Hartleib in his Sprint derivative action, Kahn Swick chose not to represent Hartleib in connection with his objection to the Sprint derivative settlement, his related application for a direct financial award, or his unsuccessful appeal of the orders denying his objection to the settlement and his application for a financial award.

Upon the completion of my investigation into the underlying Sprint-Nextel derivative case, I suspect I will be well prepared to address and rebut all of the outrageous and seemingly false factual allegations throughout the Petition. Moreover, although I do not represent proposed defendant Monica Ross-Williams, her status as an adequate derivative plaintiff was fully adjudicated in the Sprint-Nextel litigation, rendering any questions with respect thereto moot on the basis of collateral estoppel. Further, to suggest that Ms. Ross-Williams owes a fiduciary duty to another shareholder of a publicly traded company is patently absurd.

Should you possess any contrary evidence or information I am unaware of that would support the allegations that Hartleib retained my Clients as his counsel and that my Clients entered into an attorney-client relationship with Hartleib, I would be interested in reviewing the same. It would only be in that instance where it might make sense to engage in a dialogue with you regarding the many other deeply flawed and apparently false allegations of the Petition. I might also note that I am counsel for the Weiser Firm in a pending lawsuit against Mr. Silow and the lawyer placement

{01025448;3}

EXHIBIT 35
654

Andrew Protzman, Esquire
December 19, 2018
Page 5

agency responsible for Mr. Silow's placement at the Weiser Firm to perform document review work, so I am confident in assuring that your facts regarding Mr. Silow are flatly wrong in almost all instances.

I respectfully submit that the filing of the Petition would violate Kansas Rule of Professional Conduct 3.1 and/or various other ethical and professional obligations, and my Clients hereby reserve all rights to pursue all available remedies. Therefore, I suggest you carefully reconsider ever filing the Petition.

Be guided accordingly.

Very truly yours,

PHILIP S. ROSENZWEIG

PSR/mer
Enclosure

cc:     Robert B. Weiser, Esquire (via email)

{01025448;3}

EXHIBIT 35

# EXHIBIT 32

EXHIBIT 35
656

| | |
|---|---|
| **From:** | Andrew Protzman <andy@protzmanlaw.com> |
| **Sent:** | Monday, January 07, 2019 3:06 PM |
| **To:** | Philip Rosenzweig |
| **Subject:** | Re: Hartleib v. Weiser Law Firm, P.C., et al. |

Phil:

I have not received a response to my email, below.  Please advise before close of business Thursday if your client is interested in a pre-suit mediation of this matter.  If not, or if I don't hear from you, we will proceed with filing suit Friday.

Thank you.

Andy.

Andrew B. Protzman
Protzman Law Firm, LLC
1100 Main Street
Suite 2430
Kansas City, Missouri 64105
816.421.5100/5105(fax)
andy@protzmanlaw.com

NOTE: The Missouri Bar Disciplinary Counsel requires all Missouri lawyers to notify all recipients of e-mail that (1) e-mail communication is not a secure method of communication, (2) any e-mail that is sent to you or by you may be copied and held by various computers it passes through as it goes from me to you or vice versa, (3) persons not participating in our communication may intercept our communications by improperly accessing your computer or my computer or even some computer unconnected to either of us which the e-mail passed through. I am communicating to you via e-mail because you have consented to receive communications via this medium. If you change your mind and want future communications to be sent in a different fashion, please let me know AT ONCE. The information contained in this electronic message may be attorney-client privileged, confidential, and exempt from disclosure under applicable law and is intended only for the use of the individual(s) to whom this electronic message is addressed. If the reader of this message is not the intended recipient, or the employee or agent responsible to deliver it to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this electronic communication or any attachment thereto is strictly prohibited. If you have received this electronic communication in error, you should immediately return it to us and delete the message from your system. We would also

1

EXHIBIT 35
657

appreciate it if you would telephone us at (816) 421-5100, to advise of the misdirected communication. Thank you.

On 12/21/18, 11:23 AM, "Andrew Protzman" <andy@protzmanlaw.com> wrote:

Phil:

I write in response to your December 19, 2018 letter to me.  Please dispense with the threats to me.  They are neither well-founded, nor well-received.

Mr. Hartleib vigorously disputes virtually every statement made in your letter.  Just as an example, on March 22, 2009, Mr. Murphy communicated to Mr. Hartleib on his and Mr. Weiser's behalf that they had jointly reviewed Mr. Hartleib's requested revisions to the retainer and agreed to them.  Subsequent to that, Mr. Weiser and Mr. Hartleib spoke on multiple occasions wherein Mr. Hartleib relied on Mr. Weiser as his lawyer, provided confidential and work-product communications to him, and received legal advice.  As you well know, or should, the existence of an attorney-client relationship is not dependent upon a written agreement but is based on conduct and client expectations.  See, e.g., Matter of Hodge, 307 Kan. 170, 407 P.3d 613 (2017).  I will not belabor the additional misstatements Mr. Weiser has provided you that you repeat in your correspondence.

Regardless of these parties' factual disagreements about the course of their relationship, I did not receive an answer to the ultimate question posed:  Does your client want to follow through on his suggestion of a mediation between these parties prior to Mr. Hartleib filing suit?  If the answer is no, that is fine, we will file.  If the answer is yes, then we need to schedule it within the next 30-60 days in order than it can be given every opportunity to succeed before we must file in the absence of a tolling agreement.  Given your intimate familiarity with the Silow matter and the contents of your letter to me, I suspect that 30 days will be more than enough time for Mr. Weiser to get you up to speed.

Andy

Andrew B. Protzman
Protzman Law Firm, LLC
1100 Main Street
Suite 2430
Kansas City, Missouri 64105
816.421.5100/5105(fax)
andy@protzmanlaw.com

2

EXHIBIT 35

NOTE: The Missouri Bar Disciplinary Counsel requires all Missouri lawyers to notify all recipients of e-mail that (1) e-mail communication is not a secure method of communication, (2) any e-mail that is sent to you or by you may be copied and held by various computers it passes through as it goes from me to you or vice versa, (3) persons not participating in our communication may intercept our communications by improperly accessing your computer or my computer or even some computer unconnected to either of us which the e-mail passed through. I am communicating to you via e-mail because you have consented to receive communications via this medium. If you change your mind and want future communications to be sent in a different fashion, please let me know AT ONCE. The information contained in this electronic message may be attorney-client privileged, confidential, and exempt from disclosure under applicable law and is intended only for the use of the individual(s) to whom this electronic message is addressed. If the reader of this message is not the intended recipient, or the employee or agent responsible to deliver it to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this electronic communication or any attachment thereto is strictly prohibited. If you have received this electronic communication in error, you should immediately return it to us and delete the message from your system. We would also appreciate it if you would telephone us at (816) 421-5100, to advise of the misdirected communication. Thank you.

On 12/19/18, 4:25 PM, "MaryEllen Raynor" <MRaynor@sanddlawyers.com> wrote:

ON BEHALF OF PHILIP S. ROSENZWEIG, ESQUIRE

Mr. Protzman:

 Please see the attached correspondence.  Thank you.

Best Regards,

Phil

_____
Philip S. Rosenzweig, Esquire
Partner
Silverang, Donohoe, Rosenzweig & Haltzman, LLC
595 East Lancaster Avenue
Suite 203
St. Davids, Pa. 19087
610-263-0124 (direct)
610-263-0115 (main)

3

EXHIBIT 35
659

215-754-4139 (efax)
prosenzweig@sanddlawyers.com

4

EXHIBIT 35
660

# EXHIBIT 33

EXHIBIT 35
661

# UNITED STATES DISTRICT COURT
## DISTRICT OF KANSAS

| | |
|---|---|
| MICHAEL HARTLEIB, Derivatively on Behalf of SPRINT NEXTEL CORPORATION, <br><br> Plaintiff, <br><br> vs. <br><br> GARY D. FORSEE, PAUL N. SALEH, TIMOTHY E. KELLY, LINDA K. LORIMER, WILLIAM G. ARENDT, BARRY J. WEST, ROBERT R. BENNETT, GORDON M. BETHUNE, LARRY C. GLASSCOCK, JAMES H. HANCE, JR., V. JANET HILL, and RODNEY O'NEAL, <br><br> Defendants, <br><br> -and- <br><br> SPRINT NEXTEL CORPORATION, <br><br> Nominal Defendant. | Case No 11-CV-1184-EFM- <br><br> **Jury Trial Demanded** |

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Plaintiff, by his undersigned attorneys, submits this Verified Shareholder Derivative Complaint in the name and on behalf of nominal defendant Sprint Nextel Corporation ("Sprint" or the "Company") against certain directors and officers of Sprint named herein (the "Defendants"). Plaintiff bases his allegations on personal knowledge as to his own acts and on information and belief as to all other allegations, based upon due investigation by counsel, including: (a) review and analysis of public filings made by Sprint and other persons with the Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and other publications caused to be disseminated by certain of the Defendants and other persons; (c) review of news articles, shareholder communications, and postings on Sprint's website concerning the Company's public statements; and (d) review of other publicly available information concerning Sprint and other persons.

EXHIBIT 35
662

## INTRODUCTION AND OVERVIEW

1.    This is a shareholder derivative action brought by a shareholder of Sprint on behalf of the Company against certain of its officers and directors seeking to remedy Defendants' violations of state law, including breaches of fiduciary duties, gross mismanagement, waste of corporate assets, and unjust enrichment, that occurred between October 26, 2006 and February 27, 2008 (the "Relevant Period") and that have caused substantial monetary losses to Sprint and other damages, including damages to its reputation and goodwill.  On behalf of Sprint, this action seeks damages, corporate governance reforms, an accounting, rescission, and the imposition of a constructive trust to remedy Defendants' violations of law.

2.    During the Relevant Period, Defendants caused Sprint to issue or make materially false and misleading statements concerning the Company's business operations and financial condition.  Additionally, Defendants caused Sprint to file materially false and misleading financial statements with the SEC.

3.    In 2005, Sprint was markedly lagging behind wireless leaders AT&T and Verizon.  In a frantic attempt to bolster the Company's competitiveness against AT&T and Verizon, Sprint's Board of Directors, including former CEO, Defendant Gary D. Forsee, decided to purchase Nextel Communications Inc. ("Nextel").  In August 2005, Sprint spent $37.8 billion to purchase Nextel in hopes that combining Sprint's code division multiple access ("CDMA") technology with Nextel's integrated digital enhanced network ("iDEN") would give Sprint the competitive firepower necessary to win market share from its wireless rivals, AT&T and Verizon.  One key aspect of Sprint's plan was to hone in on Nextel's niche in "push to talk," or walkie-talkie technology, the iDEN network.  The combination of Sprint's CDMA and Nextel's "push to talk" iDEN was touted as

capable of achieving merger synergies worth more than the overall purchase amount or greater than $37.8 billion.

4.    After the merger, the merger synergies touted by Defendants never materialized. Instead, Sprint suffered numerous technical, financial, and operational issues. Through Defendants' failure of oversight, the newly-merged company failed to successfully integrate the CDMA and iDEN systems. Along with failing to integrate the two technology systems, Defendants also caused Sprint to inherit Nextel's large subprime subscriber base, which quickly caused Sprint's average revenue per use ("ARPU") to drop and increased customer churn rates.

5.    In an attempt to hide these symptoms of a failed merger, the Defendants publicly attributed the drop in ARPU to Sprint's new heightened credit standards and its policy of decreasing reliance on subprime subscribers. These statements were false and misled shareholders, to the detriment of both them and the Company.

## JURISDICTION AND VENUE

6.    This Court has diversity jurisdiction over this action pursuant to 28 U.S.C. § 1332. All Defendants are completely diverse from Plaintiff. The amount in controversy exceeds $75,000.00.

7.    The Court has personal jurisdiction over each of the Defendants because each either is a corporation that is incorporated under the laws of, conducts business in and maintains operations in this District or is an individual who either is present in this District for jurisdictional purposes or has sufficient minimum contacts with this District as to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

8.    Venue is proper in this District pursuant to 28 U.S.C. § 1391 because: (a) one or more of the Defendants either resides in or maintains executive offices here; (b) a substantial portion

of the transactions and wrongs complained of herein occurred here; and (c) Defendants have received substantial compensation and other transfers of money here by doing business here and engaging in activities having an effect here.

**PARTIES**

### A.    Plaintiff

9.    Plaintiff Michael Hartleib is and was during the Relevant Period an owner and holder of Sprint common stock. For most of the Relevant Period, Mr. Hartleib has owned several hundred thousand dollars' worth of Sprint stock. He currently holds approximately 11,000 shares. He is a citizen of California.

### B.    Nominal Defendant

10.    Nominal Defendant Sprint is a corporation organized under the laws of Kansas with its principal place of business in Overland Park, Kansas.

### C.    Defendants

11.    Defendant Gary D. Forsee ("Forsee") was the Chief Executive Officer, and a director, of Sprint until October 2007. Because of Forsee's positions, he knew, consciously disregarded, was reckless and grossly negligent in not knowing, or should have known the wrongful conduct and adverse, non-public information about the business of Sprint including its finances, markets and present and future business prospects, via access to corporate documents, conversations and connections with other corporate officers and employees, attendance at management and Board meetings and committees thereof, as well as reports and other information provided to him in connection therewith. During the Relevant Period, Forsee participated in the wrongful conduct and issuance of improper statements, including the preparation of the improper press releases and improper SEC filings and approval of other statements made to the press, security analysts and

Sprint shareholders. Forsee received $40 million in salary and other compensation from Sprint in

2007—including nearly $14 million in falsely-described "severance" benefits upon his termination.

Forsee is a citizen of the District of Columbia.

12.    Defendant Paul N. Saleh ("Saleh") was the Chief Financial Officer of Sprint from

2005 until January 2008 and its Acting Chief Executive Officer during October-December 2007.

Because of Saleh's positions, he knew, consciously disregarded, was reckless and grossly negligent

in not knowing, or should have known the wrongful conduct and adverse, non-public information

about the business of Sprint including its finances, markets and present and future business

prospects, via access to corporate documents, conversations and connections with other corporate

officers and employees, attendance at management and Board meetings and committees thereof, as

well as reports and other information provided to him in connection therewith. During the Relevant

Period, Saleh participated in the wrongful conduct and issuance of improper statements, including

the preparation of the improper press releases and improper SEC filings and approval of other

statements made to the press, security analysts and Sprint shareholders. In 2008, Saleh received

$13.7 million in stock awards and other compensation from Sprint. He is a citizen of Virginia.

13.    Defendant Timothy E. Kelly ("Kelly") was the Chief Marketing Officer of Sprint

from May 2007 to January 2008, and held numerous positions in marketing and customer relations

dating back to 2004. Because of Kelly's positions, he knew, consciously disregarded, was reckless

and grossly negligent in not knowing, or should have known the wrongful conduct and adverse, non-

public information about the business of Sprint including its finances, markets and present and future

business prospects, via access to corporate documents, conversations and connections with other

corporate officers and employees, attendance at management and Board meetings and committees

thereof, as well as reports and other information provided to him in connection therewith. During

the Relevant Period, Kelly participated in the wrongful conduct and issuance of improper statements, including the preparation of the improper press releases and improper SEC filings and approval of other statements made to the press, security analysts and Sprint shareholders. In 2008, Kelly received $4.9 million in stock awards and other compensation. In 2007, while in the possession of material, non-public information concerning Sprint and its deteriorating financial condition, Kelly sold substantially all of his personal holdings of Company stock, garnering an *additional* $1.3 million in ill-gotten gains. He is a citizen of South Carolina.

14.    Defendant Linda K. Lorimer ("Lorimer") was a member of Sprint's Board of Directors from March 1993 to May 2008, as well as a member of its Audit Committee from 2006 to 2007. Because of Lorimer's positions, she knew, consciously disregarded, was reckless and grossly negligent in not knowing, or should have known the wrongful conduct and adverse, non-public information about the business of Sprint including its finances, markets and present and future business prospects, via access to corporate documents, conversations and connections with other corporate officers and employees, attendance at management and Board meetings and committees thereof, as well as reports and other information provided to him in connection therewith. During the Relevant Period, Lorimer participated in the wrongful conduct and issuance of improper statements, including the preparation of the improper press releases and improper SEC filings and approval of other statements made to the press, security analysts and Sprint shareholders. Lorimer personally approved the decision to allow Forsee to be terminated voluntarily, and not "for cause," and to receive approximately $14 million in "severance" benefits. In 2007, Lorimer received $250,000 in stock awards and other compensation. In 2006, while in the possession of material, non-public information concerning Sprint and its deteriorating financial condition, Lorimer sold

substantially all of her personal holdings of Company stock, garnering an *additional* $1.1 million in ill-gotten gains.    She is a citizen of Connecticut.

15.    Defendant William G. Arendt ("Arendt") was Sprint's Senior Vice President and Corporate Controller from 2005 to 2008.  He served as Acting Chief Financial Officer for the first half of 2008.  Because of Arendt's positions, he knew, consciously disregarded, was reckless and grossly negligent in not knowing, or should have known the wrongful conduct and adverse, non-public information about the business of Sprint including its finances, markets and present and future business prospects, via access to corporate documents, conversations and connections with other corporate officers and employees, attendance at management and Board meetings and committees thereof, as well as reports and other information provided to him in connection therewith.  During the Relevant Period, Arendt participated in the wrongful conduct and issuance of improper statements, including the preparation of the improper press releases and improper SEC filings and approval of other statements made to the press, security analysts and Sprint shareholders.  In 2008, Arendt received $4.1 million in "other compensation" and other compensation.  In 2006 and 2007, while in the possession of material, non-public information concerning Sprint and its deteriorating financial condition, Arendt sold substantially all of his personal holdings of Company stock, garnering an *additional* $1.2 million in ill-gotten gains.  He is a citizen of Virginia.

16.    Defendant Barry J. West ("West") was the Chief Technology Officer of Sprint from 2005 to 2008.  Because of West's positions, he knew, consciously disregarded, was reckless and grossly negligent in not knowing, or should have known the wrongful conduct and adverse, non-public information about the business of Sprint including its finances, markets and present and future business prospects, via access to corporate documents, conversations and connections with other corporate officers and employees, attendance at management and Board meetings and committees

EXHIBIT 35

thereof, as well as reports and other information provided to him in connection therewith.  During the Relevant Period, West participated in the wrongful conduct and issuance of improper statements, including the preparation of the improper press releases and improper SEC filings and approval of other statements made to the press, security analysts and Sprint shareholders.  In 2007, West received $5.8 million in bonuses and other compensation.  In 2007, while in the possession of material, non-public information concerning Sprint and its deteriorating financial condition, West sold substantially all of his personal holdings of Company stock, garnering an *additional* $9.1 million in ill-gotten gains.  He is a citizen of Florida.

17.    Defendant Robert R. Bennett ("Bennett") is a Sprint director and has been since October 2006.  He has served on Sprint's Audit Committee since April 2006.  Because of Bennett's position, he knew, consciously disregarded, was reckless and grossly negligent in not knowing, or should have known the wrongful conduct and adverse, non-public information about the business of Sprint including its finances, markets and present and future business prospects, via access to corporate documents, conversations and connections with other corporate officers and employees, attendance at management and Board meetings and committees thereof, as well as reports and other information provided to him in connection therewith.  During the Relevant Period, Bennett participated in the wrongful conduct and issuance of improper statements, including the preparation of the improper press releases and improper SEC filings and approval of other statements made to the press, security analysts and Sprint shareholders.  Bennett received $224,000 in fees and other compensation from Sprint in 2010.  Bennett is a citizen of Colorado.

18.    Defendant Gordon M. Bethune ("Bethune") has been a Sprint director since March 2004.  Because of Bethune's position, he knew, consciously disregarded, was reckless and grossly negligent in not knowing, or should have known the wrongful conduct and adverse, non-public

information about the business of Sprint including its finances, markets and present and future

business prospects, via access to corporate documents, conversations and connections with other

corporate officers and employees, attendance at management and Board meetings and committees

thereof, as well as reports and other information provided to him in connection therewith. During

the Relevant Period, Bethune participated in the wrongful conduct and issuance of improper

statements, including the preparation of the improper press releases and improper SEC filings and

approval of other statements made to the press, security analysts and Sprint shareholders. Bethune

received $218,500 in fees and other compensation from Sprint in 2010. Bethune is a citizen of

Texas.

19.     Defendant Larry C. Glasscock ("Glasscock") has been a Sprint director since August

2007. He has served on Sprint's Audit Committee since April 2007. Because of Glasscock's

position, he knew, consciously disregarded, was reckless and grossly negligent in not knowing, or

should have known the wrongful conduct and adverse, non-public information about the business of

Sprint including its finances, markets and present and future business prospects, via access to

corporate documents, conversations and connections with other corporate officers and employees,

attendance at management and Board meetings and committees thereof, as well as reports and other

information provided to him in connection therewith. During the Relevant Period, Glasscock

participated in the wrongful conduct and issuance of improper statements, including the preparation

of the improper press releases and improper SEC filings and approval of other statements made to

the press, security analysts and Sprint shareholders. Glasscock received $229,000 in fees and other

compensation from Sprint in 2010. Glasscock is a citizen of Indiana.

20.     Defendant James H. Hance, Jr. ("Hance") is a Sprint director and Chairman of the

Board and has been since 2005. He has served on Sprint's Audit Committee since April 2006.

Because of Hance's positions, he knew, consciously disregarded, was reckless and grossly negligent in not knowing, or should have known the wrongful conduct and adverse, non-public information about the business of Sprint including its finances, markets and present and future business prospects, via access to corporate documents, conversations and connections with other corporate officers and employees, attendance at management and Board meetings and committees thereof, as well as reports and other information provided to him in connection therewith. During the Relevant Period, Hance participated in the wrongful conduct and issuance of improper statements, including the preparation of the improper press releases and improper SEC filings and approval of other statements made to the press, security analysts and Sprint shareholders. Hance received $375,500 in fees and other compensation from Sprint in 2010. Hance is a citizen of New York.

21.    Defendant V. Janet Hill ("Hill") has been a Sprint director since 2005. Because of Hill's position, she knew, consciously disregarded, was reckless and grossly negligent in not knowing, or should have known the wrongful conduct and adverse, non-public information about the business of Sprint including its finances, markets and present and future business prospects, via access to corporate documents, conversations and connections with other corporate officers and employees, attendance at management and Board meetings and committees thereof, as well as reports and other information provided to her in connection therewith. During the Relevant Period, Hill participated in the wrongful conduct and issuance of improper statements, including the preparation of the improper press releases and improper SEC filings and approval of other statements made to the press, security analysts and Sprint shareholders. Hill received $218,583 in fees and other compensation from Sprint in 2010. Hill is a citizen of Virginia.

22.    Defendant Rodney O'Neal ("O'Neal") is a Sprint director and has been since August 2007. Because of O'Neal's position, he knew, consciously disregarded, was reckless and grossly

negligent in not knowing, or should have known the wrongful conduct and adverse, non-public information about the business of Sprint including its finances, markets and present and future business prospects, via access to corporate documents, conversations and connections with other corporate officers and employees, attendance at management and Board meetings and committees thereof, as well as reports and other information provided to him in connection therewith.  During the Relevant Period, O'Neal participated in the wrongful conduct and issuance of improper statements, including the preparation of the improper press releases and improper SEC filings and approval of other statements made to the press, security analysts and Sprint shareholders.  O'Neal received $203,000 in fees and other compensation from Sprint in 2010.  O'Neal is a citizen of Michigan.

### D.    Persons Not Named Defendants

23.    Daniel R. Hesse ("Hesse") is Sprint's President, Chief Executive Officer and, since 2007, a member of its Board of Directors.

24.    Frank Ianna ("Ianna") has been a Sprint director since 2009.  Ianna received $205,167 in fees and other compensation from Sprint in 2010.

25.    Sven-Christer Nilsson ("Nilsson") is a Sprint director and has been since 2008.  Nilsson received $186,000 in fees and other compensation from Sprint in 2009.

26.    Defendant William R. Nuti ("Nuti") is a Sprint director and has been since April 2008.  Nuti received $195,000 in fees and other compensation from Sprint in 2010.

27.    Hesse, Ianna, Nilsson, and Nuti—together with Defendants, Bennett, Bethune, Glasscock, Hance, Hill, and O'Neal—are referred to herein as the "Directors."

### GENERAL FIDUCIARY DUTIES OF THE DEFENDANTS

28.    The Defendants had stringent fiduciary obligations to Sprint and its shareholders.

29.    By reason of their positions as officers, directors and/or fiduciaries of Sprint and because of their ability to control the business and corporate affairs of Sprint, the Defendants owed Sprint and its shareholders fiduciary obligations of loyalty, good faith, due care, disclosure, candor, and oversight, and were and are required to use their utmost ability to control and manage Sprint in a fair, just, honest and equitable manner.  The Defendants were and are required to act in furtherance of the best interests of Sprint and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.

30.    Each director and officer of the Company owes to Sprint and its shareholders the fiduciary duty to exercise good faith, loyalty, and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and to uphold the highest obligations of fair dealing.  In addition, as officers and/or directors of a publicly held company, the Defendants had a duty to promptly disseminate accurate and truthful information with regard to the Company's true intentions regarding Sprint's post-merger activities.

31.    The Defendants, because of their positions of control and authority as directors and/or officers of Sprint, were able to, and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by the Company.  Because of their advisory, executive, managerial and directorial positions with Sprint, each of the Defendants had access to adverse, non-public information about the financial condition, operations, and improper representations of Sprint.

32.    At all times relevant hereto, each of the Defendants was the agent of each of the other Defendants and of Sprint, and was at all times acting within the course and scope of such agency.

33.    To discharge their duties, the officers and directors of Sprint were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the

Case 8:23-cv-00171-CJC-JDE   Document 1   Filed 01/27/23   Page 674 of 1580   Page
Case 6:11-cv-01184-EFM -KGG   Document 1   Filed 07/14/11   Page 13 of 45
ID #:674

operational affairs of the Company.  By virtue of such duties, the officers and directors of Sprint were required to, among other things:

(a)     refrain from acting upon material, inside, corporate information to benefit themselves;

(b)     conduct the affairs of the Company in an efficient, businesslike manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the Company's value;

(c)     properly and accurately guide shareholders and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's financial results and prospects, and ensuring that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times;

(d)     ensure that the Company's financial statements were based on appropriate support and documentation, and were routinely checked for accuracy;

(e)     ensure that financial records could not be manipulated;

(f)     ensure that the Company was operated in a diligent, honest and prudent manner in compliance with all applicable federal, state and local laws, rules and regulations;

(g)     ensure that these were sufficient checks and balances in Sprint's accounting and finance functions, and related functions, to prevent accounting irregularities, internal control problems, and/or overstatement of revenue or asset values; and

Case 8:23-cv-00171-CJC-JDE   Document 1   Filed 01/27/23   Page 675 of 1580   Page
Case 6:11-cv-01184-EFM -KGG   Document 1   Filed 07/14/11   Page 14 of 45
ID #:675

(h)     ensure that no inaccurate financial information about Sprint was released to the public that would tend to artificially inflate Sprint's stock, and that would thus cause corresponding or greater harm to the Company's value when the truth was revealed.

34.     Each of the Defendants, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the fiduciary duties of loyalty, good faith, due care, disclosure, candor, and oversight in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets.  The conduct of the Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Sprint, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its shareholders.  The Defendants were aware, or should have been aware, that those violations, absences of good faith, and the reckless disregard of duties posed a risk of serious injury to the Company.  The conduct of the Defendants who were also officers and/or directors of the Company during the Relevant Period has been ratified by the remaining Defendants who collectively comprised all of Sprint's Board during the Relevant Period.

35.     Because of their positions with the Company, and their access to material non-public information available to them but not to the public, Sprint, through the Defendants, knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations being made were then materially false and misleading.  As a result of defendant's illegal actions and course of conduct during the Relevant Period, the Company is now subject to class action lawsuits that allege violations of both federal and state law.  As a result, Sprint has expended, and will continue to expend, significant sums of money.

## SPECIFIC FIDUCIARY DUTIES OF DEFENDANTS

### Duties of the Audit Committee

36.    The Audit Committee during the Relevant Period included Defendants Glasscock, Bennett, and Hance. Ianna currently serves on the Committee.

37.    The primary purpose of the Audit Committee is to "review and discuss the annual audited financial statements and quarterly financial statements to be included in Sprint's Annual Report on Form 10-K and Quarterly Reports on Form 10-Q, respectively, with management and the independent registered public accounting firm, including review of Sprint's specific disclosures under "Management Discussion and Analysis of Financial Condition and Results of Operations."

38.    The Charter of the Audit Committee contains specific areas of responsibility, including:

- "Review with Sprint Nextel's general counsel and legal matters that could have a significant impact on Sprint Nextel's financial statements ..."

- "Oversee the quality-control process of the independent registered public accounting firm by, at least annually, obtaining and reviewing reports from the independent registered public accounting firm describing the firm's internal quality-control procedures; any material issues raised by the most recent internal quality control review, or peer review, of the independent registered public accounting firm, or by any inquiry or investigation by governmental or professional authorities, within the preceding five years, respecting one or more independent audits carried out by the firm and any steps taken to deal with any such issues. At least annually, conduct an evaluation of the independent registered public accounting firm's qualifications, performance and independence, taking into account the opinions of management and the internal audit function. The evaluation of the independent registered public accounting firm will include the review and evaluation of the lead partner of such firm. The Audit Committee will review and discuss with the Board its determinations with respect to the independent registered public accounting firm."

- "Review the impact of pronouncements of the Financial Accounting Standards Board, SEC and other governing or regulating bodies on Sprint Nextel's financial statements."

- "Review the integrity of Sprint Nextel's financial reporting processes, both internal and external, with input from the independent registered public accounting firm and the internal audit function."

15

EXHIBIT 35
676

- "Receive reports from management regarding all significant deficiencies and material weaknesses in the design or operation of Sprint Nextel's internal control over financial reporting which are reasonably likely to adversely affect Sprint Nextel's ability to record, process, summarize and report financial information."

- "Discuss with management the Chief Executive Officer's and Chief Financial Officer's evaluations of Sprint Nextel's disclosure controls and procedures."

**Duties of the Compensation Committee**

39.    The Compensation Committee during the Relevant Period included Defendants Bethune, Hill, and O'Neal.  Nuti currently serves on the Committee.

40.    The Compensation Committee must "review and approve any severance, retention or other termination plans and any severance retention or other termination payments proposed to be made to any current or former principal senior office."

41.    The Charter of the Compensation Committee contains specific areas of responsibility, including:

- "With input from the non-employee Board members who are not members of the Compensation Committee, review and approve Sprint Nextel's goals and objectives relevant to the CEO's compensation, evaluate the performance of the CEO in light of those goals and objectives, and set the annual compensation levels for the CEO based on the Board's and the Compensation Committee's performance evaluations and the Compensation Committee approved compensation principles."

- "Review and approve any proposed employment agreement (including any amendments) with principal senior officers. The Compensation Committee will review and approve any severance, retention or other termination plans and any severance, retention or other termination payments proposed to be made to any current or former principal senior officer, except for any such payment made in accordance with a plan or agreement previously approved by the Board or the Compensation Committee."

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

42.    In committing the wrongful acts alleged herein, the Defendants have pursued, or joined in the pursuit of, a common course of conduct.  They have acted in concert with and

conspired with one another in furtherance of their common plan or design.  In addition to pursuing

the wrongful conduct that gives rise to their primary liability, the Defendants also aided and abetted,

and/or assisted, each other in breach of their respective duties.

43.    During the Relevant Period, the Defendants collectively and individually initiated a

course of conduct that was designed to and did:  (i) conceal that most of the "growth" in Sprint's

CDMA business was actually due to pre-existing iDEN customers switching to CDMA; (ii) conceal

that Sprint would be unable to successfully integrate the CDMA and iDEN networks as promised,

including by completing the migration of the Company's customer base to a uniform billing platform

by 2007; (iii) conceal the Company's failure to address and resolve its customer service issues; (iv)

conceal that the Company was not adequately reserving for goodwill associated with Nextel in

violation of GAAP; (v) conceal that the Company was not adequately reserving for loan losses

related to subprime subscribers in violation of GAAP; and (vi) deceive the shareholders of Sprint

while in possession of non-public information regarding the Defendants' management of Sprint's

operations, the Company's financial health and stability, and its future business prospects that were

repeatedly misrepresented by Defendants.

44.    The purpose and effect of the Defendants' conspiracy, common enterprise, and/or

common course of conduct was, among other things, to disguise the Defendants' violations of state

law, including breaches of fiduciary duty, abuse of control, gross mismanagement, waste of

corporate assets and unjust enrichment; and to conceal adverse information concerning the

Company's future earnings outlook.

45.    The Defendants accomplished their conspiracy, common enterprise, and/or common

course of conduct by purposefully or recklessly releasing improper statements on the Company's

behalf.  Because the actions described herein occurred under the Board's authority, each of the

Directors except Hesse, Ianna, Nilsson, and Nuti was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

46.     Each of the Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein.  In taking such actions to substantially assist the commission of the wrongdoing complained of herein, Defendants acted with knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and was aware of his or her overall contribution to and furtherance of the wrongdoing.

## DEFENDANTS BREACH THEIR FIDUCIARY DUTIES

47.     Defendants, by their fiduciary duties of care, good faith, and loyalty, owe to Sprint a duty to insure that the Company's public filings and statements fairly represent the operations and business prospects of the Company.  In order to adequately carry out these duties, it is necessary for the Defendants to know and understand the material, non-public information that should be either disclosed or omitted from the Company's public statements.

48.     This material, non-public information principally concerned Sprint's misleading statements regarding the Company's growth expectations and their purported post-merger efficiencies.  The Defendants owed a fiduciary duty to Sprint to ensure that Sprint's Relevant Period statements properly disclosed all material facts concerning the Company.

49.     On October 26, 2006, the Defendants caused Sprint to issue a press release reporting its financial results for the third quarter 2006.  In this release, the Defendants touted "progress on margins, merger integration and operational improvements to enhance competitive position" and revenues of $9.1 billion, an increase of 12% from the third quarter 2005.  CEO Forsee also claimed that the Company benefited from "merger synergies."  The release specifically stated:

Sprint Nextel Corp. (NYSE:S) today reported third quarter 2006 financial results. In the quarter, the company improved profitability and launched several initiatives to enhance operating performance.

For the quarter, diluted earnings per share (EPS) from continuing operations were 8 cents, compared to 12 cents per share for the third quarter 2005. The reported earnings include charges of 2 cents for special items and 22 cents for merger and acquisition-related amortization cost. For the quarter, Adjusted EPS before Amortization*, which removes these effects, increased 7% to 32 cents per share, versus pro forma Adjusted EPS before Amortization* of 30 cents in the year-ago period. Third quarter results reflect growth in operating income from the Wireless segment, offset by a lower contribution from Long Distance.

In the current quarter, the company reported consolidated revenue of $10.5 billion, an increase of 8% compared to pro forma revenues in the 2005 third quarter. Consolidated Adjusted OIBDA* of $3.4 billion increased 14 percent compared to the third quarter of 2005 pro forma results. In the quarter, the company reported a 38.4% Adjusted OIBDA margin* in the Wireless segment and a Consolidated Adjusted OIBDA margin of 34.8%, a 150-basis point improvement from the year-ago period. Third-quarter Consolidated Free Cash Flow* was $769 million.

Total wireless net subscriber additions were 233,000 for the quarter due to growth in CDMA post-paid subscribers, a gain in Boost pre-paid service subscribers and renewed growth in wholesale subscribers, offset by a decline in iDEN post-paid subscribers. At the end of the quarter, Sprint Nextel's total base was 51.9 million subscribers.

In the third quarter, Wireless data revenues increased 74% compared to the year-ago period. Long Distance IP services increased 26% and Cable Voice over Internet Protocol (VoIP) users served by Sprint Nextel more than doubled from the third quarter a year-ago.

In August, the company initiated its common stock buy-back program which is expected to total up to $6 billion over an 18-month period. In the third quarter, the company acquired 91 million common shares at an aggregate cost of approximately $1.5 billion. The company will vary the amount and timing of its common stock purchases from time to time as the program proceeds.

"In the third quarter, our margins benefited from merger synergies and the scale provided by acquisitions," said Sprint Nextel President and Chief Executive Officer Gary Forsee. "Our profitability in the quarter is encouraging and demonstrates the potential of an asset mix that now is predominantly wireless. In the third quarter we took some actions to improve the quality of the customers coming into our business, and this is constraining our near-term growth. At the same time, we have taken a number of actions we believe will improve our top-line growth performance over time."

Case 8:23-cv-00171-CJC-JDE    Document 1    Filed 01/27/23    Page 681 of 1580    Page
Case 6:11-cv-01184-EFM -KGG    Document 1    Filed 07/14/11    Page 20 of 45
Document 1

50.    Sprint's Form 10-Q filed on November 9, 2006 emphasized Sprint's "more restrictive credit policies," which was put into place under the Defendants' direction.  The Form 10-Q stated in relevant part:

> We have implemented a number of programs in an effort to improve customer retention and lower our rate of churn.  We also have implemented more restrictive credit policies and have distribution of our prepaid services in certain markets, which may adversely impact our ability to attract lower credit quality subscribers and users of prepaid services in the affected markets.

51.    On January 8, 2007, the Defendants caused the Company to issue a press release entitled "Sprint Nextel Provides Update on Financial Outlook and Operating Performance."  The press release reiterated the actions undertaken by the Company, through the direction of Defendants, in 2006 to "designed to improve network performance, raise brand awareness, enhance customer satisfaction, stabilize average customer revenues, reduce churn and increase sales and distribution productivity."  Specifically, the press release stated:

> Based on preliminary data, Sprint Nextel expects to report full-year 2006 consolidated operating revenues of approximately $41.0 billion, while Adjusted Operating Income Before Depreciation and Amortization (adjusted OIBDA) continues to be projected in a range of $12.6 billion to $12.9 billion. Total capital expenditures are estimated to be $7.0 billion to $7.3 billion.

> During the fourth quarter, Sprint Nextel added 742,000 total net subscribers and ended the period with a base of 53.1 million. The fourth quarter net additions include 876,000 from wholesale and affiliates, and 171,000 new Boost customers, which were offset by a decline of 306,000 post-paid subscribers. Post-paid performance in the quarter reflects solid gains in CDMA subscribers, offset by a decline in the iDEN base."

*    *    *

> "Sprint Nextel ended 2006 in a solid financial position," said Gary D. Forsee, the company's chairman and chief executive officer. "We expect our full-year projected financial results will be in line with our prior guidance, and we remain on or ahead of plan in integrating our pre-merger operations, systems and product and service line up."

52.     In addressing the Company's plan to "improve customer satisfaction," the January 8,

2007 press release specifically stated:

Improved Customer Satisfaction

-- The company expects to complete the conversion of its entire customer base to a
unified billing platform in 2007 from the multiple legacy platforms in place today.

-- A new call center dedicated to serving Boost customers will be opened and the
number of business and consumer centers will be expanded during the year.

-- As part of its efforts to improve customer satisfaction, in the second half of 2006
business and consumer customer service operations were consolidated into one
organization, allowing for greater efficiency in supporting the customer experience.
New executives have been named to lead customer retention and customer operations
activities.

53.     On February 28, 2007, Defendants caused the Company to issue its fourth quarter

2006 year-end earnings results.  On the same day, the Defendants caused Sprint to issue a press

release highlighting the purported success that "net subscriber growth on the CDMA platform was

solid, with a total of more than 1.3 million net additions from post-paid, wholesale and affiliate

subscribers."  The press release stated in relevant part:

"In the fourth quarter, we increased funding of business operations and network
investments. We are seeing early returns from these investments as we widen our
lead in wireless data services on the CDMA platform and with the iDEN network
now delivering substantially improved call quality metrics," said Gary Forsee, Sprint
Nextel Chairman and CEO.

54.     On March 1, 2007, the Defendants caused the Company to file its Form 10-K for the

year ending December 31, 2006.  In this filing, the Defendants allowed the Company to state that

Sprint "tightened Sprint's credit policies for new subscribers of both CDMA and iDEN services."

The filing also contended that Sprint's "churn of subscribers of our CDMA services remains high

relative to our competitors, in large part due to credit-related deactivations."

21
EXHIBIT 35
682

55.     On May 2, 2007, the Defendants caused the Company to release its first quarter 2007

earnings results.  The Company was caused to state in relevant part:

> In the quarter, the company added nearly 600,000 net new subscribers, expanded
> network coverage and capabilities and significantly increased investments in
> business operations. The company reported strong demand for wireless data services
> and wireline IP services and achieved a fast start for its PowerSource(TM) handset
> offering that combines the best push-to-talk, voice and data capabilities on one
> device. The company also substantially completed a major headcount reduction,
> continued to build momentum on its planned fourth generation wireless data offering
> and launched a market trial for a Boost Mobile unlimited local calling plan.

*     *     *

> "Our plans in 2007 call for a substantial increase in the funding of business
> operations to build long term growth and profitability," said Gary Forsee, Sprint
> Nextel chairman and CEO. "We established a quick ramp on these investments in the
> first quarter to accelerate our progress. These increased commitments, along with
> notably higher device subsidies to drive acquisition and retention, impacted our
> profitability in the quarter. However, we are seeing some positive tradeoffs in the
> form of enhanced competitiveness. Examples include:

> -- Double-digit annual growth in prime credit post-paid acquisitions;

> -- Continuing improvements in the customer experience;

> -- Good progress in integrating our disparate network users through new
> PowerSource devices and transitioning to a single billing and service delivery
> platform;

> -- Stronger key brand recognition metrics as a result of an increase in year-over-year
> advertising spend, and further enhancement of our marketing potential with the
> announcement of a new advertising agency;

> -- iDEN and CDMA networks now performing at their "best ever" levels; and

> -- Great strides in planning for next generation capabilities, including announcing the
> market launch schedule for our WiMAX broadband wireless data services.

> "In the quarter, we had solid performance in our CDMA post-paid business,
> including sequential growth in both gross and net additions and improved customer
> churn," said Forsee. "We also achieved a stronger Boost Mobile customer gain,
> continued growth in MVNO channels and good velocity with PowerSource sales.
> Together, these four lines of business generated 1.3 million net additions during the
> first quarter. However, these gains were partially offset by a decline in the iDEN

post-paid subscriber base reflecting prior network constraints, which have since been largely mitigated.

"Overall post-paid subscriber retention rates again trended slightly positive in the quarter, and reported net add performance was ahead of expectations. In the quarter, 44% year-over-year growth in wireless data services continued to partially offset voice revenue declines. In the Wireline segment, we reported 28% growth in IP services year-over-year, and increased the number of cable telephony customers we serve by more than 200,000 during the quarter. Over the course of the year, we expect to achieve improving profitability in consolidated results, consistent with our previously announced annual guidance," Forsee said.

56.     On August 8, 2007, Defendants caused the Company to release its second quarter 2007 earnings results. The Company was caused to state that it "experienced strong post-paid demand on the CDMA platform" and that "these gains were offset by lower demand for iDEN post-paid services."

57.     The foregoing statements regarding the Company's credit policies and customer quality were misleading because the Defendants had not "tightened credit" or "implemented more restrictive credit policies" during the fourth quarter of 2006. Defendants would later admit that they had actually reversed the credit standards implemented in the earlier part of 2006 and increased credit extended to boost subscriber growth, reduce churn, and inflate APRU through the addition of subprime customers on both the iDEN and CDMA networks.

58.     The foregoing statements regarding the health of the Company's business were also misleading because, as is later revealed, the Defendants would be unable to complete "the conversion of its entire customer base to a unified billing platform in 2007 from the multiple legacy platforms in place," integrate the CDMA and iDEN networks, therefore causing more problems with synergies and customer service, and read other consolidation "merger synergies," which would have a negative effect on the Company's churn rate and financial earnings.

59.    The foregoing statements regarding the Company's financial prospects were also misleading because, as is later revealed, the Defendants were not properly accounting for the Company's repaired goodwill associated with the merger, causing its financial statements to be materially misstated and not in compliance with GAAP.

## THE MISCONDUCT IS REVEALED

60.    On October 8, 2007, Defendants caused Sprint to issue a press release announcing that the Company's President, CEO, and Chairman of the Board, Gary D. Forsee, was "stepping down." In this same press release, Sprint was caused to announce a net loss of approximately 337,000 post-paid subscribers in the third quarter of 2007.

61.    An article in the New York *Times* on October 9, 2007, discussing Gary Forsee's departure and dismal third quarter results, stated that:

> Analysts attribute Sprint's problems and Mr. Forsee's departure to the poorly executed union of Sprint and Nextel Communications, a deal struck in 2005.
>
> The Sprint and Nextel networks operated on different wireless technologies, which made it harder to merge operations.
>
> "When Sprint bought Nextel, it was like buying a completely alien technology with no synergy at all," said Edward Snyder, a telecommunications industry analyst with Charter Equity Research. But, he noted, Sprint figured "everybody else was merging, why not them?"
>
> The two companies also had different marketing strategies. Nextel sought more business clients, while Sprint focused primarily on consumers. After the merger "there was a tremendous amount of brand confusion," said Walter Piecyk, an industry analyst with Pali Research.
>
> Mr. Piecyk said that problems were widespread within Sprint. In its wireless business, which is the future of a telecommunications company, Mr. Piecyk said the network needed improvement and customer service was poor. The cost of acquiring new customers has been rising as well.

62.    A MarketWatch.com report on October 9, 2007, reiterated these issues, stating:

> Former Chief Executive Gary Forsee is out of a job because he couldn't keep customers happy. … The problems can be traced to Sprint's $35 billion purchase of

Nextel in 2005, championed by Forsee. Efforts to combine Sprint and Nextel ran into frequent obstacles, leading to increased service disruptions and the defection of 1 million premium customers over the past year.

\*    \*    \*

Improving Sprint's performance, at least against its chief rivals, won't be an easy task in the ultra-competitive wireless industry. AT&T Inc. and Verizon Wireless, the two largest U.S. mobile carriers, appear to be firing on all cylinders and other vendors such as T-Mobile USA Inc. are snapping at Sprint's heels.

\*    \*    \*

The first order of business is to minimize service disruptions for customers when they make calls on the Sprint or Nextel networks. Sprint consistently ranks at the bottom of customer-satisfaction surveys and its 2%-plus churn rate is the highest in the industry. Churn measures the percentage of customers who cancel service.

"They've got to focus," said wireless consultant Jane Zweig of The Shosteck Group, an early critic of the Sprint-Nextel merger. "They are not doing anything well."

The problems run deep. Sprint and Nextel use different technologies to run their networks, target different customers and operate with different corporate cultures.

One of the biggest drags on Sprint is the continued cost of running two networks. Sprint uses a wireless standard known as CDMA while Nextel relies on a unique technology known as iDEN.

Attempts to shift iDEN customers to the CDMA network have been too slow and far from seamless. In addition, capacity on the iDEN network has been strained by fast growth in Nextel's prepaid Boost service.

The result: more disruptions and unhappy customers. What's worse, those customers also happen to be the most lucrative in the industry.

\*    \*    \*

"Whoever the new CEO is, he's going to have a big uphill challenge," Zweig said.

63.    Despite Defendant Forsee's responsibility for the losses to the Company, the Sprint Board of Directors allowed Forsee to resign, instead of treating his termination as one for cause. Thus, the Board allowed Forsee to retain over $40 million in compensation for 2007—including nearly $14 million in purported "severance" benefits.  There was no rational business purpose to

conferring such largesse on a departing executive who had not benefited but had actively *harmed*

Sprint.

64.     On November 1, 2007, Defendants caused the Company to issue its third quarter 2007

financial results, including its earnings results.  In a press release caused filed on the same day,

Sprint announced that it was no longer following its 2008 earnings guidance.  The press release

stated in relevant part:

> Sprint Nextel Corp. (NYSE: S) today reported third quarter 2007 financial results.
> Consolidated net operating revenues in the quarter were $10 billion compared to
> $10.5 billion in the year-ago third quarter. Net income in the quarter was $64 million
> or 2 cents diluted earnings per share, which compares to $279 million or 9 cents
> diluted earnings per share (EPS) in the year-ago period. Adjusted EPS before
> Amortization*, which removes the effects of special items and merger-related
> amortization costs, was 23 cents in the quarter compared to 32 cents in this quarter of
> 2006. The decline in earnings is due to a lower contribution from Wireless, partially
> offset by an improved contribution from Wireline.
>
> The company reported a net decline of 60,000 total wireless subscribers in the third
> quarter.  Overall subscriber results include growth from CDMA post-paid, Boost
> Unlimited, wholesale and affiliate channels. These gains were offset by declines
> from iDEN post-paid and traditional Boost pre-paid product lines. In the quarter,
> post-paid churn was 2.3% on seasonally higher involuntary deactivations and
> competitive market conditions. The Wireless post-paid ARPU* of a little more than
> $59 in the quarter continues to be supported by data growth, offset by lower voice
> contributions.

65.     On November 9, 2007, Defendants caused the Company to file its Form 10-Q for the

period ending September 30, 2007.  The Form 10-Q reported Sprint's financial results as announced

in the Company's November 1, 2007 press release.  In response to this filing, analysts at Morgan

Stanley issued a scathing assessment of Sprint's future prospects.  The Morgan Stanley report, dated

November 14, 2007, stated in relevant part:

> Sprint's 10Q commentary indicates that there is little relief in sight.  The company
> has been plagued by numerous ongoing operational issues, including secular decline
> in its iDEN business, increasing churn, declining revenues, billing system integration
> delays and its Clearwire partnership disintegration.  The company has also been
> burdened with executive turnover which heightens the level of uncertainty on the

direction of the company. With that said, outlook for 4Q and 2008 is not promising, with little sign of turnaround."

66.    On December 18, 2007, Hesse was announced as being Sprint's new President and CEO. In a press release, Hesse conceded that "clearly we must improve execution across the board."

67.    As noted by The Wall Street Journal on December 18, 2007:

Sprint Nextel shares have plummeted nearly 50% since the Sprint-Nextel deal closed in August 2005. Putting together the companies' disparate networks and cultures has proven a trickier task than their directors and executives anticipated, and many customers have defected as a result.

68.    On January 18, 2008, Defendants caused the Company to issue a press release announcing Sprint's fourth quarter subscriber results and a plan to "Streamline Operations." One aspect of the plan to "streamline operations," as announced in the January 18, 2008 press release, was to lay off employees and record a non-cash impairment charge related to goodwill in the fourth quarter of 2007. Specifically, the release stated "anticipating continued downward pressure on subscriber trends, revenues, and profitability in 2008, Sprint Nextel also announced initial plans to streamline the business in the coming months. These plans call for job reductions across the company." The press release further stated in relevant part:

Sprint Nextel is currently performing its annual assessment of the goodwill recorded on its financial statements and expects to conclude this process prior to the release of its fourth-quarter earnings report. Given current market conditions, particularly the recent decrease in the company's stock price, Sprint Nextel could determine that it will record a non-cash impairment charge related to goodwill in the fourth quarter 2007. Any such charge would have no affect on either the company's current cash balance or future cash flows.

69.    That same day, MarketWatch.com reported on the Company's January 18, 2008 press release:

The company has been hurt by a reliance on credit-risky subscribers, mediocre customer service and a less attractive roster of handsets compared to competitors such as AT&T Inc., the exclusive provider of the iPhone.

27
EXHIBIT 35
688

In the fourth quarter, Sprint lost 109,000 subscribers overall and 683,000 postpaid customers -- larger than Wall Street analysts expected. Postpaid customer, who sign up for annual plans and pay at the end of each month, are considered the most valuable in the industry.

\*    \*    \*

Churn, or the number of customers who cancel service, remained stubbornly high at 2.3% in the fourth quarter.

Part of the reason was that Sprint has been culling out customers who've had trouble paying their bills. Sprint relied too much in the past on credit-risky consumers to generate growth and management has been taking steps to limit the company's exposure.

\*    \*    \*

Sprint ended 2007 with 53.8 million wireless customers, barely higher than the 53.1 million it served at the end of 2006. AT&T and Verizon, by contrast, added millions of new customers.

Market leader AT&T, for instance, gained a net 4.7 million mobile customers through the first three quarters of 2007 to 65.7 million. In the same time frame, Verizon added 4.6 million mobile subscribers to 63.7 million.

What's worse, the number of postpaid subscribers served by Sprint fell by 1 million in 2007 to 40.8 million.

70.    The Company's problems were discussed in a New York *Times* article published the

next day, on January 19, 2008:

Industry analysts had estimated that in the fourth quarter Sprint lost about 350,000 contract subscribers — a carrier's most valuable customers, signed up for contracts of a year or more. Instead, Sprint announced that it had a net loss of 638,000 contract customers.

"It's the magnitude of the weakness that is shocking," said Michael Nelson, an analyst at the Stanford Group, an investment firm.

To reduce costs, Sprint said it planned to cut its payroll by 4,000 workers. The company, based in Reston, Va., currently has about 60,000 employees.

Sprint said it would also close 125 company-owned retail stores, about 8 percent of the nearly 1,400 in the Sprint chain. The total labor savings, the company said, should be $700 million to $800 million a year.

\*    \*    \*

EXHIBIT 35

Cutting costs at Sprint, analysts say, is a logical step, given the decline in business. But they say the company must address other fundamental issues — some unresolved since Sprint completed its $35 billion purchase of Nextel in 2005. The company, the analysts say, runs two networks that use different technologies, and making the transition to a single compatible technology is proving to be more time-consuming and costly than expected.

Sprint, Mr. Nelson said, has also not settled on a consistent marketing strategy. By contrast, he said, Verizon has successfully promoted the quality of its network with advertisements that include the catchphrase "Can you hear me now?"

And AT&T has carved out a position as offering a reliable network and stylish handsets. It was the first to offer Motorola's Razr and, later, Apple's iPhone.

"But Sprint has not come up with a broad enough marketing strategy to appeal to a mass consumer audience yet," Mr. Nelson said.

71.    Upon this news and over concerns about a lack of visibility of the company's performance going forward and financial and operating results, Fitch Ratings downgraded Sprint's credit ratings on its long-term debt to junk status and place the Company on rating watch negative. Rating agency Standard & Poor's took a similar rating action a mere three days later on January 22, 2008.  Within three days of Defendants causing Sprint to announce its plans to "streamline operations," two of the largest rating agencies lowered Sprint's debt rating to "junk" status.

72.    On January 31, 2008, in a Form 8-K, the Defendants caused the Company to announce that Sprint would record a material, non-cash impairment charge that would represent "a substantial portion, and potentially all, of the goodwill recorded on its balance sheet at the conclusion of the second test of the goodwill assessment."  The 8-K stated in relevant part:

Sprint Nextel is required to assess goodwill for impairment annually under generally accepted accounting principles. This assessment occurs during the fourth quarter of each calendar year.

The annual goodwill impairment assessment consists of two tests. Sprint Nextel first tests goodwill for impairment by comparing the fair value of the wireless reporting unit with its net book value. If the fair value of the wireless reporting unit exceeds its net book value, goodwill is not impaired, and no further testing is necessary. If the net book value of the wireless reporting unit exceeds its fair value, Sprint Nextel must perform a second test to measure any impairment charge.

Sprint Nextel has completed the first test of its annual goodwill impairment assessment. The results of the first test have been reviewed and discussed by management and the audit committee of the board of directors. On January 30, 2008, management concluded that the net book value of the wireless reporting unit exceeds its fair value; therefore, Sprint Nextel must perform the second test of the goodwill impairment assessment.

To measure the amount of any impairment charge under the second test, Sprint Nextel must determine the implied fair value of goodwill. Specifically, Sprint Nextel must make a hypothetical allocation of the fair value of the wireless reporting unit among all of the tangible and intangible assets and liabilities of that unit, including any unrecognized intangible assets, to determine the implied fair value of goodwill. If the implied fair value of goodwill is less than the approximately $31 billion of goodwill currently recorded on its balance sheet, Sprint Nextel must record an impairment charge for the difference.

Based on the work completed to date, Sprint Nextel will be required to record a material, non-cash impairment charge that will represent a substantial portion, and potentially all, of the goodwill recorded on its balance sheet at the conclusion of the second test of the goodwill assessment. That charge, which will be reported in its fourth quarter 2007 financial results, will not impact Sprint Nextel's current cash balance or future cash flows, or result in a violation in any covenant of any of Sprint Nextel's debt instruments.

73.    On February 28, 2008, Defendants caused the Company to issue a press release announcing Sprint's fourth quarter and full year 2007 financial results.  The release confirmed that Sprint recorded a goodwill impairment charge of $29.7 billion in the fourth quarter of 2007.  Equally shocking, Sprint announced that it would be suspending its dividend payments "for the foreseeable future."  The press release stated in relevant part:

"The fourth quarter financial results reflect the challenges facing our Wireless business," said Dan Hesse, Sprint Nextel CEO. "We are making significant changes across the organization in an effort to improve execution, stabilize our customer base and deliver on the opportunity provided by our assets. Given current deteriorating business conditions, which are more difficult than what I had expected to encounter, these changes will take time to produce improved operating performance, and our near-term subscriber and financial results will continue to be pressured. Additionally, in light of current capital market conditions, we are taking steps to increase our financial flexibility and mitigate refinancing risk by borrowing funds from a revolving credit facility and discontinuing declaring a dividend for the foreseeable future."

74.    In response to this news, on February 28, 2008, S&P Ratings placed the Company's corporate rating and all other ratings on CreditWatch with negative implications. "The erosion in Sprint Nextel's subscriber base and the resultant decline in EBITDA are substantially higher than we anticipated and the company's business profile is probably no longer supportive of an investment-grade rating," said S&P's credit analyst Allyn Arden.

75.    According to MarketWatch.com, in a conference call with analysts that same day, February 28, 2008, Hesse admitted that the Company faced serious problems and that management had previously "never let investors or analysts onto the true depth of the company's problems." The article stated:

> On Thursday, the struggling wireless-phone carrier admitted it has a big problem. Namely, that lots of customers dislike its service. New Chief Executive Dan Hesse was unusually blunt in a conference call with analysts detailing the company's myriad woes.

> He gets high marks for honesty, but the road to recovery doesn't have short detours. The problems at Sprint - dating to the $35 billion acquisition of Nextel in 2005 - were at least three years in the making. It could take just as long to fully repair the damage.

> Poor customer service, uneven network quality, lackluster choice of phones and bureaucratic inertia or infighting have all contributed to the company's deteriorating health. This is most evident in the company's stock price, which has lost more than half its value since last summer.

> *    *    *

> Hesse is not in denial like the former management team, which never let investors or analysts onto the true depth of the company's problems.

> *    *    *

> To cite one example, former executives always played down independent consumer-satisfaction surveys that showed Sprint with one of the worse records in the industry. Hesse on Thursday open acknowledged the results of those surveys.

> "This has hurt our brand," he said.

76.     On February 29, 2008, Defendants caused the Company to file its Form 10-K for the period ending December 31, 2007. In the 10-K, Defendants revealed the extent of Sprint's problems which stemmed from the Company's prior reliance on subprime customers, a policy implemented under Defendants control of the Company. Further disclosed in the 10-K by Defendants was the scope of Defendants' failure to successfully merge Sprint and Nextel. The Form 10-K revealed that Sprint lost 683,000 post-paid subscribers in the fourth quarter of 2007 and divulged that 686,000 post-paid subscribers left the iDen network, while there were only 3,000 additions to the CDMA network, down more than 99% from the prior year.

77.     In addressing the issue of iDEN losses in 2007, the Form 10-K for the period ending December 31, 2007 stated that such loses were the result of "consumer sentiment regarding the iDEN network, reduced marketing programs and limited new handset offerings." Nowhere within the Form 10-K did the Defendants attribute the 2007 iDEN losses to heightened credit standards. Moreover, the 10-K further acknowledged, for the first time, that the Company "increased credit extended in early 2007 and 2006" and "earlier in the year, we adjusted our credit policy in certain markets in an effort to attract new subscribers. In late 2007, we adjusted our credit policies and returned to policy standards similar to those in mid-2006, which also contributed to the decline in subscriber additions."

## DERIVATIVE ALLEGATIONS

78.     Plaintiff brings this action derivatively in the right and for the benefit of Sprint to redress injuries suffered, and to be suffered, by Sprint as a direct result of the violations of state law, including breaches fiduciary duty, abuse of control, and unjust enrichment, as well as the aiding and abetting thereof, by Defendants.

79.     Sprint is named as a nominal defendant in this case solely in a derivative capacity. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

Plaintiff was a shareholder of Sprint at the time of the transactions complained of.  Plaintiff will adequately and fairly represent the interests of Sprint and its shareholders in enforcing and prosecuting their rights.  Prosecution of this action, independent of the current Board of Directors, is in the best interests of the Company.

80.    The wrongful acts complained of herein subject, and will continue to subject, Sprint to continuing harm because the adverse consequences of the actions are still in effect and ongoing.

81.    The wrongful acts complained of herein were unlawfully concealed from Sprint's shareholders.

## DEMAND FUTILITY

82.    Plaintiff has not made any demand on the Board of Sprint to institute this action since such demand would be a futile and useless act because the wrongful acts complained of show an abdication by Defendants of their fiduciary duties of due care and oversight.  Such abdication included, but was not limited to:

    (a)    allowing the Company to become engaged in and/or suspected of potentially illegal and fraudulent activities;

    (b)    allowing knowingly false material representations to be made to federal regulatory and law enforcement officials so as to induce them to approve the merger; and

    (c)    allowing the Company's financial statements to be artificially inflated.

83.    Plaintiff has not made any demand on shareholders of Sprint because such demand would be similarly futile.  As a widely-held public company, Sprint has nearly 3 billion shares outstanding; identifying and making demand on the hundreds of thousands, if not millions, of shareholders who own these shares would be impossible for Plaintiff, both as a matter of practical reality and in terms of financial cost.

84.     The misconduct of the Directors alleged herein was not, and could not have been, the product of a valid or good faith exercise of business judgment.

85.     Whenever a director is entrusted to make a decision about a corporate transaction in which that director has a financial interest, the entire fairness doctrine is triggered.  That doctrine carries a presumption that the transaction was accomplished to favor the interests of the director over the corporation, and the director carries the burden of demonstrating that the transaction was actually entirely fair to the corporation.  Given that presumption and burden shifting, the business judgment rule is rebutted, and demand is not required.

86.     As detailed above, the Directors were directly involved in the misconduct challenged in this action, by virtue of their respective positions on the Board and its Committees.  The Directors abdicated their responsibility to oversee the Company's operations and instead directed and encouraged management, in the service of its own personal gain, to engage in illegal and/or improper conduct that rendered the Company's discussions with federal regulatory and law enforcement officials deceptive.  The Directors' conduct lacked any legitimate business purpose and was not a product of a valid exercise of business judgment.  As such, demand is excused as futile.

87.     Moreover, while Sprint and its public shareholders have suffered substantial damage and losses due to the deceit and deception committed by its insiders and the director oversight failings committed by its Board, the insiders and directors of this Company have not only suffered no damages but, in fact, have greatly profited from their participation in the illegal conduct. These individuals have usurped millions of dollars of regular and bonus compensation as a result of their incompetent performance and deceptive activities, and demand on them is therefore excused.

88.     The Audit Committee of Sprint during the Relevant Period included Defendants Bennett, Hance, and Glasscock.  As such, they were responsible for reviewing and approving

Sprint's quarterly and annual filings with the SEC, as well as press releases.   By virtue of these facts, these Defendants face a substantial likelihood of liability for breaching their fiduciary duties of loyalty, good faith, and due care to Sprint.   The Audit Committee met frequently during the Relevant Period, and these Defendants could not have failed to become aware of the disparity between Sprint's public statement and its actual results—including the failure to write down good will as necessary to keep Sprint's records accurate.   While conscious of these disparities, these Defendants nonetheless directed Sprint *not* to write down its good will and *not* to correct its (and other Defendants') false public statements.   These actions constituted acts of disloyalty, conscious wrongdoing, and bad faith.

89.     The Compensation Committee of Sprint during the Relevant Period included Defendants Hill, Bethune, and O'Neal.   As such, they were responsible for setting Sprint's compensation and retention policies for senior executive officers.   Together with the Directors on Audit Committee, these Directors were also responsible for ensuring that compensation decisions did not upset the financial reporting and integrity of Sprint.   The Defendants who served on these two Committees—Bennett, Hance, Glasscock, Hill, Bethune, and O'Neal—face a substantial likelihood of liability for breaching their fiduciary duties of loyalty, good faith, and due care to Sprint.   Both the Compensation Committee and the Audit Committee approved the decision to allow Defendant Forsee to be terminated voluntarily, instead of "for cause"—ensuring that as his reward for ruining the Company's financial soundness he would walk away with over $40 million total for 2007, including approximately $14 million in purported "severance" benefits.  These "severance" benefits were, in reality, nothing but largesse and pay-off to a former insider for no rational business purpose in the circumstances.   These actions constituted acts of disloyalty, conscious wrongdoing, and bad faith.

90.     Defendant Hance is further incapable of objectively considering demand because he is, for all intents and purposes, a professional Board member—sitting simultaneously on the Boards of no less than five public companies:  Sprint, Cousins Properties Inc., Duke Energy Corporation, Ford Motor Co., and Morgan Stanley.  This voluminous "portfolio" of engagements not only prevents Hance from diligently attending to his fiduciary duties at any one company (including Sprint), it also gives him a vested interest in *not* acting (and not even being perceived as acting) to demand accountability from fellow directors at any company (including Sprint), much less to assert legal claims against such directors, lest his livelihood and future earnings be jeopardized.

91.     For similar reasons, Defendants Bennett and Glasscock have a vested interest in not being perceived to act against fellow directors at Sprint.  Glasscock is a director at Simon Property Group, Inc., Sysco Corporation, and Zimmer Holdings, Inc., in addition to Sprint, and all are major, publicly-traded companies.  Bennett is a director at public companies Discovery Communications, Inc., Demand Media, Inc., and Liberty Media Corporation.  Like Hance, Bennett and Glassock are not capable of considering demand objectively.

92.     In addition, and as a result of their concealments and falsifications, many of the directors and managers of Sprint held onto their positions of power, prestige and profit at the Company.  The managers of Sprint obtained millions of dollars of salaries and bonuses which would have been denied them had the truth been disclosed. The directors avoided not only the exposure and embarrassment of their oversight failures, but also continued in their prestigious and profitable positions as directors.

93.     Furthermore, the Sprint Board is still dominated and controlled by the exact same wrongdoers who continue to obscure their own misconduct, and will not take action to protect the

Case 8:23-cv-00171-CJC-JDE    Document 1    Filed 01/27/23    Page 698 of 1580    Page
Case 6:11-cv-01184-EFM -KGG    Document 1    Filed 07/14/11    Page 37 of 45
ID #:698

interests of Sprint or its shareholders.  The present Board has refused, and will continue to refuse, to institute this action for the foregoing and following reasons:

(a)    The acts complained of herein constitute violations of fiduciary duties owed by the Board of Directors and these acts are incapable of ratification;

(b)    Certain of the known principal wrongdoers and beneficiaries of the wrongdoing complained of herein are in a position to, and do, dominate and control the Board of Directors.  Thus, the Board could not exercise independent objective judgment in deciding whether to bring or vigorously prosecute this action;

(c)    The acts complained of herein are illegal and improper and thus are acts incapable of ratification;

(d)    In order to bring this action for breach of fiduciary duty, abuse of control and fraud, the members of the Board of Directors would have been required to sue themselves and/or their fellow directors and allies in the top ranks of the Company, who are their good friends and with whom they have entangling financial alliances, interests, and dependencies, which they would not do.  They therefore would not be able to vigorously prosecute any such action;

(e)    The members of the Sprint Board, including each of the Defendants herein, receive substantial salaries, bonuses, payments, benefits, and other emoluments by virtue of their membership on the Board and their control of Sprint. They have thus benefited from the wrongs herein alleged and have engaged therein to preserve their positions of control and the perquisites thereof, and are incapable of exercising independent objective judgment in deciding whether to bring this action.  The Board members also have close personal or business ties with each other and are, consequently, interested parties and cannot in good

EXHIBIT 35

faith exercise independent business judgment to determine whether to bring this action against themselves.

94.     As an additional basis for excusing demand, each of the Directors (except Hesse, Ianna, Nilsson, and Nuti) either knew or was reckless or negligent in not knowing of the illegal and improper accounting and disclosure practices that were sanctioned and approved at the Company throughout the Relevant Period. Those Directors will not now take action against the other Directors or the other Defendants because each actively engaged in or allowed Sprint to mislead the Company shareholders regarding the Company's post-merger growth expectations.

95.     Demand is also excused because the Directors have already failed, in the face of several pending lawsuits, to address the transactions challenged herein. The Directors have thus been made aware of the improper conduct and have failed to even investigate it. This repeated resistance to correcting, or even investigating, improper conduct demonstrates that a demand on the Directors to take action would be futile.

96.     Moreover, as an additional reason for excusing demand, each of the Directors (except Hesse, Ianna, Nilsson, and Nuti), as a longstanding director (and, in some cases, officer) of Sprint, had intimate knowledge of all major operations of the Company, and yet he or she participated in the dissemination of material misstatements of the Company's financial information. Thus, those Directors all have a personal interest in concealing any blame for Sprint's internal control problems, and away from himself or herself for consciously disregarding fiduciary duties. An investigation or inquiry that spread blame higher up the corporate ladder — to the officers or Directors — would not be in the personal interest of these Directors. The result of such an inquiry would require them to return valuable but unearned compensation to the Company.

97.    Additionally, each of the Directors except Hesse, Ianna, Nilsson, and Nuti also faces a sufficiently substantial likelihood of liability for the misconduct alleged herein, and, thus, there is a reasonable doubt as to his disinterestedness in deciding whether pursuing legal action would be in the Company's best interest.

## COUNT I

### Derivatively Against All Defendants for Breach of Fiduciary Duty

98.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

99.    The Defendants owed and owe Sprint fiduciary obligations.  By reason of their fiduciary relationships, Defendants owed and owe Sprint the highest obligation of loyalty, good faith, due care, oversight, fair dealing, and candor.

100.    The Defendants, and each of them, violated and breached their fiduciary duties of loyalty, good faith, due care, oversight, fair dealing, and candor.

101.    Each of the Defendants had actual or constructive knowledge that they had caused the Company to improperly misrepresent the growth expectations of the Company.  These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

102.     The Defendants caused or allowed Sprint to lack requisite internal controls, and, as a result, the Company's projections and reported results were based upon defective assumptions, manipulated facts, and/or fraudulent accounting practices.

103.    The Defendants failed to supervise, and to exert internal controls over, and consciously disregarded responsibilities involving the Company.

104.    As a direct and proximate result of the Defendants' failure to perform their fiduciary obligations, including their gross mismanagement and abuse of control, Sprint has sustained

significant damages, including the cost of defending against numerous lawsuits.  As a result of the
misconduct alleged herein, the Defendants are liable to the Company.

105.    The Defendants' misconduct alleged herein constituted an abuse of their ability to
control and influence Sprint, for which they are legally responsible. Among the abuses of control
were: (i) the Defendants' failure to supervise, and to exert internal controls over, and conscious
disregard of responsibilities involving public statements represented to federal regulators,
shareholders, and the public; (ii) conferring on Defendant Forsee $14 million in ersatz "severance"
benefits and failing to terminate him "for cause"; and (iii) failing to implement a policy against the
misuse of material, non-public information such that the insider trading of Defendants Kelly, Arendt,
West, and Lorimer could have been detected and prevented.

106.    In addition, by their actions alleged herein, the Defendants, either directly or through
aiding and abetting one another, abandoned and abdicated their responsibilities and fiduciary duties
with regard to prudently managing the public statements of Sprint in a manner consistent with the
operations of a publicly held corporation.

107.    As a direct and proximate result of the Defendants' abuse of control, Sprint has
sustained significant damages and potentially faces the imposition of monetary damages.

108.    As a result of the misconduct alleged herein, the Defendants are liable to the
Company.

## COUNT II

### Derivatively Against All Defendants for Unjust Enrichment

109.    Plaintiff incorporates by reference and realleges each and every allegation set forth
above, as though fully set forth herein.

110.    By their wrongful acts and omissions set forth herein, the Defendants were unjustly
enriched at the expense of and to the detriment of Sprint.

111.    Defendants, by virtue of their misconduct, usurped millions of dollars in unearned salaries, "bonuses," stock awards, option awards, retirement benefits, and other emoluments. Additionally, Defendant Forsee usurped $14 million in purported "severance" benefits, and Defendants Kelly, Lorimer, Arendt, and West usurped tens of millions in illicit insider trading proceeds.

112.    Plaintiff, as a shareholder and representatives of Sprint, seeks restitution from these Defendants, and each of them, and seek an order of this Court disgorging all profits, benefits and other compensation obtained by these Defendants, and each of them, from their wrongful conduct and fiduciary breaches.

113.    Plaintiff on behalf of Sprint has no adequate remedy at law.

## COUNT III

### Derivatively Against Lorimer, Bennett, Bethune, Glasscock, Hance, Hill, and O'Neal

114.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

115.    Lorimer, Bennett, Bethune, Glasscock, Hance, Hill, and O'Neal were members of the Board of Directors of Sprint and personally approved the Board's decision to allow Forsee to be terminated voluntarily and "not for cause," and to pay him $14 million in putative "severance" benefits.

116.    The decision to pay Forsee such "severance," did not have a rational business purpose and was so one-sided that no person acting in good faith in the pursuit of the Company's best interests would have approved of it in the circumstances.

117.    Plaintiff on behalf of Sprint has no adequate remedy at law.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff demands judgment as follows:

A.      Against all of the Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the Defendants' fiduciary breaches, including damages paid in respect of numerous lawsuits pending against the Company from the Defendants conduct leading Sprint to deceive its shareholders.

B.      Extraordinary equitable and/or injunctive relief as permitted by law, equity and state statutory provisions sued hereunder, including attaching, impounding, imposing a constructive trust on or otherwise restricting the proceeds of Defendants' trading activities or their other assets so as to assure that Plaintiff on behalf of Sprint have an effective remedy;

C.      Awarding to Sprint restitution from the Defendants, and each of them, and ordering disgorgement of all profits, benefits and other compensation obtained by the Defendants;

D.      Directing Sprint to take all necessary actions to reform and improve their corporate governance and internal procedures to comply with applicable laws and to protect Sprint and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote resolutions for amendments to the Company's By-Laws or Articles of Incorporation and taking such other action as may be necessary to place before shareholders for a vote the following Corporate Governance Policies, including measures to:

1.      Strengthen the Board's supervision of operations and accounting procedures and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

2.      Permit the shareholders of Sprint to nominate at least three candidates for election to the Board; and

3.      Appropriately test and then strengthen the internal audit and control functions so as to avoid a recurrence of the deceptive dealings with federal law enforcement and regulatory officials set forth herein, and the Company's accounting policies.

E.      Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

F.      Granting such other and further relief as the Court deems just and proper.

EXHIBIT 35

## DEMAND FOR JURY TRIAL AND DESIGNATION OF PLACE OF TRIAL

Plaintiff hereby demands a trial by jury of the above-captioned matter and designates the place of trial as Wichita, Kansas.

Dated: July 13, 2011                  Respectfully submitted,

**SHAMBERG, JOHNSON & BERGMAN, CHTD.**

By: */s/ Lynn R. Johnson*
Lynn R. Johnson, KS #07041
*ljohnson@sjblaw.com*
John M. Parisi, KS #14078
*jparisi@sjblaw.com*
Douglas R. Bradley, KS #23046
*dbradley@sjblaw.com*
2600 Grand Boulevard, Suite 550
Kansas City, MO  64108
Telephone: (816) 474-0004
Fax: (816) 474-0003 Facsimile

**KAHN SWICK & FOTI, LLC**
Lewis S. Kahn (*pro hac vice* application to be filed)
*lewis.kahn@ksfcounsel.com*
Albert M. Myers (*pro hac vice* application to be filed)
*albert.myers@ksfcounsel.com*
Melinda A. Nicholson (*pro hac vice* application to be filed)
*melinda.nicholson@ksfcounsel.com*
206 Covington Street
Madisonville, Louisiana 70477
Telephone: (504) 455-1400
Fax: (504) 455-1498

*Attorneys for Plaintiff*

EXHIBIT 35

## VERIFICATION

I, Michael Hartleib, declare under penalty of perjury of the laws of the United States that I have reviewed the Verified Shareholder Derivative Complaint in the case captioned *Michael Hartleib, Derivatively on Behalf of Sprint Nextel Corporation v. Daniel R. Hesse, et al.*, D. Kan.., and I authorize its filing. I have reviewed the allegations made in the Complaint, and to those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely on my counsel and their investigation and for that reason I believe them to be true.

_____

Michael Hartleib

Date: 7-11-2011

EXHIBIT 35
706

# EXHIBIT 34

EXHIBIT 35
707

under separate cover. Below is the YouTube link to a shortened version on the documentary which includes candid comments from my parents and a very prominent attorney.

In closing, I would advise Cathy not to worry, as Weiser et.al. are corrupt and inept. After all, a layperson has defeated and humiliated them, and I am far from finished. I predict when over certain attorneys may not be practicing law in the future. I am hopeful that we can work together.

Respectfully,

Michael Hartlieb (949) 283-2441 cell

https://www.youtube.com/watch?v=70KWO3o99Kk


**From:** Joyce Feinstein [mailto:jfeinstein@abelsonlegalsearch.com]
**Sent:** Friday, February 23, 2018 9:23 AM
**To:** michaelhartleib@cox.net
**Subject:** got your message, Cathy Abelson is out today but got your email too and forwarded to our attorneys

Michael I ran out for the dinner I was late for. Never got the email off to you, but told Cathy what I could about you and our phone call. I was confused about the motivation for your call to Abelson. Also confused if you were an attorney or a plaintiff yourself. I found out through more digging, you are a professional plaintiff. If they want to speak with you, they have your contact information.


**Joyce A. Feinstein | Senior Legal Recruiter**

(215) 561-3010 | jfeinstein@abelsonlegalsearch.com

**Abelson Legal Search**
1880 JFK Blvd., Suite 1740, Phila., PA 19103
www.abelsonlegalsearch.com

<image001.jpg>



<Hartlieb Sprint Objection Fee sur reply.doc>

EXHIBIT 35
708

# EXHIBIT 35

EXHIBIT 35
709

## Michael Hartleib

| | |
|---|---|
| **From:** | Michael Hartleib <michaelhartleib@cox.net> |
| **Sent:** | Saturday, February 24, 2018 4:31 PM |
| **To:** | 'Joyce Feinstein' |
| **Cc:** | mjhartleib@gmail.com |
| **Subject:** | FW: got your message, Cathy Abelson is out today but got your email too and forwarded to our attorneys |

Joyce, I just checked my email and I think Cathy sent this to me in error. I think it was intended for you. I do not get the Cox email on my phone, so the best email for immediate response is the mjhartleib@gmail.com  It seems Cathy is having to deal with something much more important than Weiser's frivolous suit, throwing Abelson under the bus in an attempt to save his firm. I just found out his firm was appointed lead in a huge nationwide suit. I will be working tonight and tomorrow on an Amicus Brief, whereby I will inform the court of his criminal acts in the Sprint case, ongoing PA Bar investigation and forthcoming Order from the Kansas Court of Appeals. His firm is unfit to be lead Counsel in any representative suit at this time. I am certain that when sending in their firms CV and qualifications they failed to tell the Court about the Silow situation and PA Bar investigation. My goal will be to have him removed as lead plaintiff counsel in said case. You are in a fantastic position with regard to the Weiser suit, this could end up being a huge win for Abelson.  Tell Cathy not to worry about it. They have dug themselves a hole that will impossible to escape from. Not sure who Bob is, but positive thoughts and prayers for a speedy recovery.

**From:** Cathy Abelson [mailto:cabelson@abelsonlegalsearch.com]
**Sent:** Saturday, February 24, 2018 4:54 AM
**To:** Michael Hartleib <michaelhartleib@cox.net>
**Subject:** Re: got your message, Cathy Abelson is out today but got your email too and forwarded to our attorneys

I can't even absorb this now to be honest. I'm going to wait until Monday and talk with Leonard and or Jeff. Thank you for  Dealing with him.
I'm concentrating on Bob this weekend. To help in anyway I can. He is okay but struggling with every step possibly because of the added stress of his fall. Frankly it breaks my heart so I have to try to do what I can. The MRI did not indicate that there was damage in the surgical area but has had a bad bruise and the effects of a head injury. Tomorrow an at home PT person is coming to the house which is great because I'll be there.
It takes patience which is so hard for him and hard for me too.
Xoxo

Sent from my iPhone

On Feb 24, 2018, at 3:30 AM, Michael Hartleib <michaelhartleib@cox.net> wrote:

> Hi Joyce, thank you for your response. My apologies for making you late to your dinner date, I assure
> you that Cathy will be elated that you took my call. I understand that you do not know me from Adam,
> but please do not rush to judgement. I have invaluable information that can help with the meritless

1

EXHIBIT 35
710

claims in Weiser's action against your agency. I too have been wronged by Weiser et.al. on multiply occasions.

Calling me a professional plaintiff is a knife through my heart, given that I have spent the last 10 years fighting to expose the use of professional plaintiffs. I have worked with the Department of Justice, the FBI and the San Diego District Attorney's office to expose the use of professional plaintiffs in lawyer driven litigation. I paid for a full page ad in a local newspaper calling for a Grand Jury investigation into a San Diego firm (involved in this Sprint case) which led to a senior partner being terminated. I have spent over $150,000.00 in personal funds, thousands of hours of time, appeared of Fox Business twice, and helped produce a documentary exposing naked shorting and corruption on Wall Street. I facilitated Senate Bill (SB 1997) that changed State Law in California, whereby saving homeowners millions of dollars in property taxes. My actions have led to six Wall Street Journal Articles, and countless other print articles, radio and TV interviews. I was appointed to several steering committees including that of Christina Shea the multi-term Mayer of Irvine California. This is a sampling of my crusades.

I understand that I am on a rant, but you hit a nerve. I can't believe that one uniformed biased person has required me to defend my honor. I am assuming that you did a very shallow Google search and came upon a Blog by Brandon Matthews, whereby he accuses me of being a professional plaintiff, a falsehood. Brandon, not his real name, is in the documentary. I have included a link to a shortened version my documentary. Many were upset with me, because I uncovered information, filed a Petition for Declaratory Ruling with the FCC which held up a 30 billion dollar merger between Sirius and XM. This delay cost me over 800 thousand dollars and delayed the consummation of the merger by 24 months. Mr. Matthews was ignorant to facts, and was proven entirely wrong. Please note that I have never used a pseudonym on any blog or public domain, unlike Brandon and many others. Always my real name and contact information.

Hopefully you will take the time to do your due diligence which will show I am a man of integrity, and intellect on a fearless quest for truth, justice and accountability. I tell people all the time that I have a personality disorder, which prevents me from attempting to right a wrong, and exposing injustice. In the current case, I have singlehandedly defeated several on the most powerful securities firms in the nation. This includes powerful defense firms such as Skadden Arps. I have added yet another Cease and Desists letter to my office wall. They are hung as a trophy commemorating my accomplishments exposing corrupt firms such as (Weiser) et.al. and their lawyer driven litigation. In each and every case I inform them that I will not cease nor desist as the truth is an absolute defense. In fact, I have begged them to sue me as the prospects of discovery are exciting and compelling. I have even offered to waive service to expedite litigation, but no action commences.

They made many fatal errors in this case, not the least of which is attempting to save their firm by suing you, now you have discovery. With that, I cannot only help you defeat their suit, I can facilitate a cross-complaint that could lead to the demise of the Weiser Firm and damages for Abelson. If you are still not convinced, I can provide contacts, or more from the current case to convince you. I implore you to have Cathy contact me, with counsel is fine. I give my word that you will be thankful. As for my motive, it is the same as yours. I have been screwed over by said firms on multiple occasions. Given the comments by the appellate Court justices at the recent hearing this may be the last time they falsely purport to represent shareholders such as myself for their unjust enrichment. As for my prior litigation, I have sued Sirius satellite radio after losing over 800 thousand dollars, my homebuilder after a flood which caused $150,000.00 in damages. It should be noted that out of the 950 homes in my community over 900 have litigated. And lastly the current Sprint Nextel case, which I have lost over 900 thousand dollars. So you can imagine how upset you would be if you lost similar sums, and corrupt firms falsely purport to represent your interests, only to find out that they have jettisoned the original claims plead to settle for nothing less than illusory reforms and unjust fees for themselves. I will include a couple of pleadings

2

EXHIBIT 35

under separate cover. Below is the YouTube link to a shortened version on the documentary which includes candid comments from my parents and a very prominent attorney.

In closing, I would advise Cathy not to worry, as Weiser et.al. are corrupt and inept. After all, a layperson has defeated and humiliated them, and I am far from finished. I predict when over certain attorneys may not be practicing law in the future. I am hopeful that we can work together.

Respectfully,

Michael Hartlieb (949) 283-2441 cell

https://www.youtube.com/watch?v=70KWO3o99Kk

**From:** Joyce Feinstein [mailto:jfeinstein@abelsonlegalsearch.com]
**Sent:** Friday, February 23, 2018 9:23 AM
**To:** michaelhartlieb@cox.net
**Subject:** got your message, Cathy Abelson is out today but got your email too and forwarded to our attorneys

Michael I ran out for the dinner I was late for. Never got the email off to you, but told Cathy what I could about you and our phone call. I was confused about the motivation for your call to Abelson. Also confused if you were an attorney or a plaintiff yourself. I found out through more digging, you are a professional plaintiff. If they want to speak with you, they have your contact information.

**Joyce A. Feinstein | *Senior Legal Recruiter***

(215) 561-3010  |  jfeinstein@abelsonlegalsearch.com

**Abelson Legal Search**
1880 JFK Blvd., Suite 1740, Phila., PA 19103
**www.abelsonlegalsearch.com**

<image001.jpg>



<Hartlieb Sprint Objection Fee sur reply.doc>

EXHIBIT 35
712

# EXHIBIT 36

EXHIBIT 35
713

**michael hartleib**

| | |
|---|---|
| **From:** | michael hartleib <michaelhartleib@cox.net> |
| **Sent:** | Thursday, February 22, 2018 9:18 PM |
| **To:** | 'cabelson@abelsonlegalsearch.com' |
| **Cc:** | 'michael hartleib' |
| **Subject:** | Orders form the district court |
| **Attachments:** | 11CV01688_13958671.pdf; 11CV01688.pdf; 2017_03_14_16_14_01.pdf |

| **Tracking:** | **Recipient** | **Read** |
|---|---|---|
| | 'cabelson@abelsonlegalsearch.com' | Read: 2/23/2018 3:04 AM |
| | 'michael hartleib' | Read: 2/22/2018 9:38 PM |

Hello Cathy, I spoke with someone in your office today who suggested that I email you. My name is Michael Hartleib, I am the person who has exposed the fraud committed by the Weiser firm in the case that has brought Mr. Silow's criminal past and disbarred status into focus. I have included two Orders from the District Court. I am not surprised that the firm is throwing you under the bus in an attempt to save themselves. It will not work as the truth is an absolute defense. Their actions in this case are truly unconscionable, sadly this is just the tip of the ice-berg. I have faced a barrage of ad hominem attacks, they have filed multiple purjurious declarations and will stop at nothing to protect their duplicitous acts and criminal enterprise.

I just got back from oral arguments in Kansas City, which in my opinion was a 10 out of 10 train wreck for Weiser et.al. Imagine, the hearing in District court was a 9 of 10 train wreck which led to the most scathing orders I have ever seen against a firm. (*see attached*) I believe the forthcoming appellate order will be worse! I am hopeful that we can work together and facilitate a cross-complaint against the Weiser firm. I understand that you have retained counsel and may want to discuss things first. I know where the bodies are buried and intend to dig them up. I look forward to speaking with you.

Michael Hartleib

(949) 283-2441 cell

1

EXHIBIT 35
714

# EXHIBIT 37

EXHIBIT 35
715

## Michael Hartleib

| | |
|---|---|
| **From:** | Michael Hartleib <michaelhartleib@cox.net> |
| **Sent:** | Saturday, February 24, 2018 4:31 PM |
| **To:** | 'Joyce Feinstein' |
| **Cc:** | mjhartleib@gmail.com |
| **Subject:** | FW: got your message, Cathy Abelson is out today but got your email too and forwarded to our attorneys |

Joyce, I just checked my email and I think Cathy sent this to me in error. I think it was intended for you. I do not get the Cox email on my phone, so the best email for immediate response is the mjhartleib@gmail.com  It seems Cathy is having to deal with something much more important than Weiser's frivolous suit, throwing Abelson under the bus in an attempt to save his firm. I just found out his firm was appointed lead in a huge nationwide suit. I will be working tonight and tomorrow on an Amicus Brief, whereby I will inform the court of his criminal acts in the Sprint case, ongoing PA Bar investigation and forthcoming Order from the Kansas Court of Appeals. His firm is unfit to be lead Counsel in any representative suit at this time. I am certain that when sending in their firms CV and qualifications they failed to tell the Court about the Silow situation and PA Bar investigation. My goal will be to have him removed as lead plaintiff counsel in said case. You are in a fantastic position with regard to the Weiser suit, this could end up being a huge win for Abelson.  Tell Cathy not to worry about it. They have dug themselves a hole that will impossible to escape from. Not sure who Bob is, but positive thoughts and prayers for a speedy recovery.

**From:** Cathy Abelson [mailto:cabelson@abelsonlegalsearch.com]
**Sent:** Saturday, February 24, 2018 4:54 AM
**To:** Michael Hartleib <michaelhartleib@cox.net>
**Subject:** Re: got your message, Cathy Abelson is out today but got your email too and forwarded to our attorneys

I can't even absorb this now to be honest. I'm going to wait until Monday and talk with Leonard and or Jeff. Thank you for  Dealing with him.
I'm concentrating on Bob this weekend. To help in anyway I can. He is okay but struggling with every step possibly because of the added stress of his fall. Frankly it breaks my heart so I have to try to do what I can. The MRI did not indicate that there was damage in the surgical area but has had a bad bruise and the effects of a head injury. Tomorrow an at home PT person is coming to the house which is great because I'll be there.
It takes patience which is so hard for him and hard for me too.
Xoxo

Sent from my iPhone

On Feb 24, 2018, at 3:30 AM, Michael Hartleib <michaelhartleib@cox.net> wrote:

> Hi Joyce, thank you for your response. My apologies for making you late to your dinner date, I assure you that Cathy will be elated that you took my call. I understand that you do not know me from Adam, but please do not rush to judgement. I have invaluable information that can help with the meritless

1

EXHIBIT 35
716

# EXHIBIT 38

EXHIBIT 35
717

**michael hartleib**

| | |
|---|---|
| **From:** | michael hartleib <michaelhartleib@cox.net> |
| **Sent:** | Saturday, June 2, 2018 12:42 AM |
| **To:** | 'cabelson@abelsonlegalsearch.com' |
| **Subject:** | Following up |

Cathy, are you interested in working together to commence an action against the Weiser firm? Why won't you have your attorneys contact me?

1

EXHIBIT 35
718

# EXHIBIT 39

EXHIBIT 35
719

Could you clarify and help me understand the following issues?

1. Did Mr. Silow perform legal work beyond legal research?
2. When did the Weiser Law Firm claim that Jeffrey Silow pled guilty? Is that contemporaneously related to the Kansas legal billing or are they referencing past conduct that resulted in a suspension?
3. Who from the Weiser law firm made the representation that they pursued criminal charges?
4. What PA court did Weiser claim the charges were filed?

Thanks,
Tom

---

**From:** michael hartleib [mailto:michaelhartleib@cox.net]
**Sent:** Tuesday, March 13, 2018 11:28 PM
**To:** Goggin, Thomas J.
**Subject:** Jeffrey Mark Silow and Alexander Silow
**Importance:** High

Mr. Goggins, I am reaching out again to seek filing criminal charges against Alexander Silow and his father Jeffrey Mark Silow. We just had an Appellate Court hearing in Kansas wherein, the Weiser frim claims that they pressed charges against Jeffrey Mark Silow. They claim he pled guilty to three misdemeanors in open court. My concern is the Weiser firm is claiming to be a victim of Mr. Silow, when there is irrefutable proof they knew of Mr. Silow fraud and conspiracy against the court. In fact the appellate court justice we not convinced by the victim argument, and informed Weiser et.al. that the court would be certain the Pennsylvania Bar would get a copy of their forthcoming order. This does not bode well for the frim. Mr. Jeffrey Mark Silow has used his sons name Alexander to bill in excess of 100 million dollars in case across the country. What is the most troubling, is that a former deputy DA was aware and complicit in this abuse of process and fraud committed upon the courts. Mr. Alexander Silow must be held responsible as a co-conspirator, as on information and belief Weiser et. made checks payable to Alexander making him a willing participant to his father's crimes. Please let me know how I can file criminal charges against Mr. Jeffrey mark, and Alexander Silow.

This County of Chester e-mail message, including any attachments, is intended for the sole use of the individual(s) and entity(ies) to whom it is addressed, and may contain information that is privileged, confidential and exempt from disclosure under applicable law. If you are not the intended addressee, nor authorized to receive for the intended addressee, you are hereby notified that you may not use, copy, disclose or distribute to anyone this e-mail message including any attachments, or any information contained in this e-mail message including any attachments. If

2

EXHIBIT 35

# EXHIBIT 40

EXHIBIT 35
721

## Michael Hartleib

| | |
|---|---|
| **From:** | Michael Hartleib <michael@socalskinandlaser.com> |
| **Sent:** | Wednesday, March 14, 2018 4:40 PM |
| **To:** | 'Goggin, Thomas J.' |
| **Subject:** | RE: Jeffrey Mark Silow and Alexander Silow |
| **Attachments:** | 2018_03_14_15_02_07.pdf |

Hey Thomas, we do not know if Silow did more than document review. He was presented as an attorney in good standing, and a securities expert who bills at over $300 per hour. Bret Stecker was the one that said they pressed charges against Mr. Silow to the appellate court. The judges sure didn't by their argument that Weiser et. al. didn't know his true name and status. He also said that they were suing Abelson legal research the firm that placed Mr. Silow. The judge held up the resume and ask why, they presented him as Jeffrey Mark not Alexander. The judge also pointed out that he was never licensed in PA so why did they proffer that he was. I talked to the Abelson firm and confirmed they are being sued as a way for Weiser to claim the victim card. I was told that the Weiser firm knew exactly who Silow was and the Weiser is lying. His pleading is directly related to the Kansas case assuming Stecker wasn't lying to the Court yet again. I don't know what Court they allegedly filed. Attached is A brief that was sent out today in another case, whereby I am informing the court of the Weiser firms duplicitous acts. Included as an exhibit is the purjuriuos declarations of Silow.

**From:** Michael Hartleib [mailto:michaelhartleib@cox.net]
**Sent:** Wednesday, March 14, 2018 4:26 PM
**To:** Michael Hartleib <michael@socalskinandlaser.com>
**Subject:** Fwd: Jeffrey Mark Silow and Alexander Silow

Sent from my iPhone

Begin forwarded message:

> **From:** "Goggin, Thomas J." <tgoggin@chesco.org>
> **Date:** March 14, 2018 at 8:01:38 AM PDT
> **To:** 'michael hartleib' <michaelhartleib@cox.net>
> **Subject: RE: Jeffrey Mark Silow and Alexander Silow**
>
> Mr. Hartleib,
>
> My recollection is that you believe Mr. Silow was employed by the Weiser Law Firm in PA and was working in PA with a suspended law license. During the period of suspension, Mr. Silow, as an employee of the PA law firm, performed legal research and submitted billing to the court in Kansas using the name and attorney ID of Alex Silow, who is his son.

1

EXHIBIT 35
722

Could you clarify and help me understand the following issues?

1. Did Mr. Silow perform legal work beyond legal research?
2. When did the Weiser Law Firm claim that Jeffrey Silow pled guilty? Is that contemporaneously related to the Kansas legal billing or are they referencing past conduct that resulted in a suspension?
3. Who from the Weiser law firm made the representation that they pursued criminal charges?
4. What PA court did Weiser claim the charges were filed?

Thanks,
Tom

---

**From:** michael hartleib [mailto:michaelhartleib@cox.net]
**Sent:** Tuesday, March 13, 2018 11:28 PM
**To:** Goggin, Thomas J.
**Subject:** Jeffrey Mark Silow and Alexander Silow
**Importance:** High

Mr. Goggins, I am reaching out again to seek filing criminal charges against Alexander Silow and his father Jeffrey Mark Silow. We just had an Appellate Court hearing in Kansas wherein, the Weiser frim claims that they pressed charges against Jeffrey Mark Silow. They claim he pled guilty to three misdemeanors in open court. My concern is the Weiser firm is claiming to be a victim of Mr. Silow, when there is irrefutable proof they knew of Mr. Silow fraud and conspiracy against the court. In fact the appellate court justice we not convinced by the victim argument, and informed Weiser et.al. that the court would be certain the Pennsylvania Bar would get a copy of their forthcoming order. This does not bode well for the frim. Mr. Jeffrey Mark Silow has used his sons name Alexander to bill in excess of 100 million dollars in case across the country. What is the most troubling, is that a former deputy DA was aware and complicit in this abuse of process and fraud committed upon the courts. Mr. Alexander Silow must be held responsible as a co-conspirator, as on information and belief Weiser et. made checks payable to Alexander making him a willing participant to his father's crimes. Please let me know how I can file criminal charges against Mr. Jeffrey mark, and Alexander Silow.

This County of Chester e-mail message, including any attachments, is intended for the sole use of the individual(s) and entity(ies) to whom it is addressed, and may contain information that is privileged, confidential and exempt from disclosure under applicable law. If you are not the intended addressee, nor authorized to receive for the intended addressee, you are hereby notified that you may not use, copy, disclose or distribute to anyone this e-mail message including any attachments, or any information contained in this e-mail message including any attachments. If

2

EXHIBIT 35
723

# EXHIBIT 41

EXHIBIT 35
724

**Michael Hartleib**

| | |
|---|---|
| **From:** | Michael Hartleib <michael@socalskinandlaser.com> |
| **Sent:** | Monday, May 14, 2018 10:27 PM |
| **To:** | 'Goggin, Thomas J.' |
| **Subject:** | RE: Weiser firm |
| **Attachments:** | 95 (002).pdf |

Published opinion from the appellate court. Were you ever able to find the charges filed against Silow? I can't believe that the can commit perjury and try to defraud the court and Sprint and walk away with 450k . The Court commended my work and admonished Weiser. Alexander Silow knew and was likely receiving payments from Weiser. You can't investigate him? I am going to file a Bar complaint and commence a civil action.

-----Original Message-----
From: Goggin, Thomas J. [mailto:tgoggin@chesco.org]
Sent: Thursday, March 22, 2018 6:53 AM
To: 'Michael Hartleib' <michael@socalskinandlaser.com>
Subject: RE: Weiser firm

Sorry for the delay - I've been in and out of court and we had a strange snow storm yesterday that closed the courthouse.  I don't have anything new to report as of this date but will get back to you.

-----Original Message-----
From: Michael Hartleib [mailto:michael@socalskinandlaser.com]
Sent: Thursday, March 22, 2018 9:48 AM
To: Goggin, Thomas J.
Subject: Weiser firm

Mr. Goggin's I have had friends in PA searching for the Weiser suit vs Abelson and we cant find it! I spoke with Abelson and they confirmed the litigation. They also said Weiser knew exactly who Silow was! I was hopeful they would want to work together but I have not heard back from there lawyers. I am going to bring a civil suit against Weiser. Were you able to find the misdemeanor charges against Silow? Were you able to find the suit Vs Abelson? Any information could be helpful!

Sent from my iPhone


This County of Chester e-mail message, including any attachments, is intended for the sole use of the individual(s) and entity(ies) to whom it is addressed, and may contain information that is privileged, confidential and exempt from disclosure under applicable law. If you are not the

1

EXHIBIT 35
725

intended addressee, nor authorized to receive for the intended addressee, you are hereby notified that you may not use, copy, disclose or distribute to anyone this e-mail message including any attachments, or any information contained in this e-mail message including any attachments. If you have received this e-mail message in error, please immediately notify the sender by reply e-mail and delete the message. Thank you very much.

EXHIBIT 35

# EXHIBIT 42

EXHIBIT 35
727

## Michael Hartleib

| | |
|---|---|
| **From:** | Michael Hartleib <michael@socalskinandlaser.com> |
| **Sent:** | Monday, May 14, 2018 10:27 PM |
| **To:** | 'Goggin, Thomas J.' |
| **Subject:** | RE: Weiser firm |
| **Attachments:** | 95 (002).pdf |

Published opinion from the appellate court. Were you ever able to find the charges filed against Silow? I can't believe that the can commit perjury and try to defraud the court and Sprint and walk away with 450k . The Court commended my work and admonished Weiser. Alexander Silow knew and was likely receiving payments from Weiser. You can't investigate him? I am going to file a Bar complaint and commence a civil action.

-----Original Message-----
From: Goggin, Thomas J. [mailto:tgoggin@chesco.org]
Sent: Thursday, March 22, 2018 6:53 AM
To: 'Michael Hartleib' <michael@socalskinandlaser.com>
Subject: RE: Weiser firm

Sorry for the delay - I've been in and out of court and we had a strange snow storm yesterday that closed the courthouse.  I don't have anything new to report as of this date but will get back to you.

-----Original Message-----
From: Michael Hartleib [mailto:michael@socalskinandlaser.com]
Sent: Thursday, March 22, 2018 9:48 AM
To: Goggin, Thomas J.
Subject: Weiser firm

Mr. Goggin's I have had friends in PA searching for the Weiser suit vs Abelson and we cant find it! I spoke with Abelson and they confirmed the litigation. They also said Weiser knew exactly who Silow was! I was hopeful they would want to work together but I have not heard back from there lawyers. I am going to bring a civil suit against Weiser. Were you able to find the misdemeanor charges against Silow? Were you able to find the suit Vs Abelson? Any information could be helpful!

Sent from my iPhone

This County of Chester e-mail message, including any attachments, is intended for the sole use of the individual(s) and entity(ies) to whom it is addressed, and may contain information that is privileged, confidential and exempt from disclosure under applicable law. If you are not the

1

EXHIBIT 35
728

intended addressee, nor authorized to receive for the intended addressee, you are hereby notified that you may not use, copy, disclose or distribute to anyone this e-mail message including any attachments, or any information contained in this e-mail message including any attachments. If you have received this e-mail message in error, please immediately notify the sender by reply e-mail and delete the message. Thank you very much.

EXHIBIT 35

# EXHIBIT 43

EXHIBIT 35
730

**michael hartleib**

| | |
|---|---|
| **From:** | Michael Hartleib <michaelhartleib@cox.net> |
| **Sent:** | Tuesday, November 6, 2018 11:29 AM |
| **To:** | tgoggin@chesco.org |
| **Subject:** | Emailing: Weiser declaration Equifax |
| **Attachments:** | Weiser declaration Equifax.pdf |

   Mr. Goggin's, I am following up to see if any action was taken by your department. I am very trouble the Alexander Silow was aware of his father's chicanery and likely complicate yet continues on as if nothing happened.


Completely inconsistent with what he told the appellate court. Just received their attempt to impugn my integrity.

1

EXHIBIT 35
731

**SILVERANG, ROSENZWEIG**
**& HALTZMAN, LLC**
By:    Philip S. Rosenzweig, Esquire
        PA Atty ID No. 62461
prosenzweig@sanddlawyers.com
Woodlands Center
900 E. 8th Avenue, Suite 300
King of Prussia, PA  19406
 (610) 263-0115 (telephone)
(610) 263-0122 (facsimile)
*Attorneys for Plaintiffs*

**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| THE WEISER LAW FIRM, P.C. et al | : | |
| | : | |
| Plaintiffs, | : | CIVIL ACTION |
| | : | |
| v. | : | Case No. 2:19-CV-02728-KSM |
| | : | |
| MICHAEL HARTLEIB | : | |
| | : | |
| Defendant. | : | |

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on January 21, 2021, I electronically filed the foregoing *Plaintiffs' First Amended Complaint, exhibits attached thereto*, and this *Certificate of Service* with the Clerk of the Court using the CM/ECF system and serve a true and correct copy upon the following via First Class Mail and ECF.

Eamon Merrigan, Esquire
North American Building
121 South Broad Street, Suite 1600
Philadelphia, PA 19107
Attorney for Defendant

{01320865;1}

1

EXHIBIT 35
732

**SILVERANG, ROSENZWEIG**
**& HALTZMAN, LLC**


By:    /s/ Philip S. Rosenzweig
       Philip S. Rosenzweig, Esquire
       Attorney Identification No. 62461
       prosenzweig@sanddlawyers.com
       Woodlands Center
       900 E. 8th Avenue, Suite 300
       King of Prussia, PA  19406
       (610) 263-0115
       *Attorneys for Plaintiffs*
       *The Weiser Law Firm, P.C. and*
       *Robert B. Weiser, Esquire*

EXHIBIT 35

# EXHIBIT 36

EXHIBIT 36
734

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **THE WEISER LAW FIRM, P.C., and** | : | |
| **ROBERT B. WEISER, ESQUIRE** | : | **CIVIL ACTION** |
| | : | |
| **v.** | : | **NO.: 2:19-CV-02728-KSM** |
| | : | |
| **MICHAEL HARTLEIB** | : | |
| | : | |

## <u>ORDER</u>

**AND NOW**, this _____ day of _____, 2022, upon consideration of the

Defendant's Motion for Sanctions in the Form of Dismissal or to Stay Discovery, it is hereby

**ORDERED** that the Motion is **GRANTED** and this matter is dismissed with prejudice. The

Court will issue a separate Order regarding proceedings and submissions for monetary sanctions.

**IT IS SO ORDERED**

_____, J.

EXHIBIT 36
735

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **THE WEISER LAW FIRM, P.C., and ROBERT B. WEISER, ESQUIRE** : | **CIVIL ACTION** |
| : | |
| v.  : | **NO.: 2:19-CV-02728-KSM** |
| : | |
| **MICHAEL HARTLEIB**  : | |

## <u>ORDER</u>

**AND NOW**, this _____ day of _____, 2022, upon consideration of the

Defendant's Motion for Sanctions in the Form of Dismissal or to Stay Discovery, it is hereby

**ORDERED** that the Motion is **GRANTED** and discovery in this matter is stayed pending

further proceedings. The Court will hold Defendant's Motion for Sanctions under advisement

and issue a separate Order regarding proceedings and submissions on outstanding issues of

discovery and spoilation.

**IT IS SO ORDERED**


_____

, J.


EXHIBIT 36

736

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **THE WEISER LAW FIRM, P.C., and**<br>**ROBERT B. WEISER, ESQUIRE** : | **CIVIL ACTION** |
| : | |
| **v.** : | **NO.: 2:19-CV-02728-KSM** |
| : | |
| **MICHAEL HARTLEIB** : | |

## MOTIONS FOR SANCTIONS IN THE FORM OF DISMISSAL OR TO STAY DISCOVERY

Defendant, Michael Hartleib, by and through his attorneys, Goldberg, Miller & Rubin, P.C., respectfully moves this honorable Court to issue sanctions in this matter in the form of dismissal. Defendant respectfully requests this Honorable Court grant the instant Motions in his favor as set forth in the attached Proposed Orders for the reasons set forth in the Defendant's Brief in Support. Defendant respectfully requests an in person hearing before this Honorable Court.

GOLDBERG, MILLER & RUBIN, P.C.

BY:    _/s/ Eamon Merrigan_____

EAMON MERRIGAN, ESQUIRE
Pa. Attorney Id. No. 87920
GOLDBERG, MILLER & RUBIN, P.C.
The North American Building
121 South Broad Street
Suite 1600
Philadelphia, PA  19107
(215) 735-3994
emerrigan@gmrlawfirm.com

EXHIBIT 36
737

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **THE WEISER LAW FIRM, P.C., and** : | | |
| **ROBERT B. WEISER, ESQUIRE** : | **CIVIL ACTION** | |
| : | | |
| **v.** : | **NO.: 2:19-CV-02728-KSM** | |
| : | | |
| **MICHAEL HARTLEIB** : | | |

**BRIEF IN SUPPORT OF MOTION FOR SANCTIONS**

Defendant, Michael Hartleib, by and through his attorneys, Goldberg, Miller & Rubin,

P.C., respectfully has moved this honorable Court for sanctions in the form of dismissal.

**I.      FACTUAL AND PROCEDURAL BACKGROUND**

Plaintiffs initiated this action on June 24, 2019. *Doc. #1.* In their original Complaint,

Plaintiffs had brought claims for vexatious litigation, abuse of process, defamation, intentional

infliction of emotional distress, negligent misrepresentation, interference with prospective

contractual relations, and tortious interference with contract. *See Doc. # 1.* On August 23, 2019,

Hartleib filed motions to dismiss for lack of jurisdiction and improper venue. *Doc. # 9.* After a

number of briefs, limited discovery, and oral argument, the Court dismissed Counts I, V, VI, and

VII (vexatious litigant order, negligent misrepresentation, intentional interference with

contractual relations, and tortious interference) for lack of personal jurisdiction and Count II

(abuse of process) for improper venue. *Doc. #36.* Hartleib's motions were denied as to the

remaining Counts III and IV (defamation and IIED). *Doc. #36.* Pursuant to the Court's August 5,

2019, Order bifurcating Hartleib's intended 12(b) motions, Hartleib was granted leave on

October 28, 2020, to file a 12(b)(6) motion. *Doc. #41.* Plaintiffs then filed a Motion for Leave to

File First Amended Complaint on November 12, 2020. *Doc. #50.* Hartleib filed a Motion to

Dismiss the original Complaint on November 13, 2020. *Doc. #52-53.* The Court granted

Hartleib's Motion to Withdraw his Motion to Dismiss without prejudice pending the Court's

EXHIBIT 36
738

ruling on Plaintiff's Motion for Leave. *Doc. #61, 63.* The Court granted leave on January 19, 2021, and the First Amended Complaint was filed on January 21, 2021. *Doc. #68, 69.*

Plaintiffs had brought claims for defamation, false light, and commercial disparagement for seventeen alleged statements by Defendant. *Doc. #69.* The majority of these statements consist of emails and/or court submissions which Plaintiffs received when the statements were published or shortly thereafter and are attached to the First Amended Complaint as exhibits. *See generally Doc. # 69, particularly ¶ 69, 71, 76-76, 79, 83, 101-108, 183(a)-(h), 184(a), 185(a)-(d), 198(a)-(h), 199(a), 200(a)-(d), 212(a)-(h), 213(a).* Plaintiff, Robert B. Weiser, Esquire, has also brought a claim for intentional infliction of emotional distress ("IIED"). *Doc. #69.* Defendant filed a Motion to Dismiss the First Amended Complaint on February 9, 2021. *Doc. #72.* Defendant's Motion raised, raised among other things, statute of limitations defenses for a majority of the statements alleged as well as the absolute privilege affirmative defense Pennsylvania law affords to statements made in the course of investigatory and judicial/or proceedings. *Doc. #72.* The Court ruled on the Motion to Dismiss on March 31st, 2022, dismissing fifteen of the seventeen statements as they pertain to the defamation, false light, and commercial disparagement claims. *Doc. #151.*

## II.   ARGUMENT

### A. Standard of Review.

#### i.   Motion for Sanctions

The federal rules of civil procedure "should be construed, administered, and employed by the court and the parties to secure the just, speedy, and inexpensive determination of every action and proceeding." USCS Fed Rules Civ Proc R 1. "On notice to other parties and all affected persons, a party may move for an order compelling disclosure or discovery." USCS Fed Rules

EXHIBIT 36
739

Civ Proc R 37. "If the motion is granted—or if the disclosure or requested discovery is provided after the motion was filed—the court must, after giving an opportunity to be heard, require the party or deponent whose conduct necessitated the motion, the party or attorney advising that conduct, or both to pay the movant's reasonable expenses incurred in making the motion, including attorney's fees." USCS Fed Rules Civ Proc R 37

> If electronically stored information that should have been preserved in the anticipation or conduct of litigation is lost because a party failed to take reasonable steps to preserve it, and it cannot be restored or replaced through additional discovery, the court: (1) upon finding prejudice to another party from loss of the information, may order measures no greater than necessary to cure the prejudice; or (2) only upon finding that the party acted with the intent to deprive another party of the information's use in the litigation may: (A) presume that the lost information was unfavorable to the party; (B) instruct the jury that it may or must presume the information was unfavorable to the party; or (C) dismiss the action or enter a default judgment.

USCS Fed Rules Civ Proc R 37(e).

"'Spoliation is the destruction or significant alteration of evidence, or the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation.' When a district court finds that spoliation has occurred, it has the authority to fashion an appropriate sanction to remedy the damage to other parties." Bistrian v. Levi, 448 F. Supp. 3d 454, 464 (E.D. Pa. 2020). Under the Federal Rules of Civil Procedure and relevant jurisprudence, district courts have broad discretion to manage discovery. Sempier v. Johnson & Higgins, 45 F.3d 724, 734 (3d Cir. 1995). This includes permitting discovery on the question of sanctions. In re Avandia Mktg., 415 F. Supp. 3d 498, 503 n.5 (E.D. Pa. 2019).

### ii.    The Court's Inherent Power to Sanction Bad Faith Conduct.

"It has long been established that a 'court may safely rely on its inherent power' to levy sanctions when parties engage in 'bad-faith conduct.'" Theokary v. Shay (In re Theokary), 592 F. App'x 102, 106 (3d Cir. 2015).

EXHIBIT 36
740

Moreover, it is beyond dispute that courts are endowed with the intrinsic authority to dismiss an action *sua sponte*. This power derives from a court's inherent duty to administer, manage, and adjudicate disputes, as well as the court's obligation to regulate the conduct of the attorneys and parties who appear before it. This authority "include[s] the ability to do whatever is reasonably necessary to deter abuse of the judicial process." Id. (internal citations omitted).

"[F]actors include whether the bad faith conduct is part of 'a pattern of wrongdoing' or 'an isolated incident,' the gravity of the wrongdoing, and whether the wrongdoing 'actually prejudices the wrongdoer's opponent or hinders the administration of justice.'" Walney v. Swepi LP, No. 13-cv-102 (ERIE), 2020 U.S. Dist. LEXIS 24546, at *6 (W.D. Pa. Feb. 11, 2020). "A court, therefore, is empowered to vacate its own judgment upon a showing that a party has committed fraud… or to dismiss an ongoing action as a sanction for a party's 'flagrant bad faith' conduct." Id. at 106.

### iii.    <u>Motion to Stay</u>

The Court possesses broad discretion to control the scope of discovery. Sempier v. Johnson & Higgins, 45 F.3d 724, 734 (3d Cir.1995). Pursuant to Federal Rule of Civil Procedure 26(c)(1) "…[t]he court may, for good cause, issue an order to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense…".

### B.  <u>Plaintiffs' Actions Demonstrate a Pattern of Bad Faith and Abuse of Process to the Prejudice of Defendant.</u>

Mr. Hartleib lost a fortune due to misfeasance and misrepresentations of directors and officers following the Sprint-Nextel merger. He wanted accountability and reforms. Plaintiffs wanted a cheap and easy settlement in the Sprint case and to maximize their fee award.

[T]he billing records reviewed by the Court paint a troublesome portrait of exploiting Sprint's missteps for a substantial reward for counsel, and minimal relief to Sprint and its shareholders that suffered. The billing records submitted furthermore lack credibility. The focus appears to have been upon an easy, cheap settlement in the first instance. No motion practice or serious discovery efforts

EXHIBIT 36

were ever undertaken to address the egregious acts originally alleged against the
individual Defendants who were responsible for the losses to Sprint.

*Exhibit A p. 29.* Plaintiffs brought the instant ill-conceived action in the Eastern District of

Pennsylvania to stop Hartleib from continuing to bring attention to Plaintiffs' <u>actual</u> unethical

conduct and other dishonest or questionable conduct. That is why Plaintiffs sought a preliminary

injunction in this matter. *Doc. #2.* Regardless of how Hartleib describes or characterizes what

occurred in the Sprint case, Plaintiffs submitted "unbelievable!", "illusory bills for near illusory

work". *Exhibit A.* <u>That happened</u>. It is a matter of public record that Plaintiffs want to bury. The

trial court in the Sprint shareholder derivative litigation noted that of the "[o]f the nearly 18,000

of work, 6905.25 of those hours were billed by attorney Alexander J. Silow for document

review. This is astonishing!" <u>That happened</u>. It is a matter of public record that Plaintiffs want to

bury. The Kansas trial court "[found] that the hours billed to this matter are grossly excessive…"

finding "disturbing billing patterns" and that "counsel's billing history relating to the document

review tells a very different story" from the statements made by counsel from the Weiser Law

Firm. *Exhibit A p. 27-28.*

At a time when the Law Firm's bills were subject to heightened scrutiny due to Mr.

Hartleib's objection to the proposed Sprint settlement, an employee identified in prior cases by

Plaintiffs as Jeffrey Silow suddenly became one Alexander Silow with new credentials. <u>That</u>

<u>happened</u>. It is a matter of public record. In subsequent filings in other jurisdictions that were not

subject to such scrutiny, he was Jeffrey Silow once again. <u>That happened</u>. It is matter of public

record. Plaintiffs suddenly felt the need place an attorney profile for Alexander Silow on their

website when preparing to submit their proposed settlement and request for attorney's fees, they

never felt such a need when seeking approval for the work of Jeffrey Silow. Illusory bills for

illusory work performed by Plaintiffs' illusory "of counsel" attorney with illusory credentials and

EXHIBIT 36
742

a hastily posted profile on the firm's website. It can fairly be described as criminal, corrupt, inept, reckless, an unethical level of indifference or willful ignorance or all of the above. Regardless of how Hartleib chooses to characterize what happened and Plaintiffs' level of culpability, what actually happened, regardless of any commentary or characterization, tarnishes Plaintiffs' reputation and they want it buried by any means necessary even if those means include a perversion of tort litigation. When Plaintiffs tout their reputation and accomplishments in courts across the country while seeking appointments as lead or co-lead counsel in consolidated derivative cases, they do not want anyone to draw attention to what actually happened the one time Plaintiffs' practices were subject to true scrutiny. Having to repeat their story in other jurisdictions that they lacked knowledge or lacked intent, that this was somehow a series of unfortunate events that occurred under their leadership, is worse than any adjective or characterization Hartleib has uttered or could utter. The language throughout the Kansas trial court's scathing opinion is worse than anything Hartleib has uttered or could utter because it is authoritative and beyond dispute by any illusory audit that Plaintiffs allegedly performed but will not produce despite a clear order from this Court. *See Exhibit A; Doc. # 120.* Hartleib threatens to continue to draw attention to what actually happened.

It is clear from the conduct outlined below that Plaintiffs do not wish to litigate their claims on the merits and be compensated for the unsupportable losses they claim. Plaintiffs want to cover up their actual conduct in the Sprint case so that it can be repeated. In fact, Weiser Law Firm Co-Founder, Co-Owner, and Vice President, Patricia Weiser, does not even believe in the merits of the case and admits that it was brought for the sole purpose of stopping future action, not seeking compensation for prior torts: "This case is -- was brought with the sole purpose of stopping him…" *Exhibit B p. 248:21-23*. "And there's no winning. There's no winning with this

EXHIBIT 36
743

lawsuit." *Exhibit B p. 179:3-4.* This case is an attempt at a *de facto* injunction to prevent Hartleib drawing attention to the Sprint case in the future. This Court cannot order Hartleib to refrain from seeking permission to address another court in another jurisdiction whether it be in person or through the filing of an amicus brief. The jurisdictional and constitutional restraints that would prevent such an order are immediately apparent. "[P]rior restraints on speech and publication are the most serious and the least tolerable infringement on First Amendment rights." Nebraska Press Ass'n v. Stuart, 427 U.S. 539, 559, 96 S. Ct. 2791, 49 L. Ed. 2d 683 (1976). "[T]he maxim that equity will not enjoin a libel has enjoyed nearly two centuries of widespread acceptance at common law. The welter of academic and judicial criticism of the last seventy years has, in truth, done little more than chip away at its edges. In any event,… Pennsylvania would appear firmly bound to the traditional rule." Kramer v. Thompson, 947 F.2d 666, 677-78 (3d Cir. 1991).

This matter cannot accomplish the "sole purpose" for which it was brought, its ulterior motive, without being perverted into something outside the bounds of tort litigation. Plaintiffs have made clear that this is exactly what they are attempting. Plaintiffs want to tout their accomplishments and reputation without contest and continue their usual practices without being subject to scrutiny. Similarly, Plaintiffs allege millions in economic damages, reputational harm, lost clients, lost opportunities, lost referrals and severe emotional distress resulting in PTSD in the instant action without contest and will obstruct any discovery into the veracity of these allegations. They want to cover up criminal activity that they either facilitated knowingly or permitted to occur through an alarming demonstration of ineptitude and reckless indifference. Plaintiffs have demonstrated a clear ulterior motive and their bad faith obstruction of legitimate discovery. They have done so through the blatant withholding of documents and information relevant to their claims and through motions to quash subpoenas issued to obtain basic

EXHIBIT 36
744

information they refuse to provide. See Turkos v. Dupont Borough, No. 3:14cv2243, 2017 U.S. Dist. LEXIS 49074, at *14-15 (M.D. Pa. Mar. 31, 2017)1) ((1) an "abuse" or "perversion" of process already initiated (2) with some unlawful or ulterior purpose and (3) harm to the plaintiff as a result.)

Hartleib pursued discovery on the matters at issue serving discovery demands on Plaintiffs on October 22, 2020. *See Discovery Requests as Exhibit C.* Since that time, Hartleib has argued in numerous filings that Plaintiffs have either failed preserve information and documents or are withholding basic relevant and discoverable information and documents without any specific claim of privilege. *Doc. #110, 111.* Magistrate Rice based the ruling on Hartleib's prior discovery motions, in part, on Plaintiffs' affirmations that they have produced all non-privileged documents in their possession. *Doc. # 119.* It is now clear that these affirmations are false. Defendant has repeatedly been forced to pursue third party discovery to seek basic information at Plaintiffs' fingertips. Recent testimony has made clear that regardless of the legitimacy any request by Defendant or prior orders from this Court, Plaintiffs are unwilling to produce or search for any document beyond what they pre-packaged prior to the instant litigation.

Plaintiffs generally claim millions of dollars in lost income, lost referrals, and lost opportunities. They continue to provide no basis their calculations and have not identified any lost opportunities and object to any third-party inquiry regarding the same.[1] Defendant has

---

[1] Plaintiffs recent Court Ordered statement of lost income references only the *Equifax* case as an identifiable instance of lost income due to statements made by Hartleib. This Court has already ruled that the statements made during that litigation would be subject to judicial privilege. *Doc. #154.* "even if the Amended Complaint had listed the Equifax Statements as a basis for the defamation, commercial disparagement, and false light claims, the Equifax Statements are protected by the judicial privilege and cannot serve as a basis for [the defamation, commercial

EXHIBIT 36
745

attempted to depose and/or obtain documents from third parties that are familiar with Plaintiffs' reputation, who have been identified as a referral source through investigation, or who could reasonably lead to discoverable material that corroborate or dispel the basis of Plaintiff's IIED claim. Plaintiffs object and generally assert privileges as a basis for withholding responsive documents but refuse to identify what is being hidden under these blanket assertions. On multiple occasions, Plaintiffs have moved to quash deposition subpoenas for individuals that Plaintiffs identified as potential witness and referenced in Plaintiffs' pleadings. *Doc. #77, #129.*

## C. <u>Discovery Regarding Plaintiff's IIED Claim Has Been Repeatedly Obstructed in Bad Faith</u>

Recently, Plaintiffs have produced an expert report wherein Robert Weiser is diagnosed with PTSD. *See Exhibit D.* Mr. Weiser refuses to provide the most basic information that would permit an inquiry into his prior and current health as it relates to his IIED claim and recent diagnosis. Hartleib sought the identity of Plaintiff, Robert Weiser's pharmacy, primary care physician, and mental health providers in relation to his intentional infliction of emotional distress claim. *Exhibit C Interrogatories #1-3.* Hartleib also requested that Plaintiff admit he "has not sought any medical, psychiatric, or psychological treatment for the harm alleged" as part of the IIED. *Exhibit C Request for Admission #71.* Mr. Weiser originally denied that he did not seek treatment related to his intentional infliction of emotion distress claim and frivolously objected to interrogatories into his treating providers citing HIPAA. *See Exhibit E Response to Requests for Admission #71 and Answers to Interrogatories #1-3.* Hartleib filed a discovery motion seeking, among other things, to compel substantive responses to these interrogatories. *Doc. # 112.* The

disparagement, or false light] claims." Plaintiffs also identify losses associated with another matter for the first time without any explanation as to how it is attributable to Hartleib.

EXHIBIT 36
746

relevant portion of the Order dated August 6, 2021, addressing Defendant's motion stated as follows:

> In response to Interrogatories 1-3, Plaintiffs shall disclose only mental health treatment, including visits to any medical provider or prescriptions, Robert Weiser has obtained in relation to his claim of intentional infliction of emotional distress, if the Court denies Defendant's motion to dismiss this claim….

*Doc. 120 p. 3 paragraph 5a.* On March 31, 2022, the Court denied Hartleib's motion to dismiss as to the emotional distress claim. *Doc. #151.* On May 25, 2022, Plaintiff supplemented the responses to interrogatories #1-3 stating Mr. Weiser "has been evaluated by a Doctor of Psychology (PhD) with respect to his mental health" but did not identify the provider, their address, dates of treatment. *See Exhibit F.* Hartleib filed a Motion to Compel Specific Answers to Interrogatories #1-3 on June 21, 2022. *Doc. #158.* The Court granted the Motion stating that "[i]f he was treated, Plaintiff Robert B. Weiser shall disclose the identity of the Doctor of Psychology who treated him, provide the address, and the dates of care by June 28, 2022." *Doc. #160.* Plaintiff supplemented his answers to the three interrogatories stating that he did not treat with the particular Doctor of Psychology mentioned in prior responses. *See Exhibit G.* Plaintiff finally amended his response to Request for Admission #71 stating: "[i]t is solely admitted that Robert Weiser did not receive 'treatment' from a psychologist or Doctor of Psychology or other medical professional prior to the institution of this litigation." *Exhibit H.*

Plaintiff, Robert Weiser has not identified his pharmacy or a single provider that treated him for any symptoms allegedly related to his IIED claim. Plaintiff has represented to this Court and to defense counsel that Robert Weiser has not treated for his injuries related to his IIED claim. <u>This is false</u>. Patricia Weiser, the wife of Robert Weiser and Co-Founder of the Weiser Law Firm, was deposed on July 21, 2022. *Exhibit B p. 8:1-9:6.* According to Ms. Weiser, he suffers "horrible migraines" due to stress caused by Hartleib and has tried numerous prescription

EXHIBIT 36
747

medications and Botox while under the care of a neurologist. *Exhibit B p. 179-181*. The stress has also caused Plaintiff to suffer physical pain "all the time" and treats with a chiropractor and masseuse. *Exhibit B p. 194:6-12*. Plaintiff also suffers from TMJ which flares up due to the stress allegedly caused by Hartleib. *Exhibit B p. 204:17-24*. Despite continued requests, Plaintiff refuses to identify any provider that could corroborate any manifestations of symptoms described Mrs. Weiser or the medical and mental health history provided by Plaintiff's expert, Dr. V. Richard Roeder, Ph.D.. *Exhibit D.* Plaintiff, Robert Weiser's continued refusal to permit any inquiry into the veracity of his claimed injuries warrants a dismissal of this claim. Hartleib is severely prejudiced by this bad faith conduct. When Plaintiff claims to have PTSD and other physical and mental health issues due Hartleib's actions, he cannot be denied an inquiry into whether Plaintiff actually suffers from these issues or whether those issues were pre-existing.

**D.** <u>**The Weiser Law Firm's Documents**</u>

Prior to the instant litigation, the Weiser Law Firm, through its co-founder, Patricia Weiser requested their IT provider, Ace Technologies, to perform searches of "all emails for… a list of words…." which would have included Jeffrey Silow. *Exhibit B p. 107:6-8.* At some point prior to the instant litigation searches were performed by the IT provider related to Mr. Hartleib. *Exhibit B p. 108:10.* However, the Law Firm did not request that Ace perform any IT searches in response to Hartleib's discovery requests because Mrs. Weiser had "already preserved group of documents to -- to reference and produce as directed by Counsel knowing that it was a fulsome search…." *Exhibit B p. 109:3-5.* Plaintiffs printed some of the emails of the various searches performed, assembled them into binders, and scanned the printed binders to preserve only what they packaged togeher. *Exhibit B p. 108, 113.*

EXHIBIT 36
748

E.  **Contrary to Prior Representations Plaintiffs, Possess and/or Control Versions of Previously Produced Emails that Contain Dates**

Plaintiffs have previously produced emails pertaining to Jeffrey Silow consisting predominantly of emails where Silow sends a timesheet. *See Doc. #112-9.* Each individual email chain in the production begins with an email that does not indicate the date it was sent due to the method of production. What Plaintiffs knew or discovered about Jeffrey Silow and when they discovered this information is crucial to the issues of this case. As an example[2], below is an email (Doc. #112-9 page 5, Weiser 000005) between current Law Firm employee, James Ficaro, and former Law Firm employee, Brett Stecker, is illustrative of the general problem with Plaintiffs' production.

**Archita Patel**

| | |
|---|---|
| From: | James Ficaro |
| To: | Brett Stecker |

Holy shit, his name isn't even Alexander: https://www.lawyer.com/jeffrey silow.html

Jimmy Ficaro

The Weiser Law Firm, P.C.
office: 610.225.0206 | fax: 610.408.8062

22 Cassatt Avenue | Berwyn, PA 19312

The email has no date or time or even a subject line. At his deposition, Jeffrey Silow testified that he emailed his time sheets as attachments to Plaintiffs every two weeks.[3] Plaintiffs have previously represented that this is the only version the emails they are able to produce without

---

[2] Hartleib previously identified every email missing a date and provided it to Plaintiffs' counsel.
[3] Pursuant to this Court's Order, any filing of Jeffrey Silow's deposition transcript is required to be filed under seal and is intentionally absent from the instant motion. Plaintiffs do not appear dispute that Silow sent timesheets as attachments.

EXHIBIT 36
749

explanation. It is now clear from Mrs. Weiser's testimony that Plaintiffs possess and/or control electronic versions of the emails with the date sent and possibly any attachments but cannot be bothered to look outside their pre-packaged binder for this litigation.

**F.    Plaintiffs Possess Documents and Communications Regarding Defendant and Silow that They Will Not Identify or Produce**

As this Court has previously recognized, "[b]ecause some of Hartlieb's alleged defamatory statements concern Plaintiffs' relationship with Silow, documentation of that relationship could make the truth or falsity of such statements more or less probable." *Doc. #75.* Hartlieb requested internal communications regarding himself and Jeffrey Silow. *Exhibit C Requests #14 and 15.* Hartlieb also requested that Plaintiffs "[i]dentify and produce any and all communications with third-parties regarding Silow [and/or Hartlieb], including, but not limited to, any counsel involved in Ross-Williams [(Sprint)], In re Equifax, Inc. Derivative Litigation, No. 1:18-cv-00317-TWT, In re CenturyLink Sales Practices and Securities Litigation, No. 17-md-2795-MJD-MM, In re Big Lots, Inc. Shareholder Litigation, No. 2:12-cv-445, and the Kraft Heinz matters Case No. 1:19-cv-01339 and 1:20-cv-02071. *Exhibit C Requests for Production #16 and 17.* Despite being provided emails by their IT company, Plaintiffs have not produced any emails that mention Hartlieb and have not asserted a claim of privilege for any specific communication being withheld.  To date, Plaintiffs have not produced any emails with third parties regarding Silow beyond those from his original retention in 2008 through Abelson. Hartlieb has previously documented in other filings Plaintiffs' emails with an attorney from the Center for Class Action Fairness regarding Silow from February of 2017 that Plaintiffs did not produce. *Doc. # 90 p. 34-35.* Weiser Law Firm partner, James Ficarro, also testified as to an exchange of emails with Jeffrey Silow regarding his bar number that has never been produced.

EXHIBIT 36
750

*See Deposition of James Ficaro attached as Exhibit I p. 26:13-27:19.* James Ficaro would receive emails from colleagues regarding Hartleib including emails that contained the Wall Street Journal article or discussed Hartleib's filings which are alleged to have defamed Plaintiffs and cause Plaintiff, Robert Weiser emotional distress. *Exhibit I p. 55:11, p. 112:14-113:24.*

```
14    Q.        Outside of any electronic notification
15    emails, have you received any emails or sent any
16    emails to the other plaintiffs' firms regarding
17    Michael Hartleib?
18    A.        Yes.  So, for example, he filed something
19    in a case, there's a notification, and then
20    there's -- you know, that would be a chain of emails
21    between plaintiffs' counsel regarding that filing.
```

None of these emails have been produced despite the clear relevance to claims at issue in the present matter.

### G.  Plaintiffs Possess the Binder and Other Documents Submitted to the Montgomery County District Attorneys' Office

Hartleib previously request production of "documentation and communications related to the criminal proceedings against Silow referenced in paragraph 65 of your Complaint." *Exhibit A Production Request #26.* Plaintiffs claimed to have no responsive documents that are not subject to privilege. *See Exhibit E Request #26.* Plaintiff, Robert B. Weiser and former Weiser Law Firm attorney, Brett Stecker, had email communications with local criminal investigators and forwarded that investigator responsive documentation. *See Affidavit of Probable Cause attached hereto as Exhibit J.* This included documents provided to the Pennsylvania Disciplinary Board which were also requested. According to Mrs. Weiser, a binder of documents was put together for and provided to the Montgomery County District Attorney's Office. This binder is still in the

EXHIBIT 36
751

Law Firm's possession. *Exhibit B p. 108-109.* Plaintiffs had claimed to have produced majority of the contents of binder provided to investigators, they represented to this Court that the remainder was not in their possession. *Doc. # 119-2 p. 11.* Whether the information provided to law enforcement is consistent with Plaintiffs allegations and information provided in the instant matter is relevant and discoverable. In fact, one would think that if the information were consistent, Plaintiffs would have no issue with providing that information. Plaintiffs also have not explained why they cannot produce more recent emails to investigators but can selectively attach emails with Hartleib dating back to 2008 to their pleadings. Further, upon information and belief, Plaintiffs provided documentation from their alleged "audit" of Jeffrey Silow's work to investigators including reports run on the Relativity platform regarding Jeffrey Silow's IP address. *See Exhibit J.* Plaintiffs were previously ordered to "identify who performed the billing audit using the Relativity software, the scope of the audit, and any documentation from the audit." *Doc. #120.* To date, Plaintiffs have not complied with the Order.

### H.  <u>Weiser Law Firm Partner, James Ficarro, Personally Created the Billing Records Plaintiffs Claim They Do Not Possess.</u>

Hartleib also requested that Plaintiffs produce their billing records requested by the trial court and submitted for *in camera* review in the Sprint case. *Exhibit C Request for Production #21 see also Exhibit A.* Plaintiffs contend that the billing records they submitted in the Sprint Case are somehow not in their possession. Magistrate Rice previously accepted Plaintiffs' affirmance that they fully responded to this request. *Doc. #120.* Weiser Law Firm partner, James Ficarro, testified that he personally prepared the PDF of billing records that were submitted to the trial court in the Sprint case. *Exhibit I p. 34:19-35:4.* How they lost this court submission has not been explained to defense counsel or this Court.

EXHIBIT 36
752

### III.   **CONCLUSION**

Plaintiffs' motives and bad faith conduct are clear. They do not want to litigate the remaining claims or statements on the merits. Plaintiffs have demonstrated a course of conduct that has prejudiced Defendant by denying him a basic good faith inquiry into the veracity of Plaintiffs' claims. Plaintiff, Robert Weiser's deposition has yet to occur. Defendant should not be forced close out discovery and continue litigating this matter without the basic outstanding information and discovery discussed above. Defendant respectfully requests that this Honorable Court exercise its inherent authority and authority under the Federal Rules of Civil Procedure and grant the motion and enter the proposed order dismissing this matter. Alternatively, Defendant contends that he has demonstrated good cause for an immediate stay of discovery and respectfully requests that this Court stay discovery for further proceedings and submissions on outstanding issues of discovery and spoilation.

GOLDBERG, MILLER & RUBIN, P.C.

BY:    _/s/ Eamon Merrigan_____

EAMON MERRIGAN, ESQUIRE
Pa. Attorney Id. No. 87920
GOLDBERG, MILLER & RUBIN, P.C.
The North American Building
121 South Broad Street
Suite 1600
Philadelphia, PA  19107
(215) 735-3994
emerrigan@gmrlawfirm.com

DATED:  8/23/22

EXHIBIT 36
753

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **THE WEISER LAW FIRM, P.C., and** | : | |
| **ROBERT B. WEISER, ESQUIRE** | : | **CIVIL ACTION** |
| | : | |
| **v.** | : | **NO.: 2:19-CV-02728-KSM** |
| | : | |
| **MICHAEL HARTLEIB** | : | |
| | : | |

### CERTIFICATE OF SERVICE

I, EAMON MERRIGAN, ESQUIRE, do hereby certify that service of a true and correct copy of the foregoing Motion has been forwarded to all counsel of record via electronic notification.

GOLDBERG, MILLER & RUBIN, P.C.

BY:     _/s/ Eamon Merrigan_____
EAMON MERRIGAN, ESQUIRE
Pa. Attorney Id. No. 87920
GOLDBERG, MILLER & RUBIN, P.C.
The North American Building
121 South Broad Street
Suite 1600
Philadelphia, PA  19107
(215) 735-3994
emerrigan@gmrlawfirm.com

DATED:  8/23/22

EXHIBIT 36
754

# EXHIBIT "A"

EXHIBIT 36
755

11CV01688
Div2

IN THE DISTRICT COURT OF JOHNSON COUNTY, KANSAS
CIVIL DEPARTMENT

MONICA ROSS-WILLIAMS, derivatively,
on behalf of SPRINT NEXTEL
CORPORATION,

           Plaintiff,

v.

ROBERT R. BENNETT, GORDON M.
BETHUNE, LARRY C. GLASSCOCK,
JAMES H. HANCE, JR., DANIEL R. HESSE,
V. JANET HILL, IRVINE O. HOCKADAY, JR.,
FRANK IANNA, SVEN-CHRISTER NILSSON,
WILLIAM R. NUTI, RODNEY O'NEAL, GARY
D. FORSEE, PAUL N. SALEH, and WILLIAM
G. ARENDT,

           Defendants,

    and

SPRINT NEXTEL CORPORATION, a Kansas
Corporation,

           Nominal Defendant.

Case No. 11CV1688
Division 2
Chapter 60

## MEMORANDUM DECISION

(Approving Settlement with a Reduced Attorney Fee/Expense Award)

    This matter comes before the Court on Plaintiff's Unopposed Motion for Final Approval of Settlement and Award of Attorneys' Fees and Reimbursement of Expenses.[1] The settlement at issue arises from litigation concerning Sprint's unsuccessful merger with Nextel a decade ago. The Court stayed the case nearly immediately after filing while the parties were monitoring other litigation. While this case was stayed, they conducted mediation.

    The parties' proposed Settlement lists several corporate reforms, including changes to corporate governance, the make-up of the Board of Directors, changes to the language of the Committee Charter, and some additional oversight to Sprint's stock repurchasing program. These

---

[1] Doc. 24.

*Clerk of the District Court, Johnson County Kansas*
*11/22/16  01:17pm MM*

EXHIBIT 36

reforms are discussed in further detail below. In addition to the reforms, the Settlement proposes $4.25 million for the Plaintiff's attorneys' fees.

Plaintiff filed an Unopposed Motion for Preliminary Approval of Settlement on February 26, 2016.[2] The Court granted the motion, and scheduled a final settlement conference hearing for May 26, 2016. Pursuant to the notice sent out by Plaintiff's counsel, objectors were invited to appear at the final settlement conference. Michael Hartlieb of California appeared to object to the proposed Settlement. At the conclusion of the settlement conference, the Court directed the parties and Mr. Hartlieb to file supplemental briefs regarding the sufficiency of the corporate governance reforms which are the core of the proposed Settlement and the fairness of the requested fee award of $4.25 million as analyzed under the KRPC 1.5 factors.

Although titled as an unopposed motion, the Court has heard orally and received written objections, opposition, observations and comments from Mr. Hartlieb who is a shareholder in the Sprint Corporation. His objections to the corporate governance reforms have been considered, but are not entirely persuasive. However, his opposing comments regarding the requested attorneys' fees award have given the Court considerable pause.

## I.    Factual Overview

On August 12, 2005, Sprint completed the purchase of Nextel for $37.8 billion. Sprint recorded that Nextel was paid $15.6 billion in excess of the fair value of Nextel at the time of purchase. Sprint booked this payment as "goodwill." Sprint reasoned that the goodwill payment reflected the anticipated benefits Sprint would receive by gaining access to Nextel's propriety iDEN network, which supported push-to-talk technology that was believed to be increasing in popularity at the time. Sprint planned to integrate its Code Division Multiple Access ("CDMA")

---

[2] Doc. 19.

*Clerk of the District Court, Johnson County Kansas*
*11/22/16  01:17pm MM*

EXHIBIT 36
757

network with Nextel's iDEN network. But following the purchase of Nextel, Sprint was unable to successfully integrate the two technologies.

Plaintiff alleged that Sprint concealed post-merger issues by shifting its focus away from subprime subscribers and heralding tightened credit standards. A large segment of Nextel's business targeted subprime subscribers. Those subprime subscribers inflated subscription numbers for reporting purposes. But reports are merely a snapshot in time, and subprime subscriber numbers exaggerated the number of loyal subscribers. Subprime subscriptions carry a significant risk of consumers canceling a plan or not renewing a contract when the time comes to do so. At the same time, Sprint failed to disclose that the CDMA and iDEN networks were incompatible. As a result, it appeared to many industry insiders and market observers that Sprint vastly overpaid for the goodwill in Nextel. Plaintiff also alleges that before it became well-known that the Sprint Nextel merger failed, Sprint's Board of Directors caused Sprint to spend nearly $2 billion to repurchase millions of its own shares. Sprint's shares were trading at inflated prices while the effects of the merger were taking a negative toll on Sprint internally. Investors were none the wiser. Sprint insiders may have used this information to sell their own personal holdings in Sprint before it was too late.

On February 28, 2008, Sprint publicly disclosed that it would record a $29.7 billion non-cash goodwill impairment charge for Q4 of the FY2007, which resulted in a net loss of $29.5 billion for the quarter. Following this announcement, Sprint loosened its credit standards to boost the number of subscribers. As a result, Sprint's stock price tumbled by ten percent.

In June 2013, long after this lawsuit was filed, Sprint's shareholders approved a transaction by which Softbank Group Corp. ("Softbank") acquired 70% of Sprint's stock. The new Softbank-owned "Sprint" or "Sprint Corporation" reorganized as a Delaware corporation. Shareholders who

held positions in Sprint prior to Softbank's acquisition were given the option of receiving cash buyouts or shares in the new Sprint entity. After Sprint and Softbank completed their transaction, the new Sprint became classified as a "controlled company" by the New York Stock Exchange.

This action was filed in 2011 before the former Sprint Nextel Corporation was acquired by Softbank. After Plaintiff filed, both parties agreed to stay the case for a number of years to prevent extraordinary expense, as Sprint securities litigation was also pending and being monitored by these parties.[3] This case and others were stayed.[4] After the securities litigation was resolved, the parties engaged in mediation with retired Federal Judge Layn Phillips, who by all accounts is an expert mediator in complex business litigation. He had mediated the securities class action. After three rounds of mediation, the parties agreed to the proposed Settlement now before the Court.

The originally named individual Defendants were Directors and officers of the old entity. They were alleged to have committed significant breaches of fiduciary duties which damaged the old entity. At least two Officers received substantial bonuses and severance packages after they were "discharged without cause" following the Nextel merger debacle thereby triggering their "entitlement" to that compensation. They had some kind of indemnification shield that Plaintiff's did not test at all. There may have been statute of limitations problems with the claims even before the lawsuit was drafted. The Plaintiff quit prosecuting the case and "settled" with the new corporation without any formal substitution of parties in this action. Within the context of this decision, the Defendant entity is referred to simply as Sprint.

## II.    The Settlement

Pursuant to K.S.A. 60-223a, the Court must approve all dispositive actions in a derivative

---

[3] *Williams v. Sprint/United Mgmt. Co.*, Civ. No. 03-2200-JWL (D. Kan.)
[4] *Murphy v. Forsee*, Case No. 09 CV 3132 (removed to Federal Court: No. 09-CV-2422-EFM/KMH); *Price v. Forsee*, Case No. 11 CV 3257; *Randolph v. Forsee,* Case Nos. 10 CV 6261 and 12 CV 4447.

*Clerk of the District Court, Johnson County Kansas*
*11/22/16  01:17pm MM*

EXHIBIT 36
759

lawsuit. This includes settlements, voluntary dismissals, and compromises. The purpose behind this requirement is, among other things, to protect the interests of the shareholders. In *Quality Developers, Inc. v. Thorman*,[5] the Kansas Court of Appeals quoted the Southern District of New York, stating:

> The role of the Court is to see that the compromise is fair and reasonable under the circumstances and that no collusion or fraud has been practiced in the consummation of the settlement. To do this, the Court must weigh the probabilities and possibility of victory or defeat as indicated by the legal or factual situation presented. If such considerations lead to the conclusion that the settlement agreed upon by the plaintiffs in the suit is not unfair or unreasonable to the corporation (in which all the other stockholders have their interest), then the action of the plaintiffs in compromising the suit should be approved.[6]

With this in mind, the Court now examines the parties' Settlement for final approval. Generally, there are two modes of relief in derivative suits. There is pecuniary relief, which adds a monetary benefit to the corporation. This may occur in the form of a claw-back provision in a judgment or settlement that would require a former Director or executive to return a portion of the millions received as a golden parachute payment or ill-gotten gains. The second type of relief is non-pecuniary relief, as we have here. The Delaware courts, who see many more derivative actions than Kansas, use the term "therapeutic relief." Therapeutic relief often comes in the form of corporate governance changes, structural changes, or other reforms that affect the internal behavior of a corporation. The Court may focus on the corrective measures taken by the corporation as a part of a settlement, but it should determine that such measures represent more than "corporate cosmetics" and are likely to result in meaningful relief that would not have occurred but for a settlement.[7]

This Settlement under review concerns exclusively therapeutic relief in the form of four

---

[5] 29 Kan. App. 2d 702, 31 P.3d 296 (2001).
[6] *Id.* at 716 (quoting *Winkelman v. General Motors Corp.* 48 F. Supp. 490, 493 (S.D.N.Y. 1942).
[7] *Principles of Corporate Governance*, §7.14, note (d) (1994).

major corporate governance reforms, discussed herein, together with a substantial fee and expense payment from the surviving corporate entity to Plaintiff's lawyers. It is difficult to assign an exact value to therapeutic relief achieved in a Settlement. Any value achieved is speculative and depends on a number of factors, ranging from decisions of the Directors to market forces.

In approving this Settlement, the Court is charged with the responsibility to determine whether its end result is not unfair to the corporation. As a corollary, the Court must also determine whether the requested fee and expense award for Plaintiff's counsel is fair and adequately reflects the work performed by counsel. Determining the adequacy of a fee requires the Court to acknowledge and examine other factors, such as whether the work was performed on a contingency basis. The Court must look for careful balance. A fee must be proportional and fair in view of the amount of work performed, and most importantly, the results achieved by Plaintiff's counsel.

The parties' Settlement consists of reforms that aim to enhance Sprint's merger activity, if any, and decisions made by the Board of Directors in the near future. Plaintiff retained Professor James Tompkins of Kennesaw State University as an expert in crafting the corporate governance reforms that are a part of the Settlement. Plaintiff stated in the Motion for Final Approval[8] that Prof. Tompkins assisted in securing "significant and valuable" reforms regarding Sprint's future mergers and acquisitions ("M&A") activities. Ideally, these reforms will prevent Sprint from engaging in transactions like the Sprint Nextel merger, and improve post-merger processes and activities.

First, the Settlement provides that Sprint's Finance Committee will receive education on topics related to M&A transactions, due diligence, and implementation. In his Declaration, Prof. Tompkins stated that the heightened M&A oversight is "highly likely to result in improved process

---

[8] Doc 24.

change," which would make Sprint's future M&A activity more deliberate, and thus less risky for Sprint and its shareholders. The Settlement speculates that the Directors will take the education they will receive seriously (or at least more seriously than they would in governing this multi-billion dollar company without these special governance principles in place), and that they will implement these vital changes in Sprint's processes.

The effectiveness of this reform depends on several factors. It will only be effective for as long as the Directors must receive the education. The Settlement contains a sunset provision that allows Sprint to deviate from the reforms after three years. If the education program for the Finance Committee ends with the sunset provision, any future Directors on the Finance Committee would not receive the benefit of the education. The effectiveness of this reform also depends on Directors receiving an adequate amount of education. Because the education program is intended only for Finance Committee members, if some Directors are shuffled from committee to committee, the education will not be ingrained into the "corporate DNA" of the Finance Committee. If this occurs, the reform is worthless.

The second reform in the Settlement addresses information flow issues and expands Audit Committee responsibilities. Parties suggest that the Settlement will bolster the Audit Committee's oversight of financial reporting, risk management, and compliance. Under the Settlement, the Audit Committee would receive annual updates regarding goodwill impairment testing, noting that had this measure been in place during the Sprint Nextel merger, it could have prevented or mitigated the $29.7 billion goodwill impairment during 2008. Additionally, the Audit Committee would monitor statements made about the customer credit policy, the value of goodwill, and efficacy of post-merger activities. Parties claim these changes to the Audit Committee will also address internal controls that were severely lacking at the time of the Sprint Nextel Merger.

*Clerk of the District Court, Johnson County Kansas*
*11/22/16  01:17pm MM*

EXHIBIT 36
762

It is unclear whether this reform requires Sprint to perform annual goodwill impairment testing because it currently is not doing so, or whether the reform will ensure that the Audit Committee will be made aware of the results and updates relating to Sprint's current goodwill impairment testing. Because of the sheer size of Sprint, the Court is inclined to believe that Sprint currently implements goodwill impairment testing, which is something that any corporation of any size responsibly should be doing to some extent.

Generally speaking, the function of a corporation's Audit Committee is to oversee financial reporting and disclosures. While the reform puts the Audit Committee's actions in the future in a positive light, the Court cannot help but be concerned about its prior activities in the shadows. If the Committee responsible for ensuring that Sprint's financial reporting was not aware of the effects or extent of the impending goodwill impairment in 2008, then the reform may be beneficial. It does cause concern, however, that the Settlement must provide for the Audit Committee to be more careful or aware with respect to goodwill impairment. At most, the reform will put Sprint's Audit Committee on par with any other major corporation. This will probably benefit Sprint and its survival going forward, but it is nonetheless disconcerting that Sprint requires a legal settlement to implement this procedure—if in fact it does.

The third reform in the Settlement concerns Sprint's adoption of a new share repurchasing program. Corporations use share repurchasing programs to strategically remove shares from the open market when the Board of Directors is concerned that a stock's price is too low. By removing a substantial number of shares from the market, the price of the stock theoretically will increase, thus providing more value to the shareholders maintaining their positions in that corporation. According to Plaintiff's expert, the policy will require Sprint's Board of Directors to consider cash needs, strategic alternatives, and other financial and strategic implications. Theoretically, this new

policy will assist the Directors to better recognize hazardous situations when repurchasing Sprint's shares off of the market.

Again, this reform exemplifies par behavior of other major corporation. In essence, it proposes that Sprint will investigate the effects of repurchasing its own shares, and whether repurchasing its shares is even necessary. Any other corporation using a share repurchasing program should already be performing such an investigation. If a corporation initiates a share repurchasing program without performing due diligence before repurchasing, then it gambles with the effects that will follow. It is difficult to believe that a company would engage in a share repurchasing program without investigating the resulting effects on the corporation and its shareholders. A share repurchasing strategy cannot exist without careful, deliberate execution. It would be improvident, or perhaps a severe breach of fiduciary duty, to do otherwise.

The fourth reform in the Settlement concerns the composition of the Board of Directors. The overall goal is to strengthen the independence and operation of the Board. Currently, Sprint's Board of Directors consists of Sprint's CEO, three Directors affiliated with its parent company Softbank, and five independent Directors. The Settlement will require the new Sprint to now take extra precautions by increasing Board independence, which it normally would not have to do because of its controlled corporation status.

The Settlement will require the majority of the Board of Directors to be outside Directors, and will require the majority of the members of the Finance Committee to be independent Directors. It also will require the Compensation Committee to consist solely of outside Directors.

The Settlement will also require the Board to disclose and explain its votes to the CEO in writing. This reform aims to ensure accountability and transparency, and to better protect the interests of the shareholders. In conjunction with a majority of independent, outside Directors, this

*Clerk of the District Court, Johnson County Kansas*
*11/22/16  01:17pm MM*

EXHIBIT 36
764

requirement may help shine a light on any conflicts of interests the Directors may have and the potential for such conflicts may be minimized. This reform is a success for both the corporation and its shareholders, in light of the lack of transparency leading up to the $29.7 billion goodwill impairment that contributed to the old Sprint's stock value plummeting.

The final part of the fourth reform requires the Board of Directors to examine the qualifications of each Director to ensure the Board and its Committees are properly staffed by those with the requisite skill and knowledge. Of course, a corporation's Board of Directors should have qualified Directors. The Board cannot function properly if it lacks those with the skills to run a multi-billion dollar corporation. Sprint, from its retail division to its broadband division, undoubtedly interviews all employees to ensure they are properly qualified to handle their job responsibilities. This reform is merely cosmetic in nature, and its inclusion in the Settlement adds no material benefit to Sprint. While a Board of Directors should ensure that its Directors are qualified to be members, this is something Sprint is likely already doing, and is not an added benefit to Sprint by virtue of the Settlement.

At the hearing for final Settlement, the Court expressed concerns about the efficacy and the enforceability of the Settlement. Plaintiff's Petition requested an array of relief based upon the egregious conduct of Officers and Directors as originally alleged:

> WHEREFORE, Plaintiff demands judgment as follows:
> A.  Against all Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of Defendants' breaches of fiduciary duties;
> B.  Directing Sprint to take all necessary actions to comply with Applicable laws and to protect the company and its shareholders from a repeat of the damaging events [of the Sprint Nextel merger], including, but not limited to, putting forward for shareholder vote resolutions for amendments to the Company's By-Laws or Articles of Incorporation and taking such other action as may be necessary to place before shareholders for a vote a proposal to strengthen the Board's supervision of operations and develop and implement procedures for grater shareholder input into the policies and guidelines of the Board
> C.  Awarding to Sprint restitution from Defendants, and each of them, and ordering

*Clerk of the District Court, Johnson County Kansas*
*11/22/16  01:17pm MM*

EXHIBIT 36

disgorgement of all profits, benefits, and other compensation obtained by the Defendants;

D.   Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' fees, and experts' fees and expenses; and

E.  Granting such other and further relief as the Court deems just and proper.[9]

When comparing the requested relief and the achieved results, the Settlement brings a mixed bag of reforms that the parties claim will benefit Sprint. After closely examining them, however, the reforms may be far less effective than as portrayed by the parties in their filings and oral statements at the settlement conference in May.

The ultimate goal of the Settlement is to prevent Sprint, in its current or future iterations, from retuning to its old ways. It gives the narrow benefit of promising to implement these reforms, but does not include any pecuniary relief as requested in the Petition. The effectiveness of the Settlement depends on Sprint dutifully carrying out its responsibilities under the Settlement and implementing the reforms to improve Sprint. Essentially, Plaintiff's counsel was able to get Sprint to agree to conduct itself like the telecommunications giant that it is. The reforms achieved by the Settlement are programs and guidelines that Sprint could implement on its own for the sake of the corporation's own survival. As such, they are not unfair to the corporation. The Court does recognize that some of the reforms, as they would be for any corporation, are in Sprint's best interest and could help ensure its survival in the short run. However, this Court does not think that the results achieved by Plaintiff's counsel warrant a $4.25 million fee award.

### III.    Analysis of the Requested Fee Award under KRPC 1.5

The Settlement, if approved, would award Plaintiff's counsel $4.25 million in attorneys' fees. Both parties lauded each other's work, emphasized that this derivative action was taken on a contingency fee basis, and said that the proposed Settlement was the result of hard-fought

---

[9] Doc. 1 at 73–4.

*Clerk of the District Court, Johnson County Kansas*
*11/22/16  01:17pm MM*

EXHIBIT 36
766

negotiations on both sides. Objector Michael Hartlieb, however, also appeared to give argument and reasons for the Court not to approve the Settlement. Mr. Hartlieb is particularly concerned because, as an individual he holds a significant position in Sprint. His standing to be heard as a million dollar investor in the old Sprint and current entity was not challenged. He objects to both the reforms and the attorneys' fees award. He thinks that the reforms are illusory and will not benefit Sprint, and that Plaintiff's counsel would receive an unjustifiably high fee award relative to the work those lawyers performed and the results achieved.

The Court directed the parties and Mr. Hartlieb to file supplemental briefs with the Court detailing whether the $4.25 million attorneys' fees award is warranted under the Kansas Rules of Professional Conduct. Plaintiff's counsel and Mr. Hartlieb filed several post hearing documents.[10] Normally, the Court would have limited the briefing. However, because the Court had several other matters pending and needed additional time to review the time records submitted, the Court will accept and has considered the merits of all positions orally stated and expressed in writing prior to this decision. No party has been cut-off and all have been given an opportunity to be heard fully. This matter has been under advisement and fully considered for several months.

There are eight factors under KRPC 1.5(a) for this Court to consider in granting an award of attorneys' fees that is reasonable. Each factor is addressed in detail below.

**(1) The time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly:**

Plaintiff's counsel claims that it has invested nearly 18,000 hours in this matter on a contingency fee basis (discussed below), and has incurred at least $265,000 in expenses that it contends were reasonably expended and necessary to investigate and successfully resolve

---

[10] Docs 35, 36, 37, 38, 39, 40, 41, and 42.

*Clerk of the District Court, Johnson County Kansas*
*11/22/16  01:17pm MM*

EXHIBIT 36
767

Plaintiff's claims. Derivative litigation, by its nature, is notoriously difficult and unpredictable.[11] Plaintiff's counsel conducted research regarding the Sprint Nextel merger to assess the strength of a potential suit prior to filing the *Murphy, Randolph, Price,* and *Ross-Williams* actions. This case ran concurrently with a securities litigation case, and was stayed after its filing on February 25, 2011, pending the outcome of the securities litigation.[12] Plaintiff asserts that this was a mutual decision of the parties that would be "informative" in this and the other derivative cases for the sake of efficiency. As a matter of course, staying derivative litigation while other litigation is pending is routine practice.[13]

In August 2011, Plaintiff's counsel started receiving discovery from the securities action, including documents, deposition transcripts and copies of the written discovery requests. The volume was approximately 460,000 documents. Plaintiff's counsel coordinated a document review to gather information that would support a derivative claim. They focused on discovering what internal controls were in place at the time of the Sprint Nextel merger. Plaintiff's counsel asserts that the document review tasks were done efficiently on a single platform to prevent duplicate coding. They state that the document review yielded documents that were instrumental in achieving the Settlement. Following the document review, the parties met with Judge Layn Phillips three times between July 2014 and December 2015. The Settlement tasks among counsel were divided to prevent duplicate work.

Mr. Hartlieb objects to the number of hours that were worked, and contests the number of hours billed, stating, "They cannot just bill for hours, even if the work was done if there is no meaningful benefit." The rules regarding attorneys' fees in Kansas require that the fee must be

---

[11] *Maher v. Zapata Corp.*, 714 F.2d 436, 455 (5th Cir. 1983).

[12] Doc. 2

[13] *See e.g. Brenner v. Albrecht*, No. CIV. A 6514-VCP, 2012 WL. 252286 (Del. Ch. Jan. 27, 2012.).

*Clerk of the District Court, Johnson County Kansas*
*11/22/16  01:17pm MM*

EXHIBIT 36

reasonable in light of the work done. Presumably, Mr. Hartlieb is upset because he believes the suit would have been successful had it proceeded to trial. This Court cannot make that kind of determination or prophetic utterance that it would have been successful. The Court can see, on the other hand, that success on the merits was abandoned fairly quickly by Plaintiff's counsel. Indeed, the statute of limitations may have been a significant problem for them by the time this case was even filed.

Derivative suits are notoriously difficult and complex, and require significant discovery to proceed. Experienced counsel know that going into a derivative action and prior to accepting the cases. The vast majority of the time spent in preparing the Settlement in this case seems to come from the massive document review of the materials received from the securities litigation. And, as counsel indicated, they focused upon the internal controls of the old corporation. The other major time costs of this litigation would be the three mediations with Judge Phillips and the work surrounding those mediations and the preparation of the Settlement. Surely, 18,000 hours—or 750 cumulative days of work—is an astonishing amount work performed in light of the progress of the lawsuit. Of the nearly 18,000 of work, 6905.25 of those hours were billed by attorney Alexander J. Silow for document review. This is astonishing! The adequacy of Mr. Silow's billing records are discussed in detail below.

Mr. Hartlieb does not believe the amount of time billed to the case is justified, and that in some ways he is being left in the dark because of the protective order over the time logs and billing records, arguing that "[i]f they are so proud of their 'comprehensive and robust' reforms, they should be equally proud of the fees sought . . . it is not possible for me to present my best argument in opposition of the fee request when Plaintiff's counsel provides summaries and declarations of hours and work performed without any proof, receipts, or time logs . . . [and] puts me at a

significant disadvantage."[14] However, the time logs and billing records of Plaintiff's counsel are duly protected under attorney-client privilege. The billing records were provided for *in camera* review. The Court has carefully reviewed them, and paid particular attention to the type of objections Mr. Hartlieb was making even with his inability to review them himself.

> **(2)  The likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer:**

Derivatives suits are called "complex litigation" for a reason. The subject matter and the sheer size of discovery and information necessary to prosecute a lawsuit, as well as the amount of time required, can be overwhelming. Mr. Hartlieb argues that Plaintiff's counsel's firms are "litigation mill[s]," eagerly hopping on the gravy train of complex litigation for a multi-million dollar attorneys' fee payout to force slight change on a corporation where the facts and circumstances would allow. It has been noted by other courts that large-scale class actions and derivative suits necessarily require a great deal of work, and because of this, attorneys (or sometimes, entire firms) are unable to take on other matters.[15]

In *Lucas v. Kmart Corp.*, a two-attorney firm entered into a contingency fee agreement with plaintiffs to bring a suit against Kmart for violations of Title III of the ADA. The case grew in magnitude from a single plaintiff to a nationwide class action. Class counsel submitted a significant amount of evidence that the research into the case was extensive, including 100,000 pages of documents and over 65,000 "mystery shopper" reports, taking over 50 depositions. Like Plaintiff here, the *Lucas* plaintiffs were forced to stay the case, albeit because of the bankruptcy automatic stay. After Kmart emerged from bankruptcy, there was significant motion practice from May 2003 through the settlement in late 2005. The settlement provided for $13 million to be set

---

[14] Doc. 36 at 2.
[15] *See e.g. Lucas v. Kmart Corp.*, No. 99-cv-01923-JLK-CBS, 2006 WL 2729260 at *2 (D. Colo. July 27, 2006).

aside in a fund for beneficiaries—the largest monetary settlement at that time for a public accommodations disability discrimination case.

The *Lucas* settlement also provided that the plaintiff's firm would receive a fee award of $3.25 million—one million less than is requested by Plaintiff's counsel here. The Colorado Court considered similar factors as this Court, and was particularly swayed to approve the fee in its entirety because of the grand nature of the case, and the fact that the two-attorney firm handled the entire litigation. Because there were only two attorneys, it precluded them from accepting other significant work—their own incomes were essentially put on hold while focusing much of their attention on the *Lucas* case.

In comparison, Plaintiff's counsel spoke about a massive document review, but from the comments made at the final approval hearing, the litigation and work did not come close to the intensity of the *Lucas* case. Plaintiff's attorneys belong to large, well-respected firms—much larger than the two-attorney partnership in *Lucas*. The fee request compared to the results obtained also differs from the result in *Lucas*. The *Lucas* counsel obtained a record-setting award. Plaintiff's counsel here achieved some cursory corporate governance reforms that do not achieve any significant financial relief, *e.g.* such as a claw-back provision aimed at Sprint's former CEO, who oversaw the merger. This fact particularly disappoints Mr. Hartlieb and is troubling for the Court.

Mr. Hartlieb further argues that the document review could have been done by legal aids and should not have precluded the attorneys from working on other cases. But Mr. Hartlieb's focus here is too narrow. This factor concerns not only the attorneys involved, but the support staff as well. Furthermore, Plaintiff's counsel is entitled to seek an award for the time and work performed by their support staff. But still, that fee must be reasonable. Mr. Hartlieb further objects that there was no additional discovery. The document review was limited scope discovery to determine what

corporate governance principles were in place during the Sprint Nextel merger. As far as the Court can tell, Plaintiff's counsel achieved its intended goal through the document review. It appears to have jettisoned the damages allegations without discovery. As stated, they focused on documents instrumental to achieving the Settlement because they focused on governance instead of the damage claims they made.

This case included allegations and inferences of significant incompetence and self-dealing by the former Officers and Directors involved in the Sprint Nextel acquisition and merger. It involved accusations of breaching fiduciary duties that resulted in large compensation packages for the violators while Sprint stockholders lost tumbling value and, as a side note unrelated to the claims in this case, many Sprint employees lost employment. The case included allegations and inferences of a major breach of fiduciary duties when the Board discharged offending Officers "without cause" thereby triggering significant severance packages (huge by any common person standards) and an indemnity provision for those executives. Yet, all those allegations were quickly abandoned—if they were ever seriously made in the first place—as the focus was placed upon governance principles for an entirely new entity. That does not justify a $4.25 million fee award.

The purpose for recognizing a derivative suit is to allow an adequate representative to prosecute claims on behalf of a damaged or threatened corporation when that corporation—by its Officers and Directors—is unwilling to act on its own. The allegedly injured corporation in this case (and indirectly, the injured shareholder group) is now being asked by the terms of Settlement put before the Court by its allegedly adequate representative to foot the bill, pay out even more money adding damage upon damage, to adopt governance principles which by all rights should be in place already for the new entity and which in no way compensate the company already harmed by the conduct alleged by that representative. That cannot be in keeping with the purpose for a

*Clerk of the District Court, Johnson County Kansas*
*11/22/16  01:17pm MM*

EXHIBIT 36
772

derivative lawsuit or consistent with the notions of adequate representation.

### (3) The fee customarily charged in the locality for similar legal services:

In Kansas, a fee is reasonable if it is in line with those prevailing in the community for similar services by lawyers of reasonably comparable skill, expertise, and reputation.[16] Kansas law allows courts to approve fee requests that exceed local rates if the fees were incurred in a matter involving specialized skills or a niche area of law, *e.g.*, complex litigation.[17]

Here, Plaintiff's counsel seeks an award of $4.25 million in compensation for achieving the governance reforms that comprise the Settlement. Of the nearly 18,000 hours incurred, 17,092.1 hours were incurred by Plaintiff's attorneys. The remaining amount was incurred by their support staff who contributed to the litigation efforts and undertook various tasks that otherwise would have been performed by the attorneys on the matter. The requested fee award computes to an effective hourly rate of $233 per hour, which is on par with the cost of similar services in Kansas as a whole ($236 per hour according a 2012 KBA survey). Through other litigation and experience overseeing cases generally, the Court is familiar with the hourly rates customarily charged by business litigation attorneys in this locale. The Court is also familiar with the rates paid for "document review" companies and for attorneys doing that limited type of work in this area. The mean rate in Kansas City is $228 per hour for business litigation. The regular hourly rates charged by Plaintiff's out-of-state counsel is higher than charged in this area. The Court recognizes that services were performed in California and Pennsylvania—states that on average have significantly higher hourly rates than Kansas City law firms for similar work. Document review rates, on the other hand, are significantly lower than those that business litigation counsel charge. Document reviews, notably high volume reviews, might be outsourced or performed in-house. Firms often

---

[16] *Consolver v. Hotze*, 51 Kan. App. 2d 286, 291, 346 P.3d 1094 (2015).
[17] *Reazin v. Blue Cross Blue Shield of Kansas, Inc.*, 663 F. Supp. 1360, 1454 (D. Kan. 1987).

rely upon temporary staffing agencies to hire document review attorneys who earn from $25-50 per hour.

### (4) The amount involved and the results obtained:

The most important factor in assessing the reasonableness of a fee is the ultimate result obtained.[18] This is particularly true for contingency fee cases. Sprint and Plaintiff agree that the corporate governance reforms resulting from the Settlement should confer a material benefit to Sprint going forward. The Court is not second-guessing that agreement. Indeed, all of the literature on corporate governance principles which the Court has independently reviewed supports that notion. Corporate governance principles are a good thing. Plaintiff's counsel proposes that, pursuant to the Settlement, Sprint's Finance Committee's deeper involvement will strengthen the company's M&A process and prevent post-merger issues. The Settlement proposes reforms that should enhance the responsibility of Sprint's Directors and Officers, and thereby improve general governance practices to further strengthen Sprint in the future. That is not wholly untrue.

Plaintiff's prayer for relief included a financial component that is noticeably lacking. The Settlement lacks any clawback provision to disgorge the profits made by the Board of Directors or any individual Defendants that allegedly caused Sprint to circle the drain until it was purchased by Softbank in 2013. While corporate governance reforms may confer some benefit, they depend nearly entirely on the will of the Board of Directors to implement these changes, and maintain the reforms for three years through the end of the sunset provision. Significant damage and disgorgement awards, on the other hand, although difficult to obtain, tend to send real, tangible messages for prompting corporate reform. Those objectives were abandoned long before the work was done in this case.

---

[18] *Gigot v. Cities Service Oil Co.*, 241 Kan. 304, 315, 737 P.2d 18 (1987).

*Clerk of the District Court, Johnson County Kansas*
*11/22/16  01:17pm MM*

EXHIBIT 36

The Court expressed strong concern regarding the enforceability of the Settlement. There is no clear mechanism for shareholders to enforce the corporate governance reforms. The reforms concern education for the Directors and detailed changes to conduct within the closed doors of the boardroom. Surely, shareholders can assure themselves that certain reforms are being implemented. For example, a shareholder could easily ascertain the identities of the members of the Board of Directors and which Committees that they are on, and whether there are inside Directors on the Compensation Committee when there should not be. However, other reforms concern conduct behind the closed doors of the boardroom which could seriously seal the direction of the company before they are ever known by anyone outside. Obviously, the normal reasonable investor will not know anything of the confidential goings-on information being shared among the M&A groups and the Finance Committee in preparation for the merger or before the potential damage is done. When asked how a shareholder may ensure that Sprint is following the terms of the Settlement, counsel suggested that the shareholder could stay up to date with Sprint's plethora of public filings.

Plaintiff's counsel argues that the Settlement is public knowledge and has been made available to all shareholders. But the enforcement of the Settlement by shareholders would likely require another derivative suit should Sprint fail to implement the reforms or violate any of them. Alternatively, Plaintiff might be able to re-initiate this suit and pursue breach of contract remedies. This would, of course, require the current Plaintiff to remain apprised of Sprint's internal conduct—something that counsel suggested would be very difficult to do regarding Sprint's internal reforms. Also, the Plaintiff would have to be motivated enough to re-initiate the lawsuit. It seems, though, that the $4.25 million dollar fee that is requested positions Plaintiff's counsel as a quasi-party in interest. To Plaintiff's counsel, Sprint's poor financial condition might reasonably

have been the blood in the water luring them into filing a derivative suit against Sprint to force a Settlement that would make nominal changes in exchange for a significant fee. Whether Plaintiff's counsel would be motivated enough to re-open the case for admittedly difficult enforcement after receiving a substantial fee award is dubious and remains a legitimate concern before the Court evaluating the result obtained.

Fee awards should be a fair amount that reflects the complexity of the litigation. The Court should take into consideration the difficulty and extent of motion practice or mediations when determining whether a fee is fair. The court must also be mindful that fee awards should not result in a windfall for minimal work. The results obtained by Plaintiff's counsel as a result of the Settlement are moderately commendable and hopefully will help Sprint succeed in the future. Yet, the reforms fall far short of any strong compensatory or punitive messages or measures against the Board of Directors or those individual Defendants who were alleged to have grossly mishandled a merger that nearly led to Sprint's demise according to the original pleadings. The reforms achieved will require Sprint, at least until sunset, to act as any other major corporation should, by doing the bare minimum of what is expected and nearly nothing more.

Plaintiff's counsel argues that disgorgement is not necessary to obtain the requested award, citing to *In re FAB Universal Corp. S'holder Derivative Litigation*,[19] where the District Court held that a corporation may receive a substantial benefit form a derivative suit, even if the relief is non-pecuniary.[20] Like the present case, the settlement in *FAB Universal* consisted of corporate governance reforms, and the reforms in the settlement aimed to strengthen oversight and Board competence. The Court approved a $236,167.67 fee for 266.2 hours billed, with a lodestar multiplier of 1.35. The Court found that the fee was reasonable because the relevant facts were not

---

[19] 148 F. Supp.3d 277 (S.D.N.Y 2015),
[20] *Id*. at 281.

*Clerk of the District Court, Johnson County Kansas*
*11/22/16  01:17pm MM*

EXHIBIT 36
776

simple and straightforward, and that recovery was far from certain—taking the matter on a contingency fee basis was a significant risk. In this case, at least if one looks solely on the face of the original pleading, Plaintiff's counsel took the risk.

Here, as Plaintiff's counsel points out, the requested fee award results in a negative lodestar of 0.71.[21] But Plaintiff's counsel completed nearly 18,000 hours of work on this matter from the date of filing to the date of decision, despite the case being stayed a significant amount of time and without any motion practice on the merits of their claims. Over 6,900 of those hours were billed by a single attorney for document review services. As discussed in detail below, this Court found some of Plaintiff's counsel's billing records to be suspect, casting doubt on the strenuousness of its prosecution of the case. It causes the Court to question whether Plaintiff's counsel requests a negative lodestar to counteract inflated billing records.

Mr. Hartlieb raises his objections, arguing that the benefit achieved by Plaintiff's counsel is so nominal that they are not entitled to *any* award. This is not the case. While the Court is skeptical of the actual benefit conferred to Sprint that would warrant a $4.25 million fee award, Plaintiff's counsel should be fairly compensated for what reforms they were able to achieve, even if they fell short of their original shot across the bow. Plaintiff's counsel spent some amount of time and energy on this matter, despite it being stayed while the securities litigation was ongoing. The Court is mindful that the stay was approved because it was intended to limit the expense of litigation. Plaintiff's counsel had to coordinate and perform a document review and prepare for three mediations, had to pay out-of-pocket to hire Prof. Tompkins as an expert. This alone is worth something, even if it is substantially less than the $4.25 million requested.

**(5) The time limitations imposed by the client or by the circumstances:**

---

[21] Doc. 34 at 101:3–4.

*Clerk of the District Court, Johnson County Kansas*
*11/22/16  01:17pm MM*

EXHIBIT 36
777

This factor does not apply, and Mr. Hartlieb's objection is not substantive with respect to this factor.

**(6) The nature and length of the professional relationship with the client:**

There has been a significant relationship between Plaintiff and counsel for the duration of this case. Plaintiff and counsel entered into a professional relationship in 2010. Other attorneys on the case have represented other plaintiffs in similar derivative actions filed upon the same premises since 2010 as well. Robbins Arroyo represented Randolph since 2010, Schubert represented Price since 2011, and Yates has represented Murphy since 2012. Objector argues that there is no true attorney-client relationship between the Plaintiff and counsel. That is not true. While the structure of a derivative suit is non-traditional, there still is an attorney-client relationship between shareholder plaintiffs bringing a derivative lawsuit against a Board of Directors. There appears to have been no significant longstanding relationship between Plaintiff and counsel prior to this case.

**(7) The experience, reputation, and ability of the lawyer(s) performing the services:**

Plaintiff's counsel come from the leading firms in shareholder litigation, and have extensive experience in the highly complex field. The Court has no qualms about the capability or reputation of Plaintiff's counsel. That factor is considered in their presumed assessment of the case before ever getting involved or filing a suit in the first place.

**(8) Whether the fee is fixed or contingent:**

A law firm undertakes a significant risk when handling complex litigation on a contingency basis. Plaintiff's counsel, experienced in complex litigation, took this case with the risk. Generally, a contingency fee controls compensation paid *by the client* from the recovery. When approving attorney fee awards, Kansas courts take into consideration that cases on a contingency basis are generally deserving of a reasonably higher fee award when there is monetary recovery. Plaintiff's counsel has worked on this action since 2011. Derivative suits are notoriously

risky because there is an extremely small likelihood that such actions would succeed at trial.[22]

Over the last five years, Plaintiff's counsel has devoted a significant amount of time and expenses into this case without a guarantee of Settlement or success at trial. They focused on settlement efforts and governance, likely recognizing early on the problems they might have with limitations and indemnity. No motion ever came before this Court on those issues. Plaintiff's counsel deserves a fee award for taking on a high-risk matter, albeit not the amount requested. That is particularly so when there is no fund of money in recovery and when the fee is to be paid by *the derivative client corporation* that suffered the alleged harm in the first place.

Counsel's taking the contingency risk in the first place does not justify a wholesale shifting of the fee burden to the client, even a derivative client, when nothing monetary is recovered.

### IV.    Balancing the Benefit of the Settlement and the Requested Fee Award

The role of the Court in approving a settlement agreement is to merely ensure that the agreement is not the product of fraud or collusion, and that when taken as a whole, the Settlement is fair or at least not unfair, adequate and reasonable to all concerned.[23] For all reasons identified, the Court finds that the proposed reforms in the proposed Settlement probably will confer some substantial benefit to Sprint when compared with their purposes and the alleged cause of this contingent fee litigation in the first instance. The disgorgement of profits from former Board members is not necessary for the Court to find that the Settlement may ultimately benefit Sprint. Implementing the reforms for the prescribed three-year sunset period will hopefully prevent some future harm to Sprint. However, it is very slight benefit related to the harm alleged when the case was filed. Contingent fees import the risk that the hoped-for results may not be obtained.

There is precedent for drastically reducing a requested fee award when a matter is taken on

---

[22] *See In re Pac. Enters. Sec. Litig.*, 47 F.3d 373, 378 (9th Cir. 1995).
[23] *Coulter v. Anadarko Petroleum Corp.*, 296 Kan. 336, 369, 292 P.3d 289 (2013).

*Clerk of the District Court, Johnson County Kansas*
*11/22/16  01:17pm MM*

EXHIBIT 36
779

a contingency fee basis. Kansas courts routinely review case law from Delaware on corporate matters. Kansas corporation laws are substantially similar to those of Delaware, and thus are highly persuasive.[24]

In *Seinfeld v. Coker*,[25] shareholders brought a derivative action, alleging that payments to former Directors constituted waste. The parties agreed to settle, but certain shareholders objected to the settlement, particularly to the requested attorneys' fee award. The Delaware Court examined the fee request under the factors presented in *Sugarland Industries, Inc. v. Thomas*.[26] In *Sugarland*, the Delaware Supreme Court identified factors for lower courts to consider when awarding fees or expenses for the creation of a common fund or benefit, such as the proposed Settlement here. The *Sugarland* factors are substantially similar to the KRPC 1.5 factors reviewed above.

The Delaware Court noted that it was not obligated to award plaintiff's counsel what would amount to an unreasonably high fee based on percentage alone because doing so might incentivize counsel's early, rather cheap settlements in complex matters such as a derivative suit.[27] The primary concern of the Court was whether the fee requested was equitable when compared to the settlement obtained. The contingency fee in *Seinfeld* was twenty percent of the $2.5 million common fund, or $500,000. The Court determined that the fee should be reduced to $250,000. The course of litigation conducted in *Seinfeld* was not particularly onerous ("no heroic efforts . . . were made") and the attorneys were sophisticated corporate law practitioners who could easily determine the risk of taking on such a case.[28]  In this case, we do not even have a common fund established by the Settlement.

---

[24] *Gray v. Manhattan Medical Center, Inc.*, 28 Kan. App. 2d 572, 576, P.3d 291 (2001).
[25] *Seinfeld v. Coker*, 847 A.2d 330 (Del. Ch. 2000).
[26] 420 A.2d 142 (Del. 1980).
[27] *Seinfeld*, 847 A.2d at 335.
[28] *Id*. at 338.

*Clerk of the District Court, Johnson County Kansas*
*11/22/16  01:17pm MM*

EXHIBIT 36
780

Here, the litigation was not particularly onerous, either. While the parties did meet in New York several times for mediation, coordinated a document review, and retained experts, the matter was stayed for a significant period of time for the purpose of keeping expenses down, and there has been no true motion practice. Counsel in this case are highly experienced and should be able to recognize a difficult case, know when to "fold their cards" and have the skill to disengage and minimize their time when the underlying action could not survive on the merits—if that is the case. Here, they cite to little or no discovery or research whatsoever on the merits of the breach of fiduciary duties claims or recovery of the damages claimed. Yet, they want a fee as though they had obtained some damage recovery. Like the *Seinfeld* Court, this Court is concerned that the requested $4.25 million fee must not incentivize settlements at the expense of abandoning notions of zealous advocacy for the underlying claim. When looking at the relief requested versus the relief obtained, Sprint promises to implement nominal reforms for a brief period that will likely benefit the corporation, but lack true enforcement mechanisms or a pecuniary measure or even a potential common fund that would incentivize Sprint to abide by the Settlement. Even though pecuniary relief is not required for approval or to justify a fee, it certainly would have added significant value to the Settlement and would have warranted a higher fee award.

Similarly, in *In re Abercrombie & Fitch Co. S'holder Derivative Litig.*,[29] the defendants agreed to pay $1.2 million in attorneys' fees and expenses to plaintiff's counsel. The Delaware Chancery Court reduced the fee award to $217,799.75, finding that the fee resulted in an exorbitant hourly billing rate of $1,061 per hour of attorney time. The Delaware Supreme Court held that the lower court did not abuse its discretion in reducing the fee.[30] The Court further relied on *In re*

---

[29] *In re Abercrombie & Fitch Co. S'holder Derivative Litig.*, 886 A.2d 1271 (Del. 2005).
[30] *Id.* at 1275.

*Clerk of the District Court, Johnson County Kansas*
*11/22/16  01:17pm MM*

EXHIBIT 36
781

*Prodigy Comm. Corp. S'holders Litig.*,[31] which stated that while a Court should give great weight to a private agreement for attorneys' fees, "the weight given derives from and depends on the Court's sense of confidence that the negotiations over the fee agreement were conducted in good faith and had no effect on other terms of the settlement."[32]

In some ways, this matter is the inverse of *Abercrombie*. The effective hourly rate for work performed on this matter is a reasonable $233 per hour. This is marginally higher than the $233 per hour average billing rate for business litigation in Kansas City but significantly higher than document review services normally in this area. However, the Court is not only concerned with the billing rate, but rather, the sheer number of hours worked for relatively light concessions obtained in the Settlement. The Court is especially concerned with the amount of hours billed by Alexander Silow, who allegedly performed substantially all of the document review.

The Court requested that Plaintiff's counsel submit billing records for *in camera* review after making whatever appropriate redactions they wished to make in order to protect attorney-client privilege, if they deemed it necessary. Plaintiff's counsel submitted those records to the Court. After comprehensive review, the Court finds that the hours billed to this matter are grossly excessive in comparison to the results obtained.

Plaintiff filed this case on February 25, 2011. The parties jointly agreed to stay the case, as memorialized in a joint stipulation filed in June 2, 2011.[33] The parties' purpose for staying the case was two-fold. First, staying the case would allow pending securities cases to be resolved, which would in turn be "informative" to both parties on how to proceed. Second, the stay was meant to conserve the resources of the parties and to keep attorney expenses down.

---

[31] *In re Prodigy Comm. Corp. S'holders Litig.*, No. Civ.A 19113, 2002 WL 1767543 (Del. Ch. July 26, 2002).
[32] *Id.* at *6 (citing *In re Axa Financial Inc. S'holders Litig.*, No. Civ.A 18268, 2002 WL 1022518 at *18 (Del. Ch. May 16, 2002).
[33] Doc. 2.

*Clerk of the District Court, Johnson County Kansas*
*11/22/16  01:17pm MM*

EXHIBIT 36
782

In its review, the Court found some disturbing billing patterns. During the settlement conference hearing, Plaintiff's counsel made several references to the document review it undertook. Counsel's statements reflected that the document review consisted of nearly two million pages, and was an onerous task. The document review was performed on a single document review platform to prevent reviewing and coding duplicate documents. While this is admirable, Plaintiff's counsel's billing history relating to the document review tells a very different story.

According to the billing records submitted by the Weiser Law Firm, the document review was handled by attorney Alexander J. Silow, who is of counsel to the firm. The Weiser Law Firm's declaration reflects that Mr. Silow's regular billing rate is $300 per hour, and both the Declaration and the billing records reflect that Mr. Silow worked an astonishing 6,905.25 hours on this matter, solely performing document review. The billing history spans 550 billing entries from November 3, 2011 through November 26, 2014.

The billing records are deserving of strong criticism. Mr. Silow's billing records reflect that on most days, he performed billable work between 10 to 15 hours per day. In fact, only 46 out of the 550 billing records—8.36% in total—show Mr. Silow working under ten hours a day. The Court is very skeptical about the credibility of Mr. Silow's billing records. Working 14 hours a day, as Mr. Silow's records reflect he did for 315 of the days in question, would mean that he would be performing document review from 6:00 AM until 8:00 PM every day, without any breaks to eat meals or attend to other personal matters. This is unbelievable!

Mr. Silow billed on average 12.6 hours per day over the entire billing history. Even more shocking is the pattern of days that Mr. Silow claims he has worked. From November 3, 2011 through February 4, 2012, Mr. Silow worked in five to 14 day stints, with one day gaps in between, all while billing over 10 hours per day. There is a month-long gap in Mr. Silow's billing history

from February 5, 2012 through March 5, 2012 where he presumably did not work on this matter. Mr. Silow then began working in five to 12 day stints from March 5, 2012 through April 7, 2012 at the same rigorous pace, taking one day off between each stint.

Mr. Silow then worked the next 75 days, from April 9, 2012 through June 23, 2012 without taking any days off. This is not the only time Mr. Silow recorded his work in long stints like this. He worked 55 days without a break in billing activity from September 30, 2012 through November 23, 2012. After only one day off, he worked 97 more days without a break in his billing activity from November 25, 2012 through March 2, 2013. Then, after a period of no billing activity from March 3, 2013 through July 31, 2014, Mr. Silow recorded a final 118 day stint of continual billing activity from August 1, 2014 through November 26, 2014.

The Court does not find that Mr. Silow's billing records are remotely accurate or credible. The Court understands the rigorous nature of document review, and that an attorney may *occasionally* log 14 hours for a short stint of days to meet a discovery deadline. Yet Mr. Silow logged 315 days over the course of the document review where he worked 14 hours. Even the most junior of associates, let alone an attorney that bills $300 per hour, would not be expected to record 14-hour days, every single day for two to four months at a clip.

Mr. Silow's billing history casts a cloud of doubt that looms over the veracity of the other billing records. The number of hours Mr. Silow claims he worked, 6,905.25 hours, which when multiplied by the effective billing rate of $233 per hour results in $1,539,870.75 in fees, or 36.23% of the requested fee award. That is over three normal full-time 8-hour day work years exclusively on a stayed case! Taking this into consideration, it seems that the vast amount of work performed on this case was illusory, perhaps done for the purpose of inflating billable hours to push the effective billing rate down in order to support a multi-million dollar fee award.

*Clerk of the District Court, Johnson County Kansas*
*11/22/16  01:17pm MM*

EXHIBIT 36

The recent decision *In re Walgreens S'holder Litig.*[34] concerned the adequacy of a settlement between Walgreens and its shareholders when objectors to a merger requested supplemental information that could affect the shareholder's approval of the merger. Judge Richard Posner, writing for the majority, identified the suit as a "strike suit," or as a case where a large public company announces a settlement that would require shareholder approval, and a later class action suit is filed for the sole purpose of obtaining plaintiff's attorneys' fees. These "strike suits" often result in minimal disclosures that are worthless to shareholders, yet request an exorbitant fee award as provided by the settlement agreement. The supplemental disclosure at issue in *Walgreens* added a mere 800 words to the disclosure—less than a one percent increase in length over the various disclosures. Meanwhile, class counsel requested $370,000 in fees without opposition from Walgreens.[35]

Judge Posner determined that the supplemental disclosures were worthless to Walgreens shareholders. The new information merely rehashed information already included elsewhere in the disclosures, or otherwise did not add any substantive information to assist shareholders in making an informed decision on approval. The District Court noted while approving the settlement that the supplemental disclosure "may have mattered to a reasonable investor."[36] But Judge Posner boldly stated that "may have" is not good enough, and that "the question the [District Court] judge had to answer was not whether the disclosures 'may have mattered,' but whether they *would be likely* to matter to a reasonable investor."[37]

This Court examined the reforms through Judge Posner's suggested lens and considered whether the reforms will likely benefit the parties truly in interest. The reforms add protections

---

[34] *In re Walgreens S'holder Litig.*, 832 F.3d 718 (7th Cir. 2016).
[35] *Id*. at 721.
[36] *Id*. at 724.
[37] *Id*. (emphasis supplied).

*Clerk of the District Court, Johnson County Kansas*
*11/22/16  01:17pm MM*

EXHIBIT 36
785

that, if missing, could cause Sprint to fail. Certain reforms do their best to protect the corporation from harming itself as it did following the Nextel merger, which in turn should benefit the shareholders. However, this Court is strongly convinced as a matter of fact that approving the $4.25 million fee and expense award of the Settlement, with respect to the actual relief obtained, is not in the best interests of the corporation or, indirectly, its shareholders.

Judge Posner rejected the proposed $370,000 fee award in its entirety, noting that it was excessive and completely unwarranted given the worthlessness of the supplemental disclosures. The value of the disclosures to shareholders "appear[ed] to have been nil," and even thought the proposed fee is mere pennies to Walgreens.[38] Furthermore, Judge Posner noted that this sort of class action that yields fees for class counsel, yet nothing for the class is nothing more than "a racket . . . [that] must end." In the present case, the value of the reforms is vastly overshadowed by the excessive $4.25 million fee award requested by Plaintiff's counsel, particularly when based upon dubious time records submitted to this Court.

It is the responsibility of the Court to determine whether an attorneys' fee award is reasonable.[39] While the Court should give weight to an agreement regarding attorney fees, it does not require blind acceptance.[40] Plaintiff's counsel spoke in superlatives about the results obtained through the three rounds of mediation, possibly as a nod to *Hensley v. Eckerhart*,[41] where the Supreme Court held that when a plaintiff's attorney involved in complex litigation has obtained "excellent results," the attorney "should recover a fully compensatory fee . . . encompass[ing] all hours reasonably expended on the litigation . . . ."[42]

---

[38] *Id*. at 723.
[39] *Freebird Inc. v. Cimarex Energy Co.*, 46 Kan. App. 2d 631, 637, 264 P.3d 500 (2011).
[40] *In re Abercrombie & Fitch Co. S'holders Derivative Litig.*, 886 A.2d at 1275.
[41] *Hensley v. Eckerhart*, 461 U.S. 424, 103 S. Ct. 1933 (1983).
[42] *Id*. at 435.

*Clerk of the District Court, Johnson County Kansas*
*11/22/16  01:17pm MM*

EXHIBIT 36
786

The results obtained by Plaintiff's counsel are far from excellent. Plaintiff's counsel wants a fee for illusory work in obtaining near-illusory relief. The Settlement achieved by Plaintiff's counsel after three rounds of "hard fought" mediation results in negligible changes to Sprint, and marginal benefit, if any, to its shareholders, that had suffered dearly because of the former Board's and Officers' indiscretions. The Settlement sets forth four reforms that Plaintiff's counsel argues will greatly benefit Sprint. The Court disagrees with Plaintiff's counsel's assessment. The Court thinks that the Settlement could, should and might have some benefit to Sprint if honestly implemented and rigorously followed, but that it is mostly illusory, with the most beneficial aspect being only those reforms to the Board of Directors and Committee compositions. Taking another $4.25 million from Sprint is not beneficial at all.

Part of the Settlement lacks teeth. The reform regarding education for the Finance Committee will last only as long as certain members remain on the Committee. The commitment for implementing the education program lasts only three years to the end of the sunset period.

Part of the Settlement is redundant. Annual goodwill impairment testing and a share repurchasing programs are policies that Sprint should already have in place. Although there was no evidence presented relating to the existence or non-existence of these programs in Sprint's current form, the Court assumes that Sprint more likely than not has these responsible policies in some form already in place. The goal of these reforms is seemingly to show that Sprint is willing to model par behavior of any large telecommunication corporation.

Part of the Settlement is illogical. Under the terms of the proposed Settlement, Sprint promises to vet its Board of Directors to ensure that they have the proper qualifications to perform their duties. This "reform" is analogous to adding 800 useless words to a disclosure as seen in *Walgreens*. Sprint is likely already vetting its Board of Directors to ensure they are qualified, just

as Sprint's retail division likely vets applicants for a mobile phone sales position.

Sprint's promise to bring in outside Directors to make up the majority of the Board and Finance Committee, and to comprise the Compensation Committee of solely outside Directors is the only truly beneficial reform within the Settlement agreement. Had the Settlement lacked this provision, the Court would be inclined to reject such an illusory Settlement entirely. But this reform, unlike nearly all of the others, has the potential to bring about positive change to Sprint moving forward. Thus, the Settlement is approved with respect to the reforms.

The Court rejects the requested $4.25 million fee award. The results obtained in the Settlement are not commensurate with the fee requested. An unjustifiably high fee award with respect to the minimal relief obtained abuses the trust of the shareholders. Furthermore, the billing records reviewed by the Court paint a troublesome portrait of exploiting Sprint's missteps for a substantial reward for counsel, and minimal relief to Sprint and its shareholders that suffered. The billing records submitted furthermore lack credibility. The focus appears to have been upon an easy, cheap settlement in the first instance. No motion practice or serious discovery efforts were ever undertaken to address the egregious acts originally alleged against the individual Defendants who were responsible for the losses to Sprint. The Court approves a Settlement that allows Plaintiff's counsel a reasonable fee and their expenses limited to the total amount of $450,000.00.

This is the order of the Court. No further Journal Entry is required.

IT IS SO ORDERED.

Dated this 22nd day of November, 2016.

　　　　　　　　　　　　　　　　　　　　 /s/ James F. Vano
　　　　　　　　　　　　　　　　　　　　JAMES F. VANO
　　　　　　　　　　　　　　　　　　　　District Judge, Division 2

*Clerk of the District Court, Johnson County Kansas*
*11/22/16  01:17pm MM*

EXHIBIT 36
788

<u>NOTICE OF SERVICE</u>

Copies of the above and foregoing have been sent by the Court to counsel and/or self-represented litigants at the address(es) provided by them as of record in the JIMS this date of filing.

*Clerk of the District Court, Johnson County Kansas*
*11/22/16  01:17pm MM*

EXHIBIT 36

# EXHIBIT "B"

EXHIBIT 36
790

```
           IN THE UNITED STATES DISTRICT COURT
        FOR THE EASTERN DISTRICT OF PENNSYLVANIA
                 NO: 2:19-CV-02728-MSG


THE WEISER LAW          )   DEPOSITION UPON
FIRM, P.C.,             )
and ROBERT B.           )   ORAL EXAMINATION
WEISER, ESQUIRE,        )
                        )          OF
        Plaintiffs,     )
                        )
   - vs -               )   PATRICIA WEISER
                        )
MICHAEL HARTLEIB,       )
                        )
        Defendant.      )
- - - - - - - - - - -
```

         VIDEOTAPED DEPOSITION VIA ZOOM,

taken by and before CHRISTOPHER M. PILOT,

Professional Reporter and Notary Public, by

THE HOSTING OFFICES OF ERSA COURT REPORTERS,

30 South 17th Street, Suite 1520,

Philadelphia, Pennsylvania on Thursday,

July 21, 2022, commencing at 10:03 a.m.


                      - - -


             ERSA COURT REPORTERS
             30 South 17th Street
           United Plaza - Suite 1520
             Philadelphia, PA 19103
               (215) 564-1233

EXHIBIT 36
791

PATRICIA WEISER

```
 1    A P P E A R A N C E S:

 2

 3            SILVERANG, ROSENZWEIG & HALTZMAN, LLC
              BY:   PHILIP S. ROSENZWEIG, ESQUIRE
 4                  KEVIN MCGOWAN, ESQUIRE
                900 East 8th Avenue
 5              Suite 300
                King of Prussia, Pennsylvania 19406
 6                  Attorney for the Plaintiffs

 7

 8            GOLDBERG, MILLER & RUBIN, P.C.
              BY:  TYSON MOTT, ESQUIRE
 9              121 South Broad Street
                North American Building, Suite 1500
10              Philadelphia, Pennsylvania 19107
                    Attorney for the Defendant
11

12

13

14

15

16

17

18

19

20    VIDEO SPECIALIST:              ALSO PRESENT:

21    Luke Simpson                   Michael Hartleib

22

23

24
```

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36

792

PATRICIA WEISER

3

1                         I N D E X

2

3    WITNESS                                    PAGE

4

5    PATRICIA WEISER

6

7             By:  Mr. Mott                     5

8

9

10

11                       - - -

12

13

14                  E X H I B I T S

15                              PAGE    PAGE

16    NUMBER        DESCRIPTION     MARKED   ATTACHED

17

18

19

20             (No Exhibits Were Marked)

21

22

23

24

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36
793

PATRICIA WEISER

4

1              VIDEO SPECIALIST:  This

2       deposition is being taken on Thursday, July

3       21st, 2022, scheduled for 10:00 a.m., via

4       Zoom conferencing.

5              This deposition is for the

6       United States District Court for the

7       Eastern District of Pennsylvania, Numbers

8       02728, in the case of The Weiser Law

9       Firm, P.C., et al., versus Michael

10      Hartleib.

11             Present for the taking of this

12      video deposition is the deponent

13      Patricia Weiser.

14             Counsel will now introduce

15      themselves.

16             MR. ROSENZWEIG:  Good morning.

17             It's Phil Rosenzweig and my

18      colleague Kevin McGowan from Silverang,

19      Rosenzweig & Haltzman on behalf of the

20      plaintiffs, The Weiser Law Firm and Robert

21      Weiser.

22             MR. MOTT:  Good morning.

23             Tyson Mott, from the law firm

24      Goldberg, Miller & Rubin on behalf of the

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36

794

PATRICIA WEISER

5

1          defendant, Michael Hartleib.

2                    VIDEO SPECIALIST:  Thank you,

3          Counsel.

4                    The court reporter is Chris Pilot

5          of ERSA.  The court reporter will now swear

6          in the witness.

7                    PATRICIA WEISER, having been duly

8          sworn, was examined and testified as

9          follows:

10                   VIDEO SPECIALIST:  The time is

11         now 10:05, we will now begin questioning.

12

13   BY MR. MOTT:

14   Q.     Good morning, Ms. Weiser.

15   A.     Good morning.

16   Q.     How are you?

17   A.     Okay.

18   Q.     Okay.

19          You are a practicing attorney, correct?

20   A.     I no longer practice law.  My license is

21   active, but I'm not a practicing attorney.

22   Q.     Okay.

23          And, approximately, when did you stop

24   practicing?

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36

795

PATRICIA WEISER

6

1   A.       2012, I would say approximately is when I

2   stopped actively litigating cases.  I've been

3   involved in the business since then, but I stopped

4   actively litigating cases around 2012.

5   Q.       After 2012 would you have entered your

6   experience in -- in any matters?

7   A.       Not that I can recall, no.

8   Q.       And when were you first admitted to any bar

9   for the practice of law?

10  A.       If memory serves -- 1996, if memory serves.

11           The '90s don't seem so far away, but all of

12  a sudden I realize they are.

13           Sorry.

14  Q.       And where did you go to law school?

15  A.       I went to Widener University School of Law

16  in Delaware.

17  Q.       And what year did you graduate?

18  A.       I want to say 1996.  I feel like I

19  graduated, passed the bar and then started working

20  the same year.  Again, that's my recollection.

21  Q.       And where did you go to undergrad?

22  A.       Undergrad was St. Joseph's University.

23  Q.       And what did you study in undergrad?

24  A.       I studied a lot of things in undergrad.

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36

796

PATRICIA WEISER

7

1    Q.       What was your degree in undergrad?

2    A.       I graduated with a B.A. in English.  Yeah.

3    Q.       And did you attend law school right after

4    undergrad?

5    A.       No, I did not.  No, I don't think I did.

6    Q.       Okay.

7    A.       No, I didn't.  I didn't.

8    Q.       Well, you are currently employed with

9    The Weiser Law Firm, correct?

10   A.       Correct.

11   Q.       And how long have you been employed by

12   The Weiser Law Firm?

13   A.       Since its founding in 2004 or '5, whenever

14   we founded the firm.  I think it was 2004 or 2005,

15   December of 2004.  There's documents that would say,

16   but I -- I just don't remember.

17   Q.       Okay.

18   A.       Since its beginning I have been employed by

19   them.

20   Q.       If I ask you a question for a date, you can

21   feel free to qualify it with saying approximately or

22   I believe, and I won't hold you to the exact number

23   or the exact date.

24            If -- well, strike that.

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36
797

PATRICIA WEISER

8

1              When you say we founded, who were the

2    original founders of the firm?

3    A.        My husband and I, Robert Weiser.

4    Q.        Are you still -- well, strike that.

5              Are you an owner of the firm?

6    A.        I am.

7    Q.        And is it a equal ownership between you and

8    Mr. Weiser?

9    A.        Currently, I own 49 percent, and he owns

10   51 percent of the capital stock of the corporation.

11   Q.        And has anyone other than the two of you

12   ever owned stock in the corporation?

13   A.        No.

14   Q.        Do you have a formal title for the

15   corporation?

16                      MR. ROSENZWEIG:  Objection as to

17            form.

18                      THE WITNESS:  Yeah.

19                      I'm not sure I understand your

20            question.

21   BY MR. MOTT:

22   Q.        I can rephrase.  I'm sorry.

23            Are you an officer of the corporation?

24   A.        Yes, I am.

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36

798

PATRICIA WEISER

9

1    Q.        And what role do you hold as an officer

2    with the corporation?

3    A.        Currently, I -- I am the vice president

4    and, I believe secretary.  Yeah, there are documents

5    that say it somewhere, roles changed some, but,

6    yeah, I'm the VP.

7    Q.        Would that make Mr. Weiser the president?

8    A.        He is.

9    Q.        Does he have any other office or roles with

10   the corporation?

11   A.        I'm not sure who holds the roles of

12   secretary and treasurer to be quite honest.  One or

13   the other of us do, I believe.  I haven't looked at

14   that in a while.

15   Q.        And as for the firm, do you have a formal

16   job title with the firm currently?

17   A.        I mean, I -- no, we're not big on

18   formalities at the law firm.

19   Q.        Okay.

20   A.        I'm an owner, like VP, I'm Pat, if you need

21   something I'll get it done.

22   Q.        Do you have any role in the managing of the

23   day-to-day operations of the firm?

24   A.        What do you mean by day-to-day-operations?

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36

799

PATRICIA WEISER

10

1    Q.       Administrative, supplies, that kind of

2    day-to-day economic things.

3    A.       Sure.

4             My -- my duties are administrative in

5    nature.  I do not have any duties related to the

6    cases, management thereof or the employees, other

7    than HR, back office, administrative things.

8    Q.       What are your current duties in regards to

9    HR and -- or personnel, however you would want to

10   refer to it?

11   A.       Sure.

12            I would say I am responsible for the

13   following, among other things, payroll, maintaining

14   HR records, all of the IT at the firm that the

15   employees use, like all of the -- like any vendors

16   for the firm or contracts that the firm has with any

17   third-party vendors, I am responsible for managing

18   those, making sure payroll gets out, making sure --

19   that's why I deal with the banking, the accountant,

20   the bookkeeper, the lawyers, the insurance brokers,

21   all of the business at the firm.

22            Anything that doesn't have to do with

23   actual cases and litigation and the employees

24   thereon is generally what I take care of so that

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36

PATRICIA WEISER

11

1    they can focus on litigation, and I take care of the

2    rest.

3    Q.      Currently, does the law firm have a written

4    handbook for its employees?

5    A.      There is.

6    Q.      Back in 2014 would the law firm have had a

7    written handbook?

8    A.      Yes -- ah, I'm going to -- yeah, I'm pretty

9    sure we would.

10           We had, yes, Counsel or an HR independent

11   third-party contractor, HR firm which was then

12   reviewed by Counsel.  There's been an employee

13   handbook in existence, I mean, as long as I can

14   remember.

15           Not from the very beginning when it was

16   just Rob and I, but when we started having

17   employees, I'm certain that that was something that

18   we took care of.  I just don't remember when we

19   first did that.

20   Q.      During the timeframe when the law firm was

21   engaging Jeffrey Silo, would there have been

22   handbooks -- a handbook in effect?

23                   MR. ROSENZWEIG:  Note my

24           objection as to form.

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36
801

PATRICIA WEISER

12

1                    THE WITNESS:  Yeah, I'm not sure

2             when -- I just don't remember the span of

3             when he did work for the firm, to be

4             honest.

5                    If you want to give me dates?

6    BY MR. MOTT:

7    Q.      Yeah.

8            And what about in approximately 2008 into

9    early 2017?

10   A.      I don't -- I just don't recall.

11   Q.      Okay.

12           If there were a handbook, would a

13   contracted attorney be required to review that

14   handbook?

15                    MR. ROSENZWEIG:  Objection as to

16           form.

17                    Are you asking her for an expert

18           opinion in employment law, in which case --

19                    MR. MOTT:  Okay.

20                    MR. ROSENZWEIG:  -- it's

21           objectionable --

22                    MR. MOTT:  I can --

23                    MR. ROSENZWEIG:  -- if you're

24           asking her about the practice of the firm.

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36

802

PATRICIA WEISER

13

1                     MR. MOTT:  I can rephrase.

2                     MR. ROSENZWEIG:  Okay.

3                     Thank you.

4    BY MR. MOTT:

5    Q.     Are contracted attorneys provided a copy of

6    the firm's handbook?

7                     MR. ROSENZWEIG:  Again, I'm going

8             to object to form.

9                     THE WITNESS:  Their -- all

10            independent contractors are provided with

11            the confidentiality provision that are --

12            that exist in the handbook.  Employees are

13            handed -- are provided the employee

14            handbook.

15                    There are separate documentation

16            for independent contractors, but the page

17            from the employee handbook concerning

18            confidentiality with respect to our

19            information, our cases, our work product,

20            that is provided -- we have -- you know,

21            that's provided to everyone that does any

22            work on any cases at the firm.

23   BY MR. MOTT:

24   Q.     What type of documentation would be

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36
803

PATRICIA WEISER

14

1    provided to a contracted attorney beyond the

2    confidentiality agreement, if anything?

3              MR. ROSENZWEIG:  Objection as to

4         form.

5              THE WITNESS:  At what point in

6         time are you asking about?

7              Sorry.

8  BY MR. MOTT:

9  Q.      When the firm engages a contracted

10   attorney, what documentation or policy documents are

11   provided to them by the firm, if any?

12   A.      So before Jeffrey Silo revealed that he was

13   not -- that he had been disbarred we utilized

14   third-party contractors, The Ableson Firm to take

15   care of all paperwork and background checks relating

16   to contractors, and they were 1099 contractors,

17   either we paid Ableson or the individual.

18            Since the information about Jeffrey Silo

19   came out, and I didn't feel we could rely upon

20   independent third-party contractors to do the

21   background checks that we thought they were retained

22   to do, we retained a separate third-party contractor

23   to do background checks of any and all persons who

24   would do work for the firm, including student

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36
804

PATRICIA WEISER

15

1    interns, independent contractors, document

2    reviewers.   We never, again, got any -- any workers

3    from Ableson or any -- none from Ableson, but

4    everyone that came to the firm after the Jeffrey

5    Silo incident, I will call it, went through a

6    vigorous background check that was conducted by a

7    company that I retained to do so.

8            And, again, that was directly in response

9    to Ableson was supposed to do it, and they didn't,

10   so I -- we're a small firm.   I use trusted

11   third-party contractors who work (inaudible).

12           So, currently -- we haven't -- we haven't

13   retained anyone in -- in a while, so I -- I can't

14   remember the name of the firm used, to be honest.

15   Q.       Are you familiar with an attorney by the

16   name of Debra Goodman?

17   A.       I am.

18   Q.       Is she an attorney that the law firm has

19   contracted with?

20   A.       Yes.

21           She -- she is -- she is an independent

22   contractor, and historically she was a former

23   employee, and prior to that she was my boss when I

24   graduated from law school.   I've known her a very

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36

PATRICIA WEISER

16

1    long time.

2              Her roles -- her roles at -- with -- with

3    our business have changed.

4    Q.       I got a little sidetracked.

5    A.       Sure.

6    Q.       But prior to founding The Weiser Law Firm

7    did you have any employment after graduating law

8    school?

9    A.       I did.

10   Q.       And where did you work before the founding

11   of The Weiser Law Firm?

12   A.       My -- the founding of the The Weiser Law

13   Firm, and after I graduated law school, you said?

14   Q.       Um-hmm.

15   A.       Okay.

16              My first job out of law school was with

17   Margolis Edelstein in Philadelphia.  I worked there

18   a year or two, then I went and worked for a firm by

19   the name of Penning, Bowman & Chanan (ph) worked

20   there for a couple of years, and then I went to

21   Schiffrin & Barroway to work there.  Umm, 2000 -- I

22   worked there for about five years, and then we

23   started the firm.

24              We left -- we left Schiffrin & -- Rob and I

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36
806

PATRICIA WEISER

17

1    left Schiffrin & -- Rob was also at Schiffrin &

2    Barroway.  We both left there and started the firm

3    together.

4    Q.      And are you currently married to

5    Mr. Weiser?

6    A.      I am.

7    Q.      And how long have you been married to

8    Mr. Weiser?

9    A.      A long, long time.

10          Oh, this is terrible.  Don't let him see

11   this video.  Um, late '90s we got married.

12          '98?  '98.  '98.  '96?  '98?  I think '98.

13   Darn it.  He knows.  He's very good about it.

14          We've been together since 1986, that I

15   remember.  Forever.  Forever.

16   Q.      I won't mention at his deposition that you

17   couldn't recall the exact date you got married.

18   A.      Don't -- he knows.  He knows.  I can never

19   remember.  I know the date, I don't remember the

20   year.  Like '98, I think.  Yeah.

21          Elvis was there.  It was lovely.

22   Q.      I'll follow up on that off the record.

23   A.      Uh-huh, sure.  We have the colorful life.

24   Q.      A little bit ago you mentioned personnel

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36
807

PATRICIA WEISER

18

1    folders.

2              Was there ever a personnel folder for

3    Jeffrey Silo during the time period when your firm

4    engaged him as a contracted attorney?

5    A.        No.  No, he was never an employee of the

6    firm.

7    Q.        Did the firm maintain any kind of file or

8    group of records pertaining to Jeffrey Silo for

9    the -- for his employment with the law firm?

10                        MR. ROSENZWEIG:  Objection; she

11            just testified he wasn't employed.

12                        MR. MOTT:  I'm sorry.

13   BY MR. MOTT:

14   Q.        For the time period that The Weiser Law

15   Firm engaged Jeffrey Silo as a contract attorney?

16   A.        And before --

17   Q.        I'll just rephrase.

18              Was there any type of set of records or a

19   file pertaining to Jeffrey Silo's engagement with

20   The Weiser Law Firm as a contract attorney?

21   A.        So we keep all of our records in

22   QuickBooks.  That's managed by Cheryl Tryon.  So

23   records of any payments made to him would be in

24   QuickBooks.

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36
808

PATRICIA WEISER

19

1              Like our bookkeeping records I think would

2      have -- they should have copies of -- I mean,

3      depending on the date, obviously, we purge them

4      when -- you know, after a period of time.

5              The -- I'm trying to think what the process

6      was.  I don't know if he invoiced or he sent

7      e-mails.  However his time was submitted to Cheryl

8      as approved by the attorney who he was working with,

9      that would generally be kept -- scanned and kept

10     with -- in our -- in our bookkeeping records.

11             So, like, our bills and our payment of

12     bills, there is record of that.

13                      THE COURT REPORTER:  Would you

14           repeat the last part?  I lost you.

15                      THE WITNESS:  Oh, I'm sorry.

16                      Sure.  Sure.

17                      I said there -- in our

18           bookkeeping records, there is record of

19           every check we wrote.  Every check we write

20           has record of that check and any

21           documentation relating to that expense.

22                      In the normal course of business,

23           that's how we keep our records, as we need

24           to.

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36
809

PATRICIA WEISER

20

1   BY MR. MOTT:

2   Q.        And for any records that are not considered

3   part of a case file, what is the firm's document

4   retention policy for non-case file records?

5   A.        You mean, like, bookkeeping records?

6   Q.        Like bookkeeping, any type of record that

7   pertains to the administrative side of the firm.

8   A.        So I don't think we have a policy, so to

9   speak, like a written policy as we would for -- like

10  we have a document retention policy that relates to

11  the cases.

12         I -- I confer with my accountant and ask --

13  I've asked them how long do I need to keep certain

14  things, tax records, backup, all that kind of stuff,

15  and I -- at the direction of my accountant I keep

16  things as long as he tells me to keep them or his

17  assistant.  Yeah, so I don't know off the top of my

18  head what the number of years are, but Cheryl and I

19  have a system that complies with what the accountant

20  has said that we need to keep.

21         We also used to have an HR -- an outsource

22  HR firm that provided us with HR resources.  I'm --

23  I'm having, like, a vague recollection of a list

24  of -- like of them providing me with a list of this

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36
810

PATRICIA WEISER

21

1    is what you should keep and how long you should keep

2    it and how long you should keep it, and so we

3    complied with that as well.

4    Q.      For any accounting records such as an

5    invoice or documentation of a check payment or any

6    record such as that, that -- where the original copy

7    was in a digital format, how would the law firm

8    maintain that record?

9              MR. ROSENZWEIG:  I'm just going

10             to object to the form, but, Pat, you can

11             answer it if you can.

12             THE WITNESS:  Are you talking

13             about, like, bookkeeping records?

14   BY MR. MOTT:

15   Q.      Yes.

16   A.      So our system has changed over the 20-year

17   history of the firm because in the beginning -- like

18   before Cheryl it was just me, and we have always

19   maintained electronic records in an effort to not

20   kill too many trees.

21             So if an e-mail came in from an attorney

22   with a -- an invoice attached, that invoice would be

23   saved electronically and stored in the appropriate

24   file for the month and year in which it came in or

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36

PATRICIA WEISER

22

1    in which it was paid.  And we have the same system

2    year after year after year, and let's say you keep

3    those records for seven years, once you pass the

4    seven-year mark that year can get purged.

5              And our -- since -- since -- it's -- the

6    electronic system has evolved and gotten very

7    streamlined in that everything's electronic now, so

8    everything gets saved electronically into the same

9    folder system, which is the month and year in which

10   the bill was paid.

11   Q.        Approximately, how long has The Weiser Law

12   Firm used Cheryl Tryon to help with the bookkeeping?

13   A.        So we started the firm 2005.  I want to

14   say, like, 2006 or '7.  It was pretty early on.

15   Q.        And would that be the approximate timeframe

16   for when The Weiser Law Firm would have stored

17   accounting records typically?

18   A.        Yes.

19   Q.        So if Jeffrey Silo was e-mailing timesheets

20   or invoices to Cheryl and the attorney handling the

21   particular case he was working on, would those

22   invoices or timesheets be maintained digitally?

23                   MR. ROSENZWEIG:  So I'm going to

24              object to the form because Ms. Weiser

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36
812

PATRICIA WEISER

23

1          already testified that after seven years

2          things were purged.

3               So if you could just restate the

4          question, I'd appreciate it.

5               MR. MOTT:  Sure.

6               MR. ROSENZWEIG:  You just need a

7          timeframe, Mr. Mott, that's really what I'm

8          suggesting.

9               MR. MOTT:  Okay.

10   BY MR. MOTT:

11   Q.     If -- well, if Jeffrey Silo sent invoices

12   or timesheets digitally, would those have been

13   maintained in a digital format for purposes of

14   recordkeeping until it was outside the retention

15   period?

16   A.     Maybe.  It really depends how it comes in.

17          Like if it's an e-mail saying I worked this

18   many hours, and -- and it goes to an attorney not

19   Cheryl -- again, this is -- these are questions for

20   Cheryl.  Like Cheryl has a process, and I don't -- I

21   don't -- like it's her process.  She's great at what

22   she does.

23          If -- if there's an invoice, yes, the

24   invoice gets saved and filed away.  If it's an

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36

PATRICIA WEISER

24

1    e-mail, I'm not sure how that gets handled.  I know

2    how I would do it, but I'm not the bookkeeper.

3            So I -- I don't know what she does with

4    e-mails if it's just an e-mail, and I have no

5    recollection of how that was handled back when

6    Mr. Silo was doing work for the firm.  I was not

7    involved in that.  So I just don't know.

8    Q.        The digital records saved or stored by

9    Cheryl, would those records be maintained at

10   The Weiser Law Firm or somewhere else?

11   A.        They are all in my possession and control

12   on -- I mean, The Weiser Law Firm -- I mean,

13   everything exists.  There's no building, so to

14   speak, it's all electronic, right?  So it's saved

15   and stored, and it's all under my authority and

16   control.

17           Cheryl has certain access to do work on it,

18   but it is not -- it's under my -- my authority and

19   control.

20   Q.        Is -- other than QuickBooks, are there

21   other platforms that the law firm currently uses to

22   store digital records such -- such as payroll or

23   personnel information?

24   A.        So not case -- not case-related documents.

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36

814

PATRICIA WEISER

25

1   We use Microsoft Office platform for all of that,

2   for the -- for the administrative documents.  So I

3   think it's SharePoint.

4           There -- there are a couple different

5   Microsoft Office.  365 is what we use.  Specifically

6   where things are within that, I -- I'm not sure the

7   titles of the -- SharePoint is one.

8   Q.      Is that a cloud-based platform?

9   A.      Yes.

10  Q.      And that's a cloud-based platform that you

11  have access to?

12  A.      Yes.

13  Q.      Who else would have access to digital

14  personnel information?

15  A.      Just me.  I don't think Cheryl has access

16  to the personnel, but I could be wrong.  I'm not

17  sure about that.

18  Q.      Okay.

19          And who else would have access to any

20  digital accounting records?

21  A.      Digital accounting records?

22                  MR. ROSENZWEIG:  Objection.

23                  Mr. Mott, at the present time, or

24          when?

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36

PATRICIA WEISER

26

1               MR. MOTT:  Currently.

2               THE WITNESS:  Digital accounting

3          records?

4    BY MR. MOTT:

5    Q.        Um-hmm.

6    A.        Our accountant.

7    Q.        Anyone else?

8    A.        I mean, I have access to them.  I don't --

9    I don't even think Rob has -- I mean, if you're

10   talking about a log-in, I don't think Rob has it, so

11   I don't think -- I mean, if he wants something, he

12   asks me, and I get it.  The fewer people accessing

13   things, the better.

14              Just the accountant and Cheryl to the

15   extent she needs to provide something to the

16   accountant.  Yeah -- well, and that's not -- the

17   accounting records are -- are -- the accountant has

18   those.  There's a shared-file system that he has

19   that he stores all of our accounting records in.

20              To the extent there are copies of it in our

21   system, then it's in our Microsoft Office 365

22   cloud-based system, which Cheryl does have access to

23   and I have access to, and that's it.

24              Yeah, none of the other employees, not even

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36

PATRICIA WEISER

27

1    Rob have access -- direct access to any of the

2    administrative files.

3    Q.      Did the law firm ever employ a woman by the

4    name of Archita Patel?

5    A.      I'm sorry?

6            I didn't hear your question.

7    Q.      I'm sorry.

8            Did the law firm ever employ an Archita

9    Patel?

10   A.      Yes, that was her name when we hired her.

11   Q.      Okay.

12           What is her name now, if you know?

13   A.      She got married before she left the firm,

14   and her last name is now Rokowski (ph), I believe.

15   Rokowski, if she's still married, I don't know.

16   Q.      Okay.

17           And what was her job title with the firm?

18   A.      She was a paralegal.

19   Q.      Do you know approximately when she left the

20   firm?

21   A.      It was right before the pandemic and COVID

22   hit.  So the -- it was -- it would have been

23   January -- was that 2020?  January of 2020.

24           I'm -- if my recollection serves, it was

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36

817

PATRICIA WEISER

28

1    before the pandemic.  January of 2020 is what I'm

2    going to -- I mean, there -- there's a record of it

3    somewhere, but off the top of my head, that's my

4    recollection.

5    Q.      Do you know approximately how long she

6    worked for the firm?

7    A.      I don't remember.  A couple years, I just

8    don't remember.

9    Q.      Okay.

10           Do you know why she left?

11   A.      She was terminated.

12   Q.      And why was she terminated?

13   A.      I don't remember specifically.  Or was she

14   laid off?  I mean, I don't know.  These are legal

15   terms that are not in my area of expertise.

16           Terminated or laid off.  I don't -- I don't

17   recall which it was, but, yeah.

18   Q.      And who made the decision to terminate

19   Ms. Patel?

20                   THE WITNESS:  (Lost Internet

21           connection.)

22                   VIDEO SPECIALIST:  10:37, off the

23           video record.

24                   (At this time, off the videotaped

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36

PATRICIA WEISER

29

```
 1            and stenographic record.)
 2                        (At this time, the court reporter
 3            read back from the record as was
 4            requested.)
 5                        VIDEO SPECIALIST:  10:38, on
 6            video.
 7                        THE WITNESS:  Rob, and I make
 8            those types of decisions together.  I don't
 9            recall specifically, but we make them
10            together.
11     BY MR. MOTT:
12     Q.    When The Weiser Firm [sic] terminates an
13     employee, does it document the reasons for the
14     termination?
15                        MR. ROSENZWEIG:  Objection to
16            form.
17                        THE WITNESS:  (Lost Internet
18            connection.)
19                        VIDEO SPECIALIST:  Off video
20            record.
21                        (At this time, off the videotaped
22            and stenographic record.)
23                        (At this time, the court reporter
24            read back from the record as was
```

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36

PATRICIA WEISER

30

1          requested.)

2                    MR. MOTT:  I'm ready.

3                    VIDEO SPECIALIST:  11:03, on

4          video.

5                    MR. MOTT:  Okay.

6     BY MR. MOTT:

7     Q.      Ms. Weiser, we're just coming back from a

8     brief break to address some technical issues.

9              Would the reasons for Ms. Patel's

10    termination be documented in her personnel file?

11    A.      When we -- when anyone ever -- whenever

12    anyone leaves the firm there's a bunch of

13    documentation that gets filled out for anyone that

14    leaves the firm.

15             So, yeah, there is -- there is

16    documentation regarding her termination from the

17    firm, yeah.  I don't know if that would give -- I

18    don't -- I don't know that it would give the reason,

19    but there would be documentation.

20    Q.      Okay.

21             I'll -- I'll just request that you provide

22    that documentation to your counsel, and then if he

23    deems it appropriate, he can provide that

24    documentation to me.

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36

PATRICIA WEISER

31

1          MR. ROSENZWEIG:  Yes.

2              So, Mr. Mott, while we're just

3        doing this, you're going to have to tell me

4        why that's relevant to this case, but we

5        can deal with that offline.

6              MR. MOTT:  Yeah.  Understood.

7   BY MR. MOTT:

8   Q.     Earlier you -- you testified that you had

9   not actively practiced since 2012.

10        With that in mind, after 2012 were there

11   any occasions where you would perform attorney work

12   on a file on a temporary basis or to pitch in and

13   help out?

14   A.     Sure, yes.

15   Q.     Would the Sprint derivative litigation --

16   well, strike that.

17        Would you have pitched in to help out to

18   perform attorney work on the Sprint derivative case?

19   A.     No.

20              MR. ROSENZWEIG:  Objection as to

21        form, but go ahead.

22              THE WITNESS:  No.

23              To my knowledge, I've never

24        worked on a derivative case, that's Rob's

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36

PATRICIA WEISER

32

1              department.

2    BY MR. MOTT:

3    Q.       Okay.

4    A.       We -- we have a -- yeah, no.

5    Q.       And prior to when you stopped actively

6    practicing on behalf of the firm, what were your

7    areas of practice?

8    A.        My area of practice was M&A litigation,

9    mergers and acquisitions, shareholder, class-action,

10   litigation-challenging corporate mergers and --

11   yeah.  And that pretty much -- that's pretty much

12   all I did.

13   Q.       Did you review any documents to prepare for

14   today's deposition?

15   A.        I started to read the Amended Complaint.  I

16   got a few pages in, and it was pretty upsetting to

17   me, and I stopped.

18   Q.        Other than that occasion that you just

19   referenced, have you reviewed the First Amended

20   Complaint in its entirety?

21   A.        When it was originally drafted, sure.

22   Q.        And in your role as a founder and owner of

23   the firm, would you have had to approve the First

24   Amended Complaint --

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36

PATRICIA WEISER

33

1    A.        That --

2    Q.        -- prior to filing?

3    A.        That was Rob's -- that was Rob's duty.

4              I believe Rob signed it.  He was a named

5    plaintiff.  I did review it before it was filed, but

6    this -- that -- this is litigation matters that

7    Rob's handling with my knowledge, but not my

8    involvement, unless my involvement is requested by

9    Counsel, in which case, obviously, I'm involved.

10   Q.        As part of your administrative duties with

11   The Weiser Law Firm, are you involved in the

12   disbursement of any settlement proceeds that come in

13   when -- after cases have resolved?

14                      MR. ROSENZWEIG:  Objection as to

15             form.

16                      THE WITNESS:  Yes.

17   BY MR. MOTT:

18   Q.        And how are you involved in the

19   disbursement of settlement proceeds?

20   A.        Administratively, I am responsible for the

21   paperwork that gets prepared to document the

22   distribution of funds in connection with any

23   settlement, and then once that documentation is

24   finalized and approved by the counsel involved, I am

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36
823

PATRICIA WEISER

34

1    then responsible for distributing the funds, whether

2    it be through a printed check, which I work with

3    Cheryl to accomplish or through a wire transfer,

4    which I do myself on -- in the online banking

5    platform that we use.

6            And then there's usually a letter that goes

7    to the person who is to receive the check, I take

8    care of that, and I'm also responsible for postage

9    and taking it to the mail, taking it to the post

10   office to drop it off.

11           So, soup to nuts, the money comes in, I

12   make sure it gets where it needs to go, that's all

13   my responsibility.

14           Who gets what is a discussion amongst

15   counsel involved and always with Rob involved,

16   finalizing the numbers of who gets what and where it

17   goes.  That's -- that's always a final approval by

18   Rob before I cut checks or send money anywhere.

19   Q.      And how about for the disbursement of any

20   attorney-fee award; are you involved in the

21   disbursement of attorney-fee awards?

22   A.      Sorry, now I'm confused.

23           What was the last question?  Isn't that --

24   Q.      Well, I said settlement proceeds.

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36

824

PATRICIA WEISER

35

1    A.        Oh, so let me go back.  I want to fix my

2    answer.

3    Q.        Okay.

4    A.        We don't receive settlement -- so in a

5    class-action lawsuit, if the class members are

6    getting settlement proceeds, we do not receive those

7    funds, a third-party administrator handles that.

8              The only monies that come to our firm would

9    be fees and expenses for counsel in a case.  That

10   amount would not necessarily be just for us, it

11   rarely is, and there is a distribution of fees and

12   expenses to counsel involved.

13             The only other -- the only other monies

14   that would flow through with that amount would be

15   client-incentive awards come with that as well, and

16   they either get distributed to their counsel to

17   distribute to them or if they are our client they

18   get distributed directly from us.

19             So the only monies that comes to us are

20   attorney fees, expenses by law firms involved in the

21   case and client-incentive awards.  I can't think of

22   any other monies that come to us other than qui tam

23   cases where clients -- in the qui tam cases that we

24   have are the only cases that we do where the clients

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36
825

PATRICIA WEISER

36

1    receive settlement proceeds directly, and they -- we

2    distribute those funds to the clients in those

3    qui tam cases only.  But for all the shareholder

4    litigation, only -- only fees and expenses come to

5    us.

6            So if there's different -- different types

7    of cases are handled differently, and money flows

8    differently in different types of cases.

9    Q.       And what is a client-incentive award?

10   A.       So in a shareholder litigation, whether it

11   be derivative or M&A, although -- I mean, let's not

12   talk about M&A since I haven't done that since 2012,

13   and derivative litigation, if a client is a named

14   plaintiff, a lead plaintiff in the case, I don't

15   know if they call them that, but if they have an

16   active role in the litigation, sometimes counsel --

17   lead counsel will ask for an incentive award to

18   compensate them for their efforts in the case to

19   bring it to its close.

20           They're usually, like, a 1,000 to $5,000, I

21   can't think of one that's larger than that, but it's

22   a Court approved -- you ask the Court, the Court

23   approves it or they don't, those monies then are

24   included with the fees and expenses that get

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36
826

PATRICIA WEISER

37

1    distributed to counsel, and the incentive award

2    would go to the client or the client's counsel if it

3    wasn't us.

4            But that's all Court approved, that's not

5    something we give our clients.  It's -- it -- it's

6    something the Court approves from the settlement

7    that the defendants pay, we don't pay it.

8    Q.       In your administrative role with the firm,

9    are you involved in the satisfaction of any referral

10   fee obligations that the firm has on any particular

11   case?

12   A.       I'm -- I'm not sure I -- I understand the

13   terminology you're using, but in terms of what I

14   just answered, when fees and expenses are

15   distributed, yes.  If there's a referral fee owed,

16   it's paid as part of that distribution.

17   Q.       Okay.

18   A.       Only if it's a referral fee owed by our

19   firm.  If any other firm's involved in the

20   litigation that we are -- we owe money to, if they

21   owe referral fees to their own referral counsel, I

22   don't know about that, and that's their

23   responsibility to take care of.

24            If our firm has a referral obligation, it's

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36

PATRICIA WEISER

38

1    taken care of through the distribution of funds.
2    And there's a form, like there's a form that's used
3    in every single case.
4    Q.      Are you familiar with an individual by the
5    name of Oliver Thieler or Thieler?
6    A.      I am.
7    Q.      And is Oliver Thieler someone that the law
8    firm has a relationship with?
9    A.      Oliver Thieler is someone that my husband
10   has a relationship with.
11   Q.      And what is the -- well, strike that.
12           Do you know the nature of your husband's
13   relationship with Oliver Thieler?
14   A.      I -- I think it's best if you can ask him.
15           They're business colleagues and friends.
16   Q.      Have you ever met Oliver Thieler?
17   A.      I did.  Yes, I met him one time.
18   Q.      Do you know approximately when that was?
19   A.      Everything falls into, like, pre-COVID and
20   post-COVID, right?
21           It was -- I don't remember.  I don't
22   remember.  It was before -- before COVID, so it was
23   before 2020, but I don't remember.
24   Q.      And where were you when you met him?

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36

PATRICIA WEISER

39

1    A.        I was in San Diego.  I think I was in

2    San Diego.  I was in California.  I know -- I know

3    his office is -- and he lives in San Diego.  I -- I

4    don't -- I was in California.

5             I'm not sure where, if we were out there on

6    a different case and he met us or we met him.  I

7    don't remember that actually.

8    Q.        Was there ever a period of time where

9    The Weiser Law Firm maintained an office in

10   California?

11   A.        Yes.

12   Q.        Does The Weiser Law Firm still maintain an

13   office in California?

14   A.        No.

15   Q.        Do you know when The Weiser Law Firm closed

16   its office in California?

17   A.        Off the top of my head I don't recall when

18   we -- we had a virtual office, and we had an

19   attorney out there.  I -- I don't -- I don't have a

20   recollection of the year we did that.

21   Q.        Okay.

22   A.        I mean, there's records of it.  I just

23   don't know off the top of my head.

24   Q.        Yeah.

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36

PATRICIA WEISER

40

1           On the occasion when you met Oliver

2    Thieler, do you know whether the California office

3    was still open?

4    A.       No, it was not.  To -- to the best of my

5    recollection it was not.  Like I had never been to

6    the California office, so I -- it's not something

7    that's, like, fresh in my head.

8    Q.       In your administrative role with the firm,

9    have you ever disbursed a referral fee to Oliver

10   Thieler?

11   A.       Yes.

12   Q.       Do you know approximately how many

13   occasions you disbursed a referral fee payment to

14   Oliver Thieler?

15   A.       I couldn't say.

16   Q.       Do you know if it was more or less than

17   five occasions?

18   A.       I couldn't say.

19   Q.       Okay.

20   A.       There's -- there are records of it, I just

21   couldn't say.

22   Q.       All right.

23           In your administrative role with The Weiser

24   Law Firm or any other role with The Weiser Law Firm,

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36
830

PATRICIA WEISER

41

1    have you ever disbursed any other type of funds or

2    payment to Oliver Thieler?

3    A.       Yes.

4    Q.       And what type of -- what were the other

5    types of disbursements to Mr. Thieler?

6    A.       There's only one.  He receives a monthly

7    check from us.

8             Again, in my administrative role I cut the

9    check every month, but that's all I could tell you

10   about it.  I -- I don't recall when that started or

11   what the details of that are, that's something you

12   would have to ask Rob.

13   Q.       Okay.

14   A.       Like we keep our -- we keep our business

15   very separate.  Rob does Rob's thing, I do my thing,

16   we trust each other, and when he tells me to do

17   something that -- for a reason and it makes sense to

18   me, I start doing it, and then I -- I don't think

19   about the reason again after that.

20            So it's our business and --

21   Q.       Is that --

22   A.       -- I do my job, he does his.

23   Q.       Is that -- well, strike that.

24            Do you receive any kind of corresponding

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36

PATRICIA WEISER

42

1   invoice or bill for those monthly checks?

2   A.        No.

3   Q.        Do you know generally what that monthly

4   payment is intended to satisfy or what obligation it

5   is intended to satisfy?

6   A.        I couldn't say.

7             At --at one time when they began I knew for

8   sure and a discussion was had.  And I can't remember

9   what the nature of that discussion was, but as I sit

10  here now, no, I couldn't tell you.

11            That -- that's something that Rob -- Rob

12  would have to tell you more about it.

13  Q.        Do you know if The Weiser Firm [sic] has

14  received any invoices from Oliver Thieler or an

15  entity owned by Oliver Thieler?

16                    MR. ROSENZWEIG:  Objection as to

17            form.

18                    THE WITNESS:  I don't know.  Not

19            that I recall.

20                    I -- I don't know what you mean

21            by entity, the entity part, but Oliver

22            Thieler I don't recall getting -- I don't

23            recall getting any invoices.  We might

24            have, I just don't recall it.

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36

832

PATRICIA WEISER

43

1                    And as for an entity, I just

2          don't know who you are talking about.

3    BY MR. MOTT:

4    Q.      Just for an example, Thieler Law Corp.?

5    A.      Thieler Law Corp.?

6          That does not sound familiar.  It doesn't

7    sound familiar.  I mean, as I sit here today, it

8    doesn't sound familiar.

9    Q.      When did you first learn that Jeffrey Silo

10   had been using a false identity for -- to establish

11   himself as a barred attorney?

12                    MR. ROSENZWEIG:  Objection as to

13          form.

14                    THE WITNESS:  I don't remember

15          when I learned that.

16   BY MR. MOTT:

17   Q.      Well, I'll -- I'll represent to you that in

18   the First Amended Complaint it represents that

19   Robert Weiser first became aware of Mr. Silo's

20   disbarred status on or around February 2nd of 2017.

21          Would you have learned of Jeffrey's Silo's

22   disbarred status around that same time?

23   A.      That's a different question than you just

24   asked.

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36

PATRICIA WEISER

44

1              I have a specific memory of where I was

2       sitting when I learned of his disbarred status.

3       Q.      Okay.

4       A.      I don't -- I don't remember when I learned

5       about the name issues, it just kind of got weirder

6       after the disbar -- the disbarment, but I remember

7       where I was sitting when I heard it, and it -- yes,

8       I remember that.

9              I don't remember the day, but I remember

10      where I was, and I remember how shocked I was.

11      Q.      Okay.

12             And where were you?

13      A.      I was in the office sitting at my desk.

14      Q.      And --

15      A.      And Rob -- Rob came in and told me.  He

16      came in and told me.

17      Q.      And what did he tell you?

18      A.      I don't remember specifically, but the gist

19      of it was that Silo was disbarred -- had been

20      disbarred, and we needed to talk about, like, what

21      the implications of that were.  Like -- and from

22      that my job became -- you know, I was going to call

23      Ableson and find out what the heck was going on, and

24      then Rob was going to take care of other things.

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36

PATRICIA WEISER

45

1              But my -- the job for me out of that

2      conversation was to deal with Abelson.  We were

3      trying to get our heads around what exactly was

4      going on because it was an extreme shock to find

5      that out, I mean, shocking.

6      Q.       And what was Rob's reaction while you were

7      discussing Silo's disbarred status?

8                          MR. ROSENZWEIG:  I am going to

9                  object to the form.

10                         THE WITNESS:  I don't know.

11                         We didn't -- we didn't discuss

12                 his disbarred status, he came in and told

13                 me what he had -- what he had been -- what

14                 he found out and how he found out.

15                         I don't remember the specifics of

16                 that, but we were all incredibly shocked

17                 and in a -- in a little -- in disbelief.

18                         I'm not sure where the source of

19                 the information came from, but there was

20                 some -- there certainly was some, like,

21                 let's get to the bottom of this and figure

22                 out what's true and what's not.

23                         I honestly don't remember the

24                 source of it.  I -- I feel like it was -- I

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36

835

PATRICIA WEISER

46

1          feel like Mr. Hartleib was the source of

2          it, that's, like, my memory, but I'm not

3          sure if that's accurate.

4                    But there was -- there's

5          definitely an element of let's find out

6          what's true and what's not about this, and

7          there was discussion about the bigger

8          picture.

9                    Rob -- Rob is always concerned

10         about the bigger picture of protecting our

11         reputation in our business and field, and

12         who -- who do we need to call, like who --

13         like what -- what are the things we need to

14         do to protect the firm as we deal with this

15         challenge?  So we discussed lawyers we

16         needed to call.

17                   And I don't -- I don't recall if

18         this was the same day.  I mean, this was --

19         this was, like -- this was a super-shocking

20         thing that was discussed more than in one

21         sitting, but there was a discussion of

22         lawyers, PR firms, State Bar, colleagues,

23         just the investigational stage to determine

24         what exactly was going on and what did we

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36
836

PATRICIA WEISER

47

1          need to do to fix it and preserve the

2          integrity and reputation of the firm.

3   BY MR. MOTT:

4   Q.          And what were the actions that The Weiser

5   Law Firm took to protect its reputation immediately

6   following the discovery of Jeffrey Silo's true

7   identity?

8                    MR. ROSENZWEIG:  I am going to

9          object to the form.

10                   I'm very concerned about

11         timeframes, Mr. Mott.  So I don't know what

12         immediately means.  So if you could be --

13                   MR. MOTT:  Yeah.

14                   MR. ROSENZWEIG:  -- a little more

15         helpful in terms of the timeframes, that

16         would be great.

17  BY MR. MOTT:

18  Q.          In the first two weeks following the

19  discovery of Jeffrey Silo's true identity, what

20  actions did the firm take to protect its reputation?

21  A.          So I want to be clear that I do not

22  remember finding out about his disbarment and

23  finding about -- finding out about the different

24  identities at the same time.  It may have happened

PATRICIA WEISER

48

```
 1    that way, but those were two shocking -- two

 2    different shocking things to me.  The disbarment I

 3    have a distinct memory of that being communicated to

 4    me.

 5            At some point, I don't -- I don't think it

 6    was the same day, at least it wasn't to me, but

 7    there was a separate revelation about the names

 8    Jeff and Andrew and -- like that was even more

 9    confusing than his disbarment, to be quite honest.

10            Like, I was, like, I'm sorry, what?

11    Q.      Okay.

12            I'll -- I'll --

13    A.      The names -- the names were very confusing,

14    and I -- I wasn't getting involved in that.  I -- I

15    do not, did not, have not ever met Mr. Silo.  I am

16    not involved with him whatsoever, never was, so

17    it -- it was a confusing, shocking -- it got more

18    confusing and shocking after I learned about the

19    disbarment.

20            So if you want to know what we did after I

21    learned -- we learned of the disbarment, that I can

22    tell you.  I -- I don't remember when all of the

23    names came into the mix, I just don't.

24    Q.      That's fine.
```

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36

838

PATRICIA WEISER

49

```
 1            Okay.  I'll try and make a better
 2    distinction.
 3    A.      Okay.
 4    Q.      So in the two weeks following the discovery
 5    of Mr. Silo's disbarment, what actions did the law
 6    firm take to protect its reputation?
 7    A.      Okay.
 8            So there were many things, and I'll list as
 9    many as I can remember.
10            Someone, and I don't recall who, tried
11    contacting Mr. Silo.  I don't know if they reached
12    him or not, but there -- there was reaching out to
13    Mr. Silo, there was a call to our counsel at
14    Blank Rome, they have special ethics counsel there
15    that I wanted to speak with to determine what were
16    the best steps to follow in order to protect the
17    firm's integrity and reputation.
18            From that conversation -- well, that's
19    attorney-client.
20            That's attorney-client.  Can I answer
21    what -- who else we called after that?  I mean, I
22    can say what we did.
23    Q.      Yeah.
24            Well, I'm -- I'm not interested in any
```

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36

PATRICIA WEISER

50

1    protected communications, but in terms of the

2    content --

3    A.        Sure.

4    Q.        -- but if you took a particular act --

5    A.        So there was another law firm we were

6    recommended to call based in Chester County, whose

7    name I can't remember.  We retained their services

8    to represent us.

9              I believe we self-reported to the

10   Pennsylvania Bar, and they helped facilitate that

11   process.  We communicated -- we -- we reached out to

12   the Montgomery County District Attorney's office.

13   I'm not sure if we reached out to other District

14   Attorneys' offices.  We -- our office is near three

15   different counties, but we reached out to them to

16   bring that to their attention and see if they would

17   commence a -- an investigation.

18             We contacted a PR firm, at least one.  I

19   know we retained one.  I don't know how many calls

20   were made to how many PR firms, but there was -- Rob

21   felt very strongly that we needed to hire someone to

22   oversee and proactively manage the Internet, for

23   lack of a better way of saying that, that if this

24   blew up, as things do on social media, we needed to

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36

840

PATRICIA WEISER

51

1    be able to be on top of that and be proactive about

2    it.

3            I remember that being a lot of money, and I

4    was against it because I -- I was, like, look, this

5    isn't going to happen, like it's just -- and after I

6    talked to Counsel, I -- I had some perspective that,

7    like, this wasn't the craziest thing anyone's ever

8    heard and it had happened before to other people,

9    which I find incredible and shocking, but I

10   appreciate that when it's happening to you, it's,

11   like, really incredible and shocking.

12           I just -- I just couldn't imagine that it

13   was going to swirl the way Rob proactively wanted to

14   protect against it's ruin.  So we -- we paid a lot

15   of money to hire PR firms to monitor and manage

16   social media, so two law firms, a PR firm, the DA.

17           I know the guys at the office did a lot of

18   their own Internet research trying to get to the

19   bottom of, like, what -- what happened here, like

20   where was he -- when was he disbarred, when -- the

21   name changes, like Facebook.

22           Like there was a lot of research done by

23   the guys at the firm who were very upset by -- I

24   mean, very upset by this turn of events.

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36

PATRICIA WEISER

52

1            And, you know, assuming it to be something

2      beyond our control, that we need to just let the

3      Court know about, we double and triple checked

4      everything we had done along the way and wanted to

5      ensure that we haven't missed steps, and we were

6      sure that we had not.  We still felt horrible, but

7      it -- we had not.  And we wanted to make sure that

8      we did everything we needed to do to preserve the

9      integrity and the reputation of the firm.

10           I personally called Abelson, the recruiter

11     that we got Silo from the day I found out about his

12     disbarment.

13           What else did we do?

14           I mean, those were the initial -- those

15     were the initial steps that were discussed, and then

16     we -- I don't know if this was in -- within the

17     first two weeks or not, I honestly just don't

18     remember, but at some point we communicated with

19     every -- we sent a letter to every court where we

20     had submitted time in support of a settlement that

21     was contributed by Mr. Silo.

22           My recollection is most of those cases were

23     closed, were over, but we, out of an abundance of

24     caution and an abundance of integrity, let the

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36
842

PATRICIA WEISER

53

1    Courts know that this has come to our attention, we

2    were not aware of it, we just wanted to let them

3    know, and if they wanted to know anything else, to

4    let us know.

5            So we communicated with anyone that this

6    embarrassing, awful information could in any way

7    taint our reputation.  I can't think of anything

8    else at the moment.  I'm sure there were more

9    things, but those are the things that are -- that

10   are in the forefront of my brain right now.

11   Q.      I appreciate that.  And as we go along, if

12   something else pops into your head and you want to

13   go back and amend the response, feel free to stop

14   me, and we'll do so.

15   A.      Okay.

16   Q.      The other Chester County firm whose name

17   you couldn't recall, were they also ethics counsel

18   or did they serve some other role?

19   A.      As I recall, there -- there definitely was

20   an ethic's component to this.  There was a -- I

21   believe they have a judge, a former judge of counsel

22   at the firm.

23           Like I remember we were going to, like, the

24   highest of all high ethics' people, and it was a

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36

843

PATRICIA WEISER

54

1    former judge.  And I'm embarrassed to say I don't

2    remember his name, but truly I've tried not to think

3    about all this stuff for a long time now.

4            So he was, like, a former judge, and he was

5    going to advise us on what we should do to protect

6    our reputation, and self-reporting to the bar was a

7    process that, I believe, he recommended.

8            Again, that's something that Rob could

9    confirm.  That's my recollection of it, in that

10   their firm helped facilitate that process.

11           I -- I know we spent a lot of money on that

12   firm, and I -- of which there's record of how much

13   we spent.  I couldn't tell you what else we did for

14   them -- what else they did for us, like the full

15   scope of the work they did for us in connection with

16   this, I don't recall off the top of my head.

17           But the fact that Mr. Hartleib was

18   involved, and my recollection is the source of the

19   information about the disbarment and then all the

20   absurd accusations that followed therefrom, his --

21   Mr. Hartleib's involvement is what made us act and

22   do so many things to make sure we stepped properly

23   and -- and did everything we could to preserve and

24   protect our reputation.

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36
844

PATRICIA WEISER

55

1          Absent him, I don't -- I think this would

2    have gone the way of any unfortunate thing that

3    happens, which is someone lied to us, we disclosed

4    it.

5          We had fulsome records supporting every

6    hour he worked on the case, which isn't always the

7    case, but we really did in this case, so it's -- it

8    was very fortunate, he did very good work, and that

9    would have been that.

10          But the fact that Mr. Hartleib was involved

11   made everything rise to a heightened level that we

12   were going to be attacked by him.  We didn't know

13   the scope of what he was going to do, had no idea it

14   would be what it became, but that we needed to

15   prepare ourselves for whatever crazy things might

16   come, and that was -- that was what I was led to

17   expect from Mr. Hartleib by Rob, who had dealings

18   with him.

19   Q.     How many PR firms has The Weiser Law Firm

20   retained to address the concerns about the potential

21   harm to the firm's reputation?

22   A.     My recollection -- I -- I'm seeing right

23   now there were two checks that were sent.  I don't

24   recall if it was one firm or two firms, but there

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36

845

PATRICIA WEISER

56

1    were definitely two separate retainers, two separate

2    people who were going to be working on this.  Like I

3    can kind of see the invoice in my head, but I --

4    there were two big retainer checks that had to be

5    cut.  Whether it was two separate entities or two

6    people working for the same entity, I don't recall.

7    And I -- I didn't deal with them after that.

8            Again, I'm just administratively in charge

9    of getting the invoice, approving the invoice and

10   paying it.

11   Q.       Other than the two retainer checks, do you

12   know if there were any other payments made to any

13   public relations firm?

14   A.       I don't recall.  I mean, there's records of

15   that in our -- in our records, but I don't recall

16   additional payments that were made to those folks.

17   I don't recall any other -- I mean, as I sit here

18   right now, I don't recall any other PR firms other

19   than the two retainer checks I just mentioned.  And

20   whether they were paid more after that, I just don't

21   remember.

22   Q.       Prior to February of 2017 had The Weiser

23   Law Firm ever retained a public relations firm?

24   A.       No.

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36
846

PATRICIA WEISER

57

1    Q.        Are you able to approximate the amount of

2    the -- amounts of the two retainer checks?

3    A.        So what I can do for you is give you a

4    general sense of the leanness with which we run our

5    law firm and always have.  So, no, I can't give you

6    a number.

7    Q.        Okay.

8    A.        But what I can say is, you know, we -- we

9    run a very tight ship.  There are not many checks

10   that go out the door for five figures, other than

11   when fees come in, but, like, expenses, no, that

12   doesn't happen.  And these were -- these were high

13   five-figure checks that were, like, some of the

14   bigger checks I had ever written for an expense.  So

15   it was upsetting.  It was unnerving.

16             These were not -- and because I didn't know

17   how long it was going to last and how long we were

18   going to have to pay, so there was a great unknown

19   about the expense associated, like, with what we

20   were going to have to do to deal with the lies and

21   just the harassment from Mr. Hartlieb and not being

22   able to budget for that.

23             And the -- the first expenses to deal with

24   it were already, you know, multiples of what I'm

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36

PATRICIA WEISER

58

1    used to paying -- the firm was used to paying for

2    expenses for litigation.  This was more money than

3    we spent on expenses ever from day one.

4    Q.       Do you have any knowledge as to whether

5    The Weiser Law Firm received the remainder of any

6    retainer that was paid to the PR firms?

7    A.       I don't remember getting any money back,

8    no, from anyone ever actually.

9             I -- I want to say it was, like, 25,000

10   each.  It was, like, fifty-grand, and that -- honest

11   to God, like, that was an ungodly amount of money.

12            I mean, this is money that, like, I hoped

13   to, like, bonus to my employees, and now I'm giving

14   it to PR firms.  That was a lot.  And that might not

15   seem like a lot to someone on this phone or anyone

16   off it, but that was a lot.

17   Q.       Okay.

18            Do you have -- well, strike that.

19            Do you have any knowledge of the fee

20   reduction that the trial court made in the Sprint

21   derivative case?

22   A.       I do.

23   Q.       And do you know approximately how much was

24   requested as part of the proposed settlement?

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36
848

PATRICIA WEISER

59

1   A.      I do.

2           I recall the fee was going to be four or

3   four-and-a-half million, in that range, and then it

4   was reduced to 400,000 or 450,000, in that range.

5   Q.      And that reduction or Order by the Court,

6   that occurred prior to The Weiser Law Firm's

7   discovery that Jeffrey Silo was disbarred, correct?

8   A.      I don't recall.

9           I -- all -- all I recall is that

10  Mr. Hartleib was involved in an objection.  I do not

11  recall exactly when the disbarment came out in

12  relation to when the fee was reduced.  Yeah.

13  Q.      The --

14  A.      There was also an appeal, so, like, I'm not

15  sure which level of -- of court you're talking

16  about, but I'm assuming you're talking about the

17  lower court.

18          But as I recall, there was an appeal, and

19  it was dealt with at a higher level as well.  And I

20  just don't remember where the disbarment came in the

21  course of that litigation.

22  Q.      The fee award that was made in the Sprint

23  case, was that an award that The Weiser Law Firm

24  disbursed to other counsel?

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36

849

PATRICIA WEISER

60

1    A.        As I recall, we were the -- what do you

2    call it -- we were holding the fee, and we would be

3    responsible for distributing it to the firm.  We did

4    not take a single penny in fee from the fee that was

5    awarded.

6            After all the intensely, stressful

7    fighting, let's say, and I'll call it harassment

8    that went on about Mr. Silo's hours and accusations

9    by Mr. Hartleib, completely unfounded, that somehow

10   we knew about it and had orchestrated it.

11           We were extremely embarrassed to have

12   played any part in our colleague's having to go

13   through that and having to -- having to go through

14   that.  It was -- it was awful.  I mean, these are

15   our -- these are our colleagues in our business, in

16   our careers, and you never want to expose your

17   colleagues and your business to embarrassment,

18   public humiliation or anything that questions their

19   integrity.

20           And, when that happened, we told them we

21   wouldn't take a penny.  I -- I mean, it was -- it

22   wasn't a great gift since the fee went from

23   4,000,000 to 400,000, but we weren't going to take a

24   penny of it.  We were going to let them have it all,

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36

850

PATRICIA WEISER

61

1    whatever was left.  So, yes, I --I administratively

2    took care of the distribution of those funds.

3            Eventually, again, as I recall it went on

4    appeal and it took a long time before we were able

5    to distribute, but at the direction of Rob, who had

6    had those discussions with the co-counsel in that

7    case about how the funds would be distributed, the

8    fees -- the expenses, as I recall were distributed

9    earlier than that because they just -- expenses were

10   what they were, but the fees after Rob's discussions

11   with his co-counsel and colleagues, numbers were

12   arrived at.

13           I administratively filled out my

14   distribution form, Rob okayed it, and payments were

15   made to the other firms in the case per the

16   agreement amongst those counsel.  I have no memory

17   of the allocations or the numbers other than we were

18   weren't part of it.

19   Q.      Did Rob ever express any concerns that the

20   fee reduction would have an impact on the firm's

21   reputation?

22   A.      Yes, everyone did.

23   Q.      Did you ever read the trial court's

24   memorandum that accompanied the Order reducing the

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36

851

PATRICIA WEISER

62

1    attorney-fee award?

2    A.       I don't recall.  I just don't recall.  I --

3    I -- I don't recall if I did or not.  It would seem

4    unlikely that I wouldn't, but I cannot recall.

5    Q.       Did you communicate with any of the PR

6    firms that The Weiser Law Firm retained?

7    A.       I don't recall communicating with them.

8             I -- I administratively took care of the

9    retainer agreements, and if there were contracts, I

10   don't -- if there were contracts to sign, like,

11   that's what I would do, and then Rob took care of

12   the -- any interaction that happened thereafter.

13            He may have -- he may have informed me

14   about it or I'm sure we talked about it, but I was

15   not involved in it, that I recall.

16                    MR. ROSENZWEIG:  Mr. Mott?

17                    MR. MOTT:  Yes.

18                    MR. ROSENZWEIG:  I just want you

19            to be thinking about a five-minute break

20            sometime as -- when it's logical for you,

21            and then also I want you to be thinking

22            about a slightly longer break as we come up

23            to noon, and it could be, you know,

24            something like 1:00, so that people have a

PATRICIA WEISER

                                                                    63

1            chance to eat something.

2                    MR. MOTT:  Yeah, absolutely.

3                    Why don't we -- we can go ahead

4            and do the five now.

5                    VIDEO SPECIALIST:  11:51, off

6            video.

7                    (At this time, a short break was

8            taken.)

9                    VIDEO SPECIALIST:  12:08, on

10           video.

11   BY MR. MOTT:

12   Q.      Ms. Weiser, where are you currently

13   located?

14   A.      I'm currently located in Stone Harbor,

15   New Jersey.

16   Q.      Is that a residence?

17   A.      Yes.

18   Q.      And what is the address for your current

19   location?

20                   MR. ROSENZWEIG:  I'm going to

21           object to that question.

22                   What's its relevance, Mr. Mott?

23                   MR. MOTT:  Where she's -- her

24           location during today's Zoom deposition

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36

PATRICIA WEISER

64

1          isn't relevant?

2                    MR. ROSENZWEIG:  Yeah, how is it

3          relevant?

4                    MR. MOTT:   Okay.

5    BY MR. MOTT:

6    Q.      Is it your residence, Ms. Weiser?

7    A.      Mine and Robert's, yes.

8    Q.      Okay.

9            Do you have a residence in Pennsylvania

10   near the firm's office?

11                   MR. ROSENZWEIG:  Objection as to

12          form.

13                   MR. MOTT:  All right.

14                   Strike that.

15   BY MR. MOTT:

16   Q.      Do you have a residence in Pennsylvania?

17   A.      I do.

18   Q.      And what town is that in?

19   A.      Villanova.

20   Q.      And does Mr. Weiser also live there?

21   A.      Yes.  Yeah, we own the house together in

22   Villanova, and we live there together with our kids

23   and many dogs.

24   Q.      Since the time when you married Mr. Weiser,

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36
854

PATRICIA WEISER

65

1    have you always resided together?

2    A.        Yes.

3    Q.        Have there been any extended periods of

4    separation?

5    A.        No.

6              He was on vacation with my oldest daughter

7    for a week, that was about the longest we've been

8    apart from each other, this year.

9    Q.        In your role with The Weiser Law Firm,

10   are -- are you familiar with the firm's year-to-year

11   financial performance?

12   A.        Sure.

13             I mean, I'm involved with the accountant,

14   the bookkeeper and Rob, and we -- it's something we

15   discuss regularly.  It's not something I have on the

16   tip of my tongue as I sit here now because it's all,

17   you know, in the computer, but, yeah, of course.

18   Q.        Comparing the years of 2017 and 2018, do

19   you know whether the firm revenues increased or

20   changed at all from 2017 to 2018 -- through 2018?

21   A.        I can tell you that the firm experienced

22   year-over-year growth up until the year the Sprint

23   fee was reduced.

24             I have a specific memory of this because

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36

855

PATRICIA WEISER

66

1    my book -- Cheryl and I, our bookkeeper, talked

2    about a new budgeting process that we were planning

3    going forward.

4              We got one fee in before the Sprint thing

5    happened, as I recall, and -- and then -- and

6    then -- then everything kind of dried up.

7              It -- we never actually implemented our

8    budget plan.  Like I was so excited to have it, and

9    then we didn't get to implement it because from

10   Sprint and everything that happened thereafter.

11             We've been struggling for five years with

12   the cost, the extreme cost of dealing with

13   Mr. Hartleib's incessant harassment and assaults in

14   public, and the stress that's put on our firm and

15   our personal relationships.  Like, yeah, the

16   revenues have gone down since then, and it's -- it's

17   been tough.

18   Q.        And when you say everything dried up, are

19   you referring to all revenues or something else?

20   A.        No, no.

21             And I'll -- I'll take that back that

22   everything dried up.  I'll say that when we

23   budget -- our budgets are very short term, so year

24   to year, with the exception of the qui tam cases,

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36

856

PATRICIA WEISER

67

1    which take a lot longer, sometimes

2    seven-to-ten-or-longer years -- so they don't appear

3    on our budget until something is -- is a certain --

4    it's coming in, it doesn't end up on our budgeting.

5    We're very conservative in that way.

6            So when the Sprint-fee reduction happened,

7    that was a big hit to the budgeting we had done.

8    And when the information -- when Mr. Hartleib

9    started all the -- the public harassment with

10   respect to Mr. Hart -- the Silo issue and then just

11   attacked on Rob personally in court, it made for a

12   lot of uncertainty in our budgeting going forward.

13           It felt -- like I will say that the

14   Hartleib curse came into effect that year, is how I

15   thought of it, and that it's felt that time after

16   time -- things that had never happened before.

17   We've never had a fee cut.  Rob had never had a fee

18   cut in his career until Sprint.  It -- it made for a

19   lot of uncertainty.

20           So the actual revenues of the firm went

21   down year over year, and then our ability to grow

22   the business knowing that Mr. Hartleib was going to

23   be possibly in every court that we went into was

24   very difficult.

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36

857

PATRICIA WEISER

68

1           And, in fact, the business -- the

2    derivative cases especially declined year over year

3    thereafter, causing us to sell assets, both personal

4    and business and let several valued employees and

5    good friends go.

6           It was awful.  It was really awful.

7           And I thought it would be a year.  Like

8    when it happened, I was, like, okay, we'll have a

9    tough year, that's fine, we can handle a tough year.

10   And then when you look back and you realize it's

11   been five, it's really been hard.  It's not -- you

12   can't run a business this way.

13          You can't run a business in our field where

14   your reputation is why people want to work with you,

15   is why clients want to hire you, when you have all

16   this going on.  It's -- it's not -- it's not

17   feasible.  It's not possible, certainly incredibly

18   stressful.

19          I never thought it would last this long,

20   but it's been year over year and very, very

21   difficult financially and emotionally.

22   Q.      You referenced earlier about a decrease in

23   derivatives.

24          Were you referring to a decrease in the

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36

PATRICIA WEISER

69

1    number of cases or just revenue generally or a

2    mixture of the two?

3            If you could just explain that a little

4    bit.

5    A.       Sure.  Sure.

6            So, just to be clear, we have had different

7    departments in our firm over the years.

8            So, again, I did the M&A, that's my

9    department.  Rob does the derivative cases, which is

10   totally different, not class actions.  And then the

11   qui tam is a third separate.  Over time the

12   shareholder actions are kind of what we do.  Some

13   other types of shareholder class actions, 10(b) and

14   Section 11.

15           Mr. Nelson is -- is particularly

16   specialized in those areas.  We don't do a lot of

17   them.  In fact, I don't know if we have any going

18   right now, but I would put -- I would put the bulk

19   of our business into two categories now, which is

20   shareholder litigation and qui tam.

21           It became increasingly apparent that we

22   could not pursue derivative litigation, according to

23   our prior business model, because we couldn't go

24   into court seeking to be lead counsel, seeking to

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36
859

PATRICIA WEISER

70

1   get control of the cases, seeking to continue to

2   litigate cases and then resolve them and ultimately

3   get settlements approved with Mr. Hartleib always

4   there.

5            There were several instances where we were

6   moving for lead counsel -- or, I think, even in one

7   that we were lead counsel, where the Court

8   ultimately decided all things being equal, if you

9   have this shit going on and this person's going to

10  come into your litigation, we're going to choose

11  someone else to be lead counsel.  Like he -- like

12  the judge didn't want to even get into it.

13           Like if we have all this Hartleib nonsense,

14  true or untrue, you know, it -- it would be better

15  off for the class to not have you as lead counsel.

16           One of the cases -- and, again, I think we

17  were actually lead counsel, and Mr. Hartleib came in

18  and spouted all the usual lies and just awful, just

19  awful attacks on my husband and business partner and

20  our firm, and the judge removed us as lead counsel,

21  and for no reason other than that, and the case went

22  on to settle for a ten-million-dollar fee.

23           So I can tell you that a case that we were

24  lead counsel in earned a ten-million-dollar fee, and

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36

PATRICIA WEISER

71

1    we were removed from the case because of

2    Mr. Hartleib.

3            So, the -- you know, it's -- it's -- the

4    cases we had pending in 2017 are what they are, the

5    number is what it is.  How they resolved was

6    different once Mr. Hartleib started appearing in

7    court.

8            Everything was -- everything took more time

9    and more money to pursue, and year over year

10   revenues declined with respect to the derivative

11   litigation, which includes both not having fees

12   approved in full, not getting lead counsel

13   positions, and ultimately wondering if we could

14   continue with that -- those lines of cases at all if

15   he was going to be out there waiting to disparage us

16   and our reputation publically in the courts.

17   Q.      Do you know the name of the case where the

18   judge removed the firm as lead counsel?

19   A.      The shorter answer is I don't off the top

20   of my head, but the name that's in my head, and I'm

21   not sure if this is the case, but Equifax was one

22   case.  I remember it being in Georgia.

23           I don't know why I remember it being in

24   Georgia because I kind of -- I remember it being in

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36

PATRICIA WEISER

72

1    Georgia for some reason, maybe it was who was

2    involved in the case.  And I really -- I distinctly

3    remember finding how much the case settled for after

4    we left.

5           And, to be clear, you know, we didn't leave

6    kicking and screaming.  The -- the folks that

7    were -- the folks who were working in the case are

8    our colleagues, our business colleagues,

9    longstanding, who we respect, and they respect us.

10   We didn't want to bring all this -- all this

11   ugliness onto them and the case.  So we backed out

12   quietly, like we just stepped back, never received a

13   penny, didn't get any of our expenses back.

14          You know, I have no desire to make this

15   business any more difficult for any of our collogues

16   or clients than it already is.

17          And -- and with Mr. Hartleib always right

18   behind us waiting to -- to submit churlish amicus

19   briefs, which I believe he did in that case in

20   Georgia, totally un -- well, I mean, like, it was

21   totally inappropriate.  You have no standing to

22   submit an amicus brief, but he did, and then our

23   livelihood was -- was -- our livelihood was -- was

24   damaged that day and many others.

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36
862

PATRICIA WEISER

73

1          I -- I don't know what axe he has to grind

2     against my husband or my firm.  We are good people,

3     upstanding citizens and attorneys.  We respect the

4     law.  We respect the truth.  And -- and to deal with

5     all the lies and have them impact our ability to run

6     our firm, support our families, is -- is -- is the

7     hardest thing we've ever had to deal with.  I had to

8     fire people I loved.  I loved my people that worked

9     for me.

10          Brett Stecker is, like, family to me, and I

11     sold a car to be able to pay him.  To keep him I

12     sold a couple cars.  Like I'm personally selling my

13     assets to keep my people who are spending their time

14     not making money for the firm, but defending

15     themselves against Mr. Hartleib's lies.  And, like,

16     should a person sell their assets to support their

17     employees?  Probably not.  That's not good business.

18          I care about these people, and we had to

19     let them go because we can't afford to pay their

20     salaries.  Because not only has the money that was

21     supposed to come in not come in, but now our ability

22     to generate income has been severely hard.

23          And the guys that work for me now, all this

24     money I'm spending on Mr. Rosenzweig --

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36

PATRICIA WEISER

74

1              THE WITNESS:  No offense, Phil.

2     A.        -- that should be going to my people, that

3     should be going to Chris and Jimmy.

4              They are working hard for this firm to go

5     after fraud and corporate America, which there is a

6     ton, always is, and always will be -- they're

7     excellent lawyers.  They are honest lawyers with

8     great integrity, and they should be getting the

9     money I have to spend on these lawyers.

10             I'm not getting paid.  I mean, come on,

11    this is outrageous.

12             So, yeah, year over year revenues went down

13    as a direct result of Mr. Hartleib's attacks on us.

14    And it lasted a long time, a lot longer than I

15    thought it would.

16    Q.        So there were year-over-year decreases in

17    revenue until what time period or what year?

18    A.        So, again, like, this isn't the bottom line

19    number that's on a tax return, this is our ability

20    to build an inventory and generate revenues going

21    forward.  So if I can't file -- so if we file 20

22    cases a year, and I'm pulling that number out of the

23    air, those cases -- a percentage of those cases will

24    work out and will pay off in two to five years.

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36
864

PATRICIA WEISER

75

```
 1           If I can't file cases or I choose not to
 2    file cases because I -- I don't know where I would
 3    file them without being attacked.
 4           If we don't file those cases and get those
 5    going, that produces a lag, a glut of revenues in
 6    two to five years.  So whether our -- our revenues
 7    went down from '17 to '18, if that's when Sprint
 8    happened because of Sprint.
 9           And, then again, what I'll call, like, the
10    Hartleib curse, like our luck got bad after that.
11    And -- and I'll say our luck got bad, but what I
12    could also say is that Mr. Hartleib's taunting and
13    lies and -- and attacks in public, like, affected
14    judges and our colleagues and their willingness or
15    ability to work with us and/or approve our -- our
16    cases, our settlements.
17           And, like, the details of the cases you'll
18    have to ask Rob and the people that worked on them
19    because I don't have those because I wasn't working
20    on the cases.  All I was doing was sitting in the
21    back trying to budget for future years.  Really,
22    really difficult to do, really difficult to do when
23    everything's a question mark after Sprint.
24    Q.     And for the matter that had the $10,000
```

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36

PATRICIA WEISER

76

1    settlement --

2                         MR. ROSENZWEIG:  10,000,000.

3                         THE WITNESS:  $10,000?

4                         MR. ROSENZWEIG:  10,000,000.

5                         MR. MOTT:  I'm sorry.

6                         My -- my mistake.  My mistake.

7              Let me --

8    BY MR. MOTT:

9    Q.       The matter that resolved for 10,000,000,

10   was that a case where the firm was already appointed

11   lead counsel?

12   A.       So, first of all, the case didn't settle

13   for $10,000,000.  I forget what the case settled

14   for.  The 10,000,000 was to attorneys' fees that

15   were approved, so the case was multiples greater

16   than that.  The value of the case was multiples

17   greater than 10,000,000 if the fee approved was 10.

18             My recollection is that we were appointed

19   lead counsel and it was taken away from us.  There's

20   another situation I'm thinking of, and I could be

21   confusing the two, where we were moving for lead

22   counsel and were not appointed because all things

23   being equal we had Hartleib attached to us.

24   Q.       And how do you know the -- the reason or

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36

PATRICIA WEISER

77

1   reasons for the judge's decision to either remove

2   The Weiser Law Firm as lead counsel or to deny their

3   appointment as lead counsel?

4   A.        Well, in the case where we were removed as

5   lead counsel we were removed after Mr. Hartleib

6   inserted himself improperly into the litigation so

7   that he could spout all the heinous accusations

8   about my husband and our firm, and then the Court

9   removed us as lead counsel not finding that any of

10  it was true, but that all things being equal this

11  mess should not be at the top of a leadership

12  structure of a case, and he's right, like this mess

13  can't be in a leadership structure.

14        It's -- it's -- I mean, it just casts a

15  pall on everything.  And all of it's untrue.  So,

16  like, even -- like even when all of it's untrue, you

17  cannot effectively lead with all that dragging you

18  down.  We know this, judges know this, and that's my

19  understanding of what the judge said in that case,

20  was that, you know, we just can't have this mess, so

21  we're going to appoint someone else.

22        I -- I am aware of no other reason given by

23  the Court to remove us as lead counsel other than

24  Mr. Hartleib's awful attacks.

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36

PATRICIA WEISER

78

1    Q.        You mentioned firm assets that were sold as

2    a result of the financial performance or the

3    year-over-year decreases in revenue?

4    A.        Yeah.

5    Q.        What assets were sold?

6    A.        So I'm going to correct that because it's

7    actually not a firm asset.  There's a -- a separate

8    entity called High Trees & Holdings that owned the

9    building.  Rob and I owned High Trees & Holdings,

10   and so the building that the law firm leased its

11   office space from was owned by us, and at some

12   point that -- this was an investment, a personal

13   investment of our own that we intended to, like,

14   live off of into our old age, and we had to sell it.

15   I had to modify it to be able to support us and our

16   firm.

17            So, to be clear, like the -- I -- when we

18   sold the building we had to change -- we had to

19   change banks a couple times.  And in order to secure

20   a line of credit we sold the building, and I used

21   the cash proceeds from the building to secure a line

22   of credit so that we could keep running the firm.

23   Q.        And what was the --

24   A.        Then from that point on -- now, we

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36

868

PATRICIA WEISER

79

1    personally are not receiving the rent that flows

2    through that -- that -- throughout this whole period

3    of time Rob and I didn't receive -- I believe we

4    didn't receive any -- any income from the firm.

5              I don't remember us paying ourselves,

6    frankly.  I mean, we -- we had to not pay some of

7    our employees a couple of times because we couldn't

8    make payroll.  So in order to -- the -- the -- the

9    building was supporting Rob and I and our family

10   during this mess.

11             When we sold the building we needed to use

12   the cash as collateral for a line of credit to keep

13   the business running.  It made for a very, very

14   stressful financial time personally, and the

15   business.

16   Q.      What was the address for the building?

17   A.      22 Cassatt Avenue, that was in Berwyn,

18   Pennsylvania.  I don't recall the ZIP code though.

19   Q.      And, approximately, how long did you own

20   it?

21   A.      Um, about --

22                  MR. ROSENZWEIG:  Just objection

23            as to form in terms of the you.

24                  She's already testified --

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36
869

PATRICIA WEISER

80

1                    THE WITNESS:  Right.

2                    MR. ROSENZWEIG:  -- it was

3           High Trees & Holdings that owned it.  I

4           object to that.

5                    Please proceed.

6                    THE WITNESS:  Thanks, Phil.

7    BY MR. MOTT:

8    Q.      With that understanding, how long did

9    High Trees own the building?

10   A.      About ten years.  I think it was 2010 or

11   '11 that we bought it.

12   Q.      And do you know the approximate date that

13   it was sold or -- strike that.

14           Do you know the approximate date that you

15   reached a sales agreement for the building?

16   A.      I'm just going -- I -- I don't know how to

17   answer that question.  Like I said, there wasn't --

18   I don't know if there was a sales agreement, like

19   the terminology is tripping me a little bit there.

20   Q.      Okay.

21           I -- I can be a little bit --

22   A.      Okay.

23   Q.      -- more general.

24           When did High Trees then cease to own the

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36
870

PATRICIA WEISER

81

1    building?

2    A.        I -- I believe it was December of 2020.

3             2020 or 2021.

4             I'm sorry, like things that happened over

5    the pandemic make things very -- it's '20 or '21, I

6    think.  It was shutdown.

7             I feel like it was 2020.  One or the other.

8                      MR. ROSENZWEIG:  I believe --

9    BY MR. MOTT:

10   Q.       Sometime --

11                     MR. ROSENZWEIG:  -- was 2020.

12                     I believe it was 2020.

13                     THE WITNESS:  Okay.

14                     Yeah, the law firm couldn't pay

15            its rent.  We had to get rid of it.  We had

16            to sell the building.

17   BY MR. MOTT:

18   Q.       Did High Trees have any other tenants in

19   that building during its course of ownership other

20   than the law firm?

21   A.       Yes.

22            It was a 12,000-square foot building.  The

23   Weiser Law Firm occupied half, and we had -- when we

24   first bought the building there were three tenants.

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36

PATRICIA WEISER

82

1              One of those tenants in the small space

2      moved out at some point over the course of that

3      decade and another kind of -- two became one.   So

4      someone had two floors, and the third floor was --

5      was vacant for some period of time at the end.

6      Q.       Approximately how long was it vacant for?

7      A.       What was vacant for, the third floor?

8      Q.       At the end, that period that you were

9      talking about.

10     A.       So the third floor was the smallest space,

11     and then the first and second were -- were occupied

12     by one tenant.  And the third-floor space was -- it

13     was tiny, like maybe 1,000 -- 1,000 to 1,500 square

14     feet.

15             We were going to occupy it, and then COVID

16     hit, and you were weren't allowed to use the

17     building for a little while, I guess.  We were all

18     working remotely.  I don't recall.  I just don't

19     recall how long it was vacant.

20             We had several people interested in moving

21     in, and there was, like, always something going on

22     trying to figure out how to best use that space, but

23     it was small.  A couple years.  I'd be guessing.

24             Ah, I shouldn't guess.  Sorry.

PATRICIA WEISER

83

1          I don't know.

2     Q.        Under the last lease term that the law firm

3     had at that location, how much did they pay per

4     month in rent, if you know?

5     A.        I don't remember.

6               Again, it's in a document somewhere.   I

7     just don't remember.

8     Q.        And who was the property sold to?

9     A.        The exact entity I don't remember the name

10    of.

11    Q.        Okay.

12    A.        They were all, like, LLCs, and I -- I don't

13    remember.

14    Q.        And you also mentioned the sales of

15    personal assets, and there was -- you referenced a

16    car.

17              What kind of car was it?

18    A.        I sold three cars in the year preceding

19    letting Brett and other employees go.

20              Rob and I had some investments in cars, so

21    these were, like, cars that actually went up in

22    value from the time we bought them.   These were not,

23    like, daily driver things.

24              So I had a Limited Edition Porsche.   I'm

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36

PATRICIA WEISER

84

1    trying to remember the year.  2011, I think it was.

2    It was a Limited Edition, there were only 356 of

3    them made.

4          It was a 356 remake of the old one, the

5    old/original.  I sold that.  I sold -- we sold an

6    Aston Martin.  We sold -- we sold a Ferrari.  I

7    don't remember the make and model of that.  That was

8    a -- that was a new -- a new one, like only a couple

9    years old.  Well, not a couple years old, it was

10   more than a couple years old.

11         These are all things that were purchased

12   when the firm was doing very well, and when the firm

13   hit these tough times it didn't make sense to keep

14   them, we needed the money to live on, so I sold

15   them.  We sold them.

16   Q.       Any other personal assets that you've sold?

17   A.       I'm trying to remember.

18         I remember specifically kind of coming to a

19   moment in time where I just wanted to sell

20   everything.  I wanted to close the law firm and just

21   sell everything and just make life simple again and

22   just, you know, not having Mr. Hartleib like and all

23   this stuff in my life.  And so -- so the cars are

24   the things I specifically remember selling, but I --

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36

PATRICIA WEISER

85

1    I generally went through a multiyear process of

2    really tightening up, cutting out any unnecessary

3    expense anywhere.

4            It was a -- it was a long process, a long

5    thoughtful process to limit our expenses as much as

6    possible because I did not know how long this was

7    going to last and how long I was going to have to

8    come up for ways to pay for this litigation and to

9    defend ourselves in courts across the country

10   against Mr. Hartleib's accusations.

11   Q.       So outside of cutting expenses, I just want

12   to ask if there is any other personal assets of high

13   value or notable value that you sold as a result of

14   decreasing revenues?

15   A.       I'm not thinking of any as I sit here right

16   now.  Not to say that there aren't any, but I just

17   can't -- I mean, there are lines of credit that have

18   been tapped the last five years, like that -- you

19   know, like I -- so we -- we look to lines of credit,

20   yeah.  Yeah, and so they're tapped.

21           I can't think of any other assets that

22   we've sold that are of material value like the cars

23   were.

24   Q.       For the three vehicles that you listed, you

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36

875

PATRICIA WEISER

86

1    mentioned that there was an increase in value.

2              Did all three vehicles experience an

3    increase in value in relation to your purchase

4    price?

5    A.        No, they didn't.  No, they didn't.

6              The Porsche was the one I was thinking of,

7    and I think I sold that for about what I bought it

8    for, notwithstanding the fact that I had driven it

9    for, you know, almost ten years because it increased

10   in value from the time I bought it until we sold it.

11   So there was an increase in value, but not a

12   corresponding profit, if you will.

13             The -- I -- I -- I mean, car values change.

14   They -- they kind of change over time.  They go

15   higher and lower, and you try to sell them at the

16   right time.  I -- I believe the other two were sold

17   for less than what we bought them for, but I -- I

18   needed to sell them.  I needed to sell them.

19   Q.        Okay.

20             Did Archita Patel receive any kind of

21   severance following her termination --

22   A.        No.

23   Q.        -- or as a result of her termination, I

24   should say?

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36

876

PATRICIA WEISER

87

1   A.        No, not that I recall.  Not that I recall.

2   Q.        Does the law firm have a retention policy

3   for the employee handbook and prior versions of any

4   employee handbook?

5   A.        No policy.

6   Q.        Okay.

7   A.        I mean, we're a small mom-and-pop shop.  We

8   try to keep it simple, so, no, no policy.

9   Q.        In your role with the firm, do you

10  currently have any oversight of the firm's website?

11  A.        So I -- sure.

12            I have -- I retained the company that

13  maintains it.  So if anybody needs anything I would

14  be -- I guess I would be the person to connect with

15  them to change it.  I'll be honest, I haven't looked

16  at the website in a while.

17            The -- there used to be more activity on

18  the website in terms of if we have to post a notice

19  or -- like, you know, courts require you to post

20  notices in connection with settlements, and I can't

21  remember that happening for a while now, otherwise

22  it's just the attorneys' bios, contact information,

23  information about our various practices, I think.

24  It's been a while since I worked on it.

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36
877

PATRICIA WEISER

88

1          We did -- we did do an upgrade of it years

2     ago, not too long ago, but I haven't really thought

3     about it much since.

4          So, yeah, I -- I'm -- I am the person you

5     would -- if someone had an issue with the website I

6     would be the one to reach out to the contractor and

7     fix it.

8     Q.     And what's the name of the current

9     contractor that you use?

10    A.     I can't remember.  It's literally been

11    years since I've had to deal with them.  I pay some

12    monthly fee for them to do what they do with the

13    website, but I -- honestly, I -- I just don't

14    remember off the top of my head as we sit here

15    today.

16    Q.     Yeah.

17          I don't remember, I don't recall is

18    perfectly acceptable.

19    A.     Yeah.

20    Q.     If -- do you know whether the current

21    contractor -- well, strike that.

22          Do you know approximately how long you've

23    used the current contractor to maintain your

24    website?

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36
878

PATRICIA WEISER

89

1   A.        Approximately, a couple years.

2             We had someone else prior to that who just

3   lives too far away.  It just became impractical.

4   And he -- he does a lot of different things, so we

5   got someone local who can upgrade and update the

6   site.  And we did that, I want to say, within the

7   last year or two.  So I found them, did that, the

8   website went live, and I haven't thought about it

9   much since.

10  Q.        Do you know which contractor The Weiser

11  Firm [sic] would have used in 2016 to maintain its

12  website?

13  A.        In 2016?

14            No, I don't.  Over the course of the life

15  of the firm -- you're talking about content of the

16  website?

17            Do you mean content or do you mean --

18  Q.        Whatever vendor would be used to update

19  or -- or change the -- the website during that time

20  period?

21  A.        The website content?

22            I had an individual independent contractor

23  who did work for us on ad hoc basis for a long time.

24  I would have -- I would have no -- I have no memory

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36

PATRICIA WEISER

90

1    of whether he did work for us in 2016.  I don't -- I

2    don't remember.

3            And then we probably had someone before

4    him, and I don't remember -- yeah, I just don't

5    remember, too many contractors ago.

6            2016?

7            No, I just don't remember.

8    Q.      Was --

9    A.      It would -- it would have been my

10   responsibility to be dealing with that contractor,

11   whoever that was, but I just don't remember in 2016

12   who that was.

13   Q.      That's fine.

14           Did Jeffrey Silo ever have a bio or a

15   profile on The Weiser Law Firm website?

16   A.      Not, not that I'm aware of, no.

17           He was never an employee, no.

18   Q.      Do you know if any attorney contracted by

19   The Weiser Law Firm has ever had a bio or a profile

20   on the firm's website?

21   A.      I am -- I am fairly certain that only W-2

22   employees of the law firm have ever had a bio on the

23   website, so no contractors to my recollection as I

24   sit here today.

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36
880

PATRICIA WEISER

91

1    Q.        When was the -- well, when was the last

2    time The Weiser Law Firm hired an attorney as an

3    employee?

4    A.        I'm going to -- I'd be guessing.  It's one

5    of two people.  I don't know who came first.

6    Q.        What two people are you referring to?

7    A.        So John Gross is a current employee of the

8    firm.

9              You're saying any employees or

10   attorney/employees?

11   Q.        Attorney/employees.

12   A.        So John Gross and Ross Wolf (ph) would have

13   been the last two hires as I -- if I'm recalling

14   correctly.  Who came first, I'm not sure.  And Ross

15   worked for us twice.

16             Like he worked for us, and then he --

17   then -- I think we let him go, and then he came

18   back, and then he left on his own accord in the last

19   couple of years.  So it's either Ross Wolf or John

20   Gross.

21   Q.        For either of those two hires, would you

22   have been involved in the interview process?

23   A.        The interview process, no, I would have

24   been involved in the paperwork process, any

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36
881

PATRICIA WEISER

92

1    paperwork associated with hiring, I -- no, not in

2    the interview process, no.

3    Q.        Currently, does The Weiser Law Firm have

4    any written policies regarding maintaining active

5    bar registration and CLE compliance?

6    A.        A policy, no, a practice, sure.

7    Q.        What are the current practices of

8    The Weiser Law Firm regarding the maintaining of

9    active bar registration and CLE compliance?

10   A.        So, current, today, everyone's responsible

11   for keeping their bar, and registrations and CLEs

12   up-to-date and reporting them to me annually so that

13   I can check with the -- PACKAL (ph), to make sure

14   everyone is compliant.

15            Years ago I -- I was not directly

16   responsible for that years ago.  Our paralegals used

17   to track that just mostly to make sure the guys were

18   up-to-date on their CLEs, and we never had a

19   problem.

20   Q.        Would the -- well, strike that.

21            Does the law firm cover the cost of annual

22   registration for the Pennsylvania Bar?

23   A.        Yes.

24   Q.        Do you know if it's ever done so for a

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36

882

PATRICIA WEISER

93

1    contracted attorney such as Jeffrey Silo?

2    A.      No.

3    Q.      Would there -- strike that.

4            Was there any policy for confirming or

5    tracking the bar status or CLE compliance of

6    contract attorneys that the firm engages?

7    A.      When?

8    Q.      Prior to February of 2017.

9    A.      I'm sorry.

10           Can you just ask the question again?

11   Q.      Sure.

12           Prior to February of 2017 did the firm have

13   any policies regarding the -- maintaining the active

14   registration of contract attorneys or confirming the

15   CLE compliance of contract attorneys?

16   A.      No policy, no formal policy.

17           In practice, the only people we have ever

18   hired as independent contractor attorneys we have

19   either hired through Ableson, who, as part of their

20   service, their contracting service does that, or at

21   least represents that they do that.

22           The only other people we have hired to work

23   as independent contractors are attorneys that we

24   personally know, that we have worked with in the

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36
883

PATRICIA WEISER

94

1    past, such as Ms. Goodman.

2            And it's -- it's been so long since we've

3    contracted with anyone, I -- I -- it's a rare thing

4    that we contract, but prior to 2017 I think it was

5    through Ableson, and they were -- we asked them --

6    you know, we would ask them to provide us with an

7    attorney for document review, and it was part of

8    their checklist of things that they would take care

9    of, and that's why we hire them to do it, so that we

10   didn't have to.

11           After the Silo disbarment news, like I had

12   mentioned earlier, we retained a third-party

13   contractor to do background searches for anyone that

14   worked at the firm.  And then attorneys of which

15   there are only a few now, either a paralegal or

16   myself checked that on an annual basis.  Everybody's

17   in a different group.

18           I don't know how it works for you, but you

19   have a compliance period.

20           And, again, there's only five of us now, so

21   it's pretty easy to keep on track.

22   Q.      I just placed on the screen Page 10 of the

23   First Amended Complaint.

24           Are you able to see that?

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36

884

PATRICIA WEISER

95

1   A.      Yeah.

2           If you can make it bigger it would be

3   great, but I could probably go find a pair of

4   glasses.

5   Q.      I can zoom in.

6   A.      Thank you very much.

7           That's great.  I can see it.

8   Q.      Okay.

9           So I zoomed in towards Paragraph 59 --

10  A.      Okay.

11  Q.      -- where it states that Jeffrey M. Silo was

12  hired by the law firm as a contract attorney on

13  several occasions between 2008 and 2017 for purposes

14  of performing document-review work.  He was

15  initially sourced through Philadelphia Based Legal

16  Search & Placement Firm Abelson Legal Search, with

17  which the law firm had contracted.

18          Did I read that correctly?

19  A.      You did.

20  Q.      Okay.

21          So the law firm initially utilized Abelson

22  Legal Search to vet Jeffrey Silo, correct?

23  A.      That's what it says, yes.

24  Q.      Okay.

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36
885

PATRICIA WEISER

96

1          And on the subsequent occasions when the

2     law firm engaged Jeffrey Silo, did it utilize

3     Abelson Legal Search?

4     A.     I don't know.

5               MR. ROSENZWEIG:  I'm going to

6          object to the form, but go ahead, Pat.

7               THE WITNESS:  Yeah, I -- I don't

8          know.

9               When -- when -- so, again,

10         separating my administrative role from Rob

11         and other attorneys' substantive role in

12         hiring people, I don't know who decided to

13         use Ableson, whether it was me, Rob or

14         someone else.

15              I mean, they're well-known, but

16         the idea is you would hired them to do the

17         legwork because we don't have the resources

18         to do that, and that's -- so that's where

19         we got him at first.

20              I don't know how -- I know we

21         paid Ableson for his work -- I mean, we

22         paid Ableson, not Silo.

23              I remember throughout the course

24         of this litigation seeing documents that

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36

886

PATRICIA WEISER

97

1              reflected payments to Ableson for some

2              period of time, and I don't remember how

3              long that time was.  And then at some point

4              down the road -- that's a long period of

5              time, 2000 -- what were the dates again,

6              2000 --

7    BY MR. MOTT:

8    Q.        2008 through 2017 --

9    A.        So almost ten years.

10   Q.        -- is the range.

11   A.        I don't know how many of those years we

12   paid Ableson directly for him or when we paid him

13   directly, that's not something I would have been

14   involved in.  I would have been involved in paying,

15   like making sure whoever was supposed to get paid

16   got paid.

17   Q.        I'm sorry.

18   A.        No.

19             I just generally understand that he worked

20   through Ableson for a period of time, and -- and it

21   wasn't -- he didn't work for us the entire -- he

22   didn't work for us in 2007 or 2000 -- that whole

23   time period he did not work for us, like,

24   consistently.  It was for specific cases here and

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36
887

PATRICIA WEISER

98

1    there, and I don't know which ones we got -- we --

2    when we -- I just don't know when we used him

3    through Ableson or not.

4    Q.        There were some years where Jeffrey Silo

5    was paid directly by The Weiser Law Firm?

6    A.        I believe so.

7    Q.        Okay.

8              And --

9    A.        As an independent contractor, as a 1099

10   independent contractor, not as an employee.

11   Q.        Understood.

12             And on those occasions when Jeffrey Silo

13   was paid directly by The Weiser Law Firm, do you

14   know if the firm had any policy to confirm his

15   active bar status and annual registration and annual

16   CLE compliance?

17   A.        No, we didn't.

18             Now poo on us, we assumed that it was

19   accurate from the time he came to us through Ableson

20   and -- yeah.  Yeah, no, we did not have a policy.

21   After all this happened we instituted one.

22   Q.        Okay.

23   A.        Not to mention, it would have been fine to

24   have an attorney to do document review who was

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36

888

PATRICIA WEISER

99

1    disbarred, just to be clear.  I wouldn't have wanted

2    one ever, but, like, I don't fundamentally have a

3    problem with that happening, you know, depending

4    what the disbarment was.

5          It doesn't fundamentally prevent a person

6    from being a good document reviewer.  In fact, he

7    was a really good one, apparently, but, yeah, I --

8    that -- that was something Ableson -- we -- I -- I

9    relied on to my detriment, our detriment, Ableson

10    doing that initial screening.

11          It never would have occurred to me in a

12    million years what happened.  I'm a little too

13    trusting, I guess.

14    Q.     Earlier you mentioned amicus briefs made by

15    Mr. Hartleib.

16    A.     Yeah.

17    Q.     Have you ever seen one of those amicus

18    briefs?

19    A.     I've never read them, no.

20          I am generally aware of their content.  It

21    is far too personally upsetting to me to -- it's

22    hard enough for one person in our marriage to be

23    deep in this, both of us can't be, so Rob handles

24    all the substantive dealings with Mr. Hartleib, and

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36

PATRICIA WEISER

100

1    I -- and he tells me what I need to know in order to

2    do whatever we need to do to get through a day, but

3    I do not involve myself in the day-to-day reading of

4    every awful thing he writes or says.

5    Q.       And would that also be true of any of the

6    e-mails that Mr. Hartleib sent regarding The Weiser

7    Law Firm and your husband?

8    A.       Again, I'm aware of them.

9             I don't access Rob's e-mail.  I'm aware of

10   them.  They're all listed in the Complaint.  I've

11   read the Complaint.

12            When the Motion to Dismiss Order was

13   entered, I'm aware there are statements that

14   survived for both the defamation and the IIEV

15   claims.  Again, I'm aware generally of everything.

16   Rob and I talk all the time, but I do not sit at a

17   desk and read this stuff every day.

18   Q.       Okay.

19            Was there ever an occasion where you sat

20   and read the memorandum accompanying the Order in

21   the Sprint case reducing the fee award?

22   A.       I -- I would guess that I did because when

23   I refer to -- like it's too upsetting to read these

24   things.  This is all -- I relate that all to

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36
890

PATRICIA WEISER

101

1    Mr. Hartleib.  So the Sprint memorandum was the

2    beginning of it all.  And I could not have -- have

3    anticipated, guessed or even dreamed that a

4    nightmare like this could happen.

5          So, no, in the beginning, depending on what

6    was on my to-do list for the day or what my role was

7    at the firm at that moment, that was a material --

8    that was something material to the firm that was

9    going to hit our revenues.

10         For sure I had a conversation with Rob and

11   everyone else at the firm about it.  We have

12   meetings all the time talking about things that

13   impact the firm and each other.

14         Did I read it word for word?  I don't know.

15   I don't know.

16         It's not necessary for me to read it to do

17   my job, it's necessary for Rob and the guys to read

18   it to do theirs, and I trust them, and I trust their

19   judgment.  And I'm pretty busy myself.

20         So, yeah, we segregate our work based on

21   who needs to do what when.  So I don't know if I

22   read it, but it wouldn't -- it wouldn't have been

23   the upsetting thing that -- everything that has come

24   since would be.

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36

PATRICIA WEISER

102

1          Like I wouldn't have avoided it because of

2     that, where I -- I could not finish -- I couldn't

3     get through Page 5 of the Amended Complaint two days

4     ago without crying, so that I avoid.

5     Q.      Did Rob ever express any concern to you

6     regarding -- not the reduction in the actual award,

7     but the Court's language or characterization of

8     the -- the bills that were submitted?

9     A.      I don't remember.

10          I'm sure -- I mean, again, we are business

11     partners and life partners, we talk about

12     everything.  I don't remember.

13                    MR. ROSENZWEIG:  Is it a good

14          time for that break, Mr. Mott:

15                    MR. MOTT:  Yeah, let's go ahead

16          and do that.

17                    VIDEO SPECIALIST:  1:04, off

18          video.

19                    (At this time, a luncheon recess

20          was taken.)

21                    VIDEO SPECIALIST:  1:36, on

22          video.

23     BY MR. MOTT:

24     Q.      Ms. Weiser, earlier when discussing hours

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36
892

PATRICIA WEISER

103

1    submitted by Jeffrey Silo for payment for his work

2    as a contract attorney you mentioned an attorney at

3    The Weiser Firm [sic] approving either the -- either

4    the hours themselves or the payment for the invoice

5    that he was submitting, and I just want to clarify

6    what the attorney that Jeffrey Silo was working with

7    would have been approving?

8    A.        So when invoices are submitted for payment

9    to Cheryl they need to be -- like they need to be

10   approved, in the sense that if they come from an

11   attorney, like if Brett sent an invoice to        Mr.

12   Silo, Brett sending that to Cheryl is Brett -- Brett

13   is asking for payment of that invoice.

14             Sometimes we get invoices directly from

15   contractors, and if I just -- if it's related to a

16   case, I need it to go through an attorney just so I

17   know the attorney approves that expense in that

18   case.

19             If it's purely administrative, then it's

20   just me, I take care of it because I know what it

21   is, but if something comes through about a case

22   expense, I need to make sure with the attorney what

23   case it's for so that we make sure we allocate it

24   properly in our books.

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36

893

PATRICIA WEISER

104

1          So, in the case of Silo, as you mentioned

2    Mr. Silo, so if Brett submitted an e-mail or

3    paper -- I don't know how he did it.  I honestly

4    don't know.

5          However that was submitted to Cheryl, it

6    would come from Brett, not Mr. Silo.  And if it did

7    come from Mr. Silo, Cheryl would need to get an okay

8    from Brett for the time and whatever -- whatever

9    service was being requested payment for.

10   Q.     During Mr. Vaccaro's (ph) deposition he

11   recalled an e-mail that he sent to Jeffrey Silo

12   requesting his Pennsylvania Bar Number and a

13   response by Jeffrey Silo shortly thereafter that

14   same day providing a bar number.

15          Do you know in 2017 whether that e-mail

16   would have been retained or archived or stored

17   anywhere?

18               MR. ROSENZWEIG:  Objection as to

19          form because it doesn't relate

20          Mr. Vaccaro's testimony about an e-mail to

21          the date and timeframe you just suggested,

22          but subject to that objection, Pat, if you

23          can, answer it.

24               THE WITNESS:  So e-mails are

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36

PATRICIA WEISER

105

1           generally retained and stored.

2                   Each attorney organizes their

3           e-mails as they see fit, but as a general

4           matter -- we -- we don't have any policies

5           or rules about retention of e-mails, I can

6           say that, but I -- but -- yeah, so if it

7           was in an e-mail inbox, it -- it's saved

8           there, and we -- and I think people

9           could -- could access it.

10                  It's a little confusing question,

11          but that's -- I mean, yeah, if -- if it's

12          in an e-mail, my IT guy could go in and

13          retrieve it.

14   BY MR. MOTT:

15   Q.     Well, I guess -- yeah, let me -- let me ask

16   a -- a different question.

17   A.     Okay.

18   Q.     So if you -- if there were an e-mail

19   communication between Mr. Vaccaro and Mr. Silo

20   around February of 2017, if you were to look for

21   that e-mail you would contact the firm's IT service

22   to locate it or would you look directly yourself to

23   locate it?

24   A.     So I personally would not because I

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36

895

PATRICIA WEISER

106

1    wouldn't have access to Jimmy's e-mail,

2    Mr. Vaccaro's e-mail.  I mean, I guess I do have

3    administrative access, but I wouldn't do that.

4         If we needed to administratively go into an

5    employee's e-mail I would do so through our IT

6    contractor, and if we -- it would be there or it

7    wouldn't be there.

8         And I would -- I would just note that over

9    the course of the existence of the firm we've had

10   two different IT firms.  We have moved from

11   hardware, like we -- where we had a server in our

12   office, like a hard server in our office, to

13   cloud-based.  We had moved -- during COV -- when we

14   sold the building we moved everything to

15   cloud-based, different platforms.

16        In the moving of the -- in all of that

17   moving everything doesn't always make it to the end,

18   intended spot.  So, along the way, over the course

19   of the many years we've had this firm.

20        I'm aware of several occasions where we

21   have lost some electronic information for reasons

22   that go unexplained other than technology, and it's

23   not perfect, but we have a system for saving things,

24   and if it's there, our IT guys will go in and do

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36

PATRICIA WEISER

107

1    that.

2              At some point, we were -- as soon as we

3    realized about the disbarment and this was going to

4    turn into a litigation -- and, again, there was

5    prior litigation between Abelson and Mr. Silo.

6              I -- I recall asking our IT people to do a

7    search of all e-mails for -- yeah, there's, like, a

8    list of words, and I'm sure Silo was one of them.

9    There were words where I don't remember, but they do

10   a search on all e-mails and come up with what they

11   come up with so we can preserve it for litigation.

12   Q.        Do you still have the list of words that

13   was provided to the IT company to search for?

14   A.        No, and I -- I don't know that there was a

15   list of words.

16             And, truly, if we asked for all

17   communications to or from Mr. Silo, then I -- I

18   don't know what we asked for specifically, but

19   whatever we asked for they searched for, and they

20   gave us what we needed or asked for, and we would

21   have saved it accordingly.

22   Q.        Did you request that your IT provider

23   perform any inquiries in response to the discovery

24   requests that were served by my office on behalf of

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36
897

PATRICIA WEISER

108

1    Mr. Hartleib?

2    A.        So, yes -- wait.

3              You asked if I asked the IT firm to do

4    that.  I don't believe the IT firm needed to be

5    asked at that time.

6              In connection with the district attorney's

7    investigation, we had asked the IT firm -- we had --

8    we did a deep search of all things related to

9    Mr. Silo.  At some point, there was one done with

10   respect to Mr. Hartleib, and we gathered documents

11   in response to the district attorney's request.

12             Those were, as I recall, put in a binder

13   and produced to the district attorney.  There was an

14   electronic version of that binder that was saved,

15   and over the course of the multiple years since then

16   there are multiple copies of it.  And I won't -- you

17   know, there's -- you don't want to delete the copy

18   of what you produced.

19             And my recollection is that there are

20   several -- there was at least a binder and one

21   electronic copy of all of the electronic searches

22   that our IT company did for us in connection with

23   that litigation and this one.

24   Q.        The --

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36

PATRICIA WEISER

109

1    A.        And, yeah, and then when your -- I'm sorry,

2    your question was about your discovery.

3               So, yes, then I had a preserved group of

4    documents to -- to reference and produce as directed

5    by Counsel knowing that it was a fulsome search, but

6    the search was not initially done in response to

7    your requests.

8    Q.        The electronic version of the binder --

9    A.        Yeah.

10   Q.        -- does the firm still have a version of

11   that?

12   A.        I believe so.

13   Q.        Does the firm have --

14   A.        We have a folder named Silo, and there's a

15   folder named Hartleib, and there are other

16   litigation folders related to the litigation against

17   us, and by us.  And where that information is, in

18   which of those folders, I'm not sure, but, yes, I'm

19   certain there is an electronic version of what we

20   produced to the DA.  In response to your discovery

21   requests we all responded as directed by our

22   counsel.

23               So if -- if you asked us to search our

24   e-mails for something, we did, and we produced

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36
899

PATRICIA WEISER

110

1    whatever we found.  We responded to your requests

2    fully.  To the extent you did not get something that

3    exists, I assume that our counsel claims them

4    privileged.  I -- I do not know.

5    Q.      What -- what are the names of the two IT

6    firms that you referred to earlier?

7    A.      So our current IT firm is H Technology

8    Group.

9    Q.      Um-hmm.

10   A.      I can't remember the name of the other

11   former one.  I can't remember.  It was a long time

12   ago.

13   Q.      Do you know approximately how long you've

14   been using H Technology?

15   A.      So we've moved -- we had a couple --

16   actually, no, there -- there have been several, like

17   so let me step back and say there weren't only two,

18   there were probably three, now that I think about

19   it.

20           Let me step back.  Hold on.

21           When we started the firm it was Rob and I

22   in this tiny office, and a friend of ours set up our

23   computers for us.  We did not have a network or a

24   whole system.  It was literally two of us in an

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36
900

PATRICIA WEISER

111

1    office of 500-square feet, and our buddy who is a

2    technological guy set up the computers.

3            After that, we moved into a bigger space.

4    After we hired Brett at least and maybe Debra

5    Goodman we needed to network, we needed to have a

6    network set up.  And I believe we used someone from

7    our former firm, like the former firm Rob and I

8    worked at, Schiffrin & Barroway.  Their IT guys I

9    stayed in touch with.  I was friendly with them.  I

10   think they helped us.  I don't remember the name of

11   the firm when we used them.  It changed since we

12   used them back at Schiffrin & Barroway.

13           And then one of our office managers, her

14   husband had an IT firm.  When we moved into the

15   office he designed our IT system at the firm, at the

16   new office in Berwyn, set it up.  She was our office

17   manager for some period of time, and while she was

18   our office manager, he provided our IT services.

19           After she left, I -- that's when we

20   switched to ACE.  I don't remember the year she

21   left, but I wanted to make a clean break and have a

22   new -- have a new firm, kind of re-evaluate and

23   streamline.  Everything in technology just changes

24   so often, I just really wanted to be more

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36
901

PATRICIA WEISER

112

1    streamlined.

2             And, ironically, it was just set up so you

3    can do more remote things like we're all doing now.

4    We've been doing this for, like, ten years.

5             So I would say certainly -- certainly prior

6    to 2012 because I was at the firm when I retained

7    them.

8    Q.       In their Affidavit of Probable Cause for

9    the criminal proceedings against Jeffrey Silo it

10   references not only a binder but also documents

11   containing IP addresses.

12            Would -- would that -- would those

13   documents be in that Silo folder that the firm

14   maintains?

15   A.       I don't know what that means.

16   Q.       Okay.

17            Where are -- does the firm have all of the

18   documents that were turned over to the detectives as

19   part of the criminal proceedings for Mr. Silo?

20   A.       My -- to my knowledge, yes.

21   Q.       And the folder that you have for

22   Mr. Hartleib, is that the result of a search that

23   the IT depart -- that your IT contractor performed

24   looking for the name Hartleib?

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36
902

PATRICIA WEISER

113

1    A.        I don't know.  I don't know what's in it,

2    to be honest.  I'm seeing in my head the screen.

3              You know, we're a very small firm.  We

4    have -- like everything fits into a couple of

5    folders, and there are -- the only separate folders

6    are Hartleib, Silo.  I honestly don't know what's in

7    it.  I know it's -- I'm pretty sure it exists.

8              It's the place I dump things when I don't

9    have to read them because I'll cry.

10   Q.        When the IT department sent you the results

11   of the Hartleib inquiry, do you know how it was

12   delivered to the firm?

13   A.        So I -- I do.  I remember there being,

14   like, a weird glitchy IT thing.

15             Hold on a second.  Let me just think.

16             I remember -- because we needed to produce

17   them, and I believe, like, Archita Patel printed

18   them all out.  Like I'm remembering, like, she --

19   like she had to print them out, and so I feel like

20   they had -- I mean, I -- I don't know if this makes

21   technological sense, but I feel like they had to be

22   acc -- she had to get access.  They were giving

23   access to her, she printed them out, like, through

24   her e-mail.

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36

903

PATRICIA WEISER

114

1          I remember there being an issue with her

2     looking like it was all being printed out of her

3     e-mail, like her name was at the top.  I don't know

4     if we redacted that or not.

5          It -- it certainly had no relevance to the

6     content of the document.  It was just that on the

7     day we were printing them out to produce, that was

8     how we had to do it.

9          I remember there being some technical

10    glitchy issue as -- as to how we can get them from

11    Point A to Point B, and they had to go through

12    Archita's e-mail, I think.  And so they all had -- I

13    think -- if I'm thinking of the right production,

14    there was definitely a production where her e-mail

15    tag was on it as if she printed it out.

16          I -- I would suspect, although I -- I don't

17    recall specifically, that we would have gone through

18    each and every page and done some form of redaction,

19    but I don't know that we did.  With the documents

20    provided to the DA, I don't -- I don't remember the

21    specifics of that.

22          It would be my practice, and I would have

23    expected that the entire production would have been

24    scanned so that we did have one document that said

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36

904

PATRICIA WEISER

115

1    this is what we produced, and I think there's a

2    paper copy as well.

3            So we had the binder being produced and a

4    copy of it to keep for ourselves so that if they

5    called us and wanted to talk about it or had any

6    questions we'd be talking about the same document,

7    and then there would be an electronic copy of it.

8            So, in my perfect world and system, the

9    original, it's copied twice -- well, it gets printed

10   out, copied, put in two binders.  One binder gets

11   produced to the DA, one binder stays with us.  The

12   contents of both those binders are -- are scanned

13   electronically and saved on our system.

14           I -- I like plans and backup plans and

15   backup plans for discovery.  I -- I've been involved

16   in litigation a lot in my life, and being able to

17   substantiate what I produced is an important thing.

18   So I had paper and electronic, I'm certain, of what

19   we produced to the DA.

20   Q.      Do you have any knowledge as to what types

21   of documents are in the Hartleib folder?

22   A.      As I sit here now, no, I have no idea.

23   Q.      Okay.

24   A.      I can't remember the last time I -- I -- I

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36
905

PATRICIA WEISER

116

1    have no idea.

2    Q.        And earlier you mentioned we -- or you said

3    we performed some redactions.

4              Was that -- when you say we, are you

5    referring to the redactions that the firm or its

6    employees personally performed or redactions that

7    were performed by Counsel?

8    A.        So I feel like we're talking about two

9    different things.

10             I was talking about the production we made

11   to the DA.  I don't know -- and, again, I'm having a

12   memory that may be inaccurate of Archita's name and,

13   like, e-mail tag.

14   Q.        No, that -- I'll represent to you that that

15   part is accurate.

16   A.        Oh.

17   Q.        We have -- we have a large production with

18   Ms. Patel, and that has been explained to me by your

19   counsel, so --

20                  MR. ROSENZWEIG:  In -- in this

21             case, Pat?

22                  THE WITNESS:  Okay.  Fair enough.

23                  So redactions -- I -- I don't

24             know if there were any redactions in the

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36

PATRICIA WEISER

117

1          documents we produced to the DA, I don't

2          know, period.  We produced all of these

3          documents to our counsel, Mr. Rosenzweig in

4          connection with this litigation.

5               If there were any redactions from

6          that point on, they were done by him and

7          his office --

8               MR. MOTT:  Okay.

9               THE WITNESS:  -- not by us.

10   BY MR. MOTT:

11   Q.      Prior to when those documents were provided

12   to your counsel --

13   A.      Yeah.

14   Q.      -- were any portions of it redacted or,

15   otherwise, removed from the results of the search

16   that was performed by your IT service?

17   A.      Not that I'm aware of.

18          In the normal course of business --

19   litigation, in the normal course of litigation, like

20   the steps would be to find the documents, review the

21   documents, review for privilege, you know, so we

22   would go through the normal steps.

23          Whether they applied or anything happen

24   from that, I -- I just don't remember.

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36

907

PATRICIA WEISER

118

1    Q.        Okay.

2    A.        I -- I -- I'm trying to envision, like, why

3    we would redact anything going to the DA, and I

4    can't think of a reason, but I just don't remember.

5    Q.        For the electronic versions of the

6    documents that are in the folders that you've

7    mentioned --

8    A.        Yeah.

9    Q.        -- are those the scanned printouts or is

10   that the original electronic version of what came

11   from the IT company?

12   A.        Right.

13            So the ones I'm referring to in these

14   folders are the scanned copies of the printouts.

15            The original, I'm not certain -- I'm not

16   certain if that exists.  If it does it's something

17   that the IT firm could still access in theory, but

18   Archita is not an employee anymore, so her e-mail is

19   not active.  I don't know how much -- I don't know.

20   I don't know if we have that or not or if that's

21   accessible.

22            I specifically remember there being, like,

23   some weird accessibility issues at the time that we

24   had to go through Archita's e-mail, but I don't know

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36

908

**PATRICIA WEISER**

119

1  if the -- the original format still exists, I just

2  don't.

3  Q.      Did your ask your IT contractor to perform

4  any other searches other than the ones that we've

5  already discussed pertaining to Silo, the Sprint

6  case or Michael Hartleib?

7  A.      I just don't remember.

8  Q.      And when you made these search requests,

9  how were they communicated to the IT provider?

10  A.      As I sit here right now I do not remember.

11  I mean, either by phone or e-mail are the two ways I

12  communicate with them regularly, although not very

13  regularly, but if -- that's the two ways I could

14  communicate with them --

15  Q.      Does the law --

16  A.      -- you know, I just don't recall.

17  Q.      Does the law firm currently have a main

18  point of contact with H Technology Group?

19  A.      So, you know, we've -- we've had a

20  relationship with them for over a decade.  So I -- I

21  know the owner, but in terms of IT support, it --

22  there's an IT support number, and we get whoever we

23  get.  And they have a great group of people there,

24  and anyone is capable of handling whatever requests

**ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES**

EXHIBIT 36
909

PATRICIA WEISER

120

1   or problems we have.

2           So it's no one -- no one person, unless it

3   rises to the admin level, and then I would probably

4   call the owner or one of their -- I would probably

5   just call the owner or e-mail the owner.

6   Q.      Okay.

7   A.      I -- I -- I like to have a relationship

8   with the people I do business with.  It makes for a

9   good-working relationship, so, yeah, I -- I -- I

10  would have called -- I called the owner.  He's a

11  nice guy.

12  Q.      And what's the name of the owner?

13  A.      Chris Shank, S-H-A-N-K.

14          Although to be clear, Chris would not

15  perform any search.  He would not be the person who

16  I would ask to do a search.  He's not a person who

17  would do the search.  He's the person if I had

18  trouble with any of his employees conducting a

19  search I would call and say, hey, we're having

20  trouble doing this, do you have any other idea?

21          Like he's not the person I would have asked

22  to do the search, nor would he have been involved in

23  it.  It's too far below his pay rate.

24  Q.      Were there any issues with the searches

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36
910

PATRICIA WEISER

121

1   that you requested that you had to take to the

2   owner?

3   A.        No, these guys are great.  These guys are

4   great.  What -- whatever was possible to be

5   retrieved was retrieved, so, no, I -- I never had

6   any issue at all with any one of these guys who

7   performed for us, certainly not with -- with respect

8   to the document production or search.

9   Q.        Now, the First Amended Complaint references

10  an audit that was performed regarding the work of

11  Jeffrey Silo in the Sprint case.

12            Were you involved at all in the audit?

13  A.        No.

14  Q.        Do you know who was involved in the audit?

15  A.        No.

16  Q.        Have you -- do you have any knowledge of

17  the result of the audit?

18  A.        I'm not sure what you mean by audit, to be

19  honest.

20  Q.        Yeah.  Okay.

21  A.        I wasn't involved in Sprint, in the

22  litigation of Sprint.

23  Q.        Okay.

24            As a part of the Sprint proceedings, the

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36
911

PATRICIA WEISER

122

1   Court requested billing records to be provided for

2   an in-camera review.

3            Did you have any role in gathering the

4   timesheets or invoices that Mr. Silo submitted in

5   order to comply with the Court's request for the

6   billing records?

7   A.        I don't recall being personally involved.

8            My one recollection about Mr. Silo's work

9   and the timekeeping is that it was all done on an

10  electronic platform.  I don't remember the name of

11  it, but that all of his time that he billed in that

12  case was, like, real time accounted for, which isn't

13  always the case, but conveniently and luckily it

14  was.  So it was all completely backed up and

15  substantiated.

16           It's my recollection, although I personally

17  had no involvement --

18  Q.        Okay.

19  A.        -- with that software or the timekeeping or

20  the billing or anything about the case.

21  Q.        So you're not familiar with what was

22  actually submitted to the Court --

23  A.        I don't remember.

24  Q.        -- in-camera review?

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36
912

PATRICIA WEISER

123

1   A.        I don't remember.  I don't think I was.

2   Q.        And for -- what is the firm's policy for a

3   retention of case files?

4                     MR. ROSENZWEIG:  At what point in

5             time?

6                     So objection as to form.

7                     MR. MOTT:  Sure.

8   BY MR. MOTT:

9   Q.        Currently, what is the firm's document

10  retention policy for its case files?

11  A.        I'm not sure we have a current document

12  retention policy.  I know I worked with Counsel at

13  some point in time to come up with one.

14            Again, we have a very unique area of

15  practice, aside -- you know, at the time you're

16  talking about, prior -- like 2017?

17            Like prior to getting into the qui tam

18  business -- we don't have any documents that aren't

19  publically filed other than our attorney notes.  So

20  there's no client documents.  There's nothing that

21  traditional law firms have to retain for a period of

22  time.

23            Like, for example, wills and trusts, estate

24  attorneys have to retain the stuff for a long time.

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36

PATRICIA WEISER

124

1    Like we just don't have any of those documents.

2    They're not part of our litigation or our business.

3    So it was -- I remember discussing whether we needed

4    to have a document-retention policy because we don't

5    have documents which generally fall within those

6    policies.  So I don't think -- my -- my recollection

7    is we don't need to have one.

8            From an administrative standpoint, I have a

9    tough time of throwing things away, so I like to

10   have a system that allows for me to get rid of, you

11   know, all the paper, which -- which isn't always

12   much because, frankly, a lot of it -- we are -- we

13   are an online -- like we do have our -- our data is

14   stored online, but, you know, just in terms of you

15   have to pay for storage in the cloud.  Like it's not

16   free, so there should be some mechanism whereby to

17   reduce the stuff you're saving.

18           So I -- I do remember -- I don't remember

19   when, but I spoke with Counsel about a policy.  I

20   remember drafting one up, and I'm going to say three

21   to five years maybe.  Now, that was not in effect

22   when this Jeffrey Silo issue came up.  I know this

23   specifically because the documents that were

24   retrieved went far beyond three to five years.

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36

914

PATRICIA WEISER

125

1          So not having a policy helped us in that

2     case because we had the e-mail that we sent to

3     Ableson, and we were asking for a lawyer, and, like,

4     we found the -- the e-mails relating to the initial

5     hiring of -- or seeking an attorney and then using

6     Mr. Silo.

7          So there's that -- you know, there's, like,

8     a -- there was a tension between wanting a policy so

9     I can clean house and realizing that not having one

10    actually was helpful to us so we could find -- have

11    those documents.

12         So this is my longwinded way of saying

13    there's not a policy in effect right now.  I

14    generally try to stay on top of keeping an

15    ordinarily house, and if I am able to purge under --

16    under the direction of Counsel or my accountant, I

17    do so.  I don't do it all the time.  I don't do it

18    regularly.  In fact, there's no regular process, but

19    I -- but I do clean house, and I do it under the

20    guidance of Counsel and my accountant.

21    Q.       So regardless of -- of the existence of

22    any --

23    A.       Yeah.

24    Q.       -- retention policy, do you know if

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36

915

PATRICIA WEISER

126

1    The Weiser Law Firm still maintains a case file for

2    the Sprint derivative litigation?

3    A.        That's a good question.

4              I don't know.  I don't know because I don't

5    know what year that was, and I -- I don't know.  I

6    guess it should be closed.  It's over.  I don't

7    know.

8              I mean, in -- in conjunction with the --

9    the three-to-five year -- like it could be -- it

10   could have been pursuant to that policy we drafted,

11   or because all this is going on we could have held

12   onto it.  I -- I don't know.

13   Q.        And if you were to inquire as to whether

14   The Weiser Law Firm still maintains the case file

15   for the Sprint derivative case, how would you do

16   that?

17   A.        I would go onto the system and look myself

18   in our case file system.  I -- I can't imagine it

19   would be in our active cases because it's not an

20   active case.  And I think what is more likely is if

21   there are any documents from that case relevant to

22   the -- the litigation by us against Ableson and Silo

23   or Mr. Hartleib against us or us against

24   Mr. Hartleib, all that would be in -- would have

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36

PATRICIA WEISER

127

1    been saved and stored in folders related to those

2    separate litigations.  But the case file itself is

3    publically filed information and documents.

4            They're all readily available online, other

5    than our attorney notes, which are not discoverable

6    anyway.

7    Q.      And any documents submitted for in-camera

8    review would also not be publically accessible.  So

9    would your office have maintained those records?

10   A.      I don't know.  I would have to look.  I

11   just don't know.

12   Q.      If The Weiser Law Firm needed to make an

13   inquiry regarding the in-camera submissions and

14   whether they existed or not, is that a task that you

15   would perform or is that a task that someone else at

16   the firm would perform?

17   A.      So I would perform the initial search, and

18   I would just hop on and look, and I would start with

19   active case files where an active case would be,

20   which it is not.  So it probably wouldn't be there.

21           There are closed cases stored, which

22   pursuant to the -- the retention/destruction policy

23   I had mentioned that we drafted -- they stay there

24   until the year comes up for them to be purged.  I

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36
917

PATRICIA WEISER

128

1    would search there.

2           I guess as a last resort I would ask the IT

3    firm if they can do a search and find anything

4    anywhere that I otherwise didn't look, that would

5    be -- that would be my process, and it would end

6    there.  If they didn't find it, then it doesn't

7    exist.

8           Again, I -- I don't go into the case files.

9    So that's -- you know, this is something that has

10   not been on my mind ever, so I'm just -- I'm just

11   telling you how I would look for it because I know

12   where things generally should be.  And if I couldn't

13   find them there I would ask the IT firm to help, and

14   that would be it.

15   Q.      Have you ever made an inquiry into whether

16   the firm possesses the records that were submitted

17   for in-camera review in the Sprint case?

18   A.      Me personally, no.

19   Q.      Okay.

20           At any point did you direct another

21   employee of The Weiser Law Firm to make an inquiry

22   or search into whether the firm possessed the

23   billing records that were submitted for in-camera

24   review?

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36
918

PATRICIA WEISER

129

1    A.         I have no recollection of that.

2    Q.         At any point did you ask your IT provider

3    to inquire or search for the billing records that

4    were submitted for in-camera review in the Sprint

5    case?

6    A.         I have no personal recollection of that.

7    Q.         Outside of any attorney representing you or

8    your law firm and the attorney employed by the law

9    firm, have you ever communicated with an attorney

10   related to my Michael Hartleib?

11   A.         I -- I don't understand the question.

12   Q.         Sure.

13             Have any colleagues of the firm ever

14   communicated with you regarding Michael Hartleib

15   outside of any attorney/client relationship?

16   A.         I don't speak with anyone about Hartleib,

17   that's Rob's -- that's something I just -- I just

18   stay out of.  So I don't recall speaking to any

19   attorneys about Hartleib.  The only -- I only speak

20   to Rob about it, and then he handles the details and

21   anything relating to Mr. Hartleib.

22   Q.         Has Rob ever forwarded you an e-mail

23   communication or a text message from a

24   colleague/attorney regarding Michael Hartleib?

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36
919

PATRICIA WEISER

130

1    A.        I can't recall.  It's possible.

2              I mean, we communicate in person.  We

3    communicate by e-mail.  We communicate by text.

4    Like Rob and I communicate all the time.  And

5    sometimes it's to download things that he wants me

6    to be aware of or that we need to discuss and figure

7    out.  Sometimes it's to convey what's happening in

8    cases or with other people, and sometimes it is --

9    he does forward e-mails to -- to let me know what

10   other people are thinking, doing or saying.

11             So it could be, but I -- I have no -- I

12   have no recollection of that as I sit -- I have no

13   specific recollection as I sit here now.

14   Q.        Have you ever seen any kind of printed or

15   written communication where someone mentioned

16   Michael Hartleib and the impact he was having on the

17   firm?

18   A.        Something written?

19             I'm just drawing a blank.  I think I'm not

20   sure what you're referring to, and I'm not

21   remembering anything that would qualify as an answer

22   to the question you're asking me, which I don't

23   entirely understand.

24   Q.        Okay.

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36

920

PATRICIA WEISER

131

1          Do you have any knowledge as to how

2    The Weiser Law Firm gets signed for shareholder

3    derivative cases?

4    A.      Rob's in charge of all client dealings and

5    communications.

6    Q.      I understand that, but do you have any

7    knowledge as to how the firm obtains clients as

8    shareholders for derivative cases?

9    A.      I do generally.

10   Q.      And what is your general knowledge

11   regarding how the firm obtains shareholder

12   derivative clients?

13   A.      There are a variety of ways.

14          I mean, this is -- this is our -- our

15   secret sauce here, like this is, like, the stuff

16   that nobody talks about because you don't -- like

17   this is how we stay in business.

18          I have to answer this?

19          I mean, we have relationships.  We have a

20   lot of relationships.  The easy answer is we have a

21   lot of relationships with folks who have connections

22   with people who have an interest in monitoring their

23   shareholders -- their holdings, their shareholdings

24   in a variety of companies in an active way, that are

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36

PATRICIA WEISER

132

1    interested in the type of work, are interested in

2    finding out about fraud conducted by

3    publically-traded companies, people who are

4    interested in being activists in trying to right

5    those wrongs, people who have suffered damages and

6    losses as a result of security fraud, insider

7    trading, any number of illegal acts by officers or

8    directors of corporations.  And so it's the

9    relationships that are the way we get our clients

10   and cases.  And there are layers to it.

11         So we are -- we are -- we have strong

12   relationships with clients of ours, and then those

13   clients may refer us to other clients.  We have

14   strong relationships with people who have access to

15   lots of potential clients, people that are -- that

16   are very interested and are active in the markets.

17         So it's a relationship business, and being

18   able to maintain those relationships and keep them

19   healthy and happy and friendly -- you know, these

20   are people we -- we -- you know, they're good,

21   strong relationships, colleagues and friends.

22         So if people come upon -- like we get

23   calls, random, unsolicited calls who say, oh, my

24   gosh, is this happening at my company or at this

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36

922

PATRICIA WEISER

133

1    company I own stock in?  You know, is this something

2    you can look into?  Is this -- could this be a case?

3           We have -- you know, sometimes insiders are

4    companies.  Officers, directors will reach out to

5    discuss wrongdoings.  Usually, it's a -- it's a --

6    being connected with shareholders.

7           In the case of derivative, it's -- it's

8    being connected with shareholders who are

9    longstanding holders of publically-traded companies

10   who have standing to bring an action on behalf of

11   the company, which is how derivative actions work,

12   to right some wrong that occurred at the company.

13          Because as the -- as the law goes, the

14   officers and directors won't sue themselves, so you

15   file a lawsuit on behalf of the company against

16   them.  That's how derivative litigation works,

17   generally, to my knowledge.  And getting those

18   clients are -- all come through relationships we

19   have with certain clients, and people who have

20   relationships with -- you know, extended

21   relationships with other clients.

22          And we're known for our expertise and our

23   integrity and professionalism and all the good

24   things we have built up over a lifetime of careers,

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36

923

PATRICIA WEISER

134

1    and so we are sought out for that through the

2    relationships we have.

3    Q.        Is Oliver Thieler one of the relationships

4    that the firm maintains for client referrals?

5    A.        Oliver is one of the people who Rob has a

6    business relationship with and friendly relationship

7    with, who -- yes, we are connected with clients or

8    potential clients or people who are concerned about

9    something and they want to discuss something that we

10   have an expertise in, and he connects them with us

11   or us with them.  I'm not sure how that works

12   specifically, but, yes, he is one of the sources of

13   clients who are looking for you or who are looking

14   for information about the public holdings, which

15   they have in their brokerage accounts, the -- the

16   public holdings they have in stock.

17   Q.        And just a bit ago you mentioned

18   relationships with the type of people who have lots

19   of access to potential representative plaintiffs.

20            Can you give me an example of someone or

21   the type of person who would have lots of access to

22   potential shareholders plaintiffs?

23   A.        Sure.

24                        MR. ROSENZWEIG:  I'm going to

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36

924

PATRICIA WEISER

135

1          object to the question.

2                    Mr. Mott, I don't know how that's

3          relevant, and I think it's going far afield

4          of trying to discover something that is

5          relevant to the claims in this case.

6                    MR. MOTT:  All right.

7                    Are you going to instruct her not

8          to answer?

9                    MR. ROSENZWEIG:  I'm going to

10         instruct her not to reveal any trade

11         secrets of The Weiser Firm [sic].

12                   MR. MOTT:  Sure.

13                   THE WITNESS:  You know, over a --

14         the course of a career people build

15         relationships so that they can do business.

16                   So if there's someone who has --

17         who like -- who has a lot of friends, who

18         owns a lot of stock in a lot of companies

19         and they have built up this -- this world

20         of friendships of people who are similarly

21         interested in monitoring their

22         stockholdings and possibly becoming active

23         in litigation to right wrongs that are

24         unearthed through various means -- I mean,

PATRICIA WEISER

136

1           it's a lifetime of building relationship.

2                  So if I have a relationship with

3           Joe Smith, and he has a relationship with a

4           book of people that he has -- he has built

5           over the course of his career, that --

6           those are the types of relationships that

7           you rely on to find clients in cases or

8           have clients find you for cases.

9                  It's a two-way street.  It's

10          not -- it's not the part of the business

11          that I am involved in, that's strictly

12          Rob's area of business.  And I'm just

13          speaking to generally, not specifically of

14          my knowledge of how this has worked in this

15          field since I've been in it from 2000 to

16          present day.  Keeping in mind, of course,

17          that I have not been actively litigating

18          since 2012.

19                 But I -- I am a professional who

20          understands how business relationships

21          work.  And business works because people

22          have relationships.  And you spend a

23          lifetime of building them.  And a lifetime

24          of building them can be destroyed, at least

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36
926

PATRICIA WEISER

137

1              a lot of pressure be put on them such that

2              you don't want to do business anymore

3              because it's not worth the hassle of having

4              to deal with the stress of harassment by

5              Mr. Hartleib.

6    BY MR. MOTT:

7    Q.      Do you know whether The Weiser Law Firm

8    receives referrals from other shareholder derivative

9    plaintiff's counsel, such as those who were involved

10   in the Sprint litigation?

11   A.      (No response.)

12   Q.      I'll -- I'll withdraw the question then and

13   try to simplify it --

14   A.      Okay.

15   Q.      -- a little bit.

16           Does The Weiser Law Firm receive client

17   referrals from shareholder derivative plaintiff's

18   attorneys?  I'll just leave it at that.

19           Do they -- does The Weiser Law Firm receive

20   client referrals from shareholder derivative

21   plaintiff's counsel?

22   A.      You'll have to ask Rob that.  I don't know

23   the answer to that.

24   Q.      When you reference the maintaining and --

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36

927

PATRICIA WEISER

138

1    and building of relationships over time, do you

2    include your -- the shareholder derivative

3    colleagues, the plaintiff's attorneys that

4    The Weiser Law Firm works with?

5                    MR. ROSENZWEIG:  Objection as to

6         form.

7                    THE WITNESS:  Like what do you

8         mean by shareholder derivative attorneys?

9    BY MR. MOTT:

10   Q.      So the -- so, for instance, the -- the

11   attorneys who represented -- who represent

12   shareholder derivative plaintiffs in matters that

13   have been consolidated with the matter that

14   The Weiser Firm is involved in, does The Weiser Law

15   Firm maintain those relationships for purposes of

16   obtaining new business?

17   A.      Yes.

18           I mean, we -- we try to maintain all the

19   relationships we have.  One, for the purpose of

20   having a good relationship because that makes work

21   so much better and so much easier when you actually

22   like to work with the person.

23           I think we're fortunate, generally, present

24   company excluded, to not have to -- to work with

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36
928

PATRICIA WEISER

139

1    people we don't really want to work with.  And, so,

2    yes, we have built and preserved relationships over

3    the course of our entire careers, 20-plus-odd years

4    so that we can continue to work together with people

5    who we respect and admire and -- and want to work

6    with in a field that we have worked very hard in for

7    20-odd years to gain an expertise that allows us to

8    pursue litigation to a successful end, both for our

9    clients, the companies, frankly, on whose behalf

10    derivative cases are brought, their shareholders and

11    the firm and our employees, and by extension my

12    family.

13           I mean, this is what we do for a living.

14    So, yeah, the relationships are a necessary part of

15    building a firm and a career.  We have done that,

16    and it has for years now felt very at risk and under

17    attack.

18    Q.      Did you have any of your own communications

19    with the Pennsylvania Disciplinary Board regarding

20    your self-reporting for Jeffrey Silo?

21    A.      I do not have any specific recollection of

22    how that was conducted.

23           Again, we -- I -- I testified earlier about

24    the firm in Chester County that assisted us with

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36

929

PATRICIA WEISER

140

1    that, either through advice or -- I -- I just don't

2    recall the -- the process, phone, paper, otherwise,

3    where we self-reported, nor do I recall the extent

4    of my involvement in that.

5            I don't recall being involved in that other

6    than general discussions with Rob, possibly being on

7    a phone call with that firm, although I don't recall

8    that, just generally discussing what the plan was,

9    what the alternatives were, why this was being

10   recommended and then -- I don't remember personally

11   being involved in that, although I was generally

12   aware.

13   Q.      Have you ever seen the Wall Street Journal

14   article regarding the fee reduction in the Sprint

15   case?

16   A.      I'm aware of it.

17   Q.      Have you ever read it?

18   A.      I -- I feel certain that I did, but I don't

19   recall.

20   Q.      Did you have any response to statements in

21   the article or the contents of the article regarding

22   how it described the judge's ruling for the work of

23   Jeffrey Silo?

24   A.      I don't recall specifically as I sit here

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36
930

PATRICIA WEISER

141

1    today.

2            I mean, this is a topic that Rob and I have

3    discussed at length for the duration, from the day

4    we found out that Mr. Silo had been disbarred 20 or

5    30 years prior, and -- and that -- that particular

6    article has come up in conversation.  The specific

7    content thereof, I -- I have no specific

8    recollection of.

9            My -- my focus has always been on

10   identifying the untruths and doing everything in my

11   power to preserve the integrity and the reputation

12   of the law firm and its people.

13   Q.      Do you recall any untruths in the

14   Wall Street Journal article?

15   A.      I don't, not as I sit here today I do not.

16           I don't recall any specifics in the article

17   right now, period.

18   Q.      What actions did The Weiser Firm [sic] take

19   to protect its reputation following the publication

20   of the Wall Street Journal article?

21   A.      I don't recall specifically in response to

22   the Wall Street Journal article.  My specific

23   recollection, as I testified to earlier, was how we

24   responded to the -- to finding out that Mr. Silo had

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36

931

**PATRICIA WEISER**

142

1    been disbarred many years prior, how that was going

2    to impact the firm, and specifically inside the

3    Sprint matter, and more generally in any other

4    matters that Mr. Silo had been involved in or more

5    generally just how this would impact the reputation

6    of the firm.

7              We quickly determined that we

8    had (indiscernible) --

9                        MR. ROSENZWEIG:  (Indiscernible.)

10                       THE WITNESS:  Sorry, Phil?

11                       MR. ROSENZWEIG:  That was

12              (indiscernible).

13                       No, no, continue, please.

14                       THE WITNESS:  No problem.

15                       We quickly determined that we

16              had -- we had -- there had been no

17              wrongdoing on our part.

18                       We continued our investigation to

19              understand the wrongdoing by Mr. Silo and

20              then the rest, in my memory, is some

21              combination of trying to -- discussing and

22              talking about and thinking about how best

23              to respond or not to Mr. Hartleib's

24              continual harassment publically in the

**ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES**

EXHIBIT 36

PATRICIA WEISER

143

1          courts and privately toward my husband by

2          e-mail and phone.

3                    And for a time we -- I thought it

4          best to ignore it, and it would go away, it

5          always worked with my little brother, and I

6          didn't see the benefit to us spending time

7          and money to fight what I thought was,

8          like, a crazy person talking crazy, and I

9          had hoped that our trusted colleagues and

10         friends would see that.

11                   And in a large part, they did,

12         but that kind of doesn't matter when you

13         all have to stand in front of a judge some

14         day.  So whether they believed and have

15         faith in us and trusted us in our

16         integrity, doesn't mean they want to stand

17         next to us when they're asking to be lead

18         counsel.  And that's really a difficult

19         thing after twenty years of practice.

20                   If we had done something wrong,

21         it would make sense, but having done

22         nothing wrong, it's a -- it's a hard pill

23         to swallow to have your colleagues feel for

24         you.  And some of them have dealt with

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36

933

PATRICIA WEISER

144

1          Mr. Hartleib.  So they really feel for us,

2          and they know what we're going through, but

3          what -- what we did specifically with

4          respect to that article, I -- I couldn't

5          tell you.

6               I -- I -- I think in general

7          terms of what I have done personally and

8          professionally in my life, to deal with the

9          stress and the problems caused by

10         Mr. Hartleib for my firm, my husband, my

11         family, my colleagues, and my employees,

12         both former and current.

13              And, honestly, like, for the last

14         several years I try not to think about

15         this.  You know, I -- I tried to read the

16         Amended Complaint two days ago, and I -- I

17         almost had a panic attack.  Like I really

18         just try not to think about this, and I

19         just have faith that it's all going to work

20         out in the end.

21              And if in the end it means we

22         don't have a law firm, fine.  Like fine.

23         I'm over it.  It's wrong though.

24              You know, Rob and I have been

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36
934

PATRICIA WEISER

145

1          together since we were sixteen years old.
2          We built this from nothing.  We treated our
3          employees like family because they are like
4          family, and we try to do right by them, by
5          our clients against corporate America,
6          which is constantly trying to do something
7          to pull one over on them all.  I feel like
8          we're doing the right thing.
9                    And to have your name drug
10         through the mud in a Wall Street Journal
11         article that every colleague we know and
12         every friend we know reads, is -- it's very
13         hard.
14                   And I can laugh it off and roll
15         my eyes and be like, oh, yeah, he's just a
16         crazy person, and they may agree with me,
17         but it hurts.  It really hurts.  And this
18         has caused me such physical and emotional
19         pain and anguish seeing my husband go
20         through this, myself, but living in a house
21         with kids who you, like, don't want them to
22         know that, like, this crazy shit happens,
23         but at the same time you want them to know
24         what the world is like, and you want them

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36
935

PATRICIA WEISER

146

1          to be prepared for it.  It's just so hard.

2          I -- I have -- I have to take medication

3          sometimes for my anxiety and panic attacks.

4                    It's, like, I was a bad-ass

5          litigator, nothing bothered me.  This has

6          totally crushed my soul.  And I'll do

7          whatever I need to.  To get through this

8          with my husband is all that matters.

9                    If we have a firm, great.  If we

10         don't, fine.  We'll be fine.  But it is not

11         right that this man can just spout all of

12         this awful stuff in courts that prevents us

13         from doing the thing we worked twenty years

14         to be able to do, because he's wrong.

15                   I don't know why he thinks what

16         he thinks, I have no idea, but he's wrong,

17         and this is wrong.

18                   MR. ROSENZWEIG:  If you need a

19         minute --

20                   MR. MOTT:  Yeah.

21                   Would you like to take a couple

22         minutes?

23                   THE WITNESS:  Yeah, please.

24                   VIDEO SPECIALIST:  2:36, off

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36

PATRICIA WEISER

147

1          video.

2                         (Pause in the proceedings.)

3                         VIDEO SPECIALIST:  2:40, on

4          video.

5                         MR. MOTT:  Okay.

6     BY MR. MOTT:

7     Q.     Ms. Weiser, are you okay to continue?

8     A.     Yes.

9     Q.     Okay.

10            Regardless of how Mr. Silo came into the

11    employment or -- you know, he came to be a

12    contracted attorney with The Weiser Law Firm, is the

13    facts that that happened with The Weiser Law Firm,

14    employed Jeffrey Silo and that it turned out that he

15    was disbarred, harmful to the firm's reputation?

16                         MR. ROSENZWEIG:  Objection as to

17            form.  It has been testified to quite

18            clearly that he was never employed.

19                         And, Mr. Mott, your question --

20            correct --

21                         MR. MOTT:  I will rephrase.

22                         MR. ROSENZWEIG:  Yeah, okay,

23            thank you.

24                         So it's objection as to form.

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36
937

PATRICIA WEISER

148

1                    Thank you for withdrawing it and

2          rephrasing it.

3                    THE WITNESS:  I can answer?

4                    MR. ROSENZWEIG:  No.

5                    MR. MOTT:  I'm going to re -- I'm

6          going to rephrase the question to correct

7          Phil's legitimate objection.

8    BY MR. MOTT:

9    Q.      Does the fact that The Weiser Law Firm

10   engaged Jeffrey Silo, regardless of how it came to

11   be, and did so on several occasions, harmful to the

12   firm's reputation?

13   A.      No.

14           I mean, I -- if you had asked me this

15   before it happened, I would have been like, oh, my

16   gosh, but I -- it was shocking, and it's -- it's

17   shocking that it happened, right?  It's shocking

18   what he did.  I guess not so shocking why he did it,

19   but it is.

20           But the fact that we had no part in it,

21   that we didn't orchestrate it, like it was

22   perpetrated on us it -- it -- it gave us something

23   to deal with, and we did, but it in no way injured

24   the reputation of the firm because we had nothing to

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36

938

PATRICIA WEISER

149

1   do with it.

2           And it was interesting in talking with both

3   counsel at Blank Rome and, like, the ethics counsel

4   and just colleagues, like, through the couple -- for

5   the time after finding out he was disbarred, I mean,

6   I heard a lot of stories about crazy things that

7   happened at firms, including this at one of them.  I

8   can't remember which one, but somebody said, oh,

9   that happened to us too.  And I'm like what?

10          Like I just can't imagine this happening at

11  all.  And, you know, this isn't something people

12  talk about all the, you know, bad things that happen

13  in a day at work, but in talking with colleagues

14  about the disbarment issue itself and the contract

15  attorney, who wasn't a licensed attorney, I was -- I

16  was pleasantly surprised to learn that people were

17  not surprised.

18          Again, I put this in the category of me

19  being pretty naive even at my advanced age that this

20  stuff happens, but, no, at -- I never at any time

21  felt that that -- the day -- the day it came out I

22  was concerned about what we were going to do to, A,

23  find out what really happened, and, B, correct

24  the -- like correct whatever needed to be corrected

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36

PATRICIA WEISER

150

1    in order to preserve our reputation because we

2    hadn't done anything wrong.

3            And so, no, that -- that in and of itself,

4    no, because we hadn't -- again, we hadn't done

5    anything that would hurt our reputation.  It was

6    perpetrated on us.  We pursued an action against

7    Mr. Silo and Ableson and came to a resolution.  So

8    no, that -- that -- at no time did I think that

9    that -- that I feel that that hurt our reputation.

10            When -- when -- when that information gets

11    take -- like when that information ends up in an

12    article and gets taken out of context and then

13    assumptions, presumptions and conclusions are made

14    which are unfounded, that hurts a reputation.

15            When Mr. Hartleib goes into courts all

16    around the country making that look like something

17    that it is not, including that we perpetrated it,

18    that hurts our reputation because all of that goes

19    to the insinuation that we did something wrong,

20    which we did not.

21    Q.        Do you know if The Weiser Law Firm

22    possesses any documents referring to an Alex or

23    Alexander Silo, other than what was submitted as

24    part of the Sprint litigation?

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36
940

PATRICIA WEISER

151

1   A.        I don't -- I don't even understand what
2   you're asking, but, no, I don't.  I'm not aware of
3   any documents with -- no.
4             I don't understand the question.
5   Q.        Sure.
6   A.        Sorry.
7   Q.        Are you aware of any documents referring to
8   the name Alex or Alexander Silo?
9   A.        The name -- I -- I'm familiar with the
10  name.  I'm not familiar as I sit here today with any
11  documents on which that name appears.  I'm sure it
12  does.  It's one of the names involved with Silo.
13  And I don't -- honestly, as I sit here, I'm not sure
14  which is his real name because it doesn't matter to
15  me anymore, that's resolved.
16             So, no, I don't -- and, you know, I'm sure
17  there are documents.  I -- I don't -- as I sit here
18  today I couldn't identify any of them.
19  Q.        For purposes of preparation of any, like,
20  accounting disclosures or tax filings, would the
21  firm have used the name Jeffrey Silo or some
22  iteration of Jeffrey Silo?
23  A.        So let me answer that in two parts.  For
24  the period of time when we were paying Ableson

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36
941

PATRICIA WEISER

152

1    directly for his work, no, we would have gotten

2    their tax ID number, and the 1099 would have went to

3    them.

4            For any period of time where we contracted

5    with him directly or -- I take back contracted

6    because I don't believe there's any contract -- any

7    period of time that he did work for us directly and

8    not through Ableson, the normal -- the normal tax

9    rules would apply whereby if he made over a certain

10   amount he would be 1099 for those amounts.

11           And -- and in order to be 1099 we would

12   have needed to get a W-9 from him that he would have

13   filled out and signed and submitted to us.  We would

14   not have written a check without a W-9 being

15   submitted.

16   Q.      And --

17   A.      W-9 or W-4?

18           I'm sorry, W-9.  W-9, yes.

19   Q.      For the times that The Weiser Law Firm

20   engaged Jeffrey Silo as a contract attorney, would

21   he have submitted a -- a new W-9 on those occasions

22   or on each occasion or would it just be a single

23   1099 for the first time The Weiser Law Firm engaged

24   him independently?

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36
942

PATRICIA WEISER

153

1                    MR. ROSENZWEIG:   Objection as to

2           form.

3                    Hold on, Pat.

4                    THE WITNESS:   Yeah.

5                    Go ahead.

6                    MR. ROSENZWEIG:   Mr. Mott, you

7           muddled up 1099 and W-9, so I'm going to

8           have to ask you to ask the question again.

9                    MR. MOTT:   Yeah.

10                   No, I appreciate you catching

11          that and bringing it to my attention.

12                   Okay.

13   BY MR. MOTT:

14   Q.      So in order for Mr. Silo to be paid for his

15   work from The Weiser Law Firm, would -- he would

16   have provided the firm a 1099?

17   A.      No.

18   Q.      No, I'm sorry, let me correct that, a W-9.

19   A.      For the first time any contractor submits

20   an invoice, in order to get payment they have to

21   submit a W-9.

22           So the first time he did work for us where

23   we had to pay him over a certain amount, I don't

24   remember what that amount is, it could be 500 or

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36
943

PATRICIA WEISER

154

1    1,500, I -- I just can't remember.  That's a Cheryl

2    thing.  Cheryl would have asked before she wrote

3    that check for a W-9.

4            If, for example -- let's say the amount's

5    1,000 -- like, again, I just don't remember what the

6    amount is, that's Cheryl's daily work.

7            So if it was 1,000 and we paid him 200,

8    then 400, then 200, it wouldn't have been until he

9    went over that amount that, I believe, Cheryl would

10   have asked for a W-9.  I just -- I just don't

11   remember how it worked in this particular instance.

12           But at some point a 1099 would have been

13   prepared for the monies that we paid him, provided

14   in any one year they were in excess of a certain

15   amount, otherwise he would not get a 1099 because it

16   wouldn't be required.

17           I -- I do not know what he made in any

18   given year for us.  So I don't know if he submitted

19   a W-9 or got a 1099.

20   Q.      Would the 1099 or any 1099 issued to

21   Jeffrey Silo from The Weiser Law Firm contain the

22   name that was stated on the W-9?

23   A.      Yes.

24           So exactly what is written on the W-9, the

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36

944

PATRICIA WEISER

155

1    name and the Social Security number, are what would

2    appear on the 1099, and the address.  And that's

3    where the 1099 would be sent to, that name, that

4    address.

5              Sometimes they get sent back to us.  I

6    don't recall if it did, but that's -- it is the

7    information from the W-9 that goes onto the 1099,

8    yes, and -- and on the check or any check.

9    Q.        And do you know whether the firm still has

10   the W-9 or any W-9 from Jeffrey Silo?

11   A.        I don't know because I don't know if we

12   ever got one because I don't know how much he was

13   paid as I sit here today, so that's my first answer.

14             If it was more than seven years ago that we

15   got it, then probably not because all tax records

16   can be purged after seven years.  I -- that's also a

17   question for Cheryl specifically because I don't

18   know what -- where she stores them, if she stores

19   them.  I don't know how she accounts for them

20   when -- like she collects them, and she does the

21   1099s.  I don't know -- I don't know where that

22   documentation is or stays, so you would have to ask

23   her.  I get it for her and give it to her, but what

24   happens after that I don't know.

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36

PATRICIA WEISER

156

1   Q.      Okay.

2           When you requested that your IT provider

3   perform searches related to Silo from Mr. Hartleib,

4   what was -- what was the scope of the inquiry?  Was

5   it in the entire cloud or an entire server or were

6   they searching -- or was it a more limited search?

7   A.      My -- if memory serves, we were doing an

8   e-mail search.  So any active e-mail boxes would

9   have been searched.

10          I'm not an IT person, so I don't know what

11  that means in terms of -- I'm not an I -- I mean --

12  I mean, all of the e-mails were searched for

13  whatever we asked them to search for.

14  Q.      Okay.

15  A.      Yeah.

16  Q.      And so the -- to your knowledge, was the

17  search that they performed just for e-mails or was

18  it for any other type of documents?

19  A.      I don't remember.  I don't remember.

20          I mean, they certainly can check the entire

21  server, but I don't know -- I don't remember the

22  specific search terms, so I don't know what

23  specifically we were asked to look for.

24          My general recollection is we were looking

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36
946

PATRICIA WEISER

157

1    for e-mails related to Silo, Ableson and at some

2    point, Hartleib.  Again, documents, like, case

3    related documents.  So, yeah, e-mails was my

4    recollection of what the search was.

5    Q.      Okay.

6    A.      But I -- but I -- but I don't remember

7    specifically.

8    Q.      The Hartleib folder --

9    A.      Yeah.

10   Q.      -- for the scanned search results, do you

11   know if that folder has anything in it?

12   A.      So I'm just going to correct you there that

13   the scanned search results are -- I don't believe

14   they're in the Hartleib folder.  I believe they're

15   in the Silo folder because that was the documents

16   that we were asked to gather in response to the

17   district attorney's investigation, and that

18   commenced in relation to Mr. Silo.  So they would be

19   in the Silo folder.

20           I mean, I suspect that the Hartleib folder

21   just has the litigation documents related to

22   Mr. Hartleib, but I -- I just don't remember.  I --

23   I know there is or was a folder labeled Hartleib.

24           As this grew into becoming the scope of

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36

947

PATRICIA WEISER

158

1    what it's become -- you know, I -- I'm sure at the

2    time I had hoped and thought that this was going to

3    be, like -- if I get more than two or three

4    documents on an issue, I create a folder for it for

5    as long as it needs to live and then put it where it

6    needs to go.

7            This, obviously, turned into a much, much

8    larger mess, so the organization thereof certainly

9    changed over time.

10           I -- I don't know what's in the Hartleib

11   folder, if it exists with just that name on it now.

12   But your question about the documents gathered in

13   response to the district attorney's investigation,

14   those documents were in the Silo folder and a

15   separate paper binder.

16   Q.      I'll try to be a little bit more simple and

17   direct.

18           Did the IT provider's search for Hartleib

19   turn up anything?  Were there any results from that

20   search?

21   A.      I don't know.  I don't remember.

22           Like I have never had any communications

23   with him, so, like, I don't -- I couldn't even

24   imagine what the role of that search would be, I --

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36
948

PATRICIA WEISER

159

1    I don't know.

2         Rob may be able to speak more on that

3    specifically in terms of what was being looked for.

4    I was more responsible for just the administration

5    of it and the gathering of it and making sure the

6    documents got to who was asking for it, not the

7    content thereof.

8    Q.    Getting to the Ableson and Silo

9    litigation --

10   A.    Yeah.

11   Q.    -- do you -- do you have any knowledge as

12   to whether The Weiser Law Firm produced any

13   documents related to that litigation?

14                  MR. ROSENZWEIG:  Objection as to

15          form.

16                  Produced documents related to

17          that litigation in what context?

18                  MR. MOTT:  In response to any

19          discovery request.

20                  MR. ROSENZWEIG:  In this case?

21                  THE WITNESS:  In what litigation,

22          in this litigation?

23   BY MR. MOTT:

24   Q.    No, in the Ableson/Silo litigation?

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36
949

PATRICIA WEISER

160

1    A.        I don't remember.  I don't remember.  As

2    soon as that was over, I purged that from my head.

3             No, I don't remember.

4    Q.        Do you know how much -- well, strike that.

5             Of the settlement proceeds from the

6    Ableson-and-Silo litigation, were those payments

7    that you would have handled in your role as an

8    administrator with The Weiser Law Firm in terms of

9    the receipt of those payments?

10   A.        What -- what payments?

11   Q.        The -- the payments by Jeffrey Silo and

12   Ableson Legal Search, to The Weiser Law Firm.

13   A.        I'm not aware of any.

14   Q.        Mr. Silo testified that there was a payment

15   made, and he described the amount as around or -- or

16   less than his monthly Social Security payment that

17   he receives.

18   A.        Hmm, I -- I honestly don't have any memory

19   of that.

20   Q.        Okay.

21   A.        I -- I have no knowledge of that, or at

22   least I don't remember, as I sit here right now.

23   Q.        And for any payment that was disbursed to

24   The Weiser Law Firm, has settlement proceeds from

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36
950

PATRICIA WEISER

161

1    Abelson Legal Search -- do you have any recollection

2    regarding that payment for disbursement?

3    A.        I -- I just don't.

4              I mean, I don't remember.  I don't

5    remember.  It doesn't -- I don't remember feeling

6    that it was successful in terms of financial

7    recovery.  My -- my vague recollection is only if

8    there was any money, it was used to satisfy

9    Mr. Rosenzweig's bills that were outstanding to some

10   small degree, but -- but, like, honestly, I -- I

11   cannot remember there being some proceeds in that --

12   that case.

13             And maybe that's just how I follow the way

14   of my memory with a big fat zero, so -- monetarily

15   anyway.

16   Q.        As part of the efforts to protect the

17   firm's reputation, did anyone from the firm ever

18   contact or reach out to the Wall Street Journal to

19   request a correction or retraction of the article

20   that they published?

21   A.        Not that I'm aware of.

22             Since the very beginning of my career, my

23   general -- my general -- Rob and my general process

24   is to not engage with the Press, just to do our jobs

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36
951

PATRICIA WEISER

162

1    and keep our heads down.  You know, yesterday's news

2    becomes today's kitty litter, you just move on with

3    your work.

4              I do not know if Rob or anyone else reached

5    out to the Wall Street Journal.  I suspect not.  I

6    know I did not.

7    Q.       Do you know if the firm's efforts to

8    protect its reputation included any attempts to

9    decrease the visibility of the Wall Street Journal

10   article or any republication of the Wall Street

11   Journal article?

12   A.       I'm not sure how we would do that.

13             So I'm -- I'm not sure exactly what your

14   question is, other than that I know it has been a

15   topic of conversation over the last several years

16   that, like, the -- if you search for The Weiser Law

17   Firm, that's the first thing that comes up.

18             I don't know if that's -- I -- I've never

19   done that search myself.  I -- I don't need to

20   torture myself, but it is my understanding that that

21   pops up.  And that's been discussed amongst the guys

22   at the firm.  Like I -- I'm -- I recall

23   conversations around that.

24   Q.       Conversations regarding the -- the

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36
952

PATRICIA WEISER

163

1    visibility of the article or conversations about how

2    to decrease or lower its visibility when someone

3    searches for the law firm?

4    A.        I don't know how you would do that.  So

5    I -- I -- I can't answer the question because I -- I

6    don't even know if that's possible.  So if it is --

7    I mean, I had testified to the efforts we made and

8    the people we hired to help us preserve the

9    integrity and reputation of the firm.

10            What specifically they did with respect to

11   Internet-search results, I do not know.  I don't

12   know.  That's a question for someone else.

13   Q.        When you heard conversations about the

14   visibility of the Wall Street Journal article, was

15   there any mention of visibility of the statements

16   made by Michael Hartleib outside of any statements

17   that were quoted in the Wall Street Journal article?

18                        MR. ROSENZWEIG:  I object to the

19            form.

20                        THE WITNESS:  To the extent that

21            you're asking am I aware of conversations

22            about the many statements made by

23            Mr. Hartleib, derogatory statements,

24            harassing statements by Mr. Hartleib

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36

953

PATRICIA WEISER

164

1           against my husband and my firm, yes, I'm --

2           I'm aware of many conversations about that.

3                 They have caused strife and

4           embarrassment and stress for every member

5           of my family and firm, and there have been

6           conversations ever since they started.  And

7           I -- and I have worked very hard to have

8           that not be at the forefront of my brain on

9           a daily basis.  And when it pops back up

10          again, it's hurtful, it's painful.  It

11          causes me physical and emotional stress.

12          It causes Rob physical and emotional

13          stress.

14                 Yeah, there have been -- there

15          have been many conversations, and they're

16          awful.  And it feels like there's nothing

17          we can do about it, which is why we came to

18          the conclusion to pursue this litigation.

19                 And, at the end of the day, it

20          feels like we've just given him a vehicle

21          to harass us more.  It's awful.

22   BY MR. MOTT:

23   Q.    Well, while you are -- are no longer

24   actively practicing, I -- I believe you stated

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36

954

PATRICIA WEISER

165

1    earlier that your membership with the Pennsylvania

2    Bar is still in active status; is that correct?

3    A.        Yes, Pennsylvania and New Jersey.

4    Q.        Do -- do you receive any of the

5    newsletters, letters sent by the Pennsylvania Bar or

6    the Pennsylvania Disciplinary Board?

7    A.        I believe I get -- as a member of the

8    Pennsylvania Bar I think I get regular e-mails.  I'm

9    not sure if I am an active status member of the

10   Pennsylvania Bar as I sit here right now.  I feel

11   like my membership might had lapsed.

12            And that doesn't mean I -- it lapsed as a

13   member of the Bar, but the Pennsylvania Bar

14   Association is who sends those e-mails.  So,

15   generally, I've seen them in -- over time, but,

16   specifically, I can't remember the last time I saw

17   one.

18            I don't generally look at them in terms of

19   who's been disbarred and who's been -- I -- I keep

20   track of my own employees, but I don't generally

21   look at who's on the list.

22   Q.        You don't like to see --

23   A.        No.

24   Q.        -- if any attorneys you know --

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36

955

PATRICIA WEISER

166

1    A.        No.

2    Q.        -- turned up on the list?

3    A.        That's not me, nope.

4              Why, are you on the list?  Should I go

5    look?

6    Q.        I was just going to comment that you're a

7    better person than me because I look to see who got

8    disbarred.

9    A.        No.  I would rather spend time with my

10   kids.

11   Q.        Have you ever seen the letter to the

12   Chester County Court of Common Pleas that was sent

13   anonymously?

14   A.        I'm aware of it, but I don't think I --

15   I -- I don't recall seeing it.  I may have, but I

16   don't recall it as I sit here now.

17   Q.        Has -- has Rob ever discussed that letter

18   with you?

19   A.        Rob discusses everything with me.

20   Q.        Did you have any personal knowledge that it

21   was Michael Hartleib that sent that letter?

22   A.        No.

23   Q.        Has Robert Weiser ever expressed to you how

24   he knows that that anonymous letter was sent by

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36
956

PATRICIA WEISER

167

1    Robert -- was sent by Michael Hartleib?

2    A.       I don't remember.  I -- I don't remember.

3    Q.       Do you know of any other anonymous

4    statements that Mr. Weiser attributes to

5    Mr. Hartleib?

6    A.       I'm only generally aware of what appears in

7    our Amended Complaint, our First Amended Complaint.

8            Like anything that's in there I'm aware of.

9    Anything outside of that, if I was aware of it, I

10   have pushed it down into my subconscious very deeply

11   and have forgotten it.

12   Q.       Have you ever seen the affidavit executed

13   by Mr. Silo as a condition of his settlement

14   agreement with The Weiser Law Firm?

15   A.       I do --

16                   MR. ROSENZWEIG:  Objection as to

17          form.

18                   THE WITNESS:  -- recall seeing it

19          at the time.

20                   MR. ROSENZWEIG:  Objection as to

21          form.

22   BY MR. MOTT:

23   Q.       Did you have any role in the drafting of

24   that affidavit?

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36

957

PATRICIA WEISER

168

1    A.        I don't recall.

2               I mean, I didn't draft -- do you mean

3    actual drafting, like typing?  No, definitely not.

4    If -- did I review it and provide comments,

5    possibly, but I do not recall.  But I did not draft

6    it, no.

7    Q.        Thank you for the clarification.

8               Do you have any knowledge as to whether the

9    trial courts memorandum in the Sprint case was

10   harmful to The Weiser Law Firm's reputation?

11   A.        I haven't -- I haven't thought about it in

12   that -- in that sense, the way you phrased it.

13              It's -- I don't think in and of itself if

14   it had just ended there, I wouldn't anticipate that

15   to be so injurious.  It wouldn't be pleasant.  It

16   wouldn't be a positive thing, but it would -- it

17   would come and go like anything else.

18              So the memorandum opinion itself, I mean,

19   who reads those?  That, in and of itself, I would

20   say, had very little impact.  It may have had some,

21   but I haven't actually thought of it in -- out --

22   out of context like that by itself.

23   Q.        Do you know an attorney by the name of

24   John Mannino?

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36

PATRICIA WEISER

169

1   A.        I know the name, but I do not know

2   Mr. Mannino.

3   Q.        And do you know what relationship he has,

4   if any, with The Weiser Law Firm?

5   A.        I don't think we have a relationship with

6   Mr. Mannino.  I believe -- Mr. Mannino is involved

7   in qui tam litigation, and I don't know if or how we

8   are or were connected with him or that litigation.

9   I just -- I -- I -- I'm not aware of -- I know his

10  name.  I know what he -- what his -- his inkeeping

11  of cases.  I -- I'm not aware of any current

12  relationship.

13           Yeah, that's all -- that's all -- that's

14  all I can say to that.

15  Q.        During his testimony earlier this week

16  Mr. Nelson referenced a Philly-based vendor that

17  The Weiser Law Firm uses to set up LLCs for purposes

18  of pursuing qui tam litigation.

19           Do you know who that vendor is?

20                    MR. ROSENZWEIG:  Objection as to

21           form.

22                    THE WITNESS:  No, I'd be

23           guessing.

24                    Mr. Nelson -- Mr. Nelson manages

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36

PATRICIA WEISER

170

1          the qui tam practice, and how that has to

2          be conducted is very precise by statute,

3          protecting the clients and the

4          whistleblowers themselves, so I'm not

5          involved in the qui tam litigation other

6          than administratively.

7               But, no, I have not been involved

8          in this aspect of it.

9    BY MR. MOTT:

10   Q.     And, in your role administratively --

11   A.     Yeah.

12   Q.     -- do you know of any payments that were

13   made to a vendor that performs or assists in the

14   creation of LLC entities?

15   A.     I'm not.

16          If you gave me a name I could tell you if I

17   recognize, like, a check having been written out to

18   them, but short of that, I'm not aware --

19   Q.     Okay.

20   A.     -- as I sit here now.

21   Q.     Did you have any role in the appeal of the

22   trial court's decision to reduce the fee award?

23   A.     Can you define role, like what are you --

24   Q.     Yeah, I -- I -- I mean -- and I'll -- in

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36
960

PATRICIA WEISER

171

1    terms of attorney -- attorney work on the appeal,

2    did you perform any attorney work in -- in relation

3    to the appeal?

4              MR. ROSENZWEIG:  And I'm going to

5         object only because it doesn't have

6         context.

7              Mr. Mott, are you referring to

8         the Sprint/Nextel appeal?

9              MR. MOTT:  Yes.

10             THE WITNESS:  Can you give me a

11        year?  When did that happen?

12   BY MR. MOTT:

13   Q.     So I -- I believe that this -- the trial

14   court decision was in late 2016, and so the appeal

15   would have -- the appeal proceedings would have

16   taken place primarily in 2017.

17   A.     So I generally remember, you know,

18   discussions with Rob, possibly others at the firm

19   where we would, like, talk about status litigation,

20   what's happening, what's going on, what do you

21   think?  We do that.  We've done that a -- a lot over

22   the years.  I -- I do not recall any personal

23   involvement.

24             In 2016 I can't imagine I had any personal

PATRICIA WEISER

172

1    involvement in the actual appeal.

2    Q.      Do you believe that -- well, strike that.

3            Mr. Weiser has brought a claim for

4    intentional infliction of emotional distress.  And

5    if you could, just bear with me here while I pull up

6    the Complaint.

7    A.      Yeah.

8                        (Pause in the proceedings.)

9    BY MR. MOTT:

10   Q.      Are you able to see -- I've placed Page 46

11   of the -- of the First Amended Complaint on your

12   screen.  Are you able to see it?

13   A.      Can you zoom that just a little bit for me,

14   just a couple more?

15   Q.      (Complies.)

16   A.      Yeah.

17   Q.      I'm sorry, did you say in or out?  I'm

18   assuming --

19   A.      Make it bigger.

20   Q.      (Complies.)

21   A.      Oh, perfect.  Thanks.

22           I can see it now.  Thank you.

23   Q.      Okay.

24           And down on Paragraph 194 it states,

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36

PATRICIA WEISER

173

1    Hartleib's conduct, as described here and above, has

2    intentionally caused Weiser to suffer enormous

3    stress, anxiety, sleep deprivation, depression,

4    anger and torment.

5            Did I read Paragraph 194 correctly?

6    A.      You did.

7    Q.      In terms of the suffering of enormous

8    stress, are you aware of any instances where you

9    observed Mr. Weiser suffer enormous stress

10   attributable to Mr. Hartleib?

11   A.      Yes.

12   Q.      Can you give me some examples of instances

13   where Mr. Weiser demonstrated signs of enormous

14   stress?

15   A.      At multiple times since the Sprint

16   litigation, multiple times.

17           Every time some -- we become aware of

18   something Mr. Hartleib has said or done, there is --

19   there's just, like, an instant -- like the whole

20   world tightens up and all the air goes out of it

21   every single time, and you know all of the times.

22           Any time Mr. Rosenzweig calls us to give us

23   an update on something.  Any time we hear the

24   H word, it's -- it's like he -- he's shooting

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36

963

PATRICIA WEISER

174

 1   some -- it's like a Harry Potter thing in our house.

 2   Like I -- I can't hear the name without constricting

 3   my chest.  And Rob -- look, I've -- I've learned

 4   over time with some therapy to show my emotions and

 5   not just be a stoic, strong woman.

 6        My husband is a very, strong proud man

 7   who -- this absolutely crushes him.  Like the --

 8   the -- like nothing physical can crush Rob, he'll

 9   run through any wall, but the -- the idea that his

10   reputation, which he has spent his whole life

11   building could be tarnished repeatedly without any

12   seeming end, has caused him more stress than I have

13   seen in -- in his entire life.

14        I have -- I have literally been with him

15   since we were sixteen years old, 1986, and we've

16   been married a very long time, like, so there's been

17   stressful things in our lives.  I -- I can't think

18   of anything that causes the level of stress that

19   Mr. Hartleib and his conduct has.

20        Where we'll -- we'll be having a fine day,

21   and I'll just see, like, this whole -- this just

22   wave comes over him, and he gets quiet.  He usually

23   goes to the same chair to sit down or he goes for a

24   really long run.  He gets very quiet.

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36

964

PATRICIA WEISER

175

1          And I -- and I know in that moment, having

2    known him my whole life that I need to give him his

3    space before I find out what exactly's upsetting

4    him.  If it's me, he usually tells me right away.

5    So if he hasn't said anything, then I -- then I kind

6    of know what it is.  And, honestly, for, like, the

7    last five years, it's just been this.

8          I will say we're pretty lucky because

9    our -- like our kids are great, like I -- I have a

10   happy marriage, I have very good friends.  And this

11   is one thing, this is the one thing that can suck

12   the life out of Rob and suck the joy out of his life

13   and his heart.  And I -- I'm never sure whether

14   trying to talk to him about it or trying to just let

15   him have his space to deal with it himself is the

16   right thing.

17         I never want to let on how upset I am

18   because that will make him more upset because

19   something that -- he -- he thinks that this is his

20   fault in the sense that Hartleib was attacking him,

21   and so it's something about him that's causing me

22   stress and pain.  I -- it's awful.  It's just awful.

23         Rob is a happy, fun guy.  Like he's a

24   happy, fun, smart -- he loves life, and whenever --

PATRICIA WEISER

176

1   whenever something in this case or something that

2   Hartleib has done pops up, it just -- it just sucks

3   the life out of us, and especially out of Rob.  And

4   it's a -- it's a combination of, like, powering up

5   to be tough to it and not let it kill you and -- and

6   just knowing it's crushing you.

7            And on many occasions, you know, he'll --

8   he'll be sitting down and say, Pat, I think I'm

9   depressed.  And while they might seem normal to some

10  people to have, like, a human being say that, it's

11  not normal in my house.

12           I think I'm depressed.  I -- I think maybe

13  I need to see someone.

14           Even two days ago when I -- I got all upset

15  about trying to read the Amended Complaint and

16  preparing for this deposition, and I -- I started to

17  have what felt like a panic attack, and he was so

18  kind.  He came over and he gave me a hug, and he was

19  like, I know.  I know how it feels.

20           It never occurred to me that he was having

21  the kind of panic attacks that I was having, that I

22  need medication to, like, not feel like I'm going to

23  have a heart attack, that he -- I said, I'll be

24  okay.  It's just coming in waves.  If I need to take

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36

966

PATRICIA WEISER

177

1    a pill, I'll take one because I don't, like, want to
2    feel like I'm going to have a heart attack.
3            And he said it -- he said it to me with
4    such empathy, like, I know.  I know how you feel.
5    And I was, like, wait a minute, wait a minute, wait
6    a minute.  Do you mean that you've been feeling this
7    panic-attacky stuff all of this time too?  And I
8    swear to God I didn't know that until two days ago.
9    And he says, yeah, it comes in waves.
10           Like three years ago I could not sleep at
11   night.  I -- I thought I was going to have a heart
12   attack every night, and I woke up stressed about the
13   finances of this firm and who I was going to have to
14   fire next, and that caused extreme stress on Rob.
15           Like when I'm upset, he's upset because
16   then he's failing somehow if I'm upset.  And the --
17   the financial stress on the firm.  And what do we
18   have to sell?  Who do we have to fire?  How are we
19   going to do this?  Should we not do anything or
20   should we go after Mr. Hartleib?  Like I didn't --
21   it causes him more stress than a human being should
22   have to handle.  And I underestimated how much
23   stress it was even as recently as two days ago.
24           He runs.  He's a runner.  He runs six to

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36

PATRICIA WEISER

178

1    ten miles every single day.  That's literally the
2    only reason he hasn't had a heart attack from all
3    this.  Exercise makes me feel better too.  Like,
4    that's -- you know, get the endorphins going.  He
5    runs every day.  He runs fast.  He runs, like, a
6    six-minute mile for ten miles.  I -- I would be
7    scared to think what shape he would be in mentally
8    if he wasn't able to do that.
9            He is the most loving father, and yet when
10   this stuff happens he needs to be alone, he needs,
11   you know, to find a corner and figure out how to
12   deal with it.  And the kids know this, and they can
13   see when he's upset, they know when he's upset, and
14   this is not something we're going to burn them with
15   the details of.  But to carry the weight of the
16   personal attacks, the weight of feeling like you're
17   letting your spouse and business partner down
18   because this person is coming after you, trying to
19   hold all this together for your kids and your
20   family -- and it -- it doesn't feel like it's ever
21   going to end.
22           I -- I have spent more money defending
23   against all of this shit.  I've spent more money
24   defending this than I have, like, pursuing cases in

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36
968

PATRICIA WEISER

179

1    our career, I'd be willing to bet.  Because it's not
2    good business to spend this much money on something
3    that you don't know you can win.  And there's no
4    winning.  There's no winning with this lawsuit.
5              I just want him to stop.  There's no amount
6    of money.  I just want him to stop.  And so, you
7    know, I'm going to spend seven figures trying to get
8    a man to stop being mean to my husband, and, like, I
9    don't know if we're going to be successful.
10             So we'll continue because we cannot do
11   business if he's going to continue what he's doing
12   to my husband and our firm.  And if that means we
13   don't have a firm, fine, we'll have each other, but
14   this has been the hardest thing.
15             He doesn't sleep.  He never sleeps, like
16   never, never, never.  He gets migraines.  They're
17   horrifying, horrifying migraines.  He has to be in a
18   cold/dry -- a cold, cold place.  They make him
19   nauseous.  He's trying all different kinds of
20   medicines to stop the headaches to help the
21   headaches, never sleeping medication, though,
22   because he doesn't like to take drugs.
23             It's just -- look, there's a lot of things
24   that have gone on in the world for last five years

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36
969

PATRICIA WEISER

180

1    or so, right?  Every -- a lot of things go out of

2    control.  This is the most uncontrolled thing I've

3    ever had to deal with, and it's costing me money I

4    don't have, time away from my family where I should

5    be today, and a relationship with my husband that

6    should be sweeter and not so stressed.

7            Look, when you decide to go into business

8    with your spouse, this comes with it.  I am Rob

9    Weiser's partner, everything.  I will stand by his

10   side through everything.  And I truly think we can

11   do anything together, and we'll get through this.  I

12   just have no faith that it's going to end ever, and

13   it should because it's wrong.  It's mean.  It's just

14   really mean and destructive to a human being and his

15   family.

16   Q.      What are some of the things that your

17   husband takes to try and deal with some of the

18   symptoms that you've just described?

19   A.      So for the migraines he has Imitrex.  The

20   problem with the Imitrex is that taking the Imitrex

21   makes him feel a different kind of awful.  So he

22   tries not to take it unless he really, really has to

23   because although it will stop the migraines, he's

24   going to feel shitty for a whole day after that.  So

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36

970

PATRICIA WEISER

181

1    there's Imitrex.

2           I know recently, in the last couple of

3    months his neurologist has suggested a couple of

4    different migraine medications that he could try,

5    that maybe they would provide him with relief

6    without the side effects of Imitrex.  I -- I -- I'm

7    not aware of anything working any better than

8    Imitrex.

9           He gets Botox shots in his skull to try to

10   stop the migraines from happening.  It used to work

11   pretty well.  It used to -- it used to work for,

12   like, six months or so.  He would get the shots in

13   his head, like big needles in his head, and then his

14   head would feel like a bowling ball for, like, a

15   couple of weeks.

16          The cross benefit, if you cannot have a

17   migraine for six months, you can have a bowling ball

18   head for a couple of weeks.  And then over time the

19   benefits decreased, and the bowling ball effect

20   increased.  But I know he stopped doing that for a

21   while, but he's doing it again.  He's getting the

22   shots again, and he's getting them more often, and

23   it's -- it's like -- it looks like torture.  Like

24   they're literally putting these big needles in his

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36
971

PATRICIA WEISER

182

1   head, and I don't have a sense that it really helps

2   that much anymore.

3           He has a really hard time sleeping,

4   especially when he is thinking a lot.  In -- in the

5   best of times when we were litigating fun cases, you

6   would be thinking all the time, you, like, wouldn't

7   want to go to sleep because your brain -- you

8   couldn't turn it off.

9           And he's one of these -- he's a big thinker

10  that doesn't turn his brain off.  And while there's,

11  like, some instance where that's, like, kind of a

12  cool thing, in this instance it's impossible to turn

13  off his brain and -- and the thought processes that

14  swirl, trying to figure out how to get out of this

15  swirl of stress and vexatious attacks, personal

16  attacks that are -- are designed to end our business

17  and humiliate my husband personally.

18          So -- not sleeping.  So that -- that causes

19  no sleeping.  He's just constantly -- you know, he

20  can't turn his brain off.  Stress prevents sleeping.

21          Some what am I saying?

22          So the pills is just Imitrex, and the --

23  the new medicines that -- I don't know what they

24  are, you would have to ask him, that the doctor told

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36

PATRICIA WEISER

183

1    him to try.

2    Q.      And the new medication that the doctor

3    recommended, was that for -- for the migraines?

4    A.      Yes.

5            Apparently, there are new migraine

6    medications, different ones, and they work

7    differently and -- and attack different -- they

8    address different areas of the brain.

9            I don't -- I mean, I'm not a doctor, but

10   there are new medications finally, so he's trying

11   some of them, I think.  I'm not aware of any -- any

12   relief.

13   Q.      Did your husband have any issues of

14   migraines before 2016?

15   A.      He has, not with the frequency with which

16   he has had them since then.

17   Q.      Is it your belief that the increase of

18   frequency of migraines is due to Mr. Hartleib?

19   A.      Yes, Mr. Hartleib and the whole swirl

20   that's become our life of dealing with -- I mean,

21   ironically, we're litigators, right?  Being involved

22   in litigation is ridiculously stressful, especially

23   when it's not, like, just your job.  It's stressful

24   when it is your job, but when you're involved in it,

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36
973

PATRICIA WEISER

184

1    even more so.

2              And so the more blown out of proportion

3    this has become in terms of Mr. Hartleib suing us in

4    Kansas, and then us counterclaiming against him, and

5    then him -- him -- you know, all the things he's

6    doing, and showing up in court and filing amicus

7    briefs, you know, all of his actions to prevent us

8    from doing -- to running our business to be -- being

9    lead counsel in cases and prosecuting cases is

10   stressful.  Stress causes migraines.  Poor Rob.

11             This is the most stressful thing we ever

12   had to deal with.

13                       MR. ROSENZWEIG:  Can we take a --

14             excuse me, can we take a three-minute

15             break?

16                       MR. MOTT:  Sure.

17                       THE WITNESS:  I need to get a

18             glass of water.

19                       VIDEO SPECIALIST:  3:34, off

20             video.

21                       (At this time, a short break was

22             taken.)

23                       VIDEO SPECIALIST:  3:41, on

24             video.

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36

PATRICIA WEISER

185

1                    MR. MOTT:  Okay.

2    BY MR. MOTT:

3    Q.        Ms. Weiser, do you know if your husband

4    takes any kind of medication for -- for the panic

5    attacks that he disclosed to you?

6    A.        I never said he had panic attacks, that's

7    going to be for him to describe to you.  What I

8    described was my own panic attack, and he said,

9    yeah, I -- I feel that.  I'm not aware of any

10   medication he takes for that.  Like I said, he runs

11   six to ten miles a day.  I think most of his stress

12   is managed through that exercise.

13             I was surprised -- I was surprised to learn

14   that he had that type of stress attack.

15   Q.        Okay.

16             And do you know if he's sought any kind of

17   treatment for the depression that -- that he

18   mentioned to you or believed that he may be -- may

19   have been experiencing?

20   A.        Not that I'm aware of.

21             Like I said, he's mentioned a couple times,

22   you know, I think I -- I think I'm depressed.  Rob

23   is a very -- Rob likes to figure out things for

24   himself, including his own health and mental

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36
975

PATRICIA WEISER

186

1    well-being.  He's done it his whole life.

2              Would this have been easier and quicker

3    with professional assistance?  Probably.  I have

4    chosen that route, and I have found it helpful, but

5    he chooses to figure this stuff out on his own.

6    He's a very proud and smart person and decides

7    what's best for him.

8    Q.      Do you know if he sought any kind of

9    counseling, whether it be from a medical provider

10   like a psychiatrist or -- or a counselor, like a

11   social worker, related to some of the symptoms

12   that -- that you have described?

13   A.      Not that I'm aware.  Not that I'm aware.

14   Q.      And the migraine medication that he takes.

15   Do you know where he fills that prescription?

16   A.      The doctor or the pharmacy?

17   Q.      The pharmacy.

18   A.      I think the Imitrex is just from CVS.  The

19   Botox is -- is different and has to come from

20   someplace special.

21   Q.      The -- the Botox that you mentioned, is

22   that something that the provider administers or is

23   that something that he was able to perform himself?

24   A.      Oh, no, no, the neurologist does the Botox

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36
976

PATRICIA WEISER

187

1    shots.

2    Q.        Okay.

3    A.        The neurologist prescribes it, and you have

4    to get it from a -- a different pharm -- like it's a

5    different level of procurement of the Botox to the

6    doctor who then administers it.

7    Q.        Okay.

8    A.        And it's -- and it's strictly for -- I

9    mean, I could use it right here (indicating), I'm

10   looking, but he uses it strictly for the -- as a

11   proactive treatment for migraines, which works more

12   or less to a degree, but lately hasn't worked very

13   well at all.

14   Q.        And the CVS that you mentioned, do you know

15   what street that's on?

16   A.        I'm not sure which one he goes to.  I'm

17   going to say Rosemont is probably -- Rosemont or

18   Conshohocken.  I'm not sure what the street is in

19   Conshohocken.  In Rosemont, it's Lancaster Avenue.

20   Q.        And do you know the name of his

21   neurologist?

22   A.        I don't.

23   Q.        Do you know where the office is located?

24   A.        Nope.

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36
977

PATRICIA WEISER

188

1    Q.      Do you know whether the neurologist has any

2    affiliation with one of the health networks in our

3    area?

4    A.      I have no idea.

5            Rob independently manages his healthcare.

6    Q.      Does the law firm provide health insurance

7    to its employees?

8    A.      Yes.

9    Q.      And who is the current health insurance

10   carrier for the law firm?

11   A.      Independence BlueCross.

12   Q.      And how long has IBX been the health

13   insurance carrier for The Weiser Law Firm?

14   A.      Since inception of the firm.

15   Q.      Who is -- well, strike that.

16           Does Robert Weiser have a primary care

17   physician?

18   A.      I'm not sure.

19   Q.      Do you know if he has ever attended annual

20   checkups?

21   A.      Don't know.

22           With, like, a primary care physician, I

23   don't know.

24   Q.      Do you know how long Mr. Weiser has been

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36
978

PATRICIA WEISER

189

1    treating with this particular neurologist that

2    administers the Botox?

3    A.        I couldn't say.  I -- I don't -- I don't

4    recall who it is, and I couldn't say.  Like it could

5    have changed over time, like I don't know.  That's

6    not something that falls under my to-do list.  It

7    may seem strange, but true.

8    Q.        How frequently does Mr. Weiser experience

9    issues with the sleeping at night?

10   A.        Every night.

11   Q.        Did he have any issues with sleeping prior

12   to 2016?

13   A.        I would say from time to time, yes.

14   Stress is something that does impact his sleep.

15   Yeah, from time to time, but it's -- it's never been

16   worse than now and the last couple of years.

17   Q.        Prior to the issues with Mr. Hartleib, did

18   Mr. Weiser ever seek any kind of, like, treatment or

19   relief for his sleep issues?

20   A.        Treatment for sleep issues?

21             Not that I'm aware, no, and not that I can

22   recall.

23   Q.        Other than the stress or anxiety by

24   Mr. Hartleib, does your husband suffer from any

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36

PATRICIA WEISER

190

1    other issues that impact his ability to sleep, for

2    example, sleep apnea?

3    A.        Not that I'm aware.

4    Q.        Other than the symptoms that we have gone

5    over that you believe is attributable to

6    Mr. Hartleib, does Mr. Weiser suffer from any other

7    health issues that you know of?

8    A.        He has a congenital heart defect.  He has

9    a -- a cardiologist that he sees about that.

10            You know, we're very athletic, so a variety

11   of athletic injuries over the years, too many to

12   talk about, but none that I can think of that rise

13   to the level of what you're asking.

14            I mean, he's had, you know, sports injuries

15   in -- in high school and college, if you want to go

16   back that far.

17   Q.        Other than running, does your husband have

18   any hobbies?

19   A.        Yes.

20            Rob loves to read, playing cards,

21   generally, like, fitness is something that we do a

22   lot of together.  So whether it's running or

23   lifting -- you know, weightlifting, boxing, bike

24   riding, swimming.  He does, like, a triathlon every

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36

PATRICIA WEISER

191

1    day when we stay down the shore.  He -- he likes --

2    it makes him feel better.  He feels better when he

3    is being active.

4            Reading, reading is probably what he does

5    second most.  Playing cards and games with the kids.

6    He plays a lot of poker and rummy.

7            What else are hobbies?

8            We watch a lot of Phillies games.  I mean,

9    we like to go to Phillies games.  We're active more

10   than, I guess, just sports and athletics.  Watching

11   our kids play.  They're both very active athletes,

12   so we're at kids' games constantly.  He's coached.

13   He's done a lot of coaching.

14           Wow, I'm -- I'm stumped.

15   Q.      Okay.

16   A.      I know there's -- there's a lot of that in

17   every day.

18   Q.      As we try to wrap this up, if anything else

19   comes to mind before we --

20   A.      Sure.

21   Q.      -- finish, please -- please jump in.

22   A.      Sure.

23   Q.      For some of the fitness stuff, are you and

24   your husband a member of any gyms?

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36

981

PATRICIA WEISER

192

1    A.        So at home, no, down the shore he's in --

2    he or the family is a member of The 10th Street

3    Gym [sic], which is a gym in Wildwood, New Jersey,

4    just an old-school gym that we like to work out at

5    when we're down the shore.

6              At home we -- we've always had the ability

7    to work out at home.  We have a whole setup at home.

8    So I have -- we have cardio equipment in the

9    basement and in the garage, and we basically just

10   converted that into a boxing and a weightlifting

11   gym.  All four of us are very engaged in that,

12   especially during the pandemic.

13             You know, when everyone got locked down we

14   worked and looked very fit and strong.  It's

15   something we like to do.  So, like, the -- the

16   family all uses that, all that equipment.

17   Q.        For your husband's running --

18   A.        Yeah.

19   Q.        -- has his habits in terms of frequency or

20   distance changed at all since 2016?

21   A.        So I would say that Rob's -- Rob's always

22   been a runner.  I mean, he's always been very

23   active.  I think that it is necessary.  I think it's

24   a necessary stress release, as much as anything now,

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36

982

PATRICIA WEISER

193

1    if you ask me.

2          I -- I know I had a couple injuries and was

3    not able to, like, run, play tennis, do -- do

4    lifting, all that kind of stuff, and I was surprised

5    at how, like, depressed I felt not being able to

6    exercise, and it just kind of hit me at that point

7    in time, but I'm glad he can and hasn't had any

8    injuries that stopped him from the running.  I'm

9    appreciating how important that is to his life and

10   to his mental health.

11         As far as changing, I mean, you know, like,

12   it's nothing drastic, it's been pretty steady.

13   Q.      For the triathlons, is that an -- organized

14   events that he does?

15   A.      No.  No.  No.

16         So, like, for example, he'll get up and go

17   for a bike ride, and then he'll go for a run, and

18   then he'll go for a swim, like, he'll literally, you

19   know, run, bike, jump in the ocean and swim, but

20   it's a little mini triathlon every time he does it.

21   It's more than -- more than anyone down here is kind

22   of doing, but it makes him feel good.  I mean,

23   that's what makes him feel physically and mentally

24   good, so I'm glad he does it.

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36

983

PATRICIA WEISER

194

1   Q.      All right.

2           Do you believe that the actions of

3   Mr. Hartleib that are at issue in this litigation

4   have -- have caused any changes in Mr. Weiser's

5   appearance?

6   A.      I mean, I'll say, yes, because it's -- it's

7   a level of stress that is unsustainable as a human

8   being.  You know, he -- he is in pain all the time.

9   His body hurts all the time.  How much of that is

10  correlated to stress?  I'm -- I'm not a doctor, I

11  can't say.  And I don't know if any doctor could

12  say, but he is in pain all the time.

13          Pain prevents him from sleeping.  Pain

14  makes him get -- get migraines triggered.  He feels

15  good when he's running.  He takes a tub, a hot-hot

16  tub every single night for an hour just to relax his

17  back and neck so that he hopes he'll be able to

18  sleep every single night.

19          We were in Virginia for a softball

20  tournament for my younger daughter last week, and

21  for some reason hotels don't put tubs in the rooms

22  anymore, so there were no hotel rooms in Virginia

23  that had a tub.  So the whole team was staying at

24  this one place, so we booked a room.  So I was there

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36
984

PATRICIA WEISER

195

1    with the team and -- and with my daughter, and Rob

2    had to find a hotel that had a tub or he can't come,

3    like he literally can't come.

4           So he found, like, a Best Western somewhere

5    that had a tub because it was, like, you know, the

6    oldest hotel in Virginia Beach, so he can soak every

7    night for an hour, hour and a half, and -- you know,

8    and then he doesn't sleep, and then we're, you know,

9    sitting on the sidelines of softball watching our

10   daughter play and he's -- he's just in pain all the

11   time.  It's hard.  It's really hard.

12          And to not get sleep on top of -- like to

13   be stressed is one thing, to be in physical pain is

14   another -- is another stage of it, which is harder.

15   And then to not sleep on top of that is just

16   unbearable, just unbearable.

17          I started feeling stressed about this

18   deposition and just thinking about the firm's

19   finances and the firm's future while I was in

20   Virginia Beach.  It really overwhelmed me, and I --

21   I just couldn't stop crying.

22          Like I left -- I left the field one day,

23   everybody went out somewhere, and I just went back

24   to the hotel and cried for a couple hours.

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36

985

PATRICIA WEISER

196

1          And then I couldn't sleep.  Like I'm a

2    really good sleeper, but for the last three to four

3    years, like, I wake up every night in the middle of

4    the night.  He's always awake when I wake up.  Like

5    when -- when I -- I'm starting to have the symptoms

6    that Rob has had for a long time of not sleeping

7    and -- and body aches that come from stress and not

8    sleeping.

9          And I now understand and appreciate the

10   scope of what he has been dealing with in a way that

11   I just ignorantly did not because I wasn't actually

12   feeling it myself.

13         When we drove back from Virginia, I was,

14   like, holy shit, is this what it feels like to be

15   you?  I'm, like, exhausted and in pain, and I've got

16   a headache.  And I've never had a migraine, so I

17   don't even know how awful that is.  So, yeah, it's

18   very hard to be him physically and mentally, and

19   yet, you know, I'm sure he's out playing with my

20   daughters on the beach right now because he's a good

21   dad, and that's what you do.

22   Q.       Have you noticed any changes in your

23   husband's weight?

24   A.       We don't have a scale at our house, so to

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36

PATRICIA WEISER

197

1    be honest, I have no idea.  I just don't believe in

2    scales, so I don't know.

3            I mean, general size -- I haven't had to

4    buy him, like, bigger or smaller clothes.  No, I --

5    I have not noticed.

6    Q.      You're not aware of him having to get suits

7    altered or --

8    A.      No --

9    Q.      -- or get a new wardrobe or anything?

10   A.      -- we don't wear suits.  There are no

11   suits.  Like, it's like -- you know, we wear what we

12   wear.  No, I'm not -- no -- no health-related weight

13   gain or loss that I'm aware of.  I mean, for a guy

14   that runs as much as he does, no, I'm not aware of

15   that.

16   Q.      And unless I'm -- unless I'm

17   misinterpreting your testimony, you mentioned

18   physical pain earlier that Mr. Weiser experiences.

19           And where does he experience this physical

20   pain?

21   A.      It's really all over, his neck, back, and

22   where on the back depends on -- I mean, it changes.

23           His hips are very tight.  Like everything's

24   very tight, which, you know, if you get a massage or

PATRICIA WEISER

198

1    you get some kind of PT, like, they're able to,

2    like, loosen things up for you, but if you're

3    constantly, like, in, like, fighter-or-flight mode

4    in response to stressors, it builds.

5          And I only had this happen to me twice in

6    my life, and both -- I appreciated the -- the stress

7    impact, the impact of stress on the physical.  And

8    it was extreme because it was -- the first time was

9    2012 when I -- when I stopped practicing, and my

10   youngest daughter at the time -- like I was trying

11   to do too -- I was trying to be a good mom and a

12   good lawyer and all at the same time, and, like,

13   it's really hard.

14         And my then five-year-old came up to me and

15   said -- and I -- I had such pain in my back at that

16   point in time -- and she came up to me, she's like,

17   Mommy, can't you just stay home with us?  And I

18   said, sure.  And I walked to the other side of the

19   house, and I told Rob that I quit.  And that back

20   pain went away.

21         So no doctor diagnosed it.  I have no

22   doctor or medical report about, like, the pain in my

23   back, but I removed the stressor, and it went away.

24         I have a lot of pain in my shoulder right

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36

PATRICIA WEISER

199

1   now, and I associate that with all of the stress of

2   this because it comes and goes, as this whole

3   litigation and shit comes and goes.  And my -- my --

4   what I suspect is, is that Rob -- Rob's is just with

5   him all the time.  Everything hurts.  You can ask

6   him when you depose him, everything hurts.

7   Q.        Do you know if Mr. Weiser ever had any neck

8   or back issues before 2016?

9   A.        Yes.

10   Q.        And did he have neck or back issues before

11   2016?

12   A.        He did, he had a neck injury in college.

13   Q.        Any prior back issues?

14   A.        I mean, he -- he's had -- I think he's had

15   back pain or soreness at various times in his life.

16   I don't -- I -- I can't remember a specific event or

17   cause, to be honest.  I -- I would chalk it up to

18   stress.  Again, I'm not an M.D., but no, just -- no

19   particular injury that I can recall.

20   Q.        Since 2016 has he sought any form of

21   treatment for his neck or back issues?

22   A.        Yes.

23            He has received a lot of massage.  He has

24   gone to PT.  He -- like just different PT and

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36
989

PATRICIA WEISER

200

1    massage has been, like, the primary reliever of

2    pain.  It doesn't cure it, but it relieves it for a

3    period of time.

4           I think he probably -- I know he's been to

5    chiropractic, maybe acupuncture.  I know there was

6    acupuncture back in college when he had the original

7    neck injury.  Oh, they did the cryotherapy.  He

8    tried that, I'm pretty sure.  Like anything that can

9    alleviate pain, you know, we're going to try.

10          Yoga seems to be the thing that works best

11   for him if he's consistent with it.  Over the past

12   year or so he has tried to do yoga regularly, and I

13   think the physical and mental benefits of yoga have

14   been good for him.

15          When we get off track, like, for example,

16   when we're traveling for softball, things get a

17   little tight and pain -- more painful again, but

18   yoga has -- I think in my view has been the most

19   helpful in his day-to-day management of pain and

20   stress, that and the running.

21   Q.      Do you know the names of any of the

22   facilities where he is attending physical therapy?

23   A.      There is the one that they -- the physical

24   therapy, and they also do pilates as part of their

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36

990

PATRICIA WEISER

201

1    regimen is One Physical Therapy and Wellness in

2    Bryn Mawr.

3              Like the cryotherapy, I don't know the name

4    of it, various massage.  I mean, we've gone to them,

5    they've come to us.  Like I know first names, to be

6    honest, yeah.

7    Q.       Do you know the names of any other places

8    where he may have attended physical therapy?

9    A.       Like ever?

10   Q.       Since 2016.

11   A.       I mean, there may have been one or two.  I

12   just can't think -- I -- I don't know.

13   Q.       That's okay.

14             And how about the -- any chiropractors

15   you've seen since 2016, do you know the names of any

16   of the chiropractors?

17   A.       John Crooker is the only one I can think

18   of, John, C-R-O-O-K-E-R.  I don't know the name of

19   his office practice, but that's his name.

20   Q.       Have you -- strike that.

21             I'll represent to you that the original

22   Complaint in this case was filed in June 2019.

23   A.       Okay.

24   Q.       Have you noticed any changes in the -- your

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36
991

PATRICIA WEISER

202

1    husband's physical symptoms since this litigation

2    was initiated?

3    A.      Yes.

4            I would say more frequent migraines.  I

5    would say depression, depression which he now talks

6    to me about.  The depression and -- and the

7    migraines I would say have gotten significantly

8    worse since this litigation commenced.

9            And -- and a lot of it has to do with the

10   fact that, like, we're the plaintiff, and yet we

11   still feel like we're still the hunted.  This --

12   this really feels like we have exposed ourselves to

13   more harassment, and using our litigation against

14   him as the vehicle for that is particularly

15   frustrating and painful.

16           Like it's -- it's bad enough it is what it

17   is, but to be a litigator who can't control the

18   litigation and be the aggressor in it and put

19   pressure on Mr. Hartleib to stop is really

20   difficult.  It's really difficult to deal with.

21           So this whole thing has been way more

22   stressful than we ever anticipated.

23   Q.      Have you noticed any changes in the anxiety

24   that your husband experiences since this case was

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36

992

PATRICIA WEISER

203

1   initiated?

2   A.        Yeah, I'll tell you that I -- I feel like I

3   normalized myself to it, and I think it's just

4   always there, and it's just normal.  So that's

5   fucked up.  Oh, I shouldn't say that on a

6   deposition.

7            It's like -- you know, you're, like, in it,

8   and it all feels normal, but it's awful, and he's

9   stressed all the time.  All the time.  Like the only

10  time I -- and, like, the reason I say this is

11  because there are moments when I notice that he's

12  not, and it's, like, literally when he is, like,

13  snuggling with a puppy and -- and he, like -- you

14  just see this whole thing just goes away, and he's

15  like relaxed and calm and smiling and, like, really

16  smiling.  And I'm not saying he's, like, angry all

17  the time, he's not, but when I see him not stressed

18  in these -- these rare moments of just calm

19  peacefulness where Michael Hartleib does not exist,

20  it's lovely to see.  It's really lovely to see.

21           Sometimes when we're at a baseball game, we

22  go to a Phillies game, and we're just having fun.

23  Like we love baseball.  Or even if we're just

24  watching the Phillies at home or holding each

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36
993

PATRICIA WEISER

204

1    others' hands walking down the beach, like there are

2    moments when he feels light to me, but I'm

3    appreciating as I'm telling you this right now that

4    those are rare.

5    Q.      Have you noticed any changes in the quality

6    of your husband's sleep since this case was

7    initiated?

8    A.      Yes, he gets very little directly related

9    to the case and Mr. Hartleib.  Nothing has caused

10   him more stress and kept him from sleep more than

11   this.

12   Q.      Using the timeframe for when this case was

13   initiated June of 2019, would you say that his

14   quality of sleep has gotten worse?

15   A.      Yes.  As has mine, which was never a

16   problem.

17   Q.      Any other symptoms that you believe have

18   gotten worse since this case was initiated?

19   A.      Yes, TMJ.  It's not something he talks

20   about a lot, but I -- I'm remembering that he

21   mentioned it recently.  And so I'm -- I'm -- like

22   TMJ, that's something that really -- again, it's,

23   like, a tightening and a stress-induced thing, but

24   the TMJ flare-ups happen.

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36

994

PATRICIA WEISER

205

1            I don't know how often, you'll have to ask

2    him, but I know that it's increased.  It's been

3    worse the last couple of years.

4    Q.       Do you know where your husband treats for

5    the TMJ?

6    A.       He doesn't.

7            If he does the yoga -- I mean, there's --

8    you know, there are things that you can do to try to

9    and relieve stress.  Like -- like I said, he's

10   trying to solve his own problems and take care of

11   himself.

12           I wonder if -- I mean, the PT and the

13   chiropractor, I know they both do treat for that.  I

14   don't know if he received treatment from them for

15   that.

16   Q.       Do you know if he's ever treated with an

17   ENT for his TMJ?

18   A.       An EMT?

19   Q.       ENT, I'm sorry, ears, nose and throat.

20   A.       Not that I'm aware of.  I don't know.

21   Q.       Other than the TMJ, the sleep, the anxiety,

22   the depression and the migraines, have you observed

23   or noticed any other symptoms that have gotten worse

24   since this case was initiated?

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36

995

PATRICIA WEISER

206

1    A.        Not off the top of my head, no.

2    Q.        Okay.

3              Are you able to estimate or approximate how

4    much has been spent to defend against Mr. Hartleib's

5    statements or filings to date?

6    A.        I mean, I would -- I would throw out over a

7    million dollars.  I know that the numbers are

8    written somewhere.  I -- I have pulled them together

9    various times over the last couple of years.

10             Yeah, not including my employees' salaries,

11   it's more than I've ever spent in this law firm on

12   anything.  So, yeah, it's seven figures.  This isn't

13   cheap being on this with you all day.

14   Q.        And that seven-figure calculation that you

15   just provided or approximation, would that include

16   amounts spent on ethics counsel?

17   A.        Yes.

18   Q.        Do you believe the conduct of Mr. Hartleib

19   that are at issue in -- in this action have had an

20   impact on your relationship with your husband?

21   A.        Yes.

22   Q.        And how would you describe the impact that

23   the conduct of Mr. Hartleib at issue in this case

24   have had on that relationship?  And I'd ask that you

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36
996

PATRICIA WEISER

207

1    differentiate between the impact of this litigation

2    versus conduct of Mr. Hartleib prior to this

3    litigation.

4    A.        Sure.

5              So it's the conduct of Mr. Hartleib that

6    causes all the stress.  Litigation doesn't stress me

7    out, we're litigators, it's his conduct before and

8    during this lit -- it's his conduct that causes the

9    stress.  So it generally puts a huge strain on our

10   relationship as business partners and as husband and

11   wife because it is something that we experience

12   differently and have at times felt we should deal

13   with differently.

14             I would not spend seven figures to be

15   fighting with Mr. Hartleib.  Easy for me to say, but

16   Rob has made it very clear that he does not -- he

17   will not practice law if Mr. Hartleib is out there

18   able to continue his harassment.  He will not.  His

19   firm will not.  We can't -- we cannot exist with him

20   harassing us.

21             We will not impugn the relationships with

22   the colleagues and friends we have made over twenty

23   years by bringing this awful mess and harassment to

24   the doorstep of our friends and colleagues, which

PATRICIA WEISER

208

1   this litigation has.  So there are days when I want

2   to close up shop and do something else.  I don't

3   know what that is.  It's not very rational thinking

4   on my part all the time.

5          I do still feel responsible for my

6   employees, our clients, the inventory of cases that

7   we are trying to pursue, which I believe we should

8   try to right those wrongs.

9          So it strains us because it's stressful.

10  It strains us because -- there's no good answer on

11  how to deal with it.  And so I tread lightly when I

12  get to a point where I just don't want to do this

13  anymore because having -- having a relation --

14  having a business relationship with your spouse is a

15  tough one because on the one hand I'm his business

16  partner, and from a business standpoint I have a

17  view on what we should and shouldn't spend money on.

18          As his wife, I'm really upset that this

19  man's harassing my husband and making him so

20  depressed and unable to sleep and have migraines

21  more frequently than he's ever had them in his life.

22  So I don't want to bring him up.  I don't want to

23  bring up the H word and make my husband more upset

24  and unable to sleep.

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36

PATRICIA WEISER

209

```
 1            So it strains the ability to have calm,
 2    thoughtful conversations about a really difficult
 3    thing, knowing that bringing it up is going to cause
 4    more pain.  So it's very hard to manage that.  At
 5    the same time I think it has made Rob and I closer.
 6            I think it's really easy when you are
 7    business partners to just be so busy.  I used to be
 8    very busy when I -- you know, before 2012 when I
 9    stopped litigating.  And even now, like, it's easy
10    to get busy and take -- take for granted what
11    matters most.
12            And I will say Rob and I both make sure we
13    take a lot of time to hold hands and to be there for
14    each other and to not think about
15    he-who-should-not-be-named because we can't let him
16    infiltrate our entire lives, even though it feels
17    like he does most of the time.
18            So I manage that by just not thinking about
19    him.  I don't know if that's emotionally healthy or
20    not, you can ask my therapist, but I just don't
21    think about it.
22            I know Rob thinks about it all the time,
23    which is why he doesn't sleep.  It's just always
24    there.  It's just always there.  It's like there's a
```

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36
999

PATRICIA WEISER

210

1    sickness.  It's just always there.  And I know

2    everyone in the world has to deal with something.

3    Like God forbid, we don't have cancer.  We have

4    Hartleib.  It's hard.  It's what we have to deal

5    with.

6             You know, I have an aunt who's dying of

7    cancer right now, so her kids are dealing with that.

8    Like Hartleib feels like a cancer, and that's what

9    we deal with.  I have a lot to be grateful for,

10   including my relationship with my husband/business

11   partner, but this -- Mr. Hartleib has made this very

12   hard.  He's made life very hard.

13   Q.       Do you spend less time with your husband?

14   A.       No.  I spend more time.

15   Q.       As a result of the conduct alleged in the

16   First Amended Complaint in this case, have -- do you

17   communicate less with your husband?

18   A.       I tread more -- I tread lightly.  I tread

19   lightly.  I don't like to talk about this subject

20   with him, I like to just defer to him and support

21   him whatever he wants to do because this is an

22   attack on him.  So my business partner hat comes

23   off, and my wife comes on, and I support him and

24   what he needs to do, even if it's not what, I, as

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36

1000

PATRICIA WEISER

211

1    his business partner think we should do.

2            So that's a difficult -- that's a

3    challenging thing, but -- I -- I mean, Rob and I

4    are -- are, like, joined at the hip like we always

5    have been.  We're two -- I mean, it's everything.

6    He's everything.

7            No, this is not a situation where, like,

8    Mr. Hartleib is driving us to divorce.  Quite the

9    contrary.  We are a team that has been together for

10   a really long time, and we are managing as best we

11   can and enjoying the moments we can without it as

12   much as we can.

13           And today's the day that I have to deal

14   with this.  So today's the day I'm going to sit here

15   and be upset.  And I'll be okay, or not, but Rob and

16   I will be fine.

17   Q.     Other than the period where Mr. Weiser

18   would prefer to be alone or -- or needs to be alone,

19   has the conduct of Mr. Hartleib alleged in the

20   First Amended Complaint had any impact on

21   Mr. Weiser's relationship with his children that you

22   have observed?

23   A.     So, you know, in any familial situation

24   where there are stressors that cause a parent to

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36
1001

PATRICIA WEISER

212

1   have a short fuse -- you know, you have a short

2   fuse, you get angry, you yell, you're not as

3   understanding, what-have-you, I can't think of

4   anything that makes Rob upset -- like puts Rob in --

5   in a mood other than Hartleib, otherwise, like, it's

6   life, like, you know, you deal with ups, downs,

7   sideway, whatever.

8          So if there have been moments when he has

9   been short with me or the kids, I cannot think of

10  any other stress trigger than Hartleib that has led

11  to that.  That in connection with the not sleeping

12  and the headaches.  I mean, look, when you have a

13  migraine and you haven't slept, it's hard, right?

14  And notwithstanding that, he's -- he's the sweetest

15  dad ever.

16         He's there at every game.  He goes to every

17  game.  He coaches all their teams even when he's not

18  sleeping and has migraines.  You know, it's -- he is

19  a very responsible person who takes his job of being

20  a father super seriously.  And if it's at his own

21  personal expense, so be it, he is going to be a good

22  dad, and he -- so -- me and the kids are very tight,

23  we're super tight.

24         Sorry about the dog barking.

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36

1002

PATRICIA WEISER

213

1          I don't think the kids appreciate the depth

2    of the pain he is feeling, and I -- maybe they do.

3    I don't know.  Probably.

4          They don't understand it.  They don't

5    understand why this is allowed to happen.  And

6    they're not -- they're not four-year-olds, they're

7    young adults.  But turn on the television, there's a

8    lot to not understand as well.

9    Q.     Do you know if your husband has ever been

10   formally diagnosed with TMJ?

11   A.     I -- someone with an M.D. at the end of

12   their name?

13   Q.     Any healthcare specialist.

14   A.     I mean, I know what TMJ is and when I have

15   it.  I don't know.  Probably though.

16         Oh, because he has -- he does have, like --

17   he has, like -- oh, he does have, like, dentists

18   and, like, oral surgeons and -- yeah, he's got a

19   bunch of dental people, so I'm -- I'm certain that

20   he has been -- I'm certain they're the ones who have

21   dealt with that for him.  But I wouldn't be

22   surprised if the PT and the chiropractor have it as

23   well because I know they both provide the service as

24   well, but you'd have to ask him.  I'm not sure.

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36

1003

PATRICIA WEISER

214

1          Sorry, I forget about the dentist.  He got

2    his teeth knocked out when he was younger, and the

3    saga continues.

4    Q.      Have you purchased any vehicles since 2016?

5    A.      So I -- let me think.

6          So I purchased a -- a Jeep, a Jeep

7    Wrangler.  I'm trying to think what that replaced.

8          We -- oh, no, wait, we had -- so we had a

9    Jeep Wrangler, that was my day-to-day driver from,

10   gosh, 2010 on, I think.  It was, like, ten years

11   old, and I purchased -- we purchased a -- a used one

12   to replace that a couple years back, back in 2016,

13   so two, three years ago maybe.

14         So we replaced an old Jeep with a new

15   Jeep Wrangler -- not new, a used Jeep Wrangler, and

16   then my now eighteen-year-old daughter started

17   driving.  So she -- I didn't have a car because she

18   was driving the Jeep, so I purchased a Lincoln

19   Nautilus so that I would have a car to drive.  And

20   we had given Rob's parents a car to drive when

21   their's died, which they still have.  Like we own

22   it, but his parents use it.  I don't remember when

23   we bought that.  And Rob -- what does he drive?

24   His -- his car's in the shop.

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36

PATRICIA WEISER

215

1           It's an Alpina B7.  I'm not sure what that

2    is, you'll have to ask him.  So a couple of Jeeps

3    and American-made --

4    Q.      Have there been any purchases of any other

5    collector or investment --

6    A.      No.

7    Q.      -- vehicle such as the ones that you had

8    sold?

9    A.      No.

10          I have one left that I -- Rob gave me for

11   my 40th birthday, but, no, it's in the garage.

12   Q.      How long -- well, strike that.

13          Has Rob purchased any investment or

14   collector vehicles?

15   A.      No.  No.

16          When it comes to cars I was just saying we

17   collectively, but I was just detailing the cars that

18   we own now, and that's all we own.

19   Q.      After -- well, strike that.

20          Are you familiar with the lawsuit that

21   The Weiser Law Firm brought against Brett Stecker

22   after he was terminated?

23                  MR. ROSENZWEIG:  Can you read

24          that question back?

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36
1005

PATRICIA WEISER

216

1                    (At this time, the court reporter

2             read back from the record as was

3             requested.)

4                    MR. ROSENZWEIG:  So you can

5             certainly answer whether you're familiar,

6             and then we'll see where the questions go.

7                    THE WITNESS:  Okay.

8                    I am familiar with litigation

9             involving the firm and Brett.

10                   Honestly, I'm not sure who

11            started it.  I thought he sued us and then

12            we counterclaimed, but maybe we sued him.

13            I -- I'm just not remembering as I sit here

14            right now.

15     BY MR. MOTT:

16     Q.      Okay.

17     A.      But I am aware that it was litigation

18     between the firm and Brett.

19     Q.      Would you have reviewed or approved any of

20     the pleadings in that litigation before they were

21     filed?

22     A.      Yes.

23     Q.      Okay.

24                   So I have placed on your screen the first

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36

1006

PATRICIA WEISER

217

1    page of the Complaint in the case brought against

2    Brett Stecker and his current employer, Shuman,

3    Glenn & Stecker.

4    A.        Okay.

5    Q.        Does this refresh your recollection as to

6    who sued who first?

7    A.        Sure, yeah, it does -- well, I mean,

8    that -- that shows me that the Complaint you're

9    showing me is us versus him.

10             My recollection is, is that he made claims

11   against us that -- that triggered our EPLI

12   insurance, and I was involved in some insurance

13   dealings.  And whether they turned into

14   litigation -- I don't know if there's a Complaint of

15   Brett versus us, to be honest, but I am familiar

16   with the one you just showed.  I just don't know

17   that it's the only one.  There was a lot of

18   back-and-forths for a while there.

19   Q.        And in that case or that -- where I just

20   showed you the -- the caption --

21   A.        Yup.

22   Q.        -- it was alleged that Mr. Stecker had

23   poached clients from The Weiser Law Firm, right?

24   A.        Yes, it was alleged.

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36
1007

PATRICIA WEISER

218

1   Q.        And do you have any knowledge as to why

2   those clients decided to terminate their

3   relationship with The Weiser Law Firm?

4   A.        No, I don't.

5   Q.        Do you have any reason to believe that they

6   chose to terminate their relationship with The

7   Weiser Law Firm because of the conduct of Michael

8   Hartleib?

9   A.        I don't know.

10            You know, I -- I will say that I think it's

11  an allegation in there, and if not, I -- I recall it

12  being said that Brett was telling people that we

13  were closing down our derivative department, and

14  that's why we let him go, and that they needed to go

15  with him because we weren't going to be doing those

16  cases.  All of that would be a result of

17  Mr. Hartleib.  Whether that was true or not is

18  besides the point, but that is all -- that would all

19  be a result of Mr. Hartleib.

20  Q.        Mr. -- Mr. Stecker's statements to those

21  clients were the result of Mr. Hartleib?

22  A.        To the extent that Mr. Stecker represented

23  to anyone, including our former clients that our

24  firm was not going to be in the derivative

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36
1008

PATRICIA WEISER

219

1    litigation business and that they should move with

2    him so that he could continue the case, that would

3    be a result of Mr. Hartleib.  Mr. Hartleib would be

4    the only reason why we would discontinue our

5    derivative litigation practice.

6    Q.      Do you know the basis or the lead for

7    allegation that Mr. Stecker made those statements

8    that The Weiser Law Firm was no longer performing or

9    engaged in shareholder derivative litigation?

10   A.      That's a terrible question.  I don't know

11   what you're asking.

12   Q.      Sure.

13           I appreciate the bluntness, but do you --

14               MR. ROSENZWEIG:  If it's not

15           coming from Pat, it's certainly coming from

16           me, but go ahead.

17               MR. MOTT:  Well, she beat you to

18           it.  She's sharper than you, Phil.

19               MR. ROSENZWEIG:  She did.  She

20           did.

21   BY MR. MOTT:

22   Q.      Do you know who Mr. Stecker made those

23   statements to?

24   A.      As I sit here right now, I don't.  That was

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36

1009

PATRICIA WEISER

220

1    part of the -- the -- part of the conversations that

2    were had at the firm that I recall people

3    discussing, but I don't -- I don't know who he said

4    it to.  I wasn't involved in the conversation.  So I

5    wasn't there, no.

6    Q.      Do you know whether those statements were

7    only made to clients or were limited to clients of

8    The Weiser Law Firm?

9    A.      No.  My understanding is that was his

10   story, so I -- I imagine it wasn't just the clients.

11           My recollection, I remember -- so, again,

12   like, we would have, like, lunch, like we would all

13   sit around and have lunch or we would all be having

14   a conversation about things, and so I can't speak to

15   specifics, but I recall being told that Brett was

16   telling people that we were shutting down our

17   derivative litigation practice.

18           I believe -- I -- I recall Brett -- that

19   Brett had reached out to some of our client sources

20   to see if they would work with him and told them the

21   same, and I can only imagine other attorneys -- like

22   as he's trying to establish himself at a new firm

23   and explaining why he's leaving the firm he's been

24   at for so long, that sounds like a reasonable story,

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36

1010

PATRICIA WEISER

221

1    I guess, to him.

2    Q.      Which sources did he contact and inform

3    that The Weiser Law Firm was closing down its

4    shareholder derivative litigation?

5    A.      I don't remember.

6            I just remember being advised in these kind

7    of group chats, whether it was Rob, Chris, John,

8    like, when we would have chats -- or maybe it was --

9    it could have just been Rob -- that -- that Brett

10   was telling people this.

11           Yeah, I'm sad -- I'm sad it didn't end

12   better than it did and that we couldn't do this in a

13   joint way, meaning Mr. Stecker and the firm.  He was

14   very upset, rightfully so, as were we, and it wasn't

15   handled as well as it could have been, and I had

16   hoped it would be.

17           So he had his story and went his way, and I

18   can't control what he says to the other people, but

19   I can -- I can estimate and guess that there's only

20   one reason why that story would be true, and that

21   was Mr. Hartleib.

22   Q.      And --

23   A.      And Brett was more upset about Mr. Hartleib

24   than anyone.  He may have been more upset about

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36

1011

PATRICIA WEISER

222

1    Mr. Hartleib than Rob would even admit to be.  Like

2    he was really offended by how -- the lies and the --

3    and the vexatious harassment.  Like Brett was really

4    upset by it.

5            And I think that partly played into why he

6    was upset that we let him go because he felt that he

7    had been so loyal to us through all this and had

8    been through all this with us, which he had, but at

9    the end of the day if I can't afford to pay you, I

10   can't afford to pay you.

11   Q.      And any statement that Mr. Stecker may have

12   made to the effect of The Weiser Law Firm shutting

13   down its shareholder derivative litigation practice

14   would have been a false statement, correct?

15   A.      I mean, not necessarily.  Like it was

16   never -- we never decided to do that, but it was

17   absolutely discussed.

18           We -- there was no way -- we could not --

19   I -- I couldn't imagine a way that we could pursue

20   the growth of that department with Mr. Hartleib

21   showing up in every court we ended up in, which he

22   threatened to do time and again.  Like where are you

23   guys going to be next?

24           And, look, all this is publically

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36
1012

PATRICIA WEISER

223

1   available.  You make a public file, and it's

2   publically available.  You can do a -- set an alert

3   for our name, and he'll know every Complaint we file

4   anywhere in the country.  And so that was absolutely

5   a discussion, that we cannot have a derivative

6   department with him harassing us like this in every

7   case.  And so that -- that -- now, not having a

8   derivative department is your last step in that

9   consideration.

10         The first step is, I can't support a

11  department of three people, a derivative department

12  of three people when the revenues are not coming in,

13  the prospects are so -- are so unsure because of the

14  continuing threat of Mr. Hartleib.  Like, it --

15  it -- we could not substantiate having three people,

16  Rob not included, in a department that had that much

17  uncertainty associated with it because of

18  Mr. Hartleib.

19         So, yeah, we downsized, and Brett was

20  the -- the head of that department.  And so if that

21  department -- if he couldn't figure out a way or we

22  couldn't figure out a way to make that -- that

23  department profitable with prospects for growth,

24  like certain prospects for growth, that's why we let

PATRICIA WEISER

224

1    him go.  Again, hardest thing we ever had to -- like

2    one of the hardest things we ever had to do.

3           Love Brett, his family, his kids, like,

4    they're a great family, not anymore.  Nobody talks

5    to each other.

6           So, yeah, Mr. Hartleib drove us to that

7    point where we had to let Brett go.  And it is not

8    unreasonable for Brett to think that we were going

9    to ultimately shut down our derivative department

10   because of Hartleib.

11          I think it was presumptuous of him to tell

12   people that when it hadn't actually happened, but I

13   don't fault him for it.  I mean, it was a shitty

14   time.  He's a good person who was offended and hurt

15   by a situation that was caused by Michael Hartleib.

16   Q.      Did Mr. Stecker statements to The Weiser

17   Law Firm sources of contact have any impact on the

18   shareholder derivative line of business?

19   A.      I don't know what you mean by sources of

20   contact.

21   Q.      You mentioned that he had reached --

22   reached out to the firm's sources of contact for

23   derivative cases and made statements to the effect

24   of the firm's no longer --

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36
1014

PATRICIA WEISER

225

1   A.      Our -- our client sources?

2   Q.      Yeah.

3   A.      Okay.

4           Not source -- I don't know what sources of

5   contact means.  If I said that, then I take it back.

6   But our client sources.

7           You know, you need clients to pursue a

8   business.  And he was going to a new firm, and he

9   needed to bring business.  So he needed clients or

10  client sources, and he tried to take ours and did

11  take some.  And they weren't his.  They were Rob's,

12  and he poached them.

13  Q.      Do you know which client sources he

14  poached?

15  A.      He didn't poach client sources, he poached

16  actual clients.  And there were a couple of cases.

17  I -- I don't remember the name of the clients, two

18  or three cases.  But he contacted -- I know he

19  contacted a longer list of clients.

20          Hey, look, I wasn't involved.  Again, I was

21  not personally involved in dealing with that, other

22  than administratively providing support to whoever

23  was dealing with it or providing documents to

24  Counsel in connection with the litigation against

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36

1015

PATRICIA WEISER

226

1    Brett, but in terms of who he contacted, I -- I

2    don't remember.  How many clients he took, I don't

3    remember.  I'm sure it's all set forth in that -- in

4    the Complaint that you have on your screen.

5    Q.      You have -- you were explaining your -- the

6    firm's budgeting process, generally, and you

7    mentioned how the -- some of the cases or types of

8    cases that the firm has, you know, you -- you can't

9    really budget for those due to, you know, the -- the

10   amount of time it takes before they -- they resolve.

11           For the Sprint derivative case, once that

12   had reached a tentative settlement agreement amongst

13   the parties, would that have been a point where the

14   proceeds from that litigation would have been

15   budgeted?

16   A.      So -- and we're speaking generally and not

17   specifically about Sprint because I don't --

18   Q.      I'm not asking you if it was on the budget.

19           Generally, if a Tentative Settlement

20   Agreement is reached and pending, would that be

21   included on the firm's budget?

22                   MR. ROSENZWEIG:  Objection as to

23           form.

24                   THE WITNESS:  So, to be clear,

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36
1016

PATRICIA WEISER

227

1        this is internal budgeting.

2                 This is not anything that rises

3        to the level of giving projections to banks

4        or bankers for financing, this is our

5        internal budgeting.  We have three tiers,

6        three internal tiers of how it lands on our

7        budget.

8                 There is -- well, at the very top

9        is the money that comes in.  So when it

10       comes in, it's reflected on the top, this

11       is the money that's come in this year, then

12       there is the settlements, then the cases

13       for which there is a Final Settlement

14       Agreement signed, and for which we have no

15       reason to believe that there will be any

16       issue with approval of that settlement.

17                 So to the extent that we had no

18       reason to believe that there would be any

19       issue with Sprint prior to Mr. Hartleib's

20       objection, for example, the full amount of

21       settlement would have been reflected on

22       the -- on the sheet.

23                 We were in that case with

24       multiple partners.  So our perspective

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36
1017

PATRICIA WEISER

228

1          piece of that would have been reflected on

2          the budget, per the agreement amongst

3          counsel as to how we were going to split

4          it.  That agreement is made before the case

5          sometimes, during the case sometimes, after

6          the case sometimes.

7                I do not know how it was made or

8          if it was made in Sprint, but that number

9          would be reflected once there is a

10         certainty to our receiving it.  If there's

11         any reason it's not certain, it -- it might

12         not be on the budget at all.

13               Like -- so as soon as -- as soon

14         as there's an -- an objection by

15         Mr. Hartleib, who's a known objector, at

16         that point it -- it may stay on with, like,

17         a question mark or it may be taken off, and

18         just kind of wait to see what happens.  If

19         there is a Tentative Settlement -- so then

20         there's another layer.

21               The bottom-bottom layer is we are

22         working on a settlement, we are close to a

23         settlement, we have signed a Preliminary

24         Settlement Agreement, anything short of

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36
1018

PATRICIA WEISER

229

1          there is a final signed Stipulation

2          Settlement with, like, a hearing date set.

3          That's the lowest level, and it could go on

4          that.

5                    So if there is any uncertainty

6          about a Final Settlement Agreement, it

7          might pop down to the next level.  Anything

8          less than that, the entire rest of the

9          caseload is not on it, is not on our

10         budget.  And the budget has changed over

11         the years.

12                   So, for example, when I was

13         actively litigating M&A cases, they only

14         last twelve to eighteen months.  How much

15         you're going to make in them is soon in the

16         litigation.  Like it's easy to budget for

17         them, they're quick, and the amounts get

18         decided quickly, and there's a certainty of

19         process in terms of how they get approved.

20                   So I can't project out M&A cases

21         beyond a year, a year and a half, at the

22         most because I haven't even filed the cases

23         that I'm going to have next year yet.

24                   So it -- it's impossible for me

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36
1019

PATRICIA WEISER

230

```
 1          to do, like, a five-year projection, for
 2          example, for M&A.  You know, I'll -- I'll
 3          go through five rounds of cases from that
 4          time.
 5                  For derivatives they usually last
 6          three to five years.  So derivative cases
 7          could land on there, but not until they
 8          reach the point of settlement.  So the
 9          whole length of the case, it's not on my
10          budget.  It's not on my -- it's not on my
11          projection's list.  And some things drop
12          off when things go sideways.
13                  So if Sprint was on it, it was on
14          it, and at some point it got deleted.
15          As -- and as soon as we make the decision
16          that we are not going to take any money
17          from this case, so as not to -- so to try
18          to alleviate stress from our partners in
19          the case, our colleagues in the case, like
20          we're not going to take anything.
21                  It's happened a handful of times
22          where something happens, I don't know what
23          it is, and I'm like, look, I'm not going --
24          like, I'm just going to back out.  You guys
```

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36

PATRICIA WEISER

231

```
 1             keep going.  It happens with everyone,

 2             like, you know, it's life.

 3                      So when things went sideways with

 4             Sprint, yeah, it just got -- it just

 5             dropped off the list.  We weren't going to

 6             get any money from it, and we didn't, other

 7             than, like, some small number of expenses

 8             that were distributed, like, earlier.

 9   BY MR. MOTT:

10   Q.      Have there been other shareholder

11   derivative cases where The Weiser Law Firm

12   participated in the case through a Tentative

13   Settlement Agreement and then decided not to take

14   any portion of the fee award?

15   A.      Not that I'm aware of.

16           Sprint was the first case where Rob ever

17   had a fee reduced, as far as I can remember.

18   Q.      Since the Sprint case, have there been any

19   other cases where a fee has been reduced?

20   A.      I think there was one, and you're going to

21   have to ask Rob, but, I -- but, again, this goes to,

22   like, the Hartleib curse and just the dark cloud

23   that kind of waves over us all.  I think there's one

24   more.  We've -- we've also had a couple of cases.  I
```

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36
1021

PATRICIA WEISER

232

1    think these were M&A cases, where they literally

2    just sat on a judge's desk for years.

3           I -- I can't tell you why it's that.  I

4    don't know what -- if that judge reads The Wall

5    Street Journal, like, I don't know, but we didn't

6    get paid in cases over the course of, like, three to

7    five years waiting for judges to sign them, and I

8    can't tell you why because the judge won't say.  And

9    one of them we got nothing -- I -- two I'm thinking

10   of, one I don't think we got paid at all, and the

11   other one we eventually got paid some amount of

12   money, that, you know, we needed five years prior.

13                    MR. ROSENZWEIG:  Tyson, I'm going

14          to ask for three minutes.

15                    MR. MOTT:  Yeah.

16                    Let's make it five.  I'm going to

17          see if I can kind of find out an efficient

18          way to complete this, but I think I'm done.

19                    Let's take five.

20                    VIDEO SPECIALIST:  4:52, off

21          video.

22                    (At this time, a short break was

23          taken.)

24                    VIDEO SPECIALIST:  5:00 p.m., on

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36

1022

PATRICIA WEISER

233

1          video.

2    BY MR. MOTT:

3    Q.        Are you aware of any instances where a

4    third-party has expressed an opinion regarding the

5    reputation of The Weiser Law Firm subsequent to the

6    conduct of Mr. Hartleib?

7    A.        A negative one, you mean?

8    Q.        Any -- any instances where they have

9    expressed an opinion.

10   A.        Not to me personally.

11             I would say, generally, I've heard Rob

12   speak of it over the past couple of years, but I

13   couldn't give you any specifics, you'll have to ask

14   him.

15   Q.        What is your husband's date of birth?

16   A.        ███████████████.

17   Q.        Has he ever applied for any form of

18   disability, whether it be with the government or

19   through a private carrier?

20   A.        No, not that I'm aware of.

21   Q.        Okay.

22             Has he ever had to take a leave of absence

23   from the firm for any reason?

24   A.        A formal leave of absence, no.  And that's

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36
1023

PATRICIA WEISER

234

1    not how the -- the firm works, but no, not formally

2    as other businesses do.

3    Q.       Was he -- was there ever a period where he

4    took an extended break from his obligations at the

5    firm regardless of whether it was a formal leave?

6    A.       Sure.

7             Over the years -- look, you know, we -- we

8    work when we have to, sometimes that's all the time.

9    When you need to take a break, you need to take a

10   break.

11            I would say that all of the stress caused

12   by Mr. Hartleib has caused him to take more breaks

13   than normal.  It hasn't had him work -- not complete

14   his work that he needs to do, but, yeah, I mean,

15   like, he takes breaks when he needs to, when the

16   stress gets too much.

17            Never -- never has he stepped away from his

18   position as the -- the managing partner of the firm

19   who's running the cases, but we have able-bodied

20   attorneys working on things.  So if people need to

21   take a day off, then take a day off.  If you need to

22   take a week off, take a week off.

23            Rob is very good about taking care of

24   himself and knowing what he needs to stay in good

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36

1024

PATRICIA WEISER

235

1    shape physically and mentally as best he can.  I

2    think that professionals would disagree at how good

3    of a job he may or may not be doing.  I think he's

4    carrying a lot because he feels he has to.

5             So, yeah, nothing formal, but if somebody

6    needs to take a break, they take a break.

7    Q.      And earlier today you referenced a -- a

8    vacation that he -- that he took without you.

9    A.      Yeah.

10   Q.      When was this?

11   A.      So this was, I want to say the end of June,

12   this year.

13   Q.      And how long was that trip?

14   A.      About ten days, I think.

15   Q.      And where did he go?

16   A.      He went to Paris with my oldest -- our

17   oldest daughter.  She just graduated from high

18   school, and they have been planning this for a long

19   time.  And, unfortunately, myself and my other

20   daughter could not go at that time, so they just had

21   their own dad/daughter.

22   Q.      And why were -- strike that.

23           How many children do you have?

24   A.      Two.

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36
1025

PATRICIA WEISER

236

1   Q.        And how old are they?

2   A.        Eighteen and sixteen.

3   Q.        Do they both still reside with you and your

4   husband?

5   A.        At the moment, yes.

6            The eighteen-year-old is going off to

7   college in the fall.

8   Q.        And why were you and your daughter unable

9   to attend the trip with your husband?

10  A.        Softball.  She had a softball tournament.

11           We had to -- we were out in Denver for a

12  week, for the exact same week for a -- a national

13  softball tournament that she was invite -- that

14  she -- she and her team were attending and competing

15  in, so we had to -- it was always softball.  If

16  it's -- if it's May through -- ah, it's always

17  softball.  We just couldn't find a week when

18  softball didn't conflict with something else because

19  there aren't any.

20  Q.        Other than --

21  A.        This is one of those times, like this is a

22  good example of taking a leave where Rob needed to

23  get -- get away, and get away from the day-to-day

24  stress and grind.  So I -- you know, in -- in prior

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36
1026

PATRICIA WEISER

237

1    years perhaps I would have pressed a little more to

2    find a time when all four of us could go, but I

3    think he really needed to get away and spend that

4    time with -- with our older daughter.  It was well

5    spent.

6    Q.      Has the conduct alleged in the First

7    Amended Complaint or any resulting symptoms that

8    Mr. Weiser has suffered as a result of that conduct

9    had any impact on your physical relationship with

10   your husband?

11   A.      No.

12           Well, I don't know what you mean by that

13   exactly.

14   Q.      Any -- any expressions of affection or

15   intimacy?

16   A.      Yeah, it has.

17           Boy, I wasn't prepared to get into this.

18           It's just super stressful, like, you know,

19   I -- we are very close and are very loving.  We hold

20   hands a lot.  We're always with each other.  It's

21   too stressful for more than that.  Like we need this

22   to be done, to get past this.

23   Q.      Other than attorney's fees and related

24   expenses, how would you calculate the law firm's

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36
1027

PATRICIA WEISER

238

1    losses attributable to the conduct of Mr. Hartleib

2    alleged in the First Amended Complaint?

3    A.        I think the largest loss is the loss -- the

4    opportunity cost.

5            You know, I -- I testified earlier about

6    the example of the case where we were either not

7    appointed or removed as lead counsel that resulted

8    in a $10,000,000 fee.  That fee would have been

9    ours, but not for Mr. Hartleib and his involvement.

10           My recollection is that the judge made it

11   very clear that while he did not accept

12   Mr. Hartleib's harassing and vexatious statements as

13   true, all things being equal, lead counsel can't

14   have this mess hovering over them.  So that, so

15   there's $10,000,000.  How that would have been

16   distributed and what we would have netted out of

17   that, I don't know.

18           There's all the cases that we did not get a

19   call about, the cases that our colleagues would have

20   worked with us, but for knowing Mr. Hartleib was

21   going to show up in court, I can't count those

22   because there would be absence of a call.

23           What I can count is the absence of revenues

24   and the -- the significantly lower number of lead

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36
1028

PATRICIA WEISER

239

1    counsel positions that we both got and pursued over

2    time because it became very clear that we did not

3    want to pursue -- well, we didn't want -- we didn't

4    want to put our -- ourselves or our colleagues in

5    harm's way, and Mr. Hartleib was in -- in that way.

6    He was -- he was harm's way.

7           And so it's the absence of what we would

8    have done had we not known he would be waiting for

9    us in every court we ever entered in appearance, to

10   calculate that, I'm not sure.  I -- I'd have to give

11   that some more thought.

12          There is the -- the -- the damages.  The --

13   the other big calculation for me is the amount of

14   money that we have spent in time and money dealing

15   with this.  We are -- like I said earlier, we are a

16   very efficient operation.  Our lawyers have spent

17   thousands, thousands of hours dealing with this,

18   working on this, defending this when Mr. Hartleib

19   sued us.

20          You know, we have insurance to cover when

21   someone sues us, so that triggered that coverage,

22   much like Mr. Hartleib, his insurance is paying for

23   you, and yet commercial insurance isn't quite as

24   broad as personal insurance.  So we -- let me step

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36

1029

PATRICIA WEISER

240

1    back.

2              It's not as broad.  It doesn't cover as

3    much.  It doesn't allow for the proactive litigation

4    that we're used to conducting.  We -- we're not

5    satisfied with the counsel that were assigned to us.

6    They were not familiar with our business, which I

7    appreciate is a very niche, high-sophisticated

8    business, but the best way to -- we knew the best

9    way to defend ourselves, they did not.  So we did a

10   lot of the work ourselves.

11             We wanted to pursue counterclaims, and our

12   insurer would not pay for that, so we hired

13   Mr. Rosenzweig and expended countless hours and lots

14   of money drafting counterclaims and preparing a

15   litigation strategy in an attempt to stop the

16   harassment that eventually led to the Amended

17   Complaint that you have in this case now.

18             You know, administratively, dealing with

19   all the insurers throughout this process and all the

20   things that Mr. Hartleib and his harassment has

21   touched in our lives in the last five years, it's

22   touched everything.

23             So, like, for example, every year I have to

24   do insurance renewals.  Every year I have to mention

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36

PATRICIA WEISER

241

1    this, like is there an outstanding litigation that

2    the firm's involved in?  Every year I have to

3    explain where we're at and what's happening.  Every

4    year my insurance broker says, what, what's that guy

5    doing?  This is something that I deal with

6    administratively on a regular basis because it's

7    part of who we are now.

8            That impacts insurance rates, renewal

9    rates.  I -- I couldn't calculate the differences or

10   how the underwriting does it.  I'm not privy to that

11   information.

12           We've lost employees, valued employees who

13   we care very deeply for, the opportunity cost of

14   other work that those employees could have performed

15   were they still with the firm.  It -- it's a lot of

16   lost opportunity because we cannot do our jobs with

17   him threatening to say what he says about my husband

18   and our firm every time we go into court.

19           We will not expose our employees and our

20   colleagues.  So we cannot pursue our business in the

21   way that we would have otherwise.

22           So I -- I rely on Mr. Rosenzweig and his

23   colleagues and Rob to figure out the best way to

24   calculate that.  I know Rob has more information

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36

1031

PATRICIA WEISER

242

1    than I do about the lost opportunities that we

2    missed out on because of Mr. Hartleib over the

3    years.  There are numbers associated with all those

4    opportunities, and then there's just the more

5    general -- you know, I -- you can't calculate what

6    you don't do because of someone, but I can calculate

7    how much I had to sell to pay -- you know, how much

8    I had -- like I -- I sold to pay salaries.

9              And I had to let people go over time

10   because I couldn't afford their salaries, and I

11   haven't been able to give, you know, a -- real

12   salaries to the people that still are working for

13   me, and no bonuses.

14             It's -- all the cases that would have been

15   filed, revenues that would have been earned and the

16   lives that would have been impacted in a positive

17   way have been impacted in a negative way, and that

18   is attributable to Mr. Hartleib.

19             How we come up with the numbers, I'm going

20   to leave that to Mr. Rosenzweig, but it's the --

21   it's the opportunity cost as much as anything and

22   expense that we have incurred out-of-pocket, and

23   time, thousands and thousands of hours of time.  I

24   mean, we bill out almost $1,000 an hour.

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36
1032

PATRICIA WEISER

243

```
 1              Do you want to add that up?
 2    Q.       The loss of opportunity in terms of not
 3    getting the client referrals that you used to, is --
 4    is there any way to measure the -- the change in the
 5    amount of referrals for any given time period,
 6    whether it be year to year or quarterly, anything
 7    like that?
 8    A.       Well, first of all, I would take issue with
 9    your characterization that the referrals went down.
10    I don't believe I ever said that.  If they did,
11    that's something that Rob could answer.
12              More than that, from where I'm sitting, is
13    the inability to expose our referral sources to
14    Mr. Hartleib, we just can't do that, we're not going
15    to do it.  You know, they're all getting subpoenas
16    from you, it's super disruptive, it's super
17    embarrassing, it's super stressful, and we're --
18    we're just not going to do it.  So there's a lot of
19    opportunity missed to prevent and protect our
20    colleagues and friends from Mr. Hartleib.
21    Q.       The statements that are included as
22    exhibits to the First Amended Complaint are --
23    include e-mails, correct?
24    A.       I mean, you can show them to me.  I don't
```

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36

1033

PATRICIA WEISER

244

1    know.

2    Q.        Sure.

3    A.        Yeah.

4    Q.        Do you -- while I'm getting that ready, did

5    you participate at all in the identification of

6    potential witnesses, giving The Weiser Law Firm's

7    initial disclosures in this litigation?

8    A.        Not that I recall.  I -- I suspect that

9    I -- I was made aware of it, but I don't -- I would

10   not be the primary source for those types of

11   details.

12   Q.        Okay.

13             Would -- do you know an attorney by the

14   name of Alfred Yates?

15   A.        Yes.

16   Q.        Is he a colleague?

17   A.        Yes.

18             I -- I haven't spoken to him in a very long

19   time, but he was one of the -- yes, he -- he was a

20   colleague for the better part of my early career in

21   this field.

22   Q.        Would George Agular (ph) be considered a

23   colleague?

24   A.        I don't -- I -- I know Mr. Agular.  I think

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36
1034

PATRICIA WEISER

245

1    I worked with him on a case or two.  I -- I

2    recognize the name, but -- he's certainly a

3    colleague of the firm and the other folks that work

4    at our firm, but our timing didn't -- didn't overlap

5    personally.

6    Q.      Do you know an attorney by the name of

7    Mark McGrory?

8    A.      I'm sorry, can you just say that again?

9    Q.      Mark McGrory?

10   A.      Could you spell the last name?  That

11   doesn't sound familiar.

12   Q.      M-C-G-R-O-R-Y.

13   A.      That doesn't sound familiar to me, no.

14   Q.      How about a Jay Razzouk?

15   A.      One more time.

16   Q.      Razzouk.

17   A.      Could you spell that?

18   Q.      R-A-Z-Z-O-U-K?

19   A.      No, it doesn't sound familiar.

20   Q.      Brian J. Robbins?

21   A.      Oh, Brian Robbins, sure.

22   Q.      Would -- would he be considered a

23   colleague?

24   A.      He would be a colleague and friend, to Rob

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36
1035

PATRICIA WEISER

246

1    especially.  I haven't saw -- I haven't spoke to him

2    in a long time, but early in my career absolutely.

3    Certainly a colleague of Rob's.

4    Q.      I have placed on your screen Exhibit-12 for

5    the First Amended Complaint.

6    A.      Can you make it a little bit bigger?

7    Q.      Absolutely.

8    A.      Thank you.

9            Okay.  Okay.  All right, got it.

10   Q.      Okay.

11           And I'll -- I'll represent to you that

12   recipients of the e-mailed statements that were

13   attached to the First Amended Complaint have been

14   identified, also an admission to disclosures in this

15   litigation.

16           By bringing this litigation and -- and

17   including all -- all of the e-mails, has The Weiser

18   Law Firm exposed its colleagues to Mr. Hartleib?

19   A.      I don't -- could you ask the question

20   again?  I don't understand the question.

21   Q.      I'm sorry.

22           By bringing this litigation, has The Weiser

23   Law Firm exposed its colleagues to Mr. Hartleib?

24   A.      By bringing this litigation, the one that I

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36
1036

PATRICIA WEISER

247

1    am being deposed in right now?

2    Q.       Yes.

3    A.       I am appreciating that we have provided a

4    vehicle for Mr. Hartleib to continue his harassment

5    to anyone who had the misfortune of being copied on

6    an -- on an e-mail or a Complaint or any litigation

7    that we've been involved in.

8             So by our -- any -- any way any firms are

9    associated with us in litigation, they have been

10   exposed to Mr. Hartleib, and therein lies the -- the

11   heart of the problem that we can't control and that

12   we -- we don't want to continue to expose.

13            So for some time while he was harassing us,

14   we ignored him and just dealt with what he was

15   alleging in any particular case, in any particular

16   court, at any time, and we did that for years.

17            And after the Kansas litigation where he

18   sued us that we won, and he kept going, it became

19   very clear and -- and very -- and Rob became very

20   adamant that we could not continue with the firm

21   with Mr. Hartleib continuing his harassment and that

22   we had to take corrective measurers, including this

23   litigation.

24            So, yes, by -- by commencing this

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36

1037

PATRICIA WEISER

248

1    litigation in an effort to stop the harassment, it

2    has resulted in our colleagues being harassed by

3    subpoenas served by your office.  Ironic, but true.

4    Q.        And so subpoenaing individuals identified

5    by The Weiser Law Firm as part of this litigation,

6    you would consider that to be harassment?

7    A.        I would need to you rephrase that.

8    Q.        Yeah.

9              By Mr. Hartleib, through my office

10   subpoenaing potential witnesses identified by at

11   The Weiser Law Firm in this litigation, Mr. Hartleib

12   has harassed -- engaged in further harassment?

13   A.        Yes, I believe so.

14             It -- I believe that every subpoena has

15   been issued from your -- from your firm by -- by

16   Mr. Hartleib, your client, it has been done to

17   perpetuate the nonsense that he's been spewing in

18   courts around the country that serve only -- that

19   are lies, that serve only to harass my husband, my

20   firm, and anyone that they're directed to.

21             This case is -- was brought with the sole

22   purpose of stopping him from harassing us with

23   baseless lies.  Lies.  And yet he is using this

24   litigation to harass anyone and everyone he can.

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36
1038

PATRICIA WEISER

249

1          God forbid they get their name mentioned at

2     a deposition.  So, yeah, we -- we have -- we have

3     in -- we have inadvertently given him a vehicle to

4     harass further.

5          Yeah, it's harassment when you're -- when

6     you're -- when you're spewing lies.  It's harassment

7     when you are telling untruths.  It's harassment when

8     you are serving subpoenas on people with no valid

9     basis for doing so.  No, it's harassment.

10    Q.      So asking Mr. Yates whether the statements

11    of Mr. Hartleib have had an impact on his opinion of

12    the law firm's reputation constitutes harassment?

13                    MR. ROSENZWEIG:  Objection as to

14          form.

15                    THE WITNESS:  Yeah.

16                    MR. ROSENZWEIG:  I don't think

17          that's --

18                    THE WITNESS:  Go ahead, Phil.

19                    MR. ROSENZWEIG:  I think that

20          mischaracterizes what the testimony was,

21          Pat, if you can, answer the question.

22                    THE WITNESS:  So -- I just feel

23          like I'm speaking to a six-year-old, so I'm

24          just going to speak to a six-year-old.

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36

PATRICIA WEISER

250

1            So when I had spoke to my

2       six-year-old, when she was six, it's not

3       the point, but you can't tell that to a

4       six-year-old because they don't get it.

5            So you can ask someone if

6       something happened.

7            So has this changed his opinion

8       of us?  You know, Mr. Yates has whatever

9       opinion of us he has, and I don't know what

10      it is.  I have nothing but good things to

11      say about Mr. Yates.  I -- I haven't spoken

12      to him in probably twenty years.  I have

13      fond memories.

14           But if Mr. Yates had attached to

15      him someone who was harassing him in court

16      and saying the things in court about him, I

17      wouldn't want to do business with him.  Not

18      because I don't respect him and trust him.

19      It wouldn't change my opinion of him

20      whatsoever.  It would, however, change

21      my -- my decision to do business with him

22      in court if I knew Mr. Hartleib was going

23      to be there every time he showed up.

24      That's the question to ask.

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36
1040

PATRICIA WEISER

251

1          Did it affect his -- his opinion

2      of us?  Maybe, maybe not.  I hope not, but

3      it -- it -- it will -- and, look, I don't

4      know the last time we did a case with Al

5      Yates.  So -- but if -- I assure you if one

6      comes up now and he thinks that

7      Mr. Hartleib's just going to show up, it --

8      it's just not something you want to walk

9      into.  It's something to avoid.  And it's

10     something we're not going to let him get

11     into, like we're not going to bring him to

12     it.  We're not going to ask him to come

13     join the harassment party with

14     Mr. Hartleib.

15          So, like, the question -- yes,

16     it's harassment because you're -- you're

17     subpoenaing them to ask them questions that

18     are stupid, that have answers that are not

19     relevant to what's going on here.

20          You're asking if it changed his

21     opinion of us.

22          No, because he knows us.  He

23     knows us.  I don't know what he said.  I

24     didn't read the deposition.  He knows us,

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36

1041

PATRICIA WEISER

252

1          and he respects us, I presume.

2                    He understands what's going on,

3          but at the end of the day, have I done any

4          business with Mr. Yates since 2016?  No.

5          Have I done any business with any of these

6          folks?  No.

7                    And that's for two reasons, one,

8          I don't want to pull my colleagues into

9          this shit and expose them to this

10         humiliating activity and abuse, and, two,

11         they don't want to be in it either.  It's

12         much easier just to do business with

13         somebody else.

14                    Yeah, there's an appropriate way

15         to subpoena people and an appropriate way

16         to ask them questions in the context of

17         litigation, and this is not it.

18                    So you want to ask us what he

19         thinks of us and if he thinks

20         Mr. Hartleib -- if that changes his opinion

21         of us?  I hope it doesn't.  I expect it

22         didn't.  You didn't have to subpoena him to

23         figure that out.

24                    Have we done any business

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36

1042

PATRICIA WEISER

253

1           together since?  No.

2    BY MR. MOTT:

3    Q.       Have -- you -- you mentioned a second ago

4    that you have not seen the transcript of the

5    deposition of Mr. Yates, just continuing to use

6    Mr. Yates as an example, but you have not reviewed

7    that transcript, correct?

8    A.       Nope.  I haven't reviewed anything, not

9    one.

10   Q.       And you didn't attend that deposition?

11   A.       Nope.

12   Q.       So you don't know what questions were asked

13   of Mr. Yates at his deposition?

14   A.       Nope.

15   Q.       And without revealing any attorney-client

16   communications, you -- you don't know what specific

17   questions were posed to Alfred Yates?

18   A.       No.

19   Q.       But the fact that the deposition occurred

20   in and of itself, when he was identified as a

21   witness by the law firm, is harassment?

22                   MR. ROSENZWEIG:  Objection.

23                   And what you're doing right now,

24           Mr. Mott, is bordering on harassment, so

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36

1043

PATRICIA WEISER

254

1          you're going to end this line of

2          questioning.

3                    She answered the question in a

4          very precise way, and you're right, she's

5          not going to get into anything that's

6          attorney-client privileged, so move on.

7                    MR. MOTT:  Are you instructing

8          her not to answer?

9                    MR. ROSENZWEIG:  I'm instructing

10         you to -- I'm instructing you to move on.

11                   MR. MOTT:  So she can answer?

12                   MR. ROSENZWEIG:  You asked an

13         objectionable question, and, you know, I

14         don't think it's worthy of an answer, but

15         I'm not instructing her not to answer.

16                   You know, she has answered the

17         question.  And unless you're going to

18         represent that you asked the questions that

19         she indicated were appropriate in the

20         deposition of Mr. Yates, which you did not,

21         then, you know, you've got nothing more to

22         ask on this topic.

23                   MR. MOTT:  All right.

24                   Let's take a two-minute break.

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36

PATRICIA WEISER

255

1          I'm going to take one more look at my

2          notes, but I believe we're -- we're pretty

3          much done here.

4                    VIDEO SPECIALIST:  5:31, off

5          video.

6                    (At this time, a short break was

7          taken.)

8                    VIDEO SPECIALIST:  5:34, on

9          video.

10   BY MR. MOTT:

11   Q.      Has the litigation that we're here for

12   today and the harassment that has occurred during

13   this litigation done any harm to the reputation of

14   The Weiser Law Firm or to the business of The Weiser

15   Law Firm?

16   A.      Yes, it has contin -- because of the

17   litigation that we feel we must pursue against

18   Mr. Hartleib to stop the harassment, stress levels

19   at the firm are high, financial resources are

20   strained, we cannot pursue the lines of business

21   that we wish to pursue, the opportunity cost is

22   high, the emotional stress is high, and the

23   uncertainty of the business going forward --

24   there's -- there's great uncertainty about the

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36
1045

PATRICIA WEISER

256

1   business going forward because of Mr. Hartleib, and

2   whether it will continue as a business or not.

3   Q.      And just to clear that up a little bit,

4   those things that you just described, have -- have

5   they harmed your reputation amongst your colleagues?

6   A.      So I would say that it has lessened our

7   rep -- it has hurt our reputation by not -- by not

8   allowing us the opportunity to grow our reputation.

9          Like we have our reputation because of the

10  exemplary work we have done in courts across the

11  nation, which has been lauded by judges and our

12  colleagues and the like.  And in the absence of

13  that, we are being prevented the opportunity to grow

14  our reputation.

15         The opposite of growth is what's happening.

16         We will, unless Mr. Hartleib stops, always

17  have this associated with us, mostly because I fear

18  he will appear in every court we go into if he

19  could.

20         So, yes, it has hurt our reputation because

21  we have backed out of the fulsome careers that we

22  were pursuing and the fulsome caseload that we were

23  pursuing because of him.  So, yeah, our reputation

24  has suffered greatly because they have not -- not

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36

PATRICIA WEISER

257

1    been permitted to grow during this time.

2    Q.      And --

3    A.      And the firm, the firm's reputation.

4    Q.      What about this litigation that we are here

5    for, these proceedings for this case, what about

6    that causes a loss of opportunity for the firm?

7    A.      The whole purpose of this litigation is to

8    get a human being to stop harassing us.

9            This isn't about money.  Like I just want

10   him to stop.  The firm -- he needs to stop or the

11   firm cannot go forward.  Like we just can't work

12   like this, it's too embarrassing, it's -- it's too

13   humiliating, it's too hurtful, it's too distracting

14   and too destructive.

15           So we just need him to stop harassing us

16   and telling lies about us in public everywhere we

17   go, that's the point of the litigation that we have

18   been forced to bring in order to try to salvage our

19   careers and our business.

20   Q.      And so the opportunities that The Weiser

21   Firm has not pursued or has felt that they -- it

22   would not be proper for them to pursue for whatever

23   reason, is that the result of Mr. Hartleib not going

24   away or a result of any action that has been taken

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36
1047

PATRICIA WEISER

258

1    as part of this that we are here for today?

2                    MR. ROSENZWEIG:  Objection as to

3            form.

4                    You can answer it, if you can.

5                    THE WITNESS:  Yeah.

6                    There was -- there was some part

7            of that that I feel like you

8            mischaracterized my testimony, so I don't

9            want to answer that question.

10                    If you could rephrase it, I'd

11            appreciate it.

12    BY MR. MOTT:

13    Q.      I'm -- what's I'm -- what I'm trying to

14    draw a distinction between is the conduct of

15    Mr. Hartleib that is the subject of this litigation

16    versus the proceedings pursuant to this litigation,

17    whether it be the filings, the discovery, the

18    subpoenas, the depositions, that's what I'm trying

19    to separate.

20    A.      Okay.

21    Q.      I understand that there has been ongoing

22    harm from the -- the -- him still being out there,

23    him not going away, I -- I understand that portion

24    of your testimony, but my question is very specific

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36
1048

PATRICIA WEISER

259

1    to the proceedings in this case and whether the

2    proceedings in this case have caused any harm to the

3    firm's reputation.

4    A.       So to the extent that our colleagues are

5    being subpoenaed in the matter and for the purposes

6    for which they are being subpoenaed, yeah, I think

7    that hurts our reputation and -- and our colleagues'

8    willingness and desire to do business with us going

9    forward, yes.  So there's that.

10           The -- the activity in the litigation

11   itself I -- I feel has had a detrimental effect on

12   our business and personal reputations.  In that --

13   not that we've done -- not that anyone thinks we did

14   anything wrong.  I don't think anyone does.  I think

15   we have -- we have -- I think people hold us in a

16   high esteem, frankly, which is a great feeling to

17   achieve that in your career after many, many years.

18           Not being -- not being able to work with

19   your colleagues because you're embarrassed that

20   you're going to bring this mess along with you

21   that's going to expose them to similar harassment --

22   you know, we're not the only people Mr. Hartleib has

23   done this to.  You know, the Robbins Firm, they've

24   been through this.  They don't want to go through it

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36

PATRICIA WEISER

260

1    again, and we're not going to bring it to their

2    doorstep.

3           So the -- Mr. Hartleib has caused the harm

4    that we allege in the Complaint.  He is continuing

5    to cause harm in the context of this litigation, and

6    I anticipate that he will continue to cause harm if

7    he will not agree to stop harassing us publically.

8           So there's a past, present and future of

9    harm that has been, is, and will continue to be

10   conducted by Mr. Hartleib in my view.

11   Q.      Thank you.

12           And I appreciate that clarification.

13                   MR. MOTT:  And with -- with that,

14           I believe we can conclude the deposition.

15                   THE WITNESS:  Okay.

16                   MR. ROSENZWEIG:  Thank you.

17                   MR. MOTT:  Oh, I'm sorry, I

18           assumed Phil didn't have any questions, and

19           I shouldn't have done that.

20                   MR. ROSENZWEIG:  It's okay.

21                   She's my witness, ultimately,

22           although she's your deponent.  And I've got

23           nothing to ask her now.

24                   VIDEO SPECIALIST:  5:42,

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36
1050

PATRICIA WEISER

261

1          conclusion of video.

2

3                    (Witness excused.)

4                    (Videotaped deposition concluded

5          at 5:42 p.m.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36
1051

PATRICIA WEISER

262

1                    C E R T I F I C A T I O N

2

3

4                        I, Christopher M. Pilot,

5           Professional Court Reporter and Notary

6           Public, do hereby certify that the

7           foregoing is a true and accurate transcript

8           of the stenographic notes taken by me in

9           the aforementioned matter.

10

11

12

13

14

15                        - - -

16

17

18

19

20

21

22           _____

23           Christopher M. Pilot

24           Professional Reporter

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36
1052

**PATRICIA WEISER**

263

**A**

**a.m** 1:18 4:3
**Abelson** 45:2 52:10 95:16,21 96:3 107:5 161:1
**ability** 67:21 73:5,21 74:19 75:15 190:1 192:6 209:1
**able** 51:1 57:1,22 61:4 73:11 78:15 94:24 115:16 125:15 132:18 146:14 159:2 172:10 172:12 178:8 186:23 193:3 193:5 194:17 198:1 206:3 207:18 242:11 259:18
**able-bodied** 234:19
**Ableson** 14:14,17 15:3,3,9 44:23 93:19 94:5 96:13,21 96:22 97:1,12,20 98:3,19 99:8,9 125:3 126:22 150:7 151:24 152:8 157:1 159:8 160:12
**Ableson-and-Silo** 160:6
**Ableson/Silo** 159:24
**absence** 233:22,24 238:22,23 239:7 256:12
**Absent** 55:1
**absolutely** 63:2 174:7 222:17 223:4 246:2,7
**absurd** 54:20
**abundance** 52:23,24
**abuse** 252:10
**acc** 113:22
**accept** 238:11
**acceptable** 88:18
**access** 24:17 25:11,13,15,19 26:8,22,23 27:1,1 100:9 105:9 106:1,3 113:22,23 118:17 132:14 134:19,21
**accessibility** 118:23
**accessible** 118:21 127:8
**accessing** 26:12
**accompanied** 61:24
**accompanying** 100:20
**accomplish** 34:3
**accord** 91:18
**accountant** 10:19 20:12,15 20:19 26:6,14,16,17 65:13 125:16,20

**accounted** 122:12
**accounting** 21:4 22:17 25:20 25:21 26:2,17,19 151:20
**accounts** 134:15 155:19
**accurate** 46:3 98:19 116:15 262:7
**accusations** 54:20 60:8 77:7 85:10
**ACE** 111:20
**aches** 196:7
**achieve** 259:17
**acquisitions** 32:9
**act** 50:4 54:21
**action** 133:10 150:6 206:19 257:24
**actions** 47:4,20 49:5 69:10,12 69:13 133:11 141:18 184:7 194:2
**active** 5:21 36:16 92:4,9 93:13 98:15 118:19 126:19 126:20 127:19,19 131:24 132:16 135:22 156:8 165:2 165:9 191:3,9,11 192:23
**actively** 6:2,4 31:9 32:5 136:17 164:24 229:13
**activists** 132:4
**activity** 87:17 252:10 259:10
**acts** 132:7
**actual** 10:23 67:20 102:6 168:3 172:1 225:16
**acupuncture** 200:5,6
**ad** 89:23
**adamant** 247:20
**add** 243:1
**additional** 56:16
**address** 30:8 55:20 63:18 79:16 155:2,4 183:8
**addresses** 112:11
**admin** 120:3
**administers** 186:22 187:6 189:2
**administration** 159:4
**administrative** 10:1,4,7 20:7 25:2 27:2 33:10 37:8 40:8 40:23 41:8 96:10 103:19 106:3 124:8
**administratively** 33:20 56:8

61:1,13 62:8 106:4 170:6,10 225:22 240:18 241:6
**administrator** 35:7 160:8
**admire** 139:5
**admission** 246:14
**admit** 222:1
**admitted** 6:8
**adults** 213:7
**advanced** 149:19
**advice** 140:1
**advise** 54:5
**advised** 221:6
**affect** 251:1
**affection** 237:14
**affidavit** 112:8 167:12,24
**affiliation** 188:2
**afford** 73:19 222:9,10 242:10
**afield** 135:3
**aforementioned** 262:9
**age** 78:14 149:19
**aggressor** 202:18
**ago** 17:24 88:2,2 90:5 92:15 92:16 102:4 110:12 134:17 144:16 155:14 176:14 177:8 177:10,23 214:13 253:3
**agree** 145:16 260:7
**agreement** 14:2 61:16 80:15 80:18 167:14 226:12,20 227:14 228:2,4,24 229:6 231:13
**agreements** 62:9
**Agular** 244:22,24
**ah** 11:8 82:24 236:16
**ahead** 31:21 63:3 96:6 102:15 153:5 219:16 249:18
**air** 74:23 173:20
**al** 4:9 251:4
**alert** 223:2
**Alex** 150:22 151:8
**Alexander** 150:23 151:8
**Alfred** 244:14 253:17
**allegation** 218:11 219:7
**allege** 260:4
**alleged** 210:15 211:19 217:22 217:24 237:6 238:2
**alleging** 247:15
**alleviate** 200:9 230:18

**PATRICIA WEISER**

264

allocate 103:23
allocations 61:17
allow 240:3
allowed 82:16 213:5
allowing 256:8
allows 124:10 139:7
Alpina 215:1
altered 197:7
alternatives 140:9
amend 53:13
Amended 32:15,19,24 43:18
  94:23 102:3 121:9 144:16
  167:7,7 172:11 176:15
  210:16 211:20 237:7 238:2
  240:16 243:22 246:5,13
America 74:5 145:5
American 2:9
American-made 215:3
amicus 72:18,22 99:14,17
  184:6
amount 35:10,14 57:1 58:11
  152:10 153:23,24 154:6,9
  154:15 160:15 179:5 226:10
  227:20 232:11 239:13 243:5
amount's 154:4
amounts 57:2 152:10 206:16
  229:17
and/or 75:15
Andrew 48:8
anger 173:4
angry 203:16 212:2
anguish 145:19
annual 92:21 94:16 98:15,15
  188:19
annually 92:12
anonymous 166:24 167:3
anonymously 166:13
answer 21:11 35:2 49:20
  71:19 80:17 104:23 130:21
  131:18,20 135:8 137:23
  148:3 151:23 155:13 163:5
  208:10 216:5 243:11 249:21
  254:8,11,14,15 258:4,9
answered 37:14 254:3,16
answers 251:18
anticipate 168:14 260:6
anticipated 101:3 202:22

anxiety 146:3 173:3 189:23
  202:23 205:21
anybody 87:13
anymore 118:18 137:2
  151:15 182:2 194:22 208:13
  224:4
anyone's 51:7
anyway 127:6 161:15
apart 65:8
apnea 190:2
apparent 69:21
apparently 99:7 183:5
appeal 59:14,18 61:4 170:21
  171:1,3,8,14,15 172:1
appear 67:2 155:2 256:18
appearance 194:5 239:9
appearing 71:6
appears 151:11 167:6
applied 117:23 233:17
apply 152:9
appoint 77:21
appointed 76:10,18,22 238:7
appointment 77:3
appreciate 23:4 51:10 53:11
  153:10 196:9 213:1 219:13
  240:7 258:11 260:12
appreciated 198:6
appreciating 193:9 204:3
  247:3
appropriate 21:23 30:23
  252:14,15 254:19
approval 34:17 227:16
approve 32:23 75:15
approved 19:8 33:24 36:22
  37:4 70:3 71:12 76:15,17
  103:10 216:19 229:19
approves 36:23 37:6 103:17
approving 56:9 103:3,7
approximate 22:15 57:1
  80:12,14 206:3
approximately 5:23 6:1 7:21
  12:8 22:11 27:19 28:5
  38:18 40:12 58:23 79:19
  82:6 88:22 89:1 110:13
approximation 206:15
Archita 27:4,8 86:20 113:17
  118:18

Archita's 114:12 116:12
  118:24
archived 104:16
area 28:15 32:8 123:14
  136:12 188:3
areas 32:7 69:16 183:8
arrived 61:12
article 140:14,21,21 141:6,14
  141:16,20,22 144:4 145:11
  150:12 161:19 162:10,11
  163:1,14,17
aside 123:15
asked 20:13 43:24 94:5
  107:16,18,19,20 108:3,3,5,7
  109:23 120:21 148:14 154:2
  154:10 156:13,23 157:16
  253:12 254:12,18
asking 12:17,24 14:6 103:13
  107:6 125:3 130:22 143:17
  151:2 159:6 163:21 190:13
  219:11 226:18 249:10
  251:20
asks 26:12
aspect 170:8
assaults 66:13
asset 78:7
assets 68:3 73:13,16 78:1,5
  83:15 84:16 85:12,21
assigned 240:5
assistance 186:3
assistant 20:17
assisted 139:24
assists 170:13
associate 199:1
associated 57:19 92:1 223:17
  242:3 247:9 256:17
Association 165:14
assume 110:3
assumed 98:18 260:18
assuming 52:1 59:16 172:18
assumptions 150:13
assure 251:5
Aston 84:6
athletes 191:11
athletic 190:10,11
athletics 191:10
attached 3:16 21:22 76:23

**ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES**

EXHIBIT 36
1054

PATRICIA WEISER

265

246:13 250:14
**attack** 139:17 144:17 176:17
  176:23 177:2,12 178:2
  183:7 185:8,14 210:22
**attacked** 55:12 67:11 75:3
**attacking** 175:20
**attacks** 70:19 74:13 75:13
  77:24 146:3 176:21 178:16
  182:15,16 185:5,6
**attempt** 240:15
**attempts** 162:8
**attend** 7:3 236:9 253:10
**attended** 188:19 201:8
**attending** 200:22 236:14
**attention** 50:16 53:1 153:11
**attorney** 2:6,10 5:19,21 12:13
  14:1,10 15:15,18 18:4,15,20
  19:8 21:21 22:20 23:18
  31:11,18 35:20 39:19 43:11
  90:18 91:2 93:1 94:7 95:12
  98:24 103:2,2,6,11,16,17,22
  105:2 108:13 123:19 125:5
  127:5 129:7,8,9 147:12
  149:15,15 152:20 168:23
  171:1,1,2 244:13 245:6
**attorney's** 50:12 108:6,11
  157:17 158:13 237:23
**attorney-client** 49:19,20
  253:15 254:6
**attorney-fee** 34:20,21 62:1
**attorney/client** 129:15
**attorney/employees** 91:10,11
**attorneys** 13:5 73:3 93:6,14
  93:15,18,23 94:14 123:24
  129:19 137:18 138:3,8,11
  165:24 220:21 234:20
**attorneys'** 50:14 76:14 87:22
  96:11
**attributable** 173:10 190:5
  238:1 242:18
**attributes** 167:4
**audit** 121:10,12,14,17,18
**aunt** 210:6
**authority** 24:15,18
**available** 127:4 223:1,2
**Avenue** 2:4 79:17 187:19
**avoid** 102:4 251:9

**avoided** 102:1
**awake** 196:4
**award** 34:20 36:9,17 37:1
  59:22,23 62:1 100:21 102:6
  170:22 231:14
**awarded** 60:5
**awards** 34:21 35:15,21
**aware** 43:19 53:2 77:22
  90:16 99:20 100:8,9,13,15
  106:20 117:17 130:6 140:12
  140:16 151:2,7 160:13
  161:21 163:21 164:2 166:14
  167:6,8,9 169:9,11 170:18
  173:8,17 181:7 183:11
  185:9,20 186:13,13 189:21
  190:3 197:6,13,14 205:20
  216:17 231:15 233:3,20
  244:9
**awful** 53:6 60:14 68:6,6
  70:18,19 77:24 100:4
  146:12 164:16,21 175:22,22
  180:21 196:17 203:8 207:23
**axe** 73:1

**B**

**B** 1:4 3:14 114:11 149:23
**B.A** 7:2
**B7** 215:1
**back** 10:7 11:6 24:5 29:3,24
  30:7 35:1 53:13 58:7 66:21
  68:10 72:12,13 75:21 91:18
  110:17,20 111:12 152:5
  155:5 164:9 190:16 194:17
  195:23 196:13 197:21,22
  198:15,19,23 199:8,10,13
  199:15,21 200:6 214:12,12
  215:24 216:2 225:5 230:24
  240:1
**back-and-forths** 217:18
**backed** 72:11 122:14 256:21
**background** 14:15,21,23
  15:6 94:13
**backup** 20:14 115:14,15
**bad** 75:10,11 149:12 202:16
**bad-ass** 146:4
**ball** 181:14,17,19
**bankers** 227:4

**banking** 10:19 34:4
**banks** 78:19 227:3
**bar** 6:8,19 46:22 50:10 54:6
  92:5,9,11,22 93:5 98:15
  104:12,14 165:2,5,8,10,13
  165:13
**barking** 212:24
**barred** 43:11
**Barroway** 16:21 17:2 111:8
  111:12
**baseball** 203:21,23
**based** 50:6 95:15 101:20
**baseless** 248:23
**basement** 192:9
**basically** 192:9
**basis** 31:12 89:23 94:16
  164:9 219:6 241:6 249:9
**beach** 195:6,20 196:20 204:1
**bear** 172:5
**beat** 219:17
**becoming** 135:22 157:24
**began** 42:7
**beginning** 7:18 11:15 21:17
  101:2,5 161:22
**behalf** 4:19,24 32:6 107:24
  133:10,15 139:9
**belief** 183:17
**believe** 7:22 9:4,13 27:14
  33:4 50:9 53:21 54:7 72:19
  79:3 81:2,8,12 86:16 98:6
  108:4 109:12 111:6 113:17
  152:6 154:9 157:13,14
  164:24 165:7 169:6 171:13
  172:2 190:5 194:2 197:1
  204:17 206:18 208:7 218:5
  220:18 227:15,18 243:10
  248:13,14 255:2 260:14
**believed** 143:14 185:18
**benefit** 143:6 181:16
**benefits** 181:19 200:13
**Berwyn** 79:17 111:16
**best** 38:14 40:4 49:16 82:22
  142:22 143:4 182:5 186:7
  195:4 200:10 211:10 235:1
  240:8,8 241:23
**bet** 179:1
**better** 26:13 49:1 50:23 70:14

**ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES**

EXHIBIT 36
1055

PATRICIA WEISER

266

138:21 166:7 178:3 181:7 191:2,2 221:12 244:20
**beyond** 14:1 52:2 124:24 229:21
**big** 9:17 56:4 67:7 161:14 181:13,24 182:9 239:13
**bigger** 46:7,10 57:14 95:2 111:3 172:19 197:4 246:6
**bike** 190:23 193:17,19
**bill** 22:10 42:1 242:24
**billed** 122:11
**billing** 122:1,6,20 128:23 129:3
**bills** 19:11,12 102:8 161:9
**binder** 108:12,14,20 109:8 112:10 115:3,10,11 158:15
**binders** 115:10,12
**bio** 90:14,19,22
**bios** 87:22
**birth** 233:15
**birthday** 215:11
**bit** 17:24 69:4 80:19,21 134:17 137:15 158:16 172:13 246:6 256:3
**blank** 49:14 130:19 149:3
**blew** 50:24
**blown** 184:2
**BlueCross** 188:11
**bluntness** 219:13
**Board** 139:19 165:6
**body** 194:9 196:7
**bonus** 58:13
**bonuses** 242:13
**book** 66:1 136:4
**booked** 194:24
**bookkeeper** 10:20 24:2 65:14 66:1
**bookkeeping** 19:1,10,18 20:5 20:6 21:13 22:12
**books** 103:24
**bordering** 253:24
**boss** 15:23
**bothered** 146:5
**Botox** 181:9 186:19,21,24 187:5 189:2
**bottom** 45:21 51:19 74:18
**bottom-bottom** 228:21

**bought** 80:11 81:24 83:22 86:7,10,17 214:23
**bowling** 181:14,17,19
**Bowman** 16:19
**boxes** 156:8
**boxing** 190:23 192:10
**Boy** 237:17
**brain** 53:10 164:8 182:7,10 182:13,20 183:8
**break** 30:8 62:19,22 63:7 102:14 111:21 184:15,21 232:22 234:4,9,10 235:6,6 254:24 255:6
**breaks** 234:12,15
**Brett** 73:10 83:19 103:11,12 103:12,12 104:2,6,8 111:4 215:21 216:9,18 217:2,15 218:12 220:15,18,19 221:9 221:23 222:3 223:19 224:3 224:7,8 226:1
**Brian** 245:20,21
**brief** 30:8 72:22
**briefs** 72:19 99:14,18 184:7
**bring** 36:19 50:16 72:10 133:10 208:22,23 225:9 251:11 257:18 259:20 260:1
**bringing** 153:11 207:23 209:3 246:16,22,24
**broad** 2:9 239:24 240:2
**broker** 241:4
**brokerage** 134:15
**brokers** 10:20
**brother** 143:5
**brought** 139:10 172:3 215:21 217:1 248:21
**Bryn** 201:2
**buddy** 111:1
**budget** 57:22 66:8,23 67:3 75:21 226:9,18,21 227:7 228:2,12 229:10,10,16 230:10
**budgeted** 226:15
**budgeting** 66:2 67:4,7,12 226:6 227:1,5
**budgets** 66:23
**build** 74:20 135:14
**building** 2:9 24:13 78:9,10,18

78:20,21 79:9,11,16 80:9,15 81:1,16,19,22,24 82:17 106:14 136:1,23,24 138:1 139:15 174:11
**builds** 198:4
**built** 133:24 135:19 136:4 139:2 145:2
**bulk** 69:18
**bunch** 30:12 213:19
**burn** 178:14
**business** 6:3 10:21 16:3 19:22 38:15 41:14,20 46:11 60:15 60:17 67:22 68:1,4,12,13 69:19,23 70:19 72:8,15 73:17 79:13,15 102:10 117:18 120:8 123:18 124:2 131:17 132:17 134:6 135:15 136:10,12,20,21 137:2 138:16 178:17 179:2,11 180:7 182:16 184:8 207:10 208:14,15,16 209:7 210:22 211:1 219:1 224:18 225:8,9 240:6,8 241:20 250:17,21 252:4,5,12,24 255:14,20,23 256:1,2 257:19 259:8,12
**businesses** 234:2
**busy** 101:19 209:7,8,10
**buy** 197:4

---
**C**
---

**C** 2:1 262:1,1
**C-R-O-O-K-E-R** 201:18
**calculate** 237:24 239:10 241:9,24 242:5,6
**calculation** 206:14 239:13
**California** 39:2,4,10,13,16 40:2,6
**call** 15:5 36:15 44:22 46:12 46:16 49:13 50:6 60:2,7 75:9 120:4,5,19 140:7 238:19,22
**called** 49:21 52:10 78:8 115:5 120:10,10
**calls** 50:19 132:23,23 173:22
**calm** 203:15,18 209:1
**cancer** 210:3,7,8
**capable** 119:24

**PATRICIA WEISER**

267

capital 8:10
caption 217:20
car 73:11 83:16,17 86:13
214:17,19,20
car's 214:24
cardio 192:8
cardiologist 190:9
cards 190:20 191:5
care 10:24 11:1,18 14:15 34:8
37:23 38:1 44:24 61:2 62:8
62:11 73:18 94:8 103:20
188:16,22 205:10 234:23
241:13
career 67:18 135:14 136:5
139:15 161:22 179:1 244:20
246:2 259:17
careers 60:16 133:24 139:3
256:21 257:19
carrier 188:10,13 233:19
carry 178:15
carrying 235:4
cars 73:12 83:18,20,21 84:23
85:22 215:16,17
case 4:8 12:18 20:3 22:21
24:24 31:4,18,24 33:9 35:9
35:21 36:14,18 37:11 38:3
39:6 55:6,7,7 58:21 59:23
61:7,15 70:21,23 71:1,17,21
71:22 72:2,3,7,11,19 76:10
76:12,13,15,16 77:4,12,19
100:21 103:16,18,21,23
104:1 116:21 119:6 121:11
122:12,13,20 123:3,10
125:2 126:1,14,15,18,20,21
127:2,19,19 128:8,17 129:5
133:2,7 135:5 140:15 157:2
159:20 161:12 168:9 176:1
201:22 202:24 204:6,9,12
204:18 205:24 206:23
210:16 217:1,19 219:2
223:7 226:11 227:23 228:4
228:5,6 230:9,17,19,19
231:12,16,18 238:6 240:17
245:1 247:15 248:21 251:4
257:5 259:1,2
case-related 24:24
caseload 229:9 256:22

cases 6:2,4 10:6,23 13:19,22
20:11 33:13 35:23,23,24
36:3,7,8 52:22 66:24 68:2
69:1,9 70:1,2,16 71:4,14
74:22,23,23 75:1,2,4,16,17
75:20 97:24 126:19 127:21
130:8 131:3,8 132:10 136:7
136:8 139:10 169:11 178:24
182:5 184:9,9 208:6 218:16
224:23 225:16,18 226:7,8
227:12 229:13,20,22 230:3
230:6 231:11,19,24 232:1,6
234:19 238:18,19 242:14
cash 78:21 79:12
Cassatt 79:17
casts 77:14
catching 153:10
categories 69:19
category 149:18
cause 112:8 199:17 209:3
211:24 260:5,6
caused 144:9 145:18 164:3
173:2 174:12 177:14 194:4
204:9 224:15 234:11,12
259:2 260:3
causes 164:11,12 174:18
177:21 182:18 184:10 207:6
207:8 257:6
causing 68:3 175:21
caution 52:24
cease 80:24
certain 11:17 20:13 24:17
67:3 90:21 109:19 115:18
118:15,16 133:19 140:18
152:9 153:23 154:14 213:19
213:20 223:24 228:11
certainly 45:20 68:17 112:5,5
114:5 121:7 156:20 158:8
216:5 219:15 245:2 246:3
certainty 228:10 229:18
certify 262:6
chair 174:23
chalk 199:17
challenge 46:15
challenging 211:3
Chanan 16:19
chance 63:1

change 78:18,19 86:13,14
87:15 89:19 243:4 250:19
250:20
changed 9:5 16:3 21:16 65:20
111:11 158:9 189:5 192:20
229:10 250:7 251:20
changes 51:21 111:23 194:4
196:22 197:22 201:24
202:23 204:5 252:20
changing 193:11
characterization 102:7 243:9
charge 56:8 131:4
chats 221:7,8
cheap 206:13
check 15:6 19:19,19,20 21:5
34:2,7 41:7,9 92:13 152:14
154:3 155:8,8 156:20
170:17
checked 52:3 94:16
checklist 94:8
checks 14:15,21,23 34:18
42:1 55:23 56:4,11,19 57:2
57:9,13,14
checkups 188:20
Cheryl 18:22 19:7 20:18
21:18 22:12,20 23:19,20,20
24:9,17 25:15 26:14,22 34:3
66:1 103:9,12 104:5,7 154:1
154:2,9 155:17
Cheryl's 154:6
chest 174:3
Chester 50:6 53:16 139:24
166:12
children 211:21 235:23
chiropractic 200:5
chiropractor 205:13 213:22
chiropractors 201:14,16
choose 70:10 75:1
chooses 186:5
chose 218:6
chosen 186:4
Chris 5:4 74:3 120:13,14
221:7
Christopher 1:13 262:4,23
churlish 72:18
citizens 73:3
claim 172:3

EXHIBIT 36
1057

PATRICIA WEISER

268

claims 100:15 110:3 135:5 217:10
clarification 168:7 260:12
clarify 103:5
class 35:5 69:10,13 70:15
class-action 32:9 35:5
CLE 92:5,9 93:5,15 98:16
clean 111:21 125:9,19
clear 47:21 69:6 72:5 78:17 99:1 120:14 207:16 226:24 238:11 239:2 247:19 256:3
clearly 147:18
CLEs 92:11,18
client 35:17 36:13 37:2 123:20 131:4 134:4 137:16 137:20 220:19 225:1,6,10 225:13,15 243:3 248:16
client's 37:2
client-incentive 35:15,21 36:9
clients 35:23,24 36:2 37:5 68:15 72:16 131:7,12 132:9 132:12,13,13,15 133:18,19 133:21 134:7,8,13 136:7,8 139:9 145:5 170:3 208:6 217:23 218:2,21,23 220:7,7 220:10 225:7,9,16,17,19 226:2
close 36:19 84:20 208:2 228:22 237:19
closed 39:15 52:23 126:6 127:21
closer 209:5
closing 218:13 221:3
clothes 197:4
cloud 124:15 156:5 231:22
cloud-based 25:8,10 26:22 106:13,15
co-counsel 61:6,11
coached 191:12
coaches 212:17
coaching 191:13
code 79:18
cold 179:18,18
cold/dry 179:18
collateral 79:12
colleague 4:18 145:11 244:16

244:20,23 245:3,23,24 246:3
colleague's 60:12
colleague/attorney 129:24
colleagues 38:15 46:22 60:15 60:17 61:11 72:8,8 75:14 129:13 132:21 138:3 143:9 143:23 144:11 149:4,13 207:22,24 230:19 238:19 239:4 241:20,23 243:20 246:18,23 248:2 252:8 256:5,12 259:4,19
colleagues' 259:7
collectively 215:17
collector 215:5,14
collects 155:20
college 190:15 199:12 200:6 236:7
collogues 72:15
colorful 17:23
combination 142:21 176:4
come 33:12 35:8,15,22 36:4 53:1 55:16 57:11 62:22 70:10 73:21,21 74:10 85:8 101:23 103:10 104:6,7 107:10,11 123:13 132:22 133:18 141:6 168:17 186:19 195:2,3 196:7 201:5 227:11 242:19 251:12
comes 23:16 34:11 35:19 103:21 127:24 162:17 174:22 177:9 180:8 191:19 199:2,3 210:22,23 215:16 227:9,10 251:6
coming 30:7 67:4 84:18 176:24 178:18 219:15,15 223:12
commence 50:17
commenced 157:18 202:8
commencing 1:18 247:24
comment 166:6
comments 168:4
commercial 239:23
Common 166:12
communicate 62:5 119:12,14 130:2,3,3,4 210:17
communicated 48:3 50:11

52:18 53:5 119:9 129:9,14
communicating 62:7
communication 105:19 129:23 130:15
communications 50:1 107:17 131:5 139:18 158:22 253:16
companies 131:24 132:3 133:4,9 135:18 139:9
company 15:7 87:12 107:13 108:22 118:11 132:24 133:1 133:11,12,15 138:24
Comparing 65:18
compensate 36:18
competing 236:14
Complaint 32:15,20,24 43:18 94:23 100:10,11 102:3 121:9 144:16 167:7,7 172:6 172:11 176:15 201:22 210:16 211:20 217:1,8,14 223:3 226:4 237:7 238:2 240:17 243:22 246:5,13 247:6 260:4
complete 232:18 234:13
completely 60:9 122:14
compliance 92:5,9 93:5,15 94:19 98:16
compliant 92:14
complied 21:3
complies 20:19 172:15,20
comply 122:5
component 53:20
computer 65:17
computers 110:23 111:2
concern 102:5
concerned 46:9 47:10 134:8 149:22
concerning 13:17
concerns 55:20 61:19
conclude 260:14
concluded 261:4
conclusion 164:18 261:1
conclusions 150:13
condition 167:13
conduct 173:1 174:19 206:18 206:23 207:2,5,7,8 210:15 211:19 218:7 233:6 237:6,8 238:1 258:14

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36
1058

PATRICIA WEISER

269

conducted 15:6 132:2 139:22 170:2 260:10
conducting 120:18 240:4
confer 20:12
conferencing 4:4
confidentiality 13:11,18 14:2
confirm 54:9 98:14
confirming 93:4,14
conflict 236:18
confused 34:22
confusing 48:9,13,17,18 76:21 105:10
congenital 190:8
conjunction 126:8
connect 87:14
connected 133:6,8 134:7 169:8
connection 28:21 29:18 33:22 54:15 87:20 108:6,22 117:4 212:11 225:24
connections 131:21
connects 134:10
conservative 67:5
Conshohocken 187:18,19
consider 248:6
consideration 223:9
considered 20:2 244:22 245:22
consistent 200:11
consistently 97:24
consolidated 138:13
constantly 145:6 182:19 191:12 198:3
constitutes 249:12
constricting 174:2
contact 87:22 105:21 119:18 161:18 221:2 224:17,20,22 225:5
contacted 50:18 225:18,19 226:1
contacting 49:11
contain 154:21
containing 112:11
content 50:2 89:15,17,21 99:20 114:6 141:7 159:7
contents 115:12 140:21
context 150:12 159:17 168:22

171:6 252:16 260:5
contin 255:16
continual 142:24
continue 70:1 71:14 139:4 142:13 147:7 179:10,11 207:18 219:2 247:4,12,20 256:2 260:6,9
continued 142:18
continues 214:3
continuing 223:14 247:21 253:5 260:4
contract 18:15,20 93:6,14,15 94:4 95:12 103:2 149:14 152:6,20
contracted 12:13 13:5 14:1,9 15:19 18:4 90:18 93:1 94:3 95:17 147:12 152:4,5
contracting 93:20
contractor 11:11 14:22 15:22 88:6,9,21,23 89:10,22 90:10 93:18 94:13 98:9,10 106:6 112:23 119:3 153:19
contractors 13:10,16 14:14 14:16,16,20 15:1,11 90:5,23 93:23 103:15
contracts 10:16 62:9,10
contrary 211:9
contributed 52:21
control 24:11,16,19 52:2 70:1 180:2 202:17 221:18 247:11
conveniently 122:13
conversation 45:2 49:18 101:10 141:6 162:15 220:4 220:14
conversations 162:23,24 163:1,13,21 164:2,6,15 209:2 220:1
converted 192:10
convey 130:7
cool 182:12
copied 115:9,10 247:5
copies 19:2 26:20 108:16 118:14
copy 13:5 21:6 108:17,21 115:2,4,7
corner 178:11
Corp 43:4,5

corporate 32:10 74:5 145:5
corporation 8:10,12,15,23 9:2,10
corporations 132:8
correct 5:19 7:19 59:7 78:6 95:22 147:20 148:6 149:23 149:24 153:18 157:12 165:2 222:14 243:23 253:7
corrected 149:24
correction 161:19
corrective 247:22
correctly 91:14 95:18 173:5
correlated 194:10
corresponding 41:24 86:12
cost 66:12,12 92:21 238:4 241:13 242:21 255:21
costing 180:3
counsel 4:14 5:3 11:10,12 30:22 33:9,24 34:15 35:9,12 35:16 36:16,17 37:1,2,21 49:13,14 51:6 53:17,21 59:24 61:16 69:24 70:6,7,11 70:15,17,20,24 71:12,18 76:11,19,22 77:2,3,5,9,23 109:5,22 110:3 116:7,19 117:3,12 123:12 124:19 125:16,20 137:9,21 143:18 149:3,3 184:9 206:16 225:24 228:3 238:7,13 239:1 240:5
counseling 186:9
counselor 186:10
count 238:21,23
counterclaimed 216:12
counterclaiming 184:4
counterclaims 240:11,14
counties 50:15
countless 240:13
country 85:9 150:16 223:4 248:18
County 50:6,12 53:16 139:24 166:12
couple 16:20 25:4 28:7 73:12 78:19 79:7 82:23 84:8,9,10 89:1 91:19 110:15 113:4 146:21 149:4 172:14 181:2 181:3,15,18 185:21 189:16

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36
1059

PATRICIA WEISER

270

193:2 195:24 205:3 206:9 214:12 215:2 225:16 231:24 233:12
**course** 19:22 59:21 65:17 81:19 82:2 89:14 96:23 106:9,18 108:15 117:18,19 135:14 136:5,16 139:3 232:6
**court** 1:1,15,21 4:6 5:4,5 19:13 29:2,23 36:22,22,22 37:4,6 52:3,19 58:20 59:5 59:15,17 67:11,23 69:24 70:7 71:7 77:8,23 122:1,22 166:12 171:14 184:6 216:1 222:21 238:21 239:9 241:18 247:16 250:15,16,22 256:18 262:5
**court's** 61:23 102:7 122:5 170:22
**courts** 53:1 71:16 85:9 87:19 143:1 146:12 150:15 168:9 248:18 256:10
**COV** 106:13
**cover** 92:21 239:20 240:2
**coverage** 239:21
**COVID** 27:21 38:22 82:15
**craziest** 51:7
**crazy** 55:15 143:8,8 145:16 145:22 149:6
**create** 158:4
**creation** 170:14
**credit** 78:20,22 79:12 85:17 85:19
**cried** 195:24
**criminal** 112:9,19
**Crooker** 201:17
**cross** 181:16
**crush** 174:8
**crushed** 146:6
**crushes** 174:7
**crushing** 176:6
**cry** 113:9
**crying** 102:4 195:21
**cryotherapy** 200:7 201:3
**cure** 200:2
**current** 10:8 63:18 88:8,20 88:23 91:7 92:7,10 110:7

123:11 144:12 169:11 188:9 217:2
**currently** 7:8 8:9 9:3,16 11:3 15:12 17:4 24:21 26:1 63:12,14 87:10 92:3 119:17 123:9
**curse** 67:14 75:10 231:22
**cut** 34:18 41:8 56:5 67:17,18
**cutting** 85:2,11
**CVS** 186:18 187:14

**D**

**D** 3:1
**DA** 51:16 109:20 114:20 115:11,19 116:11 117:1 118:3
**dad** 196:21 212:15,22
**dad/daughter** 235:21
**daily** 83:23 154:6 164:9
**damaged** 72:24
**damages** 132:5 239:12
**dark** 231:22
**Darn** 17:13
**data** 124:13
**date** 7:20,23 17:17,19 19:3 80:12,14 104:21 206:5 229:2 233:15
**dates** 12:5 97:5
**daughter** 65:6 194:20 195:1 195:10 198:10 214:16 235:17,20 236:8 237:4
**daughters** 196:20
**day** 44:9 46:18 48:6 52:11 58:3 72:24 100:2,17 101:6 104:14 114:7 136:16 141:3 143:14 149:13,21,21 164:19 174:20 178:1,5 180:24 185:11 191:1,17 195:22 206:13 211:13,14 222:9 234:21,21 252:3
**day-to-day** 9:23 10:2 100:3 200:19 214:9 236:23
**day-to-day-operations** 9:24
**days** 102:3 144:16 176:14 177:8,23 208:1 235:14
**deal** 10:19 31:5 45:2 46:14 56:7 57:20,23 73:4,7 88:11

137:4 144:8 148:23 175:15 178:12 180:3,17 184:12 202:20 207:12 208:11 210:2 210:4,9 211:13 212:6 241:5
**dealing** 66:12 90:10 183:20 196:10 210:7 225:21,23 239:14,17 240:18
**dealings** 55:17 99:24 131:4 217:13
**dealt** 59:19 143:24 213:21 247:14
**Debra** 15:16 111:4
**decade** 82:3 119:20
**December** 7:15 81:2
**decide** 180:7
**decided** 70:8 96:12 218:2 222:16 229:18 231:13
**decides** 186:6
**decision** 28:18 77:1 170:22 171:14 230:15 250:21
**decisions** 29:8
**declined** 68:2 71:10
**decrease** 68:22,24 162:9 163:2
**decreased** 181:19
**decreases** 74:16 78:3
**decreasing** 85:14
**deems** 30:23
**deep** 99:23 108:8
**deeply** 167:10 241:13
**defamation** 100:14
**defect** 190:8
**defend** 85:9 206:4 240:9
**defendant** 1:9 2:10 5:1
**defendants** 37:7
**defending** 73:14 178:22,24 239:18
**defer** 210:20
**define** 170:23
**definitely** 46:5 53:19 56:1 114:14 168:3
**degree** 7:1 161:10 187:12
**Delaware** 6:16
**delete** 108:17
**deleted** 230:14
**delivered** 113:12
**demonstrated** 173:13

PATRICIA WEISER

271

**dental** 213:19
**dentist** 214:1
**dentists** 213:17
**Denver** 236:11
**deny** 77:2
**depart** 112:23
**department** 32:1 69:9 113:10 218:13 222:20 223:6,8,11 223:11,16,20,21,23 224:9
**departments** 69:7
**depending** 19:3 99:3 101:5
**depends** 23:16 197:22
**deponent** 4:12 260:22
**depose** 199:6
**deposed** 247:1
**deposition** 1:3,12 4:2,5,12 17:16 32:14 63:24 104:10 176:16 195:18 203:6 249:2 251:24 253:5,10,13,19 254:20 260:14 261:4
**depositions** 258:18
**depressed** 176:9,12 185:22 193:5 208:20
**depression** 173:3 185:17 202:5,5,6 205:22
**deprivation** 173:3
**depth** 213:1
**derivative** 31:15,18,24 36:11 36:13 58:21 68:2 69:9,22 71:10 126:2,15 131:3,8,12 133:7,11,16 137:8,17,20 138:2,8,12 139:10 218:13 218:24 219:5,9 220:17 221:4 222:13 223:5,8,11 224:9,18,23 226:11 230:6 231:11
**derivatives** 68:23 230:5
**derogatory** 163:23
**describe** 185:7 206:22
**described** 140:22 160:15 173:1 180:18 185:8 186:12 256:4
**DESCRIPTION** 3:16
**designed** 111:15 182:16
**desire** 72:14 259:8
**desk** 44:13 100:17 232:2
**destroyed** 136:24

**destructive** 180:14 257:14
**detailing** 215:17
**details** 41:11 75:17 129:20 178:15 244:11
**detectives** 112:18
**determine** 46:23 49:15
**determined** 142:7,15
**detriment** 99:9,9
**detrimental** 259:11
**diagnosed** 198:21 213:10
**died** 214:21
**Diego** 39:1,2,3
**differences** 241:9
**different** 25:4 36:6,6,8 39:6 43:23 47:23 48:2 50:15 69:6,10 71:6 89:4 94:17 105:16 106:10,15 116:9 179:19 180:21 181:4 183:6 183:7,8 186:19 187:4,5 199:24
**differentiate** 207:1
**differently** 36:7,8 183:7 207:12,13
**difficult** 67:24 68:21 72:15 75:22,22 143:18 202:20,20 209:2 211:2
**digital** 21:7 23:13 24:8,22 25:13,20,21 26:2
**digitally** 22:22 23:12
**direct** 27:1 74:13 128:20 158:17
**directed** 109:4,21 248:20
**direction** 20:15 61:5 125:16
**directly** 15:8 35:18 36:1 92:15 97:12,13 98:5,13 103:14 105:22 152:1,5,7 204:8
**directors** 132:8 133:4,14
**disability** 233:18
**disagree** 235:2
**disbar** 44:6
**disbarment** 44:6 47:22 48:2 48:9,19,21 49:5 52:12 54:19 59:11,20 94:11 99:4 107:3 149:14
**disbarred** 14:13 43:20,22 44:2,19,20 45:7,12 51:20

59:7 99:1 141:4 142:1 147:15 149:5 165:19 166:8
**disbelief** 45:17
**disbursed** 40:9,13 41:1 59:24 160:23
**disbursement** 33:12,19 34:19 34:21 161:2
**disbursements** 41:5
**Disciplinary** 139:19 165:6
**disclosed** 55:3 185:5
**disclosures** 151:20 244:7 246:14
**discontinue** 219:4
**discover** 135:4
**discoverable** 127:5
**discovery** 47:6,19 49:4 59:7 107:23 109:2,20 115:15 159:19 258:17
**discuss** 45:11 65:15 130:6 133:5 134:9
**discussed** 46:15,20 52:15 119:5 141:3 162:21 166:17 222:17
**discusses** 166:19
**discussing** 45:7 102:24 124:3 140:8 142:21 220:23
**discussion** 34:14 42:8,9 46:7 46:21 223:5
**discussions** 61:6,10 140:6 171:18
**Dismiss** 100:12
**disparage** 71:15
**disruptive** 243:16
**distance** 192:20
**distinct** 48:3
**distinction** 49:2 258:14
**distinctly** 72:2
**distracting** 257:13
**distress** 172:4
**distribute** 35:17 36:2 61:5
**distributed** 35:16,18 37:1,15 61:7,8 231:8 238:16
**distributing** 34:1 60:3
**distribution** 33:22 35:11 37:16 38:1 61:2,14
**district** 1:1,1 4:6,7 50:12,13 108:6,11,13 157:17 158:13

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36
1061

PATRICIA WEISER

272

**divorce** 211:8
**doctor** 182:24 183:2,9 186:16 187:6 194:10,11 198:21,22
**document** 15:1 20:3,10 29:13 33:21 83:6 94:7 98:24 99:6 114:6,24 115:6 121:8 123:9 123:11
**document-retention** 124:4
**document-review** 95:14
**documentation** 13:15,24 14:10 19:21 21:5 30:13,16 30:19,22,24 33:23 155:22
**documented** 30:10
**documents** 7:15 9:4 14:10 24:24 25:2 32:13 96:24 108:10 109:4 112:10,13,18 114:19 115:21 117:1,3,11 117:20,21 118:6 123:18,20 124:1,5,23 125:11 126:21 127:3,7 150:22 151:3,7,11 151:17 156:18 157:2,3,15 157:21 158:4,12,14 159:6 159:13,16 225:23
**dog** 212:24
**dogs** 64:23
**doing** 24:6 31:3 41:18 75:20 84:12 99:10 112:3,4 120:20 130:10 141:10 145:8 146:13 156:7 179:11 181:20,21 184:6,8 193:22 218:15 235:3 241:5 249:9 253:23
**dollars** 206:7
**door** 57:10
**doorstep** 207:24 260:2
**double** 52:3
**download** 130:5
**downs** 212:6
**downsized** 223:19
**draft** 168:2,5
**drafted** 32:21 126:10 127:23
**drafting** 124:20 167:23 168:3 240:14
**dragging** 77:17
**drastic** 193:12
**draw** 258:14
**drawing** 130:19
**dreamed** 101:3

**dried** 66:6,18,22
**drive** 214:19,20,23
**driven** 86:8
**driver** 83:23 214:9
**driving** 211:8 214:17,18
**drop** 34:10 230:11
**dropped** 231:5
**drove** 196:13 224:6
**drug** 145:9
**drugs** 179:22
**due** 183:18 226:9
**duly** 5:7
**dump** 113:8
**duration** 141:3
**duties** 10:4,5,8 33:10
**duty** 33:3
**dying** 210:6

**E**

**E** 2:1,1 3:1,14 262:1
**e-mail** 21:21 23:17 24:1,4 100:9 104:2,11,15,20 105:7 105:12,18,21 106:1,2,5 113:24 114:3,12,14 116:13 118:18,24 119:11 120:5 125:2 129:22 130:3 143:2 156:8,8 247:6
**e-mailed** 246:12
**e-mailing** 22:19
**e-mails** 19:7 24:4 100:6 104:24 105:3,5 107:7,10 109:24 125:4 130:9 156:12 156:17 157:1,3 165:8,14 243:23 246:17
**earlier** 31:8 61:9 68:22 94:12 99:14 102:24 110:6 116:2 139:23 141:23 165:1 169:15 197:18 231:8 235:7 238:5 239:15
**early** 12:9 22:14 244:20 246:2
**earned** 70:24 242:15
**ears** 205:19
**easier** 138:21 186:2 252:12
**East** 2:4
**Eastern** 1:1 4:7
**easy** 94:21 131:20 207:15

209:6,9 229:16
**eat** 63:1
**economic** 10:2
**Edelstein** 16:17
**Edition** 83:24 84:2
**effect** 11:22 67:14 124:21 125:13 181:19 222:12 224:23 259:11
**effectively** 77:17
**effects** 181:6
**efficient** 232:17 239:16
**effort** 21:19 248:1
**efforts** 36:18 161:16 162:7 163:7
**eighteen** 229:14 236:2
**eighteen-year-old** 214:16 236:6
**either** 14:17 35:16 77:1 91:19 91:21 93:19 94:15 103:3,3 119:11 140:1 238:6 252:11
**electronic** 21:19 22:6,7 24:14 106:21 108:14,21,21 109:8 109:19 115:7,18 118:5,10 122:10
**electronically** 21:23 22:8 115:13
**element** 46:5
**Elvis** 17:21
**embarrassed** 54:1 60:11 259:19
**embarrassing** 53:6 243:17 257:12
**embarrassment** 60:17 164:4
**emotional** 145:18 164:11,12 172:4 255:22
**emotionally** 68:21 209:19
**emotions** 174:4
**empathy** 177:4
**employ** 27:3,8
**employed** 7:8,11,18 18:11 129:8 147:14,18
**employee** 11:12 13:13,17 15:23 18:5 29:13 87:3,4 90:17 91:3,7 98:10 118:18 128:21
**employee's** 106:5
**employees** 10:6,15,23 11:4,17

PATRICIA WEISER

273

13:12 26:24 58:13 68:4 73:17 79:7 83:19 90:22 91:9 116:6 120:18 139:11 144:11 145:3 165:20 188:7 208:6 241:12,12,14,19
**employees'** 206:10
**employer** 217:2
**employment** 12:18 16:7 18:9 147:11
**EMT** 205:18
**ended** 168:14 222:21
**endorphins** 178:4
**ends** 150:11
**engage** 161:24
**engaged** 18:4,15 96:2 148:10 152:20,23 192:11 219:9 248:12
**engagement** 18:19
**engages** 14:9 93:6
**engaging** 11:21
**English** 7:2
**enjoying** 211:11
**enormous** 173:2,7,9,13
**ensure** 52:5
**ENT** 205:17,19
**entered** 6:5 100:13 239:9
**entire** 97:21 114:23 139:3 156:5,5,20 174:13 209:16 229:8
**entirely** 130:23
**entirety** 32:20
**entities** 56:5 170:14
**entity** 42:15,21,21 43:1 56:6 78:8 83:9
**envision** 118:2
**EPLI** 217:11
**equal** 8:7 70:8 76:23 77:10 238:13
**Equifax** 71:21
**equipment** 192:8,16
**ERSA** 1:15,21 5:5
**especially** 68:2 176:3 182:4 183:22 192:12 246:1
**ESQUIRE** 1:5 2:3,4,8
**establish** 43:10 220:22
**estate** 123:23
**esteem** 259:16

**estimate** 206:3 221:19
**et** 4:9
**ethic's** 53:20
**ethics** 49:14 53:17 149:3 206:16
**ethics'** 53:24
**event** 199:16
**events** 51:24 193:14
**eventually** 61:3 232:11 240:16
**everybody** 195:23
**Everybody's** 94:16
**everyone's** 92:10
**everything's** 22:7 75:23 197:23
**evolved** 22:6
**exact** 7:22,23 17:17 83:9 236:12
**exactly** 45:3 46:24 59:11 154:24 162:13 237:13
**exactly's** 175:3
**EXAMINATION** 1:4
**examined** 5:8
**example** 43:4 123:23 134:20 154:4 190:2 193:16 200:15 227:20 229:12 230:2 236:22 238:6 240:23 253:6
**examples** 173:12
**excellent** 74:7
**exception** 66:24
**excess** 154:14
**excited** 66:8
**excluded** 138:24
**excuse** 184:14
**excused** 261:3
**executed** 167:12
**exemplary** 256:10
**exercise** 178:3 185:12 193:6
**exhausted** 196:15
**Exhibit-12** 246:4
**exhibits** 3:20 243:22
**exist** 13:12 128:7 203:19 207:19
**existed** 127:14
**existence** 11:13 106:9 125:21
**exists** 24:13 110:3 113:7 118:16 119:1 158:11

**expect** 55:17 252:21
**expected** 114:23
**expended** 240:13
**expense** 19:21 57:14,19 85:3 103:17,22 212:21 242:22
**expenses** 35:9,12,20 36:4,24 37:14 57:11,23 58:2,3 61:8 61:9 72:13 85:5,11 231:7 237:24
**experience** 6:6 86:2 189:8 197:19 207:11
**experienced** 65:21
**experiences** 197:18 202:24
**experiencing** 185:19
**expert** 12:17
**expertise** 28:15 133:22 134:10 139:7
**explain** 69:3 241:3
**explained** 116:18
**explaining** 220:23 226:5
**expose** 60:16 241:19 243:13 247:12 252:9 259:21
**exposed** 202:12 246:18,23 247:10
**express** 61:19 102:5
**expressed** 166:23 233:4,9
**expressions** 237:14
**extended** 65:3 133:20 234:4
**extension** 139:11
**extent** 26:15,20 110:2 140:3 163:20 218:22 227:17 259:4
**extreme** 45:4 66:12 177:14 198:8
**extremely** 60:11
**eyes** 145:15

**F**

**F** 262:1
**Facebook** 51:21
**facilitate** 50:10 54:10
**facilities** 200:22
**fact** 54:17 55:10 68:1 69:17 86:8 99:6 125:18 148:9,20 202:10 253:19
**facts** 147:13
**failing** 177:16
**Fair** 116:22

PATRICIA WEISER

274

fairly 90:21
faith 143:15 144:19 180:12
fall 124:5 236:7
falls 38:19 189:6
false 43:10 222:14
familial 211:23
familiar 15:15 38:4 43:6,7,8
65:10 122:21 151:9,10
215:20 216:5,8 217:15
240:6 245:11,13,19
families 73:6
family 73:10 79:9 139:12
144:11 145:3,4 164:5
178:20 180:4,15 192:2,16
224:3,4
far 6:11 89:3 99:21 120:23
124:24 135:3 190:16 193:11
231:17
fast 178:5
fat 161:14
father 178:9 212:20
fault 175:20 224:13
fear 256:17
feasible 68:17
February 43:20 56:22 93:8
93:12 105:20
fee 37:10,15,18 40:9,13 58:19
59:2,12,22 60:2,4,4,22
61:20 65:23 66:4 67:17,17
70:22,24 76:17 88:12
100:21 140:14 170:22
231:14,17,19 238:8,8
feel 6:18 7:21 14:19 45:24
46:1 53:13 81:7 113:19,21
116:8 140:18 143:23 144:1
145:7 150:9 165:10 176:22
177:2,4 178:3,20 180:21,24
181:14 185:9 191:2 193:22
193:23 202:11 203:2 208:5
249:22 255:17 258:7 259:11
feeling 161:5 177:6 178:16
195:17 196:12 213:2 259:16
feels 164:16,20 176:19 191:2
194:14 196:14 202:12 203:8
204:2 209:16 210:8 235:4
fees 35:9,11,20 36:4,24 37:14
37:21 57:11 61:8,10 71:11

76:14 237:23
feet 82:14 111:1
felt 50:21 52:6 67:13,15
139:16 149:21 176:17 193:5
207:12 222:6 257:21
Ferrari 84:6
fewer 26:12
field 46:11 68:13 136:15
139:6 195:22 244:21
fifty-grand 58:10
fight 143:7
fighter-or-flight 198:3
fighting 60:7 207:15
figure 45:21 82:22 130:6
178:11 182:14 185:23 186:5
223:21,22 241:23 252:23
figures 57:10 179:7 206:12
207:14
file 18:7,19 20:3,4 21:24
30:10 31:12 74:21,21 75:1,2
75:3,4 126:1,14,18 127:2
133:15 223:1,3
filed 23:24 33:5 123:19 127:3
201:22 216:21 229:22
242:15
files 27:2 123:3,10 127:19
128:8
filing 33:2 184:6
filings 151:20 206:5 258:17
filled 30:13 61:13 152:13
fills 186:15
final 34:17 227:13 229:1,6
finalized 33:24
finalizing 34:16
finally 183:10
finances 177:13 195:19
financial 65:11 78:2 79:14
161:6 177:17 255:19
financially 68:21
financing 227:4
find 44:23 45:4 46:5 51:9
95:3 117:20 125:10 128:3,6
128:13 136:7,8 149:23
175:3 178:11 195:2 232:17
236:17 237:2
finding 47:22,23,23 72:3 77:9
132:2 141:24 149:5

fine 48:24 68:9 90:13 98:23
144:22,22 146:10,10 174:20
179:13 211:16
finish 102:2 191:21
fire 73:8 177:14,18
firm 1:4 4:9,20,23 7:9,12,14
8:2,5 9:15,16,18,23 10:14
10:16,16,21 11:3,6,11,20
12:3,24 13:22 14:9,11,14,24
15:4,10,14,18 16:6,11,13,18
16:23 17:2 18:3,6,7,9,15,20
20:7,22 21:7,17 22:12,13,16
24:6,10,12,21 27:3,8,13,17
27:20 28:6 29:12 30:12,14
30:17 32:6,23 33:11 35:8
37:8,10,19,24 38:8 39:9,12
39:15 40:8,24,24 42:13
46:14 47:2,5,20 49:6 50:5
50:18 51:16,23 52:9 53:16
53:22 54:10,12 55:19,24
56:13,23,23 57:5 58:1,5
59:23 60:3 62:6 65:9,19,21
66:14 67:20 69:7 70:20
71:18 73:2,6,14 74:4 76:10
77:2,8 78:1,7,10,16,22 79:4
81:14,20,23 83:2 84:12,12
84:20 87:2,9 89:11,15 90:15
90:19,22 91:2,8 92:3,8,21
93:6,12 94:14 95:12,16,17
95:21 96:2 98:5,13,14 100:7
101:7,8,11,13 103:3 106:9
106:19 108:3,4,7 109:10,13
110:7,21 111:7,7,11,14,15
111:22 112:6,13,17 113:3
113:12 116:5 118:17 119:17
126:1,14 127:12,16 128:3
128:13,16,21,22 129:8,9,13
130:17 131:2,7,11 134:4
135:11 137:7,16,19 138:4
138:14,15 139:11,15,24
140:7 141:12,18 142:2,6
144:10,22 146:9 147:12,13
148:9,24 150:21 151:21
152:19,23 153:15,16 154:21
155:9 159:12 160:8,12,24
161:17 162:17,22 163:3,9
164:1,5 167:14 169:4,17

PATRICIA WEISER

275

171:18 177:13,17 179:12,13 188:6,10,13,14 206:11 207:19 215:21 216:9,18 217:23 218:3,7,24 219:8 220:2,8,22,23 221:3,13 222:12 224:17 225:8 226:8 231:11 233:5,23 234:1,5,18 241:15,18 245:3,4 246:18 246:23 247:20 248:5,11,15 248:20 253:21 255:14,15,19 257:3,6,10,11,21 259:23
**firm's** 13:6 20:3 37:19 49:17 55:21 59:6 61:20 64:10 65:10 87:10 90:20 105:21 123:2,9 147:15 148:12 161:17 162:7 168:10 195:18 195:19 224:22,24 226:6,21 237:24 241:2 244:6 249:12 257:3 259:3
**firms** 35:20 46:22 50:20 51:15,16 55:19,24 56:18 58:6,14 61:15 62:6 106:10 110:6 123:21 149:7 247:8
**first** 6:8 11:19 16:16 32:19,23 43:9,18,19 47:18 52:17 57:23 76:12 81:24 82:11 91:5,14 94:23 96:19 121:9 152:23 153:19,22 155:13 162:17 167:7 172:11 198:8 201:5 210:16 211:20 216:24 217:6 223:10 231:16 237:6 238:2 243:8,22 246:5,13
**fit** 105:3 192:14
**fitness** 190:21 191:23
**fits** 113:4
**five** 16:22 40:17 57:10 63:4 66:11 68:11 74:24 75:6 85:18 94:20 124:21,24 175:7 179:24 230:3,6 232:7 232:12,16,19 240:21
**five-figure** 57:13
**five-minute** 62:19
**five-year** 230:1
**five-year-old** 198:14
**fix** 35:1 47:1 88:7
**flare-ups** 204:24
**floor** 82:4,7,10

**floors** 82:4
**flow** 35:14
**flows** 36:7 79:1
**focus** 11:1 141:9
**folder** 18:2 22:9 109:14,15 112:13,21 115:21 157:8,11 157:14,15,19,20,23 158:4 158:11,14
**folders** 18:1 109:16,18 113:5 113:5 118:6,14 127:1
**folks** 56:16 72:6,7 131:21 245:3 252:6
**follow** 17:22 49:16 161:13
**followed** 54:20
**following** 10:13 47:6,18 49:4 86:21 141:19
**follows** 5:9
**fond** 250:13
**foot** 81:22
**forbid** 210:3 249:1
**forced** 257:18
**forefront** 53:10 164:8
**foregoing** 262:7
**Forever** 17:15,15
**forget** 76:13 214:1
**forgotten** 167:11
**form** 8:17 11:24 12:16 13:8 14:4 21:10 22:24 29:16 31:21 33:15 38:2,2 42:17 43:13 45:9 47:9 61:14 64:12 79:23 96:6 104:19 114:18 123:6 138:6 147:17 147:24 153:2 159:15 163:19 167:17,21 169:21 199:20 226:23 233:17 249:14 258:3
**formal** 8:14 9:15 93:16 233:24 234:5 235:5
**formalities** 9:18
**formally** 213:10 234:1
**format** 21:7 23:13 119:1
**former** 15:22 53:21 54:1,4 110:11 111:7,7 144:12 218:23
**forth** 226:3
**fortunate** 55:8 138:23
**forward** 66:3 67:12 74:21 130:9 255:23 256:1 257:11

259:9
**forwarded** 129:22
**found** 45:14,14 52:11 89:7 110:1 125:4 141:4 186:4 195:4
**founded** 7:14 8:1
**founder** 32:22
**founders** 8:2
**founding** 7:13 16:6,10,12
**four** 59:2 192:11 196:2 237:2
**four-and-a-half** 59:3
**four-year-olds** 213:6
**frankly** 79:6 124:12 139:9 259:16
**fraud** 74:5 132:2,6
**free** 7:21 53:13 124:16
**frequency** 183:15,18 192:19
**frequent** 202:4
**frequently** 189:8 208:21
**fresh** 40:7
**friend** 110:22 145:12 245:24
**friendly** 111:9 132:19 134:6
**friends** 38:15 68:5 132:21 135:17 143:10 175:10 207:22,24 243:20
**friendships** 135:20
**front** 143:13
**frustrating** 202:15
**fucked** 203:5
**full** 54:14 71:12 227:20
**fully** 110:2
**fulsome** 55:5 109:5 256:21,22
**fun** 175:23,24 182:5 203:22
**fundamentally** 99:2,5
**funds** 33:22 34:1 35:7 36:2 38:1 41:1 61:2,7
**further** 248:12 249:4
**fuse** 212:1,2
**future** 75:21 195:19 260:8

___

**G**

**gain** 139:7 197:13
**game** 203:21,22 212:16,17
**games** 191:5,8,9,12
**garage** 192:9 215:11
**gather** 157:16
**gathered** 108:10 158:12

**PATRICIA WEISER**

276

gathering 122:3 159:5
general 57:4 80:23 105:3
131:10 140:6 144:6 156:24
161:23,23,23 197:3 242:5
generally 10:24 19:9 42:3
69:1 85:1 97:19 99:20
100:15 105:1 124:5 125:14
128:12 131:9 133:17 136:13
138:23 140:8,11 142:3,5
165:15,18,20 167:6 171:17
190:21 207:9 226:6,16,19
233:11
generate 73:22 74:20
George 244:22
Georgia 71:22,24 72:1,20
getting 35:6 42:22,23 48:14
56:9 58:7 71:12 74:8,10
123:17 133:17 159:8 181:21
181:22 243:3,15 244:4
gift 60:22
gist 44:18
give 12:5 30:17,18 37:5 57:3
57:5 134:20 155:23 171:10
173:12,22 175:2 233:13
239:10 242:11
given 77:22 154:18 164:20
214:20 243:5 249:3
giving 58:13 113:22 227:3
244:6
glad 193:7,24
glass 184:18
glasses 95:4
Glenn 217:3
glitchy 113:14 114:10
glut 75:5
go 6:14,21 31:21 34:12 35:1
37:2 53:11,13 57:10 60:12
60:13 63:3 68:5 69:23
73:19 74:4 83:19 86:14
91:17 95:3 96:6 102:15
103:16 105:12 106:4,22,24
114:11 117:22 118:24
126:17 128:8 143:4 145:19
153:5 158:6 166:4 168:17
177:20 180:1,7 182:7
190:15 191:9 193:16,17,18
203:22 216:6 218:14,14

219:16 222:6 224:1,7 229:3
230:3,12 235:15,20 237:2
241:18 242:9 249:18 256:18
257:11,17 259:24
God 58:11 177:8 210:3 249:1
goes 23:18 34:6,17 133:13
150:15,18 155:7 173:20
174:23,23 187:16 199:2,3
203:14 212:16 231:21
going 11:8 13:7 21:9 22:23
28:2 31:3 44:22,23,24 45:4
45:8 46:24 47:8 51:5,13
53:23 54:5 55:12,13 56:2
57:17,18,20 59:2 60:23,24
63:20 66:3 67:12,22 68:16
69:17 70:9,9,10 71:15 74:2
74:3,20 75:5 77:21 78:6
80:16 82:15,21 85:7,7 91:4
96:5 101:9 107:3 118:3
124:20 126:11 134:24 135:3
135:7,9 142:1 144:2,19
148:5,6 149:22 153:7
157:12 158:2 166:6 171:4
171:20 176:22 177:2,11,13
177:19 178:4,14,21 179:7,9
179:11 180:12,24 185:7
187:17 200:9 209:3 211:14
212:21 218:15,24 222:23
224:8 225:8 228:3 229:15
229:23 230:16,20,23,24
231:1,5,20 232:13,16 236:6
238:21 242:19 243:14,18
247:18 249:24 250:22 251:7
251:10,11,12,19 252:2
254:1,5,17 255:1,23 256:1
257:23 258:23 259:8,20,21
260:1
Goldberg 2:8 4:24
good 4:16,22 5:14,15 17:13
55:8 68:5 73:2,17 99:6,7
102:13 126:3 132:20 133:23
138:20 175:10 179:2 193:22
193:24 194:15 196:2,20
198:11,12 200:14 208:10
212:21 224:14 234:23,24
235:2 236:22 250:10
good-working 120:9

Goodman 15:16 94:1 111:5
gosh 132:24 148:16 214:10
gotten 22:6 152:1 202:7
204:14,18 205:23
government 233:18
graduate 6:17
graduated 6:19 7:2 15:24
16:13 235:17
graduating 16:7
granted 209:10
grateful 210:9
great 23:21 47:16 57:18
60:22 74:8 95:3,7 119:23
121:3,4 146:9 175:9 224:4
255:24 259:16
greater 76:15,17
greatly 256:24
grew 157:24
grind 73:1 236:24
Gross 91:7,12,20
group 18:8 94:17 109:3 110:8
119:18,23 221:7
grow 67:21 256:8,13 257:1
growth 65:22 222:20 223:23
223:24 256:15
guess 82:17,24 87:14 99:13
100:22 105:15 106:2 126:6
128:2 148:18 191:10 221:1
221:19
guessed 101:3
guessing 82:23 91:4 169:23
guidance 125:20
guy 105:12 111:2 120:11
175:23 197:13 241:4
guys 51:17,23 73:23 92:17
101:17 106:24 111:8 121:3
121:3,6 162:21 222:23
230:24
gym 192:3,3,4,11
gyms 191:24

--- H ---

H 3:14 110:7,14 119:18
173:24 208:23
habits 192:19
half 81:23 195:7 229:21
Haltzman 2:3 4:19

**ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES**

EXHIBIT 36
1066

**PATRICIA WEISER**

277

**hand** 208:15
**handbook** 11:4,7,13,22 12:12 12:14 13:6,12,14,17 87:3,4
**handbooks** 11:22
**handed** 13:13
**handful** 230:21
**handle** 68:9 177:22
**handled** 24:1,5 36:7 160:7 221:15
**handles** 35:7 99:23 129:20
**handling** 22:20 33:7 119:24
**hands** 204:1 209:13 237:20
**happen** 51:5 57:12 101:4 117:23 149:12 171:11 198:5 204:24 213:5
**happened** 47:24 51:8,19 60:20 62:12 66:5,10 67:6,16 68:8 75:8 81:4 98:21 99:12 147:13 148:15,17 149:7,9 149:23 224:12 230:21 250:6
**happening** 51:10 87:21 99:3 130:7 132:24 149:10 171:20 181:10 241:3 256:15
**happens** 55:3 145:22 149:20 155:24 178:10 228:18 230:22 231:1
**happy** 132:19 175:10,23,24
**harass** 164:21 248:19,24 249:4
**harassed** 248:2,12
**harassing** 163:24 207:20 208:19 223:6 238:12 247:13 248:22 250:15 257:8,15 260:7
**harassment** 57:21 60:7 66:13 67:9 137:4 142:24 202:13 207:18,23 222:3 240:16,20 247:4,21 248:1,6,12 249:5,6 249:7,9,12 251:13,16 253:21,24 255:12,18 259:21
**Harbor** 63:14
**hard** 68:11 73:22 74:4 99:22 106:12 139:6 143:22 145:13 146:1 164:7 182:3 195:11 195:11 196:18 198:13 209:4 210:4,12,12 212:13
**harder** 195:14

**hardest** 73:7 179:14 224:1,2
**hardware** 106:11
**harm** 55:21 255:13 258:22 259:2 260:3,5,6,9
**harm's** 239:5,6
**harmed** 256:5
**harmful** 147:15 148:11 168:10
**Harry** 174:1
**Hart** 67:10
**Hartleib** 1:8 2:21 4:10 5:1 46:1 54:17 55:10,17 57:21 59:10 60:9 67:8,14,22 70:3 70:13,17 71:2,6 72:17 75:10 76:23 77:5 84:22 99:15,24 100:6 101:1 108:1,10 109:15 112:22,24 113:6,11 115:21 119:6 126:23,24 129:10,14,16,19,21,24 130:16 137:5 144:1,10 150:15 156:3 157:2,8,14,20 157:22,23 158:10,18 163:16 163:23,24 166:21 167:1,5 173:10,18 174:19 175:20 176:2 177:20 183:18,19 184:3 189:17,24 190:6 194:3 202:19 203:19 204:9 206:18,23 207:2,5,15,17 210:4,8,11 211:8,19 212:5 212:10 218:8,17,19,21 219:3,3 221:21,23 222:1,20 223:14,18 224:6,10,15 228:15 231:22 233:6 234:12 238:1,9,20 239:5,18,22 240:20 242:2,18 243:14,20 246:18,23 247:4,10,21 248:9,11,16 249:11 250:22 251:14 252:20 255:18 256:1 256:16 257:23 258:15 259:22 260:3,10
**Hartleib's** 54:21 66:13 73:15 74:13 75:12 77:24 85:10 142:23 173:1 206:4 227:19 238:12 251:7
**hassle** 137:3
**hat** 210:22
**he'll** 174:8 176:7,8 193:16,17

193:18,18 194:17 223:3
**he-who-should-not-be-na...** 209:15
**head** 20:18 28:3 39:17,23 40:7 53:12 54:16 56:3 71:20,20 88:14 113:2 160:2 181:13,13,14,18 182:1 206:1 223:20
**headache** 196:16
**headaches** 179:20,21 212:12
**heads** 45:3 162:1
**health** 185:24 188:2,6,9,12 190:7 193:10
**health-related** 197:12
**healthcare** 188:5 213:13
**healthy** 132:19 209:19
**hear** 27:6 173:23 174:2
**heard** 44:7 51:8 149:6 163:13 233:11
**hearing** 229:2
**heart** 175:13 176:23 177:2,11 178:2 190:8 247:11
**heck** 44:23
**heightened** 55:11
**heinous** 77:7
**held** 126:11
**help** 22:12 31:13,17 128:13 163:8 179:20
**helped** 50:10 54:10 111:10 125:1
**helpful** 47:15 125:10 186:4 200:19
**helps** 182:1
**hey** 120:19 225:20
**high** 53:24 57:12 78:8,9 80:3 80:9,24 81:18 85:12 190:15 235:17 255:19,22,22 259:16
**high-sophisticated** 240:7
**higher** 59:19 86:15
**highest** 53:24
**hip** 211:4
**hips** 197:23
**hire** 50:21 51:15 68:15 94:9
**hired** 27:10 91:2 93:18,19,22 95:12 96:16 111:4 163:8 240:12
**hires** 91:13,21

PATRICIA WEISER

278

hiring 92:1 96:12 125:5
historically 15:22
history 21:17
hit 27:22 67:7 82:16 84:13
  101:9 193:6
Hmm 160:18
hobbies 190:18 191:7
hoc 89:23
hold 7:22 9:1 110:20 113:15
  153:3 178:19 209:13 237:19
  259:15
holders 133:9
holding 60:2 203:24
holdings 78:8,9 80:3 131:23
  134:14,16
holds 9:11
holy 196:14
home 192:1,6,7,7 198:17
  203:24
honest 9:12 12:4 15:14 48:9
  58:10 74:7 87:15 113:2
  121:19 197:1 199:17 201:6
  217:15
honestly 45:23 52:17 88:13
  104:3 113:6 144:13 151:13
  160:18 161:10 175:6 216:10
hop 127:18
hope 251:2 252:21
hoped 58:12 143:9 158:2
  221:16
hopes 194:17
horrible 52:6
horrifying 179:17,17
HOSTING 1:15
hot-hot 194:15
hotel 194:22 195:2,6,24
hotels 194:21
hour 55:6 194:16 195:7,7
  242:24
hours 23:18 60:8 102:24
  103:4 195:24 239:17 240:13
  242:23
house 64:21 125:9,15,19
  145:20 174:1 176:11 196:24
  198:19
hovering 238:14
HR 10:7,9,14 11:10,11 20:21

20:22,22
hug 176:18
huge 207:9
human 176:10 177:21 180:14
  194:7 257:8
humiliate 182:17
humiliating 252:10 257:13
humiliation 60:18
hunted 202:11
hurt 150:5,9 224:14 256:7,20
hurtful 164:10 257:13
hurts 145:17,17 150:14,18
  194:9 199:5,6 259:7
husband 8:3 38:9 70:19 73:2
  77:8 100:7 111:14 143:1
  144:10 145:19 146:8 164:1
  174:6 179:8,12 180:5,17
  182:17 183:13 185:3 189:24
  190:17 191:24 202:24 205:4
  206:20 207:10 208:19,23
  210:13,17 213:9 236:4,9
  237:10 241:17 248:19
husband's 38:12 192:17
  196:23 202:1 204:6 233:15
husband/business 210:10

## I

IBX 188:12
ID 152:2
idea 55:13 96:16 115:22
  116:1 120:20 146:16 174:9
  188:4 197:1
identification 244:5
identified 246:14 248:4,10
  253:20
identify 151:18
identifying 141:10
identities 47:24
identity 43:10 47:7,19
ignorantly 196:11
ignore 143:4
ignored 247:14
IIEV 100:14
illegal 132:7
imagine 51:12 126:18 149:10
  158:24 171:24 220:10,21
  222:19

Imitrex 180:19,20,20 181:1,6
  181:8 182:22 186:18
immediately 47:5,12
impact 61:20 73:5 101:13
  130:16 142:2,5 168:20
  189:14 190:1 198:7,7
  206:20,22 207:1 211:20
  224:17 237:9 249:11
impacted 242:16,17
impacts 241:8
implement 66:9
implemented 66:7
implications 44:21
important 115:17 193:9
impossible 182:12 229:24
impractical 89:3
improperly 77:6
impugn 207:21
in-camera 122:2,24 127:7,13
  128:17,23 129:4
inability 243:13
inaccurate 116:12
inadvertently 249:3
inappropriate 72:21
inaudible 15:11
inbox 105:7
incentive 36:17 37:1
inception 188:14
incessant 66:13
incident 15:5
include 138:2 206:15 243:23
included 36:24 162:8 223:16
  226:21 243:21
includes 71:11
including 14:24 149:7 150:17
  185:24 206:10 210:10
  218:23 246:17 247:22
income 73:22 79:4
increase 86:1,3,11 183:17
increased 65:19 86:9 181:20
  205:2
increasingly 69:21
incredible 51:9,11
incredibly 45:16 68:17
incurred 242:22
Independence 188:11
independent 11:10 13:10,16

PATRICIA WEISER

279

14:20 15:1,21 89:22 93:18
93:23 98:9,10
**independently** 152:24 188:5
**indicated** 254:19
**indicating** 187:9
**indiscernible** 142:8,9,12
**individual** 14:17 38:4 89:22
**individuals** 248:4
**infiltrate** 209:16
**infliction** 172:4
**inform** 221:2
**information** 13:19 14:18
24:23 25:14 45:19 53:6
54:19 67:8 87:22,23 106:21
109:17 127:3 134:14 150:10
150:11 155:7 241:11,24
**informed** 62:13
**initial** 52:14,15 99:10 125:4
127:17 244:7
**initially** 95:15,21 109:6
**initiated** 202:2 203:1 204:7
204:13,18 205:24
**injured** 148:23
**injuries** 190:11,14 193:2,8
**injurious** 168:15
**injury** 199:12,19 200:7
**inkeeping** 169:10
**inquire** 126:13 129:3
**inquiries** 107:23
**inquiry** 113:11 127:13
128:15,21 156:4
**inserted** 77:6
**inside** 142:2
**insider** 132:6
**insiders** 133:3
**insinuation** 150:19
**instance** 138:10 154:11
182:11,12
**instances** 70:5 173:8,12
233:3,8
**instant** 173:19
**instituted** 98:21
**instruct** 135:7,10
**instructing** 254:7,9,10,15
**insurance** 10:20 188:6,9,13
217:12,12 239:20,22,23,24
240:24 241:4,8

**insurer** 240:12
**insurers** 240:19
**integrity** 47:2 49:17 52:9,24
60:19 74:8 133:23 141:11
143:16 163:9
**intended** 42:4,5 78:13 106:18
**intensely** 60:6
**intentional** 172:4
**intentionally** 173:2
**interaction** 62:12
**interest** 131:22
**interested** 49:24 82:20 132:1
132:1,4,16 135:21
**interesting** 149:2
**internal** 227:1,5,6
**Internet** 28:20 29:17 50:22
51:18
**Internet-search** 163:11
**interns** 15:1
**interview** 91:22,23 92:2
**intimacy** 237:15
**introduce** 4:14
**inventory** 74:20 208:6
**investigation** 50:17 108:7
142:18 157:17 158:13
**investigational** 46:23
**investment** 78:12,13 215:5
215:13
**investments** 83:20
**invite** 236:13
**invoice** 21:5,22,22 23:23,24
42:1 56:3,9,9 103:4,11,13
153:20
**invoiced** 19:6
**invoices** 22:20,22 23:11
42:14,23 103:8,14 122:4
**involve** 100:3
**involved** 6:3 24:7 33:9,11,18
33:24 34:15,15,20 35:12,20
37:9,19 48:14,16 54:18
55:10 59:10 62:15 65:13
72:2 91:22,24 97:14,14
115:15 120:22 121:12,14,21
122:7 136:11 137:9 138:14
140:5,11 142:4 151:12
169:6 170:5,7 183:21,24
217:12 220:4 225:20,21

241:2 247:7
**involvement** 33:8,8 54:21
122:17 140:4 171:23 172:1
238:9
**involving** 216:9
**IP** 112:11
**Ironic** 248:3
**ironically** 112:2 183:21
**issue** 67:10 88:5 114:1,10
121:6 124:22 149:14 158:4
194:3 206:19,23 227:16,19
243:8
**issued** 154:20 248:15
**issues** 30:8 44:5 118:23
120:24 183:13 189:9,11,17
189:19,20 190:1,7 199:8,10
199:13,21
**iteration** 151:22

J

**J** 245:20
**January** 27:23,23 28:1
**Jay** 245:14
**Jeep** 214:6,6,9,14,15,15,18
**Jeeps** 215:2
**Jeff** 48:8
**Jeffrey** 11:21 14:12,18 15:4
18:3,8,15,19 22:19 23:11
43:9 47:6,19 59:7 90:14
93:1 95:11,22 96:2 98:4,12
103:1,6 104:11,13 112:9
121:11 124:22 139:20
140:23 147:14 148:10
151:21,22 152:20 154:21
155:10 160:11
**Jeffrey's** 43:21
**Jersey** 63:15 165:3 192:3
**Jimmy** 74:3
**Jimmy's** 106:1
**job** 9:16 16:16 27:17 41:22
44:22 45:1 101:17 183:23
183:24 212:19 235:3
**jobs** 161:24 241:16
**Joe** 136:3
**John** 91:7,12,19 168:24
201:17,18 221:7
**join** 251:13

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36

1069

**PATRICIA WEISER**

280

**joined** 211:4
**joint** 221:13
**Joseph's** 6:22
**Journal** 140:13 141:14,20,22
   145:10 161:18 162:5,9,11
   163:14,17 232:5
**joy** 175:12
**judge** 53:21,21 54:1,4 70:12
   70:20 71:18 77:19 143:13
   232:4,8 238:10
**judge's** 77:1 140:22 232:2
**judges** 75:14 77:18 232:7
   256:11
**judgment** 101:19
**July** 1:18 4:2
**jump** 191:21 193:19
**June** 201:22 204:13 233:16
   235:11

**K**

**Kansas** 184:4 247:17
**keep** 18:21 19:23 20:13,15,16
   20:20 21:1,1,2 22:2 41:14
   41:14 73:11,13 78:22 79:12
   84:13 87:8 94:21 115:4
   132:18 162:1 165:19 231:1
**keeping** 92:11 125:14 136:16
**kept** 19:9,9 204:10 247:18
**Kevin** 2:4 4:18
**kicking** 72:6
**kids** 64:22 145:21 166:10
   175:9 178:12,19 191:5,11
   210:7 212:9,22 213:1 224:3
**kids'** 191:12
**kill** 21:20 176:5
**kind** 10:1 18:7 20:14 41:24
   44:5 56:3 66:6 69:12 71:24
   82:3 83:17 84:18 86:14,20
   111:22 130:14 143:12 175:5
   176:18,21 182:11 182:11
   185:4,16 186:8 189:18
   193:4,6,21 198:1 221:6
   228:18 231:23 232:17
**kinds** 179:19
**King** 2:5
**kitty** 162:2
**knew** 42:7 60:10 240:8

250:22
**knocked** 214:2
**know** 13:20 17:19 19:4,6
   20:17 24:1,3,7 27:12,15,19
   28:5,10,14 30:17,18 36:15
   37:22 38:12,18 39:2,2,15,23
   40:2,12,16 42:3,13,18,20
   43:2 44:22 45:10 47:11
   48:20 49:11 50:19,19 51:17
   52:1,3,16 53:1,3,3,4 54:11
   55:12 56:12 57:8,16,24
   58:23 62:23 65:17,19 69:17
   70:14 71:3,17,23 72:5,14
   73:1 75:2 76:24 77:18,18,20
   80:12,14,16,18 83:1,4 84:22
   85:6,19 86:9 87:19 88:20,22
   89:10 90:18 91:5 92:24
   93:24 94:6,18 96:4,8,12,20
   96:20 97:11 98:1,2,14 99:3
   100:1 101:14,15,21 103:17
   103:20 104:3,4,15 107:14
   107:18 108:17 110:4,13
   112:15 113:1,1,3,6,7,11,20
   114:3,19 116:11,24 117:2
   117:21 118:19,19,20,24
   119:16,19,21 121:14 123:12
   123:15 124:11,14,22 125:7
   125:24 126:4,4,5,5,7,12
   127:10,11 128:9,11 130:9
   132:19,20 133:1,3,20 135:2
   135:13 137:7,22 144:2,15
   144:24 145:11,12,22,23
   146:15 147:11 149:11,12
   150:21 151:16 154:17,18
   155:9,11,11,12,18,19,21,21
   155:24 156:10,21,22 157:11
   157:23 158:1,10,21 159:1
   160:4 162:1,4,6,7,14,18
   163:4,6,11,12 165:24 167:3
   168:23 169:1,1,3,7,9,10,19
   170:12 171:17 173:21 175:1
   175:6 176:7,19,19 177:4,4,8
   178:4,11,12,13 179:3,7,9
   181:2,20 182:19,23 184:5,7
   185:3,16,22 186:8,15
   187:14,20,23 188:1,19,21
   188:23,24 189:5 190:7,10

190:14,23 191:16 192:13
   193:2,11,19 194:8,11 195:5
   195:7,8 196:17,19 197:2,11
   197:24 199:7 200:4,5,9,21
   201:3,5,7,12,15,18 203:7
   205:1,2,4,8,13,14,16,20
   206:7 208:3 209:8,19,22
   210:1,6 211:23 212:1,6,18
   213:3,9,14,15,23 217:14,16
   218:9,10 219:6,10,22 220:3
   220:6 223:3 224:19 225:4,7
   225:13,18 226:8,9 228:7
   230:2,22 231:2 232:4,5,12
   234:7 236:24 237:12,18
   238:5,17 239:20 240:18
   241:24 242:5,7,11 243:15
   244:1,13,24 245:6 250:8,9
   251:4,23 253:12,16 254:13
   254:16,21 259:22,23
**knowing** 67:22 109:5 176:6
   209:3 234:24 238:20
**knowledge** 31:23 33:7 58:4
   58:19 112:20 115:20 121:16
   131:1,7,10 133:17 136:14
   156:16 159:11 160:21
   166:20 168:8 218:1
**known** 15:24 133:22 175:2
   228:15 239:8
**knows** 17:13,18,18 166:24
   251:22,23,24

**L**

**labeled** 157:23
**lack** 50:23
**lag** 75:5
**laid** 28:14,16
**Lancaster** 187:19
**land** 230:7
**lands** 227:6
**language** 102:7
**lapsed** 165:11,12
**large** 116:17 143:11
**larger** 36:21 158:8
**largest** 238:3
**lasted** 74:14
**late** 17:11 171:14
**lately** 187:12

PATRICIA WEISER

281

**lauded** 256:11
**laugh** 145:14
**law** 1:3 4:8,20,23 5:20 6:9,14
    6:15 7:3,9,12 9:18 11:3,6,20
    12:18 15:18,24 16:6,7,11,12
    16:13,16 18:9,14,20 21:7
    22:11,16 24:10,12,21 27:3,8
    33:11 35:20 38:7 39:9,12,15
    40:24,24 43:4,5 47:5 49:5
    50:5 51:16 55:19 56:23
    57:5 58:5 59:6,23 62:6 65:9
    73:4 77:2 78:10 81:14,20,23
    83:2 84:20 87:2 90:15,19,22
    91:2 92:3,8,21 95:12,17,21
    96:2 98:5,13 100:7 119:15
    119:17 123:21 126:1,14
    127:12 128:21 129:8,8
    131:2 133:13 137:7,16,19
    138:4,14 141:12 144:22
    147:12,13 148:9 150:21
    152:19,23 153:15 154:21
    159:12 160:8,12,24 162:16
    163:3 167:14 168:10 169:4
    169:17 188:6,10,13 206:11
    207:17 215:21 217:23 218:3
    218:7 219:8 220:8 221:3
    222:12 224:17 231:11 233:5
    237:24 244:6 246:18,23
    248:5,11 249:12 253:21
    255:14,15
**lawsuit** 35:5 133:15 179:4
    215:20
**lawyer** 125:3 198:12
**lawyers** 10:20 46:15,22 74:7
    74:7,9 239:16
**layer** 228:20,21
**layers** 132:10
**lead** 36:14,17 69:24 70:6,7,11
    70:15,17,20,24 71:12,18
    76:11,19,21 77:2,3,5,9,17
    77:23 143:17 184:9 219:6
    238:7,13,24
**leadership** 77:11,13
**leanness** 57:4
**learn** 43:9 149:16 185:13
**learned** 43:15,21 44:2,4
    48:18,21,21 174:3

**lease** 83:2
**leased** 78:10
**leave** 72:5 137:18 233:22,24
    234:5 236:22 242:20
**leaves** 30:12,14
**leaving** 220:23
**led** 55:16 212:10 240:16
**left** 16:24,24 17:1,2 27:13,19
    28:10 61:1 72:4 91:18
    111:19,21 195:22,22 215:10
**legal** 28:14 95:15,16,22 96:3
    160:12 161:1
**legitimate** 148:7
**legwork** 96:17
**length** 141:3 230:9
**lessened** 256:6
**let's** 22:2 36:11 45:21 46:5
    60:7 102:15 154:4 232:16
    232:19 254:24
**letter** 34:6 52:19 166:11,17
    166:21,24
**letters** 165:5
**letting** 83:19 178:17
**level** 55:11 59:15,19 120:3
    174:18 187:5 190:13 194:7
    227:3 229:3,7
**levels** 255:18
**license** 5:20
**licensed** 149:15
**lied** 55:3
**lies** 57:20 70:18 73:5,15
    75:13 222:2 247:10 248:19
    248:23,23 249:6 257:16
**life** 17:23 84:21,23 89:14
    102:11 115:16 144:8 174:10
    174:13 175:2,12,12,24
    176:3 183:20 186:1 193:9
    198:6 199:15 208:21 210:12
    212:6 231:2
**lifetime** 133:24 136:1,23,23
**lifting** 190:23 193:4
**light** 204:2
**lightly** 208:11 210:18,19
**likes** 185:23 191:1
**limit** 85:5
**limited** 83:24 84:2 156:6
    220:7

**Lincoln** 214:18
**line** 74:18 78:20,21 79:12
    224:18 254:1
**lines** 71:14 85:17,19 255:20
**list** 20:23,24 49:8 101:6 107:8
    107:12,15 165:21 166:2,4
    189:6 225:19 230:11 231:5
**listed** 85:24 100:10
**lit** 207:8
**literally** 88:10 110:24 174:14
    178:1 181:24 193:18 195:3
    203:12 232:1
**litigate** 70:2
**litigating** 6:2,4 136:17 182:5
    209:9 229:13
**litigation** 10:23 11:1 31:15
    32:8 33:6 36:4,10,13,16
    37:20 58:2 59:21 69:20,22
    70:10 71:11 77:6 85:8
    96:24 107:4,5,11 108:23
    109:16,16 115:16 117:4,19
    117:19 121:22 124:2 126:2
    126:22 133:16 135:23
    137:10 139:8 150:24 157:21
    159:9,13,17,21,22,24 160:6
    164:18 169:7,8,18 170:5
    171:19 173:16 183:22 194:3
    199:3 202:1,8,13,18 207:1,3
    207:6 208:1 216:8,17,20
    217:14 219:1,5,9 220:17
    221:4 222:13 225:24 226:14
    229:16 240:3,15 241:1
    244:7 246:15,16,22,24
    247:6,9,17,23 248:1,5,11,24
    252:17 255:11,13,17 257:4
    257:7,17 258:15,16 259:10
    260:5
**litigation-challenging** 32:10
**litigations** 127:2
**litigator** 146:5 202:17
**litigators** 183:21 207:7
**litter** 162:2
**little** 16:4 17:24 45:17 47:14
    69:3 80:19,21 82:17 99:12
    105:10 137:15 143:5 158:16
    168:20 172:13 193:20
    200:17 204:8 237:1 246:6

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36
1071

PATRICIA WEISER

282

256:3
live 64:20,22 78:14 84:14 89:8 158:5
livelihood 72:23,23
lives 39:3 89:3 174:17 209:16 240:21 242:16
living 139:13 145:20
LLC 2:3 170:14
LLCs 83:12 169:17
local 89:5
locate 105:22,23
located 63:13,14 187:23
location 63:19,24 83:3
locked 192:13
log-in 26:10
logical 62:20
long 7:11 11:13 16:1 17:7,9,9 20:13,16 21:1,2 22:11 28:5 54:3 57:17,17 61:4 68:19 74:14 79:19 80:8 82:6,19 85:4,4,6,7 88:2,22 89:23 94:2 97:3,4 110:11,13 123:24 158:5 174:16,24 188:12,24 196:6 211:10 215:12 220:24 235:13,18 244:18 246:2
longer 5:20 62:22 67:1 74:14 164:23 219:8 224:24 225:19
longest 65:7
longstanding 72:9 133:9
longwinded 125:12
look 51:4 68:10 85:19 105:20 105:22 126:17 127:10,18 128:4,11 133:2 150:16 156:23 165:18,21 166:5,7 174:3 179:23 180:7 212:12 222:24 225:20 230:23 234:7 251:3 255:1
looked 9:13 87:15 159:3 192:14
looking 112:24 114:2 134:13 134:13 156:24 187:10
looks 181:23
loosen 198:2
loss 197:13 238:3,3 243:2 257:6
losses 132:6 238:1

lost 19:14 28:20 29:17 106:21 241:12,16 242:1
lot 6:24 51:3,14,17,22 54:11 58:14,15,16 67:1,12,19 69:16 74:14 89:4 115:16 124:12 131:20,21 135:17,18 135:18 137:1 149:6 171:21 179:23 180:1 182:4 190:22 191:6,8,13,16 198:24 199:23 202:9 204:20 209:13 210:9 213:8 217:17 235:4 237:20 240:10 241:15 243:18
lots 132:15 134:18,21 240:13
love 203:23 224:3
loved 73:8,8
lovely 17:21 203:20,20
loves 175:24 190:20
loving 178:9 237:19
lower 59:17 86:15 163:2 238:24
lowest 229:3
loyal 222:7
luck 75:10,11
luckily 122:13
lucky 175:8
Luke 2:21
lunch 220:12,13
luncheon 102:19

**M**

M 1:13 95:11 262:4,23
M-C-G-R-O-R-Y 245:12
M&A 32:8 36:11,12 69:8 229:13,20 230:2 232:1
M.D 199:18 213:11
mail 34:9
main 119:17
maintain 18:7 21:8 39:12 88:23 89:11 132:18 138:15 138:18
maintained 21:19 22:22 23:13 24:9 39:9 127:9
maintaining 10:13 92:4,8 93:13 137:24
maintains 87:13 112:14 126:1,14 134:4

making 10:18,18 73:14 97:15 150:16 159:5 208:19
man 146:11 174:6 179:8
man's 208:19
manage 50:22 51:15 209:4,18
managed 18:22 185:12
management 10:6 200:19
manager 111:17,18
managers 111:13
manages 169:24 188:5
managing 9:22 10:17 211:10 234:18
Mannino 168:24 169:2,6,6
Margolis 16:17
mark 22:4 75:23 228:17 245:7,9
Marked 3:16,20
markets 132:16
marriage 99:22 175:10
married 17:4,7,11,17 27:13 27:15 64:24 174:16
Martin 84:6
massage 197:24 199:23 200:1 201:4
material 85:22 101:7,8
matter 75:24 76:9 105:4 138:13 142:3 143:12 151:14 259:5 262:9
matters 6:6 33:6 138:12 142:4 146:8 209:11
Mawr 201:2
McGowan 2:4 4:18
McGrory 245:7,9
mean 9:17,24 11:13 19:2 20:5 24:12,12 26:8,9,11 28:2,14 36:11 39:22 42:20 43:7 45:5 46:18 49:21 51:24 52:14 56:14,17 58:12 60:14 60:21 65:13 72:20 74:10 77:14 79:6 85:17 86:13 87:7 89:17,17 96:15,21 102:10 105:11 106:2 113:20 119:11 121:18 126:8 130:2 131:14,19 135:24 138:8,18 139:13 141:2 143:16 148:14 149:5 156:11,12,20 157:20 161:4 163:7 165:12 168:2,2

PATRICIA WEISER

283

168:18 170:24 177:6 179:8
180:13,14 183:9,20 187:9
190:14 191:8 192:22 193:11
193:22 194:6 197:3,13,22
199:14 201:4,11 205:7,12
206:6 211:3,5 212:12
213:14 217:7 222:15 224:13
224:19 233:7 234:14 237:12
242:24 243:24
**meaning** 221:13
**means** 47:12 112:15 135:24
144:21 156:11 179:12 225:5
**measure** 243:4
**measurers** 247:22
**mechanism** 124:16
**media** 50:24 51:16
**medical** 186:9 198:22
**medication** 146:2 176:22
179:21 183:2 185:4,10
186:14
**medications** 181:4 183:6,10
**medicines** 179:20 182:23
**meetings** 101:12
**member** 164:4 165:7,9,13
191:24 192:2
**members** 35:5
**membership** 165:1,11
**memorandum** 61:24 100:20
101:1 168:9,18
**memories** 250:13
**memory** 6:10,10 44:1 46:2
48:3 61:16 65:24 89:24
116:12 142:20 156:7 160:18
161:14
**mental** 185:24 193:10 200:13
**mentally** 178:7 193:23
196:18 235:1
**mention** 17:16 98:23 163:15
240:24
**mentioned** 17:24 56:19 78:1
83:14 86:1 94:12 99:14
103:2 104:1 116:2 118:7
127:23 130:15 134:17
185:18,21 186:21 187:14
197:17 204:21 224:21 226:7
249:1 253:3
**mergers** 32:9,10

**mess** 77:11,12,20 79:10 158:8
207:23 238:14 259:20
**message** 129:23
**met** 38:16,17,24 39:6,6 40:1
48:15
**Michael** 1:8 2:21 4:9 5:1
119:6 129:10,14,24 130:16
163:16 166:21 167:1 203:19
218:7 224:15
**Microsoft** 25:1,5 26:21
**middle** 196:3
**migraine** 181:4,17 183:5
186:14 196:16 212:13
**migraines** 179:16,17 180:19
180:23 181:10 183:3,14,18
184:10 187:11 194:14 202:4
202:7 205:22 208:20 212:18
**mile** 178:6
**miles** 178:1,6 185:11
**Miller** 2:8 4:24
**million** 59:3 99:12 206:7
**mind** 31:10 128:10 136:16
191:19
**mine** 64:7 204:15
**mini** 193:20
**minute** 146:19 177:5,5,6
**minutes** 146:22 232:14
**mischaracterized** 258:8
**mischaracterizes** 249:20
**misfortune** 247:5
**misinterpreting** 197:17
**missed** 52:5 242:2 243:19
**mistake** 76:6,6
**mix** 48:23
**mixture** 69:2
**mode** 198:3
**model** 69:23 84:7
**modify** 78:15
**mom** 198:11
**mom-and-pop** 87:7
**moment** 53:8 84:19 101:7
175:1 236:5
**moments** 203:11,18 204:2
211:11 212:8
**Mommy** 198:17
**monetarily** 161:14
**money** 34:11,18 36:7 37:20

51:3,15 54:11 58:2,7,11,12
71:9 73:14,20,24 74:9 84:14
143:7 161:8 178:22,23
179:2,6 180:3 208:17 227:9
227:11 230:16 231:6 232:12
239:14,14 240:14 257:9
**monies** 35:8,13,19,22 36:23
154:13
**monitor** 51:15
**monitoring** 131:22 135:21
**Montgomery** 50:12
**month** 21:24 22:9 41:9 83:4
**monthly** 41:6 42:1,3 88:12
160:16
**months** 181:3,12,17 229:14
**mood** 212:5
**morning** 4:16,22 5:14,15
**Motion** 100:12
**Mott** 2:8 3:7 4:22,23 5:13
8:21 12:6,19,22 13:1,4,23
14:8 18:12,13 20:1 21:14
23:5,7,9,10 25:23 26:1,4
29:11 30:2,5,6 31:2,6,7 32:2
33:17 43:3,16 47:3,11,13,17
62:16,17 63:2,11,22,23 64:4
64:5,13,15 76:5,8 80:7 81:9
81:17 97:7 102:14,15,23
105:14 117:8,10 123:7,8
135:2,6,12 137:6 138:9
146:20 147:5,6,19,21 148:5
148:8 153:6,9,13 159:18,23
164:22 167:22 170:9 171:7
171:9,12 172:9 184:16
185:1,2 216:15 219:17,21
231:9 232:15 233:2 253:2
253:24 254:7,11,23 255:10
258:12 260:13,17
**move** 162:2 219:1 254:6,10
**moved** 82:2 106:10,13,14
110:15 111:3,14
**moving** 70:6 76:21 82:20
106:16,17
**mud** 145:10
**muddled** 153:7
**multiple** 108:15,16 173:15,16
227:24
**multiples** 57:24 76:15,16

**ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES**

EXHIBIT 36
1073

PATRICIA WEISER

284

**multiyear** 85:1

**N**

**N** 2:1 3:1 262:1
**naive** 149:19
**name** 15:14,16 16:19 27:4,10 27:12,14 38:5 44:5 50:7 51:21 53:16 54:2 71:17,20 83:9 88:8 110:10 111:10 112:24 114:3 116:12 120:12 122:10 145:9 151:8,9,10,11 151:14,21 154:22 155:1,3 158:11 168:23 169:1,10 170:16 174:2 187:20 201:3 201:18,19 213:12 223:3 225:17 244:14 245:2,6,10 249:1
**named** 33:4 36:13 109:14,15
**names** 48:7,13,13,23 110:5 151:12 200:21 201:5,7,15
**nation** 256:11
**national** 236:12
**nature** 10:5 38:12 42:9
**nauseous** 179:19
**Nautilus** 214:19
**near** 50:14 64:10
**necessarily** 35:10 222:15
**necessary** 101:16,17 139:14 192:23,24
**neck** 194:17 197:21 199:7,10 199:12,21 200:7
**need** 9:20 19:23 20:13,20 23:6 46:12,13 47:1 52:2 100:1,2 103:9,9,16,22 104:7 124:7 130:6 146:7,18 162:19 175:2 176:13,22,24 184:17 225:7 234:9,9,20,21 237:21 248:7 257:15
**needed** 44:20 46:16 50:21,24 52:8 55:14 79:11 84:14 86:18,18 106:4 107:20 108:4 111:5,5 113:16 124:3 127:12 149:24 152:12 218:14 225:9,9 232:12 236:22 237:3
**needles** 181:13,24
**needs** 26:15 34:12 87:13

101:21 158:5,6 178:10,10 210:24 211:18 234:14,15,24 235:6 257:10
**negative** 233:7 242:17
**Nelson** 69:15 169:16,24,24
**netted** 238:16
**network** 110:23 111:5,6
**networks** 188:2
**neurologist** 181:3 186:24 187:3,21 188:1 189:1
**never** 15:2 17:18 18:5 31:23 40:5 48:16 60:16 66:7 67:16,17,17 68:19 72:12 90:17 92:18 99:11,19 121:5 147:18 149:20 158:22 162:18 175:13,17 176:20 179:15,16,16,16,21 185:6 189:15 196:16 204:15 222:16,16 234:17,17
**new** 63:15 66:2 84:8,8 111:16 111:22,22 138:16 152:21 165:3 182:23 183:2,5,10 192:3 197:9 214:14,15 220:22 225:8
**news** 94:11 162:1
**newsletters** 165:5
**nice** 120:11
**niche** 240:7
**night** 177:11,12 189:9,10 194:16,18 195:7 196:3,4
**nightmare** 101:4
**non-case** 20:4
**nonsense** 70:13 248:17
**noon** 62:23
**nope** 166:3 187:24 253:8,11 253:14
**normal** 19:22 117:18,19,22 152:8,8 176:9,11 203:4,8 234:13
**normalized** 203:3
**North** 2:9
**nose** 205:19
**notable** 85:13
**Notary** 1:14 262:5
**note** 11:23 106:8
**notes** 123:19 127:5 255:2 262:8

**notice** 87:18 203:11
**noticed** 196:22 197:5 201:24 202:23 204:5 205:23
**notices** 87:20
**notwithstanding** 86:8 212:14
**number** 3:16 7:22 20:18 57:6 69:1 71:5 74:19,22 104:12 104:14 119:22 132:7 152:2 155:1 228:8 231:7 238:24
**numbers** 4:7 34:16 61:11,17 206:7 242:3,19
**nuts** 34:11

**O**

**O** 262:1
**object** 13:8 21:10 22:24 45:9 47:9 63:21 80:4 96:6 135:1 163:18 171:5
**objection** 8:16 11:24 12:15 14:3 18:10 25:22 29:15 31:20 33:14 42:16 43:12 59:10 64:11 79:22 104:18 104:22 123:6 138:5 147:16 147:24 148:7 153:1 159:14 167:16,20 169:20 226:22 227:20 228:14 249:13 253:22 258:2
**objectionable** 12:21 254:13
**objector** 228:15
**obligation** 37:24 42:4
**obligations** 37:10 234:4
**observed** 173:9 205:22 211:22
**obtaining** 138:16
**obtains** 131:7,11
**obviously** 19:3 33:9 158:7
**occasion** 32:18 40:1 100:19 152:22
**occasions** 31:11 40:13,17 95:13 96:1 98:12 106:20 148:11 152:21 176:7
**occupied** 81:23 82:11
**occupy** 82:15
**occurred** 59:6 99:11 133:12 176:20 253:19 255:12
**ocean** 193:19
**offended** 222:2 224:14

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36
1074

PATRICIA WEISER

285

offense 74:1
office 9:9 10:7 25:1,5 26:21 34:10 39:3,9,13,16,18 40:2 40:6 44:13 50:12,14 51:17 64:10 78:11 106:12,12 107:24 110:22 111:1,13,15 111:16,16,18 117:7 127:9 187:23 201:19 248:3,9
officer 8:23 9:1
officers 132:7 133:4,14
offices 1:15 50:14
offline 31:5
oh 17:10 19:15 35:1 116:16 132:23 145:15 148:15 149:8 172:21 186:24 200:7 203:5 213:16,17 214:8 245:21 260:17
okay 5:17,18,22 7:6,17 9:19 12:11,19 13:2 16:15 23:9 25:18 27:11,16 28:9 30:5,20 32:3 35:3 37:17 39:21 40:19 41:13 44:3,11 48:11 49:1,3,7 53:15 57:7 58:17 64:4,8 68:8 80:20,22 81:13 83:11 86:19 87:6 95:8,10,20 95:24 98:7,22 100:18 104:7 105:17 112:16 115:23 116:22 117:8 118:1 120:6 121:20,23 122:18 128:19 130:24 137:14 147:5,7,9,22 153:12 156:1,14 157:5 160:20 170:19 172:23 176:24 185:1,15 187:2,7 191:15 201:13,23 206:2 211:15 216:7,16,23 217:4 225:3 233:21 244:12 246:9 246:9,10 258:20 260:15,20
okayed 61:14
old 78:14 84:4,9,9,10 145:1 174:15 214:11,14 236:1
old-school 192:4
old/original 84:5
older 237:4
oldest 65:6 195:6 235:16,17
Oliver 38:5,7,9,13,16 40:1,9 40:14 41:2 42:14,15,21 134:3,5

once 22:3 33:23 71:6 226:11 228:9
ones 98:1 118:13 119:4 183:6 213:20 215:7
ongoing 258:21
online 34:4 124:13,14 127:4
open 40:3
operation 239:16
operations 9:23
opinion 12:18 168:18 233:4,9 249:11 250:7,9,19 251:1,21 252:20
opportunities 242:1,4 257:20
opportunity 238:4 241:13,16 242:21 243:2,19 255:21 256:8,13 257:6
opposite 256:15
oral 1:4 213:18
orchestrate 148:21
orchestrated 60:10
order 49:16 59:5 61:24 78:19 79:8 100:1,12,20 122:5 150:1 152:11 153:14,20 257:18
ordinarily 125:15
organization 158:8
organized 193:13
organizes 105:2
original 8:2 21:6 115:9 118:10,15 119:1 200:6 201:21
originally 32:21
others' 204:1
out-of-pocket 242:22
outrageous 74:11
outside 23:14 85:11 129:7,15 163:16 167:9
outsource 20:21
outstanding 161:9 241:1
overlap 245:4
oversee 50:22
oversight 87:10
overwhelmed 195:20
owe 37:20,21
owed 37:15,18
owned 8:12 42:15 78:8,9,11 80:3

owner 8:5 9:20 32:22 119:21 120:4,5,5,10,12 121:2
ownership 8:7 81:19
owns 8:9 135:18

**P**

P 2:1,1
P.C 1:4 2:8 4:9
p.m 232:24 261:5
PA 1:23
PACKAL 92:13
page 3:3,15,15 13:16 94:22 102:3 114:18 172:10 217:1
pages 32:16
paid 14:17 22:1,10 37:16 51:14 56:20 58:6 74:10 96:21,22 97:12,12,15,16 98:5,13 153:14 154:7,13 155:13 232:6,10,11
pain 145:19 175:22 194:8,12 194:13,13 195:10,13 196:15 197:18,20 198:15,20,22,24 199:15 200:2,9,17,19 209:4 213:2
painful 164:10 200:17 202:15
pair 95:3
pall 77:15
pandemic 27:21 28:1 81:5 192:12
panic 144:17 146:3 176:17,21 185:4,6,8
panic-attacky 177:7
paper 104:3 115:2,18 124:11 140:2 158:15
paperwork 14:15 33:21 91:24 92:1
Paragraph 95:9 172:24 173:5
paralegal 27:18 94:15
paralegals 92:16
parent 211:24
parents 214:20,22
Paris 235:16
part 19:14 20:3 33:10 37:16 42:21 58:24 60:12 61:18 93:19 94:7 112:19 116:15 121:24 124:2 136:10 139:14 142:17 143:11 148:20

PATRICIA WEISER

286

150:24 161:16 200:24 208:4
220:1,1 241:7 244:20 248:5
258:1,6
**participate** 244:5
**participated** 231:12
**particular** 22:21 37:10 50:4
141:5 154:11 189:1 199:19
247:15,15
**particularly** 69:15 202:14
**parties** 226:13
**partly** 222:5
**partner** 70:19 178:17 180:9
208:16 210:11,22 211:1
234:18
**partners** 102:11,11 207:10
209:7 227:24 230:18
**parts** 151:23
**party** 251:13
**pass** 22:3
**passed** 6:19
**Pat** 9:20 21:10 96:6 104:22
116:21 153:3 176:8 219:15
249:21
**Patel** 27:4,9 28:19 86:20
113:17 116:18
**Patel's** 30:9
**Patricia** 1:7 3:5 4:13 5:7
**Pause** 147:2 172:8
**pay** 37:7,7 57:18 73:11,19
74:24 79:6 81:14 83:3 85:8
88:11 120:23 124:15 153:23
222:9,10 240:12 242:7,8
**paying** 56:10 58:1,1 79:5
97:14 151:24 239:22
**payment** 19:11 21:5 40:13
41:2 42:4 103:1,4,8,13
104:9 153:20 160:14,16,23
161:2
**payments** 18:23 56:12,16
61:14 97:1 160:6,9,10,11
170:12
**payroll** 10:13,18 24:22 79:8
**peacefulness** 203:19
**pending** 71:4 226:20
**Penning** 16:19
**Pennsylvania** 1:1,17 2:5,10
4:7 50:10 64:9,16 79:18

92:22 104:12 139:19 165:1
165:3,5,6,8,10,13
**penny** 60:4,21,24 72:13
**people** 26:12 51:8 53:24 56:2
56:6 62:24 68:14 73:2,8,8
73:13,18 74:2 75:18 82:20
91:5,6 93:17,22 96:12 105:8
107:6 119:23 120:8 130:8
130:10 131:22 132:3,5,14
132:15,20,22 133:19 134:5
134:8,18 135:14,20 136:4
136:21 139:1,4 141:12
149:11,16 163:8 176:10
213:19 218:12 220:2,16
221:10,18 223:11,12,15
224:12 234:20 242:9,12
249:8 252:15 259:15,22
**percent** 8:9,10
**percentage** 74:23
**perfect** 106:23 115:8 172:21
**perfectly** 88:18
**perform** 31:11,18 107:23
119:3 120:15 127:15,16,17
156:3 171:2 186:23
**performance** 65:11 78:2
**performed** 112:23 116:3,6,7
117:16 121:7,10 156:17
241:14
**performing** 95:14 219:8
**performs** 170:13
**period** 18:3,14 19:4 23:15
39:8 74:17 79:2 82:5,8
89:20 94:19 97:2,4,20,23
111:17 117:2 123:21 141:17
151:24 152:4,7 200:3
211:17 234:3 243:5
**periods** 65:3
**permitted** 257:1
**perpetrated** 148:22 150:6,17
**perpetuate** 248:17
**person** 34:7 73:16 87:14 88:4
99:5,22 120:2,15,16,17,21
130:2 134:21 138:22 143:8
145:16 156:10 166:7 178:18
186:6 212:19 224:14
**person's** 70:9
**personal** 66:15 68:3 78:12

83:15 84:16 85:12 129:6
166:20 171:22,24 178:16
182:15 212:21 239:24
259:12
**personally** 52:10 67:11 73:12
79:1,14 93:24 99:21 105:24
116:6 122:7,16 128:18
140:10 144:7 182:17 225:21
233:10 245:5
**personnel** 10:9 17:24 18:2
24:23 25:14,16 30:10
**persons** 14:23
**perspective** 51:6 227:24
**pertaining** 18:8,19 119:5
**pertains** 20:7
**ph** 16:19 27:14 91:12 92:13
104:10 244:22
**pharm** 187:4
**pharmacy** 186:16,17
**Phil** 4:17 74:1 80:6 142:10
219:18 249:18 260:18
**Phil's** 148:7
**Philadelphia** 1:17,23 2:10
16:17 95:15
**PHILIP** 2:3
**Phillies** 191:8,9 203:22,24
**Philly-based** 169:16
**phone** 58:15 119:11 140:2,7
143:2
**phrased** 168:12
**physical** 145:18 164:11,12
174:8 195:13 197:18,19
198:7 200:13,22,23 201:1,8
202:1 237:9
**physically** 193:23 196:18
235:1
**physician** 188:17,22
**picture** 46:8,10
**piece** 228:1
**pilates** 200:24
**pill** 143:22 177:1
**pills** 182:22
**Pilot** 1:13 5:4 262:4,23
**pitch** 31:12
**pitched** 31:17
**place** 113:8 171:16 179:18
194:24

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36
1076

**PATRICIA WEISER**

287

**placed** 94:22 172:10 216:24 246:4
**Placement** 95:16
**places** 201:7
**plaintiff** 33:5 36:14,14 202:10
**plaintiff's** 137:9,17,21 138:3
**plaintiffs** 1:6 2:6 4:20 134:19 134:22 138:12
**plan** 66:8 140:8
**planning** 66:2 235:18
**plans** 115:14,14,15
**platform** 25:1,8,10 34:5 122:10
**platforms** 24:21 106:15
**play** 191:11 193:3 195:10
**played** 60:12 222:5
**playing** 190:20 191:5 196:19
**plays** 191:6
**Plaza** 1:22
**pleadings** 216:20
**Pleas** 166:12
**pleasant** 168:15
**pleasantly** 149:16
**please** 80:5 142:13 146:23 191:21,21
**poach** 225:15
**poached** 217:23 225:12,14,15
**point** 14:5 48:5 52:18 78:12 78:24 82:2 97:3 107:2 108:9 114:11,11 117:6 119:18 123:4,13 128:20 129:2 154:12 157:2 193:6 198:16 208:12 218:18 224:7 226:13 228:16 230:8,14 250:3 257:17
**poker** 191:6
**policies** 92:4 93:13 105:4 124:6
**policy** 14:10 20:4,8,9,10 87:2 87:5,8 92:6 93:4,16,16 98:14,20 123:2,10,12 124:4 124:19 125:1,8,13,24 126:10 127:22
**poo** 98:18
**Poor** 184:10
**pop** 229:7

**pops** 53:12 162:21 164:9 176:2
**Porsche** 83:24 86:6
**portion** 231:14 258:23
**portions** 117:14
**posed** 253:17
**position** 234:18
**positions** 71:13 239:1
**positive** 168:16 242:16
**possessed** 128:22
**possesses** 128:16 150:22
**possession** 24:11
**possible** 68:17 85:6 121:4 130:1 163:6
**possibly** 67:23 135:22 140:6 168:5 171:18
**post** 34:9 87:18,19
**post-COVID** 38:20
**postage** 34:8
**potential** 55:20 132:15 134:8 134:19,22 244:6 248:10
**Potter** 174:1
**power** 141:11
**powering** 176:4
**PR** 46:22 50:18,20 51:15,16 55:19 56:18 58:6,14 62:5
**practice** 5:20 6:9 12:24 32:7 32:8 92:6 93:17 114:22 123:15 143:19 170:1 201:19 207:17 219:5 220:17 222:13
**practiced** 31:9
**practices** 87:23 92:7
**practicing** 5:19,21,24 32:6 164:24 198:9
**pre-COVID** 38:19
**preceding** 83:18
**precise** 170:2 254:4
**prefer** 211:18
**Preliminary** 228:23
**preparation** 151:19
**prepare** 32:13 55:15
**prepared** 33:21 146:1 154:13 237:17
**preparing** 176:16 240:14
**prescribes** 187:3
**prescription** 186:15
**present** 2:20 4:11 25:23

136:16 138:23 260:8
**preserve** 47:1 52:8 54:23 107:11 141:11 150:1 163:8
**preserved** 109:3 139:2
**president** 9:3,7
**Press** 161:24
**pressed** 237:1
**pressure** 137:1 202:19
**presume** 252:1
**presumptions** 150:13
**presumptuous** 224:11
**pretty** 11:8 22:14 32:11,11,16 94:21 101:19 113:7 149:19 175:8 181:11 193:12 200:8 255:2
**prevent** 99:5 184:7 243:19
**prevented** 256:13
**prevents** 146:12 182:20 194:13
**price** 86:4
**primarily** 171:16
**primary** 188:16,22 200:1 244:10
**print** 113:19
**printed** 34:2 113:17,23 114:2 114:15 115:9 130:14
**printing** 114:7
**printouts** 118:9,14
**prior** 15:23 16:6 32:5 33:2 56:22 59:6 69:23 87:3 89:2 93:8,12 94:4 107:5 112:5 117:11 123:16,17 141:5 142:1 189:11,17 199:13 207:2 227:19 232:12 236:24
**private** 233:19
**privately** 143:1
**privilege** 117:21
**privileged** 110:4 254:6
**privy** 241:10
**proactive** 51:1 187:11 240:3
**proactively** 50:22 51:13
**Probable** 112:8
**probably** 73:17 90:3 95:3 110:18 120:3,4 127:20 155:15 186:3 187:17 191:4 200:4 213:3,15 250:12
**problem** 92:19 99:3 142:14

**ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES**

EXHIBIT 36
1077

**PATRICIA WEISER**

288

180:20 204:16 247:11
**problems** 120:1 144:9 205:10
**proceed** 80:5
**proceedings** 112:9,19 121:24
   147:2 171:15 172:8 257:5
   258:16 259:1,2
**proceeds** 33:12,19 34:24 35:6
   36:1 78:21 160:5,24 161:11
   226:14
**process** 19:5 23:20,21 50:11
   54:7,10 66:2 85:1,4,5 91:22
   91:23,24 92:2 125:18 128:5
   140:2 161:23 226:6 229:19
   240:19
**processes** 182:13
**procurement** 187:5
**produce** 109:4 113:16 114:7
**produced** 108:13,18 109:20
   109:24 115:1,3,11,17,19
   117:1,2 159:12,16
**produces** 75:5
**product** 13:19
**production** 114:13,14,23
   116:10,17 121:8
**professional** 1:14 136:19
   186:3 262:5,24
**professionalism** 133:23
**professionally** 144:8
**professionals** 235:2
**profile** 90:15,19
**profit** 86:12
**profitable** 223:23
**project** 229:20
**projection** 230:1
**projection's** 230:11
**projections** 227:3
**proper** 257:22
**properly** 54:22 103:24
**property** 83:8
**proportion** 184:2
**proposed** 58:24
**prosecuting** 184:9
**prospects** 223:13,23,24
**protect** 46:14 47:5,20 49:6,16
   51:14 54:5,24 141:19
   161:16 162:8 243:19
**protected** 50:1

**protecting** 46:10 170:3
**proud** 174:6 186:6
**provide** 26:15 30:21,23 94:6
   168:4 181:5 188:6 213:23
**provided** 13:5,10,13,20,21
   14:1,11 20:22 107:13
   111:18 114:20 117:11 122:1
   153:16 154:13 206:15 247:3
**provider** 107:22 119:9 129:2
   156:2 186:9,22
**provider's** 158:18
**providing** 20:24 104:14
   225:22,23
**provision** 13:11
**Prussia** 2:5
**psychiatrist** 186:10
**PT** 198:1 199:24,24 205:12
   213:22
**public** 1:14 56:13,23 60:18
   66:14 67:9 75:13 134:14,16
   223:1 257:16 262:6
**publically** 71:16 123:19
   127:3,8 142:24 222:24
   223:2 260:7
**publically-traded** 132:3
   133:9
**publication** 141:19
**published** 161:20
**pull** 145:7 172:5 252:8
**pulled** 206:8
**pulling** 74:22
**puppy** 203:13
**purchase** 86:3
**purchased** 84:11 214:4,6,11
   214:11,18 215:13
**purchases** 215:4
**purely** 103:19
**purge** 19:3 125:15
**purged** 22:4 23:2 127:24
   155:16 160:2
**purpose** 138:19 248:22 257:7
**purposes** 23:13 95:13 138:15
   151:19 169:17 259:5
**pursuant** 126:10 127:22
   258:16
**pursue** 69:22 71:9 139:8
   164:18 208:7 222:19 225:7

239:3 240:11 241:20 255:17
   255:20,21 257:22
**pursued** 150:6 239:1 257:21
**pursuing** 169:18 178:24
   256:22,23
**pushed** 167:10
**put** 66:14 69:18,18 108:12
   115:10 137:1 149:18 158:5
   194:21 202:18 239:4
**puts** 207:9 212:4
**putting** 181:24

---

**Q**

**qualify** 7:21 130:21
**quality** 204:5,14
**quarterly** 243:6
**question** 7:20 8:20 23:4 27:6
   34:23 43:23 63:21 75:23
   80:17 93:10 105:10,16
   109:2 126:3 129:11 130:22
   135:1 137:12 147:19 148:6
   151:4 153:8 155:17 158:12
   162:14 163:5,12 215:24
   219:10 228:17 246:19,20
   249:21 250:24 251:15 254:3
   254:13,17 258:9,24
**questioning** 5:11 254:2
**questions** 23:19 60:18 115:6
   216:6 251:17 252:16 253:12
   253:17 254:18 260:18
**qui** 35:22,23 36:3 66:24
   69:11,20 123:17 169:7,18
   170:1,5
**quick** 229:17
**QuickBooks** 18:22,24 24:20
**quicker** 186:2
**quickly** 142:7,15 229:18
**quiet** 174:22,24
**quietly** 72:12
**quit** 198:19
**quite** 9:12 48:9 147:17 211:8
   239:23
**quoted** 163:17

---

**R**

**R** 2:1 262:1
**R-A-Z-Z-O-U-K** 245:18

PATRICIA WEISER

289

random 132:23
range 59:3,4 97:10
rare 94:3 203:18 204:4
rarely 35:11
rate 120:23
rates 241:8,9
rational 208:3
Razzouk 245:14,16
re-evaluate 111:22
reach 88:6 133:4 161:18
    230:8
reached 49:11 50:11,13,15
    80:15 162:4 220:19 224:21
    224:22 226:12,20
reaching 49:12
reaction 45:6
read 29:3,24 32:15 61:23
    95:18 99:19 100:11,17,20
    100:23 101:14,16,17,22
    113:9 140:17 144:15 173:5
    176:15 190:20 215:23 216:2
    251:24
readily 127:4
reading 100:3 191:4,4
reads 145:12 168:19 232:4
ready 30:2 244:4
real 122:12 151:14 242:11
realize 6:12 68:10
realized 107:3
realizing 125:9
really 23:7,16 51:11 55:7
    68:6,11 72:2 75:21,22,22
    85:2 88:2 99:7 111:24
    139:1 143:18 144:1,17
    145:17 149:23 174:24
    180:14,22,22 182:1,3
    195:11,20 196:2 197:21
    198:13 202:12,19,20 203:15
    203:20 204:22 208:18 209:2
    209:6 211:10 222:2,3 226:9
    237:3
reason 30:18 41:17,19 70:21
    72:1 76:24 77:22 118:4
    178:2 194:21 203:10 218:5
    219:4 221:20 227:15,18
    228:11 233:23 257:23
reasonable 220:24

reasons 29:13 30:9 77:1
    106:21 252:7
recall 6:7 12:10 17:17 28:17
    29:9 39:17 41:10 42:19,22
    42:23,24 46:17 49:10 53:17
    53:19 54:16 55:24 56:6,14
    56:15,17,18 59:2,8,9,11,18
    60:1 61:3,8 62:2,2,3,4,7,15
    66:5 79:18 82:18,19 87:1,1
    88:17 107:6 108:12 114:17
    119:16 122:7 129:18 130:1
    140:2,3,5,7,19,24 141:13,16
    141:21 155:6 162:22 166:15
    166:16 167:18 168:1,5
    171:22 189:4,22 199:19
    218:11 220:2,15,18 244:8
recalled 104:11
recalling 91:13
receipt 160:9
receive 34:7 35:4,6 36:1
    41:24 79:3,4 86:20 137:16
    137:19 165:4
received 42:14 58:5 72:12
    199:23 205:14
receives 41:6 137:8 160:17
receiving 79:1 228:10
recess 102:19
recipients 246:12
recognize 170:17 245:2
recollection 6:20 20:23 24:5
    27:24 28:4 39:20 40:5
    52:22 54:9,18 55:22 76:18
    90:23 108:19 122:8,16
    124:6 129:1,6 130:12,13
    139:21 141:8,23 156:24
    157:4 161:1,7 217:5,10
    220:11 238:10
recommended 50:6 54:7
    140:10 183:3
record 17:22 19:12,18,20
    20:6 21:6,8 28:2,23 29:1,3
    29:20,22,24 54:12 216:2
recordkeeping 23:14
records 10:14 18:8,18,21,23
    19:1,10,18,23 20:2,4,5,14
    21:4,13,19 22:3,17 24:8,9
    24:22 25:20,21 26:3,17,19

39:22 40:20 55:5 56:14,15
    122:1,6 127:9 128:16,23
    129:3 155:15
recovery 161:7
recruiter 52:10
redact 118:3
redacted 114:4 117:14
redaction 114:18
redactions 116:3,5,6,23,24
    117:5
reduce 124:17 170:22
reduced 59:4,12 65:23
    231:17,19
reducing 61:24 100:21
reduction 58:20 59:5 61:20
    67:6 102:6 140:14
refer 10:10 100:23 132:13
reference 109:4 137:24
referenced 32:19 68:22 83:15
    169:16 235:7
references 112:10 121:9
referral 37:9,15,18,21,21,24
    40:9,13 243:13
referrals 134:4 137:8,17,20
    243:3,5,9
referred 110:6
referring 66:19 68:24 91:6
    116:5 118:13 130:20 150:22
    151:7 171:7
reflected 97:1 227:10,21
    228:1,9
refresh 217:5
regarding 30:16 92:4,8 93:13
    100:6 102:2 121:10 127:13
    129:14,24 131:11 139:19
    140:14,21 161:2 162:24
    233:4
regardless 125:21 147:10
    148:10 234:5
regards 10:8
regimen 201:1
registration 92:5,9,22 93:14
    98:15
registrations 92:11
regular 125:18 165:8 241:6
regularly 65:15 119:12,13
    125:18 200:12

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36
1079

PATRICIA WEISER

290

relate 100:24 104:19
related 10:5 103:15 108:8
  109:16 127:1 129:10 156:3
  157:1,3,21 159:13,16
  186:11 204:8 237:23
relates 20:10
relating 14:15 19:21 125:4
  129:21
relation 59:12 86:3 157:18
  171:2 208:13
relations 56:13,23
relationship 38:8,10,13
  119:20 120:7,9 129:15
  132:17 134:6,6 136:1,2,3
  138:20 169:3,5,12 180:5
  206:20,24 207:10 208:14
  210:10 211:21 218:3,6
  237:9
relationships 66:15 131:19
  131:20,21 132:9,12,14,18
  132:21 133:18,20,21 134:2
  134:3,18 135:15 136:6,20
  136:22 138:1,15,19 139:2
  139:14 207:21
relax 194:16
relaxed 203:15
release 192:24
relevance 63:22 114:5
relevant 31:4 64:1,3 126:21
  135:3,5 251:19
relied 99:9
relief 181:5 183:12 189:19
relieve 205:9
reliever 200:1
relieves 200:2
rely 14:19 136:7 241:22
remainder 58:5
remake 84:4
remember 7:16 11:14,18
  12:2 15:14 17:15,19,19 28:7
  28:8,13 38:21,22,23 39:7
  42:8 43:14 44:4,6,8,9,9,10
  44:18 45:15,23 47:22 48:22
  49:9 50:7 51:3 52:18 53:23
  54:2 56:21 58:7 59:20
  71:22,23,24 72:3 79:5 83:5
  83:7,9,13 84:1,7,17,18,24

87:21 88:10,14,17 90:2,4,5
  90:7,11 96:23 97:2 102:9,12
  107:9 110:10,11 111:10,20
  113:13,16 114:1,9,20
  115:24 117:24 118:4,22
  119:7,10 122:10,23 123:1
  124:3,18,18,20 140:10
  149:8 153:24 154:1,5,11
  156:19,19,21 157:6,22
  158:21 160:1,1,3,22 161:4,5
  161:5,11 165:16 167:2,2
  171:17 199:16 214:22
  220:11 221:5,6 225:17
  226:2,3 231:17
remembering 113:18 130:21
  204:20 216:13
remote 112:3
remotely 82:18
remove 77:1,23
removed 70:20 71:1,18 77:4
  77:5,9 117:15 198:23 238:7
renewal 241:8
renewals 240:24
rent 79:1 81:15 83:4
rep 256:7
repeat 19:14
repeatedly 174:11
rephrase 8:22 13:1 18:17
  147:21 148:6 248:7 258:10
rephrasing 148:2
replace 214:12
replaced 214:7,14
report 198:22
reporter 1:14 5:4,5 19:13
  29:2,23 216:1 262:5,24
REPORTERS 1:15,21
reporting 92:12
represent 43:17 50:8 116:14
  138:11 201:21 246:11
  254:18
representative 134:19
represented 138:11 218:22
representing 129:7
represents 43:18 93:21
republication 162:10
reputation 46:11 47:2,5,20
  49:6,17 52:9 53:7 54:6,24

55:21 61:21 68:14 71:16
  141:11,19 142:5 147:15
  148:12,24 150:1,5,9,14,18
  161:17 162:8 163:9 168:10
  174:10 233:5 249:12 255:13
  256:5,7,8,9,14,20,23 257:3
  259:3,7
reputations 259:12
request 30:21 107:22 108:11
  122:5 159:19 161:19
requested 29:4 30:1 33:8
  58:24 104:9 121:1 122:1
  156:2 216:3
requesting 104:12
requests 107:24 109:7,21
  110:1 119:8,24
require 87:19
required 12:13 154:16
research 51:18,22
reside 236:3
resided 65:1
residence 63:16 64:6,9,16
resolution 150:7
resolve 70:2 226:10
resolved 33:13 71:5 76:9
  151:15
resort 128:2
resources 20:22 96:17 255:19
respect 13:18 67:10 71:10
  72:9,9 73:3,4 108:10 121:7
  139:5 144:4 163:10 250:18
respects 252:1
respond 142:23
responded 109:21 110:1
  141:24
response 15:8 53:13 104:13
  107:23 108:11 109:6,20
  137:11 140:20 141:21
  157:16 158:13 159:18 198:4
responsibility 34:13 37:23
  90:10
responsible 10:12,17 33:20
  34:1,8 60:3 92:10,16 159:4
  208:5 212:19
rest 11:2 142:20 229:8
restate 23:3
result 74:13 78:2 85:13 86:23

**PATRICIA WEISER**

291

112:22 121:17 132:6 210:15 218:16,19,21 219:3 237:8 257:23,24
**resulted** 238:7 248:2
**resulting** 237:7
**results** 113:10 117:15 157:10 157:13 158:19 163:11
**retain** 123:21,24
**retained** 14:21,22 15:7,13 50:7,19 55:20 56:23 62:6 87:12 94:12 104:16 105:1 112:6
**retainer** 56:4,11,19 57:2 58:6 62:9
**retainers** 56:1
**retention** 20:4,10 23:14 87:2 105:5 123:3,10,12 125:24
**retention/destruction** 127:22
**retraction** 161:19
**retrieve** 105:13
**retrieved** 121:5,5 124:24
**return** 74:19
**reveal** 135:10
**revealed** 14:12
**revealing** 253:15
**revelation** 48:7
**revenue** 69:1 74:17 78:3
**revenues** 65:19 66:16,19 67:20 71:10 74:12,20 75:5,6 85:14 101:9 223:12 238:23 242:15
**review** 12:13 32:13 33:5 94:7 98:24 117:20,21 122:2,24 127:8 128:17,24 129:4 168:4
**reviewed** 11:12 32:19 216:19 253:6,8
**reviewer** 99:6
**reviewers** 15:2
**rid** 81:15 124:10
**ride** 193:17
**ridiculously** 183:22
**riding** 190:24
**right** 7:3 24:14 27:21 38:20 40:22 53:10 55:22 56:18 64:13 69:18 72:17 77:12 80:1 85:15 86:16 114:13

118:12 119:10 125:13 132:4 133:12 135:6,23 141:17 145:4,8 146:11 148:17 160:22 165:10 175:4,16 180:1 183:21 187:9 194:1 196:20 198:24 204:3 208:8 210:7 212:13 216:14 217:23 219:24 246:9 247:1 253:23 254:4,23
**rightfully** 221:14
**rise** 55:11 190:12
**rises** 120:3 227:2
**risk** 139:16
**road** 97:4
**Rob** 11:16 16:24 17:1 26:9,10 27:1 29:7 33:4 34:15,18 41:12,15 42:11,11 44:15,15 44:24 46:9,9 50:20 51:13 54:8 55:17 61:5,14,19 62:11 65:14 67:11,17 69:9 75:18 78:9 79:3,9 83:20 96:10,13 99:23 100:16 101:10,17 102:5 110:21 111:7 129:20 129:22 130:4 134:5 137:22 140:6 141:2 144:24 159:2 161:23 162:4 164:12 166:17 166:19 171:18 174:3,8 175:12,23 176:3 177:14 180:8 184:10 185:22,23 188:5 190:20 195:1 196:6 198:19 199:4 207:16 209:5 209:12,22 211:3,15 212:4,4 214:23 215:10,13 221:7,9 222:1 223:16 231:16,21 233:11 234:23 236:22 241:23,24 243:11 245:24 247:19
**Rob's** 31:24 33:3,3,7 41:15 45:6 61:10 100:9 129:17 131:4 136:12 192:21,21 199:4 214:20 225:11 246:3
**Robbins** 245:20,21 259:23
**Robert** 1:4 4:20 8:3 43:19 166:23 167:1 188:16
**Robert's** 64:7
**Rokowski** 27:14,15
**role** 9:1,22 32:22 36:16 37:8

40:8,23,24 41:8 53:18 65:9 87:9 96:10,11 101:6 122:3 158:24 160:7 167:23 170:10 170:21,23
**roles** 9:5,9,11 16:2,2
**roll** 145:14
**Rome** 49:14 149:3
**room** 194:24
**rooms** 194:21,22
**Rosemont** 187:17,17,19
**Rosenzweig** 2:3,3 4:16,17,19 8:16 11:23 12:15,20,23 13:2 13:7 14:3 18:10 21:9 22:23 23:6 25:22 29:15 31:1,20 33:14 42:16 43:12 45:8 47:8,14 62:16,18 63:20 64:2 64:11 73:24 76:2,4 79:22 80:2 81:8,11 96:5 102:13 104:18 116:20 117:3 123:4 134:24 135:9 138:5 142:9 142:11 146:18 147:16,22 148:4 153:1,6 159:14,20 163:18 167:16,20 169:20 171:4 173:22 184:13 215:23 216:4 219:14,19 226:22 232:13 240:13 241:22 242:20 249:13,16,19 253:22 254:9,12 258:2 260:16,20
**Rosenzweig's** 161:9
**Ross** 91:12,14,19
**rounds** 230:3
**route** 186:4
**Rubin** 2:8 4:24
**ruin** 51:14
**rules** 105:5 152:9
**ruling** 140:22
**rummy** 191:6
**run** 57:4,9 68:12,13 73:5 174:9,24 193:3,17,19
**runner** 177:24 192:22
**running** 78:22 79:13 184:8 190:17,22 192:17 193:8 194:15 200:20 234:19
**runs** 177:24,24 178:5,5,5 185:10 197:14

---

**S**

PATRICIA WEISER

292

S 2:1,3 3:14
S-H-A-N-K 120:13
sad 221:11,11
saga 214:3
salaries 73:20 206:10 242:8 242:10,12
sales 80:15,18 83:14
salvage 257:18
San 39:1,2,3
sat 100:19 232:2
satisfaction 37:9
satisfied 240:5
satisfy 42:4,5 161:8
sauce 131:15
saved 21:23 22:8 23:24 24:8 24:14 105:7 107:21 108:14 115:13 127:1
saving 106:23 124:17
saw 165:16 246:1
saying 7:21 23:17 50:23 91:9 125:12 130:10 182:21 203:16 215:16 250:16
says 95:23 100:4 177:9 221:18 241:4,17
scale 196:24
scales 197:2
scanned 19:9 114:24 115:12 118:9,14 157:10,13
scared 178:7
scheduled 4:3
Schiffrin 16:21,24 17:1,1 111:8,12
school 6:14,15 7:3 15:24 16:8 16:13,16 190:15 235:18
scope 54:15 55:13 156:4 157:24 196:10
screaming 72:6
screen 94:22 113:2 172:12 216:24 226:4 246:4
screening 99:10
search 95:16,16,22 96:3 107:7,10,13 108:8 109:5,6 109:23 112:22 117:15 119:8 120:15,16,17,19,22 121:8 127:17 128:1,3,22 129:3 156:6,8,13,17,22 157:4,10 157:13 158:18,20,24 160:12

161:1 162:16,19
searched 107:19 156:9,12
searches 94:13 108:21 119:4 120:24 156:3 163:3
searching 156:6
second 82:11 113:15 191:5 253:3
secret 131:15
secretary 9:4,12
secrets 135:11
Section 69:14
secure 187:19,21
security 132:6 155:1 160:16
see 17:10 50:16 56:3 94:24 95:7 105:3 143:6,10 165:22 166:7 172:10,12,22 174:21 176:13 178:13 203:14,17,20 203:20 216:6 220:20 228:18 232:17
seeing 55:22 96:24 113:2 145:19 166:15 167:18
seek 189:18
seeking 69:24,24 70:1 125:5
seen 99:17 130:14 140:13 165:15 166:11 167:12 174:13 201:15 253:4
sees 190:9
segregate 101:20
self-reported 50:9 140:3
self-reporting 54:6 139:20
sell 68:3 73:16 78:14 81:16 84:19,21 86:15,18,18 177:18 242:7
selling 73:12 84:24
send 34:18
sending 103:12
sends 165:14
sense 41:17 57:4 84:13 103:10 113:21 143:21 168:12 175:20 182:1
sent 19:6 23:11 52:19 55:23 100:6 103:11 104:11 113:10 125:2 155:3,5 165:5 166:12 166:21,24 167:1
separate 13:15 14:22 41:15 48:7 56:1,1,5 69:11 78:7 113:5 127:2 158:15 258:19

separating 96:10
separation 65:4
seriously 212:20
serve 53:18 248:18,19
served 107:24 248:3
server 106:11,12 156:5,21
serves 6:10,10 27:24 156:7
service 93:20,20 104:9 105:21 117:16 213:23
services 50:7 111:18
serving 249:8
set 18:18 110:22 111:2,6,16 112:2 169:17 223:2 226:3 229:2
settle 70:22 76:12
settled 72:3 76:13
settlement 33:12,19,23 34:24 35:4,6 36:1 37:6 52:20 58:24 76:1 160:5,24 167:13 226:12,19 227:13,16,21 228:19,22,23,24 229:2,6 230:8 231:13
settlements 70:3 75:16 87:20 227:12
setup 192:7
seven 22:3 23:1 155:14,16 179:7 206:12 207:14
seven-figure 206:14
seven-to-ten-or-longer 67:2
seven-year 22:4
severance 86:21
severely 73:22
Shank 120:13
shape 178:7 235:1
shared-file 26:18
shareholder 32:9 36:3,10 69:12,13,20 131:2,11 137:8 137:17,20 138:2,8,12 219:9 221:4 222:13 224:18 231:10
shareholders 131:8,23 133:6 133:8 134:22 139:10
shareholdings 131:23
SharePoint 25:3,7
sharper 219:18
sheet 227:22
ship 57:9
shit 70:9 145:22 178:23

**PATRICIA WEISER**

293

196:14 199:3 252:9
**shitty** 180:24 224:13
**shock** 45:4
**shocked** 44:10 45:16
**shocking** 45:5 48:1,2,17,18
  51:9,11 148:16,17,17,18
**shooting** 173:24
**shop** 87:7 208:2 214:24
**shore** 191:1 192:1,5
**short** 63:7 66:23 170:18
  184:21 212:1,1,9 228:24
  232:22 255:6
**shorter** 71:19
**shortly** 104:13
**shots** 181:9,12,22 187:1
**shoulder** 198:24
**show** 174:4 238:21 243:24
  251:7
**showed** 217:16,20 250:23
**showing** 184:6 217:9 222:21
**shows** 217:8
**Shuman** 217:2
**shut** 224:9
**shutdown** 81:6
**shutting** 220:16 222:12
**sic** 29:12 42:13 89:11 103:3
  135:11 141:18 192:3
**sickness** 210:1
**side** 20:7 180:10 181:6
  198:18
**sidelines** 195:9
**sidetracked** 16:4
**sideway** 212:7
**sideways** 230:12 231:3
**sign** 62:10 232:7
**signed** 33:4 131:2 152:13
  227:14 228:23 229:1
**significantly** 202:7 238:24
**signs** 173:13
**Silo** 11:21 14:12,18 15:5 18:3
  18:8,15 22:19 23:11 24:6
  43:9 44:19 48:15 49:11,13
  52:11,21 59:7 67:10 90:14
  93:1 94:11 95:11,22 96:2,22
  98:4,12 103:1,6,12 104:1,2
  104:6,7,11,13 105:19 107:5
  107:8,17 108:9 109:14

112:9,13,19 113:6 119:5
121:11 122:4 124:22 125:6
126:22 139:20 140:23 141:4
141:24 142:4,19 147:10,14
148:10 150:7,23 151:8,12
151:21,22 152:20 153:14
154:21 155:10 156:3 157:1
157:15,18,19 158:14 159:8
160:11,14 167:13
**Silo's** 18:19 43:19,21 45:7
  47:6,19 49:5 60:8 122:8
**Silverang** 2:3 4:18
**similar** 259:21
**similarly** 135:20
**simple** 84:21 87:8 158:16
**simplify** 137:13
**Simpson** 2:21
**single** 38:3 60:4 152:22
  173:21 178:1 194:16,18
**sit** 42:9 43:7 56:17 65:16
  85:15 88:14 90:24 100:16
  115:22 119:10 130:12,13
  140:24 141:15 151:10,13,17
  155:13 160:22 165:10
  166:16 170:20 174:23
  211:14 216:13 219:24
  220:13
**site** 89:6
**sitting** 44:2,7,13 46:21 75:20
  176:8 195:9 243:12
**situation** 76:20 211:7,23
  224:15
**six** 177:24 181:12,17 185:11
  250:2
**six-minute** 178:6
**six-year-old** 249:23,24 250:2
  250:4
**sixteen** 145:1 174:15 236:2
**size** 197:3
**skull** 181:9
**sleep** 173:3 177:10 179:15
  182:7 189:14,19,20 190:1,2
  194:18 195:8,12,15 196:1
  204:6,10,14 205:21 208:20
  208:24 209:23
**sleeper** 196:2
**sleeping** 179:21 182:3,18,19

182:20 189:9,11 194:13
196:6,8 212:11,18
**sleeps** 179:15
**slept** 212:13
**slightly** 62:22
**small** 15:10 82:1,23 87:7
  113:3 161:10 231:7
**smaller** 197:4
**smallest** 82:10
**smart** 175:24 186:6
**smiling** 203:15,16
**Smith** 136:3
**snuggling** 203:13
**soak** 195:6
**social** 50:24 51:16 155:1
  160:16 186:11
**softball** 194:19 195:9 200:16
  236:10,10,13,15,17,18
**software** 122:19
**sold** 73:11,12 78:1,5,18,20
  79:11 80:13 83:8,18 84:5,5
  84:5,6,6,14,15,16 85:13,22
  86:7,10,16 106:14 215:8
  242:8
**sole** 248:21
**solve** 205:10
**somebody** 149:8 235:5
  252:13
**someplace** 186:20
**soon** 107:2 160:2 228:13,13
  229:15 230:15
**soreness** 199:15
**sorry** 6:13 8:22 14:7 18:12
  19:15 27:5,7 34:22 48:10
  76:5 81:4 82:24 93:9 97:17
  109:1 142:10 151:6 152:18
  153:18 172:17 205:19
  212:24 214:1 245:8 246:21
  260:17
**sought** 134:1 185:16 186:8
  199:20
**soul** 146:6
**sound** 43:6,7,8 245:11,13,19
**sounds** 220:24
**soup** 34:11
**source** 45:18,24 46:1 54:18
  225:4 244:10

**ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES**

EXHIBIT 36
1083

PATRICIA WEISER

294

sourced 95:15
sources 134:12 220:19 221:2
    224:17,19,22 225:1,4,6,10
    225:13,15 243:13
South 1:16,22 2:9
space 78:11 82:1,10,12,22
    111:3 175:3,15
span 12:2
speak 20:9 24:14 49:15
    129:16,19 159:2 220:14
    233:12 249:24
speaking 129:18 136:13
    226:16 249:23
special 49:14 186:20
specialist 2:20 4:1 5:2,10
    28:22 29:5,19 30:3 63:5,9
    102:17,21 146:24 147:3
    184:19,23 213:13 232:20,24
    255:4,8 260:24
specialized 69:16
specific 44:1 65:24 97:24
    130:13 139:21 141:6,7,22
    156:22 199:16 253:16
    258:24
specifically 25:5 28:13 29:9
    44:18 84:18,24 107:18
    114:17 118:22 124:23
    134:12 136:13 140:24
    141:21 142:2 144:3 155:17
    156:23 157:7 159:3 163:10
    165:16 226:17
specifics 45:15 114:21 141:16
    220:15 233:13
spell 245:10,17
spend 74:9 136:22 166:9
    179:2,7 207:14 208:17
    210:13,14 237:3
spending 73:13,24 143:6
spent 54:11,13 58:3 174:10
    178:22,23 206:4,11,16
    237:5 239:14,16
spewing 248:17 249:6
split 228:3
spoke 124:19 246:1 250:1
spoken 244:18 250:11
sports 190:14 191:10
spot 106:18

spouse 178:17 180:8 208:14
spout 77:7 146:11
spouted 70:18
Sprint 31:15,18 58:20 59:22
    65:22 66:4,10 67:18 75:7,8
    75:23 100:21 101:1 119:5
    121:11,21,22,24 126:2,15
    128:17 129:4 137:10 140:14
    142:3 150:24 168:9 173:15
    226:11,17 227:19 228:8
    230:13 231:4,16,18
Sprint-fee 67:6
Sprint/Nextel 171:8
square 82:13
St 6:22
stage 46:23 195:14
stand 143:13,16 180:9
standing 72:21 133:10
standpoint 124:8 208:16
start 41:18 127:18
started 6:19 11:16 16:23 17:2
    22:13 32:15 41:10 67:9
    71:6 110:21 164:6 176:16
    195:17 214:16 216:11
starting 196:5
State 46:22
stated 154:22 164:24
statement 222:11,14
statements 100:13 140:20
    163:15,16,22,23,24 167:4
    206:5 218:20 219:7,23
    220:6 224:16,23 238:12
    243:21 246:12 249:10
states 1:1 4:6 95:11 172:24
status 43:20,22 44:2 45:7,12
    93:5 98:15 165:2,9 171:19
statute 170:2
stay 125:14 127:23 129:18
    131:17 191:1 198:17 228:16
    234:24
stayed 111:9
staying 194:23
stays 115:11 155:22
steady 193:12
Stecker 73:10 215:21 217:2,3
    217:22 218:22 219:7,22
    221:13 222:11 224:16

Stecker's 218:20
stenographic 29:1,22 262:8
step 110:17,20 223:8,10
    239:24
stepped 54:22 72:12 234:17
steps 49:16 52:5,15 117:20,22
Stipulation 229:1
stock 8:10,12 133:1 134:16
    135:18
stockholdings 135:22
stoic 174:5
Stone 63:14
stop 5:23 53:13 179:5,6,8,20
    180:23 181:10 195:21
    202:19 240:15 248:1 255:18
    257:8,10,15 260:7
stopped 6:2,3 32:5,17 181:20
    193:8 198:9 209:9
stopping 248:22
stops 256:16
storage 124:15
store 24:22
stored 21:23 22:16 24:8,15
    104:16 105:1 124:14 127:1
    127:21
stores 26:19 155:18,18
stories 149:6
story 220:10,24 221:17,20
strain 207:9
strained 255:20
strains 208:9,10 209:1
strange 189:7
strategy 240:15
streamline 111:23
streamlined 22:7 112:1
street 1:16,22 2:9 136:9
    140:13 141:14,20,22 145:10
    161:18 162:5,9,10 163:14
    163:17 187:15,18 192:2
    232:5
stress 66:14 137:4 144:9
    164:4,11,13 173:3,8,9,14
    174:12,18 175:22 177:14,17
    177:21,23 182:15,20 184:10
    185:11,14 189:14,23 192:24
    194:7,10 196:7 198:6,7
    199:1,18 200:20 204:10

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36
1084

PATRICIA WEISER

295

205:9 207:6,6,9 212:10
230:18 234:11,16 236:24
255:18,22
**stress-induced** 204:23
**stressed** 177:12 180:6 195:13
195:17 203:9,17
**stressful** 60:6 68:18 79:14
174:17 183:22,23 184:10,11
202:22 208:9 237:18,21
243:17
**stressor** 198:23
**stressors** 198:4 211:24
**strictly** 136:11 187:8,10
**strife** 164:3
**strike** 7:24 8:4 31:16 38:11
41:23 58:18 64:14 80:13
88:21 92:20 93:3 160:4
172:2 188:15 201:20 215:12
215:19 235:22
**strong** 132:11,14,21 174:5,6
192:14
**strongly** 50:21
**structure** 77:12,13
**struggling** 66:11
**student** 14:24
**studied** 6:24
**study** 6:23
**stuff** 20:14 54:3 84:23 100:17
123:24 124:17 131:15
146:12 149:20 177:7 178:10
186:5 191:23 193:4
**stumped** 191:14
**stupid** 251:18
**subconscious** 167:10
**subject** 104:22 210:19 258:15
**submissions** 127:13
**submit** 72:18,22 153:21
**submits** 153:19
**submitted** 19:7 52:20 102:8
103:1,8 104:2,5 122:4,22
127:7 128:16,23 129:4
150:23 152:13,15,21 154:18
**submitting** 103:5
**subpoena** 248:14 252:15,22
**subpoenaed** 259:5,6
**subpoenaing** 248:4,10 251:17
**subpoenas** 243:15 248:3

249:8 258:18
**subsequent** 96:1 233:5
**substantiate** 115:17 223:15
**substantiated** 122:15
**substantive** 96:11 99:24
**successful** 139:8 161:6 179:9
**suck** 175:11,12
**sucks** 176:2
**sudden** 6:12
**sue** 133:14
**sued** 216:11,12 217:6 239:19
247:18
**sues** 239:21
**suffer** 173:2,9 189:24 190:6
**suffered** 132:5 237:8 256:24
**suffering** 173:7
**suggested** 104:21 181:3
**suggesting** 23:8
**suing** 184:3
**Suite** 1:16,22 2:5,9
**suits** 197:6,10,11
**super** 212:20,23 237:18
243:16,16,17
**super-shocking** 46:19
**supplies** 10:1
**support** 52:20 73:6,16 78:15
119:21,22 210:20,23 223:10
225:22
**supporting** 55:5 79:9
**supposed** 15:9 73:21 97:15
**sure** 8:19 9:11 10:3,11,18,18
11:9 12:1 16:5 17:23 19:16
19:16 23:5 24:1 25:6,17
31:14 32:21 34:12 37:12
39:5 42:8 45:18 46:3 50:3
50:13 52:6,7 53:8 54:22
59:15 62:14 65:12 69:5,5
71:21 87:11 91:14 92:6,13
92:17 93:11 97:15 101:10
102:10 103:22,23 107:8
109:18 113:7 121:18 123:7
123:11 129:12 130:20
134:11,23 135:12 151:5,11
151:13,16 158:1 159:5
162:12,13 165:9 175:13
184:16 187:16,18 188:18
191:20,22 196:19 198:18

200:8 207:4 209:12 213:24
215:1 216:10 217:7 219:12
226:3 234:6 239:10 244:2
245:21
**surgeons** 213:18
**surprised** 149:16,17 185:13
185:13 193:4 213:22
**survived** 100:14
**suspect** 114:16 157:20 162:5
199:4 244:8
**swallow** 143:23
**swear** 5:5 177:8
**sweeter** 180:6
**sweetest** 212:14
**swim** 193:18,19
**swimming** 190:24
**swirl** 51:13 182:14,15 183:19
**switched** 111:20
**sworn** 5:8
**symptoms** 180:18 186:11
190:4 196:5 202:1 204:17
205:23 237:7
**system** 20:19 21:16 22:1,6,9
26:18,21,22 106:23 110:24
111:15 115:8,13 124:10
126:17,18

---

**T**

**T** 3:14 262:1,1
**tag** 114:15 116:13
**taint** 53:7
**take** 10:24 11:1 14:14 34:7
37:23 44:24 47:20 49:6
60:4,21,23 66:21 67:1 94:8
103:20 121:1 141:18 146:2
146:21 150:11 152:5 176:24
177:1 179:22 180:22 184:13
184:14 205:10 209:10,10,13
225:5,10,11 230:16,20
231:13 232:19 233:22 234:9
234:9,12,21,21,22,22 235:6
235:6 243:8 247:22 254:24
255:1
**taken** 1:13 4:2 38:1 63:8
76:19 102:20 150:12 171:16
184:22 228:17 232:23 255:7
257:24 262:8

**PATRICIA WEISER**

296

takes 180:17 185:4,10 186:14 194:15 212:19 226:10 234:15
talk 36:12 44:20 100:16 102:11 115:5 149:12 171:19 175:14 190:12 210:19
talked 51:6 62:14 66:1
talking 21:12 26:10 43:2 59:15,16 82:9 89:15 101:12 115:6 116:8,10 123:16 142:22 143:8 149:2,13
talks 131:16 202:5 204:19 224:4
tam 35:22,23 36:3 66:24 69:11,20 123:17 169:7,18 170:1,5
tapped 85:18,20
tarnished 174:11
task 127:14,15
taunting 75:12
tax 20:14 74:19 151:20 152:2 152:8 155:15
team 194:23 195:1 211:9 236:14
teams 212:17
technical 30:8 114:9
technological 111:2 113:21
technology 106:22 110:7,14 111:23 119:18
teeth 214:2
television 213:7
tell 31:3 41:9 42:10,12 44:17 48:22 54:13 65:21 70:23 144:5 170:16 203:2 224:11 232:3,8 250:3
telling 128:11 204:3 218:12 220:16 221:10 249:7 257:16
tells 20:16 41:16 100:1 175:4
temporary 31:12
ten 80:10 86:9 97:9 112:4 178:1,6 185:11 214:10 235:14
ten-million-dollar 70:22,24
tenant 82:12
tenants 81:18,24 82:1
tennis 193:3
tension 125:8

tentative 226:12,19 228:19 231:12
term 66:23 83:2
terminate 28:18 218:2,6
terminated 28:11,12,16 215:22
terminates 29:12
termination 29:14 30:10,16 86:21,23
terminology 37:13 80:19
terms 28:15 37:13 47:15 50:1 79:23 87:18 119:21 124:14 144:7 156:11,22 159:3 160:8 161:6 165:18 171:1 173:7 184:3 192:19 226:1 229:19 243:2
terrible 17:10 219:10
testified 5:8 18:11 23:1 31:8 79:24 139:23 141:23 147:17 160:14 163:7 238:5
testimony 104:20 169:15 197:17 249:20 258:8,24
text 129:23 130:3
thank 5:2 13:3 95:6 147:23 148:1 168:7 172:22 246:8 260:11,16
Thanks 80:6 172:21
their's 214:21
theirs 101:18
theory 118:17
therapist 209:20
therapy 174:4 200:22,24 201:1,8
therefrom 54:20
thereof 10:6 141:7 158:8 159:7
thereon 10:24
Thieler 38:5,5,7,9,13,16 40:2 40:10,14 41:2,5 42:14,15,22 43:4,5 134:3
thing 41:15,15 46:20 51:7 55:2 66:4 73:7 94:3 100:4 101:23 113:14 115:17 143:19 145:8 146:13 154:2 162:17 168:16 174:1 175:11 175:11,16 179:14 180:2 182:12 184:11 195:13

200:10 202:21 203:14 204:23 209:3 211:3 224:1
things 6:24 10:2,7,13 20:14 20:16 23:2 25:6 26:13 44:24 46:13 48:2 49:8 50:24 53:9,9 54:22 55:15 67:16 70:8 76:22 77:10 81:4,5 83:23 84:11,24 89:4 94:8 100:24 101:12 106:23 108:8 112:3 113:8 116:9 124:9 128:12 130:5 133:24 149:6,12 174:17 179:23 180:1,16 184:5 185:23 198:2 200:16 205:8 220:14 224:2 230:11,12 231:3 234:20 238:13 240:20 250:10,16 256:4
think 7:5,14 17:12,20 19:1,5 20:8 25:3,15 26:9,10,11 35:21 36:21 38:14 39:1 41:18 48:5 53:7 54:2 55:1 70:6,16 80:10 81:6 84:1 85:21 86:7 87:23 91:17 94:4 105:8 110:18 111:10 113:15 114:12,13 115:1 118:4 123:1 124:6 126:20 130:19 135:3 138:23 144:6 144:14,18 150:8 165:8 166:14 168:13 169:5 171:21 174:17 176:8,12,12 178:7 180:10 183:11 185:11,22,22 186:18 190:12 192:23,23 199:14 200:4,13,18 201:12 201:17 203:3 209:5,6,14,21 211:1 212:3,9 213:1 214:5,7 214:10 218:10 222:5 224:8 224:11 231:20,23 232:1,10 232:18 235:2,3,14 237:3 238:3 244:24 249:16,19 254:14 259:6,14,14,15
thinker 182:9
thinking 62:19,21 76:20 85:15 86:6 114:13 130:10 142:22 182:4,6 195:18 208:3 209:18 232:9
thinks 146:15,16 175:19 209:22 251:6 252:19,19

**ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES**

EXHIBIT 36
1086

PATRICIA WEISER

297

259:13
**third** 69:11 82:4,7,10
**third-floor** 82:12
**third-party** 10:17 11:11
14:14,20,22 15:11 35:7
94:12 233:4
**thought** 14:21 67:15 68:7,19
74:15 88:2 89:8 143:3,7
158:2 168:11,21 177:11
182:13 216:11 239:11
**thoughtful** 85:5 209:2
**thousands** 239:17,17 242:23
242:23
**threat** 223:14
**threatened** 222:22
**threatening** 241:17
**three** 50:14 81:24 83:18
85:24 86:2 110:18 124:20
124:24 158:3 177:10 196:2
214:13 223:11,12,15 225:18
227:5,6 230:6 232:6,14
**three-minute** 184:14
**three-to-five** 126:9
**throat** 205:19
**throw** 206:6
**throwing** 124:9
**Thursday** 1:17 4:2
**tiers** 227:5,6
**tight** 57:9 197:23,24 200:17
212:22,23
**tightening** 85:2 204:23
**tightens** 173:20
**time** 5:10 14:6 16:1 17:9 18:3
18:14 19:4,7 25:23 28:24
29:2,21,23 38:17 39:8 42:7
43:22 47:24 52:20 54:3
61:4 63:7 64:24 67:15,16
69:11 71:8 73:13 74:14,17
79:3,14 82:5 83:22 84:19
86:10,14,16 89:19,23 91:2
97:2,3,5,20,23 98:19 100:16
101:12 102:14,19 104:8
108:5 110:11 111:17 115:24
118:23 122:11,12 123:5,13
123:15,22,24 124:9 125:17
130:4 138:1 143:3,6 145:23
149:5,20 150:8 151:24

152:4,7,23 153:19,22 158:2
158:9 165:15,16 166:9
167:19 173:17,21,22,23
174:4,16 177:7 180:4
181:18 182:3,6 184:21
189:5,13,13,15,15 193:7,20
194:8,9,12 195:11 196:6
198:8,10,12,16 199:5 200:3
203:9,9,10,17 208:4 209:5
209:13,17,22 210:13,14
211:10 216:1 222:22 224:14
226:10 230:4 232:22 234:8
235:19,20 237:2,4 239:2,14
241:18 242:9,23,23 243:5
244:19 245:15 246:2 247:13
247:16 250:23 251:4 255:6
257:1
**timeframe** 11:20 22:15 23:7
104:21 204:12
**timeframes** 47:11,15
**timekeeping** 122:9,19
**times** 78:19 79:7 84:13
152:19 173:15,16,21 182:5
185:21 199:15 206:9 207:12
230:21 236:21
**timesheets** 22:19,22 23:12
122:4
**timing** 245:4
**tiny** 82:13 110:22
**tip** 65:16
**title** 8:14 9:16 27:17
**titles** 25:7
**TMJ** 204:19,22,24 205:5,17
205:21 213:10,14
**to-do** 101:6 189:6
**today** 43:7 88:15 90:24 92:10
141:1,15 151:10,18 155:13
180:5 235:7 255:12 258:1
**today's** 32:14 63:24 162:2
211:13,14
**told** 44:15,16 45:12 60:20
182:24 198:19 220:15,20
**ton** 74:6
**tongue** 65:16
**top** 20:17 28:3 39:17,23 51:1
54:16 71:19 77:11 88:14
114:3 125:14 195:12,15

206:1 227:8,10
**topic** 141:2 162:15 254:22
**torment** 173:4
**torture** 162:20 181:23
**totally** 69:10 72:20,21 146:6
**touch** 111:9
**touched** 240:21,22
**tough** 66:17 68:9,9 84:13
124:9 176:5 208:15
**tournament** 194:20 236:10
236:13
**town** 64:18
**track** 92:17 94:21 165:20
200:15
**tracking** 93:5
**trade** 135:10
**trading** 132:7
**traditional** 123:21
**transcript** 253:4,7 262:7
**transfer** 34:3
**traveling** 200:16
**tread** 208:11 210:18,18,18
**treasurer** 9:12
**treat** 205:13
**treated** 145:2 205:16
**treating** 189:1
**treatment** 185:17 187:11
189:18,20 199:21 205:14
**treats** 205:4
**trees** 21:20 78:8,9 80:3,9,24
81:18
**trial** 58:20 61:23 168:9
170:22 171:13
**triathlon** 190:24 193:20
**triathlons** 193:13
**tried** 49:10 54:2 144:15 200:8
200:12 225:10
**tries** 180:22
**trigger** 212:10
**triggered** 194:14 217:11
239:21
**trip** 235:13 236:9
**triple** 52:3
**tripping** 80:19
**trouble** 120:18,20
**true** 45:22 46:6 47:6,19 70:14
77:10 100:5 189:7 218:17

**PATRICIA WEISER**

298

221:20 238:13 248:3 262:7
**truly** 54:2 107:16 180:10
**trust** 41:16 101:18,18 250:18
**trusted** 15:10 143:9,15
**trusting** 99:13
**trusts** 123:23
**truth** 73:4
**try** 49:1 86:15 87:8 125:14
   137:13 138:18 144:14,18
   145:4 158:16 180:17 181:4
   181:9 183:1 191:18 200:9
   205:8 208:8 230:17 257:18
**trying** 19:5 45:3 51:18 75:21
   82:22 84:1,17 118:2 132:4
   135:4 142:21 145:6 175:14
   175:14 176:15 178:18 179:7
   179:19 182:14 183:10
   198:10,11 205:10 208:7
   214:7 220:22 258:13,18
**Tryon** 18:22 22:12
**tub** 194:15,16,23 195:2,5
**tubs** 194:21
**turn** 51:24 107:4 158:19
   182:8,10,12,20 213:7
**turned** 112:18 147:14 158:7
   166:2 217:13
**twelve** 229:14
**twenty** 143:19 146:13 207:22
   250:12
**twice** 91:15 115:9 198:5
**two** 8:11 16:18 47:18 48:1,1
   49:4 51:16 52:17 55:23,24
   56:1,1,4,5,5,11,19 57:2 69:2
   69:19 74:24 75:6 76:21
   82:3,4 86:16 89:7 91:5,6,13
   91:21 102:3 106:10 110:5
   110:17,24 115:10 116:8
   119:11,13 144:16 151:23
   158:3 176:14 177:8,23
   201:11 211:5 214:13 225:17
   232:9 235:24 245:1 252:7
   252:10
**two-minute** 254:24
**two-way** 136:9
**type** 13:24 18:18 20:6 41:1,4
   132:1 134:18,21 156:18
   185:14

**types** 29:8 36:6,8 41:5 69:13
   115:20 136:6 226:7 244:10
**typically** 22:17
**typing** 168:3
**Tyson** 2:8 4:23 232:13

--- U ---

**ugliness** 72:11
**Uh-huh** 17:23
**ultimately** 70:2,8 71:13 224:9
   260:21
**Um** 17:11 79:21
**Um-hmm** 16:14 26:5 110:9
**Umm** 16:21
**un** 72:20
**unable** 208:20,24 236:8
**unbearable** 195:16,16
**uncertainty** 67:12,19 223:17
   229:5 255:23,24
**uncontrolled** 180:2
**underestimated** 177:22
**undergrad** 6:21,22,23,24 7:1
   7:4
**understand** 8:19 37:12 97:19
   129:11 130:23 131:6 142:19
   151:1,4 196:9 213:4,5,8
   246:20 258:21,23
**understanding** 77:19 80:8
   162:20 212:3 220:9
**understands** 136:20 252:2
**Understood** 31:6 98:11
**underwriting** 241:10
**unearthed** 135:24
**unexplained** 106:22
**unfortunate** 55:2
**unfortunately** 235:19
**unfounded** 60:9 150:14
**ungodly** 58:11
**unique** 123:14
**United** 1:1,22 4:6
**University** 6:15,22
**unknown** 57:18
**unnecessary** 85:2
**unnerving** 57:15
**unreasonable** 224:8
**unsolicited** 132:23
**unsure** 223:13

**unsustainable** 194:7
**untrue** 70:14 77:15,16
**untruths** 141:10,13 249:7
**up-to-date** 92:12,18
**update** 89:5,18 173:23
**upgrade** 88:1 89:5
**ups** 212:6
**upset** 51:23,24 175:17,18
   176:14 177:15,15,16 178:13
   178:13 208:18,23 211:15
   212:4 221:14,23,24 222:4,6
**upsetting** 32:16 57:15 99:21
   100:23 101:23 175:3
**upstanding** 73:3
**use** 10:15 15:10 25:1,5 34:5
   79:11 82:16,22 88:9 96:13
   187:9 214:22 253:5
**uses** 24:21 169:17 187:10
   192:16
**usual** 70:18
**usually** 34:6 36:20 133:5
   174:22 175:4 230:5
**utilize** 96:2
**utilized** 14:13 95:21

--- V ---

**vacant** 82:5,6,7,19
**vacation** 65:6 235:8
**Vaccaro** 105:19
**Vaccaro's** 104:10,20 106:2
**vague** 20:23 161:7
**valid** 249:8
**value** 76:16 83:22 85:13,13
   85:22 86:1,3,10,11
**valued** 68:4 241:12
**values** 86:13
**variety** 131:13,24 190:10
**various** 87:23 135:24 199:15
   201:4 206:9
**vehicle** 164:20 202:14 215:7
   247:4 249:3
**vehicles** 85:24 86:2 214:4
   215:14
**vendor** 89:18 169:16,19
   170:13
**vendors** 10:15,17
**version** 108:14 109:8,10,19

PATRICIA WEISER

299

118:10
**versions** 87:3 118:5
**versus** 4:9 207:2 217:9,15 258:16
**vet** 95:22
**vexatious** 182:15 222:3 238:12
**vice** 9:3
**video** 2:20 4:1,12 5:2,10 17:11 28:22,23 29:5,6,19,19 30:3,4 63:5,6,9,10 102:17 102:18,21,22 146:24 147:1 147:3,4 184:19,20,23,24 232:20,21,24 233:1 255:4,5 255:8,9 260:24 261:1
**videotaped** 1:12 28:24 29:21 261:4
**view** 200:18 208:17 260:10
**vigorous** 15:6
**Villanova** 64:19,22
**Virginia** 194:19,22 195:6,20 196:13
**virtual** 39:18
**visibility** 162:9 163:1,2,14,15
**VP** 9:6,20
**vs** 1:7

---

**W**

**W-2** 90:21
**W-4** 152:17
**W-9** 152:12,14,17,18,18,21 153:7,18,21 154:3,10,19,22 154:24 155:7,10,10
**wait** 108:2 177:5,5,5 214:8 228:18
**waiting** 71:15 72:18 232:7 239:8
**wake** 196:3,4
**walk** 251:8
**walked** 198:18
**walking** 204:1
**wall** 140:13 141:14,20,22 145:10 161:18 162:5,9,10 163:14,17 174:9 232:4
**want** 6:18 10:9 12:5 22:13 35:1 47:21 48:20 53:12 58:9 60:16 62:18,21 68:14

68:15 70:12 72:10 85:11 89:6 103:5 108:17 134:9 137:2 139:1,5 143:16 145:21,23,24 175:17 177:1 179:5,6 182:7 190:15 208:1 208:12,22,22 235:11 239:3 239:3,4 243:1 247:12 250:17 251:8 252:8,11,18 257:9 258:9 259:24
**wanted** 49:15 51:13 52:4,7 53:2,3 84:19,20 99:1 111:21 111:24 115:5 240:11
**wanting** 125:8
**wants** 26:11 130:5 210:21
**wardrobe** 197:9
**wasn't** 18:11 37:3 48:6,14 51:7 60:22 75:19 80:17 97:21 121:21 149:15 178:8 196:11 220:4,5,10 221:14 225:20 237:17
**watch** 191:8
**watching** 191:10 195:9 203:24
**water** 184:18
**wave** 174:22
**waves** 176:24 177:9 231:23
**way** 48:1 50:23 51:13 52:4 53:6 55:2 67:5 68:12 106:18 125:12 131:24 132:9 148:23 161:13 168:12 196:10 202:21 221:13,17 222:18,19 223:21,22 232:18 239:5,5,6 240:8,9 241:21,23 242:17,17 243:4 247:8 252:14,15 254:4
**ways** 85:8 119:11,13 131:13
**we'll** 53:14 68:8 146:10 174:20,20 179:10,13 180:11 216:6
**we're** 9:17 15:10 30:7 31:2 67:5 70:10 77:21 87:7 112:3 113:3 116:8 120:19 133:22 138:23 144:2 145:8 175:8 178:14 179:9 183:21 190:10 191:9,12 192:5 195:8 200:9,16 202:10,11 203:21,22,23 207:7 211:5

212:23 226:16 230:20 237:20 240:4,4 241:3 243:14,17,18 251:10,11,12 255:2,2,11 259:22 260:1
**we've** 17:14 65:7 66:11 67:17 73:7 85:22 94:2 106:9,19 110:15 112:4 119:4,19,19 164:20 171:21 174:15 192:6 201:4 231:24,24 241:12 247:7 259:13
**wear** 197:10,11,12
**website** 87:10,16,18 88:5,13 88:24 89:8,12,16,19,21 90:15,20,23
**week** 65:7 169:15 194:20 234:22,22 236:12,12,17
**weeks** 47:18 49:4 52:17 181:15,18
**weight** 178:15,16 196:23 197:12
**weightlifting** 190:23 192:10
**weird** 113:14 118:23
**weirder** 44:5
**Weiser** 1:3,5,7 3:5 4:8,13,20 4:21 5:7,14 7:9,12 8:3,8 9:7 16:6,11,12 17:5,8 18:14,20 22:11,16,24 24:10,12 29:12 30:7 33:11 39:9,12,15 40:23 40:24 42:13 43:19 47:4 55:19 56:22 58:5 59:6,23 62:6 63:12 64:6,20,24 65:9 77:2 81:23 89:10 90:15,19 91:2 92:3,8 98:5,13 100:6 102:24 103:3 126:1,14 127:12 128:21 131:2 135:11 137:7,16,19 138:4,14,14 141:18 147:7,12,13 148:9 150:21 152:19,23 153:15 154:21 159:12 160:8,12,24 162:16 166:23 167:4,14 168:10 169:4,17 172:3 173:2,9,13 185:3 188:13,16 188:24 189:8,18 190:6 197:18 199:7 211:17 215:21 217:23 218:3,7 219:8 220:8 221:3 222:12 224:16 231:11 233:5 237:8 244:6 246:17

---

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36
1089

**PATRICIA WEISER**

300

246:22 248:5,11 255:14,14 257:20
**Weiser's** 180:9 194:4 211:21
**well-being** 186:1
**well-known** 96:15
**Wellness** 201:1
**went** 6:15 15:5 16:18,20 60:8 60:22 61:3 67:20,23 70:21 74:12 75:7 83:21 85:1 89:8 124:24 152:2 154:9 195:23 195:23 198:20,23 221:17 231:3 235:16 243:9
**weren't** 60:23 61:18 82:16 110:17 218:15 225:11 231:5
**Western** 195:4
**what-have-you** 212:3
**whatsoever** 48:16 250:20
**whistleblowers** 170:4
**Widener** 6:15
**wife** 207:11 208:18 210:23
**Wildwood** 192:3
**willing** 179:1
**willingness** 75:14 259:8
**wills** 123:23
**win** 179:3
**winning** 179:4,4
**wire** 34:3
**wish** 255:21
**withdraw** 137:12
**withdrawing** 148:1
**witness** 3:3 5:6 8:18 12:1 13:9 14:5 19:15 21:12 26:2 28:20 29:7,17 31:22 33:16 42:18 43:14 45:10 74:1 76:3 80:1,6 81:13 96:7 104:24 116:22 117:9 135:13 138:7 142:10,14 146:23 148:3 153:4 159:21 163:20 167:18 169:22 171:10 184:17 216:7 226:24 249:15 249:18,22 253:21 258:5 260:15,21 261:3
**witnesses** 244:6 248:10
**woke** 177:12
**Wolf** 91:12,19
**woman** 27:3 174:5
**won** 247:18

**wonder** 205:12
**wondering** 71:13
**word** 101:14,14 173:24 208:23
**words** 107:8,9,12,15
**work** 12:3 13:19,22 14:24 15:11 16:10,21 24:6,17 31:11,18 34:2 54:15 55:8 68:14 73:23 74:24 75:15 89:23 90:1 93:22 95:14 96:21 97:21,22,23 101:20 103:1 121:10 122:8 132:1 133:11 136:21 138:20,22,24 139:1,4,5 140:22 144:19 149:13 152:1,7 153:15,22 154:6 162:3 171:1,2 181:10 181:11 183:6 192:4,7 220:20 234:8,13,14 240:10 241:14 245:3 256:10 257:11 259:18
**worked** 16:17,18,19,22 23:17 28:6 31:24 55:6 73:8 75:18 87:24 91:15,16 93:24 94:14 97:19 111:8 123:12 136:14 139:6 143:5 146:13 154:11 164:7 187:12 192:14 238:20 245:1
**worker** 186:11
**workers** 15:2
**working** 6:19 19:8 22:21 56:2 56:6 72:7 74:4 75:19 82:18 103:6 181:7 228:22 234:20 239:18 242:12
**works** 94:18 133:16 134:11 136:21 138:4 187:11 200:10 234:1
**world** 115:8 135:19 145:24 173:20 179:24 210:2
**worse** 189:16 202:8 204:14 204:18 205:3,23
**worth** 137:3
**worthy** 254:14
**wouldn't** 60:21 62:4 99:1 101:22,22 102:1 106:1,3,7 127:20 154:8,16 168:14,15 168:16 182:6 213:21 250:17 250:19

**Wow** 191:14
**Wrangler** 214:7,9,15,15
**wrap** 191:18
**write** 19:19
**writes** 100:4
**written** 11:3,7 20:9 57:14 92:4 130:15,18 152:14 154:24 170:17 206:8
**wrong** 25:16 133:12 143:20 143:22 144:23 146:14,16,17 150:2,19 180:13 259:14
**wrongdoing** 142:17,19
**wrongdoings** 133:5
**wrongs** 132:5 135:23 208:8
**wrote** 19:19 154:2

---
**X**
---

**X** 3:1,14

---
**Y**
---

**Yates** 244:14 249:10 250:8 250:11,14 251:5 252:4 253:5,6,13,17 254:20
**yeah** 7:2 8:18 9:4,6 11:8 12:1 12:7 17:20 20:17 26:16,24 28:17 30:15,17 31:6 32:4,11 39:24 47:13 49:23 59:12 63:2 64:2,21 65:17 66:15 74:12 78:4 81:14 85:20,20 88:4,16,19 90:4 95:1 96:7 98:20,20 99:7,16 101:20 102:15 105:6,11,15 107:7 109:1,9 117:13 118:8 120:9 121:20 125:23 139:14 145:15 146:20,23 147:22 153:4,9 156:15 157:3,9 159:10 164:14 169:13 170:11,24 172:7,16 177:9 185:9 189:15 192:18 196:17 201:6 203:2 206:10,12 213:18 217:7 221:11 223:19 224:6 225:2 231:4 232:15 234:14 235:5,9 237:16 244:3 248:8 249:2,5,15 252:14 256:23 258:5 259:6
**year** 6:17,20 16:18 17:20 21:24 22:2,2,2,4,9 39:20

**PATRICIA WEISER**

301

65:8,22 66:23,24 67:14,21 67:21 68:2,2,7,9,9,20,20 71:9,9 74:12,12,17,22 83:18 84:1 89:7 111:20 126:5,9 127:24 154:14,18 171:11 200:12 227:11 229:21,21,23 235:12 240:23,24 241:2,4 243:6,6
**year-over-year** 65:22 74:16 78:3
**year-to-year** 65:10
**years** 16:20,22 20:18 22:3 23:1 28:7 65:18 66:11 67:2 69:7 74:24 75:6,21 80:10 82:23 84:9,9,10 85:18 86:9 88:1,11 89:1 91:19 92:15,16 97:9,11 98:4 99:12 106:19 108:15 112:4 124:21,24 139:3,7,16 141:5 142:1 143:19 144:14 145:1 146:13 155:14,16 162:15 171:22 174:15 175:7 177:10 179:24 189:16 190:11 196:3 205:3 206:9 207:23 214:10,12,13 229:11 230:6 232:2,7,12 233:12 234:7 237:1 240:21 242:3 247:16 250:12 259:17
**yell** 212:2
**yesterday's** 162:1
**yoga** 200:10,12,13,18 205:7
**young** 213:7
**younger** 194:20 214:2
**youngest** 198:10
**Yup** 217:21

_____
**Z**
_____
**zero** 161:14
**ZIP** 79:18
**zoom** 1:12 4:4 63:24 95:5 172:13
**zoomed** 95:9

_____
**0**
_____
**02728** 4:8

_____
**1**
_____
**1,000** 36:20 82:13,13 154:5,7

242:24
**1,500** 82:13 154:1
**1:00** 62:24
**1:04** 102:17
**1:36** 102:21
**10** 76:17 94:22
**10(b)** 69:13
**10,000** 75:24 76:3
**10,000,000** 76:2,4,9,13,14,17 238:8,15
**10:00** 4:3
**10:03** 1:18
**10:05** 5:11
**10:37** 28:22
**10:38** 29:5
**1099** 14:16 98:9 152:2,10,11 152:23 153:7,16 154:12,15 154:19,20,20 155:2,3,7
**1099s** 155:21
**10th** 192:2
**11** 69:14 80:11
**11:03** 30:3
**11:51** 63:5
**12,000-square** 81:22
**12:08** 63:9
**121** 2:9
**1500** 2:9
**1520** 1:16,22
**17** 75:7
**17th** 1:16,22
**18** 75:7
**19103** 1:23
**19107** 2:10
**194** 172:24 173:5
**19406** 2:5
**1969** 233:16
**1986** 17:14 174:15
**1996** 6:10,18

_____
**2**
_____
**2:19-CV-02728-MSG** 1:2
**2:36** 146:24
**2:40** 147:3
**20** 74:21 81:5 141:4
**20-odd** 139:7
**20-plus-odd** 139:3
**20-year** 21:16

**200** 154:7,8
**2000** 16:21 97:5,6,22 136:15
**2004** 7:13,14,15
**2005** 7:14 22:13
**2006** 22:14
**2007** 97:22
**2008** 12:8 95:13 97:8
**2010** 80:10 214:10
**2011** 84:1
**2012** 6:1,4,5 31:9,10 36:12 112:6 136:18 198:9 209:8
**2014** 11:6
**2016** 89:11,13 90:1,6,11 171:14,24 183:14 189:12 192:20 199:8,11,20 201:10 201:15 214:4,12 252:4
**2017** 12:9 43:20 56:22 65:18 65:20 71:4 93:8,12 94:4 95:13 97:8 104:15 105:20 123:16 171:16
**2018** 65:18,20,20
**2019** 201:22 204:13
**2020** 27:23,23 28:1 38:23 81:2,3,7,11,12
**2021** 81:3
**2022** 1:18 4:3
**21** 1:18 81:5
**215** 1:23
**21st** 4:3
**22** 79:17
**25,000** 58:9
**2nd** 43:20

_____
**3**
_____
**3:34** 184:19
**3:41** 184:23
**30** 1:16,22 141:5
**300** 2:5
**356** 84:2,4
**365** 25:5 26:21

_____
**4**
_____
**4,000,000** 60:23
**4:52** 232:20
**400** 154:8
**400,000** 59:4 60:23
**40th** 215:11

**PATRICIA WEISER**

302

**450,000** 59:4
**46** 172:10
**49** 8:9

_____5_____

**5** 3:7 7:13 102:3
**5,000** 36:20
**5:00** 232:24
**5:31** 255:4
**5:34** 255:8
**5:42** 260:24 261:5
**500** 153:24
**500-square** 111:1
**51** 8:10
**564-1233** 1:23
**59** 95:9
**5th** 233:16

_____6_____

_____7_____

**7** 22:14

_____8_____

**8th** 2:4

_____9_____

**900** 2:4
**90s** 6:11 17:11
**96** 17:12
**98** 17:12,12,12,12,12,20

# EXHIBIT "C"

EXHIBIT 36
1093

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **THE WEISER LAW FIRM, P.C., and** | : | **CIVIL ACTION** |
| **ROBERT B. WEISER, ESQUIRE** | : | |
| | : | |
| **v.** | : | **NO.: 2:19-CV-02728- KSM** |
| | : | |
| **MICHAEL HARTLEIB** | : | |
| | : | |

## DEFENDANT, REQUEST FOR ADMISSIONS, INTERROGATORIES AND, REQUEST FOR PRODUCTION OF DOCUMENTS TO BE DIRECTED TO PLAINTIFFS THE WEISER LAW FIRM, P.C. AND ROBERT B. WEISER, ESQUIRE

Pursuant to Federal Rules of Civil Procedure 33, 34 and 36, Defendant Michael Hartleib, by his undersigned attorneys, Goldberg, Miller & Rubin P.C., hereby serve the following Requests for Admissions, Interrogatories, and Request for Production of Documents (collectively, "Requests") upon Plaintiffs The Weiser Law Firm, P.C. (the "Law Firm") and Robert L. Weiser, Esquire ("Weiser").

## DEFINITIONS

1.    "Communications" shall mean any written or oral transmission of fact, information or opinion, including any utterance, notation or statement of any nature whatsoever and including, but not limited to, documents maintained in hard copy, electronically or otherwise, as well as written, oral and/or electronic correspondence as defined herein.

2.    "Complaint" shall mean the Complaint filed by Plaintiffs in the United States District Court for the Eastern District of Pennsylvania, currently pending, captioned *The Weiser Law Firm et al v. Hartleib,* Civil Action No. 2:19-CV-02728-MSG-KSM, as well as, with respect to any supplemental Requests or supplemental responses to these Requests, any subsequent amended Complaint(s) filed by Plaintiffs, or any of them.

EXHIBIT 36
1094

3.    "Ross-Williams v. Bennett" or "Ross-Williams" shall mean all proceedings, filings, docket entries, communications and record entries in Kansas trial Court and Court of Appeals in Ross-Williams v. Bennett.

4.    "Billing records" shall include all documents used for the billing, tracking, submission, invoicing, and payment for work performed by "Silow" or "you" or "Plaintiffs" as defined below including, bills, invoices, time sheets, time logs, spreadsheets, log notes, billing notes,  and communications regarding these topics and documents.

5.    "Kansas Courts" shall collectively mean the Kansas trial Court and Court of Appeals.

6.    "Declarations" shall mean the declarations referenced as part of the record by the Kansas Courts in Ross-Williams v. Bennett and other similar sworn statements including those submitted in the "several occasions" you employed "Silow" "between 2008 and 2017" as described in paragraph 59 of your Complaint.

7.    "Silow" shall mean the Jeffrey M. Silow that performed work on behalf Plaintiffs under the name Alexander Jeffrey Silow in the Sprint litigation referenced in the Complaint.

8.    "Plaintiffs" shall mean The Weiser Law Firm and/or Robert Weiser, Esquire and/or any person(s) or entity/ies acting on his/their behalf in past, present or future.

9.    "Defendant" or "Hartleib" shall mean Michael Hartleib and/or any other person or entity acting on his behalf in any way, at any time, and for any reason.

10.    "You" or "Yours" shall mean the parties to whom these Requests are directed and/or any other person or entity acting on their behalf, including but not limited to their agents, servants, employees, and their respective agents, servants and employees or other person acting for or on his behalf in any capacity.

EXHIBIT 36
1095

11.    "Document" and "Documents" shall mean any papers, writings, or records of any type or source of authorship in your possession, custody, or control or of which you have knowledge, wherever located, however produced or reproduced, regardless of whether a draft, original or copy, including electronically generated information and electronically stored information. By way of illustration and not limitation, the term "Documents" shall include memoranda of telephone conversations, summaries, drafts, diaries, or other records of personal conversations or interviews and minutes, summaries or other records of meetings, discussions, or conferences; as well as other notes, reports, records, data, databases, memoranda, correspondence, electronic mail, notebooks, Dropbox files and/or documents stored in other web-enabled information/document sharing services, scrapbooks, diaries, minutes, financial statements, ledgers, videotapes, magnetic tape or other sounds recordings, CDs, DVDs, telegrams, photographs, drawings, plans, studies, manuals, instructions, bids, specifications, graphs, sketches, blueprints, charts, curves, motion picture film, microfilm, computer records, cell phone records including text messages, photographs, photographic negatives, photocopies, photostats, descriptions, purchase orders, agreements, contracts, invoices, bills of lading, published or unpublished speeches, manuscripts or articles, transcripts, affidavits, deposition transcripts, deposition exhibits, hearing transcripts, hearing exhibits, trial transcripts, trial exhibits, printed matter, publications and any other retrievable intelligence, however recorded, memorialized or preserved. This definition includes but is not limited to any electronically stored data on magnetic or optical storage media as an "active" file or files (readily readable by one or more computer applications or forensics software); any "deleted" but recoverable electronic files on said media; any electronic file fragments (files that have been deleted and partially overwritten with new data); and slack (data fragments stored randomly from random

EXHIBIT 36
1096

access memory on a hard drive during the normal operation of a computer [RAM slack] or residual data left on the hard drive after new data has overwritten some but not all of previously stored data). Any original or copy containing or having attached thereto and any alterations, notes, comments, or other material not included in each other original or copy shall be deemed a separate Document within the foregoing definition.

12.    With respect to these Requests:

   a. "Each" includes the word "every," and "every" includes the word "each."

   b. "Any" includes the word "all," and "all" includes the word "any."

   c. "And" includes the word "or," and "or" includes the word "and."

13.    "Refer" or "Relate" or "Regard" shall mean directly or indirectly mentioning or describing, pertaining to, being connected with or reflecting upon a stated subject matter.

14.    "Referring to" and/or "Relating to" and/or "Regarding" shall mean directly or indirectly, in whole or in part, constituting, evidencing, recording, reflecting, substantiating, describing, summarizing, identifying or referring or related in any way.

15.    "Identify" shall mean when used in reference to:

   a. A natural person—his or her full name and present or last known address.

   b. A company, corporation, association, joint venture, sole proprietorship, form, partnership, or any other business or legal entity not a natural person—its full name now and at the time in question, its principal place of business now and at the time in question, date of incorporation or jurisdictional status, description or type of entity now and at the time in question, date and place of formation, current jurisdictional status, and nature of business activities in which it is engaged or was engaged at the time in question.

EXHIBIT 36
1097

c. A document — its character (e.g. letter, memoranda, report, etc.), its title, date, author, addresses, all distributes, the number of pages, its subject matter, and identification of each person Plaintiff has reason to believe may have knowledge of the contents thereof, its present location, the identification of its custodian, or if any such document was, but is no longer in existence or in your possession or subject to your control, the disposition made of it and the circumstances and date of such disposition, as well as the document retention policy of those previously in control of said document.

d. An oral statement or communication:

i. the date and place where uttered;

ii. the place where received;

iii. the substance thereof;

iv. the means or medium employed for transmission thereof; and

v. the identification of each person to whom such statement or communication was made, each person who was present when such statement or communication was made, and each person who was present when such statement was received.

e. Any other thing—a description with sufficient particularity that such thing may thereafter be specified and recognized as such.

16.  "Litigation" shall mean the legal action initiated by the Complaint.

17.  "Cases" shall mean legal actions filed in state or federal court.

**<u>INSTRUCTIONS</u>**

EXHIBIT 36
1098

1.      Each of the Requests and Interrogatories shall be deemed continuing so as to require, in accordance with the Federal Rules of Civil Procedure, the additional production of information if it is discovered subsequent to the date of your response hereto.

2.      If any of the Requests is deemed to call for disclosure of proprietary non-privileged information Defendant prepared to receive such information pursuant to an appropriate order or stipulation with respect to confidentiality.

3.      If you object to producing a response to any Request or Interrogatory for any reason, state the nature of the objection, the extent to which it applies to the Requests and, to the extent that the objection does not apply, provide the requested information.

4.      To the extent precise and complete information cannot be furnished, such information shall be supplied as is available. Where firsthand knowledge is not available, you should respond to the best of your information and belief, and any such response should be so described.

5.      The fact that your investigation is continuing, or that discovery is not complete, should not be used as an excuse for failing to provide responses that are as full and complete as possible as of the date of response. The omission of any name, fact, date, description or other item of information from the response shall be deemed a representation that such name, fact, date, description or other information was not known to, or in the possession, custody or control of, you or anyone acting on your behalf at the time of service of your response.

6.      These Requests are not directed merely to the party whose name appears above, but are meant to include that party's past and present agents, servants, insurers, employers, employees, investigators, attorneys, and others similarly situated to the named party or person, including, but not limited to, directors, trustees, officers or other officials.

EXHIBIT 36
1099

7.	Whenever any of the Requests seeks information which is not available to you in the form requested, but is available in another form or can be obtained at least in part from other sources in your possession, you should so state and either supply the information requested in the form in which it is available or supply the sources from which the information can be obtained.

8.	If any ambiguity in construing either the Requests or a Definition or Instruction relevant to the inquiry contained within the Requests is encountered, you shall identify the matter deemed ambiguous and set forth the construction chosen or used in the response.

9.	In answering these Requests, you shall furnish all information available to you at the time of answering including information in the possession of your representatives, agents or attorneys. You shall supplement your answers whenever necessary in accordance with the Federal Rules of Civil Procedure.

10.	Each Request shall be answered separately and as completely as possible.

11.	If you are unable to answer an Request after you have attempted to obtain the information, answer to the extent possible. State what information you have concerning the unanswered portion, specify why you are unable to answer the remainder, and specify how you attempted to obtain the unknown information.

12.	Except as otherwise stated, each Request requests information for the period of 2008 to the present. If any form of privilege or other protection from disclosure is claimed as a ground for withholding responsive information contained in a document, set forth with respect to the document, the date, title, identity of the author (including the individual's title), a brief description of the subject matter (without revealing the information for which privilege is claimed), to whom a communication was directed (including the individual's title), and all facts

EXHIBIT 36
1100

or bases on which you claim the privilege. The claim should contain such specificity as to permit the Court to make a full determination of its validity.

      13.    For each Request:

a. They are directed to both Plaintiffs.

b. Identify the person who has answered the Request;

c. Identify each document relied on, or which forms a basis for the answer, or which corroborates the answer given. Cite the specific pages of each document on which you rely; and

d. Identify each person who assisted or participated in preparing and/or supplying any of the information given in answer to, or relied upon in preparing answers to, the Request.

## **<u>REQUEST FOR ADMISSIONS</u>**

1.   Admit that you held out Silow as "of counsel" at the Weiser Law Firm in <u>Ross-Williams v. Bennett</u>.

2.   Admit that you held out Silow as "of counsel" at the Weiser Law Firm in other cases.

3.   Admit that the Weiser Law Firm submitted a firm resume that was part of the record in the <u>Ross-Williams v. Bennett</u> case.

4.   Admit that the firm resume of the Weiser Law Firm submitted in <u>Ross-Williams v. Bennett</u> listed "Alexander Jeffrey Silow" as being "admitted to practice in Pennsylvania and the District of Columbia".

5.   Admit that you submitted this firm resume listing "Alexander Jeffrey Silow" as being "admitted to practice in Pennsylvania and the District of Columbia" in other cases.

6.   Admit that the firm resume of the Weiser Law Firm submitted in <u>Ross-Williams v. Bennett</u> contains false information.

EXHIBIT 36
1101

7. Admit that prior to January of 2017 you were aware that Silow's actual name was Jeffrey M. Silow or some other iteration such as Jeffrey Silow Jeff M. Silow or Jeff Silow.

8. Admit that you addressed Silow as Jeffrey or Jeff in your communications with him.

9. Admit that prior to January of 2017 you were aware that Silow was not barred in the state of Pennsylvania.

10. Admit that prior to January of 2017 you were aware that Silow was using his son's Pennsylvania bar idea.

11. Admit that you received an email from Jessica Abelson of Abelson Legal Search on June 27, 2008 identifying Silow as Jeffrey Silow, Esq. and attaching his resume.

12. Admit that the attached the resume you received from Abelson Legal Search identifies Silow as Jeffrey Silow, Esq.

13. Admit that the Silow resume you received from Abelson Legal Search does not state that Silow is barred in the state of Pennsylvania.

14. Admit that the Silow resume you received from Abelson Legal Search does state that Silow is barred in the District of Columbia.

15. Admit that at the time you received the Silow resume from Abelson Legal Search in June of 2008, Silow was barred in the District of Columbia.

16. Admit that you were not "defrauded" by Abelson Legal Search as alleged in paragraph 68 your Complaint.

17. Admit that you recruited Monica Ross-Williams to be a plaintiff in the Sprint litigation.

18. Admit that after Hartleib rejected your invitation to resolve the Sprint case you hired an investigator to investigate Hartleib.

EXHIBIT 36
1102

19. Admit that you did not communicate to Monica Ross-Williams that you were investigating Hartleib.

20. Admit that the Ross-Williams case was lawyer-driven litigation.

21. Admit that that the trial court's decision to reduce the attorneys' fees in Ross-Williams v. Bennett, 2016 WL 6888094 (Kan.Dist.Ct. Nov. 22, 2016) occurred before the Kansas Courts were made aware of Silow's actual identity and bar status.

22. Admit that you submitted declarations to the Kansas trial court in support of the attorneys' fees requested in Ross-Williams v. Bennett.

23. Admit that submitted declarations to the Court of Appeals of Kansas in support of the attorneys' fees requested in Ross-Williams v. Bennett.

24. Admit that Silow submitted declarations to the Kansas trial court in support of the attorneys' fees requested in Ross-Williams v. Bennett within the scope of his employment with you.

25. Admit that Silow submitted declarations to the Court of Appeals of Kansas in support of the attorneys' fees requested in Ross-Williams v. Bennett within the scope of his employment with you.

26. Admit that Silow made false statements in his declarations in Ross-Williams v. Bennett case within the scope of his employment with you.

27. Admit that you reviewed Silow's billing records before requesting the attorneys' fees in the proposed settlement in Ross-Williams v. Bennett.

28. Admit that you have no work product for the work performed by Silow in Ross-Williams v. Bennett.

EXHIBIT 36
1103

29. Admit that you approved Silow's billing records and/or entries before requesting the attorneys' fees in the proposed settlement in <u>Ross-Williams v. Bennett</u>.

30. Admit that, regardless of your knowledge or intent at the time, you made false statements in your declarations in <u>Ross-Williams v. Bennett</u>.

31. Admit that, regardless of your knowledge or intent at the time, you made false statements in your motions and briefs in <u>Ross-Williams v. Bennett</u>.

32. Admit that prior to March 6, 2017, you never informed Monica Ross-Williams that you employed a disbarred to perform thousands of hours of work in her case <u>Ross-Williams v. Bennett</u>.

33. Admit that Defendant did not publish the Wall Street Journal article referenced in your Complaint.

34. Admit that you have no factual basis for your allegation that Mr. Hartleib wrote the April 25, 2017 letter referenced attached as Exhibit 17 in your Complaint.

35. Admit that the trial court in <u>Ross-Williams v. Bennett</u> made factual finding that your billing records were not accurate or credible.

36. Admit that billing for illusory work (i.e. work that was not actually performed) by submitting bills that are not accurate or credible would constitute a criminal act.

37. Admit that billing for illusory work (i.e. work that was not actually performed) by submitting bills that are not accurate or credible utilizing a disbarred attorney and getting caught would be embarrassing.

38. Admit that there is a basis to call an organized entity billing for illusory work (i.e. work that was not actually performed) by submitting bills that are not accurate or credible utilizing a disbarred attorney a criminal enterprise.

EXHIBIT 36
1104

39. Admit that there is a basis to call billing for illusory work (i.e. work that was not actually performed) by submitting bills that are not accurate or credible utilizing a disbarred attorney chicanery.

40. Admit that there is a basis to call billing for illusory work (i.e. work that was not actually performed) by submitting bills that are not accurate or credible utilizing a disbarred attorney corrupt.

41. Admit that there is a basis to call billing for illusory work (i.e. work that was not actually performed) by submitting bills that are not accurate or credible utilizing a disbarred attorney fraud.

42. Admit that there is a basis to call billing for illusory work (i.e. work that was not actually performed) by submitting bills that are not accurate or credible utilizing a disbarred attorney and submitting those bills in court threatens "the integrity of the judicial system…".

43. Admit that there is a basis to call billing for illusory work (i.e. work that was not actually performed) by submitting bills that are not accurate or credible utilizing a disbarred attorney and submitting those bills in court "fraudulent acts and a bastardization [sic] of the judicial process".

44. Admit that there was basis to say you had "little credibility" because the Kansas trial court in Ross-Williams v. Bennett held that the billing records you submitted were not "remotely accurate or credible."

45. Admit that there was a basis to state you needed to consult with an ethics attorney as the Court of Appeals for raised the below referenced ethical concerns.

Although we will yield to the disciplinary authorities in the Commonwealth of Pennsylvania—or elsewhere—to sort out what the attorneys representing the plaintiffs in

EXHIBIT 36
1105

these derivative actions knew or should have known about the status of Jeffrey Silow's license to practice law, we find the information provided by Weiser to be very troubling.

Ross-Williams v. Bennett, 55 Kan. App. 2d 524, 543, 419 P.3d 608, 623-24 (2018).

46. Admit that there is a basis to refer to Wall Street Journal article referenced in your Complaint an "embarrassment to the bar!"

47. Admit that based on the opinions of the Kansas Courts, the discovery of Silow's true identity, and the Wall Street Journal article, there was a basis to say your "ill-advised actions" were "making the Weiser Firm radioactive."

48. Admit that the Court of Appeals of Kansas directly questioned the credibility of your representations that you were not aware of Silow's true identity and bar status in the below quotation.

Interestingly, although the résumé of the Weiser Law Firm—which is part of the record on appeal—listed "Alexander Jeffrey Silow" as being "admitted to practice in Pennsylvania and the District of Columbia," Silow's résumé—which was attached to Weiser's letter—listed his name as "Jeffrey Silow" and did not state that he was a member of the Pennsylvania bar. Instead, Silow's résumé only listed the District of Columbia under the heading "Bar Admissions." In a footnote to his letters, Weiser stated that "it appears as though Mr. Silow has also been suspended from the practice of law by the District of Columbia." We note that the District of Columbia subsequently disbarred Silow from the practice of law on December 21, 2017. *In re Jeffrey M. Silow*, 175 A.3d 88 (D.C. 2017).

Weiser evidently continues to believe that Silow actually performed the work reported in the billing records submitted to the district court. Nevertheless, Weiser recognized in his letter "that Mr. Silow had been held out as an active attorney, and that Mr. Silow's declaration, signed under penalty of perjury, states, *inter alia*, that he is a licensed attorney in good standing that had never been the subject of any disciplinary action." Hence, Weiser acknowledges that Silow's "declaration is therefore false in material respects," and as a result, the Weiser Law Firm—which served as the lead counsel in this derivative action—"will not be participating in any recovery that may result from the pending Cross-Appeal."

Although we will yield to the disciplinary authorities in the Commonwealth of Pennsylvania—or elsewhere—to sort out what the attorneys representing the plaintiffs in these derivative actions knew or should have known about the status of Jeffrey Silow's license to practice law, we find the information provided by Weiser to be very troubling.

EXHIBIT 36
1106

Ross-Williams v. Bennett, 55 Kan. App. 2d 524, 543, 419 P.3d 608, 623-24 (2018)

49. Admit that based on the above citation in paragraph 48, there was a basis to state you were "attempt[ing] to obfuscate your chicanery" in the Ross-Williams v. Bennett matter.

50. Admit that based on the above citation in paragraph 48, there was a basis to state your representations to the Court of Appeals of Kansas "were disingenuous at best" in the Ross-Williams v. Bennett matter.

51. Admit that based on the findings of the trial court in the Ross-Williams v. Bennett , including the quotation below, there was a basis to state you were "not serving [Ross-Williams'] interest as a Sprint Shareholder.

The results obtained in the Settlement are not commensurate with the fee requested. An unjustifiably high fee award with respect to the minimal relief obtained abuses the trust of the shareholders. Furthermore, the billing records reviewed by the Court paint a troublesome portrait of exploiting Sprint's missteps for a substantial reward for counsel, and minimal relief to Sprint and its shareholders that suffered.

Ross-Williams v. Bennett, 2016 WL 6888094 (Kan.Dist.Ct. Nov. 22, 2016)

52. Admit that you "really should have been more diligent" when reviewing the bills and credentials of Silow. See paragraph 56 of your Complaint.

53. Admit that you provided the billing records of the Weiser Law Firm to the trial court for in camera review in Ross-Williams v. Bennett.

54. Admit that the billing records you provided for in camera review in Ross-Williams v. Bennett included the billing records of Silow.

55. Admit that trial court in Ross-Williams v. Bennett stated "The Court does not find that Mr. Silow's billing records are remotely accurate or credible."

56. Admit that trial court in Ross-Williams v. Bennett found that the billing records you provided to it were not "remotely accurate or credible."

EXHIBIT 36
1107

57. Admit that the that the billing records you provided for *in camera* review in <u>Ross-Williams v. Bennett</u> are representations of work performed by "you" as defined above.

58. Admit that trial court in <u>Ross-Williams v. Bennett</u> found that representations you made to it were not "remotely accurate or credible".

59. Admit that the Court of Appeals of Kansas found that "a review of the record reveals that the findings made by the district court are supported by substantial competent evidence." <u>Ross-Williams v. Bennett</u>, 55 Kan. App. 2d 524, 563, 419 P.3d 608, 635 (2018).

60. Admit that the Court of Appeals of Kansas agreed that the billing records you submitted were not remotely accurate or credible.

61. Admit that you did not disclose the findings or the opinions of the trial court or Court of Appeals of Kansas in <u>Ross-Williams v. Bennett</u> to the United States District Court for the Northern District of Georgia *In re Equifax, Inc. Derivative Litigation,* No. 1:18-cv-00317-TWT.

62. Admit that you did not disclose the findings or the opinions of the trial court or Court of Appeals of Kansas in <u>Ross-Williams v. Bennett</u> to the United States District Court for the District of Minnesota in *In re CenturyLink Sales Practices and Securities Litigation*, No. 17-md-2795-MJD-MM.

63. Admit that you did not disclose the findings or the opinions of the trial court or Court of Appeals of Kansas in <u>Ross-Williams v. Bennett</u> to the United States District Court for the Southern District of Ohio in *In re Big Lots, Inc. Shareholder Litigation*, No. 2:12-cv-445.

64. Admit that the holdings of trial court and Court of Appeals of Kansas in <u>Ross-Williams v. Bennett</u> is embarrassing to you.

EXHIBIT 36
1108

65. Admit that Ted Frank of the Hamilton Lincoln Law Institute (f/k/a Center for Class Action Fairness) told you he was aware of Silow's true identity and bar status and provided you the opportunity to disclose Silow's true identity and bar status to the court in Ross-Williams v. Bennett.

66. Admit that prior to January of 2017 you were aware that Silow was using his son's identity.

67. Admit that prior to January of 2017 you were aware that Silow was using a false identity.

68. Admit that you have collected/received over a million dollars in attorneys' fees for work performed by Silow over the course of his employment with you.

69. Admit that prior to January of 2017 you had met Silow in person.

70. Admit that prior to January of 2017 you were aware Silow has son named Alex or Alexander who practiced law in Pennsylvania.

71. Admit that Robert Weiser has not sought any medical, psychiatric, or psychological treatment for the harm alleged in paragraph 201 of your Complaint.

72. Admit that you have no documentation evidencing your allegation that Mr. Hartleib proposed a consulting agreement.

73. Admit that your decision not to represent Mr. Hartleib in a Sprint shareholder derivative action was due to his opposition to involving the "Robbins Geller" and/or "Robbins Arroyo" firms referenced in your Complaint.

74. Admit that Monica Ross-Williams was not involved in the Ross-Williams case other being a named plaintiff prior to being contacted by Mr. Hartleib.

EXHIBIT 36
1109

75. Admit that after the initial retention and pleadings Monica Ross-Williams was not involved in the Ross-Williams case other being a named plaintiff prior to being contacted by Mr. Hartleib.

**<u>INTERROGATORIES</u>**

EXHIBIT 36
1110

1. Please identify the name, address, and office of Robert Weiser's current primary care physician and the name, address, office and relevant dates of all of Mr. Weiser's primary care physicians over the past ten (10) years.

2. Please identify any prescriptions filled by Robert Weiser as well as the name and address of the pharmacy(ies) used to fill them. Please identify by name and address every pharmacy Robert Weiser has used to fill prescription medication in the past ten (10) years.

3. Please identify the name, address, and office of Robert Weiser's current mental health provider (i.e. psychiatrist, psychologist, counselor, social worker, etc) and the name, address, office and relevant dates of all of Mr. Weiser's mental providers over the past ten (10) years.

4. Identify all contracted, "of counsel", or document review professionals you have employed in the last seven years, the cases they worked on, the dates of employment, and their most recent contact information including address, email, and phone numbers.

5. Identify all cases Silow worked on behalf of Plaintiffs.

6. State the total amount of hours billed by Silow on behalf of Plaintiffs and the total dollar amount billed for all of the work by Silow on behalf of Plaintiffs.

7. Identify all courts notified as referenced in paragraph 64 of your Complaint and produce copies of these notifications.

8. Identify persons or entities who performed the billing audit referenced in paragraph 67 of your Complaint, the scope of the audit, the amount paid by you to have audit performed, and produce any and all communications, documents, and reports related to the audit.

EXHIBIT 36

9.  Identify the public relations firm referenced in paragraph 84 of your Complaint and provide their contact information.

10. State the basis for your allegation that "[n]early one hundred media outlets picked up and further publicized" the Wall Street Journal article as alleged in paragraph 87 of your Complaint.

11. Identify the persons or entities you hired to investigate Mr. Hartleib and produce the results of the investigation.

12. If you are claiming a loss of income, state the amount you are claiming, and the basis for your calculation.

13. Identify the total amount paid to Monica Ross-Williams as a result of the Sprint Settlement.

14. Identify all software, services, contractors or applications you use for maintaining "billing records" as defined above.

15. Identify all individual(s) who were responsible for or who are currently responsible receivables and/or billing and the storage, maintenance, review, and submission of billing records for the past seven years at the Weiser Law Firm. Please state their job title, describe their responsibilities, and provide dates of employment. If they are no longer employed by you, provide their contact information.

16. Identify all individuals who reviewed and/or approved the billing records of Silow in <u>Ross-Williams</u> and in the "several occasions" you hired him "between 2008 and 2017" as described in paragraph 59 of your Complaint. Please state their job title, describe their responsibilities, and provide dates of employment. If they are no longer employed by you, provide their contact information.

EXHIBIT 36
1112

17. Please state your document or electronically stored information retention policies for case files and billing records and produce any documents stating or regarding these polices.

18. Identify all individuals involved in the drafting, review, and approval of the Weiser Law Firm resume submitted in the Ross-Williams case. Please state their job title, describe their responsibilities, and provide dates of employment. If they are no longer employed by you, provide their contact information.

EXHIBIT 36
1113

## <u>REQUEST FOR PRODUCTION</u>

1.  Identify and produce any and all documents that are referenced in, evidence, concern, support, refute, refer or relate to your responses to Defendant's Requests for Admissions and/or Defendant's Interrogatories.

2.  Identify and produce any and all documents relied upon in preparing your responses to Defendant's Requests for Admissions or Interrogatories.

3.  Identify and produce any and all documents or communications referencing, stating, or indicating that Silow was barred in the state of Pennsylvania.

4.  Identify and produce any and all declarations and/or sworn statements by you and/or Silow in <u>Ross-Williams</u>.

5.  Identify and produce any and all declarations and/or sworn statements by you and/or Silow in the "several occasions" you employed Silow "between 2008 and 2017" as described in paragraph 59 of your Complaint..

6.  Produce the resumes of all contracted attorneys, "of counsel", or document review professionals you have employed in the last seven years.

7.  Identify and produce your entire file in the *The Weiser Law Firm, P.C. v. Abelson Legal Search and Jeffrey Mark Silow* including, but not limited to, any and all filings, pleadings, discovery requests and responses, motions, briefs, subpoenaed documents, deposition transcripts, deposition notices, etc. of all parties, include any correspondence not subject to attorney/client privilege.

8.  Identify and produce any and all work product, including, but not limited to, notes, emails, memorandums, outlines, motions, briefings, declarations, pleadings, discovery authored by Silow in <u>Ross-Williams</u>.

EXHIBIT 36
1114

9.  Identify and produce any and all work product including, including, but not limited to, notes, emails, memorandums, outlines, motions, briefings, declarations, pleadings, discovery authored by Silow, in the "several occasions" you hired him "between 2008 and 2017" as described in paragraph 59 of your Complaint.

10. Identify and produce any and all billing records for Silow for the "several occasions" you hired him "between 2008 and 2017" as described in paragraph 59 of your Complaint.

11. Identify and produced any and all communications with Silow.

12. Identify and produce any and all communications with the real Alexander J. Silow barred in Pennsylvania (Jeffrey M. Silow's son).

13. Identify and produce any and all communications with Abelson Legal Search including, but not limited to, those regarding Silow and/or Mr. Hartleib.

14. Identify and produced any and all internal communications regarding Silow.

15. Identify and produced any and all internal communications regarding Mr. Hartleib.

16. Identify and produce any and all communications with third-parties regarding Silow including, but not limited to, any counsel involved in Ross-Williams, *In re Equifax, Inc. Derivative Litigation,* No. 1:18-cv-00317-TWT, *In re CenturyLink Sales Practices and Securities Litigation*, No. 17-md-2795-MJD-MM, *In re Big Lots, Inc. Shareholder Litigation*, No. 2:12-cv-445, and the Kraft Heinz matters Case No. 1:19-cv-01339 and 1:20-cv-02071.

17. Identify and produce any and all communications with third-parties regarding Mr. Hartleib including, but not limited to, any counsel involved in Ross-Williams, *In re Equifax, Inc. Derivative Litigation,* No. 1:18-cv-00317-TWT, *In re CenturyLink Sales Practices and Securities Litigation*, No. 17-md-2795-MJD-MM, *In re Big Lots, Inc.*

EXHIBIT 36
1115

*Shareholder Litigation*, No. 2:12-cv-445, and the Kraft Heinz matters Case No. 1:19-cv-01339 and 1:20-cv-02071.

18. Identify and produce any and all communications with Monica Ross-Williams regarding the March 2017 contact with Mr. Hartleib and the resulting protective order.

19. Identify and produce any and all communications, contracts, releases, retainer letters, emails, etc. with Monica Ross-Williams regarding Ross-Williams .

20. Identify and produce your state and federal income tax returns for the past seven years.

21. Identify and produce the billing records you submitted for review in Ross-Williams.

22. Identify and produce the billings records in Ross-Williams regardless of whether or not they were submitted for review.

23. Identify and produce any and all documents of Silow's employment with you including expense sheets, resumes, handbooks, policy agreements, checks, paystubs, tax forms, W-9s, W-2s, contracts, engagement letters, retainment letters, or any other document referencing Silow's scope of work with you.

24. Identify and produce the Weiser Law Firm resume submitted in Ross-Williams.

25. Identify and produce the Weiser Law Firm resume submitted during the "several occasions" you employed Silow "between 2008 and 2017".

26. Identify and produce the any and all documentation and communications related to the criminal proceedings against Silow referenced in paragraph 65 of your Complaint.

27. Identify and produce any and all documents regarding the "attorney time" lodestar calculation referenced in paragraph 64 of your Complaint.

EXHIBIT 36
1116

28. Identify and produce any and all documents and communications related to your report to the Disciplinary Board of the Supreme Court of Pennsylvania referenced in paragraph 64 of your Complaint.

29. Identify and produce any and all communications with Bruce Murphy regarding Mr. Hartleib, the retainment letter, the decision whether or not to represent Mr. Hartleib the revisions to the retainment letter, and the decision to represent Monica Ross-Williams.

30. Identify and produce any and all documentation evidencing your allegation that Mr. Hartleib proposed a consulting agreement.

31. Identify and produce any and all documents and/or communications that you contend evidences harm to your reputation or loss of business that you associate with statements made by Mr. Hartleib.


GOLDBERG, MILLER & RUBIN P.C.

BY: _____/s/_____

        Eamon Merrigan, Esquire
        Attorney for Defendant

Date: 10/22/20        State Farm Mutual Automobile Insurance Company

EXHIBIT 36
1117

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **THE WEISER LAW FIRM, P.C., and** | : | |
| **ROBERT B. WEISER, ESQUIRE** | : | **CIVIL ACTION** |
| | : | |
| **v.** | : | **NO.: 2:19-CV-02728- KSM** |
| | : | |
| **MICHAEL HARTLEIB** | : | |
| | : | |

## CERTIFICATE OF SERVICE

I, EAMON MERRIGAN, ESQUIRE, do hereby certify that service of a true and correct copy of the foregoing Discovery Requests have been forwarded to all counsel of record via electronic mail.

GOLDBERG, MILLER & RUBIN P.C.

BY: _____/s/_____
Eamon Merrigan, Esquire
Attorney for Defendant

DATED:  10/22/20

EXHIBIT 36
1118

# EXHIBIT "D"

EXHIBIT 36
1119

## UNITED STATES DISTRICT COURT
### FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| THE WEISER LAW FIRM, P.C. et al : | |
| : | |
| Plaintiffs, : | CIVIL ACTION |
| : | |
| v. : | Case No. 2:19-CV-02728-KSM |
| : | |
| MICHAEL HARTLEIB : | |
| : | |
| Defendant. : | |

### PLAINTIFFS' EXPERT DISCLOSURES
### PURSUANT TO RULE 26(a)(2)(B)

Pursuant to Federal Rule of Civil Procedure 26(a)(2)(B) and the Order of the Court dated March 30, 2022 (requiring counsel for each party to serve "the information referred to in Federal Rule of Civil Procedure 269a)(2)(B)) by expert report or answer to expert interrogatory no later than July 25, 2022"), Plaintiffs, the Weiser Law Firm, P.C. (the "Firm") and Robert Weiser, Esquire ("Weiser" or, together with the Firm, "Plaintiffs"), by and through their undersigned counsel, Silverang, Rosenzweig & Haltzman, LLC, hereby provide the following Expert Disclosures (these "Disclosures") to accompany the expert report of Dr. V. Richard Roeder, Ph.D (the "Roeder Report"), a true and correct copy of which is attached hereto as **Exhibit 1**.

    **(1)**     **Opinions of Dr. Roeder (*Rule 26(a)(2)(B)(i)*):**

Plaintiffs direct Defendant's attention to the Roeder Report, attached hereto as Exhibit 1.

    **(2)**     **Facts and Documents Considered by Dr. Roeder (*Rule 26(a)(2)(B)(ii-iii)*):**

Plaintiffs direct Defendant's attention to the Roeder Report, attached hereto as Exhibit 1.

    **(3)**     **Dr. Roeder's Qualifications (*Rule 26(a)(2)(B)(iv)*):**

Plaintiffs direct Defendant's attention to Dr. Roeder's *curriculum vitae*, attached hereto as **Exhibit 2**.

{01534644;1}                 1

EXHIBIT 36
1120

**(4)    Dr. Roeder's Prior Proffered Expert Testimony (*Rule 26(a)(2)(B)(v)*):**

Dr. Roeder has proffered expert testimony in approximately 50 cases (primarily in Delaware, Chester, Montgomery and Philadelphia Counties) over the past four years. This year, Dr. Roeder has testified in, without limitation, the following matters:

> **Pilchard v. Kain**, Delaware County Court of Common Pleas, No. CV-2019-008755;
>
> **Rosko v. Rosko**, Delaware County Court of Common Pleas, Nos. CV-2018-000260 & CV-2017-010649;
>
> **Murray v. Matthews**, Delaware County Court of Common Pleas, No. CV-2016-011275; and
>
> **Kalnoki v. Kalnoki**, Delaware County Court of Common Pleas, No. CV-2017-005758.

**(5)    Dr. Roeder's Compensation in this Matter (*Rule 26(a)(2)(B)(vi)*):**

Relative to Dr. Roeder's evaluation of Mr. Weiser and preparation of the Roeder Report, Dr. Roeder is due $2,800.00 as set forth in the invoice attached hereto as **Exhibit 3**. At trial or deposition, Dr. Roeder is to be compensated for his testimony at a base-rate of $3,500.00 per half day.

Plaintiffs expressly reserve the right to supplement the information provided herein with respect to Dr. Roeder's past trial matters as this information is not available to Plaintiffs as of the time of these disclosures.

|   |   |
|---|---|
| | **SILVERANG, ROSENZWEIG & HALTZMAN, LLC** |
| Dated: July 25, 2022 | By:    /s/ Philip S. Rosenzweig |
| | Philip S. Rosenzweig, Esquire |
| | Attorney Identification No. 6246 |
| | prosenzweig@sanddlawyers.com |
| | Woodlands Center |
| | 900 E. 8th Avenue, Suite 300 |
| | King of Prussia, PA  19406 |
| | (610) 263-0115 |
| | *Attorneys for Plaintiffs* |

{01534644;1}                                              2

EXHIBIT 36
1121

# EXHIBIT 1

### *Expert Report of*
### *Dr. V. Richard Roeder*
### *Dated July 25, 2022*

EXHIBIT 36

1122

**V. RICHARD ROEDER, Ph.D.**
*PSYCHOLOGIST*
PA LICENSE #PS-003327-L
CERTIFIED SCHOOL PSYCHOLOGIST
P.O. BOX 220
WALLINGFORD, PA 19086
Phone: (610) 892-0800

Psychological Evaluation

Name: Robert Weiser

Date of Birth: 6/05/69

Dates of Interview: 6/06/22, 7/12/22

Age at Evaluation: 53-0 years

Instruments Utilized:

Personality Assessment Inventory

Reason for Referral:

Mr. Robert Weiser, age 53, is participating in a Psychological Evaluation upon referral from his attorney, Philip S. Rosenzweig, Esq., who is seeking an evaluation on Mr. Weiser in order to document his client's emotional distress in the matter of Robert Weiser, Esq. et al vs. Michael Hartleib. The diagnosis of "emotional distress" in the form of PTSD requires that the individual must have had exposure to actual or threatened injury; the presence of intrusive symptoms associated with the traumatic event; persistent avoidance of stimuli associated with the traumatic event; negative alterations in cognition and mood; marked alterations in arousal and reactivity; distress causing clinically significant distress or impairment in social, occupational, or other areas of functioning; and symptoms lasting more than one month and are not attributable to any other medical condition. As part of this evaluation, Mr. Weiser had two 90-minute interviews with the evaluator; the evaluator reviewed pleadings in the Robert Weiser, Esq. et al vs. Michael Hartleib matter; and Mr. Weiser completed some psychological testing in the evaluator's office in Media, PA.

Background Information and History:

Mr. Robert Weiser initially appeared for his Psychological Evaluation on June 6, 2022 and indicated that he grew up in Northeast Philadelphia in a home with his mother, father, and brother (now age 51). When Mr. Weiser was age 10, the family moved to Feasterville in Lower Bucks County, and he attended Neshaminy High School graduating in 1987. He then attended Weidner University where he graduated in 1992. He later enrolled at Villanova University Law School where he graduated in 1997. Mr. Weiser reported that he and his spouse had been together since they were 16 and lived together since they were 19. They were married in 1995. They have two children together (ages 18 and 16 years). Ms. Weiser is also an attorney, and they practice law together in a firm that they founded in December 2004. Mr. Weiser reported that the firm was growing and very successful until the "Sprint settlement hearing" in July 2016, and since that time "running the firm has been a struggle" due to ongoing interference, financial loss, and professional and public disparagement from Mr. Michael Hartleib.

EXHIBIT 36
1123

2

Mr. Weiser did not report having any history of substance use or mental health problems or treatment. He reported that medically, he had bicuspid aortic valve disease that was diagnosed nine years ago. He reported that he will eventually have to have a valve replacement. Mr. Weiser also reported that he had compressed vertebra numbers 2 and 3 and that he occasionally had migraine headaches requiring that he take medication as prescribed. He reported that he practiced yoga three or four times a week and would run 25 miles a week. Mr. Weiser did not report having any history of arrests or legal problems.

Mr. Weiser indicated that prior to coming to this evaluator's office on Monday for an initial interview, he had spent much of the prior weekend ruminating about Mr. Hartleib. Anticipating this evaluation had triggered recurrent disturbing thoughts about the financial, personal, and psychological injuries that had occurred to him due to the actions of Mr. Hartleib since 2016. Mr. Weiser indicated that he apparently had engendered animosity in Mr. Hartleib by declining to represent him in the Sprint litigation. Mr. Hartleib had sought a consulting contract with Mr. Weiser which Mr. Weiser declined, resulting in Mr. Hartleib allegedly threatening him. Mr. Weiser indicated that after Mr. Hartleib's appeals were exhausted in the Sprint matter, he filed a lawsuit against him. Mr. Weiser indicated that by November 2016 he was constantly ruminating about what Mr. Hartleib was doing to potentially discredit him and destroy his business, and he reported having constant sleep problems which have persisted until this time. At one point, Mr. Weiser indicated that he spent perhaps 90% of his work time ruminating and worrying about what Mr. Hartleib was going to do to damage his reputation and business. Mr. Weiser told the evaluator, "I have a constant fear of losing it all", which he related to his business losses since harassment commenced from Mr. Hartleib, as well as potential loss of personal and professional respect and credibility, and the stress it has caused his family.

Mr. Weiser did not report having any significant mental health symptoms prior to experiencing the threat posed by Mr. Hartleib in 2016. Regarding therapeutic intervention, Mr. Weiser indicated that he did discuss several of his worries and concerns with his religious leader but continued to attempt to manage his mental health problems with running and yoga. He also (like many other individuals) believed that the symptoms would decrease and disappear over time. Mr. Weiser indicated to the evaluator (referring to the actions of Mr. Hartleib), "I had no idea that 2016 would be just the beginning of a multi-year problem." Mr. Weiser continues to worry that his personal and professional reputation have been severely (if not permanently) damaged by statements or allegations made by Mr. Hartleib (including an article about him in the Wall Street Journal instigated by Mr. Hartleib). In addition to describing symptoms of ruminations and sleep disturbance, Mr. Weiser also indicated symptoms of anhedonia (loss of interest in previously enjoyed activities). In regard to anhedonia, Mr. Weiser indicated that he did not enjoy social contact and social activities as he once did and began to avoid contact with people personally and professionally out of fear that they might believe negative allegations that had been made about him. These negative alterations in cognition and mood are consistent with a diagnosis of PTSD.

During this evaluation, Mr. Weiser was alert, oriented, attentive, cooperative, and participatory with the interview and testing, and indicated that he had never previously

EXHIBIT 36
1124

3

participated in any clinical psychological testing.  Mr. Weiser displayed a normal range of affect with occasional mild symptoms of anxiety or negativity.  He had likely Above Average Range cognitive/intellectual functioning (although this was not formally assessed).  Although he occasionally appeared mildly anxious, irritated, or annoyed regarding his current situation, there were no indications of a significant mood or thought disorder, nor any homicidal or suicidal ideation. Mr. Weiser gave no evidence of any memory problems or other neurological dysfunction.  He had a normal flow of speech, and his thoughts appeared to be coherent, logical, and goal directed. His ideas followed each other in a comprehensible manner. Mr. Weiser is obviously a very proud man who does not wish to appear "weak", symptomatic, or in need of emotional care and concern. He would mention certain experiences or symptoms in conversation but when questioned about those symptoms specifically by the evaluator would then minimize them.

Mr. Weiser was asked to respond to the items on the Personality Assessment Inventory, which is a self-descriptive objective test of personality and psychopathology designed to provide information on critical client variables. The PAI consists of four validity scales, 11 clinical scales covering major categories of pathology corresponding to the DSM-V, five treatment scales measuring constructs related to treatment and case management, and two interpersonal scales. On the PAI validity scales, Mr. Weiser produced a pattern of responses suggesting difficulty in acknowledging negative or unpleasant aspects of himself or his experiences. The results may underrepresent the extent and degree of any significant findings in certain areas (including PTSD) due to Mr. Weiser's difficulties in acknowledging negative or unpleasant aspects of himself.

On the PAI, Mr. Weiser did describe problems of greater intensity than is typical of defensive respondents including frequent routine physical complaints; physical signs of depression; unhappiness; and distrust.  However, despite his defensiveness, Mr. Weiser did endorse statements indicating "I've been troubled by memories of a bad experience for a long time" and "Since I had a very bad experience, I am no longer interested in some things that I used to enjoy."  He also responded "false" to the statement, "I have no trouble falling asleep."  All of these symptoms and behaviors are consistent with a diagnosis of PTSD.

Mr. Weiser's self-concept appears to involve a reasonably stable and positive self-evaluation that may be occasionally punctuated by periods of self-doubt or pessimism. He describes approaching life with a clear sense of purpose and distinct convictions. He is probably quite uncomfortable about the prospects of appearing weak, submissive, or passive. Therefore, it is likely that he was unable to endorse many of the problems or symptoms on this Inventory suggesting that the significance of the PTSD symptoms that he did endorse are of even greater importance.

Conclusions and Recommendations:

Mr. Robert Weiser, age 53, was referred for a Psychological Evaluation to document his emotional distress resulting from actions taken against Mr. Weiser in the matter of Robert Weiser, Esquire et al vs. Michael Hartleib by his attorney, Philip S. Rosenzweig, Esq.  Mr. Weiser believes that threats, disparaging comments, and other

EXHIBIT 36
1125

4

actions by Mr. Michael Hartleib commencing in 2016 have led to significant damage to his personal and professional reputation as well as significant financial loss to his law firm. In addition, Mr. Weiser has suffered emotionally from the actions of Mr. Hartleib in the form of anxiety, stress, worries, fears, anhedonia, ruminations, and sleep problems. Mr. Weiser appears to meet the DSM-5 Diagnostic Criteria for PTSD including experiencing a traumatic event that led to significant loss and intrusive distressing memories with intense psychological distress in response to exposure to symbols or cues of that traumatic event, hypervigilance and increased arousal, avoidance of external reminders, sleep disturbance, anhedonia, and disturbance in his social functioning with fears that the trauma might reoccur.

Mr. Weiser is a proud man who wishes to appear strong and vigorous, and the interview and testing indicates that he is quite uncomfortable about the prospects of appearing weak, submissive, or passive. He is highly resistant to the idea of having a mental health diagnosis or endorsing mental health symptoms in interviews or on testing. However, during conversation, Mr. Weiser acknowledged numerous symptoms of PTSD including ongoing sleep problems since 2016 which had not existed prior to his interactions with Mr. Hartleib. These symptoms include some withdrawal from social relationships and activities (anhedonia), recurrent thoughts and fears of the trauma occurring again, and ruminations and recurring thoughts about the trauma precipitated by symbols or comments that he associates with the trauma. On the Personality Assessment Inventory, Mr. Weiser did acknowledge that he has difficulty falling asleep, is troubled by memories of a bad experience for a long time, and after having a bad experience is no longer interested in some things that he used to enjoy, which are all consistent with a PTSD diagnosis.

Mr. Weiser's personality style has made it difficult for him to acknowledge his emotional problems and the need for help in with those problems. He reported that he has sought counseling from his religious leader but did not pursue professional counseling believing that the clue problems and other symptoms would resolve themselves. Mr. Weiser might benefit from having a few sessions of "Mindfulness Counseling" as he appears to be quite interested in the mind-body connection in regard to health and healing. A Mindfulness therapist that incorporates yoga and other mind-body techniques in their therapy would likely be a good fit for Mr. Weiser. Mr. Weiser does appear to be the victim of actions leading to severe and prolonged emotional distress in the form of PTSD.

DIAGNOSIS (DSM-V):

      AXIS I:   F43.10 Post Traumatic Stress Disorder
      AXIS II:  None
      AXIS III: History of bicuspid aortic valve disease
      AXIS IV: Loss of income and assets
      AXIS V:  GAF: 062

dic.: 7/25/22

V. Richard Roeder, Ph.D.
PA Licensed Psychologist
Certified School Psychologist

EXHIBIT 36
1126

# EXHIBIT 2

### *Curriculum Vitae of*
### *Dr. V. Richard Roeder*

EXHIBIT 36
1127

# CURRICULUM VITAE

V. Richard Roeder, Ph.D.
Pennsylvania Licensed Psychologist
PA & NJ Certified School Psychologist

P. O. Box 220
Wallingford, PA 19086
(610) 892-0800

## EDUCATIONAL BACKGROUND:

TEMPLE UNIVERSITY:    May, 1996: - Ph.D. Psychology
May, 1993: - M.Ed. School Psychology
June, 1974: - M.A. Community Psychology

MUHLENBERG COLLEGE: June, 1971: - B. A. Psychology

## PROFESSIONAL EXPERTISE

### PSYCHODIAGNOSTIC EVALUATION AND EXPERT TESTIMONY

Psychodiagnostic evaluations of adults, children, and adolescents for program referral, diagnosis, court dispositions, and educational referral. Tests used include projectives, intellectual measurements, personality inventories, and some psycho-neurological assessment instruments. Substance use evaluation and treatment in forensic and non-forensic cases, including hair testing for alcohol and drugs. Evaluation of child abuse victims and perpetrators. Testimony in court on child abuse, child custody, substance abuse and criminal cases.

### CLINICAL TREATMENT

Family Therapy

Treatment of children, adolescents, and adults within the context of their families using structural, contextual, and strategic family therapy interventions. Evaluations of families for custody and child protection and placement decisions by the courts. Treatment of couple's relationship problems involving physical abuse, lack of communication skills, and substance use, using the aforementioned modalities.

Individual Therapy

Treatment of adult clients with thought, affective and adjustment disorders utilizing contextual, behavioral, and cognitive techniques. Evaluation and treatment of adult clients referred by business and industry with substance use problems and stress disorders. Treatment of clients with post-traumatic stress disorder, chronic pain, and injury related stress.

Group Therapy

Treatment of older adults, latency age children, and adolescents in group settings. These groups use networking, trust building, and socialization; skills enhancement as well as insight oriented techniques. Utilization of peer group role models. Utilization of community resources to enhance the clients' support system.

EXHIBIT 36
1128

**ADMINISTRATION**

Coordination of services to adults and children in an outpatient mental health setting. Development of goals and objectives for service delivery. Program development and case management. Development of an annual budget for cost of service delivery in an adult and children's acute services department of an outpatient mental health clinic.

**CLINICAL SUPERVISION**

Supervision of eight graduate level psychologist and social workers in the delivery of clinical services in an outpatient mental health clinic. Supervision and training of graduate students in family therapy in this setting. Development of standards and guidelines for the delivery of therapeutic services by a clinical staff of eight graduate level therapists and four graduate students.

**CRISIS INTERVENTION**

Emergency evaluation and assessment of clients seen in a large hospital emergency room as well as at an outpatient clinic. Client problems include acute psychiatric emergencies involving psychotic, homicidal, and suicidal behavior, drug and alcohol use; and severe interpersonal problems. Functioned as a County Mental Health Delegate with familiarity with psychiatric admission and commitment regulations.

**CONSULTATION AND EDUCATION**

Development of new programs in community consultation and education for church groups, foster parents groups, nursing homes, police officers, and public access cable television. Training of volunteers in working with mental health clients within the clinic and in the community. Preparation of articles on mental health problems for local newspapers.

**EMPLOYMENT BACKGROUND**

PRIVATE PRACTICE IN PSYCHOLOGY – 1980 to present

Evaluation and treatment of individuals, couples and families (both self and court referred); including psychotherapy, counseling, child custody issues, psychological testing, fitness for civil employment, forensic drug and alcohol use assessment, and hair testing for drugs of misuse and alcohol level. Co-parent counseling provided to separated and divorced parents.

CHILDREN'S CRISIS TREATMENT CENTER: September 1998 – January 2016

Consultant
Evaluation of traumatized and emotionally disturbed children for Behavioral Health Rehabilitative Services in the community and schools at a state-licensed non-profit mental health agency in Philadelphia. Evaluation of traumatized and emotionally disturbed pre-school and school-aged children for a therapeutic day treatment program.

BEHAVIORAL ANALYSIS & THERAPY PARTNERS: April 2007 – May 2010

Consultant
Evaluation of children with ADHD, emotional problems, and/or Autistic Spectrum Disorder diagnoses for Behavioral Health Rehabilitative Services at a state-licensed non-profit mental health agency in Montgomery County.

EXHIBIT 36
1129

DELAWARE COUNTY CHILDREN & YOUTH SERVICES: June 1984 – May 1999.

Consultant
Evaluation of clients of this child welfare agency through psychological testing and family evaluations for purposes of placement, adjudication, and case planning. Expert testimony in court as needed in cases of physical, emotional and sexual abuse of children.

WIVES SELF-HELP FOUNDATION, INC.: March 1986 – December 1995

Clinical Director
Administration and supervision of a staff of eight graduate level professionals treating clients in a state licensed non-profit mental health agency. Responsible for program development and implementation of training for peer counselors for police and fire departments as well as community and school counseling. This agency also operates the Philadelphia Police and Fire Counseling service. Clients treated included individuals (children and adults), couples, and families. This position also included supervision of graduate students.

CROZER-CHESTER MENTAL HEALTH CENTER: October 1974 – February 1988

Emergency Room Crisis Counselor (part-time)
Evaluation and disposition of clients presenting to the hospital emergency room with acute psychiatric, substance abuse, housing and interpersonal problems. Functioned as a County Mental Health Delegate for psychiatric commitments.

MEDIA CHILD GUIDANCE RESOURCE CENTER: August 1976 – February 1985

Chief Psychologist/Coordinator of Acute Services
Served as staff psychologist with children and adults, providing family and individual therapy from 1976 through 1982. Served as Chief Psychologist and Coordinator of Acute Services (administering services for all clients never psychiatrically hospitalized) from 1982 through 1985. Provided staff and student supervision, administration and development of programs, psychodiagnostic evaluations, case assignment, and therapy to clients.

**PROFESSIONAL AFFILIATIONS:**

American Psychological Association
Pennsylvania Psychological Association
Association of Family and Conciliation Courts – Life member
Southeast Pennsylvania Association of Custody Evaluators

**PUBLICATIONS AND PRESENTATIONS:**

"The Dumbing of Special Education" (with Irwin Hyman), *Education Week*, May, 1993

"Substance Abuse Evaluation, Testing and Monitoring in Custody Cases", in "*The Intersection of Legal and Mental Health Issues in Custody Cases*", Pennsylvania Bar Institute, 2014

"Risk of Harm and Beyond", Family Law Institute, April 2022

EXHIBIT 36
1130

## Background Summary

Dr. Roeder has been providing evaluation and treatment for children, adults and families in Delaware County for over 40 years. He has been licensed as a psychologist in the Commonwealth of Pennsylvania since 1980 and holds a B.A. in Psychology from Muhlenberg College and an M.A., M.Ed. and Ph.D. from Temple University in various fields of Psychology. Dr. Roeder has performed over 8,000 evaluations, including over 2,000 psychological and substance abuse evaluations for court cases, as well as over 400 child custody evaluations. He has been performing substance abuse testing, particularly hair testing for attorneys and the courts, for the past 20 years. Dr. Roeder has testified in over 1,000 court hearings in Delaware, Philadelphia, Montgomery and Chester counties. He has addressed the Delaware County and Montgomery County Family Division of the Bar Association on topics such as child custody evaluations, psychological testing in the context of child custody evaluations and presented to hair testing for illegal drugs. He has previously presented on drug and alcohol testing for the Pennsylvania Bar Institute. A life member of the Association of Family and Conciliation Courts, Dr. Roeder is a member of the American and Pennsylvania Psychological Associations and the Southeast Pennsylvania Association of Custody Colleagues.

EXHIBIT 36
1131

# EXHIBIT 3

## *Invoice of Dr. V. Richard Roeder Dated July 25, 2022*

EXHIBIT 36
1132

**V. RICHARD ROEDER, Ph.D.**
*PSYCHOLOGIST*
PA LICENSE #PS-003327-L
CERTIFIED SCHOOL PSYCHOLOGIST
P.O. BOX 220
WALLINGFORD, PA 19086
Phone: (610) 892-0800

S.S. (Tax I.D.) # ███████

Invoice for Service for Weiser et. al. vs. Hartlieb – 7/25/22

| | |
|---|---|
| Review of pleadings - 2 hours @ $350.00/hr. | $700.00 |
| Interviews with Mr. Weiser - 3 hours @ $350.00/hr. | $1050.00 |
| Preparation/revision of Psychological Evaluation -3 hours @ $350.00/hr. | $1050.00 |

Total due    $2800.00

*V. Richard Roeder*

V. Richard Roeder, Ph.D.

EXHIBIT 36
1133

# EXHIBIT "E"

EXHIBIT 36
1134

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| **THE WEISER LAW FIRM, P.C., and ROBERT B. WEISER, ESQUIRE** | : : : | **CIVIL ACTION** |
| **v.** | : : | **NO.: 2:19-CV-02728- KSM** |
| **MICHAEL HARTLEIB** | : : |  |

### PLAINTIFFS' RESPONSES AND OBJECTIONS
### TO DEFENDANT'S REQUESTS FOR ADMISSIONS AND INTERROGATORIES

Plaintiffs The Weiser Law Firm, P.C. (the "Law Firm") and Robert B. Weiser, Esq. ("Weiser," or together with the Law Firm, "Plaintiffs"), by their undersigned attorneys, Silverang, Rosenzweig & Haltzman LLC, hereby submit their Responses to Defendant's Requests for Admissions and Interrogatories (collectively the "Requests") of Defendant Michael Hartleib ("Hartleib" or "Defendant").

### PRELIMINARY STATEMENT

Plaintiffs make these Responses (hereinafter, each a "Response," and together, "Responses") to the Requests without waiving or intending to waive and, on the contrary, are intended reserve:

1.      All questions as to authenticity, competence, relevance, materiality, privilege and inadmissibility of evidence for any purpose in any proceeding or trial of this or any other action or case;

2.      The right to object to the use of any of the documents or other tangible things identified or produced herein for any purpose in any proceeding or trial of this or any other action or case;

3.      The right to object on any ground at any time to a demand for further Response to this or any other set of requests for admission, interrogatory, request for production or discovery request, for production or discovery procedures, involving or relating to the subject matter of these Requests;

4.      The right to further supplement, clarify, correct and/or amend these Responses based on the discovery of additional information or documents; and

5.      Plaintiffs' attorney-client privilege, attorney "work product" protections and/or any other applicable privilege/s and, accordingly, any inadvertent production of any privileged or protected information or document shall not constitute a waiver of such privilege and/or protection.

## **GENERAL OBJECTIONS AND CONDITIONS**

Plaintiffs make and incorporate into each of their specific Responses the following General Objections and Conditions.  These General Objections and Conditions are set forth here to avoid the unnecessary repetition of restating them in each individual Response.  Failure to incorporate an objection, however, shall not be construed as waiver of it with respect to any of the Requests.

1.      Plaintiffs object to each of the Requests to the extent it seeks information that is subject to the attorney/client privilege, attorney/work product doctrine, or any other applicable privilege.

2.      Plaintiffs object to each of the Requests to the extent it seeks information or materials which reflect trade secrets, confidential, commercial or business information, or information subject to other applicable privileges, including attorney/client and accountant/client privileges.

3.      Plaintiffs object to each of the  Requests to the extent that it seeks confidential or proprietary information in documents protected from disclosure by law, court order or agreement respecting confidentiality or nondisclosure.

4.      Plaintiffs object to each of the Requests to the extent that it seeks information and/or documents which were prepared, generated or received in anticipation of or after the commencement of this litigation.

5.      Plaintiffs object to each of the Requests to the extent that it seeks information and/or documents that are not within Plaintiffs' possession, custody or control.

6.      Plaintiffs object to each of the Requests to the extent that it seeks information that is not relevant to the subject matter of this action or reasonably calculated to lead to the discovery of admissible evidence.

7.      Plaintiffs object to each of the Requests to the extent that it is overly broad, unduly burdensome and calls for information not reasonably calculated to lead to the discovery of admissible evidence.

8.      Plaintiffs object to each of the Requests to the extent that it seeks information and documents not relevant to the time period during which the events that are of subject matter of this dispute took place, on the grounds that such Request is overly broad, duly burdensome, not relevant to the subject matter of this litigation and not reasonably calculated to lead to the discovery of admissible evidence.

9.      Plaintiffs object to each of the Requests to the extent that the information or documents may be derived or ascertained from information or documents available to Defendant or which may be more readily available from a more convenient, less burdensome and less expensive source.

10.     Plaintiffs do not waive any objection by agreeing to produce certain information or documents in Response to certain of the Requests subject to objections.

11.     Plaintiffs reserve the right to challenge the competency, relevance, materiality and admissibility of, and to object on any grounds to the use of the information and/or documents provided herewith in any proceeding or trial of this or any other action.

12.     Plaintiffs reserve the right to supplement these objections.

## PLAINTIFFS' RESPONSES AND OBJECTIONS TO DEFENDANT'S REQUEST FOR ADMISSIONS

1.      Admit that you held out Silow as "of counsel" at the Weiser Law Firm in Ross-Williams v. Bennett.

**RESPONSE:** Plaintiffs object to this Request for the reasons stated in the General Objections, which are incorporated herein by reference.  Plaintiffs further object to this Request to the extent that it relies upon the undefined term "held out," and on the basis that it seeks information to which Defendant has equal or greater access.  Plaintiffs' Response to this Request is subject to further inquiry and the Response will be altered or supplemented if necessary.  Notwithstanding and without waiving the foregoing objections, this Request is denied as stated.  By way of further Response, Plaintiffs represented Mr. Silow to have the professional position commensurate with the experience and credentials Mr. Silow claimed to possess at the time, which claims were reinforced by Abelson Legal Search ("Abelson"), the legal search firm that placed Mr. Silow with the Law Firm.

2.      Admit that you held out Silow as "of counsel" at the Weiser Law Firm in other cases.

**RESPONSE:** Plaintiffs object to this Request for the reasons stated in the General Objections, which are incorporated herein by reference.  Plaintiffs further object to this Request to the extent that it relies upon the undefined term "held out," on the basis that it seeks information to which Defendant has equal or greater access, and because the information sought is not reasonably calculated to lead to the discovery of admissible evidence relevant to the cause of action.  Plaintiffs' Response to this Request is subject to further inquiry and the Response will be altered or supplemented if necessary.  Notwithstanding and without waiving the foregoing objections,

this Request is denied as stated.  By way of further Response, prior to February 2017 Plaintiffs represented Mr. Silow to have the professional position commensurate with the experience and credentials Mr. Silow claimed to possess, which claims were vetted, confirmed and reinforced by Abelson Legal Search ("Abelson"), the legal search firm that placed Mr. Silow with the Law Firm.

3.    Admit that the Weiser Law Firm submitted a firm resume that was part of the record in the <u>Ross-Williams v. Bennett</u> case.

**RESPONSE:** Plaintiffs object to this Request for the reasons stated in the General Objections, which are incorporated herein by reference.  Plaintiffs further object to this Request on the basis that it seeks information to which Defendant has equal or greater access and which is part of the public record.  Plaintiffs further object to this insofar as "firm resume" is not a defined term in these Requests.  Plaintiffs' Response to this Request is subject to further inquiry and the Response will be altered or supplemented if necessary. Notwithstanding and without waiving the foregoing objections, this Request is denied as stated.  Nevertheless, Plaintiffs direct Defendant to the documents produced in response to Defendant's Request for Production of Documents.

4.    Admit that the firm resume of the Weiser Law Firm submitted in <u>Ross-Williams v. Bennett</u> listed "Alexander Jeffrey Silow" as being "admitted to practice in Pennsylvania and the District of Columbia". [sic]

**RESPONSE:** Plaintiffs object to this Request for the reasons stated in the General Objections, which are incorporated herein by reference.  Plaintiffs further object to this Request on the basis that it seeks information to which Defendant has equal or greater access and which is part of the public record.  Plaintiffs further object to this insofar as "firm resume" is not a defined term in these Requests.  Plaintiffs' Response to this Request is subject to further inquiry and the Response will be altered or supplemented if necessary. Notwithstanding and without waiving the foregoing objections, this Request is denied as stated.  By way of further Response, any such document reflects the experience and credentials Mr. Silow claimed to possess at the time, which claims were reinforced by Abelson.  Notwithstanding and without waiving the foregoing objections, Plaintiffs direct Defendant to the documents produced in response to Defendant's Request for Production of Documents.

5.    Admit that you submitted this firm resume listing "Alexander Jeffrey Silow" as being "admitted to practice in Pennsylvania and the District of Columbia" in other cases.

**RESPONSE:** Plaintiffs object to this Request for the reasons stated in the General Objections, which are incorporated herein by reference.  Plaintiffs further object to this Request on the basis that it seeks information to which Defendant has equal or greater access and which is part of the public record.  Plaintiffs further object to this insofar as "this firm resume" is not a defined term in these Requests.  Plaintiffs' Response to this Request is subject to further inquiry and the Response will be altered or supplemented if necessary.  Notwithstanding and without waiving the foregoing objections, this Request is denied.

EXHIBIT 36

6.      Admit that the firm resume of the Weiser Law Firm submitted in <u>Ross-Williams v. Bennett</u> contains false information.

**RESPONSE:** Plaintiffs object to this Request for the reasons stated in the General Objections, which are incorporated herein by reference.  Plaintiffs further object to this Request on the basis that it seeks information to which Defendant has equal or greater access and which is part of the public record.  Plaintiffs further object to this insofar as "firm resume" is not a defined term in these Requests.  Plaintiffs' Response to this Request is subject to further inquiry and the Response will be altered or supplemented if necessary.  Notwithstanding and without waiving the foregoing objections, Plaintiffs deny knowingly including any false information on any submissions to the court in the <u>Ross-Williams</u> case.  By way of further Response, Plaintiffs direct Defendant to the documents produced in response to Defendant's Request for Production of Documents, including a firm resume which reflects the experience and credentials Mr. Silow claimed to possess at the time, which claims were reinforced by Abelson.

7.      Admit that prior to January of 2017 you were aware that Silow's actual name was Jeffrey M. Silow or some other iteration such as Jeffrey Silow Jeff M. Silow or Jeff Silow.

**RESPONSE:** Plaintiffs object to this Request for the reasons stated in the General Objections, which are incorporated herein by reference.  Plaintiffs further object to this Request on the basis that it seeks information to which Defendant has equal or greater access and which is part of the public record.  Plaintiffs' Response to this Request is subject to further inquiry and the Response will be altered or supplemented if necessary.  Notwithstanding and without waiving the foregoing objections, this Request is denied as stated.  Plaintiffs further respond that they knew Mr. Silow prior to February 2017 colloquially as "Jeff" or "Jeffrey," and at some point Mr. Silow purported that his first name was Alexander and his middle name or nickname was Jeffrey.

8.      Admit that you addressed Silow as Jeffrey or Jeff in your communications with him.

**RESPONSE:** Plaintiffs object to this Request for the reasons stated in the General Objections, which are incorporated herein by reference.  Plaintiffs further object to this Request on the basis that it seeks information to which Defendant has equal or greater access and which is part of the public record, and insofar as it unreasonably fails to contain any temporal constraints.  Plaintiffs' Response to this Request is subject to further inquiry and the Response will be altered or supplemented if necessary.  Notwithstanding and without waiving the foregoing objections, this Request is denied as stated.  Plaintiffs respond that they knew Mr. Silow prior to February 2017 colloquially as "Jeff" or "Jeffrey," and at some point Mr. Silow purported that his first name was Alexander and that his middle name and/or preferred nickname was Jeffrey.

9.      Admit that prior to January of 2017 you were aware that Silow was not barred in the state of Pennsylvania.

**RESPONSE:** Plaintiffs object to this Request for the reasons stated in the General Objections, which are incorporated herein by reference.  Plaintiffs further object to this Request on the basis that it seeks information to which Defendant has equal or greater access and which is part of the public record.  Plaintiffs further object to this insofar as "barred" is not a defined term in these

Requests.  Plaintiffs' Response to this Request is subject to further inquiry and the Response will be altered or supplemented if necessary.  Notwithstanding and without waiving the foregoing objections, this Request is denied as stated.  Plaintiffs further respond that they believed prior to February 2017 that Mr. Silow earned the bar admissions he claimed to possess with respect to the District of Columbia and the Commonwealth of Pennsylvania, which claims were reinforced by Abelson.

10.   Admit that prior to January of 2017 you were aware that Silow was using his son's Pennsylvania bar idea.

**RESPONSE:** Plaintiffs object to this Request for the reasons stated in the General Objections, which are incorporated herein by reference.  Plaintiffs further object to this Request on the basis that it seeks information to which Defendant has equal or greater access and which is part of the public record.  Plaintiffs further object to this insofar as "bar idea" is not a defined term in these Requests.  Plaintiffs' Response to this Request is subject to further inquiry and the Response will be altered or supplemented if necessary.  Notwithstanding and without waiving the foregoing objections, Plaintiffs deny any knowledge of Mr. Silow's "bar idea."

11.   Admit that you received an email from Jessica Abelson of Abelson Legal Search on June 27, 2008 identifying Silow as Jeffrey Silow, Esq. and attaching his resume.

**RESPONSE:** Plaintiffs object to this Request for the reasons stated in the General Objections, which are incorporated herein by reference.  Plaintiffs further object to this Request on the basis that it seeks information to which Defendant has equal or greater access and which is part of the public record.  Plaintiffs' Response to this Request is subject to further inquiry and the Response will be altered or supplemented if necessary.  Notwithstanding and without waiving the foregoing objections, this Request is denied as stated.  Plaintiffs further respond that Jessica Abelson placed Mr. Silow with the Law Firm and that Jessica Abelson introduced Mr. Silow as "Jeff" or "Jeffrey." Plaintiffs direct Defendant to the documents produced in response to Defendant's Request for Production of Documents, as well as the exhibits to the Complaint in this matter.

12.   Admit that the attached the resume you received from Abelson Legal Search identifies Silow as Jeffrey Silow, Esq.

**RESPONSE:** Plaintiffs object to this Request for the reasons stated in the General Objections, which are incorporated herein by reference.  Plaintiffs further object to this Request on the basis that it seeks information to which Defendant has equal or greater access and which is part of the public record.  Plaintiffs further object to this Request on the basis that this Request is illiterate and cannot be reasonably deciphered.  Plaintiffs' Response to this Request is subject to further inquiry and the Response will be altered or supplemented if necessary.  Notwithstanding and without waiving the foregoing objections, and on the basis of the meaning Plaintiffs assume this Request to have, this Request is admitted in part, denied in part.  Plaintiffs further respond that Abelson provided the Law Firm with a resume purported to be that of Mr. Silow, which resume identifies him as Jeffrey Silow, Esq.  Plaintiffs direct Defendant to the documents produced in response to Defendant's Request for Production of Documents, as well as the exhibits to the Complaint in this matter.

EXHIBIT 36

13.    Admit that the Silow resume you received from Abelson Legal Search does not state that Silow is barred in the state of Pennsylvania.

**RESPONSE:** Plaintiffs object to this Request for the reasons stated in the General Objections, which are incorporated herein by reference.  Plaintiffs further object to this Request on the basis that it seeks information to which Defendant has equal or greater access and which is part of the public record.  Plaintiffs' Response to this Request is subject to further inquiry and the Response will be altered or supplemented if necessary.  Notwithstanding and without waiving the foregoing objections, this Request is admitted in part, denied in part.  Plaintiffs further respond that Abelson provided the Law Firm with a resume purported to be that of Mr. Silow, which resume identifies him as admitted to the bar of the District of Columbia.  Plaintiffs direct Defendant to the documents produced in response to Defendant's Request for Production of Documents, as well as the exhibits to the Complaint in this matter.

14.    Admit that the Silow resume you received from Abelson Legal Search does state that Silow is barred in the District of Columbia.

**RESPONSE:** Plaintiffs object to this Request for the reasons stated in the General Objections, which are incorporated herein by reference.  Plaintiffs further object to this Request on the basis that it seeks information to which Defendant has equal or greater access and which is part of the public record.  Plaintiffs' Response to this Request is subject to further inquiry and the Response will be altered or supplemented if necessary.  Notwithstanding and without waiving the foregoing objections, this Request is denied as stated.  Plaintiffs respond that Abelson provided the Law Firm with a resume purported to be that of Mr. Silow, which resume identifies Mr. Silow as admitted to the bar of the District of Columbia.  Plaintiffs direct Defendant to the documents produced in response to Defendant's Request for Production of Documents, as well as the exhibits to the Complaint in this matter.

15.    Admit that at the time you received the Silow resume from Abelson Legal Search in June of 2008, Silow was barred in the District of Columbia.

**RESPONSE:** Plaintiffs object to this Request for the reasons stated in the General Objections, which are incorporated herein by reference.  Plaintiffs further object to this Request on the basis that it seeks information which is part of the public record.  Plaintiffs further object to this insofar as "barred" is not a defined term in these Requests.  Plaintiffs' Response to this Request is subject to further inquiry and the Response will be altered or supplemented if necessary.  Notwithstanding and without waiving the foregoing objections, this Request is denied, insofar as the District of Columbia Office of Disciplinary Counsel – and not Plaintiffs – determines when an attorney is admitted in good standing to the bar of the District of Columbia.

16.    Admit that you were not "defrauded" by Abelson Legal Search as alleged in paragraph 68 your Complaint.

**RESPONSE:** Plaintiffs object to this Request for the reasons stated in the General Objections, which are incorporated herein by reference.  Plaintiffs' Response to this Request is subject to further inquiry and the Response will be altered or supplemented if necessary.  Notwithstanding and without waiving the foregoing objections, this Request is denied.

17.   Admit that you recruited Monica Ross-Williams to be a plaintiff in the Sprint litigation.

**RESPONSE:** Plaintiffs object to this Request for the reasons stated in the General Objections, which are incorporated herein by reference. Plaintiffs further object to this insofar as "recruited" is not a defined term in these Requests. Plaintiffs' Response to this Request is subject to further inquiry and the Response will be altered or supplemented if necessary. Notwithstanding and without waiving the foregoing objections, this Request is denied.

18.   Admit that after Hartleib rejected your invitation to resolve the Sprint case you hired an investigator to investigate Hartleib.

**RESPONSE:** Plaintiffs object to this Request for the reasons stated in the General Objections, which are incorporated herein by reference. Plaintiffs' Response to this Request is subject to further inquiry and the Response will be altered or supplemented if necessary. Notwithstanding and without waiving the foregoing objections, this Request is denied. Plaintiffs deny that they invited Hartleib "to resolve the Sprint case." Plaintiffs have hired an investigator however Plaintiffs deny that the investigator was hired "to investigate Hartleib."

19.   Admit that you did not communicate to Monica Ross-Williams that you were investigating Hartleib.

**RESPONSE:** Plaintiffs object to this Request for the reasons stated in the General Objections, which are incorporated herein by reference. Plaintiffs further object to this Request on the basis that it seeks information to which Defendant has equal or greater access and which is part of the public record. This Request is denied to the extent that Plaintiffs cannot fully respond to this Request insofar as it seeks disclosure of protected attorney-client communication.

20.   Admit that the Ross-Williams case was lawyer-driven litigation.

**RESPONSE:** Plaintiffs object to this Request for the reasons stated in the General Objections, which are incorporated herein by reference. Plaintiffs further object to this insofar as "lawyer-driven litigation" is not a defined term in these Requests. Plaintiffs' Response to this Request is subject to further inquiry and the Response will be altered or supplemented if necessary. Notwithstanding and without waiving the foregoing objections, this Request is denied.

21.   Admit that that the trial court's decision to reduce the attorneys' fees in Ross-Williams v. Bennett, 2016 WL 6888094 (Kan.Dist.Ct. Nov. 22, 2016) occurred before the Kansas Courts were made aware of Silow's actual identity and bar status.

**RESPONSE:** Plaintiffs object to this Request for the reasons stated in the General Objections, which are incorporated herein by reference. Plaintiffs further object to this Request on the basis that it seeks information to which Defendant has equal or greater access and which is part of the public record. Plaintiffs further object to this insofar as "trial court" is not a defined term in these Requests. Plaintiffs' Response to this Request is subject to further inquiry and the Response will be altered or supplemented if necessary. Notwithstanding and without waiving the foregoing objections, the trial court's fee decision referenced in this Request was published

on November 22, 2016, and Plaintiffs admit that November 22, 2016 occurred prior to February 2017.

22.    Admit that you submitted declarations to the Kansas trial court in support of the attorneys' fees requested in <u>Ross-Williams v. Bennett</u>.

**RESPONSE:** Plaintiffs object to this Request for the reasons stated in the General Objections, which are incorporated herein by reference.  Plaintiffs further object to this Request on the basis that it seeks information to which Defendant has equal or greater access and which is part of the public record.  Plaintiffs' Response to this Request is subject to further inquiry and the Response will be altered or supplemented if necessary.  Notwithstanding and without waiving the foregoing objections, Plaintiffs admit that declarations were submitted to the trial court in support of the attorneys' fees requested in <u>Ross-Williams v. Bennett</u>.

23.    Admit that submitted declarations to the Court of Appeals of Kansas in support of the attorneys' fees requested in <u>Ross-Williams v. Bennett</u>.

**RESPONSE:** Plaintiffs object to this Request for the reasons stated in the General Objections, which are incorporated herein by reference.  Plaintiffs' Response to this Request is subject to further inquiry and the Response will be altered or supplemented if necessary.  This Request is illiterate and incomprehensible and is therefore denied.

24.    Admit that Silow submitted declarations to the Kansas trial court in support of the attorneys' fees requested in <u>Ross-Williams v. Bennett</u> within the scope of his employment with you.

**RESPONSE:** Plaintiffs object to this Request for the reasons stated in the General Objections, which are incorporated herein by reference.  Plaintiffs further object to this Request on the basis that it seeks information to which Defendant has equal or greater access and which is part of the public record.  Plaintiffs' Response to this Request is subject to further inquiry and the Response will be altered or supplemented if necessary.  Notwithstanding and without waiving the foregoing objections, this Request is denied insofar as Mr. Silow was not an employee of either of the Plaintiffs, but was rather a contract attorney for the Law Firm.

25.    Admit that Silow submitted declarations to the Court of Appeals of Kansas in support of the attorneys' fees requested in <u>Ross-Williams v. Bennett</u> within the scope of his employment with you.

**RESPONSE:** Plaintiffs object to this Request for the reasons stated in the General Objections, which are incorporated herein by reference.  Plaintiffs further object to this Request on the basis that it seeks information to which Defendant has equal or greater access and which is part of the public record.  Plaintiffs' Response to this Request is subject to further inquiry and the Response will be altered or supplemented if necessary.  Notwithstanding and without waiving the foregoing objections, this Request is denied insofar as Mr. Silow was not an employee of either of the Plaintiffs, but was rather a contract attorney for the Law Firm.

26.    Admit that Silow made false statements in his declarations in <u>Ross-Williams v. Bennett</u> case within the scope of his employment with you.

**RESPONSE:** Plaintiffs object to this Request for the reasons stated in the General Objections, which are incorporated herein by reference.  Plaintiffs further object to this Request on the basis that it seeks information to which Defendant has equal or greater access and which is part of the public record.  Plaintiffs' Response to this Request is subject to further inquiry and the Response will be altered or supplemented if necessary.   Notwithstanding and without waiving the foregoing objections, this Request is denied insofar as Mr. Silow was not an employee of either of the Plaintiffs, but was rather a contract attorney for the Law Firm.  By way of further Response, Plaintiffs deny that Mr. Silow submitted more than one declaration before more than one court in <u>Ross-Williams v. Bennett</u>.  Plaintiffs specifically deny any knowledge that any statement made by Mr. Silow in his declaration in <u>Ross-Williams v. Bennett</u> case was false at the time it was made.  Plaintiffs further respond that the single, subsequently corrected declaration submitted by Mr. Silow in <u>Ross-Williams v. Bennett</u> contained false statements and/or omissions with respect to Mr. Silow's identity, professional legal experience/credentials and disciplinary history, and Plaintiffs were not aware of their falsity when those statements were made by Mr. Silow.

27.    Admit that you reviewed Silow's billing records before requesting the attorneys' fees in the proposed settlement in <u>Ross-Williams v. Bennett</u>.

**RESPONSE:** Plaintiffs object to this Request for the reasons stated in the General Objections, which are incorporated herein by reference.  Plaintiffs further object to this Request on the basis that it seeks information to which Defendant has equal or greater access and which is part of the public record.  Plaintiffs' Response to this Request is subject to further inquiry and the Response will be altered or supplemented if necessary.  Notwithstanding and without waiving the foregoing objections, Plaintiffs admit only that certain members and/or employees of the Law Firm reviewed Mr. Silow's billing records prior to submitting a request for attorneys' fees in <u>Ross-Williams v. Bennett</u>.  The remainder of this Request is denied as stated.

28.    Admit that you have no work product for the work performed by Silow in <u>Ross-Williams v. Bennett</u>.

**RESPONSE:** Plaintiffs object to this Request for the reasons stated in the General Objections, which are incorporated herein by reference.  Plaintiffs further object to this Request on the basis that it seeks information to which Defendant has equal or greater access and which is part of the public record.  Plaintiffs further object to this insofar as "work product" is not a defined term in these Requests.  Plaintiffs' Response to this Request is subject to further inquiry and the Response will be altered or supplemented if necessary.  Notwithstanding and without waiving the foregoing objections, this Request is denied. Plaintiffs direct Defendant to the documents produced in response to Defendant's Request for Production of Documents.

29.     Admit that you approved Silow's billing records and/or entries before requesting the attorneys' fees in the proposed settlement in <u>Ross-Williams v. Bennett</u>.

**RESPONSE:** Plaintiffs object to this Request for the reasons stated in the General Objections, which are incorporated herein by reference.  Plaintiffs' Response to this Request is subject to further inquiry and the Response will be altered or supplemented if necessary.  Notwithstanding and without waiving the foregoing objections, Plaintiffs admit only that certain members and/or employees of the Law Firm reviewed Mr. Silow's billing records prior to making out a request for attorneys' fees in <u>Ross-Williams v. Bennett</u>.  By way of further Response, Mr. Silow's billing records were "approved" when he submitted them to the Law Firm on a bi-monthly basis when he was working on projects as a document reviewer.  The remainder of this Request is denied.

30.     Admit that, regardless of your knowledge or intent at the time, you made false statements in your declarations in <u>Ross-Williams v. Bennett</u>.

**RESPONSE:** Plaintiffs object to this Request for the reasons stated in the General Objections, which are incorporated herein by reference.  Plaintiffs' Response to this Request is subject to further inquiry and the Response will be altered or supplemented if necessary.  Notwithstanding and without waiving the foregoing objections, this Request is denied.  By way of further Response, and for clarification, with the exception of the declaration of Mr. Silow, neither of the Plaintiffs submitted declarations containing false statements in <u>Ross-Williams v. Bennett</u>.  Therefore, as previously stated, this Request is denied.

31.     Admit that, regardless of your knowledge or intent at the time, you made false statements in your motions and briefs in <u>Ross-Williams v. Bennett</u>.

**RESPONSE:** Plaintiffs object to this Request for the reasons stated in the General Objections, which are incorporated herein by reference.  Plaintiffs further object to this Request on the basis that it seeks information to which Defendant has equal or greater access and which is part of the public record.  Notwithstanding and without waiving the foregoing objections, this Request is denied.

32.     Admit that prior to March 6, 2017, you never informed Monica Ross-Williams that you employed a disbarred to perform thousands of hours of work in her case <u>Ross-Williams v. Bennett</u>.

**RESPONSE:** Plaintiffs object to this Request for the reasons stated in the General Objections, which are incorporated herein by reference.  Plaintiffs' Response to this Request is subject to further inquiry and the Response will be altered or supplemented if necessary.  This Request is illiterate and incomprehensible and is therefore denied.

33.     Admit that Defendant did not publish the Wall Street Journal article referenced in your Complaint.

**RESPONSE:** Plaintiffs object to this Request for the reasons stated in the General Objections, which are incorporated herein by reference.  Plaintiffs further object to this Request on the basis that it seeks information to which Defendant has equal or greater access and which is part of the public record.  Plaintiffs further object to this insofar as "publish" is not a defined term in these

Requests.  Plaintiffs' Response to this Request is subject to further inquiry and the Response will be altered or supplemented if necessary.  Notwithstanding and without waiving the foregoing objections, this Request is denied.

34.    Admit that you have no factual basis for your allegation that Mr. Hartleib wrote the April 25, 2017 letter referenced attached as Exhibit 17 in your Complaint.

**RESPONSE:** Plaintiffs object to this Request for the reasons stated in the General Objections, which are incorporated herein by reference.  Plaintiffs further object to this Request on the basis that it seeks information to which Defendant has equal or greater access and which is part of the public record.  Plaintiffs' Response to this Request is subject to further inquiry and the Response will be altered or supplemented if necessary.  Notwithstanding and without waiving the foregoing objections, this Request is denied.

35.    Admit that the trial court in <u>Ross-Williams v. Bennett</u> made factual finding that your billing records were not accurate or credible.

**RESPONSE:** Plaintiffs object to this Request for the reasons stated in the General Objections, which are incorporated herein by reference.  Plaintiffs further object to this Request on the basis that it seeks information to which Defendant has equal or greater access and which is part of the public record.  Plaintiffs' Response to this Request is subject to further inquiry and the Response will be altered or supplemented if necessary.  Notwithstanding and without waiving the foregoing objections, this Request is denied as stated.  Plaintiffs further respond that the trial court in <u>Ross-Williams v. Bennett</u> made a fee award which was less than the fees the Law Firm sought.

36.    Admit that billing for illusory work (i.e. work that was not actually performed) by submitting bills that are not accurate or credible would constitute a criminal act.

**RESPONSE:** Plaintiffs object to this Request for the reasons stated in the General Objections, which are incorporated herein by reference.  Plaintiffs further object to this Request on the basis that it seeks information to which Defendant has equal or greater access and which is part of the public record.  Plaintiffs' Response to this Request is subject to further inquiry and the Response will be altered or supplemented if necessary.  Notwithstanding and without waiving the foregoing objections, this Request is denied as stated.  Plaintiffs do not practice criminal law and are without knowledge or information sufficient to form a belief as to the legally correct answer to this theoretical Request.

37.    Admit that billing for illusory work (i.e. work that was not actually performed) by submitting bills that are not accurate or credible utilizing a disbarred attorney and getting caught would be embarrassing.

**RESPONSE:** Plaintiffs object to this Request for the reasons stated in the General Objections, which are incorporated herein by reference.  Plaintiffs' Response to this Request is subject to further inquiry and the Response will be altered or supplemented if necessary.  Notwithstanding and without waiving the foregoing objections, this Request is denied as stated.  Plaintiffs cannot respond to improper conjecture in these Requests and are thus without knowledge or information sufficient to form a belief as to the truth or falsity of the allegation contained in this Request.

EXHIBIT 36

Therefore, this Request is denied.

    38.    Admit that there is a basis to call an organized entity billing for illusory work (i.e. work that was not actually performed) by submitting bills that are not accurate or credible utilizing a disbarred attorney a criminal enterprise.

**RESPONSE:** Plaintiffs object to this Request for the reasons stated in the General Objections, which are incorporated herein by reference.  Plaintiffs' Response to this Request is subject to further inquiry and the Response will be altered or supplemented if necessary.  Notwithstanding and without waiving the foregoing objections, this Request is denied.

    39.    Admit that there is a basis to call billing for illusory work (i.e. work that was not actually performed) by submitting bills that are not accurate or credible utilizing a disbarred attorney chicanery.

**RESPONSE:** Plaintiffs object to this Request for the reasons stated in the General Objections, which are incorporated herein by reference.  Plaintiffs' Response to this Request is subject to further inquiry and the Response will be altered or supplemented if necessary. Further, this request is illiterate and incomprehensible.  Notwithstanding and without waiving the foregoing objections, this Request is denied.

    40.    Admit that there is a basis to call billing for illusory work (i.e. work that was not actually performed) by submitting bills that are not accurate or credible utilizing a disbarred attorney corrupt.

**RESPONSE:** Plaintiffs object to this Request for the reasons stated in the General Objections, which are incorporated herein by reference.  Plaintiffs' Response to this Request is subject to further inquiry and the Response will be altered or supplemented if necessary. Further, this request is illiterate and incomprehensible.  Notwithstanding and without waiving the foregoing objections, this Request is denied.

    41.    Admit that there is a basis to call billing for illusory work (i.e. work that was not actually performed) by submitting bills that are not accurate or credible utilizing a disbarred attorney fraud.

**RESPONSE:** Plaintiffs object to this Request for the reasons stated in the General Objections, which are incorporated herein by reference.  Plaintiffs' Response to this Request is subject to further inquiry and the Response will be altered or supplemented if necessary. Further, this request is illiterate and incomprehensible.  Notwithstanding and without waiving the foregoing objections, this Request is denied.

    42.    Admit that there is a basis to call billing for illusory work (i.e. work that was not actually performed) by submitting bills that are not accurate or credible utilizing a disbarred attorney and submitting those bills in court threatens "the integrity of the judicial system…".

**RESPONSE:** Plaintiffs object to this Request for the reasons stated in the General Objections, which are incorporated herein by reference.  Plaintiffs' Response to this Request is subject to

further inquiry and the Response will be altered or supplemented if necessary.  This Request is illiterate and incomprehensible.  Notwithstanding and without waving the foregoing objections, this Request is denied.

43.    Admit that there is a basis to call billing for illusory work (i.e. work that was not actually performed) by submitting bills that are not accurate or credible utilizing a disbarred attorney and submitting those bills in court "fraudulent acts and a bastardization [sic] of the judicial process".

**RESPONSE:** Plaintiffs object to this Request for the reasons stated in the General Objections, which are incorporated herein by reference.  Plaintiffs' Response to this Request is subject to further inquiry and the Response will be altered or supplemented if necessary. Further, this request is illiterate and incomprehensible.  Notwithstanding and without waiving the foregoing objections, this Request is denied.

44.    Admit that there was basis to say you had "little credibility" because the Kansas trial court in Ross-Williams v. Bennett held that the billing records you submitted were not "remotely accurate or credible."

**RESPONSE:** Plaintiffs object to this Request for the reasons stated in the General Objections, which are incorporated herein by reference.  Plaintiffs' Response to this Request is subject to further inquiry and the Response will be altered or supplemented if necessary. Further, this request is illiterate and incomprehensible.  Notwithstanding and without waiving the foregoing objections, this Request is denied.

45.    Admit that there was a basis to state you needed to consult with an ethics attorney as the Court of Appeals for raised the below referenced ethical concerns.

Although we will yield to the disciplinary authorities in the Commonwealth of Pennsylvania—or elsewhere—to sort out what the attorneys representing the plaintiffs in these derivative actions knew or should have known about the status of Jeffrey Silow's license to practice law, we find the information provided by Weiser to be very troubling.

Ross-Williams v. Bennett, 55 Kan. App. 2d 524, 543, 419 P.3d 608, 623-24 (2018).

**RESPONSE:** Plaintiffs object to this Request for the reasons stated in the General Objections, which are incorporated herein by reference.  Plaintiffs further object to this Request insofar as it calls for a conclusion of law or for the divulgence of Plaintiffs' legal theory.  Plaintiffs' Response to this Request is subject to further inquiry and the Response will be altered or supplemented if necessary.  Further, this request is illiterate and incomprehensible. Notwithstanding and without waiving the foregoing objections, Plaintiffs respond that the opinion cited in this Request is a writing which speaks for itself; to the extent deemed otherwise, this Request is denied.

46.    Admit that there is a basis to refer to Wall Street Journal article referenced in your Complaint an "embarrassment to the bar!"

**RESPONSE:** Plaintiffs object to this Request for the reasons stated in the General Objections,

which are incorporated herein by reference.  Plaintiffs' Response to this Request is subject to further inquiry and the Response will be altered or supplemented if necessary.  This Request is illiterate and incomprehensible and is therefore denied.

47.    Admit that based on the opinions of the Kansas Courts, the discovery of Silow's true identity, and the Wall Street Journal article, there was a basis to say your "ill-advised actions" were "making the Weiser Firm radioactive."

**RESPONSE:** Plaintiffs object to this Request for the reasons stated in the General Objections, which are incorporated herein by reference.  Plaintiffs' Response to this Request is subject to further inquiry and the Response will be altered or supplemented if necessary.  Notwithstanding and without waiving the foregoing objections, this Request is denied.

48.    Admit that the Court of Appeals of Kansas directly questioned the credibility of your representations that you were not aware of Silow's true identity and bar status in the below quotation.

Interestingly, although the résumé of the Weiser Law Firm—which is part of the record on appeal—listed "Alexander Jeffrey Silow" as being "admitted to practice in Pennsylvania and the District of Columbia," Silow's résumé—which was attached to Weiser's letter—listed his name as "Jeffrey Silow" and did not state that he was a member of the Pennsylvania bar. Instead, Silow's résumé only listed the District of Columbia under the heading "Bar Admissions." In a footnote to his letters, Weiser stated that "it appears as though Mr. Silow has also been suspended from the practice of law by the District of Columbia." We note that the District of Columbia subsequently disbarred Silow from the practice of law on December 21, 2017. *In re Jeffrey M. Silow*, 175 A.3d 88 (D.C. 2017).

Weiser evidently continues to believe that Silow actually performed the work reported in the billing records submitted to the district court. Nevertheless, Weiser recognized in his letter "that Mr. Silow had been held out as an active attorney, and that Mr. Silow's declaration, signed under penalty of perjury, states, *inter alia*, that he is a licensed attorney in good standing that had never been the subject of any disciplinary action." Hence, Weiser acknowledges that Silow's "declaration is therefore false in material respects," and as a result, the Weiser Law Firm—which served as the lead counsel in this derivative action—"will not be participating in any recovery that may result from the pending Cross-Appeal."

Although we will yield to the disciplinary authorities in the Commonwealth of Pennsylvania—or elsewhere—to sort out what the attorneys representing the plaintiffs in these derivative actions knew or should have known about the status of Jeffrey Silow's license to practice law, we find the information provided by Weiser to be very troubling.

Ross-Williams v. Bennett, 55 Kan. App. 2d 524, 543, 419 P.3d 608, 623-24 (2018)

**RESPONSE:** Plaintiffs object to this Request for the reasons stated in the General Objections, which are incorporated herein by reference.  Plaintiffs' Response to this Request is subject to

further inquiry and the Response will be altered or supplemented if necessary.  Notwithstanding and without waiving the foregoing objections, Plaintiffs respond that the opinion cited in this Request is a writing which speaks for itself; to the extent deemed otherwise, this Request is denied.

49.    Admit that based on the above citation in paragraph 48, there was a basis to state you were "attempt[ing] to obfuscate your chicanery" in the <u>Ross-Williams v. Bennett</u> matter.

**RESPONSE:** Plaintiffs object to this Request for the reasons stated in the General Objections, which are incorporated herein by reference.  Plaintiffs' Response to this Request is subject to further inquiry and the Response will be altered or supplemented if necessary.  Notwithstanding and without waiving the foregoing objections, Plaintiffs respond that the opinion cited in Request 48 is a writing which speaks for itself; to the extent deemed otherwise, this Request is denied.

50.    Admit that based on the above citation in paragraph 48, there was a basis to state your representations to the Court of Appeals of Kansas "were disingenuous at best" in the <u>Ross-Williams v. Bennett</u> matter.

**RESPONSE:** Plaintiffs object to this Request for the reasons stated in the General Objections, which are incorporated herein by reference.  Plaintiffs' Response to this Request is subject to further inquiry and the Response will be altered or supplemented if necessary.  Notwithstanding and without waiving the foregoing objections, Plaintiffs respond that the opinion cited in Request 48 is a writing which speaks for itself; to the extent deemed otherwise, this Request is denied.

51.    Admit that based on the findings of the trial court in the <u>Ross-Williams v. Bennett</u>, including the quotation below, there was a basis to state you were "not serving [Ross-Williams'] interest as a Sprint Shareholder.

The results obtained in the Settlement are not commensurate with the fee requested. An unjustifiably high fee award with respect to the minimal relief obtained abuses the trust of the shareholders. Furthermore, the billing records reviewed by the Court paint a troublesome portrait of exploiting Sprint's missteps for a substantial reward for counsel, and minimal relief to Sprint and its shareholders that suffered.

<u>Ross-Williams v. Bennett</u>, 2016 WL 6888094 (Kan.Dist.Ct. Nov. 22, 2016)

**RESPONSE:** Plaintiffs object to this Request for the reasons stated in the General Objections, which are incorporated herein by reference.  Plaintiffs' Response to this Request is subject to further inquiry and the Response will be altered or supplemented if necessary.  Notwithstanding and without waiving the foregoing objections, Plaintiffs respond that the opinion cited in this Request is a writing which speaks for itself; to the extent deemed otherwise, this Request is denied.

EXHIBIT 36

52.   Admit that you "really should have been more diligent" when reviewing the bills and credentials of Silow. *See paragraph 56 of your Complaint.*

**RESPONSE:** Plaintiffs object to this Request for the reasons stated in the General Objections, which are incorporated herein by reference. Plaintiffs' Response to this Request is subject to further inquiry and the Response will be altered or supplemented if necessary. Notwithstanding and without waiving the foregoing objections, this Request is denied.

53.   Admit that you provided the billing records of the Weiser Law Firm to the trial court for *in camera* review in <u>Ross-Williams v. Bennett</u>.

**RESPONSE:** Plaintiffs object to this Request for the reasons stated in the General Objections, which are incorporated herein by reference. Plaintiffs' Response to this Request is subject to further inquiry and the Response will be altered or supplemented if necessary. Notwithstanding and without waiving the foregoing objections, this Request is admitted.

54.   Admit that the billing records you provided for *in camera* review in <u>Ross-Williams v. Bennett</u> included the billing records of Silow.

**RESPONSE:** Plaintiffs object to this Request for the reasons stated in the General Objections, which are incorporated herein by reference. Plaintiffs' Response to this Request is subject to further inquiry and the Response will be altered or supplemented if necessary. Notwithstanding and without waiving the foregoing objections, this Request is admitted.

55.   Admit that trial court in <u>Ross-Williams v. Bennett</u> stated "The Court does not find that Mr. Silow's billing records are remotely accurate or credible."

**RESPONSE:** Plaintiffs object to this Request for the reasons stated in the General Objections, which are incorporated herein by reference. Plaintiffs' Response to this Request is subject to further inquiry and the Response will be altered or supplemented if necessary. Plaintiffs further object to this Request on the basis that it seeks information which is part of the public record. Notwithstanding and without waiving the foregoing objections, Plaintiffs respond that the statement purportedly excerpted without citation in this Request is an alleged writing which speaks for itself. Without more, this Request is denied.

56.   Admit that trial court in <u>Ross-Williams v. Bennett</u> found that the billing records you provided to it were not "remotely accurate or credible."

**RESPONSE:** Plaintiffs object to this Request for the reasons stated in the General Objections, which are incorporated herein by reference. Plaintiffs' Response to this Request is subject to further inquiry and the Response will be altered or supplemented if necessary. Notwithstanding and without waiving the foregoing objections, Plaintiffs respond that the statement purportedly excerpted without citation in this Request is an alleged writing which speaks for itself. Without more, this Request is denied.

57. Admit that the that the billing records you provided for *in camera* review in <u>Ross-Williams v. Bennett</u> are representations of work performed by "you" as defined above.

**RESPONSE:** Plaintiffs object to this Request for the reasons stated in the General Objections, which are incorporated herein by reference. Plaintiffs' Response to this Request is subject to further inquiry and the Response will be altered or supplemented if necessary. Notwithstanding and without waiving the foregoing objections, this Request is denied.

58. Admit that trial court in <u>Ross-Williams v. Bennett</u> found that representations you made to it were not "remotely accurate or credible".

**RESPONSE:** Plaintiffs object to this Request for the reasons stated in the General Objections, which are incorporated herein by reference. Plaintiffs' Response to this Request is subject to further inquiry and the Response will be altered or supplemented if necessary. Plaintiffs further object to this Request on the basis that it seeks information to which Defendant has equal or greater access and which is part of the public record. Plaintiffs further object to this insofar as "representations" is a vague and undefined term in these Requests. Notwithstanding and without waiving the foregoing objections, Plaintiffs respond that the statement purportedly excerpted without citation in this Request is an alleged writing which speaks for itself. Without more, this Request is denied.

59. Admit that the Court of Appeals of Kansas found that "a review of the record reveals that the findings made by the district court are supported by substantial competent evidence." <u>Ross-Williams v. Bennett</u>, 55 Kan. App. 2d 524, 563, 419 P.3d 608, 635 (2018).

**RESPONSE:** Plaintiffs object to this Request for the reasons stated in the General Objections, which are incorporated herein by reference. Plaintiffs' Response to this Request is subject to further inquiry and the Response will be altered or supplemented if necessary. Notwithstanding and without waiving the foregoing objections, Plaintiffs respond that the opinion cited in this Request is a writing which speaks for itself. As Defendant has not produced a full copy of the opinion cited in this Request, Plaintiffs cannot evaluate the accuracy of the purported excerpt thereof in this Request. Therefore, this Request is denied.

60. Admit that the Court of Appeals of Kansas agreed that the billing records you submitted were not remotely accurate or credible.

**RESPONSE:** Plaintiffs object to this Request for the reasons stated in the General Objections, which are incorporated herein by reference. Plaintiffs' Response to this Request is subject to further inquiry and the Response will be altered or supplemented if necessary. Notwithstanding and without waiving the foregoing objections, Plaintiffs respond that they cannot assess the statement referenced without citation in this Request. By way of further Response, this Request is denied.

61.  Admit that you did not disclose the findings or the opinions of the trial court or Court of Appeals of Kansas in <u>Ross-Williams v. Bennett</u> to the United States District Court for the Northern District of Georgia *In re Equifax, Inc. Derivative Litigation,* No. 1:18-cv- 00317-TWT.

**RESPONSE:** Plaintiffs object to this Request for the reasons stated in the General Objections, which are incorporated herein by reference.  Plaintiffs' Response to this Request is subject to further inquiry and the Response will be altered or supplemented if necessary.  Notwithstanding and without waiving the foregoing objections, this Request is admitted.  Plaintiffs further respond that they were not required to disclose the findings or the opinions of the trial court or Court of Appeals of Kansas in <u>Ross-Williams v. Bennett</u> to the United States District Court for the Northern District of Georgia.

62.  Admit that you did not disclose the findings or the opinions of the trial court or Court of Appeals of Kansas in <u>Ross-Williams v. Bennett</u> to the United States District Court for the District of Minnesota in *In re CenturyLink Sales Practices and Securities Litigation*, No. 17-md-2795-MJD-MM.

**RESPONSE:** Plaintiffs object to this Request for the reasons stated in the General Objections, which are incorporated herein by reference.  Plaintiffs' Response to this Request is subject to further inquiry and the Response will be altered or supplemented if necessary.  Notwithstanding and without waiving the foregoing objections, this Request is admitted.  Plaintiffs further respond that they were not required to disclose the findings or the opinions of the trial court or Court of Appeals of Kansas in <u>Ross-Williams v. Bennett</u> to the United States District Court for the District of Minnesota.

63.  Admit that you did not disclose the findings or the opinions of the trial court or Court of Appeals of Kansas in <u>Ross-Williams v. Bennett</u> to the United States District Court for the Southern District of Ohio in In re Big Lots, Inc. Shareholder Litigation, No. 2:12-cv- 445.

**RESPONSE:** Plaintiffs object to this Request for the reasons stated in the General Objections, which are incorporated herein by reference.  Plaintiffs' Response to this Request is subject to further inquiry and the Response will be altered or supplemented if necessary.  Notwithstanding and without waiving the foregoing objections, this Request is admitted.  Plaintiffs further respond that they were not required to disclose the findings or the opinions of the trial court or Court of Appeals of Kansas in <u>Ross-Williams v. Bennett</u> to the United States District Court for the Southern District of Ohio.

64.  Admit that the holdings of trial court and Court of Appeals of Kansas in <u>Ross-Williams v. Bennett</u> is embarrassing to you.

**RESPONSE:** Plaintiffs object to this Request for the reasons stated in the General Objections, which are incorporated herein by reference.  Plaintiffs' Response to this Request is subject to further inquiry and the Response will be altered or supplemented if necessary.  Notwithstanding and without waiving the foregoing objections, this Request is denied as stated.  Plaintiffs respond that they stand by the propriety of the fee request made in <u>Ross-Williams v. Bennett</u> and the

accuracy of the hours worked by Mr. Silow reviewing documents in the Sprint case, and that they had no knowledge of Mr. Silow's bar admission status when the fee request was submitted.  By way of further Response, Plaintiffs submit that the propagation of false information about them and their legal practice by Defendant Hartleib was and is embarrassing.

65.    Admit that Ted Frank of the Hamilton Lincoln Law Institute (f/k/a Center for Class Action Fairness) told you he was aware of Silow's true identity and bar status and provided you the opportunity to disclose Silow's true identity and bar status to the court in <u>Ross-Williams v. Bennett</u>.

**RESPONSE:** Plaintiffs object to this Request for the reasons stated in the General Objections, which are incorporated herein by reference.  Plaintiffs' Response to this Request is subject to further inquiry and the Response will be altered or supplemented if necessary.  Notwithstanding and without waiving the foregoing objections, this Request is denied.

66.    Admit that prior to January of 2017 you were aware that Silow was using his son's identity.

**RESPONSE:** Plaintiffs object to this Request for the reasons stated in the General Objections, which are incorporated herein by reference.  Plaintiffs' Response to this Request is subject to further inquiry and the Response will be altered or supplemented if necessary.  Notwithstanding and without waiving the foregoing objections, this Request is denied.

67.    Admit that prior to January of 2017 you were aware that Silow was using a false identity.

**RESPONSE:** Plaintiffs object to this Request for the reasons stated in the General Objections, which are incorporated herein by reference.  Plaintiffs' Response to this Request is subject to further inquiry and the Response will be altered or supplemented if necessary.  Notwithstanding and without waiving the foregoing objections, this Request is denied.

68.    Admit that you have collected/received over a million dollars in attorneys' fees for work performed by Silow over the course of his employment with you.

**RESPONSE:** Plaintiffs object to this Request for the reasons stated in the General Objections, which are incorporated herein by reference.  Plaintiffs' Response to this Request is subject to further inquiry and the Response will be altered or supplemented if necessary.  Notwithstanding and without waiving the foregoing objections, this Request is denied as stated.  Plaintiffs respond that the Law Firm has collected fees for far less than the value of the work actually performed by Mr. Silow during his tenure at the Law Firm, work hours confirmed by reviews of Mr. Silow's bi-monthly bills and by an independent billing audit.  Plaintiffs further respond that the work performed by Mr. Silow was limited to document review work and, in and of itself, did not require the bar admission status Mr. Silow falsely represented himself to have had at the time.

69.    Admit that prior to January of 2017 you had met Silow in person.

**RESPONSE:** Plaintiffs object to this Request for the reasons stated in the General Objections, which are incorporated herein by reference.  Plaintiffs' Response to this Request is subject to

further inquiry and the Response will be altered or supplemented if necessary.  Notwithstanding and without waiving the foregoing objections, this Request is admitted.  Plaintiffs further respond that Mr. Weiser met Mr. Silow once in 2008 or 2009 during Mr. Silow's initial interview with the Law Firm.

70.    Admit that prior to January of 2017 you were aware Silow has son named Alex or Alexander who practiced law in Pennsylvania.

**RESPONSE:** Plaintiffs object to this Request for the reasons stated in the General Objections, which are incorporated herein by reference.  Plaintiffs' Response to this Request is subject to further inquiry and the Response will be altered or supplemented if necessary.  Notwithstanding and without waiving the foregoing objections, this Request is denied.

71.    Admit that Robert Weiser has not sought any medical, psychiatric, or psychological treatment for the harm alleged in paragraph 201 of your Complaint.

**RESPONSE:** Plaintiffs object to this Request for the reasons stated in the General Objections, which are incorporated herein by reference.  Plaintiffs further object to this insofar as "treatment" is a vague and undefined term in these Requests.  Plaintiffs' Response to this Request is subject to further inquiry and the Response will be altered or supplemented if necessary. Notwithstanding and without waiving the foregoing objections, this Request is denied.

72.    Admit that you have no documentation evidencing your allegation that Mr. Hartleib proposed a consulting agreement.

**RESPONSE:** Plaintiffs object to this Request for the reasons stated in the General Objections, which are incorporated herein by reference.  Plaintiffs' Response to this Request is subject to further inquiry and the Response will be altered or supplemented if necessary.  Notwithstanding and without waiving the foregoing objections, this Request is admitted.  Plaintiffs further respond that Defendant proposed an illicit consulting agreement during a phone call, which Mr. Weiser rejected out of hand as it was both immoral and illegal.

73.    Admit that your decision not to represent Mr. Hartleib in a Sprint shareholder derivative action was due to his opposition to involving the "Robbins Geller" and/or "Robbins Arroyo" firms referenced in your Complaint.

**RESPONSE:** Plaintiffs object to this Request for the reasons stated in the General Objections, which are incorporated herein by reference.  Plaintiffs' Response to this Request is subject to further inquiry and the Response will be altered or supplemented if necessary.  Notwithstanding and without waiving the foregoing objections, this Request is denied.

74.    Admit that Monica Ross-Williams was not involved in the Ross-Williams case other being a named plaintiff prior to being contacted by Mr. Hartleib.

**RESPONSE:** Plaintiffs object to this Request for the reasons stated in the General Objections, which are incorporated herein by reference.  Plaintiffs' Response to this Request is subject to further inquiry and the Response will be altered or supplemented if necessary.  This Request is illiterate and incomprehensible and is therefore denied.  To the extent that this Request intends to

ask whether Monica Ross-Williams was involved in the <u>Ross-Williams v. Bennett</u> case other *than* being a named plaintiff, this Request is denied.

75.   Admit that after the initial retention and pleadings Monica Ross-Williams was not involved in the <u>Ross-Williams</u> case other being a named plaintiff prior to being contacted by Mr. Hartleib.

**RESPONSE:** Plaintiffs object to this Request for the reasons stated in the General Objections, which are incorporated herein by reference.  Plaintiffs' Response to this Request is subject to further inquiry and the Response will be altered or supplemented if necessary.  This Request is illiterate and incomprehensible and is therefore denied.  To the extent that this Request intends to ask whether Monica Ross-Williams was involved in the <u>Ross-Williams v. Bennett</u> case other *than* being a named plaintiff and being involved in the pleading stage, this Request is denied.

## PLAINTIFFS' RESPONSES AND OBJECTIONS TO
## DEFENDANT'S INTERROGATORIES

1.  Please identify the name, address, and office of Robert Weiser's current primary care physician and the name, address, office and relevant dates of all of Mr. Weiser's primary care physicians over the past ten (10) years.

**RESPONSE:** Plaintiffs object to this Request for the reasons stated in the General Objections, which are incorporated herein by reference. Plaintiffs further object to this Request to the extent that it seeks to solicit confidential information protected by the Health Insurance Portability and Accountability Act of 1996. Plaintiffs' Response to this Request is subject to further inquiry and the Response will be altered or supplemented if necessary.

2.  Please identify any prescriptions filled by Robert Weiser as well as the name and address of the pharmacy(ies) used to fill them. Please identify by name and address every pharmacy Robert Weiser has used to fill prescription medication in the past ten (10) years.

**RESPONSE:** Plaintiffs object to this Request for the reasons stated in the General Objections, which are incorporated herein by reference. Plaintiffs further object to this Request to the extent that it seeks to solicit confidential information protected by the Health Insurance Portability and Accountability Act of 1996. Plaintiffs' Response to this Request is subject to further inquiry and the Response will be altered or supplemented if necessary.

3.  Please identify the name, address, and office of Robert Weiser's current mental health provider (i.e. psychiatrist, psychologist, counselor, social worker, etc) and the name, address, office and relevant dates of all of Mr. Weiser's mental providers over the past ten (10) years.

**RESPONSE:** Plaintiffs object to this Request for the reasons stated in the General Objections, which are incorporated herein by reference. Plaintiffs further object to this Request to the extent that it seeks to solicit confidential information protected by the Health Insurance Portability and Accountability Act of 1996. Plaintiffs' Response to this Request is subject to further inquiry and the Response will be altered or supplemented if necessary.

4.  Identify all contracted, "of counsel", or document review professionals you have employed in the last seven years, the cases they worked on, the dates of employment, and their most recent contact information including address, email, and phone numbers.

**RESPONSE:** Plaintiffs object to this Request for the reasons stated in the General Objections, which are incorporated herein by reference. Jeffrey Silow, 2008-2017, 1708 Salt Kettle Circle, Dresher, PA 19025; Debra S. Goodman, 2011, 2014, 2016-2017, dg@dsgoodmanlaw.com, (610) 277-6057; Jaime Gordon, 2007, 2017-2018, (215) 290-4500. Plaintiffs' Response to this Request is subject to further inquiry and the Response will be altered or supplemented if necessary.

EXHIBIT 36

5.  Identify all cases Silow worked on behalf of Plaintiffs.

**RESPONSE:** Plaintiffs object to this Request for the reasons stated in the General Objections, which are incorporated herein by reference.  Plaintiffs further object to this Request to the extent that it seeks to solicit privileged attorney work product and otherwise protected confidential information.  This Request is wholly unreasonable and incapable of Response insofar as it contains no temporal constraints.  Plaintiffs' Response to this Request is subject to further inquiry and the Response will be altered or supplemented if necessary.  With sufficient temporal constraints, Plaintiff will respond to this Request subject to a confidentiality agreement or protective order issued by the Court.

6.  State the total amount of hours billed by Silow on behalf of Plaintiffs and the total dollar amount billed for all of the work by Silow on behalf of Plaintiffs.

**RESPONSE:** Plaintiffs object to this Request for the reasons stated in the General Objections, which are incorporated herein by reference.  Plaintiffs further object to this Request insofar as it is exceedingly burdensome and not relevant to the instant litigation, which does not pertain to the vast majority of time Mr. Silow billed as a contract attorney at the Law Firm, nor does it relate to the quantity of billable time by Mr. Silow to the Law Firm or the sums billed with respect thereto. Plaintiffs' Response to this Request is subject to further inquiry and the Response will be altered or supplemented if necessary.

7.  Identify all courts notified as referenced in paragraph 64 of your Complaint and produce copies of these notifications.

**RESPONSE:** Plaintiffs object to this Request for the reasons stated in the General Objections, which are incorporated herein by reference.  Plaintiffs respond that the Law Firm notified the Honorable Jed Rakoff, United States District Court for the Southern District of New York and the Honorable David S. Doty, United States District Court for the District of Minnesota. Plaintiffs' Response to this Request is subject to further inquiry and the Response will be altered or supplemented if necessary.

8.  Identify persons or entities who performed the billing audit referenced in paragraph 67 of your Complaint, the scope of the audit, the amount paid by you to have audit performed, and produce any and all communications, documents, and reports related to the audit.

**RESPONSE:** Plaintiffs object to this Request for the reasons stated in the General Objections, which are incorporated herein by reference.  Plaintiffs' Response to this Request is subject to further inquiry and the Response will be altered or supplemented if necessary.  Notwithstanding and without waiving the foregoing objections, Plaintiffs respond that Relativity software was utilized to perform the billing analysis at issue in this Request.

9.  Identify the public relations firm referenced in paragraph 84 of your Complaint and provide their contact information.

**RESPONSE:** Plaintiffs object to this Request for the reasons stated in the General Objections, which are incorporated herein by reference.  Plaintiffs' Response to this Request is subject to

further inquiry and the Response will be altered or supplemented if necessary.  Notwithstanding and without waiving the foregoing objections, Plaintiffs respond that their public relations firm was The Swadosh Group, 101 Tudor Court Springfield Springfield, NJ 07081, (908) 723-2845.

10. State the basis for your allegation that "[n]early one hundred media outlets picked up and further publicized" the Wall Street Journal article as alleged in paragraph 87 of your Complaint.

**RESPONSE:** Plaintiffs object to this Request for the reasons stated in the General Objections, which are incorporated herein by reference.  Plaintiffs' Response to this Request is subject to further inquiry and the Response will be altered or supplemented if necessary.  Notwithstanding and without waiving the foregoing objections, Plaintiffs respond that their allegation in paragraph 87 of the Complaint was based upon a data tracking algorithm which Plaintiffs no longer maintain.

11. Identify the persons or entities you hired to investigate Mr. Hartleib and produce the results of the investigation.

**RESPONSE:** Plaintiffs object to this Request for the reasons stated in the General Objections, which are incorporated herein by reference.  Plaintiffs' Response to this Request is subject to further inquiry and the Response will be altered or supplemented if necessary.  Notwithstanding and without waiving the foregoing objections, Plaintiffs respond that they hired Mark Mershon to investigate Mr. Hartleib, and that no written report was produced.

12. If you are claiming a loss of income, state the amount you are claiming, and the basis for your calculation.

**RESPONSE:** Plaintiffs object to this Request for the reasons stated in the General Objections, which are incorporated herein by reference.  Notwithstanding and without waiving the foregoing objections, Plaintiffs respond that they have not yet calculated their lost income damages. Plaintiffs' Response to this Request is subject to further inquiry and the Response will be altered or supplemented if necessary.

13. Identify the total amount paid to Monica Ross-Williams as a result of the Sprint Settlement.

**RESPONSE:** Plaintiffs object to this Request for the reasons stated in the General Objections, which are incorporated herein by reference.  Notwithstanding and without waiving the foregoing objections, Plaintiffs respond that the court awarded Monica Ross-Williams an incentive award of $5,000, which the Law Firm paid to her from the settlement proceeds via check dated January 17, 2017. Plaintiffs' Response to this Request is subject to further inquiry and the Response will be altered or supplemented if necessary.

14. Identify all software, services, contractors or applications you use for maintaining "billing records" as defined above.

**RESPONSE:** Plaintiffs object to this Request for the reasons stated in the General Objections, which are incorporated herein by reference. Notwithstanding and without waiving the foregoing objections, this Request is wholly unreasonable and incapable of Response insofar as it contains no temporal restriction. Plaintiffs' Response to this Request is subject to further inquiry and the Response will be altered or supplemented if necessary.

15. Identify all individual(s) who were responsible for or who are currently responsible receivables and/or billing and the storage, maintenance, review, and submission of billing records for the past seven years at the Weiser Law Firm. Please state their job title, describe their responsibilities, and provide dates of employment. If they are no longer employed by you, provide their contact information.

**RESPONSE:** Plaintiffs object to this Request for the reasons stated in the General Objections, which are incorporated herein by reference. Notwithstanding and without waiving the foregoing objections, Plaintiffs respond that the attorneys employed by The Weiser Law Firm maintain their own time records on a daily basis; Plaintiff Robert Weiser reviews these time records. With respect to expenses, the attorneys employed by The Weiser Law Firm document their expenses; non-party Patricia Weiser reviews these expense records. With respect to billing, The Weiser Law Firm's bookkeeper, Cheryl Tryon, calculates, maintains, stores and submits billing records via Quickbooks.

16. Identify all individuals who reviewed and/or approved the billing records of Silow in Ross-Williams and in the "several occasions" you hired him "between 2008 and 2017" as described in paragraph 59 of your Complaint. Please state their job title, describe their responsibilities, and provide dates of employment. If they are no longer employed by you, provide their contact information.

**RESPONSE:** Plaintiffs object to this Request for the reasons stated in the General Objections, which are incorporated herein by reference. Notwithstanding and without waiving the foregoing objections, Plaintiffs respond that Mr. Silow submitted his time records to the senior attorney for whom he worked on the case for which the time was billed, either Brett Stecker, Jeffrey Ciarlanto or James Ficaro. Mesrs. Ficaro, Ciarlanto or Stecker reviewed the submissions and, if approved, forwarded same to the Law Firm's bookkeeper, Cheryl Tryon, or administrator, JeriLyn Pearson, who generated paychecks for Mr. Silow. Mr. Stecker no longer works for the Law Firm; his current contact information is 326 W. Lancaster Avenue, Ardmore, PA 19003, (866) 569-4531, brett@shumanlawfirm.com. Mr. Ciarlanto no longer works for the Law Firm; his current contact information is BDDW, 5 Crosby Street, New York, NY 10013, (212) 625-1215. Mr. Ficaro, Ms. Pearson and Ms. Tryon can be contacted via the Law Firm through its counsel.

17. Please state your document or electronically stored information retention policies for case files and billing records and produce any documents stating or regarding these polices.

**RESPONSE:** Plaintiffs object to this Request for the reasons stated in the General Objections, which are incorporated herein by reference. Plaintiffs further object to this Request to the extent that it seeks to solicit privileged attorney work product and otherwise protected confidential information. This Request is wholly unreasonable and incapable of Response insofar as it contains no temporal constraints, and insofar as Plaintiff Robert Weiser maintains no personal retention policy. By way of further Response, to the extent this Request inquires as to The Weiser Law Firm's current retention policy, it is an unwritten but widely disseminated and understood practice of retaining legal documents – regardless of form – for a five-year period. Certain documents have been kept for longer than five years. Certain documents were lost during data management transitions. Plaintiffs' Response to this Request is subject to further inquiry and the Response will be altered or supplemented if necessary.

18. Identify all individuals involved in the drafting, review, and approval of the Weiser Law Firm resume submitted in the Ross-Williams case. Please state their job title, describe their responsibilities, and provide dates of employment. If they are no longer employed by you, provide their contact information.

**RESPONSE:** Plaintiffs object to this Request for the reasons stated in the General Objections, which are incorporated herein by reference. Notwithstanding and without waiving the foregoing objections, Plaintiffs respond that Plaintiff Robert Weiser, Esq. and attorney James Ficaro, Esq. were involved in the drafting and approval of The Weiser Law Firm's resume/professional profile submitted in the Ross-Williams case. Both are employed by The Weiser Law Firm and can be contacted via the Law Firm through its counsel.

                                    **SILVERANG, ROSENZWEIG**
                                    **& HALTZMAN, LLC**

By:   /s/ Philip S. Rosenzweig
        Philip S. Rosenzweig, Esquire
        Attorney Identification No. 62461
        prosenzweig@sanddlawyers.com
        Woodlands Center
        900 E. 8th Avenue, Suite 300
        King of Prussia, PA  19406
        (610) 263-0115
        *Attorneys for Plaintiffs*
        *The Weiser Law Firm, P.C. and*
        *Robert B. Weiser, Esquire*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| THE WEISER LAW FIRM, P.C., and | : | |
| ROBERT B. WEISER, ESQUIRE | : | **CIVIL ACTION** |
| | : | |
| v. | : | **NO.: 2:19-CV-02728- KSM** |
| | : | |
| MICHAEL HARTLEIB | : | |

### CERTIFICATE OF SERVICE

The undersigned hereby certifies that on December 15, 2020, a true and correct copy of *Plaintiffs' Responses and Objections to Defendant's Interrogatories and Requests for Admission*, and this *Certificate of Service* were served upon the following via Electronic Mail.

Eamon C. Merrigan, Esquire
GOLDBERG, MILLER & RUBIN, P.C.
North American Building
121 South Broad Street, Suite 1500
Philadelphia, PA 19107
emerrigan@gmrlawfirm.com
*Attorney for Defendant*

**SILVERANG, ROSENZWEIG**
**& HALTZMAN, LLC**

By:    /s/ Philip S. Rosenzweig _____
Philip S. Rosenzweig, Esquire
Attorney Identification No. 62461
prosenzweig@sanddlwayers.com
Woodlands Center
900 E. 8th Avenue, Suite 300
King of Prussia, PA  19406
(610) 263-0115
*Attorneys for Plaintiffs*
*The Weiser Law Firm, P.C. and*
*Robert B. Weiser, Esquire*

{01296497;5}

EXHIBIT 36
1163

## VERIFICATION

I, **Michael Hartleib**, hereby affirm that the following facts are correct:

The foregoing **RESPONSE TO PLAINTIFFS' FIRST SET OF REQUESTS FOR ADMISSIONS WITH COMPANION INTERROGATORIES PLAINTIFFS' REQUESTS FOR ADMISSIONS     WITH COMPANION INTERROGATORIES** is based upon information which has been furnished to counsel and information which has been gathered by counsel in the preparation of the defense of this lawsuit.  The language of the foregoing document is that of counsel and not of me.  I have read the foregoing document and to the extent that the same is based upon information which I have given to counsel, it is true and correct to the best of my knowledge, information and belief.  To the extent that the content of the foregoing document is that of counsel, I have relied upon counsel in making this Verification.

**Michael Hartleib**

Date: 10-15-20

EXHIBIT 36
1164

## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| THE WEISER LAW FIRM, P.C. : | **CIVIL ACTION** |
| and : | |
| ROBERT B. WEISER, ESQUIRE : | **NO. 2:19-CV-02728-KSM** |
| Plaintiffs, : | |
| v. : | |
| MICHAEL HARTLEIB : | |
| Defendant. : | |

### PLAINTIFFS' RESPONSES TO DEFENDANT'S REQUESTS FOR PRODUCTION OF DOCUMENT

Plaintiffs The Weiser Law Firm, P.C. (hereinafter the "Law Firm") and Robert B. Weiser, Esquire ("Weiser" or, together with the Law Firm, "Plaintiffs"), by and through their undersigned counsel, Silverang, Rosenzweig & Haltzman, LLC, hereby responds to the Requests for Production of Documents (together the "Discovery Requests" or "Requests," and each a "Request") propounded by Defendant Michael Hartleib ("Hartleib" or "Defendant"), as follows:

### GENERAL OBJECTIONS

1.    Plaintiffs object to each Request to the extent they seek information that is subject to the attorney/client privilege, attorney/work product doctrine, or any other applicable privilege.

2.    Plaintiffs object to each Request to the extent it seeks information or materials which reflect trade secrets, confidential, commercial or business information, or information subject to other applicable privileges, including attorney/client and accountant/client privileges.

3.    Plaintiffs object to each Request to the extent that it seeks confidential or proprietary information in documents protected from disclosure by law, court order or agreement respecting confidentiality or nondisclosure.

4.    Plaintiffs object to each Request to the extent that it seeks information and documents which were prepared, generated or received in anticipation of or after the commencement of this litigation.

{01296568;3}

1

EXHIBIT 36

1165

5.      Plaintiffs object to each Request to the extent that it seeks information and documents that are not within Plaintiff's possession, custody or control.

6.      Plaintiffs object to each Request to the extent that it seeks information that is not relevant to the subject matter of this action or reasonably calculated to lead to the discovery of admissible evidence.

7.      Plaintiffs object to each Request the extent that it is overly broad, unduly burdensome and calls for information not reasonably calculated to lead to the discovery of admissible evidence.

8.      Plaintiffs object to each Request to the extent it seeks information and documents not relevant to the time period during which the events that are of subject matter of this dispute took place, on the grounds that such Interrogatory is overly broad, duly burdensome, not relevant to the subject matter of this litigation and not reasonably calculated to lead to the discovery of admissible evidence.

9.      Plaintiffs object to each Request to the extent that the information or documents may be derived or ascertained from information or documents available to Defendants or which may be more readily available from a more convenient, less burdensome and less expensive source.

10.     Plaintiffs do not waive any objection by agreeing to produce certain information or documents in response to certain requests subject to objections.

11.     Plaintiffs reserve the right to challenge the competency, relevance, materiality and admissibility of, and to object on any grounds to the use of the information and/or documents provided herewith in any proceeding or trial of this or any other action.

12.     Plaintiffs reserve the right to supplement these objections.

## RESPONSES TO REQUESTS FOR PRODUCTION OF DOCUMENTS

1.  Identify and produce any and all documents that are referenced in, evidence, concern, support, refute, refer or relate to your responses to Defendant's Requests for Admissions and/or Defendant's Interrogatories.

**RESPONSE:** Plaintiffs object to this Request for the reasons stated in the General Objections, which are incorporated herein by reference.   Notwithstanding and without waiving the foregoing objections, Plaintiffs will produce all responsive, non-privileged documents in their possession, custody or control in response to this Request, which production is contingent upon

EXHIBIT 36
1166

and subject to the parties' entry into a legally binding confidentiality agreement and/or the Court's issuance of a protective order.  Plaintiffs reserve the right to update and/or augment their response to this Request.

2. Identify and produce any and all documents relied upon in preparing your responses to Defendant's Requests for Admissions or Interrogatories.

**RESPONSE:** Plaintiffs object to this Request for the reasons stated in the General Objections, which are incorporated herein by reference.  Notwithstanding and without waiving the foregoing objections, Plaintiffs will produce all responsive, non-privileged documents in their possession, custody or control in response to this Request, which production is contingent upon and subject to the parties' entry into a legally binding confidentiality agreement and/or the Court's issuance of a protective order.  Plaintiffs reserve the right to update and/or augment their response to this Request.

3. Identify and produce any and all documents or communications referencing, stating, or indicating that Silow was barred in the state of Pennsylvania.

**RESPONSE:** Plaintiffs object to this Request for the reasons stated in the General Objections, which are incorporated herein by reference.  Notwithstanding and without waiving the foregoing objections, Plaintiffs will produce responsive, non-privileged documents in their possession, custody or control in response to this Request, which production is contingent upon and subject to the parties' entry into a legally binding confidentiality agreement and/or the Court's issuance of a protective order.  Plaintiffs reserve the right to update and/or augment their response to this Request.

{01296568;3}                                          3

EXHIBIT 36
1167

4. Identify and produce any and all declarations and/or sworn statements by you and/or Silow in <u>Ross-Williams</u>.

**RESPONSE:** Plaintiffs object to this Request for the reasons stated in the General Objections, which are incorporated herein by reference.   Notwithstanding and without waiving the foregoing objections, Plaintiffs will produce all responsive, non-privileged documents in their possession, custody or control in response to this Request, which production is contingent upon and subject to the parties' entry into a legally binding confidentiality agreement and/or the Court's issuance of a protective order.  Plaintiffs reserve the right to update and/or augment their response to this Request.

5. Identify and produce any and all declarations and/or sworn statements by you and/or Silow in the "several occasions" you employed Silow "between 2008 and 2017" as described in paragraph 59 of your Complaint.

**RESPONSE:** Plaintiffs object to this Request for the reasons stated in the General Objections, which are incorporated herein by reference.   Notwithstanding and without waiving the foregoing objections, Plaintiffs will produce all responsive, non-privileged documents in their possession, custody or control in response to this Request, which production is contingent upon and subject to the parties' entry into a legally binding confidentiality agreement and/or the Court's issuance of a protective order.  Plaintiffs reserve the right to update and/or augment their response to this Request.

6.  Produce the resumes of all contracted attorneys, "of counsel", or document review professionals you have employed in the last seven years.

**RESPONSE:** Plaintiffs object to this Request for the reasons stated in the General Objections, which are incorporated herein by reference. This Request seeks documents that are irrelevant to the instant litigation, which pertains solely to Defendant's defamatory and damaging statements about Plaintiffs. The instant litigation does not pertain to the qualifications of all of The Weiser Law Firm's "contracted attorneys, "of counsel", or document review professionals" over the past seven years. Furthermore, these Requests seek – and Plaintiffs will provide – the firm vitae of the Law Firm and a resume of Mr. Silow – whose qualifications are in issue in certain of Defendant's defamatory statements. Plaintiffs reserve the right to update and/or augment their response to this Request.

7.  Identify and produce your entire file in the *The Weiser Law Firm, P.C. v. Abelson Legal Search and Jeffrey Mark Silow* including, but not limited to, any and all filings, pleadings, discovery requests and responses, motions, briefs, subpoenaed documents, deposition transcripts, deposition notices, etc. of all parties, include any correspondence not subject to attorney/client privilege.

**RESPONSE:** Plaintiffs object to this Request for the reasons stated in the General Objections, which are incorporated herein by reference. Notwithstanding and without waiving the foregoing objections, all pleadings and filing in the matter have been previously produced. By way of further response, Defendant has subpoenaed or indicated his intention to re-subpoena all other documents responsive to this Request from Jeffrey McCarron, Esq., counsel for Abelson Legal Search, and Jeffrey Larkin, Esq., counsel for Jeffrey Silow – which subpoenas have been quashed and/or withdrawn. Plaintiffs will produce responsive, non-privileged, non-

EXHIBIT 36
1169

confidential documents in their possession, custody or control in response to this Request, which production is contingent upon and subject to the parties' entry into a legally binding confidentiality agreement and/or the Court's issuance of a protective order, provided the same Request is stricken from any subpoenas actually served to any third parties. Plaintiffs reserve the right to update and/or augment their response to this Request.

8. Identify and produce any and all work product, including, but not limited to, notes, emails, memorandums, outlines, motions, briefings, declarations, pleadings, discovery authored by Silow in <u>Ross-Williams</u>.

**RESPONSE:** Plaintiffs object to this Request for the reasons stated in the General Objections, which are incorporated herein by reference. Notwithstanding and without waiving the foregoing objections, no responsive, non-privileged, non-confidential documents exist in Plaintiffs' possession, custody or control.

9. Identify and produce any and all work product including, including, but not limited to, notes, emails, memorandums, outlines, motions, briefings, declarations, pleadings, discovery authored by Silow, in the "several occasions" you hired him "between 2008 and 2017" as described in paragraph 59 of your Complaint.

**RESPONSE:** Plaintiffs object to this Request for the reasons stated in the General Objections, which are incorporated herein by reference. Notwithstanding and without waiving the foregoing objections, no responsive, non-privileged, non-confidential documents exist in Plaintiffs' possession, custody or control.

EXHIBIT 36
1170

10. Identify and produce any and all billing records Silow for the "several occasions" you hired him "between 2008 and 2017" as described in paragraph 59 of your Complaint.

**RESPONSE:** Plaintiffs object to this Request for the reasons stated in the General Objections, which are incorporated herein by reference. Plaintiffs further object to this Request to the extent that it is indecipherable insofar as "billing records Silow" makes no sense. By way of further response, Plaintiffs do not maintain "billing records" in their usual course of business, but rather their attorney employees received and assessed requests for payment initially from Abelson and subsequently from Silow; payment to Abelson or to Silow was then issued. Notwithstanding and without waiving the foregoing objections, Plaintiffs will produce all responsive, non-privileged documents in their possession, custody or control in response to this Request, which production is contingent upon and subject to the parties' entry into a legally binding confidentiality agreement and/or the Court's issuance of a protective order. Plaintiffs reserve the right to update and/or augment their response to this Request.

11. Identify and produced any and all communications with Silow.

**RESPONSE:** Plaintiffs object to this Request for the reasons stated in the General Objections, which are incorporated herein by reference. Plaintiffs further object to this Request to the extent that it seeks to solicit privileged attorney work product and otherwise protected confidential information, and insofar as it is unduly burdensome as it contains no topical or temporal constraint. Notwithstanding and without waiving the foregoing objections, Plaintiffs will produce all responsive, non-privileged documents in their possession, custody or control in response to this Request which pertains to Silow's work for and payment from the Law firm, which production is contingent upon and subject to the

EXHIBIT 36
1171

parties' entry into a legally binding confidentiality agreement and/or the Court's issuance of a protective order.  Plaintiffs reserve the right to update and/or augment their response to this Request.

12. Identify and produce any and all communications with the real Alexander J. Silow barred in Pennsylvania (Jeffrey M. Silow's son).

**RESPONSE:** Plaintiffs object to this Request for the reasons stated in the General Objections, which are incorporated herein by reference.  Notwithstanding and without waiving the foregoing objections, no responsive, non-privileged, non-confidential documents exist in Plaintiffs' possession. Plaintiffs reserve the right to update and/or augment their response to this Request.

13. Identify and produce any and all communications with Abelson Legal Search including, but not limited to, those regarding Silow and/or Mr. Hartleib.

**RESPONSE:** Plaintiffs object to this Request for the reasons stated in the General Objections, which are incorporated herein by reference.  Plaintiffs further object to this Request to the extent that it seeks to solicit privileged attorney work product and otherwise protected confidential information.  This request is overbroad, as Plaintiff's non-Silow-related correspondence with Abelson Legal Search is entirely irrelevant to the instant litigation.  Notwithstanding and without waiving the foregoing objections, Plaintiffs reply that they have no non-privileged, non-confidential communication with Abelson Legal Search regarding Defendant, outside of the *Weiser v. Abelson* litigation.  Plaintiffs will produce all responsive, non-privileged documents in their possession, custody or control in response to this Request concerning communication with Abelson Legal Search with regard to Mr. Silow, which

EXHIBIT 36
1172

production is contingent upon and subject to the parties' entry into a legally binding confidentiality agreement and/or the Court's issuance of a protective order. Plaintiffs reserve the right to update and/or augment their response to this Request.

14. Identify and produced any and all internal communications regarding Silow.

**RESPONSE:** Plaintiffs object to this Request for the reasons stated in the General Objections, which are incorporated herein by reference. Plaintiffs further object to this Request to the extent that it seeks to solicit privileged attorney work product and otherwise protected confidential information. Notwithstanding and without waiving the foregoing objections, Plaintiffs will produce all responsive, non-privileged, non-confidential documents in their possession, custody or control in response to this Request, which production is contingent upon and subject to the parties' entry into a legally binding confidentiality agreement and/or the Court's issuance of a protective order. Plaintiffs reserve the right to update and/or augment their response to this Request.

15. Identify and produced [sic] any and all internal communications regarding Mr. Hartleib.

**RESPONSE:** Plaintiffs object to this Request for the reasons stated in the General Objections, which are incorporated herein by reference. Notwithstanding and without waiving the foregoing objections, Notwithstanding and without waiving the foregoing objections, no responsive, non-privileged, non-confidential documents exist in Plaintiffs' possession. Plaintiffs reserve the right to update and/or augment their response to this Request.

EXHIBIT 36
1173

16. Identify and produce any and all communications with third-parties regarding Silow including, but not limited to, any counsel involved in <u>Ross-Williams</u>, *In re Equifax, Inc. Derivative Litigation,* No. 1:18-cv-00317-TWT, *In re CenturyLink Sales Practices and Securities Litigation*, No. 17-md-2795-MJD-MM, *In re Big Lots, Inc. Shareholder Litigation*, No. 2:12-cv-445, and the Kraft Heinz matters Case No. 1:19-cv-01339 and 1:20-cv-02071.

**RESPONSE:** Plaintiffs object to this Request for the reasons stated in the General Objections, which are incorporated herein by reference.  Plaintiffs further object to this Request to the extent that it seeks to solicit privileged attorney work product and otherwise protected confidential information.  Notwithstanding and without waiving the foregoing objections, Plaintiffs will produce all responsive, non-privileged documents in their possession, custody or control in response to this Request, which production is contingent upon and subject to the parties' entry into a legally binding confidentiality agreement and/or the Court's issuance of a protective order.  Plaintiffs reserve the right to update and/or augment their response to this Request.

17. Identify and produce any and all communications with third-parties regarding Mr. Hartleib including, but not limited to, any counsel involved in <u>Ross-Williams</u>, *In re Equifax, Inc. Derivative Litigation,* No. 1:18-cv-00317-TWT, *In re CenturyLink Sales Practices and Securities Litigation*, No. 17-md-2795-MJD-MM, *In re Big Lots, Inc. Shareholder Litigation*, No. 2:12-cv-445, and the Kraft Heinz matters Case No. 1:19-cv-01339 and 1:20-cv-02071.

**RESPONSE:** Plaintiffs object to this Request for the reasons stated in the General Objections, which are incorporated herein by reference.  Notwithstanding and without waiving the

EXHIBIT 36
1174

foregoing objections, Notwithstanding and without waiving the foregoing objections, no responsive, non-privileged, non-confidential documents exist in Plaintiffs' possession. Plaintiffs reserve the right to update and/or augment their response to this Request.

18. Identify and produce any and all communications with Monica Ross-Williams regarding the March 2017 contact with Mr. Hartleib and the resulting protective order.

**RESPONSE:** Plaintiffs object to this Request for the reasons stated in the General Objections, which are incorporated herein by reference. Plaintiffs further object to this Request to the extent that it seeks to solicit privileged and protected attorney-client communications. Plaintiffs reserve the right to update and/or augment their response to this Request.

19. Identify and produce any and all communications, contracts, releases, retainer letters, emails, etc. with Monica Ross-Williams regarding Ross-Williams .

**RESPONSE:** Plaintiffs object to this Request for the reasons stated in the General Objections, which are incorporated herein by reference. Plaintiffs further object to this Request to the extent that it seeks to solicit privileged and protected attorney-client communications. Plaintiffs reserve the right to update and/or augment their response to this Request.

20. Identify and produce your state and federal income tax returns for the past seven years.

**RESPONSE:** Plaintiffs object to this Request for the reasons stated in the General Objections, which are incorporated herein by reference. Plaintiffs further object to this Request to the extent that it seeks to solicit irrelevant and confidential information. Plaintiffs

EXHIBIT 36
1175

Case 8:23-cv-00171-CJC-JDE    Document 1    Filed 01/27/23    Page 1176 of 1580   Page
ID #:1176
Case 2:19-cv-02728-KSM    Document 171-8    Filed 08/23/22    Page 43 of 50

reserve the right to update and/or augment their response to this Request.

21. Identify and produce the billing records you submitted for review in <u>Ross-Williams</u>.

**RESPONSE:** Plaintiffs object to this Request for the reasons stated in the General Objections, which are incorporated herein by reference.  Notwithstanding and without waiving the foregoing objections, Plaintiffs will produce all responsive, non-privileged documents in their possession, custody or control in response to this Request, which production is contingent upon and subject to the parties' entry into a legally binding confidentiality agreement and/or the Court's issuance of a protective order.  Plaintiffs reserve the right to update and/or augment their response to this Request.

22. Identify and produce the billings [sic] records in <u>Ross-Williams</u> regardless of whether or not they were submitted for review.

**RESPONSE:** Plaintiffs object to this Request for the reasons stated in the General Objections, which are incorporated herein by reference.  Notwithstanding and without waiving the foregoing objections, Plaintiffs will produce all responsive, non-privileged documents in their possession, custody or control in response to this Request, which production is contingent upon and subject to the parties' entry into a legally binding confidentiality agreement and/or the Court's issuance of a protective order.  Plaintiffs reserve the right to update and/or augment their response to this Request.

EXHIBIT 36
1176

23. Identify and produce any and all documents of Silow's employment with you including expense sheets, resumes, handbooks, policy agreements, checks, paystubs, tax forms, W-9s, W-2s, contracts, engagement letters, retainment letters, or any other document referencing Silow's scope of work with you.

**RESPONSE:** Plaintiffs object to this Request for the reasons stated in the General Objections, which are incorporated herein by reference.  Plaintiffs further object to this Request insofar as Mr. Silow was never an employee of Plaintiffs.  Mr. Silow submitted no expense sheets, was not given a handbook, did not receive a policy agreement, did not sign a contract or engagement letter or retainment letter with Plaintiffs, and Plaintiffs did not document the scope of Mr. Silow's work prior to or during his term as a contract attorney with Plaintiffs.  Mr. Silow's resume and relevant billing records (some of which were facilitated by Abelson Legal Search) will be produced in response to Requests 10 and 23. Plaintiffs reserve the right to update and/or augment their response to this Request.


24. Identify and produce the Weiser Law Firm resume submitted in <u>Ross-Williams</u>.

**RESPONSE:** Plaintiffs object to this Request for the reasons stated in the General Objections, which are incorporated herein by reference.  Plaintiffs further object to this Request to the extent that it seeks to solicit publically available information.  Notwithstanding and without waiving the foregoing objections, Plaintiffs will produce all responsive, non-privileged documents in their possession, custody or control in response to this Request, which production is contingent upon and subject to the parties' entry into a legally binding confidentiality agreement and/or the Court's issuance of a protective order.  Plaintiffs reserve the right to update and/or augment their response to this Request.

EXHIBIT 36

25. Identify and produce the Weiser Law Firm resume submitted during the "several occasions" you employed Silow "between 2008 and 2017".

**RESPONSE:** Plaintiffs object to this Request for the reasons stated in the General Objections, which are incorporated herein by reference. Plaintiffs' response to this Request is subject to further inquiry and the response will be altered or supplemented if necessary. This Request is incomprehensible and is therefore incapable of response. Plaintiffs reserve the right to update and/or augment their response to this Request.

26. Identify and produce the any and all documentation and communications related to the criminal proceedings against Silow referenced in paragraph 65 of your Complaint.

**RESPONSE:** Plaintiffs object to this Request for the reasons stated in the General Objections, which are incorporated herein by reference. Notwithstanding and without waiving the foregoing objections, Notwithstanding and without waiving the foregoing objections, no responsive, non-privileged, non-confidential documents exist in Plaintiffs' possession. Plaintiffs reserve the right to update and/or augment their response to this Request.

27. Identify and produce any and all documents regarding the "attorney time" lodestar calculation referenced in paragraph 64 of your Complaint.

**RESPONSE:** Plaintiffs object to this Request for the reasons stated in the General Objections, which are incorporated herein by reference. Notwithstanding and without waiving the foregoing objections, Notwithstanding and without waiving the foregoing objections, no responsive, non-privileged, non-confidential documents exist in Plaintiffs' possession. Plaintiffs reserve the right to update and/or augment their response to this Request.

EXHIBIT 36
1178

28. Identify and produce any and all documents and communications related to your report to the Disciplinary Board of the Supreme Court of Pennsylvania referenced in paragraph 64 of your Complaint.

**RESPONSE:** Plaintiffs object to this Request for the reasons stated in the General Objections, which are incorporated herein by reference.    By way of further response, Plaintiffs hired specialized counsel for this purpose, and will not produce documents protected by the attorney-client privilege.   Plaintiffs reserve the right to update and/or augment their response to this Request.

29. Identify and produce any and all communications with Bruce Murphy regarding Mr. Hartleib, the retainment letter, the decision whether or not to represent Mr. Hartleib the revisions to the retainment letter, and the decision to represent Monica Ross-Williams.

**RESPONSE:** Plaintiffs object to this Request for the reasons stated in the General Objections, which are incorporated herein by reference.  Plaintiffs further object to this Request to the extent that it seeks to solicit privileged attorney work product and otherwise protected confidential information.   Notwithstanding and without waiving the foregoing objections, Plaintiffs direct Defendant to Exhibits 1-3 of the Complaint.  Plaintiffs reserve the right to update and/or augment their response to this Request.

30. Identify and produce any and all documentation evidencing your allegation that Mr. Hartleib proposed a consulting agreement.

**RESPONSE:** Plaintiffs object to this Request for the reasons stated in the General Objections, which are incorporated herein by reference.   Notwithstanding and without waiving the foregoing objections, Plaintiffs cannot respond to this Request as Mr. Hartleib's proposal was made verbally and not in writing, and therefore no responsive, non-privileged, non-confidential documents exist in Plaintiffs' possession. Plaintiffs reserve the right to update and/or augment their response to this Request.

31. Identify and produce any and all documents and/or communications that you contend evidences harm to your reputation or loss of business that you associate with statements made by Mr. Hartleib.

**RESPONSE:** Plaintiffs object to this Request for the reasons stated in the General Objections, which are incorporated herein by reference.   Notwithstanding and without waiving the foregoing objections, Notwithstanding and without waiving the foregoing objections, no responsive, non-privileged, non-confidential documents exist in Plaintiffs' possession. Plaintiffs reserve the right to update and/or augment their response to this Request.

**SILVERANG, ROSENZWEIG
& HALTZMAN, LLC**

By:    /s/ Philip S. Rosenzweig
Philip S. Rosenzweig, Esquire
Attorney Identification No. 62461
prosenzweig@sanddlawyers.com
Woodlands Center
900 E. 8th Avenue, Suite 300
King of Prussia, PA  19406
(610) 263-0115
*Attorneys for Plaintiffs
The Weiser Law Firm, P.C. and
Robert B. Weiser, Esquire*

**SILVERANG, ROSENZWEIG**
**& HALTZMAN, LLC**
By:     Philip S. Rosenzweig, Esquire
        PA Atty ID No. 62461
prosenzweig@sanddlawyers.com
Woodlands Center
900 E. 8th Avenue, Suite 300
King of Prussia, PA  19406
 (610) 263-0115 (telephone)
(610) 263-0122 (facsimile)
*Attorneys for Plaintiffs*

**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| THE WEISER LAW FIRM, P.C. et al | : | |
| | : | |
| Plaintiffs, | : | CIVIL ACTION |
| | : | |
| v. | : | Case No. 2:19-CV-02728-MSG |
| | : | |
| MICHAEL HARTLEIB | : | |
| | : | |
| Defendant. | : | |

<u>**CERTIFICATE OF SERVICE**</u>

The undersigned hereby certifies that on this 30th day of December, 2020, the foregoing

***Plaintiffs' Responses to Defendant's Requests for Production of Documents*** *and this*

***Certificate of Service*** were served by electronic mail upon the following:

Eamon Merrigan, Esquire
North American Building
121 South Broad Street, Suite 1600
Philadelphia, PA 19107
Attorney for Defendant

EXHIBIT 36
1181

**SILVERANG, ROSENZWEIG**
**& HALTZMAN, LLC**

By:    /s/ Philip S. Rosenzweig
       Philip S. Rosenzweig, Esquire
       Attorney Identification No. 62461
       prosenzweig@sanddlawyers.com
       Woodlands Center
       900 E. 8th Avenue, Suite 300
       King of Prussia, PA  19406
       (610) 263-0115
       *Attorneys for Plaintiffs*
       *The Weiser Law Firm, P.C. and*
       *Robert B. Weiser, Esquire*

## VERIFICATION

I, Robert B. Weiser, Esquire, Managing Partner of The Weiser Law Firm, P.C., being duly sworn according to law, hereby depose and say that I am the Managing Partner of Plaintiff in this action. The facts set forth in the foregoing Responses and Objections to Defendant's Discovery Requests, are true and correct to the best of my knowledge, information and belief. I understand that the statements contained herein are subject to the penalties of 18 Pa. C.S. §4904, relating to unsworn falsification to authorities.

Robert B. Weiser, Esquire, Managing Partner

The Weiser Law Firm, P.C.

## VERIFICATION

I, Robert B. Weiser, Esquire, being duly sworn according to law, hereby depose and say that I am the Plaintiff in this action. The facts set forth in the foregoing Responses and Objections to Defendant's Discovery Requests, are true and correct to the best of my knowledge, information and belief. I understand that the statements contained herein are subject to the penalties of 18 Pa. C.S. §4904, relating to unsworn falsification to authorities.

Robert B. Weiser, Esquire

{01307209;1}

EXHIBIT 36

1183

# EXHIBIT "F"

EXHIBIT 36
1184

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|   |   |   |
|---|---|---|
| **THE WEISER LAW FIRM, P.C., and** | : | |
| **ROBERT B. WEISER, ESQUIRE** | : | **CIVIL ACTION** |
| | : | |
| **v.** | : | **NO.: 2:19-CV-02728- KSM** |
| | : | |
| **MICHAEL HARTLEIB** | : | |
| | : | |

### PLAINTIFFS' SUPPLEMENTAL RESPONSES
### TO DEFENDANT'S INTERROGATORIES 1-3

Pursuant to Order of the Court dated August 6, 2021 (Doc. No. 120, the "Discovery Order"), which Discovery Order provided:

> In response to Interrogatories 1-3, Plaintiffs shall disclose only mental health treatment, including visits to any medical provider or prescriptions, Robert Weiser has obtained in relation to his claim of intentional infliction of emotional distress, if the Court denies Defendant's motion to dismiss this claim. The other information sought by Defendant is disproportionate to the needs of this case.

Discovery Order, ¶ 5(a), Plaintiffs, The Weiser Law Firm, P.C. (the "Firm") and Robert B. Weiser, Esquire ("Weiser," or together with the Firm, "Plaintiffs"), by and through their undersigned attorneys, Silverang, Rosenzweig & Haltzman, LLC, hereby submit their Supplemental Responses to Defendant's Interrogatories 1-3 (the "Interrogatories") propounded by Defendant, Michael Hartleib ("Hartleib" or "Defendant").[1]

---

[1] To the extent not disposed or ruled upon by the Court, Plaintiffs reserve, reassert, and incorporate by reference each of the objections previously asserted relative to the Interrogatories addressed herein as if the same were set forth at length herein.

## PLAINTIFFS' SUPPLEMENTAL RESPONSES TO DEFENDANT'S INTERROGATORIES 1-3

1. Please identify the name, address, and office of Robert Weiser's current primary care physician and the name, address, office and relevant dates of all of Mr. Weiser's primary care physicians over the past ten (10) years.

**RESPONSE:** As provided by the Discovery Order, this Interrogatory, as posed, is overbroad and not proportionate to the needs of the above-captioned matter (the "Action"). As required by the Discovery Order, Plaintiffs respond as follows:

Plaintiff Robert Weiser has been evaluated by a Doctor of Psychology (PhD) with respect to his mental health. Mr. Weiser has not, to date, been prescribed any medications. Further, Mr. Weiser has sought the counsel of clergy with respect to the matters relating to his intentional infliction of emotional distress claims. Plaintiff Robert Weiser intends to present expert testimony in support of his claim for intentional infliction of emotional distress as permitted and required by prevailing precedent in Pennsylvania. *Lamb v. CVS Health*, No. 21-638, 2021 U.S. Dist. LEXIS 100994, at \*14 (E.D. Pa. May 28, 2021) (applying Pennsylvania precedent and citing citing *Kane v. Chester Cty. Dep't of Children, Youth & Families*, 10 F. Supp. 3d 671, 693 (E.D. Pa. 2014); *Kazatsky v. King David Memorial Park, Inc.*, 515 Pa. 183, 527 A. 2d 988, 995 (Pa. 1987)). Disclosure of any expert retained by Plaintiffs to provide requisite expert testimony relative to Plaintiff Robert Weiser's claim for intentional infliction of emotional distress shall be in strict accordance with the terms of the operative scheduling order in this Action, *i.e.*, on or before July 25, 2022.

2. Please identify any prescriptions filled by Robert Weiser as well as the name and address of the pharmacy(ies) used to fill them. Please identify by name and address every pharmacy Robert Weiser has used to fill prescription medication in the past ten (10) years.

**RESPONSE:** As provided by the Discovery Order, this Interrogatory, as posed, is overbroad and not proportionate to the needs of the above-captioned matter (the "Action"). As required by the Discovery Order, Plaintiffs respond as follows:

Plaintiff Robert Weiser has been evaluated by a Doctor of Psychology (PhD) with respect to his mental health. Mr. Weiser has not, to date, been prescribed any medications. Further, Mr. Weiser has sought the counsel of clergy with respect to the matters relating to his intentional infliction of emotional distress claims. Plaintiff Robert Weiser intends to present expert testimony in support of his claim for intentional infliction of emotional distress as permitted and required by prevailing precedent in Pennsylvania. *Lamb v. CVS Health*, No. 21-638, 2021 U.S. Dist. LEXIS 100994, at \*14 (E.D. Pa. May 28, 2021) (applying Pennsylvania precedent and citing citing *Kane v. Chester Cty. Dep't of Children, Youth & Families*, 10 F. Supp. 3d 671, 693 (E.D. Pa. 2014); *Kazatsky v. King David Memorial Park, Inc.*, 515 Pa. 183, 527 A. 2d 988, 995 (Pa. 1987)). Disclosure of any expert retained by Plaintiffs to provide requisite expert testimony relative to Plaintiff Robert Weiser's claim for intentional infliction of emotional distress shall be in strict accordance with the terms of the operative scheduling order in this Action, *i.e.*, on or before July 25, 2022.

3.  Please identify the name, address, and office of Robert Weiser's current mental health provider (i.e. psychiatrist, psychologist, counselor, social worker, etc.) and the name, address, office and relevant dates of all of Mr. Weiser's mental providers over the past ten (10) years.

**RESPONSE:** As provided by the Discovery Order, this Interrogatory, as posed, is overbroad and not proportionate to the needs of the above-captioned matter (the "Action"). As required by the Discovery Order, Plaintiffs respond as follows:

Plaintiff Robert Weiser has been evaluated by a Doctor of Psychology (PhD) with respect to his mental health. Mr. Weiser has not, to date, been prescribed any medications. Further, Mr. Weiser has sought the counsel of clergy with respect to the matters relating to his intentional infliction of emotional distress claims. Plaintiff Robert Weiser intends to present expert testimony in support of his claim for intentional infliction of emotional distress as permitted and required by prevailing precedent in Pennsylvania. *Lamb v. CVS Health*, No. 21-638, 2021 U.S. Dist. LEXIS 100994, at *14 (E.D. Pa. May 28, 2021) (applying Pennsylvania precedent and citing citing *Kane v. Chester Cty. Dep't of Children, Youth & Families*, 10 F. Supp. 3d 671, 693 (E.D. Pa. 2014); *Kazatsky v. King David Memorial Park, Inc.*, 515 Pa. 183, 527 A. 2d 988, 995 (Pa. 1987)). Disclosure of any expert retained by Plaintiffs to provide requisite expert testimony relative to Plaintiff Robert Weiser's claim for intentional infliction of emotional distress shall be in strict accordance with the terms of the operative scheduling order in this Action, *i.e.*, on or before July 25, 2022.

                    **SILVERANG, ROSENZWEIG
                    & HALTZMAN, LLC**

            By:    /s/ Philip S. Rosenzweig
                    Philip S. Rosenzweig, Esquire
                    Attorney Identification No. 62461
                    prosenzweig@sanddlawyers.com
                    Woodlands Center
                    900 E. 8th Avenue, Suite 300
                    King of Prussia, PA  19406
                    (610) 263-0115
                    *Attorneys for Plaintiffs*
                    *The Weiser Law Firm, P.C. and*
                    *Robert B. Weiser, Esquire*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| **THE WEISER LAW FIRM, P.C., and** | : | |
| **ROBERT B. WEISER, ESQUIRE** | : | **CIVIL ACTION** |
| | : | |
| **v.** | : | **NO.: 2:19-CV-02728- KSM** |
| | : | |
| **MICHAEL HARTLEIB** | : | |
| | : | |

### CERTIFICATE OF SERVICE

The undersigned hereby certifies that on May 25, 2022, a true and correct copy of *Plaintiffs' Supplemental Responses to Defendant's Interrogatories 1-3*, and this *Certificate of Service* were served upon the following via Electronic Mail.

Eamon C. Merrigan, Esquire
GOLDBERG, MILLER & RUBIN, P.C.
North American Building
121 South Broad Street, Suite 1500
Philadelphia, PA 19107
emerrigan@gmrlawfirm.com
*Attorney for Defendant*

**SILVERANG, ROSENZWEIG
& HALTZMAN, LLC**

By:   /s/ Philip S. Rosenzweig
Philip S. Rosenzweig, Esquire
Attorney Identification No. 62461
prosenzweig@sanddllwayers.com
Woodlands Center
900 E. 8th Avenue, Suite 300
King of Prussia, PA  19406
(610) 263-0115
*Attorneys for Plaintiffs*
*The Weiser Law Firm, P.C. and*
*Robert B. Weiser, Esquire*

{01511199;2}

EXHIBIT 36
1188

# EXHIBIT "G"

EXHIBIT 36
1189

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

|  |  |  |
|---|---|---|
| THE WEISER LAW FIRM, P.C., and ROBERT B. WEISER, ESQUIRE | : : : : | CIVIL ACTION |
| v. | : : | NO.: 2:19-CV-02728- KSM |
| MICHAEL HARTLEIB | : : | |

**PLAINTIFFS' SUPPLEMENTAL RESPONSES
TO DEFENDANT'S INTERROGATORIES 1-3
PER COURT ORDER OF JUNE 24, 2022 (DOC. NO. 160)**

Pursuant to Order of the Court dated June 24, 2022, Plaintiffs, The Weiser Law Firm, P.C. (the "Firm") and Robert B. Weiser, Esquire ("Weiser," or together with the Firm, "Plaintiffs"), by and through their undersigned attorneys, Silverang, Rosenzweig & Haltzman, LLC, hereby submit the herein Supplemental Responses to Defendant's Interrogatories 1-3 (the "Interrogatories") propounded by Defendant, Michael Hartleib ("Hartleib" or "Defendant"). [1]

**PLAINTIFFS' SUPPLEMENTAL RESPONSES TO
DEFENDANT'S INTERROGATORIES 1-3**

1.  Please identify the name, address, and office of Robert Weiser's current primary care physician and the name, address, office and relevant dates of all of Mr. Weiser's primary care physicians over the past ten (10) years.

**RESPONSE:**         As required by Order of the Court dated June 24, 2022 (Doc. No. 160, the "Order"), which Order disposed of Defendant's Motion to Compel Specific Responses to Interrogatories Nos. 1-3 (Doc. No. 158) and directed Plaintiffs to identify "the Doctor of Psychology that <u>treated</u>" Robert Weiser, Plaintiffs incorporate all prior responses provided to Defendant, including objections, relative to this Interrogatory as if set forth at length herein and supplement those responses as follows:

Plaintiff Robert Weiser was not "treated" and did not receive *treatment* from a psychologist or Doctor of Psychology prior to the institution of this litigation and, therefore, no further specific responsive information to this Interrogatory exists. However, for the sake of clarity, Mr. Weiser

---

[1] To the extent not disposed or ruled upon by the Court, Plaintiffs reserve, reassert, and incorporate by reference each of the objections previously asserted relative to the Interrogatories addressed herein as if the same were set forth at length herein.

has been *evaluated by a medical* **expert***, i.e.,* a Doctor of Psychology, *in connection with this litigation*, upon which expert's testimony Mr. Weiser intends to rely at trial. Reserving all rights, Plaintiffs shall disclose the identity of this expert, along with any expert opinions proffered upon which Plaintiffs will rely, in strict accordance with the Court's operative scheduling order which pertinently provides that "Counsel for each party shall serve upon counsel for every other party the information referred to in Federal Rule of Civil Procedure 26(a)(2)(B) <u>by expert report or answer to expert interrogatory</u> **no later than July 25, 2022**." (Doc. No. 149, ¶ 5)(emphasis added).

2. Please identify any prescriptions filled by Robert Weiser as well as the name and address of the pharmacy(ies) used to fill them. Please identify by name and address every pharmacy Robert Weiser has used to fill prescription medication in the past ten (10) years.

**RESPONSE:**       As required by Order of the Court dated June 24, 2022 (Doc. No. 160, the "Order"), which Order disposed of Defendant's Motion to Compel Specific Responses to Interrogatories Nos. 1-3 (Doc. No. 158) and directed Plaintiffs to identify "the Doctor of Psychology that <u>treated</u>" Robert Weiser, Plaintiffs incorporate all prior responses provided to Defendant, including objections, relative to this Interrogatory as if set forth at length herein and supplement those responses as follows:

Plaintiff Robert Weiser was not "treated" and did not receive *treatment* from a psychologist or Doctor of Psychology prior to the institution of this litigation and, therefore, no further specific responsive information to this Interrogatory exists. However, for the sake of clarity, Mr. Weiser has been *evaluated by a medical* **expert***, i.e.,* a Doctor of Psychology, *in connection with this litigation*, upon which expert's testimony Mr. Weiser intends to rely at trial. Reserving all rights, Plaintiffs shall disclose the identity of this expert, along with any expert opinions proffered upon which Plaintiffs will rely, in strict accordance with the Court's operative scheduling order which pertinently provides that "Counsel for each party shall serve upon counsel for every other party the information referred to in Federal Rule of Civil Procedure 26(a)(2)(B) <u>by expert report or answer to expert interrogatory</u> **no later than July 25, 2022**." (Doc. No. 149, ¶ 5)(emphasis added).

3. Please identify the name, address, and office of Robert Weiser's current mental health provider (i.e. psychiatrist, psychologist, counselor, social worker, etc.) and the name, address, office and relevant dates of all of Mr. Weiser's mental providers over the past ten (10) years.

**RESPONSE:**       As required by Order of the Court dated June 24, 2022 (Doc. No. 160, the "Order"), which Order disposed of Defendant's Motion to Compel Specific Responses to Interrogatories Nos. 1-3 (Doc. No. 158) and directed Plaintiffs to identify "the Doctor of Psychology that <u>treated</u>" Robert Weiser, Plaintiffs incorporate all prior responses provided to Defendant, including objections, relative to this Interrogatory as if set forth at length herein and supplement those responses as follows:

Plaintiff Robert Weiser was not "treated" and did not receive *treatment* from a psychologist or Doctor of Psychology prior to the institution of this litigation and, therefore, no further specific responsive information to this Interrogatory exists. However, for the sake of clarity, Mr. Weiser

has been *evaluated by a medical* **expert**, *i.e.,* a Doctor of Psychology, *in connection with this litigation*, upon which expert's testimony Mr. Weiser intends to rely at trial. Reserving all rights, Plaintiffs shall disclose the identity of this expert, along with any expert opinions proffered upon which Plaintiffs will rely, in strict accordance with the Court's operative scheduling order which pertinently provides that "Counsel for each party shall serve upon counsel for every other party the information referred to in Federal Rule of Civil Procedure 26(a)(2)(B) <u>by expert report or answer to expert interrogatory</u> **no later than July 25, 2022**." (Doc. No. 149, ¶ 5)(emphasis added).

 

 

**SILVERANG, ROSENZWEIG & HALTZMAN, LLC**

By:    /s/ Philip S. Rosenzweig
      Philip S. Rosenzweig, Esquire
      Attorney Identification No. 62461
      prosenzweig@sanddlawyers.com
      Woodlands Center
      900 E. 8th Avenue, Suite 300
      King of Prussia, PA  19406
      (610) 263-0115
      *Attorneys for Plaintiffs*
      *The Weiser Law Firm, P.C. and*
      *Robert B. Weiser, Esquire*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **THE WEISER LAW FIRM, P.C., and** | : | |
| **ROBERT B. WEISER, ESQUIRE** | : | **CIVIL ACTION** |
| | : | |
| **v.** | : | **NO.: 2:19-CV-02728- KSM** |
| | : | |
| **MICHAEL HARTLEIB** | : | |
| | : | |

### <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that on June 28, 2022, a true and correct copy of *Plaintiffs' Supplemental Responses to Defendant's Interrogatories 1-3 Per Court Order of June 24, 2022 (Doc. No. 160)*, and this *Certificate of Service* were served upon the following via Electronic Mail.

Eamon C. Merrigan, Esquire
GOLDBERG, MILLER & RUBIN, P.C.
North American Building
121 South Broad Street, Suite 1500
Philadelphia, PA 19107
emerrigan@gmrlawfirm.com
*Attorney for Defendant*

**SILVERANG, ROSENZWEIG**
**& HALTZMAN, LLC**

By:    /s/ Philip S. Rosenzweig
      Philip S. Rosenzweig, Esquire
      Attorney Identification No. 62461
      prosenzweig@sanddlwayers.com
      Woodlands Center
      900 E. 8th Avenue, Suite 300
      King of Prussia, PA  19406
      (610) 263-0115
      *Attorneys for Plaintiffs*
      *The Weiser Law Firm, P.C. and*
      *Robert B. Weiser, Esquire*

{01527191;1}

EXHIBIT 36

# EXHIBIT "H"

EXHIBIT 36
1194

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| THE WEISER LAW FIRM, P.C., and ROBERT B. WEISER, ESQUIRE | : : : : | CIVIL ACTION |
| v. | : : | NO.: 2:19-CV-02728- KSM |
| MICHAEL HARTLEIB | : : | |

## PLAINTIFFS' FIRST AMENDED RESPONSES AND OBJECTIONS TO DEFENDANT'S REQUESTS FOR ADMISSIONS

Plaintiffs The Weiser Law Firm, P.C. (the "Law Firm") and Robert B. Weiser, Esq. ("Weiser," or together with the Law Firm, "Plaintiffs"), by their undersigned attorneys, Silverang, Rosenzweig & Haltzman LLC, hereby submit their First Amended Responses to Defendant's Requests for Admissions (collectively the "Requests") of Defendant Michael Hartleib ("Hartleib" or "Defendant").

## PRELIMINARY STATEMENT

To the extent not set forth or modified herein, Plaintiffs incorporate their Preliminary Statement, General Objections and Conditions, specific objections and responses previously provided in response to Defendant's Requests for Admissions.

## PLAINTIFFS' FIRST AMENDED RESPONSES AND OBJECTIONS TO DEFENDANT'S REQUEST FOR ADMISSIONS

71.    Admit that Robert Weiser has not sought any medical, psychiatric, or psychological treatment for the harm alleged in paragraph 201 of your Complaint.

**RESPONSE:** Plaintiffs object to this Request for the reasons stated in the previously asserted General Objections, which are incorporated herein by reference.  Plaintiffs further object to this insofar as "treatment" is a vague and undefined term in these Requests.  Plaintiffs further object to this inquiry insofar as it is not limited to any defined period of time. Plaintiffs further object

insofar as paragraph 201 of the operative *Amended* Complaint relates to the inapplicability judicial privilege. Notwithstanding and without waiving the foregoing objections, to the extent this RFA is meant to refer to paragraph 194 of the Amended Complaint (ECF 69), which mirrors paragraph 201 of the now moot Complaint, the Request is admitted in part and denied in part. It is solely admitted that Robert Weiser did not receive "treatment" from a psychologist or Doctor of Psychology or other medical professional prior to the institution of this litigation. However, Robert Weiser has been *evaluated by a medical* **expert***, i.e.,* a Doctor of Psychology, *in connection with this litigation*, upon which expert's testimony Mr. Weiser intends to rely at trial. Reserving all rights, Plaintiffs shall disclose the identity of this expert, along with any expert opinions proffered upon which Plaintiffs will rely, in strict accordance with the Court's operative scheduling order which pertinently provides that "Counsel for each party shall serve upon counsel for every other party the information referred to in Federal Rule of Civil Procedure 26(a)(2)(B) by expert report or answer to expert interrogatory **no later than July 25, 2022**." (Doc. No. 149, ¶ 5)(emphasis added).

**SILVERANG, ROSENZWEIG & HALTZMAN, LLC**

By:    /s/ Philip S. Rosenzweig
       Philip S. Rosenzweig, Esquire
       Attorney Identification No. 62461
       prosenzweig@sanddlawyers.com
       Woodlands Center
       900 E. 8th Avenue, Suite 300
       King of Prussia, PA  19406
       (610) 263-0115
       *Attorneys for Plaintiffs,*
       *The Weiser Law Firm, P.C. and*
       *Robert B. Weiser, Esquire*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| **THE WEISER LAW FIRM, P.C., and ROBERT B. WEISER, ESQUIRE** | : : : : | **CIVIL ACTION** |
| v. | : : | **NO.: 2:19-CV-02728- KSM** |
| **MICHAEL HARTLEIB** | : : | |

### CERTIFICATE OF SERVICE

    The undersigned hereby certifies that on July 18, 2022, a true and correct copy of ***Plaintiffs' First Amended Responses and Objections to Defendant's Interrogatories and Requests for Admission***, and this ***Certificate of Service*** were served upon the following via Electronic Mail.

Eamon C. Merrigan, Esquire
GOLDBERG, MILLER & RUBIN, P.C.
North American Building
121 South Broad Street, Suite 1500
Philadelphia, PA 19107
emerrigan@gmrlawfirm.com
*Attorney for Defendant*

**SILVERANG, ROSENZWEIG
& HALTZMAN, LLC**

By:   /s/ Philip S. Rosenzweig
       Philip S. Rosenzweig, Esquire
       Attorney Identification No. 62461
       prosenzweig@sanddlwayers.com
       Woodlands Center
       900 E. 8th Avenue, Suite 300
       King of Prussia, PA  19406
       (610) 263-0115
       *Attorneys for Plaintiffs,*
       *The Weiser Law Firm, P.C. and*
       *Robert B. Weiser, Esquire*

# EXHIBIT "I"

EXHIBIT 36
1198

```
          IN THE UNITED STATES DISTRICT COURT
        FOR THE EASTERN DISTRICT OF PENNSYLVANIA
             CASE NO. 2:19-CV-02728-MSG

                      - - -

THE WEISER LAW FIRM, P.C.  :
and ROBERT B. WEISER, ESQ.,:     VIDEO DEPOSITION
                           :
           Plaintiffs,     :  UPON ORAL EXAMINATION
                           :
   - vs -                  :           OF
                           :
MICHAEL HARTLEIB,          :     JAMES FICARO, ESQ.
                           :
           Defendant.      :
- - - - - - - - - - - - - -
```

TRANSCRIPT OF VIDEO DEPOSITION, taken by and before JAMES HOPPER, a Registered Professional Reporter and Notary Public, via Zoom Video Communications, on Friday, May 6, 2022, commencing at 10:15 a.m.

                      - - -

```
            ERSA COURT REPORTERS
              30 South 17th Street
           United Plaza - Suite 1520
        Philadelphia, Pennsylvania 19103
                (215) 564-1233
```

EXHIBIT 36
1199

JAMES FICARO, ESQ.

```
 1

 2    APPEARANCES:

 3

 4            SILVERANG, ROSENZWEIG & HALTZMAN, LLC
              BY:  PHILIP ROSENZWEIG, ESQUIRE
 5            BY:  KEVIN McGOWAN, ESQUIRE
               Woodlands Center, Suite 300
 6             900 East Eighth Avenue
               King of Prussia, Pennsylvania 19406
 7             Counsel for the Plaintiffs

 8

 9
              GOLDBERG, MILLER & RUBIN, P.C.
10            BY:  TYSON MOTT, ESQUIRE
               The North American Building
11             121 South Broad Street, Suite 1600
               Philadelphia, Pennsylvania 19107
12             Counsel for the Defendant

13

14

15    ALSO PRESENT:

16
              BOB ODELL, Videographer
17            ERSA Court Reporters

18            MICHAEL HARTLEIB, Defendant

19

20

21

22

23

24
```

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36
1200

**JAMES FICARO, ESQ.**

3

1                          - - -

2

3                    I N D E X

4    WITNESS                          PAGE

5    JAMES FICARO, ESQ.

6

7         By Mr. Mott                  6

8

9                    - - -

10

11

12                E X H I B I T S

13

| LETTER | DESCRIPTION | PAGE MARKED | PAGE ATTACHED |
|---|---|---|---|
| Exhibit A | First Amended Complaint | 12 | 128 |
| Exhibit B | Big Lots Docket | 43 | 129 |
| Exhibit C | 12/20/16 Email Chain | 82 | 130 |
| Exhibit D | Weiser v. Stecker Complaint | 90 | 131 |
| Exhibit E | Ficaro Affidavit | 109 | 132 |

14

15

16

17

18

19

20

21

22

23                    - - -

24

**ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES**

EXHIBIT 36
1201

JAMES FICARO, ESQ.

4

1          (By agreement of counsel, the

2       witness will be sworn in remotely via Zoom

3       Video Communications; all objections,

4       except as to the form of the question,

5       have been reserved until the time of

6       trial.)

7               - - -

8          THE VIDEOGRAPHER:  The time is

9       now 10:15.  The following is a video

10      deposition.  My name is Bob Odell from

11      ERSA Court Reporting in Philadelphia,

12      Pennsylvania.

13          This deposition is being taken

14      on May 6, 2022, and this deposition is for

15      the United States District Court of the

16      Eastern District of Pennsylvania, Civil

17      Action No. 2:19-CV-02728-MSA (sic) in the

18      case of The Weiser Law Firm, P.C., et al.

19      versus Michael Hartleib.

20          Present for the taking of this

21      video deposition are the deponent, James

22      Ficaro, and Counsel, who will now

23      introduce themselves.

24          MR. MOTT:  Tyson Mott for

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36
1202

JAMES FICARO, ESQ.

5

1          Defendant Michael Hartleib.  I'd also note

2          for the record that Michael Hartleib is

3          attending via telephone.

4                    MR. ROSENZWEIG:  And it's Phil

5          Rosenzweig and Kevin McGowan from

6          Silverang Rosenzweig & Haltzman on behalf

7          of the plaintiffs, The Weiser Law Firm and

8          Rob Weiser.

9                    And let me note from the outset

10         that Mr. Ficaro is an attorney with The

11         Weiser Law Firm; therefore, he is being

12         represented as part of my clients this

13         morning, and I will be acting accordingly.

14                   THE VIDEOGRAPHER:  Thank you,

15         Counsel.  The court reporter is Jim Hopper

16         of ERSA, and the court reporter will now

17         swear in the witness.

18                   (At this time, the court

19         reporter administered the oath to the

20         witness.)

21                   THE VIDEOGRAPHER:  We can't hear

22         him.  Did you guys hear him?

23                   MR. ROSENZWEIG:

24                   THE WITNESS:  Do you hear me

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36

1203

JAMES FICARO, ESQ.

6

1          now?

2                    MR. ROSENZWEIG:  Yes.  Now, we

3          can hear you, although it's fairly low,

4          Jimmy.  So maybe -- is there a way to turn

5          up volume?

6                    THE WITNESS:  My volume is all

7          the way up.

8                    MR. ROSENZWEIG:  Okay.  There

9          you go.  That's -- that's great right

10          there.

11                    - - -

12                    JAMES FICARO, having been duly

13          sworn, was examined and testified as

14          follows:

15                    - - -

16                    THE VIDEOGRAPHER:  We will now

17          begin questioning.

18    BY MR. MOTT:

19    Q.       Good morning, Mr. Ficaro.

20    A.       Good morning.

21    Q.       My name is Tyson Mott, and as we just said

22    on the record, I represent Mr. Hartleib in this

23    matter.

24          You are currently an employee for The

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36

1204

JAMES FICARO, ESQ.

7

1    Weiser Law Firm, correct?

2    A.        Yes.

3    Q.        Okay.  And what is your current job title?

4    A.        I'm a partner.

5    Q.        And when did you become a partner?

6    A.        2018, I think.

7    Q.        And prior to becoming a partner, what was

8    your position?

9    A.        I was an associate.

10    Q.        How long did you have the title of

11    associate at The Weiser Law Firm?

12    A.        Seven years.  If I remember correctly,

13    about 2018 was when I was made a partner, generally.

14    Q.        And I apologize, I just had a little

15    trouble hearing.  You said seven years?

16    A.        Yes.

17    Q.        Okay.  As a partner, do you have any

18    ownership interest in the firm?

19    A.        I do not.

20    Q.        Any other kind of equitable interest in

21    the firm?

22    A.        No.

23                        MR. ROSENZWEIG:  Objection as to

24                form.  I don't know what equitable

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36

JAMES FICARO, ESQ.

8

1          interest means.

2     BY MR. MOTT:

3     Q.        And how long -- well, strike that.

4               Are -- you are a practicing attorney?

5     A.        Yes.

6     Q.        How long have you been practicing?

7     A.        Since 2010.

8     Q.        Did you work anywhere else as an attorney

9     prior to coming to The Weiser Law Firm?

10    A.        No.

11    Q.        Where did you go to law school?

12    A.        Temple University.

13    Q.        And what year did you graduate?

14    A.        2010.

15    Q.        And what are your current areas of

16    practice at The Weiser Law Firm?

17    A.        I work in the shareholder securities

18    department.  We handle derivative actions,

19    securities class actions.

20    Q.        And is that the department that you've

21    always worked in?

22    A.        Yes.  More recently the department has

23    merged.  When I began, we were a bit more siloed to

24    the extent where I was focused almost purely on

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36
1206

JAMES FICARO, ESQ.

9

1    class actions and not derivative actions until just

2    the past six years or so.

3    Q.        Do you do any work in the practice area

4    qui tam cases?

5    A.        Very little.  I have.  I'm probably

6    involved in only one active qui tam action at the

7    moment, but I help out if needed.

8    Q.        Have you ever seen the original Complaint

9    or Amended Complaint in this action that we're here

10   for today?

11   A.        I don't remember.

12   Q.        Did you review any documents in

13   preparation for today's deposition?

14   A.        I did not.

15   Q.        Did you have any role in the Sprint

16   derivative litigation case that is -- well, I'll

17   just leave it at that.  Did you have any role within

18   The Weiser Law Firm in the Sprint derivative

19   litigation?

20   A.        Not until the case was settled.  I was

21   involved in some settlement paperwork submitted to

22   the court, but I was not involved in the litigation

23   or settlement of the action.

24   Q.        Are you currently involved in an active

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36

1207

JAMES FICARO, ESQ.

10

1    derivative litigation?

2    A.         Yes.

3    Q.         Generally, how does the firm locate

4    potential derivative clients or representative

5    plaintiffs for derivative cases?

6    A.         We have relationships with other attorneys

7    in the bar and those outside the bar who know us,

8    know what we do, and sometimes they come to us.

9    They know that there's an existing -- for example,

10   maybe a class action that they've heard about or

11   read about, say that they have a client or an

12   acquaintance or someone who's interested in speaking

13   to an attorney about their rights, and then we'll

14   have a discussion with them.

15            If we're interested in the case, we'll

16   explain to them what we think the cause of action

17   might be, see if they're interested in

18   participating, and if so, then we move forward.

19   Q.         Does the firm use any kind of formal

20   referral service to locate potential representative

21   plaintiffs?

22   A.         No.  Not that I'm aware of.

23   Q.         When you mentioned other parties, non-firm

24   parties I guess I should say, can you provide an

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36
1208

JAMES FICARO, ESQ.

11

1    example of a non-attorney or non-firm referral?

2                         MR. ROSENZWEIG:  Okay.  So I

3             object to the question as to form.  I

4             object to the fact that it's a compound

5             question, and I object to the fact that it

6             mischaracterizes his testimony.  So,

7             Mr. Mott, try again.

8                         MR. MOTT:  Sure.

9    BY MR. MOTT:

10   Q.       What are the other sources of referrals

11   other than firms and attorneys?

12   A.       Oh, then I misspoke if you got the wrong

13   idea.  That's -- we're always -- any client that's

14   referred to us is always through an attorney.

15   Q.       Are you familiar with an attorney by the

16   name of Bruce Murphy?

17   A.       Only through this action.

18   Q.       Have you ever had any interaction with

19   Bruce Murphy?

20   A.       No.

21   Q.       Had you ever heard the name before this

22   action?

23   A.       I don't think so, no.

24                         MR. MOTT:  I've just placed on

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36

1209

JAMES FICARO, ESQ.

12

1          the screen what we'll mark as Exhibit A,

2          and it is the First Amended Complaint in

3          this case.

4                    (At this time, Exhibit A was

5          marked for identification.)

6   BY MR. MOTT:

7   Q.       And you don't recall whether you've ever

8   seen this document before?

9                    MR. ROSENZWEIG:  Objection as to

10         form.  You had previously asked him about

11         the Complaint, not the Amended Complaint.

12                   THE WITNESS:  Yeah.  It's

13         possible I saw a draft at one point, but I

14         don't recall ever seeing this final filed

15         version.

16                   MR. MOTT:  Okay.

17  BY MR. MOTT:

18  Q.       Now, beginning on paragraph 11, it begins

19  referencing the Sprint Securities class action and

20  the derivative case.  And if you could just read

21  through paragraph 11 and 12 and let me know when

22  you're done, and I'll go on to the next page.

23  A.       I'm ready.

24  Q.       Let me know when you finish paragraph 14.

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36

JAMES FICARO, ESQ.

13

1    A.          I'm finished.

2    Q.          Okay.  So paragraph 14 references a law

3    firm's investigation -- or, The Weiser Law Firm's

4    investigation into the Sprint/Nextel merger and

5    resulting write-downs.

6               Were you a part of any investigation into

7    the Sprint/Nextel merger and the write-downs?

8    A.          No.  I was still in law school in 2008.

9    Q.          When was the first name -- when was the

10   first time you heard the name Michael Hartleib?

11   A.          I suppose it was during the settlement

12   process in the Sprint action.

13   Q.          Do you recall approximately when that was?

14   A.          I do not.

15   Q.          When the Sprint derivative case was in the

16   settlement stages, did you have any role in any of

17   the negotiation process or was your -- well, I'll

18   just leave it there.  Did you have any role in the

19   negotiation process?

20   A.          No.

21   Q.          Did you assist in preparation for any of

22   the mediations that took place?

23   A.          No.

24   Q.          Did you attend any of the mediations that

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36
1211

JAMES FICARO, ESQ.

14

1    took place?

2    A.         No.

3    Q.         Does The Weiser Law Firm have any

4    consulting agreements with any person or entity

5    regarding shareholder derivative cases?

6                        MR. ROSENZWEIG:  Objection as to

7             form.

8                        THE WITNESS:  Not that I'm aware

9             of.

10   BY MR. MOTT:

11   Q.         The settlement paperwork that was involved

12   in the Sprint litigation case that you assisted

13   with, did that include the Motion For Settlement

14   Approval?

15                       MR. ROSENZWEIG:  Can you read

16            that back, please?

17                       (At this time, the court

18            reporter read back from the record as

19            requested.)

20                       MR. ROSENZWEIG:  Thank you.

21                       THE WITNESS:  Yes.

22   BY MR. MOTT:

23   Q.         And would that have included any

24   declarations prepared by The Weiser Law Firm in

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36

1212

JAMES FICARO, ESQ.

15

1    support of that settlement?

2    A.         I can't recall if I drafted any of the

3    declarations, but I almost certainly would have seen

4    it prior to its filing.

5    Q.         Would you have -- would you have assisted

6    with the -- with any documents in support of a fee

7    award in the Sprint case?

8    A.         Probably, yes.

9    Q.         When The Weiser Firm submits documents in

10   support of a fee petition, including -- that

11   includes the total hours spent on a particular

12   action, how does it make those calculations?

13                    MR. ROSENZWEIG:  Objection as to

14          form.

15                    THE WITNESS:  As attorneys, we

16          have to enter our time into our system

17          here.

18   BY MR. MOTT:

19   Q.         And was there a specific system in place

20   that was used in the Sprint case?

21   A.         There was a system.  We've kind of

22   switched between some during my tenure, so I don't

23   remember exactly what it was at that time.

24   Q.         Okay.  What is the current system?

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36

JAMES FICARO, ESQ.

16

1    A.         We use LEAP it's called, L-E-A-P.

2    Q.         What other systems has the firm used

3    during your time?

4    A.         There was one -- it was QuickTime or

5    QuickBooks, something like that, and then earlier in

6    my tenure attorneys individually tracked their own

7    time and we submitted it to the office manager to be

8    formally in place.  So I don't really recall what

9    the name of that system was at the time.

10   Q.         Do you know who the office manager was

11   during that time period?

12   A.         No, I do not.

13   Q.         And during that time period when it would

14   be submitted to the office manager, how would you

15   track your time?

16                    MR. ROSENZWEIG:  Objection as to

17          form.

18                    THE WITNESS:  Via timesheets or

19          we used a spreadsheet for the day that was

20          printed out.

21   BY MR. MOTT:

22   Q.         Would you fill it out by hand or type it

23   in on the computer?

24   A.         Both.

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36

JAMES FICARO, ESQ.

17

1    Q.        The QuickTime or QuickBooks program that

2    you would use, is that something that the firm would

3    maintain on its own, or was that a software that was

4    maintained by a third party?

5    A.        I don't know.

6    Q.        Do you know who the firm's current IT

7    provider is?

8    A.        I believe it's ACE Technology, but that

9    may have changed recently.  But that's what I think

10   it is.

11   Q.        Do you know how long the firm has used ACE

12   Technology as its IT provider?

13   A.        At least two or three years maybe.

14   Q.        During your time with The Weiser Law Firm,

15   did you ever work with Jeffrey Silow?

16   A.        Yes.

17   Q.        Prior to 2017 -- well, strike that.

18             Prior to becoming a partner at The Weiser

19   Law Firm, would you work as the handling attorney

20   for shareholder derivative cases?

21                    MR. ROSENZWEIG:  Objection as to

22             form.  You can answer it if you understand

23             it.

24                    THE WITNESS:  Yeah.  If you

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36

JAMES FICARO, ESQ.

18

1               could clarify that for me, please.

2     BY MR. MOTT:

3     Q.       Yes.

4     A.       I don't know what you mean by --

5     Q.       Would you --

6     A.       -- handling attorney.

7     Q.       Would you ever be -- well, strike that.

8              For any particular shareholder derivative

9     case, is there a lead attorney at the firm handling

10    the case?

11    A.       Now?

12    Q.       Yes.

13    A.       Yes.  That's me now.

14    Q.       Okay.  How long have you served in that

15    role?

16    A.       By fall of 2019.

17    Q.       Prior to the fall of 2019, who served in

18    that role at The Weiser Law Firm?

19    A.       That role didn't exist prior to 2019 in

20    the way it does now.

21    Q.       Prior to the fall of 2019, did you

22    supervise any other attorneys at The Weiser Law

23    Firm?

24    A.       No.

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36
1216

JAMES FICARO, ESQ.

19

1   Q.        Since the fall of 2019, do you supervise

2   any attorneys at The Weiser Law Firm?

3   A.        No.

4   Q.        Is there an attorney at The Weiser Law

5   Firm that you currently report to directly?

6   A.        Robert Weiser.

7   Q.        Anyone else?

8   A.        No.

9   Q.        Prior to the fall of 2019, was there

10  anyone at The Weiser Law Firm that you reported to

11  directly?

12  A.        Yes.

13  Q.        And who was that?

14  A.        It was always Robert Weiser.  Brett

15  Stecker was senior to me.  When I -- earlier than

16  that, there was an attorney named Joseph Profy when

17  we were doing -- that was back in like 2013-14, and

18  2011-2012, there was an attorney named Henry Young.

19  Q.        Prior to the fall of 2019, who was

20  primarily responsible for the shareholder derivative

21  cases at The Weiser Law Firm?

22  A.        Robert Weiser.

23  Q.        Who would review -- well, strike that.

24            Who would make decisions, final decisions,

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36

1217

JAMES FICARO, ESQ.

20

1    in terms of strategy in shareholder derivative cases

2    prior to the fall of 2019?

3    A.         I would say it was usually collectively

4    decided.

5    Q.         Collectively decided by who?

6    A.         By the individual attorneys, like, working

7    that case, so it could be a discussion between

8    myself, Brett Stecker, and Robert Weiser, and then a

9    mutual decision would be made.

10   Q.         Prior to the settlement proceedings in the

11   Sprint derivative case, did you stay informed as to

12   how the case was progressing?

13   A.         No.

14   Q.         Prior to the settlement proceedings, would

15   you have any interaction or communications with the

16   other plaintiffs' firms involved in that case?

17   A.         Not about that case, no.

18   Q.         I'm going to talk a little bit about kind

19   of the day-to-day operations at the firm prior to

20   COVID.  Prior to COVID, would you work primarily in

21   the office?

22   A.         Yes.

23   Q.         Prior to COVID, approximately how many

24   hours a week would you be in the office?

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36
1218

JAMES FICARO, ESQ.

21

1          MR. ROSENZWEIG:  I'm going to

2          object.  Mr. Mott, I'm waiting for you to

3          ask questions that are really related to

4          the gravidum of this case or any of the

5          claims in this case, and other than with

6          respect to a couple of questions about the

7          Sprint derivative action, I fail to see

8          how these questions relate to anything in

9          this case.

10          And, of course, you get some

11          latitude, but you don't get to ask

12          questions that are meaningless.  So I'm

13          just going to say that.  It's on the

14          record, and I'm going to lose patience

15          with questions that are not designed to

16          reasonably lead to anything discoverable

17          or relevant.

18          Please continue.

19          THE WITNESS:  I would say

20          between 50 and 70 hours a week.

21  BY MR. MOTT:

22  Q.      Prior to COVID, would Robert Weiser work

23  primarily in the office?

24  A.      Yes.

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36
1219

JAMES FICARO, ESQ.

22

1   Q.        Did he maintain similar hours?

2   A.        I don't know.

3   Q.        Without inquiring as to anything that may

4   have been said, have you ever had any contact with

5   Monica Ross-Williams?

6   A.        (Inaudible.)

7                      MR. ROSENZWEIG:  That was

8             inaudible, Jimmy.

9                      THE WITNESS:  Yes, I've spoken

10            to her.

11  BY MR. MOTT:

12  Q.        Approximately, how many times would you

13  say you have communicated with Monica Ross-Williams?

14  A.        I can only remember one instance.

15  Q.        And when did that occur?

16  A.        I believe it was when she received the

17  subpoena to testify in this matter.

18  Q.        And at that time, did you -- did your

19  office represent her?

20  A.        I don't know.

21  Q.        And what did she tell you when she

22  contacted you regarding the subpoena?

23  A.        She was letting me know that she had

24  received it.

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36

JAMES FICARO, ESQ.

23

1   Q.          And what did you say in response?

2   A.          I would let The Weiser Firm's attorneys

3   know, but I assumed they'd also been served a

4   courtesy copy.

5   Q.          Did The Weiser Law Firm assist in any way

6   in procuring counsel for her to represent her at the

7   deposition in this case?

8   A.          Yes.

9   Q.          Did they refer her to the counsel that

10  represented her at the deposition?

11  A.          I don't know.

12  Q.          Do you know if The Weiser Law Firm paid

13  for her counsel to represent her at the deposition?

14  A.          I do not know.

15  Q.          Did you have any role in the preparation

16  of Ms. Ross-Williams' declarations that were a part

17  of the Sprint proceedings?

18  A.          I don't recall drafting them, but again, I

19  would have seen them before they were filed.

20  Q.          Do you know who drafted them?

21  A.          I don't know.

22  Q.          Do you know how Monica Ross-Williams came

23  to be a client of The Weiser Law Firm for the Sprint

24  case?

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36
1221

JAMES FICARO, ESQ.

24

1    A.        Yeah.  I believe she was referred by

2    Mr. Murphy.

3    Q.        Do you have any idea how Mr. Murphy

4    located Monica Ross-Williams?

5    A.        I do not.

6    Q.        When was the first time you worked with

7    Jeffrey Silow?

8    A.        I think I was working a case that he was a

9    document reviewer on was a derivative action on

10   behalf of 5th Street Corporation.

11   Q.        And was The Weiser Law Firm lead counsel

12   or co-lead counsel in the 5th Street litigation?

13   A.        I don't know.

14   Q.        Do you know who hosted the document review

15   in the 5th Street litigation?

16   A.        No.

17   Q.        Did you supervise any of Jeffrey Silow's

18   work in the 5th Street litigation?

19   A.        I'm not sure I understand.

20   Q.        Did you give Jeffrey Silow any assignments

21   in the 5th Street litigation?

22   A.        Me personally, no.

23   Q.        Who would he report to at The Weiser Law

24   Firm regarding the 5th Street litigation?

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36
1222

JAMES FICARO, ESQ.

25

1    A.        Well, during that litigation there would

2    be biweekly, document-review conference calls where

3    all the reviewers would get on, report any

4    interesting documents they had or discovered or

5    reviewed and they marked as hot or had warranted

6    some sort of upper level review, have a general

7    discussion about what they were seeing in the

8    documents, but I don't recall ever fielding like a

9    personal call from him regarding something he found

10   in the documents for example.

11   Q.        Would you attend those conference calls?

12   A.        Yes.

13   Q.        Was there a particular firm or office who

14   would host those conference calls?

15   A.        I can't remember.

16   Q.        Was the document review in the 5th Street

17   case performed using Relativity software?

18   A.        (Inaudible.)

19   Q.        I'm sorry.  You were inaudible again.  We

20   didn't catch your response.

21   A.        I'm sorry that keeps happening.  I'm -- I

22   use this computer for Zoom all the time.

23            I don't recall what the software was.

24   Q.        Did you perform any document review in the

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36
1223

JAMES FICARO, ESQ.

26

1    5th Street litigation?

2    A.        I don't think so.

3    Q.        When did you -- well, strike that.

4              You're aware that -- well, strike that.

5              Are you aware of Jeffrey Silow's disbarred

6    status as a practicing attorney in Pennsylvania?

7    A.        As I sit here today, yes, I am.

8    Q.        Okay.  And when did you first become aware

9    of that?

10   A.        Same day the rest of the firm did.  I

11   don't know the day.  Early 2017.

12   Q.        And how did you become aware of it?

13   A.        I was in a meeting in Rob Weiser's office

14   with Brett Stecker.  We generally would have these,

15   like, daily check-in meetings to, like, review what

16   was happening in active cases, and he received --

17   Mr. Weiser received a phone call from someone, I

18   don't know who, asking for Mr. Silow's bar number.

19   Mr. Weiser told him he would get it to him and be

20   back in touch.

21              He then told me and Mr. Stecker what the

22   question was.  Because I had been corresponding with

23   Mr. Silow in the 5th Street case, I had my phone

24   with me, and I sent him a quick email asking for his

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36
1224

JAMES FICARO, ESQ.

27

1    bar number.  He sent it back pretty quick, or he

2    sent back a bar number pretty quick to be more

3    accurate.  I gave that to Rob, and then our meeting

4    had more -- was more or less near the end and had

5    ended.

6           So I guess to continue the story, it was

7    right around lunchtime.  I remember Brett and I were

8    having lunch downstairs in the office, and Rob came

9    down the stairs and said that -- you know, he's

10   like, you won't believe this, that as soon as

11   Mr. Silow had sent me the email, we had left the

12   office, that Mr. Silow had called Rob and told him

13   the truth, that he had been disbarred and that that

14   bar number was not his, in fact.

15   Q.      Do you still have that original email you

16   sent to Jeffrey Silow where you asked him for his

17   bar number?

18   A.      I must.  I mean, I assume it's archived

19   somewhere.  I don't know.

20   Q.      Okay.  When was the last time you saw that

21   email?

22   A.      I don't recall ever seeing it.  I mean, I

23   sent it.

24   Q.      How about Mr. Silow's response to that

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36

JAMES FICARO, ESQ.

28

1    email, do you -- have you -- when was the last time

2    you saw that?

3                        MR. ROSENZWEIG:  Objection as to

4            form.

5                        THE WITNESS:  I guess when he

6            sent it.

7    BY MR. MOTT:

8    Q.       Do you -- does The Weiser Law Firm still

9    have that email somewhere?

10   A.       I don't --

11                       MR. ROSENZWEIG:  I'm going to

12           intervene here.  So, Tyson, I can tell you

13           I've never seen that email, and it was not

14           amongst any of the documents we reviewed

15           when we reviewed emails.  I'm not telling

16           you it doesn't exist.  I've never -- I've

17           never seen it.

18                       MR. MOTT:  And I'm not trying to

19           imply that you've seen the document --

20                       MR. ROSENZWEIG:  I --

21                       MR. MOTT:  -- or are withholding

22           a document.

23                       MR. ROSENZWEIG:  I'm just

24           letting you know that this email is, you

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36

JAMES FICARO, ESQ.

29

1              know, news to me as well.

2       BY MR. MOTT:

3       Q.        If you were to go back and attempt to look

4       for that email, how would you do it, the one from

5       Mr. Silow?

6       A.        Old emails -- I'm not certain.  I don't

7       really know what I would do.  I mean, that's a long

8       time ago, and I know our system archives in some way

9       every two years.  So I don't know exactly how we

10      would go about getting that done.

11      Q.        Do you know who maintains the archives?

12      A.        No.

13      Q.        Do you know if it's handled internally by

14      the firm?

15      A.        I do not know.

16      Q.        Is there a particular email program or

17      application that The Weiser Law Firm uses?

18      A.        I use Outlook.  I presume everyone else in

19      the firm does too, but I don't know that it's

20      required in order to access our email.

21      Q.        When you sent the original email to Silow,

22      was that from a computer at the office or from a

23      mobile device or something else?

24      A.        I believe it was from my phone as I was

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36
1227

JAMES FICARO, ESQ.

30

1    not in front of my desk at the time.

2    Q.        Does the -- did The Weiser Law Firm ever

3    employ an individual by the name of Archita Patel?

4    A.        Yes.

5    Q.        And does Archita Patel still work for The

6    Weiser Law Firm?

7    A.        No.

8    Q.        And when did Archita Patel leave The

9    Weiser Law Firm?

10   A.        2020.

11   Q.        Do you know approximately when in 2020?

12   A.        Oh, I don't know.

13   Q.        Do you know if it was -- strike that.

14             What was Archita Patel's position at The

15   Weiser Law Firm?

16   A.        She was a paralegal.

17   Q.        Was that always her position?

18   A.        Yes.

19   Q.        Do you know why she left?

20   A.        Yes.

21   Q.        And why did she leave?

22   A.        She was terminated.

23   Q.        And why was she terminated?

24   A.        Poor performance.

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36

JAMES FICARO, ESQ.

31

1    Q.          How long did she work there?

2    A.          I don't know.  Only a couple years.

3    Q.          Did she work for The Weiser Law Firm

4    during the Sprint settlement proceedings?

5    A.          I don't think so.

6    Q.          Did The Weiser Law Firm ever employ an

7    individual by the name of Jonathan Zimmerman?

8    A.          Yes.

9    Q.          What was Jonathan Zimmerman's role with

10   The Weiser Law Firm?

11   A.          He was an associate for pretty much all

12   the practice groups, so he did a lot of

13   whistleblower work, the qui tam actions we talked

14   about before, some derivative actions, and some

15   class cases.

16   Q.          And is he still with the firm?

17   A.          He is not.

18   Q.          Do you know approximately when he left?

19   A.          Approximately, I would say 2017-2018.

20   Q.          And do you know why he left?

21   A.          Yeah.  His wife finished medical school

22   and got a residency in New York, and they moved to

23   New York City.

24   Q.          In the 5th Street litigation, did you ever

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36
1229

JAMES FICARO, ESQ.

32

1    review the timesheets submitted by Jeffrey Silow?

2    A.       No.

3    Q.       Do you know who at The Weiser Law Firm --

4    well, strike that.

5             Did anyone at The Weiser Law Firm review

6    Jeffrey Silow's timesheets in the 5th Street case?

7    A.       I don't know.

8    Q.       Did you ever approve any of Jeffrey

9    Silow's timesheets in any litigation?

10   A.       I don't know what you mean by approve.

11   I -- I don't think I ever saw any timesheets from

12   Mr. Silow during that litigation.

13   Q.       Have you ever seen a timesheet submitted

14   by Jeffrey Silow?

15   A.       Yes.

16   Q.       And would that have been as part of any

17   particular litigation?

18   A.       I think in the Sprint case through the

19   settlement process, when the judge asked for the

20   hours to be presented in camera, I recall seeing

21   his -- timesheet's really the wrong word.  With --

22   more like the invoices, the number of hours he said

23   he worked and on what days, but it was not a kind of

24   formal Weiser Law Firm timesheet.  It was just a

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36

1230

JAMES FICARO, ESQ.

33

1    timesheet he had created and submitted to us for

2    payment.

3    Q.        And what would that -- well, strike that.

4              Was that a digital document?

5    A.        When I saw it, it was a hardcopy.

6    Q.        Outside of the Sprint litigation, have you

7    ever seen a timesheet of Jeffrey Silow?

8    A.        No.

9    Q.        At any point in your role with The Weiser

10   Law Firm, did you ever approve payment to Mr. Silow

11   for a timesheet that was submitted?

12   A.        No.

13   Q.        Who at The Weiser Law Firm would approve

14   payments to Mr. Silow?

15   A.        I don't know.

16   Q.        Who at The Weiser Law Firm would be

17   responsible for actually delivering payment to

18   Mr. Silow?

19                  MR. ROSENZWEIG:  Objection as to

20         form.

21                  THE WITNESS:  I don't know.

22   BY MR. MOTT:

23   Q.        Has The Weiser Law Firm retained document

24   reviewers other than Jeffrey Silow?

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36
1231

JAMES FICARO, ESQ.

                                                                    34

1    A.          Not that I can recall, no.  Certainly not

2    in any derivative action that I was a part of.

3    Q.          Do you know what the outcome of the --

4    well, strike that.

5                Do you know how the Court ruled on the

6    motion to approve the settlement in the Sprint case?

7    A.          Yes.

8    Q.          Did it approve the fee award?

9    A.          Not the agreed-to fee award, no.

10   Q.          Okay.  And do you know the difference

11   between the fee requested and the fee that the Court

12   approved?

13   A.          Yes.

14   Q.          And approximately what was the difference

15   between what was proposed and what was -- what was

16   approved?

17   A.          A couple million dollars, a few million

18   dollars.

19   Q.          Did you assist in putting together the

20   billing submissions to the Court in the Sprint case

21   for in-camera review?

22   A.          Yes.

23   Q.          Did you assist in putting the actual

24   documents together?

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36

JAMES FICARO, ESQ.

35

1     A.          No.  It was more printing everything out,

2     making like a PDF of everything to submit.  It was

3     more formatting and administrative than it was

4     really anything else.

5     Q.          And what was submitted to the Court for

6     in-camera review, was that sent in PDF format?

7     A.          I believe so.  I believe --

8                         MR. ROSENZWEIG:  Objection as to

9                 form.

10                        THE WITNESS:  I believe that was

11                a requirement of the judge's order or his

12                individual practices that it had to be

13                submitted via PDF.

14    BY MR. MOTT:

15    Q.          Do you know who submitted it to the Court?

16    A.          I assume local counsel, but I don't know.

17    Q.          Do you know who provided it to local

18    counsel?

19    A.          No.

20    Q.          Was it a single PDF or multiple PDFs?

21    A.          I don't know.

22    Q.          Did you ever see the PDF or PDFs before

23    they went to local counsel?

24                        MR. ROSENZWEIG:  I'm going to

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36
1233

JAMES FICARO, ESQ.

36

 1              jump in here again and just note that you

 2              are continuing to ask questions that are

 3              irrelevant to this litigation and anything

 4              that is possibly relevant and, therefore,

 5              is beyond the bounds of legitimate

 6              discovery.  Mr. Mott, please ask questions

 7              that are relevant to the claims in this

 8              case.

 9                      THE WITNESS:  I don't remember.

10    BY MR. MOTT:

11    Q.        Did you see any other timesheets or

12    invoices or spreadsheets from The Weiser Law Firm

13    related to the time that was submitted in the Sprint

14    case?

15                      MR. ROSENZWEIG:  Objection as to

16              form.

17                      THE WITNESS:  I don't remember.

18    BY MR. MOTT:

19    Q.        Did anyone assist you in the

20    administrative work regarding the timesheets that

21    were submitted for in-camera review?

22    A.        Not that I can recall.

23    Q.        The PDFs or PDF that was put together for

24    in-camera review, do you know if Robert Weiser ever

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36

1234

JAMES FICARO, ESQ.

37

1    saw those documents before they were provided to the

2    Court?

3    A.        I don't know.

4    Q.        Do you know if they were ever provided to

5    him?

6    A.        I don't know.

7    Q.        How about Brett Stecker?  Do you know if

8    Brett Stecker ever reviewed those PDFs before they

9    were provided to local counsel or the Court?

10   A.        I don't know.

11   Q.        Have you ever seen the Wall Street Journal

12   article about the Court's reduction in the fee award

13   in the Sprint case?

14   A.        Yes.

15   Q.        When was the first time you saw that,

16   approximately?

17   A.        I believe it was the day it came out.

18   Q.        Did you have any conversations with Robert

19   Weiser about that article?

20   A.        Not that I can recall.

21   Q.        Did he ever say anything to you about the

22   article?

23   A.        No.

24   Q.        I've just placed on the screen Exhibit A

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36
1235

JAMES FICARO, ESQ.

38

1    on a different section, page 17 of the First Amended

2    Complaint, and I'll direct you to paragraph 84.  If

3    you could just let me know when you're done reading

4    that.

5    A.        I've read paragraph 84.

6    Q.        Okay.  Did you have any interaction with

7    the public relations firm that The Weiser Law Firm

8    hired in response to the Wall Street Journal

9    article?

10   A.        I did not.

11   Q.        Do you know the name of the public

12   relations firm?

13   A.        I do not.

14   Q.        Did anyone from the Wall Street Journal

15   ever contact you about the Sprint case?

16   A.        No.

17   Q.        Has anyone from the -- any press ever

18   contacted you about the Sprint case?

19   A.        No.

20   Q.        Did The Weiser Law Firm represent a

21   plaintiff in the Big Lots shareholder derivative

22   case?

23   A.        Yes.

24   Q.        Do you recall the name of the plaintiff?

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36

1236

JAMES FICARO, ESQ.

39

1  A.        I think that's Alan Brosz, B-R-O-S-Z, I

2  believe.

3  Q.        And who was the attorney at The Weiser Law

4  Firm primarily responsible for the Big Lots case?

5  A.        Again, primarily responsible's kind of

6  tough with the way we were working things.  It was

7  very collaborative, but I know Brett Stecker was

8  involved in the case from beginning to end.  He may

9  have been the one attorney that was involved for the

10  entirety of it, so I would say him.

11  Q.        Were you involved at all in the settlement

12  process in the Big Lots case?

13  A.        I don't remember.

14  Q.        Did you attend any hearings or -- well,

15  strike that.

16          Did you attend any hearings in the Big

17  Lots case?

18  A.        Yes.

19  Q.        Do you know approximately how many?

20  A.        I think two.  I remember attending the

21  final approval hearing and then a telephonic hearing

22  by the Court a few days after.

23  Q.        What was the reason for the telephonic

24  hearing, if you know?

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36

JAMES FICARO, ESQ.

40

1    A.          Mr. Hartleib's email to the judge.

2    Q.          And have you ever seen that email?

3    A.          Yeah.  I believe so.  I think Mr. Hartleib

4    forwarded it to me along with Mr. Stecker and

5    Mr. Weiser and perhaps others.

6    Q.          Do you know if you still have that email?

7    A.          I have no idea.

8    Q.          Did it include any attachments?

9    A.          I don't know.

10   Q.          Do you recall what it said?

11   A.          Not exactly, no.

12   Q.          Do you know the names of any individuals

13   who were copied on the email other than members of

14   The Weiser Law Firm?

15   A.          I do not.

16   Q.          During the telephone conference regarding

17   the email, did the Court quote any portion of it?

18   A.          I don't remember.

19   Q.          Do you know what the Court said, if

20   anything, about the email?

21   A.          Yes.  The Court started the teleconference

22   because -- saying that the reason he was convening

23   everyone was because of this email.  He wanted to

24   know our thoughts about it, why it came, who the --

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36
1238

JAMES FICARO, ESQ.

41

1    who Mr. Hartleib was, was there -- if there was any

2    notion that he was a Big Lots shareholder and, if

3    so, why he had failed to meet the objection criteria

4    involved in the Big Lots settlement.

5              I explained to him what had happened at

6    Sprint, and the judge, I believe he just kind of

7    ended the call, like, thanks everyone for the

8    additional information.  That's the best of my

9    recollection of how that call ended prior to his

10   issuance of an order approving that settlement and

11   that agreed-upon fee.

12   Q.        And how did you explain what happened in

13   the Sprint case to the Court?

14                  MR. ROSENZWEIG:  Objection as to

15             form and objection as to the use of the

16             term "how."  The question --

17                  MR. MOTT:  Well, okay.

18                  MR. ROSENZWEIG:  -- is

19             ultimately --

20                  MR. MOTT:  I'll rephrase.

21   BY MR. MOTT:

22   Q.        What was your explanation to the Court as

23   to what happened in the Sprint case?

24   A.        I believe I summarized the facts, that

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36

1239

JAMES FICARO, ESQ.

                                                                    42

1    there was a settlement presented to the state court

2    in Kansas, that Mr. Hartleib was an objector, that

3    he objected to the relief provided in the settlement

4    as well as, you know, the nature of those corporate

5    reforms and their value and whether they warranted

6    the release being offered by shareholders, that he

7    disagreed with the amount of attorneys' fees, he

8    disagreed with the amount of hours spent.

9              And that -- I told the judge that the

10   settlement was ultimately approved, that the

11   attorneys' fees weren't reduced in that case, and

12   that I was happy to answer any other questions he

13   had.

14   Q.        And did the Court have any follow-up

15   questions for you?

16   A.        No.  Not that I can recall.  It was a very

17   short teleconference.

18   Q.        Did any of the other attorneys who

19   attended that call address the Court in any way

20   regarding what happened in the Sprint case or

21   Mr. Hartleib's email?

22   A.        I don't remember.

23   Q.        And did the Court in the Big Lots case

24   approve the proposed settlement?

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36
1240

JAMES FICARO, ESQ.

43

1    A.        Yes.

2    Q.        Did it reduce any fees?

3    A.        No.

4                   MR. MOTT:  I've placed on your

5              screen a PDF of the docket from the Big

6              Lots case and --

7                   MR. ROSENZWEIG:  Are you going

8              to label this Exhibit B?

9                   MR. MOTT:  Yes.

10                   (At this time, Exhibit B was

11              marked for identification.)

12   BY MR. MOTT:

13   Q.        And the purpose for me asking you to take

14   a look at it is I'm going to ask you to follow along

15   with me through the entered counsel that are listed

16   on the docket and ask you to identify the attorneys

17   that were on the call that you are able to remember,

18   okay?

19                   So if you could -- just going through from

20   the beginning and just begin reading through the

21   names, and if one jumps out at you as being on the

22   call, I just ask that you indicate it to me and just

23   let me know when you're ready for me to go on to the

24   next page, okay?

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36

1241

JAMES FICARO, ESQ.

44

1    A.          Yes.  I am ready for page 2.

2               I believe David Wales was on that call,

3    but he was not at that firm.

4    Q.          Yeah.  It's my -- it's my understanding

5    that when you go to look up an old docket, it

6    will -- the entered counsel, their actual contacts

7    will update it with wherever they are currently, but

8    so I --

9    A.          Oh, that's confusing.

10   Q.          -- appreciate the clarification.

11   A.          That's confusing, but okay.

12   Q.          Yeah.

13   A.          You can go to the next page.

14   Q.          Do you recall what firm David Wales was

15   with at the time?

16   A.          Bernstein Litowitz Berger & Grossmann.

17               Next page.  Next page.  Next page.  Next

18   page.  If these are all defendants, I can save you

19   some time.  I don't recall which of the several

20   defense counsel in that case were on the call.

21   Q.          Okay.  And just to be clear, no one else

22   from your firm was on the call at the time?

23   A.          No.  It was just me.

24   Q.          Do you know if anyone from Kessler Topaz

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36
1242

JAMES FICARO, ESQ.

45

1    Meltzer & Check were on the call?

2    A.        I can't remember.

3    Q.        Do you know if anyone from Kessler Topaz

4    Meltzer & Check attended the prior hearing?

5    A.        I don't think so.

6    Q.        Did any of the attorneys who were on the

7    call or who were copied on the email discuss or

8    communicate with you about that email in any way?

9    A.        Like, prior to the call?  Like, in

10   preparation --

11   Q.        At any --

12   A.        -- of the call?

13   Q.        At any point before or after the call.

14                  MR. ROSENZWEIG:  I'm going to

15             object to the form.  I mean, that's --

16             about anything during the entire portion

17             of the litigation and thereafter?

18   BY MR. MOTT:

19   Q.        Has anyone other than the Court ever said

20   anything to you about this email that Michael

21   Hartleib sent to the Court in the Big Lots case?

22   A.        Yes.

23   Q.        Okay.  And I'm not -- I'm not asking about

24   any privileged communications.  Who discussed that

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36
1243

JAMES FICARO, ESQ.

46

1    email with you?

2    A.        I don't remember.

3    Q.        I'm placing on your screen what is Exhibit

4    28 to the First Amended Complaint.  It is a two-page

5    email.  Have you ever seen this email before?

6    A.        I'm sure I have as I'm listed as a

7    recipient.

8    Q.        All right.  Was that your -- well, strike

9    that.

10             What is your current email address at The

11   Weiser Law Firm?

12   A.        That one still works.  We have like a --

13   my official email is JMF@WeiserLawFirm.com, but if

14   you were to send an email to JFicaro@WeiserLawFirm,

15   it would still come to us as well.

16   Q.        Okay.  And so, do you know what if

17   (inaudible) Mr. Stecker

18   BDStecker@WeiserLawFirm.com --

19   A.        Would repeat that for me?  You broke up a

20   little bit.

21   Q.        -- was a functioning email address back

22   then?  My apologies.

23   A.        Could you repeat that for me?  You broke

24   up.

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36
1244

JAMES FICARO, ESQ.

47

1    Q.        The email address that's listed on here

2    for Mr. Stecker, was that a functioning email

3    address for The Weiser Law Firm around the time this

4    email was sent?

5    A.        I don't know, because that's a different

6    format.  I don't know.

7    Q.        Do you recall -- well, strike that.

8              Approximately, when did you first see this

9    email?

10   A.        Either the day it was sent -- I don't

11   see -- am I missing a date field here?

12   Q.        You are not.

13   A.        Okay.  Either -- generally I read emails

14   pretty quickly, so either the day it was sent or

15   shortly thereafter.

16   Q.        Do you recognize the names or email

17   addresses for the other recipients listed on this

18   document?

19   A.        I do.

20   Q.        Did you ever have any communications with

21   any of the individuals copied on this email about

22   its contents?

23   A.        No.

24   Q.        Did any of the recipients that are listed

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36
1245

JAMES FICARO, ESQ.

48

1    here ever reach out to you about the contents of the
2    email?
3    A.        (Inaudible.)
4                    MR. ROSENZWEIG:  Jimmy, if you
5             said something, I couldn't hear it.
6                    THE WITNESS:  I don't remember.
7    BY MR. MOTT:
8    Q.        Has Robert Weiser ever said anything to
9    you about this email?
10   A.        I don't recall if we talked about this
11   specific email.
12   Q.        How about Mr. Stecker?
13   A.        I don't remember.
14                   MR. ROSENZWEIG:  Again, Jimmy,
15            pretty inaudible.
16                   THE WITNESS:  Can we take -- I
17            don't remember.
18                   Can we take like a five-minute
19            break?  We've been going for an hour, and
20            I might try and get some Air Pods going or
21            something to help out.  Is that all right?
22                   MR. MOTT:  Yeah.  Absolutely.
23                   THE VIDEOGRAPHER:  The time is
24            now 11:31.  Going off video record.

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36
1246

JAMES FICARO, ESQ.

49

```
 1                    (At this time, a short break was

 2          taken.)

 3                    THE VIDEOGRAPHER:  The time is

 4          now 11:40.  We are back on video record.

 5   BY MR. MOTT:

 6   Q.        Mr. Ficaro, I've placed on your screen

 7   what has been marked as Exhibit 12 -- or, I'm sorry,

 8   it was Exhibit 12 to the First Amended Complaint.

 9   And this is an email from Mr. Hartleib from March 6,

10   2017, and it appears that you were again copied on

11   this email.  Do you recall receiving this email?

12   A.        No.

13   Q.        Did Robert Weiser ever say anything to you

14   about this email?

15   A.        I don't remember.

16   Q.        Do you know if any of the individuals who

17   are also copied on this email, whether they ever

18   said anything to you about this email?

19   A.        I don't recall having a conversation with

20   them about this email.

21   Q.        Going ahead to Exhibit 14 of the First

22   Amended Complaint is another email from Mr. Hartleib

23   dated March 7, 2017.  Do you recall receiving this

24   email?
```

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36
1247

JAMES FICARO, ESQ.

50

1    A.        Yes.

2    Q.        Did you ever have any conversations with

3    Robert Weiser about this email?

4    A.        I don't remember.

5    Q.        Did you have any conversations with any of

6    the individuals who were copied on this email about

7    its contents?

8    A.        I did talk to Brett Stecker about the

9    contents of it.  Whether it was brought about

10   because of this email specifically I don't know, or

11   I don't recall.

12   Q.        Did you ever speak to Monica Ross-Williams

13   about this email?

14   A.        I did not, no.

15   Q.        I've now gone to Exhibit 15 of the First

16   Amended Complaint, which is another email from

17   Mr. Hartleib dated April 7, 2018.  Do you recall

18   receiving this email?

19   A.        No.

20   Q.        Did you have any conversations with anyone

21   about the contents of this email?

22   A.        I don't remember.

23   Q.        Going now to Exhibit 16, it's an email

24   from Mr. Hartleib from April 12, 2017.  Do you

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36

JAMES FICARO, ESQ.

51

1    recall receiving this email?

2    A.        Can you go to the next page?  Is there

3    another page to this?

4              Oh, no, I don't.

5    Q.        Did you ever have any conversations with

6    Jill Boren from the Court Chambers about Michael

7    Hartleib's contents -- contacts with the Court?

8    A.        No.  I never spoke with Ms. Boren.

9    Q.        Do you know if anyone from The Weiser Law

10   Firm ever spoke to Ms. Boren about Mr. Hartleib's

11   contacts with the Court?

12   A.        I don't know.

13   Q.        Going to Exhibit 18, which is a May 19,

14   2018 email, have you ever seen this email?

15                      MR. ROSENZWEIG:  Tyson, what

16            exhibit to the Amended Complaint is it?

17                      MR. MOTT:  Exhibit 18.

18                      MR. ROSENZWEIG:  Thank you.

19                      THE WITNESS:  No, I don't recall

20            receiving this email.

21   BY MR. MOTT:

22   Q.        Did you ever talk to Robert Weiser about

23   this email?

24   A.        I don't think so, no.

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36
1249

JAMES FICARO, ESQ.

52

1   Q.        Did you have any communications with any

2   of the other recipients of this email about its

3   contents?

4   A.        No.

5   Q.        Generally, do you recall having any

6   communications with the attorneys involved in the

7   Sprint case about the emails that were being sent by

8   Michael Hartleib?

9   A.        Yes.

10  Q.        And what communications did you have about

11  Michael Hartleib's emails?

12  A.        Generally, we were so -- obviously, at

13  that point still in the appellate action there, so,

14  you know, our group was meeting and talking about

15  the case.

16            And, I mean, the conversations weren't

17  fairly specific.  They were just like, you know,

18  Mr. Hartleib continues to send these emails, and

19  it's constant.  I think at some point, you know,

20  there was like -- he just -- he was constant with it

21  and he's badgering the Court with his position, but

22  I don't recall everyone -- anyone ever having a

23  conversation with Ms. Boren about it.

24  Q.        And what did the -- well, strike that.

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36
1250

JAMES FICARO, ESQ.

53

1           Did the other attorneys express any

2  concerns about the emails that were being sent by

3  Michael Hartleib?

4  A.          I don't remember.

5  Q.          What was Robert Weiser's reaction, if any,

6  to the emails being sent by Michael Hartleib?

7  A.          I don't remember what his reaction was

8  exactly.

9  Q.          Has any attorney or any firm ever

10  expressed an unwillingness to work with your office

11  due to the emails sent by Michael Hartleib?

12  A.          Based on the emails alone?

13  Q.          Yeah.

14  A.          Not that I know of.

15  Q.          Okay.  Expanding the scope of that then,

16  has any attorney or law firm expressed an

17  unwillingness to work with your office due to

18  Michael Hartleib, whether it be from these emails,

19  filings, or any other action by Mr. Hartleib?

20  A.          Yes.

21  Q.          Okay.  And what attorneys have expressed

22  an unwillingness to work with your office?

23  A.          I know a gentleman by the name of William

24  Federman, F-E-D-E-R-M-A-N, from the law firm of

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36
1251

JAMES FICARO, ESQ.

54

1    Federman & Sherwood in Oklahoma City would not let

2    us also be co-lead counsel with him in an existing

3    action because he was worried that Mr. Hartleib

4    would -- even though he's maybe not a shareholder in

5    that corporation would show up and try and meddle

6    with the case.

7    Q.        And what action was that?

8    A.        I'm trying to remember.  Cognizant, I

9    think.

10   Q.        Can you spell that, please?

11   A.        C-O-G-N-I-Z-A-N-T.

12   Q.        Did he express this concern to anyone else

13   other than you that you know of?

14   A.        To Rob Weiser.

15   Q.        And how did he communicate this concern?

16   A.        I'm not certain.

17   Q.        Do you recall whether it was in writing or

18   over the phone or in person?

19   A.        I don't know.

20   Q.        Okay.  Any other instances where someone

21   has expressed an unwillingness to work with your

22   office because of Michael Hartleib?

23   A.        It was discussed a lot in cases that

24   started up kind of right after the Sprint case where

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36
1252

JAMES FICARO, ESQ.

55

1   we heard about it a lot.  There was a lot of phone

2   calls I was on where people would mention it, they

3   would raise it, they would send me the Wall Street

4   Journal article.

5           It was -- it's pretty evident that it was

6   known inside what is kind of a small world sort of

7   bar that Mr. Hartleib was following our firm or

8   trying to show up wherever we had cases and kind of

9   like, you know, just had become kind of infatuated

10  with our efforts.

11  Q.        How many times did someone send you the

12  Wall Street Journal article?

13  A.        Oh, I don't know.  A few.  Certainly a

14  few.

15  Q.        Was that through email?

16  A.        Yeah.  Yes.

17  Q.        Do you recall any particular occasion

18  where someone sent you the Wall Street Journal

19  article?

20  A.        No.  No.

21  Q.        Do you know if Robert Weiser was also

22  copied on those emails?

23  A.        I don't remember.

24  Q.        Do you know the name of any of the

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36
1253

JAMES FICARO, ESQ.

56

1    attorneys who sent you the Wall Street Journal

2    article?

3    A.        No, I can't remember.

4    Q.        Do you know the name of any of the cases

5    where you were on a call and the name Michael

6    Hartleib was mentioned?

7    A.        Yes.

8    Q.        What cases were those?

9    A.        Well, I know some of them are detailed in

10   that Complaint just from the pages you showed me, so

11   things like Equifax, you saw his previous email

12   about CenturyLink, Big Lots.  Those were cases where

13   his name was mentioned on telephone call.

14   Q.        Any other cases other than Big Lots,

15   Equifax and CenturyLink?

16   A.        5th Street.  As far as the actual case

17   relevant to the conversation at the time, that's as

18   far as I can remember, but a lot of situations --

19   you know, we stay in touch with our bar pretty well,

20   pretty regularly.  And there were folks who wanted

21   to talk about it whenever -- the next time I was on

22   a phone call with them independent of whether it was

23   about a specific case or not.

24   Q.        When you would have calls in other cases

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36

1254

JAMES FICARO, ESQ.

57

1    with other attorneys and firms, would they ever

2    bring up the Wall Street Journal article?

3    A.        Yes.

4    Q.        Would any of the attorneys from other

5    firms on those calls also express an unwillingness

6    to work with your office because of the Wall Street

7    Journal article?

8    A.        Not that specifically.

9    Q.        Going back to the First Amended Complaint,

10   I'm beginning on paragraph 10 -- or page 10,

11   paragraph 59.  It begins discussing Jeffrey Silow,

12   and I just ask that you read through beginning on

13   paragraph 59 and let me know when you're ready to go

14   to the next page.

15   A.        I'm ready for the next page.  Do I keep

16   going?

17   Q.        If you could just read through to the end

18   of this page 11.

19   A.        I'm finished.

20   Q.        Okay.  And now, looking at paragraph 64

21   specifically, it mentions notifying "the courts

22   sitting in every action in which Silow's hours were

23   included as part of an 'attorney ...' lodestar

24   calculation."

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36

1255

JAMES FICARO, ESQ.

58

1          Did you have any role in identifying the

2    cases that Jeffrey Silow worked on?

3    A.          No.

4    Q.          Did you assist in any way in notifying the

5    courts that were presiding over the cases that

6    Jeffrey Silow worked on?

7    A.          Yes.

8    Q.          And what was your role in notifying those

9    courts?

10   A.          I either drafted or edited the letters

11   that were sent to those judges.

12   Q.          And that was -- were letters sent in every

13   case that was identified?

14   A.          Yes.

15   Q.          Do you know what -- strike that.

16          Do you know if any of those courts that

17   were notified took any action in response to those

18   letters?

19   A.          I don't believe so.

20   Q.          Did you do anything to confirm receipt of

21   any of those letters?

22   A.          Yes.  So depending on who the judge was,

23   we always tried to follow the individual practices

24   for chambers submissions.  So for a vast majority of

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36

JAMES FICARO, ESQ.

59

1    the federal judges, we would send FedExes which

2    would have delivery confirmations.  In some

3    instances, email was requested per those individual

4    practices, so, or even delivery receipts were sent

5    along.  We had no reason to believe none of those --

6    that the letters weren't all received as intended.

7    Q.        Does The Weiser Law Firm still have the

8    confirmation for the FedEx deliveries?

9    A.        No idea.

10   Q.        Do you know who would be the person to ask

11   at The Weiser Law Firm about confirmation of receipt

12   of the FedEx deliveries?

13   A.        No.  Just not me.

14   Q.        Who typically handles outgoing mail and

15   FedEx at The Weiser Law Firm?

16   A.        Well, it's obviously changed.  I assume

17   you mean, like, prior to COVID?

18   Q.        Around 2017.

19   A.        I mean, it could really be anybody at the

20   firm.  Like, we all could send a FedEx or we all

21   knew where the outgoing mailbox was, and whoever was

22   at the firm or in the office at the time when mail

23   came in would grab it and distribute.

24   Q.        Who would have been the person responsible

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36

1257

JAMES FICARO, ESQ.

60

1    for emailing any of the judges who required email

2    rather than FedEx?

3    A.          Probably me or Mr. Stecker.

4    Q.          Would -- strike that.

5                Do you know, regardless of what case it

6    was, whether on any occasion you personally emailed

7    one of those letters?

8    A.          I don't remember.

9    Q.          If you did send one of those emails, would

10   it have been archived?

11   A.          Presumably.

12   Q.          Do you know if any of the letters -- well,

13   strike that.

14               When you did send the letters, would you

15   copy other counsel?

16   A.          I don't remember.

17   Q.          If the Court's procedures required you to

18   copy other counsel, would you have followed the

19   Court's procedures?

20   A.          Yes.

21   Q.          Do you know if any of the letters that

22   were sent notifying the courts appeared on any

23   docket?

24   A.          I don't know.

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36
1258

JAMES FICARO, ESQ.

61

1  Q.        Did anyone from any of the Courts'
2  chambers ever reach out to your office about the
3  letters?

4  A.        Not to me personally, no.

5  Q.        Do you know if they reached out to anyone
6  else from the firm?

7  A.        I don't.  Rob was the signatory on all the
8  letters.

9  Q.        Have you ever met Mr. Hartleib?

10  A.        I have not.

11  Q.        Do you know if Mr. Weiser has ever met
12  Mr. Hartleib?

13  A.        I believe they've met in person, yes.

14  Q.        Was that as part of the Equifax
15  proceedings?

16  A.        That sounds right.

17  Q.        Did Mr. Weiser ever say anything to you
18  about his in-person encounter with Mr. Hartleib?

19  A.        No.

20  Q.        Did you have any role in the criminal
21  proceedings that were brought against Jeffrey Silow?

22  A.        No.

23  Q.        Did you assist in any way in providing
24  documents to law enforcement regarding Jeffrey

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36
1259

JAMES FICARO, ESQ.

62

1    Silow?

2    A.        No.

3    Q.        Jumping to paragraph 87 of the First

4    Amended Complaint, it references that nearly one

5    hundred -- "one hundred media outlets picked up and

6    further publicized the Wall Street Journal's March

7    13, 2017 article."

8              Do you have any knowledge as to how many

9    media outlets actually picked up and publicized the

10   Wall Street Journal article beyond what's stated in

11   that paragraph?

12   A.        No.

13   Q.        I'll represent to you in the firm's

14   discovery responses they mention an algorithm that

15   was used to track the publication of the Wall Street

16   Journal article.  Do you know anything about the

17   algorithm that the firm had or used?

18   A.        I know nothing about algorithms in any

19   form or fashion.

20   Q.        Okay.  Do you know if The Weiser Law Firm

21   took any action to diminish or decrease the

22   visibility of the Wall Street Journal article?

23   A.        I don't know.

24   Q.        Did you have any role in the reporting to

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36

1260

JAMES FICARO, ESQ.

63

1    the Pennsylvania Disciplinary Board Mr. Silow's

2    activities with your firm?

3    A.        I did not.

4    Q.        Did you ever consult with any ethics

5    counsel regarding Jeffrey Silow and his employment

6    by your firm?

7    A.        I did not, no.

8    Q.        Did anyone from the Pennsylvania

9    Disciplinary Board ever reach out to The Weiser Law

10   Firm about Jeffrey Silow?

11   A.        I don't know.

12   Q.        Did you assist at all in the qui tam case

13   Stop Illinois Marketing Fraud, LLC, verse Addus

14   Homecare Corporation?

15   A.        Yes.  I think I was involved very early on

16   in that action.

17   Q.        Do you know what other attorneys worked on

18   that action from your office?

19   A.        Christopher Nelson.  That's the only other

20   attorney I can be sure of.

21   Q.        Do you know who owns the LLC, Stop

22   Illinois Marketing Fraud?

23   A.        No.

24   Q.        Was Jeffrey Silow ever identified as an

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36
1261

JAMES FICARO, ESQ.

64

1    attorney on The Weiser Law Firm's website?

2    A.          I don't know.

3    Q.          I've just placed on your screen The Weiser

4    Law Firm's document production in this case, and I'm

5    beginning at Weiser 1.

6                          MR. ROSENZWEIG:  Are you going

7              to mark this as Exhibit C?

8                          MR. MOTT:  I'm going to try and

9              make a collective marking.  I don't want

10             to mark the whole production if I don't

11             have to, so if you can just bear with me.

12   BY MR. MOTT:

13   Q.          And at the top of Weiser 1 is the name

14   Archita Patel, but then it lists -- it shows an

15   email, and it indicates that it's from you to

16   Jeffrey Silow.  Do you see that on your screen?

17   A.          I do see that.

18   Q.          Okay.  And you'll notice that the email --

19   the top email does not have a date on it.  Do you

20   have a version of this email that would reflect the

21   date that it was sent by you?

22   A.          I have no idea.

23   Q.          And did Archita Patel -- well, strike

24   that.

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36
1262

JAMES FICARO, ESQ.

65

1    Do you know why the name Archita Patel is

2  at the top of this document?

3            MR. ROSENZWEIG:  I'm going to

4            interject here, Mr. Mott.  As has been

5            explained to you several times, Archita

6            Patel was tasked with producing the

7            documents responsive to your document

8            demand, and therefore, she printed them

9            under the auspices of Archita Patel at the

10           top of the page.

11           That is the only reason why

12           she's identified, because she sourced them

13           when I produced them to you.  She was the

14           paralegal from The Weiser Firm who

15           cooperated with my firm in actually giving

16           us the documents that were responsive to

17           your request.

18  BY MR. MOTT:

19  Q.      And it's your recollection that Ms. Patel

20  left The Weiser Law Firm in 2020, correct?

21  A.      I believe that's right.  If not in 2020,

22  it's close to, but I believe that's right.

23  Q.      I've just placed on your screen Weiser 5,

24  and it is an email from you to Brett Stecker.  And

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36

JAMES FICARO, ESQ.

66

1    it says, "holy shit, his name isn't even Alexander,"

2    and then a web address for a website, lawyer.com.

3    Do you know when you sent this email?

4    A.        I don't -- I don't know exactly when, no.

5    To answer your question, no.

6    Q.        Okay.  Would this email be archived?

7    A.        Again, I suspect.

8    Q.        And for any email that was sent by you

9    from your Weiser Law Firm email address, it is your

10   presumption that that email would be archived

11   somewhere?

12   A.        I don't know the exact archiving system or

13   parameters that's utilized.  I know things are kept.

14   I don't know for what duration, because that's --

15   that's just not what I do.  But I do believe I can

16   access or some older emails can be accessed, but

17   again, I don't know how far back that actually goes.

18   Q.        Prior to today, have you ever seen the

19   document production that was assembled by Ms. Patel

20   in this case?

21   A.        No.

22   Q.        Have you ever seen any document production

23   by your firm related to the case that it brought

24   against Abelson Legal Search and Jeffrey Silow?

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36

1264

JAMES FICARO, ESQ.

67

1   A.        No.

2   Q.        Have you ever seen any documents related

3   to that case?

4   A.        I don't know what was produced.  I

5   don't -- I don't know what documents are part of

6   that.  So I haven't seen it as part of a production

7   in that case, but it very well could include a

8   document that I've seen in the past.

9   Q.        I've just placed on your screen what is

10  Bates stamped Weiser 427 from the same production,

11  and it is an email that appears to be from you to

12  Robert Weiser.  Are you able to see that on your

13  screen?

14  A.        I can see it.

15  Q.        Okay.  And again, the top email doesn't

16  have a date, but the email in the chain directly

17  below it has a date of May 4, 2016.  And in your

18  email it mentions "confirmation he is on the website

19  soon."

20            Looking at that email now, do you recall

21  whether Jeffrey Silow was ever on The Weiser Law

22  Firm website?

23  A.        I don't know that he ever made it on.  I

24  don't know.

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36

JAMES FICARO, ESQ.

68

1    Q.        Okay.  Do you -- do you recall whether you

2    ever received confirmation that he was on the

3    website?

4    A.        I don't recall, no.

5    Q.        Who would you have been awaiting

6    confirmation from regarding his placement on the

7    website?

8    A.        I can't remember.  We -- there was a

9    gentleman who kind of built up the website kind of

10   generally around that time, and I don't recall his

11   name.  But if there were changes to the website,

12   emails would go through him or to him, or if not to

13   him, to probably Patricia Weiser and then to him.

14   But you're going to ask me his name, and I'm not

15   going to remember.

16   Q.        But you believe that it may have been

17   Patricia Weiser who would have been communicating

18   with him directly?

19   A.        It's a possibility.

20   Q.        I've jumped to Weiser 450.  It is an email

21   from you to a Patrick Bilgere, and part of the

22   subject line is redacted but it also states

23   "additional docs for Jeff Silow."

24             Who is Patrick Bilgere?

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36
1266

JAMES FICARO, ESQ.

69

1    A.        I'm basing it on his signature at the

2    bottom.  It looks like he works for a company called

3    Reveal Data.  That might be a document review

4    platform.  I assume you visited the site.  I don't

5    know exactly.

6                    MR. ROSENZWEIG:  And, Mr. Mott,

7             for the record, can you reveal what the

8             Bates -- the Bates of this document is?

9                    MR. MOTT:  I believe -- I

10            thought I did.  It's Weiser 450.

11                   MR. ROSENZWEIG:  You hadn't, but

12            thank you.

13   BY MR. MOTT:

14   Q.        Going now to Weiser 435, it's an email

15   chain, and the top email states "Weiser admin" and

16   then in the con -- in the body of the email it says

17   "Thank you, C."  Do you know who C is?

18   A.        Cheryl Tryon, T-R-Y-O-N.

19   Q.        And back around the fall of 2016, what was

20   Ms. Tryon's role with The Weiser Law Firm?

21   A.        I'm not sure she has a title.  She's kind

22   of like our bookkeeper, but only -- my understanding

23   is her practice is she helps several different small

24   to medium-size businesses.  So she wasn't with us

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36

JAMES FICARO, ESQ.

70

1    like every day, but a couple days a week.

2    Q.        She was an independent contractor?

3    A.        Oh, I don't know her designation.

4    Q.        Okay.  Have you ever heard the name

5    Trinity Billing Solutions?

6    A.        I have not.

7    Q.        Have you ever known Cheryl Tryon to go by

8    the name Cheryl Green?

9    A.        Yes.  Yes.  I believe that's her maiden

10   name.

11   Q.        And going to page 2 of this email chain,

12   what is Weiser 436, it references timber inventory

13   documents.  Is that the Rayonier case?

14   A.        Yes, that would be.  Rayonier was a timber

15   company.

16   Q.        So Jeffrey Silow worked on that case?

17   A.        It appears so, though I -- I don't recall

18   that exactly, but it appears so.

19   Q.        Do you know whether the Court presiding

20   over the Rayonier case was notified like some of the

21   other courts that we've talked about?

22   A.        No.  No hours from Mr. Silow were ever

23   submitted to that Court.

24   Q.        I've jumped to Weiser 470.  It is an email

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36
1268

JAMES FICARO, ESQ.

71

1    from Brett Stecker to Stephanie Lewis.  What is

2    Stephanie Lewis's role with The Weiser Law Firm?

3    A.        She was I think office manager for lack of

4    a better term.

5    Q.        And -- well, I know you didn't send that

6    top email.  It references the term "ticker."  What

7    is a ticker?

8    A.        Like, a stock ticker.  That's often how

9    cases were identified internally.

10   Q.        Going to Weiser 493, it's an email from

11   Brett Stecker to Kristen L. Ross which you are

12   copied on.  Who is Kristen Ross?

13   A.        I don't remember.

14   Q.        Was she an attorney with Kessler Topaz?

15   A.        Could be.  Again --

16   Q.        And --

17   A.        -- I don't remember.

18   Q.        And for -- it references WLF.  Is that a

19   ticker?

20   A.        No.  That stands for Weiser Law Firm.

21   Q.        Okay.  Do you know what action this is

22   referring to?

23   A.        I don't.

24   Q.        Do you know the names of any cases where

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36

1269

JAMES FICARO, ESQ.

72

1    Kessler Topaz hosted the document review that

2    Jeffrey Silow worked on?

3    A.          I don't.

4    Q.          Do you know if Kessler Topaz hosted the

5    document review on the Rayonier case?

6    A.          I don't know.  I don't know that they have

7    an internal system where they can, you know, truly

8    host.  It could be a situation where they liaised

9    with whatever outside vendor or something like that

10   to get credentials, so I honestly don't know.  I --

11   I am not certain.

12   Q.          Do you know if The Weiser Law Firm

13   retained any share of the fees that were awarded in

14   the Sprint case?

15   A.          I don't believe so, no.

16   Q.          Was The Weiser Law Firm lead counsel in

17   the Sprint case?

18   A.          In our jurisdiction.  So there was an

19   action pending in federal court, an action pending

20   in state court.  I believe we were co-lead counsel

21   in the state court action, if my memory serves.

22   Q.          Do you know who was lead counsel in the

23   federal action?

24   A.          I don't know.

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36
1270

JAMES FICARO, ESQ.

73

1   Q.        Would -- as co-lead counsel, would The

2   Weiser Law Firm have received any of the fee award

3   regardless of whether it ended up retaining any

4   portion of it as part of the settlement?

5   A.        I'm not sure I follow.

6   Q.        For -- okay.  To clarify, so as -- does

7   lead counsel receive -- or does lead counsel or

8   co-lead counsel receive the entirety of a fee award

9   to be divvied up amongst the other firms, or is it

10  initially divvied up and paid out by the payee?

11                 MR. ROSENZWEIG:  I object to the

12              question because it seeks information

13              about all such cases, and I think it is an

14              inappropriate question.  Mr. Ficaro, if

15              you can respond to it, my objection is on

16              the record.

17                 THE WITNESS:  I can.  It's kind

18              of a boring answer, and the answer is

19              sometimes.

20                 So in some situations where

21              there's a large group of plaintiffs' firms

22              involved in a case, and this usually would

23              be detailed in the Stipulation of

24              Settlement, the payee, usually the

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36

JAMES FICARO, ESQ.

74

1              insurance company, you know, the insurance

2              policy who covers that corporation, would

3              pay into an escrow fund that's jointly

4              controlled by all the firms, and all the

5              firms have to jointly agree before any

6              money is released.

7                        Sometimes there's situations

8              where there is I guess a true, like, lead

9              lead counsel where one firm is really

10             doing all the work.  They would be the

11             payee -- I'm sorry.  The payee would send

12             the money to them and then they would

13             distribute.

14                       It's really a case-by-case

15             basis.  Sometimes it's joint escrow

16             account.  Sometimes every -- all the firms

17             agree who will receive the funds, because

18             it is an administrative hassle to then

19             turn around and wire money or send checks,

20             and some firms prefer not to do that.  But

21             generally speaking, it could happen a

22             number of ways.

23    BY MR. MOTT:

24    Q.       I'll just jump back to Weiser 88, and

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36

JAMES FICARO, ESQ.

75

1    within the email chain on Weiser 88 is an email from

2    KAGlive@comcast.net.  Is that Cheryl Green's email?

3    A.        Yes.

4    Q.        Did she have an internal email with The

5    Weiser Law Firm?

6    A.        I don't know about in 2017, but now there

7    is an account she can check when she is ready to do

8    work for our firm.

9                    MR. MOTT:  Why don't we take a

10                   five-minute comfort break, unless someone

11                   needs a little more time.

12                   MR. ROSENZWEIG:  So, Mr. Mott,

13                   five minutes is fine.  It is 12:30.  Two

14                   things:  One, do you have a sense of how

15                   much longer you'll go?  Two, I have a call

16                   at 1:15 that I must field, so if you're

17                   still planning on going there, I ask for a

18                   break at 1:15 for 15 or 20 minutes tops.

19                   MR. MOTT:  So why don't we do a

20                   quick break now, and then as soon as

21                   you -- do you want to hard stop at 1:15 or

22                   do you need a few minutes ahead of that?

23                   MR. ROSENZWEIG:  You know, 1:14

24                   would be fine.

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36
1273

JAMES FICARO, ESQ.

76

1              MR. MOTT:  Oh, okay.  Well,

2        let's do a quick break now, and then we'll

3        do a longer break for your call.  So you

4        can take your call and people can grab a

5        bite to eat if they need to.

6              MR. ROSENZWEIG:  Okay.  Well,

7        which therefore I ask you to answer my

8        former question, my first question, which

9        is do you have a sense of your trajectory?

10             MR. MOTT:  I will not be done in

11       time for your call, I know that.

12             MR. ROSENZWEIG:  No, no, no.

13       That's apparent.

14             THE VIDEOGRAPHER:  I'm going to

15       go off video record, so it's 12:35.  Going

16       off video record.

17             (At this time, a short break was

18       taken.)

19             MR. MOTT:  Jim, before we go

20       back on video, can you tell me what my

21       last question was?

22             (At this time, the court

23       reporter read back from the record as

24       requested.)

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36
1274

JAMES FICARO, ESQ.

77

1              THE VIDEOGRAPHER:  The time is

2       now 12:49.  We are back on video record.

3   BY MR. MOTT:

4   Q.          I've placed on your screen Weiser 502.  It

5   is an email address from you to Jeffrey Silow where

6   you inquire what city he lives in.  Do you know why

7   you inquired as to what city he resided in and when

8   you made the inquiry?

9   A.          I don't remember when, but it would have

10  been probably for one of the declarations he

11  executed, because usually the last line indicates

12  what city the declaration was executed in.

13  Q.          And do you know on how many occasions

14  Mr. Silow executed an affidavit related to his work

15  for The Weiser Law Firm?

16  A.          I'm only familiar with it -- with it being

17  Sprint, but I don't know.

18  Q.          And then going to Weiser 505, it

19  references a Silow letter in the subject line, and

20  it is an email from you to Mr. Stecker.  And it

21  states, "First draft attached for

22  comment/brainstorming."

23              Do you know what that is in reference to?

24  A.          No.  I mean, without the date, it's hard,

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36
1275

JAMES FICARO, ESQ.

78

1    so I'm not certain.

2    Q.        Okay.  Going now to Weiser 364, it's an

3    email from you to Robert Weiser referencing an

4    attachment.  It says, "Attached is what he sent me

5    when we were adding him to the website," and the

6    date of May 4, 2016.  "Says he is licensed."

7              Do you know approximately when that email

8    was sent?

9    A.        I assume after January/February 2017.

10   Q.        Okay.  So if in the email chain below it

11   references a date of February 2, 2017, you would --

12   would you have -- would this top email have been the

13   same -- would have been sent the same day or near

14   the same day?

15   A.        Oh, I don't know that that's clear from

16   this.  It would -- I think it would be sent after

17   that date, but I don't know temporally exactly how

18   soon.

19   Q.        Okay.  And based on -- I just ask that you

20   look at 364, the first email that you sent, and then

21   the second one in the chain.

22   A.        I see it.

23   Q.        Okay.  And so, based on the language in

24   that email, was Jeffrey Silow or Alexander J. Silow

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36
1276

JAMES FICARO, ESQ.

79

1    on The Weiser Law Firm website from May of 2016

2    through February of 2017, or into February of 2017?

3    A.        I don't know.  I don't recall ever

4    checking the website to confirm he was added or not.

5    Q.        Actually, going back to that same chain on

6    Weiser 364, there is an email from Mr. Silow to you

7    and Mr. Stecker referencing an attached résumé.  Did

8    you ever view the original attachment that was sent

9    by Mr. Silow?

10   A.        I don't remember.

11   Q.        Going to Weiser 424, it's another email

12   from you to Mr. Stecker and copying Robert Weiser,

13   and it states, "Updated" and then what appears to be

14   some type of description of Alexander Jeffrey

15   Silow's background.

16             Did you draft that blurb about Alexander

17   Jeffrey Silow?

18   A.        It appears so from the very bottom of 424.

19   Q.        Okay.  And would there have been a prior

20   version of that blurb since the -- since your email

21   references "updated"?

22   A.        Yeah.  It looks like the bottom email in

23   this chain -- is there more?  Is there -- can I see

24   425?  Is that all right?

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36
1277

JAMES FICARO, ESQ.

                                                                        80

1    Q.         Yeah.

2    A.         All right.

3               So, okay, you can go back to 424, please.

4               Yeah.  It looks like I turned his résumé

5    into a summary which perhaps was for the website.

6    And Brett recommended that we put the years of his

7    graduation in, and then I updated it with the years

8    of his graduation.

9    Q.         And based on what is at the bottom here,

10   there was an original blurb that you were running

11   past it appears to be Mr. Stecker and possibly

12   Mr. Weiser, correct?

13   A.         Yes.

14   Q.         And would you have that original blurb?

15   A.         I don't -- I don't know.

16   Q.         Going to Weiser 772, it's an email from

17   you to Cheryl Green and copying Brett Stecker, and

18   in the subject line is Jeff -- or, "J. Silow

19   timesheet" and it states in the body, "Yes, you can

20   pay.  Thanks, Jimmy."

21              Is that you approving a payment to Jeffrey

22   Silow?

23   A.         Yeah, I think so.

24   Q.         Okay.  And prior to approving the payment,

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36
1278

JAMES FICARO, ESQ.

81

1    what would you have done?

2                        MR. ROSENZWEIG:   Objection as to

3            form.

4                        MR. MOTT:   Yeah.   I'll rephrase.

5            Strike -- strike the question.

6    BY MR. MOTT:

7    Q.        Would you have reviewed the timesheet

8    before you approved the payment?

9    A.        I don't recall doing that, no.

10   Q.        Do you know what case this is in reference

11   to?

12   A.        I don't.

13   Q.        Was your office working on the Rayonier

14   case in 2016?

15   A.        Possibly.

16   Q.        If the time that Mr. Silow was submitting

17   to you was part of a document review that was hosted

18   on a platform such as Relativity or Reveal Data,

19   would you have verified his time on any of the

20   platforms before you approved the payment?

21   A.        No.

22   Q.        I've placed on your screen an email chain

23   that is -- that was not part of The Weiser Law

24   Firm's production, or at least this version of it

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36

1279

JAMES FICARO, ESQ.

82

1    was not part of The Weiser Law Firm production, and

2    this we will go ahead and mark as Exhibit B.

3              And within the body is -- or within the

4    chain is an email from you to Jeffrey Silow.  At the

5    beginning you say, "Got it.  Thanks!"  And then

6    further down in the chain there's an email from

7    December 20, 2016, from you to Mr. Silow attaching a

8    declaration for his signature.  Do you recall

9    sending Mr. Silow the declaration on December 20,

10   2016?

11   A.        No.

12                    THE COURT REPORTER:  There is

13             already an Exhibit B.

14                    MR. MOTT:  Oh, my mistake.

15             Exhibit C.  We'll mark this as Exhibit C.

16                    (At this time, Exhibit C was

17             marked for identification.)

18   BY MR. MOTT:

19   Q.        Then within the chain, towards the bottom,

20   same date, just an earlier email, it references an

21   updated version of a declaration, and that "we are

22   about to have another call."

23             How many versions of Jeffrey Silow's

24   declaration were there before he executed a

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36
1280

JAMES FICARO, ESQ.

83

1    signature?

2    A.          I don't know.

3    Q.          Would The Weiser Law Firm have -- well,

4    strike that.

5           If you attached declarations in your

6    emails, would those emails be archived?

7    A.          I don't know.

8    Q.          When it -- at the bottom of the chain

9    where it says "we are about to have another call,"

10   do you know who the we is?

11   A.          I don't.

12   Q.          Do you know if it would have included

13   attorneys from other firms involved in the Sprint

14   case?

15   A.          I don't know.

16   Q.          Why did you have to revise the declaration

17   that you had already sent to Jeffrey Silow?

18   A.          I'm not certain.  If -- if there was an

19   earlier version, then we could have had to update it

20   so that the date was accurate.  Like, if was going

21   to sign on a particular date, we'd have had to

22   change the date, so I'm not certain.

23   Q.          Mr. Stecker has left -- well, strike that.

24           Mr. Stecker is no longer with The Weiser

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36
1281

JAMES FICARO, ESQ.

84

1    Law Firm, correct?

2    A.          That's right.

3    Q.          Do you know why Mr. Stecker left The

4    Weiser Law Firm?

5    A.          Yes.

6    Q.          And why did Mr. Stecker leave The Weiser

7    Law Firm?

8    A.          He was let go by the firm.

9    Q.          Do you know why he was let go?

10   A.          The overall financial performance of the

11   department.

12   Q.          And when was he let go?

13   A.          Fall of 2019.

14   Q.          And which department are you referring to?

15   A.          At the time, he was the head of the

16   derivative department.

17   Q.          Do you have any knowledge of the

18   performance of the derivative department financially

19   in the fall of 2019?

20   A.          I do not.

21   Q.          How did you come to learn that he was let

22   go due to the financial performance of the

23   department?

24   A.          Because when I kind of -- when I assumed

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36
1282

JAMES FICARO, ESQ.

85

1    that role, I was told that it was expected of me to

2    have the department perform better.

3    Q.        And has the department performed better

4    since you took over?

5    A.        I'm still here, so yes.

6    Q.        And how are you able to measure whether

7    the performance of the department has improved since

8    you took over?

9    A.        By my attendance here today.

10   Q.        Have you reviewed the financials for the

11   department during the time period since you took

12   over in the fall of 2019?

13   A.        No.  But I'm aware of the revenues that

14   are brought in by cases that I participate in.

15   Q.        So you don't know the revenue for the

16   cases that Mr. Stecker was bringing in prior to the

17   fall of 2019?

18   A.        No.  Only -- only some of them, but not

19   all, no.

20   Q.        And what is the -- well, why do you

21   believe revenue has improved since you have taken

22   over?

23   A.        Because I haven't been --

24                   MR. ROSENZWEIG:  Objection as to

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36
1283

JAMES FICARO, ESQ.

86

1           form.

2                        THE WITNESS:  Because I

3           haven't --

4                        MR. ROSENZWEIG:  Go ahead,

5           Jimmy.

6                        THE WITNESS:  I haven't been

7           fired.

8    BY MR. MOTT:

9    Q.        Has Mr. Weiser ever made any statements to

10   you regarding improvements of revenue since you took

11   over?

12   A.        We've talked about the revenue of the

13   department, but we have not talked about it in terms

14   of improvements or declines, just kind of about the

15   status quo.

16   Q.        And has Mr. Rev -- or Mr. Weiser ever

17   described the quality or quantity of the revenue

18   that has been coming into the department since you

19   took over?

20   A.        I'm not sure about quality, dollars being

21   fungible and whatnot, but I think like every

22   managing partner, more would be better.  But he's

23   happy enough right now.

24   Q.        Were you involved at all in the litigation

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36

1284

JAMES FICARO, ESQ.

87

1    that was brought against Mr. Stecker after he was

2    terminated from the firm?

3    A.        I was not.

4    Q.        Do you have any knowledge of the

5    allegations made against Mr. Stecker in that case?

6    A.        I do.

7    Q.        And you're aware that it was alleged that

8    he had poached clients from the firm after he left?

9    A.        Yes.

10   Q.        Do you know approximately how many clients

11   he took with him when he left?

12                       MR. ROSENZWEIG:  Objection as to

13            form.  Also, objection as to relevance.

14                       You know, Mr. Mott, I'm going to

15            start asking you to put on the record how

16            your questions are relevant to this case,

17            and, you know, if we veer off into things

18            that are really not relevant, I'm going to

19            seek the intervention of the magistrate.

20            I've --

21                       MR. MOTT:  It's --

22                       MR. ROSENZWEIG:  I've let your

23            questions that -- go on where they were

24            relevant or quasi-relevant, but we're now

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36
1285

JAMES FICARO, ESQ.

88

1              well beyond the pale of anything relevant

2              to this case.  And you've deposed

3              Mr. Stecker, so.

4                      MR. MOTT:  It goes to the dam --

5              it goes to the damages in this case, and

6              if --

7                      MR. ROSENZWEIG:  How?  How?

8              How?  Put on the record how.

9                      MR. MOTT:  Amount and source and

10             why they lost clients or didn't have the

11             same number of clients, and it is --

12                     MR. ROSENZWEIG:  I -- yeah.  My

13             1:15 is calling in now, so can we take

14             that break for 15 or 20 minutes?

15                     MR. MOTT:  All right.  Let's try

16             and be as quick as we can, please.

17                     THE VIDEOGRAPHER:  The time is

18             now 1:10.  Going off video record.

19                     (At this time, a short break was

20             taken.)

21                     THE VIDEOGRAPHER:  The time is

22             now 1:36.  We are back on video record.

23                     MR. ROSENZWEIG:  All right.  So,

24             Mr. Mott, I informed you off the record

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36

JAMES FICARO, ESQ.

89

1          that I've made accommodations to

2          reschedule my four o'clock so that we

3          could continue to work through, but I

4          remain -- I continue to have a hard stop

5          at 5:30.

6                    Also, I appreciate the

7          accommodation for that unplanned call,

8          which was about 20 minutes.

9                    And last, I believe we left off

10         where you were trying to justify your --

11         your question with respect to the Stecker

12         claim about poaching clients, so I don't

13         know if you had finished that because I

14         did need to take that incoming phone call.

15         Thank you.

16                    MR. MOTT:  And unless you're

17         instructing him not to answer questions

18         regarding that, I don't feel to put a --

19         that I need to put a statement on the

20         record.

21                    MR. ROSENZWEIG:  Okay.  Well,

22         I'm not instructing him not to answer.

23         That's not what I've done.  I'm just

24         letting you know that I think it's wholly

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36
1287

JAMES FICARO, ESQ.

90

```
 1              irrelevant and that your explanation

 2              doesn't come close to being legitimate,

 3              but go ahead.

 4                        MR. MOTT:  Thanks.

 5   BY MR. MOTT:

 6   Q.         Mr. Ficaro, do you know how many clients

 7   Mr. Stecker took from The Weiser Law Firm when he

 8   was terminated?

 9   A.         I think it was about a handful, four or

10   five maybe.

11                        MR. MOTT:  So I've placed on

12              your screen what we'll mark as Exhibit D,

13              which is the Complaint in the case brought

14              by The Weiser Law Firm against Brett

15              Stecker and his new firm of Shuman Glenn &

16              Stecker.

17                        (At this time, Exhibit D was

18              marked for identification.)

19   BY MR. MOTT:

20   Q.         And if you go onto the page 6, beginning

21   on paragraph 26, it begins to reference letters that

22   The Weiser Law Firm received terminating

23   representation, and the first one at paragraph 26a

24   is regarding a letter from a Murray C. Turka
```

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36

1288

JAMES FICARO, ESQ.

91

1    regarding a Santee mini-bond purchaser class action.

2              Do you know why Murray Turka decided to

3    terminate their relationship with The Weiser Law

4    Firm?

5    A.        No.

6    Q.        Going to 26b, there's another letter from

7    November 7, 2019, referenced regarding a John P.

8    Dash, III, terminating its relationship with The

9    Weiser Law Firm and retaining Mr. Stecker's new

10   office, and it references a Helios & Matheson

11   shareholder litigation.

12             Do you know why John P. Dash, III,

13   terminated his relationship with The Weiser Law

14   Firm?

15   A.        I don't.

16   Q.        Paragraph 26c references a letter from the

17   same date from a Nicholas Ingrao, I-N-G-R-A-O,

18   terminating representation of The Weiser Law Firm

19   and retaining Mr. Stecker's new office with respect

20   to the Yelp shareholder litigation.

21             Do you know why this former client of The

22   Weiser Law Firm terminated its relationship --

23   A.        I don't.

24   Q.        -- with The Weiser Law Firm?

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36

1289

JAMES FICARO, ESQ.

92

1    A.        I do not.

2    Q.        Paragraph 26d references a letter from the

3    same date from a David Pinkoski terminating his

4    relationship with The Weiser Law Firm and retaining

5    Mr. Stecker's new firm regarding the Genworth

6    Financial shareholder litigation.

7              Do you know why Mr. Pinkoski terminated

8    his relationship with The Weiser Law Firm?

9    A.        I do not.

10   Q.        Paragraph 26e references a December 2,

11   2019 letter from a Nancy Thomas terminating her

12   relationship with The Weiser Law Firm and retaining

13   Mr. Stecker's new firm with respect to the Blue

14   Cross/Blue Shield antitrust litigation.

15             Do you know why Ms. Thomas terminated her

16   relationship with The Weiser Law Firm?

17   A.        I do not.

18   Q.        Paragraph 26f, a December 9 (sic), 2019

19   letter from a Marianita Lopez on behalf of Saccocio

20   & Lopez terminating representation by The Weiser Law

21   Firm and retaining Mr. Stecker's new firm relating

22   to the Blue Cross/Blue Shield antitrust litigation.

23             Do you know why Saccocio & Lopez

24   terminated its relationship with The Weiser Law

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36

1290

JAMES FICARO, ESQ.

93

1    Firm?

2    A.        I do not.

3    Q.        December 11, 2019 letter referenced in

4    paragraph 26g from Frank Lipsius terminating his

5    relationship with The Weiser Law Firm and deciding

6    to go with Mr. Stecker's new firm regarding the OPKO

7    Health, Inc., shareholder litigation.

8              Do you know why Mr. Lipsius decided to

9    terminate his relationship with The Weiser Law Firm?

10   A.        I do not.

11   Q.        Do you have any reason to believe that any

12   of these individuals or entities terminated their

13   relationship with The Weiser Law Firm due to Michael

14   Hartleib?

15   A.        I can't speculate as to why they left The

16   Weiser Law Firm.

17   Q.        Do you know of any clients who terminated

18   their relationship with The Weiser Law Firm due in

19   whole or in part because of Michael Hartleib?

20   A.        I don't know.

21   Q.        I apologize --

22              MR. ROSENZWEIG:  Can you read

23              back -- excuse me.  Can you read back that

24              last question and answer, Mr. Hopper?

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36

1291

JAMES FICARO, ESQ.

94

1               (At this time, the court

2          reporter read back from the record as

3          requested.)

4                    MR. ROSENZWEIG:  Thank you.

5          Appreciate it.  Thank you.

6                    MR. MOTT:  I apologize.  I

7          didn't hear your response, Mr. Ficaro.  I

8          wasn't just delaying.

9     BY MR. MOTT:

10    Q.      Do you -- well, strike that.

11            Do you know what your department's revenue

12    was in 2020?

13    A.      No.

14    Q.      Do you know what your department's revenue

15    was in 2021?

16    A.      No.

17    Q.      Do you know whether there was an increase

18    in revenue from 2020 to 2021?

19    A.      Yes, I believe there was.

20    Q.      Do you know if there was an increase of

21    revenue from 2019 to 2020?

22    A.      I don't know.

23    Q.      During the calls with other firms and

24    counsel where Michael Hartleib was mentioned, did

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36

1292

JAMES FICARO, ESQ.

95

1    the -- did the name Silow ever come up?

2    A.        Not specifically, but the situation

3    regarding Mr. Silow did come up.

4    Q.        Did any of the other attorneys from the

5    other firms inquire as to how The Weiser Law Firm

6    could have employed Mr. Silow for so long without

7    knowing that he was disbarred?

8    A.        No.  I don't recall anyone asking that --

9    me that question.

10   Q.        If Mr. Murphy had referred Monica

11   Ross-Williams to your office, would he have received

12   a type of referral fee or referral percentage?

13   A.        I don't know.  I wasn't involved in any

14   referral agreement with Mr. Murphy.

15   Q.        Okay.  In the cases that you have had

16   since you took over the department, do you have

17   referral fee agreements with other attorneys?

18   A.        Yes.

19   Q.        And when you do have a referral fee

20   agreement, is that disclosed to the client?

21   A.        Yes.

22   Q.        When you propose a settlement and a fee

23   award to the Court, do you inform the Court of any

24   referral fee obligations that you have when you are

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36

JAMES FICARO, ESQ.

96

1    requesting the fee award?

2    A.        If it's requested by the Court, as it

3    sometimes is.

4    Q.        In any of your cases, do you have referral

5    fee arrangements with any non-attorneys?

6    A.        No.  Not that I'm aware of.

7    Q.        Do you know of any emails that

8    Mr. Hartleib sent to Chambers in the Sprint case

9    where he did not copy all counsel and the Court

10   forwarded the email to other counsel?

11   A.        You're going to have to say that one

12   again.  I'm sorry.

13   Q.        Sure.

14             Are you aware of any emails that Michael

15   Hartleib sent to Chambers in the Sprint case that

16   were then forwarded by Chambers to other counsel?

17   A.        I'm not aware of any such email.

18   Q.        Okay.  Are you aware of any email from the

19   Court to Mr. Hartleib that included other counsel

20   where he was instructed to copy the other parties in

21   the case?

22   A.        You're asking me if there was an email

23   that copied other people asking him to copy more

24   people?  I'm not --

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36

JAMES FICARO, ESQ.

97

1    Q.        Did you --

2    A.        -- aware of any such email.

3    Q.        Are you aware of any email from Chambers

4    to Mr. Hartleib where he was instructed to copy

5    counsel for the parties involved in the Sprint case?

6    A.        I don't remember.

7    Q.        Did you have any involvement in the

8    appellate proceedings in the Sprint case?

9    A.        Yes.

10   Q.        And did you assist in any of the drafting?

11   A.        Yes.

12   Q.        I'm sorry.  There was a -- there was a

13   quick connection issue.  I didn't catch your answer.

14   A.        Yes.

15   Q.        Did you attend any of the appellate

16   proceedings?

17   A.        I did not.

18   Q.        Did you -- have you ever read the

19   appellate decision?

20   A.        Yes.

21   Q.        Did you ever discuss the appellate

22   decision with the other attorneys that were involved

23   in the Sprint case?

24   A.        Yes.

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36
1295

JAMES FICARO, ESQ.

98

1    Q.        And did any of those discussions involve

2    Michael Hartleib?

3    A.        Yes.

4    Q.        Did you have any conversations with

5    Mr. Stecker about the actual appellate hearing in

6    the Sprint case?

7    A.        Yes.

8    Q.        And did he describe for you in any way how

9    the appellate hearing -- strike that.

10            Did he describe how the appellate hearing

11   went?

12   A.        I'm sure he did, yes.

13   Q.        Do you recall how he described the

14   appellate proceedings?

15   A.        I don't.

16   Q.        Do you know if Mr. Weiser attended the

17   appellate proceedings?

18   A.        I don't believe he did.

19   Q.        Have any of the other plaintiffs' firms or

20   attorneys from the plaintiffs' firms involved in the

21   Sprint case ever mention the economic losses that

22   they incurred due to the fee reduction in the Sprint

23   case?

24   A.        Not to me, no.

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36

JAMES FICARO, ESQ.

99

1    Q.        Do you know how the fee award that the

2    Court did allow was apportioned amongst the

3    plaintiffs' firms in the Sprint case?

4    A.        I don't.

5    Q.        Do you know how it would have been

6    apportioned if the Court had approved the original

7    request?

8    A.        I don't.

9    Q.        Did you ever interact with Mr. Silow in

10   person?

11   A.        One time.

12   Q.        And when was that?

13   A.        It would have been very early in my tenure

14   at the firm.  Gosh.  2012, '13, '14, something like

15   that.  I didn't -- I was the only person in the

16   office, and a check for him had been left at the

17   front desk and our doors automatically locked.  So

18   he knocked on the door, I introduced myself and

19   handed him the check, and he was on his way.

20   Q.        Prior to the résumé that he provided to

21   The Weiser Law Firm around May of 2016, had he ever

22   referred to himself as Alex or Alexander to you,

23   whether it be in person, over the phone, or in a

24   writing?

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36

1297

JAMES FICARO, ESQ.

100

1    A.        No.  I don't believe so.

2    Q.        Prior to your email to Mr. Silow where you

3    requested his bar ID, had you ever requested his bar

4    ID?

5    A.        You were cutting out a little bit.  Could

6    you repeat that question for me, please?

7    Q.        Yes.

8              In your email that you mentioned where you

9    contacted Jeffrey Silow and requested his bar ID,

10   had you ever made any prior inquiry as to his bar

11   status before that email?

12   A.        No.

13   Q.        Do you ever interact with Mr. Weiser

14   outside of the office?

15   A.        We have.

16   Q.        How many social, non-work-related

17   interactions would you say you've had with Mr. Silow

18   since 2016?

19   A.        With Mr. Silow?  No.

20   Q.        Or, I'm sorry.  My -- Mr. Weiser.

21   A.        Oh, maybe once a year we play golf.

22   Q.        And how about -- well, strike that.

23             Have you ever noticed any changes in

24   Mr. Weiser's weight in the past five years?

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36
1298

JAMES FICARO, ESQ.

101

1    A.          Have I noticed any changes in his weight?

2    No.  But to be honest, I haven't seen him in person

3    in a while with COVID and whatnot, so it's kind of

4    hard for me to gauge.  But no.

5    Q.          Prior to COVID -- well, strike that.

6               Have you ever seen any signs that

7    Mr. Weiser was depressed or showed a lack of

8    interest in his work?

9    A.          In my entire tenure knowing him?

10   Q.          Since 2016.

11   A.          Yeah.  I would say, you know, right after

12   this information about Silow came to light, he was

13   very stressed.  I remember when he told Mr. Stecker

14   and I that he had just gotten a call back from

15   Mr. Silow, like, he came downstairs to tell us, and

16   he looked very shook.  He looked pale as a ghost.

17   Like, he couldn't believe what he had just -- the

18   phone call that he just had, so I saw that.

19               The time after that obviously was very

20   stressful, having to reach out to former clients, to

21   former judges in these cases, to former co-counsel

22   in those cases, and kind of explain what had

23   happened and hope that, you know, the judges

24   wouldn't do anything to, you know, try and recoup

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36

1299

JAMES FICARO, ESQ.

102

1    attorneys' fees that were awarded in years prior.

2    It was a very stressful time.

3    Q.       Other than the stress from the issues that

4    you just mentioned, did you notice any changes in

5    Mr. Weiser's mental health that you would relate to

6    Michael Hartleib?

7    A.       I don't know.

8    Q.       Did Patricia Weiser ever express concerns

9    to you regarding Robert Weiser's mental health

10   status?

11   A.       No.  But those aren't types of

12   conversations me and Ms. Weiser would have.

13   Q.       Do you know -- well, strike that.

14            When was the last time you played golf

15   with Robert Weiser?

16   A.       Oh, it was before COVID, yeah, so a couple

17   years ago.

18   Q.       Did he mention Michael Hartleib to you?

19   A.       I don't recall.

20   Q.       Other than concerns about Michael Hartleib

21   involving himself in other cases related to your

22   firm, has anyone ever expressed an opinion to you

23   regarding the reputation of The Weiser Law Firm?

24   A.       No one has explicitly told me, to my face

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36

JAMES FICARO, ESQ.

103

1    at least, that they think our reputation is

2    different than it was, but again, those things are

3    seldom said directly.

4    Q.        Have you ever had an instance where a

5    potential client decided not to retain your law firm

6    and they referenced the name Michael Hartleib?

7    A.        Explicitly, no.

8    Q.        Have you ever had a potential client

9    reference the Sprint case to you?

10    A.        No.  So generally what happens is I'll

11    have a conversation with a prospective client, and

12    if it's -- if it's like we're going to proceed with

13    a case, what I'll tell them is, you know, we won't

14    ask them to sign anything right away, but let us

15    work together a draft so you can see what a

16    Complaint would look like, see what the allegations

17    are going to be.

18         And while I'm working on that draft, I'll

19    send them an email usually so they have my contact

20    information should they need to reach me.  I send

21    them our firm résumé.  I expect at that time, you

22    know, because we haven't had a lot of conversations,

23    that they Google The Weiser Law Firm.  I presume

24    that that what would happen.  That's what I would

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36

1301

JAMES FICARO, ESQ.

104

1    do.

2              So I've had clients who do not sign up,

3    but I've never had anyone tell me specifically it

4    was because of up Mr. Hartleib.  But I do know that

5    that Wall Street Journal article would come up on a

6    Google search result about my firm, so that I do

7    know.

8    Q.        And how do you know that the Wall Street

9    Journal article would come back on a Google search

10   for your firm?

11   A.        Because I've Googled it myself.

12   Q.        When was the last time you Googled The

13   Weiser Law Firm and saw the Wall Street Journal

14   article?

15   A.        Probably 2018, 2019.

16   Q.        Has Michael Hartleib had any impact on the

17   revenue of your department since you took over since

18   the fall of 2019?

19   A.        I don't know.  It's too early to say.

20   Some of those cases that may have started then have

21   not yet settled or have been in settlement posture,

22   so it's hard to say.

23   Q.        And what cases are you referring to?

24   A.        Cases that were commenced in -- since I

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36

1302

JAMES FICARO, ESQ.

105

1    took over.

2    Q.        Have you had any cases that have commenced

3    since you took over that have settled?

4    A.        Yes.

5    Q.        Do you know if Michael Hartleib had any

6    impact on those cases?

7    A.        I don't think so.

8    Q.        Was The Weiser Law Firm lead or co-lead

9    counsel on any of those cases that have commenced

10   and settled since you took over in the fall of 2019?

11   A.        Yes.

12   Q.        How many cases have commenced and resolved

13   since you took over where you were -- where The

14   Weiser Law Firm was lead or co-lead counsel?

15   A.        I'm honestly not sure.

16   Q.        Can you identify any particular case that

17   has commenced and resolved?

18                     MR. ROSENZWEIG:  So, Mr. Ficaro,

19            while you think about that, note my

20            objection.  I am not inclined to let him

21            testify about any particular case, but you

22            can answer the question with a generality.

23                     THE WITNESS:  Yes.  So there was

24            a derivative action on behalf of a

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36

1303

JAMES FICARO, ESQ.

106

1               corporation named Eagle Bank Corp. that

2               was commenced late in 2019 and settled

3               late 2021.  There was not a court

4               appointment there for a co-lead or a lead.

5               We were just the only firm in the case, so

6               there was no such designation labeled in

7               that case.

8    BY MR. MOTT:

9    Q.        Do you know of any case that The Weiser

10   Law Firm has had where counsel from the other firms

11   told or informed your office that you could not be

12   lead or co-lead counsel because of Michael Hartleib?

13   A.        Yes.  That action with Mr. Federman I told

14   you about earlier.

15   Q.        Is that the only instance that you can

16   recall or were there others?

17   A.        That's the only instance where it was told

18   to me.

19   Q.        Are you familiar with Thieler Law Corp.?

20   A.        Yes.

21   Q.        And what is Thieler Law Corp.?

22   A.        It's a law firm.

23   Q.        And where do they practice?

24   A.        California, I believe.

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36
1304

JAMES FICARO, ESQ.

107

1   Q.        And do you know any of the -- do you know

2   the name of any of the attorneys that work there?

3   A.        I know Oliver Thieler, T-H-I-E-L-E-R.

4   Q.        And is that a firm that The Weiser firm

5   has a referral fee arrangement with?

6   A.        I know that we have been referred clients

7   by the Thieler Law Corp., and yes, we have paid them

8   a referral fee.  Yes.

9   Q.        Is it a -- is it a percentage fee or a

10  flat amount?

11  A.        Rob negotiates those, but I think they're

12  always percentages.

13  Q.        Have you ever spoken to Oliver Thieler?

14  A.        Yes.  Once, yes.

15  Q.        And was that in regards to a particular

16  case?

17  A.        No, it wasn't.

18  Q.        What is Thieler Law Corp.'s areas of

19  practice --

20  A.        I don't know.

21  Q.        -- if you know?

22  A.        I don't know.

23  Q.        Do you know if -- well, strike that.

24            Oliver Thieler is an attorney?

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36

1305

JAMES FICARO, ESQ.

108

1    A.        Yes, he is.

2    Q.        Is he admitted to practice in California?

3    A.        I don't know.

4    Q.        Do you know if he is admitted to practice

5    anywhere in the United States?

6    A.        I don't know his license background.

7    Q.        Do you have any documents in front of you,

8    Mr. Ficaro?

9    A.        Nope.

10   Q.        I just -- I saw you looking down at

11   something.

12   A.        I'm sorry.  I got a text from my wife.  I

13   didn't realize we were going to run so long, so I am

14   asking her to pick up the kids tonight.  I'm sorry.

15   Q.        I understand.  If any point you need a

16   break of your own to --

17   A.        No.  I thought I could -- I thought I

18   could do it during this little respite while you

19   were preparing your next question.  I didn't mean to

20   be a distraction.

21                   MR. MOTT:  I just placed on your

22              screen a document that we'll mark as

23              Exhibit E.

24                        (At this time, Exhibit E was

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36

1306

JAMES FICARO, ESQ.

109

1              marked for identification.)

2    BY MR. MOTT:

3    Q.        Do you recognize the face of this

4    document?

5    A.        I do.

6    Q.        Do you know what case this is in reference

7    to?

8    A.        A derivative action on behalf of Insulet

9    Corporation.

10   Q.        Is this one of the cases that commenced

11   after you took over the department?

12   A.        It is not.  It's -- as you can see from

13   the case number, it was started in 2017.

14   Q.        And it references a plaintiff by the name

15   of Frank Carnazza, and that was The Weiser firm's

16   client in this case, correct?

17   A.        Correct.

18   Q.        It goes on to reference a referral

19   obligation to Thieler Law Corp. where The Weiser

20   firm will pay 15% of the attorney fees awarded to

21   counsel.  Did I read that -- or did I summarize that

22   accurately?

23   A.        Yes.

24   Q.        And that -- do you know if that attorney

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36
1307

JAMES FICARO, ESQ.

110

1    fee obligation, the referral obligation, was

2    disclosed to Mr. Carnazza when he originally

3    retained your office?

4    A.        It was.  It was orally done.

5    Q.        And do you know who orally disclosed that

6    to him?

7    A.        I did.

8    Q.        So you were part of the original retention

9    of Mr. Carnazza?

10   A.        I was.

11   Q.        And how did The Weiser Law Firm receive

12   this referral from Thieler Law Corp.?

13   A.        I don't know.  It wasn't directly to me.

14   Q.        Other than this case involving

15   Mr. Carnazza, have you ever worked on any other

16   cases where there was a referral fee obligation to

17   Thieler Law Corp.?

18   A.        Yes.

19   Q.        In those other cases, was it disclosed to

20   the Court that there was a referral fee obligation?

21   A.        No.  Not unless it's requested by the

22   Court.  That's not part of standard disclosure time

23   assuming that the referral counsel is not already on

24   the papers in the case, as sometimes happens.

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36

1308

JAMES FICARO, ESQ.

111

1   Q.        Did Thieler Law Corp. work on the Insulet

2   Corporation derivative case at all?

3   A.        No.  There really wasn't much work done on

4   that case at all, period.

5   Q.        Has The Weiser firm ever had a case with

6   Thieler Law Corp. where they were entered counsel?

7   A.        I don't know.

8   Q.        Have you had any interaction with

9   Mr. Stecker since he left The Weiser Law Firm?

10  A.        Sure.  Yes.

11  Q.        Was that a part of a litigation, or did

12  you have any social interactions with Mr. Stecker?

13  A.        We try to go to lunch once a month, and

14  we're -- you know, now that he's joined his new

15  firm, they're in the same bar, so we're in a couple

16  of cases together at the moment.

17  Q.        Has Mr. Stecker ever discussed Michael

18  Hartleib with you at these lunches?

19  A.        No.

20  Q.        Have you ever had any electronic

21  communications with any of the other firms involved

22  in your bar regarding Michael Hartleib?

23  A.        Are you asking me if there's ever been an

24  email between me and someone in the bar about

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36

JAMES FICARO, ESQ.

112

1    Mr. Hartleib?

2    Q.        Any of the other plaintiffs' firms that

3    you generally work or interact with in shareholder

4    derivative cases, have you ever had a communication

5    with any of those attorneys from those other firms

6    regarding Mr. Hartleib?

7    A.        Yes.

8    Q.        Do you still have any of those emails?

9    A.        Again, I -- I don't know.  I -- presumably

10   they're saved, but when -- when Mr. Hartleib filed

11   something in an action, everyone gets it, right?  So

12   that would be other people in our bar and me on the

13   same communication.

14   Q.        Outside of any electronic notification

15   emails, have you received any emails or sent any

16   emails to the other plaintiffs' firms regarding

17   Michael Hartleib?

18   A.        Yes.  So, for example, he filed something

19   in a case, there's a notification, and then

20   there's -- you know, that would be a chain of emails

21   between plaintiffs' counsel regarding that filing.

22   Q.        Do you still have any of those emails?

23   A.        I'm not certain.

24   Q.        Have you -- strike that.

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36

1310

JAMES FICARO, ESQ.

113

1          Are you involved at all in the Kraft

2    Heinz --

3    A.        I am.

4    Q.        -- derivative case?

5    A.        Yes.

6    Q.        Are you entered counsel in that case?

7    A.        I am.

8    Q.        Are you aware of Mr. Hartleib's

9    involvement in that case?

10   A.        I am.

11   Q.        And that is still an active case, correct?

12   A.        Yes.

13   Q.        Have you received any emails regarding

14   Michael Hartleib from any of the other firms

15   involved in that case?

16   A.        Yes.

17   Q.        Do you still have those emails?

18   A.        I would assume so.  It's pretty recent.

19   Q.        Have you ever sent any emails to any of

20   the firms involved in that case regarding Michael

21   Hartleib?

22   A.        Probably.

23   Q.        Would you still have those emails?

24   A.        I would suspect.

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36
1311

JAMES FICARO, ESQ.

114

1              MR. MOTT:  We can go off the

2         record for a minute.

3              THE VIDEOGRAPHER:  The time is

4         2:19.  Going off video record.

5              MR. MOTT:  I'm just going to ask

6         for another five-minute break just to get

7         a little organized, but then I believe

8         I'll be able to get us out of here

9         relatively quickly, Phil.

10             MR. ROSENZWEIG:  Sure.

11             (At this time, a short break was

12        taken.)

13             THE VIDEOGRAPHER:  The time is

14        now 2:32.  We are back on video record.

15   BY MR. MOTT:

16   Q.      Mr. Ficaro, have any of the counsel for

17   opposing -- for the opposing parties in the cases

18   that you've been involved in expressed an

19   unwillingness to work or negotiate with your office

20   because of Michael Hartleib?

21   A.      Not to me.

22   Q.      Have they ever expressed an unwillingness

23   to negotiate settlement with your office because of

24   Michael Hartleib?

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36

JAMES FICARO, ESQ.

115

1    A.        Not to me.

2    Q.        Are you familiar with an individual by the

3    name Swadosh, S-W-A-D-O-S-H?

4    A.        No.

5    Q.        How about an entity by the name of Gryphon

6    Strategies?  G-R-Y-P-H-O-N Strategies.

7                        MR. ROSENZWEIG:  Okay.  So it's

8            Gryphon.

9                        MR. MOTT:  Gryphon.  Sorry.

10                       THE WITNESS:  Yes.  Yes.  I've

11           heard of them, yes.

12   BY MR. MOTT:

13   Q.        And what is that entity?

14   A.        I think we used them to do research for us

15   in a securities class action several years back.

16   That's my only knowledge of them.  Sometimes in

17   securities class actions, you retain researchers to

18   contact previous employees of the company to act as

19   confidential witnesses in your pleadings.

20   Q.        Do you know if Robert Weiser has developed

21   any health issues or disabilities since 2017?

22   A.        Not that he's disclosed to me.

23   Q.        Prior to 2017, did The Weiser Law Firm

24   have an employee handbook?

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36

JAMES FICARO, ESQ.

116

1    A.        Yes.

2    Q.        How many cases do you currently have that

3    have commenced since you took over your department

4    that are still pending?

5                    MR. ROSENZWEIG:  Objection as to

6              form.

7                    THE WITNESS:  A couple dozen,

8              thereabouts.

9    BY MR. MOTT:

10   Q.        Are you entered in all of those cases?

11   A.        Not every one of those is a filed action I

12   would mention, but if a derivative action was filed

13   on behalf, you know, of one of our clients and our

14   firm is in it, then yes, I would be entered.

15   Q.        Has an attorney by the name of Mark

16   McGrory ever expressed an opinion to you of The

17   Weiser Law Firm or Robert Weiser?

18                   MR. ROSENZWEIG:  Mr. Mott,

19             what's that last name, please?  Could you

20             spell it?

21                   MR. MOTT:  McGrory, M-C-G --

22                   MR. ROSENZWEIG:  Okay.

23                   MR. MOTT:  -- R-O-R-Y.

24                   MR. ROSENZWEIG:  Thank you.

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36

JAMES FICARO, ESQ.

117

1                    THE WITNESS:  I don't think I've

2            ever had a conversation with him.

3   BY MR. MOTT:

4   Q.        And how about Jay Kasner, J-A-S-N-E-R

5   (sic)?

6   A.        I'm not familiar with the name.

7   Q.        Scott Musoff, M-U-S-O-F-F?

8   A.        I've never spoken with Scott.

9   Q.        Okay.  Tom Hershewe, H-E-R-S-H-E-W-E?

10  A.        Hershewe.  I'm -- we've never had a

11  conversation like that, but I would be surprised if

12  he would act as our local counsel again.

13  Q.        Is that because of the Sprint case?

14  A.        I would assume so, yeah.

15  Q.        How about George Aguilar, has he ever

16  expressed an opinion to you of The Weiser Law Firm

17  or Robert Weiser?

18  A.        He has not.

19  Q.        How about Jill Boren from Judge Vano's

20  Chambers, has she ever expressed on opinion to you

21  of Robert Weiser or The Weiser Law Firm?

22  A.        As I said before, I've never spoken to

23  Ms. Boren.

24  Q.        How about Brian J. Robbins?

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36

JAMES FICARO, ESQ.

                                                              118

1    A.        Has he -- so the same question?

2    Q.        Yeah.

3    A.        Has he expressed opinions about Rob to me?

4    Yes.

5    Q.        And what is Brian J. Robbins -- well, what

6    has Brian J. Robbins expressed to you regarding his

7    opinion of Robert Weiser?

8    A.        Well, it -- it can vary.  They've known

9    each other a very long time, and they've been at

10   odds with each other as much as they've been on the

11   same side with each other.  So it kind of depends on

12   the day of the week and what's happening in any

13   given active case with them.

14   Q.        Has he said anything to you indicating

15   that his opinion of Robert Weiser changed since the

16   Sprint case?

17   A.        I don't think he said anything that

18   specifically to me, no.

19   Q.        How about Alfred G. Yates, has he ever

20   expressed an opinion to you of Robert Weiser or The

21   Weiser Law Firm?

22   A.        No.

23   Q.        Same question for Jay Razzouk.

24   A.        No, but I think Jay has left his practice.

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36
1316

JAMES FICARO, ESQ.

119

1    Q.        Laura Jakubec, J-A-K-U-B-E-C?

2    A.        We have not had a conversation.

3    Q.        Has Monica Ross-Williams ever expressed an

4    opinion to you of Robert Weiser or The Weiser Law

5    Firm?

6    A.        Yes.

7    Q.        And what opinion did she express to you?

8    A.        I believe her views are quite positive.

9    Like, she thanks us -- she has thanked me in the

10   past for what we did to try and protect her from

11   Mr. Hartleib and the efforts that we did in the

12   Sprint case.

13   Q.        Kayla Williams, same question.

14   A.        I don't recognize that name.

15   Q.        Perry Brandt?

16   A.        Never had a conversation.

17   Q.        Same question for Chuck Schimmel.

18   A.        Never had a conversation.

19   Q.        Same question for Robert Schubert.

20   A.        We've never had a conversation about his

21   opinion of Rob, no.

22   Q.        Greg Wright?

23   A.        Can't place him.

24   Q.        Sharp Law, LLP?

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36
1317

JAMES FICARO, ESQ.

120

1   A.       I don't know what that is.

2   Q.       Associated with -- Wright Schimmel was

3   another firm he was associated with.

4   A.       Doesn't ring a bell.

5   Q.       Okay.  Jennifer Borhorst -- Berhorst,

6   B-E-R-H-O-R-S-T?

7   A.       I don't recall ever having a conversation

8   with her.

9   Q.       Has Sarah Holdmeyer ever expressed an

10  opinion of Robert Weiser or The Weiser Law Firm to

11  you?

12  A.       I don't know who that is.

13  Q.       Jenness Parker?

14  A.       Jenness and I have never had a

15  conversation like that.

16  Q.       Loretta Mines (sic)?

17  A.       Don't know who that is.

18  Q.       Shawn Perry?

19  A.       Don't know who that is.

20  Q.       Thomas J. McKenna?

21  A.       He and I have never had a conversation

22  about -- that I can specifically recall involved his

23  thoughts on my firm's reputation.

24  Q.       How about William -- well, strike that.

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36

JAMES FICARO, ESQ.

121

1    We went over Mr. Federman.

2              Garrett D. Blanchfield?

3    A.        Don't know who that is.

4    Q.        Lawrence P. Eagel?

5    A.        He and I have not had a con --

6    conversation that I recall that specifically

7    involved this.  I did have to call him when

8    Mr. Hartleib filed his amicus brief in CenturyLink.

9    He was the firm that my firm was supporting for its

10   leadership position.

11             So I kind of had to call him out of the

12   blue and explain that Mr. Hartleib might be showing

13   up the next day and kind of explaining to him what

14   had happened years prior in Sprint, apologizing that

15   he was going to be kind of ambushed like that

16   because he was not expecting that to be the focus of

17   a hearing he was literally just landed from -- his

18   plane had just landed to attend.

19             So that was the first time I ever spoke to

20   Larry.  I've spoke to him since, and he didn't raise

21   anything specific about it, nor of course would I.

22   So I don't really know him.

23   Q.        Have you continued to work with Mr. Eagel

24   in other matters since CenturyLink?

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36

JAMES FICARO, ESQ.

122

1    A.        You know, CenturyLink, as far as I know,

2    is still going on, and I do believe they may have

3    been appointed.  I'd have to refresh my recollection

4    some, but I do know that my firm has not been

5    assigned any work in that case.

6    Q.        Is your firm working with Mr. Eagel's

7    office on any other matters?

8    A.        Loosely in another matter, they are in

9    the -- they are in the case, we are in the case, but

10   we are not adversarial or aligned at the moment.

11   Q.        Has Seth Leventhal ever expressed an

12   opinion to you regarding the reputation of The

13   Weiser Law Firm or Robert Weiser?

14   A.        I don't know who that is.

15   Q.        William A. McNab?

16   A.        I don't know who that is.

17   Q.        Sarah M. Lightdale?

18   A.        Don't know who that is.

19   Q.        Patrick E. Gibbs?

20   A.        I don't know who that is.

21   Q.        Have you ever had any communications with

22   anyone from Abelson Legal Search?

23   A.        No.

24   Q.        Has Louis Kahn ever expressed an opinion

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36
1320

JAMES FICARO, ESQ.

123

1    to you about Robert Weiser or The Weiser Law Firm?

2    A.        No.  I only met him for the first time two

3    weeks ago, and I'm not surprised that Mr. Hartleib

4    didn't come up.

5    Q.        And how about Melinda Nicholson, has she

6    ever expressed an opinion to you regarding Robert

7    Weiser or The Weiser Law Firm?

8    A.        She has not.

9                    MR. MOTT:  Thank you,

10           Mr. Ficaro.  Those are all the questions

11           that I have.

12                   MR. ROSENZWEIG:  Thanks, Jimmy.

13           Enjoy the day.  Go get the kids.

14                   THE WITNESS:  All right.  Thank

15           you guys so much.  I appreciate everyone's

16           time.

17                   THE VIDEOGRAPHER:  The time is

18           now 2:46.  That concludes this video

19           deposition.

20                   (Witness excused.)

21                   (The deposition concluded at

22           2:46 p.m.)

23

24

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36

JAMES FICARO, ESQ.

124

1

2              C E R T I F I C A T I O N

3

4

5              I, JAMES HOPPER, Registered

6      Professional Reporter, certify that the

7      foregoing is a true and accurate

8      transcript of the foregoing deposition,

9      that the witness was first sworn by me at

10     the time, place and on the date herein

11     before set forth.

12              I further certify that I am

13     neither attorney nor counsel for, not

14     related to nor employed by any of the

15     parties to the action in which this

16     deposition was taken; further, that I am

17     not a relative or employee of any attorney

18     or counsel employed in this case, nor am I

19     financially interested in this action.

20

21     _____

                James Hopper
22              Registered Professional
                Reporter and
23              Notary Public
                Dated:_____

24

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36

JAMES FICARO, ESQ.

125

1                    INSTRUCTIONS TO WITNESS

2

3                    Please read your deposition over

4          carefully and make any necessary

5          corrections.  You should state the reason

6          in the appropriate space on the errata

7          sheet for any corrections that are made.

8                    After doing so, please sign the

9          errata sheet and date it.

10                   You are signing same subject to

11         the changes you have noted on the errata

12         sheet, which will be attached to your

13         deposition.

14                   It is imperative that you return

15         the original errata sheet to the deposing

16         attorney within thirty (30) days of

17         receipt of the deposition transcript by

18         you.  If you fail to do so, the deposition

19         transcript may be deemed to be accurate

20         and may be used in court.

21

22

23

24

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36

1323

JAMES FICARO, ESQ.

```
                                                      126
 1                        - - - - - - - -

 2                         E  R  R  A  T  A

 3                        - - - - - - - -

 4    PAGE       LINE      CHANGE

 5    - - -      - - -     - - - - - - - - - - - - -

 6    - - -      - - -     - - - - - - - - - - - - -

 7    - - -      - - -     - - - - - - - - - - - - -

 8    - - -      - - -     - - - - - - - - - - - - -

 9    - - -      - - -     - - - - - - - - - - - - -

10    - - -      - - -     - - - - - - - - - - - - -

11    - - -      - - -     - - - - - - - - - - - - -

12    - - -      - - -     - - - - - - - - - - - - -

13    - - -      - - -     - - - - - - - - - - - - -

14    - - -      - - -     - - - - - - - - - - - - -

15    - - -      - - -     - - - - - - - - - - - - -

16    - - -      - - -     - - - - - - - - - - - - -

17    - - -      - - -     - - - - - - - - - - - - -

18    - - -      - - -     - - - - - - - - - - - - -

19    - - -      - - -     - - - - - - - - - - - - -

20    - - -      - - -     - - - - - - - - - - - - -

21    - - -      - - -     - - - - - - - - - - - - -

22    - - -      - - -     - - - - - - - - - - - - -

23    - - -      - - -     - - - - - - - - - - - - -

24    - - -      - - -     - - - - - - - - - - - - -
```

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36
1324

JAMES FICARO, ESQ.

127

1                ACKNOWLEDGMENT OF DEPONENT

2

3                    I, _____, do hereby

4           certify that I have read the foregoing

5           pages ___ to ___ and that the same is a

6           correct transcription of the answers given

7           by me to the questions therein propounded,

8           except for the corrections or changes in

9           form or substance, if any, noted in the

10          attached Errata Sheet.

11                    _ _ _ _ _ _ _ _ _ _ _ _ _ _ _

12                    DATE          SIGNATURE

13

14                    Subscribed and sworn to before

15          me this ___ day of _____, 20__.

16                    My commission expires: _____.

17

18                    _ _ _ _ _ _ _ _ _ _ _

19                    Notary Public

20

21

22

23

24

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36

**JAMES FICARO, ESQ.**

128

1                          Exhibit A

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

**ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES**

EXHIBIT 36

1326

JAMES FICARO, ESQ.

129

1                          Exhibit B

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36
1327

**JAMES FICARO, ESQ.**

130

1                          Exhibit C

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

**ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES**

EXHIBIT 36
1328

**JAMES FICARO, ESQ.**

131

1                        Exhibit D

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

**ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES**

EXHIBIT 36

1329

**JAMES FICARO, ESQ.**

132

1                      Exhibit E

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

**ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES**

EXHIBIT 36
1330

JAMES FICARO, ESQ.

133

## A

**a.m** 1:16
**Abelson** 66:24 122:22
**able** 43:17 67:12 85:6 114:8
**Absolutely** 48:22
**access** 29:20 66:16
**accessed** 66:16
**accommodation** 89:7
**accommodations** 89:1
**account** 74:16 75:7
**accurate** 27:3 83:20 124:7 125:19
**accurately** 109:22
**ACE** 17:8,11
**ACKNOWLEDGMENT** 127:1
**acquaintance** 10:12
**act** 115:18 117:12
**acting** 5:13
**action** 4:17 9:6,9,23 10:10,16 11:17,22 12:19 13:12 15:12 21:7 24:9 34:2 52:13 53:19 54:3,7 57:22 58:17 62:21 63:16,18 71:21 72:19,19,21 72:23 91:1 105:24 106:13 109:8 112:11 115:15 116:11 116:12 124:15,19
**actions** 8:18,19 9:1,1 31:13 31:14 115:17
**active** 9:6,24 26:16 113:11 118:13
**activities** 63:2
**actual** 34:23 44:6 56:16 98:5
**added** 79:4
**adding** 78:5
**additional** 41:8 68:23
**address** 42:19 46:10,21 47:1 47:3 66:2,9 77:5
**addresses** 47:17
**Addus** 63:13
**admin** 69:15
**administered** 5:19
**administrative** 35:3 36:20 74:18
**admitted** 108:2,4
**adversarial** 122:10

**affidavit** 3:20 77:14
**ago** 29:8 102:17 123:3
**agree** 74:5,17
**agreed-to** 34:9
**agreed-upon** 41:11
**agreement** 4:1 95:14,20
**agreements** 14:4 95:17
**Aguilar** 117:15
**ahead** 49:21 75:22 82:2 86:4 90:3
**Air** 48:20
**al** 4:18
**Alan** 39:1
**Alex** 99:22
**Alexander** 66:1 78:24 79:14 79:16 99:22
**Alfred** 118:19
**algorithm** 62:14,17
**algorithms** 62:18
**aligned** 122:10
**allegations** 87:5 103:16
**alleged** 87:7
**allow** 99:2
**ambushed** 121:15
**Amended** 3:15 9:9 12:2,11 38:1 46:4 49:8,22 50:16 51:16 57:9 62:4
**American** 2:10
**amicus** 121:8
**amount** 42:7,8 88:9 107:10
**answer** 17:22 42:12 66:5 73:18,18 76:7 89:17,22 93:24 97:13 105:22
**answers** 127:6
**antitrust** 92:14,22
**anybody** 59:19
**apologies** 46:22
**apologize** 7:14 93:21 94:6
**apologizing** 121:14
**apparent** 76:13
**APPEARANCES** 2:2
**appeared** 60:22
**appears** 49:10 67:11 70:17 70:18 79:13,18 80:11
**appellate** 52:13 97:8,15,19,21 98:5,9,10,14,17
**application** 29:17

**appointed** 122:3
**appointment** 106:4
**apportioned** 99:2,6
**appreciate** 44:10 89:6 94:5 123:15
**appropriate** 125:6
**approval** 14:14 39:21
**approve** 32:8,10 33:10,13 34:6,8 42:24
**approved** 34:12,16 42:10 81:8,20 99:6
**approving** 41:10 80:21,24
**approximately** 13:13 20:23 22:12 30:11 31:18,19 34:14 37:16 39:19 47:8 78:7 87:10
**April** 50:17,24
**Archita** 30:3,5,8,14 64:14,23 65:1,5,9
**archived** 27:18 60:10 66:6,10 83:6
**archives** 29:8,11
**archiving** 66:12
**area** 9:3
**areas** 8:15 107:18
**arrangement** 107:5
**arrangements** 96:5
**article** 37:12,19,22 38:9 55:4 55:12,19 56:2 57:2,7 62:7 62:10,16,22 104:5,9,14
**asked** 12:10 27:16 32:19
**asking** 26:18,24 43:13 45:23 87:15 95:8 96:22,23 108:14 111:23
**assembled** 66:19
**assigned** 122:5
**assignments** 24:20
**assist** 13:21 23:5 34:19,23 36:19 58:4 61:23 63:12 97:10
**assisted** 14:12 15:5
**associate** 7:9,11 31:11
**associated** 120:2,3
**assume** 27:18 35:16 59:16 69:4 78:9 113:18 117:14
**assumed** 23:3 84:24
**assuming** 110:23

JAMES FICARO, ESQ.

134

**attached** 3:14 77:21 78:4 79:7 83:5 125:12 127:10
**attaching** 82:7
**attachment** 78:4 79:8
**attachments** 40:8
**attempt** 29:3
**attend** 13:24 25:11 39:14,16 97:15 121:18
**attendance** 85:9
**attended** 42:19 45:4 98:16
**attending** 5:3 39:20
**attorney** 5:10 8:4,8 10:13 11:14,15 17:19 18:6,9 19:4 19:16,18 26:6 39:3,9 53:9 53:16 57:23 63:20 64:1 71:14 107:24 109:20,24 116:15 124:13,17 125:16
**attorneys** 10:6 11:11 15:15 16:6 18:22 19:2 20:6 23:2 42:18 43:16 45:6 52:6 53:1 53:21 56:1 57:1,4 63:17 83:13 95:4,17 97:22 98:20 107:2 112:5
**attorneys'** 42:7,11 102:1
**auspices** 65:9
**automatically** 99:17
**Avenue** 2:6
**awaiting** 68:5
**award** 15:7 34:8,9 37:12 73:2 73:8 95:23 96:1 99:1
**awarded** 72:13 102:1 109:20
**aware** 10:22 14:8 26:4,5,8,12 85:13 87:7 96:6,14,17,18 97:2,3 113:8

———————————
**B**
———————————
**B** 1:4 3:12,16 43:8,10 82:2,13 129:1
**B-E-R-H-O-R-S-T** 120:6
**B-R-O-S-Z** 39:1
**back** 14:16,18 19:17 26:20 27:1,2 29:3 46:21 49:4 57:9 66:17 69:19 74:24 76:20,23 77:2 79:5 80:3 88:22 93:23 93:23 94:2 101:14 104:9 114:14 115:15
**background** 79:15 108:6

**badgering** 52:21
**Bank** 106:1
**bar** 10:7,7 26:18 27:1,2,14,17 55:7 56:19 100:3,3,9,10 111:15,22,24 112:12
**based** 53:12 78:19,23 80:9
**basing** 69:1
**basis** 74:15
**Bates** 67:10 69:8,8
**BDStecker@WeiserLawFi...** 46:18
**bear** 64:11
**becoming** 7:7 17:18
**began** 8:23
**beginning** 12:18 39:8 43:20 57:10,12 64:5 82:5 90:20
**begins** 12:18 57:11 90:21
**behalf** 5:6 24:10 92:19 105:24 109:8 116:13
**believe** 17:8 22:16 24:1 27:10 29:24 35:7,7,10 37:17 39:2 40:3 41:6,24 44:2 58:19 59:5 61:13 65:21,22 66:15 68:16 69:9 70:9 72:15,20 85:21 89:9 93:11 94:19 98:18 100:1 101:17 106:24 114:7 119:8 122:2
**bell** 120:4
**Berger** 44:16
**Berhorst** 120:5
**Bernstein** 44:16
**best** 41:8
**better** 71:4 85:2,3 86:22
**beyond** 36:5 62:10 88:1
**Big** 3:16 38:21 39:4,12,16 41:2,4 42:23 43:5 45:21 56:12,14
**Bilgere** 68:21,24
**billing** 34:20 70:5
**bit** 8:23 20:18 46:20 100:5
**bite** 76:5
**biweekly** 25:2
**Blanchfield** 121:2
**blue** 92:13,22 121:12
**blurb** 79:16,20 80:10,14
**Board** 63:1,9
**Bob** 2:16 4:10

**body** 69:16 80:19 82:3
**bookkeeper** 69:22
**Boren** 51:6,8,10 52:23 117:19 117:23
**Borhorst** 120:5
**boring** 73:18
**bottom** 69:2 79:18,22 80:9 82:19 83:8
**bounds** 36:5
**Brandt** 119:15
**break** 48:19 49:1 75:10,18,20 76:2,3,17 88:14,19 108:16 114:6,11
**Brett** 19:14 20:8 26:14 27:7 37:7,8 39:7 50:8 65:24 71:1 71:11 80:6,17 90:14
**Brian** 117:24 118:5,6
**brief** 121:8
**bring** 57:2
**bringing** 85:16
**Broad** 2:11
**broke** 46:19,23
**Brosz** 39:1
**brought** 50:9 61:21 66:23 85:14 87:1 90:13
**Bruce** 11:16,19
**Building** 2:10
**built** 68:9
**businesses** 69:24

———————————
**C**
———————————
**C** 3:17 64:7 69:17,17 82:15 82:15,16 90:24 124:2,2 130:1
**C-O-G-N-I-Z-A-N-T** 54:11
**calculation** 57:24
**calculations** 15:12
**California** 106:24 108:2
**call** 25:9 26:17 41:7,9 42:19 43:17,22 44:2,20,22 45:1,7 45:9,12,13 56:5,13,22 75:15 76:3,4,11 82:22 83:9 89:7 89:14 101:14,18 121:7,11
**called** 16:1 27:12 69:2
**calling** 88:13
**calls** 25:2,11,14 55:2 56:24 57:5 94:23

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36
1332

JAMES FICARO, ESQ.

135

camera 32:20
carefully 125:4
Carnazza 109:15 110:2,9,15
case 1:2 4:18 9:16,20 10:15
    12:3,20 13:15 14:12 15:7,20
    18:9,10 20:7,11,12,16,17
    21:4,5,9 23:7,24 24:8 25:17
    26:23 32:6,18 34:6,20 36:8
    36:14 37:13 38:15,18,22
    39:4,8,12,17 41:13,23 42:11
    42:20,23 43:6 44:20 45:21
    52:7,15 54:6,24 56:16,23
    58:13 60:5 63:12 64:4
    66:20,23 67:3,7 70:13,16,20
    72:5,14,17 73:22 81:10,14
    83:14 87:5,16 88:2,5 90:13
    96:8,15,21 97:5,8,23 98:6
    98:21,23 99:3 103:9,13
    105:16,21 106:5,7,9 107:16
    109:6,13,16 110:14,24
    111:2,4,5 112:19 113:4,6,9
    113:11,15,20 117:13 118:13
    118:16 119:12 122:5,9,9
    124:18
case-by-case 74:14
cases 9:4 10:5 14:5 17:20
    19:21 20:1 26:16 31:15
    54:23 55:8 56:4,8,12,14,24
    58:2,5 71:9,24 73:13 85:14
    85:16 95:15 96:4 101:21,22
    102:21 104:20,23,24 105:2
    105:6,9,12 109:10 110:16
    110:19 111:16 112:4 114:17
    116:2,10
catch 25:20 97:13
cause 10:16
Center 2:5
CenturyLink 56:12,15 121:8
    121:24 122:1
certain 29:6 54:16 72:11 78:1
    83:18,22 112:23
certainly 15:3 34:1 55:13
certify 124:6,12 127:4
chain 3:17 67:16 69:15 70:11
    75:1 78:10,21 79:5,23 81:22
    82:4,6,19 83:8 112:20
chambers 51:6 58:24 61:2

96:8,15,16 97:3 117:20
change 83:22 126:4
changed 17:9 59:16 118:15
changes 68:11 100:23 101:1
    102:4 125:11 127:8
check 45:1,4 75:7 99:16,19
check-in 26:15
checking 79:4
checks 74:19
Cheryl 69:18 70:7,8 75:2
    80:17
Christopher 63:19
Chuck 119:17
city 31:23 54:1 77:6,7,12
Civil 4:16
claim 89:12
claims 21:5 36:7
clarification 44:10
clarify 18:1 73:6
class 8:19 9:1 10:10 12:19
    31:15 91:1 115:15,17
clear 44:21 78:15
client 10:11 11:13 23:23
    91:21 95:20 103:5,8,11
    109:16
clients 5:12 10:4 87:8,10
    88:10,11 89:12 90:6 93:17
    101:20 104:2 107:6 116:13
close 65:22 90:2
co-counsel 101:21
co-lead 24:12 54:2 72:20 73:1
    73:8 105:8,14 106:4,12
Cognizant 54:8
collaborative 39:7
collective 64:9
collectively 20:3,5
come 10:8 46:15 84:21 90:2
    95:1,3 104:5,9 123:4
comfort 75:10
coming 8:9 86:18
commenced 104:24 105:2,9
    105:12,17 106:2 109:10
    116:3
commencing 1:15
comment/brainstorming
    77:22
commission 127:16

communicate 45:8 54:15
communicated 22:13
communicating 68:17
communication 112:4,13
communications 1:15 4:3
    20:15 45:24 47:20 52:1,6,10
    111:21 122:21
company 69:2 70:15 74:1
    115:18
Complaint 3:15,19 9:8,9 12:2
    12:11,11 38:2 46:4 49:8,22
    50:16 51:16 56:10 57:9
    62:4 90:13 103:16
compound 11:4
computer 16:23 25:22 29:22
con 69:16 121:5
concern 54:12,15
concerns 53:2 102:8,20
concluded 123:21
concludes 123:18
conference 25:2,11,14 40:16
confidential 115:19
confirm 58:20 79:4
confirmation 59:8,11 67:18
    68:2,6
confirmations 59:2
confusing 44:9,11
connection 97:13
constant 52:19,20
consult 63:4
consulting 14:4
contact 22:4 38:15 103:19
    115:18
contacted 22:22 38:18 100:9
contacts 44:6 51:7,11
contents 47:22 48:1 50:7,9,21
    51:7 52:3
continue 21:18 27:6 89:3,4
continued 121:23
continues 52:18
continuing 36:2
contractor 70:2
controlled 74:4
convening 40:22
conversation 49:19 52:23
    56:17 103:11 117:2,11
    119:2,16,18,20 120:7,15,21

JAMES FICARO, ESQ.

136

121:6
conversations 37:18 50:2,5
  50:20 51:5 52:16 98:4
  102:12 103:22
cooperated 65:15
copied 40:13 45:7 47:21
  49:10,17 50:6 55:22 71:12
  96:23
copy 23:4 60:15,18 96:9,20
  96:23 97:4
copying 79:12 80:17
Corp 106:1,19,21 107:7
  109:19 110:12,17 111:1,6
Corp.'s 107:18
corporate 42:4
corporation 24:10 54:5 63:14
  74:2 106:1 109:9 111:2
correct 7:1 65:20 80:12 84:1
  109:16,17 113:11 127:6
corrections 125:5,7 127:8
correctly 7:12
corresponding 26:22
counsel 2:7,12 4:1,22 5:15
  23:6,9,13 24:11,12 35:16,18
  35:23 37:9 43:15 44:6,20
  54:2 60:15,18 63:5 72:16,20
  72:22 73:1,7,7,8 74:9 94:24
  96:9,10,16,19 97:5 105:9,14
  106:10,12 109:21 110:23
  111:6 112:21 113:6 114:16
  117:12 124:13,18
couple 21:6 31:2 34:17 70:1
  102:16 111:15 116:7
course 21:10 121:21
court 1:1,22 2:17 4:11,15
  5:15,16,18 9:22 14:17 34:5
  34:11,20 35:5,15 37:2,9
  39:22 40:17,19,21 41:13,22
  42:1,14,19,23 45:19,21 51:6
  51:7,11 52:21 70:19,23
  72:19,20,21 76:22 82:12
  94:1 95:23,23 96:2,9,19
  99:2,6 106:3 110:20,22
  125:20
Court's 37:12 60:17,19
courtesy 23:4
courts 57:21 58:5,9,16 60:22

70:21
Courts' 61:1
covers 74:2
COVID 20:20,20,23 21:22
  59:17 101:3,5 102:16
created 33:1
credentials 72:10
criminal 61:20
criteria 41:3
Cross/Blue 92:14,22
current 7:3 8:15 15:24 17:6
  46:10
currently 6:24 9:24 19:5 44:7
  116:2
cutting 100:5

## D

D 3:3,18 90:12,17 121:2
  131:1
daily 26:15
dam 88:4
damages 88:5
Dash 91:8,12
Data 69:3 81:18
date 47:11 64:19,21 67:16,17
  77:24 78:6,11,17 82:20
  83:20,21,22 91:17 92:3
  124:10 125:9 127:12
dated 49:23 50:17 124:23
David 44:2,14 92:3
day 16:19 26:10,11 37:17
  47:10,14 70:1 78:13,14
  118:12 121:13 123:13
  127:15
day-to-day 20:19
days 32:23 39:22 70:1 125:16
December 82:7,9 92:10,18
  93:3
decided 20:4,5 91:2 93:8
  103:5
deciding 93:5
decision 20:9 97:19,22
decisions 19:24,24
declaration 77:12 82:8,9,21
  82:24 83:16
declarations 14:24 15:3
  23:16 77:10 83:5

declines 86:14
decrease 62:21
deemed 125:19
Defendant 1:8 2:12,18 5:1
defendants 44:18
defense 44:20
delaying 94:8
deliveries 59:8,12
delivering 33:17
delivery 59:2,4
demand 65:8
department 8:18,20,22 84:11
  84:14,16,18,23 85:2,3,7,11
  86:13,18 95:16 104:17
  109:11 116:3
department's 94:11,14
depending 58:22
depends 118:11
deponent 4:21 127:1
deposed 88:2
deposing 125:15
deposition 1:4,12 4:10,13,14
  4:21 9:13 23:7,10,13 123:19
  123:21 124:8,16 125:3,13
  125:17,18
depressed 101:7
derivative 8:18 9:1,16,18
  10:1,4,5 12:20 13:15 14:5
  17:20 18:8 19:20 20:1,11
  21:7 24:9 31:14 34:2 38:21
  84:16,18 105:24 108:9
  111:2 112:4 113:4 116:12
describe 98:8,10
described 86:17 98:13
description 3:14 79:14
designation 70:3 106:6
designed 21:15
desk 30:1 99:17
detailed 56:9 73:23
developed 115:20
device 29:23
difference 34:10,14
different 38:1 47:5 69:23
  103:2
digital 33:4
diminish 62:21
direct 38:2

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36

1334

JAMES FICARO, ESQ.

137

**directly** 19:5,11 67:16 68:18 103:3 110:13
**disabilities** 115:21
**disagreed** 42:7,8
**disbarred** 26:5 27:13 95:7
**Disciplinary** 63:1,9
**disclosed** 95:20 110:2,5,19 115:22
**disclosure** 110:22
**discoverable** 21:16
**discovered** 25:4
**discovery** 36:6 62:14
**discuss** 45:7 97:21
**discussed** 45:24 54:23 111:17
**discussing** 57:11
**discussion** 10:14 20:7 25:7
**discussions** 98:1
**distraction** 108:20
**distribute** 59:23 74:13
**District** 1:1,1 4:15,16
**divvied** 73:9,10
**docket** 3:16 43:5,16 44:5 60:23
**docs** 68:23
**document** 12:8 24:9,14 25:16 25:24 28:19,22 33:4,23 47:18 64:4 65:2,7 66:19,22 67:8 69:3,8 72:1,5 81:17 108:22 109:4
**document-review** 25:2
**documents** 9:12 15:6,9 25:4,8 25:10 28:14 34:24 37:1 61:24 65:7,16 67:2,5 70:13 108:7
**doing** 19:17 74:10 81:9 125:8
**dollars** 34:17,18 86:20
**door** 99:18
**doors** 99:17
**downstairs** 27:8 101:15
**dozen** 116:7
**draft** 12:13 77:21 79:16 103:15,18
**drafted** 15:2 23:20 58:10
**drafting** 23:18 97:10
**due** 53:11,17 84:22 93:13,18 98:22
**duly** 6:12

**duration** 66:14

**E**

**E** 3:3,12,20 108:23,24 122:19 124:2 126:2 132:1
**Eagel** 121:4,23
**Eagel's** 122:6
**Eagle** 106:1
**earlier** 16:5 19:15 82:20 83:19 106:14
**early** 26:11 63:15 99:13 104:19
**East** 2:6
**Eastern** 1:1 4:16
**eat** 76:5
**economic** 98:21
**edited** 58:10
**efforts** 55:10 119:11
**Eighth** 2:6
**either** 47:10,13,14 58:10
**electronic** 111:20 112:14
**email** 3:17 26:24 27:11,15,21 28:1,9,13,24 29:4,16,20,21 40:1,2,6,13,17,20,23 42:21 45:7,8,20 46:1,5,5,10,13,14 46:21 47:1,2,4,9,16,21 48:2 48:9,11 49:9,11,11,14,17,18 49:20,22,24 50:3,6,10,13,16 50:18,21,23 51:1,1,14,14,20 51:23 52:2 55:15 56:11 59:3 60:1 64:15,18,19,20 65:24 66:3,6,8,9,10 67:11 67:15,16,18,20 68:20 69:14 69:15,16 70:11,24 71:6,10 75:1,1,2,4 77:5,20 78:3,7,10 78:12,20,24 79:6,11,20,22 80:16 81:22 82:4,6,20 96:10 96:17,18,22 97:2,3 100:2,8 100:11 103:19 111:24
**emailed** 60:6
**emailing** 60:1
**emails** 28:15 29:6 47:13 52:7 52:11,18 53:2,6,11,12,18 55:22 60:9 66:16 68:12 83:6,6 96:7,14 112:8,15,15 112:16,20,22 113:13,17,19 113:23

**employ** 30:3 31:6
**employed** 95:6 124:14,18
**employee** 6:24 115:24 124:17
**employees** 115:18
**employment** 63:5
**encounter** 61:18
**ended** 27:5 41:7,9 73:3
**enforcement** 61:24
**Enjoy** 123:13
**enter** 15:16
**entered** 43:15 44:6 111:6 113:6 116:10,14
**entire** 45:16 101:9
**entirety** 39:10 73:8
**entities** 93:12
**entity** 14:4 115:5,13
**Equifax** 56:11,15 61:14
**equitable** 7:20,24
**errata** 125:6,9,11,15 127:10
**ERSA** 1:22 2:17 4:11 5:16
**escrow** 74:3,15
**ESQ** 1:4,7 3:5
**ESQUIRE** 2:4,5,10
**et** 4:18
**ethics** 63:4
**everyone's** 123:15
**evident** 55:5
**exact** 66:12
**exactly** 15:23 29:9 40:11 53:8 66:4 69:5 70:18 78:17
**EXAMINATION** 1:5
**examined** 6:13
**example** 10:9 11:1 25:10 112:18
**excuse** 93:23
**excused** 123:20
**executed** 77:11,12,14 82:24
**exhibit** 3:15,16,17,18,20 12:1 12:4 37:24 43:8,10 46:3 49:7,8,21 50:5,23 51:13,16 51:17 64:7 82:2,13,15,15,16 90:12,17 108:23,24 128:1 129:1 130:1 131:1 132:1
**exist** 18:19 28:16
**existing** 10:9 54:2
**Expanding** 53:15
**expect** 103:21

JAMES FICARO, ESQ.

138

expected 85:1
expecting 121:16
expires 127:16
explain 10:16 41:12 101:22 121:12
explained 41:5 65:5
explaining 121:13
explanation 41:22 90:1
explicitly 102:24 103:7
express 53:1 54:12 57:5 102:8 119:7
expressed 53:10,16,21 54:21 102:22 114:18,22 116:16 117:16,20 118:3,6,20 119:3 120:9 122:11,24 123:6
extent 8:24

F

F 124:2
F-E-D-E-R-M-A-N 53:24
face 102:24 109:3
fact 11:4,5 27:14
facts 41:24
fail 21:7 125:18
failed 41:3
fairly 6:3 52:17
fall 18:16,17,21 19:1,9,19 20:2 69:19 84:13,19 85:12 85:17 104:18 105:10
familiar 11:15 77:16 106:19 115:2 117:6
far 56:16,18 66:17 122:1
fashion 62:19
February 78:11 79:2,2
federal 59:1 72:19,23
Federman 53:24 54:1 106:13 121:1
FedEx 59:8,12,15,20 60:2
FedExes 59:1
fee 15:6,10 34:8,9,11,11 37:12 41:11 73:2,8 95:12,17 95:19,22,24 96:1,5 98:22 99:1 107:5,8,9 110:1,16,20
feel 89:18
fees 42:7,11 43:2 72:13 102:1 109:20
Ficaro 1:7 3:5,20 4:22 5:10

6:12,19 49:6 73:14 90:6 94:7 105:18 108:8 114:16 123:10
field 47:11 75:16
fielding 25:8
filed 12:14 23:19 112:10,18 116:11,12 121:8
filing 15:4 112:21
filings 53:19
fill 16:22
final 12:14 19:24 39:21
financial 84:10,22 92:6
financially 84:18 124:19
financials 85:10
fine 75:13,24
finish 12:24
finished 13:1 31:21 57:19 89:13
fired 86:7
firm 1:4 4:18 5:7,11 7:1,11 7:18,21 8:9,16 9:18 10:3,19 14:3,24 15:9 16:2 17:2,11 17:14,19 18:9,18,23 19:2,5 19:10,21 20:19 23:5,12,23 24:11,24 25:13 26:10 28:8 29:14,17,19 30:2,6,9,15 31:3,6,10,16 32:3,5,24 33:10,13,16,23 36:12 38:7,7 38:12,20 39:4 40:14 44:3,14 44:22 46:11 47:3 51:10 53:9,16,24 55:7 59:7,11,15 59:20,22 61:6 62:17,20 63:2 63:6,10 65:14,15,20 66:9,23 67:22 69:20 71:2,20 72:12 72:16 73:2 74:9 75:5,8 77:15 79:1 82:1 83:3 84:1,4 84:7,8 87:2,8 90:7,14,15,22 91:4,9,14,18,22,24 92:4,5,8 92:12,13,16,21,21 93:1,5,6 93:9,13,16,18 95:5 99:14,21 102:22,23 103:5,21,23 104:6,10,13 105:8,14 106:5 106:10,22 107:4,4 109:20 110:11 111:5,9,15 115:23 116:14,17 117:16,21 118:21 119:5 120:3,10 121:9,9 122:4,6,13 123:1,7

firm's 13:3,3 17:6 23:2 62:13 64:1,4 81:24 109:15 120:23
firms 11:11 20:16 57:1,5 73:9 73:21 74:4,5,16,20 83:13 94:23 95:5 98:19,20 99:3 106:10 111:21 112:2,5,16 113:14,20
first 3:15 12:2 13:9,10 24:6 26:8 37:15 38:1 46:4 47:8 49:8,21 50:15 57:9 62:3 76:8 77:21 78:20 90:23 121:19 123:2 124:9
five 75:13 90:10 100:24
five-minute 48:18 75:10 114:6
flat 107:10
focus 121:16
focused 8:24
folks 56:20
follow 43:14 58:23 73:5
follow-up 42:14
followed 60:18
following 4:9 55:7
follows 6:14
foregoing 124:7,8 127:4
form 4:4 7:24 11:3 12:10 14:7 15:14 16:17 17:22 28:4 33:20 35:9 36:16 41:15 45:15 62:19 81:3 86:1 87:13 116:6 127:9
formal 10:19 32:24
formally 16:8
format 35:6 47:6
formatting 35:3
former 76:8 91:21 101:20,21 101:21
forth 124:11
forward 10:18
forwarded 40:4 96:10,16
found 25:9
four 89:2 90:9
Frank 93:4 109:15
Fraud 63:13,22
Friday 1:15
front 30:1 99:17 108:7
functioning 46:21 47:2
fund 74:3

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36

1336

JAMES FICARO, ESQ.

139

**funds** 74:17
**fungible** 86:21
**further** 62:6 82:6 124:12,16

**G**

**G** 118:19
**G-R-Y-P-H-O-N** 115:6
**Garrett** 121:2
**gauge** 101:4
**general** 25:6
**generality** 105:22
**generally** 7:13 10:3 26:14
47:13 52:5,12 68:10 74:21
103:10 112:3
**gentleman** 53:23 68:9
**Genworth** 92:5
**George** 117:15
**getting** 29:10
**ghost** 101:16
**Gibbs** 122:19
**give** 24:20
**given** 118:13 127:6
**giving** 65:15
**Glenn** 90:15
**go** 6:9 8:11 12:22 29:3,10
43:23 44:5,13 51:2 57:13
68:12 70:7 75:15 76:15,19
80:3 82:2 84:8,9,12,22 86:4
87:23 90:3,20 93:6 111:13
114:1 123:13
**goes** 66:17 88:4,5 109:18
**going** 20:18 21:1,13,14 28:11
35:24 43:7,14,19 45:14
48:19,20,24 49:21 50:23
51:13 57:9,16 64:6,8 65:3
68:14,15 69:14 70:11 71:10
75:17 76:14,15 77:18 78:2
79:5,11 80:16 83:20 87:14
87:18 88:18 91:6 96:11
103:12,17 108:13 114:4,5
121:15 122:2
**GOLDBERG** 2:9
**golf** 100:21 102:14
**Good** 6:19,20
**Google** 103:23 104:6,9
**Googled** 104:11,12
**Gosh** 99:14

**gotten** 101:14
**grab** 59:23 76:4
**graduate** 8:13
**graduation** 80:7,8
**gravidum** 21:4
**great** 6:9
**Green** 70:8 80:17
**Green's** 75:2
**Greg** 119:22
**Grossmann** 44:16
**group** 52:14 73:21
**groups** 31:12
**Gryphon** 115:5,8,9
**guess** 10:24 27:6 28:5 74:8
**guys** 5:22 123:15

**H**

**H** 3:12
**H-E-R-S-H-E-W-E** 117:9
**Haltzman** 2:4 5:6
**hand** 16:22
**handbook** 115:24
**handed** 99:19
**handful** 90:9
**handle** 8:18
**handled** 29:13
**handles** 59:14
**handling** 17:19 18:6,9
**happen** 74:21 103:24
**happened** 41:5,12,23 42:20
101:23 121:14
**happening** 25:21 26:16
118:12
**happens** 103:10 110:24
**happy** 42:12 86:23
**hard** 75:21 77:24 89:4 101:4
104:22
**hardcopy** 33:5
**Hartleib** 1:7 2:18 4:19 5:1,2
6:22 13:10 40:3 41:1 42:2
45:21 49:9,22 50:17,24 52:8
52:18 53:3,6,11,18,19 54:3
54:22 55:7 56:6 61:9,12,18
93:14,19 94:24 96:8,15,19
97:4 98:2 102:6,18,20 103:6
104:4,16 105:5 106:12
111:18,22 112:1,6,10,17

113:14,21 114:20,24 119:11
121:8,12 123:3
**Hartleib's** 40:1 42:21 51:7,10
52:11 113:8
**hassle** 74:18
**head** 84:15
**health** 93:7 102:5,9 115:21
**hear** 5:21,22,24 6:3 48:5 94:7
**heard** 10:10 11:21 13:10 55:1
70:4 115:11
**hearing** 7:15 39:21,21,24
45:4 98:5,9,10 121:17
**hearings** 39:14,16
**Heinz** 113:2
**Helios** 91:10
**help** 9:7 48:21
**helps** 69:23
**Henry** 19:18
**Hershewe** 117:9,10
**hired** 38:8
**Holdmeyer** 120:9
**holy** 66:1
**Homecare** 63:14
**honest** 101:2
**honestly** 72:10 105:15
**hope** 101:23
**Hopper** 1:13 5:15 93:24
124:5,21
**host** 25:14 72:8
**hosted** 24:14 72:1,4 81:17
**hot** 25:5
**hour** 48:19
**hours** 15:11 20:24 21:20 22:1
32:20,22 42:8 57:22 70:22
**hundred** 62:5,5

**I**

**I-N-G-R-A-O** 91:17
**ID** 100:3,4,9
**idea** 11:13 24:3 40:7 59:9
64:22
**identification** 12:5 43:11
82:17 90:18 109:1
**identified** 58:13 63:24 65:12
71:9
**identify** 43:16 105:16
**identifying** 58:1

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36

1337

JAMES FICARO, ESQ.

140

**III** 91:8,12
**Illinois** 63:13,22
**impact** 104:16 105:6
**imperative** 125:14
**imply** 28:19
**improved** 85:7,21
**improvements** 86:10,14
**in-camera** 34:21 35:6 36:21 36:24
**in-person** 61:18
**inappropriate** 73:14
**inaudible** 22:6,8 25:18,19 46:17 48:3,15
**inclined** 105:20
**include** 14:13 40:8 67:7
**included** 14:23 57:23 83:12 96:19
**includes** 15:11
**including** 15:10
**incoming** 89:14
**increase** 94:17,20
**incurred** 98:22
**independent** 56:22 70:2
**indicate** 43:22
**indicates** 64:15 77:11
**indicating** 118:14
**individual** 20:6 30:3 31:7 35:12 58:23 59:3 115:2
**individually** 16:6
**individuals** 40:12 47:21 49:16 50:6 93:12
**infatuated** 55:9
**inform** 95:23
**information** 41:8 73:12 101:12 103:20
**informed** 20:11 88:24 106:11
**Ingrao** 91:17
**initially** 73:10
**inquire** 77:6 95:5
**inquired** 77:7
**inquiring** 22:3
**inquiry** 77:8 100:10
**inside** 55:6
**instance** 22:14 103:4 106:15 106:17
**instances** 54:20 59:3
**instructed** 96:20 97:4

**instructing** 89:17,22
**INSTRUCTIONS** 125:1
**Insulet** 109:8 111:1
**insurance** 74:1,1
**intended** 59:6
**interact** 99:9 100:13 112:3
**interaction** 11:18 20:15 38:6 111:8
**interactions** 100:17 111:12
**interest** 7:18,20 8:1 101:8
**interested** 10:12,15,17 124:19
**interesting** 25:4
**interject** 65:4
**internal** 72:7 75:4
**internally** 29:13 71:9
**intervene** 28:12
**intervention** 87:19
**introduce** 4:23
**introduced** 99:18
**inventory** 70:12
**investigation** 13:3,4,6
**invoices** 32:22 36:12
**involve** 98:1
**involved** 9:6,21,22,24 14:11 20:16 39:8,9,11 41:4 52:6 63:15 73:22 83:13 86:24 95:13 97:5,22 98:20 111:21 113:1,15,20 114:18 120:22 121:7
**involvement** 97:7 113:9
**involving** 102:21 110:14
**irrelevant** 36:3 90:1
**issuance** 41:10
**issue** 97:13
**issues** 102:3 115:21

— J —

**J** 78:24 80:18 117:24 118:5,6 120:20
**J-A-K-U-B-E-C** 119:1
**J-A-S-N-E-R** 117:4
**Jakubec** 119:1
**James** 1:7,13 3:5 4:21 6:12 124:5,21
**January/February** 78:9
**Jay** 117:4 118:23,24

**Jeff** 68:23 80:18
**Jeffrey** 17:15 24:7,17,20 26:5 27:16 32:1,6,8,14 33:7,24 57:11 58:2,6 61:21,24 63:5 63:10,24 64:16 66:24 67:21 70:16 72:2 77:5 78:24 79:14,17 80:21 82:4,23 83:17 100:9
**Jenness** 120:13,14
**Jennifer** 120:5
**JFicaro@WeiserLawFirm** 46:14
**Jill** 51:6 117:19
**Jim** 5:15 76:19
**Jimmy** 6:4 22:8 48:4,14 80:20 86:5 123:12
**JMF@WeiserLawFirm.com** 46:13
**job** 7:3
**John** 91:7,12
**joined** 111:14
**joint** 74:15
**jointly** 74:3,5
**Jonathan** 31:7,9
**Joseph** 19:16
**Journal** 37:11 38:8,14 55:4 55:12,18 56:1 57:2,7 62:10 62:16,22 104:5,9,13
**Journal's** 62:6
**judge** 32:19 40:1 41:6 42:9 58:22 117:19
**judge's** 35:11
**judges** 58:11 59:1 60:1 101:21,23
**jump** 36:1 74:24
**jumped** 68:20 70:24
**Jumping** 62:3
**jumps** 43:21
**jurisdiction** 72:18
**justify** 89:10

— K —

**KAGlive@comcast.net** 75:2
**Kahn** 122:24
**Kansas** 42:2
**Kasner** 117:4
**Kayla** 119:13

**ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES**

EXHIBIT 36
1338

JAMES FICARO, ESQ.

141

**keep** 57:15
**keeps** 25:21
**kept** 66:13
**Kessler** 44:24 45:3 71:14 72:1,4
**Kevin** 2:5 5:5
**kids** 108:14 123:13
**kind** 7:20 10:19 15:21 20:18 32:23 39:5 41:6 54:24 55:6 55:8,9 68:9,9 69:21 73:17 84:24 86:14 101:3,22 118:11 121:11,13,15
**King** 2:6
**knew** 59:21
**knocked** 99:18
**know** 7:24 10:7,8,9 12:21,24 16:10 17:5,6,11 18:4 22:2 22:20,23 23:3,11,12,14,20 23:21,22 24:13,14 26:11,18 27:9,19 28:24 29:1,7,8,9,11 29:13,15,19 30:11,12,13,19 31:2,18,20 32:3,7,10 33:15 33:21 34:3,5,10 35:15,16,17 35:21 36:24 37:3,4,6,7,10 38:3,11 39:7,19,24 40:6,9 40:12,19,24 42:4 43:23 44:24 45:3 46:16 47:5,6 49:16 50:10 51:9,12 52:14 52:17,19 53:14,23 54:13,19 55:9,13,21,24 56:4,9,19 57:13 58:15,16 59:10 60:5 60:12,21,24 61:5,11 62:16 62:18,20,23 63:11,17,21 64:2 65:1 66:3,4,12,13,14 66:17 67:4,5,23,24 69:5,17 70:3,19 71:5,21,24 72:4,6,6 72:7,10,12,22,24 74:1 75:6 75:23 76:11 77:6,13,17,23 78:7,15,17 79:3 80:15 81:10 83:2,7,10,12,15 84:3,9 85:15 87:10,14,17 89:13,24 90:6 91:2,12,21 92:7,15,23 93:8,17,20 94:11,14,17,20 94:22 95:13 96:7 98:16 99:1,5 101:11,23,24 102:7 102:13 103:13,22 104:4,7,8 104:19 105:5 106:9 107:1,1

107:3,6,20,21,22,23 108:3,4 108:6 109:6,24 110:5,13 111:7,14 112:9,20 115:20 116:13 120:1,12,17,19 121:3,22 122:1,1,4,14,16,18 122:20
**knowing** 95:7 101:9
**knowledge** 62:8 84:17 87:4 115:16
**known** 55:6 70:7 118:8
**Kraft** 113:1
**Kristen** 71:11,12

**L**

**L** 71:11
**L-E-A-P** 16:1
**label** 43:8
**labeled** 106:6
**lack** 71:3 101:7
**landed** 121:17,18
**language** 78:23
**large** 73:21
**Larry** 121:20
**late** 106:2,3
**latitude** 21:11
**Laura** 119:1
**law** 1:4 4:18 5:7,11 7:1,11 8:9 8:11,16 9:18 13:2,3,8 14:3 14:24 17:14,19 18:18,22 19:2,4,10,21 23:5,12,23 24:11,23 28:8 29:17 30:2,6 30:9,15 31:3,6,10 32:3,5,24 33:10,13,16,23 36:12 38:7 38:20 39:3 40:14 46:11 47:3 51:9 53:16,24 59:7,11 59:15 61:24 62:20 63:9 64:1,4 65:20 66:9 67:21 69:20 71:2,20 72:12,16 73:2 75:5 77:15 79:1 81:23 82:1 83:3 84:1,4,7 90:7,14,22 91:3,9,13,18,22,24 92:4,8 92:12,16,20,24 93:5,9,13,16 93:18 95:5 99:21 102:23 103:5,23 104:13 105:8,14 106:10,19,21,22 107:7,18 109:19 110:11,12,17 111:1 111:6,9 115:23 116:17

117:16,21 118:21 119:4,24 120:10 122:13 123:1,7
**Lawrence** 121:4
**lawyer.com** 66:2
**lead** 18:9 21:16 24:11 72:16 72:22 73:7,7 74:8,9 105:8 105:14 106:4,12
**leadership** 121:10
**LEAP** 16:1
**learn** 84:21
**leave** 9:17 13:18 30:8,21 84:6
**left** 27:11 30:19 31:18,20 65:20 83:23 84:3 87:8,11 89:9 93:15 99:16 111:9 118:24
**Legal** 66:24 122:22
**legitimate** 36:5 90:2
**let's** 76:2 88:15
**letter** 3:14 77:19 90:24 91:6 91:16 92:2,11,19 93:3
**letters** 58:10,12,18,21 59:6 60:7,12,14,21 61:3,8 90:21
**letting** 22:23 28:24 89:24
**level** 25:6
**Leventhal** 122:11
**Lewis** 71:1
**Lewis's** 71:2
**liaised** 72:8
**license** 108:6
**licensed** 78:6
**light** 101:12
**Lightdale** 122:17
**line** 68:22 77:11,19 80:18 126:4
**Lipsius** 93:4,8
**listed** 43:15 46:6 47:1,17,24
**lists** 64:14
**literally** 121:17
**litigation** 9:16,19,22 10:1 14:12 24:12,15,18,21,24 25:1 26:1 31:24 32:9,12,17 33:6 36:3 45:17 86:24 91:11,20 92:6,14,22 93:7 111:11
**Litowitz** 44:16
**little** 7:14 9:5 20:18 46:20 75:11 100:5 108:18 114:7

JAMES FICARO, ESQ.

142

lives 77:6
LLC 2:4 63:13,21
LLP 119:24
local 35:16,17,23 37:9 117:12
locate 10:3,20
located 24:4
locked 99:17
lodestar 57:23
long 7:10 8:3,6 17:11 18:14
   29:7 31:1 95:6 108:13
   118:9
longer 75:15 76:3 83:24
look 29:3 43:14 44:5 78:20
   103:16
looked 101:16,16
looking 57:20 67:20 108:10
looks 69:2 79:22 80:4
Loosely 122:8
Lopez 92:19,20,23
Loretta 120:16
lose 21:14
losses 98:21
lost 88:10
lot 31:12 54:23 55:1,1 56:18
   103:22
Lots 3:16 38:21 39:4,12,17
   41:2,4 42:23 43:6 45:21
   56:12,14
Louis 122:24
low 6:3
lunch 27:8 111:13
lunches 111:18
lunchtime 27:7

**M**

M 122:17
M-C-G 116:21
M-U-S-O-F-F 117:7
magistrate 87:19
maiden 70:9
mail 59:14,22
mailbox 59:21
maintain 17:3 22:1
maintained 17:4
maintains 29:11
majority 58:24
making 35:2

manager 16:7,10,14 71:3
managing 86:22
March 49:9,23 62:6
Marianita 92:19
mark 12:1 64:7,10 82:2,15
   90:12 108:22 116:15
marked 3:14 12:5 25:5 43:11
   49:7 82:17 90:18 109:1
Marketing 63:13,22
marking 64:9
Matheson 91:10
matter 6:23 22:17 122:8
matters 121:24 122:7
McGOWAN 2:5 5:5
McGrory 116:16,21
McKenna 120:20
McNab 122:15
mean 18:4 27:18,22 29:7
   32:10 45:15 52:16 59:17,19
   77:24 108:19
meaningless 21:12
means 8:1
measure 85:6
meddle 54:5
media 62:5,9
mediations 13:22,24
medical 31:21
medium-size 69:24
meet 41:3
meeting 26:13 27:3 52:14
meetings 26:15
Melinda 123:5
Meltzer 45:1,4
members 40:13
memory 72:21
mental 102:5,9
mention 55:2 62:14 98:21
   102:18 116:12
mentioned 10:23 56:6,13
   94:24 100:8 102:4
mentions 57:21 67:18
merged 8:23
merger 13:4,7
met 61:9,11,13 123:2
Michael 1:7 2:18 4:19 5:1,2
   13:10 45:20 51:6 52:8,11
   53:3,6,11,18 54:22 56:5

93:13,19 94:24 96:14 98:2
   102:6,18,20 103:6 104:16
   105:5 106:12 111:17,22
   112:17 113:14,20 114:20,24
MILLER 2:9
million 34:17,17
Mines 120:16
mini-bond 91:1
minute 114:2
minutes 75:13,18,22 88:14
   89:8
mischaracterizes 11:6
missing 47:11
misspoke 11:12
mistake 82:14
mobile 29:23
moment 9:7 111:16 122:10
money 74:6,12,19
Monica 22:5,13 23:22 24:4
   50:12 95:10 119:3
month 111:13
morning 5:13 6:19,20
motion 14:13 34:6
Mott 2:10 3:7 4:24,24 6:18
   6:21 8:2 11:7,8,9,24 12:6,16
   12:17 14:10,22 15:18 16:21
   18:2 21:2,21 22:11 28:7,18
   28:21 29:2 33:22 35:14
   36:6,10,18 41:17,20,21 43:4
   43:9,12 45:18 48:7,22 49:5
   51:17,21 64:8,12 65:4,18
   69:6,9,13 74:23 75:9,12,19
   76:1,10,19 77:3 81:4,6
   82:14,18 86:8 87:14,21 88:4
   88:9,15,24 89:16 90:4,5,11
   90:19 94:6,9 106:8 108:21
   109:2 114:1,5,15 115:9,12
   116:9,18,21,23 117:3 123:9
move 10:18
moved 31:22
multiple 35:20
Murphy 11:16,19 24:2,3
   95:10,14
Murray 90:24 91:2
Musoff 117:7
mutual 20:9

JAMES FICARO, ESQ.

143

## N

N 3:3 124:2
name 4:10 6:21 11:16,21 13:9 13:10 16:9 30:3 31:7 38:11 38:24 53:23 55:24 56:4,5,13 64:13 65:1 66:1 68:11,14 70:4,8,10 95:1 103:6 107:2 109:14 115:3,5 116:15,19 117:6 119:14
named 19:16,18 106:1
names 40:12 43:21 47:16 71:24
Nancy 92:11
nature 42:4
near 27:4 78:13
nearly 62:4
necessary 125:4
need 75:22 76:5 89:14,19 103:20 108:15
needed 9:7
needs 75:11
negotiate 114:19,23
negotiates 107:11
negotiation 13:17,19
neither 124:13
Nelson 63:19
never 28:13,16,17 51:8 104:3 117:8,10,22 119:16,18,20 120:14,21
new 31:22,23 90:15 91:9,19 92:5,13,21 93:6 111:14
news 29:1
Nicholas 91:17
Nicholson 123:5
non-attorney 11:1
non-attorneys 96:5
non-firm 10:23 11:1
non-work-related 100:16
Nope 108:9
North 2:10
Notary 1:14 124:23 127:19
note 5:1,9 36:1 105:19
noted 125:11 127:9
notice 64:18 102:4
noticed 100:23 101:1
notification 112:14,19

notified 58:17 70:20
notifying 57:21 58:4,8 60:22
notion 41:2
November 91:7
number 26:18 27:1,2,14,17 32:22 74:22 88:11 109:13

## O

O 124:2
o'clock 89:2
oath 5:19
object 11:3,4,5 21:2 45:15 73:11
objected 42:3
objection 7:23 12:9 14:6 15:13 16:16 17:21 28:3 33:19 35:8 36:15 41:3,14,15 73:15 81:2 85:24 87:12,13 105:20 116:5
objections 4:3
objector 42:2
obligation 109:19 110:1,1,16 110:20
obligations 95:24
obviously 52:12 59:16 101:19
occasion 55:17 60:6
occasions 77:13
occur 22:15
odds 118:10
Odell 2:16 4:10
offered 42:6
office 16:7,10,14 20:21,24 21:23 22:19 25:13 26:13 27:8,12 29:22 53:10,17,22 54:22 57:6 59:22 61:2 63:18 71:3 81:13 91:10,19 95:11 99:16 100:14 106:11 110:3 114:19,23 122:7
official 46:13
Oh 11:12 30:12 44:9 51:4 55:13 70:3 76:1 78:15 82:14 100:21 102:16
okay 6:8 7:3,17 11:2 12:16 13:2 15:24 18:14 26:8 27:20 34:10 38:6 41:17 43:18,24 44:11,21 45:23 46:16 47:13 53:15,21 54:20

57:20 62:20 64:18 66:6 67:15 68:1 70:4 71:21 73:6 76:1,6 78:2,10,19,23 79:19 80:3,24 89:21 95:15 96:18 115:7 116:22 117:9 120:5
Oklahoma 54:1
old 29:6 44:5
older 66:16
Oliver 107:3,13,24
once 100:21 107:14 111:13
operations 20:19
opinion 102:22 116:16 117:16,20 118:7,15,20 119:4,7,21 120:10 122:12 122:24 123:6
opinions 118:3
OPKO 93:6
opposing 114:17,17
ORAL 1:5
orally 110:4,5
order 29:20 35:11 41:10
organized 114:7
original 9:8 27:15 29:21 79:8 80:10,14 99:6 110:8 125:15
originally 110:2
outcome 34:3
outgoing 59:14,21
outlets 62:5,9
Outlook 29:18
outset 5:9
outside 10:7 33:6 72:9 100:14 112:14
overall 84:10
ownership 7:18
owns 63:21

## P

P 91:7,12 121:4
P.C 1:4 2:9 4:18
p.m 123:22
page 3:4,13,13 12:22 38:1 43:24 44:1,13,17,17,17,18 51:2,3 57:10,14,15,18 65:10 70:11 90:20 126:4
pages 56:10 127:5
paid 23:12 73:10 107:7
pale 88:1 101:16

JAMES FICARO, ESQ.

144

papers 110:24
paperwork 9:21 14:11
paragraph 12:18,21,24 13:2 38:2,5 57:10,11,13,20 62:3 62:11 90:21,23 91:16 92:2 92:10,18 93:4
paralegal 30:16 65:14
parameters 66:13
Parker 120:13
part 5:12 13:6 23:16 32:16 34:2 57:23 61:14 67:5,6 68:21 73:4 81:17,23 82:1 93:19 110:8,22 111:11
participate 85:14
participating 10:18
particular 15:11 18:8 25:13 29:16 32:17 55:17 83:21 105:16,21 107:15
parties 10:23,24 96:20 97:5 114:17 124:15
partner 7:4,5,7,13,17 17:18 86:22
party 17:4
Patel 30:3,5,8 64:14,23 65:1 65:6,9,19 66:19
Patel's 30:14
patience 21:14
Patricia 68:13,17 102:8
Patrick 68:21,24 122:19
pay 74:3 80:20 109:20
payee 73:10,24 74:11,11
payment 33:2,10,17 80:21,24 81:8,20
payments 33:14
PDF 35:2,6,13,20,22 36:23 43:5
PDFs 35:20,22 36:23 37:8
pending 72:19,19 116:4
Pennsylvania 1:1,23 2:6,11 4:12,16 26:6 63:1,8
people 55:2 76:4 96:23,24 112:12
percentage 95:12 107:9
percentages 107:12
perform 25:24 85:2
performance 30:24 84:10,18 84:22 85:7

performed 25:17 85:3
period 16:11,13 85:11 111:4
Perry 119:15 120:18
person 14:4 54:18 59:10,24 61:13 99:10,15,23 101:2
personal 25:9
personally 24:22 60:6 61:4
petition 15:10
Phil 5:4 114:9
Philadelphia 1:23 2:11 4:11
PHILIP 2:4
phone 26:17,23 29:24 54:18 55:1 56:22 89:14 99:23 101:18
pick 108:14
picked 62:5,9
Pinkoski 92:3,7
place 13:22 14:1 15:19 16:8 119:23 124:10
placed 11:24 37:24 43:4 49:6 64:3 65:23 67:9 77:4 81:22 90:11 108:21
placement 68:6
placing 46:3
plaintiff 38:21,24 109:14
plaintiffs 1:5 2:7 5:7 10:5,21
plaintiffs' 20:16 73:21 98:19 98:20 99:3 112:2,16,21
plane 121:18
planning 75:17
platform 69:4 81:18
platforms 81:20
play 100:21
played 102:14
Plaza 1:23
pleadings 115:19
please 14:16 18:1 21:18 36:6 54:10 80:3 88:16 100:6 116:19 125:3,8
poached 87:8
poaching 89:12
Pods 48:20
point 12:13 33:9 45:13 52:13 52:19 108:15
policy 74:2
Poor 30:24
portion 40:17 45:16 73:4

position 7:8 30:14,17 52:21 121:10
positive 119:8
possibility 68:19
possible 12:13
possibly 36:4 80:11 81:15
posture 104:21
potential 10:4,20 103:5,8
practice 8:16 9:3 31:12 69:23 106:23 107:19 108:2,4 118:24
practices 35:12 58:23 59:4
practicing 8:4,6 26:6
prefer 74:20
preparation 9:13 13:21 23:15 45:10
prepared 14:24
preparing 108:19
Present 2:15 4:20
presented 32:20 42:1
presiding 58:5 70:19
press 38:17
presumably 60:11 112:9
presume 29:18 103:23
presumption 66:10
pretty 27:1,2 31:11 47:14 48:15 55:5 56:19,20 113:18
previous 56:11 115:18
previously 12:10
primarily 19:20 20:20 21:23 39:4,5
printed 16:20 65:8
printing 35:1
prior 7:7 8:9 15:4 17:17,18 18:17,19,21 19:9,19 20:2,10 20:14,19,20,23 21:22 41:9 45:4,9 59:17 66:18 79:19 80:24 85:16 99:20 100:2,10 101:5 102:1 115:23 121:14
privileged 45:24
probably 9:5 15:8 60:3 68:13 77:10 104:15 113:22
procedures 60:17,19
proceed 103:12
proceedings 20:10,14 23:17 31:4 61:15,21 97:8,16 98:14 98:17

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36
1342

JAMES FICARO, ESQ.

145

process 13:12,17,19 32:19 39:12
procuring 23:6
produced 65:13 67:4
producing 65:6
production 64:4,10 66:19,22 67:6,10 81:24 82:1
Professional 1:13 124:6,22
Profy 19:16
program 17:1 29:16
progressing 20:12
propose 95:22
proposed 34:15 42:24
propounded 127:7
prospective 103:11
protect 119:10
provide 10:24
provided 35:17 37:1,4,9 42:3 99:20
provider 17:7,12
providing 61:23
Prussia 2:6
public 1:14 38:7,11 124:23 127:19
publication 62:15
publicized 62:6,9
purchaser 91:1
purely 8:24
purpose 43:13
put 36:23 80:6 87:15 88:8 89:18,19
putting 34:19,23

Q

quality 86:17,20
quantity 86:17
quasi-relevant 87:24
question 4:4 11:3,5 26:22 41:16 66:5 73:12,14 76:8,8 76:21 81:5 89:11 93:24 95:9 100:6 105:22 108:19 118:1,23 119:13,17,19
questioning 6:17
questions 21:3,6,8,12,15 36:2 36:6 42:12,15 87:16,23 89:17 123:10 127:7
qui 9:4,6 31:13 63:12

quick 26:24 27:1,2 75:20 76:2 88:16 97:13
QuickBooks 16:5 17:1
quickly 47:14 114:9
QuickTime 16:4 17:1
quite 119:8
quo 86:15
quote 40:17

R

R 124:2 126:2,2
R-O-R-Y 116:23
raise 55:3 121:20
Rayonier 70:13,14,20 72:5 81:13
Razzouk 118:23
reach 48:1 61:2 63:9 101:20 103:20
reached 61:5
reaction 53:5,7
read 10:11 12:20 14:15,18 38:5 47:13 57:12,17 76:23 93:22,23 94:2 97:18 109:21 125:3 127:4
reading 38:3 43:20
ready 12:23 43:23 44:1 57:13 57:15 75:7
realize 108:13
really 16:8 21:3 29:7 32:21 35:4 59:19 74:9,14 87:18 111:3 121:22
reason 39:23 40:22 59:5 65:11 93:11 125:5
reasonably 21:16
recall 12:7,14 13:13 15:2 16:8 23:18 25:8,23 27:22 32:20 34:1 36:22 37:20 38:24 40:10 42:16 44:14,19 47:7 48:10 49:11,19,23 50:11,17 51:1,19 52:5,22 54:17 55:17 67:20 68:1,4,10 70:17 79:3 81:9 82:8 95:8 98:13 102:19 106:16 120:7 120:22 121:6
receipt 58:20 59:11 125:17
receipts 59:4
receive 73:7,8 74:17 110:11

received 22:16,24 26:16,17 59:6 68:2 73:2 90:22 95:11 112:15 113:13
receiving 49:11,23 50:18 51:1,20
recipient 46:7
recipients 47:17,24 52:2
recognize 47:16 109:3 119:14
recollection 41:9 65:19 122:3
recommended 80:6
record 5:2 6:22 14:18 21:14 48:24 49:4 69:7 73:16 76:15,16,23 77:2 87:15 88:8 88:18,22,24 89:20 94:2 114:2,4,14
recoup 101:24
redacted 68:22
reduce 43:2
reduced 42:11
reduction 37:12 98:22
refer 23:9
reference 77:23 81:10 90:21 103:9 109:6,18
referenced 91:7 93:3 103:6
references 13:2 62:4 70:12 71:6,18 77:19 78:11 79:21 82:20 91:10,16 92:2,10 109:14
referencing 12:19 78:3 79:7
referral 10:20 11:1 95:12,12 95:14,17,19,24 96:4 107:5,8 109:18 110:1,12,16,20,23
referrals 11:10
referred 11:14 24:1 95:10 99:22 107:6
referring 71:22 84:14 104:23
reflect 64:20
reforms 42:5
refresh 122:3
regarding 14:5 22:22 24:24 25:9 36:20 40:16 42:20 61:24 63:5 68:6 86:10 89:18 90:24 91:1,7 92:5 93:6 95:3 102:9,23 111:22 112:6,16,21 113:13,20 118:6 122:12 123:6
regardless 60:5 73:3

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36
1343

JAMES FICARO, ESQ.

146

regards 107:15
Registered 1:13 124:5,22
regularly 56:20
relate 21:8 102:5
related 21:3 36:13 66:23 67:2
  77:14 102:21 124:14
relating 92:21
relations 38:7,12
relationship 91:3,8,13,22
  92:4,8,12,16,24 93:5,9,13
  93:18
relationships 10:6
relative 124:17
relatively 114:9
Relativity 25:17 81:18
release 42:6
released 74:6
relevance 87:13
relevant 21:17 36:4,7 56:17
  87:16,18,24 88:1
relief 42:3
remain 89:4
remember 7:12 9:11 15:23
  22:14 25:15 27:7 36:9,17
  39:13,20 40:18 42:22 43:17
  45:2 46:2 48:6,13,17 49:15
  50:4,22 53:4,7 54:8 55:23
  56:3,18 60:8,16 68:8,15
  71:13,17 77:9 79:10 97:6
  101:13
remotely 4:2
repeat 46:19,23 100:6
rephrase 41:20 81:4
report 19:5 24:23 25:3
reported 19:10
reporter 1:14 5:15,16,19
  14:18 76:23 82:12 94:2
  124:6,22
Reporters 1:22 2:17
reporting 4:11 62:24
represent 6:22 22:19 23:6,13
  38:20 62:13
representation 90:23 91:18
  92:20
representative 10:4,20
represented 5:12 23:10
reputation 102:23 103:1

120:23 122:12
request 65:17 99:7
requested 14:19 34:11 59:3
  76:24 94:3 96:2 100:3,3,9
  110:21
requesting 96:1
required 29:20 60:1,17
requirement 35:11
reschedule 89:2
research 115:14
researchers 115:17
reserved 4:5
resided 77:7
residency 31:22
resolved 105:12,17
respect 21:6 89:11 91:19
  92:13
respite 108:18
respond 73:15
response 23:1 25:20 27:24
  38:8 58:17 94:7
responses 62:14
responsible 19:20 33:17 39:4
  59:24
responsible's 39:5
responsive 65:7,16
rest 26:10
result 104:6
resulting 13:5
résumé 79:7 80:4 99:20
  103:21
retain 103:5 115:17
retained 33:23 72:13 110:3
retaining 73:3 91:9,19 92:4
  92:12,21
retention 110:8
return 125:14
Rev 86:16
reveal 69:3,7 81:18
revenue 85:15,21 86:10,12,17
  94:11,14,18,21 104:17
revenues 85:13
review 9:12 19:23 24:14 25:6
  25:16,24 26:15 32:1,5 34:21
  35:6 36:21,24 69:3 72:1,5
  81:17
reviewed 25:5 28:14,15 37:8

81:7 85:10
reviewer 24:9
reviewers 25:3 33:24
revise 83:16
right 6:9 27:7 46:8 48:21
  54:24 61:16 65:21,22 79:24
  80:2 84:2 86:23 88:15,23
  101:11 103:14 112:11
  123:14
rights 10:13
ring 120:4
Rob 5:8 26:13 27:3,8,12
  54:14 61:7 107:11 118:3
  119:21
Robbins 117:24 118:5,6
Robert 1:4 19:6,14,22 20:8
  21:22 36:24 37:18 48:8
  49:13 50:3 51:22 53:5
  55:21 67:12 78:3 79:12
  102:9,15 115:20 116:17
  117:17,21 118:7,15,20
  119:4,19 120:10 122:13
  123:1,6
role 9:15,17 13:16,18 18:15
  18:18,19 23:15 31:9 33:9
  58:1,8 61:20 62:24 69:20
  71:2 85:1
Rosenzweig 2:4,4 5:4,5,6,23
  6:2,8 7:23 11:2 12:9 14:6
  14:15,20 15:13 16:16 17:21
  21:1 22:7 28:3,11,20,23
  33:19 35:8,24 36:15 41:14
  41:18 43:7 45:14 48:4,14
  51:15,18 64:6 65:3 69:6,11
  73:11 75:12,23 76:6,12 81:2
  85:24 86:4 87:12,22 88:7,12
  88:23 89:21 93:22 94:4
  105:18 114:10 115:7 116:5
  116:18,22,24 123:12
Ross 71:11,12
Ross-Williams 22:5,13 23:22
  24:4 50:12 95:11 119:3
Ross-Williams' 23:16
RUBIN 2:9
ruled 34:5
run 108:13
running 80:10

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36
1344

JAMES FICARO, ESQ.

147

| S | | |
|---|---|---|
| **S** 3:12 | 28:6 29:21 35:6 45:21 47:4 | **signing** 125:10 |
| **S-W-A-D-O-S-H** 115:3 | 47:10,14 52:7 53:2,6,11 | **signs** 101:6 |
| **Saccocio** 92:19,23 | 55:18 56:1 58:11,12 59:4 | **siloed** 8:23 |
| **Santee** 91:1 | 60:22 64:21 66:3,8 78:4,8 | **Silow** 17:15 24:7,20 26:23 |
| **Sarah** 120:9 122:17 | 78:13,16,20 79:8 83:17 96:8 | 27:11,12,16 29:5,21 32:1,12 |
| **save** 44:18 | 96:15 112:15 113:19 | 32:14 33:7,10,14,18,24 |
| **saved** 112:10 | **served** 18:14,17 23:3 | 57:11 58:2,6 61:21 62:1 |
| **saw** 12:13 27:20 28:2 32:11 | **serves** 72:21 | 63:5,10,24 64:16 66:24 |
| 33:5 37:1,15 56:11 101:18 | **service** 10:20 | 67:21 68:23 70:16,22 72:2 |
| 104:13 108:10 | **set** 124:11 | 77:5,14,19 78:24,24 79:6,9 |
| **saying** 40:22 | **Seth** 122:11 | 79:17 80:18,22 81:16 82:4,7 |
| **says** 66:1 69:16 78:4,6 83:9 | **settled** 9:20 104:21 105:3,10 | 82:9 83:17 95:1,3,6 99:9 |
| **Schimmel** 119:17 120:2 | 106:2 | 100:2,9,17,19 101:12,15 |
| **school** 8:11 13:8 31:21 | **settlement** 9:21,23 13:11,16 | **Silow's** 24:17 26:5,18 27:24 |
| **Schubert** 119:19 | 14:11,13 15:1 20:10,14 31:4 | 32:6,9 57:22 63:1 79:15 |
| **scope** 53:15 | 32:19 34:6 39:11 41:4,10 | 82:23 |
| **Scott** 117:7,8 | 42:1,3,10,24 73:4,24 95:22 | **Silverang** 2:4 5:6 |
| **screen** 12:1 37:24 43:5 46:3 | 104:21 114:23 | **similar** 22:1 |
| 49:6 64:3,16 65:23 67:9,13 | **seven** 7:12,15 | **single** 35:20 |
| 77:4 81:22 90:12 108:22 | **share** 72:13 | **sit** 26:7 |
| **search** 66:24 104:6,9 122:22 | **shareholder** 8:17 14:5 17:20 | **site** 69:4 |
| **second** 78:21 | 18:8 19:20 20:1 38:21 41:2 | **sitting** 57:22 |
| **section** 38:1 | 54:4 91:11,20 92:6 93:7 | **situation** 72:8 95:2 |
| **securities** 8:17,19 12:19 | 112:3 | **situations** 56:18 73:20 74:7 |
| 115:15,17 | **shareholders** 42:6 | **six** 9:2 |
| **see** 10:17 21:7 35:22 36:11 | **Sharp** 119:24 | **small** 55:6 69:23 |
| 47:8,11 64:16,17 67:12,14 | **Shawn** 120:18 | **social** 100:16 111:12 |
| 78:22 79:23 103:15,16 | **sheet** 125:7,9,12,15 127:10 | **software** 17:3 25:17,23 |
| 109:12 | **Sherwood** 54:1 | **Solutions** 70:5 |
| **seeing** 12:14 25:7 27:22 | **Shield** 92:14,22 | **soon** 27:10 67:19 75:20 78:18 |
| 32:20 | **shit** 66:1 | **sorry** 25:19,21 49:7 74:11 |
| **seek** 87:19 | **shook** 101:16 | 96:12 97:12 100:20 108:12 |
| **seeks** 73:12 | **short** 42:17 49:1 76:17 88:19 | 108:14 115:9 |
| **seen** 9:8 12:8 15:3 23:19 | 114:11 | **sort** 25:6 55:6 |
| 28:13,17,19 32:13 33:7 | **shortly** 47:15 | **sounds** 61:16 |
| 37:11 40:2 46:5 51:14 | **show** 54:5 55:8 | **source** 88:9 |
| 66:18,22 67:2,6,8 101:2,6 | **showed** 56:10 101:7 | **sourced** 65:12 |
| **seldom** 103:3 | **showing** 121:12 | **sources** 11:10 |
| **send** 46:14 52:18 55:3,11 | **shows** 64:14 | **South** 1:22 2:11 |
| 59:1,20 60:9,14 71:5 74:11 | **Shuman** 90:15 | **space** 125:6 |
| 74:19 103:19,20 | **sic** 4:17 92:18 117:5 120:16 | **speak** 50:12 |
| **sending** 82:9 | **side** 118:11 | **speaking** 10:12 74:21 |
| **senior** 19:15 | **sign** 83:21 103:14 104:2 | **specific** 15:19 48:11 52:17 |
| **sense** 75:14 76:9 | 125:8 | 56:23 121:21 |
| **sent** 26:24 27:1,2,11,16,23 | **signatory** 61:7 | **specifically** 50:10 57:8,21 |
| | **signature** 69:1 82:8 83:1 | 95:2 104:3 118:18 120:22 |
| | 127:12 | 121:6 |

**ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES**

EXHIBIT 36

1345

JAMES FICARO, ESQ.

148

speculate 93:15
spell 54:10 116:20
spent 15:11 42:8
spoke 51:8,10 121:19,20
spoken 22:9 107:13 117:8,22
spreadsheet 16:19
spreadsheets 36:12
Sprint 9:15,18 12:19 13:12
    13:15 14:12 15:7,20 20:11
    21:7 23:17,23 31:4 32:18
    33:6 34:6,20 36:13 37:13
    38:15,18 41:6,13,23 42:20
    52:7 54:24 72:14,17 77:17
    83:13 96:8,15 97:5,8,23
    98:6,21,22 99:3 103:9
    117:13 118:16 119:12
    121:14
Sprint/Nextel 13:4,7
stages 13:16
stairs 27:9
stamped 67:10
standard 110:22
stands 71:20
start 87:15
started 40:21 54:24 104:20
    109:13
state 42:1 72:20,21 125:5
stated 62:10
statement 89:19
statements 86:9
states 1:1 4:15 68:22 69:15
    77:21 79:13 80:19 108:5
status 26:6 86:15 100:11
    102:10
stay 20:11 56:19
Stecker 3:18 19:15 20:8
    26:14,21 37:7,8 39:7 40:4
    46:17 47:2 48:12 50:8 60:3
    65:24 71:1,11 77:20 79:7,12
    80:11,17 83:23,24 84:3,6
    85:16 87:1,5 88:3 89:11
    90:7,15,16 98:5 101:13
    111:9,12,17
Stecker's 91:9,19 92:5,13,21
    93:6
Stephanie 71:1,2
Stipulation 73:23

stock 71:8
stop 63:13,21 75:21 89:4
story 27:6
Strategies 115:6,6
strategy 20:1
Street 1:22 2:11 24:10,12,15
    24:18,21,24 25:16 26:1,23
    31:24 32:6 37:11 38:8,14
    55:3,12,18 56:1,16 57:2,6
    62:6,10,15,22 104:5,8,13
stress 102:3
stressed 101:13
stressful 101:20 102:2
strike 8:3 17:17 18:7 19:23
    26:3,4 30:13 32:4 33:3 34:4
    39:15 46:8 47:7 52:24
    58:15 60:4,13 64:23 81:5,5
    83:4,23 94:10 98:9 100:22
    101:5 102:13 107:23 112:24
    120:24
subject 68:22 77:19 80:18
    125:10
submissions 34:20 58:24
submit 35:2
submits 15:9
submitted 9:21 16:7,14 32:1
    32:13 33:1,11 35:5,13,15
    36:13,21 70:23
submitting 81:16
subpoena 22:17,22
Subscribed 127:14
substance 127:9
Suite 1:23 2:5,11
summarize 109:21
summarized 41:24
summary 80:5
supervise 18:22 19:1 24:17
support 15:1,6,10
supporting 121:9
suppose 13:11
sure 11:8 24:19 46:6 63:20
    69:21 73:5 86:20 96:13
    98:12 105:15 111:10 114:10
surprised 117:11 123:3
suspect 66:7 113:24
Swadosh 115:3
swear 5:17

switched 15:22
sworn 4:2 6:13 124:9 127:14
system 15:16,19,21,24 16:9
    29:8 66:12 72:7
systems 16:2

T

T 3:12 124:2,2 126:2
T-H-I-E-L-E-R 107:3
T-R-Y-O-N 69:18
take 43:13 48:16,18 75:9
    76:4 88:13 89:14
taken 1:12 4:13 49:2 76:18
    85:21 88:20 114:12 124:16
talk 20:18 50:8 51:22 56:21
talked 31:13 48:10 70:21
    86:12,13
talking 52:14
tam 9:4,6 31:13 63:12
tasked 65:6
Technology 17:8,12
teleconference 40:21 42:17
telephone 5:3 40:16 56:13
telephonic 39:21,23
tell 22:21 28:12 76:20 101:15
    103:13 104:3
telling 28:15
Temple 8:12
temporally 78:17
tenure 15:22 16:6 99:13
    101:9
term 41:16 71:4,6
terminate 91:3 93:9
terminated 30:22,23 87:2
    90:8 91:13,22 92:7,15,24
    93:12,17
terminating 90:22 91:8,18
    92:3,11,20 93:4
terms 20:1 86:13
testified 6:13
testify 22:17 105:21
testimony 11:6
text 108:12
thank 5:14 14:20 51:18 69:12
    69:17 89:15 94:4,5 116:24
    123:9,14
thanked 119:9

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

EXHIBIT 36
1346

JAMES FICARO, ESQ.

149

thanks 41:7 80:20 82:5 90:4 119:9 123:12
thereabouts 116:8
they'd 23:3
Thieler 106:19,21 107:3,7,13 107:18,24 109:19 110:12,17 111:1,6
things 39:6 56:11 66:13 75:14 87:17 103:2
think 7:6 10:16 11:23 17:9 24:8 26:2 31:5 32:11,18 39:1,20 40:3 45:5 51:24 52:19 54:9 63:15 71:3 73:13 78:16 80:23 86:21 89:24 90:9 103:1 105:7,19 107:11 115:14 117:1 118:17 118:24
third 17:4
thirty 125:16
Thomas 92:11,15 120:20
thought 69:10 108:17,17
thoughts 40:24 120:23
three 17:13
ticker 71:6,7,8,19
timber 70:12,14
time 4:5,8 5:18 12:4 13:10 14:17 15:16,23 16:3,7,9,11 16:13,15 17:14 22:18 24:6 25:22 27:20 28:1 29:8 30:1 36:13 37:15 43:10 44:15,19 44:22 47:3 48:23 49:1,3 56:17,21 59:22 68:10 75:11 76:11,17,22 77:1 81:16,19 82:16 84:15 85:11 88:17,19 88:21 90:17 94:1 99:11 101:19 102:2,14 103:21 104:12 108:24 110:22 114:3 114:11,13 118:9 121:19 123:2,16,17 124:10
times 22:12 55:11 65:5
timesheet 32:13,24 33:1,7,11 80:19 81:7
timesheet's 32:21
timesheets 16:18 32:1,6,9,11 36:11,20
title 7:3,10 69:21
today 9:10 26:7 66:18 85:9

today's 9:13
told 26:19,21 27:12 42:9 85:1 101:13 102:24 106:11,13,17
Tom 117:9
tonight 108:14
top 64:13,19 65:2,10 67:15 69:15 71:6 78:12
Topaz 44:24 45:3 71:14 72:1 72:4
tops 75:18
total 15:11
touch 26:20 56:19
tough 39:6
track 16:15 62:15
tracked 16:6
trajectory 76:9
transcript 1:12 124:8 125:17 125:19
transcription 127:6
trial 4:6
tried 58:23
Trinity 70:5
trouble 7:15
true 74:8 124:7
truly 72:7
truth 27:13
try 11:7 48:20 54:5 64:8 88:15 101:24 111:13 119:10
trying 28:18 54:8 55:8 89:10
Tryon 69:18 70:7
Tryon's 69:20
Turka 90:24 91:2
turn 6:4 74:19
turned 80:4
two 17:13 29:9 39:20 75:13 75:15 123:2
two-page 46:4
type 16:22 79:14 95:12
types 102:11
typically 59:14
Tyson 2:10 4:24 6:21 28:12 51:15

___

U

ultimately 41:19 42:10
understand 17:22 24:19 108:15

understanding 44:4 69:22
United 1:1,23 4:15 108:5
University 8:12
unplanned 89:7
unwillingness 53:10,17,22 54:21 57:5 114:19,22
update 44:7 83:19
updated 79:13,21 80:7 82:21
upper 25:6
use 10:19 16:1 17:2 25:22 29:18 41:15
uses 29:17
usually 20:3 73:22,24 77:11 103:19
utilized 66:13

___

V

v 3:18
value 42:5
Vano's 117:19
vary 118:8
vast 58:24
veer 87:17
vendor 72:9
verified 81:19
verse 63:13
version 12:15 64:20 79:20 81:24 82:21 83:19
versions 82:23
versus 4:19
video 1:4,12,14 4:3,9,21 48:24 49:4 76:15,16,20 77:2 88:18,22 114:4,14 123:18
Videographer 2:16 4:8 5:14 5:21 6:16 48:23 49:3 76:14 77:1 88:17,21 114:3,13 123:17
view 79:8
views 119:8
visibility 62:22
visited 69:4
volume 6:5,6
vs 1:6

___

W

waiting 21:2
Wales 44:2,14

JAMES FICARO, ESQ.

150

**Wall** 37:11 38:8,14 55:3,12 55:18 56:1 57:2,6 62:6,10 62:15,22 104:5,8,13
**want** 64:9 75:21
**wanted** 40:23 56:20
**warranted** 25:5 42:5
**wasn't** 69:24 94:8 95:13 107:17 110:13 111:3
**way** 6:4,7 18:20 23:5 29:8 39:6 42:19 45:8 58:4 61:23 98:8 99:19
**ways** 74:22
**we'll** 10:13,15 12:1 76:2 82:15 90:12 108:22
**we're** 9:9 10:15 11:13 87:24 103:12 111:14,15
**we've** 15:21 48:19 70:21 86:12 117:10 119:20
**web** 66:2
**website** 64:1 66:2 67:18,22 68:3,7,9,11 78:5 79:1,4 80:5
**week** 20:24 21:20 70:1 118:12
**weeks** 123:3
**weight** 100:24 101:1
**Weiser** 1:4,4 3:18 4:18 5:7,8 5:11 7:1,11 8:9,16 9:18 13:3 14:3,24 15:9 17:14,18 18:18,22 19:2,4,6,10,14,21 19:22 20:8 21:22 23:2,5,12 23:23 24:11,23 26:17,19 28:8 29:17 30:2,6,9,15 31:3 31:6,10 32:3,5,24 33:9,13 33:16,23 36:12,24 37:19 38:7,20 39:3 40:5,14 46:11 47:3 48:8 49:13 50:3 51:9 51:22 54:14 55:21 59:7,11 59:15 61:11,17 62:20 63:9 64:1,3,5,13 65:14,20,23 66:9 67:10,12,21 68:13,17 68:20 69:10,14,15,20 70:12 70:24 71:2,10,20 72:12,16 73:2 74:24 75:1,5 77:4,15 77:18 78:2,3 79:1,6,11,12 80:12,16 81:23 82:1 83:3,24 84:4,6 86:9,16 90:7,14,22 91:3,9,13,18,22,24 92:4,8

92:12,16,20,24 93:5,9,13,16 93:18 95:5 98:16 99:21 100:13,20 101:7 102:8,12 102:15,23 103:23 104:13 105:8,14 106:9 107:4 109:15,19 110:11 111:5,9 115:20,23 116:17,17 117:16 117:17,21,21 118:7,15,20 118:21 119:4,4 120:10,10 122:13,13 123:1,1,7,7
**Weiser's** 26:13 53:5 100:24 102:5,9
**went** 35:23 98:11 121:1
**weren't** 42:11 52:16 59:6
**whatnot** 86:21 101:3
**whistleblower** 31:13
**wholly** 89:24
**wife** 31:21 108:12
**William** 53:23 120:24 122:15
**Williams** 119:13
**wire** 74:19
**withholding** 28:21
**witness** 3:4 4:2 5:17,20,24 6:6 12:12 14:8,21 15:15 16:18 17:24 21:19 22:9 28:5 33:21 35:10 36:9,17 48:6,16 51:19 73:17 86:2,6 105:23 115:10 116:7 117:1 123:14,20 124:9 125:1
**witnesses** 115:19
**WLF** 71:18
**Woodlands** 2:5
**word** 32:21
**work** 8:8,17 9:3 17:15,19 20:20 21:22 24:18 30:5 31:1,3,13 36:20 53:10,17,22 54:21 57:6 74:10 75:8 77:14 89:3 101:8 103:15 107:2 111:1,3 112:3 114:19 121:23 122:5
**worked** 8:21 24:6 32:23 58:2 58:6 63:17 70:16 72:2 110:15
**working** 20:6 24:8 39:6 81:13 103:18 122:6
**works** 46:12 69:2
**world** 55:6

**worried** 54:3
**wouldn't** 101:24
**Wright** 119:22 120:2
**write-downs** 13:5,7
**writing** 54:17 99:24
**wrong** 11:12 32:21

| X |
| --- |

**X** 3:3,12

| Y |
| --- |

**Yates** 118:19
**yeah** 12:12 17:24 24:1 31:21 40:3 44:4,12 48:22 53:13 55:16 79:22 80:1,4,23 81:4 88:12 101:11 102:16 117:14 118:2
**year** 8:13 100:21
**years** 7:12,15 9:2 17:13 29:9 31:2 80:6,7 100:24 102:1,17 115:15 121:14
**Yelp** 91:20
**York** 31:22,23
**Young** 19:18

| Z |
| --- |

**Zimmerman** 31:7
**Zimmerman's** 31:9
**Zoom** 1:14 4:2 25:22

| 0 |
| --- |

| 1 |
| --- |

**1** 64:5,13
**1:10** 88:18
**1:14** 75:23
**1:15** 75:16,18,21 88:13
**1:36** 88:22
**10** 57:10,10
**10:15** 1:16 4:9
**109** 3:20
**11** 12:18,21 57:18 93:3
**11:31** 48:24
**11:40** 49:4
**12** 3:15 12:21 49:7,8 50:24
**12/20/16** 3:17
**12:30** 75:13
**12:35** 76:15

**JAMES FICARO, ESQ.**

151

**12:49** 77:2
**121** 2:11
**128** 3:15
**129** 3:16
**13** 62:7 99:14
**130** 3:17
**131** 3:18
**132** 3:20
**14** 12:24 13:2 49:21 99:14
**15** 50:15 75:18 88:14
**15%** 109:20
**1520** 1:23
**16** 50:23
**1600** 2:11
**17** 38:1
**17th** 1:22
**18** 51:13,17
**19** 51:13
**19103** 1:23
**19107** 2:11
**19406** 2:6

---
**2**
**2** 44:1 70:11 78:11 92:10
**2:19** 114:4
**2:19-CV-02728-MSA** 4:17
**2:19-CV-02728-MSG** 1:2
**2:32** 114:14
**2:46** 123:18,22
**20** 75:18 82:7,9 88:14 89:8
   127:15
**2008** 13:8
**2010** 8:7,14
**2011-2012** 19:18
**2012** 99:14
**2013-14** 19:17
**2016** 67:17 69:19 78:6 79:1
   81:14 82:7,10 99:21 100:18
   101:10
**2017** 17:17 26:11 49:10,23
   50:24 59:18 62:7 75:6 78:9
   78:11 79:2,2 109:13 115:21
   115:23
**2017-2018** 31:19
**2018** 7:6,13 50:17 51:14
   104:15
**2019** 18:16,17,19,21 19:1,9

19:19 20:2 84:13,19 85:12
   85:17 91:7 92:11,18 93:3
   94:21 104:15,18 105:10
   106:2
**2020** 30:10,11 65:20,21 94:12
   94:18,21
**2021** 94:15,18 106:3
**2022** 1:15 4:14
**215** 1:24
**26** 90:21
**26a** 90:23
**26b** 91:6
**26c** 91:16
**26d** 92:2
**26e** 92:10
**26f** 92:18
**26g** 93:4
**28** 46:4

---
**3**
**30** 1:22 125:16
**300** 2:5
**364** 78:2,20 79:6

---
**4**
**4** 67:17 78:6
**424** 79:11,18 80:3
**425** 79:24
**427** 67:10
**43** 3:16
**435** 69:14
**436** 70:12
**450** 68:20 69:10
**470** 70:24
**493** 71:10

---
**5**
**5** 65:23
**5:30** 89:5
**50** 21:20
**502** 77:4
**505** 77:18
**564-1233** 1:24
**59** 57:11,13
**5th** 24:10,12,15,18,21,24
   25:16 26:1,23 31:24 32:6
   56:16

---
**6**
**6** 1:15 3:7 4:14 49:9 90:20
**64** 57:20

---
**7**
**7** 49:23 50:17 91:7
**70** 21:20
**772** 80:16

---
**8**
**82** 3:17
**84** 38:2,5
**87** 62:3
**88** 74:24 75:1

---
**9**
**9** 92:18
**90** 3:18
**900** 2:6

**ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES**

EXHIBIT 36
1349

# EXHIBIT "J"

EXHIBIT 36
1350

## POLICE CRIMINAL COMPLAINT

| Docket Number: | Date Filed: 12 / 6 / 2017 | OTN / LiveScan Number | Complaint/Incident Number 2017-0543 |
| --- | --- | --- | --- |
| Defendant Name: | First: Jeffrey | Middle: Mark | Last: Silow |

## AFFIDAVIT OF PROBABLE CAUSE

On February 3, 2017 Robert Weiser of the Weiser Law Firm reported a fraud just discovered to Montgomery County Detective Bureau. Mr. Weiser advised that the fraud involved Weiser Law Firm in Berwyn, PA and a Jeffrey Silow, a subject employed by Weiser Law Firm as a document review attorney. Mr. Weiser reported that the firm had just learned that Silow had been disbarred by the PA Disciplinary Board some years ago, but, presented himself as fully licensed attorney to Weiser Law Firm. Robert Weiser presented the following background information about the employment of Jeffrey Silow:

Mr. Weiser explained that in 2008 the firm took on a case with a need for extensive document review. As such, the firm contacted Abelson Legal Search, a legal recruiting firm, to obtain resumes for attorneys to conduct document review for the case. Abelson Legal Search forwarded several resumes and the firm hired two subjects based upon these resumes, one of whom was Jeffrey Silow. Mr. Weiser said that the firm was very pleased with Silow's performance as it was impeccable and he put in lengthy hours reviewing various documents for the firm. Mr. Weiser explained that the firm would have one or two large document review cases per year and would hire Silow through Abelson Legal Search. Mr. Weiser advised this continued for several years.

Mr. Weiser said that sometime around 2010, the firm was so pleased with the work of Silow, they simply hired him directly, no longer going through Abelson. Mr. Weiser said that when Silow was hired through Abelson, the firm paid Abelson's fee for Silow. After 2010 when Silow was hired directly, the firm negotiated Silow's fee with him. Mr. Weiser said that the payments were based upon the belief that Silow was an attorney in good standing. Mr. Weiser advised that Silow worked on several law firm cases as a document review attorney.

Mr. Weiser went on to explain that the firm was involved in a case with Sprint Nextel Corporation which was decided in the fall of 2016. The case was based in Kansas but the firm put in extensive work on the case including a very large document review. Silow was hired to assist with this document review. The document review accounted for thousands of hours over the course of several years and this review was very pertinent to the case. Silow reviewed approximately forty percent of the documents in the case. The document review time was critical to the firm for getting paid so Silow's time was very important. A third-party objector came forward and questioned the time entered for document review. This objection gained the Court's attention and, as such, the Court, although approving the settlement proposed, cut the firm's fees substantially. Mr. Weiser noted that the times reported by Silow and the times Silow logged through reporting software were fairly close to each other thus confirming the time spent by Silow.

Due to the fact that the firm lost a substantial amount in fees as a result of the Court's decision, the firm filed a motion to reconsider. As part of that motion, the firm had Silow complete a "Declaration in Support of Plaintiff's Second Motion to Alter or Amend the Court's November 22, 2016 Order." In this declaration, Silow identified himself as Alexander J. Silow, swore under penalty of perjury that he is "Of Counsel" at Weiser Law Firm, that he has "been practicing law for over 40 years" and that he has "never been accused of an ethical violation or been the subject of any disciplinary action." Finally, the declaration ended that it was "Executed this 20th day of December, 2016 at Fort Washington, Pennsylvania."

The declaration is then signed with a signature appearing to be "AJ Silow." Mr. Weiser advised he questioned the name provided by Silow to which Silow explained that he uses his middle name of Jeffrey, but, his proper name is Alexander Jeffrey Silow. It should be noted that the signature of "Silow" on the Declaration is very similar to the "Silow" signature on the PA Operator's License of Jeffrey Silow.

Based upon a request from an outside firm, Mr. Weiser asked Silow for his attorney bar number. Silow texted the ID number to Mr. Weiser. Mr. Weiser explained that he became curious when he was provided the ID number since it was a higher number than his own. Mr. Weiser explained that the attorney ID numbers are issued chronologically and since

EXHIBIT 36
1351

## POLICE CRIMINAL COMPLAINT

| Docket Number: | Date Filed: 12/6/2017 | OTN / LiveScan Number | Complaint/Incident Number 2017-0543 |
|---|---|---|---|
| Defendant Name: | First: Jeffrey | Middle: Mark | Last: Silow |

## AFFIDAVIT OF PROBABLE CAUSE

Silow received his bar admittance before Mr. Weiser, the ID number should be lower, not higher than that of Mr. Weiser. Shortly after texting the ID number, Silow called Mr. Weiser and admitted that he had been lying to Mr. Weiser all these years and that he had been disbarred in 1990. Mr. Weiser reviewed the ID number provided by Silow and determined it to belong to an attorney named Alexander Louis Silow practicing in West Chester, PA.

Mr. Weiser was asked about the software used to track Silow's work. Mr. Weiser identified that software as "Relativity" and explained that an employee will log into the system and the system will track the employee's work.

On February 24, 2017 an associate of Mr. Weiser, Brett Stecker, forwarded a list of Internet Protocol (IPs) Addresses captured during Silow's use of the Relativity Document Review Software from November 17, 2016 through February 2, 2017, the most recent project that Silow was working on for Weiser Law Firm. The majority of the IP addresses were the same and through investigation, this single IP address was assigned to the address of 1708 Salt Kettle Circle, Dresher, PA 19025.

During the initial report, Mr. Weiser advised that paychecks for Silow were delivered by US Mail to Silow's home at 1708 Salt Kettle Circle, Dresher, PA 19025. Additionally, the ongoing investigation revealed that Silow's PA Operator's License Number comes back to a the same Dresher address in Upper Dublin Township, Montgomery County.

As part of his report, Mr. Weiser provided a binder containing pertinent investigative materials including copies of time sheets and pay stubs for the work completed by Silow for the Weiser Law Firm over the course of numerous cases. Also included was additional documentation for Silow's pay as well as a resume for Jeffrey Silow. Additionally, the investigation was able to obtain a copy of a complaint filed by Mr. Weiser with the Office of Disciplinary Council (ODC). The ODC is the investigative and prosecutorial division of the attorney disciplinary system. The primary mission of the ODC is protection of the public. The role of the ODC is to investigate complaints against attorneys, and when appropriate, prosecute within the civil attorney disciplinary system.

Attached to this complaint was a Fee & Policy Agreement between Weiser Law Firm and Abelson Legal Search, e-mail with a slightly different Silow resume to Weiser Law Firm from Abelson Legal Search, and several letters to courts in which the cases worked on by Silow were heard.

All resumes on file for Silow were requested from Abelson Legal Search, Silow's previous employer. Nine different resumes for Jeffrey Silow were provided. These resumes were dated April 2003 through August 2008. Upon review, it was noted that the same phone number of 215-341-1561 and listed as a Silow contact, was present on all resumes. Further, the e-mail user name of "triman1021" was present on all the resumes, either as at AOL.com or at Gmail.com. The known home address for Silow was listed on three of the resumes. All resumes list part of Silow's education as "JD, University of Miami School of Law." It is noted that, beginning with the resume for March 2005, an entry of "District of Columbia Bar Association" is present. This listing is under the "Education" section of the resume for the March 2005 resume. Beginning with the February 2006 resume and continuing through the last resume (August 2008) a separate section titled "Bar Admissions" is present with an entry of "District of Columbia." The resume of March 2008 also adds "member number 211-847" to the Bar Admissions section. It is noted that the resume present in the binder provided by Weiser Law Firm matches the June 2008 resume provided by Abelson Legal Search. It is further noted that resumes dated March 2005, February 2006, March 2008, and June 2008 are all on Abelson letterhead and use "Jeffrey Silow, Esq." Finally, beginning with the March 2005 dated resume and continuing through the remaining resumes, both with and without Abelson letterhead, under "Prior Experience" at the PA Securities Commission the wording, "Office of General Counsel, Senior Attorney" is listed.

A certified copy of the disbarment order for suspect Jeffrey Silow was requested from the Office of Disciplinary

EXHIBIT 36
1352

CR# 809247-2017 12/13/2017 Scan 5

## POLICE CRIMINAL COMPLAINT

| Docket Number: | Date Filed: 12/6/2017 | OTN / LiveScan Number | Complaint/Incident Number 2017-0543 |
|---|---|---|---|
| Defendant Name: | First: Jeffrey | Middle: Mark | Last: Silow |

## AFFIDAVIT OF PROBABLE CAUSE

Counsel and was received. The Order received from the Office of the Chief Justice revealed that on December 23, 1987 the resignation from the Bar of Jeffrey M. Silow was accepted and he was "Disbarred on Consent from the Bar of the Commonwealth of Pennsylvania." The Order listed Silow's Attorney Registration No. as 20244. A current check on the ODC website for the status of attorneys revealed that both the name Jeffrey Mark Silow as well as the ID #20244 are listed as "Disbarred on Consent" with an effective date of December 23, 1987. Due to the listing of the Bar of the District of Columbia within Silow's resume, that status was also checked. Silow's attorney status with the District of Columbia Bar is listed as "Suspended" due to "Non-Payment of Dues."

Based upon the above information, it is requested that a warrant of arrest be issued against Jeffrey Silow for Securing Execution of Documents by Deception, a misdemeanor of the second degree; Unsworn Falsification to Authorities and Unauthorized Practice of Law, both misdemeanors of the third degree.

I,    **Det. Jean Morrison**    , BEING DULY SWORN ACCORDING TO THE LAW, DEPOSE AND SAY THAT THE FACTS SET FORTH IN THE FOREGOING AFFIDAVIT ARE TRUE AND CORRECT TO THE BEST OF MY KNOWLEDGE, INFORMATION, AND BELIEF.

(Signature of Affiant)

Sworn to me and subscribed before me this    8    day of    December    2017

12/8/17 Date

, Magisterial District Judge

My commission expires first Monday of January, 2018

SEAL

# EXHIBIT 37

EXHIBIT 37
1354

Page 1

1          UNITED STATES DISTRICT COURT
        FOR THE EASTERN DISTRICT OF PENNSYLVANIA

2                   -   -   -

3

        THE WEISER LAW FIRM,  :  CIVIL ACTION
4       P.C., et al           :
                              :
5              Plaintiffs,:
                              :
6          v.                 :
                              :
7       MICHAEL HARTLEIB,     :  NO.:  2:19-CV-02728-KSM
                              :
8              Defendant. :

9

                    -   -   -

10

                November 16, 2022

11

                    -   -   -

12

13          Oral deposition of MICHAEL
14       HARTLEIB, taken pursuant to Notice,
15       held at Silverang, Rosenzweig &
16       Haltzman, LLC, 900 E. 8th Avenue,
17       Suite 300, King of Prussia,
18       Pennsylvania 19406, beginning at
19       approximately 10:00 a.m., before
20       Mary Hammond, a Registered
21       Professional Reporter and Notary
22       Public in the state of
23       Pennsylvania.
24                  -   -   -

## Page 2

```
 1   A-P-P-E-A-R-A-N-C-E-S
 2
 3   SILVERANG, ROSENZWEIG & HALTZMAN
     BY:  PHILIP S. ROSENZWEIG, ESQUIRE
     900 E. 8th Avenue
 4   Suite 300
     King of Prussia, Pennsylvania  19406
 5   prosenzweig@sanddlawyers.com
     Counsel for Plaintiffs
 6
 7   GOLDBERG, MILLER & RUBIN, P.C.
     BY:  EAMON MERRIGAN, ESQUIRE
 8   121 South Broad Street
     Suite 1600
 9   Philadelphia, Pennsylvania  19107
     emerrigan@gmmrlawfirm.com
10   Counsel for Defendant
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

## Page 4

```
 1                    -  -  -
 2              E-X-H-I-B-I-T-S
 3                    -  -  -
 4   NAME        DESCRIPTION        PAGE
 5   Hartleib-11  Declaration of Monica   222
                  Ross-Williams
 6
 7   Hartleib-12  Email Dated 3/7/17      231
 8   Hartleib-13  Letter Dated 3/7/17     232
 9   Hartleib-14  Email Dated 4/7/18      253
10   Hartleib-15  Email Dated 4/12/17     257
11   Hartleib-16  Email Dated 4/26/17     258
12   Hartleib-17  Email Dated 4/7/18      263
13   Hartleib-18  Email Dated 5/19/18     272
14   Hartleib-19  Email Dated 6/2/18      277
15   Hartleib-20  Forwarded Email         288
16   Hartleib-21  Letter Dated 12/12/18   293
     Hartleib-22  Opinion and Order       316
17
18
19
20
21
22
23
24
```

## Page 3

```
 1                    -  -  -
 2              I-N-D-E-X
 3                    -  -  -
 4   WITNESS:
 5   MICHAEL HARTLEIB
 6                    PAGE
 7   BY MR. ROSENZWEIG      5
 8   BY MR. MERRIGAN        --
 9
10
11                    -  -  -
12              E-X-H-I-B-I-T-S
13                    -  -  -
14   NAME        DESCRIPTION        PAGE
```
```
15   Hartleib-1   Email Dated 3/20/09    52
16   Hartleib-2   Email Dated 3/27/09    63
17   Hartleib-3   Email Dated 6/2/11     92
18   Hartleib-4   Email Dated 8/31/11    104
19   Hartleib-5   Email Dated 2/16/12    109
20   Hartleib-6   Email Dated 5/24/16    116
21   Hartleib-7   Email Dated 5/31/16    150
22   Hartleib-8   Email Dated 6/28/16    154
23   Hartleib-9   Letter to Judge Vano   163
24   Hartleib-10  Email Dated 3/6/17     213
```

## Page 5

```
 1                    -  -  -
 2         P-R-O-C-E-E-D-I-N-G-S
 3                    -  -  -
 4       (By agreement of counsel,
 5   sealing, certification and filing
 6   are waived, and all objections as
 7   to the form of the question, are
 8   reserved until the time of trial.)
 9                    -  -  -
10       MICHAEL HARTLEIB, after having
11   been first duly sworn, was examined
12   and testified as follows:
13                    -  -  -
14       MR. MERRIGAN:  Usual
15   stipulations with read and sign is
16   fine.
17                    -  -  -
18          DIRECT EXAMINATION
19                    -  -  -
20   BY MR. ROSENZWEIG:
21   Q.  Mr. Hartleib, good morning.
22   A.  Good morning.
23   Q.  I'm glad we are finally here for
24   your deposition, and I appreciate the
```

2 (Pages 2 - 5)

Page 6

1 cooperation shown by you and your counsel
2 with respect to setting these dates.
3        You had the good fortune of sitting
4 in on the multiple days of depositions of Mr.
5 Weiser. You saw how those proceedings
6 unfolded, and I'd like to know whether you
7 need me to give you a full set of
8 instructions for depositions, or whether I
9 can just sit the highlights.
10      A. You can hit the highlights.
11      Q. Okay.
12         So you are here this morning to be
13 deposed. You're under oath. I'm going to
14 ask you questions, and to the extent that you
15 can you're going to give me truthful answers
16 to those questions. That presupposes that
17 you understand my questions.
18         Should you not understand a
19 question, I ask you tell me, I'll reword it,
20 I'll rephrase it, I'll break it into pieces.
21 I'll do whatever I can to make it
22 understandable for you.
23         To the extent that you do not
24 indicate otherwise, it's going to be assumed

Page 7

1 that you've understood my question and that
2 your answer that you give is to the question
3 that I have posed; do you understand that?
4      A. Yes.
5      Q. Okay.
6         You've just done something, which I
7 appreciate greatly, not every witness does,
8 all of your answers need to be verbal in full
9 words.
10        Nods of the head, shrugs of the
11 shoulders, hand gestures, whatever they may
12 be can't be taken down by the court reporter
13 so please do speak all of your answers, and
14 it will make our process very official today;
15 do you understand that?
16      A. I do.
17      Q. Okay. Great.
18        To the extent that I may ask a long
19 question or you may have a long answer, let's
20 each give each other the courtesy of trying
21 to let the other finish. I know sometimes it
22 is hard. You may be anticipating what I'm
23 asking. Sometimes I may believe you've
24 finished an answer, and you haven't quite.

Page 8

1        Only one person can really speak at
2 a time. Again, for purposes of an accurate
3 record, I will try to give you the courtesy
4 of letting you finish your answer. Please
5 try to give me the courtesy of letting me
6 finish my question. To the extent that
7 that's imperfect, we'll do the best we can.
8        It will be not purposeful if I step
9 on an answer with the next question because I
10 haven't realized that you've finished, so you
11 will just indicate that you need to finish
12 that answer, okay?
13      A. Understood.
14      Q. Great.
15        In the course of this deposition
16 Mr. Merrigan, as your counsel, may object to
17 a question that I ask. When he does so, stop
18 talking. Mr. Merrigan and I will deal with
19 that objection. To the extent that they're
20 usual stipulations, he can object to form and
21 you'll go ahead and answer my question.
22        Mr. Merrigan gave me some latitude
23 in that universe where if he needs to say
24 something about an objection, I'm going to

Page 9

1 generally let him do that, and, you know,
2 then I may or may not alter my question and
3 we will make lawyer statements on the record
4 to the extent we need to. So understand that
5 that may occur.
6        I'm sure Mr. Merrigan has repaired
7 you in that regard; do you understand that?
8      A. Yes.
9      Q. We are going to be here all day,
10 and, likely, all day tomorrow. I have shared
11 my intention to complete this deposition in
12 two business days and to not go into Friday.
13 So it's going to be a long day. I will
14 provide lunch at a reasonable time. Should
15 you need a break, please, you know, feel free
16 to let me know that, and that could be for
17 any reasonable reason.
18        If you want to speak to
19 Mr. Merrigan, I'm going to ask that you not
20 ask to do so while there is a pending
21 question. If I've asked a pending question,
22 answer that question.
23        If you need time with your counsel,
24 we will go off the record so that you can

3 (Pages 6 - 9)

Page 10

1  have a private conversation with
2  Mr. Merrigan; do you understand?
3      A.  I do.
4      Q.  Okay.
5          I'm going to be referring to
6  documents and marking certain documents in
7  the course of this deposition today and
8  tomorrow in front of you, in front of
9  Mr. Merrigan, with the court reporter.  Both
10 Mr. McGowan and I have binders of the
11 documents that intend to use with an exhibit
12 list, which fronts the 43 documents that are
13 all tabbed.
14         When I refer to a document, I will
15 refer to it by the tab in this binder, and,
16 then, I will, you know, relate it to whether
17 it's an exhibit to the Complaint, or an
18 exhibit to something else; do you understand
19 that?
20     A.  I do.
21     Q.  Okay.
22         And I will make sure that we're all
23 talking about the same exhibit when I ask you
24 my questions with respect to such document,

Page 11

1  okay?
2      A.  Understood.
3      Q.  Great.
4          Do you have any questions for me
5  before we proceed with the actual deposition?
6      A.  No, sir.
7          MR. ROSENZWEIG:  Mr. Merrigan,
8      do you have anything that you'd
9      like to add?
10         MR. MERRIGAN:  Yes.  I was
11     thinking I'll probably make a quick
12     statement because it will probably
13     keep things moving if I make it
14     now.
15         I expect and understand that
16     Plaintiff's counsel's probably
17     going to ask questions concerning
18     most, if not all, of the statements
19     alleged in the -- whatever the
20     operative Complaint is that we're
21     at this time.  I forget how many
22     amendments there have been.
23         However, there has been a
24     Court ruling that the majority of

Page 12

1  those statements are in-actionable,
2  as of right now in the lawsuit,
3  based on the Court's ruling of -- I
4  certainly can't remember the date
5  right now.
6          MR. ROSENZWEIG:  There is a
7  Court order exists.
8          MR. MERRIGAN:  Right.  So what
9  I'm saying is I object to counsel
10 covering those statements because
11 of that Court order and them not
12 being actionable in this case and
13 not likely to lead to admissible
14 evidence.
15         However, I'm not going to
16 instruct my client not to answer
17 those questions.  I'll make my --
18 note my objection here and assume I
19 can have a continuing objection
20 based on that statement.
21         MR. ROSENZWEIG:  So,
22 Mr. Merrigan, you have noted your
23 objection.  It can certainly be a
24 continuing objection without any

Page 13

1  issue from me.  However, I will
2  note in response that -- and I am
3  sure you are well aware as a
4  seasoned lawyer -- that the
5  plaintiffs in this case have
6  certain appellate rights with
7  respect to the rulings of
8  Judge Marston, all of which, or the
9  vast majority of which are
10 interlocutory at this point in
11 time, and may be subject to an
12 appellate practice and appellate
13 filings at the conclusion of this
14 case when there is a final
15 determination.
16         Therefore, I believe it is
17 wholly appropriate to inquire of
18 Mr. Hartleib as to all the
19 statements that were pled in this
20 case as they may, in fact, at some
21 point become relevant again, and
22 that is my reason for doing so.
23         But, you know, your continuing
24 objection is otherwise duly noted.

4 (Pages 10 - 13)

Page 14

1    MR. MERRIGAN:  Thank you.
2    MR. ROSENZWEIG:  All right.
3  BY MR. ROSENZWEIG:
4    Q.  Mr. Hartleib, are you ready to
5  begin?
6    A.  I'm ready.
7    Q.  Okay.  Terrific.  Thank you.
8    Why don't we start with where you
9  live right now?
10    A.  Laguna Niguel, California.
11    Q.  Okay.
12    What's your address?
13    A.  24892 Laguna Niguel, California
14  92677.
15    Q.  Okay.
16    So you didn't give me a street in
17  there.
18    A.  Oh.
19    Q.  You gave me a number, and you gave
20  me a place.
21    A.  I'm sorry.
22    Q.  I'm sure that was inadvertent.
23    A.  Halo Circle.
24    Q.  So why don't you do that one more

Page 15

1  time?
2    A.  I live at 24892 Hollow Circle,
3  Laguna Niguel, California 92677.
4    Q.  Thank you, Mr. Hartleib.
5    Is that a single family residence?
6    A.  Yes.
7    Q.  Is that owned by you?
8    A.  Yes.
9    Q.  Is it owned by anybody else?
10    A.  No.
11    Q.  Okay.
12    How long have you lived there,
13  approximately?
14    A.  20 years.
15    Q.  Okay.
16    And are you married?
17    A.  No.
18    Q.  Have you ever been married?
19    A.  Yes.
20    Q.  Did that marriage end in a divorce?
21    A.  Yes.
22    Q.  Okay.
23    And is that one prior marriage, one
24  marriage?

Page 16

1    A.  One marriage.
2    Q.  Okay.
3    And what is your ex-wife's name?
4    A.  Tijen, T-I-J-E-N.  And her name now
5  is Dalinas, D-A-L-I-N-A-S, I guess.
6    Q.  Okay.
7    When were you divorced, approximate
8  year?
9    A.  Approximate, 15 years ago.
10    Q.  Okay, great.
11    And do you have any kids?
12    A.  No.
13    Q.  Okay.
14    Mr. Hartleib, just broadly, share
15  with me your post high school education.
16    Did you go to college and get a
17  degree?
18    A.  No.
19    Q.  Okay.
20    I asked you two questions so I
21  guess I should break it.
22    Did you attend college?
23    A.  Yes.
24    Q.  Okay.

Page 17

1    Where did you attend?
2    A.  Golden West.
3    Q.  Okay.
4    Is that in California?
5    A.  Yes.
6    Q.  For how long did you matriculate at
7  Golden West?
8    A.  I took random classes.  One was one
9  for aviation.  I don't recall how many
10  semesters in total, but it led to no degree.
11    Q.  Okay.
12    And did you voluntarily leave that
13  institution?
14    A.  Yeah.
15    Q.  And after leaving Golden West, did
16  you become employed in a particular industry?
17    A.  I own my own business.
18    Q.  Okay.
19    For how long have you owned your
20  own business?
21    A.  I owned my own business for many
22  years.  I no longer own my own business, as
23  of six or seven years ago, I believe, or
24  something to that effect.

5 (Pages 14 - 17)

Page 18

1    Q.  Okay.
2        What was that business?
3    A.  I had -- I did mortgage banking and
4 real estate and then I had a landscape
5 company.
6    Q.  Okay.
7        Tell me the name of the mortgage
8 banking company.
9    A.  That was not my own company.  I
10 worked for Caldwell Banker, and, then, I
11 worked for several mortgage banking
12 companies.  I don't recall the name.
13    Q.  Okay.
14        Which were not founded or owned by
15 you?
16    A.  No.
17    Q.  Okay.
18        And so what business was your own
19 business that you worked --
20    A.  The landscaping company.
21    Q.  Okay.
22        What was that called?
23    A.  Softscape Landscape.
24    Q.  And for how long did you operate

Page 19

1 Softscape Landscape?
2    A.  15 years or so, I believe.
3    Q.  Okay.
4        When did that business conclude?
5    A.  Seven or eight years ago.
6    Q.  Okay.
7        And why did it conclude?
8    A.  I decided it was time to do
9 something different.
10    Q.  Okay.
11        And what was that something
12 different you chose to do at that point in
13 time?
14    A.  I'm now administrator of a medical
15 practice and we have started a clinical
16 trials and research company.
17    Q.  Okay.
18        So what is the medical practice for
19 which you are an administrator?
20    A.  Tonya Y. Evans, M.D., Inc., and the
21 clinical trials company is Avance Clinical
22 Trials.
23    Q.  Is Dr. --
24    A.  Evans.

Page 20

1    Q.  -- Evans, thank you, a member of
2 that clinical trials business?
3    A.  She is.
4    Q.  Okay.
5        Are you a member of that clinical
6 trials business?
7    A.  I am.
8    Q.  Okay.
9        Can you tell me what form of entity
10 that is, the clinical trials business that
11 is?  Is it a corporation, is it a Limited
12 Liability Company, if you know?
13    A.  Which business?
14    Q.  The clinical trials business.
15    A.  Clinical trials.  Right now, it's
16 just a subdivision of the parent corporation,
17 Tonya Evans, Inc.
18    Q.  Okay.
19        Which is Dr. Evans' medical
20 practice?
21    A.  Correct.
22    Q.  Okay.
23        And do you have any ownership
24 interest in Dr. Evans' medical practice?

Page 21

1    A.  No.
2    Q.  Okay.
3        So, therefore, is it fair to say
4 that you have no ownership interest in the
5 clinical trials business as well?
6    A.  At present, yes.
7    Q.  At present, okay.
8        And to date; is that a fair
9 statement?
10    A.  Yes.
11    Q.  And what do you do in the context
12 of being an administrator for Dr. Evans'
13 practice?
14    A.  Day-to-day business operation,
15 contracts, negotiate contracts, put out
16 fires, you know.
17    Q.  Are you at a W-2 employee of that
18 enterprise?
19    A.  Yes.
20    Q.  Okay.
21        And do you report to anybody other
22 than Dr. Evans?
23    A.  No.
24    Q.  Okay.

6 (Pages 18 - 21)

Page 22

1        Are there any other physicians in
2    that practice?
3        A.  Not employed by that entity.
4        Q.  Okay.
5        So do you have or do you hold,
6    Mr. Hartlieb, any patents?
7        A.  No.
8        Q.  Do you -- have you ever been
9    prosecuted for anything criminal?
10           MR. MERRIGAN:  Objection.
11       But you can answer.
12           THE WITNESS:  A DUI.
13   BY MR. ROSENZWEIG:
14       Q.  Well, that would be -- so were you
15   prosecuted for a DUI?
16       A.  Yes.
17       Q.  Okay.
18       And when was that, approximately?
19       A.  25 years ago.
20       Q.  And was that the only instance of
21   such occurrence?
22       A.  Yes.
23       Q.  Okay.
24       And how was that criminal

Page 23

1    prosecution resolved?
2        A.  I did whatever requirements were
3    for school that they sent me to, et cetera,
4    et cetera, and I believe it was dismissed,
5    but I'm not positive.
6        Q.  Okay.
7        So I'm going to characterize it in
8    a way that you can either say, "yeah, that
9    sounds familiar," or, "no, it doesn't."
10       But was there some pre-trial
11   intervention program that you entered into --
12       A.  Yes.
13       Q.  -- that ultimately avoided any
14   criminal conviction on that charge?
15       A.  Yes.
16       Q.  Okay.  Thank you.
17       Mr. Hartlieb, in what litigation
18   matters have you been either a plaintiff or
19   defendant from the time of your adulthood to
20   now?
21       A.  Several.  Let's see if I can
22   remember them.
23       One was a construction defect case
24   against my home builder of the -- of my

Page 24

1    current residence, which you have on record.
2        One was a minor vehicle accident
3    where I was hit in a gas station by an SUV.
4        Q.  Okay.
5        Was that a personal injury action
6    that you instituted?
7        A.  Yes.  There have been several
8    interventions and objections, an actual
9    intervention, I believe, in the SiriusXM case
10   in state court in New York, as well as
11   federal objections, I believe, in another
12   case with regard to Sirius Satellite Radio in
13   New York Federal Court.
14       And, then, numerous objections --
15   several objections in other venues,
16   Minnesota, Georgia -- that's all I'm
17   recalling at the moment.  And, then, of
18   course, Kansas, and I believe that's it.
19       Q.  Okay.
20       So, Mr. Hartlieb, when you say --
21   and I want to use your words not mine but
22   "objections" and what else did you call it?
23       A.  Intervention.
24       Q.  "Interventions."

Page 25

1        In those instances were you a named
2    party in the lawsuit?
3        A.  No.
4        Q.  Okay.  So let me take a step back.
5        I assumed you were a named party in
6    the lawsuit against the builder for
7    construction defects?
8        A.  Correct.
9        Q.  So that it was Michael Hartlieb
10   versus Builder, correct?
11       A.  Correct.
12       Q.  Was that in California state court?
13       A.  California state court.
14       Q.  Okay.
15       And then in the personal injury
16   action where your vehicle was struck, it was
17   Michael Hartlieb versus Bad Driver X; is that
18   fair?
19       A.  Yeah.  The only caveat to that --
20   there was -- my vehicle wasn't involved.  I
21   was walking across the gas station and got
22   hit from behind.
23       Q.  Okay.
24       So you were personally struck?

7 (Pages 22 - 25)

Page 26

1    A.  That's right.
2    Q.  Thank you for that clarification.
3        And that was Michael Hartleib
4  versus Bad Driver for striking you?
5    A.  Correct.
6    Q.  Okay.
7        Also California state court?
8    A.  Yes.
9    Q.  In what other litigation, lawsuits,
10  were you a named party as opposed to an
11  intervener or an objector?
12    A.  In the construction defect case, I
13  was sued for civil harassment by the builder.
14    Q.  Is that a counterclaim in the
15  lawsuit that you filed?
16    A.  Counterclaim.
17    Q.  Okay.
18        Were you a named party in any
19  class-action lawsuit against a corporation of
20  the United States of America, meaning a
21  business incorporated somewhere in the United
22  States of America?
23        MR. MERRIGAN:  Just to be
24    clear, when you -- in the

Page 27

1    class-action context, would you
2    mean his -- he was one of the
3    plaintiffs literally named on the
4    pleadings in the caption or opted
5    into the class?
6        MR. ROSENZWEIG:  Okay.  Let me
7    clarify the question.
8  BY MR. ROSENZWEIG:
9    Q.  Mr. Hartleib, were you an actual
10  named party in any lawsuit -- in a
11  class-action lawsuit against a publicly
12  traded corporation in the United States of
13  America in any state in the union?
14    A.  I think so, yes.  But my
15  recollection is not 100-percent clear.  I
16  believe so in SiriusXM at one point.  Also, I
17  filed an action against the Federal
18  Communications Commission in relation to the
19  SiriusXM merger and action.
20    Q.  How about with respect to Sprint
21  Nextel, were you a plaintiff in any class
22  action in -- with respect to the merger
23  between Sprint and Nextel?
24    A.  Yes.  I believe that Kahn Swick --

Page 28

1  the law firm of Kahn Swick filed an action
2  whereby I was the lead plaintiff in that
3  representative suit.
4    Q.  Okay.
5        In a class-action lawsuit?
6    A.  I believe that was derivative.
7    Q.  Okay.
8        What about in a class-action
9  lawsuit, were you a plaintiff in a
10  class-action lawsuit regarding the
11  Sprint-Nextel merger?
12    A.  Honestly, I don't think so, but I
13  can't -- I don't recall 100 percent.
14    Q.  Okay.
15        As you sit here today, do you have
16  any recollection beyond what you've testified
17  about?
18    A.  Not at the moment.  Something may
19  come to me.
20    Q.  All right.
21        And focusing your attention in the
22  timeframe of 2017 and 2018, can you tell me,
23  as you sit here today, in what publicly
24  traded corporations you owned stock in your

Page 29

1  individual name, as opposed to through a
2  mutual fund, or, you know, some other broader
3  investment where you may have had an interest
4  in a company, but it was not in your
5  individual name as it was through a mutual
6  fund?  Do you understand the question?
7    A.  I do.  It's a difficult question
8  because I don't have any records in front of
9  me to determine what I owned when.  I would
10  say it was safe to say that I had a large
11  position in Sprint.  I don't know when I sold
12  or liquidated my large position in SiriusXM.
13  Those are the two large holdings that I would
14  expect that I owned during that period of
15  time.
16    Q.  Okay.
17        And by "expect" you mean, to the
18  best of your recollection, those are large
19  holdings you had in that timeframe?
20    A.  Correct.
21    Q.  Okay.  Fair enough.
22        And how do you define "large," what
23  was your holding in Sprint in or about that
24  timeframe?

8 (Pages 26 - 29)

Page 30

1    A.  I don't recall number of shares
2  or -- but they -- everything would be
3  multiple six figures on the large holdings.
4    Q.  Okay.
5    A.  Potentially, seven figures.
6    Q.  How about with respect to Sirius?
7    A.  Yes.  That was a seven-figure
8  holding -- over the course of my investment,
9  it was a seven-year -- a seven-figure holding
10  throughout a number of years.
11    Q.  Okay.
12      What was your first information,
13  Mr. Hartleib, regarding the Sprint-Nextel
14  merger happening?
15    A.  My recollection is my holding -- my
16  holdings initially were in Nextel.  Sprint
17  acquired Nextel at some point, and Nextel
18  became Sprint, if I recall correctly.
19    Q.  Okay.
20    A.  And we received Sprint shares in
21  lieu of our Nextel shares for some conversion
22  rate.  I don't remember what it was.
23    Q.  Okay.
24      Mr. Hartleib, you have used the

Page 31

1  term "we."
2      Who is "we" at that point in time?
3    A.  I was just referring to
4  shareholders in general.
5    Q.  Okay.
6    A.  Nextel shareholders.
7    Q.  So what I'm going to ask you to do
8  is refer to you, okay?
9    A.  All right, yeah.
10    Q.  If there is a "we," you can tell
11  me, you know, that in a particular instance
12  it's, you know, you and, you know, your then
13  wife, right -- and I understand that's a
14  different timeframe, right, that would be a
15  "we."
16      I'm really interested in what your
17  involvement was and your knowledge and your
18  personal, you know, information, not the
19  shareholders as general.  But if you're going
20  to refer to the shareholders as general,
21  which you are certainly welcome to do, don't
22  use the term "we," use the term
23  "shareholders."

Page 32

1    A.  Understood.
2    Q.  Thank you.
3      So is your last answer
4  appropriately modified to be that this was
5  you received -- as a Nextel shareholder
6  receiving Sprint shares upon the happening of
7  the merger transaction, and, then, therefore,
8  becoming a Sprint shareholder of the combined
9  Sprint-Nextel entity?
10    A.  Correct.
11    Q.  Okay.
12      And I didn't ask you about
13  conversion rates, but you became a Sprint
14  shareholder in that way?
15    A.  Yes.
16    Q.  Okay.
17      Did you object to the happening of
18  the Sprint-Nextel merger as a Nextel
19  shareholder in any way, shape, or form?
20    A.  Honestly, I don't recall.  My
21  recollection is that that acquisition -- I
22  don't recall.
23    Q.  Okay.
24    A.  That one, I don't recall.

Page 33

1    Q.  Were you generally in favor of this
2  merger happening as a Nextel shareholder at
3  the time?
4    A.  This is, to the best of my
5  recollection, I -- for some reason -- I don't
6  know if it's accurate, but my recollection is
7  that deal was, I think, fairly valued, but
8  I'm not positive.
9      If it wasn't, I would have been
10  involved for sure because I would be
11  protecting my interest.  But my recollection
12  is -- and this is going way back, I mean, I
13  don't know what year it was, but my
14  recollection is it was something around
15  30-some dollars a share rings a bell, but I'm
16  not positive because we're going back a long
17  time, and there has been a lot that's
18  happened from that date to this date, a lot
19  of transactions, a lot of mergers, a lot of
20  --
21      That's to the best of my
22  recollection.  I don't remember if I was --
23  if had a problem with the valuation of that
24  deal, but, for some reason, my recollection

9 (Pages 30 - 33)

Page 34

1    is that I didn't, but I could be completely
2    wrong.
3        Q.  Okay.
4            Now, when you're referring to
5    "going back a long time," is this referring
6    back to, let's say, the 2008/2009 timeframe?
7        A.  You know, Phil, honestly, I'm going
8    to have a really hard time --
9        Q.  We'll show you some documents.
10       A.  Yeah.
11       Q.  Okay.
12       A.  Without seeing documents, it's
13   going to be very difficult for me to know
14   what year we're talking about.
15       Q.  And, Mr. Hartleib, I don't want you
16   to guess.  I guess that was an instruction I
17   didn't give you.  I don't want you to guess.
18       A.  Right.
19       Q.  If you know, if you can
20   approximate, great; if not, we'll take you
21   through some documents and hopefully be able
22   to --
23       A.  That would be helpful.
24       Q.  -- help expedite things better.

Page 35

1            MR. ROSENZWEIG:  Off the
2        record for one second.
3            -  -  -
4            (Whereupon, there was a brief
5        discussion held off the record at
6        10:29 a.m.)
7            -  -  -
8            MR. ROSENZWEIG:  Back on the
9        record.
10           -  -  -
11           (Back on the record at
12       a.m.)
13           -  -  -
14   BY MR. ROSENZWEIG:
15       Q.  Mr. Hartleib, when did you first
16   learn of or become acquainted with Bruce
17   Murphy?
18       A.  I don't recall when.  I recall how,
19   if that helps.
20       Q.  Okay.
21           So did you become acquainted with
22   Bruce Murphy in the context of the
23   transaction that -- that resulted in Nextel's
24   acquisition by Sprint?

Page 36

1        A.  Yes, sometime thereafter.
2        Q.  Okay.
3        A.  Probably, a year or two thereafter.
4        Q.  And prior to that, you had no
5    dealings with Mr. Murphy?
6        A.  I don't believe so.
7        Q.  Okay.
8            And how did you become acquainted
9    with Bruce Murphy?
10       A.  I don't recall who recommended him,
11   but it was a referral from another lawyer.  I
12   was very unhappy with that merger or
13   acquisition at that time and was seeking
14   redress and someone referred or recommended
15   him to me saying, quote, "He was one of the
16   good guys."
17       Q.  Okay.
18           Who recommended Bruce Murphy to
19   you?
20       A.  I don't recall who -- which
21   attorney it was.
22       Q.  Okay.
23           And what was your understanding of
24   what was meant by, "He's one of the good

Page 37

1    guys"?
2        A.  I had an issue with at least one
3    firm or several firms for the handling of the
4    SiriusXM merger in a case regarding the
5    SiriusXM merger, and I didn't want the firms
6    that were involved in that -- I did not want
7    to reach out to any of those firms, or do
8    business with any of those firms.
9        Q.  Okay.
10           Do you know who those firms were,
11   do you recall who those firms were?
12       A.  I do, but considering we're here
13   for what I consider privileged
14   communications, I choose not to give you
15   those names at this time.
16       Q.  Okay.
17           So I don't think you have a right
18   to do that.  I can't ask you what you
19   discussed with someone who was your lawyer.
20           I believe I can ask you about which
21   firms at that time you had issue with that
22   you did not want to do business with, unless
23   Mr. Merrigan says otherwise, and then we'll
24   have a discussion.

10 (Pages 34 - 37)

Page 38

1    MR. MERRIGAN: My concern is
2 especially in the life of this
3 lawsuit and in argument -- the
4 lawsuit we're here for, and in
5 arguments and comments made in
6 filings by the plaintiff, that
7 they -- in both this lawsuit and --
8 in both allegations made in this
9 lawsuit in collateral arguments
10 made to the Court, that Plaintiffs
11 have taken the position that there
12 was a great deal of latitude in
13 what is not covered by litigation
14 privilege in regard to, for
15 example, saying something
16 defamatory about a person or
17 entity.
18    I would instruct Mr. Hartleib
19 that it's not in his interest to
20 name any individuals or entities
21 that are not parties in this
22 lawsuit in any way that could be
23 construed as defamatory.
24    He said he had problems with

Page 39

1 certain firms. I know to some
2 extent they are named in some of
3 the documents, probably some of
4 even these exhibits that we have in
5 front of us, and that is what it
6 is.
7    I'm concerned that anything he
8 testifies to today about firms and
9 individuals that are not parties to
10 this lawsuit, while I think it
11 doesn't because it's protected by
12 privilege, Plaintiffs have
13 exhibited other opinions and
14 arguments in this case and he
15 shouldn't have to open himself up
16 to having to deal with that with
17 other people and parties that are
18 in the lawsuit.
19    MR. ROSENZWEIG: So that's not
20 a legitimate basis to instruct him
21 not to answer something. I'm not
22 interested in any discussions he
23 had with them. I want to know what
24 law firms at that time he did not

Page 40

1 want to do business with because he
2 had broad problems with them. I
3 don't -- I don't know how you get
4 from my question to your colloquy.
5    MR. MERRIGAN: That specific
6 phraseology of broad problems, I'm
7 okay with Mr. Hartleib answering
8 that question to the best of his
9 recollection, but --
10    MR. ROSENZWEIG: I'm not
11 delving beyond that.
12    MR. MERRIGAN: I'm okay with
13 that.
14    THE WITNESS: So it would be
15 at the time it was Robbins Umeda &
16 Fink, which became Robbins, LLP, I
17 believe eventually. And there
18 were -- there were several others,
19 two or three others as well. So it
20 was basically the firms that were
21 involved in the SiriusXM case.
22 BY MR. ROSENZWEIG:
23    Q. Okay.
24    And what do you mean by "the

Page 41

1 SiriusXM case"?
2    A. There was a merger on the table
3 between Sirius and XM and Sirius
4 shareholders, in my opinion, were not
5 receiving a fair valuation. Not just my
6 opinion, but others. Litigation was
7 commenced. I reached out to the firms to
8 provide information that I had, which was
9 germane to their case, and the firm was
10 very -- or firms were very interested until
11 it was time to travel to the hearing, and
12 things changed. I was no longer going to
13 appear at the hearing, and, apparently, a
14 settlement had been reached.
15    Q. Was the Weiser Law Firm or Rob
16 Weiser amongst those firms or lawyers with
17 whom you had a problem at this time?
18    A. No. Not to my knowledge, no.
19    Q. Well, your knowledge is what's
20 relevant here, so --
21    A. Right.
22    Q. Yeah.
23    A. I mean, I don't know -- because I
24 know he has a relationship with some of those

11 (Pages 38 - 41)

1  firm, so I don't know if there was anything
2  that I was not privy to, but, to my
3  knowledge, he had no involvement at that time
4  in the SiriusXM matter.
5      Q.  Okay.
6          And prior to being -- is it fair to
7  say referred to Bruce Murphy?
8      A.  Yeah.  Yes.
9      Q.  -- had you ever had any dealings,
10  whatsoever, with either the Weiser Law Firm
11  or Rob Weiser?
12      A.  I don't believe so, but I'm not
13  positive because I was talking to a lot of
14  lawyers at the time.
15      Q.  Okay.
16          As you sit here today, do you have
17  any recollection of ever communicating with
18  Rob Weiser or any lawyer who represented
19  themselves to be a lawyer with the Weiser Law
20  Firm, prior to your being referred to
21  Bruce Murphy by some other lawyer?
22      A.  Honestly, I can't answer that
23  because I have some vague recollection that
24  maybe there were conversations prior to.

1  There were several times that I had
2  conversations or communications with the
3  Weiser Law Firm.
4          I didn't even -- I didn't realize
5  at one point in time that I had prior
6  communication with the Weiser Law Firm, and,
7  then, there was additional communication,
8  and, then, I realized I had had prior
9  communication with the Weiser Law Firm, but I
10  don't know what timeframe that was.
11      Q.  Okay.
12          Do you recall how you were
13  introduced to the Weiser Law Firm or by whom?
14      A.  I do not.
15      Q.  Okay.
16      A.  It could have been through
17  Bruce Murphy.  I don't -- I can't swear that
18  there was no communication, or I had not
19  communicated with Robert Weiser before
20  Bruce Murphy brought him into the Sprint
21  case.  I don't -- I have no recollection.  I
22  don't know the answer to that.
23      Q.  Okay.
24          But, as you sit here today, you

1  can't tell me an instance where you did have
2  communication with Rob Weiser or the Weiser
3  Law Firm before Bruce Murphy, to use your
4  words, brought the Weiser firm into the
5  Sprint-Nextel case?
6      A.  No, no.
7      Q.  Okay.
8          So what was your first dealing with
9  Bruce Murphy?
10      A.  I discussed my concerns that --
11          MR. MERRIGAN:  Michael, to the
12          extent that Mr. Murphy was at any
13          point serving as your legal
14          counsel, I would instruct you not
15          to reveal conversations or
16          communications you had with him.
17          If you had communications with him
18          outside of the legal counsel
19          relationship, that's fine.
20          MR. ROSENZWEIG:  Well, I think
21          he can certainly tell me what
22          brought him to communicate with
23          Bruce Murphy and about what topics.
24          MR. MERRIGAN:  I agree.  I

1          just -- I was concerned that he was
2          about to start discussing things
3          they discussed.
4  BY MR. ROSENZWEIG:
5      Q.  Well, we haven't gotten to the
6  point yet where Bruce Murphy became your
7  lawyer, right?
8      A.  Right.
9      Q.  Okay.
10          So before Bruce -- do you believe
11  that Bruce Murphy became your lawyer?
12      A.  Yes.
13      Q.  So prior to Bruce Murphy becoming
14  your lawyer, what were your first
15  communications with Mr. Murphy or someone
16  from his office, firm?
17      A.  The conversations were surrounding
18  redress or an action involving Sprint,
19  Nextel, and the loss of value that took place
20  after the merger.  My recollection is it was
21  a year or two after consummation of the
22  merger.
23      Q.  Okay.
24          And you as a shareholder of now the

12 (Pages 42 - 45)

Page 46

1 combined entity were unhappy with what was
2 going on with the value of Sprint stock of
3 the combined entity?
4     A.  Yes, that's my recollection.
5     Q.  Okay.
6         And, ultimately, did you hire
7 Mr. Murphy to represent your interests with
8 respect to the Sprint-Nextel merger fallout?
9     A.  Can you describe "hire"?
10    Q.  Sure.  Well, you know, most people,
11 I think, have a common understanding of the
12 word "hire."
13        Did you sign a retainer agreement
14 with Bruce Murphy?
15    A.  I signed a retainer.  No moneys had
16 transacted, but, yes, I signed a retainer.
17    Q.  And by "a retainer," I called it a
18 retainer agreement, fair enough?
19    A.  Fair enough.
20    Q.  Okay.
21        And was that retainer agreement
22 that you signed with Bruce Murphy with
23 respect to pursuing legal redress about the
24 Sprint-Nextel merger?

Page 47

1     A.  Yes.
2     Q.  Okay.
3         Was it specifically about a
4 derivative lawsuit in that regard?
5     A.  I don't think at that time there
6 was any definitive discussion with regard to
7 what type of action it would be.  I was
8 simply looking for redress and...
9     Q.  And Bruce Murphy was your guy --
10 you chose to hire him?
11        MR. MERRIGAN:  Objection to
12        the form.
13           But you can answer.
14           THE WITNESS:  Yes, I signed a
15        retainer with him and with Mr.
16        Weiser is my understanding.
17 BY MR. ROSENZWEIG:
18    Q.  Okay.  So we'll get to that.
19        Were you aware broadly -- I'm not
20 asking about a specific conversation with
21 Mr. Murphy, who is now your counsel, in or
22 around 2009 -- and we'll get to documents
23 that I'll show you that that's the right
24 timeframe, but were you discussing a

Page 48

1 derivative lawsuit with Mr. Murphy broadly
2 after you signed a retainer agreement with
3 him?
4     A.  Yes, at that particular point in
5 time, I believe that retainer was
6 specifically for a derivative lawsuit.
7     Q.  Okay.
8         And were you going to be joining
9 with others as derivative Plaintiffs?
10    A.  I wasn't aware of that.  I had no
11 knowledge of that.  I believe that I was the
12 only person on the draft Complaint.  As far
13 as my recollection, I was the only -- I was
14 the nominal defendant with regard...
15    Q.  Okay.
16        And you referred to a draft
17 Complaint.
18        Was that a draft Complaint prepared
19 by Mr. Murphy?
20    A.  Yes.
21        MR. MERRIGAN:  Michael, just
22        so the record is clear, you said,
23        "Defendant."
24        MR. ROSENZWEIG:  I know.

Page 49

1        MR. MERRIGAN:  I think you
2        meant Plaintiff.
3        MR. ROSENZWEIG:  Plaintiff,
4        yeah, sorry.
5        MR. MERRIGAN:  Okay.
6        MR. ROSENZWEIG:  I was getting
7        there.  Right, yeah.  Good.  Thank
8        you.
9 BY MR. ROSENZWEIG:
10    Q.  So that it was the draft Complaint
11 about which you testified was Michael
12 Hartleib as derivative plaintiff against
13 Sprint, which was the surviving entity of the
14 Sprint-Nextel merger?
15    A.  Yes.
16    Q.  In the context of your working with
17 Mr. Murphy after you signed a retainer
18 agreement with him, did Mr. Murphy introduce
19 to Mr. Weiser or the Weiser Law Firm
20 regarding the Sprint-Nextel matter?
21    A.  Yes.
22    Q.  What was your first contact with
23 Rob Weiser, not Mr. Murphy's, you?
24    A.  As I testified previously, I'm not

13 (Pages 46 - 49)

Page 50

1   certain that this was the first contact I'd
2   had with Mr. Weiser.  There may have been
3   subsequent contact prior to.  I just don't
4   recall at this point in time with.
5           With that caveat, I believe that
6   Mr. Murphy started copying Rob -- he sent an
7   email and said that he works with other firms
8   and that this is the firm that he would be
9   working with, or he would be referring this
10  case to.
11          I was copied on emails to Mr.
12  Weiser, whereby Mr. Weiser responded that he
13  looks forward to working together on this
14  matter.
15      Q.  Okay.
16          And is that -- Mr. Weiser responded
17  to whom in that email?
18      A.  I believe there were several
19  emails, and they were to Mr. Murphy.  They
20  included me.  I believe one of them was
21  addressed to me, but I don't know that for
22  certain.
23      Q.  Okay.
24          Did you actually have a verbal

Page 51

1   conversation with Mr. Weiser in or around
2   that time?
3       A.  Yes, I believe so.
4       Q.  Okay.
5           And can you tell me who initiated
6   that communication, was it by telephone?
7       A.  My recollection is after the
8   emails -- there was a telephone conversation
9   after several emails back and forth --
10      Q.  Go ahead.
11      A.  -- that I think that Mr. Murphy
12  arranged.
13      Q.  And was Mr. Murphy involved in that
14  conversation?
15      A.  I don't believe so.
16      Q.  So it was just you and Mr.
17  Weiser --
18      A.  I believe so.
19      Q.  Okay.
20          Your best recollection, right?
21      A.  My best recollection is it was just
22  Mr. Weiser and myself.
23      Q.  Okay.
24          And do you recall the timeframe of

Page 52

1   that discussion?
2       A.  I only recall that it was after
3   several emails back and forth.  It led to
4   that call, I believe.
5       Q.  All right.
6           So let me turn your attention,
7   Mr. Hartleib, to what is in this binder,
8   Exhibit-2.  It's an email chain.  As emails
9   chains tend to do, the earliest of the emails
10  is on the second page of the exhibit, and the
11  more recent is on the first page.
12          I'm going to ask you to take a look
13  at that.
14          MR. ROSENZWEIG:  We will mark
15      this as Hartleib-1, please.
16              -   -   -
17          (Whereupon, Email Dated
18      March 20th, 2009, was marked as
19      Exhibit Hartleib-1 for
20      identification.)
21              -   -   -
22          MR. ROSENZWEIG:  Okay.  Are
23      you ready?
24          THE COURT REPORTER:  Yes.

Page 53

1           MR. ROSENZWEIG:  Okay.
2   BY MR. ROSENZWEIG:
3       Q.  Mr. Hartleib, have you had a chance
4   to look at what I've marked as Hartleib-1?
5       A.  Yes.
6       Q.  Okay.
7           Starting on the second page of
8   Hartleib-1, there's a March 20th, 2009 email
9   from you to bgm@brucemurphy.biz.
10          Is that address, to the best of
11  your knowledge, for Mr. Murphy, the lawyer,
12  about whom we are speaking?
13      A.  As terrible as that address is,
14  yes, I believe so.
15      Q.  Okay.
16          And michaelhartleib@cox.net is you?
17      A.  Correct.
18      Q.  Okay.
19          And this email, again, is dated
20  March 20th, 2008, at 11:50 p.m.
21          Does that refresh your recollection
22  about what timeframe we were talking about
23  regarding your dealings with Mr. Murphy about
24  the Sprint-Nextel merger?

14 (Pages 50 - 53)

Page 54

1    A.  Yes.
2    Q.  Okay.
3         And would you agree that we are now
4    talking about the early part of 2009?
5    A.  Yes.
6    Q.  Okay.
7         Your email to Mr. Murphy of that
8    date, that I just mentioned, says, quote,
9    "Bruce, I am faxing the signed copy over
10   now."
11        Do you agree?
12   A.  Yes.
13   Q.  Okay.
14        Can you tell me to what that
15   refers?
16   A.  I believe it's the retainer.
17   Q.  The retainer agreement?
18   A.  Correct.
19   Q.  To Mr. Murphy, for Mr. Murphy?
20        MR. MERRIGAN:  What do you
21        mean by "for"?
22        MR. ROSENZWEIG:  Well,
23        Mr. Murphy's firm.  Retaining
24        Mr. Murphy's firm.

Page 55

1         THE WITNESS:  Yes.  But my
2         understanding was Mr. Weiser was
3         involved at that time.
4    BY MR. ROSENZWEIG:
5    Q.  Okay.
6    A.  So I believe I was signing a
7    retainer with -- Mr. Murphy let it be known
8    that Mr. Weiser would be handling the case,
9    so my impression was that I had retained
10   Mr. Murphy and Mr. Weiser.
11   Q.  Is that -- at that moment in time,
12   had Mr. Weiser or the Weiser Law Firm offered
13   you a retainer agreement or retention letter?
14   A.  I had thought that the retention
15   letter or what I was signing was for both
16   because he'd already made it clear that he
17   was bringing Robert Weiser in to handle the
18   case.
19   Q.  Okay.
20        The email that is carried over on
21   the second page of this two-page document,
22   but it starts Sunday, March 22nd, 2009, from
23   Bruce Murphy to you, copy to Rob Weiser --
24   A.  Mm-humm.

Page 56

1    Q.  -- that's, again, Sunday, March
2    22nd, 2009, 9:53 p.m.
3         Do you see that?
4    A.  Yes.
5    Q.  Okay.
6         And would you agree that's an email
7    from Bruce Murphy to you?
8    A.  Yes.
9    Q.  Okay.
10        5do you recall receiving this
11   email?
12   A.  Yes.
13   Q.  Okay.
14   A.  Can we go back to the prior email?
15   Q.  The March 20th?
16   A.  March 20th email.
17   Q.  Yes.
18   A.  So if you read Mr. Murphy's email
19   to me, it says, "Michael, I sent your revised
20   retention to my co-counsel, Rob Weiser, for
21   his review and comment.  We are fine with
22   your changes.  We mostly just amplified and
23   clarified the points you made.  Yes, we do
24   work 24/7.  Please review, sign, and fax."

Page 57

1         So any reasonable human being would
2    think that they were signing a retention
3    letter with Mr. Weiser and Mr. Murphy as
4    confirmed by this email.
5    Q.  Okay.
6         So, Mr. Hartleib, that email is the
7    email about which I was just asking you.
8    That's not the prior email.  That's the email
9    of March 22nd.
10        Can you look at the document, and
11   tell me that you understand that?
12   A.  Oh, I see.  Okay.
13        Yes.
14   Q.  So the email I asked you about
15   previously was the first --
16   A.  The earlier email.
17   Q.  -- the early email of the 20th --
18   A.  20th, yes.
19   Q.  -- of which Mr. Weiser was not
20   copied, correct?
21   A.  Correct.
22   Q.  And you're already telling
23   Mr. Murphy that you're faxing over a signed
24   copy to Mr. Murphy, correct?

15 (Pages 54 - 57)

Page 58

1      A.   Yes.
2      Q.   And, then, several days later, the
3   email that you just read into the record is
4   the March 22nd email on which Mr. Weiser is
5   copied, correct?
6      A.   Correct.
7      Q.   Okay.
8           Then, Monday, March 23rd,
9   Mr. Murphy writes to you again by email.
10  This is all part of Hartleib-1, copy to Rob
11  Weiser.  It's at 8:59 a.m., on March 23rd,
12  2009.
13          And he says, "Michael, can you get
14  this back to me this a.m. your time.  Bruce."
15  Correct?
16     A.   Correct.
17     Q.   Okay.
18          Mr. Hartleib, then, did you reply
19  to Mr. Murphy?
20     A.   It looks like I replied -- I mean,
21  via email, it looks like I ask him to call me
22  on the 26th, three days later.
23     Q.   Correct.  26th of March, 2009,
24  correct?

Page 59

1      A.   Correct.
2      Q.   10:29 p.m.?
3      A.   Correct.
4      Q.   And that is just from you to
5   Mr. Murphy?
6      A.   Correct.
7      Q.   All right.
8           Mr. Weiser's not copied on that
9   email --
10     A.   No.
11     Q.   -- from you?  Okay.
12          And, then, let's look at the next
13  email, which is -- and when I say "next,"
14  we're working in reverse, so the one higher
15  up on the page, March 27th, 2009, 4:33 and 59
16  seconds, from Bruce Murphy to you.
17          Do you see that?
18     A.   Mm-humm, yes.
19     Q.   And Mr. Weiser's not copied on
20  that, correct?
21     A.   Correct.
22     Q.   And it says from Bruce Murphy to
23  you, Mr. Hartleib, "Michael, I'm working on
24  something else right now.  I will try to get

Page 60

1   back with you tomorrow, or over the weekend.
2   Bruce."  Correct?
3      A.   Correct.
4      Q.   All right.
5           Then, the top email of this exhibit
6   is March 27th, 2009, at 7:21 a.m., correct?
7      A.   Correct.
8      Q.   From Mr. Weiser to Mr. Murphy?
9      A.   Yes.
10     Q.   And I'm going to read it and you
11  tell me if I've done so correctly.
12          Quote -- this is from Rob Weiser to
13  Mr. Murphy, "I think he has a potential
14  conflict in light of the other litigation
15  he's involved in, plus I don't think he would
16  make an adequate representative for Sprint."
17          Did I read that correctly?
18     A.   You did.
19     Q.   Okay.
20          And is that Mr. Weiser's writing at
21  a time when there was no signed engagement
22  letter by Rob Weiser or the Weiser Law Firm
23  with respect to representing you?
24          MR. MERRIGAN:  Objection to

Page 61

1   the form.
2           But you can answer.
3           THE WITNESS:  I don't think
4   other than their signed retention
5   with Bruce Murphy that said he
6   would be using Robert Weiser, I
7   wasn't expecting a signed retention
8   from Robert Weiser because I had
9   thought that Bruce Murphy and
10  Robert Weiser were working together
11  on the case, as outlined by several
12  emails and conversations.
13          The other thing these emails
14  are refreshing my recollection, and
15  these are your exhibits, so I would
16  have to go back and see -- I
17  believe that in between these
18  emails in that three-day lapse that
19  there was a phone call that was had
20  with Mr. Weiser, and I believe
21  during this period of time I was
22  being ghosted by counsel.
23  BY MR. ROSENZWEIG:
24     Q.   By -- who do you mean by "counsel"?

16 (Pages 58 - 61)

Page 62

1    A.  I was not getting replies from
2  Bruce Murphy or Mr. Weiser, if I recall.
3    Q.  Okay.
4        But let's dive into what you've
5  just said.
6        Is it fair that you never received
7  an engagement letter or retainer agreement
8  from Rob Weiser or the Weiser Law Firm signed
9  by them?
10    A.  Yes, that's fair.
11    Q.  Okay.
12        And is it your testimony,
13  Mr. Hartleib, that you surmised from
14  Mr. Murphy that he would be working with Mr.
15  Weiser, and that, therefore, you believed
16  that Mr. Weiser was also going to be your
17  counsel?
18    A.  Based on emails saying that he
19  looks forward to working together on this
20  case, yes, that's what I surmised.
21    Q.  Okay.
22        Let's turn your attention to what
23  is Tab 3, which I'm going to mark as
24  Hartleib-2.

Page 63

1              - - -
2        (Whereupon, Email Dated March
3        27, 2009, was marked as Exhibit
4        Hartleib-2 for identification.)
5              - - -
6  BY MR. ROSENZWEIG:
7    Q.  All right.
8        Mr. Hartleib, take a look at that
9  document.  It's one page.  I'm only going to
10  turn your attention to the very top email,
11  because we've already talked about the others
12  that are reflected lower on the chain.
13        I want to refer your attention to
14  the Friday, March 27th, 2009, 9:55 a.m.,
15  email from Bruce Murphy to you, copied to Rob
16  Weiser.
17        Do you see that?
18    A.  Mm-humm, yes.
19    Q.  Do you recall getting this email?
20    A.  Yes.
21    Q.  Okay.
22        And I'm going to read the email and
23  you tell me if I've done so accurately.
24        "Good morning, Michael.  Rob Weiser

Page 64

1  and I have conferred and thought about the
2  motion to appoint the Sprint derivative
3  action representative.  We believe you may
4  have a potential conflict in light of the
5  other litigation in which you were involved.
6        "Defense counsel can be expected to
7  you serving as the representative on the
8  grounds of advocacy; therefore, we will not
9  be able to file the Sprint derivative suit in
10  your name.
11        "We appreciate the opportunity you
12  gave us to look into this matter for you.
13  Bruce."
14        Did I read this accurately?
15    A.  Yes.
16    Q.  Okay.
17        Do you recall receiving this email?
18    A.  Yes.
19    Q.  Okay.
20        And at that point in time, which is
21  the same day of your last communication with
22  Bruce Murphy from the document I marked
23  Hartleib-1 where he tells you that -- "he,"
24  meaning Bruce Murphy, will get back to you --

Page 65

1  with you tomorrow, or over the weekend, but
2  nevertheless that same day he writes to tell
3  you that they will not be representing your
4  interests in this Sprint derivative action,
5  correct?
6    A.  That's what the email says, yes.
7    Q.  Okay.
8        And other than the plain words of
9  the email, did you have information to
10  believe otherwise?
11    A.  Yes.
12    Q.  Okay.
13        What information did you have to
14  believe otherwise?
15    A.  Telephone conversations with Mr.
16  Weiser.
17    Q.  Prior to this email of March 27th,
18  2009, at 9:55 a.m.?
19    A.  Yes.
20    Q.  Not subsequent to, correct?
21    A.  No, prior to.
22    Q.  Okay.
23        And do you believe that you spoke
24  to Mr. Weiser at some point in time in March

17 (Pages 62 - 65)

Page 66

1  of 2009, prior to the Friday, March 27th,
2  2009, 9:55 a.m., email from Bruce Murphy to
3  you?
4      A.  Yes.  I believe that somewhere
5  between the 20th, I believe it was,
6  March 20th, somewhere between the March --
7  there were three days there, I believe.
8          Let's see, March 20- -- March 20th,
9  and the 27th, there was a conversation that
10 took place between Robert Weiser and myself.
11         You asked about a conversation and
12 if Bruce Murphy was on that call.  He had
13 arranged a call with Robert Weiser in between
14 these emails, I believe.  It was after that
15 call with Robert Weiser that these emails
16 followed.
17     Q.  Okay.
18         So it was sometime in -- to the
19 best of your recollection, sometime between
20 March 20th, 2009 and March 27th of 2009, but
21 prior to the actual day of March 27th, that
22 the conversation between you and Rob Weiser
23 occurred?
24     A.  Yes, I believe so.

Page 67

1      Q.  Okay.
2          And to be clear, did you ever sign
3  any retainer agreement or engagement letter
4  with the Weiser Law Firm or with Rob Weiser
5  with respect to the Sprint-Nextel matter,
6  derivative or otherwise?
7      A.  I think I've answered that like two
8  twice so far.
9      Q.  You've answered it with respect to
10 Mr. Murphy.  I just want to establish that
11 you never signed a separate, distinct
12 engagement letter with the Weiser Law Firm or
13 Rob Weiser.
14     A.  No.
15     Q.  Did Rob Weiser or the Weiser Law
16 Firm serve as a signatory to the engagement
17 letter or retainer agreement between you and
18 Bruce Murphy?
19     A.  Define "signatory."
20     Q.  That Mr. Weiser or the Weiser firm
21 by an authorized representative physically
22 signed the retainer agreement or engagement
23 letter with Mr. Murphy.
24     A.  No, but it was acknowledged that he

Page 68

1  would be working on the case after Mr. Murphy
2  received the signed retainer from me.
3      Q.  It was acknowledged by Mr. Murphy?
4      A.  Mr. Weiser.  He wrote, "We look
5  forward to" -- "I look forward to working
6  with you on this."
7      Q.  Okay.
8          And do you think those words, which
9  you've testified about very clearly, actually
10 formed an attorney-client relationship
11 between you and Mr. Weiser?
12     A.  Yes.
13         MR. MERRIGAN:  I'm just going
14     to note an objection.
15         But you can answer.
16 BY MR. ROSENZWEIG:
17     Q.  Have you ever signed an engagement
18 letter or retainer agreement of any
19 kind directly between -- of any kind, for any
20 matter, okay, now it's a broader question, so
21 it's not the same question, with Rob Weiser
22 or the Weiser Law Firm?
23     A.  Other than the Murphy agreement
24 that was sent and the retainer agreement was

Page 69

1  amended by Rob Weiser and Bruce Murphy.
2      Q.  In writing?
3      A.  Yes.  They -- it says that they
4  worked on it, and they were okay with the
5  changes that I made to the retainer
6  agreement, because as I -- as I said
7  previously, testified previously, there were
8  certain firms that I didn't want to be
9  involved with.
10         There were stipulations put in the
11 retainer agreement with Mr. Murphy because
12 he's bringing in Mr. Weiser, and I wanted to
13 make sure that none of these firms would be
14 brought in to my case because of my past
15 dealings with them.
16         I do not think that they were
17 representing the interests of the corporation
18 or its shareholders derivatively
19 sufficiently, that the retainer agreement was
20 actually amended.  I amended the retainer
21 agreement prior to sending it back, excluding
22 those firms.
23         It was acknowledged in writing that
24 Mr. Murphy and Mr. Weiser had no problems

18 (Pages 66 - 69)

1  with it, that they just reiterated or
2  strengthened by -- I forget what the email
3  said -- changes, and that they had no
4  objection. That's -- Exhibit-2, I believe,
5  references that.
6      Q.  Yeah. Let me turn your attention
7  back to Hartleib-1, which I think is what
8  you're referring to. I want to start with
9  March 20th of 2009 again, Mr. Hartleib, an
10 email from you.
11     It's the second page of Hartleib-1
12 from you to Bruce Murphy in which you say,
13 quote, "Bruce, I am faxing the signed copy
14 over now."
15     A.  Yes.
16     Q.  Right.
17     So you signed a retainer agreement
18 or engagement letter with Mr. Murphy that you
19 transmitted to him on March 20th of 2009,
20 fair?
21     A.  Yes.
22     Q.  And, then, subsequent to that, as a
23 matter of fact, couple of days subsequent to
24 that, you then engaged in some changes with

1  respect to these firms that you found
2  offensive, or with whom you did not want to
3  work?
4      MR. MERRIGAN: Objection to
5  the form.
6      But you can answer.
7      THE WITNESS: I believe that's
8  accurate, yes. I don't remember
9  why there was a need to sign
10 another retainer, but -- I don't
11 know if it was at the request of
12 Mr. Murphy, but there was --
13 something needed to be clarified or
14 changed, if I recall.
15     And, you know, I sent your
16 revised retention letter to my
17 co-counsel, Rob Weiser.
18     What would a layperson think
19 when I'm talking about a retention
20 letter, and he's having his
21 co-counsel, Rob Weiser, review
22 changes to the retention letter?
23     I think any reasonable person
24 would assume that Robert Weiser was

1  your counsel -- his counsel as
2  well.
3  BY MR. ROSENZWEIG:
4      Q.  Until several days letter -- later,
5  Mr. Hartleib, when on Friday, March 27th,
6  Mr. Murphy informs you that Rob Weiser and he
7  had conferred and that they do not believe
8  you're an appropriate plaintiff with respect
9  to the Sprint derivative action; and,
10 therefore, that they would not be filing a
11 Sprint derivative suit in your name, correct?
12     MR. MERRIGAN: Objection in
13 that this question has been asked
14 and answered several times. You're
15 now just arguing with him because
16 you don't like the answers.
17     MR. ROSENZWEIG: No. I
18 actually quite like his answers,
19 Mr. Merrigan. You would be
20 absolutely incorrect in that
21 conclusion. I think that I'm
22 trying to get away from some of the
23 hedge language that Mr. Hartleib
24 has cleverly used.

1      I just want to make sure that
2  we're talking about the same days,
3  the same timeframe, and the
4  evolution of five days between when
5  Mr. Hartleib purports to make
6  changes to an already signed
7  engagement letter between him and
8  Mr. Murphy and the time that he's
9  told that they won't be
10 representing him.
11 BY MR. ROSENZWEIG:
12     Q.  Do you remember the question?
13     MR. MERRIGAN: I didn't finish
14 my objection. I really don't care
15 what you really think about his
16 answers, but you are asking the
17 questions in an argumentative
18 manner, which is a valid objection.
19     However, phrase it however
20 you'd like. I'm not going to
21 instruct my client not to answer.
22     MR. ROSENZWEIG: Could you
23 read back the question, if you
24 could find it after all that.

19 (Pages 70 - 73)

Page 74

1           - - -
2           (Whereupon, the court reporter
3    read back the last question:
4           "Q.   Until several days letter
5    -- later, Mr. Hartleib, when on
6    Friday, March 27th,
7    Mr. Murphy informs you that Rob
8    Weiser and he had conferred and
9    that they do not believe you're an
10   appropriate plaintiff with respect
11   to the Sprint derivative action;
12   and, therefore, that they would not
13   be filing a Sprint derivative suit
14   in your name, correct?")
15          - - -
16          MR. MERRIGAN:  I think they're
17   waiting for you to answer.
18          THE WITNESS:  I know they're
19   waiting for me to answer, but the
20   problem with these questions are --
21   or is -- there were several
22   communications via telephone in
23   between these emails.  This suits
24   their narrative, and they're

Page 75

1    leaving out facts.
2           MR. MERRIGAN:  You're free to
3    answer the question however you
4    think is appropriate.
5           THE WITNESS:  Okay.
6           MR. ROSENZWEIG:  So let me ask
7    a different question.
8    BY MR. ROSENZWEIG:
9       Q.   Okay.
10          Did you respond to Mr. Murphy by
11   email to his March 27th -- I'm talking about
12   Hartleib-2 -- to his March 27th email at
13   9:55 a.m., in which Mr. Murphy said that they
14   would not be representing you in the Sprint
15   derivative action?
16          Did you respond by saying, "Hey,
17   you're my lawyer Mr. Murphy," or "You're my
18   lawyer, Mr. Weiser, and you can't do that"?
19          MR. MERRIGAN:  Objection to
20   form.
21          But you can answer.
22          THE WITNESS:  So, yes, via
23   telephone there were several
24   conversations that happened, and I

Page 76

1    don't know what the requirements
2    are, but I was told that they -- we
3    had several conversations, and was
4    led to believe that they were still
5    considering filing with me via
6    these conversations.
7    BY MR. ROSENZWEIG:
8       Q.   Subsequent to the March 27th email?
9       A.   Subsequent to the March 22nd email.
10      Q.   27th.
11      A.   27th.  After the March 27th email,
12   there was ongoing communication with both
13   Bruce Murphy and Robert Weiser, to the best
14   of my recollection, and it was still
15   undetermined whether or not they would file
16   in my name at that time.
17      Q.   Okay.
18          Specifically, tell me what Rob
19   Weiser said to you in any of those
20   conversations subsequent to March 27th, 2009?
21      A.   The context of the conversation --
22      Q.   I'm not asking you for context.
23   I'm asking you for what he said to you.
24      A.   Without getting into the context of

Page 77

1    the actual discussion with which involved
2    other firms, it was my impression that they
3    were still considering moving forward with
4    the derivative action in my name based on our
5    conversations.  I never received a letter.
6           I always thought there was a
7    requirement that if a law firm is no longer
8    going to represent somebody, that you send
9    them a letter saying that you need to seek
10   other counsel, that we're not going to be
11   representing you from this point forward.
12   That never happened.
13      Q.   Did you receive that March 27th,
14   2009 email from Bruce Murphy, at 9:55 a.m.?
15      A.   Yes, but there was still ongoing
16   conversation after that where they were still
17   considering representing me.
18      Q.   I am going to ask you the question
19   again.  You've testified as you have.
20          Specifically, what did Rob Weiser
21   say to you in any of those conversations,
22   subsequent to March 27th, 2009, at 9:55 a.m.,
23   with regard to the Sprint-Nextel matter and
24   you?

20 (Pages 74 - 77)

1      A.   Without getting into the context,
2   that he and Bruce Murphy would discuss things
3   and they would consider what we had discussed
4   over the phone calls.
5      Q.   What was the conflict, as you
6   understood it, as to what they referred, or
7   to which Bruce Murphy referred, rather, in
8   that March 27, 2009 email?
9         Mr. Hartleib, you're looking at me.
10  You have to tell me.
11     A.   You would have to ask your client
12  because there was no conflict.  The conflict
13  had nothing to do with any other litigation
14  that I was involved in.
15     Q.   What was your understanding of the
16  conflict?
17     A.   I know what the conflict was.
18     Q.   So tell me, right now, what it was.
19     A.   The conflict is that your client
20  and firms like your client don't want a real
21  plaintiff.  Plaintiffs are a necessary
22  nuisance.  These cases are entirely lawyer
23  driven.  They don't want a plaintiff that has
24  7 figure losses in a company that's going to

1   force them to get actual reform and redress
2   and claw back actual money.  That's not what
3   they want.
4         They want a plaintiff that's going
5   to lend their name to a case, and the case is
6   entirely lawyer driven and it results in a
7   settlement like we received here.  Lipstick
8   on a pig, illusory reforms, and millions of
9   dollars in attorneys fees.
10        Unfortunately, that's what's wrong
11  with derivative litigation.  The shareholders
12  are harmed yet again.  The company has to pay
13  millions of dollars in attorneys fees for
14  something that is nearly valueless, according
15  to Judge Vano.
16     Q.   So without referencing Judge Vano,
17  is it fair to say that you personally have
18  significant material issue with the entire
19  nature of derivative shareholder litigation
20  for the reasons you've just stated?
21     A.   I believe that there needs to be
22  reform to derivative litigation.  I believe
23  that Mr. Weiser and firms like the Weiser Law
24  Firm can do a much better job, and seek real

1   reform, benefit the corporation, make their
2   money, and protect the shareholders, you
3   know, derivatively.
4         I believe that -- that much like
5   class-action litigation, the Private Security
6   Litigations Reform Act that helped rein some
7   of this in, there needs to be something
8   similar in derivative litigation to stop this
9   lawyer-driven litigation or this litigation
10  that results in no meaningful benefit for the
11  corporations or its shareholders.  Something
12  needs to be done, yes.
13     Q.   Okay.
14        So that's your belief as to why
15  Mr. Murphy and Mr. Weiser didn't want to take
16  you on as the derivative plaintiff, fair?
17     A.   I don't know why someone wouldn't
18  want a plaintiff with a very large loss who
19  has actually agreed, who is looking for
20  recompense and redress who knows all of the
21  facts of the corporation in a manner that I
22  did.
23     Q.   You were offended by the fact that
24  they didn't take you on as a plaintiff?

1      A.   No, I wasn't --
2         MR. MERRIGAN:  Objection to
3      the form.
4         But you can answer.
5         THE WITNESS:  No, I wasn't
6      offended.  I wasn't surprised, but
7      I'm not -- I wasn't offended.
8   BY MR. ROSENZWEIG:
9      Q.   So the email from Bruce Murphy that
10  we've referred to, March 27, 2009, at
11  a.m., is an email which references a
12  conflict.  Okay.
13        Did you ask Mr. Murphy what the
14  conflict was?
15     A.   I believe we discussed -- I believe
16  it had something to do with the Sirius case,
17  Sirius Satellite Radio, I believe.
18     Q.   Okay.
19        And were you a class-action
20  plaintiff in that case?
21     A.   I don't believe so.
22     Q.   Were you a derivative plaintiff in
23  that case?
24     A.   I believe I was a plaintiff in one

21 (Pages 78 - 81)

Page 82

1   case against them.
2     Q.  Were you a class action plaintiff
3   in -- against Sprint Nextel at this time,
4   meaning March of 2009?
5     A.  I don't believe so, no.
6     Q.  Okay.
7       Were you ever a class-action
8   plaintiff in Sprint Nextel?
9     A.  I don't believe so, no.
10    Q.  That's okay.
11      And how about -- I'm sorry, with
12  respect to SiriusXM, were you ever a
13  class-action plaintiff, or was it derivative
14  or both?  I'm not trying to preclude both.
15    A.  You know, you're testing my memory,
16  but I believe there was injunctive relief
17  sought in this class, so I don't recall if it
18  was a class action or derivative.
19      I believe it was a derivative, and
20  injunctive relief was sought to block the
21  merger, but I don't recall.  It was a long
22  time ago, 2004, or '5, I think, or '6.
23    Q.  Had you had communications with
24  either the Robbins law firm, to which you

Page 83

1   referred, anybody at the Robbins law firm, to
2   which you referred, about being a securities
3   class-action plaintiff with regard to Sprint
4   Nextel?
5     A.  I know that's the narrative that
6   your clients are put forth putting forth.  I
7   don't think so.  I don't believe so.
8     Q.  Did you speak with any other law
9   firm -- again, in this timeframe, so we're
10  talking 2009, with respect to being a
11  class-action plaintiff regarding the
12  Sprint-Nextel matter?
13    A.  I spoke to hundreds of law firms
14  over the course of years.  I'm sure that I
15  spoke to some firms about seeking redress for
16  what had happened to the shareholders of
17  Sprint.  They wrote down $31 billion of a
18  $33 billion merger.  It's like the worst
19  merger integration in the history of the
20  country.
21      So I was not happy because I lost a
22  lot of money.  What made it worse was the
23  executives rode off into the sunset with
24  large golden parachutes, while the

Page 84

1   shareholders were left in shambles, and the
2   corporation was left in shambles.
3     Q.  Okay.
4       Did you ever provide research or
5   data or information about Sprint Nextel to
6   any law firm or lawyer in the context of them
7   considering a class-action lawsuit against
8   Sprint and Nextel?
9     A.  I think the only person I provided
10  specific details to after inquiring or after
11  discussing it with several firms, I think
12  that's how it led to the referral to
13  Bruce Murphy.  It was discussed with another
14  firm.  They recommended Bruce Murphy, to my
15  recollection.  I provided specific details to
16  Mr. Murphy.
17      I was shocked -- I was not certain,
18  but I did research.  I was shocked to find
19  out that I had never seen a class action, was
20  not certain it hadn't happened, but I had not
21  seen a class action, nor a derivative suit
22  for the $31 billion write-down, and loss of
23  value to the shareholders at that time.
24    Q.  At that time, okay.

Page 85

1       But you can't recall specifically
2   providing data, material, insight, you know,
3   your -- I'll call it your arguments about the
4   catastrophic nature of the Sprint-Nextel
5   merger to any particular lawyer or law firm
6   with respect to a class action?
7     A.  No, I can't recall.  I can't swear
8   that that discussion never happened, but I
9   honestly don't have any recollection of that.
10    Q.  Are you aware, as you sit here
11  today, that in that timeframe there were, in
12  fact, class actions filed with respect to the
13  Sprint-Nextel merger?
14    A.  I was made aware by Mr. Murphy.
15    Q.  At that time?
16    A.  At that time.
17    Q.  Okay.
18      And let's just be clear, "at that
19  time" means in March of 2009 or thereabout?
20    A.  So, initially, when I provided the
21  information to Mr. Murphy, he would not
22  believe that the plaintiff's bar missed a
23  $31 billion write-down.  He calls me, I don't
24  know how long, two weeks later.  He'd done --

22 (Pages 82 - 85)

Page 86

1  he had some research.
2         He said, "You're right."
3         And I believe at the time I was
4  contacted he told me that Darren Robbins had
5  filed a Securities class action, a 10(b)(5)
6  case, but Mr. Murphy wanted me to be the
7  derivative representative plaintiff in which
8  I agreed.
9      Q.  Okay.
10        So --
11     A.  By the way, I have high regard for
12 Robbins Geller.  Darren Robbins is a very
13 good attorney, a very smart man, which
14 obtained meaningful relief on behalf of the
15 class in that case.
16     Q.  Did you ultimately become a
17 derivative plaintiff, as well as a direct
18 plaintiff in the SiriusXM case sometime in
19 around 2011?
20        Let me make your life easy.
21        Look at Exhibit-4 in your binder,
22 which I'm not sure I'm going to mark, but...
23     A.  (Witness complies.)
24        Yes.

Page 87

1      Q.  Okay.
2         And who was counsel who represented
3  you in that?
4      A.  Honestly, I don't recall.
5      Q.  Fair enough.
6         Could you look at the last page,
7  Page 22, of that document.  Again, I'm not
8  necessarily marking it.
9      A.  (Witness complies.)
10     Q.  Mr. Hartleib, is that your
11 signature?
12     A.  Yes.  So I guess I did it pro se.
13     Q.  Does that refresh your recollection
14 that you did it pro se?
15     A.  I was still learning then.  Yes.
16     Q.  Okay.
17        Did you -- so you had -- you've
18 testified about conversations you had with
19 Rob Weiser subsequent to the March 27th, 2009
20 email, 9:55 a.m., from Bruce Murphy, correct?
21     A.  Correct.
22     Q.  Okay.
23        And some of those conversations,
24 Mr. Hartleib, had to do with the

Page 88

1  Sprint-Nextel case?  There's a question mark
2  there.
3         Did some of those conversations
4  have to do with the Sprint-Nextel case?
5      A.  What timeframe?
6      Q.  After March 27th, 2009.
7      A.  Yes.
8      Q.  Ultimately, was there ever a point
9  in time when Mr. Weiser said in any of those
10 conversations, "Hey, yeah, we're going to
11 take you on as a derivative plaintiff
12 regarding Sprint Nextel"?
13     A.  I don't believe an acknowledgment
14 to that degree was ever conveyed.  I believe
15 it was left open-ended.
16     Q.  Is it a fair statement that, in
17 fact, Mr. Weiser and the Weiser Law Firm
18 never did, in fact, take you on as a
19 plaintiff in this Sprint-Nextel derivative
20 matter?
21        MR. MERRIGAN:  Objection.
22        But you can answer.
23        THE WITNESS:  I believe
24        that's -- they believe that's their

Page 89

1      position, yes.  I believe I had a
2      retainer with Mr. Murphy and
3      Mr. Weiser, so I was a client, but
4      I believe that your clients will
5      believe that I was not.
6  BY MR. ROSENZWEIG:
7      Q.  Was a pleading ever filed by Rob
8  Weiser or the Weiser Law Firm, in which they
9  name Michael Hartleib as a derivative
10 plaintiff in Sprint-Nextel litigation?
11     A.  No.
12     Q.  Was any filing ever made in a
13 public court context in which Rob Weiser or
14 the Weiser Law Firm represented Michael
15 Hartleib with respect to any corporation,
16 Sprint Nextel, or otherwise?
17     A.  Absolutely.
18     Q.  Okay.
19        And what would that be?
20     A.  Ross-Williams.
21     Q.  That wasn't my question.
22     A.  I'm a shareholder, and their action
23 represents my interest.
24     Q.  But you were not a named party?

23 (Pages 86 - 89)

1      A.  That's not what you asked just now.
2      Q.  I think it is.  But I'll go back
3  and ask.  It's fine.
4          Did Rob Weiser or the Weiser Law
5  Firm ever file a pleading with respect to any
6  matter, Sprint Nextel, or otherwise, in which
7  Michael Hartleib is a named party --
8      A.  I don't believe --
9      Q.  -- expressly named party?
10     A.  I don't believe so, no.
11     Q.  Okay.
12         Is it your position that because
13  the Weiser Law Firm and Rob Weiser filed an
14  action with Monica Ross-Williams as a
15  derivative plaintiff in the Sprint-Nextel
16  matter, that that action, that derivative
17  action, represented your interests and all
18  the other shareholders of Sprint's interests
19  because of its derivative nature?
20     A.  Poorly, but yes.
21     Q.  Subsequent to the conversations you
22  had with Mr. Weiser about Sprint Nextel,
23  which was subsequent to March 27th of 2009,
24  did you have further conversations with

1  Mr. Weiser about the SiriusXM case?
2      A.  Yes, I believe so.
3      Q.  And what was that context, if you
4  can recall?
5      A.  I believe we were -- we.  I was
6  looking --
7      Q.  Thank you.
8      A.  -- for -- I was looking for someone
9  to bring an action against SiriusXM, and
10  Mr. Weiser was referred by one of a myriad of
11  attorneys I had spoken with to bring forth a
12  case.
13     Q.  So okay.
14         Did you then reach out to
15  Mr. Weiser to engage in conversation about
16  SiriusXM?
17     A.  I don't know.  Mr. Weiser had
18  reached out to me on several occasions,
19  wishing me happy holidays, asking me about
20  cases that he had commenced, or was going to
21  commence.
22         So, to answer your question, I
23  don't know if I reached out to him.  I think
24  that's the recollection with regard to

1  SiriusXM, or if we were having conversations
2  about other cases or other things, and the
3  SiriusXM thing came up.
4          My recollection is that Mr. Weiser
5  was recommended to me, and I reached out to
6  him.
7      Q.  And he was not a stranger to you at
8  that time --
9      A.  No.
10     Q.  -- because of your dealings in 2009
11  with Mr. Murphy and regarding Sprint Nextel?
12     A.  Correct.
13     Q.  Okay.
14         So let me turn your attention to
15  Exhibit-5, which I am going to March as
16  Hartleib-3.
17              -  -  -
18         (Whereupon, Email Dated June
19         2, 2011, was marked as Exhibit
20         Hartleib-3 for identification.)
21              -  -  -
22  BY MR. ROSENZWEIG:
23     Q.  Mr. Hartleib, it's a three-page
24  document, although it is interesting at the

1  bottom that two of the pages are labeled one,
2  so there's a Page 1, a Page 1, and a Page 2.
3          At the top, as part of a previous
4  filing, it's 2, 3, and 4, but it is a
5  three-page document in the exhibit binder
6  that I am calling Hartleib-3 for the purposes
7  of the deposition.
8          Do you see that?
9      A.  Yes.
10     Q.  And can you take a look at all
11  three pages, please.  They're relatively
12  short.
13     A.  (Witness complies.)
14     Q.  Okay?
15     A.  Yes.
16     Q.  We're going to start on Page 1 and
17  the bottom of Page 1.
18         MR. MERRIGAN:  Which page?
19         MR. ROSENZWEIG:  The first
20     Page 1.  If you'd like, we can do
21     Page 2 of 4 at the top.
22  BY MR. ROSENZWEIG:
23     Q.  And I'd like you to look at the
24  bottom email from Mr. Weiser to you,

24 (Pages 90 - 93)

Page 94

1  Mr. Hartleib, June 1st, 2011, 1:59 a.m.,
2  okay?
3      A.  Yes.
4      Q.  That simply says, "Subject
5  delivered email check."  And it says, "Your
6  message was delivered to recipient."
7          Do you know what that is?
8      A.  No.
9      Q.  Okay.
10         Above it is an email from you to
11 Mr. Weiser, June 2nd, 2011, 6:59 p.m.  The
12 subject is, "My Sirius Case."
13         Do you see that?
14     A.  Yes.
15     Q.  Okay.
16         Is that an email you sent to
17 Mr. Weiser on that date?
18     A.  Yes.
19     Q.  And the email says, and I quote,
20 "Rob, give me a call so that we can talk
21 about your thoughts on my case, as well as
22 the settlement in the antitrust suit.  I did
23 make multiple demands on the board."
24         Did I read that correctly?

Page 95

1      A.  Yes.
2      Q.  Okay.
3          Mr. Hartleib, what antitrust suit
4  are you referring to -- or let me fix the
5  grammar of that.
6          To what antitrust suit do you
7  refer?
8      A.  I'm thinking.  I don't recall what
9  antitrust suit.  I'm sure if there are
10 documents, it will refresh my recollection.
11         But an overview is that there was a
12 provision from the FCC, the Federal
13 Communications Commission, with regard to the
14 licensing mandate for both Sirius and XM
15 Satellite Radio.  There were to be no
16 exclusive OEM deals.
17         They were to have an
18 interoperability man- -- there was an
19 interoperability mandate, meaning if one
20 system went down, the other provider would
21 have to provide coverage or service to the --
22 their competitor.
23         The antitrust suit would have been
24 addressing these issues.  Consumers were

Page 96

1  harmed in a myriad of ways by all the
2  exclusive content deals and exclusive OEM
3  deals the two companies engaged in, in
4  violation of their licensing mandate by the
5  FCC.
6          So, for example, the holiday season
7  comes along, people NASCAR fans.  They spend
8  millions of dollar for radios to get XM,
9  because the XM has the exclusive contract for
10 NASCAR.
11         Come to find out, January 3rd or
12 4th, they lost the contract so all of those
13 folks that brought those -- that hardware for
14 their relatives that were NASCAR fans, they
15 were all useless to them.
16         The mandate was to prevent things
17 like that from happening.  So the antitrust
18 suit would have encompassed al of those
19 things, and Sirius and XM's willful violation
20 of their licensing mandate from the Federal
21 Communications Commission.
22     Q.  Thank you for that.
23         So to make it simple:  The
24 antitrust suit, to which you refer,

Page 97

1  specifically relates to SiriusXM?
2      A.  I believe so, yes.
3      Q.  Okay.
4          And, then, in this email, you ask
5  Rob to give you a call, and you talk about
6  your thoughts on -- I'm quoting you -- "your
7  thoughts on my case."
8          What do you mean by "my case"?
9      A.  I'm assuming it has to do with the
10 prior exhibit we looked at whereby I filed a
11 pro se derivative/direct action against
12 SiriusXM.
13     Q.  And let's just, once again,
14 establish for the record that that's
15 Exhibit-4 in my binder.  I'm not marking
16 this.  But that is a document, which you
17 identified as having been filed pro se by
18 you, and there is a statement stamp on the
19 first page that says, "New York County
20 Clerk's Office, March 8, 2011."
21         Okay?  Am I correct in that?
22     A.  Yes.
23     Q.  And it's assigned Case Number
24 650606/11, which means 2011.

25 (Pages 94 - 97)

Page 98

1    A.  Yes.
2    Q.  Did I read that correctly?
3    A.  Yes.
4    Q.  Okay.
5        And that is the suit to which
6  you've just referred, right?
7    A.  I believe so, yes.
8    Q.  Okay.  Got it.
9        Why did you want to talk to
10  Mr. Weiser about that case that you filed pro
11  se?
12    A.  Because I needed help.
13    Q.  You were seeking his professional
14  input or to explore whether he was interested
15  in giving you professional input?
16    A.  Yeah, probably both, to see if he
17  was interested in a case of his own, getting
18  involved, his advice, yes, probably all of
19  the above.
20    Q.  Okay.
21        Mr. Hartleib, I'm going to now
22  refer you to the third page of this exhibit,
23  which I've marked as Hartleib-3, and it's the
24  one that at the top says, "Page 4 of 4."

Page 99

1        MR. MERRIGAN:  Five, Tab 5.
2        MR. ROSENZWEIG:  Tab 5.
3  BY MR. ROSENZWEIG:
4    Q.  If you have any confusion about
5  tabs, we'll go to tabs.  But I have marked
6  this as Hartleib-3 for the purposes of this
7  deposition.
8    A.  I'm sorry, which page are you on?
9  BY MR. ROSENZWEIG:
10    Q.  The third page, which is Page 4 of
11  4 at the top, okay?
12    A.  Got it.
13    Q.  It's Monday, June 20th, 4:48 p.m.,
14  from you to Rob Weiser.  You say, "Rob, when
15  are you available?"
16        Is this a follow-up email to your
17  email to Mr. Weiser of June 2nd?
18    A.  I don't know that for sure.  Like I
19  said, Rob and I have talked over the years
20  about his cases, my cases, other cases.  I
21  don't know for sure.
22    Q.  The subject line says, "Re:
23  Delivered," "Re: Delivered," that's Re, R-E,
24  colon, Delivered, R-E colon Delivered, "My

Page 100

1  Sirius Case."
2    A.  I see that.  I don't know what it
3  means.
4    Q.  Okay.
5        Then let's look at Page 3 of 4,
6  which is the middle of the pages of --
7        MR. MERRIGAN:  Same tab.
8  BY MR. ROSENZWEIG:
9    Q.  -- Hartleib-3.  Right, that same
10  tab.
11    A.  (Witness complies.)
12    Q.  This is an email from you to Rob
13  Weiser, June 21st, 2011 3:03 a.m., quote,
14  "Rob, that works.  Old merger case withdrawn,
15  converted to an individual claim, and then
16  dismissed.  This was after they offered me
17  700K to go away.  The case I sent you is
18  pending.  Yes, they were proper.  Here is one
19  of the older demands made."
20        Do you see that?
21    A.  Yes.
22    Q.  Okay.
23        And did you send that email to Rob
24  Weiser?

Page 101

1    A.  Yes.
2    Q.  What -- to what do you refer when
3  you say, quote, "old merger case withdrawn"?
4    A.  That was a case that was filed by
5  Robbins Umeda & Fink in state court in New
6  York.
7    Q.  Regarding SiriusXM?
8    A.  Regarding SiriusXM.
9    Q.  What does converted to an
10  individual claim mean?  What did you mean?
11  Those are your words.
12    A.  This was the case that I testified
13  to earlier with regard to Robbins Umeda &
14  Fink whereby I had reached out to them
15  because they had filed a case.  As I
16  testified, I did not remember if it was a
17  derivative or a class action, but there was
18  injunctive relief sought to block said case.
19        We had several communications.
20  They said, "We really want to talk to you.
21  When can you meet us at our offices?"
22        Subsequent to that, while I was
23  trying to make arrangements with them and
24  attend a hearing that was forthcoming for

26 (Pages 98 - 101)

Page 102

1  injunctive relief, I did not receive any
2  phone calls in return.
3        I found out from Defense counsel
4  that a settlement had been reached in that
5  case, and they were no longer looking to
6  enjoin the merger. I decided that I was
7  going to object to the settlement.
8        The reference to the $700,000 was I
9  received a phone call from an attorney to my
10  attorney at the time -- I had local counsel
11  in New York. There was a conference call that
12  whereby they offered me $700,000 to withdraw
13  my objection. I turned it down. I felt as
14  though it would be selling out the class. It
15  was turned down.
16        Prior to -- I also found out that
17  the plaintiff in that case was the college
18  roommate of an attorney, Jeffrey P. Fink, who
19  didn't own a single share of stock. He
20  lacked standing, and he's representing my
21  seven-figure losses in the company.
22        I actually intervened in this case.
23  I did not file an objection. I intervened in
24  that case, informed the judge as to what had

Page 103

1  transpired, and the Robbins Umeda & Fink firm
2  withdrew their Complaint, but prior to doing
3  so they converted it from a representative
4  suit, a class action, to an individual action
5  and then dismissed it the next day.
6        I did not understand what that
7  meant, why they did it at the time, but it's
8  my understanding the reason that they did it
9  is because on the docket now it looked as
10  though it was an individual case, and it
11  would make it much more difficult for me to
12  go after them for malpractice because the
13  case was no longer a representative suit.
14        But I don't know that for sure.
15  This is just my opinion.
16    Q. Okay.
17        So this all refers to SiriusXM.
18    A. Yes.
19    Q. And subsequent to all of that,
20  which you've just described, you, pro se,
21  filed the action, which we've identified, you
22  know, by your own hand against SiriusXM?
23    A. Yes.
24    Q. Okay.

Page 104

1        And so in this 2011 timeframe, you
2  were still in communication with Mr. Weiser,
3  and in that context about his interest in
4  getting involved in some way in your already
5  filed pro se action?
6    A. Or filing an action of his own,
7  yes.
8    Q. Okay.
9        I'm going to turn your attention to
10  Tab 6, and I'm going to mark the documents in
11  Tab 6 as Hartleib-4.
12                -  -  -
13        (Whereupon, Email Dated August
14        31, 2011, was marked as Exhibit
15        Hartleib-4 for identification.)
16                -  -  -
17        MR. MERRIGAN: I want to make
18  sure, Phil, this is just one page?
19        MR. ROSENZWEIG: It's just one
20  page.
21        MR. MERRIGAN: Okay. You said
22  document, so I wanted to make sure
23  I wasn't missing something.
24        MR. ROSENZWEIG: Did I say it

Page 105

1  with an "S"?
2        MR. MERRIGAN: Yeah. That's
3  fine. I just wanted to make sure
4  we're on the -- we had everything.
5        MR. ROSENZWEIG: Yeah, one
6  page.
7  BY MR. ROSENZWEIG:
8    Q. Okay.
9        Do you see that, Mr. Hartleib?
10    A. Yes.
11    Q. The first of the emails, the bottom
12  one, is from you to Rob Weiser with a copy to
13  David Sacks.
14        Do you see that?
15    A. Yes.
16    Q. Who's David Sacks?
17    A. A friend of mine.
18    Q. Why did you copy him on this email?
19    A. I don't know why. I mean, he's
20  copied on several correspondence. I mean,
21  he's just a good friend, and we run things by
22  each other.
23    Q. Is he a lawyer?
24    A. No, but he's very bright.

27 (Pages 102 - 105)

1  Q. Is he -- what is his profession?
2  A. He's actually in the entertainment
3  industry.
4  Q. Okay.
5  And where does he live, in what
6  state?
7  A. California.
8  Q. Has he been involved in any
9  litigation with you in any way, as either a
10  co-plaintiff, or as co-party?
11  A. No, but he's had many discussions
12  with Robert Weiser and about entertainment
13  projects and different things to that degree.
14  Q. Okay.
15  Nothing to do with litigation?
16  A. He's had discussions with Rob
17  regarding litigation as well. Nothing that
18  he's personally involved in.
19  Q. Okay.
20  Discussions to which you were a
21  party?
22  A. Yes.
23  Q. So you have had phone calls with
24  Mr. Sacks and Rob Weiser and you?

1  A. Yes.
2  Q. Okay.
3  In this timeframe?
4  A. Yes.
5  Q. So August of 2011-ish?
6  A. I don't know specific dates, but,
7  yes.
8  Q. In this August 31st, 2011 email
9  from you to Rob Weiser with a copy to
10  David Sacks, you say, quote, "Rob, we need to
11  talk about you coming in on my Sirius state
12  case. This federal case was taken from my
13  case, which was filed first. Kahn Swick with
14  work with us as I am providing all of the
15  research. Call me ASAP."
16  Did I read that correctly?
17  A. Yes.
18  Q. Okay.
19  Your first sentence says, "Rob, we
20  need to talk about" -- is the "we" you and
21  rob?
22  A. Right.
23  Q. Does it involve David Sacks?
24  A. No.

1  Q. Okay.
2  Was David Sacks involved in your
3  Sirius state case?
4  A. No.
5  Q. Can you tell me specifically
6  regarding this email why you copied
7  Mr. Sacks?
8  A. No.
9  Q. No, you -- because you don't know?
10  A. No, I don't know why.
11  Q. Okay.
12  A. I think that David found all of
13  this very interesting from just an
14  entertainment perspective, just very
15  interesting in general, as to what was
16  transpiring.
17  Q. Okay.
18  And Mr. Weiser responds
19  August 31st, 2011, "I can't tonight. I have
20  a dinner meeting." Correct?
21  A. Yes.
22  Q. Did you ever have a conversation
23  with Mr. Weiser about the Sirius state case?
24  A. Many.

1  Q. Okay.
2  Did Mr. Weiser ever agree to
3  represent you or your interest in that case?
4  A. No, not to my knowledge, but -- not
5  to my knowledge.
6  Q. Okay.
7  I'd like to turn your attention to
8  7 -- it's Tab 7.
9  MR. ROSENZWEIG: I'm going to
10  mark it as Hartleib-5.
11  - - -
12  (Whereupon, Email Dated
13  February 16, 2012, was marked as
14  Exhibit Hartleib-5 for
15  identification.)
16  - - -
17  BY MR. ROSENZWEIG:
18  Q. It is a one-page document --
19  A. Yes.
20  Q. -- an email from you, Mr. Hartleib,
21  to Rob Weiser, again, copied to
22  David Sacks --
23  A. Yes.
24  Q. -- February 16, 2012, 1:40:08 p.m.

Page 110

1    EST, correct?
2        A.  Yes.
3        Q.  And you say to Mr. Weiser, quote,
4    "Rob, are you going to do business together or
5    what?  You never called us back after we
6    tried to six times to reach you.  David and I
7    need to make some money, so that we can buy
8    you a new phone!"
9        Okay.  Do you see that?
10       A.  Yes.
11       Q.  Did I read it accurately?
12       A.  Yes.
13       Q.  Okay.
14       Tell me, Mr. Hartleib, what you
15   meant by, "Are we going to do some business
16   together, or what?"
17       A.  Okay.
18       It's going to be a long answer.
19       Q.  Answer the question, please.
20       A.  So having uncovered the problems
21   with derivative litigation, and after I
22   uncovered the fact that Jeffrey Fink was
23   using a college roommate that lacks standing,
24   that didn't own a single share of stock to

Page 111

1    represent my seven-figure loss, I realized
2    there was something wrong or broken with the
3    system.
4        I thought that having real
5    Plaintiffs that have lost substantial sums of
6    money would be better representatives of the
7    corporation, seek real redress, real reform,
8    and I couldn't understand why firms used
9    non-qualified Plaintiffs or Plaintiffs with
10   ten shares of stock or things such as that.
11       I had thought at the time that with
12   my network and people that I know that have
13   large investments, that there could be a
14   business model to put real Plaintiffs with
15   substantial holdings in connection with law
16   firms in representative cases.  These things
17   were discussed with Rob and others.
18       Unfortunately, it wasn't determined
19   until several years later that that isn't
20   necessarily in all parties' best interests.
21   I -- we have now something that I call a race
22   to the bottom.  We have firms that get a
23   reputation for providing the broadest breadth
24   indemnification for the executives that have

Page 112

1    harmed the corporation for the least amount
2    of money.
3        In that scenario, Defense counsel
4    is somewhat complicit in the problems with
5    regard to derivative litigation whereby they
6    seek these firms, they don't object to these
7    firms becoming lead plaintiff or lead firms
8    in these derivative actions because they have
9    a reputation to settle for nothing more than
10   a illusory reforms or near illusory reforms
11   for nothing more than attorney fees.
12       So, for example, $31 billion in
13   losses and write-downs in Sprint.  If
14   those -- that DNO insurer can get out of a
15   case and extinguish $31 billion in liability
16   for several million dollars in attorneys
17   fees, that's a win for the carrier, that's a
18   win for Defense counsel, that's a win for the
19   executives, that's a win for Plaintiff's
20   counsel.  The only parties that lose with are
21   the corporation and its shareholders
22   derivatively.
23       This is at the time when I was
24   learning about the whole system, what was

Page 113

1    wrong with the system, and thinking of ways
2    that the system could be reformed and fix
3    some of the shortcomings within the system
4    itself.
5        Q.  And your view in this timeframe, as
6    you're thinking about those issues, is that
7    Rob Weiser and the Weiser Law Firm is still
8    a -- or are still, respectively, a lawyer and
9    law firm with whom you would like to do
10   business?
11       A.  Yes.
12       Q.  And is that because, to your
13   understanding at the time, Rob Weiser and the
14   Weiser Law Firm had a high reputation for
15   being not only very good at what they did but
16   having high ethical standards?
17       MR. MERRIGAN:  Objection to
18       the form.
19       But you can answer.
20       THE WITNESS:  I don't know
21       that I knew all of that.  I just
22       knew that we had a good rapport
23       with Rob Weiser.  He seemed smart.
24       He seemed like he was one of the

29 (Pages 110 - 113)

Page 114

1    good guys. He got it. He agreed
2    with our concerns.
3        Look, you have to understand,
4    as a shareholder who's lost
5    tremendous amounts of money, I want
6    to be made whole, right. I want
7    other shareholders to be made
8    whole.
9        You see my attempt to file a
10    derivative, in one of the exhibits,
11    a derivative/direct action.
12        I didn't even understand in
13    the beginning that I couldn't be
14    made whole, like, it's not a good
15    situation for investors that lose a
16    lot of money. A derivative goes
17    become to the corporation, you get
18    pennies on the dollar reflected in
19    your share price, right?
20        A direct action is nearly
21    impossible. You can't file a
22    direct action because your damages
23    are the same as all the other
24    shareholders, so it has to be a

Page 115

1    class action, et cetera, et cetera.
2        This was all during the period
3    of time when I was naive, green,
4    and still learning.
5    BY MR. ROSENZWEIG:
6    Q. And you didn't have an
7    understanding or have since developed an
8    understanding that a class action is the
9    mechanism through which shareholders can
10    theoretically obtain the loss of value of
11    their shares as a result of the bad acts of
12    whomever?
13    A. Yes, but you know that's not
14    possible because you get pennies on the
15    dollar.
16    Q. But that is the means by which, the
17    mechanism by which actual damages are sought,
18    as opposed to a derivative action which seeks
19    corporate reform and governance changes and
20    other protective measures from the board of
21    said corporation.
22    A. Not entirely true. You can seek
23    monetary damages as well with regard to
24    derivative. If the executive stole, you

Page 116

1    know, $400 million from the corporation, you
2    can go after those executives, claw back that
3    money, that money goes back into the corp
4    coffer, shareholders benefit because the
5    shareholders benefit because the money goes
6    back into the corporate coffers.
7    Q. Right.
8        But that's for an affirmative bad
9    act of an officer or a director, as opposed
10    to a bad deal that results in massive
11    shareholder diminution of value, correct?
12    A. Yes.
13    Q. Okay.
14        Let's look at D-8, could we,
15    please, also a one-page document, which I'm
16    going to mark as Hartleib-6.
17    A. (Witness complies.)
18        - - -
19        (Whereupon, Email Dated May
20        24, 2016, was marked as Exhibit
21        Hartleib-6 for identification.)
22        - - -
23    BY MR. ROSENZWEIG:
24    Q. By the way, just as an aside, as

Page 117

1    we're talking about Mr. Sacks, have you ever
2    worked for Mr. Sacks?
3    A. No.
4    Q. Have you ever worked for a company
5    that is owned by Mr. Sacks?
6    A. No.
7    Q. Is Mr. Sacks involved in the Avance
8    clinical trials business?
9    A. Yes.
10    Q. In what capacity?
11    A. As a consultant.
12    Q. Paid by Avance for --
13    A. No.
14    Q. Not paid?
15    A. No.
16    Q. Is he an officer or director of
17    Avance?
18    A. No.
19    Q. And does he have an ownership
20    interest in Avance?
21    A. No.
22    Q. Okay.
23        Did you introduce Mr. Sacks to
24    Mr. --

30 (Pages 114 - 117)

Page 118

1    A.  I believe so, yes.
2    Q.  Okay.
3        Let's look at Hartleib-6, if you
4    could.  It's a one-page document.
5    A.  (Witness complies.)
6    Q.  Are you there?  It's Tab 8.
7    A.  Right.  I'm here.
8    Q.  Okay.
9        Just take a look at this to quickly
10   acquaint yourself with it.
11   A.  (Witness reviews document.)
12   Q.  Okay?
13   A.  Yes.
14   Q.  An email from you, Mr. Hartleib, to
15   Rob Weiser, copied to Mr. Sacks, May 24th,
16   2016, 2:55 a.m., right?
17   A.  Yes.
18   Q.  Quote, "Rob, are you going to lose
19   either" -- I'm sorry, strike that.  I'll read
20   it more capably.
21       Quote, "Rob, you are going to lose
22   either with the Honorable Vano or on appeal!
23   You must not have thought that anyone would
24   read these proposed, 'reforms' or that anyone

Page 119

1    would take a hard look at the standing issue.
2    You really should have been more diligent."
3        Can you tell me the context in
4    which you sent that email?  You seem to be
5    struggling.
6    A.  I'm not struggling.  I mean, the
7    context is pretty clear.  I'm not happy with
8    the reforms, and I don't think a proper job
9    was done.
10   Q.  Okay.
11       But it doesn't refer to the matter.
12       So does this email relate to the
13   Sprint-Nextel case?
14   A.  Yes.
15   Q.  Okay.
16       And why did you copy David Sacks on
17   this email?
18   A.  No reason.  I just -- he's -- like
19   I said, he's a very smart guy.  I keep him
20   apprised of some of the things that I'm
21   doing.
22   Q.  Okay.
23       MR. MERRIGAN:  Now would be a
24       good time to take a brief restroom

Page 120

1    break?
2        MR. ROSENZWEIG:  Sure.  By all
3    means.
4            -  -  -
5        (Whereupon, there was a brief
6    recess held off the record at
7    p.m.)
8            -  -  -
9        (Back on the record
10   p.m.)
11           -  -  -
12   BY MR. ROSENZWEIG:
13   Q.  While you're having communications
14   with Rob Weiser, subsequent to March 27th of
15   2009, which is that email from Bruce Murphy
16   to you, and all the way up through, let's
17   say, 2012 or 2013 where I've shown you
18   emails, certainly through 2012, did you
19   discuss cases other than SiriusXM with
20   Rob Weiser?
21   A.  I believe so, yes.
22   Q.  Okay.
23       And what was your intention in
24   discussing those cases with him?

Page 121

1    A.  To see if he was interested in
2    filing.  Like there are a lot of times where
3    I see injustice, or I have a grievance with
4    the corporation, or they aren't doing
5    something properly, consumers are being
6    harmed, shareholders are being harmed, and I
7    believe something should be done about it.
8    Q.  Okay.
9        And did Rob Weiser or the Weiser
10   Law Firm ever take you up on any of these
11   possible cases, and represent your interests
12   with respect to them?
13   A.  I don't know, because I don't know
14   all the cases that he's filed.  I know that
15   he's filed several cases, Sprint being one
16   that I brought to his attention.  I know that
17   there were others as well.  Are you asking me
18   if he ever filed a case, in which I was the
19   plaintiff or the representative?
20   Q.  That was my next question.  So, no.
21       But you've -- have you finished
22   answering?
23   A.  Yes.
24   Q.  Okay.

31 (Pages 118 - 121)

Page 122

1    Did Rob Weiser or the Weiser Law
2   Firm ever sign an engagement letter with you
3   or a retainer agreement, with respect to any
4   class action or derivative shareholders
5   litigation in which they were going to
6   represent you as a named party in this case?
7    A.  No, I don't believe so.
8    Q.  Okay.
9    Did the Weiser Law Firm decline any
10   request that you made to represent you in
11   your individual capacity, with respect to any
12   litigation from the time of the March 27th,
13   2009 email from Bruce Murphy all the way
14   through, let's say, 2016?
15    A.  Well, clearly Sprint.
16    Q.  Any others?
17    A.  Not that I'm aware, no.  I mean, do
18   you want to rephrase the question?
19    Q.  Well, I asked the question that I
20   wanted you to answer.  I think you've
21   answered it.
22    A.  Okay.
23    Q.  Okay.
24    Did you ever engage in any business

Page 123

1   transaction with the Weiser Law Firm or
2   Rob Weiser at any point in time, other than
3   what you've testified about your belief with
4   Mr. Murphy regarding Sprint Nextel?
5    A.  No.
6    Q.  Did you ever engage in any legal
7   representation by the Weiser Law Firm or
8   Rob Weiser, other than what you've already
9   testified about regarding Mr. Murphy and
10   Sprint Nextel?
11    A.  By "legal representation," you mean
12   any kind of formal pleading, or -- is that
13   what you're saying?
14    Q.  Did the Weiser Law Firm or
15   Rob Weiser ever represent you in a named
16   individual capacity regarding any matter,
17   whatsoever, for as long as time has existed,
18   other than your assertion with respect to
19   Mr. Murphy and Sprint Nextel?
20    A.  No.
21    Q.  Did you discuss with Rob Weiser in
22   any phone conversation or -- well, let me
23   strike that.
24    Have you ever met Rob Weiser in

Page 124

1   person, other than at his deposition several
2   months ago?
3    A.  Yes.
4    Q.  And when did you meet Rob Weiser in
5   person?
6    A.  I believe it was at the Equifax
7   hearing.
8    Q.  In court?
9    A.  In court.
10    Q.  Do you recall approximately when
11   that was?
12    A.  No, but it will be in the
13   pleadings.
14    Q.  Okay.
15    Other than that instance, had you
16   ever meet Mr. Weiser in person?
17    A.  No.
18    Q.  All conversations, therefore, with
19   Mr. Weiser were by telephone?
20    A.  Yes.
21    Q.  Other than whatever communication
22   you may have had with him in court in a
23   hearing with Equifax.
24    A.  The conversation with Mr. Weiser in

Page 125

1   the Equifax was not part of the hearing.  It
2   was outside in the lobby area.  I introduced
3   myself.  It's the first time that I had met
4   him in person.
5    Q.  And the only time you had met him
6   in person until he was deposed in the context
7   of this case a few months ago?
8    A.  Yes.
9    Q.  Okay.
10    So whenever we're referring to
11   conversations, unless you specifically are
12   telling me that it was in the hallway outside
13   of the Equifax hearing, would have been by
14   telephone between you and Mr. Weiser, fair?
15    A.  Correct.
16    Q.  Okay.
17    So did you ever have a phone
18   conversation with Mr. Weiser in which you
19   proposed a business arrangement where he --
20   he or the Weiser Law Firm would retain your
21   services as a referral source for either
22   class actions or derivative shareholder
23   claims?
24    A.  I don't know that we ever got that

32 (Pages 122 - 125)

Page 126

1  nuanced or that specific.  But I previously
2  testified to the problems with derivative
3  litigation and had suggested that there's got
4  to be a better way to do things.  So we
5  talked about that situation.  We talked about
6  legislative reform.  He knew my concerns.
7      Rob was a big proponent stating
8  that my concerns may take legislative reform,
9  something that I testified to earlier,
10  something, I think, needs to be done.
11      I don't know that we ever got that
12  nuanced to having a deal on the table, per
13  se, but we did talk about a service that
14  could be -- a company or a service that could
15  be enabled or put together that would put
16  investors with large losses together with law
17  firms.
18      Q.  Okay.
19      And that you would be involved in
20  such an endeavor?
21      A.  Yeah, I didn't have a problem.  I
22  would be involved in that.
23      Q.  And that you would expect some kind
24  of compensation for your role in that?

Page 127

1      A.  Yeah.  We never got to that, but
2  yes.
3      Q.  Okay.
4      Did you ever communicate with Rob
5  that you had an expectation of a certain
6  amount of money on a monthly basis?
7      A.  No.
8      Q.  Did you ever discuss with
9  Rob Weiser -- and, again, we're talking about
10  these phone conversations over the course of
11  time --
12      A.  Right.
13      Q.  -- which, you know, we could say
14  began or may have began in March of 2009,
15  and, now, I'm taking you up to -- you know,
16  up to 2016, let's say, did you ever make a
17  request of Mr. Weiser or the Weiser Law Firm
18  for a specific amount of money as a monthly
19  retainer for your services?
20      A.  No.
21      Q.  And did you ever discuss with
22  Mr. Weiser what your expectations would be if
23  you were working with the Weiser Law Firm and
24  Mr. Weiser regarding -- I'll call it broadly

Page 128

1  a consultancy in the -- with the construct
2  that you yourself described earlier?
3      A.  Right.  There were several -- there
4  were many discussions about the problems with
5  derivative litigation as a whole, and why is
6  it this way.  Like I said, it wasn't until
7  later that I found out that nobody really
8  wants to fix it because everybody benefits,
9  except the corporation and the shareholders.
10      I don't -- I know that your client
11  has thrown numbers around and suggested that
12  I made certain statements and certain things.
13  I have no recollection of any -- any
14  definitive numbers or any kind of detailed
15  discussions that even got to that point.
16      We couldn't even get past -- you
17  know, my concern was that whatever would have
18  to be done has to be completely ethical,
19  especially given my ongoing crusade to expose
20  what I consider to be fraud, and that's rife
21  throughout derivative litigation, whereby
22  what I experienced in the Sirius case with a
23  plaintiff representing my interest that
24  didn't even own the stock.

Page 129

1      This seems to be a common theme
2  throughout the plaintiff's bar with regard to
3  derivative litigation.
4      Q.  And that plaintiff who didn't even
5  own stock was represented by what firm?
6      A.  Robbins Umeda & Fink.
7      Q.  Okay.
8      And not the Weiser firm?
9      A.  No.
10      Q.  Okay.
11      So can you recall any other terms
12  or conditions or aspects of a construct that
13  you and Rob Weiser discussed regarding a
14  potential business relationship between you
15  and either Mr. Weiser or the Weiser Law Firm?
16      A.  No.  The only thing that I recall
17  is that Rob said that he was going to -- he
18  was going to take the ideas or suggestions,
19  and run them by an ethics attorney to make
20  sure that anything being proposed because it
21  was my concern, especially given this whole
22  paid plaintiff scenario, that whatever is
23  done has to be ethical and proper.
24      Like I said, early on, before I

33 (Pages 126 - 129)

Page 130

1  even knew what a derivative lawsuit was, I
2  didn't know that I couldn't be made whole in
3  a case where I lost a substantial amount of
4  money. There's no vehicle for a shareholder
5  to be made whole, you know, once he's loss a
6  tremendous amount of money from the
7  malfeasance of officers and directors.
8        I didn't even realize that until
9  years or -- you know, until I educated myself
10 more, I didn't even realize that that was how
11 things worked.
12     Q.  At some point in time,
13 Mr. Hartleib, you were no longer interested
14 in Mr. Weiser or the Weiser Law Firm
15 representing your interests as a named party
16 in derivative actions; is that fair?
17     A.  Up until what point?
18     Q.  So up -- let's say you were
19 interested in pursuing some kind of a
20 business and/or legal relationship with Rob
21 Weiser or the Weiser Law Firm from March of
22 2009 through just before the Sprint
23 derivative settlement; is that fair?
24     A.  Yeah, I guess that would be a fair

Page 131

1  statement. I don't know the timelines that
2  those discussions happened. There were
3  several. I don't recall the dates that those
4  discussions happened.
5        I would say up until the point of
6  the settlement in Sprint where I was
7  disappointed with the settlement, I didn't
8  have any issues up until, I guess, that
9  point.
10     Q.  And at the time of the
11 Sprint-Nextel derivative named plaintiff was
12 Monica Ross-Williams, correct?
13     A.  Correct.
14     Q.  And did you come to understand that
15 she was, in fact, a shareholder of Sprint?
16     A.  I believe through depositions and
17 such it was determined that she was a
18 shareholder, although I think it was a very
19 nominal number of shares. I don't know that
20 for sure. I never saw a trading statement.
21 I never saw --
22        When I was asked to sign the
23 retainer with Bruce Murphy and your client,
24 one of the things that they wanted was all of

Page 132

1  my trading statements to verify my holdings.
2  I've never seen those from Ross-Williams.
3     Q.  Okay.
4        Nor necessarily would you, correct?
5     A.  You would think I would in
6  depositions and through discovery, but I
7  didn't.
8     Q.  Okay.
9        Well, do you know if you ever asked
10 to see them?
11     A.  I don't know. I don't know.
12     Q.  Okay.
13        And Monica Ross-Williams herself
14 was deposed in this case, was she not?
15     A.  Yes.
16     Q.  Okay.
17        By your counsel?
18     A.  Yes.
19     Q.  Okay.
20        So it was at or around the point in
21 time that the Sprint-Nextel settlement was
22 proffered, that you became upset with the
23 nature and scope of that proposed settlement;
24 is that fair?

Page 133

1     A.  Yes.
2     Q.  And what was the nature of your
3  unhappiness with that proposed settlement?
4     A.  Short version or long version?
5     Q.  Whatever version you want to give
6  me that answers my question.
7     A.  Well, so I previously testified to
8  a write-down of 31 billion of a $33 billion
9  deal. Executives walked away with hundreds
10 of millions, I think, combined, over a
11 hundred million dollars in golden parachutes.
12        Mr. Forsee had the audacity after
13 driving the company into the ground, former
14 CEO of Sprint, to appoint himself
15 co-two-position executive. He fired the CFO,
16 appointed himself CFO, as well as being CEO,
17 right before he was removed from the board
18 without cause, and received two golden
19 parachutes not one. Outrageous.
20        The case that was filed was a very
21 good case. I helped provide the information
22 for that case. That case was to claw back
23 millions of dollars from the executives for
24 their malfeasance and damage to the company.

34 (Pages 130 - 133)

Page 134

1    For whatever reason, your client
2  decided to jettison all of those valid
3  claims, and settle for what is tantamount to
4  lipstick on a pig.  Corporate governance
5  reform is really meaningless.
6    Judge Vano even acknowledged that
7  it was nearly meaningless, but he was wrong
8  with the part that he thought gave some value
9  to shareholders because it wasn't even the
10  same corporation.  It was owned by SoftBank.
11  So the settlement was entirely meaningless,
12  and did nothing for the shareholders,
13  whatsoever, absolutely nothing.
14    It's unfortunate because there were
15  very valid claims in that suit that I would
16  have loved to have seen moneys clawed back
17  from the executives.  That was the intent of
18  this suit, amongst others, was to claw back
19  money from the executives.
20    I was disappointed with the
21  settlement, because it did nothing to help
22  redress the damage to the corporation or its
23  shareholders derivatively.
24    Q.  Okay.

Page 135

1    And what you just described to me,
2  was that the basis on which you attacked the
3  settlement?
4    MR. MERRIGAN:  Object to form.
5    But you can answer.
6    THE WITNESS:  Yes.  Yes.  Yes.
7    Amongst other things, yes.
8  BY MR. ROSENZWEIG:
9    Q.  And what were the other things?
10    A.  I thought that in derivative
11  litigation attorneys fees have to be
12  commensurate with the relief obtained.  The
13  relief obtained was, like I said,
14  meaningless, in my opinion.  In Judge Vano's
15  opinion, it was 99 percent meaningless, I
16  believe he testified to or ruled to.
17    The other issue that I had were the
18  attorneys fees.  I felt as though the fees
19  were not commensurate with the relief
20  obtained.  I didn't understand how someone
21  could review documents, millions of
22  documents, which lead to no discovery,
23  additional discovery, not a single deposition
24  was taken.

Page 136

1    I didn't understand how just merely
2  looking at the documents provided any relief
3  in billing for that document review, provided
4  any relief to the corporation.
5    So it was the benefits of the
6  settlement, which I deemed meaningless to the
7  corporation, and the size of the attorney fee
8  request, which I believe disproportionate to
9  the relief obtained -- to be disproportionate
10  to the relief obtained.
11    Q.  In gross numbers, meaning, just in
12  the overall numbers themselves?
13    A.  The case was stayed for like the
14  entire duration.  The pendency of the case,
15  it was stayed.  How do you run up a
16  $4.5 million bill on a stayed case.
17    Q.  So it was your belief that during a
18  case being stayed that discovery document
19  review legal work is not performed?
20    MR. MERRIGAN:  Objection.
21    But you can answer.
22    THE WITNESS:  It's my
23  understanding this in this case an
24  agreement was reached with Defense

Page 137

1  counsel to allow discovery from the
2  Robbins Geller firm in the
3  class-action case to share said
4  discovery with the firms, including
5  your client's firm, in the
6  derivative litigation.
7    It's my understanding the
8  agreement was reached to allow
9  review of that discovery to
10  continue during the pendency of the
11  stay.  I don't know for sure,
12  but that's my understanding.
13  BY MR. ROSENZWEIG:
14    Q.  Okay.
15    Which means that millions of
16  documents were being reviewed during the
17  pendency of the stay?
18    A.  Yes.
19    Q.  Okay.
20    A.  But led to no additional discovery
21  or no new information.  Not a single
22  deposition.
23    Q.  I understand that's the rest of
24  your answer, but that, in fact, millions of

35 (Pages 134 - 137)

Page 138

1  documents were reviewed during the pendency
2  of the stay, so that legal time and resources
3  of lawyers and document reviewers, and what
4  have you, was spent in that timeframe?
5      A.  Yes, but, unfortunately, you don't
6  get a bill for that if it's not commensurate
7  with the relief obtained in the settlement.
8      Q.  Okay.
9          Well, is that your overall view,
10  your overall personal view, or is that based
11  upon --
12      A.  The law.
13      Q.  Okay.
14          So your -- that's your opinion of
15  the law?
16      A.  I think it's Judge Vano, and I
17  think it's the opinion of -- I think it's --
18      Q.  There are lots and lots and lots of
19  derivative cases across the country where
20  things are approved, and lots of other cases
21  where judges write opinions.  I'm not asking
22  you to be the collective resource for all of
23  that, but, you know, you're also not a
24  lawyer, correct?

Page 139

1      A.  No.
2      Q.  Okay.
3      A.  I mean, yes, I'm not a lawyer.
4      Q.  Fair enough.
5          In the context of the Sprint
6  derivative litigation, did you contact Monica
7  Ross-Williams?
8      A.  Yes.
9      Q.  What was the purpose for you
10  contacting Monica Ross-Williams?
11      A.  To find out who's representing my
12  interest, as well as the interest of the
13  corporation.
14      Q.  Well, how would Monica
15  Ross-Williams be able to tell you that?
16      A.  She's the plaintiff.
17      Q.  What does that have to do with your
18  interests?
19      A.  She's representing my interest,
20  albeit derivatively.
21      Q.  She is a named plaintiff being
22  represented by counsel, correct?
23      A.  She's a representative plaintiff.
24  That's her duty and her job.

Page 140

1      Q.  And you thought it appropriate to
2  contact her directly?
3      A.  So did the Courts.
4      Q.  Okay.
5          And, well, that's your opinion of
6  what the Court said.  But what --
7          MR. MERRIGAN:  Objection.
8  BY MR. ROSENZWEIG:
9      Q.  What did you discuss -- did you
10  call Monica Ross-Williams?
11      A.  Yes.
12      Q.  And what did you discuss with
13  Monica Ross-Williams?
14      A.  Her case.
15      Q.  In Sprint Nextel?
16      A.  Yes.
17      Q.  What did you specifically ask her?
18      A.  If she had seen Judge Vano's
19  ruling.
20      Q.  Okay.
21          And did she respond to you?
22      A.  Yes.
23      Q.  What did she say?
24      A.  "Who are you?"

Page 141

1      Q.  Okay.
2          And how about this, rather than me
3  taking you through every back and forth, can
4  you tell me what you said to
5  Monica Ross-Williams and what she said back
6  to you in the context of that conversation?
7  Was it a single conversation?
8      A.  Yes.
9      Q.  Okay.
10          So in the context of that single
11  conversation, can you relate to me what you
12  said and what she said?
13      A.  So I obtained her number by doing a
14  Google search.  I reached out.  She answered
15  right away.  She was, I believe, three hours
16  ahead, so it was in the evening.
17          I introduced myself as Michael
18  Hartleib.  I told her that I was a large
19  shareholder in Sprint, and had concerns about
20  what was happening in her case.
21          She was wholly uninformed.  She had
22  no knowledge of Judge Vano's scathing ruling,
23  either ruling.  She was not aware that an
24  appeal had been filed on her behalf.  She

36 (Pages 138 - 141)

Page 142

1  continued to refer to herself as the
2  defendant.  I know that I did that mistakenly
3  as well, but I explained to her that, no, she
4  was actually the plaintiff.
5       She said that I should be talking
6  to her lawyers.
7       I said that I would, but I believe
8  that they were entire corrupt in this case.
9       Q.  Okay.
10      And did you say the words "corrupt"
11  to her?
12      A.  I did.  She said, that's my
13  opinion.
14      And I said, "No, actually, it's
15  Judge Vano's opinion."
16      Q.  Okay.
17      Where in Judge Vano's opinion did
18  he say that the lawyers were corrupt?
19      A.  Several places.  He said that there
20  was nothing believable or credible about any
21  of the veracity of any of their billing.
22      Q.  Where did Judge Vano say they were
23  corrupt?
24      A.  I just told you.

Page 143

1       Q.  Okay.
2       Did Judge Vano use the word,
3  "corrupt"?
4       A.  I don't recall if he used the word,
5  "corrupt," but the fact of the matter is he
6  affirmed that there was nothing credible or
7  believable with any of their billing.
8       Q.  Okay.
9       And "corrupt" is your word and your
10  characterization of what occurred?
11      A.  I think I have a good faith basis
12  for coming to that conclusion.  In fact, it
13  was affirmed fraud had taken place by the
14  appellate court.
15      The chief justice said,
16  "Mr. Hartleib, we can all agree that fraud
17  has taken place in this case, at least with
18  regard to the billing."
19      So I don't know what else one would
20  need to determine that there were corrupt
21  actions going on in the case.
22      Q.  Let's go back to
23  Monica Ross-Williams, and tell me
24  specifically what you said and specifically

Page 144

1  what she said.
2       A.  Well, I'm going from recollection.
3       Q.  I understand.
4       A.  And, then, I believe she said that
5  that's my opinion.
6       And I said, "No, ma'am, it's
7  Judge Vano's opinion.  Have you seen his
8  ruling?"
9       She said, "No."
10      I said, "I will be happy to send it
11  to you," whereby she provided an email
12  address that wasn't listed online, which I
13  sent her the two rulings from Judge Vano,
14  which, I believe, she received the following
15  day because it was after 12, midnight, by the
16  time that email -- I was able to get those
17  emails out, so it would have been
18  o'clock my final, but it was already
19  12:00 o'clock her time.
20      Q.  Okay.
21      Did you have further conversation
22  with her in that regard?
23      A.  That was the only conversation that
24  I had with her.

Page 145

1       Q.  Okay.
2       And that's the material you sent to
3  her?
4       A.  Yes.
5       Q.  Okay.
6       And what was your purpose, again,
7  in communicating with her?
8       A.  To find out her involvement in the
9  case, which was very little, if any, at all.
10  She was completely uninformed, and she was
11  not a proper representative for any
12  representative suit.  She didn't know what
13  she was doing.  She knew nothing about the
14  case.
15      Q.  Okay.
16      That's your opinion?
17      A.  Well, it will be the jury's opinion
18  when they hear her testimony and her
19  deposition.
20      Q.  Okay.
21      To the extent that that's relevant
22  to what gets tried, okay, fine.
23      Mr. Hartleib, did she ask you not
24  to call her again?

37 (Pages 142 - 145)

Page 146

1    A.  Yes.
2    Q.  And did she direct any further
3  inquiry to her counsel?
4    A.  I believe so, yes.
5    Q.  Okay.
6        And just so I'm clear, she was the
7  derivative plaintiff against Sprint Nextel
8  acting on behalf of the corporation?
9    A.  Yes, and its shareholders albeit
10  derivatively.  She's a representative
11  plaintiff.  She should not be adverse to
12  speaking to another shareholder, especially
13  one with seven-figure holdings.
14    Q.  But she was, in fact, adverse to
15  that -- having that discussion?
16    A.  Well, I will refrain from going
17  into the reasons why I think she was adverse
18  to having that conversation.
19    Q.  Okay.
20        So those would be your speculative
21  opinions, correct?
22    A.  That would be correct.
23    Q.  Okay.
24        So we won't pursue that in the

Page 147

1  context of this deposition.
2        Let me ask you:  I'm trying to --
3        MR. ROSENZWEIG:  Let's go off
4    the record for two minutes.
5            -  -  -
6        (Whereupon, there was a brief
7    recess held off the record
8    p.m.)
9            -  -  -
10        (Back on the record at
11    p.m.)
12            -  -  -
13  BY MR. ROSENZWEIG:
14    Q.  Mr. Hartleib, in the Amended
15  Complaint, the operative Complaint against
16  you in this matter, there's reference made to
17  a defined term of the 2016 Sprint Derivative
18  Settlement.
19        Can we agree, just for language
20  purposes to make my questions go easily, that
21  that was the proposed settlement to which you
22  objected in the Sprint-Nextel derivative
23  case, the proposed 2016 -- it was a 2016
24  proposed settlement; is that fair?

Page 148

1    A.  You're saying that's the draft that
2  I objected to?
3    Q.  That was the settlement proposal
4  put to the Court that you objected to.
5    A.  Okay.  I don't know if there were
6  any revised settlements submitted, so I'll
7  just take your word for it.
8    Q.  Well, I just want to --
9        MR. MERRIGAN:  He's just using
10    it for means for vocabulary
11    purposes.
12        MR. ROSENZWEIG:  Right.
13  BY MR. ROSENZWEIG:
14    Q.  Look, there's a record, right?
15    A.  Yeah, that's fine.  Yeah, sure.
16    Q.  That is what it is, right?
17    A.  Right.
18    Q.  Right.
19        When the -- when that 2016 Sprint
20  derivative settlement was slated for an
21  approval hearing on/or about May 20th of
22  2016, did you appear, you know, in Judge
23  Vano's courtroom to object to that proposed
24  settlement?

Page 149

1    A.  At the fairness hearing?  Yes.
2    Q.  Okay.
3        And did you speak to Rob Weiser
4  prior to appearing at that hearing about --
5  about the 2016 Sprint derivative proposed
6  settlement?
7    A.  I think that there were some email
8  correspondence, and we might have spoken.  I
9  don't recall for sure, but I seem to
10  remember, yes.
11    Q.  Did you convey to him why you were
12  unhappy with the proposed 2016 Sprint
13  derivative settlement?
14    A.  I mean, I don't have any
15  recollection, but I sure -- I'm sure that I
16  would have.
17    Q.  Okay.
18        And do you have any reason to
19  disagree with the motion that it was a
20  May 20th, 2016 fairness hearing?
21    A.  I don't have any documents in front
22  of me, but if you say that's the date.
23    Q.  I believe that's the date.
24    A.  Yeah.

38 (Pages 146 - 149)

Page 150

1    Q.  Does that sound --
2    A.  Yeah.
3    Q.  -- approximately correct?
4    A.  Sure.
5    Q.  Okay.
6        And do you recall what Mr. Weiser
7  said to you with respect to your stated
8  unhappiness to him?
9    A.  No.
10   Q.  Let me turn your attention to Tab
11  9, what I'm going to mark as Hartleib-7.
12              -   -   -
13       (Whereupon, Email Dated May
14       31, 2016, was marked as Exhibit
15       Hartleib-7 for identification.)
16              -   -   -
17  BY MR. ROSENZWEIG:
18   Q.  I'm going to ask to you to take a
19  look at that one-page document.
20   A.  (Witness reviews document.)
21   Q.  Do you see that, Mr. Hartleib?
22   A.  Yes.
23   Q.  Okay.
24       This is an email from you to Rob

Page 151

1  Weiser, a copy to Mr. Sacks, May 31, 2016,
2  5:57 p.m.  The reference is, "Call regarding
3  current and forthcoming case."  It says,
4  quote, "Rob, let me know when you are
5  available to discuss the current case and any
6  forthcoming derivative on the tax issues.  I
7  would like to see the old board held
8  accountable."
9    A.  Yes.
10   Q.  Do you know to what you're
11  referring?
12   A.  Yes.
13   Q.  Please tell me.
14   A.  Well, I'll do the best, to my
15  ability to recall.
16   Q.  To the best of your recollection.
17   A.  So, obviously, the current case was
18  the Ross-Williams, et al, case.  I think
19  there were seven or eight cases all
20  consolidated into one, if I'm not mistaken.
21  I think your client's firm took kind of the
22  lead role in those consolidated cases.
23       The forthcoming derivative was
24  another issue by the incompetent former board

Page 152

1  and executives, whereby they didn't pay their
2  state sales tax in New York, and I wanted,
3  again, the board to be held accountable
4  because I believe millions of dollars in
5  fines -- tens of millions of dollars in
6  fines, if I recall, were paid out in -- in
7  resolving that case.
8    Q.  Okay.
9        And you were still interested in
10  what Mr. Weiser had to say about that tax
11  issue?
12   A.  Sure.
13   Q.  Even though you were objecting to
14  the underlying 2016 Sprint derivative
15  settlement?
16   A.  Well, Phil, if he had a real
17  plaintiff in the case, we could actually do
18  some good for the corporation.  I was still
19  hopeful that we could still do something to
20  benefit the corporation.
21   Q.  Okay.
22       And what did you want to discuss
23  with respect to the, quote, "current case"
24  that you reference in your email.

Page 153

1    A.  I don't recall at that -- I mean, I
2  don't recall.
3    Q.  Okay.
4        Were you interested or did you
5  express any interest in kind of negotiating
6  surrounding your objection?
7    A.  I don't recall.
8    Q.  Did you make any of offer of any
9  kind to withdraw your objection, subject to
10  any terms or conditions?
11   A.  Well, I know your client is
12  alleging that those conversations took place.
13  I don't know if he proposed a resolution to
14  my objection.  I don't know.  But there could
15  have been discussions about resolving the
16  objection from your client.
17       I know that he sent an email asking
18  me to resolve the ongoing Sprint issues, as
19  well as the Equifax Amicus brief.  I don't
20  know what timeframe we're speaking of, like I
21  don't know when that happened.  I'd have to
22  look at the documents for the Equifax case.
23   Q.  Okay.
24       So I'm looking at this email, you

39 (Pages 150 - 153)

Page 154

1    know, that I've marked as Hartleib-7 --
2        A.  Right.
3        Q.  -- so that's the timeframe I'm
4    talking about.
5        A.  I don't recall.
6        Q.  Okay.
7            Let me turn your attention to what
8    I'm going to mark as Hartleib-8, which is
9    Tab 10.
10           -    -    -
11           (Whereupon, Email Dated June
12       28, 2016, was marked as Exhibit
13       Hartleib-8 for identification.)
14           -    -    -
15   BY MR. ROSENZWEIG:
16       Q.  Mr. Hartleib, it's also a one-page
17   document.
18           Are you there?
19       A.  Yes.
20       Q.  Okay.
21           It's a June 28, 2016 email,
22   p.m., from you to Rob Weiser, copy to David
23   Sacks, copy to Scott Musoff at Skadden.
24           Who is Scott Musoff at Skadden.

Page 155

1        A.  He's one of the defense attorneys
2    in the Sprint case.
3        Q.  Okay.
4            Can you tell me why you're copying
5    David Sacks on this?
6        A.  Like I said, I keep him apprised of
7    some of my -- some of my dealings.
8        Q.  Okay.
9        A.  I don't know why, in particular, he
10   was -- you can see it's his entertainment
11   email address.
12       Q.  Okay.
13           So the subject, quote, "Please
14   provide PDF of response in support of fees,"
15   right?
16       A.  Yes.
17       Q.  Okay.
18           And you say, "Robert, please supply
19   me with the documents in support of your fees
20   filed yesterday, as I have said before I do
21   not need conformed copies.  PDF copies of
22   what was submitted will be fine.  I will
23   notify the clerk if I don't get them today.
24   Also, your delay will provide me yet another

Page 156

1    reason to appeal is the Honorable Vano
2    approves the settlement.  Thank you,
3    Michael."
4            MR. MERRIGAN:  I'm sorry.
5            MR. ROSENZWEIG:  Hmm?
6            MR. MERRIGAN:  Sorry, I
7        accidentally made a noise.
8    BY MR. ROSENZWEIG:
9        Q.  Did I read that correctly?
10       A.  Well, you read it correctly, but,
11   clearly, I didn't type it correctly because I
12   believe that "is" was supposed to be an "if."
13       Q.  Okay.  So noted.
14           But I did read it correctly, that
15   it says "is"?
16       A.  Yes, you did.
17       Q.  Okay.
18           And you asked for documents in
19   support of the Weiser firm fee application.
20           What documents were you looking
21   for?
22       A.  Well, so what was happening is they
23   were filing statements in support of their
24   fees, affidavits in support of their fees.  I

Page 157

1    believe that a Judge Lane Phillips filed an
2    affidavit in support of their fees.  So all
3    of these things were being filed.
4            If my recollection serves me
5    correctly, I was supposed to attend to
6    fairness hearing, and I don't know if -- at
7    this particular time, if my objection was
8    already in, or if I was filing another
9    pleading, I don't recall.
10           The problem was your clients would
11   not provide me with the documentation filed,
12   until they received it back from the Court as
13   conformed, stamped, and it was causing me a
14   delay.  I was running out of time to get done
15   whatever it is that I was trying to get done.
16           I don't know if it was a
17   supplemental brief in opposition to the fees.
18   I don't recall as to what it was in regard
19   to, but I specifically remember that I was
20   pressed for time, I was trying to get
21   something done, and I didn't need the
22   conformed copies.  I just needed copies, so
23   that I could draft my response pleading
24   accordingly.

40 (Pages 154 - 157)

Page 158

1    Q.  Okay.
2        And what -- what diligence -- what
3  had you done, you personally, with respect to
4  investigating the fee application and the
5  fees that were claimed in that fee
6  application in the Sprint-Nextel case at this
7  time, meaning -- I'm sorry, "this time,"
8  meaning 2016, at the time more or less of
9  this email, not "this time" meaning now?
10    A.  Are you asking me what was the
11  basis of my objection, or what did I base my
12  objection on at this particular time?
13    Q.  What work had you done to determine
14  that the fees were objectionable and the
15  bases on which you were objecting?
16    A.  Right.  I don't recall specifically
17  how much -- you know, I know that I've done a
18  tremendous amount of research, and I think at
19  this particular point in time I had analyzed
20  the settlement stipulation and the terms of
21  the settlement with regard to the relief.
22        And I realized that, in my opinion,
23  the relief was meaningless because the
24  company was being acquired -- it was acquired

Page 159

1  by SoftBank Corporation.  So I based the
2  objection on the fact that the fees sought
3  were not commensurate with the relief
4  obtained in my view.
5        As an overview, I can't tell you
6  specifically.  I know I spent a lot of time
7  on it.  I wanted to read all the pleadings.
8  I had read every single pleading multiple
9  times.  That's why I wanted copies of these
10  pleadings, so that I could read these if I
11  was --
12        I believe I was working on a
13  supplemental brief that was delivered the day
14  I appeared at the hearing.  It was handed to
15  them.  It was filed the night before the --
16  Judge Vano received it the night before, and
17  it was handed to the parties the day of my
18  attendance.
19    Q.  Okay.
20        And is this before any knowledge
21  with respect to the bar status of Jeff Silow
22  was known to you?
23    A.  Oh, yes.
24    Q.  So this was purely based on your

Page 160

1  view of the amount of fees in relationship to
2  the relief?
3    A.  Correct.  I don't know what other
4  analysis, given their pleadings that I put
5  into my conclusion, but in a nutshell, a
6  vague overview, yes, I'd say that's correct.
7    Q.  Okay.
8        At what point in time in the
9  context of the Sprint-Nextel settlement --
10  2016 settlement process of the proposed 2016
11  settlement put before Judge Vano, did you
12  learn of the issue of Jeff Silow's identity
13  and/or bar status?
14        MR. MERRIGAN:  It's always
15      hard to figure out what to call it,
16      right?
17        MR. ROSENZWEIG:  It is.
18        THE WITNESS:  When?  Is what
19      you're asking?
20  BY MR. ROSENZWEIG:
21    Q.  Yeah.  When -- give me when and
22  how, frankly.
23    A.  So I was told by someone -- I don't
24  recall who, that Jeffrey Silow was an older

Page 161

1  gentleman, or that the Silow that was in this
2  case was an older gentleman.  I've never met
3  him.  They don't appear in court at the
4  hearings, so it's hard to know what who
5  you're talking about.
6        I had done a lot of research trying
7  to determine who he was because I could not
8  find anyone barred in Pennsylvania that was
9  not a younger gentleman.  I could not find
10  someone that's an older gentleman with that
11  name barred in Pennsylvania.
12    Q.  And you were looking at that issue
13  why?
14    A.  Because I had concerns about the
15  veracity and legitimacy of all hours
16  billed -- he billed the majority of the
17  hours, and I was just doing my due diligence
18  looking at every different angle.
19        Someone had -- someone had put in
20  my ear that he was an older gentleman, so
21  someone raised my awareness -- I don't know
22  who -- that caused me to look into him
23  further.
24        I had reached out, so it wasn't

41 (Pages 158 - 161)

1  until we went to appeal after both of
2  Judge Vano's rulings.  So it wasn't until we
3  went to appeal that this information was
4  uncovered.
5      I had reached out to Ted Frank at
6  the Class Action Fairness Center.  I knew Ted
7  from my appearances in this SiriusXM case in
8  Manhattan, and his work there.  I had reached
9  out to Ted Frank, asking him if he would be
10 interested in helping me file an appeal in
11 the Sirius -- I'm sorry, the Sprint case.
12     He said, no, he didn't like my
13 argument with regard to standing because
14 Kansas was an outlier state with regard to
15 standing.
16     I don't remember if it was that
17 conversation or a subsequent conversation
18 after he declined to help me with the appeal,
19 whereby he said, "But I have some information
20 that may be of help to you."
21     That information was regarding
22 Jeffrey Silow.
23 Q.  Okay.
24     And this came from whom?

1  A.  Ted Frank, Class Action Fairness
2  Center.
3  Q.  Okay.
4  A.  And Ted Frank basically informed me
5  that he didn't believe that Jeffrey Silow was
6  barred.  I believe that's how it happened.
7  Q.  And is this -- what's the timeframe
8  of that?
9  A.  Right before the appeals were
10 filed, so I don't know.  We'd have to look at
11 the documents.
12 Q.  Okay.
13     So I'm going to show you a couple
14 of letters, which I'm going to mark both
15 letters, collectively, as Hartleib-9.  It's
16 Tab 11.
17         -  -  -
18     (Whereupon, Letter to Judge
19     Vano, was marked as Exhibit
20     Hartleib-9 for identification.)
21         -  -  -
22 BY MR. ROSENZWEIG:
23 Q.  I'm going to ask you to take a look
24 at these letters, and, then, I'm going to

1  have some questions for you.
2  A.  (Witness reviews documents.)
3  Q.  Okay.
4      Mr. Hartleib, have you had a look?
5  A.  Yes.
6  Q.  Okay.
7      Can you tell me whether this
8  conversation you had with Mr. Frank was
9  before or -- and I'll acknowledge to you that
10 the letter to Judge Vano, which is the first
11 of the two letters, is not dated.
12     However, the second paragraph of
13 that letter says, "As of February 2, 2017,
14 the firm learned..."
15     And then the second letter is
16 February -- dated to Mr. Douglas Shima,
17 S-H-I-M-A, is dated February 6th, 2017.
18     I'll refer to both letters as being
19 from early in February 2017; is that fair?
20 A.  Yes.
21 Q.  Can you tell me whether you learned
22 from Mr. Frank about Silow's bar status
23 before or after these letters from the Weiser
24 Firm to Judge Vano and to the Kansas court?

1  A.  Before.
2  Q.  Okay.
3      Do you know how long before?
4  A.  No, I don't recall as to how long
5  before.
6  Q.  Okay.
7      And do you -- is it correct that
8  you did not raise the issue of bar status to
9  Judge -- strike that.
10     Did you raise the issue of bar
11 status to Judge Vano prior to the Weiser Law
12 Firm's letter to him, which is now marked as
13 Hartleib-9?
14 A.  No, because Ted Frank informed him
15 of the information, and your clients got out
16 in front of it by drafting the letters.
17 Q.  Okay.
18     So the simple answer is that you
19 did not have prior communication with the
20 Court regarding Jeff Silow's bar status prior
21 to the letters that are marked as Hartleib-9?
22 A.  I don't know that for sure.  I know
23 that I was told by Ted Frank days prior to
24 these letters, maybe weeks prior, I don't

42 (Pages 162 - 165)

Page 166

1  know.  I don't know when I spoke with Ted
2  Frank, and he informed me of the information
3  that he uncovered.
4      Q.  Okay.
5          It was -- would you be comfortable
6  saying it was contemporaneous with these
7  letters, if it was before, it was shortly
8  before?
9      A.  It depends on what your definition
10 of "shortly before" is.
11     Q.  Well, you tell me.
12     A.  I would say it was within a month.
13 I don't know if it was two weeks, three
14 weeks.  It was within a month or two.
15     Q.  Okay.
16         And is it your understanding that
17 Mr. Frank also similarly informed the Weiser
18 firm?
19     A.  I was told that Mr. Weiser was
20 already made aware.  Before I could address
21 the issue, Mr. Weiser was informed by
22 Mr. Frank.
23     Q.  Okay.
24         And you were told that by

Page 167

1  Mr. Frank?
2      A.  I believe so, yes.
3      Q.  Okay.
4          And, Mr. Hartleib, when you learned
5  that from Mr. Frank -- strike that.
6          Did you subsequently become privy
7  to the fact that these letters were sent by
8  the Weiser firm to both Judge Vano and to
9  Mr. Shima?
10     A.  Of course.  They have to serve me.
11 I was served these letters.
12     Q.  Okay.
13         And why were you served these
14 letters?
15     A.  Because I was a party to the
16 actions or the appeal.
17     Q.  By way of your objection?
18     A.  No.  I mean, I'm -- I was the
19 appellant.  I filed the appeal of the
20 settlement.
21     Q.  You filed an objection to the
22 settlement, correct?
23     A.  No, I filed an appeal.  Your
24 clients filed a cross appeal.

Page 168

1      Q.  Okay.
2      A.  So I had to be served as the
3  appellant.  I was served these letters.  I
4  was served the letter to Vano, Vano no longer
5  had jurisdiction over the case --
6      Q.  Because it was in the appellate
7  division?
8      A.  -- because at this point it had
9  already reached the appellate division.
10     Q.  Court, right.
11     A.  I don't know.  In my mind, I seem
12 to believe that we found out about
13 Mr. Silow's disbarred status prior to the
14 cross appeal being filed, or maybe even the
15 appeal, but I don't know that for sure.
16     Q.  You used the term "we" again.
17         Who do you mean by "we"?
18     A.  Me, myself, and I.  I'm sorry.
19     Q.  That's okay.  You understand why I
20 asked.
21         And what was the basis of your
22 appeal?
23     A.  That Judge Vano got the standing
24 issue wrong.

Page 169

1      Q.  Mm-humm.
2      A.  Any other state it would have
3  been -- the derivative case would have been
4  extinguished as soon as the corporation no
5  longer existed.  But Kansas is an outlier,
6  the only outlier in the country, I believe,
7  that derivative rights to a nonexistent
8  corporation can still supersede the
9  dissolution of that corporation.  It makes no
10 sense.
11     Q.  And that's based on the argument
12 that Sprint, which had absorbed Nextel had,
13 in turn, been acquired?
14     A.  No.
15     Q.  "No"?
16     A.  That was based on SoftBank
17 acquiring the combined entity.
18     Q.  Well, that -- that's -- I think
19 what I said meant the same thing, but fair
20 enough.
21         Because Sprint had acquired Nextel,
22 correct?
23     A.  Yes.
24     Q.  And SoftBank acquired Sprint?

43 (Pages 166 - 169)

Page 170

1    A.  The combined entity of Sprint and
2  Nextel, yes.
3    Q.  Yes, but Nextel had been absorbed
4  by Sprint?
5    A.  By -- yes, right.
6    Q.  So I think the way I said it was
7  correct, but your clarification is also quite
8  clear.
9    A.  So how does one bring a derivative
10  action on behalf of a corporation that no
11  longer exists?  So in every other state as
12  soon as that corporate entity is acquired,
13  all there's -- you don't have standing.
14       The standing is extinguished, and
15  the cases are thrown out.  Kansas is the only
16  state that is an outlier, and allows those
17  derivative rights.  I don't know how you sue
18  for reforms on a corporation that no longer
19  exists.
20    Q.  So, really, not the topic of --
21    A.  Well, you asked me what my appeal
22  was about.  So my appeal was about --
23    Q.  Yes, I did.
24    A.  -- standing issue.

Page 171

1    Q.  Right.
2    A.  I thought the Courts got it wrong.
3  My appeal was also about the $450,000 that
4  your clients still received because my
5  position was if you get caught robbing a bank
6  or defrauding a court, you don't get to keep
7  any of the ill-gotten gain.
8       So my appeal was to address the
9  $450,000 that they received.  They
10  telegraphed to Judge Vano that they would be
11  filing an appeal.
12    Q.  Mm-humm.
13    A.  I filed the appeal prior.  They
14  filed a cross appeal asking for their $4.5
15  million back.
16    Q.  Thank you for that clarity.
17       Nobody robbed a bank, correct?
18    A.  It's a colloquialism.
19    Q.  I'm just making sure.  Language
20  matters.
21       And nobody was prosecuted for
22  fraud, correct?
23    A.  I don't believe that's correct.
24    Q.  Well, why do you believe that's not

Page 172

1  correct?
2    A.  Because I believe your client's
3  attorney, Mr. Silow, was prosecuted for a
4  myriad of crimes in this case.
5    Q.  Okay.
6       So Mr. Silow, in his individual
7  capacity, was pursued by the Montgomery
8  County Pennsylvania District Attorney,
9  correct, criminally?
10    A.  I believe so.  But your client had
11  Mr. Silow listed on his website as of counsel
12  for the firm.
13    Q.  Okay.
14       So I won't get into the slippery
15  slope of that, Mr. Hartleib.
16       But Rob Weiser was not prosecuted
17  for fraud, correct?
18    A.  Not to my knowledge.
19    Q.  And the Weiser Law Firm was not
20  prosecuted for fraud, correct?
21    A.  Not to my knowledge.
22    Q.  And Mr. Silow who, in fact,
23  committed a fraud on the Weiser firm,
24  Rob Weiser, the Court, and others, was the

Page 173

1  prosecuted party, correct?
2       MR. MERRIGAN:  Objection to
3  form.
4       But you can answer.
5       THE WITNESS:  That's your
6  argument.  I don't buy it.
7       MR. ROSENZWEIG:  Well, that's
8  the fact, right.
9       MR. MERRIGAN:  Well --
10       MR. ROSENZWEIG:  That's the
11  fact of who was prosecuted by --
12  let me finish -- by the Montgomery
13  County District Attorney?
14       MR. MERRIGAN:  That part's a
15  fact.  My objection was to the
16  characterization of --
17       MR. ROSENZWEIG:  Your
18  objection is noted.
19       THE WITNESS:  It's a
20  convenient fact for your clients.
21  BY MR. ROSENZWEIG:
22    Q.  Okay.
23       So at this point in time where
24  Judge Vano has reduced fees and approved the

44 (Pages 170 - 173)

Page 174

1  Sprint settlement, subject to his reduced --
2  the reduced fees, you file your appeal
3  arguing that he shouldn't have approved
4  anything in the first place because there was
5  no standing because Sprint had been absorbed
6  by SoftBank.
7      And, also, that the $450,000 in
8  fees should not have been awarded.  The
9  Weiser firm files a cross appeal, correct?
10  We're at that moment in time.
11      Other than a conversation with
12  Mr. Frank, in which he informed you of
13  Mr. Silow's disbarred status, and the letters
14  from the Weiser firm that are now marked as
15  Hartleib-9, what information did you have
16  with respect to Jeffrey Silow?
17      MR. MERRIGAN:  At what point
18    in time?
19      MR. ROSENZWEIG:  At that
20    moment in time, meaning, February
21    of 2017.
22      MR. MERRIGAN:  That's what I
23    thought you meant.
24      THE WITNESS:  Yeah.  I would

Page 175

1      expect the only information I had
2      at that time, because I would have
3      just started additional due
4      diligence, was that he wasn't
5      barred in Pennsylvania.  I started
6      doing more investigation and more
7      research as to who he was and where
8      he was barred, and those type
9      things, so --
10  BY MR. ROSENZWEIG:
11    Q.  Okay.
12    A.  -- I think that was it.
13    Q.  And when you received the letters
14  from the Weiser firm to Judge Vano and to Mr.
15  --
16    A.  Shima.
17    Q.  -- Shima, I almost called him
18  Cymba, but that's okay -- did you also
19  receive the June 27, 2008 email from Jessica
20  Ableson to Brett Stecker and Rob Weiser that
21  was an attachment to the Vano letter?
22    A.  Yes.  I believe I used this as an
23  exhibit in my appeal.
24    Q.  Okay.

Page 176

1      In which Ableson represented
2  Jeffrey Silow as Jeffrey Silow, Esq.,
3  correct?
4    A.  Correct.
5    Q.  And did you also get a copy of the
6  Jeffrey Silow résumé from Ableson Legal
7  Search, also appended to the Vano letter,
8  which indicated Jeffrey Silow, Esq.?
9    A.  I believe so, yes.
10    Q.  And okay.
11      Did you similarly -- right.  And I
12  think you said you were served with a Shima
13  letter as well, correct?
14    A.  Yes.
15    Q.  Okay.
16      So, at that point in time, did you
17  have an understanding that Ableson Legal
18  Search had represented to Weiser that Jeffrey
19  Silow was a lawyer based on those documents?
20  Based on nothing else.
21    A.  I would say that when I read this,
22  I had tremendous concerns in looking at his
23  history.  I also had even more concerns
24  because, to me, this proved that your clients

Page 177

1  knew who he was when he was hired by the
2  firm.
3      He was Jeffrey Silow, not Alexander
4  Silow.  So this raised even more concerns, in
5  my mind, why was he being put forth as
6  Alexander Silow and not Jeffrey Silow.
7    Q.  Okay.
8      I'm going to ask you some more
9  questions about that.  But in the Silow
10  résumé attached to the Judge Vano letter from
11  Weiser Law Firm, it lists his bar admissions
12  as District of Columbia, correct?
13    A.  Correct.
14    Q.  And when you spoke with Mr. Frank,
15  he spoke strictly about Mr. Silow being
16  disbarred in Pennsylvania, correct?
17    A.  No.
18    Q.  Okay.
19      What did he --
20    A.  I don't recall, but he didn't give
21  any specificity whatsoever.  He said -- he
22  just let me know that he doesn't appear to be
23  barred.
24    Q.  Okay.  Fair enough.

45 (Pages 174 - 177)

Page 178

1    And that's from your conversation
2    with Mr. Frank directly?
3    A.  Correct.
4    Q.  Okay.
5    So what -- from the point you got
6    these letters that are Hartleib-9 forward,
7    what diligence did you do with respect to
8    Jeffrey Silow, if any?
9    A.  I don't recall specifically, but
10    I'm pretty diligent so I would have done, you
11    know, extensive Google searches.  I would
12    have tried to obtain information in any way
13    that I could.  I don't recall, as we sit here
14    today, what exactly that was.
15    Q.  Okay.
16    Do you recall that you, in fact,
17    did something?
18    A.  Oh, yeah.  Well, and I also started
19    to investigate Alexander Silow.
20    Q.  Okay.
21    Now, I know the answer to this
22    question, so does Mr. Merrigan, and so does
23    Mr. McGowan.
24    But what set you on the path to

Page 179

1    investigating the name, Alexander Silow,
2    which I think to be complete was Alexander J.
3    Silow, correct?
4    A.  I don't recall specifically, but
5    because allegedly Alexander Silow was in the
6    Sprint case.
7    Q.  And how did you come to learn that?
8    A.  Through the pleadings and through a
9    sworn declaration where Alexander Silow
10    testifies to the hours that he worked, and,
11    basically, admonishes Judge Vano for even
12    suggesting that he didn't do the work that he
13    said he did.
14    Q.  And correct to say that that is in
15    the context of the cross appeal?
16    A.  I would -- I'm sure they would put
17    that in the cross appeal, yes.
18    Q.  Right, because Jim Vano --
19    Judge Vano's questioning of the time that was
20    submitted by -- I'll just say Silow was in
21    the context of the fee reduction that
22    Judge Vano ruled on when he approved the 2016
23    Sprint derivative settlement, subject to the
24    fee reduction from 4.5 million to 450,000?

Page 180

1    A.  Yes, but there was a lot more in
2    between.  So when these letters came out,
3    Judge Vano had already ruled not knowing
4    Mr. Silow's disbarred status.  So I felt it
5    prudent to petition, seek leave of the
6    appellate court, to remand the case back to
7    Judge Vano to find out if it would have
8    changed his ruling with regard to the
9    settlement in the first instance.
10    The case was remanded.  The
11    appellate court granted the remand, sent it
12    back down to Judge Vano.  Judge Vano had --
13    we had another round of briefing and
14    pleadings, and, then, Judge Vano affirmed his
15    ruling, and said it didn't change his
16    position.
17    Q.  And it didn't change the nature of
18    his reduction of the fee --
19    A.  No.
20    Q.  -- or the ultimate fee that he
21    awarded, which was 450,000?
22    A.  Correct.
23    Q.  Okay.
24    So what -- you testified several

Page 181

1    questions ago that the letters, the Jessica
2    Ableson email, the Jeffrey Silow, Esquire,
3    résumé, led you to further believe or led you
4    to believe -- I don't want to put words in
5    your mouth -- that the Weiser firm knew who
6    Silow was because of the subsequent Alexander
7    Silow name; is that fair?
8    If it to mirky for you, tell me,
9    I'll just withdraw it and ask a different
10    question.  My feelings won't be hurt, if you
11    didn't.
12    A.  Can you read back the question.
13    Q.  I'm going to withdraw the question.
14    Mr. Hartleib, what facts led you to
15    believe that the Weiser firm knew that
16    Jeff Silow was a disbarred attorney at the
17    time that Silow's billing records were
18    submitted to the Court for approval?
19    MR. MERRIGAN:  Objection to
20    the form.
21    But you can answer.
22    BY MR. ROSENZWEIG:
23    Q.  -- in the context of the 2016
24    Sprint derivative settlement?

46 (Pages 178 - 181)

Page 182

1     A.  So Alexander Silow was barred in
2  Pennsylvania.  The real, quote, "real"
3  Alexander Silow, which, I believe, is the son
4  is barred in Pennsylvania.  That is the only
5  barred Silow that I could find in
6  Pennsylvania.  Nowhere on here does it say
7  that Mr. Silow is barred in Pennsylvania.  In
8  fact --
9         MR. MERRIGAN:  What are you --
10        what piece of paper are you
11        referring to?
12        THE WITNESS:  I am talking
13        about --
14  BY MR. ROSENZWEIG:
15     Q.  Hartleib-9.
16     A.  Hartleib-9, the résumé from
17  Ableson.
18     Q.  Ableson.
19     A.  Ableson.  The résumé that was
20  attached to the letter sent to Douglas Shima
21  of the appellate court.  I believe to
22  Judge Vano, but -- I'm not certain, but I
23  think maybe only --
24     Q.  There's a letter to Judge Vano.

Page 183

1     A.  No, the letter to Judge Vano, I
2  don't believe included the résumé.  I think
3  the résumé only went to Douglas Shima at the
4  appellate court, if my memory serves me
5  correctly.
6         But nowhere in here does it say
7  that he's barred in Pennsylvania.  The real
8  Alexander Silow is a criminal defense
9  attorney or a DUI-type attorney in
10  Pennsylvania.
11        During the hour-and-a-half-long
12  oral arguments in the appellate court, I --
13  it was brought up by -- I don't believe it
14  was the chief justice, but I believe the
15  Justice's names was Burns.  He wanted to know
16  why the Weiser firm put forth Mr. Silow as
17  barred in Pennsylvania, because in the résumé
18  he was never put forth as barred in
19  Pennsylvania.
20        But yet in all of the -- on your
21  client's website when they listed him as of
22  counsel, he was barred in Pennsylvania.  I
23  believe it was there.  He was barred in
24  Pennsylvania, and all the pleadings they sent

Page 184

1  to the Court.
2         So even the appellate justice
3  caught that it was -- that he was not barred
4  in Pennsylvania.  So my opinion was that it
5  was convenient for somebody -- maybe
6  everybody involved, that he was assuming his
7  son's identity for the purposes of billing
8  $380 an hour in the Sprint case when he was
9  only paid $35 an hour or thereabouts.
10     Q.  So what -- other than that
11  appearance to you, what facts did you have at
12  the time that led you to believe that
13  Rob Weiser or the Weiser Law Firm knew of
14  Mr. Silow's subterfuge?
15     A.  I said -- I think what I said was
16  that Mr. Weiser knew exactly who Mr. Silow
17  was.  He hired him as Jeffrey Silow not
18  Alexander.  I think what I said repeatedly in
19  my pleadings is that Mr. Weiser knew who
20  Mr. Silow was because he hired him as Jeffrey
21  Silow.
22        I think I even said if I got
23  discovery, we would find out who he made the
24  checks out to, which were all Jeffrey Silow.

Page 185

1  So my confusion is when did Mr. Silow become
2  Alexander and for what purpose?
3     Q.  Okay.
4         And you are aware now of
5  Mr. Silow's testimony in multiple days of
6  depositions in this case and of his
7  declaration, correct?
8     A.  Yes.  And I'm also aware of a
9  document that I'm not even allowed to see.
10  I'm also aware of the testimony from
11  Mr. Silow saying that your clients knew
12  exactly who he was, that they're the ones
13  that created the fake résumé, and the whole
14  bit to defraud the Court.  I'm aware of all
15  of that too.
16     Q.  I think that's patently untrue --
17     A.  It's not patently untrue.  It's a
18  fact, and it'll be something for a jury to
19  determine.
20     Q.  So where do you get that fact?
21     A.  In the pleadings that I've read
22  from Mr. Silow.  He filed a cross complaint.
23  He sued your clients in those documents.  I'm
24  not allowed to see whatever this affidavit

47 (Pages 182 - 185)

Page 186

1  is. I mean, can you imagine, this is a case
2  against me, and I, as the defendant, can't
3  see a document because you object to it?
4      Q.  That's not the way it happened.
5          MR. MERRIGAN:  Wait for a
6      question.
7          MR. ROSENZWEIG:  Yeah.
8  BY MR. ROSENZWEIG:
9      Q.  It's not the way it happened.  It's
10  not my job to debate the points of the law of
11  this case with you.  Mr. Merrigan is your
12  counsel.  He knows exactly what the judge
13  ruled and why.
14          Let me take you back to the
15  timeframe surrounding, let's say,
16  February 2017, and we'll call it 2017,
17  generally, you know, what facts did you have
18  at that time that the Weiser Law Firm or
19  Rob Weiser knew that Jeff Silow was
20  disbarred?
21      A.  I think I've already answered or
22  testified to that.  What I knew was -- and I
23  think what I said repeatedly was that your
24  clients knew exactly who Jeffrey Silow was.

Page 187

1      Q.  Okay.
2      A.  In addition, I was told by
3  Ableson -- not Ableson herself, but I believe
4  her name is Joyce Feinstein that they also --
5  she affirmed that your clients knew exactly
6  who he was.
7      Q.  So that doesn't answer my question
8  with regard to disbarred status.
9      A.  Well, apparently, he was --
10  apparently, he was never barred in
11  Pennsylvania, so --
12      Q.  Yeah, but --
13      A.  And, honestly, Phil --
14          MR. ROSENZWEIG:  I'm not going
15      to debate with him.
16          THE WITNESS:  No, no, wait.
17          Respectfully, to this day, I
18      don't know what his status was in
19      the District of Columbia.  I'm
20      still confused as to whether or not
21      he was barred at the time of the
22      Sprint case with regard to the
23      District of Columbia, or he wasn't.
24          I don't -- I've gotten

Page 188

1          conflicting information on that.
2  BY MR. ROSENZWEIG:
3      Q.  Okay.
4          And, as you sit here today, from
5  the -- let's say, from 2016 to the present,
6  you do not know whether Jeffrey Silow was
7  ever barred in Pennsylvania in the first
8  place?
9      A.  I believe he was, and disbarred a
10  long, long time ago.  I believe he -- this is
11  my belief -- that he was barred in the
12  District of Columbia, but I don't know the
13  status of -- I was told he was disbarred in
14  the District of Columbia, then I was told
15  that there was a disciplinary hearing, like
16  he was barred and not practicing.
17          And, then, I was told that the
18  disciplinary board removed -- you know,
19  removed his bar status.  So, to this day, I
20  know he's not barred, and I believe he was
21  barred in Pennsylvania, but he certainly
22  wasn't barred during the time that he was
23  presented to your clients as barred in
24  Pennsylvania.  His son was.  He wasn't.

Page 189

1          I believe he was barred in the
2  District of Columbia when he was presented to
3  your clients, but I don't know -- I know he's
4  disbarred completely everywhere now.  That's
5  my understanding.  But I don't know the
6  specifics as to when he was disbarred in the
7  District of Columbia.
8      Q.  You said you were told.
9          By whom?
10      A.  I don't recall.  I don't recall if
11  it was my lawyers.  I don't recall who it
12  was.  It's very complex and very complicated.
13      Q.  Okay.  And I'm going to take one
14  more shot at this.
15          Tell me every fact that you have
16  from the beginning of time to right now, upon
17  which you base the assertion that Rob Weiser
18  or the Weiser Law Firm knew that Jeffrey
19  Silow was a disbarred lawyer at the time they
20  hired him as a contract employee -- strike
21  that -- hired him as a contractor.
22          MR. MERRIGAN:  Objection, in
23      that it has been asked and answered
24      several times already.

48 (Pages 186 - 189)

Page 190

1     MR. ROSENZWEIG: Yeah, I wish
2 it was answered.
3     MR. MERRIGAN: He specifically
4 referred you -- and I asked him to
5 point out for the record what
6 document it was, the résumé, and
7 referred to -- it had a different
8 name. It didn't say he was barred
9 in Pennsylvania. That was his
10 answer.
11 BY MR. ROSENZWEIG:
12   Q. Is that the only fact?
13     MR. MERRIGAN: You keep
14 asking.
15     THE WITNESS: So, if you look
16 at the résumé, nowhere in the
17 résumé does it say he was ever
18 barred in Pennsylvania. Your
19 clients put him out as a barred
20 attorney in the state of
21 Pennsylvania.
22 BY MR. ROSENZWEIG:
23   Q. So it's your conclusion from that,
24 that they knew he was disbarred?

Page 191

1   A. My conclusion is that they knew he
2 was never Alexander. And when they hired
3 him, they knew he was never barred in
4 Pennsylvania. His résumé doesn't say he was
5 barred. The chief justice at the appellate
6 court says, "Why are you telling this
7 Court -- why did you submit documents in
8 pleadings to Vano's court and to this Court
9 that said he was barred in Pennsylvania when
10 he was never presented to you as barred in
11 Pennsylvania?"
12   Q. Well, the declaration that was
13 submitted was not in the name of Jeffrey
14 Silow, was it?
15     MR. MERRIGAN: You're talking
16 about the Alexander J. Silow's
17 declaration?
18     MR. ROSENZWEIG: The Alexander
19 J. Silow declaration.
20     THE WITNESS: But why would
21 your clients --
22     MR. MERRIGAN: Answer
23 questions. Don't ask them.
24     MR. ROSENZWEIG: Yes, fair

Page 192

1 enough.
2     THE WITNESS: What's the
3 question?
4 BY MR. ROSENZWEIG:
5   Q. Okay.
6     So are there any other facts upon
7 which you rely in asserting that the Weiser
8 Law Firm knew that Jeffrey Silow was a
9 disbarred attorney when they submitted his
10 billing records?
11     MR. MERRIGAN: Right up
12 through today, or facts that you
13 had in 2017?
14     MR. ROSENZWEIG: No, no, no.
15 In this timeframe. I'm sorry.
16     MR. MERRIGAN: So back --
17     MR. ROSENZWEIG: Yeah.
18     MR. MERRIGAN: -- in 2017
19 timeframe. Anything other than
20 this résumé.
21     THE WITNESS: Jeffrey Silow
22 didn't file sworn declarations that
23 everything he did was righteous and
24 just and legitimate. Alexander

Page 193

1 did. That's fraud.
2 BY MR. ROSENZWEIG:
3   Q. By Mr. Silow. I'm trying to --
4   A. But you're -- listen, with all due
5 respect, Rob Weiser's a very bright guy. I
6 give you client credit that he's not obtuse
7 enough to allow someone who's working for his
8 firm to assume a different identity that
9 happens to be someone who's barred in
10 Pennsylvania.
11     Like, seriously, that's what you
12 want a jury to believe, that your client is
13 not bright enough to -- that he lets people
14 just willy-nilly change their name mid case
15 to suit his firm and be able to bill $350 an
16 hour?
17   Q. Mr. Hartleib, the alternative to
18 that is that there was a purposeful fraud on
19 the court, and that seems to be what you're
20 asserting. And I'm trying to understand,
21 given that we're going to get into the
22 statements that you've made to a variety of
23 people, which are actually the basis of this
24 case, I'm trying to understand the facts on

49 (Pages 190 - 193)

1  which you rely in asserting that Rob Weiser
2  knew, and that Rob Weiser, therefore, was
3  part of a purposeful fraud on the court, as
4  opposed to being a victim of Silow's
5  duplicity?
6          MR. MERRIGAN:  The facts that
7  Mr. Hartleib relied on in 2017 --
8          MR. ROSENZWEIG:  Yeah, yeah,
9  yeah.
10         MR. MERRIGAN:  -- or up until
11  today?
12         MR. ROSENZWEIG:  I keep going
13  back to the facts he knew at the
14  time.
15         MR. MERRIGAN:  Okay.  Well, I
16  just want to make sure.
17         THE WITNESS:  I think I've
18  answered it.
19         MR. MERRIGAN:  I think so,
20  too, but if you can think of
21  anything else.
22         MR. ROSENZWEIG:  Okay.
23  BY MR. ROSENZWEIG:
24     Q.  So do you not have any further --

1  you don't --
2      A.  What else does somebody need?
3  You're filing sworn declarations under oath.
4  You're committing perjury to a Court.
5  Mr. Weiser is the head of a law firm.  He has
6  an obligation to make sure that his staff,
7  his of counsel, is not -- I understand your
8  argument is he's 1099, and he's just a
9  contract attorney, and all that.
10         That's not how he was presented to
11  the Court.  He was presented as Alexander
12  Silow, as a barred attorney in Pennsylvania,
13  right?  That's how they were able to bill
14  $380 an hour for somebody they were paying
15  $350 an hour for.
16         The other thing that comes into
17  question is:  How do you pay a barred
18  attorney in Pennsylvania?  What barred
19  attorney that doesn't have skeletons in his
20  closet, how many barred attorneys do you know
21  that accept $35 an hour to work?
22         Like every other document review
23  attorney gets paid 300, $400 an hour.
24         Why is this guy accepting $35 an

1  hour?
2          MR. MERRIGAN:  All right.
3  Michael.
4          THE WITNESS:  Okay.  Sorry.
5          MR. MERRIGAN:  Answers, not
6  questions.
7          MR. ROSENZWEIG:  Okay.
8          MR. MERRIGAN:  And, Phil,
9  questions.
10         THE WITNESS:  Okay.  I
11  apologize.
12  BY MR. ROSENZWEIG:
13     Q.  You don't have to apologize.
14     A.  I just think the whole thing is
15  just ridiculous at this point.
16     Q.  Well, you know, so does my
17  client --
18     A.  Well, then, you know --
19     Q.  -- in exactly the opposite
20  direction because, you know, I'm not
21  explaining.  I'm asking the next question.
22  Now --
23     A.  Then it sounds like you should talk
24  to my attorney, is what it sounds like.  You

1  two should talk.
2      Q.  Now, not limited to 2017, right,
3  but from the beginning of time to the
4  present, what -- on what facts do you rely in
5  asserting that Rob Weiser or the Weiser Law
6  Firm knew that Jeff Silow was a disbarred
7  lawyer, not an active member of any bar at
8  the time his billing records were submitted?
9          And you can incorporate your
10  previous answer by reference.  You don't have
11  to repeat it.
12         Tell me if there are any other
13  facts that you've learned since 2017 that you
14  purport, indicate, that Rob Weiser or the
15  Weiser Law Firm knew that Jeff Silow was not
16  a member of the Pennsylvania bar or the DC
17  bar.  He was a disbarred lawyer at the time
18  his billing records were submitted to the
19  Court in the Sprint-Nextel case.
20     A.  I don't even know what his status
21  was in the District of Columbia when he
22  started doing document review.  Sitting here,
23  to this day, I don't know what date he became
24  disbarred.  There's still confusion.  And at

50 (Pages 194 - 197)

Page 198

1    a break, I would actually like to know that
2    answer, right.
3            There is still confusion as to when
4    he was technically disbarred from the
5    District of Columbia. I know he wasn't
6    practicing, but I don't have the answer to
7    that.
8            So, in answer to your question, all
9    of the testimony from Mr. Silow himself, I
10   understand now that Mr. Silow has fallen on
11   the sword. I get it, okay.
12           Do I believe that -- do I believe
13   that to be true, absolutely not. I don't
14   believe it. I have a good faith basis for
15   believing what I believe.
16       Q. Which is what?
17       A. Which is your clients knew exactly
18   who Mr. Silow was. Mr. Silow was never
19   Alexander Silow, yet they preferred him to be
20   to the Courts. They allowed sworn
21   declarations to be filed in court because it
22   suited their needs, right, as Alexander
23   Silow.
24       Q. And from that fact you surmise

Page 199

1    knowledge, you assume knowledge?
2        A. I mean, you can say what you want
3    to say. I mean, the fact of the matter is I
4    uncovered a huge fraud upon the Court. Your
5    client should thank me. I mean, they had a
6    disbarred criminal working for their firm for
7    two decades.
8        Q. Okay.
9            And that disbarred criminal being
10   Jeff Silow?
11       A. Yes.
12           MR. ROSENZWEIG: Okay. Why
13       don't we break here. This has been
14       fun.
15           MR. MERRIGAN: I'm going to
16       need to turn the air conditioner
17       up. I'm starting to sweat.
18           -   -   -
19           (Whereupon, there was a brief
20       recess held off the record at
21       p.m.)
22           -   -   -
23           MR. ROSENZWEIG: Back on the
24       record.

Page 200

1            -   -   -
2            (Back on the record at
3        p.m.)
4            -   -   -
5    BY MR. ROSENZWEIG:
6        Q. Mr. Hartleib, back on record.
7            Did you ever become familiar with a
8    billing audit that was performed of
9    Jeff Silow's hours, and what's validated that
10   he spent the hours he alleged and verified
11   the quality of his work was in the context of
12   the cross appeal?
13           MR. MERRIGAN: Object to the
14       characterization.
15           But I think you probably know
16       what he's asking you about.
17           THE WITNESS: I don't know if
18       that was different than the billing
19       record that was submitted before
20       Vano. The only issue I would take
21       is that you said it verified the
22       hours that were worked. I think
23       that's in question, or that's
24       debatable.

Page 201

1    BY MR. ROSENZWEIG:
2        Q. Okay.
3            Well, through the relativity
4    platform, which was controlled by the Robbins
5    firm, not by the Weiser firm, there was an
6    audit, which verified the number of hours
7    that Silow logged.
8            Are you familiar with that?
9        A. I'm familiar with the relativity
10   software, and I'm familiar with the report
11   that was submitted, yes. I just would take
12   issue with your representation that
13   verified the hours that were performed in
14   document review.
15       Q. Okay.
16           And what is the issue that you take
17   with that? You do not believe it verified
18   that?
19       A. No.
20       Q. Why?
21       A. I don't know if -- I don't know
22   what safeguards are in place that would
23   prevent someone from gaming the system,
24   so-to-speak.

51 (Pages 198 - 201)

Page 202

1    Q.  Okay.
2        That would be your concern with it,
3    or your -- your --
4    A.  Yeah, because I was never presented
5    any evidence that would show that it wasn't
6    possible.  I know that there were concerns
7    raised.  I know that there were concerns by
8    Judge Vano that said it's not humanly
9    possible or feasible for anyone to work those
10   hours.
11   Q.  Okay.
12       And just touching on a moment with
13   the Supreme Court of the State of New York
14   Complaint you filed pro se in the SiriusXM
15   matter, you are a named plaintiff in this
16   pleading, and so is someone named Jack Sorge,
17   S-O-R-G-E.
18       Can you tell me who Mr. Sorge is,
19   and if I'm saying it incorrectly.  You
20   actually pleaded as John (Jack) Sorge, and
21   Mr. Sorge is one of the signatories in
22   addition to you on the pro se.
23   A.  Yeah.  He was another shareholder
24   who was not happy with the terms of the

Page 203

1    merger, and we filed the Complaint together.
2    Q.  Okay.
3        And how --
4    A.  He was an older gentleman in his
5    80s.  I don't even know if he's still living
6    today.
7    Q.  How did you know Mr. Sorge, or how
8    did you become acquainted with him?
9    A.  I had started a called group called
10   SaveSirius.org, and had thousands of
11   shareholders that were interested in what was
12   going on with that entity and with the
13   manager, et cetera.
14   Q.  Okay.
15       And do you know where Mr. Sorge
16   either is or was from?
17   A.  New Jersey.
18   Q.  Do you know where in New Jersey?
19   A.  I actually visited him at his
20   house, but I don't recall where.
21   Q.  Okay.
22       For those of us who are Philly
23   people, there's north, central, and South
24   Jersey.  So could you -- you're from

Page 204

1    California.  It may have no meaning to you.
2        Do you have any sense of the part
3    of the state Mr. Sorge was from?  Was it
4    close to Philly?  Was it not close to Philly?
5    If you don't know, it's okay.
6    A.  I don't know.  The only thing I
7    know is I took the ferry from New York over
8    and met him there and we didn't drive that
9    far.
10   Q.  So that would be North Jersey, for
11   sure.
12       So if you took the ferry into
13   northern New Jersey, from Manhattan?
14   A.  Yes.
15   Q.  Yeah.
16       Then I don't think anybody would
17   quarrel with the characterization of that
18   being North Jersey.
19   A.  I thought that was pretty cool.
20       MR. MERRIGAN:  I'm always
21       surprised how much farther North
22       Jersey goes past New York City.
23       MR. ROSENZWEIG:  Much indeed.
24

Page 205

1    BY MR. ROSENZWEIG:
2    Q.  Okay.
3        And is it fair and correct that the
4    Weiser Law Firm never agreed to represent
5    your interest in the SiriusXM derivative
6    litigation?
7    A.  Yes.
8    Q.  Okay.
9        And did Kahn Swick ever ultimately
10   take up representation of you?
11   A.  They ultimately filed a case.  I
12   know Judge Rakoff was the judge.  I don't
13   know if I was a named plaintiff in this case.
14       I don't recall, but it was maybe
15   similar circumstances to the case I tried to
16   file pro se.  I don't recall.
17   Q.  Okay.  Got it.  Thanks.
18       Mr. Hartleib, I'm going to ask you
19   some questions about a certain Wall Street
20   Journal article that was published with
21   respect to the billing in the Sprint-Nextel
22   case, as well as the Court's ruling in that record,
23   as well as the Silow disbarment status,
24       I'm saying those things broadly,

52 (Pages 202 - 205)

Page 206

1    right.
2        You spoke with the journalist from
3    the Wall Street Journal, did you not?
4        A.  Yes.  I believe his name was
5    Joseph Palazzolo.
6        Q.  And Mr. Palazzolo contacted you, or
7    did you contact him?
8        A.  I don't recall.  I may have reached
9    out to him.  I don't recall.
10        Q.  Okay.
11        So you -- and do you know who
12    initiated the contact?
13        A.  I don't recall.  It could have been
14    me.  I don't actually remember.
15        Q.  Okay.
16        Do you know if it was prior to the
17    publication of the article itself?
18        A.  It was prior.
19        Q.  Okay.
20        And if you reached out to the
21    gentleman from the Wall Street Journal, whom
22    you identified, how did you know he was
23    working on a story?
24        A.  I didn't.

Page 207

1        Q.  Okay.
2        So why might --
3        A.  I think I gave him the information
4    which led to the story.
5        Q.  Okay.
6        So you initiated a contact with the
7    Wall Street Journal?
8        A.  I don't remember if he reached out
9    to me, or if I reached out to him.  But it's
10    my understanding that I provided him with
11    some of the information to draft the story.
12        Q.  Okay.
13        And this is prior to the March 13,
14    2017 publication of that article?
15        A.  I believe so.  I believe I provided
16    Judge Vano's orders, yes.
17        Q.  Okay.
18        And can we agree that the article
19    is entitled, quote, "One Lawyer 6,905 Hours
20    Leads to a 1.5 million bill in a Sprint
21    Suit"?
22        A.  I don't have the article in front
23    of me, but it sounds familiar.
24        Q.  Okay.

Page 208

1        And did you speak with anybody
2    other than Mr. -- how did you say it --
3    Palazzolo?
4        A.  Palazzolo.
5        Q.  Palazzolo.
6        A.  In what regard.
7        Q.  With respect to the Wall Street
8    Journal article in any regard, anybody else
9    other than Mr. Palazzolo.
10        MR. MERRIGAN:  From the Wall
11        Street Journal?
12        MR. ROSENZWEIG:  From the Wall
13        Street Journal, yes, thanks.
14        THE WITNESS:  I may have.  I
15        had connections at the Wall Street
16        Journal from prior stories that
17        were written.  A Sarah McBride.  So
18        someone may have referred to
19        Mr. Palazzolo.  I don't recall.
20    BY MR. ROSENZWEIG:
21        Q.  Okay.
22        But is Mr. Palazzolo the only
23    person from the Wall Street Journal with
24    which you had substantive discussions about

Page 209

1    the Weiser Law Firm and the Sprint-Nextel
2    merger?
3        A.  I don't know.
4        Q.  Okay.
5        Anybody else you can think of?
6        A.  Other than maybe I reached out to
7    Sarah McBride, and I think that she was no
8    longer there.  I think that might have been
9    my first call.
10        Q.  Okay.
11        A.  If I was the one who initiated the
12    call, she would have been the one I reached
13    out to because I had -- she had done several
14    articles in the past regarding SiriusXM.
15        Q.  Okay.
16        And what was your purpose in
17    reaching out to the Wall Street Journal for
18    that substance?
19        A.  To draw attention to what had
20    transpired in Kansas, if I did initiate the
21    call.
22        Q.  Okay.
23        Or if you didn't initiate the call
24    and were just interviewed by Mr. Palazzolo,

53 (Pages 206 - 209)

Page 210

1 was your motivation the same?
2    A.  Yeah.  The motivation was to shed
3 light on what transpired, given my concerns
4 with derivative litigation for like over a
5 decade at that point, I believe, so yes.
6    Q.  Okay.
7       And did you raise the Weiser Law
8 Firm or Rob Weiser by name in your
9 discussions with Palazzolo?
10    A.  I don't recall, but the names would
11 have been provided if I provided Judge Vano's
12 orders.
13    Q.  Okay.
14       And you are saying orders, plural,
15 with an "S," so can you tell me what you
16 provided specifically?
17    A.  I don't recall specifically, but
18 I'm certain that I would have included the
19 orders, as they're pretty much
20 self-explanatory.
21       There were two orders from
22 Judge Vano.  The first order was quite
23 scathing.  Subsequent to that first order,
24 your clients filed a motion for

Page 211

1 reconsideration, whereby the judge issued a
2 second order, which was equally as scathing,
3 and I believe that those would have been
4 provided to any reporters that I had spoken
5 to.
6    Q.  Okay.
7       And did you in conversations with
8 Mr. Palazzolo from the Wall Street Journal
9 give your opinion of the Weiser Law Firm or
10 Rob Weiser's role with respect to Silow's
11 billing records?
12    A.  Probably.  I'm pretty opinionated.
13    Q.  Okay.
14       And do you recall if you were
15 specifically mentioned in the Wall Street
16 Journal article by name?
17    A.  I don't recall.
18    Q.  Okay.
19       Do you recall reading that article
20 and -- after it was published?
21    A.  Yes.
22    Q.  Did you take issue with anything in
23 that article that you recall?
24    A.  Well, the whole thing I took issue

Page 212

1 with.  I wasn't happy with any of what had
2 transpired in Kansas.  What the article --
3 specifically, I don't recall if there was
4 something that I didn't think was accurate,
5 or I didn't agree with.
6    Q.  Okay.
7       Did you when speaking to
8 Mr. Palazzolo from the Wall Street Journal
9 make any allegations against the Weiser Law
10 Firm or Rob Weiser about their criminal
11 activity or alleged criminal activity?
12    A.  Not to my knowledge.  I just
13 provided the information that was outlined in
14 the orders, and my involvement in the case as
15 an objector.
16    Q.  Okay.
17       Anything else that you recall you
18 said to Mr. Palazzolo in your discussion or
19 discussions with him?
20    A.  Not specifically that I recall, but
21 I'm certain that I would have expressed my
22 concerns over derivative litigation, and the
23 fact that I feel as though a lot of it is
24 lawyer-driven and the relief is not what the

Page 213

1 shareholders deserve, that there's a problem
2 with derivative litigation as a whole.
3    Q.  And that's your point of view about
4 the whole derivative litigation practice,
5 correct?
6    A.  Yes.
7    Q.  Anything else that you can recall
8 about your dealings with Mr. Palazzolo or the
9 Wall Street Journal?
10    A.  Not off the top of my head.
11    Q.  Okay.
12       What I'm next going to turn your
13 attention to is what is Exhibit-12, which
14 we're going to mark as Hartleib-10.
15       - - -
16       (Whereupon, Email Dated March
17       6, 2017, was marked as Exhibit
18       Hartleib-10 for identification.)
19       - - -
20 BY MR. ROSENZWEIG:
21    Q.  Okay.
22       Are you there?
23       And take a minute to refresh your
24 familiarity with it.

54 (Pages 210 - 213)

Page 214

1    A.  Yes, I'm reviewing.
2    Q.  Okay.
3        It is a two-page document, although
4  at the top it first says Page 2 of 3.
5    A.  Yes.
6    Q.  And then it says Page 3 of 3, as it
7  reflects a previously filed document in the
8  case.
9    A.  Yes.
10    Q.  Are you ready?
11    A.  I'm ready.
12    Q.  Okay.  Great.
13        So, Mr. Hartlieb, this is a
14  March 6, 2017 email from you, 8:37 p.m., to
15  Rob Weiser on which a number of people are
16  copied.  It's subject is "Re: Ross-WMS" --
17  can we take that to mean Williams?
18    A.  I believe so, yes.
19    Q.  -- "versus Sprint-Appellate Case
20  Number 17-117139-A," right?
21    A.  Yes.
22    Q.  Okay.
23        The people copied on this email by
24  you are whom?

Page 215

1    A.  The parties that were in the
2  underlying Sprint case that led to the
3  appeal.
4    Q.  Okay.
5        And by "the parties" you mean
6  counsel?
7    A.  Yes, the attorneys involved.
8    Q.  Okay.
9        Who was Mark McGrory?
10    A.  Defense attorney for Sprint, I
11  believe.
12    Q.  Okay.
13        And the two Skadden lawyers, Mr.
14  Kasner, and Mr. Musoff?
15    A.  Defense attorneys for either --
16  there were defense counsel there for the
17  individual defendants, and there were defense
18  counsel for the corporation.
19    Q.  Okay.
20        Mr. Ficaro and Mr. Stecker from the
21  Weiser firm, correct?
22    A.  Correct.
23    Q.  Mr. Hershewe, who is he?
24    A.  Yeah.  Local counsel.

Page 216

1    Q.  For?
2    A.  For your clients.
3    Q.  Okay.
4        Mr. Aguilar from Robbins Arroyo?
5    A.  Yes.
6    Q.  What was his role?
7    A.  I believe he had -- I believe all
8  of these parties had consolidated complaints.
9  There were six or so that were consolidated
10  into one.  I believe all of them had actions
11  that were consolidated in the Ross-Williams
12  action that your clients kind of led.
13    Q.  Okay.
14        And so George Aguilar was from
15  Robbins Sarroyo, as Brian Robbins, as was
16  Jay Razzouk, correct?
17    A.  Yes.
18    Q.  Okay.
19        And Laura Jakubec is from the same
20  firm as Tom Hershewe?
21    A.  Local counsel.
22    Q.  Okay.
23        And, then, who's Jill Boren?
24    A.  She is Judge Vano's clerk.

Page 217

1    Q.  And why did you put her as a CC on
2  this email?
3    A.  She was -- Judge Vano's clerk was
4  copied on all correspondence I had with the
5  Court.
6        At one point in time, I had -- I
7  was remiss as a lay party, and I had sent a
8  letter or correspondence to the Court, and
9  did not copy all of the other attorneys in
10  the case and I was quasi admonished by
11  Judge Vano.
12        So after that point forward, I made
13  sure that every party was copied on every
14  correspondence.
15    Q.  And who is -- I think the last
16  person I haven't mentioned is Al Yates,
17  Alfred Yates?
18    A.  He had a consolidated Complaint as
19  well, I believe.
20    Q.  Okay.
21        So what was your purpose in writing
22  this email?
23    A.  To follow the Court's instructions.
24  You mean, copying the parties?

55 (Pages 214 - 217)

Page 218

1    Q.   No, no, your purpose in the
2   authorship in the first place.
3    A.   Same purpose I've had all the way
4   along, trying to get to the bottom of what
5   was transpiring in Kansas, exposing fraud,
6   and alerting the Court.
7    Q.   Okay.
8        And so just to be clear, you
9   intended to communicate that to Rob Weiser.
10       What was your intention of copying
11   all these parties, all these lawyers?
12    A.   Because it was sent to Judge Vano,
13   and Judge Vano's clerk.  So the intent -- I
14   believe the intent was to notify Judge Vano
15   as to what was taking place in the appeal,
16   and letting him know that I was seeking a
17   remand.
18    Q.   And you did that by copying
19   Ms. Boren, right, that was the root to
20   Judge Vano?
21    A.   I didn't have Judge Vano's email,
22   so all correspondence went to Jill Boren.
23    Q.   I'm not criticizing it.  I'm just
24   making sure that that's --

Page 219

1    A.   Yes.
2    Q.   -- what you're referring to?
3    A.   Yes.  And I did not want to copy
4   the Court on anything without copying all
5   parties that were involved in the
6   consolidated actions because I was admonished
7   once for that.  I didn't want to be
8   admonished again.
9    Q.   When you say on Page 2 of the -- of
10   this document, which I've marked as
11   Hartleib-10, "This lawyer-driven litigation
12   must and will cease," are you referring to
13   specifically the Sprint derivative case or
14   all derivative cases?
15    A.   I think that's a generic statement
16   that is saying this and all other cases in
17   general.  I think it's a generalized
18   statement.  It's hard to know what my frame
19   of mind was during this correspondence.
20       It looks as though I wasn't
21   particularly pleased as to what was going on,
22   so, but I'm pretty certain that that was a
23   general statement to include all derivative
24   litigation.

Page 220

1    Q.   When you say, quote, "Your attempts
2   to obfuscate your chicanery in this case is
3   galvanizing my convictions" --
4    A.   Mm-humm.
5    Q.   -- I understand that's a partial
6   statement of, you know, what the full
7   statement is here on paper.
8        What chicanery are you talking
9   about, to what are you referring?
10    A.   I'm referring to the use of parties
11   that didn't exist or aliases, or fraudulent
12   billing logs, time sheets, you know, you have
13   to understand it's very easy to take certain
14   statements out of context without reading all
15   of the pleadings that lead up to these
16   statements.  But I was being attacked
17   viciously in pleadings during this particular
18   period of time, as I'm only trying to uncover
19   the truth.
20    Q.   Which you characterize as
21   chicanery?
22    A.   Yes.
23    Q.   Okay.
24        And then you after saying, "Is

Page 221

1   galvanizing my convictions," you go on to
2   say, "strengthening my resolve to expose all
3   of the corrupt parties in this case."
4    A.   Yes.
5    Q.   Who are the "corrupt parties" to
6   whom you referred?
7    A.   Well, at that time my belief was --
8   and on information and belief, it was several
9   parties and several firms all working
10   together to submit fraudulent or exaggerated
11   billing logs using a disbarred attorney to
12   bill $1.7 million of those hours, for
13   example.
14    Q.   Okay.
15       And specifically directing that to
16   the Silow issues with the Weiser firm?
17    A.   Well, at that particular point in
18   time, I had no idea how broad breadth the
19   fraud in the case was.  I mean, it was
20   shocking to find out what we had found out at
21   this particular point in time.
22       Judge Vano found it shocking.  I
23   mean, I think that this shocked the moral
24   sensibilities of the Court, me, and other

56 (Pages 218 - 221)

Page 222

1  parties as well. I didn't know to what
2  extent the fraud was. I know all the
3  ad hominem attacks I was -- that were
4  incoming, as I was uncovering these things.
5      So, at this particular point in
6  time, I gave you the examples. I don't
7  know -- I didn't know at this particular
8  point in time what other fraud or examples we
9  may find.
10     Q. Okay.
11        But you've shared with me now the
12  extent of the knowledge you had when you
13  wrote this email?
14     A. To the best of my recollection,
15  yes.
16     Q. Okay.
17        I'd like to turn your attention to
18  what is Exhibit-13, which I will mark as
19  Hartleib-11.
20              - - -
21        (Whereupon, Declaration of
22        Monica Ross-Williams, was marked as
23        Exhibit Hartleib-11 for
24        identification.)

Page 223

1              - - -
2  BY MR. ROSENZWEIG:
3      Q. And it's the -- this is the
4  Declaration of Monica Ross-Williams in the
5  Sprint-Nextel case.
6        And, really, what I want to do is
7  turn your attention to Paragraph 2 of it.
8      A. (Witness complies.)
9      Q. Okay.
10       Which references the unsolicited
11  telephone call from you to
12  Monica Ross-Williams.
13     A. Okay.
14     Q. Okay.
15       Is this the telephone call about
16  which we previously engaged?
17     A. This is her interpretation of the
18  telephone call that we previously discussed.
19     Q. Well, I don't know if there is any
20  interpretation in Paragraph 2.
21       Do you have any reason to believe
22  that the call was not the evening of March 6,
23  2017?
24     A. No.

Page 224

1      Q. Was the call unsolicited by her?
2      A. Yes.
3      Q. Okay.
4        Do you take any issue with the fact
5  that she didn't know how you got her number,
6  other than she believed it was via an
7  internet search?
8      A. No.
9      Q. And is it also correct that she
10  states she never previously had any contact
11  engagement or involvement with you?
12     A. Do I have a problem with that?
13     Q. Right.
14     A. No.
15     Q. Okay.
16        So there's nothing in Paragraph 2
17  with which you actually disagree?
18     A. No.
19     Q. Okay.
20     A. I mean, just in describing the
21  document, this is her interpretation of our
22  correspondence.
23     Q. Yeah, but I was talking about
24  Paragraph 2.

Page 225

1      A. That's fine.
2      Q. That's fine.
3      A. That's okay.
4      Q. And because this was a filed
5  document in the -- well, strike that.
6        Was this, to the best of your
7  knowledge, a filed document in this
8  Sprint-Nextel case?
9      A. I believe so, yes, but this is also
10  not stamped.
11     Q. I agree. This is not stamped from
12  the Sprint-Nextel case.
13     A. Right, but I believe it was, so I
14  can't swear to its authenticity because it
15  isn't stamped, but I believe it is, yes.
16     Q. Okay.
17        Can you -- and I want to do this
18  kind of quickly, so I can do it paragraph by
19  paragraph.
20        But could you read through, and
21  tell me with what you differ in this Monica
22  Ross-Williams declaration?
23        MR. MERRIGAN: So you want him
24        to read through and point out what

57 (Pages 222 - 225)

Page 226

1 he, if anything, disagrees with?
2 MR. ROSENZWEIG: Yeah,
3 correct. And I can ask the
4 questions in pieces, but I'm trying
5 to be efficient here.
6 THE WITNESS: Okay. Tell me
7 when you are ready to begin.
8 BY MR. ROSENZWEIG:
9 Q. Go ahead. You can begin.
10 A. Paragraph 3, "highly
11 confrontational manner," that's incorrect.
12 Q. Keep going.
13 A. She did ask me to speak to her
14 counsel. So that part is true. I explained
15 to her why I could not speak to her counsel
16 with regard to this. I didn't --
17 Paragraph 4, I didn't try to
18 continue the conversation. I did continue
19 the conversation with her, making references
20 to the orders that she was unfamiliar with,
21 knew nothing of the orders from Judge Vano in
22 her own case.
23 I told her that I found her number
24 in relation to -- it took me five minutes

Page 227

1 online to find her number, with regard to
2 the -- do you want to tackle that name
3 somebody -- yep, Ypsilanti Township, so
4 that's where I found her number. It was
5 listed publicly based on that.
6 Number 5, I have no reason why she
7 would be taken back or frightened, probably
8 because she hadn't had any communication with
9 her counsel for years in the case, but she
10 should be expecting a call from fellow
11 shareholders. There's nothing wrong with a
12 fellow shareholder contacting a lead
13 plaintiff representative in a shareholder
14 derivative case.
15 Q. Well, let me interrupt you right
16 there for a second.
17 Isn't it so that there was a
18 March 30, 2017 order from the Kansas appeals
19 court, which determined that your call
20 violated Kansas Rules of Professional Conduct
21 4.2?
22 A. I'm not bound by the Rules of
23 Professional Conduct. I'm not an attorney.
24 That's for counsel. I'm not a counsel. In

Page 228

1 fact, there's case law all over the place
2 that suggests parties, even adverse parties,
3 to an action communicate without their
4 attorneys.
5 Q. So did you appeal the March 30th,
6 2017 Order of the Court?
7 A. I'm sure, I did.
8 Q. Okay.
9 Was that order amended or reversed?
10 A. Phil, the Court got one wrong.
11 They got most of it right, but they actually
12 got one wrong.
13 Q. So say you. Okay.
14 Please tell me more about what's --
15 with what you differ in the
16 Monica Ross-Williams declaration.
17 A. Number -- the fifth paragraph, I
18 didn't call to intimidate her. I called to
19 ascertain her level of involvement in the
20 case, and her level of knowledge as to what
21 was taking place.
22 So it says she felt uncomfortable,
23 but any time she could have hung up the phone
24 call. Amazing that she felt threatened and

Page 229

1 intimidated when I'm in California, and she's
2 in Michigan.
3 So on the eighth -- the eighth
4 paragraph, I believe it is, I forwarded the
5 emails at her request. She provided me with
6 an email that was not listed online with the
7 private email, whereby I gave her copies of
8 Judge Vano's orders, and a copy of the appeal
9 that had been filed on her behalf, which she
10 had absolutely no knowledge of.
11 So I see this is in regard to --
12 this letter is in regard to my request to
13 rescind or reconsider the protective order.
14 There were other letters that predated this,
15 but I see this is -- this is -- this is in
16 response to the actual -- my requesting the
17 Court rescind the protective order.
18 She was contacted one time. I
19 informed the Court there was no need for a
20 protective order. I gathered the information
21 that I needed, which was to find out her
22 involvement, which was little to none. Her
23 sophistication in the case, which was subpar,
24 at best, and there was no need for me contact

58 (Pages 226 - 229)

Page 230

1  her ever again. I informed the appellate
2  court of that, so there was no need for a
3  protective order.
4      Q. And was a protective order
5  ultimately entered?
6      A. It was entered, yes. So they
7  denied my request.
8      Q. Okay.
9      A. Like I said, the Court got one
10  wrong.
11      Q. Anything else -- well, that would
12  be the second thing they got wrong, according
13  to you, right?
14      A. That's true.
15      Q. Okay.
16      A. Yeah. They got it wrong twice. At
17  least their consistent.
18      Q. Anything else that you want to tell
19  me with which you take issue in this
20  document, understanding that things that you
21  said may permeate more than one paragraph.
22      A. You know, no, I mean, if there's
23  something I'm missing, I'm sure you'll point
24  it out to me.

Page 231

1      Q. Okay.
2          Let's look at Tab 14, which I'm
3  going to mark as Hartleib-12.
4              - - -
5          (Whereupon, Email Dated March
6          7, 2017, was marked as Exhibit
7          Hartleib-12 for identification.)
8              - - -
9  BY MR. ROSENZWEIG:
10      Q. There are actually two components
11  to this. There is a March 7, 2017, 4:25 a.m.
12  email from you to kayla9170@yahoo.com.
13          Is that Monica Ross-Williams?
14      A. I don't have knowledge of that now,
15  but it appears that that is the email she
16  provided.
17      Q. Because your email begins, "Dear
18  Ms. Williams."
19      A. Right. So I'm assuming that's her
20  email.
21      Q. And the second part of this is a
22  March 2007 letter from Rob Weiser and the
23  Weiser Law Firm to you?
24      A. Yes.

Page 232

1      Q. And it attaches an email from you
2  of March 7, 2017, 7:21 p.m., to a series of
3  people addressed to Mr. Weiser, correct?
4      A. Yes.
5      Q. Let's break these into two,
6  actually. I'd like to take to two-page email
7  from you to Monica Ross-Williams, and call
8  that 12.
9          And, then, the March 17, 2017 cease
10  and desist letter in the email that attached
11  as Hartleib-13.
12          Okay, Mr. Hartleib?
13      A. Okay.
14              - - -
15          (Whereupon, Letter Dated March
16          7, 2017, was marked as Exhibit
17          Hartleib-13 for identification.)
18              - - -
19          MR. ROSENZWEIG: The
20  attachment is the letter.
21          MR. MERRIGAN: Okay.
22          MR. ROSENZWEIG: So the letter
23  is the two-page letter with the
24  one-page attachment. Okay? Great.

Page 233

1  BY MR. ROSENZWEIG:
2      Q. So, Mr. Hartleib, with respect to
3  the March 7, 2017, 4:25 a.m. email from you
4  to kayla9170@yahoo.com, is this an email that
5  you sent to Monica Ross-Williams, and even
6  though you're not immediately familiar with
7  the email address, it says, "Dear
8  Ms. Williams," and you believe it to be here?
9      A. Yes.
10      Q. Or believe it to be she.
11          The people who are copied on this
12  email are many of the same lawyers in that
13  firm.
14          Ms. Boren is Judge Vano's clerk,
15  correct?
16      A. Correct.
17      Q. Who is HMSK@HFMlegal.com?
18      A. I don't know.
19      Q. Who is Perry Brandt?
20      A. So these -- Perry Brandt, I know --
21  these folks appeared -- they were at oral
22  arguments at the appellate court hearing.
23  They were defense counsel for either Sprint
24  or the executives. I don't know which.

59 (Pages 230 - 233)

Page 234

1    Who this is, "HMSK," I don't know,
2  off the top of my head, but it would have
3  been one of the parties that was involved in
4  the Sprint appeal.
5    Q.  Okay.
6    And who's docketing@ERISEIP?
7    A.  ERISE is the law firm that Mark
8  McGrory worked for or was...
9    Q.  But what's "docketing," do you
10  know?
11    A.  I have no idea.
12    Q.  Okay.
13    A.  Yeah, I don't know.
14    So what happened in some of these
15  correspondence is I would take a prior
16  correspondence that was to the same parties
17  and copy those emails and paste them into the
18  new correspondence because it's extremely
19  time consuming when there are this many
20  attorneys and consolidated cases.  It's
21  confusing, and, you know, so that's what
22  would have happened.
23    One thing I would like to point
24  out, too, with regard to this email, it says

Page 235

1  that it was at 4:25 a.m.  That would have
2  been 1:25 Pacific Standard Time, when I
3  drafted the email.  So she received it at
4  4:25 a.m.  I was on the phone with her late
5  in the evening.
6    And, then, I said that I would
7  forward these emails to her.  Your clients
8  made it sound like despite me being warned
9  not to contact her or communicate with her,
10  that there was a continued course of contact,
11  which there wasn't.  There was one
12  communication with her via telephone.
13    I provided the documents that I
14  said I would provide, that she wanted, at her
15  email address.  But that would have been at
16  1:25 by the time I got around to doing it
17  that evening.
18    Q.  Okay.
19    So let's look at the substance of
20  one more question, because who is Tom -- who
21  is Greg Wright?  I'm sorry.
22    A.  I don't know, but he looks like
23  he's with Dollar Burns & Becker, which would
24  have been local counsel as well.

Page 236

1    Q.  Okay.
2    Because it's Greg Wright, and,
3  then, there's a semicolon before
4  tom@dollar.law.
5    A.  That must be it, because that's not
6  Rob's email.
7    Q.  Okay.
8    In your communication to
9  Ms. Williams, you state -- and I'll show you
10  where, but it's four lines up from the bottom
11  of the first page, quote, "I am no expert,
12  but when a firm admits criminal acts in a
13  case, I believe they are obligated to notify
14  you as the plaintiff."
15    And, then, the second quote,
16  "Mr. Weiser and his firm have already
17  contacted their bar associations and other
18  courts to self-report their criminal acts."
19    A.  Yes.
20    Q.  What criminal acts do those two
21  sentences refer to?
22    A.  Submitting fraudulent billing to
23  the Court in the Sprint Nextel -- or the
24  Sprint case.

Page 237

1    Q.  Whose criminal acts are you
2  alleging that to be?
3    A.  The Weiser firm, and, I guess,
4  Alexander Silow's or Jeffrey Silow that we
5  know him to be.
6    Q.  On what basis do you assert that
7  the Weiser firm or Rob Weiser committed a
8  criminal act?
9    A.  The lawyers were working for him
10  and his firm, I would assume, under his
11  leadership.
12    Q.  Do you have a working
13  understanding, Mr. Hartleib, of what the
14  elements are of a crime in that regard,
15  meaning the legal elements of a crime?
16    A.  I mean, my understanding of the
17  definition of a crime is to commit criminal
18  acts.  You don't have to be prosecuted for
19  the crime to be a criminal.
20    So as affirmed by the appellate
21  court, fraud was submitted to the Court.
22  Fraud took place.  Fraud is a crime in my
23  estimation.
24    Q.  Okay.

60 (Pages 234 - 237)

Page 238

1    And you are in this email accusing
2 Rob Weiser and the Weiser firm of committing
3 criminal acts?
4    A.  I'm saying that criminal acts took
5 place in her case, yes, that she was unaware
6 of.
7    Q.  And that Rob Weiser and/or the
8 Weiser firm are the perpetrators of those
9 crimes?
10    A.  Okay.
11    Is that a question?
12    Q.  It is a question.  And I'm asking
13 you to confirm or deny what I've said to you.
14    You said, quote, "Mr. Weiser and
15 his firm have already contacted their bar
16 associations and other courts to self-report
17 their criminal acts."
18    Okay.  What criminal acts of
19 Rob Weiser or the Weiser firm are you
20 referring to in that statement?
21    MR. MERRIGAN:  Objection.  It
22    has been asked and answered.
23    You can answer again.
24    THE WITNESS:  Having a

Page 239

1    disbarred attorney under their
2    employ submitting millions of
3    dollars in fraudulent billing.
4 BY MR. ROSENZWEIG:
5    Q.  And that is the basis on which you
6 accuse Rob Weiser and Rob Weiser's law firm
7 of being criminals?
8    MR. MERRIGAN:  Objection to
9    form.
10    But you can answer.
11    THE WITNESS:  It kind of
12    speaks for itself.
13 BY MR. ROSENZWEIG:
14    Q.  Okay.
15    You then say, and I quote, "I have
16 contacted the District Attorney's Offices in
17 Pennsylvania and Kansas and will be filing
18 formal criminal complaints."
19    When you say, "and will be filing
20 formal criminal complaints" --
21    MR. MERRIGAN:  It doesn't say,
22    "criminal."
23    MR. ROSENZWEIG:  I'm sorry.
24    You're right.  It doesn't.

Page 240

1 BY MR. ROSENZWEIG:
2    Q.  -- "and will be filing formal
3 complaints."
4    Did you file formal complaints in
5 either Pennsylvania or Kansas?
6    A.  I don't think I had a chance to do
7 that.  I did contact detectives or
8 investigators.  I wasn't sure who to contact.
9 I started in Kansas reaching out to try to
10 inquire as to who I would contact.  I was
11 then told, because they were domiciled here,
12 to contact the District Attorney's Office
13 here, I believe, if I remember the chain of
14 events correctly.
15    Q.  Okay.
16    And did you speak to either an
17 investigating officer or a member of the
18 District Attorney's Office in Montgomery
19 County, Pennsylvania?
20    A.  I believe so, yes.
21    Q.  With whom did you speak?
22    A.  I'm drawing a blank.
23    Q.  Okay.
24    If you don't remember, you don't

Page 241

1 remember.  And if it comes back to you later
2 with something else --
3    A.  I just saw his name, and it's at
4 the tip of my mind, but I can't think of it.
5 Goggins.  Detective Goggins, I believe.
6    Q.  Okay.
7    And what did you discuss with
8 Detective Goggins?
9    A.  What transpired in Kansas, the
10 Sprint case.
11    Q.  And did you tell him that you
12 believe that either Mr. Weiser or The Weiser
13 Law Firm were guilty of criminal acts?
14    A.  I told him that fraud was committed
15 in the case.
16    Q.  You say on the second page of this
17 email, which is Hartleib-12, "I will provide
18 incontrovertible proof that Mr. Weiser, et
19 al, is as guilty as Mr. Silow."
20    Do you see that?
21    A.  Yes.
22    Q.  What incontrovertible proof do you
23 have that Mr. Silow is as guilty -- I'm
24 sorry, that Mr. Weiser is as guilty as

61 (Pages 238 - 241)

Page 242

1 Mr. Silow? What proof did you have at the
2 time you wrote this?
3     A.   The only proof I had at the time
4 that this was written, I believe -- and this
5 is from memory -- is the fact that he was
6 presented -- that Mr. Silow was presented to
7 the Weiser Law Firm as Jeffrey Silow; that
8 Alexander became the person filing all the
9 sworn declarations and the affidavits, et
10 cetera, et cetera.
11     So the proof that I had at the time
12 was that Mr. Weiser knew exactly who
13 Mr. Silow was because for years -- for a
14 decade under his employ, or as a 1099
15 attorney, whatever you are suggesting that he
16 is, that he knew him as Jeffrey; that no one
17 ever knew him as Alexander.
18     So, to me, in my mind, the
19 incontrovertible proof was he knew he was not
20 Alexander.  He knew he was Jeffrey.  He hired
21 him as Jeffrey.
22     Q.   Okay.
23     Anything else?
24     A.   I mean, that's what I can remember

Page 243

1 at this point.
2     Q.   Okay.
3     Now, I would like to turn your
4 attention to what I've marked as Hartleib-13,
5 which is the March 7, 2017 cease and desist
6 letter.  I'm calling it a cease and desist
7 letter.  And the March 7, 2017, 7:21 p.m.,
8 email from you to -- it actually doesn't say
9 "To."  It's a little odd.  But there are lots
10 and lots of people copied on it.
11     It is the second page -- I'm sorry,
12 the third page of what I've marked as
13 Hartleib-13.  It is clearly from you.  And a
14 whole host of people are copied, including
15 Rob Weiser.
16     Do you know to whom this was sent?
17 It's missing the "To."  Usually, there's a
18 "From" and a "To."
19     A.   It was sent to all these parties,
20 all of these lawyers in all of the
21 consolidated cases.
22     Q.   Okay.
23     Well, it shows that as a CC.  It
24 doesn't show who the original recipient "To"

Page 244

1 is?
2     A.   I don't know.
3     Q.   Okay.
4     Is this March 7, 2017, 7:21 p.m.,
5 email, Mr. Hartleib, your response to the
6 cease and desist letter from Mr. Weiser to
7 you of March 7, 2017?
8     A.   Let me take a look at it.
9     Q.   Take your time.
10     A.   Yes, I believe so.
11     Q.   Okay.
12     And in this email, you refer to,
13 quote, "Your fraudulent acts," so to
14 Mr. Weiser, correct?
15     And what are you -- what are the
16 fraudulent acts to which you refer?  And I
17 can count the number of lines down for that
18 language.
19     Do you want me to point to it?
20     A.   No, you don't need to.
21     Q.   Okay.
22     So to what fraudulent acts are you
23 referring to?
24     A.   The fraud that was committed upon

Page 245

1 the Kansas court.
2     Q.   With respect to the Silow billing
3 records?
4     A.   With respect to the perjurious
5 declarations filed.
6     Q.   By -- of Mr. Silow?
7     A.   I think that there were other
8 parties that have affirmed and swore to the
9 accuracy of all of Mr. Silow's billing that
10 was submitted, so I will not say it was just
11 Mr. Silow.
12     I believe there were affidavits
13 from Mr. Weiser.  I believe there were
14 affidavits from the Robbins firm, whether it
15 be Aguilar, Brian.  It could have been a
16 myriad or multitude of lawyers.  So I would
17 not just categorize it, unless I have all of
18 those documents in front of me.
19     But at the time I was in the heat
20 of battle, we had all of these documents
21 coming in, and I could more easily address
22 specifically which things I was referring to.
23     But the fact of the matter is this
24 was in response to the cease and desist

62 (Pages 242 - 245)

Page 246

1  letter, and in response to my -- that we kind
2  of glazed over -- my email where I
3  memorialize every detail of the conversation
4  that I had with Ms. Ross-Williams because I
5  predicted the cease and desist letter would
6  be forthcoming.
7      Q.  And that's the email that I marked
8  as Hartlieb-12 that we discussed previously.
9      A.  Yes.  "Dear Ms. Williams, it was a
10 pleasure speaking with you."
11     Q.  Right, right, right.
12     A.  It's very cordial, I might add, if
13 you read the context of that email.  I can
14 read it for the record, if you'd like.
15     Q.  It's in the record.
16     A.  Okay.
17     Q.  It's my deposition.
18     A.  All right.
19     Q.  So if you would like to have
20 Mr. Merrigan read to you later, he can
21 certainly do that.
22     A.  Phil, I'd like to point out one
23 other thing, if I may.
24     Q.  Well, is it in response to a

Page 247

1  question I've asked?
2      A.  It is.
3      Q.  Okay.
4      A.  The cease and desist letter, your
5  clients warned me in the strongest of terms
6  not to harass -- you know, basically not to
7  harass their client.  But we all know that I
8  had every right to contact her as a
9  representative plaintiff representing my
10 interest, and one phone call is not
11 tantamount to harassment.  It could have
12 would have to be a continued course of
13 conduct.  In addition, it was for a
14 legitimate purpose, so it cannot be deemed
15 harassment.
16     Q.  Well, I would say that there is an
17 Order of the Kansas Court that disagrees with
18 you.  So --
19     A.  Touché.
20     Q.  So I would respectfully say that
21 your colloquy is rejected by the Kansas
22 Court.  Nevertheless, let me ask you my next
23 question about your March 7th responding
24 email, March 7, 2017.

Page 248

1      You, again, make a statement in
2  this to Mr. Weiser, quote, "You, sir, and
3  your coconspirators are the ones that need to
4  cease and desist."
5      Do you see that?
6      A.  Yes.
7      Q.  Who do you allege were Mr. Weiser's
8  coconspirators?
9          MR. MERRIGAN:  I'll give you
10     the same advice I gave you last
11     time about making any statements --
12         THE WITNESS:  Okay.
13         MR. MERRIGAN:  -- that could
14     be argued, although I think they
15     should be protected by litigation
16     privilege in this case.
17         THE WITNESS:  Yeah.  So it's
18     good advice from counsel since
19     we're here for what should be
20     litigation privileged protected
21     statements.
22         That said -- I know you
23     disagree with that.  That said,
24     it's hard to say at this particular

Page 249

1      point in time.  As a layperson,
2      these cases are very confusing.
3          So when I refer to Mr. Weiser
4      in 99.99 percent of every pleading
5      I draft.  And this wasn't a
6      pleading.  This was an email to his
7      client, the clients supposed to be
8      representing my interest, or this
9      was an email to Rob himself, who
10     was supposed to be my lawyer, or
11     was at one point in time, which
12     begs the question:  Why is he
13     taking an adverse position to a
14     former client in the first
15     instance.
16 BY MR. ROSENZWEIG:
17     Q.  Which is answered by the fact that
18 he was never you lawyer in the first place.
19     A.  That's your argument.
20     Q.  Well, but -- if you're going to
21 make the argument --
22     A.  I understand --
23     Q.  I asked a simple question.
24         MR. MERRIGAN:  Answer the

63 (Pages 246 - 249)

Page 250

1    question, Michael.
2        MR. ROSENZWEIG:  Okay.  Thank
3    you.
4        THE WITNESS:  So it's very
5    complicated because like even when
6    you file on the docket, there are
7    all of these cases.  They're
8    consolidated as one.  There's --
9    like in this case, I didn't even
10   know that there was a master case
11   number, like, so even knowing which
12   docket to file on, you know, all of
13   this.
14       So I was always very careful,
15   and I -- in the pleadings, I would
16   would also include Robert Weiser,
17   et al, amongst others, because I
18   didn't know at this particular
19   juncture how deep the fraud went,
20   or how deep the conspiracy to
21   defraud the Court went.
22       I didn't know if they were all
23   acting in unison, all acting as
24   one, or if it was just the Weiser

Page 251

1    firm or it was the Robbins firm
2    involved.  I don't know.  I don't
3    have all of those details.
4    BY MR. ROSENZWEIG:
5    Q.  So you used the term
6    "coconspirators" broadly to catch everybody
7    theoretically in that net?
8    A.  Everybody was that was involved in
9    this case, because it was -- it was -- it was
10   an evolving thing.  We're still finding out
11   information.
12   Q.  Don't you think, Mr. Hartlieb, or
13   didn't you think in 2017 when you authored
14   this email, that referring to lawyers as
15   coconspirators was a weighty and serious
16   thing to do?
17       MR. MERRIGAN:  Objection to
18       form.
19       But you can answer.
20       THE WITNESS:  I think it was
21       fitting, given the circumstances.
22   BY MR. ROSENZWEIG:
23   Q.  When you didn't even know to whom
24   you were referring or about what you were

Page 252

1    referring specifically?
2    A.  I think there was enough evidence
3    at this time for a good faith basis for, you
4    know, concerns about everything.
5    Q.  Okay.
6        What were those facts at this point
7    in time that led you to use the term
8    "coconspirators" with Mr. Weiser?
9    A.  A completely disinterested
10   plaintiff that had little to zero involvement
11   in the case; a case that was entirely
12   lawyer-driven; a case that hired a disbarred
13   criminal, potentially a felon, to bill $1.7
14   million of the $4.5 million settlement.
15       Voluminous ad hominem attacks
16   against me that were directed by your client,
17   and poorly put forward by local counsel, that
18   was completely inept, and actually horrible
19   at their job.
20       I think that was enough.
21   Q.  Have you completed your answer?
22   A.  Yes.
23       MR. ROSENZWEIG:  Take a quick
24       break.

Page 253

1        - - -
2        (Whereupon, there was a brief
3        recess held off the record at
4        p.m.)
5        - - -
6        MR. ROSENZWEIG:  Back on the
7        record.
8        - - -
9        (Back on the record at
10       p.m.)
11       - - -
12   BY MR. ROSENZWEIG:
13   Q.  Last question with respect to --
14   let's just move on.
15       I would like to turn your attention
16   to Tab 16, which I'm going to mark as
17   Hartlieb-14.
18       - - -
19       (Whereupon, Email Dated April
20       7, 2018, was marked as Exhibit
21       Hartlieb-14 for identification.)
22       - - -
23   BY MR. ROSENZWEIG:
24   Q.  And it's a relativity short

64 (Pages 250 - 253)

Page 254

1  one-page email.
2      Mr. Hartleib, take a minute and
3  take a look at it.
4      A.  (Witness reviews document.)
5      Yes.
6      Q.  It's an email from you to Laura
7  Jakubec with copies to a number of people,
8  including Rob Weiser.
9      Do you see that?
10     A.  I do.
11     Q.  The subject is, "Ross-WMS," which
12  we've agreed is Williams, "versus Sprint" and
13  with the appellate case number.
14     To whom -- who is Laura Jakubec?
15     A.  She was with Dollar Burns & Becker,
16  local counsel, I believe.
17     Q.  Okay.
18     And are you addressing her when you
19  say, "when your position is indefensible"?
20     A.  Again, I believe that this was a
21  general statement.  It's interesting.  I gave
22  you a good segue into this document when I
23  talked about the incompetence of that firm.
24  They attacked me viciously in pleadings, I'm

Page 255

1  sure the direction of your clients or the
2  group of firms in the case.
3      They could not even file their
4  cross appeal.  They didn't realize you had to
5  have conformed documents, and it was rejected
6  by the Court several times.  Then they
7  couldn't follow Court instructions, and they
8  were sanctioned or admonished by the
9  appellate court several times.
10     So I believe that this was in
11  reference to their complete lack of
12  professionalism, lack of ability to follow
13  the Court, and all of their attacks in their
14  pleadings against me.  So I believe it was a
15  general statement.
16     Q.  Okay.
17     You say, "When your position is
18  indefensible, attack your opponent with clap
19  trap."
20     What is clap trap?
21     A.  A nonsensical verbiage on paper, I
22  mean, meaningless words on paper.  That's my
23  understanding of the definition.
24     Q.  Then you say, "What an

Page 256

1  embarrassment to the bar."
2      What was embarrassing?
3      A.  Everything that they were doing.  I
4  mean, they were admonished by the appellate
5  court.  Their cross appeal was chock full of
6  footnotes.  The instructions from the Court
7  was specifically no footnotes.
8      I, as a layperson, although it was
9  extremely difficult, was able to do an
10  appeal.  I went over by three or four pages,
11  asked for an exception to the Court's rule,
12  and I was granted that exception, but they
13  could not even get their cross appeal filed.
14  It was rejected from the Court, I think,
15  three times.
16     Q.  Okay.
17     And the lawyers who were copied on
18  this, as you previously testified, are the
19  lawyers who were part and parcel of the case?
20     A.  Yes.  But as you can see, the
21  number is substantially less in this
22  correspondence than the prior correspondence
23  that I've testified to.  And, again, it was
24  confusing at that time because you had

Page 257

1  several of the firms that ran for the hills.
2      Once this went to appeal, they
3  jumped ship jettisoned their cases and called
4  it a day.  So that number or that list of
5  attorneys was a constantly moving target and
6  changing.
7      Q.  Okay.
8      But, nevertheless, these particular
9  attorneys who were copied are attorneys who
10  were involved in the case in some way or
11  another?
12     A.  I think Jill Boren was maybe on
13  Judge Vano's court, but, yes, they were.
14     Q.  Right, and I think you testified
15  that Ms. Boren was his clerk --
16     A.  His clerk, right.
17     Q.  -- if that refreshes your memory.
18     A.  Yes.
19     Q.  Okay.
20     So let's take a look, if we could,
21  at Exhibit-17, Tab 17, with which we're going
22  to mark has Hartleib-15.
23          - - -
24     (Whereupon, Email Dated April

65 (Pages 254 - 257)

Page 258

1    12 2017, was marked as Exhibit
2    Hartleib-15 for identification.)
3           - - -
4           MR. ROSENZWEIG:  Kevin, so --
5    so it's somewhere.
6           I don't need to do it in that
7    order.  I don't know how that got
8    kind of -- so where is that?  I'm
9    not finding that.  Okay.
10          - - -
11          (Whereupon, Email Dated April
12   26, 2017, was marked as Exhibit
13   Hartleib-16 for identification.)
14          - - -
15   BY MR. ROSENZWEIG:
16      Q.  All right.
17          So we have marked Tab 17, and the
18   April 26, 2017 forwarding email of the
19   April 25th, 2017 letter as Hartleib-16.
20          Can you take a look at the email
21   and the letter?
22      A.  I have.
23      Q.  Now, you were not privy to the
24   Loretta Hines' email to Rob Weiser forwarding

Page 259

1    the letter that was received by Judge
2    Sarclone, correct?
3       A.  I think that's the first time I've
4    seen that, yes.
5       Q.  So when was the first time that you
6    saw this document that I've marked as
7    Hartleib-16, which is the email, federal
8    copy to Judge Sarclone and a copy of several
9    pages of Court dockets that are circled and a
10   letter in large print.
11          Have you seen this before?
12      A.  Yes.
13      Q.  In what context did you see it?
14      A.  I believe when you served me with
15   the 700-page Complaint and exhibits.
16      Q.  Okay.
17          You had never previously seen it?
18      A.  Not that I'm aware.  I'm going from
19   recollection, but I think that's the first
20   time that I've seen this document.
21      Q.  So I'm going to ask you some very
22   direct questions.
23          Did you write this document?
24      A.  No.

Page 260

1       Q.  Did you direct anybody to write
2    this document?
3       A.  No.
4       Q.  Did your -- did your -- to your
5    knowledge, did your colleague, Mr. Sacks,
6    write this document?
7       A.  No.
8       Q.  Did --
9       A.  I said he's brighter than I am.
10      Q.  You did say that, but that's still
11   doesn't mean -- I didn't ask the question.
12          Do you have any idea who wrote this
13   document?
14      A.  No.
15      Q.  You don't know who "A. Anonymous,
16   Esquire" is?
17          That's the return address on the
18   envelope.
19      A.  No.
20      Q.  Okay.
21          If you look at the first page,
22   which has circled "Court docs, Pennsylvania
23   firm for disbarred lawyer billings"?
24      A.  Yes.

Page 261

1       Q.  Is that your handwriting?
2       A.  Where?
3       Q.  There is a previous page.
4       A.  Oh, no.
5       Q.  Do you know where this cover
6    document of "Court docs Pennsylvania firm for
7    disbarred lawyer billings" came from?
8       A.  No.
9       Q.  Do you have any information about
10   why this letter was written?
11      A.  No.
12      Q.  Do you have any information about
13   by whom this letter was written?
14      A.  No.
15      Q.  Okay.
16          Do you agree with the statement in
17   the letter that Judge Vano's 90-percent
18   reduction in fees was a good thing?
19      A.  No.
20      Q.  And why is that?
21      A.  It should have been 100-percent
22   reduction.
23      Q.  Do you know who Andrew Silow is?
24      A.  Do I know of an Andrew Silow?

66 (Pages 258 - 261)

Page 262

1    Q.   Yeah.
2    A.   No.  The only Silow I know is
3  Jeffrey or Alexander.  I don't know if they
4  call him Andrew.
5    Q.   Do you know who Andy Silow is?
6    A.   No.
7    Q.   The letter pretty much states, if
8  not implies, that Rob Weiser knew that
9  Jeff Silow was a disbarred lawyer.
10        Do you agree with that contention?
11    A.   I agree that Rob Weiser knew who
12  Mr. Silow was, that he was Jeffrey not
13  Alexander.
14    Q.   And do you believe with the
15  implication of this letter that Rob Weiser
16  believed that Jeff Silow was engaged in phony
17  billing?
18    A.   I believe that Mr. Silow's billing
19  was for illusory work that had little to no
20  value, and did not warrant the $4.5 million
21  fee request.  I don't have enough information
22  to know if the relativity software system can
23  be corrupted or gained.
24    Q.   Do you know anybody -- do you

Page 263

1  personally know anybody who lives or works in
2  West Chester, Pennsylvania?
3    A.   No.  The only -- I've never been to
4  Pennsylvania prior to this case.  I bought a
5  car from this state at one point in time that
6  was shipped to me.  I've never had any
7  communication with anybody in this state,
8  that I can recall, with the exception of that
9  automotive purchase, and with the exception
10  of Mr. Goggins, which we already discussed.
11    Q.   And you testified earlier that John
12  Sorge, also known as Jack Sorge lived in New
13  Jersey.
14        You don't have any information that
15  he lived in West Chester, Pennsylvania, or
16  those environments in 2017?
17    A.   No.  Honestly, I would be surprised
18  if he's still living.
19    Q.   I understand.  I will turn your
20  attention to Tab 15, which I will mark as
21  Hartleib-17.
22              - - -
23        (Whereupon, Email Dated April
24      7, 2018, was marked as Exhibit

Page 264

1        Hartleib-17 for identification.)
2              - - -
3        THE WITNESS:  I would like to
4        add that this is one of the most
5        offensive things about this lawsuit
6        that you guys think that I wrote
7        this, or that it was alleged that I
8        wrote this.  It's ludicrous.  I've
9        never done anything anonymously in
10        my life, never, nor do I write this
11        poorly.
12  BY MR. ROSENZWEIG:
13    Q.   Okay.
14        The record so reflects your
15  testimony.  Let's take a look at, as I said,
16  Tab 15, which I'm marking as 17.
17    A.   (Witness complies.)
18    Q.   Are you ready?
19    A.   Yes.
20        MR. MERRIGAN:  You said, 15 at
21        17?
22        MR. ROSENZWEIG:  It Tab 15,
23        which I'm marking as Hartleib-17.
24

Page 265

1  BY MR. ROSENZWEIG:
2    Q.   It's actually two pages, apologize,
3  but all the substance is on the first page.
4    A.   Yes.
5    Q.   Mr. Hartleib, did you write this
6  email from you, Saturday, April 17, 2018, to
7  Rob Weiser, with a copy to a series of people
8  with a subject "Re Ross-Williams Appellate
9  Case"?
10    A.   I believe so, yes.
11    Q.   And this email was written by and
12  sent by you?
13    A.   Yes.
14    Q.   Okay.
15        What was the context in which this
16  motion was sent -- I'm sorry, this email was
17  sent?  I said, "motion."
18    A.   The context was that your clients
19  hired a private investigator to dig up any
20  kind of dirt they can find on me to try to
21  besmirch my reputation.
22    Q.   Okay.
23        And what was the information that
24  is -- that reference to L English Research

67 (Pages 262 - 265)

Page 266

1 Services as the investigator?
2     A.  That's who went into the Orange
3 County docket, I believe, to look for any
4 cases that involve me, such as my divorce, et
5 cetera.
6     Q.  You reference in the second
7 sentence, a line, and I will read it.
8 "Clearly, this is in retaliation to your
9 being rightfully removed as colead counsel in
10 the Equifax case."
11     A.  Yes.
12     Q.  What was your involvement in the
13 Equifax case?
14     A.  I filed an Amicus brief, and
15 appeared at a hearing.
16     Q.  Okay.
17        And what was the purpose of your
18 filing an Amicus brief?
19     A.  To inform the Court what had
20 transpired in Kansas and the Sprint case what
21 was ongoing at that time.
22     Q.  Did you have any personal interest
23 in Equifax or the outcome of the Equifax
24 case?

Page 267

1     A.  Yes.  I was a shareholder, and I
2 believe a victim of the alleged data breach.
3     Q.  And the purpose of your informing
4 the Equifax court of this was what, why?
5     A.  To give the Court information that
6 it should have when rendering a decision on
7 appointing lead counsel in the case.
8     Q.  So was your intention to prevent
9 the Weiser firm from being the lead counsel
10 on the case?
11     A.  That's not my job.  That's up to
12 the judge.  My intent was to provide the
13 judge with information that may or may not be
14 germane into his rendering a decision on who
15 to appoint as lead in that case.
16     Q.  And why did you think what happened
17 in the Equifax case was -- in the Sprint
18 Nextel case was germane to the appointment of
19 counsel in the Equifax case?
20     A.  It had to do with qualifications
21 candor, all the things that a judge may use
22 to render a ruling, as to which firm is most
23 appropriate to handle a case of that size.  I
24 believe it was one of the largest cases in

Page 268

1 history, as far as every state was involved,
2 both derivative and 10(b)(5), I believe
3 Securities actions also.
4     Q.  And did you know that the Weiser
5 Law Firm had been appointed colead counsel in
6 the Equifax case?
7     A.  I don't know that I was aware that
8 he had been appointed.  I heard -- I must
9 have heard somewhere that there was going to
10 be an appointment or reconsideration of that
11 appointment, but I don't recall where I heard
12 that, or if I read that.  I don't know.
13     Q.  Okay.
14        So was your intention to have the
15 Weiser firm removed?
16     A.  That's not -- that was not up for
17 me to decide.  What -- my purpose of being
18 there was to inform the Court as to what
19 transpired, what happened, let the Court make
20 a decision as to whether or not this was
21 relevant to who was appointed as lead
22 Plaintiff's counsel.
23        In my mind, I didn't, of course,
24 think what transpired in Kansas and what was

Page 269

1 ongoing in Kansas, that the Weiser firm was
2 the best fit.
3     Q.  Meaning, as lead counsel or colead
4 counsel in the Equifax case?
5     A.  Right.
6     Q.  And did you, in fact, come to know
7 that the Weiser firm was removed as lead
8 counsel or colead counsel in the --
9     A.  Yeah.  I found out that he was
10 colead with another firm, and that, yes, he
11 was -- they were removed, both were removed,
12 including the other firm, I believe.
13     Q.  And was that your intended result?
14     A.  My -- I had no expectations as to
15 what my results would be, other than the fact
16 that I believed it prudent and important for
17 the judge to have all of the information when
18 rendering his ruling on who would lead such a
19 large case.
20     Q.  But it is fair to say,
21 Mr. Hartleib, that there was no other -- what
22 you submitted to the Equifax court was
23 certainly not intended to enhance the good
24 feeling of the Court toward the Weiser firm

68 (Pages 266 - 269)

1  in keeping them as counsel or colead counsel?
2    A.  Let's put it this way.  The
3  information speaks for itself.
4    Q.  So when you provided it -- when you
5  provided the information to the Equifax
6  court, it was certainly on your mind that it
7  would lead to the Weiser firm being removed
8  as colead counsel?
9    A.  It was up to whatever the judge
10  would decide to do with that information.
11    Q.  But that information was provided
12  by you with the intention of having the
13  Equifax court reconsider its appointment of
14  colead counsel?
15    A.  I don't know that I knew that
16  colead counsel or lead counsel had already
17  been appointed.  I just knew that I wanted to
18  provide the information to the Court because
19  I heard that they were making a decision on
20  lead counsel in that case.
21    Q.  Did you provide any other negative
22  information about any other firm to the
23  Equifax court?
24    A.  I think I gave all of the

1  information and all of the pleadings from the
2  Kansas case as exhibits in the Amicus filing,
3  which would have reflected poorly, or, you
4  know, with regard to the other firms in that
5  case.
6    Like I said, it's very difficult to
7  ascertain who's doing what because all of the
8  firms kind of operate as one.
9    Q.  But specifically the allegations
10  that you brought to the Court's attention,
11  Equifax case, were heavily influenced by what
12  the Weiser firm did with respect to billing
13  and the Silow issues; is that fair?
14    A.  Obviously, like I said, the
15  information speaks for itself, and Judge Vano
16  made it clear that he took particular issue
17  with Mr. Silow and the billing records, but,
18  you know, without getting and naming names,
19  those billing records were performed and put
20  together by another firm in the case, and
21  under their tutelage, or their supervision
22  and there were sworn affidavits to the
23  accuracy of those billing records that are in
24  serious question as to their accuracy.

1    Q.  Okay.
2    Let's turn your attention to what
3  I'm going to mark as 18.
4    It's the funny alignment.  It is
5  Tab 18, and we will mark it as Hartleib-18.
6  I juggled things around, so that it would
7  come out that way.
8    A.  Clever.
9    -  -  -
10    (Whereupon, Email Dated May
11    19, 2018, was marked as Exhibit
12    Hartleib-18 for identification.)
13    -  -  -
14  BY MR. ROSENZWEIG:
15    Q.  Mr. Hartleib, I'm going to ask you
16  to take a moment and look at what is
17  Hartleib-18.
18    A.  (Witness complies.)
19    Q.  This is two pages, but the
20  substance is obviously Page 1.
21    A.  Okay.
22    Q.  Also, an email from you Saturday,
23  May 21st, 2018, 5:40 p.m., to Laura Jakubec.
24    A.  Dollar Burns & Becker.

1    Q.  Dollar Burns & Becker firm with
2  other lawyers, including Rob Weiser and Brett
3  Stecker as copies.
4    It also seems to leave off -- so,
5  in any event, you state in this email, and I
6  quote, "Plaintiff's counsel and I use this
7  term loosely when making false allegations
8  against the party.  I would suggest you at
9  least get it right.  I am no expert, but I am
10  pretty sure it would be libelous!"
11    To what are you referring?
12    A.  So, at this particular juncture, it
13  was getting very contentious with gratuitous
14  attacks against me, and my person and there
15  were libelous comments that were made.  One
16  could argue that they were protected by
17  litigation privilege, but --
18    Q.  By whom, Mr. Hartleib?
19    A.  By the parties that made the
20  libelous statements or comments.
21    Q.  Which were who?
22    A.  Which were attorneys involved in
23  the Sprint litigation.
24    Q.  All of them?

69 (Pages 270 - 273)

Page 274

1     A.  No, but I -- at the advice of
2  counsel, I'm not going to give specific
3  names.
4         MR. MERRIGAN:  I'm okay with
5     it in this one -- in this
6     circumstance.
7         THE WITNESS:  You are, okay.
8     So, in large part -- but
9     here's the thing:  I don't know who
10    was instructing.  I assumed it was
11    your clients, but maybe I'm
12    mistaken.  Maybe it was the Robbins
13    firm.
14        Somebody was instructing local
15    counsel, or someone was drafting
16    these pleadings for local counsel
17    because, frankly, I don't think
18    local counsel was bright enough to
19    draft the pleadings that they
20    drafted, or that they presented.
21        I don't know who was writing
22    all of the pleadings that were
23    so -- that they were taking such
24    vicious ad hominem attacks and

Page 275

1  gratuitous attacks against me, but
2  that was during this period of
3  time.
4         I believe this was directed
5  mostly to Dollar Burns & Becker,
6  one of the most incompetent law
7  firms I've seen to date.  I believe
8  it was being drafted to them in
9  response to them even using
10 accusatory or statements against me
11 for defamation, for liable, you
12 know, and those type things, or
13 slander.
14        In this particular instance,
15 it was written so it would be
16 libelous.  If it was spoken, it
17 would be slanderous.  So they got
18 it wrong, and I was correcting
19 them.
20 BY MR. ROSENZWEIG:
21    Q.  Do you have any information
22 specifically that Rob Weiser or the Weiser
23 Law Firm was a part in that process?
24    A.  Yes.  In regard that everything

Page 276

1  being filed was being filed through local
2  counsel, who was directing local counsel, who
3  was drafting the pleadings for local counsel.
4  Who was instructing local counsel to do the
5  things that they did, I don't know.
6         The only thing I know is that
7  Rob Weiser was -- his firm was kind of the
8  lead case handling everything in this.  I
9  believe it was his firm that was dealing
10 directly with Dollar Burns & Becker, but I
11 honestly, to this day, don't know if the
12 Robbins firm had involvement, the Hershewe
13 firm had involvement.  I don't know.  I
14 wasn't behind the scenes.
15        You didn't turn over a single email
16 that had my name mentioned in it anywhere, so
17 through discovery we weren't able to obtain
18 that information.
19    Q.  And just for the heck of it, when
20 you say, "I will demonstrate its use post
21 haste," do you mean of the term "libelous"?
22    A.  Yes.
23    Q.  Because you believe that the
24 statements made against you were libelous?

Page 277

1     A.  Well, I filed a pleading in
2  response to this pleading that emphasized my
3  point, I guess.
4     Q.  Let's go to Exhibit-19 -- to be 19,
5  which I'm going to mark as Hartleib-19.
6  That's June 2, 2018.
7     A.  (Witness complies.)
8              -  -  -
9         (Whereupon, Email Dated June
10        2, 2018, was marked as Exhibit
11        Hartleib-19 for identification.)
12             -  -  -
13 BY MR. ROSENZWEIG:
14    Q.  Are you there?
15    A.  I'm there.
16        MR. ROSENZWEIG:  Mr. Merrigan?
17        MR. MERRIGAN:  Yep.
18 BY MR. ROSENZWEIG:
19    Q.  Okay.
20        Have you had a chance to look at
21 it, Mr. Hartleib?
22    A.  Yes.
23    Q.  So this is a June 2nd 2018,
24 12:12 a.m., email to you from Jill Boren with

70 (Pages 274 - 277)

1  a whole bunch of people copied to Rob Weiser.
2  Subject, "Judge, Pressing, Lead Street Bank
3  Lawsuit on Overbilling Questions/National Law
4  Review," correct?
5      A.  Yes.
6      Q.  What was your purpose in writing
7  this email to Ms. Boren?
8      A.  To get the information to Judge
9  Vano.
10     Q.  And what was pending before
11 Judge Vano at this time?
12     A.  I don't believe anything was
13 pending at this time.  I think -- I don't
14 know for sure, but I believe the remand was
15 already addressed, and I believe the case was
16 back before the appellate court.  There was
17 nothing pending at this time.
18         This was just me wanting to affirm
19 my concerns about derivative litigation, the
20 fraud that's rife throughout the derivative,
21 the plaintiff's bar regarding derivative
22 litigation.
23         This was, I believe, something that
24 I thought Judge Vano would appreciate or take

1  note of or take notice of.
2      Q.  Why?
3      A.  Because he's a good judge.
4      Q.  But there was nothing pending
5  before him, it was just -- was it gratuitous?
6      A.  That's okay.  It was an unsolicited
7  correspondence to the Court.  I copied
8  everybody, so there could be never any
9  question as to any kind of an ex parte
10 communication with the Court.
11         The Court retains jurisdiction over
12 the settlement.  So I believe, you know, it's
13 prudent or -- prudent to continue to send
14 things to the Court that he may -- the judge
15 -- he or she may deem relevant, but it's my
16 understanding -- and it was testified to in
17 open court by Mr. Stecker, that the Court
18 retains jurisdiction over this case and over
19 this settlement for years to come.
20     Q.  Did you have personal involvement
21 in the State Street Bank case?
22     A.  I don't believe so.  I believe
23 someone sent me the article, but I believe
24 that I knew the players or some of the firms

1  that were involved in that case.
2      Q.  But you were not a shareholder with
3  separate standing in State Street?
4      A.  Not to my recollection, no.
5      Q.  And were you aware of what the
6  Weiser Law Firm or Rob Weiser's role was in
7  State Street Bank in the litigation?
8      A.  I may have been then, but I'm -- I
9  don't recall now.  I mean, I would have read
10 the article, which there is no copy of here.
11 I would have read all of this.  I would have
12 done investigation into it, and, then, I
13 drafted this correspondence to Judge Vano.
14     Q.  And the copies were all people who
15 were lawyers in the Sprint-Nextel case,
16 correct?
17     A.  Sprint Nextel, and the ongoing --
18 yeah, the State case with Judge Vano and/or
19 attorneys in the appellate case regarding
20 Sprint.
21     Q.  But none of them were in the State
22 Street Bank case?
23     A.  No, because I don't believe I was
24 involved in this case, nor did I have any of

1  the email addresses for the attorneys that
2  were involved in that case.
3      Q.  But that is -- but you've
4  identified who you copied and why, correct?
5      A.  Yes.  It looks like -- in looking
6  at these, I believe all of these attorneys
7  are -- these -- are parties to the appeal, I
8  believe.  Like I said, if -- at this
9  particular point in time I stopped copying
10 all the attorneys in the Sprint case, because
11 a lot of those attorneys had already
12 withdrawn their suits when it went to appeal.
13 So I think that's the reason this number is
14 substantially smaller.
15     Q.  Great.
16     A.  The number copied in the email is
17 substantially less because I believe all the
18 other firms had dismissed their cases.  They
19 did not take it up on appeal.  I believe
20 that's accurate.
21     Q.  Was Judge Vano involved in the
22 State Street Bank case?
23     A.  No.
24     Q.  Did you communicate any of this

71 (Pages 278 - 281)

Page 282

1  information to the State Street Bank case
2  court, judge, law clerk, or lawyers?
3      A.  That's a good question.  I don't
4  recall.  If I -- I would have, if they
5  weren't aware of it already.  So it's
6  possible they were already aware of it, based
7  on the Law Journal, the National Law Journal.
8  I believe the judge already addressed these
9  issues.  So I don't think there was any need
10  for me to contact them, but I'm just going by
11  number.
12      Q.  Okay.
13      A.  Which is a long time ago.
14      Q.  Understood.
15          And the link -- did you have any
16  part in the National Law Journal article,
17  either in contributing to it, being
18  interviewed for it, or anything of the sort?
19      A.  Not to my knowledge.
20      Q.  No memory of that?
21      A.  No.
22      Q.  So you just came across it and
23  decided to share it --
24      A.  Yes.

Page 283

1      Q.  -- because it correlated to what
2  transpired in the Sprint case?
3      A.  And the fact that something needs
4  to be done to reform derivative litigation
5  and just because a law firm reviews millions
6  of documents doesn't mean that they can just
7  run a printing press and generate hours
8  billed by reviewing documents that lead to no
9  meaningful reform or inflate those hours
10  billed, et cetera, et cetera.
11      Q.  Did you file an Amicus brief in the
12  State Street case?
13      A.  I don't believe so, but I'm not
14  certain.  Like I said, I believe it was
15  already resolved when I obtained the
16  information, but I'm not certain.
17      Q.  Okay.
18          You reference filing an Amicus
19  brief in the email.  That's why I'm asking
20  you if you ever did.
21      A.  I don't have any -- I don't have
22  any recollection of filing an Amicus brief in
23  this case.  I don't know that, like once I
24  did the research it was a moot point at that

Page 284

1  particular point in time.  I don't recall.
2      Q.  In the last sentence of the second
3  paragraph you state, and I quote, "The
4  actions of Weiser, et al, and the firms in
5  this State Street case is the very definition
6  of racketeering and warrants regulative
7  reform."
8          Do you see that?
9      A.  Yes.
10      Q.  What is the definition of
11  "racketeering" Mr. Hartleib?
12      A.  You're going to test my memory
13  here.  So the definition of racketeering --
14  and I know I'm not going to get it perfectly
15  right, but a layperson's understanding of a
16  definition of "racketeering" is when there is
17  a group that's organized, that uses the
18  instrumentalities of wire mail and -- and/or
19  another means of communication, I don't
20  recall off -- which, off the top of my head,
21  for the purpose of committing a crime.
22          So it's a group of organized
23  participants that use the instrumentalities
24  of mail, wire, electronic mail, or electronic

Page 285

1  communications to facilitate a criminal
2  enterprise or criminal acts.  That's my
3  layperson definition.
4      Q.  Okay.
5          So tell me how the actions of the
6  Weiser -- of Weiser, et al, and the firms in
7  the State Street case constitute the very
8  definition of "racketeering."
9      A.  I would have to go back and read
10  what transpired in the State Street case.
11  But if law firms are knowingly working
12  together to bill a illusory hours for an
13  illusory work, share each other's databases,
14  timekeeping databases, transmit details of
15  said systems, emails, all of these things to
16  defraud courts out of illicit fees or fees
17  that they're not entitled to, to me, that
18  would be the definition of "racketeering."
19      Q.  And do you know what the State
20  Street Bank court judge ultimately determined
21  in the State Street Bank case?
22      A.  Not off the top of my head, and I
23  don't know when this was written, if that was
24  even concluded, like I've testified to, I

72 (Pages 282 - 285)

1  don't know.  This was written right after I
2  received the article, so the case may have
3  still been pending.  The case may have been
4  resolved.
5      I don't know the status of the case
6  when this was drafted, and I believe that
7  there were substantial sums of money that
8  were billed that were fraudulent, or that was
9  for an illusory work or didn't happen or
10 inflated bills.
11     There's been a lot of cases that
12 I've investigated, so I may be conflating the
13 two.  I know there was even a case with a
14 very large Grant Eisenhower, I believe, and I
15 don't know if Grant Eisenhower was involved,
16 but that name was coming to mind, and people
17 were shocked that Grant Eisenhower had issues
18 with their billing logs because they were
19 supposed to be one of the gold standards of
20 defense firms.  So I don't recall.
21     Q.  Did you think it was serious to
22 accuse the Weiser firm and others in the
23 State Street Bank case of racketeering to
24 another court and judge?

1      MR. MERRIGAN:  Objection.
2      But you can answer.
3      THE WITNESS:  Yeah, but this
4      was -- yeah, of course, it's always
5      serious any time you make
6      allegations or acquisitions as
7      such.
8      In this particular case, all
9      of the parties knew what transpired
10     in the Sprint case, so it was no
11     shocker to them.  I said that
12     throughout my pleadings in the
13     course of litigation, and the
14     course of being attacked and the
15     course in the "battle,"
16     quote/unquote, "battle."  And if
17     you notice, it says, "Weiser,
18     amongst others."
19 BY MR. ROSENZWEIG:
20     Q.  Well, it says, "et al," right?
21     A.  Mm-humm, yes.
22     Q.  Let's look at Tab 28, please.
23     A.  (Witness complies.)
24     Q.  And Tab 28 is going to be -- now

1  that I keep it interesting, it will be
2  Hartleib-20.
3      -  -  -
4      (Whereupon, Forwarded Email,
5      was marked as Exhibit Hartleib-20
6      for identification.)
7      -  -  -
8  BY MR. ROSENZWEIG:
9      Q.  So let's look at 28, please, Tab
10 28, which I'm marking as Hartleib-20.
11     A.  (Witness complies.)
12     Q.  Mr. Hartleib, have you had a chance
13 to look at this?
14     A.  Yes.
15     Q.  Okay.
16     Is this an email that you sent?
17     A.  It appears so, yes.
18     Q.  Now, I have information that this
19 was March 14th of 2019, and I believe in your
20 answer at Paragraph 134 you admit that date.
21     But do you have any specific sense
22 of when this email was sent?
23     MR. MERRIGAN:  I'm going to
24     object to the form.  If it turns

1  out to be inconsistent with what's
2  employed in the case.
3      MR. ROSENZWEIG:  I'm asking
4  him for what his knowledge of the
5  date is.
6      MR. MERRIGAN:  Sure.
7      THE WITNESS:  Yeah, I don't
8  understand what's happened to the
9  format of some of these emails,
10 because, you know, there should be
11 a time stamp and date, which was
12 not there.  I have no clue.  So I
13 didn't --
14 BY MR. ROSENZWEIG:
15     Q.  These are as received, so --
16     A.  Yeah, I don't know.
17     Q.  Fair enough.
18     But is this an email sent by you?
19     A.  Yes.
20     Q.  And it's, again, to Ms. Boren --
21     A.  Correct.
22     Q.  -- Judge Vano's law clerk?
23     A.  Correct.
24     Q.  And there are a whole host of

73 (Pages 286 - 289)

Page 290

1 people copied on this, a much longer list
2 than in other lists.
3        Can you tell me who these copies
4 are?
5    A.  All parties in the original Sprint
6 case, and parties in -- including local
7 counsel and parties in the appeal.
8    Q.  And what was your intention in
9 including all of these lawyers?
10   A.  Like I said, sometimes for the sake
11 of expediency and ease, there would be -- and
12 maybe that's why I don't know, but there
13 would be copy and pasting going on from
14 recent correspondence to different parties,
15 so that all of these didn't have to be typed
16 out again.
17   Q.  All right.
18        What was your purpose in sending
19 this email to Ms. Boren?
20   A.  More information for Judge Vano.
21 Like I said, I believe that Judge Vano
22 maintained jurisdiction over the Sprint case
23 with regard to the settlement, and this was
24 more information that I wanted to share with

Page 291

1 the judge that I believe was important and
2 relevant in for him to use in the future or
3 just for his education.
4    Q.  You have a subject forward emailing
5 Amicus Curiae in Centurylink?
6    A.  Correct.
7    Q.  Did you file an amicus brief in
8 Centrylink?
9    A.  I did.
10   Q.  Were you a shareholder in
11 Centrylink?
12   A.  Yes.
13   Q.  What was your purpose in filing the
14 Amicus Curiae in the case?
15   A.  It's the same as in all the cases.
16 It's to inform the Court of what transpired
17 in Kansas, what was still ongoing in Kansas,
18 and to give the judge all relevant
19 information that he may or she may deem
20 relevant or important in rendering any kind
21 of a decision on appointment of lead counsel,
22 and just management of the case in general.
23   Q.  And was it your intention to
24 enclose and attach the Amicus brief that you

Page 292

1 sent to Judge Davis in the Amicus litigation?
2    A.  I don't recall if it was enclosed
3 or not.  I don't recall.
4    Q.  What about the transcript, the
5 hearing before Judge Davis, did you send that
6 as well to Ms. Boren?
7        You said in the first paragraph,
8 "Attached is an Amicus brief filed in
9 Minnesota, Michael J. Davis," that's in the
10 text of your own email?
11   A.  Right.
12   Q.  So I assume that because you said
13 it, you did it?
14   A.  Unless I forget.  But, yeah, any
15 intention would have been to send it.  I
16 generally would try to include all
17 attachments in the emails.  It's possible
18 that it was missed, and there is no time
19 stamp on here, so I don't know what time at
20 night this was sent.  I mean, a lot of this
21 was done late night.
22   Q.  And you also enclosed the lawsuit
23 you filed in Kansas against the Weiser Law
24 Firm, Rob Weiser, and Monica Ross-Williams,

Page 293

1 correct, which is Exhibit-30.  It's Tab 30.
2        And while we're at it, why don't we
3 mark Tab 30 as Hartleib-21.
4    A.  Yes.
5            -  -  -
6        (Whereupon, Letter Dated
7        December 12, 2018, was marked as
8        Exhibit Hartleib-21 for
9        identification.)
10           -  -  -
11 BY MR. ROSENZWEIG:
12   Q.  So that's the action ultimately
13 that you filed against Weiser, Weiser Law
14 Firm, Rob Weiser, and Monica Ross-Williams?
15   A.  I believe so, but it's stamped
16 "Draft, 12/13/18."  I have no clue if this is
17 what was filed.
18   Q.  But look at the cover letter from
19 your counsel, Mr. Protzman?
20   A.  Yes.
21   Q.  Which is part of that?
22   A.  Yes.
23   Q.  So is it your testimony that that
24 looks like the Complaint, but you're not sure

74 (Pages 290 - 293)

Page 294

1  that's the exact version that was filed?
2      A.  Correct.
3      Q.  Fair enough.
4          And that -- you transmitted that --
5  that draft or the filed version of the
6  Complaint to Ms. Boren?  I encourage you to
7  look at your email.
8      A.  Yeah.  I -- I'm looking at the
9  email.  It must have been my intent to attach
10  it.  Whether or not I did, I don't know.
11          The other thing is I doubt that I
12  would send a draft version of any Complaint.
13  I believe that I would only send a conformed
14  copy, if I was sending something out in PDF
15  form only.
16      Q.  So it would not be, according to
17  you, what has been marked as Hartleib-21,
18  but, rather, a final version that was
19  actually filed?
20      A.  I can't swear to that under oath
21  today, but it would be my standard practice
22  not to file a draft version of something that
23  had not been filed yet.
24      Q.  Fair enough.

Page 295

1          As any non-good lawyer would do.
2          You state in the second paragraph
3  of your email to Ms. Boren, and I quote,
4  "Maybe Judge Vano would be interested in
5  setting the record straight before the Court
6  appoints lead counsel in the aforementioned
7  case."
8          I assume the aforementioned case is
9  Centurylink, correct?
10      A.  Yes.
11      Q.  Do you know who was appointed lead
12  counsel in Centrylink?
13      A.  I don't remember the plaintiff's
14  name, but I don't recall -- but like Bragar
15  Squire rings a bell as the firm, but I don't
16  know that for a fact.  I did at the time, but
17  I don't recall today.
18      Q.  Were you aware that at the time of
19  this email that Weiser Law Firm was not
20  seeking appointment as colead counsel in
21  Centurylink?
22      A.  I believe I was aware of that, yes,
23  but I believe that the Robbins firm was
24  seeking lead, and they were seeking

Page 296

1  multi-jurisdictional lead, and per pleadings
2  that you have -- and I think it's evident or
3  clear that I have issues with that firm,
4  also, or have had issues with that firm.
5      Q.  But the -- is it fair to say that
6  the Sprint-Nextel filings and opinions, and
7  what have you, were largely focused on the
8  Weiser firm and the Silow billings?
9      A.  The Silow billings became clearly a
10  focus of Judge Vano, henceforth, a focus for
11  me, but I don't think it's fair to say that
12  everything outside of that focused on the
13  Weiser firm, because my argument has always
14  been that these firms act as one.
15      Q.  What do you mean by that?
16      A.  They all act as one.  They decide
17  who's going to work in this case, who's going
18  to work in this case, who's going to put
19  forth this, who's going to put forth that,
20  whoever gets leads divvies up the moneys.
21          You know, like I said, if there is
22  something that far at foot, it's the very
23  definition of racketeering because they're
24  all acting as one.  They file multiple

Page 297

1  complaints.
2          If one of the complaints doesn't
3  have a plaintiff that's not standing or gets
4  hit by a bus or dies, next person in line
5  takes their plaintiff, and the case goes on.
6      Q.  And you think that amounts to
7  racketeering?
8      A.  I think given everything else, when
9  you put it all together, yes.
10      Q.  What is your, quote, "quest" to
11  expose lawyer-driven litigation rife
12  throughout the plaintiff's bar, what is that?
13  What's your quest?
14      A.  Exactly what I've testified to.  So
15  what I -- what I have seen and experienced
16  firsthand, that the plaintiff's bar in
17  general in derivative litigation does not
18  want a real plaintiff.
19          They want someone to lend their
20  name to the case, so that they can do
21  whatever it is that they want to do, that
22  they can get whatever relief they want to
23  get.  Not a lot of real work is done in the
24  cases.

75 (Pages 294 - 297)

Page 298

1    I'm not saying every derivative
2  case, there's no meaningful relief, but,
3  unfortunately, the ones that I have been
4  involved in, there hadn't been. So I believe
5  that a real plaintiff is not something they
6  want. I believe a real plaintiff is not
7  something derivative firms want because the
8  settlements would get much more expensive.
9    There have been many firms that
10 have used serial criminal plaintiffs. I'm
11 sure you're familiar with (inaudible). They
12 went to the federal penitentiary for doing
13 some of the very things that these firms
14 continue to do, the firms, by using their
15 college roommate, buddies, to act as lead
16 plaintiffs in these cases.
17    There is no real agreed party in
18 these case. It's strictly plaintiffs are
19 seen as a necessary nuisance to get to an end
20 means, which results in millions in attorneys
21 fees and little to nothing for the
22 corporation, or its shareholders
23 derivatively.
24    Q.  And is this the same bundle of

Page 299

1  concerns you have, Mr. Hartleib, as the
2  quote, "quest" to expose and reform the
3  corporation rife throughout the derivative
4  litigation?
5    A.  Yes, and not only is it the same --
6  it's the same players. The same parties
7  continue to do the same thing that they were
8  caught redhanded doing with Melvin Wiess and
9  William LaRock.
10    Q.  In this email from you, that we've
11 marked as Hartleib-20, second page, you refer
12 to -- in the third paragraph, quote,
13 "Interestingly, I received an anonymous
14 letter last night, which details an elaborate
15 scheme by Weiser, et al, to procure, quote,
16 'realtors,' unquote, in Qui TAM cases. It
17 involves the use of several LLC shell
18 corporations set up for the sole purpose of
19 soliciting information under false pretenses
20 to facilitate lawyer-driven Qui TAM cases."
21    When did you receive an anonymous
22 letter?
23    A.  It would have been whenever I said.
24 Interesting, I said "last night." So it

Page 300

1  would have been -- there's no date on this
2  email.
3    Q.  Okay.
4    Was there a reason you didn't
5  attach the anonymous letter?
6    A.  No.
7    Q.  Was the anonymous letter received
8  by you by US Mail?
9    A.  Yes.
10    Q.  Did you ever come to learn who
11 wrote the anonymous letter?
12    A.  No.
13    Q.  Can you describe the anonymous
14 letter to me?
15    A.  Yes.
16    Q.  Please do.
17      MR. MERRIGAN:  The contents of
18   it or?
19      MR. ROSENZWEIG:  It's a fair
20   clarification.
21 BY MR. ROSENZWEIG:
22    Q.  First, tell me, was it handwritten,
23 typed, what kind of paper it was on,
24 physically describe it.

Page 301

1    A.  I'm going by recollection. I still
2  have the envelope in which it came. Very
3  strange. The envelope was open, had unusual
4  postage on it, like strange postage that I
5  haven't seen before. I believe that
6  anonymous letter and the envelope was
7  scanned, and was made an exhibit in one of
8  the pleadings on appeal in the appeal. I'm
9  90-percent sure of that.
10    Q.  In the Sprint-Nextel appeal?
11    A.  Yes. I'm not 100-percent, but
12 90-percent sure. I have the envelope. I
13 cannot find the letter. It has to be there
14 somewhere.
15    Q.  Would you produce the envelope to
16 your attorney to produce to me?
17    A.  Yes.
18    Q.  Okay.
19    A.  The letter was -- the envelope is a
20 maybe 6 x 10 or something to that effect.
21    Q.  So larger than a standard
22 business --
23    A.  Larger than a manila envelope. The
24 paper was, I think, trifolded or bifolded, I

76 (Pages 298 - 301)

Page 302

1  think, trifolded, very short, small font, if
2  I recall correctly, typed explanation of this
3  elaborate scheme. I investigated what was
4  alleged in this letter.
5       It wasn't a lot of content, like a
6  small paragraph, small font, like ten maybe,
7  and found the Department of Justice motion to
8  dismiss, and, then, them outing all of these
9  Qui TAM cases, which corresponded to what the
10  anonymous letter said.
11  Q.  Do you have an understanding --
12  okay -- of, you know, what a Qui TAM case is,
13  and the anonymity hat is required of them?
14  A.  Yes.
15  Q.  Do you have an understanding that
16  shell corporations, LLCs, are common practice
17  in the practice to shield the identity of the
18  complaining witness for a period of time to
19  prevent their identification from being
20  public, unless and until the case is sealed?
21  A.  I understand that while the case is
22  sealed, that's something that happens. I
23  understand it's something that the Department
24  of Justice really does not like, and I

Page 303

1  understand that the argument has been made in
2  this particular situation that those LLCs
3  were established for -- for those purposes to
4  shield the realtor.
5       The unfortunate thing is the
6  Department of Justice unblinded all of those
7  cases, and everything that files a Qui TAM, a
8  whistleblower claim, should expect to have
9  their identity known. It's expected that
10  their identity will be known once the case is
11  unblinded.
12       The problem that we have here with
13  regard to lawyer-driven litigation is it
14  appears as though with the cases we're
15  referring to, to your clients, there was no
16  relator. The relator was the very entity
17  that the law firms created.
18  Q.  So that's based on what
19  information?
20  A.  Based on my research and
21  information that will probably be forthcoming
22  at some point.
23  Q.  So I will tell you that we flatly
24  reject that assertion, but --

Page 304

1  A.  I'm sure you do.
2  Q.  Fine. But, then, you say, quote,
3  "The level of sinister is truly
4  unbelievable."
5       What is sinister, Mr. Hartleib?
6  A.  The elaborate scheme that was used
7  to extract information from an unassuming,
8  unsuspecting persons that work for the large
9  pharma companies that were baited into
10  interviews under the guise of helping seniors
11  and people on Medicare obtain their
12  medications more promptly and without less
13  hoops to jump through.
14  Q.  What facts do you have to support
15  that assertion?
16  A.  The Department of Justice's motion
17  to dismiss.
18  Q.  So I've seen the Department of
19  Justice's motion to dismiss. I don't think
20  that that's what it says.
21  A.  Well, it's my understanding, and I
22  haven't read that for a long time, but -- I
23  will read it, but I did read somewhere that
24  this is exactly what transpired. That's why

Page 305

1  the Department of Justice unblinded 13 now.
2  I think it was up to 32, and I believe
3  your --
4  Q.  13 or 32 what?
5  A.  Cases that were unblinded and
6  thrown out by the Department of Justice. In
7  addition --
8  Q.  That belonged to whom?
9  A.  Well --
10  Q.  These are not all Weiser cases.
11  A.  No, but we know of three that were,
12  and Mr. Mr. Manino, I believe, was supposed
13  to be deposed.
14       Who, I believe, your clients have
15  had business dealings with, and Mr. Manino
16  was at the heart of all of these, and so was
17  his entity that was created.
18       And the Department of Justice
19  doesn't want anything to do with it. They
20  don't like it because it is tantamount to --
21  like I said, to lawyer-driven litigation.
22  There is no agreed party.
23  Q.  We didn't prevent you from taking
24  the deposition of Mr. Manino?

Veritext Legal Solutions
215-241-1000 ~ 610-434-8588 ~ 302-571-0510 ~ 202-803-8830
EXHIBIT 37
1431

Page 306

```
1      A.  Well --
2           MR. MERRIGAN:  Again, I guess
3      I will say this as an objection.  I
4      object to you making statements,
5      not asking questions, and I'm not
6      objecting, but I'm instructing you
7      to answer questions and not make
8      statements or ask questions.
9           THE WITNESS:  Fair enough.  I
10     apologize.
11 BY MR. ROSENZWEIG:
12     Q.  Let's move on.
13          So what independent research did
14 you conduct with respect to the anonymous
15 letter allegations that you received?
16     A.  I research all of the Department of
17 Justice filings.
18     Q.  That was public record?
19     A.  Public record.  I believe I went on
20 PACER.  I read the Complaints.  The
21 Complaints had to do with specialty
22 pharmacies and their involvement in helping
23 to get prescriptions filled for patients.
24     Q.  Do you know -- specifically, you
```

Page 307

```
1  refer to in email, which is Hartleib-20,
2  Abbvie, A-B-B-V-I-E.
3           Do you know what other cases were
4  alleged in the anonymous letter?
5       A.  I did know several of the large
6  pharmaceutical companies, because we deal
7  with them.
8           MR. MERRIGAN:  I just --
9           THE WITNESS:  But I don't have
10     it off the top of my head.
11          MR. MERRIGAN:  Note my
12     objection if it's inconsistent with
13     something he said earlier, but I
14     don't think the email says about --
15     mentioned in the letter.
16          MR. ROSENZWEIG:  I just said
17     it was.
18          THE WITNESS:  Page 2.
19          MR. ROSENZWEIG:  Page 2.
20 BY MR. ROSENZWEIG:
21     Q.  It says, "Including filed by
22 Weiser, including ANSI."
23          MR. MERRIGAN:  The email
24     mentions ANSI.  I'm -- I'm saying
```

Page 308

```
1      the anonymous letter.
2           MR. ROSENZWEIG:  That's not my
3      question.
4           MR. MERRIGAN:  I think you
5      said the anonymous letter.  I may
6      have misheard or misinterpreted the
7      question.
8           MR. ROSENZWEIG:  That's fine.
9  BY MR. ROSENZWEIG:
10     Q.  What I thought I asked was:  What
11 cases in a -- in addition to that, who did
12 you learn were subject to a motion to
13 dismiss?
14     A.  As I sit here today, I don't
15 recall.
16     Q.  But there were others?
17     A.  There were others, yes.
18     Q.  So what was your purpose in raising
19 Qui TAM issues to Judge Vano through his
20 clerk?
21     A.  Just to inform the judge of the
22 ongoing issues with this and other firms.
23     Q.  What was pending before Judge Vano
24 at that time in Sprint Nextel?
```

Page 309

```
1      A.  Oversight of the settlement.
2      Q.  It was over, wasn't it?
3      A.  No.  The Court retains jurisdiction
4  for several years, I believe.  That's what
5  was pled to by Mr. Stecker in open court.
6      Q.  But there were no motions or
7  rulings to come from the Court, were there?
8      A.  I wasn't expecting any.  If your
9  clients took part of the 450,000 that they
10 weren't supposed to, or Sprint didn't
11 initiate the so-called robust incompetence, I
12 have reform that Mr. Stecker assumed so much
13 that Judge Vano almost threw him in contempt
14 of Court.
15          If it wasn't for -- you know, maybe
16 they didn't -- the company did not initiate
17 those corporate reforms, and the judge would
18 have to step in to enforce the terms of the
19 settlement.
20     Q.  But you weren't asking the Court to
21 do anything, right?
22     A.  No.
23     Q.  So you were just providing
24 information for what purpose?  What response
```

78 (Pages 306 - 309)

Page 310

1  did you expect?
2      A.  I didn't expect any response.  No
3  response.  I don't believe I ever expected or
4  received any response, whatsoever, if Jill
5  Boren thought it might be something that the
6  judge would find interesting or relevant to
7  future cases, or if another firm came before
8  his Court, not just the Weiser firm, but any
9  firm, it would give him information that he
10  might otherwise not have.
11     Q.  That he needs for what purpose?
12     A.  To be a good judge.
13     Q.  To be a good judge to --
14     A.  For the sake of jurors' presence.
15     Q.  Does that translate into just
16  making the Weiser Law Firm look bad in front
17  of Judge Vano?
18         MR. MERRIGAN:  Objection.
19     But you can answer.
20         THE WITNESS:  I don't think
21     the Weiser firm was the only firm
22     involved in this elaborate scheme
23     for Qui TAM investors or relators.
24     There were several firms that were

Page 311

1      involved.
2  BY MR. ROSENZWEIG:
3      Q.  What is a Qui TAM investor, or did
4  you just miss speak?
5      A.  I misspoke.  A Qui TAM realtor, a
6  whistleblower.
7      Q.  I just wanted to make sure there
8  was no term of art that I didn't know.
9         And the genesis of your mentioning
10  these Qui TAM concerns was this anonymous
11  letter?
12     A.  I didn't know anything about it,
13  until I received the anonymous letter.
14     Q.  How did you come to know or how do
15  you assert that any of the DOJ cases
16  dismissing certain Qui TAM -- any of the DOJ
17  motions dismissing -- seeking to dismiss
18  certain Qui TAMs that involved the Weiser
19  firm?
20     A.  Because I looked it up on the
21  docket under PACER, I believe.  I'm not
22  100-percent certain, but I had access to
23  PACER, so I believe I looked it up on PACER
24  and saw who counsel of record was in those

Page 312

1  cases.
2      Q.  And in cases like the Otsuka,
3  O-T-S-U-K-A, case, or the Biogen case, were
4  those Weiser cases?
5      A.  I don't know.
6      Q.  In your Answer to the Amended
7  Complaint, Paragraphs 138 and 39, you claim
8  that you didn't have knowledge of the fact
9  that the Weiser firm had never entered an
10  appearance in either of those cases; is
11  that --
12     A.  Like I said before, as a layperson
13  trying to navigate the system, navigate
14  PACER, navigate the docket, sometimes there's
15  three and four dockets that are open on one
16  case.  There is a fight for lead, and then
17  they get consolidated in a certain
18  jurisdiction or venue, as you know.
19         Sometimes you may have a company
20  domiciled in one state.  You get three or
21  four people rushed to that state because with
22  derivative cases it's first a file in a lot
23  of instances to control the case, instead of
24  the largest loss, or the party, the

Page 313

1  shareholder, with the largest loss, which
2  would have more skin in the game, in my
3  opinion.
4         That's a better system than whoever
5  has a plaintiff with ten shares.  The first
6  one to get to the Court because they have the
7  best database to scan the dockets, scan the
8  news to find an issue like this.
9         So that's something that can be
10  done in the reform aspect of derivative
11  litigation, in my estimation, that would make
12  things potentially better.  It's very
13  difficult to ascertain who's in charge of
14  what.  Like to this day, I don't know that
15  there was -- if Weiser was appointed lead of
16  the consolidated cases for Sprint.
17         I know that Stecker was doing the
18  arguments in open court, and nobody else was.
19  So I'm assuming that the Weiser firm was
20  quasi lead in that case.  So you want to ask
21  why things were directed towards your client,
22  because it was my understanding they were in
23  charge of all the consolidated cases.
24         It wouldn't have been any different

79 (Pages 310 - 313)

Page 314

1  if another firm -- if Robbins would have been
2  up there, or somebody else.  I would have
3  done the same thing that I did.
4      Q.  When you wrote in this email, which
5  is Hartleib-20, to Ms. Boren, "This is the
6  result in the DOJ filing a motion to dismiss
7  11 active cases filed by Weiser, et al,
8  including ANSI," is it fair to say that only
9  three cases were involving Weiser --
10     A.  I don't --
11     Q.  -- because you use the term,
12  "Weiser, et al," and --
13     A.  Meaning, "amongst others."
14  Weiser -- the Weiser firm and other firms,
15  11, and I was told that that number is very
16  low now that, I believe, 32 were unblinded
17  and dismissed by the Department of Justice.
18     Q.  But when you use the firm "Weiser,"
19  and then everybody else is "et al," don't you
20  think there's a clear implication that the
21  cases are Weiser's --
22          MR. MERRIGAN:  Objection to
23      the form.
24          But you can answer.

Page 315

1          THE WITNESS:  No.
2  BY MR. ROSENZWEIG:
3      Q.  -- as opposed to, you know,
4  Robbins, et al, or any other firm at all.  It
5  seems to me that you always lead with Weiser.
6          MR. MERRIGAN:  Objection.
7      Hold on.
8          THE WITNESS:  Because I'm
9      writing the Kansas court.
10         MR. MERRIGAN:  He didn't ask
11     you a question.
12         MR. ROSENZWEIG:  But I got an
13     answer.  So, it's not my fault.
14         MR. MERRIGAN:  Well, I noted
15     my objection.  Again, answer
16     questions.
17  BY MR. ROSENZWEIG:
18     Q.  And to the extent that Weiser was
19  only counsel in three of these cases, which
20  relate to Manino, which may relate to Manino,
21  and that all these other cases involved other
22  firms, would you still have characterized it
23  as filed by Weiser, et al?  I'm talking about
24  how you characterize it in your email.

Page 316

1      A.  I know what you're talking about.
2  I'm thinking.  So I received an anonymous
3  letter telling me how Weiser received his Qui
4  TAM realtors.  Didn't say how Robbins did.
5  Didn't say how anyone else did.
6          I'm simply telling the Court that I
7  received an anonymous letter, right, and what
8  the anonymous letter said and I included -- I
9  believe I included the Department of Justice
10  motion to dismiss, so that whoever read the
11  email could make the determination for
12  themselves as to who was involved and their
13  degree of involvement.
14     Q.  Let's look at Tab 25, please.
15     A.  (Witness complies.)
16              - - -
17         (Whereupon, Opinion and Order,
18         was marked as Exhibit Hartleib-22
19         for identification.)
20              - - -
21  BY MR. ROSENZWEIG:
22     Q.  All right.
23         So Exhibit-25, which I've marked as
24  Hartleib-22 --

Page 317

1      A.  Yes.
2      Q.  Are you there?
3      A.  I am there.
4      Q.  Thank you.
5          Are you familiar with the Big Lots
6  derivative litigation?
7      A.  Yes.
8      Q.  Are you or were you a shareholder
9  of Big Lots?
10     A.  No.
11     Q.  Were you ever a shareholder of Big
12  Lots?
13     A.  No.
14     Q.  Did you become an active -- were
15  you a party to Big Lots derivative
16  litigation?
17     A.  Define "party."
18     Q.  Were you a named --
19     A.  No.
20     Q.  -- plaintiff or other party to the
21  case, meaning named, appeared in captions, or
22  in pleadings.
23     A.  No.
24     Q.  Did you file an Amicus?

Veritext Legal Solutions
215-241-1000 ~ 610-434-8588 ~ 302-571-0510 ~ 202-803-8830
EXHIBIT 37
1434

1     A.  I tried.
2     Q.  Did you file objections of any
3  kind?
4     A.  So whether or not -- I reached out
5  to the Court.  I spoke to -- I think just via
6  email, honestly, or maybe it was via
7  telephone.  I don't recall.  But I reached
8  out to the Court to ask the Court how -- if
9  it was too late for me to file an Amicus
10  brief in the case.  I was instructed to send
11  the clerk an email.
12     Q.  And I will turn your attention to
13  Page 11 of 13 of the -- this document, which
14  I think will -- and there is a footnote?
15     A.  Yes.
16     Q.  Is that the email to which you're
17  referring, or does that reference the email
18  to which you were referring?
19     A.  Yes.  But there is an error in this
20  because I never put myself out as being a
21  shareholder.  So this starts out by saying
22  court received an email from "Michael
23  Hartleib, shareholder, who had an interest in
24  a different case involving the Weiser" --

1  "Hartleib raised concern over Weiser's
2  billing practices in this prior case and
3  stated that he wanted to inform the Court so
4  that it could scrutinize the fee request in
5  this case.  Hartleib does not indicate that
6  he is a shareholder in Big Lots or otherwise
7  an interested party in this case."
8     So this is kind of contradictory
9  because in one section it says that I was a
10  shareholder, and, then, it goes on to correct
11  that, and say that I was not a shareholder.
12     Q.  So are you saying that by use of
13  the phrase, quote, "a shareholder" who had an
14  interest in a different case involving the
15  Weiser Law Firm, PC, that that implies that
16  you were a shareholder in Big Lots?
17     A.  I guess it depends on how you read
18  it.
19     Q.  I think that's a fair response, but
20  it could also be read differently?
21     A.  It could.
22     Q.  Okay.
23     That you are not a shareholder in
24  Big Lots, right?

1     A.  Fair enough.
2     Q.  But you were a shareholder in the
3  entity in the other case?
4     A.  Fair enough.
5     Q.  But notwithstanding that is -- this
6  August 24, 2018 email that the Court says it
7  received from you, the email to which you
8  refer?
9     A.  Yes.  I believe -- I don't know the
10  date -- I assume the date is accurate.  It's
11  here, so I have no idea to believe that it's
12  not accurate, so yes.
13     Q.  Was it your intention that this
14  email to send to Judge Watson, your concern
15  about Weiser billing practices as a result of
16  Sprint Nextel?
17     A.  If that was the judge in the Big
18  Lots case, which it says.
19     Q.  Michael Watson is the judge who
20  signed the order, which is the exhibit that
21  I've marked --
22     A.  So I have the same answer for you.
23  Like I said, it would be the same for all.
24     My intent was to provide

1  information that the judge may or may not
2  deem relevant to his determination as to
3  fairness of fees, appointment of lead
4  counsel, any of those things, so this had to
5  do with fees.
6     Given what had transpired in
7  Kansas, I deemed it prudent to inform the
8  judge as to what took place.  At that time, I
9  didn't know who was involved in the case and
10  who billed.  I didn't know if Silow was
11  involved in the case.  I didn't know who was
12  involved.  It's just giving the judge
13  information that he may or may not deem
14  relevant.
15     And in this instance, as you can
16  see, he didn't change anything, and he said
17  he always scrutinizes the billing records
18  very carefully, and my information wasn't
19  helpful.
20     MR. ROSENZWEIG:  Because of
21  the court reporter's limit, and
22  because my next series of questions
23  will go to more than 50, we will
24  adjourn for the evening, although

81 (Pages 318 - 321)

Page 322

1  it is out of respect for the court
2  reporter, not because I'm prepared
3  to wrap up.
4      Have you communicated with
5  your office that whomever comes
6  tomorrow needs to be prepared to
7  stay?
8          -  -  -
9      (Whereupon, the witness was
10  excused at this time.)
11          -  -  -
12      (Whereupon, the deposition
13  concluded at 5:15 p.m.)
14          -  -  -
15
16
17
18
19
20
21
22
23
24

Page 324

1  Eamon Merrigan, Esquire
2  emerrigan@gmmrlawfirm.com
3          December 5, 2022
4  RE:   The Weiser Law Firm PC Et Al v. Hartleib, Michael
5      11/16/2022, Michael Hartleib (#5584606)
6      The above-referenced transcript is available for
7  review.
8      Within the applicable timeframe, the witness should
9  read the testimony to verify its accuracy. If there are
10  any changes, the witness should note those with the
11  reason, on the attached Errata Sheet.
12      The witness should sign the Acknowledgment of
13  Deponent and Errata and return to the deposing attorney.
14  Copies should be sent to all counsel, and to Veritext at
15  cs-midatlantic@veritext.com
16
17   Return completed errata within 30 days from
18  receipt of testimony.
19    If the witness fails to do so within the time
20  allotted, the transcript may be used as if signed.
21
22          Yours,
23          Veritext Legal Solutions
24
25

Page 323

1          -  -  -
2      C-E-R-T-I-F-I-C-A-T-I-O-N
3          -  -  -
4      I hereby certify that the
5  witness was duly sworn in for this
6  deposition matter by the Court
7  Reporter.
8
9
10  _____
      Mary Hammond
11    November 16, 2022
12
13      (The foregoing certification
14  of this transcript does not apply
15  to any reproduction of the same by
16  any means, unless under the direct
17  control and/or supervision of the
18  Registered Professional Reporter.)
19
20
21
22
23
24

Page 325

1  The Weiser Law Firm PC Et Al v. Hartleib, Michael
2  Michael Hartleib (#5584606)
3      E R R A T A  S H E E T
4  PAGE_____ LINE_____ CHANGE_____
5  _____
6  REASON_____
7  PAGE_____ LINE_____ CHANGE_____
8  _____
9  REASON_____
10  PAGE_____ LINE_____ CHANGE_____
11  _____
12  REASON_____
13  PAGE_____ LINE_____ CHANGE_____
14  _____
15  REASON_____
16  PAGE_____ LINE_____ CHANGE_____
17  _____
18  REASON_____
19  PAGE_____ LINE_____ CHANGE_____
20  _____
21  REASON_____
22
23  _____  _____
24  Michael Hartleib          Date
25

82 (Pages 322 - 325)

Page 326

```
 1   The Weiser Law Firm PC Et Al v. Hartleib, Michael
 2   Michael Hartleib (#5584606)
 3            ACKNOWLEDGEMENT OF DEPONENT
 4      I, Michael Hartleib, do hereby declare that I
 5   have read the foregoing transcript, I have made any
 6   corrections, additions, or changes I deemed necessary as
 7   noted above to be appended hereto, and that the same is
 8   a true, correct and complete transcript of the testimony
 9   given by me.
10
11   _____   _____
12   Michael Hartleib                Date
13   *If notary is required
14            SUBSCRIBED AND SWORN TO BEFORE ME THIS
15            _____ DAY OF _____, 20___.
16
17
18            _____
19            NOTARY PUBLIC
20
21
22
23
24
25
```

Veritext Legal Solutions
215-241-1000 ~ 610-434-8588 ~ 302-571-0510 ~ 202-803-8830

EXHIBIT 37
1437

**[& - 2017]**                                                                                    Page 1

| & | | | |
|---|---|---|---|

**&** 1:15 2:2,7 40:15 101:5,13 103:1 129:6 235:23 254:15 272:24 273:1 275:5 276:10

**0**

**02728** 1:7

**1**

**1** 3:15 52:15,19 53:4,8 58:10 64:23 70:7,11 93:2,2,16,17,20 272:20
**1.5** 207:20
**1.7** 221:12 252:13
**10** 3:24 86:5 154:9 213:14,18 219:11 268:2 301:20
**100** 27:15 28:13 261:21 301:11 311:22
**104** 3:18
**109** 3:19
**1099** 195:8 242:14
**10:00** 1:19
**10:29** 35:6 59:2
**11** 4:5 163:16 222:19,23 314:7 314:15 318:13
**11/16/2022** 324:5

**116** 3:20
**11:50** 53:20
**12** 4:6 144:15 213:13 231:3,7 232:8 241:17 246:8 258:1 293:7
**12/12/18** 4:15
**12/13/18** 293:16
**121** 2:8
**12:00** 144:19
**12:12** 277:24
**13** 4:7 207:13 222:18 232:11 232:17 243:4,13 305:1,4 318:13
**134** 288:20
**138** 312:7
**14** 4:8 231:2 253:17,21
**1471** 323:9
**14th** 288:19
**15** 4:9 16:9 19:2 257:22 258:2 263:20 264:16 264:20,22
**150** 3:21
**154** 3:22
**16** 1:10 4:10 109:13,24 253:16 258:13 258:19 259:7 323:11
**1600** 2:8
**163** 3:23
**17** 4:11 232:9 257:21,21 258:17 263:21

**264**:1,16,21,23 265:6
**17-117139** 214:20
**18** 4:12 272:3,5,5 272:12,17
**19** 4:13 272:11 277:4,4,5,11
**19107** 2:9
**19406** 1:18 2:4
**1:25** 235:2,16
**1:40:08** 109:24
**1:59** 94:1
**1st** 94:1

**2**

**2** 3:16 21:17 52:8 62:24 63:4 70:4 75:12 92:19 93:2,4,21 164:13 214:4 219:9 223:7,20 224:16,24 277:6 277:10 307:18 307:19
**2/16/12** 3:19
**20** 4:14 15:14 66:8 288:2,5,10 299:11 307:1 314:5 326:15
**2004** 82:22
**2007** 231:22
**2008** 53:20 175:19
**2008/2009** 34:6
**2009** 47:22 52:18 53:8 54:4 55:22 56:2 58:12,23

**59**:15 60:6 63:3 63:14 65:18 66:1,2,20,20 70:9,19 76:20 77:14,22 78:8 81:10 82:4 83:10 85:19 87:19 88:6 90:23 92:10 120:15 122:13 127:14 130:22
**2011** 86:19 92:19 94:1,11 97:20,24 100:13 104:1,14 107:5,8 108:19
**2012** 109:13,24 120:17,18
**2013** 120:17
**2016** 116:20 118:16 122:14 127:16 147:17 147:23,23 148:19,22 149:5 149:12,20 150:14 151:1 152:14 154:12 154:21 158:8 160:10,10 179:22 181:23 188:5
**2017** 28:22 164:13,17,19 174:21 186:16 186:16 192:13 192:18 194:7 197:2,13 207:14 213:17 214:14 223:23 227:18

228:6 231:6,11 232:2,9,16 233:3 243:5,7 244:4,7 247:24 251:13 258:1,12,18,19 263:16
**2018** 28:22 253:20 263:24 265:6 272:11,23 277:6,10,23 293:7 320:6
**2019** 288:19
**2022** 1:10 323:11 324:3
**20th** 52:18 53:8 53:20 56:15,16 57:17,18 66:5,6 66:8,20 70:9,19 99:13 148:21 149:20
**21** 4:15 293:3,8 294:17
**213** 3:24
**21st** 100:13 272:23
**22** 4:16 87:7 316:18,24
**222** 4:5
**22nd** 55:22 56:2 57:9 58:4 76:9
**231** 4:6
**232** 4:7
**23rd** 58:8,11
**24** 116:20 320:6
**24/7** 56:24
**24892** 14:13 15:2
**24th** 118:15

**25** 22:19 316:14 316:23
**253** 4:8
**257** 4:9
**258** 4:10
**25th** 258:19
**26** 258:12,18
**263** 4:11
**26th** 58:22,23
**27** 63:3 78:8 81:10 175:19
**272** 4:12
**277** 4:13
**27th** 59:15 60:6 63:14 65:17 66:1,9,20,21 72:5 74:6 75:11 75:12 76:8,10,11 76:11,20 77:13 77:22 87:19 88:6 90:23 120:14 122:12
**28** 154:12,21 287:22,24 288:9 288:10
**288** 4:14
**293** 4:15
**2:19** 1:7
**2:55** 118:16
**2nd** 94:11 99:17 277:23

**3**

**3** 3:17 62:23 92:16,20 93:4,6 98:23 99:6 100:5,9 214:4,6 214:6 226:10

**3/20/09** 3:15
**3/27/09** 3:16
**3/6/17** 3:24
**3/7/17** 4:6,7
**30** 33:15 227:18 293:1,1,3 324:17
**300** 1:17 2:4 195:23
**30th** 228:5
**31** 83:17 84:22 85:23 104:14 112:12,15 133:8 150:14 151:1
**316** 4:16
**31st** 107:8 108:19
**32** 305:2,4 314:16
**33** 83:18 133:8
**35** 184:9 195:21 195:24
**350** 193:15 195:15
**380** 184:8 195:14
**39** 312:7
**3:03** 100:13
**3rd** 96:11

**4**

**4** 3:18 86:21 93:4,21 97:15 98:24,24 99:10 99:11 100:5 104:11,15 226:17
**4.2** 227:21
**4.5** 136:16 171:14 179:24

252:14 262:20
**4/12/17** 4:9
**4/26/17** 4:10
**4/7/18** 4:8,11
**400** 116:1 195:23
**43** 10:12
**450,000** 171:3,9 174:7 179:24 180:21 309:9
**4:25** 231:11 233:3 235:1,4
**4:33** 59:15
**4:48** 99:13
**4th** 96:12

**5**

**5** 3:7,19 82:22 86:5 92:15 99:1 99:2 109:10,14 227:6 268:2 324:3
**5/19/18** 4:12
**5/24/16** 3:20
**5/31/16** 3:21
**50** 321:23
**52** 3:15
**5584606** 324:5 325:2 326:2
**59** 59:15
**5:15** 322:13
**5:40** 272:23
**5:57** 151:2
**5do** 56:10

**6**

**6** 3:20 82:22 104:10,11 116:16,21 118:3 213:17 214:14

**[6 - action]**                                                    Page 3

223:22 301:20
**6,905** 207:19
**6/2/11** 3:17
**6/2/18** 4:13
**6/28/16** 3:22
**63** 3:16
**650606/11** 97:24
**6:59** 94:11
**6th** 164:17

**7**

**7** 3:21 78:24
109:8,8 150:11
150:15 154:1
231:6,11 232:2
232:16 233:3
243:5,7 244:4,7
247:24 253:20
263:24
**700** 259:15
**700,000** 102:8,12
**700k** 100:17
**7:21** 60:6 232:2
243:7 244:4
**7th** 247:23

**8**

**8** 3:22 97:20
116:14 118:6
154:8,13
**8/31/11** 3:18
**80s** 203:5
**8:37** 214:14
**8:59** 58:11
**8th** 1:16 2:3

**9**

**9** 3:23 150:11
163:15,20
165:13,21

174:15 178:6
182:15,16
**90** 261:17 301:9
301:12
**900** 1:16 2:3
**92** 3:17
**92677** 14:14 15:3
**99** 135:15
**99.99** 249:4
**9:53** 56:2
**9:55** 63:14 65:18
66:2 75:13
77:14,22 87:20

**a**

**a.m.** 1:19 35:6
35:12 58:11,14
60:6 63:14
65:18 66:2
75:13 77:14,22
81:11 87:20
94:1 100:13
118:16 231:11
233:3 235:1,4
277:24
**abbvie** 307:2
**ability** 151:15
255:12
**able** 34:21 64:9
139:15 144:16
193:15 195:13
256:9 276:17
**ableson** 175:20
176:1,6,17 181:2
182:17,18,19
187:3,3
**absolutely** 72:20
89:17 134:13

198:13 229:10
**absorbed** 169:12
170:3 174:5
**accept** 195:21
**accepting** 195:24
**access** 311:22
**accident** 24:2
**accidentally**
156:7
**accountable**
151:8 152:3
**accuracy** 245:9
271:23,24 324:9
**accurate** 8:2
33:6 71:8 212:4
281:20 320:10
320:12
**accurately** 63:23
64:14 110:11
**accusatory**
275:10
**accuse** 239:6
286:22
**accusing** 238:1
**acknowledge**
164:9
**acknowledged**
67:24 68:3
69:23 134:6
**acknowledge...**
326:3
**acknowledgm...**
88:13 324:12
**acquaint** 118:10
**acquainted**
35:16,21 36:8
203:8

**acquired** 30:17
158:24,24
169:13,21,24
170:12
**acquiring**
169:17
**acquisition**
32:21 35:24
36:13
**acquisitions**
287:6
**act** 80:6 116:9
237:8 296:14,16
298:15
**acting** 146:8
250:23,23
296:24
**action** 1:3 24:5
25:16 26:19
27:1,11,17,19,22
28:1,5,8,10
45:18 47:7 64:3
65:4 72:9 74:11
75:15 77:4 80:5
81:19 82:2,7,13
82:18 83:3,11
84:7,19,21 85:6
86:5 89:22
90:14,16,17 91:9
97:11 101:17
103:4,4,21 104:5
104:6 114:11,20
114:22 115:1,8
115:18 122:4
137:3 162:6
163:1 170:10
216:12 228:3
293:12

**actionable**  12:1
  12:12
**actions**  85:12
  112:8 125:22
  130:16 143:21
  167:16 216:10
  219:6 268:3
  284:4 285:5
**active**  197:7
  314:7 317:14
**activity**  212:11
  212:11
**acts**  115:11
  236:12,18,20
  237:1,18 238:3,4
  238:17,18
  241:13 244:13
  244:16,22 285:2
**actual**  11:5 24:8
  27:9 66:21 77:1
  79:1,2 115:17
  229:16
**ad**  222:3 252:15
  274:24
**add**  11:9 246:12
  264:4
**addition**  187:2
  202:22 247:13
  305:7 308:11
**additional**  43:7
  135:23 137:20
  175:3
**additions**  326:6
**address**  14:12
  53:10,13 144:12
  155:11 166:20
  171:8 233:7
  235:15 245:21

260:17
**addressed**  50:21
  232:3 278:15
  282:8
**addresses**  281:1
**addressing**
  95:24 254:18
**adequate**  60:16
**adjourn**  321:24
**administrator**
  19:14,19 21:12
**admissible**  12:13
**admissions**
  177:11
**admit**  288:20
**admits**  236:12
**admonished**
  217:10 219:6,8
  255:8 256:4
**admonishes**
  179:11
**adulthood**  23:19
**adverse**  146:11
  146:14,17 228:2
  249:13
**advice**  98:18
  248:10,18 274:1
**advocacy**  64:8
**affidavit**  157:2
  185:24
**affidavits**  156:24
  242:9 245:12,14
  271:22
**affirm**  278:18
**affirmative**
  116:8
**affirmed**  143:6
  143:13 180:14

187:5 237:20
  245:8
**aforementioned**
  295:6,8
**ago**  16:9 17:23
  19:5 22:19
  82:22 124:2
  125:7 181:1
  188:10 282:13
**agree**  44:24 54:3
  54:11 56:6
  109:2 143:16
  147:19 207:18
  212:5 225:11
  261:16 262:10
  262:11
**agreed**  80:19
  86:8 114:1
  205:4 254:12
  298:17 305:22
**agreement**  5:4
  46:13,18,21 48:2
  49:18 54:17
  55:13 62:7 67:3
  67:17,22 68:18
  68:23,24 69:6,11
  69:19,21 70:17
  122:3 136:24
  137:8
**aguilar**  216:4,14
  245:15
**ahead**  8:21
  51:10 141:16
  226:9
**air**  199:16
**al**  1:4 96:18
  151:18 217:16
  241:19 250:17

284:4 285:6
  287:20 299:15
  314:7,12,19
  315:4,23 324:4
  325:1 326:1
**albeit**  139:20
  146:9
**alerting**  218:6
**alexander**  177:3
  177:6 178:19
  179:1,2,5,9
  181:6 182:1,3
  183:8 184:18
  185:2 191:2,16
  191:18 192:24
  195:11 198:19
  198:22 237:4
  242:8,17,20
  262:3,13
**alfred**  217:17
**aliases**  220:11
**alignment**  272:4
**allegations**  38:8
  212:9 271:9
  273:7 287:6
  306:15
**allege**  248:7
**alleged**  11:19
  200:10 212:11
  264:7 267:2
  302:4 307:4
**allegedly**  179:5
**alleging**  153:12
  237:2
**allotted**  324:20
**allow**  137:1,8
  193:7

**allowed**   185:9,24
  198:20
**allows**   170:16
**alter**   9:2
**alternative**
  193:17
**amazing**   228:24
**amended**   69:1
  69:20,20 147:14
  228:9 312:6
**amendments**
  11:22
**america**   26:20
  26:22 27:13
**amicus**   153:19
  266:14,18 271:2
  283:11,18,22
  291:5,7,14,24
  292:1,8 317:24
  318:9
**amount**   112:1
  127:6,18 130:3,6
  158:18 160:1
**amounts**   114:5
  297:6
**amplified**   56:22
**analysis**   160:4
**analyzed**   158:19
**andrew**   261:23
  261:24 262:4
**andy**   262:5
**angle**   161:18
**anonymity**
  302:13
**anonymous**
  260:15 299:13
  299:21 300:5,7
  300:11,13 301:6

302:10 306:14
307:4 308:1,5
311:10,13 316:2
316:7,8
**anonymously**
  264:9
**ansi**   307:22,24
  314:8
**answer**   7:2,19
  7:24 8:4,9,12,21
  9:22 12:16
  22:11 32:3
  39:21 42:22
  43:22 47:13
  61:2 68:15 71:6
  73:21 74:17,19
  75:3,21 81:4
  88:22 91:22
  110:18,19
  113:19 122:20
  135:5 136:21
  137:24 165:18
  173:4 178:21
  181:21 187:7
  190:10 191:22
  197:10 198:2,6,8
  238:23 239:10
  249:24 251:19
  252:21 287:2
  288:20 306:7
  310:19 312:6
  314:24 315:13
  315:15 320:22
**answered**   67:7,9
  72:14 122:21
  141:14 186:21
  189:23 190:2
  194:18 238:22

249:17
**answering**   40:7
  121:22
**answers**   6:15 7:8
  7:13 72:16,18
  73:16 133:6
  196:5
**anticipating**
  7:22
**antitrust**   94:22
  95:3,6,9,23
  96:17,24
**anybody**   15:9
  21:21 83:1
  204:16 208:1,8
  209:5 260:1
  262:24 263:1,7
**apologize**   196:11
  196:13 265:2
  306:10
**apparently**
  41:13 187:9,10
**appeal**   118:22
  141:24 156:1
  162:1,3,10,18
  167:16,19,23,24
  168:14,15,22
  170:21,22 171:3
  171:8,11,13,14
  174:2,9 175:23
  179:15,17
  200:12 215:3
  218:15 228:5
  229:8 234:4
  255:4 256:5,10
  256:13 257:2
  281:7,12,19
  290:7 301:8,8,10

**appeals**   163:9
  227:18
**appear**   41:13
  148:22 161:3
  177:22
**appearance**
  184:11 312:10
**appearances**
  162:7
**appeared**   159:14
  233:21 266:15
  317:21
**appearing**   149:4
**appears**   231:15
  288:17 303:14
**appellant**   167:19
  168:3
**appellate**   13:6
  13:12,12 143:14
  168:6,9 180:6,11
  182:21 183:4,12
  184:2 191:5
  214:19 230:1
  233:22 237:20
  254:13 255:9
  256:4 265:8
  278:16 280:19
**appended**   176:7
  326:7
**applicable**   324:8
**application**
  156:19 158:4,6
**apply**   323:14
**appoint**   64:2
  133:14 267:15
**appointed**
  133:16 268:5,8
  268:21 270:17

295:11 313:15

**appointing**
267:7

**appointment**
267:18 268:10
268:11 270:13
291:21 295:20
321:3

**appoints** 295:6

**appreciate** 5:24
7:7 64:11
278:24

**apprised** 119:20
155:6

**appropriate**
13:17 72:8
74:10 75:4
140:1 267:23

**appropriately**
32:4

**approval** 148:21
181:18

**approved** 138:20
173:24 174:3
179:22

**approves** 156:2

**approximate**
16:7,9 34:20

**approximately**
1:19 15:13
22:18 124:10
150:3

**april** 253:19
257:24 258:11
258:18,19
263:23 265:6

**area** 125:2

**argue** 273:16

**argued** 248:14

**arguing** 72:15
174:3

**argument** 38:3
162:13 169:11
173:6 195:8
249:19,21
296:13 303:1

**argumentative**
73:17

**arguments** 38:5
38:9 39:14 85:3
183:12 233:22
313:18

**arranged** 51:12
66:13

**arrangement**
125:19

**arrangements**
101:23

**arroyo** 216:4

**art** 311:8

**article** 205:20
206:17 207:14
207:18,22 208:8
211:16,19,23
212:2 279:23
280:10 282:16
286:2

**articles** 209:14

**asap** 107:15

**ascertain** 228:19
271:7 313:13

**aside** 116:24

**asked** 9:21 16:20
57:14 66:11
72:13 90:1

122:19 131:22
132:9 156:18
168:20 170:21
189:23 190:4
238:22 247:1
249:23 256:11
308:10

**asking** 7:23
47:20 57:7
73:16 76:22,23
91:19 121:17
138:21 153:17
158:10 160:19
162:9 171:14
190:14 196:21
200:16 238:12
283:19 289:3
306:5 309:20

**aspect** 313:10

**aspects** 129:12

**assert** 237:6
311:15

**asserting** 192:7
193:20 194:1
197:5

**assertion** 123:18
189:17 303:24
304:15

**assigned** 97:23

**associations**
236:17 238:16

**assume** 12:18
71:24 193:8
199:1 237:10
292:12 295:8
320:10

**assumed** 6:24
25:5 274:10

309:12

**assuming** 97:9
184:6 231:19
313:19

**attach** 291:24
294:9 300:5

**attached** 177:10
182:20 232:10
292:8 324:11

**attaches** 232:1

**attachment**
175:21 232:20
232:24

**attachments**
292:17

**attack** 255:18

**attacked** 135:2
220:16 254:24
287:14

**attacks** 222:3
252:15 255:13
273:14 274:24
275:1

**attempt** 114:9

**attempts** 220:1

**attend** 16:22
17:1 101:24
157:5

**attendance**
159:18

**attention** 28:21
52:6 62:22
63:10,13 70:6
92:14 104:9
109:7 121:16
150:10 154:7
209:19 213:13
222:17 223:7

243:4 253:15
263:20 271:10
272:2 318:12
**attorney**  36:21
68:10 86:13
102:9,10,18
112:11 129:19
136:7 172:3,8
173:13 181:16
183:9,9 190:20
192:9 195:9,12
195:18,19,23
196:24 215:10
221:11 227:23
239:1 242:15
301:16 324:13
**attorney's**
239:16 240:12
240:18
**attorneys**  79:9
79:13 91:11
112:16 135:11
135:18 155:1
195:20 215:7,15
217:9 228:4
234:20 257:5,9,9
273:22 280:19
281:1,6,10,11
298:20
**audacity**  133:12
**audit**  200:8
201:6
**august**  104:13
107:5,8 108:19
320:6
**authenticity**
225:14

**authored**  251:13
**authorized**
67:21
**authorship**
218:2
**automotive**
263:9
**available**  99:15
151:5 324:6
**avance**  19:21
117:7,12,17,20
**avenue**  1:16 2:3
**aviation**  17:9
**avoided**  23:13
**awarded**  174:8
180:21
**aware**  13:3
47:19 48:10
85:10,14 122:17
141:23 166:20
185:4,8,10,14
259:18 268:7
280:5 282:5,6
295:18,22
**awareness**
161:21

**b**

**b**  3:12 4:2 86:5
268:2 307:2,2
**back**  25:4 33:12
33:16 34:5,6
35:8,11 51:9
52:3 56:14
58:14 60:1
61:16 64:24
69:21 70:7
73:23 74:3 79:2

90:2 110:5
116:2,3,6 120:9
133:22 134:16
134:18 141:3,5
143:22 147:10
157:12 171:15
180:6,12 181:12
186:14 192:16
194:13 199:23
200:2,6 227:7
241:1 253:6,9
278:16 285:9
**bad**  25:17 26:4
115:11 116:8,10
310:16
**baited**  304:9
**bank**  171:5,17
278:2 279:21
280:7,22 281:22
282:1 285:20,21
286:23
**banker**  18:10
**banking**  18:3,8
18:11
**bar**  85:22 129:2
159:21 160:13
164:22 165:8,10
165:20 177:11
188:19 197:7,16
197:17 236:17
238:15 256:1
278:21 297:12
297:16
**barred**  161:8,11
163:6 175:5,8
177:23 182:1,4,5
182:7 183:7,17
183:18,22,23

184:3 187:10,21
188:7,11,16,20
188:21,22,23
189:1 190:8,18
190:19 191:3,5,9
191:10 193:9
195:12,17,18,20
**base**  158:11
189:17
**based**  12:3,20
62:18 77:4
138:10 159:1,24
169:11,16
176:19,20 227:5
282:6 303:18,20
**bases**  158:15
**basically**  40:20
163:4 179:11
247:6
**basis**  39:20
127:6 135:2
143:11 158:11
168:21 193:23
198:14 237:6
239:5 252:3
**battle**  245:20
287:15,16
**becker**  235:23
254:15 272:24
273:1 275:5
276:10
**becoming**  32:8
45:13 112:7
**began**  127:14,14
**beginning**  1:18
114:13 189:16
197:3

**begins**  231:17
**begs**  249:12
**behalf**  86:14
   141:24 146:8
   170:10 229:9
**belief**  80:14
   123:3 136:17
   188:11 221:7,8
**believable**
   142:20 143:7
**believe**  7:23
   13:16 17:23
   19:2 23:4 24:9
   24:11,18 27:16
   27:24 28:6 36:6
   37:20 40:17
   42:12 45:10
   48:5,11 50:5,18
   50:20 51:3,15,18
   52:4 53:14
   54:16 55:6
   61:17,20 64:3
   65:10,14,23 66:4
   66:5,7,14,24
   70:4 71:7 72:7
   74:9 76:4 79:21
   79:22 80:4
   81:15,15,17,21
   81:24 82:5,9,16
   82:19 83:7
   85:22 86:3
   88:13,14,23,24
   89:1,4,5 90:8,10
   91:2,5 97:2 98:7
   118:1 120:21
   121:7 122:7
   124:6 131:16
   135:16 136:8

141:15 142:7
144:4,14 146:4
149:23 152:4
156:12 157:1
159:12 163:5,6
167:2 168:12
169:6 171:23,24
172:2,10 175:22
176:9 181:3,4,15
182:3,21 183:2
183:13,14,23
184:12 187:3
188:9,10,20
189:1 193:12
198:12,12,14,15
201:17 206:4
207:15,15 210:5
211:3 214:18
215:11 216:7,7
216:10 217:19
218:14 223:21
225:9,13,15
229:4 233:8,10
236:13 240:13
240:20 241:5,12
242:4 244:10
245:12,13
254:16,20
255:10,14
259:14 262:14
262:18 265:10
266:3 267:2,24
268:2 269:12
275:4,7 276:9,23
278:12,14,15,23
279:12,22,22,23
280:23 281:6,8
281:17,19 282:8

283:13,14 286:6
286:14 288:19
290:21 291:1
293:15 294:13
295:22,23 298:4
298:6 301:5
305:2,12,14
306:19 309:4
310:3 311:21,23
314:16 316:9
320:9,11
**believed**  62:15
   224:6 262:16
   269:16
**believing**  198:15
**bell**  33:15
   295:15
**belonged**  305:8
**benefit**  80:1,10
   116:4,5 152:20
**benefits**  128:8
   136:5
**besmirch**  265:21
**best**  8:7 29:18
   33:4,21 40:8
   51:20,21 53:10
   66:19 76:13
   111:20 151:14
   151:16 222:14
   225:6 229:24
   269:2 313:7
**better**  34:24
   79:24 111:6
   126:4 313:4,12
**beyond**  28:16
   40:11
**bgm**  53:9

**bifolded**  301:24
**big**  126:7 317:5
   317:9,11,15
   319:6,16,24
   320:17
**bill**  136:16 138:6
   193:15 195:13
   207:20 221:12
   252:13 285:12
**billed**  161:16,16
   283:8,10 286:8
   321:10
**billing**  136:3
   142:21 143:7,18
   181:17 184:7
   192:10 197:8,18
   200:8,18 205:21
   211:11 220:12
   221:11 236:22
   239:3 245:2,9
   262:17,18
   271:12,17,19,23
   286:18 319:2
   320:15 321:17
**billings**  260:23
   261:7 296:8,9
**billion**  83:17,18
   84:22 85:23
   112:12,15 133:8
   133:8
**bills**  286:10
**binder**  10:15
   52:7 86:21 93:5
   97:15
**binders**  10:10
**biogen**  312:3
**bit**  185:14

**blank** 240:22
**block** 82:20
  101:18
**board** 94:23
  115:20 133:17
  151:7,24 152:3
  188:18
**boren** 216:23
  218:19,22
  233:14 257:12
  257:15 277:24
  278:7 289:20
  290:19 292:6
  294:6 295:3
  310:5 314:5
**bottom** 93:1,17
  93:24 105:11
  111:22 218:4
  236:10
**bought** 263:4
**bound** 227:22
**bragar** 295:14
**brandt** 233:19
  233:20
**breach** 267:2
**breadth** 111:23
  221:18
**break** 6:20 9:15
  16:21 120:1
  198:1 199:13
  232:5 252:24
**brett** 175:20
  273:2
**brian** 216:15
  245:15
**brief** 35:4
  119:24 120:5
  147:6 153:19

157:17 159:13
  199:19 253:2
  266:14,18
  283:11,19,22
  291:7,24 292:8
  318:10
**briefing** 180:13
**bright** 105:24
  193:5,13 274:18
**brighter** 260:9
**bring** 91:9,11
  170:9
**bringing** 55:17
  69:12
**broad** 2:8 40:2,6
  221:18
**broader** 29:2
  68:20
**broadest** 111:23
**broadly** 16:14
  47:19 48:1
  127:24 205:24
  251:6
**broken** 111:2
**brought** 43:20
  44:4,22 69:14
  96:13 121:16
  183:13 271:10
**bruce** 35:16,22
  36:9,18 42:7,21
  43:17,20 44:3,9
  44:23 45:6,10,11
  45:13 46:14,22
  47:9 54:9 55:23
  56:7 58:14
  59:16,22 60:2
  61:5,9 62:2
  63:15 64:13,22

64:24 66:2,12
  67:18 69:1
  70:12,13 76:13
  77:14 78:2,7
  81:9 84:13,14
  87:20 120:15
  122:13 131:23
**brucemurphy....**
  53:9
**buddies** 298:15
**builder** 23:24
  25:6,10 26:13
**bunch** 278:1
**bundle** 298:24
**burns** 183:15
  235:23 254:15
  272:24 273:1
  275:5 276:10
**bus** 297:4
**business** 9:12
  17:17,20,21,22
  18:2,18,19 19:4
  20:2,6,10,13,14
  21:5,14 26:21
  37:8,22 40:1
  110:4,15 111:14
  113:10 117:8
  122:24 125:19
  129:14 130:20
  301:22 305:15
**buy** 110:7 173:6

**c**

**c** 2:1 5:2 323:2,2
**caldwell** 18:10
**california** 14:10
  14:13 15:3 17:4
  25:12,13 26:7

106:7 204:1
  229:1
**call** 24:22 52:4
  58:21 61:19
  66:12,13,15 85:3
  94:20 97:5
  102:9,11 107:15
  111:21 127:24
  140:10 145:24
  151:2 160:15
  186:16 209:9,12
  209:21,23
  223:11,15,18,22
  224:1 227:10,19
  228:18,24 232:7
  247:10 262:4
**called** 18:22
  46:17 110:5
  175:17 203:9,9
  228:18 257:3
  309:11
**calling** 93:6
  243:6
**calls** 78:4 85:23
  102:2 106:23
**candor** 267:21
**capably** 118:20
**capacity** 117:10
  122:11 123:16
  172:7
**caption** 27:4
**captions** 317:21
**car** 263:5
**care** 73:14
**careful** 250:14
**carefully** 321:18
**carried** 55:20

EXHIBIT 37
1446

| | | | |
|---|---|---|---|
| **carrier**  112:17 | 184:8 185:6 | 297:20 298:2,18 | **caught**   171:5 |
| **case**  12:12 13:5 | 186:1,11 187:22 | 302:12,20,21 | 184:3 299:8 |
| 13:14,20 23:23 | 193:14,24 | 303:10 312:3,3 | **cause**  133:18 |
| 24:9,12 26:12 | 197:19 205:11 | 312:16,23 | **caused**  161:22 |
| 37:4 39:14 | 205:13,15,22 | 313:20 317:21 | **causing**  157:13 |
| 40:21 41:1,9 | 212:14 214:8,19 | 318:10,24 319:2 | **caveat**  25:19 |
| 43:21 44:5 | 215:2 217:10 | 319:5,7,14 320:3 | 50:5 |
| 50:10 55:8,18 | 219:13 220:2 | 320:18 321:9,11 | **cc**  217:1 243:23 |
| 61:11 62:20 | 221:3,19 223:5 | **cases**  78:22 | **cease**  219:12 |
| 68:1 69:14 79:5 | 225:8,12 226:22 | 91:20 92:2 | 232:9 243:5,6 |
| 79:5 81:16,20,23 | 227:9,14 228:1 | 99:20,20,20 | 244:6 245:24 |
| 82:1 86:6,15,18 | 228:20 229:23 | 111:16 120:19 | 246:5 247:4 |
| 88:1,4 91:1,12 | 236:13,24 238:5 | 120:24 121:11 | 248:4 |
| 94:12,21 97:7,8 | 241:10,15 | 121:14,15 | **center**  162:6 |
| 97:23 98:10,17 | 248:16 250:9,10 | 138:19,20 | 163:2 |
| 100:1,14,17 | 251:9 252:11,11 | 151:19,22 | **central**  203:23 |
| 101:3,4,12,15,18 | 252:12 254:13 | 170:15 219:14 | **centrylink**  291:8 |
| 102:5,17,22,24 | 255:2 256:19 | 219:16 234:20 | 291:11 295:12 |
| 103:10,13 | 257:10 263:4 | 243:21 249:2 | **centurylink** |
| 107:12,12,13 | 265:9 266:10,13 | 250:7 257:3 | 291:5 295:9,21 |
| 108:3,23 109:3 | 266:20,24 267:7 | 266:4 267:24 | **ceo**  133:14,16 |
| 112:15 119:13 | 267:10,15,17,18 | 281:18 286:11 | **certain**  10:6 13:6 |
| 121:18 122:6 | 267:19,23 268:6 | 291:15 297:24 | 39:1 50:1,22 |
| 125:7 128:22 | 269:4,19 270:20 | 298:16 299:16 | 69:8 84:17,20 |
| 130:3 132:14 | 271:2,5,11,20 | 299:20 302:9 | 127:5 128:12,12 |
| 133:20,21,22,22 | 276:8 278:15 | 303:7,14 305:5 | 182:22 205:19 |
| 136:13,14,16,18 | 279:18,21 280:1 | 305:10 307:3 | 210:18 212:21 |
| 136:23 137:3 | 280:15,18,19,22 | 308:11 310:7 | 219:22 220:13 |
| 140:14 141:20 | 280:24 281:2,10 | 311:15 312:1,2,4 | 283:14,16 |
| 142:8 143:17,21 | 281:22 282:1 | 312:10,22 | 311:16,18,22 |
| 145:9,14 147:23 | 283:2,12,23 | 313:16,23 314:7 | 312:17 |
| 151:3,5,17,18 | 284:5 285:7,10 | 314:9,21 315:19 | **certainly**  12:4,23 |
| 152:7,17,23 | 285:21 286:2,3,5 | 315:21 | 31:22 44:21 |
| 153:22 155:2 | 286:13,23 287:8 | **catastrophic** | 120:18 188:21 |
| 158:6 161:2 | 287:10 289:2 | 85:4 | 246:21 269:23 |
| 162:7,11 168:5 | 290:6,22 291:14 | **catch**  251:6 | 270:6 |
| 169:3 172:4 | 291:22 295:7,8 | **categorize** | **certification**  5:5 |
| 179:6 180:6,10 | 296:17,18 297:5 | 245:17 | 323:13 |

certify 323:4
cetera 23:3,4
  115:1,1 203:13
  242:10,10 266:5
  283:10,10
cfo 133:15,16
chain 52:8 63:12
  240:13
chains 52:9
chance 53:3
  240:6 277:20
  288:12
change 180:15
  180:17 193:14
  321:16 325:4,7
  325:10,13,16,19
changed 41:12
  71:14 180:8
changes 56:22
  69:5 70:3,24
  71:22 73:6
  115:19 324:10
  326:6
changing 257:6
characterization
  143:10 173:16
  200:14 204:17
characterize
  23:7 220:20
  315:24
characterized
  315:22
charge 23:14
  313:13,23
check 94:5
checks 184:24
chester 263:2,15

chicanery 220:2
  220:8,21
chief 143:15
  183:14 191:5
chock 256:5
choose 37:14
chose 19:12
  47:10
circle 14:23 15:2
circled 259:9
  260:22
circumstance
  274:6
circumstances
  205:15 251:21
city 204:22
civil 1:3 26:13
claim 100:15
  101:10 303:8
  312:7
claimed 158:5
claims 125:23
  134:3,15
clap 255:18,20
clarification
  26:2 170:7
  300:20
clarified 56:23
  71:13
clarify 27:7
clarity 171:16
class 26:19 27:1
  27:5,11,21 28:5
  28:8,10 80:5
  81:19 82:2,7,13
  82:17,18 83:3,11
  84:7,19,21 85:6
  85:12 86:5,15

101:17 102:14
  103:4 115:1,8
  122:4 125:22
  137:3 162:6
  163:1
classes 17:8
claw 79:2 116:2
  133:22 134:18
clawed 134:16
clear 26:24
  27:15 48:22
  55:16 67:2
  85:18 119:7
  146:6 170:8
  218:8 271:16
  296:3 314:20
clearly 68:9
  122:15 156:11
  243:13 266:8
  296:9
clerk 155:23
  216:24 217:3
  218:13 233:14
  257:15,16 282:2
  289:22 308:20
  318:11
clerk's 97:20
clever 272:8
cleverly 72:24
client 12:16
  68:10 73:21
  78:11,19,20 89:3
  128:10 131:23
  134:1 153:11,16
  172:10 193:6,12
  196:17 199:5
  247:7 249:7,14
  252:16 313:21

client's 137:5
  151:21 172:2
  183:21
clients 83:6 89:4
  157:10 165:15
  167:24 171:4
  173:20 176:24
  185:11,23
  186:24 187:5
  188:23 189:3
  190:19 191:21
  198:17 210:24
  216:2,12 235:7
  247:5 249:7
  255:1 265:18
  274:11 303:15
  305:14 309:9
clinical 19:15,21
  19:21 20:2,5,10
  20:14,15 21:5
  117:8
close 204:4,4
closet 195:20
clue 289:12
  293:16
coconspirators
  248:3,8 251:6,15
  252:8
coffer 116:4
coffers 116:6
colead 266:9
  268:5 269:3,8,10
  270:1,8,14,16
  295:20
collateral 38:9
colleague 260:5
collective 138:22

**collectively**
163:15
**college**  16:16,22
102:17 110:23
298:15
**colloquialism**
171:18
**colloquy**  40:4
247:21
**colon**  99:24,24
**columbia**  177:12
187:19,23
188:12,14 189:2
189:7 197:21
198:5
**combined**  32:8
46:1,3 133:10
169:17 170:1
**come**  28:19
96:11 131:14
179:7 269:6
272:7 279:19
300:10 309:7
311:14
**comes**  96:7
195:16 241:1
322:5
**comfortable**
166:5
**coming**  107:11
143:12 245:21
286:16
**commence**  91:21
**commenced**  41:7
91:20
**commensurate**
135:12,19 138:6
159:3

**comment**  56:21
**comments**  38:5
273:15,20
**commission**
27:18 95:13
96:21
**commit**  237:17
**committed**
172:23 237:7
241:14 244:24
**committing**
195:4 238:2
284:21
**common**  46:11
129:1 302:16
**communicate**
44:22 127:4
218:9 228:3
235:9 281:24
**communicated**
43:19 322:4
**communicating**
42:17 145:7
**communication**
43:6,7,9,18 44:2
51:6 64:21
76:12 104:2
124:21 165:19
227:8 235:12
236:8 263:7
279:10 284:19
**communications**
27:18 37:14
43:2 44:16,17
45:15 74:22
82:23 95:13
96:21 101:19
120:13 285:1

**companies**  18:12
96:3 304:9
307:6
**company**  18:5,8
18:9,20 19:16,21
20:12 29:4
78:24 79:12
102:21 117:4
126:14 133:13
133:24 158:24
309:16 312:19
**compensation**
126:24
**competitor**
95:22
**complaining**
302:18
**complaint**  10:17
11:20 48:12,17
48:18 49:10
103:2 147:15,15
185:22 202:14
203:1 217:18
259:15 293:24
294:6,12 312:7
**complaints**
216:8 239:18,20
240:3,4 297:1,2
306:20,21
**complete**  9:11
179:2 255:11
326:8
**completed**
252:21 324:17
**completely**  34:1
128:18 145:10
189:4 252:9,18

**complex**  189:12
**complicated**
189:12 250:5
**complicit**  112:4
**complies**  86:23
87:9 93:13
100:11 116:17
118:5 223:8
264:17 272:18
277:7 287:23
288:11 316:15
**components**
231:10
**concern**  38:1
128:17 129:21
202:2 319:1
320:14
**concerned**  39:7
45:1
**concerning**
11:17
**concerns**  44:10
114:2 126:6,8
141:19 161:14
176:22,23 177:4
202:6,7 210:3
212:22 252:4
278:19 299:1
311:10
**conclude**  19:4,7
**concluded**
285:24 322:13
**conclusion**  13:13
72:21 143:12
160:5 190:23
191:1
**conditioner**
199:16

conditions
129:12 153:10
conduct 227:20
227:23 247:13
306:14
conference
102:11
conferred 64:1
72:7 74:8
confirm 238:13
confirmed 57:4
conflating
286:12
conflict 60:14
64:4 78:5,12,12
78:16,17,19
81:12,14
conflicting 188:1
conformed
155:21 157:13
157:22 255:5
294:13
confrontational
226:11
confused 187:20
confusing
234:21 249:2
256:24
confusion 99:4
185:1 197:24
198:3
connection
111:15
connections
208:15
consider 37:13
78:3 128:20

considering
37:12 76:5 77:3
77:17 84:7
consistent
230:17
consolidated
151:20,22 216:8
216:9,11 217:18
219:6 234:20
243:21 250:8
312:17 313:16
313:23
conspiracy
250:20
constantly 257:5
constitute 285:7
construct 128:1
129:12
construction
23:23 25:7
26:12
construed 38:23
consultancy
128:1
consultant
117:11
consumers 95:24
121:5
consuming
234:19
consummation
45:21
contact 49:22
50:1,3 139:6
140:2 206:7,12
207:6 224:10
229:24 235:9,10
240:7,8,10,12

247:8 282:10
contacted 86:4
206:6 229:18
236:17 238:15
239:16
contacting
139:10 227:12
contemporane...
166:6
contempt 309:13
content 96:2
302:5
contention
262:10
contentious
273:13
contents 300:17
context 21:11
27:1 35:22
49:16 76:21,22
76:24 78:1 84:6
89:13 91:3
104:3 119:3,7
125:6 139:5
141:6,10 147:1
160:9 179:15,21
181:23 200:11
220:14 246:13
259:13 265:15
265:18
continue 137:10
226:18,18
279:13 298:14
299:7
continued 142:1
235:10 247:12
continuing 12:19
12:24 13:23

contract 96:9,12
189:20 195:9
contractor
189:21
contracts 21:15
21:15
contradictory
319:8
contributing
282:17
control 312:23
323:17
controlled 201:4
convenient
173:20 184:5
conversation
10:1 47:20 51:1
51:8,14 66:9,11
66:22 76:21
77:16 91:15
108:22 123:22
124:24 125:18
141:6,7,11
144:21,23
146:18 162:17
162:17 164:8
174:11 178:1
226:18,19 246:3
conversations
42:24 43:2
44:15 45:17
61:12 65:15
75:24 76:3,6,20
77:5,21 87:18,23
88:3,10 90:21,24
92:1 124:18
125:11 127:10
153:12 211:7

EXHIBIT 37
1450

**conversion**
30:21 32:13
**converted**
100:15 101:9
103:3
**convey** 149:11
**conveyed** 88:14
**conviction** 23:14
**convictions**
220:3 221:1
**cool** 204:19
**cooperation** 6:1
**copied** 50:11
57:20 58:5 59:8
59:19 63:15
105:20 108:6
109:21 118:15
214:16,23 217:4
217:13 233:11
243:10,14
256:17 257:9
278:1 279:7
281:4,16 290:1
**copies** 155:21,21
157:22,22 159:9
229:7 254:7
273:3 280:14
290:3 324:14
**copy** 54:9 55:23
57:24 58:10
70:13 105:12,18
107:9 119:16
151:1 154:22,23
176:5 217:9
219:3 229:8
234:17 259:8,8
265:7 280:10
290:13 294:14

**copying** 50:6
155:4 217:24
218:10,18 219:4
281:9
**cordial** 246:12
**corp** 116:3
**corporate**
115:19 116:6
134:4 170:12
309:17
**corporation**
20:11,16 26:19
27:12 69:17
80:1,21 84:2
89:15 111:7
112:1,21 114:17
115:21 116:1
121:4 128:9
134:10,22 136:4
136:7 139:13
146:8 152:18,20
159:1 169:4,8,9
170:10,18
215:18 298:22
299:3
**corporations**
28:24 80:11
299:18 302:16
**correct** 20:21
25:8,10,11 26:5
29:20 32:10
53:17 54:18
57:20,21,24 58:5
58:6,15,16,23,24
59:1,3,6,20,21
60:2,3,6,7 65:5
65:20 72:11
74:14 87:20,21

92:12 97:21
108:20 110:1
116:11 125:15
131:12,13 132:4
138:24 139:22
146:21,22 150:3
160:3,6 165:7
167:22 169:22
170:7 171:17,22
171:23 172:1,9
172:17,20 173:1
174:9 176:3,4,13
177:12,13,16
178:3 179:3,14
180:22 185:7
205:3 213:5
215:21,22
216:16 224:9
226:3 232:3
233:15,16
244:14 259:2
278:4 280:16
281:4 289:21,23
291:6 293:1
294:2 295:9
319:10 326:8
**correcting**
275:18
**corrections**
326:6
**correctly** 30:18
60:11,17 94:24
98:2 107:16
156:9,10,11,14
157:5 183:5
240:14 302:2
**correlated** 283:1

**corresponded**
302:9
**correspondence**
105:20 149:8
217:4,8,14
218:22 219:19
224:22 234:15
234:16,18
256:22,22 279:7
280:13 290:14
**corrupt** 142:8,10
142:18,23 143:3
143:5,9,20 221:3
221:5
**corrupted**
262:23
**counsel** 2:5,10
5:4 6:1 8:16
9:23 12:9 44:14
44:18 47:21
56:20 61:22,24
62:17 64:6
71:17,21 72:1,1
77:10 87:2
102:3,10 112:3
112:18,20
132:17 137:1
139:22 146:3
172:11 183:22
186:12 195:7
215:6,16,18,24
216:21 226:14
226:15 227:9,24
227:24 233:23
235:24 248:18
252:17 254:16
266:9 267:7,9,19
268:5,22 269:3,4

[counsel - date]                                                                    Page 15

269:8,8 270:1,1
270:8,14,16,16
270:20 273:6
274:2,15,16,18
276:2,2,3,4
290:7 291:21
293:19 295:6,12
295:20 311:24
315:19 321:4
324:14
**counsel's**   11:16
**count**   244:17
**counterclaim**
26:14,16
**country**   83:20
138:19 169:6
**county**   97:19
172:8 173:13
240:19 266:3
**couple**   70:23
163:13
**course**   8:15 10:7
24:18 30:8
83:14 127:10
167:10 235:10
247:12 268:23
287:4,13,14,15
**court**   1:1 7:12
10:9 11:24 12:7
12:11 24:10,13
25:12,13 26:7
38:10 52:24
74:2 89:13
101:5 124:8,9,22
140:6 143:14
148:4 157:12
161:3 164:24
165:20 168:10

171:6 172:24
180:6,11 181:18
182:21 183:4,12
184:1 185:14
191:6,7,8,8
193:19 194:3
195:4,11 197:19
198:21 199:4
202:13 217:5,8
218:6 219:4
221:24 227:19
228:6,10 229:17
229:19 230:2,9
233:22 236:23
237:21,21 245:1
247:17,22
250:21 255:6,7,9
255:13 256:5,6
256:14 257:13
259:9 260:22
261:6 266:19
267:4,5 268:18
268:19 269:22
269:24 270:6,13
270:18,23
278:16 279:7,10
279:11,14,17,17
282:2 285:20
286:24 291:16
295:5 309:3,5,7
309:14,20 310:8
313:6,18 315:9
316:6 318:5,8,8
318:22 319:3
320:6 321:21
322:1 323:6
**court's**   12:3
205:22 217:23

256:11 271:10
**courtesy**   7:20
8:3,5
**courtroom**
148:23
**courts**   140:3
171:2 198:20
236:18 238:16
285:16
**cover**   261:5
293:18
**coverage**   95:21
**covered**   38:13
**covering**   12:10
**cox.net**   53:16
**created**   185:13
303:17 305:17
**credible**   142:20
143:6
**credit**   193:6
**crime**   237:14,15
237:17,19,22
284:21
**crimes**   172:4
238:9
**criminal**   22:9,24
23:14 183:8
199:6,9 212:10
212:11 236:12
236:18,20 237:1
237:8,17,19
238:3,4,17,18
239:18,20,22
241:13 252:13
285:1,2 298:10
**criminally**   172:9
**criminals**   239:7

**criticizing**
218:23
**cross**   167:24
168:14 171:14
174:9 179:15,17
185:22 200:12
255:4 256:5,13
**crusade**   128:19
**cs**   324:15
**curiae**   291:5,14
**current**   24:1
151:3,5,17
152:23
**cv**   1:7
**cymba**   175:18

**d**

**d**   3:2 5:2 16:5
116:14
**dalinas**   16:5
**damage**   133:24
134:22
**damages**   114:22
115:17,23
**darren**   86:4,12
**data**   84:5 85:2
267:2
**database**   313:7
**databases**
285:13,14
**date**   12:4 21:8
33:18,18 54:8
94:17 149:22,23
197:23 275:7
288:20 289:5,11
300:1 320:10,10
325:24 326:12

dated   3:15,16,17
3:18,19,20,21,22
3:24 4:6,7,8,9,10
4:11,12,13,15
52:17 53:19
63:2 92:18
104:13 109:12
116:19 150:13
154:11 164:11
164:16,17
213:16 231:5
232:15 253:19
257:24 258:11
263:23 272:10
277:9 293:6
dates   6:2 107:6
131:3
david   105:13,16
107:10,23 108:2
108:12 109:22
110:6 119:16
154:22 155:5
davis   292:1,5,9
day   9:9,10,13
21:14,14 61:18
64:21 65:2
66:21 103:5
144:15 159:13
159:17 187:17
188:19 197:23
257:4 276:11
313:14 326:15
days   6:4 9:12
58:2,22 66:7
70:23 72:4 73:2
73:4 74:4
165:23 185:5
324:17

dc   197:16
deal   8:18 33:7
33:24 38:12
39:16 116:10
126:12 133:9
307:6
dealing   44:8
276:9
dealings   36:5
42:9 53:23
69:15 92:10
155:7 213:8
305:15
deals   95:16 96:2
96:3
dear   231:17
233:7 246:9
debatable
200:24
debate   186:10
187:15
decade   210:5
242:14
decades   199:7
december   293:7
324:3
decide   268:17
270:10 296:16
decided   19:8
102:6 134:2
282:23
decision   267:6
267:14 268:20
270:19 291:21
declaration   4:5
179:9 185:7
191:12,17,19
222:21 223:4

225:22 228:16
declarations
192:22 195:3
198:21 242:9
245:5
declare   326:4
decline   122:9
declined   162:18
deem   279:15
291:19 321:2,13
deemed   136:6
247:14 321:7
326:6
deep   250:19,20
defamation
275:11
defamatory
38:16,23
defect   23:23
26:12
defects   25:7
defendant   1:8
2:10 23:19
48:14,23 142:2
186:2
defendants
215:17
defense   64:6
102:3 112:3,18
136:24 155:1
183:8 215:10,15
215:16,17
233:23 286:20
define   29:22
67:19 317:17
defined   147:17
definition   166:9
237:17 255:23

284:5,10,13,16
285:3,8,18
296:23
definitive   47:6
128:14
defraud   185:14
250:21 285:16
defrauding
171:6
degree   16:17
17:10 88:14
106:13 316:13
delay   155:24
157:14
delivered   94:5,6
99:23,23,24,24
159:13
delving   40:11
demands   94:23
100:19
demonstrate
276:20
denied   230:7
deny   238:13
department
302:7,23 303:6
304:16,18 305:1
305:6,18 306:16
314:17 316:9
depends   166:9
319:17
deponent   324:13
326:3
deposed   6:13
125:6 132:14
305:13
deposing   324:13

[deposition - discovery]

**deposition** 1:13
5:24 8:15 9:11
10:7 11:5 93:7
99:7 124:1
135:23 137:22
145:19 147:1
246:17 305:24
322:12 323:6
**depositions** 6:4,8
131:16 132:6
185:6
**derivative** 28:6
47:4 48:1,6,9
49:12 64:2,9
65:4 67:6 72:9
72:11 74:11,13
75:15 77:4
79:11,19,22 80:8
80:16 81:22
82:13,18,19
84:21 86:7,17
88:11,19 89:9
90:15,16,19
97:11 101:17
110:21 112:5,8
114:10,11,16
115:18,24 122:4
125:22 126:2
128:5,21 129:3
130:1,16,23
131:11 135:10
137:6 138:19
139:6 146:7
147:17,22
148:20 149:5,13
151:6,23 152:14
169:3,7 170:9,17
179:23 181:24

205:5 210:4
212:22 213:2,4
219:13,14,23
227:14 268:2
278:19,20,21
283:4 297:17
298:1,7 299:3
312:22 313:10
317:6,15
**derivatively**
69:18 80:3
112:22 134:23
139:20 146:10
298:23
**describe** 46:9
300:13,24
**described**
103:20 128:2
135:1
**describing**
224:20
**description** 3:14
4:4
**deserve** 213:1
**desist** 232:10
243:5,6 244:6
245:24 246:5
247:4 248:4
**despite** 235:8
**detail** 246:3
**detailed** 128:14
**details** 84:10,15
251:3 299:14
**detective** 241:5,8
**detectives** 240:7
**determination**
13:15 316:11
321:2

**determine** 29:9
143:20 158:13
161:7 185:19
**determined**
111:18 131:17
227:19 285:20
**developed** 115:7
**dies** 297:4
**differ** 225:21
228:15
**different** 19:9,12
31:15 75:7
106:13 161:18
181:9 190:7
193:8 200:18
290:14 313:24
318:24 319:14
**differently**
319:20
**difficult** 29:7
34:13 103:11
256:9 271:6
313:13
**dig** 265:19
**diligence** 158:2
161:17 175:4
178:7
**diligent** 119:2
178:10
**diminution**
116:11
**dinner** 108:20
**direct** 5:18 86:17
97:11 114:11,20
114:22 146:2
259:22 260:1
323:16

**directed** 252:16
275:4 313:21
**directing** 221:15
276:2
**direction** 196:20
255:1
**directly** 68:19
140:2 178:2
276:10
**director** 116:9
117:16
**directors** 130:7
**dirt** 265:20
**disagree** 149:19
224:17 248:23
**disagrees** 226:1
247:17
**disappointed**
131:7 134:20
**disbarment**
205:23
**disbarred**
168:13 174:13
177:16 180:4
181:16 186:20
187:8 188:9,13
189:4,6,19
190:24 192:9
197:6,17,24
198:4 199:6,9
221:11 239:1
252:12 260:23
261:7 262:9
**disciplinary**
188:15,18
**discovery** 132:6
135:22,23
136:18 137:1,4,9

137:20 184:23 276:17

**discuss** 78:2 120:19 123:21 127:8,21 140:9 140:12 151:5 152:22 241:7

**discussed** 37:19 44:10 45:3 78:3 81:15 84:13 111:17 129:13 223:18 246:8 263:10

**discussing** 45:2 47:24 84:11 120:24

**discussion** 35:5 37:24 47:6 52:1 77:1 85:8 146:15 212:18

**discussions** 39:22 106:11,16 106:20 128:4,15 131:2,4 153:15 208:24 210:9 212:19

**disinterested** 252:9

**dismiss** 302:8 304:17,19 308:13 311:17 314:6 316:10

**dismissed** 23:4 100:16 103:5 281:18 314:17

**dismissing** 311:16,17

**disproportionate** 136:8,9

**dissolution** 169:9

**distinct** 67:11

**district** 1:1,1 172:8 173:13 177:12 187:19 187:23 188:12 188:14 189:2,7 197:21 198:5 239:16 240:12 240:18

**dive** 62:4

**division** 168:7,9

**divorce** 15:20 266:4

**divorced** 16:7

**divvies** 296:20

**dno** 112:14

**docket** 103:9 250:6,12 266:3 311:21 312:14

**docketing** 234:6 234:9

**dockets** 259:9 312:15 313:7

**docs** 260:22 261:6

**document** 10:14 10:24 55:21 57:10 63:9 64:22 87:7 92:24 93:5 97:16 104:22 109:18 116:15 118:4,11 136:3 136:18 138:3

150:19,20 154:17 185:9 186:3 190:6 195:22 197:22 201:14 214:3,7 219:10 224:21 225:5,7 230:20 254:4,22 259:6 259:20,23 260:2 260:6,13 261:6 318:13

**documentation** 157:11

**documents** 10:6 10:6,11,12 34:9 34:12,21 39:3 47:22 95:10 104:10 135:21 135:22 136:2 137:16 138:1 149:21 153:22 155:19 156:18 156:20 163:11 164:2 176:19 185:23 191:7 235:13 245:18 245:20 255:5 283:6,8

**doing** 13:22 103:2 119:21 121:4 141:13 145:13 161:17 175:6 197:22 235:16 256:3 271:7 298:12 299:8 313:17

**doj** 311:15,16 314:6

**dollar** 96:8 114:18 115:15 235:23 254:15 272:24 273:1 275:5 276:10

**dollar.law.** 236:4

**dollars** 33:15 79:9,13 112:16 133:11,23 152:4 152:5 239:3

**domiciled** 240:11 312:20

**doubt** 294:11

**douglas** 164:16 182:20 183:3

**downs** 112:13

**dr** 19:23 20:19 20:24 21:12,22

**draft** 48:12,16 48:18 49:10 148:1 157:23 207:11 249:5 274:19 293:16 294:5,12,22

**drafted** 235:3 274:20 275:8 280:13 286:6

**drafting** 165:16 274:15 276:3

**draw** 209:19

**drawing** 240:22

**drive** 204:8

**driven** 78:23 79:6 80:9 212:24 219:11 252:12 297:11 299:20 303:13

305:21
**driver**  25:17
26:4
**driving**  133:13
**due**  161:17
175:3 193:4
**dui**  22:12,15
183:9
**duly**  5:11 13:24
323:5
**duplicity**  194:5
**duration**  136:14
**duty**  139:24

**e**

**e**  1:16 2:1,1,3 3:2
3:12 4:2 5:2,2
16:4 99:23,24
202:17 307:2
323:2 325:3,3,3
**eamon**  2:7 324:1
**ear**  161:20
**earlier**  57:16
101:13 126:9
128:2 263:11
307:13
**earliest**  52:9
**early**  54:4 57:17
129:24 164:19
**ease**  290:11
**easily**  147:20
245:21
**eastern**  1:1
**easy**  86:20
220:13
**educated**  130:9
**education**  16:15
291:3

**effect**  17:24
301:20
**efficient**  226:5
**eight**  19:5
151:19
**eighth**  229:3,3
**eisenhower**
286:14,15,17
**either**  23:8,18
42:10 82:24
106:9 118:19,22
125:21 129:15
141:23 203:16
215:15 233:23
240:5,16 241:12
282:17 312:10
**elaborate**  299:14
302:3 304:6
310:22
**electronic**
284:24,24
**elements**  237:14
237:15
**email**  3:15,16,17
3:18,19,20,21,22
3:24 4:6,8,9,10
4:11,12,13,14
50:7,17 52:8,17
53:8,19 54:7
55:20 56:6,11,14
56:16,18 57:4,6
57:7,8,8,14,16
57:17 58:3,4,9
58:21 59:9,13
60:5 63:2,10,15
63:19,22 64:17
65:6,9,17 66:2
70:2,10 75:11,12

76:8,9,11 77:14
78:8 81:9,11
87:20 92:18
93:24 94:5,10,16
94:19 97:4
99:16,17 100:12
100:23 104:13
105:18 107:8
108:6 109:12,20
116:19 118:14
119:4,12,17
120:15 122:13
144:11,16 149:7
150:13,24
152:24 153:17
153:24 154:11
154:21 155:11
158:9 175:19
181:2 213:16
214:14,23 217:2
217:22 218:21
222:13 229:6,7
231:5,12,15,17
231:20 232:1,6
232:10 233:3,4,7
233:12 234:24
235:3,15 236:6
238:1 241:17
243:8 244:5,12
246:2,7,13
247:24 249:6,9
251:14 253:19
254:1,6 257:24
258:11,18,20,24
263:23 265:6,11
265:16 272:10
272:22 273:5
276:15 277:9,24

278:7 281:1,16
283:19 288:4,16
288:22 289:18
290:19 292:10
294:7,9 295:3,19
299:10 300:2
307:1,14,23
314:4 315:24
316:11 318:6,11
318:16,17,22
320:6,7,14
**emailing**  291:4
**emails**  50:11,19
51:8,9 52:3,8,9
61:12,13,18
62:18 66:14,15
74:23 105:11
120:18 144:17
229:5 234:17
235:7 285:15
289:9 292:17
**embarrassing**
256:2
**embarrassment**
256:1
**emerrigan**  2:9
324:2
**emphasized**
277:2
**employ**  239:2
242:14
**employed**  17:16
22:3 289:2
**employee**  21:17
189:20
**enabled**  126:15
**enclose**  291:24

EXHIBIT 37
1456

**enclosed** 292:2
292:22
**encompassed**
96:18
**encourage** 294:6
**endeavor** 126:20
**ended** 88:15
**enforce** 309:18
**engage** 91:15
122:24 123:6
**engaged** 70:24
96:3 223:16
262:16
**engagement**
60:21 62:7 67:3
67:12,16,22
68:17 70:18
73:7 122:2
224:11
**english** 265:24
**enhance** 269:23
**enjoin** 102:6
**entered** 23:11
230:5,6 312:9
**enterprise** 21:18
285:2
**entertainment**
106:2,12 108:14
155:10
**entire** 79:18
136:14 142:8
**entirely** 78:22
79:6 115:22
134:11 252:11
**entities** 38:20
**entitled** 207:19
285:17

**entity** 20:9 22:3
32:9 38:17 46:1
46:3 49:13
169:17 170:1,12
203:12 303:16
305:17 320:3
**envelope** 259:7
260:18 301:2,3,6
301:12,15,19,23
**environments**
263:16
**equally** 211:2
**equifax** 124:6,23
125:1,13 153:19
153:22 266:10
266:13,23,23
267:4,17,19
268:6 269:4,22
270:5,13,23
271:11
**erise** 234:7
**eriseip** 234:6
**errata** 324:11,13
324:17
**error** 318:19
**especially** 38:2
128:19 129:21
146:12
**esq** 176:2,8
**esquire** 2:3,7
181:2 260:16
324:1
**est** 110:1
**establish** 67:10
97:14
**established**
303:3

**estate** 18:4
**estimation**
237:23 313:11
**et** 1:4 23:3,4
115:1,1 151:18
203:13 241:18
242:9,10 250:17
266:4 283:10,10
284:4 285:6
287:20 299:15
314:7,12,19
315:4,23 324:4
325:1 326:1
**ethical** 113:16
128:18 129:23
**ethics** 129:19
**evans** 19:20,24
20:1,17,19,24
21:12,22
**evening** 141:16
223:22 235:5,17
321:24
**event** 273:5
**events** 240:14
**eventually** 40:17
**everybody** 128:8
184:6 251:6,8
279:8 314:19
**evidence** 12:14
202:5 252:2
**evident** 296:2
**evolution** 73:4
**evolving** 251:10
**ex** 16:3 279:9
**exact** 294:1
**exactly** 178:14
184:16 185:12
186:12,24 187:5

196:19 198:17
242:12 297:14
304:24
**exaggerated**
221:10
**examination**
5:18
**examined** 5:11
**example** 38:15
96:6 112:12
221:13
**examples** 222:6
222:8
**exception** 256:11
256:12 263:8,9
**excluding** 69:21
**exclusive** 95:16
96:2,2,9
**excused** 322:10
**executive** 115:24
133:15
**executives** 83:23
111:24 112:19
116:2 133:9,23
134:17,19 152:1
233:24
**exhibit** 10:11,17
10:18,23 52:8,10
52:19 60:5 63:3
70:4 86:21
92:15,19 93:5
97:10,15 98:22
104:14 109:14
116:20 150:14
154:12 163:19
175:23 213:13
213:17 222:18
222:23 231:6

232:16 253:20
257:21 258:1,12
263:24 272:11
277:4,10 288:5
293:1,8 301:7
316:18,23
320:20
**exhibited** 39:13
**exhibits** 39:4
61:15 114:10
259:15 271:2
**exist** 220:11
**existed** 123:17
169:5
**exists** 12:7
170:11,19
**expect** 11:15
29:14,17 126:23
175:1 303:8
310:1,2
**expectation**
127:5
**expectations**
127:22 269:14
**expected** 64:6
303:9 310:3
**expecting** 61:7
227:10 309:8
**expediency**
290:11
**expedite** 34:24
**expensive** 298:8
**experienced**
128:22 297:15
**expert** 236:11
273:9
**explained** 142:3
226:14

**explaining**
196:21
**explanation**
302:2
**explanatory**
210:20
**explore** 98:14
**expose** 128:19
221:2 297:11
299:2
**exposing** 218:5
**express** 153:5
**expressed**
212:21
**expressly** 90:9
**extensive** 178:11
**extent** 6:14,23
7:18 8:6,19 9:4
39:2 44:12
145:21 222:2,12
315:18
**extinguish**
112:15
**extinguished**
169:4 170:14
**extract** 304:7
**extremely**
234:18 256:9

**f**

**f** 323:2
**facilitate** 285:1
299:20
**fact** 13:20 70:23
80:23 85:12
88:17,18 110:22
131:15 137:24
143:5,12 146:14

159:2 167:7
172:22 173:8,11
173:15,20
178:16 182:8
185:18,20
189:15 190:12
198:24 199:3
212:23 224:4
228:1 242:5
245:23 249:17
269:6,15 283:3
295:16 312:8
**facts** 75:1 80:21
181:14 184:11
186:17 192:6,12
193:24 194:6,13
197:4,13 252:6
304:14
**fails** 324:19
**fair** 21:3,8 25:18
29:21 41:5 42:6
46:18,19 62:6,10
70:20 79:17
80:16 87:5
88:16 125:14
130:16,23,24
132:24 139:4
147:24 164:19
169:19 177:24
181:7 191:24
205:3 269:20
271:13 289:17
294:3,24 296:5
296:11 300:19
306:9 314:8
319:19 320:1,4
**fairly** 33:7

**fairness** 149:1
149:20 157:6
162:6 163:1
321:3
**faith** 143:11
198:14 252:3
**fake** 185:13
**fallen** 198:10
**fallout** 46:8
**false** 273:7
299:19
**familiar** 23:9
200:7 201:8,9,10
207:23 233:6
298:11 317:5
**familiarity**
213:24
**family** 15:5
**fans** 96:7,14
**far** 48:12 67:8
204:9 268:1
296:22
**farther** 204:21
**fault** 315:13
**favor** 33:1
**fax** 56:24
**faxing** 54:9
57:23 70:13
**fcc** 95:12 96:5
**feasible** 202:9
**february** 109:13
109:24 164:13
164:16,17,19
174:20 186:16
**federal** 24:11,13
27:17 95:12
96:20 107:12
259:7 298:12

**fee** 136:7 156:19
158:4,5 179:21
179:24 180:18
180:20 262:21
319:4
**feel** 9:15 212:23
**feeling** 269:24
**feelings** 181:10
**fees** 79:9,13
112:11,17
135:11,18,18
155:14,19
156:24,24 157:2
157:17 158:5,14
159:2 160:1
173:24 174:2,8
261:18 285:16
285:16 298:21
321:3,5
**feinstein** 187:4
**fellow** 227:10,12
**felon** 252:13
**felt** 102:13
135:18 180:4
228:22,24
**ferry** 204:7,12
**ficaro** 215:20
**fifth** 228:17
**fight** 312:16
**figure** 30:7,9
78:24 102:21
111:1 146:13
160:15
**figures** 30:3,5
**file** 64:9 76:15
90:5 102:23
114:9,21 162:10
174:2 192:22

205:16 240:4
250:6,12 255:3
283:11 291:7
294:22 296:24
312:22 317:24
318:2,9
**filed** 26:15 27:17
28:1 85:12 86:5
89:7 90:13
97:10,17 98:10
101:4,15 103:21
104:5 107:13
121:14,15,18
133:20 141:24
155:20 157:1,3
157:11 159:15
163:10 167:19
167:21,23,24
168:14 171:13
171:14 185:22
198:21 202:14
203:1 205:11
210:24 214:7
225:4,7 229:9
245:5 256:13
266:14 276:1,1
277:1 292:8,23
293:13,17 294:1
294:5,19,23
307:21 314:7
315:23
**files** 174:9 303:7
**filing** 5:5 72:10
74:13 76:5
89:12 93:4
104:6 121:2
156:23 157:8
171:11 195:3

239:17,19 240:2
242:8 266:18
271:2 283:18,22
291:13 314:6
**filings** 13:13
38:6 296:6
306:17
**filled** 306:23
**final** 13:14
144:18 294:18
**finally** 5:23
**find** 73:24 84:18
96:11 139:11
145:8 161:8,9
180:7 182:5
184:23 221:20
222:9 227:1
229:21 265:20
301:13 310:6
313:8
**finding** 251:10
258:9
**fine** 5:16 44:19
56:21 90:3
105:3 145:22
148:15 155:22
225:1,2 304:2
308:8
**fines** 152:5,6
**finish** 7:21 8:4,6
8:11 73:13
173:12
**finished** 7:24
8:10 121:21
**fink** 40:16 101:5
101:14 102:18
103:1 110:22
129:6

**fired** 133:15
**fires** 21:16
**firm** 1:3 28:1
37:3 41:9,15
42:1,10,20 43:3
43:6,9,13 44:3,4
45:16 49:19
50:8 54:23,24
55:12 60:22
62:8 67:4,12,16
67:20 68:22
77:7 79:24
82:24 83:1,9
84:6,14 85:5
88:17 89:8,14
90:5,13 103:1
113:7,9,14
121:10 122:2,9
123:1,7,14
125:20 127:17
127:23 129:5,8
129:15 130:14
130:21 137:2,5
151:21 156:19
164:14,24
166:18 167:8
172:12,19,23
174:9,14 175:14
177:2,11 181:5
181:15 183:16
184:13 186:18
189:18 192:8
193:8,15 195:5
197:6,15 199:6
201:5,5 205:4
209:1 210:8
211:9 212:10
215:21 216:20

| | | | |
|---|---|---|---|
| 221:16 231:23 | 257:1 271:4,8 | **folks**  96:13 | 296:19,19 |
| 233:13 234:7 | 275:7 279:24 | 233:21 | **forthcoming** |
| 236:12,16 237:3 | 281:18 284:4 | **follow**  99:16 | 101:24 151:3,6 |
| 237:7,10 238:2,8 | 285:6,11 286:20 | 217:23 255:7,12 | 151:23 246:6 |
| 238:15,19 239:6 | 296:14 298:7,9 | **followed**  66:16 | 303:21 |
| 241:13 242:7 | 298:13,14 | **following**  144:14 | **fortune**  6:3 |
| 245:14 251:1,1 | 303:17 308:22 | **follows**  5:12 | **forward**  50:13 |
| 254:23 260:23 | 310:24 314:14 | **font**  302:1,6 | 62:19 68:5,5 |
| 261:6 267:9,22 | 315:22 | **foot**  296:22 | 77:3,11 178:6 |
| 268:5,15 269:1,7 | **first**  5:11 30:12 | **footnote**  318:14 | 217:12 235:7 |
| 269:10,12,24 | 35:15 44:8 | **footnotes**  256:6 | 252:17 291:4 |
| 270:7,22 271:12 | 45:14 49:22 | 256:7 | **forwarded**  4:14 |
| 271:20 273:1 | 50:1 52:11 | **force**  79:1 | 229:4 288:4 |
| 274:13 275:23 | 57:15 93:19 | **foregoing** | **forwarding** |
| 276:7,9,12,13 | 97:19 105:11 | 323:13 326:5 | 258:18,24 |
| 280:6 283:5 | 107:13,19 125:3 | **forget**  11:21 | **found**  71:1 102:3 |
| 286:22 292:24 | 164:10 174:4 | 70:2 292:14 | 102:16 108:12 |
| 293:14 295:15 | 180:9 188:7 | **form**  5:7 8:20 | 128:7 168:12 |
| 295:19,23 296:3 | 209:9 210:22,23 | 20:9 32:19 | 221:20,22 |
| 296:4,8,13 310:7 | 214:4 218:2 | 47:12 61:1 71:5 | 226:23 227:4 |
| 310:8,9,16,21,21 | 236:11 249:14 | 75:20 81:3 | 269:9 302:7 |
| 311:19 312:9 | 249:18 259:3,5 | 113:18 135:4 | **founded**  18:14 |
| 313:19 314:1,14 | 259:19 260:21 | 173:3 181:20 | **four**  236:10 |
| 314:18 315:4 | 265:3 292:7 | 239:9 251:18 | 256:10 312:15 |
| 319:15 324:4 | 300:22 312:22 | 288:24 294:15 | 312:21 |
| 325:1 326:1 | 313:5 | 314:23 | **frame**  219:18 |
| **firm's**  165:12 | **firsthand**  297:16 | **formal**  123:12 | **frank**  162:5,9 |
| **firms**  37:3,5,7,8 | **fit**  269:2 | 239:18,20 240:2 | 163:1,4 164:8,22 |
| 37:10,11,21 39:1 | **fitting**  251:21 | 240:4 | 165:14,23 166:2 |
| 39:8,24 40:20 | **five**  73:4 99:1 | **format**  289:9 | 166:17,22 167:1 |
| 41:7,10,16 50:7 | 226:24 | **formed**  68:10 | 167:5 174:12 |
| 69:8,13,22 71:1 | **fix**  95:4 113:2 | **former**  133:13 | 177:14 178:2 |
| 77:2 78:20 | 128:8 | 151:24 249:14 | **frankly**  160:22 |
| 79:23 83:13,15 | **flatly**  303:23 | **forsee**  133:12 | 274:17 |
| 84:11 111:8,16 | **focus**  296:10,10 | **forth**  51:9 52:3 | **fraud**  128:20 |
| 111:22 112:6,7,7 | **focused**  296:7,12 | 83:6,6 91:11 | 143:13,16 |
| 126:17 137:4 | **focusing**  28:21 | 141:3 177:5 | 171:22 172:17 |
| 221:9 255:2 | | 183:16,18 | 172:20,23 193:1 |

**[fraud - golden]**                                                         Page 24

| | | | |
|---|---|---|---|
| 193:18 194:3 | **gained** 262:23 | 34:17 37:14 | 46:2 48:8 52:12 |
| 199:4 218:5 | **galvanizing** | 94:20 97:5 | 60:10 62:16,23 |
| 221:19 222:2,8 | 220:3 221:1 | 133:5 160:21 | 63:9,22 68:13 |
| 237:21,22,22 | **game** 313:2 | 177:20 193:6 | 73:20 77:8,10,18 |
| 241:14 244:24 | **gaming** 201:23 | 211:9 248:9 | 78:24 79:4 |
| 250:19 278:20 | **gas** 24:3 25:21 | 267:5 274:2 | 86:22 88:10 |
| **fraudulent** | **gathered** 229:20 | 291:18 310:9 | 91:20 92:15 |
| 220:11 221:10 | **geller** 86:12 | **given** 128:19 | 93:16 98:21 |
| 236:22 239:3 | 137:2 | 129:21 160:4 | 102:7 104:9,10 |
| 244:13,16,22 | **general** 31:4,20 | 193:21 210:3 | 109:9 110:4,15 |
| 286:8 | 31:21 108:15 | 251:21 297:8 | 110:18 116:16 |
| **free** 9:15 75:2 | 219:17,23 | 321:6 326:9 | 118:18,21 122:5 |
| **friday** 9:12 | 254:21 255:15 | **giving** 98:15 | 129:17,18 |
| 63:14 66:1 72:5 | 291:22 297:17 | 321:12 | 143:21 144:2 |
| 74:6 | **generalized** | **glad** 5:23 | 146:16 150:11 |
| **friend** 105:17,21 | 219:17 | **glazed** 246:2 | 150:18 154:8 |
| **frightened** 227:7 | **generally** 9:1 | **gmmrlawfirm....** | 163:13,14,23,24 |
| **front** 10:8,8 29:8 | 33:1 186:17 | 2:9 324:2 | 177:8 181:13 |
| 39:5 149:21 | 292:16 | **go** 8:21 9:12,24 | 187:14 189:13 |
| 165:16 207:22 | **generate** 283:7 | 16:16 51:10 | 193:21 194:12 |
| 245:18 310:16 | **generic** 219:15 | 56:14 61:16 | 199:15 203:12 |
| **fronts** 10:12 | **genesis** 311:9 | 90:2 99:5 | 205:18 213:12 |
| **full** 6:7 7:8 220:6 | **gentleman** 161:1 | 100:17 103:12 | 213:14 219:21 |
| 256:5 | 161:2,9,10,20 | 116:2 143:22 | 226:12 231:3 |
| **fun** 199:14 | 203:4 206:21 | 147:3,20 221:1 | 249:20 253:16 |
| **fund** 29:2,6 | **george** 216:14 | 226:9 277:4 | 257:21 259:18 |
| **funny** 272:4 | **georgia** 24:16 | 285:9 321:23 | 259:21 268:9 |
| **further** 90:24 | **germane** 41:9 | **goes** 114:16 | 272:3,15 274:2 |
| 144:21 146:2 | 267:14,18 | 116:3,5 204:22 | 277:5 282:10 |
| 161:23 181:3 | **gestures** 7:11 | 297:5 319:10 | 284:12,14 |
| 194:24 | **getting** 49:6 62:1 | **goggins** 241:5,5 | 287:24 288:23 |
| **future** 291:2 | 63:19 76:24 | 241:8 263:10 | 290:13 296:17 |
| 310:7 | 78:1 98:17 | **going** 6:13,15,24 | 296:17,18,19 |
| | 104:4 271:18 | 8:24 9:9,13,19 | 301:1 |
| **g** | 273:13 | 10:5 11:17 | **gold** 286:19 |
| **g** 5:2 202:17 | **ghosted** 61:22 | 12:15 23:7 31:8 | **goldberg** 2:7 |
| **gain** 171:7 | **give** 6:7,15 7:2 | 31:20 33:12,16 | **golden** 17:2,7,15 |
| | 7:20 8:3,5 14:16 | 34:5,7,13 41:12 | 83:24 133:11,18 |

| | | | |
|---|---|---|---|
| **good** 5:21,22 6:3 36:16,24 49:7 63:24 86:13 105:21 113:15 113:22 114:1,14 119:24 133:21 143:11 152:18 198:14 248:18 252:3 254:22 261:18 269:23 279:3 282:3 295:1 310:12,13 | **ground** 133:13 **grounds** 64:8 **group** 203:9 255:2 284:17,22 **guess** 16:5,21 34:16,16,17 87:12 130:24 131:8 237:3 277:3 306:2 319:17 **guilty** 241:13,19 241:23,24 | **handwritten** 300:22 **happen** 286:9 **happened** 33:18 75:24 77:12 83:16 84:20 85:8 131:2,4 153:21 163:6 186:4,9 234:14 234:22 267:16 268:19 289:8 | 13:18 14:4 15:4 16:14 22:6 23:17 24:20 25:9,17 26:3 27:9 30:13,24 34:15 35:15 38:18 40:7 49:12 52:7,15,19 53:3,4,8 57:6 58:10,18 59:23 62:13,24 63:4,8 |
| **google** 141:14 178:11 | **guise** 304:10 **guy** 47:9 119:19 193:5 195:24 | **happening** 30:14 32:6,17 33:2 96:17 141:20 | 64:23 70:7,9,11 72:5,23 73:5 74:5 75:12 78:9 |
| **gotten** 45:5 171:7 187:24 | **guys** 36:16 37:1 114:1 264:6 | 156:22 **happens** 193:9 | 87:10,24 89:9,15 90:7 92:16,20,23 |
| **governance** 115:19 134:4 | **h** | 302:22 **happy** 83:21 | 93:6 94:1 95:3 98:21,23 99:6 |
| **grammar** 95:5 **grant** 286:14,15 286:17 | **h** 3:12 4:2 164:17 325:3 | 91:19 119:7 144:10 202:24 212:1 | 100:9 104:11,15 105:9 109:10,14 109:20 110:14 |
| **granted** 180:11 256:12 | **half** 183:11 **hallway** 125:12 | **harass** 247:6,7 **harassment** | 116:16,21 118:3 118:14 130:13 |
| **gratuitous** 273:13 275:1 279:5 | **halo** 14:23 **haltzman** 1:16 2:2 | 26:13 247:11,15 **hard** 7:22 34:8 119:1 160:15 | 141:18 143:16 145:23 147:14 150:11,15,21 |
| **great** 7:17 8:14 11:3 16:10 34:20 38:12 214:12 232:24 281:15 | **hammond** 1:20 323:10 **hand** 7:11 103:22 **handed** 159:14 159:17 | 161:4 219:18 248:24 **hardware** 96:13 **harmed** 79:12 96:1 112:1 121:6,6 | 154:1,8,13,16 163:15,20 164:4 165:13,21 167:4 172:15 174:15 178:6 181:14 182:15,16 |
| **greatly** 7:7 **green** 115:3 **greg** 235:21 236:2 | **handle** 55:17 267:23 **handling** 37:3 55:8 276:8 | **hartleib** 1:7,14 3:5,15,16,17,18 3:19,20,21,22,23 3:24 4:5,6,7,8,9 | 193:17 194:7 200:6 205:18 213:14,18 214:13 219:11 |
| **grievance** 121:3 **gross** 136:11 | **handwriting** 261:1 | 4:10,11,12,13,14 4:15,16 5:10,21 | 222:19,23 231:3 231:7 232:11,12 |

**[hartleib - identification]** Page 26

232:17 233:2
237:13 241:17
243:4,13 244:5
246:8 251:12
253:17,21 254:2
257:22 258:2,13
258:19 259:7
263:21 264:1,23
265:5 269:21
272:5,12,15,17
273:18 277:5,11
277:21 284:11
288:2,5,10,12
293:3,8 294:17
299:1,11 304:5
307:1 314:5
316:18,24
318:23 319:1,5
324:4,5 325:1,2
325:24 326:1,2,4
326:12
**haste**  276:21
**hat**  302:13
**head**  7:10 195:5
213:10 234:2
284:20 285:22
307:10
**hear**  145:18
**heard**  268:8,9,11
270:19
**hearing**  41:11,13
101:24 124:7,23
125:1,13 148:21
149:1,4,20 157:6
159:14 188:15
233:22 266:15
292:5

**hearings**  161:4
**heart**  305:16
**heat**  245:19
**heavily**  271:11
**heck**  276:19
**hedge**  72:23
**held**  1:15 35:5
120:6 147:7
151:7 152:3
199:20 253:3
**help**  34:24 98:12
134:21 162:18
162:20
**helped**  80:6
133:21
**helpful**  34:23
321:19
**helping**  162:10
304:10 306:22
**helps**  35:19
**henceforth**
296:10
**hereto**  326:7
**hershewe**  215:23
216:20 276:12
**hey**  75:16 88:10
**hfmlegal.com**
233:17
**high**  16:15 86:11
113:14,16
**higher**  59:14
**highlights**  6:9,10
**highly**  226:10
**hills**  257:1
**hines**  258:24
**hire**  46:6,9,12
47:10

**hired**  177:1
184:17,20
189:20,21 191:2
242:20 252:12
265:19
**history**  83:19
176:23 268:1
**hit**  6:10 24:3
25:22 297:4
**hmm**  156:5
**hmsk**  233:17
234:1
**hold**  22:5 315:7
**holding**  29:23
30:8,9,15
**holdings**  29:13
29:19 30:3,16
111:15 132:1
146:13
**holiday**  96:6
**holidays**  91:19
**hollow**  15:2
**home**  23:24
**hominem**  222:3
252:15 274:24
**honestly**  28:12
32:20 34:7
42:22 85:9 87:4
187:13 263:17
276:11 318:6
**honorable**
118:22 156:1
**hoops**  304:13
**hopeful**  152:19
**hopefully**  34:21
**horrible**  252:18
**host**  243:14
289:24

**hour**  183:11
184:8,9 193:16
195:14,15,21,23
196:1
**hours**  141:15
161:15,17
179:10 200:9,10
200:22 201:6,13
202:10 207:19
221:12 283:7,9
285:12
**house**  203:20
**huge**  199:4
**human**  57:1
**humanly**  202:8
**humm**  55:24
59:18 63:18
169:1 171:12
220:4 287:21
**hundred**  133:11
**hundreds**  83:13
133:9
**hung**  228:23
**hurt**  181:10

**i**

**idea**  221:18
234:11 260:12
320:11
**ideas**  129:18
**identification**
52:20 63:4
92:20 104:15
109:15 116:21
150:15 154:13
163:20 213:18
222:24 231:7
232:17 253:21

258:2,13 264:1
272:12 277:11
288:6 293:9
302:19 316:19
**identified** 97:17
103:21 206:22
281:4
**identity** 160:12
184:7 193:8
302:17 303:9,10
**illicit** 285:16
**illusory** 79:8
112:10,10
262:19 285:12
285:13 286:9
**imagine** 186:1
**immediately**
233:6
**imperfect** 8:7
**implication**
262:15 314:20
**implies** 262:8
319:15
**important**
269:16 291:1,20
**impossible**
114:21
**impression** 55:9
77:2
**inadvertent**
14:22
**inaudible** 298:11
**include** 219:23
250:16 292:16
**included** 50:20
183:2 210:18
316:8,9

**including** 137:4
243:14 254:8
269:12 273:2
290:6,9 307:21
307:22 314:8
**incoming** 222:4
**incompetence**
254:23 309:11
**incompetent**
151:24 275:6
**inconsistent**
289:1 307:12
**incontrovertible**
241:18,22
242:19
**incorporate**
197:9
**incorporated**
26:21
**incorrect** 72:20
226:11
**incorrectly**
202:19
**indefensible**
254:19 255:18
**indemnification**
111:24
**independent**
306:13
**indicate** 6:24
8:11 197:14
319:5
**indicated** 176:8
**individual** 29:1
29:5 100:15
101:10 103:4,10
122:11 123:16
172:6 215:17

**individuals**
38:20 39:9
**industry** 17:16
106:3
**inept** 252:18
**inflate** 283:9
**inflated** 286:10
**influenced**
271:11
**inform** 266:19
268:18 291:16
308:21 319:3
321:7
**information**
30:12 31:19
41:8 65:9,13
84:5 85:21
133:21 137:21
162:3,19,21
165:15 166:2
174:15 175:1
178:12 188:1
207:3,11 212:13
221:8 229:20
251:11 261:9,12
262:21 263:14
265:23 267:5,13
269:17 270:3,5
270:10,11,18,22
271:1,15 275:21
276:18 278:8
282:1 283:16
288:18 290:20
290:24 291:19
299:19 303:19
303:21 304:7
309:24 310:9
321:1,13,18

**informed** 102:24
163:4 165:14
166:2,17,21
174:12 229:19
230:1
**informing** 267:3
**informs** 72:6
74:7
**initially** 30:16
85:20
**initiate** 209:20
209:23 309:11
309:16
**initiated** 51:5
206:12 207:6
209:11
**injunctive** 82:16
82:20 101:18
102:1
**injury** 24:5
25:15
**injustice** 121:3
**input** 98:14,15
**inquire** 13:17
240:10
**inquiring** 84:10
**inquiry** 146:3
**insight** 85:2
**instance** 22:20
31:12 44:1
124:15 180:9
249:15 275:14
321:15
**instances** 25:1
312:23
**instituted** 24:6
**institution** 17:13

**instruct** 12:16
38:18 39:20
44:14 73:21
**instructed**
318:10
**instructing**
274:10,14 276:4
306:6
**instruction**
34:16
**instructions** 6:8
217:23 255:7
256:6
**instrumentalities**
284:18,23
**insurer** 112:14
**integration**
83:19
**intend** 10:11
**intended** 218:9
269:13,23
**intent** 134:17
218:13,14
267:12 294:9
320:24
**intention** 9:11
120:23 218:10
267:8 268:14
270:12 290:8
291:23 292:15
320:13
**interest** 20:24
21:4 29:3 33:11
38:19 89:23
104:3 109:3
117:20 128:23
139:12,12,19
153:5 205:5

247:10 249:8
266:22 318:23
319:14
**interested** 31:17
39:22 41:10
98:14,17 121:1
130:13,19 152:9
153:4 162:10
203:11 295:4
319:7
**interesting** 92:24
108:13,15
254:21 288:1
299:24 310:6
**interestingly**
299:13
**interests** 46:7
65:4 69:17
90:17,18 111:20
121:11 130:15
139:18
**interlocutory**
13:10
**internet** 224:7
**interoperability**
95:18,19
**interpretation**
223:17,20
224:21
**interrupt** 227:15
**intervened**
102:22,23
**intervener** 26:11
**intervention**
23:11 24:9,23
**interventions**
24:8,24

**interviewed**
209:24 282:18
**interviews**
304:10
**intimidate**
228:18
**intimidated**
229:1
**introduce** 49:18
117:23
**introduced**
43:13 125:2
141:17
**investigate**
178:19
**investigated**
286:12 302:3
**investigating**
158:4 179:1
240:17
**investigation**
175:6 280:12
**investigator**
265:19 266:1
**investigators**
240:8
**investment** 29:3
30:8
**investments**
111:13
**investor** 311:3
**investors** 114:15
126:16 310:23
**involve** 107:23
266:4
**involved** 25:20
33:10 37:6
40:21 51:13

55:3 60:15 64:5
69:9 77:1 78:14
98:18 104:4
106:8,18 108:2
117:7 126:19,22
184:6 215:7
219:5 234:3
251:2,8 257:10
268:1 273:22
280:1,24 281:2
281:21 286:15
298:4 310:22
311:1,18 315:21
316:12 321:9,11
321:12
**involvement**
31:18 42:3
145:8 212:14
224:11 228:19
229:22 252:10
266:12 276:12
276:13 279:20
306:22 316:13
**involves** 299:17
**involving** 45:18
314:9 318:24
319:14
**ish** 107:5
**issue** 13:1 37:2
37:21 79:18
119:1 135:17
151:24 152:11
160:12 161:12
165:8,10 166:21
168:24 170:24
200:20 201:12
201:16 211:22
211:24 224:4

230:19 271:16
313:8
**issued** 211:1
**issues** 95:24
113:6 131:8
151:6 153:18
221:16 271:13
282:9 286:17
296:3,4 308:19
308:22
**it'll** 185:18

**j**

**j** 16:4 179:2
191:16,19 292:9
**jack** 202:16,20
263:12
**jakubec** 216:19
254:7,14 272:23
**january** 96:11
**jay** 216:16
**jeff** 159:21
160:12 165:20
181:16 186:19
197:6,15 199:10
200:9 262:9,16
**jeffrey** 102:18
110:22 160:24
162:22 163:5
174:16 176:2,2,6
176:8,18 177:3,6
178:8 181:2
184:17,20,24
186:24 188:6
189:18 191:13
192:8,21 237:4
242:7,16,20,21
262:3,12

**jersey** 203:17,18
203:24 204:10
204:13,18,22
263:13
**jessica** 175:19
181:1
**jettison** 134:2
**jettisoned** 257:3
**jill** 216:23
218:22 257:12
277:24 310:4
**jim** 179:18
**job** 79:24 119:8
139:24 186:10
252:19 267:11
**john** 202:20
263:11
**joining** 48:8
**joseph** 206:5
**journal** 205:20
206:3,21 207:7
208:8,11,13,16
208:23 209:17
211:8,16 212:8
213:9 282:7,7,16
**journalist** 206:2
**joyce** 187:4
**judge** 3:23 13:8
79:15,16 102:24
134:6 135:14
138:16 140:18
141:22 142:15
142:17,22 143:2
144:7,13 148:22
157:1 159:16
160:11 162:2
163:18 164:10
164:24 165:9,11

167:8 168:23
171:10 173:24
175:14 177:10
179:11,19,22
180:3,7,12,12,14
182:22,24 183:1
186:12 202:8
205:12,12
207:16 210:11
210:22 211:1
216:24 217:3,11
218:12,13,14,20
218:21 221:22
226:21 229:8
233:14 257:13
259:1,8 261:17
267:12,13,21
269:17 270:9
271:15 278:2,8
278:11,24 279:3
279:14 280:13
280:18 281:21
282:2,8 285:20
286:24 289:22
290:20,21 291:1
291:18 292:1,5
295:4 296:10
308:19,21,23
309:13,17 310:6
310:12,13,17
320:14,17,19
321:1,8,12
**judges** 138:21
**juggled** 272:6
**jump** 304:13
**jumped** 257:3
**juncture** 250:19
273:12

**june** 92:18 94:1
94:11 99:13,17
100:13 154:11
154:21 175:19
277:6,9,23
**jurisdiction**
168:5 279:11,18
290:22 309:3
312:18
**jurisdictional**
296:1
**jurors** 310:14
**jury** 185:18
193:12
**jury's** 145:17
**justice** 143:15
183:14 184:2
191:5 302:7,24
303:6 305:1,6,18
306:17 314:17
316:9
**justice's** 183:15
304:16,19

**k**

**k** 312:3
**kahn** 27:24 28:1
107:13 205:9
**kansas** 24:18
162:14 164:24
169:5 170:15
209:20 212:2
218:5 227:18,20
239:17 240:5,9
241:9 245:1
247:17,21
266:20 268:24
269:1 271:2

| | | | |
|---|---|---|---|
| 291:17,17 | 242:16,17,19,20 | 155:9 157:6,16 | 274:21 275:12 |
| 292:23 315:9 | 262:8,11 270:15 | 158:17,17 159:6 | 276:5,6,11,13 |
| 321:7 | 270:17 279:24 | 160:3 161:4,21 | 278:14 279:12 |
| **kasner** 215:14 | 287:9 | 163:10 165:3,22 | 283:23 284:14 |
| **kayla9170** | **know** 6:6 7:21 | 165:22 166:1,1 | 285:19,23 286:1 |
| 231:12 233:4 | 9:1,15,16 10:16 | 166:13 168:11 | 286:5,13,15 |
| **keep** 11:13 | 13:23 20:12 | 168:15 170:17 | 289:10,16 |
| 119:19 155:6 | 21:16 29:2,11 | 177:22 178:11 | 290:12 292:19 |
| 171:6 190:13 | 31:12,13,13,19 | 178:21 183:15 | 294:10 295:11 |
| 194:12 226:12 | 33:6,13 34:7,13 | 186:17 187:18 | 295:16 296:21 |
| 288:1 | 34:19 37:10 | 188:6,12,18,20 | 302:12 305:11 |
| **keeping** 270:1 | 39:1,23 40:3 | 189:3,3,5 195:20 | 306:24 307:3,5 |
| **kevin** 258:4 | 41:23,24 42:1 | 196:16,18,20 | 309:15 311:8,12 |
| **kids** 16:11 | 43:10,22 46:10 | 197:20,23 198:1 | 311:14 312:5,18 |
| **kind** 68:19,19 | 48:24 50:21 | 198:5 200:15,17 | 313:14,17 315:3 |
| 123:12 126:23 | 71:11,15 74:18 | 201:21,21 202:6 | 316:1 320:9 |
| 128:14 130:19 | 76:1 78:17 80:3 | 202:7 203:5,7,15 | 321:9,10,11 |
| 151:21 153:5,9 | 80:17 82:15 | 203:18 204:5,6,7 | **knowing** 180:3 |
| 216:12 225:18 | 83:5 85:2,24 | 205:12,13 | 250:11 |
| 239:11 246:1 | 91:17,23 94:7 | 206:11,16,22 | **knowingly** |
| 258:8 265:20 | 99:18,21 100:2 | 209:3 218:16 | 285:11 |
| 271:8 276:7 | 103:14,22 | 219:18 220:6,12 | **knowledge** 31:18 |
| 279:9 291:20 | 105:19 107:6 | 222:1,2,7,7 | 41:18,19 42:3 |
| 300:23 318:3 | 108:9,10 111:12 | 223:19 224:5 | 48:11 53:11 |
| 319:8 | 113:20 115:13 | 230:22 233:18 | 109:4,5 141:22 |
| **king** 1:17 2:4 | 116:1 121:13,13 | 233:20,24 234:1 | 159:20 172:18 |
| **knew** 113:21,22 | 121:14,16 | 234:10,13,21 | 172:21 199:1,1 |
| 126:6 130:1 | 125:24 126:11 | 235:22 237:5 | 212:12 222:12 |
| 145:13 162:6 | 127:13,15 | 243:16 244:2 | 225:7 228:20 |
| 177:1 181:5,15 | 128:10,17 130:2 | 247:6,7 248:22 | 229:10 231:14 |
| 184:13,16,19 | 130:5,9 131:1,19 | 250:10,12,18,22 | 260:5 282:19 |
| 185:11 186:19 | 132:9,11,11 | 251:2,23 252:4 | 289:4 312:8 |
| 186:22,24 187:5 | 137:11 138:23 | 258:7 260:15 | **known** 55:7 |
| 189:18 190:24 | 142:2 143:19 | 261:5,23,24 | 159:22 263:12 |
| 191:1,3 192:8 | 145:12 148:5,22 | 262:2,3,5,22,24 | 303:9,10 |
| 194:2,13 197:6 | 151:4,10 153:11 | 263:1 268:4,7,12 | **knows** 80:20 |
| 197:15 198:17 | 153:13,14,17,20 | 269:6 270:15 | 186:12 |
| 226:21 242:12 | 153:21 154:1 | 271:4,18 274:9 | |

| | | | |
|---|---|---|---|
| **ksm**  1:7 | **law**  1:3 28:1 | 326:1 | **lay**  217:7 |
| **l** | 39:24 41:15 | **lawsuit**  12:2 | **layperson**  71:18 |
| **l**  16:5 265:24 | 42:10,19 43:3,6 | 25:2,6 26:15,19 | 249:1 256:8 |
| **labeled**  93:1 | 43:9,13 44:3 | 27:10,11 28:5,9 | 285:3 312:12 |
| **lack**  255:11,12 | 49:19 55:12 | 28:10 38:3,4,7,9 | **layperson's** |
| **lacked**  102:20 | 60:22 62:8 67:4 | 38:22 39:10,18 | 284:15 |
| **lacks**  110:23 | 67:12,15 68:22 | 47:4 48:1,6 84:7 | **lead**  12:13 28:2 |
| **laguna**  14:10,13 | 77:7 79:23 | 130:1 264:5 | 112:7,7 135:22 |
| 15:3 | 82:24 83:1,8,13 | 278:3 292:22 | 151:22 220:15 |
| **landscape**  18:4 | 84:6 85:5 88:17 | **lawsuits**  26:9 | 227:12 267:7,9 |
| 18:23 19:1 | 89:8,14 90:4,13 | **lawyer**  9:3 13:4 | 267:15 268:21 |
| **landscaping** | 111:15 113:7,9 | 36:11 37:19 | 269:3,7,18 270:7 |
| 18:20 | 113:14 121:10 | 42:18,19,21 45:7 | 270:16,20 276:8 |
| **lane**  157:1 | 122:1,9 123:1,7 | 45:11,14 53:11 | 278:2 283:8 |
| **language**  72:23 | 123:14 125:20 | 75:17,18 78:22 | 291:21 295:6,11 |
| 147:19 171:19 | 126:16 127:17 | 79:6 80:9 84:6 | 295:24 296:1 |
| 244:18 | 127:23 129:15 | 85:5 105:23 | 298:15 312:16 |
| **lapse**  61:18 | 130:14,21 | 113:8 138:24 | 313:15,20 315:5 |
| **large**  29:10,12 | 138:12,15 | 139:3 176:19 | 321:3 |
| 29:13,18,22 30:3 | 165:11 172:19 | 189:19 197:7,17 | **leadership** |
| 80:18 83:24 | 177:11 184:13 | 207:19 212:24 | 237:11 |
| 111:13 126:16 | 186:10,18 | 219:11 249:10 | **leads**  207:20 |
| 141:18 259:10 | 189:18 192:8 | 249:18 252:12 | 296:20 |
| 269:19 274:8 | 195:5 197:5,15 | 260:23 261:7 | **learn**  35:16 |
| 286:14 304:8 | 205:4 209:1 | 262:9 295:1 | 160:12 179:7 |
| 307:5 | 210:7 211:9 | 297:11 299:20 | 300:10 308:12 |
| **largely**  296:7 | 212:9 228:1 | 303:13 305:21 | **learned**  164:14 |
| **larger**  301:21,23 | 231:23 234:7 | **lawyers**  41:16 | 164:21 167:4 |
| **largest**  267:24 | 239:6 241:13 | 42:14 138:3 | 197:13 |
| 312:24 313:1 | 242:7 268:5 | 142:6,18 189:11 | **learning**  87:15 |
| **larock**  299:9 | 275:6,23 278:3 | 215:13 218:11 | 112:24 115:4 |
| **late**  235:4 | 280:6 282:2,7,7 | 233:12 237:9 | **leave**  17:12 |
| 292:21 318:9 | 282:16 283:5 | 243:20 245:16 | 180:5 273:4 |
| **latitude**  8:22 | 285:11 289:22 | 251:14 256:17 | **leaving**  17:15 |
| 38:12 | 292:23 293:13 | 256:19 273:2 | 75:1 |
| **laura**  216:19 | 295:19 303:17 | 280:15 282:2 | **led**  17:10 52:3 |
| 254:6,14 272:23 | 310:16 319:15 | 290:9 | 76:4 84:12 |
| | 324:4 325:1 | | 137:20 181:3,3 |

**[led - long]**                                                              Page 32

181:14 184:12
207:4 215:2
216:12 252:7
**left** 84:1,2 88:15
**legal** 44:13,18
46:23 123:6,11
130:20 136:19
138:2 176:6,17
237:15 324:23
**legislative** 126:6
126:8
**legitimacy**
161:15
**legitimate** 39:20
192:24 247:14
**lend** 79:5 297:19
**letter** 3:23 4:7,15
55:13,15 57:3
60:22 62:7 67:3
67:12,17,23
68:18 70:18
71:16,20,22 72:4
73:7 74:4 77:5,9
122:2 163:18
164:10,13,15
165:12 168:4
175:21 176:7,13
177:10 182:20
182:24 183:1
217:8 229:12
231:22 232:10
232:15,20,22,23
243:6,7 244:6
246:1,5 247:4
258:19,21 259:1
259:10 261:10
261:13,17 262:7
262:15 293:6,18

299:14,22 300:5
300:7,11,14
301:6,13,19
302:4,10 306:15
307:4,15 308:1,5
311:11,13 316:3
316:7,8
**letters** 163:14,15
163:24 164:11
164:18,23
165:16,21,24
166:7 167:7,11
167:14 168:3
174:13 175:13
178:6 180:2
181:1 229:14
**letting** 8:4,5
218:16
**level** 228:19,20
304:3
**liability** 20:12
112:15
**liable** 275:11
**libelous** 273:10
273:15,20
275:16 276:21
276:24
**licensing** 95:14
96:4,20
**lieu** 30:21
**life** 38:2 86:20
264:10
**light** 60:14 64:4
210:3
**limit** 321:21
**limited** 20:11
197:2

**line** 99:22 266:7
297:4 325:4,7,10
325:13,16,19
**lines** 236:10
244:17
**link** 282:15
**lipstick** 79:7
134:4
**liquidated** 29:12
**list** 10:12 257:4
290:1
**listed** 144:12
172:11 183:21
227:5 229:6
**listen** 193:4
**lists** 177:11
290:2
**literally** 27:3
**litigation** 23:17
26:9 38:13 41:6
60:14 64:5
78:13 79:11,19
79:22 80:5,8,9,9
89:10 106:9,15
106:17 110:21
112:5 122:5,12
126:3 128:5,21
129:3 135:11
137:6 139:6
205:6 210:4
212:22 213:2,4
219:11,24
248:15,20
273:17,23
278:19,22 280:7
283:4 287:13
292:1 297:11,17
299:4 303:13

305:21 313:11
317:6,16
**litigations** 80:6
**little** 145:9
229:22 243:9
252:10 262:19
298:21
**live** 14:9 15:2
106:5
**lived** 15:12
263:12,15
**lives** 263:1
**living** 203:5
263:18
**llc** 1:16 299:17
**llcs** 302:16 303:2
**llp** 40:16
**lobby** 125:2
**local** 102:10
215:24 216:21
235:24 252:17
254:16 274:14
274:16,18 276:1
276:2,3,4 290:6
**logged** 201:7
**logs** 220:12
221:11 286:18
**long** 7:18,19
9:13 15:12 17:6
17:19 18:24
33:16 34:5
82:21 85:24
110:18 123:17
133:4 165:3,4
183:11 188:10
188:10 282:13
304:22

**longer** 17:22
41:12 77:7
102:5 103:13
130:13 168:4
169:5 170:11,18
209:8 290:1

**look** 52:12 53:4
57:10 59:12
63:8 64:12 68:4
68:5 86:21 87:6
93:10,23 100:5
114:3 116:14
118:3,9 119:1
148:14 150:19
153:22 161:22
163:10,23 164:4
190:15 231:2
235:19 244:8
254:3 257:20
258:20 260:21
264:15 266:3
272:16 277:20
287:22 288:9,13
293:18 294:7
310:16 316:14

**looked** 97:10
103:9 311:20,23

**looking** 47:8
78:9 80:19 91:6
91:8 102:5
136:2 153:24
156:20 161:12
161:18 176:22
281:5 294:8

**looks** 50:13
58:20,21 62:19
219:20 235:22
281:5 293:24

**loosely** 273:7
**loretta** 258:24
**lose** 112:20
114:15 118:18
118:21
**loss** 45:19 80:18
84:22 111:1
115:10 130:5
312:24 313:1
**losses** 78:24
102:21 112:13
126:16
**lost** 83:21 96:12
111:5 114:4
130:3
**lot** 33:17,18,19
33:19 42:13
83:22 114:16
121:2 159:6
161:6 180:1
212:23 281:11
286:11 292:20
297:23 302:5
312:22
**lots** 138:18,18,18
138:20 243:9,10
317:5,9,12,15
319:6,16,24
320:18
**loved** 134:16
**low** 314:16
**lower** 63:12
**ludicrous** 264:8
**lunch** 9:14

**m**

**m** 164:17

**m.d.** 19:20
**ma'am** 144:6
**mail** 284:18,24
284:24 300:8
**maintained**
290:22
**majority** 11:24
13:9 161:16
**making** 171:19
218:24 226:19
248:11 270:19
273:7 306:4
310:16
**malfeasance**
130:7 133:24
**malpractice**
103:12
**man** 86:13 95:18
**management**
291:22
**manager** 203:13
**mandate** 95:14
95:19 96:4,16,20
**manhattan**
162:8 204:13
**manila** 301:23
**manino** 305:12
305:15,24
315:20,20
**manner** 73:18
80:21 226:11
**march** 52:18
53:8,20 55:22
56:1,15,16 57:9
58:4,8,11,23
59:15 60:6 63:2
63:14 65:17,24
66:1,6,6,8,8,20

66:20,21 70:9,19
72:5 74:6 75:11
75:12 76:8,9,11
76:20 77:13,22
78:8 81:10 82:4
85:19 87:19
88:6 90:23
92:15 97:20
120:14 122:12
127:14 130:21
207:13 213:16
214:14 223:22
227:18 228:5
231:5,11,22
232:2,9,15 233:3
243:5,7 244:4,7
247:23,24
288:19
**mark** 52:14
62:23 86:22
88:1 104:10
109:10 116:16
150:11 154:8
163:14 213:14
215:9 222:18
231:3 234:7
253:16 257:22
263:20 272:3,5
277:5 293:3
**marked** 52:18
53:4 63:3 64:22
92:19 98:23
99:5 104:14
109:13 116:20
150:14 154:1,12
163:19 165:12
165:21 174:14
213:17 219:10

222:22 231:6
232:16 243:4,12
246:7 253:20
258:1,12,17
259:6 263:24
272:11 277:10
288:5 293:7
294:17 299:11
316:18,23
320:21
**marking** 10:6
87:8 97:15
264:16,23
288:10
**marriage** 15:20
15:23,24 16:1
**married** 15:16
15:18
**marston** 13:8
**mary** 1:20
323:10
**massive** 116:10
**master** 250:10
**material** 79:18
85:2 145:2
**matriculate** 17:6
**matter** 42:4
49:20 50:14
64:12 67:5
68:20 70:23
77:23 83:12
88:20 90:6,16
119:11 123:16
143:5 147:16
199:3 202:15
245:23 323:6
**matters** 23:18
171:20

**mcbride** 208:17
209:7
**mcgowan** 10:10
178:23
**mcgrory** 215:9
234:8
**mean** 27:2 29:17
33:12 40:24
41:23 54:21
58:20 61:24
97:8 101:10,10
105:19,20 119:6
122:17 123:11
139:3 149:14
153:1 167:18
168:17 186:1
199:2,3,5 214:17
215:5 217:24
221:19,23
224:20 230:22
237:16 242:24
255:22 256:4
260:11 276:21
280:9 283:6
292:20 296:15
**meaning** 26:20
64:24 82:4
95:19 136:11
158:7,8,9 174:20
204:1 237:15
269:3 314:13
317:21
**meaningful**
80:10 86:14
283:9 298:2
**meaningless**
134:5,7,11
135:14,15 136:6

158:23 255:22
**means** 85:19
97:24 100:3
115:16 120:3
137:15 148:10
284:19 298:20
323:16
**meant** 36:24
49:2 103:7
110:15 169:19
174:23
**measures** 115:20
**mechanism**
115:9,17
**medical** 19:14
19:18 20:19,24
**medicare** 304:11
**medications**
304:12
**meet** 101:21
124:4,16
**meeting** 108:20
**melvin** 299:8
**member** 20:1,5
197:7,16 240:17
**memorialize**
246:3
**memory** 82:15
183:4 242:5
257:17 282:20
284:12
**mentioned** 54:8
211:15 217:16
276:16 307:15
**mentioning**
311:9
**mentions** 307:24

**merely** 136:1
**merger** 27:19,22
28:11 30:14
32:7,18 33:2
36:12 37:4,5
41:2 45:20,22
46:8,24 49:14
53:24 82:21
83:18,19 85:5,13
100:14 101:3
102:6 203:1
209:2
**mergers** 33:19
**merrigan** 2:7 3:8
5:14 8:16,18,22
9:6,19 10:2,9
11:7,10 12:8,22
14:1 22:10
26:23 37:23
38:1 40:5,12
44:11,24 47:11
48:21 49:1,5
54:20 60:24
68:13 71:4
72:12,19 73:13
74:16 75:2,19
81:2 88:21
93:18 99:1
100:7 104:17,21
105:2 113:17
119:23 135:4
136:20 140:7
148:9 156:4,6
160:14 173:2,9
173:14 174:17
174:22 178:22
181:19 182:9
186:5,11 189:22

EXHIBIT 37
1471

190:3,13 191:15
191:22 192:11
192:16,18 194:6
194:10,15,19
196:2,5,8 199:15
200:13 204:20
208:10 225:23
232:21 238:21
239:8,21 246:20
248:9,13 249:24
251:17 264:20
274:4 277:16,17
287:1 288:23
289:6 300:17
306:2 307:8,11
307:23 308:4
310:18 314:22
315:6,10,14
324:1
**message** 94:6
**met** 123:24
125:3,5 161:2
204:8
**michael** 1:7,13
3:5 5:10 25:9,17
26:3 44:11
48:21 49:11
56:19 58:13
59:23 63:24
89:9,14 90:7
141:17 156:3
196:3 250:1
292:9 318:22
320:19 324:4,5
325:1,2,24 326:1
326:2,4,12
**michaelhartleib**
53:16

**michigan** 229:2
**mid** 193:14
**midatlantic**
324:15
**middle** 100:6
**midnight** 144:15
**miller** 2:7
**million** 112:16
116:1 133:11
136:16 171:15
179:24 207:20
221:12 252:14
252:14 262:20
**millions** 79:8,13
96:8 133:10,23
135:21 137:15
137:24 152:4,5
239:2 283:5
298:20
**mind** 168:11
177:5 219:19
241:4 242:18
268:23 270:6
286:16
**mine** 24:21
105:17
**minnesota** 24:16
292:9
**minor** 24:2
**minute** 213:23
254:2
**minutes** 147:4
226:24
**mirky** 181:8
**misheard** 308:6
**misinterpreted**
308:6

**missed** 85:22
292:18
**missing** 104:23
230:23 243:17
**misspoke** 311:5
**mistaken** 151:20
274:12
**mistakenly**
142:2
**mm** 55:24 59:18
63:18 169:1
171:12 220:4
287:21
**model** 111:14
**modified** 32:4
**moment** 24:17
28:18 55:11
174:10,20
202:12 272:16
**monday** 58:8
99:13
**monetary**
115:23
**money** 79:2 80:2
83:22 110:7
111:6 112:2
114:5,16 116:3,3
116:5 127:6,18
130:4,6 134:19
286:7
**moneys** 46:15
134:16 296:20
**monica** 4:5
90:14 131:12
132:13 139:6,10
139:14 140:10
140:13 141:5
143:23 222:22

223:4,12 225:21
228:16 231:13
232:7 233:5
292:24 293:14
**montgomery**
172:7 173:12
240:18
**month** 166:12,14
**monthly** 127:6
127:18
**months** 124:2
125:7
**moot** 283:24
**moral** 221:23
**morning** 5:21,22
6:12 63:24
**mortgage** 18:3,7
18:11
**motion** 64:2
149:19 210:24
265:16,17 302:7
304:16,19
308:12 314:6
316:10
**motions** 309:6
311:17
**motivation**
210:1,2
**mouth** 181:5
**move** 253:14
306:12
**moving** 11:13
77:3 257:5
**multi** 296:1
**multiple** 6:4
30:3 94:23
159:8 185:5
296:24

**multitude**
  245:16
**murphy**  35:17
  35:22 36:5,9,18
  42:7,21 43:17,20
  44:3,9,12,23
  45:6,11,13,15
  46:7,14,22 47:9
  47:21 48:1,19
  49:17,18 50:6,19
  51:11,13 53:11
  53:23 54:7,19,19
  55:7,10,23 56:7
  57:3,23,24 58:9
  58:19 59:5,16,22
  60:8,13 61:5,9
  62:2,14 63:15
  64:22,24 66:2,12
  67:10,18,23 68:1
  68:3,23 69:1,11
  69:24 70:12,18
  71:12 72:6 73:8
  74:7 75:10,13,17
  76:13 77:14
  78:2,7 80:15
  81:9,13 84:13,14
  84:16 85:14,21
  86:6 87:20 89:2
  92:11 120:15
  122:13 123:4,9
  123:19 131:23
**murphy's**  49:23
  54:23,24 56:18
**musoff**  154:23
  154:24 215:14
**mutual**  29:2,5
**myriad**  91:10
  96:1 172:4

245:16

**n**

**n**  2:1 3:2 5:2
  16:4,5 323:2
**naive**  115:3
**name**  3:14 4:4
  16:3,4 18:7,12
  29:1,5 38:20
  64:10 72:11
  74:14 76:16
  77:4 79:5 89:9
  161:11 179:1
  181:7 187:4
  190:8 191:13
  193:14 206:4
  210:8 211:16
  227:2 241:3
  276:16 286:16
  295:14 297:20
**named**  25:1,5
  26:10,18 27:3,10
  39:2 89:24 90:7
  90:9 122:6
  123:15 130:15
  131:11 139:21
  202:15,16
  205:13 317:18
  317:21
**names**  37:15
  183:15 210:10
  271:18 274:3
**naming**  271:18
**narrative**  74:24
  83:5
**nascar**  96:7,10
  96:14

**national**  278:3
  282:7,16
**nature**  79:19
  85:4 90:19
  132:23 133:2
  180:17
**navigate**  312:13
  312:13,14
**near**  112:10
**nearly**  79:14
  114:20 134:7
**necessarily**  87:8
  111:20 132:4
**necessary**  78:21
  298:19 326:6
**need**  6:7 7:8 8:11
  9:4,15,23 71:9
  77:9 107:10,20
  110:7 143:20
  155:21 157:21
  195:2 199:16
  229:19,24 230:2
  244:20 248:3
  258:6 282:9
**needed**  71:13
  98:12 157:22
  229:21
**needs**  8:23 79:21
  80:7,12 126:10
  198:22 283:3
  310:11 322:6
**negative**  270:21
**negotiate**  21:15
**negotiating**
  153:5
**net**  251:7
**network**  111:12

**never**  62:6 67:11
  77:5,12 84:19
  85:8 88:18
  110:5 127:1
  131:20,21 132:2
  161:2 183:18
  187:10 191:2,3
  191:10 198:18
  202:4 205:4
  224:10 249:18
  259:17 263:3,6
  264:9,10 279:8
  312:9 318:20
**nevertheless**
  65:2 247:22
  257:8
**new**  24:10,13
  97:19 101:5
  102:11 110:8
  137:21 152:2
  202:13 203:17
  203:18 204:7,13
  204:22 234:18
  263:12
**news**  313:8
**nextel**  27:21,23
  28:11 30:13,16
  30:17,17,21 31:6
  32:5,9,18,18
  33:2 44:5 45:19
  46:8,24 49:14,20
  53:24 67:5
  77:23 82:3,8
  83:4,12 84:5,8
  85:4,13 88:1,4
  88:12,19 89:10
  89:16 90:6,15,22
  92:11 119:13

123:4,10,19
131:11 132:21
140:15 146:7
147:22 158:6
160:9 169:12,21
170:2,3 197:19
205:21 209:1
223:5 225:8,12
236:23 267:18
280:15,17 296:6
301:10 308:24
320:16
**nextel's** 35:23
**night** 159:15,16
292:20,21
299:14,24
**niguel** 14:10,13
15:3
**nilly** 193:14
**nods** 7:10
**noise** 156:7
**nominal** 48:14
131:19
**non** 111:9 295:1
**nonexistent**
169:7
**nonsensical**
255:21
**north** 203:23
204:10,18,21
**northern** 204:13
**notary** 1:21
326:13,19
**note** 12:18 13:2
68:14 279:1
307:11 324:10
**noted** 12:22
13:24 156:13

173:18 315:14
326:7
**notice** 1:14
279:1 287:17
**notify** 155:23
218:14 236:13
**notwithstanding**
320:5
**november** 1:10
323:11
**nuanced** 126:1
126:12
**nuisance** 78:22
298:19
**number** 14:19
30:1,10 97:23
131:19 141:13
201:6 214:15,20
224:5 226:23
227:1,4,6 228:17
244:17 250:11
254:7,13 256:21
257:4 281:13,16
282:11 314:15
**numbers** 128:11
128:14 136:11
136:12
**numerous** 24:14
**nutshell** 160:5

**o**

**o** 5:2 202:17
312:3 323:2
**o'clock** 144:18
144:19
**oath** 6:13 195:3
294:20

**obfuscate** 220:2
**object** 8:16,20
12:9 32:17
102:7 112:6
135:4 148:23
186:3 200:13
288:24 306:4
**objected** 147:22
148:2,4
**objecting** 152:13
158:15 306:6
**objection** 8:19
8:24 12:18,19,23
12:24 13:24
22:10 47:11
60:24 68:14
70:4 71:4 72:12
73:14,18 75:19
81:2 88:21
102:13,23
113:17 136:20
140:7 153:6,9,14
153:16 157:7
158:11,12 159:2
167:17,21 173:2
173:15,18
181:19 189:22
238:21 239:8
251:17 287:1
306:3 307:12
310:18 314:22
315:6,15
**objectionable**
158:14
**objections** 5:6
24:8,11,14,15,22
318:2

**objector** 26:11
212:15
**obligated** 236:13
**obligation** 195:6
**obtain** 115:10
178:12 276:17
304:11
**obtained** 86:14
135:12,13,20
136:9,10 138:7
141:13 159:4
283:15
**obtuse** 193:6
**obviously**
151:17 271:14
272:20
**occasions** 91:18
**occur** 9:5
**occurred** 66:23
143:10
**occurrence**
22:21
**odd** 243:9
**oem** 95:16 96:2
**offended** 80:23
81:6,7
**offensive** 71:2
264:5
**offer** 153:8
**offered** 55:12
100:16 102:12
**office** 45:16
97:20 240:12,18
322:5
**officer** 116:9
117:16 240:17
**officers** 130:7

EXHIBIT 37
1474

**offices**  101:21
239:16
**official**  7:14
**oh**  14:18 57:12
159:23 178:18
261:4
**okay**  6:11 7:5,17
8:12 10:4,21
11:1 14:7,11,15
15:11,15,22 16:2
16:6,10,13,19,24
17:3,11,18 18:1
18:6,13,17,21
19:3,6,10,17
20:4,8,18,22
21:2,7,20,24
22:4,17,23 23:6
23:16 24:4,19
25:4,14,23 26:6
26:17 27:6 28:4
28:7,14 29:16,21
30:4,11,19,23
31:5,7,9 32:11
32:16,23 34:3,11
35:20 36:2,7,17
36:22 37:9,16
40:7,12,23 42:5
42:15 43:11,15
43:23 44:7 45:9
45:23 46:5,20
47:2,18 48:7,15
49:5 50:15,23
51:4,19,23 52:22
53:1,6,15,18
54:2,6,13 55:5
55:19 56:5,9,13
57:5,12 58:7,17
59:11 60:19

62:3,11,21 63:21
64:16,19 65:7,12
65:22 66:17
67:1 68:7,20
69:4 75:5,9
76:17 80:13
81:12,18 82:6,10
84:3,24 85:17
86:9 87:1,16,22
89:18 90:11
91:13 92:13
93:14 94:2,9,15
95:2 97:3,21
98:4,8,20 99:11
100:4,22 103:16
103:24 104:8,21
105:8 106:4,14
106:19 107:2,18
108:1,11,17
109:1,6 110:9,13
110:17 116:13
117:22 118:2,8
118:12 119:10
119:15,22
120:22 121:8,24
122:8,22,23
124:14 125:9,16
126:18 127:3
129:7,10 132:3,8
132:12,16,19
134:24 137:14
137:19 138:8,13
139:2 140:4,20
141:1,9 142:9,16
143:1,8 144:20
145:1,5,15,20,22
146:5,19,23
148:5 149:2,17

150:5,23 152:8
152:21 153:3,23
154:6,20 155:3,8
155:12,17
156:13,17 158:1
159:19 160:7
162:23 163:3,12
164:3,6 165:2,6
165:17 166:4,15
166:23 167:3,12
168:1,19 172:5
172:13 173:22
175:11,18,24
176:10,15 177:7
177:18,24 178:4
178:15,20
180:23 185:3
187:1 188:3
189:13 192:5
194:15,22 196:4
196:7,10 198:11
199:8,12 201:2
201:15 202:1,11
203:2,14,21
204:5 205:2,8,17
206:10,15,19
207:1,5,12,17,24
208:21 209:4,10
209:15,22 210:6
210:13 211:6,13
211:18 212:6,16
213:11,21 214:2
214:12,22 215:4
215:8,12,19
216:3,13,18,22
217:20 218:7
220:23 221:14
222:10,16 223:9

223:13,14 224:3
224:15,19 225:3
225:16 226:6
228:8,13 230:8
230:15 231:1
232:12,13,21,24
234:5,12 235:18
236:1,7 237:24
238:10,18
239:14 240:15
240:23 241:6
242:22 243:2,22
244:3,11,21
246:16 247:3
248:12 250:2
252:5 254:17
255:16 256:16
257:7,19 258:9
259:16 260:20
261:15 264:13
265:14,22
266:16 268:13
272:1,21 274:4,7
277:19 279:6
282:12 283:17
285:4 288:15
300:3 301:18
302:12 319:22
**old**  100:14 101:3
151:7
**older**  100:19
160:24 161:2,10
161:20 203:4
**once**  97:13 130:5
219:7 257:2
283:23 303:10
**ones**  185:12
248:3 298:3

**ongoing** 76:12 77:15 128:19 153:18 266:21 269:1 280:17 291:17 308:22

**online** 144:12 227:1 229:6

**open** 39:15 88:15 279:17 301:3 309:5 312:15 313:18

**operate** 18:24 271:8

**operation** 21:14

**operative** 11:20 147:15

**opinion** 4:16 41:4,6 103:15 135:14,15 138:14,17 140:5 142:13,15,17 144:5,7 145:16 145:17 158:22 184:4 211:9 313:3 316:17

**opinionated** 211:12

**opinions** 39:13 138:21 146:21 296:6

**opponent** 255:18

**opportunity** 64:11

**opposed** 26:10 29:1 115:18 116:9 194:4 315:3

**opposite** 196:19

**opposition** 157:17

**opted** 27:4

**oral** 1:13 183:12 233:21

**orange** 266:2

**order** 4:16 12:7 12:11 210:22,23 211:2 227:18 228:6,9 229:13 229:17,20 230:3 230:4 247:17 258:7 316:17 320:20

**orders** 207:16 210:12,14,19,21 212:14 226:20 226:21 229:8

**organized** 284:17,22

**original** 243:24 290:5

**otsuka** 312:2

**outcome** 266:23

**outing** 302:8

**outlier** 162:14 169:5,6 170:16

**outlined** 61:11 212:13

**outrageous** 133:19

**outside** 44:18 125:2,12 296:12

**overall** 136:12 138:9,10

**overbilling** 278:3

**oversight** 309:1

**overview** 95:11 159:5 160:6

**owned** 15:7,9 17:19,21 18:14 28:24 29:9,14 117:5 134:10

**ownership** 20:23 21:4 117:19

**p**

**p** 2:1,1 5:2 102:18

**p.c.** 1:4 2:7

**p.m.** 53:20 56:2 59:2 94:11 99:13 109:24 120:7,10 147:8 147:11 151:2 154:22 199:21 200:3 214:14 232:2 243:7 244:4 253:4,10 272:23 322:13

**pacer** 306:20 311:21,23,23 312:14

**pacific** 235:2

**page** 3:6,14 4:4 52:10,11 53:7 55:21,21 59:15 63:9 70:11 87:6 87:7 92:23 93:2 93:2,2,5,16,17 93:18,20,21 97:19 98:22,24 99:8,10,10 100:5 104:18,20 105:6

109:18 116:15 118:4 150:19 154:16 214:3,4,6 219:9 232:6,23 232:24 236:11 241:16 243:11 243:12 254:1 259:15 260:21 261:3 265:3 272:20 299:11 307:18,19 318:13 325:4,7 325:10,13,16,19

**pages** 93:1,11 100:6 256:10 259:9 265:2 272:19

**paid** 117:12,14 129:22 152:6 184:9 195:23

**palazzolo** 206:5 206:6 208:3,4,5 208:9,19,22 209:24 210:9 211:8 212:8,18 213:8

**paper** 182:10 220:7 255:21,22 300:23 301:24

**parachutes** 83:24 133:11,19

**paragraph** 164:12 223:7,20 224:16,24 225:18,19 226:10,17 228:17 229:4 230:21 284:3

288:20 292:7
295:2 299:12
302:6
**paragraphs**
312:7
**parcel** 256:19
**parent** 20:16
**part** 54:4 58:10
93:3 125:1
134:8 194:3
204:2 226:14
231:21 256:19
274:8 275:23
282:16 293:21
309:9
**part's** 173:14
**parte** 279:9
**partial** 220:5
**participants**
284:23
**particular** 17:16
31:12 48:4 85:5
155:9 157:7
158:12,19
220:17 221:17
221:21 222:5,7
248:24 250:18
257:8 271:16
273:12 275:14
281:9 284:1
287:8 303:2
**particularly**
219:21
**parties** 38:21
39:9,17 111:20
112:20 159:17
215:1,5 216:8
217:24 218:11

219:5 220:10
221:3,5,9 222:1
228:2,2 234:3,16
243:19 245:8
273:19 281:7
287:9 290:5,6,7
290:14 299:6
**party** 25:2,5
26:10,18 27:10
89:24 90:7,9
106:10,21 122:6
130:15 167:15
173:1 217:7,13
273:8 298:17
305:22 312:24
317:15,17,20
319:7
**paste** 234:17
**pasting** 290:13
**patently** 185:16
185:17
**patents** 22:6
**path** 178:24
**patients** 306:23
**pay** 79:12 152:1
195:17
**paying** 195:14
**pc** 319:15 324:4
325:1 326:1
**pdf** 155:14,21
294:14
**pendency** 136:14
137:10,17 138:1
**pending** 9:20,21
100:18 278:10
278:13,17 279:4
286:3 308:23

**penitentiary**
298:12
**pennies** 114:18
115:14
**pennsylvania**
1:1,18,23 2:4,9
161:8,11 172:8
175:5 177:16
182:2,4,6,7
183:7,10,17,19
183:22,24 184:4
187:11 188:7,21
188:24 190:9,18
190:21 191:4,9
191:11 193:10
195:12,18
197:16 239:17
240:5,19 260:22
261:6 263:2,4,15
**people** 39:17
46:10 96:7
111:12 193:13
193:23 203:23
214:15,23 232:3
233:11 243:10
243:14 254:7
265:7 278:1
280:14 286:16
290:1 304:11
312:21
**percent** 27:15
28:13 135:15
249:4 261:17,21
301:9,11,12
311:22
**perfectly** 284:14
**performed**
136:19 200:8

201:13 271:19
**period** 29:14
61:21 115:2
220:18 275:2
302:18
**perjurious** 245:6
**perjury** 195:4
**permeate** 230:21
**perpetrators**
238:8
**perry** 233:19,20
**person** 8:1 38:16
48:12 71:23
84:9 124:1,5,16
125:4,6 208:23
217:16 242:8
273:14 297:4
**personal** 24:5
25:15 31:19
138:10 266:22
279:20
**personally** 25:24
79:17 106:18
158:3 263:1
**persons** 304:8
**perspective**
108:14
**petition** 180:5
**pharma** 304:9
**pharmaceutical**
307:6
**pharmacies**
306:22
**phil** 34:7 104:18
152:16 187:13
196:8 228:10
246:22

**philadelphia** 2:9
**philip** 2:3
**phillips** 157:1
**philly** 203:22
 204:4,4
**phone** 61:19
 78:4 102:2,9
 106:23 110:8
 123:22 125:17
 127:10 228:23
 235:4 247:10
**phony** 262:16
**phrase** 73:19
 319:13
**phraseology**
 40:6
**physically** 67:21
 300:24
**physicians** 22:1
**piece** 182:10
**pieces** 6:20
 226:4
**pig** 79:8 134:4
**place** 14:20
 45:19 66:10
 143:13,17
 153:12 174:4
 188:8 201:22
 218:2,15 228:1
 228:21 237:22
 238:5 249:18
 321:8
**places** 142:19
**plain** 65:8
**plaintiff** 23:18
 27:21 28:2,9
 38:6 49:2,3,12
 72:8 74:10

78:21,23 79:4
80:16,18,24
81:20,22,24 82:2
82:8,13 83:3,11
86:7,17,18 88:11
88:19 89:10
90:15 102:17
106:10 112:7
121:19 128:23
129:4,22 131:11
139:16,21,23
142:4 146:7,11
152:17 202:15
205:13 227:13
236:14 247:9
252:10 297:3,5
297:18 298:5,6
313:5 317:20
**plaintiff's** 11:16
 85:22 112:19
 129:2 268:22
 273:6 278:21
 295:13 297:12
 297:16
**plaintiffs** 1:5 2:5
 13:5 27:3 38:10
 39:12 48:9
 78:21 111:5,9,9
 111:14 298:10
 298:16,18
**platform** 201:4
**players** 279:24
 299:6
**pleaded** 202:20
**pleading** 89:7
 90:5 123:12
 157:9,23 159:8
 202:16 249:4,6

277:1,2
**pleadings** 27:4
 124:13 159:7,10
 160:4 179:8
 180:14 183:24
 184:19 185:21
 191:8 220:15,17
 250:15 254:24
 255:14 271:1
 274:16,19,22
 276:3 287:12
 296:1 301:8
 317:22
**please** 7:13 8:4
 9:15 52:15
 56:24 93:11
 110:19 116:15
 151:13 155:13
 155:18 228:14
 287:22 288:9
 300:16 316:14
**pleased** 219:21
**pleasure** 246:10
**pled** 13:19 309:5
**plural** 210:14
**plus** 60:15
**point** 13:10,21
 19:12 27:16
 30:17 31:2 43:5
 44:13 45:6 48:4
 50:4 64:20
 65:24 77:11
 88:8 123:2
 128:15 130:12
 130:17 131:5,9
 132:20 158:19
 160:8 168:8
 173:23 174:17

176:16 178:5
190:5 196:15
210:5 213:3
217:6,12 221:17
221:21 222:5,8
225:24 230:23
234:23 243:1
244:19 246:22
249:1,11 252:6
263:5 277:3
281:9 283:24
284:1 303:22
**points** 56:23
 186:10
**poorly** 90:20
 252:17 264:11
 271:3
**posed** 7:3
**position** 29:11
 29:12 38:11
 89:1 90:12
 133:15 171:5
 180:16 249:13
 254:19 255:17
**positive** 23:5
 33:8,16 42:13
**possible** 115:14
 121:11 202:6,9
 282:6 292:17
**post** 16:15
 276:20
**postage** 301:4,4
**potential** 60:13
 64:4 129:14
**potentially** 30:5
 252:13 313:12
**practice** 13:12
 19:15,18 20:20

20:24 21:13
22:2 213:4
294:21 302:16
302:17
**practices** 319:2
320:15
**practicing**
188:16 198:6
**pre** 23:10
**preclude** 82:14
**predated** 229:14
**predicted** 246:5
**preferred**
198:19
**prepared** 48:18
322:2,6
**prescriptions**
306:23
**presence** 310:14
**present** 21:6,7
188:5 197:4
**presented**
188:23 189:2
191:10 195:10
195:11 202:4
242:6,6 274:20
**press** 283:7
**pressed** 157:20
**pressing** 278:2
**presupposes**
6:16
**pretenses** 299:19
**pretty** 119:7
178:10 204:19
210:19 211:12
219:22 262:7
273:10

**prevent** 96:16
201:23 267:8
302:19 305:23
**previous** 93:3
197:10 261:3
**previously** 49:24
57:15 69:7,7
126:1 133:7
214:7 223:16,18
224:10 246:8
256:18 259:17
**price** 114:19
**print** 259:10
**printing** 283:7
**prior** 15:23 36:4
42:6,20,24 43:5
43:8 45:13 50:3
56:14 57:8
65:17,21 66:1,21
69:21 97:10
102:16 103:2
149:4 165:11,19
165:20,23,24
168:13 171:13
206:16,18
207:13 208:16
234:15 256:22
263:4 319:2
**private** 10:1
80:5 229:7
265:19
**privilege** 38:14
39:12 248:16
273:17
**privileged** 37:13
248:20
**privy** 42:2 167:6
258:23

**pro** 87:12,14
97:11,17 98:10
103:20 104:5
202:14,22
205:16
**probably** 11:11
11:12,16 36:3
39:3 98:16,18
200:15 211:12
227:7 303:21
**problem** 33:23
41:17 74:20
126:21 157:10
213:1 224:12
303:12
**problems** 38:24
40:2,6 69:24
110:20 112:4
126:2 128:4
**proceed** 11:5
**proceedings** 6:5
**process** 7:14
160:10 275:23
**procure** 299:15
**produce** 301:15
301:16
**profession** 106:1
**professional**
1:21 98:13,15
227:20,23
323:18
**professionalism**
255:12
**proffered** 132:22
**program** 23:11
**projects** 106:13
**promptly** 304:12

**proof** 241:18,22
242:1,3,11,19
**proper** 100:18
119:8 129:23
145:11
**properly** 121:5
**proponent** 126:7
**proposal** 148:3
**proposed** 118:24
125:19 129:20
132:23 133:3
147:21,23,24
148:23 149:5,12
153:13 160:10
**prosecuted** 22:9
22:15 171:21
172:3,16,20
173:1,11 237:18
**prosecution** 23:1
**prosenzweig** 2:5
**protect** 80:2
**protected** 39:11
248:15,20
273:16
**protecting** 33:11
**protective**
115:20 229:13
229:17,20 230:3
230:4
**protzman**
293:19
**proved** 176:24
**provide** 9:14
41:8 84:4 95:21
133:21 155:14
155:24 157:11
235:14 241:17
267:12 270:18

**[provide - racketeering]**                                                      Page 43

270:21 320:24
**provided** 84:9
84:15 85:20
136:2,3 144:11
207:10,15
210:11,11,16
211:4 212:13
229:5 231:16
235:13 270:4,5
270:11
**provider** 95:20
**providing** 85:2
107:14 111:23
309:23
**provision** 95:12
**prudent** 180:5
269:16 279:13
279:13 321:7
**prussia** 1:17 2:4
**public** 1:22
89:13 302:20
306:18,19
326:19
**publication**
206:17 207:14
**publicly** 27:11
28:23 227:5
**published**
205:20 211:20
**purchase** 263:9
**purely** 159:24
**purport** 197:14
**purports** 73:5
**purpose** 139:9
145:6 185:2
209:16 217:21
218:1,3 247:14
266:17 267:3

268:17 278:6
284:21 290:18
291:13 299:18
308:18 309:24
310:11
**purposeful** 8:8
193:18 194:3
**purposes** 8:2
93:6 99:6
147:20 148:11
184:7 303:3
**pursuant** 1:14
**pursue** 146:24
**pursued** 172:7
**pursuing** 46:23
130:19
**put** 21:15 69:10
83:6 111:14
126:15,15 148:4
160:4,11 161:19
177:5 179:16
181:4 183:16,18
190:19 217:1
252:17 270:2
271:19 296:18
296:19 297:9
318:20
**putting** 83:6

**q**

**qualifications**
267:20
**qualified** 111:9
**quality** 200:11
**quarrel** 204:17
**quasi** 217:10
313:20

**quest** 297:10,13
299:2
**question** 5:7
6:19 7:1,2,19
8:6,9,17,21 9:2
9:21,21,22 27:7
29:6,7 40:4,8
68:20,21 72:13
73:12,23 74:3
75:3,7 77:18
88:1 89:21
91:22 110:19
121:20 122:18
122:19 133:6
178:22 181:10
181:12,13 186:6
187:7 192:3
195:17 196:21
198:8 200:23
235:20 238:11
238:12 247:1,23
249:12,23 250:1
253:13 260:11
271:24 279:9
282:3 308:3,7
315:11
**questioning**
179:19
**questions** 6:14
6:16,17 10:24
11:4,17 12:17
16:20 73:17
74:20 147:20
164:1 177:9
181:1 191:23
196:6,9 205:19
226:4 259:22
278:3 306:5,7,8

315:16 321:22
**qui** 299:16,20
302:9,12 303:7
308:19 310:23
311:3,5,10,16,18
316:3
**quick** 11:11
252:23
**quickly** 118:9
225:18
**quite** 7:24 72:18
170:7 210:22
**quote** 36:15 54:8
60:12 70:13
94:19 100:13
101:3 107:10
110:3 118:18,21
151:4 152:23
155:13 182:2
207:19 220:1
236:11,15
238:14 239:15
244:13 248:2
273:6 284:3
287:16 295:3
297:10 299:2,12
299:15 304:2
319:13
**quoting** 97:6

**r**

**r** 2:1 5:2 99:23
99:24 202:17
323:2 325:3,3
**race** 111:21
**racketeering**
284:6,11,13,16
285:8,18 286:23

296:23 297:7

**radio** 24:12
81:17 95:15

**radios** 96:8

**raise** 165:8,10
210:7

**raised** 161:21
177:4 202:7
319:1

**raising** 308:18

**rakoff** 205:12

**ran** 257:1

**random** 17:8

**rapport** 113:22

**rate** 30:22

**rates** 32:13

**razzouk** 216:16

**reach** 37:7 91:14
110:6

**reached** 41:7,14
91:18,23 92:5
101:14 102:4
136:24 137:8
141:14 161:24
162:5,8 168:9
206:8,20 207:8,9
209:6,12 318:4,7

**reaching** 209:17
240:9

**read** 5:15 56:18
58:3 60:10,17
63:22 64:14
73:23 74:3
94:24 98:2
107:16 110:11
118:19,24 156:9
156:10,14 159:7
159:8,10 176:21

181:12 185:21
225:20,24
246:13,14,20
266:7 268:12
280:9,11 285:9
304:22,23,23
306:20 316:10
319:17,20 324:9
326:5

**reading** 211:19
220:14

**ready** 14:4,6
52:23 214:10,11
226:7 264:18

**real** 18:4 78:20
79:24 111:4,7,7
111:14 152:16
182:2,2 183:7
297:18,23 298:5
298:6,17

**realize** 43:4
130:8,10 255:4

**realized** 8:10
43:8 111:1
158:22

**really** 8:1 31:17
34:8 73:14,15
101:20 119:2
128:7 134:5
170:20 223:6
302:24

**realtor** 303:4
311:5

**realtors** 299:16
316:4

**reason** 9:17
13:22 33:5,24
103:8 119:18

134:1 149:18
156:1 223:21
227:6 281:13
300:4 324:11
325:6,9,12,15,18
325:21

**reasonable** 9:14
9:17 57:1 71:23

**reasons** 79:20
146:17

**recall** 17:9 18:12
28:13 30:1,18
32:20,22,24
35:18,18 36:10
36:20 37:11
43:12 50:4
51:24 52:2
56:10 62:2
63:19 64:17
71:14 82:17,21
85:1,7 87:4 91:4
95:8 124:10
129:11,16 131:3
143:4 149:9
150:6 151:15
152:6 153:1,2,7
154:5 157:9,18
158:16 160:24
165:4 177:20
178:9,13,16
179:4 189:10,10
189:11 203:20
205:14,16 206:8
206:9,13 208:19
210:10,17
211:14,17,19,23
212:3,17,20
213:7 263:8

268:11 280:9
282:4 284:1,20
286:20 292:2,3
295:14,17 302:2
308:15 318:7

**recalling** 24:17

**receipt** 324:18

**receive** 77:13
102:1 175:19
299:21

**received** 30:20
32:5 62:6 68:2
77:5 79:7 102:9
133:18 144:14
157:12 159:16
171:4,9 175:13
235:3 259:1
286:2 289:15
299:13 300:7
306:15 310:4
311:13 316:2,3,7
318:22 320:7

**receiving** 32:6
41:5 56:10
64:17

**recess** 120:6
147:7 199:20
253:3

**recipient** 94:6
243:24

**recollection**
27:15 28:16
29:18 30:15
32:21 33:5,6,11
33:14,22,24 40:9
42:17,23 43:21
45:20 46:4
48:13 51:7,20,21

53:21 61:14
66:19 76:14
84:15 85:9
87:13 91:24
92:4 95:10
128:13 144:2
149:15 151:16
157:4 222:14
259:19 280:4
283:22 301:1
**recommended**
36:10,14,18
84:14 92:5
**recompense**
80:20
**reconsider**
229:13 270:13
**reconsideration**
211:1 268:10
**record** 8:3 9:3
9:24 24:1 35:2,5
35:9,11 48:22
58:3 97:14
120:6,9 147:4,7
147:10 148:14
190:5 199:20,24
200:2,6,19
205:22 246:14
246:15 253:3,7,9
264:14 295:5
306:18,19
311:24
**records** 29:8
181:17 192:10
197:8,18 211:11
245:3 271:17,19
271:23 321:17

**redhanded**
299:8
**redress** 36:14
45:18 46:23
47:8 79:1 80:20
83:15 111:7
134:22
**reduced** 173:24
174:1,2
**reduction**
179:21,24
180:18 261:18
261:22
**refer** 10:14,15
31:9,21 63:13
95:7 96:24
98:22 101:2
119:11 142:1
164:18 236:21
244:12,16 249:3
299:11 307:1
320:8
**reference** 102:8
147:16 151:2
152:24 197:10
255:11 265:24
266:6 283:18
318:17
**referenced** 324:6
**references** 70:5
81:11 223:10
226:19
**referencing**
79:16
**referral** 36:11
84:12 125:21
**referred** 36:14
42:7,20 48:16

78:6,7 81:10
83:1,2 91:10
98:6 190:4,7
208:18 221:6
**referring** 10:5
31:3 34:4,5 50:9
70:8 95:4
125:10 151:11
182:11 219:2,12
220:9,10 238:20
244:23 245:22
251:14,24 252:1
273:11 303:15
318:17,18
**refers** 54:15
103:17
**reflected** 63:12
114:18 271:3
**reflects** 214:7
264:14
**reform** 79:1,22
80:1,6 111:7
115:19 126:6,8
134:5 283:4,9
284:7 299:2
309:12 313:10
**reformed** 113:2
**reforms** 79:8
112:10,10
118:24 119:8
170:18 309:17
**refrain** 146:16
**refresh** 53:21
87:13 95:10
213:23
**refreshes** 257:17
**refreshing** 61:14

**regard** 9:7 24:12
38:14 47:4,6
48:14 77:23
83:3 86:11
91:24 95:13
101:13 112:5
115:23 129:2
143:18 144:22
157:18 158:21
162:13,14 180:8
187:8,22 208:6,8
226:16 227:1
229:11,12
234:24 237:14
271:4 275:24
290:23 303:13
**regarding** 28:10
30:13 37:4
49:20 53:23
83:11 88:12
92:11 101:7,8
106:17 108:6
123:4,9,16
127:24 129:13
151:2 162:21
165:20 209:14
278:21 280:19
**registered** 1:20
323:18
**regulative** 284:6
**rein** 80:6
**reiterated** 70:1
**reject** 303:24
**rejected** 247:21
255:5 256:14
**relate** 10:16
119:12 141:11
315:20,20

**relates**  97:1
**relation**  27:18
   226:24
**relationship**
   41:24 44:19
   68:10 129:14
   130:20 160:1
**relatively**  93:11
**relatives**  96:14
**relativity**  201:3
   201:9 253:24
   262:22
**relator**  303:16
   303:16
**relators**  310:23
**relevant**  13:21
   41:20 145:21
   268:21 279:15
   291:2,18,20
   310:6 321:2,14
**relied**  194:7
**relief**  82:16,20
   86:14 101:18
   102:1 135:12,13
   135:19 136:2,4,9
   136:10 138:7
   158:21,23 159:3
   160:2 212:24
   297:22 298:2
**rely**  192:7 194:1
   197:4
**remand**  180:6
   180:11 218:17
   278:14
**remanded**
   180:10
**remember**  12:4
   23:22 30:22

33:22 71:8
73:12 101:16
149:10 157:19
162:16 206:14
207:8 240:13,24
241:1 242:24
295:13
**remiss**  217:7
**removed**  133:17
   188:18,19 266:9
   268:15 269:7,11
   269:11 270:7
**render**  267:22
**rendering**  267:6
   267:14 269:18
   291:20
**repaired**  9:6
**repeat**  197:11
**repeatedly**
   184:18 186:23
**rephrase**  6:20
   122:18
**replied**  58:20
**replies**  62:1
**reply**  58:18
**report**  21:21
   201:10 236:18
   238:16
**reporter**  1:21
   7:12 10:9 52:24
   74:2 322:2
   323:7,18
**reporter's**
   321:21
**reporters**  211:4
**represent**  46:7
   77:8 109:3
   111:1 121:11

122:6,10 123:15
205:4
**representation**
   123:7,11 201:12
   205:10
**representative**
   28:3 60:16 64:3
   64:7 67:21 86:7
   103:3,13 111:16
   121:19 139:23
   145:11,12
   146:10 227:13
   247:9
**representatives**
   111:6
**represented**
   42:18 87:2
   89:14 90:17
   129:5 139:22
   176:1,18
**representing**
   60:23 65:3
   69:17 73:10
   75:14 77:11,17
   102:20 128:23
   130:15 139:11
   139:19 247:9
   249:8
**represents**  89:23
**reproduction**
   323:15
**reputation**
   111:23 112:9
   113:14 265:21
**request**  71:11
   122:10 127:17
   136:8 229:5,12
   230:7 262:21

319:4
**requesting**
   229:16
**required**  302:13
   326:13
**requirement**
   77:7
**requirements**
   23:2 76:1
**rescind**  229:13
   229:17
**research**  19:16
   84:4,18 86:1
   107:15 158:18
   161:6 175:7
   265:24 283:24
   303:20 306:13
   306:16
**reserved**  5:8
**residence**  15:5
   24:1
**resolution**
   153:13
**resolve**  153:18
   221:2
**resolved**  23:1
   283:15 286:4
**resolving**  152:7
   153:15
**resource**  138:22
**resources**  138:2
**respect**  6:2
   10:24 13:7
   27:20,22 30:6
   46:8,23 60:23
   67:5,9 71:1 72:8
   74:10 82:12
   83:10 85:6,12

89:15 90:5
121:12 122:3,11
123:18 150:7
152:23 158:3
159:21 174:16
178:7 193:5
205:21 208:7
211:10 233:2
245:2,4 253:13
271:12 306:14
322:1
**respectfully**
187:17 247:20
**respectively**
113:8
**respond** 75:10
75:16 140:21
**responded** 50:12
50:16
**responding**
247:23
**responds** 108:18
**response** 13:2
155:14 157:23
229:16 244:5
245:24 246:1,24
275:9 277:2
309:24 310:2,3,4
319:19
**rest** 137:23
**restroom** 119:24
**result** 115:11
269:13 314:6
320:15
**resulted** 35:23
**results** 79:6
80:10 116:10
269:15 285:14

298:20
**retain** 125:20
**retained** 55:9
**retainer** 46:13
46:15,16,17,18
46:21 47:15
48:2,5 49:17
54:16,17 55:7,13
62:7 67:3,17,22
68:2,18,24 69:5
69:11,19,20
70:17 71:10
89:2 122:3
127:19 131:23
**retaining** 54:23
**retains** 279:11
279:18 309:3
**retaliation** 266:8
**retention** 55:13
55:14 56:20
57:2 61:4,7
71:16,19,22
**return** 102:2
260:17 324:13
324:17
**reveal** 44:15
**reverse** 59:14
**reversed** 228:9
**review** 56:21,24
71:21 135:21
136:3,19 137:9
195:22 197:22
201:14 278:4
324:7
**reviewed** 137:16
138:1
**reviewers** 138:3

**reviewing** 214:1
283:8
**reviews** 118:11
150:20 164:2
254:4 283:5
**revised** 56:19
71:16 148:6
**reword** 6:19
**ridiculous**
196:15
**rife** 128:20
278:20 297:11
299:3
**right** 12:2,5,8
14:2,9 20:15
26:1 28:20
31:10,14,15
34:18 37:17
41:21 45:7,8
47:23 49:7
51:20 52:5 59:7
59:24 60:4 63:7
70:16 78:18
86:2 98:6 100:9
107:22 114:6,19
116:7 118:7,16
127:12 128:3
133:17 141:15
148:12,14,16,17
148:18 154:2
155:15 158:16
160:16 163:9
168:10 170:5
171:1 173:8
176:11 179:18
189:16 192:11
195:13 196:2
197:2 198:2,22

206:1 214:20
218:19 224:13
225:13 227:15
228:11 230:13
231:19 239:24
246:11,11,11,18
247:8 257:14,16
258:16 269:5
273:9 284:15
286:1 287:20
290:17 292:11
309:21 316:7,22
319:24
**righteous** 192:23
**rightfully** 266:9
**rights** 13:6 169:7
170:17
**rings** 33:15
295:15
**rob** 41:15 42:11
42:18 44:2
49:23 50:6
55:23 56:20
58:10 60:12,22
62:8 63:15,24
66:22 67:4,13,15
68:21 69:1
71:17,21 72:6
74:7 76:18
77:20 87:19
89:7,13 90:4,13
94:20 97:5
99:14,14,19
100:12,14,23
105:12 106:16
106:24 107:9,10
107:19,21
109:21 110:4

**[rob - résumé]**                                                                    Page 48

| | | | |
|---|---|---|---|
| 111:17 113:7,13 | 276:12 295:23 | 120:2,12 135:8 | 316:21 321:20 |
| 113:23 118:15 | 314:1 315:4 | 137:13 140:8 | **ross**  4:5 89:20 |
| 118:18,21 | 316:4 | 147:3,13 148:12 | 90:14 131:12 |
| 120:14,20 121:9 | **robert**  43:19 | 148:13 150:17 | 132:2,13 139:7 |
| 122:1 123:2,8,15 | 55:17 61:6,8,10 | 154:15 156:5,8 | 139:10,15 |
| 123:21,24 124:4 | 66:10,13,15 | 160:17,20 | 140:10,13 141:5 |
| 126:7 127:4,9 | 71:24 76:13 | 163:22 173:7,10 | 143:23 151:18 |
| 129:13,17 | 106:12 155:18 | 173:17,21 | 214:16 216:11 |
| 130:20 149:3 | 250:16 | 174:19 175:10 | 222:22 223:4,12 |
| 150:24 151:4 | **robust**  309:11 | 181:22 182:14 | 225:22 228:16 |
| 154:22 172:16 | **rode**  83:23 | 186:7,8 187:14 | 231:13 232:7 |
| 172:24 175:20 | **role**  126:24 | 188:2 190:1,11 | 233:5 246:4 |
| 184:13 186:19 | 151:22 211:10 | 190:22 191:18 | 254:11 265:8 |
| 189:17 193:5 | 216:6 280:6 | 191:24 192:4,14 | 292:24 293:14 |
| 194:1,2 197:5,14 | **roommate** | 192:17 193:2 | **round**  180:13 |
| 210:8 211:10 | 102:18 110:23 | 194:8,12,22,23 | **rubin**  2:7 |
| 212:10 214:15 | 298:15 | 196:7,12 199:12 | **rule**  256:11 |
| 218:9 231:22 | **root**  218:19 | 199:23 200:5 | **ruled**  135:16 |
| 237:7 238:2,7,19 | **rosenzweig**  1:15 | 201:1 204:23 | 179:22 180:3 |
| 239:6,6 243:15 | 2:2,3 3:7 5:20 | 205:1 208:12,20 | 186:13 |
| 249:9 254:8 | 11:7 12:6,21 | 213:20 223:2 | **rules**  227:20,22 |
| 258:24 262:8,11 | 14:2,3 22:13 | 226:2,8 231:9 | **ruling**  11:24 |
| 262:15 265:7 | 27:6,8 35:1,8,14 | 232:19,22 233:1 | 12:3 140:19 |
| 273:2 275:22 | 39:19 40:10,22 | 239:4,13,23 | 141:22,23 144:8 |
| 276:7 278:1 | 44:20 45:4 | 240:1 249:16 | 180:8,15 205:22 |
| 280:6 292:24 | 47:17 48:24 | 250:2 251:4,22 | 267:22 269:18 |
| 293:14 | 49:3,6,9 52:14 | 252:23 253:6,12 | **rulings**  13:7 |
| **rob's**  236:6 | 52:22 53:1,2 | 253:23 258:4,15 | 144:13 162:2 |
| **robbed**  171:17 | 54:22 55:4 | 264:12,22 265:1 | 309:7 |
| **robbing**  171:5 | 61:23 63:6 | 272:14 275:20 | **run**  105:21 |
| **robbins**  40:15,16 | 68:16 72:3,17 | 277:13,16,18 | 129:19 136:15 |
| 82:24 83:1 86:4 | 73:11,22 75:6,8 | 287:19 288:8 | 283:7 |
| 86:12,12 101:5 | 76:7 81:8 89:6 | 289:3,14 293:11 | **running**  157:14 |
| 101:13 103:1 | 92:22 93:19,22 | 300:19,21 | **rushed**  312:21 |
| 129:6 137:2 | 99:2,3,9 100:8 | 306:11 307:16 | **résumé**  176:6 |
| 201:4 216:4,15 | 104:19,24 105:5 | 307:19,20 308:2 | 177:10 181:3 |
| 216:15 245:14 | 105:7 109:9,17 | 308:8,9 311:2 | 182:16,19 183:2 |
| 251:1 274:12 | 115:5 116:23 | 315:2,12,17 | 183:3,17 185:13 |

190:6,16,17
191:4 192:20

**s**

**s**   2:1,3 3:12 4:2
5:2 16:5 105:1
164:17 202:17
210:15 312:3
325:3
**sacks**   105:13,16
106:24 107:10
107:23 108:2,7
109:22 117:1,2,5
117:7,23 118:15
119:16 151:1
154:23 155:5
260:5
**safe**   29:10
**safeguards**
201:22
**sake**   290:10
310:14
**sales**   152:2
**sanctioned**   255:8
**sanddlawyers....**
2:5
**sarah**   208:17
209:7
**sarclone**   259:2,8
**sarroyo**   216:15
**satellite**   24:12
81:17 95:15
**saturday**   265:6
272:22
**savesirius.org**
203:10
**saw**   6:5 131:20
131:21 241:3

259:6 311:24
**saying**   12:9
36:15 38:15
62:18 75:16
77:9 123:13
148:1 166:6
185:11 202:19
205:24 210:14
219:16 220:24
238:4 298:1
307:24 318:21
319:12
**says**   37:23 54:8
56:19 58:13
59:22 65:6 69:3
94:4,5,19 97:19
98:24 99:22
107:19 151:3
156:15 164:13
191:6 214:4,6
228:22 233:7
234:24 287:17
287:20 304:20
307:14,21 319:9
320:6,18
**scan**   313:7,7
**scanned**   301:7
**scathing**   141:22
210:23 211:2
**scenario**   112:3
129:22
**scenes**   276:14
**scheme**   299:15
302:3 304:6
310:22
**school**   16:15
23:3

**scope**   132:23
**scott**   154:23,24
**scrutinize**   319:4
**scrutinizes**
321:17
**se**   87:12,14
97:11,17 98:11
103:20 104:5
126:13 202:14
202:22 205:16
**sealed**   302:20,22
**sealing**   5:5
**search**   141:14
176:7,18 224:7
**searches**   178:11
**season**   96:6
**seasoned**   13:4
**second**   35:2
52:10 53:7
55:21 70:11
164:12,15 211:2
227:16 230:12
231:21 236:15
241:16 243:11
266:6 284:2
295:2 299:11
**seconds**   59:16
**section**   319:9
**securities**   83:2
86:5 268:3
**security**   80:5
**see**   23:21 56:3
57:12 59:17
61:16 63:17
66:8 93:8 94:13
98:16 100:2,20
105:9,14 110:9
114:9 121:1,3

132:10 150:21
151:7 155:10
185:9,24 186:3
229:11,15
241:20 248:5
254:9 256:20
259:13 284:8
321:16
**seeing**   34:12
**seek**   77:9 79:24
111:7 112:6
115:22 180:5
**seeking**   36:13
83:15 98:13
218:16 295:20
295:24,24
311:17
**seeks**   115:18
**seen**   84:19,21
132:2 134:16
140:18 144:7
259:4,11,17,20
275:7 297:15
298:19 301:5
304:18
**segue**   254:22
**self**   210:20
236:18 238:16
**selling**   102:14
**semesters**   17:10
**semicolon**   236:3
**send**   77:8 100:23
144:10 279:13
292:5,15 294:12
294:13 318:10
320:14
**sending**   69:21
290:18 294:14

**seniors** 304:10
**sense** 169:10
204:2 288:21
**sensibilities**
221:24
**sent** 23:3 50:6
56:19 68:24
71:15 94:16
100:17 119:4
144:13 145:2
153:17 167:7
180:11 182:20
183:24 217:7
218:12 233:5
243:16,19
265:12,16,17
279:23 288:16
288:22 289:18
292:1,20 324:14
**sentence** 107:19
266:7 284:2
**sentences** 236:21
**separate** 67:11
280:3
**serial** 298:10
**series** 232:2
265:7 321:22
**serious** 251:15
271:24 286:21
287:5
**seriously** 193:11
**serve** 67:16
167:10
**served** 167:11,13
168:2,3,4 176:12
259:14
**serves** 157:4
183:4

**service** 95:21
126:13,14
**services** 125:21
127:19 266:1
**serving** 44:13
64:7
**set** 6:7 178:24
299:18
**setting** 6:2 295:5
**settle** 112:9
134:3
**settlement** 41:14
79:7 94:22
102:4,7 130:23
131:6,7 132:21
132:23 133:3
134:11,21 135:3
136:6 138:7
147:18,21,24
148:3,20,24
149:6,13 152:15
156:2 158:20,21
160:9,10,11
167:20,22 174:1
179:23 180:9
181:24 252:14
279:12,19
290:23 309:1,19
**settlements**
148:6 298:8
**seven** 17:23 19:5
30:5,7,9,9
102:21 111:1
146:13 151:19
**shambles** 84:1,2
**shape** 32:19
**share** 16:14
33:15 102:19

110:24 114:19
137:3 282:23
285:13 290:24
**shared** 9:10
222:11
**shareholder**
32:5,8,14,19
33:2 45:24
79:19 89:22
114:4 116:11
125:22 130:4
131:15,18
141:19 146:12
202:23 227:12
227:13 267:1
280:2 291:10
313:1 317:8,11
318:21,23 319:6
319:10,11,13,16
319:23 320:2
**shareholders**
31:4,6,20,21,24
41:4 69:18
79:11 80:2,11
83:16 84:1,23
90:18 112:21
114:7,24 115:9
116:4,5 121:6
122:4 128:9
134:9,12,23
146:9 203:11
213:1 227:11
298:22
**shares** 30:1,20
30:21 32:6
111:10 115:11
131:19 313:5

**shed** 210:2
**sheet** 324:11
**sheets** 220:12
**shell** 299:17
302:16
**shield** 302:17
303:4
**shima** 164:16
167:9 175:16,17
176:12 182:20
183:3
**ship** 257:3
**shipped** 263:6
**shocked** 84:17
84:18 221:23
286:17
**shocker** 287:11
**shocking** 221:20
221:22
**short** 93:12
133:4 253:24
302:1
**shortcomings**
113:3
**shortly** 166:7,10
**shot** 189:14
**shoulders** 7:11
**show** 34:9 47:23
163:13 202:5
236:9 243:24
**shown** 6:1
120:17
**shows** 243:23
**shrugs** 7:10
**sign** 5:15 46:13
56:24 67:2 71:9
122:2 131:22
324:12

**signatories**
  202:21
**signatory** 67:16
  67:19
**signature** 87:11
  323:9
**signed** 46:15,16
  46:22 47:14
  48:2 49:17 54:9
  57:23 60:21
  61:4,7 62:8
  67:11,22 68:2,17
  70:13,17 73:6
  320:20 324:20
**significant** 79:18
**signing** 55:6,15
  57:2
**silow** 159:21
  160:24 161:1
  162:22 163:5
  172:3,6,11,22
  174:16 176:2,2,6
  176:8,19 177:3,4
  177:6,6,9,15
  178:8,19 179:1,3
  179:5,9,20 181:2
  181:6,7,16 182:1
  182:3,5,7 183:8
  183:16 184:16
  184:17,20,21,24
  185:1,11,22
  186:19,24 188:6
  189:19 191:14
  191:19 192:8,21
  193:3 195:12
  197:6,15 198:9
  198:10,18,18,19
  198:23 199:10

201:7 205:23
221:16 237:4
241:19,23 242:1
242:6,7,13 245:2
245:6,11 261:23
261:24 262:2,5,9
262:12,16
271:13,17 296:8
296:9 321:10
**silow's** 160:12
  164:22 165:20
  168:13 174:13
  180:4 181:17
  184:14 185:5
  191:16 194:4
  200:9 211:10
  237:4 245:9
  262:18
**silverang** 1:15
  2:2
**similar** 80:8
  205:15
**similarly** 166:17
  176:11
**simple** 96:23
  165:18 249:23
**simply** 47:8 94:4
  316:6
**single** 15:5
  102:19 110:24
  135:23 137:21
  141:7,10 159:8
  276:15
**sinister** 304:3,5
**sir** 11:6 248:2
**sirius** 24:12 30:6
  41:3,3 81:16,17
  94:12 95:14

96:19 100:1
107:11 108:3,23
128:22 162:11
**siriusxm** 24:9
  27:16,19 29:12
  37:4,5 40:21
  41:1 42:4 82:12
  86:18 91:1,9,16
  92:1,3 97:1,12
  101:7,8 103:17
  103:22 120:19
  162:7 202:14
  205:5 209:14
**sit** 6:9 28:15,23
  42:16 43:24
  85:10 178:13
  188:4 308:14
**sitting** 6:3
  197:22
**situation** 114:15
  126:5 303:2
**six** 17:23 30:3
  110:6 216:9
**size** 136:7
  267:23
**skadden** 154:23
  154:24 215:13
**skeletons** 195:19
**skin** 313:2
**slander** 275:13
**slanderous**
  275:17
**slated** 148:20
**slippery** 172:14
**slope** 172:15
**small** 302:1,6,6
**smaller** 281:14

**smart** 86:13
  113:23 119:19
**softbank** 134:10
  159:1 169:16,24
  174:6
**softscape** 18:23
  19:1
**software** 201:10
  262:22
**sold** 29:11
**sole** 299:18
**soliciting** 299:19
**solutions** 324:23
**somebody** 77:8
  184:5 195:2,14
  227:3 274:14
  314:2
**somewhat** 112:4
**son** 182:3 188:24
**son's** 184:7
**soon** 169:4
  170:12
**sophistication**
  229:23
**sorge** 202:16,18
  202:20,21 203:7
  203:15 204:3
  263:12,12
**sorry** 14:21 49:4
  82:11 99:8
  118:19 156:4,6
  158:7 162:11
  168:18 192:15
  196:4 235:21
  239:23 241:24
  243:11 265:16
**sort** 282:18

**sought** 82:17,20
101:18 115:17
159:2
**sound** 150:1
235:8
**sounds** 23:9
196:23,24
207:23
**source** 125:21
**south** 2:8 203:23
**speak** 7:13 8:1
9:18 83:8 149:3
201:24 208:1
226:13,15
240:16,21 311:4
**speaking** 53:12
146:12 153:20
212:7 246:10
**speaks** 239:12
270:3 271:15
**specialty** 306:21
**specific** 40:5
47:20 84:10,15
107:6 126:1
127:18 274:2
288:21
**specifically** 47:3
48:6 76:18
77:20 85:1 97:1
108:5 125:11
140:17 143:24
143:24 157:19
158:16 159:6
178:9 179:4
190:3 210:16,17
211:15 212:3,20
219:13 221:15
245:22 252:1

256:7 271:9
275:22 306:24
**specificity**
177:21
**specifics** 189:6
**speculative**
146:20
**spend** 96:7
**spent** 138:4
159:6 200:10
**spoke** 65:23
83:13,15 166:1
177:14,15 206:2
318:5
**spoken** 91:11
149:8 211:4
275:16
**sprint** 27:20,23
28:11 29:11,23
30:13,16,18,20
32:6,8,9,13,18
35:24 43:20
44:5 45:18 46:2
46:8,24 49:13,14
49:20 53:24
60:16 64:2,9
65:4 67:5 72:9
72:11 74:11,13
75:14 77:23
82:3,8 83:3,12
83:17 84:5,8
85:4,13 88:1,4
88:12,19 89:10
89:16 90:6,15,22
92:11 112:13
119:13 121:15
122:15 123:4,10
123:19 130:22

131:6,11,15
132:21 133:14
139:5 140:15
141:19 146:7
147:17,22
148:19 149:5,12
152:14 153:18
155:2 158:6
160:9 162:11
169:12,21,24
170:1,4 174:1,5
179:6,23 181:24
184:8 187:22
197:19 205:21
207:20 209:1
214:19 215:2,10
219:13 223:5
225:8,12 233:23
234:4 236:23,24
241:10 254:12
266:20 267:17
273:23 280:15
280:17,20
281:10 283:2
287:10 290:5,22
296:6 301:10
308:24 309:10
313:16 320:16
**sprint's** 90:18
**squire** 295:15
**staff** 195:6
**stamp** 97:18
289:11 292:19
**stamped** 157:13
225:10,11,15
293:15
**standard** 235:2
294:21 301:21

**standards**
113:16 286:19
**standing** 102:20
110:23 119:1
162:13,15
168:23 170:13
170:14,24 174:5
280:3 297:3
**start** 14:8 45:2
70:8 93:16
**started** 19:15
50:6 175:3,5
178:18 197:22
203:9 240:9
**starting** 53:7
199:17
**starts** 55:22
318:21
**state** 1:22 24:10
25:12,13 26:7
27:13 101:5
106:6 107:11
108:3,23 152:2
162:14 169:2
170:11,16
190:20 202:13
204:3 236:9
263:5,7 268:1
273:5 279:21
280:3,7,18,21
281:22 282:1
283:12 284:3,5
285:7,10,19,21
286:23 295:2
312:20,21
**stated** 79:20
150:7 319:3

statement  11:12
  12:20 21:9
  88:16 97:18
  131:1,20 219:15
  219:18,23 220:6
  220:7 238:20
  248:1 254:21
  255:15 261:16
statements  9:3
  11:18 12:1,10
  13:19 128:12
  132:1 156:23
  193:22 220:14
  220:16 248:11
  248:21 273:20
  275:10 276:24
  306:4,8
states  1:1 26:20
  26:22 27:12
  224:10 262:7
stating  126:7
station  24:3
  25:21
status  159:21
  160:13 164:22
  165:8,11,20
  168:13 174:13
  180:4 187:8,18
  188:13,19
  197:20 205:23
  286:5
stay  137:11,17
  138:2 322:7
stayed  136:13,15
  136:16,18
stecker  175:20
  215:20 273:3
  279:17 309:5,12

313:17
step  8:8 25:4
  309:18
stipulation
  158:20
stipulations  5:15
  8:20 69:10
stock  28:24 46:2
  102:19 110:24
  111:10 128:24
  129:5
stole  115:24
stop  8:17 80:8
stopped  281:9
stories  208:16
story  206:23
  207:4,11
straight  295:5
strange  301:3,4
stranger  92:7
street  2:8 14:16
  205:19 206:3,21
  207:7 208:7,11
  208:13,15,23
  209:17 211:8,15
  212:8 213:9
  278:2 279:21
  280:3,7,22
  281:22 282:1
  283:12 284:5
  285:7,10,20,21
  286:23
strengthened
  70:2
strengthening
  221:2
strictly  177:15
  298:18

strike  118:19
  123:23 165:9
  167:5 189:20
  225:5
striking  26:4
strongest  247:5
struck  25:16,24
struggling  119:5
  119:6
subdivision
  20:16
subject  13:11
  94:4,12 99:22
  153:9 155:13
  174:1 179:23
  214:16 254:11
  265:8 278:2
  291:4 308:12
submit  191:7
  221:10
submitted  148:6
  155:22 179:20
  181:18 191:13
  192:9 197:8,18
  200:19 201:11
  237:21 245:10
  269:22
submitting
  236:22 239:2
subpar  229:23
subscribed
  326:14
subsequent  50:3
  65:20 70:22,23
  76:8,9,20 77:22
  87:19 90:21,23
  101:22 103:19
  120:14 162:17

181:6 210:23
subsequently
  167:6
substance
  209:18 235:19
  265:3 272:20
substantial
  111:5,15 130:3
  286:7
substantially
  256:21 281:14
  281:17
substantive
  208:24
subterfuge
  184:14
sue  170:17
sued  26:13
  185:23
sufficiently
  69:19
suggest  273:8
suggested  126:3
  128:11
suggesting
  179:12 242:15
suggestions
  129:18
suggests  228:2
suit  28:3 64:9
  72:11 74:13
  84:21 94:22
  95:3,6,9,23
  96:18,24 98:5
  103:4,13 134:15
  134:18 145:12
  193:15 207:21

suite  1:17 2:4,8
suited  198:22
suits  74:23
  281:12
sums  111:5
  286:7
sunday  55:22
  56:1
sunset  83:23
supersede  169:8
supervision
  271:21 323:17
supplemental
  157:17 159:13
supply  155:18
support  155:14
  155:19 156:19
  156:23,24 157:2
  304:14
supposed  156:12
  157:5 249:7,10
  286:19 305:12
  309:10
supreme  202:13
sure  9:6 10:22
  13:3 14:22
  33:10 46:10
  69:13 73:1
  83:14 86:22
  95:9 99:18,21
  103:14 104:18
  104:22 105:3
  120:2 129:20
  131:20 137:11
  148:15 149:9,15
  149:15 150:4
  152:12 165:22
  168:15 171:19

179:16 194:16
195:6 204:11
217:13 218:24
228:7 230:23
240:8 255:1
273:10 278:14
289:6 293:24
298:11 301:9,12
304:1 311:7
surmise  198:24
surmised  62:13
  62:20
surprised  81:6
  204:21 263:17
surrounding
  45:17 153:6
  186:15
surviving  49:13
suv  24:3
swear  43:17 85:7
  225:14 294:20
sweat  199:17
swick  27:24 28:1
  107:13 205:9
sword  198:11
swore  245:8
sworn  5:11
  179:9 192:22
  195:3 198:20
  242:9 271:22
  323:5 326:14
system  95:20
  111:3 112:24
  113:1,2,3 201:23
  262:22 312:13
  313:4
systems  285:15

## t

t  3:12 4:2 16:4
  312:3 323:2,2
  325:3,3
tab  10:15 62:23
  99:1,2 100:7,10
  104:10,11 109:8
  118:6 150:10
  154:9 163:16
  231:2 253:16
  257:21 258:17
  263:20 264:16
  264:22 272:5
  287:22,24 288:9
  293:1,3 316:14
tabbed  10:13
table  41:2
  126:12
tabs  99:5,5
tackle  227:2
take  25:4 34:20
  52:12 63:8
  80:15,24 88:11
  88:18 93:10
  118:9 119:1,24
  121:10 126:8
  129:18 148:7
  150:18 163:23
  186:14 189:13
  200:20 201:11
  201:16 205:10
  211:22 213:23
  214:17 220:13
  224:4 230:19
  232:6 234:15
  244:8,9 252:23
  254:2,3 257:20
  258:20 264:15

272:16 278:24
279:1 281:19
taken  1:14 7:12
  38:11 107:12
  135:24 143:13
  143:17 227:7
takes  297:5
talk  94:20 97:5
  98:9 101:20
  107:11,20
  126:13 196:23
  197:1
talked  63:11
  99:19 126:5,5
  254:23
talking  8:18
  10:23 34:14
  42:13 53:22
  54:4 71:19 73:2
  75:11 83:10
  117:1 127:9
  142:5 154:4
  161:5 182:12
  191:15 220:8
  224:23 315:23
  316:1
tam  299:16,20
  302:9,12 303:7
  308:19 310:23
  311:3,5,10,16
  316:4
tams  311:18
tantamount
  134:3 247:11
  305:20
target  257:5
tax  151:6 152:2
  152:10

**technically**
198:4
**ted** 162:5,6,9
163:1,4 165:14
165:23 166:1
**telegraphed**
171:10
**telephone** 51:6,8
65:15 74:22
75:23 124:19
125:14 223:11
223:15,18
235:12 318:7
**tell** 6:19 18:7
20:9 28:22
31:11 44:1,21
51:5 54:14
57:11 60:11
63:23 65:2
76:18 78:10,18
108:5 110:14
119:3 139:15
141:4 143:23
151:13 155:4
159:5 164:7,21
166:11 181:8
189:15 197:12
202:18 210:15
225:21 226:6
228:14 230:18
241:11 285:5
290:3 300:22
303:23
**telling** 57:22
125:12 191:6
316:3,6
**tells** 64:23

**ten** 111:10 302:6
313:5
**tend** 52:9
**tens** 152:5
**term** 31:1,23,23
147:17 168:16
251:5 252:7
273:7 276:21
311:8 314:11
**terms** 129:11
153:10 158:20
202:24 247:5
309:18
**terrible** 53:13
**terrific** 14:7
**test** 284:12
**testified** 5:12
28:16 49:11,24
68:9 69:7 77:19
87:18 101:12,16
123:3,9 126:2,9
133:7 135:16
180:24 186:22
256:18,23
257:14 263:11
279:16 285:24
297:14
**testifies** 39:8
179:10
**testimony** 62:12
145:18 185:5,10
198:9 264:15
293:23 324:9,18
326:8
**testing** 82:15
**text** 292:10
**thank** 14:1,7
15:4 20:1 23:16

26:2 32:2 49:7
91:7 96:22
156:2 171:16
199:5 250:2
317:4
**thanks** 205:17
208:13
**theme** 129:1
**theoretically**
115:10 251:7
**thereabout**
85:19
**thereabouts**
184:9
**thing** 61:13 92:3
129:16 169:19
195:16 196:14
204:6 211:24
230:12 234:23
246:23 251:10
251:16 261:18
274:9 276:6
294:11 299:7
303:5 314:3
**things** 11:13
34:24 41:12
45:2 78:2 92:2
96:16,19 105:21
106:13 111:10
111:16 119:20
126:4 128:12
130:11 131:24
135:7,9 138:20
157:3 175:9
205:24 222:4
230:20 245:22
264:5 267:21
272:6 275:12

276:5 279:14
285:15 298:13
313:12,21 321:4
**think** 27:14
28:12 33:7
37:17 39:10
44:20 46:11
47:5 49:1 51:11
57:2 60:13,15
61:3 67:7 68:8
69:16 70:7
71:18,23 72:21
73:15 74:16
75:4 82:22 83:7
84:9,11 90:2
91:23 108:12
119:8 122:20
126:10 131:18
132:5 133:10
138:16,17,17
143:11 146:17
149:7 151:18,21
158:18 169:18
170:6 175:12
176:12 179:2
182:23 183:2
184:15,18,22
185:16 186:21
186:23 194:17
194:19,20
196:14 200:15
200:22 204:16
207:3 209:5,7,8
212:4 217:15
219:15,17
221:23 240:6
241:4 245:7
248:14 251:12

251:13,20 252:2
252:20 256:14
257:12,14 259:3
259:19 264:6
267:16 268:24
270:24 274:17
278:13 281:13
282:9 286:21
296:2,11 297:6,8
301:24 302:1
304:19 305:2
307:14 308:4
310:20 314:20
318:5,14 319:19
**thinking**  11:11
95:8 113:1,6
316:2
**third**  98:22
99:10 243:12
299:12
**thought**  55:14
61:9 64:1 77:6
111:4,11 118:23
134:8 135:10
140:1 171:2
174:23 204:19
278:24 308:10
310:5
**thoughts**  94:21
97:6,7
**thousands**
203:10
**threatened**
228:24
**three**  40:19
58:22 61:18
66:7 92:23 93:5
93:11 141:15

166:13 256:10
256:15 305:11
312:15,20 314:9
315:19
**threw**  309:13
**thrown**  128:11
170:15 305:6
**tijen**  16:4
**time**  5:8 8:2 9:14
9:23 11:21
13:11 15:1 19:8
19:13 23:19
29:15 31:2 33:3
33:17 34:5,8
36:13 37:15,21
39:24 40:15
41:11,17 42:3,14
43:5 47:5 48:5
50:4 51:2 55:3
55:11 58:14
60:21 61:21
64:20 65:24
73:8 76:16 82:3
82:22 84:23,24
85:15,16,19 86:3
88:9 92:8
102:10 103:7
111:11 112:23
113:13 115:3
119:24 122:12
123:2,17 125:3,5
127:11 130:12
131:10 132:21
138:2 144:16,19
157:7,14,20
158:7,7,8,9,12
158:19 159:6
160:8 173:23

174:10,18,20
175:2 176:16
179:19 181:17
184:12 186:18
187:21 188:10
188:22 189:16
189:19 194:14
197:3,8,17 217:6
220:12,18 221:7
221:18,21 222:6
222:8 228:23
229:18 234:19
235:2,16 242:2,3
242:11 244:9
245:19 248:11
249:1,11 252:3,7
256:24 259:3,5
259:20 263:5
266:21 275:3
278:11,13,17
281:9 282:13
284:1 287:5
289:11 292:18
292:19 295:16
295:18 302:18
304:22 308:24
321:8 322:10
324:19
**timeframe**  28:22
29:19,24 31:15
34:6 43:10
47:24 51:24
53:22 73:3 83:9
85:11 88:5
104:1 107:3
113:5 138:4
153:20 154:3
163:7 186:15

192:15,19 324:8
**timekeeping**
285:14
**timelines**  131:1
**times**  43:1 72:14
110:6 121:2
159:9 189:24
255:6,9 256:15
**tip**  241:4
**today**  7:14 10:7
28:15,23 39:8
42:16 43:24
85:11 155:23
178:14 188:4
192:12 194:11
203:6 294:21
295:17 308:14
**told**  73:9 76:2
86:4 141:18
142:24 160:23
165:23 166:19
166:24 187:2
188:13,14,17
189:8 226:23
240:11 241:14
314:15
**tom**  216:20
235:20 236:4
**tomorrow**  9:10
10:8 60:1 65:1
322:6
**tonight**  108:19
**tonya**  19:20
20:17
**top**  60:5 63:10
93:3,21 98:24
99:11 213:10
214:4 234:2

284:20 285:22 307:10

**topic** 170:20

**topics** 44:23

**total** 17:10

**touching** 202:12

**touché** 247:19

**township** 227:3

**traded** 27:12 28:24

**trading** 131:20 132:1

**transacted** 46:16

**transaction** 32:7 35:23 123:1

**transactions** 33:19

**transcript** 292:4 323:14 324:6,20 326:5,8

**translate** 310:15

**transmit** 285:14

**transmitted** 70:19 294:4

**transpired** 103:1 209:20 210:3 212:2 241:9 266:20 268:19 268:24 283:2 285:10 287:9 291:16 304:24 321:6

**transpiring** 108:16 218:5

**trap** 255:19,20

**travel** 41:11

**tremendous** 114:5 130:6

158:18 176:22

**trial** 5:8 23:10

**trials** 19:16,21 19:22 20:2,6,10 20:14,15 21:5 117:8

**tried** 110:6 145:22 178:12 205:15 318:1

**trifolded** 301:24 302:1

**true** 115:22 198:13 226:14 230:14 326:8

**truly** 304:3

**truth** 220:19

**truthful** 6:15

**try** 8:3,5 59:24 226:17 240:9 265:20 292:16

**trying** 7:20 72:22 82:14 101:23 147:2 157:15,20 161:6 193:3,20,24 218:4 220:18 226:4 312:13

**turn** 52:6 62:22 63:10 70:6 92:14 104:9 109:7 150:10 154:7 169:13 199:16 213:12 222:17 223:7 243:3 253:15 263:19 272:2 276:15 318:12

**turned** 102:13 102:15

**turns** 288:24

**tutelage** 271:21

**twice** 67:8 230:16

**two** 9:12 16:20 29:13 36:3 40:19 45:21 55:21 67:7 85:24 93:1 96:3 133:15,18 144:13 147:4 164:11 166:13 166:14 197:1 199:7 210:21 214:3 215:13 231:10 232:5,6 232:23 236:20 265:2 272:19 286:13

**type** 47:7 156:11 175:8 183:9 275:12

**typed** 290:15 300:23 302:2

**u**

**u** 312:3

**ultimate** 180:20

**ultimately** 23:13 46:6 86:16 88:8 205:9,11 230:5 285:20 293:12

**umeda** 40:15 101:5,13 103:1 129:6

**unassuming** 304:7

**unaware** 238:5

**unbelievable** 304:4

**unblinded** 303:6 303:11 305:1,5 314:16

**uncomfortable** 228:22

**uncover** 220:18

**uncovered** 110:20,22 162:4 166:3 199:4

**uncovering** 222:4

**underlying** 152:14 215:2

**understand** 6:17 6:18 7:3,15 9:4 9:7 10:2,18 11:15 29:6 31:14 57:11 103:6 111:8 114:3,12 131:14 135:20 136:1 137:23 144:3 168:19 193:20 193:24 195:7 198:10 220:5,13 249:22 263:19 289:8 302:21,23 303:1

**understandable** 6:22

**understanding** 36:23 46:11 47:16 55:2

78:15 103:8
113:13 115:7,8
136:23 137:7,12
166:16 176:17
189:5 207:10
230:20 237:13
237:16 255:23
279:16 284:15
302:11,15
304:21 313:22
**understood**   7:1
8:13 11:2 32:1
78:6 282:14
**undetermined**
76:15
**unfamiliar**
226:20
**unfolded**   6:6
**unfortunate**
134:14 303:5
**unfortunately**
79:10 111:18
138:5 298:3
**unhappiness**
133:3 150:8
**unhappy**   36:12
46:1 149:12
**uninformed**
141:21 145:10
**union**   27:13
**unison**   250:23
**united**   1:1 26:20
26:21 27:12
**universe**   8:23
**unquote**   287:16
299:16
**unsolicited**
223:10 224:1

279:6
**unsuspecting**
304:8
**untrue**   185:16
185:17
**unusual**   301:3
**upset**   132:22
**use**   10:11 24:21
31:23,23 44:3
143:2 220:10
252:7 267:21
273:6 276:20
284:23 291:2
299:17 314:11
314:18 319:12
**useless**   96:15
**uses**   284:17
**usual**   5:14 8:20
**usually**   243:17

**v**

**v**   1:6 307:2
324:4 325:1
326:1
**vague**   42:23
160:6
**valid**   73:18
134:2,15
**validated**   200:9
**valuation**   33:23
41:5
**value**   45:19 46:2
84:23 115:10
116:11 134:8
262:20
**valued**   33:7
**valueless**   79:14

**vano**   3:23 79:15
79:16 118:22
134:6 138:16
142:22 143:2
144:13 156:1
159:16 160:11
163:19 164:10
164:24 165:11
167:8 168:4,4,23
171:10 173:24
175:14,21 176:7
177:10 179:11
179:18,22 180:3
180:7,12,12,14
182:22,24 183:1
200:20 202:8
210:22 217:11
218:12,14,20
221:22 226:21
271:15 278:9,11
278:24 280:13
280:18 281:21
290:20,21 295:4
296:10 308:19
308:23 309:13
310:17
**vano's**   135:14
140:18 141:22
142:15,17 144:7
148:23 162:2
179:19 191:8
207:16 210:11
216:24 217:3
218:13,21 229:8
233:14 257:13
261:17 289:22
**variety**   193:22

**vast**   13:9
**vehicle**   24:2
25:16,20 130:4
**venue**   312:18
**venues**   24:15
**veracity**   142:21
161:15
**verbal**   7:8 50:24
**verbiage**   255:21
**verified**   200:10
200:21 201:6,13
201:17
**verify**   132:1
324:9
**veritext**   324:14
324:23
**veritext.com**
324:15
**version**   133:4,4
133:5 294:1,5,12
294:18,22
**versus**   25:10,17
26:4 214:19
254:12
**vicious**   274:24
**viciously**   220:17
254:24
**victim**   194:4
267:2
**view**   113:5 138:9
138:10 159:4
160:1 213:3
**violated**   227:20
**violation**   96:4,19
**visited**   203:19
**vocabulary**
148:10

| | | | |
|---|---|---|---|
| **voluminous** | 313:20 | 166:14 | 109:21 110:3 |
| 252:15 | **wanted** 69:12 | **weighty** 251:15 | 113:7,7,13,14,23 |
| **voluntarily** | 86:6 104:22 | **weiser** 1:3 6:5 | 118:15 120:14 |
| 17:12 | 105:3 122:20 | 41:15,16 42:10 | 120:20 121:9,9 |
| **w** | 131:24 152:2 | 42:11,18,19 43:3 | 122:1,1,9 123:1 |
| | 159:7,9 183:15 | 43:6,9,13,19 | 123:2,7,8,14,15 |
| **w** 21:17 | 235:14 270:17 | 44:2,2,4 47:16 | 123:21,24 124:4 |
| **wait** 186:5 | 290:24 311:7 | 49:19,19,23 50:2 | 124:16,19,24 |
| 187:16 | 319:3 | 50:12,12,16 51:1 | 125:14,18,20 |
| **waiting** 74:17,19 | **wanting** 278:18 | 51:17,22 55:2,8 | 127:9,17,17,22 |
| **waived** 5:6 | **wants** 128:8 | 55:10,12,12,17 | 127:23,24 129:8 |
| **walked** 133:9 | **warned** 235:8 | 55:23 56:20 | 129:13,15,15 |
| **walking** 25:21 | 247:5 | 57:3,19 58:4,11 | 130:14,14,21,21 |
| **wall** 205:19 | **warrant** 262:20 | 60:8,12,22,22 | 149:3 150:6 |
| 206:3,21 207:7 | **warrants** 284:6 | 61:6,8,10,20 | 151:1 152:10 |
| 208:7,10,12,15 | **watson** 320:14 | 62:2,8,8,15,16 | 154:22 156:19 |
| 208:23 209:17 | 320:19 | 63:16,24 65:16 | 164:23 165:11 |
| 211:8,15 212:8 | **way** 23:8 32:14 | 65:24 66:10,13 | 166:17,19,21 |
| 213:9 | 32:19 33:12 | 66:15,22 67:4,4 | 167:8 172:16,19 |
| **want** 9:18 24:21 | 38:22 86:11 | 67:12,13,15,15 | 172:23,24 174:9 |
| 34:15,17 37:5,6 | 104:4 106:9 | 67:20,20 68:4,11 | 174:14 175:14 |
| 37:22 39:23 | 116:24 120:16 | 68:21,22 69:1,12 | 175:20 176:18 |
| 40:1 63:13 | 122:13 126:4 | 69:24 71:17,21 | 177:11 181:5,15 |
| 67:10 69:8 70:8 | 128:6 167:17 | 71:24 72:6 74:8 | 183:16 184:13 |
| 71:2 73:1 78:20 | 170:6 178:12 | 75:18 76:13,19 | 184:13,16,19 |
| 78:23 79:3,4 | 186:4,9 218:3 | 77:20 79:23,23 | 186:18,19 |
| 80:15,18 98:9 | 257:10 270:2 | 80:15 87:19 | 189:17,18 192:7 |
| 101:20 104:17 | 272:7 | 88:9,17,17 89:3 | 194:1,2 195:5 |
| 114:5,6 122:18 | **ways** 96:1 113:1 | 89:8,8,13,14 | 197:5,5,14,15 |
| 133:5 148:8 | **we've** 63:11 | 90:4,4,13,13,22 | 201:5 205:4 |
| 152:22 181:4 | 81:10 103:21 | 91:1,1,10,15,17 | 209:1 210:7,8 |
| 193:12 194:16 | 254:12 299:10 | 92:4 93:24 | 211:9 212:9,10 |
| 199:2 219:3,7 | **website** 172:11 | 94:11,17 98:10 | 214:15 215:21 |
| 223:6 225:17,23 | 183:21 | 99:14,17 100:13 | 218:9 221:16 |
| 227:2 230:18 | **weekend** 60:1 | 100:24 104:2 | 231:22,23 232:3 |
| 244:19 297:18 | 65:1 | 105:12 106:12 | 236:16 237:3,7,7 |
| 297:19,21,22 | **weeks** 85:24 | 106:24 107:9 | 238:2,2,7,8,14 |
| 298:6,7 305:19 | 165:24 166:13 | 108:18,23 109:2 | 238:19,19 239:6 |

[weiser - wright]    Page 60

241:12,12,18,24
242:7,12 243:15
244:6,14 245:13
248:2 249:3
250:16,24 252:8
254:8 258:24
262:8,11,15
265:7 267:9
268:4,15 269:1,7
269:24 270:7
271:12 273:2
275:22,22 276:7
278:1 280:6
284:4 285:6,6
286:22 287:17
292:23,24
293:13,13,14
295:19 296:8,13
299:15 305:10
307:22 310:8,16
310:21 311:18
312:4,9 313:15
313:19 314:7,9
314:12,14,14,18
315:5,18,23
316:3 318:24
319:15 320:15
324:4 325:1
326:1
**weiser's** 59:8,19
60:20 193:5
211:10 239:6
248:7 280:6
314:21 319:1
**welcome** 31:22
**went** 95:20
162:1,3 183:3
218:22 250:19

250:21 256:10
257:2 266:2
281:12 298:12
306:19
**west** 17:2,7,15
263:2,15
**whatsoever**
42:10 123:17
134:13 177:21
310:4
**whistleblower**
303:8 311:6
**wholly** 13:17
141:21
**wiess** 299:8
**wife** 31:14
**wife's** 16:3
**willful** 96:19
**william** 299:9
**williams** 4:5
89:20 90:14
131:12 132:2,13
139:7,10,15
140:10,13 141:5
143:23 151:18
214:17 216:11
222:22 223:4,12
225:22 228:16
231:13,18 232:7
233:5,8 236:9
246:4,9 254:12
265:8 292:24
293:14
**willy** 193:14
**win** 112:17,18
112:18,19
**wire** 284:18,24

**wish** 190:1
**wishing** 91:19
**withdraw**
102:12 153:9
181:9,13
**withdrawn**
100:14 101:3
281:12
**withdrew** 103:2
**witness** 3:4 7:7
22:12 40:14
47:14 55:1 61:3
71:7 74:18 75:5
75:22 81:5
86:23 87:9
88:23 93:13
100:11 113:20
116:17 118:5,11
135:6 136:22
150:20 160:18
164:2 173:5,19
174:24 182:12
187:16 190:15
191:20 192:2,21
194:17 196:4,10
200:17 208:14
223:8 226:6
238:24 239:11
248:12,17 250:4
251:20 254:4
264:3,17 272:18
274:7 277:7
287:3,23 288:11
289:7 302:18
306:9 307:9,18
310:20 315:1,8
316:15 322:9
323:5 324:8,10

324:12,19
**wms** 214:16
254:11
**word** 46:12
143:2,4,9 148:7
**words** 7:9 24:21
44:4 65:8 68:8
101:11 142:10
181:4 255:22
**work** 56:24 71:3
107:14 136:19
158:13 162:8
179:12 195:21
200:11 202:9
262:19 285:13
286:9 296:17,18
297:23 304:8
**worked** 18:10,11
18:19 69:4
117:2,4 130:11
179:10 200:22
234:8
**working** 49:16
50:9,13 59:14,23
61:10 62:14,19
68:1,5 127:23
159:12 193:7
199:6 206:23
221:9 237:9,12
285:11
**works** 50:7
100:14 263:1
**worse** 83:22
**worst** 83:18
**wrap** 322:3
**wright** 235:21
236:2

**[write - zero]**                                              Page 61

**write**  84:22
  85:23 112:13
  133:8 138:21
  259:23 260:1,6
  264:10 265:5
**writes**  58:9 65:2
**writing**  60:20
  69:2,23 217:21
  274:21 278:6
  315:9
**written**  208:17
  242:4 261:10,13
  265:11 275:15
  285:23 286:1
**wrong**  34:2
  79:10 111:2
  113:1 134:7
  168:24 171:2
  227:11 228:10
  228:12 230:10
  230:12,16
  275:18
**wrote**  68:4 83:17
  222:13 242:2
  260:12 264:6,8
  300:11 314:4

**x**

**x**  3:2,12 4:2
  25:17 301:20
**xm**  41:3 95:14
  96:8,9
**xm's**  96:19

**y**

**y**  19:20
**yahoo.com**
  233:4

**yahoo.com.**
  231:12
**yates**  217:16,17
**yeah**  17:14 23:8
  25:19 31:10
  34:10 41:22
  42:8 49:4,7 70:6
  88:10 98:16
  105:2,5 126:21
  127:1 130:24
  148:15,15
  149:24 150:2
  160:21 174:24
  178:18 186:7
  187:12 190:1
  192:17 194:8,8,9
  202:4,23 204:15
  210:2 215:24
  224:23 226:2
  230:16 234:13
  248:17 262:1
  269:9 280:18
  287:3,4 289:7,16
  292:14 294:8
**year**  16:8 30:9
  33:13 34:14
  36:3 45:21
**years**  15:14 16:9
  17:22,23 19:2,5
  22:19 30:10
  83:14 99:19
  111:19 130:9
  227:9 242:13
  279:19 309:4
**yep**  227:3 277:17
**yesterday**
  155:20

**york**  24:10,13
  97:19 101:6
  102:11 152:2
  202:13 204:7,22
**younger**  161:9
**ypsilanti**  227:3

**z**

**zero**  252:10

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

EXHIBIT 37

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted
fashion to authenticated parties who are permitted to
access the material. Our data is hosted in a Tier 4
SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and
State regulations with respect to the provision of
court reporting services, and maintains its neutrality
and independence regardless of relationship or the
financial outcome of any litigation. Veritext requires
adherence to the foregoing professional and ethical
standards from all of its subcontractors in their
independent contractor agreements.

Inquiries about Veritext Legal Solutions'
confidentiality and security policies and practices
should be directed to Veritext's Client Services
Associates indicated on the cover of this document or
at www.veritext.com.

EXHIBIT 37
1500

# EXHIBIT 38

EXHIBIT 38
1501

Page 1

```
 1           IN THE UNITED STATES DISTRICT COURT

            FOR THE EASTERN DISTRICT OF PENNSYLVANIA

 2

 3      THE WEISER LAW FIRM, P.C.,: CIVIL ACTION

              and              :

 4      ROBERT B. WEISER, ESQUIRE :

                               :

 5          vs.              : NO.: 2:19-CV-02728-KSM

                               :

 6      MICHAEL HARTLEIB       :

 7                          ------

 8              Thursday, November 17, 2022

 9                      DAY II

10                          ------

11              Oral deposition of MICHAEL HARTLEIB,

12      held at the law offices of SILVERANG ROSENZWEIG

13      HALTZMAN, LLC, Woodlands Center, Suite 300, 900

14      East Eighth Street, King of Prussia, Pennsylvania,

15      beginning at 10:00 a.m., on the above date, before

16      Jan Singer Brooks, Court Reporter and Notary

17      Public.

18                          ------

19              VERITEXT COURT REPORTING

                    1801 Market Street

20                    Suite 1800

21          Philadelphia, Pennsylvania 19103

22

23

24                          ------
```

Page 2

APPEARANCES

1
2
3
4    SILVERANG ROSENZWEIG HALTZMAN, LLC
5    BY: PHILIP S. ROSENZWEIG, ESQUIRE
6    Woodlands Center, Suite 300
7    900 East Eighth Street
8    King of Prussia, PA 19406
9    ph: 610.263.0115
10   prosenzweig@sanddlawyers.com
11   Counsel for Plaintiff
12
13
14   GOLDBERG MILLER & RUBIN, P.C.
15   BY: EAMON C. MERRIGAN, ESQUIRE
16   121 South Broad Street
17   Suite 1600
18   Philadelphia, PA 19107
19   ph: 215.735.3994
20   emerrigan@gmrlaw.com
21   Counsel for Defendant
22
23
24         ------

Page 3

INDEX

1
2
3    WITNESS: Michael Hartleib
4            EXAMINATION
5                          PAGE
6    By Mr. Rosenzweig          5
7
8          ------
9          EXHIBITS
10

| NO. | DESC. | PAGE |
|---|---|---|
| Exhibit 23 | Amicus Curiae Brief | 6 |
| Exhibit 24 | Motions Hearing | 40 |
| Exhibit 25 | 2/22/18 E-Mail | 50 |
| Exhibit 26 | E-Mail Chain | 56 |
| Exhibit 27 | 3/13/18 E-Mail | 79 |
| Exhibit 28 | E-Mail Chain | 90 |
| Exhibit 29 | E-Mail Chain | 92 |
| Exhibit 30 | 11/6/18 E-Mail | 94 |
| Exhibit 31 | Motion for Acceptance of Amicus Curiae Brief | 96 |
| Exhibit 32 | 3/22/18 E-Mail | 108 |
| Exhibit 33 | 4/5/18 E-Mail | 112 |

Page 4

EXHIBITS  (Continued)

| NO. | DESC. | PAGE |
|---|---|---|
| Exhibit 34 | Answer | 122 |
| Exhibit 35 | 8/17/18 E-Mail | 135 |

19         ------

Page 5

1          - - -
2          PROCEEDINGS
3          - - -
4          (It is hereby stipulated and agreed
5    by and among counsel for the respective
6    parties that the filing, sealing and
7    certification of the deposition are waived;
8    and it is agreed that all objections, except
9    as to form, are reserved until the time of
10   trial.)
11         - - -
12         MICHAEL HARTLEIB, after having been
13   first duly sworn, was examined and testified
14   as follows:
15         - - -
16         EXAMINATION
17         - - -
18   BY MR. ROSENZWEIG:
19       Q.  Good morning, Mr. Hartleib.  You have
20   had just been re-sworn.  You are under oath as you
21   were yesterday and I am going to presume that I do
22   not need to give you the instructions that I gave
23   you yesterday again.  Is that fair?
24       A.  That's fair.

2 (Pages 2 - 5)

Page 6

1    Q.  Just a reminder, it's very important
2  that you understand my question and that, you
3  know, you either indicate that you don't
4  understand it, in which case I will ask a
5  different or better question, but if you answer
6  the question I have posed we are all going to
7  presume that you have understood it.  That's the
8  only thing I wanted to reiterate.  And thank you
9  for your attendance here on Day 2 of your
10  deposition.
11        I would like to start by turning
12  your attention to what is Tab No. 26.  And I am
13  going to mark Tab No. 26 as Hartleib-23.
14        (Exhibit No. Hartleib-23, Amicus
15    Curiae Brief was marked for identification.)
16  BY MR. ROSENZWEIG:
17    Q.  Mr. Hartleib, please get to Tab 26.  We
18  have marked it at Hartleib-23 and I'm going to
19  have some questions but please acquaint yourself
20  with that document.
21    A.  Yes.
22    Q.  Yes, meaning?
23    A.  I'm ready.
24    Q.  You're ready.  Thank you.  And what is

Page 7

1  Hartleib-23 generally?
2    A.  An amicus brief.
3    Q.  Okay.  And --
4    A.  Drafted by myself.
5    Q.  Okay.  And if you look at the very last
6  page of the brief itself, Page 17, is that your
7  signature as the submitting party?
8    A.  Yes, it is.
9    Q.  And if you look at the very last page of
10  the document, which is a Certificate of Service,
11  is that your signature as the -- to the
12  Certificate of Service regarding on whom you
13  served the amicus brief?
14    A.  Yes, it is.
15    Q.  Okay.  This amicus brief was submitted
16  by you in the CenturyLink litigation, correct?
17    A.  Yes.
18    Q.  Were you at the time of this amicus
19  brief a shareholder in CenturyLink?
20    A.  I believe so, yes.
21    Q.  Okay.  And --
22    A.  I believe I still am but I believe the
23  name has changed in the corporation.
24    Q.  Okay.  So you anticipated my next

Page 8

1  question which is you believe you remain an
2  interest holder in that entity which may be known
3  as a different entity at this point?
4    A.  Yes, I believe so.
5    Q.  Okay.  But specifically at the time of
6  the filing of this amicus brief by you, you were a
7  shareholder in CenturyLink Residential Customer
8  Billing or whatever that specific entity was?
9    A.  I believe so.  I don't know if that was
10  the actual name but yes, I believe so.
11    Q.  Okay.  And how did you become aware that
12  there was -- strike that.
13        Was this litigation a derivative
14  shareholder suit?
15    A.  I believe so, yes.
16    Q.  Okay.  And how did you become aware of
17  the CenturyLink derivative litigation?
18    A.  I don't recall.
19    Q.  Okay.  But it's fair to say that at some
20  point you became aware of it?
21    A.  Yes.
22    Q.  And when you became aware of the
23  CenturyLink derivative litigation did you become
24  aware that the Weiser Law Firm was a -- was

Page 9

1  counsel or one of the counsel for derivative
2  shareholders in that case?
3    A.  Yeah, I believe so, yes.
4    Q.  Okay.
5    A.  I mean they were listed -- so if you
6  look at the Certificate of Service, I would have
7  obtained those names of those firms from the
8  docket.
9    Q.  Okay.  And can you tell me the date of
10  this amicus filing?  I have the document.
11    A.  No, I don't know the date of the
12  document.  But it says that there was a
13  forthcoming hearing 3/6/19.  So I would assume it
14  was around that time or prior to 3/6/19.
15    Q.  Very good.  Can I also turn your
16  attention to the Certificate of Service which --
17    A.  3/5/19.
18    Q.  Okay.  So since you served it on the
19  parties listed in the Certificate of Service on
20  3/5/19 according to your certificate, do you
21  believe that that's probably the date of the
22  filing?
23    A.  That day or the following day, yes, I
24  would imagine.

3 (Pages 6 - 9)

1      Q.  Okay.  And at the time you made this
2   amicus filing were you aware that a hearing
3   regarding competing motions for appointment of
4   lead counsel had been scheduled for March 6 of
5   2019?
6      A.  I don't know that I was aware of the
7   date of appointment.  I think I was aware that
8   there was a forthcoming hearing to decide lead
9   plaintiff in the case.
10     Q.  Okay.
11     A.  Lead plaintiff counsel in the case.
12     Q.  And specifically what was the purpose of
13  your filing of the amicus brief?
14     A.  To provide the Court information that it
15  may deem relevant while rendering its decision to
16  appoint lead plaintiff counsel.
17     Q.  And was it your understanding that it
18  was the Robbins Arroyo firm that had filed an
19  application for appointment as lead counsel?
20     A.  I'm going back.  You're testing my
21  memory.  But I believe there was another firm that
22  was seeking lead.  I believe this was a multi
23  jurisdictional case and I believe the Robbins firm
24  was seeking lead as the multi jurisdictional lead

1   counsel that would lead all jurisdictions in the
2   case.
3      Q.  Okay.  And you have previously testified
4   about a law firm that begins with the name
5   Robbins.  Can you remind me of what that name is?
6      A.  Well, it used to be Robbins Umeda and
7   Fink.  Then it became several other iterations of
8   multi partners' names.  Now I believe it's ended
9   up just being Robbins, LLP.
10     Q.  Okay.  So Mr. Hartleib, to your
11  knowledge, the various firms that all begin with
12  Robbins, are they all the same firm that have --
13  that has evolved over time and whose name has
14  changed?  What is your understanding?
15     A.  So my understanding, as was Robbins
16  Umeda and Fink, the same firm, different name,
17  Robbins Umeda.  There was some iteration prior to
18  Robbins Umeda.  And then ultimately it ended up
19  Robbins.  Those are all the same firm with
20  different partners -- or I don't know if their
21  structure is the same so I can't swear under oath
22  that it's the same firm.  It could be a different
23  corporation.  I don't know.
24          And then the only other caveat I

1   would give is that Robbins Geller is a completely
2   different firm and, in my personal opinion, a
3   better firm.
4      Q.  Okay.  And Robbins Arroyo, which is one
5   of the service parties on this amicus brief if you
6   look at your Certificate of Service, is that an
7   iteration of Robbins Umeda and Fink?
8      A.  I believe so, yes.
9      Q.  Okay.  And I understand that you are not
10  testifying with any inside knowledge of the exact
11  corporate structures of these firms but that
12  the -- we could trace the Robbins Umeda and Fink
13  firm through its various iterations and names
14  which would include at some point Robbins Arroyo?
15     A.  Yes.
16     Q.  All of which are distinct and separate
17  from Robbins Geller?
18     A.  Yes.
19     Q.  Okay.  So was your opinion of the
20  Robbins Arroyo firm, Mr. Hartleib, essentially the
21  same as your opinion of the Robbins Umeda and Fink
22  firm, and let's be specific, at the time you filed
23  this amicus brief?
24          MR. MERRIGAN:  Object.

1          But you can answer if you follow.
2      A.  I had issues with the Robbins Umeda and
3   Fink firm and, in particular, Mr. Jeffrey Fink.
4   In fact, I was in contact with the Department of
5   Justice and U.S. attorneys, the same U.S.
6   attorney, Richard Robinson, that convicted Melvyn
7   Weiss and William Lorack and put them in the
8   federal penitentiary.  I had multiple
9   conversations with that U.S. attorney.
10     Q.  Who is who?
11     A.  Richard Robinson.
12     Q.  Thank you.
13     A.  Shortly thereafter, Mr. Fink was no
14  longer a partner at that firm -- or no longer a
15  named partner at the firm.  I don't know what
16  happened at the back end, if he was an owner of
17  the firm, I don't know.  So I suspect it had
18  something to do with my concerns and the
19  allegations that I brought to Mr. Robinson's
20  attention but I don't know that for a fact.
21          So I would say that I had a higher
22  level of grievance with Mr. Fink when Mr. Fink was
23  part of that firm, but I still do not have a high
24  opinion or high regard for the Robbins firm, or

4 (Pages 10 - 13)

1  Robbins Arroyo, formerly known as Robbins Arroyo.
2      Q.  Thank you.  I think you have answered my
3  question.
4          What was your understanding of the
5  role that Robbins Arroyo played in the
6  Sprint/Nextel derivative litigation?
7      A.  I don't know specific facts about the
8  structure of who was handling the lead in sprint.
9  I know that your client, that the Weiser Law Firm
10 was the one making appearances at the Court,
11 although Robbins was there.  They were there.
12 They weren't addressing the Court.  So to me the
13 Weiser firm was taking the lead in the case.
14         I strongly suspected that Robbins,
15 and I still do, had a very big hand in what went
16 on with all of the drafting of the pleadings, et
17 cetera, et cetera.  I believe that Robbins carries
18 a very big stick.  I believe that 90 percent of
19 the cases that I have experienced Robbins
20 controls.  I believe that's because of the power
21 of the Robbins Geller firm.
22     Q.  Which is a separate firm?
23     A.  Which is a separate firm.
24     Q.  And why do you believe that the power of

1  Robbins Geller influences the power of Robbins
2  Arroyo?
3      A.  Because the way these derivative cases
4  work, there is something that I have dubbed
5  "Piggyback Litigation."  So there is generally a
6  class action or securities 10b-5 Class Action
7  that's filed by a firm, most often Robbins Geller.
8  There's an agreement made to share the real work
9  that's done in the case, the real discovery that's
10 done in the case.  There's an agreement to share
11 all of that discovery with the Robbins firm, which
12 happens to be his brother.  That discovery is
13 reviewed and, as you see, millions of dollars are
14 charged for that document review but it leads to
15 no meaningful reform or relief in many cases.
16         So I believe that Robbins Geller,
17 since they are the ones that share the
18 discovery -- and the plaintiff's bar with regard
19 to derivative litigation is a pretty small circle.
20 And I have spoke with many attorneys that will not
21 do anything to cross the Robbins firm for fear
22 that they will be locked out of cases, that they
23 will not be included, that no work will be sent
24 their way.

1      Q.  With respect to the Sprint/Nextel
2  derivative action, was it your understanding that
3  Robbins Arroyo was the firm that hosted the
4  document review process through the relativity
5  platform that they controlled in which process
6  Jeffrey Silow was a document reviewer?
7      A.  Yes, I believe that there were sworn
8  affidavits from Mr. Aguilar and others that he
9  oversaw the document review in his offices.  So,
10 yes, I believe there was sworn testimony from
11 multiple parties that it was their relativity
12 software system and that they were in control of
13 said software.
14     Q.  Do you have any information to
15 disbelieve, that would cause you to disbelieve or
16 discredit that position?
17     A.  Well, other than there's been perjury
18 committed in the case on a myriad of ways.  I mean
19 a sworn declaration or sworn affidavit loses some
20 of its credibility when there's been false
21 declarations filed.
22     Q.  You're not suggesting that Mr. Aguilar
23 filed any false declarations or statements, are
24 you?

1      A.  I don't know one way or another.
2      Q.  Okay.  And the false declarations or
3  statements to which you refer are that of Jeffrey
4  Silow/Alexander J. Silow?
5      A.  That's one of them.  I believe that some
6  of the other declarations, possibly even Mr.
7  Aguilar's, were not truthful as well.
8      Q.  Okay.  Can you tell me with specificity
9  why you think other declarations were not
10 truthful?
11     A.  I think that even Judge Vano took issue
12 with the time logs and didn't believe -- said that
13 they were not remotely accurate or credible, which
14 means, henceforth, they were fraudulent or false,
15 right.  So if Mr. Aguilar is swearing to those
16 hours and those time logs and Judge Vano finds
17 them highly suspect, I would have to say that I
18 find them suspect as well.
19         So you're asking me do I believe
20 Mr. Aguilar's sworn statement that those billings
21 records are true and accurate.  No, I don't.
22     Q.  With respect to the issue of the billing
23 records, correct?  I mean that's your focal point
24 in what you do not find credible?

5 (Pages 14 - 17)

Page 18

1     A.   Well, that's the question you just asked
2   me.  I'm responding to your question.
3     Q.   My question was broader.  I want to make
4   sure I just understand your answer.  So the lack
5   of credibility you find in various sworn
6   statements in the Sprint/Nextel case relates to
7   the Silow billing records in the document review
8   process.  Is that fair?
9     A.   They include the Silow billing records.
10    Q.   So what else subject matter-wise do you
11  find not credible in any of the filings or sworn
12  statements filed in the Sprint/Nextel litigation
13  other than the Jerry Silow/Alexander J. Silow
14  filing in and of itself?
15    A.   I would have to have all of the
16  affidavits and sworn declarations in front of me
17  and go through them and tell you.  For example,
18  Layn Phillips.  Layn Phillips filed sworn -- Judge
19  Phillips filed sworn declarations in the case.  I
20  find all of these sworn statements of varying
21  support for $4.5 million in fees for illusory work
22  that was done, according to Judge Vano, I find all
23  of that troubling and I question the veracity of
24  honesty of all of those declarations.

Page 19

1     Q.   In the context of your amicus brief
2   filing did you have any understanding as to
3   whether the Weiser Law Firm was seeking
4   appointment as lead or co-lead counsel in the
5   CenturyLink derivative litigation along with
6   Robbins Arroyo?
7     A.   I don't know that I had any specific
8   understanding of that, no.  I just know that the
9   Weiser Law Firm was listed on the docket so that
10  they were involved in the case.  I think, like I
11  have said repeatedly and testified to, I think
12  that many of these firms work hand in glove.  They
13  operate as one.  How they chop up the money on the
14  back end or all of these things, that's why I used
15  the term racketeering.  If you're doing something
16  nefarious and you're all working together to do,
17  you know, the nefarious acts and then you are all
18  collecting money or splitting the money up
19  different ways, I think that these firms operate
20  hand in glove and oftentimes operate as one.
21    Q.   Okay.  And that is based on your
22  conclusion that the derivative litigation
23  practice, in general, is nefarious; is that fair,
24  the very nature of the derivative shareholder

Page 20

1   litigation practice?
2     A.   I think that there are major issues with
3   the whole process regarding derivative litigation.
4   My opinion of these firms working together is what
5   I have witnessed over the last 15 years having to
6   defend my interest in cases whereby they were
7   counsel in said cases.
8          So it's my personal experience and
9   my hands-on experience in dealing with these firms
10  that I come to that conclusion, apart from the
11  overall concerns I have with regard to derivative
12  litigation, the lack of a real agreed party, the
13  lack of real plaintiffs and the fact that the
14  majority of cases are lawyer driven with little or
15  no relief for the corporation or its shareholders
16  derivatively.
17    Q.   If you look at the document that I
18  marked as Hartleib-23.  And I just want you to
19  look at the caption page so you don't have to flip
20  through it.  Again, it's Tab 26.  It's your amicus
21  brief.  Take your time.
22    A.   You confused me.  I was there.  Okay.
23    Q.   Yes, you were.  I want to turn your
24  attention to the heading of the brief.  It reads

Page 21

1   "Amicus Curiae Brief of Shareholder Michael
2   Hartleib and Concerned Citizen."  That concerned
3   citizen is also you, right?
4     A.   Correct.
5     Q.   "In Opposition of the Appointment of
6   Robbins Arroyo and the Weiser Firm, et al., As
7   Lead Counsel in the Consolidated Derivative
8   Action."
9          Did I read that correctly?
10    A.   Yes.
11    Q.   Why do you state Weiser firm, et al.?
12    A.   Because, like I said, all of -- a lot of
13  these firms work together.  It's very difficult
14  for a lay person to even know all of the firms
15  that are in a case, what docket to file on.  You
16  may have -- in this situation, this was a multi
17  jurisdictional case.  So there were cases in
18  Minnesota, there were cases in Delaware if I
19  recall, there were cases in other states also.  So
20  it's extremely difficult to ascertain which firms
21  are in which cases.  And I didn't know if the
22  Weiser firm was seeking lead, I didn't know if
23  Robbins Arroyo was seeking lead.  I didn't know
24  who was seeking lead.

6 (Pages 18 - 21)

Page 22

1    I had problems with two or three
2  other firms that were in the Sprint case as well.
3    Q.  Okay.  So I want to understand from you,
4  Mr. Hartleib, why you always name the Weiser Firm,
5  et al., and why in this instance you chose --
6  since you didn't know who was seeking lead or
7  co-lead, why you felt it appropriate to name the
8  Weiser Firm, et al., as opposed to any other firm
9  et al.?
10    MR. MERRIGAN:  Objection.
11    You can answer.
12    A.  Because I'm bringing information to the
13  Court that involves the Weiser firm, the Robbins
14  Arroyo firm and like four or five other firms that
15  were in the Sprint case.  They are all culpable as
16  well.
17    Q.  Culpable in what?
18    A.  In the fraud that took place in Kansas.
19    Q.  In the Sprint/Nextel litigation?
20    A.  Correct, or may be culpable.  Like I
21  said, I don't know what goes on behind the scenes.
22  I didn't get a single e-mail in discovery from
23  your clients that mentioned my name which is
24  remarkable.

Page 23

1    Q.  Okay.  Which is also non responsive to
2  the question.  So, please just answer the question
3  I have posed.
4    And I have one follow-up question,
5  which is in your mind isn't there a difference
6  between may be culpable and is culpable even if
7  you're correct that there was, and I will use your
8  term although I dispute it highly, a "fraud"?
9    A.  Sure.  But without knowing what was
10  going on on the back end, which I have no insight
11  to because we didn't get any documents in
12  discovery, I don't know how culpable the other
13  firms were.
14    Q.  Okay.  So Mr. --
15    A.  I didn't see outrage coming from the
16  other firms.  I didn't see anybody file anything
17  on the docket as to the outrage as to what
18  transpired in the Sprint case.  I didn't see Judge
19  Phillips, a former federal judge, a presidential
20  appointee, redact his sworn the declaration
21  supporting the $4.5 million fee request when he
22  found out that it was -- that fraud had taken
23  place in the Court.  Mr. Phillips didn't reach out
24  to the Court and say hey, I take all this back, I

Page 24

1  didn't understand or didn't realize that.
2    Q.  Okay.  So Mr. Hartleib, you keep
3  testifying about not getting, you know, e-mails in
4  discovery.  You are talking about in the present
5  case, right?
6    A.  Yes.
7    Q.  And the present case long succeeds when
8  you filed this amicus brief in the CenturyLink
9  case, right?
10    A.  Yes, but you're asking me specific
11  details of the culpability of the other firms, the
12  other four or five firms that were in the
13  Sprint/Nextel case.  I don't have the answer for
14  you.
15    Q.  Okay.  But at the time you filed this
16  amicus brief --
17    A.  Yes.
18    Q.  -- okay, which we agree is around
19  March 5 or 6 -- you served it on March 5, 2019,
20  right?
21    A.  Yes.
22    Q.  You didn't know what the culpability was
23  regarding the Weiser Law Firm or the Robbins
24  Arroyo Law Firm or any law firm with respect to

Page 25

1  the Sprint/Nextel/Jeff Silow billing issue?
2    MR. MERRIGAN:  Object.  It's been
3  asked and answered.
4    You can answer it again.
5    A.  Well, I think we knew quite a bit at
6  that point in time.  We had Judge Vano's rulings.
7  BY MR. ROSENZWEIG:
8    Q.  Who is the "we"?
9    A.  Shareholders.
10    Q.  Okay.
11    A.  The corporation.  I knew of Judge Vano's
12  rulings.  I knew of the Silow situation.  I was
13  informing the Court of things that transpired in
14  the Sprint litigation in Kansas, including the
15  Appellate Court.  At this time I don't know if the
16  syllabus -- if the ruling had come down from the
17  Appellate Court or not.
18    Q.  I would like to turn your attention to
19  Page 11 of Hartleib-23, please, the first full
20  paragraph on Page 11.  And I quote the part that I
21  would like you to pay attention to.  "Wiser and
22  Robbin," singular, "Arroyo et al. would stop at
23  nothing to protect their criminal enterprise, I
24  was subjected to repeated character attacks as I

7 (Pages 22 - 25)

Page 26

1 exposed their duplicitous acts and conspiracies
2 against the Court."
3          Do you see that?
4     A.  Yes.
5     Q.  What criminal enterprise are you
6 referring to in that sentence, what criminal
7 enterprise?
8     A.  My opinion is when you are using
9 disbarred attorneys to bill millions of dollars in
10 fees for illusory work, that's -- and committing
11 fraud upon the Court filing perjurious
12 declarations, that's the criminal enterprise that
13 I am speaking of.
14     Q.  And it is your conclusion that that
15 constitutes a criminal enterprise?
16          MR. MERRIGAN:  That's just the same
17     question asked another way.
18     A.  Yes.  The answer is yes.
19          MR. MERRIGAN:  Again, it's been
20     asked and answered.
21          You can answer it again, Michael.
22 BY MR. ROSENZWEIG:
23     Q.  On Page 2 of the same document,
24 Mr. Hartleib, could you turn to that?

Page 27

1          MR. MERRIGAN:  Two you said?
2          MR. ROSENZWEIG:  Two, yes.
3 BY MR. ROSENZWEIG:
4     Q.  You state, "Their duplicitous acts have
5 included the use of the following as Plaintiffs,
6 deceased parties, friends and family members which
7 lacked standing, and paid serial criminal
8 Plaintiffs like that of the infamous firm, Milberg
9 Weiss."
10     A.  Mm-hmm.
11     Q.  What knowledge do you have of the use of
12 diseased parties as plaintiffs --
13     A.  So --
14     Q.  -- at the time you filed this amicus?
15 What knowledge did you have of that?
16     A.  So one of the attorneys that was in this
17 case -- Bruce Murphy as well.  So one of the
18 attorneys --
19          MR. MERRIGAN:  In which case,
20     Michael?
21     A.  In the Sprint case has direct ties --
22 actually two of the attorneys have -- or more than
23 that have direct ties to the convicted felons
24 William Lorack and Melvyn Weiss.  They were in a

Page 28

1 myriad of cases with those two attorneys.  In
2 fact, they have provided plaintiffs to those firms
3 in a myriad of cases.
4     Q.  And who are those attorneys?
5          MR. MERRIGAN:  I will give you the
6     same instruction I gave you yesterday,
7     Michael.
8     A.  They are in the, they are in the Sprint
9 case without naming names.
10 BY MR. ROSENZWEIG:
11     Q.  Okay.  Well, I will ask you this and I
12 think I'm entitled to an answer to this.  Are
13 those attorneys Rob Weiser or any attorney from
14 the Weiser Law Firm?
15     A.  Not to my knowledge.
16     Q.  Okay.  So --
17     A.  With the exception of Jeffrey Silow.
18     Q.  You have information that Jeffrey Silow
19 used deceased parties as plaintiffs in duplicitous
20 acts?
21     A.  I have information that Jeffrey Silow
22 worked with or for or was involved in cases with
23 Melvyn Weiss and William Lorack.
24     Q.  Okay.  And do you, therefore, believe

Page 29

1 that any attorney who worked with Melvyn Weiss or
2 William Lorack in any variety of past cases is,
3 therefore, implicated in the acts that they
4 committed for which they were criminally
5 prosecuted and convicted?
6          MR. MERRIGAN:  Objection.
7          But you can answer.
8     A.  No.
9 BY MR. ROSENZWEIG:
10     Q.  And with respect to your statement, "and
11 paid serial criminal Plaintiffs like that of the
12 infamous firm Milberg Weiss," to whom are you
13 referring and what knowledge did you have that
14 that occurred at the time you filed this amicus
15 brief?
16     A.  Same answer.  There were at least two
17 attorneys that are involved -- that were involved
18 in the Sprint litigation that have used family
19 members, wives, other attorneys.
20          I guess the easiest thing for me to
21 do would be to direct you to Jessica Erickson's
22 Law Journal published article regarding derivative
23 litigation and the serial plaintiffs in derivative
24 litigation.  I worked with her for over a year and

8 (Pages 26 - 29)

1  a half to help her write that article or give her
2  information regarding derivative litigation.
3      Q.  At what point in time?
4      A.  I don't recall.  We would have to look
5  at the date that it was published.  But it was the
6  year, year and a half prior to the publishing date
7  of that Law Journal article.
8      Q.  Okay.  So let me ask you this.  With
9  respect to "paying serial criminal plaintiffs like
10 that of the infamous firm Milberg Weiss," did you
11 have any information at the time of the filing of
12 this amicus brief that included -- that that --
13 two thats -- that that included Robert Weiser or
14 the Weiser Law Firm or any of its lawyers?
15     MR. MERRIGAN:  I am going to note
16     an objection because I'm not sure I followed
17     the question.
18         But if you understand it you can
19     answer.
20     A.  I don't have any direct information with
21 regard to Robert Weiser.  I think that it pertains
22 more to another firm in the case.
23 BY MR. ROSENZWEIG:
24     Q.  Okay.  So would your answer then apply

1  to both Robert Weiser and the Weiser Law Firm that
2  you don't have specific information?
3      A.  I don't know.  I mean I don't know.
4      Q.  You also in -- still on Page 2 of
5  Hartleib-23.  You state, "These firms fee split,
6  interchange Plaintiffs, seek those that are
7  compromised to generate thousands of billable
8  hours for illusory work, submit fraudulent time
9  logs and seek hundreds of millions in unjust fees
10 in cases across the country."
11         Do you see that language?
12     A.  I do.
13     Q.  Did I read it correctly?
14     A.  Yes.
15     Q.  What information or belief did you have
16 at the time you filed this amicus brief with
17 respect to that statement regarding the Weiser Law
18 Firm or Rob Weiser other than with respect to
19 Sprint/Nextel and Jeff Silow about which you have
20 testified?  I don't expect you to --
21     A.  I believe that this is standard
22 operating procedure for most firms.
23     Q.  Okay.  What specific information did you
24 have that applies that statement in your amicus

1  brief to Rob Weiser or the Weiser Law Firm at the
2  time you filed the amicus brief?
3      A.  Well, this wasn't specifically directed
4  at just Rob Weiser.
5      Q.  But it was directed at Rob Weiser and
6  the Weiser Law Firm amongst others?
7      A.  That's right.
8      Q.  So I'm asking you specifically what
9  information, facts did you have at the time you
10 filed this amicus brief that that statement and
11 its allegations applied to Rob Weiser and/or the
12 Weiser Law Firm other than your allegations
13 regarding Jeffrey Silow, his billing and the
14 Sprint/Nextel case?
15     A.  Like I said, some of these statements
16 are directed at my ten or 15 years of research and
17 experience with other firms in this case who work
18 hand in glove with your client's firm.  So the
19 statement was directed at all of the parties, not
20 just your clients.
21     Q.  But it included my clients, correct?
22     A.  Yes.
23     Q.  Okay.  Let me move you on to going back
24 to Page 8, please -- or going to Page 8.  And I

1  want to draw your attention -- my apologies.  It's
2  Page 9, the next page, Mr. Hartleib.
3         You make a statement that -- and
4  this is the first paragraph that begins Judge
5  Davis.  Four lines down, end of Line 5 I quote.
6  "Mr. Jeffrey Mark Silow has worked for the Weiser
7  and Robbins Arroyo, et al. firms for over ten
8  years, billing likely more than $100 million in
9  illicit fees, in a multitude of cases across the
10 country."
11         Do you see that statement?
12     A.  Yes.
13     Q.  Is that speculation on your part?
14     A.  Sure.  I don't have exact dollar
15 amounts.
16     Q.  Okay.
17     A.  But if he billed 1.7 million in the
18 Sprint case and he has been in, you know, many,
19 many cases for your client's firm and other firms
20 billing similar amounts all while being disbarred,
21 I thought that that was an achievable sum or
22 reasonable sum.
23     Q.  So that was your estimate?
24     A.  Yes.

9 (Pages 30 - 33)

Page 34

1    Q.  The billing in the Sprint/Nextel case of
2  Mr. Silow occurred over what period of time?
3    A.  I don't recall over what period of time.
4  A year or two, or two years maybe.
5    Q.  The 6,905 hours was over a period of
6  time that as you sit here today you don't recall?
7    A.  It was, it was I think two years or so.
8    Q.  Any other facts on which you based your
9  statement regarding the "billing likely more than
10  $100 million in illicit fees"?
11    A.  Well, no.  But you can see that it says
12  "billing likely more than."  So it's not a
13  definitive or finite number.  It was -- it reads
14  as an estimate or a guesstimate.
15    Q.  I want to turn your attention to the
16  next paragraph on Page 9.  This paragraph broadly
17  pertains to Mr. Silow, correct?
18    A.  It appears so, yes.
19    Q.  Okay.  And if you carry over to the next
20  page, the remainder of that paragraph on Page 10
21  which is most of Page 10 also relates to
22  Mr. Silow, correct?
23    A.  Yes, it appears so.
24    Q.  You state in this filing, Page 10,

Page 35

1  starting on Line 15, "Alexander Silow is a former
2  Deputy District Attorney of West Chester County PA
3  and on information and belief knew of his father's
4  criminal activities and is likely complicit."
5        What facts did you have at the time
6  you wrote this in your amicus brief that Alexander
7  Silow knew of his father's criminal activities and
8  is likely complicit?
9    A.  I don't recall what facts I had but my
10  instinct or intuition and the facts that I did
11  have at the time leads me to believe even to this
12  day, especially after the depositions were taken,
13  that Alexander knew of his father's business
14  dealings.
15    Q.  After the fact or at the time they were
16  occurring?
17    A.  Both.
18    Q.  And other --
19    A.  My convictions to that statement are,
20  are -- I am even more convinced that he knew of
21  his father's business dealings.  I mean his father
22  is a life-long criminal.
23    Q.  On what facts do you base -- did you
24  base your statement in this amicus that I just

Page 36

1  read, that Alexander Silow "knew of his father's
2  criminal activities and is likely complicit" at
3  the time you wrote this and filed it?
4    A.  I think I answered it.  The same facts
5  that I used to inform Judge Vano that I strong --
6  on information and belief I strongly suspected
7  fraud in the case.  Some of it's intuition, some
8  of it's years worth of research and business
9  dealings with said firms.
10    Q.  And with respect to Alexander Silow, is
11  there anything else that you want to share that
12  led to your assertion in your amicus brief?
13    A.  Yes, there is.  I don't know that I can
14  share it.  Can I share discussions that were
15  privileged with a detective who happened to know
16  Alexander Silow and the information that he told
17  me about Alexander Silow?
18    Q.  I don't know why that would be
19  privileged.
20        MR. MERRIGAN:  I'm not aware of any
21     privilege.  Perhaps the detective might not
22     be able to reveal things you said to him but
23     I'm not aware of any other -- I'm not aware
24     of it applying the reverse.

Page 37

1  BY MR. ROSENZWEIG:
2    Q.  So if you have that information,
3  Mr. Hartleib, I'm asking for you to tell me now.
4    A.  The only thing I will tell you is I had
5  lengthy conversations with Detective Goggins.
6  Detective Goggins knew Alexander Silow.  He worked
7  with him and did not have a very high opinion of
8  him.
9    Q.  And how did that lead to the assertion
10  you made in your amicus brief that Alexander Silow
11  knew -- and again, I want to get the language
12  precise -- "knew of his father's criminal
13  activities and is likely complicit"?
14    A.  Well, it says "on information and
15  belief."  It's my belief, it's my belief that he
16  knew.
17    Q.  Okay.  And what is your information that
18  he knew?
19    A.  I just gave it to you.  That's all I'm
20  going to give you at this point in time.
21    Q.  Well, if you have more information --
22    A.  That's all I recall.
23    Q.  Okay.  Well, that's adorable.  It would
24  be interesting to see how Mr. Alexander Silow

10 (Pages 34 - 37)

Page 38

1  feels about that but okay.
2        I'm going to ask you a point blank
3  question. Do you have other information from
4  Detective Goggins that relates to my question that
5  you are not sharing?
6    A. Not that I recall.
7        MR. ROSENZWEIG: Okay. Let's move
8  on to Tab 27, which I will mark as
9  Hartleib-24.
10       MR. MERRIGAN: So are you
11  conducting discovery in this case or are you
12  conducting discovery for Alexander Silow?
13       MR. ROSENZWEIG: Mr. Merrigan, I am
14  conducting discovery regarding this case, my
15  clients. The overwhelming majority of the
16  questions I have asked in the 99-point
17  something percent range relate to that.
18       MR. MERRIGAN: I am not referring
19  to questions. I am referring --
20       MR. ROSENZWEIG: Let me finish. I
21  am also entitled to test your client's
22  veracity and the wild ass assertions he has
23  made throughout his various pleadings and
24  statements that I think have no basis in fact

Page 39

1  whatsoever.
2        MR. MERRIGAN: I am referring --
3        MR. ROSENZWEIG: So I am allowed to
4  ask that question because I think it tests
5  his credibility.
6        MR. MERRIGAN: I'm not referring to
7  any questions you have asked. I'm referring
8  to your statement that is on the record I
9  believe as to how you believe it would be
10  interesting to see how Alexander Silow feels
11  about Mr. Hartleib's testimony which suggests
12  that you plan on informing him.
13       MR. ROSENZWEIG: I -- no. I was
14  musing that it would be interesting to know.
15       MR. MERRIGAN: All right. Well, we
16  are not here for your musing. Ask him
17  questions.
18       MR. ROSENZWEIG: I don't represent
19  Alexander Silow in any capacity. I have not
20  spoken to Alexander Silow once, not once.
21  The only time I have ever laid eyes on or
22  heard words from Alexander Silow is when he
23  testified under oath in this case. So --
24       MR. MERRIGAN: We are not here for

Page 40

1  your musings. We are trying to get finished
2  today.
3        MR. ROSENZWEIG: We are also not
4  here for you to reprimand me for an offhand
5  comment, okay. So cut it out.
6        (Exhibit No. Hartleib-24, Motions
7  Hearing, was marked for identification.)
8  BY MR. ROSENZWEIG:
9    Q. Tab 27 which we have which we have
10  identified as Hartleib-24. So Mr. Silow -- strike
11  that. I apologize.
12   A. Ouch. That hurt.
13   Q. That was really inadvertent.
14   A. I understand.
15   Q. That was not in any way purposeful.
16   A. I understand.
17   Q. So just turn your attention to that
18  document, please.
19   A. Yes, I'm here.
20   Q. In that exhibit, which is a transcript
21  of the hearing before Judge Davis in CenturyLink,
22  let me turn your exact attention, I believe it's
23  Page 41 starting on Line 24.
24   A. Yes.

Page 41

1    Q. And this carries over to Page 42. You
2  say to Judge Davis, and I can read it verbatim,
3  but essentially that "if the firms would like to
4  give me" -- this is you speaking -- "a list of
5  their forthcoming cases in which they are seeking
6  leave, I could be certain to notify everybody
7  timely and I wouldn't have to prepare, stay up all
8  night, all weekend long, to try to draft an amicus
9  brief and get it to the Court."
10       Do you see that?
11   A. Yes.
12   Q. Did I read that accurately?
13   A. Yes.
14   Q. Okay. Why did you want a list of
15  forthcoming cases from the firms involved in the
16  CenturyLink matter?
17   A. I am going from memory but as I recall,
18  I don't believe that everyone was served. Like I
19  said, this was a particularly confusing or
20  complicated case because of all of the multi
21  jurisdictions that cases were filed in. And I
22  tried to serve the parties appropriately because
23  it's not right to blindside people with pleadings
24  or counsel with pleadings. So someone was

11 (Pages 38 - 41)

1  complaining that they hadn't received service
2  correctly or promptly and I was saying if they
3  wanted to provide me a list of forthcoming cases I
4  would be able to serve them more expeditiously.
5      Q.  Because it was your intention to file
6  amicus briefs in every one of those cases in which
7  they were going to appear?
8      A.  No, that's -- you're putting words in my
9  mouth.
10     Q.  Well, I'm asking.  There was a question
11 mark at the end of that.
12     A.  Oh.  No, I don't believe that was my
13 intent.
14     Q.  Well, what was your purpose in wanting
15 to know what their forthcoming cases were?
16         MR. MERRIGAN:  Objection; asked and
17     answered.
18         You can answer again, Michael.
19     A.  Yeah, I think that in what was during the
20 hearing there were contentious comments being made
21 and I think it was a response to contentious
22 comments that were being made.  I think it was
23 kind of a snide comment on my part countering
24 contentious comments that were directed my way, if

1  I recollect correctly.
2  BY MR. ROSENZWEIG:
3      Q.  Let me turn your attention to Page 43,
4  please.  You told Judge Davis, "I know for a fact
5  that the Weiser firm knew who Mr. Silow was and
6  that will come out, you know, during the course of
7  litigation."
8          Do you see that?
9      A.  Yes.
10     Q.  Did I read that accurately?
11     A.  You did.
12     Q.  Okay.  So in the context of that
13 statement --
14     A.  Yes.
15     Q.  -- did you believe when you made that
16 statement that Rob Weiser and the Weiser Law Firm
17 knew prior to 2017 that Silow had been disbarred?
18     A.  That's not what I say here.
19     Q.  I asked a question.  You can answer it.
20 Go ahead.
21         MR. MERRIGAN:  Can you read back
22     the question, please?
23         (The record was read by the
24     reporter as requested:  "Q.  Did you believe

1  when you made that statement that Rob Weiser
2  and the Weiser Law Firm knew prior to 2017
3  that Silow had been disbarred?")
4      A.  I can't answer that as a yes or a no.
5  BY MR. ROSENZWEIG:
6      Q.  What did you mean by "I know for a fact
7  that the Weiser firm knew who Mr. Silow was"?
8      A.  That I can answer.
9      Q.  Please do.
10     A.  Okay.  He knew.
11     Q.  Who is he?
12     A.  Mr. Weiser knew that Mr. Silow was
13 Jeffrey Silow, not Alexander Silow.  He knew that
14 he was Jeffrey Silow, not Alexander Silow.  He
15 hired him as Jeffrey Silow.  The resume from
16 Abelson proves that.  He was never barred in
17 Pennsylvania as was put forth in the case in
18 Kansas.  He was disbarred in 1987 from
19 Pennsylvania.  So when Mr. Weiser, et al. hired
20 Mr. Silow, he was never barred in Pennsylvania.
21         So you keep asking me to say that
22 he knew that he was disbarred.  He never hired him
23 as barred in Pennsylvania.  He was never barred in
24 Pennsylvania under your client's employ.

1          And this says that he knew exactly
2  who he was, that he knew who he was.  And I always
3  said that once you saw who was being paid and who
4  the tax documents were made out to, it would prove
5  irrefutably that he knew who he was, which it did.
6  He was Jeffrey Silow.
7      Q.  You state also on the same page of the
8  transcript, Page 43, to Judge Davis, "These firms,
9  when these firms are up to no good, when they are
10 billing illusory hours -- you know, if I had 30
11 minutes with Your Honor in chambers I could give
12 Your Honor a lot more information."
13         Do you see that?
14     A.  Yes.
15     Q.  Did you ever have 30 minutes with Judge
16 Davis in chambers?
17     A.  No, unfortunately not.
18     Q.  Okay.  So that was your statement but
19 Judge Davis never took you up on that?
20     A.  That's correct.
21     Q.  Okay.  You later -- let me turn your
22 attention to Page 47.  On Page 47, Mr. Hartleib,
23 you invite Mr. Aguilar of the Robbins Arroyo firm
24 to sue you.

12 (Pages 42 - 45)

Page 46

1    Now, that's -- those are my words,
2    those are not the words you used. Are you
3    comfortable with those words or should I just read
4    what you said into the record?
5        A. Let's read what I said.
6        Q. You said, "I have asked Mr. Aguilar on
7    numerous occasions if they would like to sue me, I
8    will waive service. I am perfectly happy for
9    you -- if you want to commence an action, then I
10   will get the discovery."
11       Did I read that correctly?
12       A. Yes, correct.
13       Q. Okay. What discovery were you referring
14   to when you referred to that in this transcript?
15       A. It's a very broad breath of discovery.
16   It's wide. I would start with Doris and Steven
17   Stare. I would start with Mr. Kerrigan. These
18   are serial plaintiffs that I believe were paid by
19   the law firms to be plaintiffs, for example.
20       Q. Okay. And just excuse me for one
21   second. You say by the law -- I heard by the law
22   firms. I was asking about Robbins Arroyo. So did
23   you intend to use the plural?
24       A. Probably.

Page 47

1        Q. Okay. So what other law firms are we
2    referring to?
3        MR. MERRIGAN: Same advice I had
4        given you yesterday.
5        A. Yes, I would just say that other -- you
6    know, we call them law firms, right. But it may
7    be a one-man show and there may be a couple of
8    one-man shows that were involved in the Sprint
9    litigation that would be included in the law
10   firms.
11       Q. Okay. Would Rob Weiser and the Weiser
12   Law Firm be included in the law firms to which you
13   referred?
14       A. I don't know. It would depend on where
15   discovery led.
16       Q. Okay. But as you said that statement,
17   you weren't intending it to be Rob Weiser and the
18   Weiser Law Firm, were you?
19       MR. MERRIGAN: This statement in
20       the transcript?
21       MR. ROSENZWEIG: Yes.
22       MR. MERRIGAN: Or the statement
23       that he just made?
24       MR. ROSENZWEIG: No, no, no, the

Page 48

1    statement in the transcript.
2        A. I can't say that.
3    BY MR. ROSENZWEIG:
4        Q. Okay. How about the statement you made
5    now where you referred to law firms, were you
6    including Rob Weiser and the Weiser Law Firm in
7    that plural?
8        A. I guess I would include the Weiser Law
9    Firm in that statement now.
10       Q. On what basis or facts would you?
11       A. The relationship that the Weiser firm
12   has with the Robbins firm or the number of cases
13   that the Weiser firm has been involved with in
14   the -- you know, with the Robbins firm.
15       Q. Okay.
16       A. So Phil, like I said, if one
17   plaintiff -- if there's a problem with one
18   plaintiff, there's four other cases filed with
19   different plaintiffs. I have witnessed this over
20   the course of the last 15 years: One plaintiff is
21   dirty or corrupt, one plaintiff doesn't own stock
22   in the company, they are not a valid plaintiff,
23   they lack standing, one plaintiff may be a serial
24   plaintiff that's been admonished by Judge Cote in

Page 49

1    the Eastern District of New York, one plaintiff
2    may be a plaintiff that was barred from being
3    any -- in any lead role or a representative
4    plaintiff in any case because it was deemed they
5    were a serial plaintiff and not qualified to do
6    so. All of these things are linked to these
7    firms.
8        Q. Okay. And what is your purpose or what
9    would your purpose have been in getting that
10   discovery had Robbins Arroyo sued you?
11       A. To once and for all expose the
12   corruption that is rifed throughout derivative
13   litigation, the abuse of process that occurs by
14   lawyer driven litigation that does nothing but
15   line the pockets of said lawyers and does little
16   to nothing to benefit the corporation of which the
17   case is allegedly filed on behalf of in the first
18   instance.
19       Q. Would you consider that mission kind of
20   a personal request?
21       MR. MERRIGAN: Objection.
22       But you can answer.
23       A. It's something that I have had -- yes,
24   that I, I have, I have been a victim of this on

13 (Pages 46 - 49)

Page 50

1   multiple occasions. It first started with Sirius
2   XM, a very large holding that I had a substantial
3   sum of money in. I was a victim of this by the
4   Robbins Arroyo and Fink firm. That's how this was
5   uncovered by me and it's continued unabated for
6   decades now.
7           MR. ROSENZWEIG: All right. Mr.
8       Hartleib, can we look at Tab 36 which I'm
9       going to mark as Hartleib-25?
10          (Exhibit No. Hartleib-25, 2/22/18
11      E-Mail, was marked for identification.)
12  BY MR. ROSENZWEIG:
13      Q. Tell me when you have had an opportunity
14  to look at that.
15      A. I have looked at it.
16      Q. Great. Can you tell me what Hartleib-25
17  is?
18      A. It appears to be an e-mail to Cathy
19  Abelson --
20      Q. Okay.
21      A. -- drafted by me to Cathy.
22      Q. Okay. To the best of your recollection,
23  is this an e-mail you sent to Ms. Abelson?
24      A. Yes.

Page 51

1       Q. From you to Cathy Abelson. It also
2   looks like it's copied to you. Is there a reason
3   that it's copied to you if it's sent by you?
4       A. Yeah, I often copied myself so I get it
5   on multiple devices.
6       Q. Okay. And it's February 22, 2018,
7   9:18 p.m., correct?
8       A. Correct.
9       Q. Okay. And so did you send this e-mail
10  to Ms. Abelson?
11      A. I believe so, yes.
12      Q. Okay. Had you already spoken to Joyce
13  Feinstein when you sent Ms. Abelson this e-mail?
14      A. I don't recall. I did speak with a
15  Joyce Feinstein but I don't know if it was prior
16  to or after this e-mail.
17      Q. Okay. And what was the impetus for you
18  e-mailing Ms. Abelson?
19      A. To advise her of what transpired in the
20  Sprint case and to continue to gather information.
21      Q. Okay. And why did you contact her?
22      A. To provide her with information as to
23  what transpired in the Sprint case in Kansas and
24  to obtain any information that I could obtain.

Page 52

1       Q. From her?
2       A. Yes.
3       Q. Okay. You state in this e-mail, "Their
4   actions in this case are truly unconscionable."
5           Do you see that?
6       A. Yes.
7       Q. Who is "their"?
8       A. The parties in the Sprint litigation in
9   Kansas, the attorneys, the plaintiff, local
10  counsel.
11      Q. Okay. And --
12      A. The whole enterprise.
13      Q. And so -- and the case to which you
14  refer is Sprint/Nextel derivative litigation?
15      A. Correct.
16      Q. And which specific actions are you
17  referring to?
18      A. All of them.
19      Q. All of the things you have described
20  over the course of this deposition?
21      A. Yes, all of the personal attacks on me,
22  the fraudulent billing, the perjurious
23  declarations.
24      Q. You say, "Sadly this is just the tip of

Page 53

1   the iceberg."
2           What did you mean by that?
3       A. What I meant by that is this is
4   something that I believe goes on on a daily basis
5   with little to no oversight.
6       Q. In derivative cases of all kinds
7   throughout the country?
8       A. Yeah. I'm not saying that there isn't a
9   derivative case where there's meaningful relief
10  obtained. But the majority of them are
11  problematic.
12      Q. Once again you refer to the "criminal
13  enterprise, plaintiff's criminal enterprise,"
14  meaning the Weiser firm and Rob Weiser.
15  Specifically tell me what you meant by that.
16      A. I think I have already described what I
17  believe a criminal enterprise is.
18      Q. Okay. But --
19      A. Somebody that does nefarious things,
20  works with others and does it to commit fraud or
21  defraud or overbill or use plaintiffs that are not
22  qualified, use the judicial system for purposes
23  that are not just or righteous, an abusive
24  process.

14 (Pages 50 - 53)

Page 54

1    Q.  I agree with you that you have testified
2  about that previously.  But I'm asking you
3  specifically about your use of the term "criminal
4  enterprise" in this e-mail.  You mean the same
5  thing?
6    A.  I just answered it.
7    Q.  Okay.  I believe you say, second
8  paragraph, "I am hopeful that we can work together
9  and facilitate a cross-complaint against the
10  Weiser firm."
11    A.  Yes.
12    Q.  What did you mean by that?
13    A.  That I would have been interested in
14  commencing a cross-complaint with them if they had
15  information that would prove that the Weiser firm
16  knew exactly who Alexander Silow was.
17    Q.  A cross-complaint in what?  What did you
18  mean by the term cross-complaint?
19    A.  I don't know why I used the term
20  "cross-complaint."  Maybe I knew of a suit that
21  had already been filed by your client against
22  Abelson.  I would expect that would be the reason
23  I would have used cross-complaint because I know
24  what a cross-complaint is.  So maybe at that time,

Page 55

1  I don't know, that maybe your clients already sued
2  Abelson.  They were suing everyone.  They sued
3  Silow, they sued Abelson, they sued former
4  partners.  I mean they sued everyone to try to
5  silence everybody.
6    Q.  Why do you think a public lawsuit is a
7  means of silencing?
8    A.  Because when we try to get discovery
9  from you on everything it's all protected because
10  it was product of the course of litigation.  So
11  you denied access to virtually everything.
12    Q.  What did you mean in this e-mail when
13  you say, "I know where the bodies are buried and
14  intend to dig them up"?
15    A.  It was just an overall statement.
16    Q.  Meaning what?
17    A.  Meaning that I think there's a lot more
18  to uncover.  Not solely directed at your client's
19  firm.
20    Q.  Were you communicating with Ms. Abelson
21  about any other firm?
22    A.  Like I said, Phil, I believe that all of
23  these firms act as one, and if we would have
24  gotten the e-mails I think we could have proved

Page 56

1  that.
2        MR. ROSENZWEIG:  I'm going to turn
3    your attention to Tab 35, which I'm going to
4    mark as Hartleib-26.
5        (Exhibit No. Hartleib-26, E-Mail
6    Chain, was marked for identification.)
7  BY MR. ROSENZWEIG:
8    Q.  And I'm going to ask you to take a look
9  at it.
10    A.  Yes, I see it.
11    Q.  It's a three-page document.  Is this an
12  e-mail that you sent to Joyce Feinstein?
13    A.  Yes.
14    Q.  February 24, 2018, 4:31 p.m.?
15    A.  Yes, yes, it appears so.
16    Q.  And actually let me restate that.  Is it
17  an -- it's a three-page document, e-mail chain,
18  that if you start at the back on the third page
19  it's an e-mail from Joyce Feinstein to you
20  February 23, 2018, 9:23 a.m.
21        Did you receive that e-mail from
22  Joyce Feinstein?
23    A.  Yes, it appears I did.
24    Q.  Okay.  And then on February 24, 2018 at

Page 57

1  3:30 a.m. you responded to Ms. Feinstein?
2    A.  Yes.
3    Q.  Then Ms. Abelson responded to you on
4  Saturday, February 24, 2018 at 4:54 a.m., correct?
5    A.  Yes, it appears so.
6    Q.  Okay.  And did you receive that e-mail?
7    A.  Yes.  But if you, if you, if you look at
8  that e-mail, I don't think that e-mail was
9  intended for me.  Ms. Abelson appears to be
10  reaching out to someone else but inadvertently
11  sent the e-mail to me.  So if you look at my
12  response to Joyce, I let Joyce know that it
13  appears Cathy inadvertently sent that e-mail to
14  me.
15    Q.  Do you believe that Cathy intended to
16  send that e-mail to Joyce?
17    A.  I don't know who she -- I don't know.
18  She was sending it to someone.  I don't know who.
19    Q.  Okay.  And then when you respond to
20  Joyce Feinstein on Saturday, February 24, 2018 at
21  4:31 p.m. you did not copy Cathy, correct?
22    A.  Doesn't appear that I did, no.
23    Q.  Okay.  What do you recall about your
24  conversation with Ms. Feinstein which you have

15 (Pages 54 - 57)

1 testified occurred?
2    A. I recall that she told me that your
3 clients knew, quote/unquote, "exactly who
4 Mr. Silow was."
5    Q. Okay. And did you ask her what she
6 meant by that?
7    A. Probably.
8    Q. Do you recall what she said?
9    A. No.
10    Q. And what was your purpose in engaging
11 Ms. Feinstein in the conversation in the first
12 place?
13    A. To provide her with the information of
14 what transpired in the Sprint case in Kansas and
15 to get whatever information I could get regarding
16 Mr. Silow.
17    Q. Did you have one single conversation
18 with Ms. Feinstein or more than one?
19    A. If I recall, I had two, a minimum of
20 two. And I don't recall if I ever spoke with
21 Cathy. But they, they were careful as to what was
22 being said. I recall that. They initially
23 expressed some interest in hearing what I had to
24 say. Then I believe they lawyered up. I believe

1 that they wanted to speak to counsel and I believe
2 that counsel instructed them not to speak with me.
3 That's my opinion.
4    Q. Okay. Did Ms. Feinstein say anything
5 else to you about Rob Weiser or the Weiser Law
6 Firm with regard to Mr. Silow other than what you
7 have testified about?
8    A. She strongly intimated that -- I left
9 that conversation more convinced than ever that
10 your clients knew who Mr. Silow was and his
11 background.
12    Q. And what do you mean by "his
13 background"?
14    A. His background.
15    Q. That he was disbarred in Pennsylvania?
16    A. He was never presented as barred in
17 Pennsylvania when Abelson presented him to your
18 clients.
19    Q. That's not what I asked.
20    A. Well, I know. But I can't answer a
21 question if he wasn't -- you're asking me a
22 question that's impossible to answer.
23    Q. Oh, I don't think so because -- and
24 Mr. Merrigan, I'm not going to argue with the

1 witness but --
2       MR. MERRIGAN: But let me argue
3    with the witness.
4       MR. ROSENZWEIG: No, no, no. But
5    I'm trying to clarify without asking 15 more
6    questions.
7 BY MR. ROSENZWEIG:
8    Q. Affirmative knowledge of a disbarred
9 status is different from not being barred, is it
10 not?
11    A. Sure. But in the resume he was never --
12 there's no -- I don't believe there's any mention
13 of his bar status in Pennsylvania.
14    Q. Let me make it easy. Did you have any
15 conversation with Ms. Feinstein or Ms. Abelson of
16 any kind in which Silow being disbarred was
17 discussed?
18    A. Yes.
19    Q. Okay.
20    A. That was the topic of the discussion.
21    Q. Him being disbarred?
22    A. The -- it was known, if I remember
23 correctly -- I would have to -- we would have to
24 go back and look at these dates and when the

1 revelation came out that Mr. Silow was disbarred.
2 When your client wrote the letter to Mr. Shema,
3 Douglas Shema of the Appellate Court and to Judge
4 Vano I believe that these calls were after because
5 I was inquiring additional information. In fact,
6 I'm certain they were after because that's when
7 the resume was sent with those letters. I didn't
8 know about Abelson until your clients provided the
9 Courts with that resume.
10    Q. February of 2017 were those letters.
11    A. Okay.
12    Q. Okay. And they are in the record.
13    A. Right.
14    Q. And they have been introduced.
15    A. Yeah. I don't just don't memorize the
16 dates. It's a lot to keep track of.
17    Q. I'm just telling you.
18    A. You're better than I am to remember
19 those dates.
20    Q. Perhaps.
21    A. Let's not get too carried away, but
22 okay.
23    Q. I left it at perhaps, okay.
24       And the e-mails that are

16 (Pages 58 - 61)

Page 62

1  Hartleib-26 are February of 2018?
2      A.  Yes.
3      Q.  Okay.  So what I'm trying to understand
4  is what about Silow being disbarred as opposed to
5  not an active member of the Pennsylvania Bar did
6  you discuss with Joyce Feinstein or Cathy Abelson?
7      A.  I don't recall the specific details of
8  the conversation but we discussed his status, his
9  bar status, we discussed everything that
10 transpired in Kansas.  And I was led to believe by
11 not Cathy, by Joyce because I don't believe I ever
12 spoke to Cathy directly -- I don't think I did.
13 But I spoke to Joyce on I believe two occasions
14 and I left that call more convinced than ever that
15 your clients knew about his bar status.
16     Q.  And I'm going to ask one more time if
17 you can recall specifically what Ms. Feinstein
18 said that led you to that conclusion or feeling.
19     A.  She was careful about what she was
20 saying.  Like I testified earlier, she didn't
21 come right out and say a specific thing.  She
22 danced around things.  It's what she didn't say
23 when I asked questions, et cetera, et cetera.  The
24 end of the conversation I was more convinced than

Page 63

1  ever that -- and she led me to believe that your
2  clients were -- had full knowledge of his bar
3  status and exactly who he was which is probably
4  the reason your clients could get away with paying
5  him $35 an hour for document review when they paid
6  everybody else 300.
7      Q.  Well, how do you know that, Mr. --
8      A.  Through discovery.
9      Q.  I think that that's not correct.
10         The next question is in your e-mail
11 to Joyce Feinstein at 3:35 a.m. on February 24,
12 2018 you -- I'm going to characterize this and you
13 can tell me if I am incorrect.  You are upset that
14 Ms. Feinstein called you a professional plaintiff,
15 correct?
16     A.  Yes.
17     Q.  And I believe you responded -- this is a
18 characterization so you will tell me if you
19 disagree.  It's a very lengthy e-mail -- by
20 telling -- you respond by telling Ms. Feinstein
21 that you have worked for the last ten years
22 fighting the use of professional plaintiffs,
23 correct?
24     A.  Yes.

Page 64

1      Q.  What -- how do you define a professional
2  plaintiff?  Or better yet.  How did you define a
3  professional plaintiff in 2018 when you sent this
4  e-mail to Ms. Feinstein?
5      A.  I would defer you to Jessica Erickson's
6  Law Journal publication.  She's Associate Dean of
7  Richmond School of Law I believe now.  That will
8  give you a lot of the answers there.
9          But plaintiffs like Steven Stare,
10 Doris Stare, now these were serial plaintiffs that
11 were in many, many, many cases for some of the
12 firms involved in the Sprint litigation in Kansas.
13         Now, after so much attention has
14 been brought to these serial plaintiffs there is a
15 new type serial plaintiff now which are in the
16 form of LLCs.  There have been LLCs set up for the
17 sole purpose of facilitating litigation, meaning
18 it's illegal to pay a plaintiff to be a plaintiff.
19 But if a law firm sets up an LLC, buys stock in
20 many, many companies, puts someone in charge of
21 that LLC, they have a built-in plaintiff.  Any
22 time there's an issue with the company they run to
23 that LLC.
24         I did articles called Litigation

Page 65

1  Kennels where you have plaintiffs well fed, well
2  kept, that are at your beck and call that you
3  cherrypick from when a case comes to be so that
4  you can be first to file.  The nefarious part of
5  all of that, despite what I just described, is the
6  party that runs the LLC keeps the million dollars
7  or the money that was used to purchase those
8  shares in the first instance.  So that's the same
9  thing as paying a plaintiff to be involved in
10 litigation.
11     Q.  I'm waiting for you to tell me you are
12 finished.
13         MR. MERRIGAN:  Does he have to tell
14 you at the end of every question or could he
15 stop talking when finished?
16         MR. ROSENZWEIG:  Well, that's an
17 adorable comment, too, Mr. Merrigan.  Mr.
18 Hartleib sometimes pauses, thinks and
19 continues.  So I did not take that to
20 necessarily be a natural break or end in his
21 response.
22 BY MR. ROSENZWEIG:
23     Q.  Mr. Hartleib, are you finished with that
24 answer?

17 (Pages 62 - 65)

Page 66

1    A.  Yes.
2    Q.  Okay.  I'm just looking to turn your
3  attention to a specific quote.  In your e-mail to
4  Joyce Feinstein that we have been referring to you
5  state -- and I can draw your attention to the
6  second page, third full paragraph, second line.
7  "I tell people all the time that I have a
8  personality disorder which prevents me from
9  attempting to right a wrong and exposing
10 injustice."
11        Do you see that?
12   A.  Yes.
13   Q.  What does that mean?
14   A.  Well, I think it's kind of tongue in
15 cheek but it's kind of clear.  Like I can't -- I
16 have always been someone that can't look at
17 injustice and look away.  I try to rectify the
18 wrongs that I see in my life.
19   Q.  But you say the personality disorder
20 "which prevents me from attempting to right a
21 wrong."  I'm trying to understand what you mean by
22 that.  That seems to be the contrary of exactly
23 what --
24   A.  Yeah, it sounds like it was a typo and

Page 67

1  poorly written.  This was written kind of in haste
2  I believe.  So it prevents me from not attempting
3  to right a wrong.
4    Q.  Okay.  That's what you intended to say?
5    A.  Yes.  I didn't realize that it was
6  poorly written.
7    Q.  What was your motivation in offering to
8  help Ms. Feinstein defend the Weiser firm's suit
9  against Abelson?
10   A.  Because I thought I could glean
11 information and it was the right thing to do I
12 thought at the time.
13   Q.  And similarly, why did you offer to help
14 Abelson file a, I think you called it a
15 cross-complaint or a countersuit against the
16 Weiser Law Firm?
17   A.  Same answer.
18   Q.  You state in this e-mail that you wanted
19 to help cause "the demise of the Weiser Law Firm."
20      Why?
21   A.  Probably because I was being attacked
22 viciously at the time.
23   Q.  So is it fair to say that when you wrote
24 that that's exactly what your intentions were, you

Page 68

1  wanted to help cause the demise of the Weiser Law
2  Firm?
3    A.  Well, I think I have said this before.
4  Anything that I would do to help cause the demise
5  of the Weiser Law Firm pales in comparison to what
6  your clients were doing on their own.  Like I
7  didn't invent this stuff, Phil.  I'm just a
8  shareholder in Sprint.  I want my interests
9  protected.  I didn't, I didn't hire Mr. Silow.  I
10 didn't create this whole situation, your clients
11 did.
12   Q.  But you viewed it as your mission to
13 help cause the demise of the Weiser Law Firm as
14 opposed to any other law firm?
15      MR. MERRIGAN:  Objection.
16      But you can answer.
17 BY MR. ROSENZWEIG:
18   Q.  Correct?
19   A.  It wasn't -- it's not just -- I
20 testified to this numerous times.  It isn't
21 specific to Mr. Weiser or the Weiser Law Firm.  It
22 is the lawyer driven derivative litigation.  You
23 know the issues I have had with the Robbins firm.
24 They were, they were, they were just as severe as

Page 69

1  the issues that I have had with your client's
2  firm.  I just happened to get a good judge in
3  Kansas that listened to what I had to say.
4    Q.  Okay.  But you didn't talk Ms. Feinstein
5  about other law firms.  You talked about the
6  demise of the Weiser Law Firm.
7    A.  Yeah, I don't recall, like I said, the
8  details of the conversation that I had with
9  Ms. Feinstein.  I am sure that we talked about the
10 problems with other firms in the case and that
11 this is something that is rife throughout the
12 derivative litigation, you know, the plaintiff's
13 bar regarding derivative litigation.
14   Q.  You also write to Ms. Feinstein, "As for
15 my motive, it is the same as yours.  I have been
16 screwed over by said firms on multiple occasions."
17      So, Mr. Hartlieb, was vengeance
18 against the Weiser Law Firm your motive here?
19      MR. MERRIGAN:  Objection.
20      But you can answer.
21   A.  No.
22 BY MR. ROSENZWEIG:
23   Q.  What was your motive?
24   A.  Truth, justice.

18 (Pages 66 - 69)

Page 70

1    Q.   And in your --
2    A.   Reform.
3    Q.   And in your personal judgment those
4  motives were served by the demise of the Weiser
5  Law Firm?
6            MR. MERRIGAN:  Objection.
7            But you can answer.
8  BY MR. ROSENZWEIG:
9    Q.   I will withdraw the question and ask
10  this.  So based upon your own stated motives,
11  which you just testified about, you thought it
12  appropriate to offer to help cause the demise of
13  the Weiser Law Firm?
14            MR. MERRIGAN:  Objection.
15            But you can answer.
16    A.   I thought if we could expose everything
17  that transpired in Kansas with whatever
18  information that they had it could lead to reform.
19  If that led to the demise of the Weiser Law Firm,
20  et al., amongst others, right, then that would
21  be -- I mean it would be a consequence of their
22  actions, not mine.
23            Like I'm just using the facts that
24  transpired in Kansas.  I have never once done

Page 71

1  anything that isn't using the facts of the case.
2  The facts are the facts.
3    Q.   But your communications with
4  Ms. Feinstein from Abelson was specifically about
5  the Weiser Law Firm, correct?
6    A.   I think I have answered that.  I think
7  it most likely included everyone that acts as one.
8  The other firms in the case as well.
9    Q.   Okay.  But --
10    A.   The comments are not, they are not
11  written.  They weren't solely directed at your
12  clients.
13    Q.   Okay.  But the only involvement that the
14  Abelson firm had was with Mr. Silow and the Weiser
15  firm, correct?
16    A.   Yes, but my grievance is with all of the
17  firms in the case that acted together in this
18  case.
19    Q.   You also wrote, and I quote, "I predict
20  that when I am done certain attorneys will not be
21  practicing law in the future."
22    A.   Right.
23    Q.   To whom were you referencing, to which
24  lawyers?

Page 72

1    A.   Mr. Silow for one.  And I didn't know at
2  the time who else but there's the possibility that
3  others may not practice law.  There was the
4  possibility, depending on what was discovered,
5  that others may not practice law either or there
6  would be consequences from, you know, their bar.
7    Q.   Did Ms. Feinstein ever reply to your
8  last February 24, 2018, 4:31 p.m. e-mail?
9    A.   I don't recall.
10    Q.   Okay.  Did Ms. Abelson reply to that
11  e-mail -- I'm sorry, strike that -- to the last
12  e-mail you sent?
13    A.   Is the last e-mail the e-mail that we
14  were just going over?
15    Q.   No.  So the last e-mail with Joyce
16  Feinstein was at the 4:31 p.m. mark.
17    A.   I see, yes.
18    Q.   Would you agree that that's the top of
19  this document?
20    A.   Yes.
21    Q.   And it's just between you and
22  Ms. Feinstein.
23    A.   Yes.
24    Q.   And I asked you about the lack of copy

Page 73

1  to Cathy Abelson which you acknowledged.
2    A.   Yes.
3    Q.   Okay.  Did Ms. Abelson ever respond to
4  you other than the mistaken response that you have
5  testified about from her on Saturday, February 24
6  at 4:54 a.m.?  And that's 2018.
7    A.   I don't recall.
8            MR. ROSENZWEIG:  Let's look at Tab
9  37, please, which I'm going to mark as
10  Hartleib-27.
11            MR. MERRIGAN:  Is that the one
12  page?
13            MR. ROSENZWEIG:  Yes.  Hang on.
14  Just give me a second.  This may be obviated
15  altogether.  It is the --
16            MR. MERRIGAN:  I'm checking.  There
17  might be an e-mail in there that's different.
18  I think the e-mail at the bottom was not in
19  the previous chain.
20            THE WITNESS:  In the February 24,
21  3:31 a.m. e-mail?  Is that the one you're
22  referring to?
23            MR. ROSENZWEIG:  No.  I think that
24  that's -- I think that this is the same first

19 (Pages 70 - 73)

Page 74

1     page, Kevin.
2         So strike this. I am not going to
3     mark anything as Hartleib-27.
4     BY MR. ROSENZWEIG:
5         Q.   So Mr. Hartleib, I am just going to have
6     a few more questions about Hartleib-26 which is
7     Tab 35. It is the same first page.
8         So just a few more questions.
9     Directing your attention to the top e-mail, the
10    4:31 p.m. February 24, 2018. Okay?
11        A.   Yes.
12        Q.   You reference, "I just found out his
13    firm was appointed lead in a huge nationwide
14    suit."
15            Were you referring to Weiser, Rob
16    Weiser and/or the Weiser firm?
17        A.   I believe so.
18        Q.   Okay. And what was that huge nationwide
19    suit?
20        A.   I would assume, I don't know for certain
21    but I would assume it was the Equifax case.
22        Q.   Okay. You then several lines down say,
23    "My goal will be to have him removed as lead
24    plaintiff counsel in said case."

Page 75

1            Do you see that?
2         A.   Yes.
3         Q.   Did I read that accurately?
4         A.   Yes.
5         Q.   So you had an understanding when you
6     communicated with Ms. Feinstein in this e-mail
7     that Rob Weiser and/or the Weiser Law Firm had
8     been appointed either lead or co-lead counsel in
9     the Equifax case and that you were -- your
10    intention was to have the firm removed?
11        A.   Is there a question there?
12        Q.   Correct?
13        A.   I think I have previously testified that
14    I wasn't sure if I knew at the time that I filed
15    the amicus brief if he was appointed. But
16    apparently this refreshes my recollection and
17    apparently he was. I believe there was another
18    party also that was co-lead with Mr. Weiser.
19            And I testified previously that I
20    believe they were both removed after my testimony
21    in my amicus brief.
22        Q.   And as reflected in this e-mail to Joyce
23    Feinstein, it was your intention to have the
24    Weiser firm removed from the Equifax case,

Page 76

1     correct?
2         A.   It appears that that was my intention at
3     the time.
4         Q.   Okay. What Pennsylvania Bar
5     investigation are you referencing in this e-mail?
6         A.   I believe at the time my intentions were
7     to contact the Pennsylvania Bar. I believe a
8     phone call was made to the Pennsylvania Bar. And
9     I was to fill out a formal complaint or -- in
10    order to initiate an official investigation from
11    the Bar. I was told by your clients as well that
12    they self reported to the bar and that there was a
13    bar investigation going on.
14        Q.   With respect to the Silow situation?
15        A.   In respect to the Sprint case and the
16    Silow situation, yes.
17        Q.   Okay. Did you ever take the steps that
18    you just testified about?
19        A.   I did not.
20        Q.   Okay. Why did you not?
21        A.   Because I was using my time to notify
22    other Courts of the chicanery that had taken place
23    in Kansas.
24        Q.   And you were doing that with the -- for

Page 77

1     what purpose?
2         A.   To give Courts information that they may
3     deem relevant in deciding appointment of lead or
4     deciding -- or checking the billing hours that
5     were submitted in the case.
6         Q.   And is that because you believed, as you
7     state in this e-mail to Ms. Feinstein, that the
8     Weiser Law Firm was unfit to be lead counsel in
9     any representative suit in the timeframe of
10    February, 2018?
11        A.   That wouldn't be a decision for me to
12    make. That would be the decision of the judge.
13        Q.   But you believed that to be true as you
14    were informing various Courts of what occurred in
15    the Sprint/Nextel case with respect to Mr. Silow
16    and the billing?
17        A.   I believed that the Court should have
18    all of the information that they may deem relevant
19    in rendering a decision.
20        Q.   Why did Ms. Feinstein need that
21    information that you supplied in this e-mail?
22        A.   Because I think your clients were suing
23    Ms. Feinstein.
24        Q.   Well --

20 (Pages 74 - 77)

Page 78

1        A. Or Abelson.
2        Q. Okay. Did you ever come to learn that
3  the Weiser Law Firm or Rob Weiser sued Joyce
4  Feinstein?
5        A. No, I believe that they sued Cathy
6  Abelson and her firm.
7        Q. Okay. You state in this e-mail that
8  Abelson is in "a fantastic position with regard to
9  the Weiser suit."
10            Why did you say that?
11        A. Because I felt that the Weiser Law Firm
12  had committed horrific wrongs in the Sprint case
13  and that the facts were on their side. And at the
14  time I felt that your clients were using Abelson
15  as a scapegoat. I still do believe that, by the
16  way.
17        Q. And you also say, and I quote, "This
18  could be a huge win for Abelson." To what were
19  you referring in that comment?
20        A. To defeat the suit that your clients
21  filed.
22            MR. ROSENZWEIG: Okay. Now I would
23  like to go to Tab 49 and that I'm going to
24  mark as Hartleib-26.

Page 79

1            (Exhibit No. Hartleib-27, 3/13/18
2  E-Mail, was marked for identification.)
3        THE WITNESS: I don't have a 49.
4        MR. ROSENZWEIG: I'm sorry, 39.
5        THE WITNESS: I thought we were
6  going for a second book here.
7  BY MR. ROSENZWEIG:
8        Q. Mr. Hartleib, if you could take a look
9  at --
10        A. I have looked at it.
11        Q. -- Hartleib-27. What is Hartleib-27?
12        A. It appears to be an e-mail to an
13  Inspector -- or a Detective Goggins regarding
14  Alexander and Jeffrey Silow.
15        Q. Is this the Detective Goggin to whom you
16  previously referred?
17        A. Yes.
18        Q. Okay. And did you send this e-mail to
19  Detective Goggin?
20        A. Yes.
21        Q. What was the first time -- I guess for
22  the record I should say this is a March 13, 2018
23  11:28 p.m. e-mail from you to Thomas J. Goggin,
24  singular, G-O-G-G-I-N.

Page 80

1            What was the first time that you
2  contacted the Chester County District Attorney's
3  Office?
4        A. I don't recall the exact time but it,
5  clearly it would have been after the revelation of
6  Mr. Silow's status and which was after the appeal
7  was filed.
8        Q. Okay. So the Weiser letter to Judge
9  Vano was February of 2017. So, sometime after
10  that?
11        A. Yes.
12        Q. Okay. Did you reach out to any other
13  law enforcement agencies in any jurisdictions with
14  respect to the Weiser Law Firm or Rob Weiser at
15  that time other than the Chester County DA's
16  Office?
17        A. You said Rob Weiser and the Weiser Law
18  Firm. You're including Silow in that, the Silow
19  issue?
20        Q. As it pertains to Rob Weiser or the
21  Weiser Law Firm, yes, sir.
22        A. Yes, I did.
23        Q. To whom else did you reach out?
24        A. I reached out to a Kansas detective.

Page 81

1        Q. Do you recall his or her name?
2        A. I do not. It was Kansas District
3  Attorney's Office and a detective. I believe I
4  was instructed to contact a Chester County or a
5  Pennsylvania detective.
6            I also reached out to the FBI.
7        Q. Okay. What were you informed by the
8  Kansas DA's Office?
9        A. That I should probably contact the
10  Pennsylvania District Attorney and the
11  Pennsylvania detectives.
12        Q. Okay. And how about the FBI, what did
13  they inform you?
14        A. There were several conversations with
15  the FBI and --
16        Q. Do you recall with whom at the FBI?
17        A. I do not. But I was told by an agent
18  and I was told by the agent's superior to contact
19  the bar.
20        Q. Okay.
21        A. Despite explaining to them that the bar
22  has no police authority, that this is a crime,
23  this is fraud, this is practicing law without a
24  license, that the bar has no authority over a non

21 (Pages 78 - 81)

Page 82

1  barred person. But despite that, the FBI said to
2  contact the bar.
3      Q.  Okay. Other than the Kansas District
4  Attorney's Office, the FBI and the Chester County
5  DA's Office, did you contact any law enforcement
6  agencies, authorities or investigators with
7  respect to the Weiser Law Firm or Rob Weiser?
8      A.  Not that I recall.
9      Q.  Was the Chester County District
10  Attorney's Office and Detective Goggin the only
11  substantive communication you had about the Weiser
12  Law Firm or Rob Weiser as it pertains to broadly
13  Sprint/Nextel and/or Jeffrey Silow?
14      A.  Yes.
15      Q.  What was your intention in communicating
16  with the Chester County District Attorney's
17  Office? What did you wish them to do?
18      A.  File criminal charges for the crimes
19  that were committed in Kansas.
20      Q.  Against whom?
21      A.  Against whoever committed the crimes.
22      Q.  Okay. And who did you believe that to
23  be in March of 2018?
24      A.  Mr. Silow for one, and then possibly

Page 83

1  other members of the Weiser firm.
2      Q.  For what activity?
3      A.  Fraud and perjury.
4      Q.  Did you want criminal charges brought
5  against Alexander Silow?
6      A.  If he was complicit and he knew of his
7  father's using his identity for identity fraud and
8  theft to practice law without a license, yes.
9      Q.  You state, "Mr. Alexander Silow must be
10  held responsible as a co-conspirator, as on
11  information and belief Weiser et. made checks
12  payable to Alexander making him a willing
13  participant to his father's crimes."
14          Do you see that in your March 13,
15  2018 e-mail to Detective Goggin?
16      A.  Yes.
17      Q.  On what facts did you base that
18  assertion?
19      A.  On all the facts and all of the
20  pleadings and everything that transpired that led
21  to the uncovering of the fraud in the Sprint case
22  in the first instance.
23      Q.  Did you ever see a check payable to
24  Alexander Silow?

Page 84

1      A.  Not at that time, no.
2      Q.  Have you ever seen a check payable to
3  Alexander Silow --
4      A.  I don't --
5      Q.  Let me finish, please -- from the Weiser
6  Law Firm or from Rob Weiser?
7      A.  I don't recall.
8      Q.  Why did you believe that you were
9  criminally victimized by Jeffrey Silow and
10  Alexander Silow?
11      A.  Because I had a huge, huge loss, seven
12  figure loss in Sprint, the value of my Sprint
13  shares. I had someone falsely purporting to
14  represent my interest, abusing the judicial system
15  for their own unjust enrichment at my expense.
16  This has interrupted my life, cost me thousands
17  and thousands and thousands of dollars, put my
18  occupation at risk, cost me tens of thousands of
19  dollars or hundreds of thousands of dollars in
20  lost opportunity costs, the amount of time that I
21  had to spend to defend myself. I mean how
22  unconscionable is it that your clients, including
23  Mr. Silow, were there to represent my interest? I
24  found myself more aligned with defense counsel who

Page 85

1  were protecting the executives that broke the
2  company and walked away with millions and millions
3  of dollars in golden parachutes. I was more
4  aligned with defense counsel than I was with
5  plaintiff's counsel that are supposed to be
6  representing my interest. There, sir, is the
7  problem.
8      Q.  How did Jeffrey Silow's bar status or
9  billing impact the relief that Judge Vano approved
10  in the Sprint/Nextel derivative case?
11      A.  Phil, this was a very good case that
12  could have clawed back $100 million from
13  executives on behalf of the Sprint shareholders.
14  Mr. Silow was reviewing documents. Was Mr. Silow
15  just hitting a button? Mr. Silow was responsible
16  for finding documents that may have led to
17  additional discovery to help shareholders get back
18  millions and millions, potentially $100 million of
19  their lost value.
20          Unfortunately, they were committing
21  fraud running up all of these billing hours that
22  Mr. -- that Judge Vano says is entirely illusory,
23  right, for relief that was meaningless and didn't
24  get a nickel back for the shareholders. I was a

22 (Pages 82 - 85)

Page 86

1 victim of your clients, their firm, Mr. Silow's
2 disbarred criminal status. I was a victim of your
3 clients. They did not properly represent my
4 interest and they did it with somebody who doesn't
5 even know that she was -- she doesn't even know
6 what her position is in the case. She doesn't
7 realize that she has a fiduciary obligation to the
8 other shareholders.
9    Q. Mr. Hartleib, did Judge Vano approve the
10 substantive settlement of the Sprint/Nextel case?
11    A. Yes, and he also said he doesn't know
12 why your clients jettisoned the what appeared to
13 be very valid claims in the suit for nothing more
14 than attorneys' fees and near illusory corporate
15 governance reforms.
16    Q. What information do you have from the
17 beginning of the Sprint/Nextel litigation to right
18 now that Jeffrey Silow did not do his job well as
19 a document reviewer, putting aside the number of
20 hours billed and his bar status?
21    A. It didn't lead to a single deposition, a
22 single additional request for discovery. They
23 took the work that Robbins Geller did that got
24 meaningful relief, over $100 million if I remember

Page 87

1 correctly in that case. They got meaningful
2 relief. They didn't, they didn't add any value
3 whatsoever by looking at the work that Robbins
4 Geller did. They walked away from a perfectly
5 good case, cut a cozy little deal with defense
6 counsel that extinguishes $31 billion in exposure
7 for the D&O insurers, all while shareholders like
8 myself lost over $1 million in the stock.
9    Q. That's not the purpose of a derivative
10 suit, is it?
11    A. Absolutely it is. The derivative suit,
12 absolutely. So the reason that a derivative suit
13 is filed after a securities class action, you need
14 to know what the damages are, and then the
15 derivative suit goes after the officers and
16 directors that caused that damage. They have D&O
17 insurance. There are millions and millions of
18 dollars that can -- hundreds of millions of
19 dollars in insurance that can be collected on
20 behalf of the corporation, paid back to the
21 corporation to help make the corporation whole.
22    Q. And in the class action, that's where
23 damages are sought for the $31 billion in
24 diminution in value as a result of the

Page 88

1 Sprint/Nextel deal?
2    A. That's, that's part of that. But where
3 do you think the money comes from? The money
4 comes -- some of the money is covered by
5 insurance, some of the money isn't. So if the
6 corporation has to pay that money out in a
7 settlement of class action, that directly damages
8 the corporation. That's why you have a derivative
9 case to go after the officers or directors to try
10 to recoup some of that money.
11    Q. How much money was recovered in the
12 Sprint/Nextel derivative action -- strike that --
13 in the Sprint/Nextel class action?
14    A. I don't recall but it was substantial.
15    Q. Okay. Was it $31 billion dollars?
16    A. No.
17    Q. Was it --
18    A. You know it never is.
19    Q. Okay.
20    A. But at least there was some real money
21 there. Darren Robbins firm did work, got
22 meaningful relief on behalf of the shareholders.
23    Q. How much money did you get from the
24 Sprint/Nextel class action --

Page 89

1    A. I don't --
2    Q. -- as a shareholder who had $1 million
3 or so in holdings?
4    A. I don't recall.
5    Q. Okay. Was it 500,000?
6    A. No, it's a nominal sum by the time it
7 gets distributed to all of the shareholders. We
8 all know that. This is the problem. You --
9 without having a direct cause of action or a way
10 for a shareholder that's taken a big beating or
11 has a huge loss it's almost impossible for a
12 shareholder to be made whole. That's not the
13 point. The point is your clients failed their
14 fiduciary duty. They used an improper plaintiff
15 that wasn't qualified to lead this suit and they
16 hired a disbarred criminal to do the document
17 review who could have missed something, and you're
18 asking me what evidence do I have that Mr. Silow
19 didn't do his document review right. The guy is a
20 life-long criminal. He stole money from little
21 old ladies.
22        MR. ROSENZWEIG: Could you take a
23    look at Exhibit-40 -- or I'm sorry, Tab 40
24    which I'm going to mark as Hartleib-28?

23 (Pages 86 - 89)

Page 90

1      (Exhibit No. Hartleib-28, E-Mail
2    Chain, was marked for identification.)
3      THE WITNESS:  Yes, I see it.
4    BY MR. ROSENZWEIG:
5      Q.  Mr. Hartleib, did you a chance to look
6    at this?
7      A.  I did.
8      Q.  Did you receive the reply from Detective
9    Goggin March 14, 2018 at 8:01:38 a.m.?
10      A.  Yes.
11      Q.  Okay.  And then did you respond to
12    Detective Goggin on the same day at 4:40 p.m.?
13      A.  It appears I did, yes.
14      Q.  Who at Abelson told you that Weiser and
15    the Weiser -- that Rob Weiser and/or the Weiser
16    Law Firm "knew exactly who Silow was"?
17      A.  Joyce Feinstein.
18      Q.  Were those her words or is that what you
19    interpreted from her words?
20      A.  Those were her words.  My recollection I
21    have already testified to that, that I distinctly
22    remember her telling me those words.
23      Q.  Okay.  And did Joyce Feinstein say that
24    Rob Weiser and the Weiser Law Firm was lying or

Page 91

1    that they weren't lying to fix the grammar of
2    that?
3      A.  If this is something that I wrote after
4    the conversation or shortly thereafter, then yes,
5    she either intimated that they were lying or she
6    flat out said that they were lying.
7      Q.  Do you recall which?
8      A.  I do not.
9      Q.  And you attached a brief to your
10    response to Detective Goggin; is that fair?  It's
11    the first -- top e-mail.
12      A.  I see there's an attachment.  I don't
13    know what it is.
14      Q.  Okay.  I was going to ask you what it
15    is.  As you sit here today you can't tell me what
16    that is?
17      A.  No.  It's 2018_03_14.  I mean the date
18    and PDF.  How would I know what that is?
19      Q.  Well, I mean you might.  I'm asking you.
20    If you don't --
21      A.  It's from 2018.
22      Q.  Well, I remember lots of things from
23    2018.  I have a right to ask and you have a right
24    to say you don't know.

Page 92

1      A.  I don't know.
2      Q.  You just referred to a brief that was
3    sent out today in another case.  And you just
4    don't know what that is?
5      A.  I do not.
6      MR. ROSENZWEIG:  Let's look at
7    Tab 41 which I'm going to mark as
8    Hartleib-29.
9      (Exhibit No. Hartleib-29, E-Mail
10    Chain, was marked for identification.)
11    BY MR. ROSENZWEIG:
12      Q.  Tell me when you have had a chance to
13    look at that.
14      A.  I have looked at it.
15      Q.  Okay.  This is two pages but there's no
16    substance on Page 2.  All the substance is on
17    Page 1.
18      A.  I'm sorry, can you please give me the
19    tab number again?
20      Q.  Forty-one.
21      A.  Okay.
22      Q.  I have marked that as Hartleib-29,
23    Mr. Hartleib.  Okay?
24      A.  Yes.

Page 93

1      Q.  And it's two pages.  But would you agree
2    with me that the second page is non substantive?
3      A.  Yes.
4      Q.  Okay.  On March 22, 2018 at 9:48 a.m.
5    you wrote to Detective Goggin again.  Is that
6    fair?
7      A.  Yes.
8      Q.  You told Detective Goggin that you have
9    "friends in PA searching for the Weiser suit
10    versus Abelson."
11      To whom were you referring?
12      A.  I don't recall.
13      Q.  And once again -- so Detective Goggin
14    responds to you, right, the same day at 6:53 a.m.,
15    yes?
16      A.  Yes.
17      Q.  And he tells you that he doesn't have
18    anything new to report.  Fair enough?
19      A.  Yes.
20      Q.  Then you respond to him on May 14, 2018
21    at 10:27 p.m., which is almost two months later,
22    correct?
23      A.  Yes.
24      Q.  Do you have any information that you

24 (Pages 90 - 93)

Page 94

1  responded to Detective Goggin earlier than that?
2      A.  Not to my recollection.  I mean I don't
3  know.
4      Q.  You state in your May 14, 2018 response
5  to Detective Goggin, "Alexander Silow knew and was
6  likely receiving payments from Weiser."
7          What information did you have in
8  May of 2018 regarding Alexander Silow's knowledge
9  or that he was receiving payments from Weiser?
10     A.  I don't recall what led me to believe
11  that at the time.  I still believe he knew to this
12  day.
13         MR. ROSENZWEIG:  Okay.  Then I
14  would like to turn your attention to Tab 43
15  which I'm going to mark as Hartleib-30.
16         (Exhibit No. Hartleib-30, 11/6/18
17  E-Mail, was marked for identification.)
18  BY MR. ROSENZWEIG:
19     Q.  Okay.  Are you there, Mr. Hartleib?
20     A.  I am here, yes.
21     Q.  This is your e-mail to Detective Goggin
22  November 6, 2018 11:29 a.m.  Fair?
23     A.  Fair.
24     Q.  Did you communicate with Detective

Page 95

1  Goggin between your May 14, 2018 e-mail which is
2  part of Hartleib-30 and November 6 of 2018 in the
3  e-mail that is Hartleib-31?
4      A.  I would say I probably did but I don't
5  recall specifically.  But it seems like that's a
6  long time in between.
7          COURT REPORTER:  Excuse me.
8          (There was a discussion held off
9  the record.)
10         MR. ROSENZWEIG:  We can correct the
11  record with no objection that the May 14
12  e-mail is Hartleib-29 and the November 6,
13  2018 e-mail is Hartleib-30.  Thank you.
14  BY MR. ROSENZWEIG:
15     Q.  So Mr. Hartleib, did you finish your
16  answer?  You don't recall if there was
17  communication in between?
18     A.  I don't.
19     Q.  Okay.
20     A.  I think I said that I don't recall but
21  it's possible because it's quite a long time in
22  between one communication to the other.
23     Q.  Okay.  And what was your purpose in
24  sending Detective Goggin the November 6, 2018

Page 96

1  e-mail?
2      A.  To find out if anything was happening
3  with regard to my complaints.
4      Q.  Okay.
5          MR. ROSENZWEIG:  Let's take a
6  five-minute break.
7          (A brief recess was held at this
8  time.)
9          MR. ROSENZWEIG:  We touched on
10  this, Mr. Hartleib, briefly but I need to
11  spend some more time on it.  I would like to
12  turn your attention to Tab 21 which I'm going
13  to mark Hartleib-31.
14         (Exhibit No. Hartleib-31, Motion
15  for Acceptance of Amicus Curiae Brief, was
16  marked for identification.)
17  BY MR. ROSENZWEIG:
18     Q.  I'm afraid you're not at 31.
19         MR. MERRIGAN:  Tab 21.
20  BY MR. ROSENZWEIG:
21     Q.  Tab 21.  There you go, that.
22     A.  Thank you.
23     Q.  And just take a minute and look at the
24  document.

Page 97

1      A.  Okay.  Is this the brief that you filed,
2  amicus curiae brief, in the Equifax case?
3      A.  (No response.)
4      Q.  If you look at Page 8, is that your
5  signature?
6          MR. MERRIGAN:  Just for clarity of
7  the record, while the brief is incorporated
8  in here the first page is the motion, the
9  motion that was filed.
10     A.  Right.  That's why I was a little
11  confused.
12  BY MR. ROSENZWEIG:
13     Q.  Fair enough.  So let me restate the
14  question.
15         Is this document, which I have
16  marked as Hartleib-31, the two-page Motion for
17  Acceptance of Amicus Curiae Brief in Opposition to
18  the Appointment of the Weiser Firm as Co-Lead
19  Counsel and the accompanying amicus curiae brief
20  itself that you filed in the Equifax case?
21     A.  Yes.
22     Q.  And Mr. Hartleib, on Page 8 of the
23  brief, is that your signature?
24     A.  Yes.

25 (Pages 94 - 97)

Page 98

1    Q.  And the filing date by the stamp of the
2  Clerk's Office United States District Court in
3  Atlanta is March 15, 2018, correct?
4    A.  Yes.
5    Q.  That is on the cover page of the motion,
6  right?
7    A.  Yes.
8    Q.  At the time you filed this amicus brief
9  did you or did you not know that Weiser had
10  already been appointed lead counsel?
11    A.  It appears now with the correspondence
12  that we went over, the Abelson or Abelson
13  correspondence, it appears that I did know.
14    Q.  Okay.  That Weiser had been appointed
15  lead counsel?
16    A.  I believe.
17    Q.  Or co-lead counsel?
18    A.  Yeah, I believe it was Weiser and
19  another firm that was appointed co-lead I believe.
20    Q.  Now, Mr. Hartleib, some of the questions
21  I'm about to ask you may seem repetitive but it is
22  strictly -- that the questions are strictly
23  related to this filing and I have asked you
24  similar questions about other uses of terms and

Page 99

1  other file filings.  So I need my questions to
2  relate to this particular motion and this
3  particular brief that I have marked as
4  Hartleib-31.  Okay?
5    A.  Okay.
6    Q.  Okay.  So you expressed, and I quote,
7  "extreme concern" about the Weiser firm's
8  employment of Jeffrey Silow as a document
9  reviewer.  Were there any other reasons you had
10  extreme concern that you were expressing to the
11  Court?
12      MR. MERRIGAN:  I'm sorry, what was
13    that quote you were reading?
14      MR. ROSENZWEIG:  It's Page 2 of the
15    brief in the very first line of the overview,
16    Mr. Merrigan.
17      MR. MERRIGAN:  Thank you.
18      MR. ROSENZWEIG:  Are you there?
19      MR. MERRIGAN:  Yes.
20      MR. ROSENZWEIG:  Good.
21    A.  I think for all the reasons that are --
22  that's one of the reasons but I think the other
23  reasons are outlined in this brief.
24

Page 100

1  BY MR. ROSENZWEIG:
2    Q.  All of which collectively constitute
3  extreme concern?
4    A.  At the time I believe, yes, it all added
5  up to extreme concern.
6    Q.  You referred to Ms. Ross-Williams as an
7  unfit plaintiff and you say, "I called Monica
8  Ross-Williams, whereby it became painfully clear
9  that she was wholly uninformed."
10      Were there other reasons that you
11  found Ms. Ross-Williams to be an unfit plaintiff?
12    A.  Yes.
13    Q.  What were they?
14    A.  She wasn't involved in the case in any
15  way.
16    Q.  Any other reasons?
17    A.  I think that's enough.
18    Q.  Okay.  You allege in this amicus brief
19  that "Plaintiffs," meaning Robert Weiser and/or
20  the Weiser Law Firm, "lied to the Court."
21      To what were you referencing
22  specifically?
23    A.  One instance is when Mr. Stecker in open
24  Court, so it should be in the transcript of the

Page 101

1  hearing with Judge Vano, said that everyone that
2  worked on the case was a securities expert.  So
3  that was patently false.  Mr. Silow billed
4  $1.7 million in the case and he was not a
5  securities expert.
6      They submitted what is now known to
7  be illusory or fraudulent billing to the Court.
8    Q.  Anything else as you sit here today?
9    A.  There were statements that were made
10  about me throughout the course of the litigation
11  that were untrue or misleading.
12      Another example would be the
13  letters that your client drafted to Douglas Shema
14  and to Judge Vano.  To Judge Vano they say we
15  believed, past tense, that Mr. Silow's billing
16  records were true and accurate, and I'm
17  paraphrasing and going from memory here, and then,
18  conversely, the letter that was sent to Douglas
19  Shema of the Appellate Court says we continue to
20  believe that Mr. Silow's billing records are true
21  and accurate.  And they still sought the
22  reinstatement of the over $4 million that Mr. Vano
23  reduced their settlement award by -- by Judge
24  Vano.

26 (Pages 98 - 101)

Page 102

1    Q.  Okay.  In this amicus brief you again
2  refer to the Weiser Law Firm as a criminal
3  enterprise, "some sort of criminal enterprise."
4    To what does that reference?
5    A.  Using a disbarred criminal working with
6  other firms, misleading the Court, filing
7  perjurious declarations, affirming said
8  declarations.
9    Q.  And to which declarations are you
10  specifically referring other than the declaration
11  of Alexander J. Silow?
12    A.  I would have to have the declarations in
13  front of me.  But there were declarations from Mr.
14  Weiser, there were declarations from Mr. Aguilar.
15  There were a lot of declarations.  There were
16  declarations from former Federal Judge Layn
17  Phillips.  There were a lot of declarations
18  affirming support for the hours billed and the
19  fairness of the $4.5 million fee request.
20    Q.  You refer in this amicus brief that "The
21  Weiser Law Firm had contempt for the Court."
22    To what were you referencing?
23    A.  Very difficult at this time, Phil, to
24  remember every nuance of everything that's gone

Page 103

1  on.  It's gone on for years and years and years
2  and it's gone on -- there's been voluminous
3  amounts of pleadings that have been pled and
4  filed, so it's very difficult to give you
5  specific, sitting here today specific reasons or
6  details that some of the conclusions that have
7  been reached were reached.
8    Q.  Mr. Hartleib, speaking of conclusions
9  reached, you have referred to perjurious
10  declarations or filings, correct?
11    A.  Yes.
12    Q.  Not in the last answer but in your
13  previous answer.
14    A.  Yes.
15    Q.  Has there been -- and, again, I'm
16  excepting the declaration of Alexander J. Silow
17  from what I'm about to ask.  But has there been
18  any finding of any Court that any declaration or
19  affidavit or filing before any Court in any matter
20  in which you have been involved was perjurious?
21    A.  Yes.
22    Q.  Okay.  What Court and with respect to
23  what filing was a determination of perjury made,
24  again, other than the declaration of Alexander J.

Page 104

1  Silow?
2    A.  Well, that for sure.  So Alexander
3  Silow's declaration was wholly perjurious.  The
4  Appellate Court affirmed that fraud had taken
5  place in the case with regard -- the Chief Justice
6  affirmed that fraud had taken place in this case.
7  We can all agree that fraud had taken place in
8  this case with regard to the billing.
9    Q.  Okay.  And just by "this case," you mean
10  Sprint/Nextel?
11    A.  That's right.
12    Q.  Because we are talking about a brief you
13  filed in Equifax so I just want to make sure we
14  all know what you're referring to when you say
15  "this case."
16    But specifically, Mr. Hartleib, was
17  a declaration or other filing of any individual
18  human being found to be perjurious by any Court in
19  the Sprint/Nextel case or any other case?
20    A.  I think Judge Vano's orders speak for
21  themselves.  They are two of the most scathing
22  orders that I have ever seen.
23    Q.  Does he find any filing before him to be
24  -- to reach the level of perjury?

Page 105

1    A.  I think he uses words like not credible,
2  not believable.  Did he use the word perjury?  I
3  don't recall.  I don't think so.  But his orders
4  speak for themselves.
5    Q.  Was anyone ever charged with perjury in
6  any -- either the Sprint/Nextel case --
7    A.  I believe Mr. Silow was but I'm not
8  certain.
9    Q.  I will finish my question, but thank
10  you.
11    Was anybody charged with perjury in
12  the Sprint/Nextel case or in any other case you
13  have filed an amicus curiae brief or other
14  opposition to lead counsel, co-lead counsel
15  appointment other than perhaps Jeffrey Silow in
16  the Sprint/Nextel case?
17    A.  Not that I am aware.
18    Q.  Okay.  You allege in your amicus curiae
19  brief in Equifax, which is Hartleib-31, that "The
20  Weiser firm engaged in self dealing."
21    To what are you referring to?
22    A.  By jettisoning legitimate claims that
23  were pled in the original complaint and settling
24  for the illusory relief that was obtained by

27 (Pages 102 - 105)

Page 106

1  hiring a disbarred criminal to bill $1.7 million
2  of a $4.5 million fee request, by not properly
3  representing shareholders like myself or the
4  corporation.
5      Q.  All in the Sprint/Nextel case?
6      A.  Yes, that's what these amicus briefs do.
7  The only thing I talk about in all of the amicus
8  briefs that have been filed is what transpired in
9  Kansas in the Sprint/Nextel case.
10     Q.  I just want to make sure that when you
11  just testified, that those issues that you
12  referred to, that are about the Sprint/Nextel case.
13     A.  Correct.
14     Q.  Okay.  You have referred to the Weiser
15  Law Firm "having unclean hands" in this amicus
16  brief.
17         To what are you referring?
18     A.  I think Judge Vano's Orders speak for
19  themselves.  I think the Appellate Court decision,
20  the syllabus from the Appellate Court speaks for
21  itself.  I think the evidence is -- speaks for
22  itself.
23     Q.  You also in this amicus brief say that
24  "The Weiser firm engaged in violations of public

Page 107

1  trust."
2         To what are you referring?
3      A.  You have a fiduciary obligation as an
4  attorney.  You are filing a derivative case to
5  seek recompense for the harm that was done to the
6  corporation by its former executives, current or
7  former executives.  That was not done, in my
8  opinion, to any extent in the Sprint/Nextel case.
9      Q.  So based upon your answer, Mr. Hartleib,
10  is it your belief that an attorney representing a
11  plaintiff in a shareholder derivative suit has a
12  fiduciary duty?
13     A.  Yes.
14     Q.  Okay.
15     A.  They are a fiduciary.
16     Q.  You allege in this amicus filing in
17  Equifax that "The Weiser firm committed criminal
18  acts upon the Kansas Court and a multitude of
19  others across the country."
20         To what are you referring?
21     A.  It's my understanding, and I believe
22  your client admitted to having Jeffrey Silow, he
23  was in a myriad of cases over the course of the
24  last decade or two while he was under the

Page 108

1  employment of your client, the Weiser Law Firm,
2  and he billed as a disbarred attorney in many,
3  many cases over the course of the last two
4  decades.  It's my understanding that your client
5  had to reach out to current cases that were
6  ongoing and inform those Courts that Mr. Silow was
7  acting -- was practicing law without a license and
8  acting as an attorney when he was a disbarred
9  criminal.
10         MR. ROSENZWEIG:  I would like to
11     mark Tab 23 as Hartleib-32.
12         (Exhibit No. Hartleib-32, 3/22/18
13     E-Mail, was marked for identification.)
14  BY MR. ROSENZWEIG:
15     Q.  And I'm going to ask you to look at this
16  e-mail.
17     A.  Yes, I see it.
18     Q.  Okay.  Did you send this March 22, 2018
19  e-mail at 11:41 p.m. to James M. Ficaro?
20     A.  Yes.
21     Q.  In this e-mail you state, and it's short
22  I will just quote it, "James, much appreciated, I
23  received these filings several hours ago!  Let Rob
24  know he is making a catastrophic mistake!"

Page 109

1         Do you see that?
2      A.  I see it.
3      Q.  Okay.  What catastrophic mistake are you
4  referring to in that e-mail?
5      A.  I don't recall specifically what it is
6  in reference to but I believe, I believe this was
7  after your client reached out to me wanting to
8  resolve the "Sprint issues" and address the
9  forthcoming amicus filing in the Equifax case.
10     Q.  So you don't know -- you don't remember
11  specifically what the catastrophic mistake was?
12     A.  Well, I believe your client hired an
13  investigator, like I previously testified to, to
14  try to dig up any dirt that he could find on me,
15  to try to besmirch my representation, not stick to
16  the facts of the case but try to undermine my
17  credibility or integrity by any means possible.  I
18  believe that that was done.  I believe your
19  clients have admitted to that at this particular
20  point.
21         I believe that I rebuffed your
22  client and I said the Sprint ship has sailed but
23  if you want to talk about the forthcoming action
24  in another case I was willing to listen, or the

28 (Pages 106 - 109)

Page 110

1  lawsuit that was being filed by me against him in
2  Kansas.
3      Q.  Against Rob Weiser and the Weiser
4  firm --
5      A.  The Weiser firm.
6      Q.  -- in Kansas which was a suit that was
7  dismissed in full and the dismissal of which was
8  upheld by the Appellate Court, correct?
9      A.  Yes.
10     Q.  Okay.  Mr. Hartleib, did you speak
11 before Judge Thrash in Court?
12     A.  The name is familiar.  Is that the judge
13 in the Equifax case?  Let me check my amicus
14 brief.  What exhibit was the amicus?
15         MR. MERRIGAN:  In Equifax?
16         THE WITNESS:  Yes.
17     A.  Yes, that's -- I have it.  Yes, I did.
18 BY MR. ROSENZWEIG:
19     Q.  And just so I guess we have a clear
20 record, Judge Thrash was the presiding judge in
21 the Equifax derivative litigation?
22     A.  I believe he was the presiding judge in
23 the derivative litigation as well as the class
24 action litigation.

Page 111

1      Q.  Okay.  And your purpose in speaking to
2  the Court and Judge Thrash was to support your
3  amicus filing?
4      A.  Yes.
5      Q.  It was in the context of what I will
6  call argument about the -- your opposition to the
7  Weiser firm being co-lead counsel, correct?
8      A.  Yes.
9      Q.  And do you recall whether you
10 essentially argued the things that were in your
11 amicus brief before Judge Thrash?
12     A.  Yes.
13     Q.  Do you recall specifically what you said
14 that day?  There is no transcript of which I am
15 aware of that hearing.  I haven't seen it.  So I'm
16 not saying it doesn't exist.  So I just want to
17 know what your recollection is as to what the
18 hearing entailed and what you said that day, if
19 you recall.
20     A.  In general, I just recall giving the
21 judge the details or information of what happened
22 in Kansas in the Sprint case.  I had a very short
23 speaking window, if I had remember correctly.  It
24 was packed.  I have never seen such a crowded

Page 112

1  courtroom in my life.
2      Q.  Are you contemplating or are you
3  finished?
4      A.  No, I'm finished.
5      Q.  Okay.
6      A.  I mean it was interesting.  The jury
7  pews were full of attorneys.  There was no place
8  to sit.  I mean there must have been 400 lawyers
9  in that courthouse.
10         MR. ROSENZWEIG:  I would like to
11 turn your attention to Tab 24 which I am
12 going to mark as Hartleib-33.
13         (Exhibit No. Hartleib-33, 4/5/18
14 E-Mail, was marked for identification.)
15 BY MR. ROSENZWEIG:
16     Q.  So let me know when you are there, Mr.
17 Hartleib.
18     A.  I am here.
19     Q.  Okay.  This is an e-mail from you to Rob
20 Weiser, Brett Stecker and James M. Ficaro April 5,
21 2018 at 4:02 a.m., correct?
22     A.  Yes.
23     Q.  And you copy yourself at a gmail
24 address.

Page 113

1      A.  Yes.
2      Q.  Is that gmail address different from the
3  address from which you sent this e-mail?
4      A.  Probably not but I don't know.  I have
5  like four or five e-mail addresses.
6      Q.  Okay.
7      A.  So one of them is set up to auto copy
8  myself, and that's probably this gmail address.
9      Q.  Okay.  The e-mail says, "Just got home
10 and wanted to make sure that you have this!  Good
11 to finally meet you, Rob!  Like I said, none of
12 this was necessary!"
13     A.  Yes.
14     Q.  Did I read that fairly?
15     A.  You did.
16     Q.  And then there's a link?
17     A.  Yes.
18     Q.  Your reference to "Good to finally meet
19 you, Rob," was it in the context of the Equifax
20 oral argument I will call it that you first met
21 Rob Weiser in person?
22     A.  Yes, outside of the courthouse in the
23 lobby.
24     Q.  As you previously testified?

29 (Pages 110 - 113)

Page 114

1    A.  Yes.
2    Q.  Okay.  And what were you sending to Rob
3  Weiser, Brett Stecker and James Ficaro by sending
4  this link?
5    A.  Probably the order from the judge.
6    Q.  Judge Thrash?
7    A.  Yes.
8    Q.  Which removed Weiser as co-lead counsel?
9    A.  Probably.
10    Q.  Is that your best recollection?
11    A.  Yes, that's my best recollection.
12    Q.  Let me focus on the last part of your
13  substantive e-mail which says, "Like I said, none
14  of this was necessary!"
15        What did you mean by that, Mr.
16  Hartleib?
17    A.  It's unfortunate.  None of it was
18  necessary.
19    Q.  None of what was necessary?
20    A.  Any of this.  It was unnecessary.  It
21  was, it was -- it's a shame that all of this
22  happened.
23    Q.  But yet you were pleased that Judge
24  Thrash entered an order removing the Weiser Law

Page 116

1  most relevant ones, the orders from Judge Vano so
2  despite what I say in my amicus brief, a judge can
3  read what actually happened.  So if a judge thinks
4  that my language is too colorful or may not agree
5  with my interpretation or something that I feel as
6  though I have every right to make based on my
7  opinion and what I have witnessed and what I have
8  seen, the judge or the parties always have the
9  actual documents that they can read for themselves
10  and make their own conclusion as to what I
11  presented in my amicus filing.
12  BY MR. ROSENZWEIG:
13    Q.  Mr. Hartleib, was there any action that
14  the Weiser Law Firm or Rob Weiser could have taken
15  to have avoided what you refer to as "none of this
16  was necessary" given the events that occurred in
17  the Sprint/Nextel case?
18        MR. MERRIGAN:  Can I ask you for a
19  point of clarity?
20        MR. ROSENZWEIG:  Of course you can.
21  It may be a terrible question.
22        MR. MERRIGAN:  I am just trying to
23  understand.  Are you asking, the way you
24  phrased it are you asking is there anything

Page 115

1  Firm as co-lead counsel in the Equifax case,
2  correct?
3        MR. MERRIGAN:  Objection.
4        But you can answer.
5  BY MR. ROSENZWEIG:
6    Q.  Let me ask it differently.  Were you
7  pleased that the judge issued an order removing
8  the Weiser Law Firm as co-lead counsel in the
9  Equifax case?
10        MR. MERRIGAN:  Objection.
11        But you can answer.
12    A.  So unlike other appearances that I made
13  where the judge had no issues with your clients,
14  they had the information, they said that the
15  information was basically not relevant to them,
16  that they had already done their due diligence and
17  there was no action taken by the judge, this judge
18  found the information to be troubling and made a
19  decision based on my appearance and the
20  information that was provided.
21        So, in all of these, in all of
22  these appearances or correspondence or e-mails I
23  always include, or nearly always include the
24  pleadings of the case in Kansas, or at least the

Page 117

1  they could have avoided, I guess things that
2  Michael did after the Sprint/Nextel events
3  or --
4        MR. ROSENZWEIG:  Yes.  So let me
5  reword the question.  I'm going to just take
6  that as an objection as to form and I'm going
7  to withdraw the question and ask this.
8  BY MR. ROSENZWEIG:
9    Q.  After the Sprint/Nextel case and Judge
10  Vano's rulings and the action of the Appellate
11  Court in that Sprint/Nextel matter, were there any
12  actions or things that the Weiser Law Firm could
13  have done that would have satisfied you or
14  obviated the need, your need to file amicus briefs
15  in all the subsequent cases?  Were you looking for
16  the Weiser firm to do something or some things
17  that would have addressed your displeasure that
18  arose from Sprint/Nextel?
19    A.  Like what?  What are you?
20    Q.  Like anything.  I'm not suggesting
21  anything.  I'm asking you a question.  Were you
22  looking for them to do something?
23        MR. MERRIGAN:  I'm going to object.
24        But you can answer.

30 (Pages 114 - 117)

Page 118

1    A. So I believe, like when the statement
2  was made "none of this was necessary," I believe
3  at this particular point in time -- I mean there
4  was definitely good faith contemplation of
5  litigation, if not, a case already filed. So I am
6  not certain if the Kansas litigation, Hartleib V
7  Weiser, et al. was filed at that particular time.
8  I don't know. But I am sure that that had
9  something to do with the comment as well.
10          You can't put a genie back in a
11  bottle. And that's why when your client reached
12  out to me when -- I think it was right after the
13  Equifax amicus was filed I received an e-mail from
14  your client. I believe it was a Sunday, Saturday
15  or a Sunday. And he wanted to know if there was
16  any way that we could resolve the "Sprint issues."
17  And I said to him -- I wrote back and I said Rob,
18  the Sprint ship has sailed but if you want to talk
19  about a resolution to the forthcoming litigation I
20  am willing to listen.
21          So I believe it was right before
22  the Kansas litigation was filed by me that you
23  said was dismissed and not because it lacked merit
24  but because of procedural problems --

Page 119

1  BY MR. ROSENZWEIG:
2    Q. Well, I didn't say that, right?
3    A. Right. No, but I'm saying that.
4    Q. That's your --
5    A. You said it was dismissed and I'm saying
6  that it's not because it lacked merit, it was
7  because of procedural issues.
8          So, I don't know what you are
9  asking me. You can't put the genie back in the
10  bottle. What happened in Kansas happened. The
11  company was harmed, shareholders were harmed, your
12  client's reputation was harmed. I had to spend a
13  tremendous amount of time, you know, being adverse
14  to counsel who is supposed to be representing my
15  interest.
16    Q. Did you ever have a conversation with
17  Rob Weiser about any kind of a resolution before
18  your commencement of the Kansas litigation which
19  without commentary or opinion was, in fact,
20  dismissed and the Appellate Court affirmed the
21  dismissal?
22    A. I don't recall timing. We, you and I
23  have had, you and my attorneys have had
24  conversations in the past.

Page 120

1    Q. Well, let me just address that for the
2  record. I have never had a private conversation
3  with you --
4    A. No, no.
5    Q. -- outside the context of your counsel.
6    A. No, no. I understand.
7    Q. Okay. That's important.
8    A. Okay. Right. But I just -- you're
9  asking me that question and there have been
10  several discussions about some sort of a
11  resolution.
12    Q. I'm talking about strictly you, Michael
13  Hartleib, and Robert Weiser in the context of
14  communications just by and between you. Did you
15  ever have a conversation with Rob Weiser in which
16  you actually discussed either avoiding the Kansas
17  litigation you were about to file or addressing
18  the whole sale dispute between you and the Weiser
19  firm and Rob Weiser which emanates from the
20  Sprint/Nextel litigation?
21    A. I honestly don't recall. I think that
22  when he reached out --
23          MR. MERRIGAN: He?
24    A. Rob Weiser reached out during the time

Page 121

1  of the Equifax case, I don't remember if we had a
2  conversation after that or not. I honestly don't
3  recall. I know that he made an overture to
4  discuss it. I rebuffed the Sprint issue because I
5  felt as though there was nothing to discuss at
6  that particular point in time.
7          And I don't know, I don't recall if
8  there was a discussion between he and I. I know
9  that there was a brief discussion at the
10  Equifax -- in the Equifax lobby. So there was a
11  face-to-face discussion that was very short. But
12  I don't believe that any -- there was any
13  substance to the discussion. I think it was very
14  short.
15    Q. Okay. And do you remember anything that
16  was discussed?
17    A. The only thing I remember is I think he
18  said "If you think I knew who Silow was we have
19  nothing to talk about." I don't know if that was
20  at the end of the conversation or if that was the
21  whole extent of the conversation.
22          MR. ROSENZWEIG: Okay. On that,
23  lunch has arrived so we are going to take a
24  short break to actually partake in that.

31 (Pages 118 - 121)

Page 122

1    (A lunch recess was held at this
2    time.)
3        MR. ROSENZWEIG:  So going back on
4    the record after a lunch break.
5        I would like to mark -- and I don't
6    actually have it as a separate tab put it is
7    right behind 43.  Tab 43 is a one-page
8    e-mail which we have already marked and
9    behind that I have Defendant Michael
10   Hartleib's Answer to Amended Complaint and I
11   would like to mark that document as
12   Hartleib-34.
13       (Exhibit No. Hartleib-34, Answer,
14   was marked for identification.)
15   BY MR. ROSENZWEIG:
16   Q.  Mr. Hartleib, let me know if and when
17   you have that document.
18   A.  I have the document.  So all of this is
19   the document.  Okay.
20       MR. MERRIGAN:  It was a long
21   Complaint so the answer is long.
22       THE WITNESS:  Yes, 700 pages or
23   something like that.  It killed like a lot of
24   trees.

Page 123

1    BY MR. ROSENZWEIG:
2    Q.  Okay.  Do you have what I have marked as
3    Hartleib-34?
4    A.  I believe so.
5    Q.  And it is a document that was filed as
6    Document 166 in the United States District Court
7    for the Eastern District of Pennsylvania on
8    July 6, 2022.  And it is by virtue of the page
9    numbers of the filing stamp 37 pages long.
10       Can you confirm that --
11   A.  Yes.
12   Q.  -- that that's the document you have in
13   front of you?
14   A.  I have it.
15   Q.  Mr. Hartleib, I don't have a
16   verification of this answer.  It was signed by
17   Mr. Merrigan as your counsel.  I have never seen a
18   verification of it.  Do you know whether you
19   reviewed and verified this answer?
20   A.  I don't recall.  I know that it was
21   discussed.  I don't know if I was ever asked to
22   verify its contents.
23       MR. ROSENZWEIG:  Mr. Merrigan, do
24   you know if it was ever verified?

Page 124

1        MR. MERRIGAN:  I'm trying to check
2    right now.
3        MR. ROSENZWEIG:  Okay.  Can we take
4    a minute?
5        MR. MERRIGAN:  I mean there may be
6    a verification but it's going to take me a
7    while to --
8        MR. ROSENZWEIG:  I will just
9    represent that we never received a
10   verification, and I am going to ask that
11   subsequent to this deposition that Mr.
12   Hartleib review the Answer as filed and
13   either verify it or you will file an Amended
14   Answer that he would then verify.
15       Okay, Mr. Merrigan?
16       MR. MERRIGAN:  Assuming we don't
17   already have a verification.
18       MR. ROSENZWEIG:  Okay.  And if you
19   do, just kindly provide it.
20       MR. MERRIGAN:  Yes.  I will keep
21   looking.
22       MR. ROSENZWEIG:  Very good.
23   BY MR. ROSENZWEIG:
24   Q.  Mr. Hartleib, do you have any reason to

Page 125

1    believe that this document that I have marked as
2    Hartleib-34 is not the actual and legitimate
3    Answer filed on your behalf to the Weiser Law Firm
4    and Robert Weiser's Amended Complaint?
5    A.  No.
6    Q.  Okay.  Do you recall having reviewed it
7    previously? You said you discussed it.  I imagine
8    you mean discussed with counsel.
9    A.  Yeah, I recall going over questions and
10   answers with counsel.
11   Q.  Do you recall correcting anything in the
12   document?
13   A.  I don't recall specifically what was
14   corrected but I recall going over, you know,
15   questions and answers and I -- if there was
16   something that I -- during that process I would
17   have told counsel to correct it.
18   Q.  Okay.  I would like to turn your
19   attention to Paragraphs 42 through 47 of this
20   answer.  That's on Page 7.  And by Page 7,
21   Mr. Hartleib, I'm looking across the top of the
22   pages where the case filing information is.
23   A.  Yes.
24   Q.  In the upper right-hand corner it says

32 (Pages 122 - 125)

Page 126

1   page blank of 37. In this case I'm asking you to
2   look at Page 7 of 37.
3       A. Yes.
4       Q. Okay. And, again, I'm returning your
5   attention to Paragraphs 42 through 47 in each of
6   which the following statement is contained: "By
7   way of further response, Plaintiffs and Defendant
8   communicated into 2012 regarding potential cases
9   and discussing other litigation."
10          Do you see that?
11      A. What number are you on?
12      Q. Paragraph 42, 43, 44, 45, 46 and 47 --
13      A. Yes, I see it.
14      Q. -- all contain that same language.
15          Do you see that?
16      A. I see it, yes.
17      Q. And do you agree that each paragraph
18  contains that language?
19      A. Yes.
20      Q. Okay. What communications were you
21  having with Rob Weiser and the Weiser firm about
22  potential cases and other litigation to the extent
23  that you haven't already told me?
24          MR. MERRIGAN: Can we, being that

Page 127

1   we are referring to specifically numbered
2   Answers to the Complaint, can we make the
3   Complaint available to him to put it in
4   context? It might not need the context but
5   just in case.
6          MR. ROSENZWEIG: Of course we can.
7   So in, I believe in every binder at the
8   beginning of the binder is the Verified
9   Amended Complaint which is a document,
10  Document 69 filed January 21, 2021. And yes,
11  the Amended Complaint was filed January of
12  '21. The Answer is July of '22. That's not
13  me misspeaking. And that's a 61-page
14  document without exhibits.
15          MR. MERRIGAN: Is that a tab in the
16  binder?
17          MR. McGOWAN: They were clipped.
18          MR. MERRIGAN: I didn't get it at
19  least. I don't know if Michael has it.
20          THE WITNESS: I don't have it.
21          MR. MERRIGAN: I will just look
22  over your shoulder.
23          MR. ROSENZWEIG: Paragraphs 42
24  through 47. Do you want a second set?

Page 128

1          MR. MERRIGAN: No, that's okay.
2          42 through 47, and he's asking
3   specifically about this part.
4          THE WITNESS: Okay. Can you read
5   back the question from before?
6          (The record was read by the
7   reporter as requested: "Q. What
8   communications were you having with Rob
9   Weiser and the Weiser firm about potential
10  cases and other litigation to the extent that
11  you haven't already told me?")
12      A. There were numerous conversations
13  throughout the years. I don't recall with
14  specificity sitting right here right now. I
15  remember one in particular where Rob reached out
16  wishing me a Merry Christmas and Happy Holidays
17  and had a case that he was asking if we -- if I
18  knew a plaintiff for.
19  BY MR. ROSENZWEIG:
20      Q. And do you recall what matter that was?
21      A. I don't. And the dates are -- what are
22  the dates? Let's see, into 2012. So does that
23  mean from 2009 into 2012?
24      Q. Let's agree that's what that means.

Page 129

1       A. Okay. There were several occasions
2   where we had conversations and we had e-mail
3   correspondence regarding other cases, other cases
4   that I am sure, like I testified to earlier, that
5   I was aggrieved or wronged and thought that action
6   should be taken to try to stop a corporation or
7   company from doing something. Like comes to mind
8   like Hewlett Packard with their ink cartridges and
9   how all of the ink stopped working when one
10  cartridge would run out. There were all kinds --
11  there were times just through the course of
12  business that I would recognize potential cases
13  that, that something needed to happen to correct
14  an abuse of a company or a corporation or an
15  action.
16          I remember the correspondence
17  asking if we knew of a plaintiff, or if I knew of
18  a plaintiff. I think maybe David Sachs was
19  involved in that request as well. So, there
20  was -- there were numerous times that we
21  communicated and had correspondence.
22      Q. Okay. And that was -- those things
23  occurred -- those communications occurred despite
24  the fact that Rob Weiser and the Weiser Law Firm

33 (Pages 126 - 129)

Page 130

1  were not representing you, correct?
2      A.  Correct.
3      Q.  And before the Silow controversy in the
4  Sprint/Nextel case?
5      A.  Yes.
6      Q.  Let me turn your attention --
7      A.  Can I add to that as well?
8      Q.  You can, yes.
9      A.  Sorry.  So there was also during the
10  time of this -- I don't know what year it was but
11  during the time of the Sprint litigation there
12  were also e-mails that Rob sent me that were --
13  where I had questions or where he was helpful to
14  me and gave me some case law or gave me some cases
15  to look up, and I think that pertained to the
16  Sirius XM case I believe.
17      Q.  Okay.  Anything more you wanted to add?
18      A.  No, that's all.
19      Q.  Let me turn your attention to Paragraphs
20  95 and 96, Page 14 of this --
21      A.  I am there.
22      Q.  -- Hartleib-34 document.  You can look
23  at the Amended Complaint and then you can look at
24  your answers to those paragraphs.

Page 131

1      A.  Okay.
2      Q.  Okay.  You state in Paragraph 95 and 96
3  of your answer that "Defendant sought to ensure
4  that other courts were aware of Plaintiff's
5  unethical and improper practices."
6          Is that a correct recitation of
7  what each Paragraphs 95 and 96 state?
8      A.  Yes.
9      Q.  Okay.  What did you do to ensure that
10  courts were aware of these assertions by you other
11  than filing amicus briefs?  What, if anything, did
12  you do other than filing amicus briefs?
13      A.  Provided the pertinent pleadings and
14  documents, orders from Judge Vano, syllabus from
15  the Appellate Court, provided all of the
16  documentation as testified to before so that the
17  judge could make their own decision.  Despite the
18  language or my recitation of facts in the amicus
19  briefs, I provided all of the pleadings, orders,
20  rulings, syllabus that were the facts that I based
21  my amicus brief on so that way the judge could
22  read through.  If they didn't agree with my
23  recitation of facts, they had the facts there to
24  make their determination if it was information

Page 132

1  that they deemed important or not.
2      Q.  And why was it important to you that
3  these other courts have this information?
4      A.  Because I didn't want other shareholders
5  harmed.  I didn't want valid claims jettisoned for
6  the sole purpose of lawyers making millions of
7  dollars.
8      Q.  And how did you determine which other
9  courts you provided this information to?
10      A.  I would be provided information from
11  other parties, I would do research, I had holdings
12  in other companies in which they filed, that there
13  were claims or cases filed.  So it was in
14  different ways.
15      Q.  Okay.  Let me turn your attention to
16  Paragraph 100 and your answer that's on Page 15 of
17  37 of the Answer.  And of course you could look at
18  the corresponding paragraph of the Complaint.
19          Let me know when you have had
20  adequate time to review those.
21      A.  Yes, I have read it.
22      Q.  Okay.  In Paragraph 100 you state,
23  "Defendant sought to make sure that other
24  jurisdictions and other parties did not fall

Page 133

1  victim to Plaintiffs or the cohorts."
2          Do you see that?
3      A.  Yes.
4      Q.  Did I read it accurately?
5      A.  Yes.
6      Q.  What did you mean by "Plaintiffs or the
7  cohorts"?
8      A.  All of the firms that were acting as one
9  or what I believe to be acting as one, plaintiffs
10  that are not involved in the cases in any way,
11  plaintiffs that don't know the facts of the case.
12          I mean you have to ask yourself why
13  would these firms not want a plaintiff like myself
14  that's going to fight and knows all of the facts
15  probably better than anybody in the country to get
16  real reform and seek recompense for the
17  corporation and the shareholders that were harmed.
18  Why would they want someone that's completely
19  disinterested at best, at worst, something else?
20      Q.  What did you mean by the use of the term
21  "other parties"?  You say, "Defendants sought to
22  make sure that other jurisdictions and other
23  parties did not fall victim to Plaintiffs or the
24  cohorts."

34 (Pages 130 - 133)

Page 134

1          Who are the other parties?
2     A.  Other shareholders.
3     Q.  Okay.
4     A.  Corporations.
5     Q.  What do you mean by "other
6  jurisdictions"?
7     A.  Other states, other, other cases in
8  other states.
9     Q.  How did you determine which other
10 parties and which other jurisdictions you needed
11 to make aware of the happenings in the
12 Sprint/Nextel case?
13    A.  I already answered that.
14    Q.  Well, but I'm asking in the context of
15 this Paragraph 100.
16    A.  It's the same answer as before.
17    Q.  Okay.  I asked you not about other
18 jurisdictions and other parties so, unfortunately,
19 I have to ask it again?
20    A.  Okay.  Can you repeat the question?
21        (The record was read by the
22    reporter as requested:  "Q.  How did you
23    determine which other parties and which other
24    jurisdictions you needed to make aware of the

Page 135

1     happenings in the Sprint/Nextel case?")
2     A.  I had access to Pacer, I had holdings in
3  other companies, I had people giving me
4  information.  The same answer as I previously
5  testified to.
6  BY MR. ROSENZWEIG:
7     Q.  Let me go back to Paragraph 97 if I
8  could.  In Paragraph 97 of your answer, Page 14 of
9  that Answer you admit that you sent the referenced
10 e-mail, and that would be an e-mail to Rob Weiser
11 of August 17, 2018 which was attached to the
12 Amended Complaint as Exhibit-20.
13        MR. MERRIGAN:  The exhibits aren't
14    on here.
15        MR. ROSENZWEIG:  No, but it's in
16    the binder.  I'm going to take you to it.
17        MR. MERRIGAN:  I was just telling
18    Michael.
19        MR. ROSENZWEIG:  So Mr. Hartleib,
20    I'm going to mark the August 17, 2018 e-mail
21    from you to Rob Weiser as Hartleib-35 and I'm
22    going to direct you to it as Tab 20.
23        (Exhibit No. Hartleib-35, 8/17/18
24    E-Mail, was marked for identification.)

Page 136

1     A.  Yes, I have it.
2  BY MR. ROSENZWEIG:
3     Q.  Okay, great.  It's an e-mail from you to
4  Rob Weiser, Friday, August 17, 2018 10:45 p.m. to
5  Rob Weiser, copy to Brett Stecker, Subject
6  Forthcoming Hearing.
7          Did you send that e-mail to Mr.
8  Weiser?
9     A.  Yes.
10    Q.  You asked Mr. Weiser if he would be at
11 the Witmer versus Steven hearing on the 27th,
12 correct?
13    A.  Correct.
14    Q.  What is the Witmer versus Steven case?
15    A.  I don't recall.  But I believe it was in
16 the Central District of California, so in my
17 backyard.  It was in Santa Ana I believe.
18    Q.  Could it be the Witmer versus Sugarman
19 case?
20    A.  Could be.
21    Q.  Okay.  But you don't know as you sit
22 here?
23    A.  I mean Sugarman sounds familiar.  If you
24 told me the name of the company, you know, it

Page 137

1     would help if the caption -- if I knew which
2  corporation it was in regards to.
3     Q.  In this e-mail you write, "We will be
4  forced to deal with each other for the foreseeable
5  future."
6     A.  Yes.
7     Q.  What did you mean by that?
8     A.  I think litigation had commenced, you
9  know, at that point in time.  I think we were
10 involved in litigation, or at least good faith
11 contemplation of litigation.
12    Q.  Okay.  And you also reference in the
13 very last sentence of this e-mail, "That said,
14 other action is eminent."
15    A.  Right.
16    Q.  What did you mean by "other action is
17 eminent"?
18    A.  Probably the lawsuit that was filed in
19 Kansas I would guess.
20    Q.  By you?
21    A.  Yes.
22    Q.  I'm not trying to quibble, nor am I
23 trying to be disrespectful.  Did you mean imminent
24 instead of eminent?

35 (Pages 134 - 137)

Page 138

1    A.  Yes.  I would like to point out that
2  these are just e-mails.  They are not a pleading.
3    Q.  I have refrained from pointing out
4  errors in pleadings.
5    A.  You pointed out a few.
6    Q.  A few but not all.
7    A.  There's not too many.  It's not too bad.
8    Q.  In paragraph --
9    A.  Remember, I'm not a lawyer.
10    Q.  I do remember that.
11        In your answer to Paragraph 99,
12  Page 14 of 37.
13    A.  Yes, I see it.
14    Q.  And you have looked at the corresponding
15  allegation in the Complaint?
16    A.  Yes.
17    Q.  So in your answer Paragraph 99 you admit
18  that you were not a named party in the LC or A10
19  cases, correct?
20    A.  Correct.
21    Q.  And it is also true that you were not a
22  shareholder in those underlying corporations?
23    A.  I -- sitting here today I don't even
24  know what they are.

Page 139

1    Q.  Okay.
2    A.  I don't believe I filed anything.  I
3  don't, I don't know why we are even talking about
4  it.
5        MR. MERRIGAN:  And it may be that
6    it's a different question and that's fine.  I
7    just want to object to the extent if you're
8    referring that the pleadings say that he
9    wasn't a shareholder, that's not what they
10    say.
11        MR. ROSENZWEIG:  No, I'm asking him
12    whether he was, right.
13        MR. MERRIGAN:  And that's fine.  I
14    just wanted to make sure it was clear.
15  BY MR. ROSENZWEIG:
16    Q.  What did you mean when you wrote, "We
17  can discuss my concerns with LC, A10 and several
18  other companies in which I am a shareholder"?
19        MR. MERRIGAN:  If you want to look
20    at the e-mail that you have your hand on.
21  BY MR. ROSENZWEIG:
22    Q.  Right, referring back to Hartleib-35.
23    A.  Without knowing what cases they were
24  sitting here today, I don't know.  Obviously there

Page 140

1  was a reason that I wrote the e-mail but I don't
2  know.  I do know who Judge Carney is.
3    Q.  Okay.  Who is Judge Carney?
4    A.  Judge Carney is a judge that I am
5  familiar with in the Central District of
6  California.  I believe it's Comac Carney or
7  something to that effect.
8    Q.  Okay.
9    A.  Cormac or, yeah.
10    Q.  I want to take you fast forward to
11  Paragraph 145 of your Answer, Page 20 of 37.
12    A.  I'm sorry, Phil, what number?
13        MR. MERRIGAN:  This one.
14    A.  145?
15  BY MR. ROSENZWEIG:
16    Q.  145, yes.
17    A.  Okay.
18    Q.  Mr. Hartleib, you admit that you
19  commenced litigation against Rob Weiser and the
20  Weiser Law Firm in Kansas in 2018, correct?
21    A.  And I believe Ross-Williams, the
22  plaintiff in the --
23    Q.  Was also a defendant?
24    A.  I believe so, yes.

Page 141

1    Q.  Yes.  Did your counsel, Mr. Protzman,
2  discuss with you that he had made a monetary
3  demand from the Weiser firm and -- the Weiser Law
4  Firm and Rob Weiser prior to filing that
5  Complaint?
6        MR. MERRIGAN:  Object to the form
7    of the question as that calls for
8    attorney-client privilege information.
9  BY MR. ROSENZWEIG:
10    Q.  So I am going to withdraw it and ask it
11  to you this way.  Did you direct Mr. Protzman to
12  make a demand for money prior to filing the
13  Complaint against the Weiser Law Firm?
14        MR. MERRIGAN:  Same objection.
15  BY MR. ROSENZWEIG:
16    Q.  Did you want a monetary settlement from
17  Mr. Weiser and the Weiser Law Firm prior to the
18  filing of the Complaint against them in Kansas?
19        MR. MERRIGAN:  Object to the form.
20        But you can answer.
21    A.  I left that up to my attorney and I
22  believe you as you were representing Mr. Weiser at
23  the time.  I believe that you had discussions with
24  Mr. Protzman.  I don't believe that -- yeah, I

36 (Pages 138 - 141)

Page 142

1  believe that that was something was handled by the
2  attorney and you.
3      Q.  I'm sorry, did you finish?
4      A.  Yes.
5          MR. MERRIGAN:  He did.
6          THE WITNESS:  I mean isn't it
7  customary for an attorney to provide a copy
8  of something before it is filed?
9          MR. MERRIGAN:  You're answering
10  questions, not asking them.  I'm not even
11  sure what you're asking about right now.
12          MR. ROSENZWEIG:  Just let the
13  record reflect that Mr. Hartleib was looking
14  directly at Mr. Merrigan when he just spoke.
15  That was not in response to anything that I
16  said or directed at me.  So, thanks for that.
17  BY MR. ROSENZWEIG:
18      Q.  Mr. Hartleib, in your Answer you have
19  asserted a litigation privilege for whatever was
20  filed in the context of the Kansas litigation
21  which was Hartleib versus Robert Weiser, the
22  Weiser Law Firm and Monica Ross-Williams.  Without
23  asking you for advice of counsel, can you tell me
24  what the basis of your assertion of litigation to

Page 143

1  those pleadings was?
2          MR. MERRIGAN:  I'm going to object
3  that it calls for a legal conclusion.
4          But you can answer to the extent
5  you can.
6      A.  You're asking me to describe what I
7  think litigation privilege is?
8  BY MR. ROSENZWEIG:
9      Q.  No, not broadly.  I'm asking the basis
10  on which litigation privilege was asserted, your
11  understanding of the basis on which litigation
12  privilege was asserted with respect to your Kansas
13  lawsuit against Weiser and the Weiser Law Firm.
14          MR. MERRIGAN:  Same objection.
15          But you can answer.
16      A.  Any communications I have with counsel
17  is protected or privileged.
18  BY MR. ROSENZWEIG:
19      Q.  I'm not, I'm not asking you for any
20  communications you have had with counsel, either
21  Mr. Protzman or Mr. Merrigan.  I'm asking you
22  about the broad assertion of litigation privilege
23  regarding the public pleadings that were filed in
24  the Kansas lawsuit where you were the Plaintiff.

Page 144

1          MR. MERRIGAN:  So not
2  attorney-client privilege, litigation
3  privilege.  And same objection to the extent
4  I need to make it.
5      A.  Well, it's my understanding that you
6  don't even need to have a Complaint filed.  If
7  there's good faith contemplation of litigation
8  there is some privilege that extends just for the
9  contemplation of litigation.  I believe there's
10  case law that supports that.
11  BY MR. ROSENZWEIG:
12      Q.  Mr. Hartleib, is it your intention to, I
13  will call it your present intention to continue to
14  file amicus briefs in shareholder derivative
15  litigations in which Rob Weiser or the Weiser Law
16  Firm are either seeking or are appointed lead
17  counsel or co-lead counsel to assert the issues
18  of -- the issues which you have identified arising
19  from and related to the Sprint/Nextel derivative
20  litigation?
21          MR. MERRIGAN:  I'm going to object
22  and at least as stated instruct my client not
23  to answer.  I don't see how that question
24  even has a good faith potential to lead to

Page 145

1  discoverable relevant or admissible evidence
2  in this case when we are talking about the
3  future which this case is not about.  This
4  case is about the past.
5          MR. ROSENZWEIG:  Well, I think
6  that's also not correct.  I think that the
7  claims that are what I will call for orders
8  of the Court the surviving claims in this
9  case your statement would be correct.  But
10  with respect to other claims that were made
11  in this case which may still find the light
12  of day before a Court the question is spot on
13  and is absolutely about discoverable relevant
14  evidence.
15          MR. MERRIGAN:  Well, if they find
16  the light of day some day maybe he will
17  answer the question.  Today he is not
18  answering.
19          MR. ROSENZWEIG:  So you are
20  continuing to instruct him not to answer.
21          MR. MERRIGAN:  I am.
22          MR. ROSENZWEIG:  Okay.  Well, then
23  we will seek redress with that.
24          I would like five minutes.  So we

37 (Pages 142 - 145)

Page 146

1    are going to take a short break.
2         MR. MERRIGAN:  Sure.
3         (A brief recess was held at this
4    time.)
5    BY MR. ROSENZWEIG:
6    Q.  Mr. Hartleib, as we sit here today are
7    there any other facts or circumstances about which
8    you claim that Rob Weiser or the Weiser Law Firm
9    did wrong in any case other than the Sprint/Nextel
10   case?
11   A.  I have no idea.
12   Q.  In each instance where you have filed an
13   amicus brief or an objection since the
14   Sprint/Nextel case is it your view of the facts
15   and circumstances of the Sprint/Nextel case that
16   you continue to raise in such subsequent filings?
17   Does that make sense?
18        MR. MERRIGAN:  I don't understand
19   the question.
20        But if you understand it.
21   A.  I didn't understand it.  Sorry.
22   BY MR. ROSENZWEIG:
23   Q.  No, that's okay.  I mean you're allowed
24   to say that.

Page 147

1         When you have filed amicus briefs
2    or objections in cases subsequent to
3    Sprint/Nextel, are the assertions, allegations,
4    arguments you make in those amicus briefs or
5    objections largely about the events which happened
6    in the context of Sprint/Nextel?
7    A.  Yes.
8    Q.  Are there any other cases other than
9    Sprint/Nextel in which you have specific complaint
10   about the Weiser firm's or Rob Weiser's conduct in
11   such other case?
12        MR. MERRIGAN:  Object.
13        But you can answer.
14   A.  As we sit here today?
15   BY MR. ROSENZWEIG:
16   Q.  Yes.
17   A.  The answer is I don't know, meaning the
18   cases that I filed the amicus briefs in my intent
19   was to simply notify the Court what happened
20   in Kansas and give that Court the information to
21   determine whether or not it was relevant to their
22   decisions, whether it be the fees and the scrutiny
23   of the fee requests or lead appointment of lead
24   counsel.  So I don't know the relief in those

Page 148

1    cases.  I can't sit here today and tell you what
2    the relief was that was obtained, nor if the fees
3    were commensurate with that relief because I
4    believe that the majority of the filings were done
5    after those decisions had already been made.
6    Q.  You have testified, Mr. Hartleib, that
7    you are a shareholder in various other
8    corporations --
9    A.  Correct.
10   Q.  -- in which there has been derivative
11   litigation.
12   A.  Correct.
13   Q.  Can you tell me as you sit here today
14   whether you have any specific allegations or
15   complaints about Rob Weiser or the Weiser Law Firm
16   with respect to their conduct in the context of
17   any of those cases that does not have to do with
18   reraising Sprint/Nextel issues of which you are
19   aware?
20   A.  I am not aware of any now but I can't
21   really answer that unless I went back and audited
22   the settlements and what was obtained in those
23   settlements and whether or not the fees were
24   commensurate with the relief obtained.

Page 149

1    Q.  Did you object to any other settlements
2    or attorneys fees awards in any other derivative
3    shareholder litigation after Sprint/Nextel?
4    A.  No.
5    Q.  Did you object to any settlements or
6    attorneys fees awards in derivative shareholder
7    cases prior to and leading into but not including
8    Sprint/Nextel?
9         MR. MERRIGAN:  So before.
10        MR. ROSENZWEIG:  Prior.  What?
11        MR. MERRIGAN:  So you're just
12   asking if he ever did it before
13   Sprint/Nextel.
14        MR. ROSENZWEIG:  Yes.
15   A.  Yes.
16   BY MR. ROSENZWEIG:
17   Q.  In which other cases?
18   A.  Sirius XM.
19   Q.  What was the basis of your objection?
20   A.  We are going back a long time.  But the
21   basis of the objection is Plaintiff's counsel
22   abandoned, much like this case, the meritorious
23   claims of the Complaint for I believe it was a
24   $2 million attorneys fee award or thereabouts, did

38 (Pages 146 - 149)

Page 150

1  not seek injunctive relief as was pled in the
2  Complaint, and then come to find out had a
3  Plaintiff that didn't own a single share of stock
4  and lacked standing.
5        Q.  And who was that Plaintiff's counsel?
6        A.  That was the Robbins Umeda and Fink
7  firm.
8        Q.  That was -- thank you for that answer.
9  And for further clarity, that was not Rob Weiser
10 or the Weiser Law Firm?
11       A.  No.
12       Q.  Okay.  Other than Sprint/Nextel which we
13 have discussed at length and Sirius XM, can you
14 tell me of any other instance where you, Michael
15 Hartleib, filed objections to either the terms of
16 the settlement or the award of attorneys fees in a
17 shareholder derivative suit?
18       A.  Yes.
19       Q.  What other cases?
20       A.  A case against State Farm Insurance
21 Corporation.
22       Q.  Okay.  Can you tell me the facts and
23 circumstances surrounding that objection and what
24 -- and to what you objected?

Page 151

1        A.  Well, the objection encompassed a wide
2  variety of concerns.  There was no oversight to
3  ensure settlement funds were properly distributed.
4  There was no consideration given for property
5  damage.  They were depreciating property based on
6  its age and you would get a depreciated amount if
7  you didn't repurchase and replace said property.
8            But I use an example like an
9  expensive designing room set.  An expensive dining
10 room set, if it's fine quality furniture it
11 doesn't depreciate in value generally.  It
12 increases in value or retains its value, right.
13           So, those are a couple.  There were
14 a whole bunch of problems, and I would have to get
15 my pleading out to remember what all of them were.
16 But there were several major, major issues with
17 that settlement.  Counsel had to completely
18 redraft the settlement because of my objections.
19           And I also objected to the size of
20 the fee award.  I appeared at the fairness hearing
21 and I believe, if I am not mistaken, the fee award
22 was reduced by 5 or $6 million.
23       Q.  Do you recall from what to what?
24       A.  I don't.

Page 152

1        Q.  Okay.  And who was the Plaintiff's
2  counsel in that firm -- in that case?
3        A.  I don't recall.  It was in, I believe it
4  was is Santa Clara County Court.  Maybe I will
5  think of it but right now I don't recall.
6        Q.  And, again, this is prior to your
7  objection in Sprint/Nextel?
8        A.  Yes.
9        Q.  Any other cases in which you, Michael
10 Hartleib, filed an objection to either a
11 settlement or a fee award in a shareholder
12 derivative action?
13       A.  I don't think so.  But I almost forgot
14 about the State Farm case.  So I am not certain
15 but I think that's all.
16       Q.  Okay.  So is it fair to say that in your
17 many years of activity in the shareholder
18 derivative litigation universe that there are
19 three cases in which you can recall filing an
20 objection to either a settlement or a fee award or
21 both, and that would be the State Farm case, the
22 Sirius XM case and the Sprint/Nextel case?
23       A.  I believe there was more than one Sirius
24 XM case.  I believe there were two, State Court

Page 153

1  and Federal Court, two separate cases.
2        Q.  Okay.  Anything else?
3        A.  One was an intervention in State Court
4  where I attempted to intervene in the case.  I did
5  intervene in the case.  The other was an objection
6  to the settlement which interestingly made its way
7  all the way to the United States Supreme Court.
8        Q.  On what grounds, if you recall?
9        A.  Not -- that wasn't because of my
10 objection.  But it was interesting.  I was
11 getting -- after I had filed an appeal I was
12 getting letters from the United States Supreme
13 Court and at the time I was still learning.  I
14 wasn't even certain what was going on.  And then I
15 realized I was a disinterested appellant.  And Ted
16 Frank, who was testified to earlier in the
17 deposition, complained and filed a writ of
18 certiorari.
19       Q.  Certiorari.
20       A.  Thank you.  See, I'm not an attorney.
21           And he objected to Judge Harold
22 Baer's appointment of lead plaintiff counsel based
23 on race and gender and it was deemed to be
24 unconstitutional.  And Judge D'Elia wrote a

39 (Pages 150 - 153)

Page 154

1  scathing letter to Judge Baer, Judge Harold Baer
2  who is passed away now, and said if you do it
3  again we are going to hear the case. So they
4  admonished him which was unusual for them to do.
5  So that was interesting. So that was one of the
6  cases. The other case was a State case.
7      Q. Is the only case in which you filed an
8  objection to either the settlement or the
9  attorneys fee award in which the Weiser Law Firm
10 or Rob Weiser was involved the Sprint/Nextel case?
11     A. I think so. I don't think --
12     Q. To the best of your knowledge.
13     A. Yes, I don't think Rob was ever involved
14 in any of the Sirius cases but I'm not positive.
15 I know that we talked about him getting involved.
16 I don't think that he ever did. So I think so,
17 yes.
18     Q. Okay. And I'm going to ask this
19 question one more time and then Mr. Merrigan is
20 going to likely instruct you not to answer. So I
21 caution you to not begin to answer and let
22 Mr. Merrigan do his job but I need a clear record
23 in this regard.
24     For any and all cases or let's just

Page 155

1  leave it -- strike that.
2      For any case in which Rob Weiser or
3  the Weiser Law Firm is a Plaintiff's counsel in a
4  shareholder derivative action or whether they are
5  seeking to be appointed as co-lead counsel or lead
6  counsel in such a case do you intend to file
7  amicus briefs or other motions or pleadings to
8  raise your Sprint/Nextel concerns in such cases?
9      MR. MERRIGAN: I will maintain the
10     objection I stated previously on the record
11     to the same or similar question. However,
12     without waiving said objection, in the
13     interest of judicial economy I will allow my
14     client to answer.
15     A. The answer is I can't foretell the
16 future, so I don't know. You're asking me to
17 predict the future.
18 BY MR. ROSENZWEIG:
19     Q. I'm asking you to tell me your
20 intentions.
21     MR. MERRIGAN: Same objection.
22     But you can answer.
23     A. As we sit here today I don't have
24 intentions either way.

Page 156

1  BY MR. ROSENZWEIG:
2      Q. I am not sure what "I don't have
3  intentions either way" means. Can you explicate?
4      A. No, I think it's clear. Like I don't
5  have intentions either way. I can't answer that
6  question because you're asking me to foretell the
7  future which I can't do. It depends on a lot of
8  factors.
9      Q. What factors?
10     A. I will just leave it at what I said.
11 You know, if, if my interests are not being
12 properly represented and it warrants my time to
13 protect my interests.
14     Q. Okay. And just tell me how you are
15 defining your interests in the answer you just
16 gave me.
17     A. I think I have given you enough. I
18 think it's the best I can define it at this
19 particular point in time. I mean I'm already, you
20 know, not heeding counsel's advice. But the
21 honest answer is I can't tell the future. And as
22 we sit here today, I can't, you know, I can't give
23 you a definitive answer one way or another.
24     Q. If you are not a shareholder in a

Page 157

1  corporation which is the subject of a shareholder
2  derivative suit, do you have an interest in the
3  outcome of that suit based upon your use of the
4  term interest?
5      MR. MERRIGAN: Objection.
6      But you can answer.
7      A. My interest would be the interest of
8  jurisprudence as a whole in that regard, in that
9  specific scenario.
10 BY MR. ROSENZWEIG:
11     Q. Okay. But that would be an interest
12 that you view you have?
13     MR. MERRIGAN: Objection.
14     But you can answer.
15 BY MR. ROSENZWEIG:
16     Q. As jurisprudence as a whole?
17     A. Again, I have testified repeatedly that
18 I believe there are major problems with derivative
19 litigation and I would love to see some reform,
20 whether it be through legislative reform,
21 whether -- you know, I believe there needs to be
22 major reform. It is not serving the purpose for
23 which it was intended at this point in time in the
24 majority of cases. I can't say that all are that

40 (Pages 154 - 157)

Page 158

1  way.  But the majority of cases it is my belief
2  and my experience, firsthand experience that these
3  cases are not achieving their intended purpose.
4        MR. ROSENZWEIG:  Thanks, Mr.
5  Hartleib.  I appreciate your time and I
6  appreciate your appearance yesterday and
7  today.
8        That's it.
9        THE WITNESS:  Thank you.
10       MR. MERRIGAN:  No questions for me.
11  Thank you.
12       (The deposition was concluded at
13  2:43 p.m.)
14
15
16        ------
17
18
19
20
21
22
23
24

Page 159

1        C E R T I F I C A T E
2
3        I do hereby certify that I am a
4  Notary Public in good standing, that the
5  aforesaid testimony was taken before me,
6  pursuant to notice, at the time and place
7  indicated; that said deponent was by me duly
8  sworn to tell the truth, the whole truth,
9  and nothing but the truth; that the
10  testimony of said deponent was correctly
11  recorded in machine shorthand by me and
12  thereafter transcribed under my supervision
13  with computer-aided transcription; that the
14  deposition is a true and correct record of
15  the testimony given by the witness; and that
16  I am neither of counsel nor kin to any party
17  in said action, nor interested in the
18  outcome thereof.
19
20        WITNESS my hand and official seal
21  this 29th day of November, 2022.
22
23
24        Notary Public

Page 160

1        CERTIFICATE OF DEPONENT
2
3        ------
4
5        I hereby acknowledge that I have read
6  the aforegoing transcript dated November 17, 2022,
7  and the same is a true and correct transcription
8  of the answers given by me to the questions
9  propounded, except for the changes, if any, noted
10  on the Errata Sheet.
11
12
13        ------
14
15
16        SIGNATURE:
17        _____
18        DATE:
19        _____
20
21
22
23
24  5584619

Page 161

1        ERRATA SHEET
2        ------
3
4  PAGE  LINE  CORRECTION  REASON FOR CORRECTION
5  ____  ____  _____
6  ____  ____  _____
7  ____  ____  _____
8  ____  ____  _____
9  ____  ____  _____
10  ____  ____  _____
11  ____  ____  _____
12  ____  ____  _____
13  ____  ____  _____
14  ____  ____  _____
15  ____  ____  _____
16  ____  ____  _____
17  ____  ____  _____
18  ____  ____  _____
19  ____  ____  _____
20  ____  ____  _____
21  ____  ____  _____
22  ____  ____  _____
23  ____  ____  _____
24  5584619

41 (Pages 158 - 161)

**[& - 3:30]**                                                                 Page 1

| & |
| --- |

**&**   2:14

| 0 |
| --- |

**02728**   1:5
**03**   91:17

| 1 |
| --- |

**1**   87:8 89:2 92:17
**1.7**   33:17 101:4 106:1
**10**   34:20,21,24
**100**   33:8 34:10 85:12,18 86:24 132:16,22 134:15
**108**   3:22
**10:00**   1:15
**10:27**   93:21
**10:45**   136:4
**10b**   15:6
**11**   25:19,20
**11/6/18**   3:20 94:16
**112**   3:24
**11:28**   79:23
**11:29**   94:22
**11:41**   108:19
**121**   2:16
**122**   4:9
**13**   79:22 83:14
**13279**   159:23
**135**   4:11
**14**   90:9 91:17 93:20 94:4 95:1 95:11 130:20 135:8 138:12

**145**   140:11,14,16
**15**   20:5 32:16 35:1 48:20 60:5 98:3 132:16
**1600**   2:17
**166**   123:6
**17**   1:8 7:6 135:11,20 136:4 160:6
**1800**   1:20
**1801**   1:19
**19103**   1:21
**19107**   2:18
**19406**   2:8
**1987**   44:18

| 2 |
| --- |

**2**   6:9 26:23 31:4 92:16 99:14 149:24
**2/22/18**   3:15 50:10
**20**   135:12,22 140:11
**2009**   128:23
**2012**   126:8 128:22,23
**2017**   43:17 44:2 61:10 80:9
**2018**   51:6 56:14 56:20,24 57:4,20 62:1 63:12 64:3 72:8 73:6 74:10 77:10 79:22 82:23 83:15 90:9 91:17,21,23 93:4,20 94:4,8 94:22 95:1,2,13

95:24 98:3 108:18 112:21 135:11,20 136:4 140:20
**2019**   10:5 24:19
**2021**   127:10
**2022**   1:8 123:8 159:21 160:6
**21**   96:12,19,21 127:10,12
**215.735.3994**   2:19
**22**   51:6 93:4 108:18 127:12
**23**   3:13 6:13,14 6:18 7:1 20:18 25:19 31:5 56:20 108:11
**24**   3:14 38:9 40:6,10,23 56:14 56:24 57:4,20 63:11 72:8 73:5 73:20 74:10 112:11
**25**   3:15 50:9,10 50:16
**26**   3:16 6:12,13 6:17 20:20 56:4 56:5 62:1 74:6 78:24
**27**   3:17 38:8 40:9 73:10 74:3 79:1,11,11
**27th**   136:11
**28**   3:18 89:24 90:1
**29**   3:19 92:8,9,22 95:12

**29th**   159:21
**2:19**   1:5
**2:43**   158:13

| 3 |
| --- |

**3/13/18**   3:17 79:1
**3/22/18**   3:22 108:12
**3/5/19**   9:17,20
**3/6/19**   9:13,14
**30**   3:20 45:10,15 94:15,16 95:2,13
**300**   1:13 2:6 63:6
**31**   3:21 87:6,23 88:15 95:3 96:13,14,18 97:16 99:4 105:19
**32**   3:22 108:11 108:12
**33**   3:24 112:12 112:13
**34**   4:9 122:12,13 123:3 125:2 130:22
**35**   4:11 56:3 63:5 74:7 135:21,23 139:22
**36**   50:8
**37**   73:9 123:9 126:1,2 132:17 138:12 140:11
**39**   79:4
**3:30**   57:1

**[3:31 - actual]**                                                                    Page 2

| | | | |
|---|---|---|---|
| **3:31**  73:21 | **56**  3:16 | **9:18**  51:7 | **accurate**  17:13 |
| **3:35**  63:11 | **6** | **9:23**  56:20 | 17:21 101:16,21 |
| **4** | **6**  3:13 10:4 | **9:48**  93:4 | **accurately**  41:12 |
| **4**  101:22 | 24:19 94:22 | **a** | 43:10 75:3 |
| **4.5**  18:21 23:21 | 95:2,12,24 123:8 | **a.m.**  1:15 56:20 | 133:4 |
| 102:19 106:2 | 151:22 | 57:1,4 63:11 | **achievable**  33:21 |
| **4/5/18**  3:24 | **6,905**  34:5 | 73:6,21 90:9 | **achieving**  158:3 |
| 112:13 | **61**  127:13 | 93:4,14 94:22 | **acknowledge** |
| **40**  3:14 89:23,23 | **610.263.0115**  2:9 | 112:21 | 160:5 |
| **400**  112:8 | **69**  127:10 | **a10**  138:18 | **acknowledged** |
| **41**  40:23 92:7 | **6:53**  93:14 | 139:17 | 73:1 |
| **42**  41:1 125:19 | **7** | **abandoned** | **acquaint**  6:19 |
| 126:5,12 127:23 | **7**  125:20,20 | 149:22 | **act**  55:23 |
| 128:2 | 126:2 | **abelson**  44:16 | **acted**  71:17 |
| **43**  43:3 45:8 | **700**  122:22 | 50:19,23 51:1,10 | **acting**  108:7,8 |
| 94:14 122:7,7 | **79**  3:17 | 51:13,18 54:22 | 133:8,9 |
| 126:12 | **8** | 55:2,3,20 57:3,9 | **action**  1:3 15:6,6 |
| **44**  126:12 | **8**  32:24,24 97:4 | 59:17 60:15 | 16:2 21:8 46:9 |
| **45**  126:12 | 97:22 | 61:8 62:6 67:9 | 87:13,22 88:7,12 |
| **46**  126:12 | **8/17/18**  4:11 | 67:14 71:4,14 | 88:13,24 89:9 |
| **47**  45:22,22 | 135:23 | 72:10 73:1,3 | 109:23 110:24 |
| 125:19 126:5,12 | **8:01:38**  90:9 | 78:1,6,8,14,18 | 115:17 116:13 |
| 127:24 128:2 | **9** | 90:14 93:10 | 117:10 129:5,15 |
| **49**  78:23 79:3 | **9**  33:2 34:16 | 98:12,12 | 137:14,16 |
| **4:02**  112:21 | **90**  3:18 14:18 | **able**  36:22 42:4 | 152:12 155:4 |
| **4:31**  56:14 57:21 | **900**  1:13 2:7 | **absolutely**  87:11 | 159:17 |
| 72:8,16 74:10 | **92**  3:19 | 87:12 145:13 | **actions**  52:4,16 |
| **4:40**  90:12 | **94**  3:20 | **abuse**  49:13 | 70:22 117:12 |
| **4:54**  57:4 73:6 | **95**  130:20 131:2 | 129:14 | **active**  62:5 |
| **5** | 131:7 | **abusing**  84:14 | **activities**  35:4,7 |
| **5**  3:6 15:6 24:19 | **96**  3:21 130:20 | **abusive**  53:23 | 36:2 37:13 |
| 24:19 33:5 | 131:2,7 | **acceptance**  3:21 | **activity**  83:2 |
| 112:20 151:22 | **97**  135:7,8 | 96:15 97:17 | 152:17 |
| **50**  3:15 | **99**  38:16 138:11 | **access**  55:11 | **acts**  19:17 26:1 |
| **500,000**  89:5 | 138:17 | 135:2 | 27:4 28:20 29:3 |
| **5584619**  160:24 | | **accompanying** | 71:7 107:18 |
| 161:24 | | 97:19 | **actual**  8:10 |
| | | | 116:9 125:2 |

**[add - answered]** Page 3

**add** 87:2 130:7 130:17
**added** 100:4
**additional** 61:5 85:17 86:22
**address** 109:8 112:24 113:2,3,8 120:1
**addressed** 117:17
**addresses** 113:5
**addressing** 14:12 120:17
**adequate** 132:20
**admissible** 145:1
**admit** 135:9 138:17 140:18
**admitted** 107:22 109:19
**admonished** 48:24 154:4
**adorable** 37:23 65:17
**adverse** 119:13
**advice** 47:3 142:23 156:20
**advise** 51:19
**affidavit** 16:19 103:19
**affidavits** 16:8 18:16
**affirmative** 60:8
**affirmed** 104:4,6 119:20
**affirming** 102:7 102:18
**aforegoing** 160:6

**aforesaid** 159:5
**afraid** 96:18
**age** 151:6
**agencies** 80:13 82:6
**agent** 81:17
**agent's** 81:18
**aggrieved** 129:5
**ago** 108:23
**agree** 24:18 54:1 72:18 93:1 104:7 116:4 126:17 128:24 131:22
**agreed** 5:4,8 20:12
**agreement** 15:8 15:10
**aguilar** 16:8,22 17:15 45:23 46:6 102:14
**aguilar's** 17:7,20
**ahead** 43:20
**aided** 159:13
**al** 21:6,11 22:5,8 22:9 25:22 33:7 44:19 70:20 118:7
**alexander** 17:4 18:13 35:1,6,13 36:1,10,16,17 37:6,10,24 38:12 39:10,19,20,22 44:13,14 54:16 79:14 83:5,9,12 83:24 84:3,10 94:5,8 102:11 103:16,24 104:2

**aligned** 84:24 85:4
**allegation** 138:15
**allegations** 13:19 32:11,12 147:3 148:14
**allege** 100:18 105:18 107:16
**allegedly** 49:17
**allow** 155:13
**allowed** 39:3 146:23
**altogether** 73:15
**amended** 122:10 124:13 125:4 127:9,11 130:23 135:12
**amicus** 3:13,21 6:14 7:2,13,15 7:18 8:6 9:10 10:2,13 12:5,23 19:1 20:20 21:1 24:8,16 27:14 29:14 30:12 31:16,24 32:2,10 35:6,24 36:12 37:10 41:8 42:6 75:15,21 96:15 97:2,17,19 98:8 100:18 102:1,20 105:13,18 106:6 106:7,15,23 107:16 109:9 110:13,14 111:3 111:11 116:2,11 117:14 118:13 131:11,12,18,21

**144**:14 146:13 147:1,4,18 155:7
**amount** 84:20 119:13 151:6
**amounts** 33:15 33:20 103:3
**ana** 136:17
**answer** 4:9 6:5 13:1 18:4 22:11 23:2 24:13 25:4 26:18,21 28:12 29:7,16 30:19,24 42:18 43:19 44:4,8 49:22 59:20,22 65:24 67:17 68:16 69:20 70:7,15 95:16 103:12,13 107:9 115:4,11 117:24 122:10 122:13,21 123:16,19 124:12,14 125:3 125:20 127:12 131:3 132:16,17 134:16 135:4,8,9 138:11,17 140:11 141:20 142:18 143:4,15 144:23 145:17 145:20 147:13 147:17 148:21 150:8 154:20,21 155:14,15,22 156:5,15,21,23 157:6,14
**answered** 14:2 25:3 26:20 36:4

42:17 54:6 71:6
134:13

**answering** 142:9
145:18

**answers** 64:8
125:10,15 127:2
130:24 160:8

**anticipated** 7:24

**anybody** 23:16
105:11 133:15

**apart** 20:10

**apologies** 33:1

**apologize** 40:11

**apparently**
75:16,17

**appeal** 80:6
153:11

**appear** 42:7
57:22

**appearance**
115:19 158:6

**appearances** 2:1
14:10 115:12,22

**appeared** 86:12
151:20

**appears** 34:18
34:23 50:18
56:15,23 57:5,9
57:13 76:2
79:12 90:13
98:11,13

**appellant** 153:15

**appellate** 25:15
25:17 61:3
101:19 104:4
106:19,20 110:8
117:10 119:20
131:15

**application**
10:19

**applied** 32:11

**applies** 31:24

**apply** 30:24

**applying** 36:24

**appoint** 10:16

**appointed** 74:13
75:8,15 98:10,14
98:19 144:16
155:5

**appointee** 23:20

**appointment**
10:3,7,19 19:4
21:5 77:3 97:18
105:15 147:23
153:22

**appreciate** 158:5
158:6

**appreciated**
108:22

**appropriate**
22:7 70:12

**appropriately**
41:22

**approve** 86:9

**approved** 85:9

**april** 112:20

**argue** 59:24 60:2

**argued** 111:10

**argument** 111:6
113:20

**arguments** 147:4

**arising** 144:18

**arose** 117:18

**arrived** 121:23

**arroyo** 10:18
12:4,14,20 14:1

14:1,5 15:2 16:3
19:6 21:6,23
22:14 24:24
25:22 33:7
45:23 46:22
49:10 50:4

**article** 29:22
30:1,7

**articles** 64:24

**ascertain** 21:20

**aside** 86:19

**asked** 18:1 25:3
26:17,20 38:16
39:7 42:16
43:19 46:6
59:19 62:23
72:24 98:23
123:21 134:17
136:10

**asking** 17:19
24:10 32:8 37:3
42:10 44:21
46:22 54:2
59:21 60:5
89:18 91:19
116:23,24
117:21 119:9
120:9 126:1
128:2,17 129:17
134:14 139:11
142:10,11,23
143:6,9,19,21
149:12 155:16
155:19 156:6

**ass** 38:22

**assert** 144:17

**asserted** 142:19
143:10,12

**assertion** 36:12
37:9 83:18
142:24 143:22

**assertions** 38:22
131:10 147:3

**associate** 64:6

**assume** 9:13
74:20,21

**assuming** 124:16

**atlanta** 98:3

**attached** 91:9
135:11

**attachment**
91:12

**attacked** 67:21

**attacks** 25:24
52:21

**attempted** 153:4

**attempting** 66:9
66:20 67:2

**attendance** 6:9

**attention** 6:12
9:16 13:20
20:24 25:18,21
33:1 34:15
40:17,22 43:3
45:22 56:3
64:13 66:3,5
74:9 94:14
96:12 112:11
125:19 126:5
130:6,19 132:15

**attorney** 13:6,9
28:13 29:1 35:2
81:10 107:4,10
108:2,8 141:8,21
142:2,7 144:2
153:20

**attorney's** 80:2
  81:3 82:4,10,16
**attorneys** 13:5
  15:20 26:9
  27:16,18,22 28:1
  28:4,13 29:17,19
  52:9 71:20
  86:14 112:7
  119:23 149:2,6
  149:24 150:16
  154:9
**audited** 148:21
**august** 135:11
  135:20 136:4
**authorities** 82:6
**authority** 81:22
  81:24
**auto** 113:7
**available** 127:3
**avoided** 116:15
  117:1
**avoiding** 120:16
**award** 101:23
  149:24 150:16
  151:20,21
  152:11,20 154:9
**awards** 149:2,6
**aware** 8:11,16
  8:20,22,24 10:2
  10:6,7 36:20,23
  36:23 105:17
  111:15 131:4,10
  134:11,24
  148:19,20

**b**

**b** 1:4

**back** 10:20
  13:16 19:14
  23:10,24 32:23
  43:21 56:18
  60:24 85:12,17
  85:24 87:20
  118:10,17 119:9
  122:3 128:5
  135:7 139:22
  148:21 149:20
**background**
  59:11,13,14
**backyard** 136:17
**bad** 138:7
**baer** 154:1,1
**baer's** 153:22
**bar** 15:18 60:13
  62:5,9,15 63:2
  69:13 72:6 76:4
  76:7,8,11,12,13
  81:19,21,24 82:2
  85:8 86:20
**barred** 44:16,20
  44:23,23 49:2
  59:16 60:9 82:1
**base** 35:23,24
  83:17
**based** 19:21 34:8
  70:10 107:9
  115:19 116:6
  131:20 151:5
  153:22 157:3
**basically** 115:15
**basis** 38:24
  48:10 53:4
  142:24 143:9,11
  149:19,21

**beating** 89:10
**beck** 65:2
**beginning** 1:15
  86:17 127:8
**begins** 11:4 33:4
**behalf** 49:17
  85:13 87:20
  88:22 125:3
**belief** 31:15 35:3
  36:6 37:15,15,15
  83:11 107:10
  158:1
**believable** 105:2
**believe** 7:20,22
  7:22 8:1,4,9,10
  8:15 9:3,21
  10:21,22,23 11:8
  12:8 14:17,18,20
  14:24 15:16
  16:7,10 17:5,12
  17:19 28:24
  31:21 35:11
  39:9,9 40:22
  41:18 42:12
  43:15,24 46:18
  51:11 53:4,17
  54:7 55:22
  57:15 58:24,24
  59:1 60:12 61:4
  62:10,11,13 63:1
  63:17 64:7 67:2
  74:17 75:17,20
  76:6,7 78:5,15
  81:3 82:22 84:8
  94:10,11 98:16
  98:18,19 100:4
  101:20 105:7
  107:21 109:6,6

  109:12,18,18,21
  110:22 118:1,2
  118:14,21
  121:12 123:4
  125:1 127:7
  130:16 133:9
  136:15,17 139:2
  140:6,21,24
  141:22,23,24
  142:1 144:9
  148:4 149:23
  151:21 152:3,23
  152:24 157:18
  157:21
**believed** 77:6,13
  77:17 101:15
**benefit** 49:16
**besmirch** 109:15
**best** 50:22
  114:10,11
  133:19 154:12
  156:18
**better** 6:5 12:3
  61:18 64:2
  133:15
**big** 14:15,18
  89:10
**bill** 26:9 106:1
**billable** 31:7
**billed** 33:17
  86:20 101:3
  102:18 108:2
**billing** 8:8 17:22
  18:7,9 25:1
  32:13 33:8,20
  34:1,9,12 45:10
  52:22 77:4,16
  85:9,21 101:7,15

101:20 104:8

**billings** 17:20

**billion** 87:6,23
88:15

**binder** 127:7,8
127:16 135:16

**bit** 25:5

**blank** 38:2 126:1

**blindside** 41:23

**bodies** 55:13

**book** 79:6

**bottle** 118:11
119:10

**bottom** 73:18

**break** 65:20 96:6
121:24 122:4
146:1

**breath** 46:15

**brett** 112:20
114:3 136:5

**brief** 3:13,21
6:15 7:2,6,13,15
7:19 8:6 10:13
12:5,23 19:1
20:21,24 21:1
24:8,16 29:15
30:12 31:16
32:1,2,10 35:6
36:12 37:10
41:9 75:15,21
91:9 92:2 96:7
96:15 97:1,2,7
97:17,19,23 98:8
99:3,15,23
100:18 102:1,20
104:12 105:13
105:19 106:16
106:23 110:14

111:11 116:2
121:9 131:21
146:3,13

**briefly** 96:10

**briefs** 42:6 106:6
106:8 117:14
131:11,12,19
144:14 147:1,4
147:18 155:7

**bringing** 22:12

**broad** 2:16
46:15 143:22

**broader** 18:3

**broadly** 34:16
82:12 143:9

**broke** 85:1

**brooks** 1:16

**brother** 15:12

**brought** 13:19
64:14 83:4

**bruce** 27:17

**built** 64:21

**bunch** 151:14

**buried** 55:13

**business** 35:13
35:21 36:8
129:12

**button** 85:15

**buys** 64:19

c

**c** 2:15 159:1,1

**california**
136:16 140:6

**call** 47:6 62:14
65:2 76:8 111:6
113:20 144:13
145:7

**called** 63:14
64:24 67:14
100:7

**calls** 61:4 141:7
143:3

**capacity** 39:19

**caption** 20:19
137:1

**careful** 58:21
62:19

**carney** 140:2,3,4
140:6

**carried** 61:21

**carries** 14:17
41:1

**carry** 34:19

**cartridge** 129:10

**cartridges** 129:8

**case** 6:4 9:2 10:9
10:11,23 11:2
14:13 15:9,10
16:18 18:6,19
19:10 21:15,17
22:2,15 23:18
24:5,7,9,13
27:17,19,21 28:9
30:22 32:14,17
33:18 34:1 36:7
38:11,14 39:23
41:20 44:17
49:4,17 51:20,23
52:4,13 53:9
58:14 65:3
69:10 71:1,8,17
71:18 74:21,24
75:9,24 76:15
77:5,15 78:12
83:21 85:10,11

86:6,10 87:1,5
88:9 92:3 97:2
97:20 100:14
101:2,4 104:5,6
104:8,9,15,19,19
105:6,12,12,16
106:5,9,12 107:4
107:8 109:9,16
109:24 110:13
111:22 115:1,9
115:24 116:17
117:9 118:5
121:1 125:22
126:1 127:5
128:17 130:4,14
130:16 133:11
134:12 135:1
136:14,19
144:10 145:2,3,4
145:9,11 146:9
146:10,14,15
147:11 149:22
150:20 152:2,14
152:21,22,22,24
153:4,5 154:3,6
154:6,7,10 155:2
155:6

**cases** 14:19 15:3
15:15,22 20:6,7
20:14 21:17,18
21:19,21 28:1,3
28:22 29:2
31:10 33:9,19
41:5,15,21 42:3
42:6,15 48:12,18
53:6 64:11
107:23 108:3,5
117:15 126:8,22

128:10 129:3,3
129:12 130:14
132:13 133:10
134:7 138:19
139:23 147:2,8
147:18 148:1,17
149:7,17 150:19
152:9,19 153:1
154:6,14,24
155:8 157:24
158:1,3
**catastrophic**
108:24 109:3,11
**cathy** 50:18,21
51:1 57:13,15,21
58:21 62:6,11,12
73:1 78:5
**cause** 16:15
67:19 68:1,4,13
70:12 89:9
**caused** 87:16
**caution** 154:21
**caveat** 11:24
**center** 1:13 2:6
**central** 136:16
140:5
**centurylink** 7:16
7:19 8:7,17,23
19:5 24:8 40:21
41:16
**certain** 41:6 61:6
71:20 74:20
105:8 118:6
152:14 153:14
**certificate** 7:10
7:12 9:6,16,19
9:20 12:6 160:1

**certification** 5:7
**certify** 159:3
**certiorari**
153:18,19
**cetera** 14:17,17
62:23,23
**chain** 3:16,18,19
56:6,17 73:19
90:2 92:10
**chambers** 45:11
45:16
**chance** 90:5
92:12
**changed** 7:23
11:14
**changes** 160:9
**character** 25:24
**characterization**
63:18
**characterize**
63:12
**charge** 64:20
**charged** 15:14
105:5,11
**charges** 82:18
83:4
**check** 83:23 84:2
110:13 124:1
**checking** 73:16
77:4
**checks** 83:11
**cheek** 66:15
**cherrypick** 65:3
**chester** 35:2
80:2,15 81:4
82:4,9,16
**chicanery** 76:22

**chief** 104:5
**chop** 19:13
**chose** 22:5
**christmas**
128:16
**circle** 15:19
**circumstances**
146:7,15 150:23
**citizen** 21:2,3
**civil** 1:3
**claim** 146:8
**claims** 86:13
105:22 132:5,13
145:7,8,10
149:23
**clara** 152:4
**clarify** 60:5
**clarity** 97:6
116:19 150:9
**class** 15:6,6
87:13,22 88:7,13
88:24 110:23
**clawed** 85:12
**clear** 66:15
100:8 110:19
139:14 154:22
156:4
**clearly** 80:5
**clerk's** 98:2
**client** 14:9 54:21
61:2 101:13
107:22 108:1,4
109:7,12,22
118:11,14 141:8
144:2,22 155:14
**client's** 32:18
33:19 38:21
44:24 55:18

69:1 119:12
**clients** 22:23
32:20,21 38:15
55:1 58:3 59:10
59:18 61:8
62:15 63:2,4
68:6,10 71:12
76:11 77:22
78:14,20 84:22
86:1,3,12 89:13
109:19 115:13
**clipped** 127:17
**cohorts** 133:1,7
133:24
**collected** 87:19
**collecting** 19:18
**collectively**
100:2
**colorful** 116:4
**comac** 140:6
**come** 20:10
25:16 43:6
62:21 78:2
150:2
**comes** 65:3 88:3
88:4 129:7
**comfortable**
46:3
**coming** 23:15
**commence** 46:9
**commenced**
137:8 140:19
**commencement**
119:18
**commencing**
54:14
**commensurate**
148:3,24

comment  40:5
42:23 65:17
78:19 118:9
commentary
119:19
comments  42:20
42:22,24 71:10
commit  53:20
committed  16:18
29:4 78:12
82:19,21 107:17
committing
26:10 85:20
communicate
94:24
communicated
75:6 126:8
129:21
communicating
55:20 82:15
communication
82:11 95:17,22
communications
71:3 120:14
126:20 128:8
129:23 143:16
143:20
companies  64:20
132:12 135:3
139:18
company  48:22
64:22 85:2
119:11 129:7,14
136:24
comparison  68:5
competing  10:3
complained
153:17

complaining
42:1
complaint  54:9
54:14,17,18,20
54:23,24 67:15
76:9 105:23
122:10,21 125:4
127:2,3,9,11
130:23 132:18
135:12 138:15
141:5,13,18
144:6 147:9
149:23 150:2
complaints  96:3
148:15
completely  12:1
133:18 151:17
complicated
41:20
complicit  35:4,8
36:2 37:13 83:6
compromised
31:7
computer
159:13
concern  99:7,10
100:3,5
concerned  21:2
21:2
concerns  13:18
20:11 139:17
151:2 155:8
concluded
158:12
conclusion  19:22
20:10 26:14
62:18 116:10
143:3

conclusions
103:6,8
conduct  147:10
148:16
conducting
38:11,12,14
confirm  123:10
confused  20:22
97:11
confusing  41:19
consequence
70:21
consequences
72:6
consider  49:19
consideration
151:4
consolidated
21:7
conspiracies
26:1
conspirator
83:10
constitute  100:2
constitutes  26:15
contact  13:4
51:21 76:7 81:4
81:9,18 82:2,5
contacted  80:2
contain  126:14
contained  126:6
contains  126:18
contemplating
112:2
contemplation
118:4 137:11
144:7,9

contempt  102:21
contentious
42:20,21,24
contents  123:22
context  19:1
43:12 111:5
113:19 120:5,13
127:4,4 134:14
142:20 147:6
148:16
continue  51:20
101:19 144:13
146:16
continued  4:1
50:5
continues  65:19
continuing
145:20
contrary  66:22
control  16:12
controlled  16:5
controls  14:20
controversy
130:3
conversation
57:24 58:11,17
59:9 60:15 62:8
62:24 69:8 91:4
119:16 120:2,15
121:2,20,21
conversations
13:9 37:5 81:14
119:24 128:12
129:2
conversely
101:18
convicted  13:6
27:23 29:5

**convictions**
35:19
**convinced**  35:20
59:9 62:14,24
**copied**  51:2,3,4
**copy**  57:21 72:24
112:23 113:7
136:5 142:7
**cormac**  140:9
**corner**  125:24
**corporate**  12:11
86:14
**corporation**  7:23
11:23 20:15
25:11 49:16
87:20,21,21 88:6
88:8 106:4
107:6 129:6,14
133:17 137:2
150:21 157:1
**corporations**
134:4 138:22
148:8
**correct**  7:16
17:23 21:4
22:20 23:7
32:21 34:17,22
45:20 46:12
51:7,8 52:15
57:4,21 63:9,15
63:23 68:18
71:5,15 75:12
76:1 93:22
95:10 98:3
103:10 106:13
110:8 111:7
112:21 115:2
125:17 129:13

130:1,2 131:6
136:12,13
138:19,20
140:20 145:6,9
148:9,12 159:14
160:7
**corrected**  125:14
**correcting**
125:11
**correction**  161:4
161:4
**correctly**  21:9
31:13 42:2 43:1
46:11 60:23
87:1 111:23
159:10
**correspondence**
98:11,13 115:22
129:3,16,21
**corresponding**
132:18 138:14
**corrupt**  48:21
**corruption**
49:12
**cost**  84:16,18
**costs**  84:20
**cote**  48:24
**counsel**  2:11,21
5:5 9:1,1 10:4
10:11,16,19 11:1
19:4 20:7 21:7
41:24 52:10
59:1,2 74:24
75:8 77:8 84:24
85:4,5 87:6
97:19 98:10,15
98:17 105:14,14
111:7 114:8

115:1,8 119:14
120:5 123:17
125:8,10,17
141:1 142:23
143:16,20
144:17,17
147:24 149:21
150:5 151:17
152:2 153:22
155:3,5,6 159:16
**counsel's**  156:20
**countering**
42:23
**countersuit**
67:15
**country**  31:10
33:10 53:7
107:19 133:15
**county**  35:2 80:2
80:15 81:4 82:4
82:9,16 152:4
**couple**  47:7
151:13
**course**  43:6
48:20 52:20
55:10 101:10
107:23 108:3
116:20 127:6
129:11 132:17
**court**  1:1,16,19
10:14 14:10,12
22:13 23:23,24
25:13,15,17 26:2
26:11 41:9 61:3
77:17 95:7 98:2
99:11 100:20,24
101:7,19 102:6
102:21 103:18

103:19,22 104:4
104:18 106:19
106:20 107:18
110:8,11 111:2
117:11 119:20
123:6 131:15
145:8,12 147:19
147:20 152:4,24
153:1,3,7,13
**courthouse**
112:9 113:22
**courtroom**  112:1
**courts**  61:9
76:22 77:2,14
108:6 131:4,10
132:3,9
**cover**  98:5
**covered**  88:4
**cozy**  87:5
**create**  68:10
**credibility**  16:20
18:5 39:5
109:17
**credible**  17:13
17:24 18:11
105:1
**crime**  81:22
**crimes**  82:18,21
83:13
**criminal**  25:23
26:5,6,12,15
27:7 29:11 30:9
35:4,7,22 36:2
37:12 53:12,13
53:17 54:3
82:18 83:4 86:2
89:16,20 102:2,3
102:5 106:1

107:17 108:9
**criminally** 29:4
84:9
**cross** 15:21 54:9
54:14,17,18,20
54:23,24 67:15
**crowded** 111:24
**culpability**
24:11,22
**culpable** 22:15
22:17,20 23:6,6
23:12
**curiae** 3:13,21
6:15 21:1 96:15
97:2,17,19
105:13,18
**current** 107:6
108:5
**customary** 142:7
**customer** 8:7
**cut** 40:5 87:5
**cv** 1:5

**d**

**d&o** 87:7,16
**d'elia** 153:24
**da's** 80:15 81:8
82:5
**daily** 53:4
**damage** 87:16
151:5
**damages** 87:14
87:23 88:7
**danced** 62:22
**darren** 88:21
**date** 1:15 9:9,11
9:21 10:7 30:5,6
91:17 98:1

160:18
**dated** 160:6
**dates** 60:24
61:16,19 128:21
128:22
**david** 129:18
**davis** 33:5 40:21
41:2 43:4 45:8
45:16,19
**day** 1:9 6:9 9:23
9:23 35:12
90:12 93:14
94:12 111:14,18
145:12,16,16
159:21
**deal** 87:5 88:1
137:4
**dealing** 20:9
105:20
**dealings** 35:14
35:21 36:9
**dean** 64:6
**decade** 107:24
**decades** 50:6
108:4
**deceased** 27:6
28:19
**decide** 10:8
**deciding** 77:3,4
**decision** 10:15
77:11,12,19
106:19 115:19
131:17
**decisions** 147:22
148:5
**declaration**
16:19 23:20
102:10 103:16

103:18,24 104:3
104:17
**declarations**
16:21,23 17:2,6
17:9 18:16,19,24
26:12 52:23
102:7,8,9,12,13
102:14,15,16,17
103:10
**deem** 10:15 77:3
77:18
**deemed** 49:4
132:1 153:23
**defeat** 78:20
**defend** 20:6 67:8
84:21
**defendant** 2:21
122:9 126:7
131:3 132:23
140:23
**defendants**
133:21
**defense** 84:24
85:4 87:5
**defer** 64:5
**define** 64:1,2
156:18
**defining** 156:15
**definitely** 118:4
**definitive** 34:13
156:23
**defraud** 53:21
**delaware** 21:18
**demand** 141:3
141:12
**demise** 67:19
68:1,4,13 69:6
70:4,12,19

**denied** 55:11
**department** 13:4
**depend** 47:14
**depending** 72:4
**depends** 156:7
**deponent** 159:7
159:10 160:1
**deposition** 1:11
5:7 6:10 52:20
86:21 124:11
153:17 158:12
159:14
**depositions**
35:12
**depreciate**
151:11
**depreciated**
151:6
**depreciating**
151:5
**deputy** 35:2
**derivative** 8:13
8:17,23 9:1 14:6
15:3,19 16:2
19:5,22,24 20:3
20:11 21:7
29:22,23 30:2
49:12 52:14
53:6,9 68:22
69:12,13 85:10
87:9,11,12,15
88:8,12 107:4,11
110:21,23
144:14,19
148:10 149:2,6
150:17 152:12
152:18 155:4
157:2,18

**derivatively**
  20:16
**desc**  3:11 4:5
**describe**  143:6
**described**  52:19
  53:16 65:5
**designing**  151:9
**despite**  65:5
  81:21 82:1
  116:2 129:23
  131:17
**details**  24:11
  62:7 69:8 103:6
  111:21
**detective**  36:15
  36:21 37:5,6
  38:4 79:13,15,19
  80:24 81:3,5
  82:10 83:15
  90:8,12 91:10
  93:5,8,13 94:1,5
  94:21,24 95:24
**detectives**  81:11
**determination**
  103:23 131:24
**determine**  132:8
  134:9,23 147:21
**devices**  51:5
**difference**  23:5
**different**  6:5 8:3
  11:16,20,22 12:2
  19:19 48:19
  60:9 73:17
  113:2 132:14
  139:6
**differently**  115:6
**difficult**  21:13
  21:20 102:23

103:4
**dig**  55:14 109:14
**diligence**  115:16
**diminution**
  87:24
**dining**  151:9
**direct**  27:21,23
  29:21 30:20
  89:9 135:22
  141:11
**directed**  32:3,5
  32:16,19 42:24
  55:18 71:11
  142:16
**directing**  74:9
**directly**  62:12
  88:7 142:14
**directors**  87:16
  88:9
**dirt**  109:14
**dirty**  48:21
**disagree**  63:19
**disbarred**  26:9
  33:20 43:17
  44:3,18,22 59:15
  60:8,16,21 61:1
  62:4 86:2 89:16
  102:5 106:1
  108:2,8
**disbelieve**  16:15
  16:15
**discoverable**
  145:1,13
**discovered**  72:4
**discovery**  15:9
  15:11,12,18
  22:22 23:12
  24:4 38:11,12,14

46:10,13,15
  47:15 49:10
  55:8 63:8 85:17
  86:22
**discredit**  16:16
**discuss**  62:6
  121:4,5 139:17
  141:2
**discussed**  60:17
  62:8,9 120:16
  121:16 123:21
  125:7,8 150:13
**discussing**  126:9
**discussion**  60:20
  95:8 121:8,9,11
  121:13
**discussions**
  36:14 120:10
  141:23
**diseased**  27:12
**disinterested**
  133:19 153:15
**dismissal**  110:7
  119:21
**dismissed**  110:7
  118:23 119:5,20
**disorder**  66:8,19
**displeasure**
  117:17
**dispute**  23:8
  120:18
**disrespectful**
  137:23
**distinct**  12:16
**distinctly**  90:21
**distributed**  89:7
  151:3

**district**  1:1,1
  35:2 49:1 80:2
  81:2,10 82:3,9
  82:16 98:2
  123:6,7 136:16
  140:5
**docket**  9:8 19:9
  21:15 23:17
**document**  6:20
  7:10 9:10,12
  15:14 16:4,6,9
  18:7 20:17
  26:23 40:18
  56:11,17 63:5
  72:19 86:19
  89:16,19 96:24
  97:15 99:8
  122:11,17,18,19
  123:5,6,12 125:1
  125:12 127:9,10
  127:14 130:22
**documentation**
  131:16
**documents**
  23:11 45:4
  85:14,16 116:9
  131:14
**doing**  19:15 68:6
  76:24 129:7
**dollar**  33:14
**dollars**  15:13
  26:9 65:6 84:17
  84:19,19 85:3
  87:18,19 88:15
  132:7
**doris**  46:16
  64:10

**douglas** 61:3
101:13,18
**draft** 41:8
**drafted** 7:4
50:21 101:13
**drafting** 14:16
**draw** 33:1 66:5
**driven** 20:14
49:14 68:22
**dubbed** 15:4
**due** 115:16
**duly** 5:13 159:7
**duplicitous** 26:1
27:4 28:19
**duty** 89:14
107:12

**e**

**e** 3:15,16,17,18
3:19,20,22,24
4:11 22:22 24:3
50:11,18,23 51:9
51:13,16,18 52:3
54:4 55:12,24
56:5,12,17,19,21
57:6,8,8,11,13
57:16 61:24
63:10,19 64:4
66:3 67:18 72:8
72:11,12,13,13
72:15 73:17,18
73:21 74:9 75:6
75:22 76:5 77:7
77:21 78:7 79:2
79:12,18,23
83:15 90:1
91:11 92:9
94:17,21 95:1,3

95:12,13 96:1
108:13,16,19,21
109:4 112:14,19
113:3,5,9 114:13
115:22 118:13
122:8 129:2
130:12 135:10
135:10,20,24
136:3,7 137:3,13
138:2 139:20
140:1 159:1,1
**eamon** 2:15
**earlier** 62:20
94:1 129:4
153:16
**easiest** 29:20
**east** 1:14 2:7
**eastern** 1:1 49:1
123:7
**easy** 60:14
**economy** 155:13
**effect** 140:7
**eighth** 1:14 2:7
**either** 6:3 72:5
75:8 91:5 105:6
120:16 124:13
143:20 144:16
150:15 152:10
152:20 154:8
155:24 156:3,5
**emanates** 120:19
**emerrigan** 2:20
**eminent** 137:14
137:17,24
**employ** 44:24
**employment**
99:8 108:1

**encompassed**
151:1
**ended** 11:8,18
**enforcement**
80:13 82:5
**engaged** 105:20
106:24
**engaging** 58:10
**enrichment**
84:15
**ensure** 131:3,9
151:3
**entailed** 111:18
**entered** 114:24
**enterprise** 25:23
26:5,7,12,15
52:12 53:13,13
53:17 54:4
102:3,3
**entirely** 85:22
**entitled** 28:12
38:21
**entity** 8:2,3,8
**equifax** 74:21
75:9,24 97:2,20
104:13 105:19
107:17 109:9
110:13,15,21
113:19 115:1,9
118:13 121:1,10
121:10
**erickson's** 29:21
64:5
**errata** 160:10
161:1
**errors** 138:4
**especially** 35:12

**esquire** 1:4 2:5
2:15
**essentially** 12:20
41:3 111:10
**estimate** 33:23
34:14
**et** 14:16,17 21:6
21:11 22:5,8,9
25:22 33:7
44:19 62:23,23
70:20 83:11
118:7
**events** 116:16
117:2 147:5
**everybody** 41:6
55:5 63:6
**evidence** 89:18
106:21 145:1,14
**evolved** 11:13
**exact** 12:10
33:14 40:22
80:4
**exactly** 45:1
54:16 58:3 63:3
66:22 67:24
90:16
**examination** 3:4
5:16
**examined** 5:13
**example** 18:17
46:19 101:12
151:8
**excepting** 103:16
**exception** 28:17
**excuse** 46:20
95:7
**executives** 85:1
85:13 107:6,7

**exhibit** 3:13,14
3:15,16,17,18,19
3:20,21,22,24
4:9,11 6:14 40:6
40:20 50:10
56:5 79:1 89:23
90:1 92:9 94:16
96:14 108:12
110:14 112:13
122:13 135:12
135:23
**exhibits** 3:9 4:1
127:14 135:13
**exist** 111:16
**expect** 31:20
54:22
**expeditiously**
42:4
**expense** 84:15
**expensive** 151:9
151:9
**experience** 20:8
20:9 32:17
158:2,2
**experienced**
14:19
**expert** 101:2,5
**explaining** 81:21
**explicate** 156:3
**expose** 49:11
70:16
**exposed** 26:1
**exposing** 66:9
**exposure** 87:6
**expressed** 58:23
99:6
**expressing** 99:10

**extends** 144:8
**extent** 107:8
121:21 126:22
128:10 139:7
143:4 144:3
**extinguishes**
87:6
**extreme** 99:7,10
100:3,5
**extremely** 21:20
**eyes** 39:21

## f

**f** 159:1
**face** 121:11,11
**facilitate** 54:9
**facilitating**
64:17
**fact** 13:4,20
20:13 28:2
35:15 38:24
43:4 44:6 61:5
119:19 129:24
**factors** 156:8,9
**facts** 14:7 32:9
34:8 35:5,9,10
35:23 36:4
48:10 70:23
71:1,2,2 78:13
83:17,19 109:16
131:18,20,23,23
133:11,14 146:7
146:14 150:22
**failed** 89:13
**fair** 5:23,24 8:19
18:8 19:23
67:23 91:10
93:6,18 94:22,23

97:13 152:16
**fairly** 113:14
**fairness** 102:19
151:20
**faith** 118:4
137:10 144:7,24
**fall** 132:24
133:23
**false** 16:20,23
17:2,14 101:3
**falsely** 84:13
**familiar** 110:12
136:23 140:5
**family** 27:6
29:18
**fantastic** 78:8
**farm** 150:20
152:14,21
**fast** 140:10
**father** 35:21
**father's** 35:3,7
35:13,21 36:1
37:12 83:7,13
**fbi** 81:6,12,15,16
82:1,4
**fear** 15:21
**february** 51:6
56:14,20,24 57:4
57:20 61:10
62:1 63:11 72:8
73:5,20 74:10
77:10 80:9
**fed** 65:1
**federal** 13:8
23:19 102:16
153:1
**fee** 23:21 31:5
102:19 106:2

147:23 149:24
151:20,21
152:11,20 154:9
**feel** 116:5
**feeling** 62:18
**feels** 38:1 39:10
**fees** 18:21 26:10
31:9 33:9 34:10
86:14 147:22
148:2,23 149:2,6
150:16
**feinstein** 51:13
51:15 56:12,19
56:22 57:1,20,24
58:11,18 59:4
60:15 62:6,17
63:11,14,20 64:4
66:4 67:8 69:4,9
69:14 71:4 72:7
72:16,22 75:6,23
77:7,20,23 78:4
90:17,23
**felons** 27:23
**felt** 22:7 78:11
78:14 121:5
**ficaro** 108:19
112:20 114:3
**fiduciary** 86:7
89:14 107:3,12
107:15
**fight** 133:14
**fighting** 63:22
**figure** 84:12
**file** 21:15 23:16
42:5 65:4 67:14
82:18 99:1
117:14 120:17
124:13 144:14

155:6
**filed** 10:18 12:22
  15:7 16:21,23
  18:12,18,19 24:8
  24:15 27:14
  29:14 31:16
  32:2,10 36:3
  41:21 48:18
  49:17 54:21
  75:14 78:21
  80:7 87:13 97:1
  97:9,20 98:8
  103:4 104:13
  105:13 106:8
  110:1 118:5,7,13
  118:22 123:5
  124:12 125:3
  127:10,11
  132:12,13
  137:18 139:2
  142:8,20 143:23
  144:6 146:12
  147:1,18 150:15
  152:10 153:11
  153:17 154:7
**filing** 5:6 8:6
  9:10,22 10:2,13
  18:14 19:2
  26:11 30:11
  34:24 98:1,23
  102:6 103:19,23
  104:17,23 107:4
  107:16 109:9
  111:3 116:11
  123:9 125:22
  131:11,12 141:4
  141:12,18
  152:19

**filings** 18:11
  99:1 103:10
  108:23 146:16
  148:4
**fill** 76:9
**finally** 113:11,18
**find** 17:18,24
  18:5,11,20,22
  96:2 104:23
  109:14 145:11
  145:15 150:2
**finding** 85:16
  103:18
**finds** 17:16
**fine** 139:6,13
  151:10
**finish** 38:20 84:5
  95:15 105:9
  142:3
**finished** 40:1
  65:12,15,23
  112:3,4
**finite** 34:13
**fink** 11:7,16 12:7
  12:12,21 13:3,3
  13:13,22,22 50:4
  150:6
**firm** 1:3 8:24
  10:18,21,23 11:4
  11:12,16,19,22
  12:2,3,13,20,22
  13:3,14,15,17,23
  13:24 14:9,13,21
  14:22,23 15:7,11
  15:21 16:3 19:3
  19:9 21:6,11,22
  22:4,8,8,13,14
  24:23,24,24 27:8

28:14 29:12
  30:10,14,22 31:1
  31:18 32:1,6,12
  32:18 33:19
  43:5,16 44:2,7
  45:23 47:12,18
  48:6,9,11,12,13
  48:14 50:4
  53:14 54:10,15
  55:19,21 59:6
  64:19 67:16,19
  68:2,5,13,14,21
  68:23 69:2,6,18
  70:5,13,19 71:5
  71:14,15 74:13
  74:16 75:7,10,24
  77:8 78:3,6,11
  80:14,18,21 82:7
  82:12 83:1 84:6
  86:1 88:21
  90:16,24 97:18
  98:19 100:20
  102:2,21 105:20
  106:15,24
  107:17 108:1
  110:4,5 111:7
  115:1,8 116:14
  117:12,16
  120:19 125:3
  126:21 128:9
  129:24 140:20
  141:3,4,13,17
  142:22 143:13
  144:16 146:8
  148:15 150:7,10
  152:2 154:9
  155:3

**firm's** 67:8 99:7
  147:10
**firms** 9:7 11:11
  12:11 19:12,19
  20:4,9 21:13,14
  21:20 22:2,14
  23:13,16 24:11
  24:12 28:2 31:5
  31:22 32:17
  33:7,19 36:9
  41:3,15 45:8,9
  46:19,22 47:1,6
  47:10,12 48:5
  49:7 55:23
  64:12 69:5,10,16
  71:8,17 102:6
  133:8,13
**first** 5:13 25:19
  33:4 49:17 50:1
  58:11 65:4,8
  73:24 74:7
  79:21 80:1
  83:22 91:11
  97:8 99:15
  113:20
**firsthand** 158:2
**five** 22:14 24:12
  96:6 113:5
  145:24
**fix** 91:1
**flat** 91:6
**flip** 20:19
**focal** 17:23
**focus** 114:12
**follow** 13:1 23:4
**followed** 30:16
**following** 9:23
  27:5 126:6

**follows**  5:14
**forced**  137:4
**foreseeable**
　137:4
**foretell**  155:15
　156:6
**forgot**  152:13
**form**  5:9 64:16
　117:6 141:6,19
**formal**  76:9
**former**  23:19
　35:1 55:3
　102:16 107:6,7
**formerly**  14:1
**forth**  44:17
**forthcoming**
　9:13 10:8 41:5
　41:15 42:3,15
　109:9,23 118:19
　136:6
**forty**  92:20
**forward**  140:10
**found**  23:22
　74:12 84:24
　100:11 104:18
　115:18
**four**  22:14 24:12
　33:5 48:18
　113:5
**frank**  153:16
**fraud**  22:18 23:8
　23:22 26:11
　36:7 53:20
　81:23 83:3,7,21
　85:21 104:4,6,7
**fraudulent**  17:14
　31:8 52:22
　101:7

**friday**  136:4
**friends**  27:6 93:9
**front**  18:16
　102:13 123:13
**full**  25:19 63:2
　66:6 110:7
　112:7
**funds**  151:3
**furniture**  151:10
**further**  126:7
　150:9
**future**  71:21
　137:5 145:3
　155:16,17 156:7
　156:21

**g**

**g**  79:24,24,24
**gather**  51:20
**geller**  12:1,17
　14:21 15:1,7,16
　86:23 87:4
**gender**  153:23
**general**  19:23
　111:20
**generally**  7:1
　15:5 151:11
**generate**  31:7
**genie**  118:10
　119:9
**getting**  24:3 49:9
　153:11,12
　154:15
**give**  5:22 12:1
　28:5 30:1 37:20
　41:4 45:11 64:8
　73:14 77:2
　92:18 103:4

　147:20 156:22
**given**  47:4
　116:16 151:4
　156:17 159:15
　160:8
**giving**  111:20
　135:3
**glean**  67:10
**glove**  19:12,20
　32:18
**gmail**  112:23
　113:2,8
**gmrlaw.com**
　2:20
**go**  18:17 43:20
　60:24 78:23
　88:9 96:21
　135:7
**goal**  74:23
**goes**  22:21 53:4
　87:15
**goggin**  79:15,19
　79:23 82:10
　83:15 90:9,12
　91:10 93:5,8,13
　94:1,5,21 95:1
　95:24
**goggins**  37:5,6
　38:4 79:13
**going**  5:21 6:6
　6:13,18 10:20
　23:10 30:15
　32:23,24 37:20
　38:2 41:17 42:7
　50:9 56:2,3,8
　59:24 62:16
　63:12 72:14
　73:9 74:2,5

　76:13 78:23
　79:6 89:24
　91:14 92:7
　94:15 96:12
　101:17 108:15
　112:12 117:5,6
　117:23 121:23
　122:3 124:6,10
　125:9,14 133:14
　135:16,20,22
　141:10 143:2
　144:21 146:1
　149:20 153:14
　154:3,18,20
**goldberg**  2:14
**golden**  85:3
**good**  5:19 9:15
　45:9 69:2 85:11
　87:5 99:20
　113:10,18 118:4
　124:22 137:10
　144:7,24 159:4
**gotten**  55:24
**governance**
　86:15
**grammar**  91:1
**great**  50:16
　136:3
**grievance**  13:22
　71:16
**grounds**  153:8
**guess**  29:20 48:8
　79:21 110:19
　117:1 137:19
**guesstimate**
　34:14
**guy**  89:19

| h | | | |
|---|---|---|---|

**half** 30:1,6
**haltzman** 1:13
  2:4
**hand** 14:15
  19:12,20 32:18
  125:24 139:20
  159:20
**handled** 142:1
**handling** 14:8
**hands** 20:9
  106:15
**hang** 73:13
**happen** 129:13
**happened** 13:16
  36:15 69:2
  111:21 114:22
  116:3 119:10,10
  147:5,19
**happening** 96:2
**happenings**
  134:11 135:1
**happens** 15:12
**happy** 46:8
  128:16
**harm** 107:5
**harmed** 119:11
  119:11,12 132:5
  133:17
**harold** 153:21
  154:1
**hartleib** 1:6,11
  3:3 5:12,19 6:13
  6:14,17,18 7:1
  11:10 12:20
  20:18 21:2 22:4
  24:2 25:19
  26:24 31:5 33:2

37:3 38:9 40:6
40:10 45:22
50:8,9,10,16
56:4,5 62:1
65:18,23 69:17
73:10 74:3,5,6
78:24 79:1,8,11
79:11 86:9
89:24 90:1,5
92:8,9,22,23
94:15,16,19 95:2
95:3,12,13,15
96:10,13,14
97:16,22 98:20
99:4 103:8
104:16 105:19
107:9 108:11,12
110:10 112:12
112:13,17
114:16 116:13
118:6 120:13
122:12,13,16
123:3,15 124:12
124:24 125:2,21
130:22 135:19
135:21,23
139:22 140:18
142:13,18,21
144:12 146:6
148:6 150:15
152:10 158:5
**hartleib's** 39:11
  122:10
**haste** 67:1
**heading** 20:24
**hear** 154:3
**heard** 39:22
  46:21

**hearing** 3:14
  9:13 10:2,8 40:7
  40:21 42:20
  58:23 101:1
  111:15,18 136:6
  136:11 151:20
**heeding** 156:20
**held** 1:12 83:10
  95:8 96:7 122:1
  146:3
**help** 30:1 67:8
  67:13,19 68:1,4
  68:13 70:12
  85:17 87:21
  137:1
**helpful** 130:13
**henceforth**
  17:14
**hewlett** 129:8
**hey** 23:24
**high** 13:23,24
  37:7
**higher** 13:21
**highly** 17:17
  23:8
**hire** 68:9
**hired** 44:15,19
  44:22 89:16
  109:12
**hiring** 106:1
**hitting** 85:15
**hmm** 27:10
**holder** 8:2
**holding** 50:2
**holdings** 89:3
  132:11 135:2
**holidays** 128:16

**home** 113:9
**honest** 156:21
**honestly** 120:21
  121:2
**honesty** 18:24
**honor** 45:11,12
**hopeful** 54:8
**horrific** 78:12
**hosted** 16:3
**hour** 63:5
**hours** 17:16 31:8
  34:5 45:10 77:4
  85:21 86:20
  102:18 108:23
**huge** 74:13,18
  78:18 84:11,11
  89:11
**human** 104:18
**hundreds** 31:9
  84:19 87:18
**hurt** 40:12

| i | | | |
|---|---|---|---|

**iceberg** 53:1
**idea** 146:11
**identification**
  6:15 40:7 50:11
  56:6 79:2 90:2
  92:10 94:17
  96:16 108:13
  112:14 122:14
  135:24
**identified** 40:10
  144:18
**identity** 83:7,7
**ii** 1:9
**illegal** 64:18

**illicit**  33:9 34:10
**illusory**  18:21
    26:10 31:8
    45:10 85:22
    86:14 101:7
    105:24
**imagine**  9:24
    125:7
**imminent**
    137:23
**impact**  85:9
**impetus**  51:17
**implicated**  29:3
**important**  6:1
    120:7 132:1,2
**impossible**  59:22
    89:11
**improper**  89:14
    131:5
**inadvertent**
    40:13
**inadvertently**
    57:10,13
**include**  12:14
    18:9 48:8
    115:23,23
**included**  15:23
    27:5 30:12,13
    32:21 47:9,12
    71:7
**including**  25:14
    48:6 80:18
    84:22 149:7
**incorporated**
    97:7
**incorrect**  63:13
**increases**  151:12

**index**  3:1
**indicate**  6:3
**indicated**  159:7
**individual**
    104:17
**infamous**  27:8
    29:12 30:10
**influences**  15:1
**inform**  36:5
    81:13 108:6
**information**
    10:14 16:14
    22:12 28:18,21
    30:2,11,20 31:2
    31:15,23 32:9
    35:3 36:6,16
    37:2,14,17,21
    38:3 45:12
    51:20,22,24
    54:15 58:13,15
    61:5 67:11
    70:18 77:2,18,21
    83:11 86:16
    93:24 94:7
    111:21 115:14
    115:15,18,20
    125:22 131:24
    132:3,9,10 135:4
    141:8 147:20
**informed**  81:7
**informing**  25:13
    39:12 77:14
**initially**  58:22
**initiate**  76:10
**injunctive**  150:1
**injustice**  66:10
    66:17

**ink**  129:8,9
**inquiring**  61:5
**inside**  12:10
**insight**  23:10
**inspector**  79:13
**instance**  22:5
    49:18 65:8
    83:22 100:23
    146:12 150:14
**instinct**  35:10
**instruct**  144:22
    145:20 154:20
**instructed**  59:2
    81:4
**instruction**  28:6
**instructions**  5:22
**insurance**  87:17
    87:19 88:5
    150:20
**insurers**  87:7
**integrity**  109:17
**intend**  46:23
    55:14 155:6
**intended**  57:9,15
    67:4 157:23
    158:3
**intending**  47:17
**intent**  42:13
    147:18
**intention**  42:5
    75:10,23 76:2
    82:15 144:12,13
**intentions**  67:24
    76:6 155:20,24
    156:3,5
**interchange**  31:6
**interest**  8:2 20:6
    58:23 84:14,23

    85:6 86:4
    119:15 155:13
    157:2,4,7,7,11
**interested**  54:13
    159:17
**interesting**  37:24
    39:10,14 112:6
    153:10 154:5
**interestingly**
    153:6
**interests**  68:8
    156:11,13,15
**interpretation**
    116:5
**interpreted**
    90:19
**interrupted**
    84:16
**intervene**  153:4
    153:5
**intervention**
    153:3
**intimated**  59:8
    91:5
**introduced**
    61:14
**intuition**  35:10
    36:7
**invent**  68:7
**investigation**
    76:5,10,13
**investigator**
    109:13
**investigators**
    82:6
**invite**  45:23
**involved**  19:10
    28:22 29:17,17

41:15 47:8
48:13 64:12
65:9 100:14
103:20 129:19
133:10 137:10
154:10,13,15
**involvement**
71:13
**involves** 22:13
**irrefutably** 45:5
**issue** 17:11,22
25:1 64:22
80:19 121:4
**issued** 115:7
**issues** 13:2 20:2
68:23 69:1
106:11 109:8
115:13 118:16
119:7 144:17,18
148:18 151:16
**iteration** 11:17
12:7
**iterations** 11:7
12:13

**j**

**j** 17:4 18:13
79:23 102:11
103:16,24
**james** 108:19,22
112:20 114:3
**jan** 1:16
**january** 127:10
127:11
**jeff** 25:1 31:19
**jeffrey** 13:3 16:6
17:3 28:17,18,21
32:13 33:6

44:13,14,15 45:6
79:14 82:13
84:9 85:8 86:18
99:8 105:15
107:22
**jerry** 18:13
**jessica** 29:21
64:5
**jettisoned** 86:12
132:5
**jettisoning**
105:22
**job** 86:18 154:22
**journal** 29:22
30:7 64:6
**joyce** 51:12,15
56:12,19,22
57:12,12,16,20
62:6,11,13 63:11
66:4 72:15
75:22 78:3
90:17,23
**judge** 17:11,16
18:18,22 23:18
23:19 25:6,11
33:4 36:5 40:21
41:2 43:4 45:8
45:15,19 48:24
61:3 69:2 77:12
80:8 85:9,22
86:9 101:1,14,14
101:23 102:16
104:20 106:18
110:11,12,20,20
110:22 111:2,11
111:21 114:5,6
114:23 115:7,13
115:17,17 116:1

116:2,3,8 117:9
131:14,17,21
140:2,3,4,4
153:21,24 154:1
154:1
**judgment** 70:3
**judicial** 53:22
84:14 155:13
**july** 123:8
127:12
**jurisdictional**
10:23,24 21:17
**jurisdictions**
11:1 41:21
80:13 132:24
133:22 134:6,10
134:18,24
**jurisprudence**
157:8,16
**jury** 112:6
**justice** 13:5
69:24 104:5

**k**

**kansas** 22:18
25:14 44:18
51:23 52:9
58:14 62:10
64:12 69:3
70:17,24 76:23
80:24 81:2,8
82:3,19 106:9
107:18 110:2,6
111:22 115:24
118:6,22 119:10
119:18 120:16
137:19 140:20
141:18 142:20

143:12,24
147:20
**keep** 24:2 44:21
61:16 124:20
**keeps** 65:6
**kennels** 65:1
**kept** 65:2
**kerrigan** 46:17
**kevin** 74:1
**killed** 122:23
**kin** 159:16
**kind** 42:23 49:19
60:16 66:14,15
67:1 119:17
**kindly** 124:19
**kinds** 53:6
129:10
**king** 1:14 2:8
**knew** 25:5,11,12
35:3,7,13,20
36:1 37:6,11,12
37:16,18 43:5,17
44:2,7,10,12,13
44:22 45:1,2,5
54:16,20 58:3
59:10 62:15
75:14 83:6
90:16 94:5,11
121:18 128:18
129:17,17 137:1
**know** 6:3 8:9
9:11 10:6 11:20
11:23 13:15,17
13:20 14:7,9
17:1 19:7,8,17
21:14,21,22,23
22:6,21 23:12
24:3,22 25:15

31:3,3 33:18
36:13,15,18
39:14 42:15
43:4,6 44:6
45:10 47:6,14
48:14 51:15
54:19,23 55:1,13
57:12,17,17,18
59:20 61:8 63:7
68:23 69:12
72:1,6 74:20
86:5,5,11 87:14
88:18 89:8
91:13,18,24 92:1
92:4 94:3 98:9
98:13 104:14
108:24 109:10
111:17 112:16
113:4 118:8,15
119:8,13 121:3,7
121:8,19 122:16
123:18,20,21,24
125:14 127:19
130:10 132:19
133:11 136:21
136:24 137:9
138:24 139:3,24
140:2,2 147:17
147:24 154:15
155:16 156:11
156:20,22
157:21
**knowing**  23:9
139:23
**knowledge**  11:11
12:10 27:11,15
28:15 29:13
60:8 63:2 94:8

154:12
**known**  8:2 14:1
60:22 101:6
**knows**  133:14
**ksm**  1:5

---
**l**
---

**lack**  18:4 20:12
20:13 48:23
72:24
**lacked**  27:7
118:23 119:6
150:4
**ladies**  89:21
**laid**  39:21
**language**  31:11
37:11 116:4
126:14,18
131:18
**large**  50:2
**largely**  147:5
**law**  1:3,12 8:24
11:4 14:9 19:3,9
24:23,24,24
28:14 29:22
30:7,14 31:1,17
32:1,6,12 43:16
44:2 46:19,21,21
47:1,6,9,12,12
47:18 48:5,6,8
59:5 64:6,7,19
67:16,19 68:1,5
68:13,14,21 69:5
69:6,18 70:5,13
70:19 71:5,21
72:3,5 75:7 77:8
78:3,11 80:13,14
80:17,21 81:23

82:5,7,12 83:8
84:6 90:16,24
100:20 102:2,21
106:15 108:1,7
114:24 115:8
116:14 117:12
125:3 129:24
130:14 140:20
141:3,13,17
142:22 143:13
144:10,15 146:8
148:15 150:10
154:9 155:3
**lawsuit**  55:6
110:1 137:18
143:13,24
**lawyer**  20:14
49:14 68:22
138:9
**lawyered**  58:24
**lawyers**  30:14
49:15 71:24
112:8 132:6
**lay**  21:14
**layn**  18:18,18
102:16
**lc**  138:18 139:17
**lead**  10:4,8,11,16
10:19,22,24,24
11:1 14:8,13
19:4,4 21:7,22
21:23,24 22:6,7
37:9 49:3 70:18
74:13,23 75:8,8
75:18 77:3,8
86:21 89:15
97:18 98:10,15
98:17,19 105:14

105:14 111:7
114:8 115:1,8
144:16,17,24
147:23,23
153:22 155:5,5
**leading**  149:7
**leads**  15:14
35:11
**learn**  78:2
**learning**  153:13
**leave**  41:6 155:1
156:10
**led**  36:12 47:15
62:10,18 63:1
70:19 83:20
85:16 94:10
**left**  59:8 61:23
62:14 141:21
**legal**  143:3
**legislative**
157:20
**legitimate**
105:22 125:2
**length**  150:13
**lengthy**  37:5
63:19
**letter**  61:2 80:8
101:18 154:1
**letters**  61:7,10
101:13 153:12
**level**  13:22
104:24
**license**  81:24
83:8 108:7
**lied**  100:20
**life**  35:22 66:18
84:16 89:20
112:1

light   145:11,16
line   33:5 35:1
  40:23 49:15
  66:6 99:15
  161:4
lines   33:5 74:22
link   113:16
  114:4
linked   49:6
list   41:4,14 42:3
listed   9:5,19
  19:9
listen   109:24
  118:20
listened   69:3
litigation   7:16
  8:13,17,23 14:6
  15:5,19 18:12
  19:5,22 20:1,3
  20:12 22:19
  25:14 29:18,23
  29:24 30:2 43:7
  47:9 49:13,14
  52:8,14 55:10
  64:12,17,24
  65:10 68:22
  69:12,13 86:17
  101:10 110:21
  110:23,24 118:5
  118:6,19,22
  119:18 120:17
  120:20 126:9,22
  128:10 130:11
  137:8,10,11
  140:19 142:19
  142:20,24 143:7
  143:10,11,22
  144:2,7,9,20

148:11 149:3
  152:18 157:19
litigations
  144:15
little   20:14 49:15
  53:5 87:5 89:20
  97:10
llc   1:13 2:4
  64:19,21,23 65:6
llcs   64:16,16
llp   11:9
lobby   113:23
  121:10
local   52:9
locked   15:22
logs   17:12,16
  31:9
long   24:7 35:22
  41:8 89:20 95:6
  95:21 122:20,21
  123:9 149:20
longer   13:14,14
look   7:5,9 9:6
  12:6 20:17,19
  30:4 50:8,14
  56:8 57:7,11
  60:24 66:16,17
  73:8 79:8 89:23
  90:5 92:6,13
  96:23 97:4
  108:15 126:2
  127:21 130:15
  130:22,23
  132:17 139:19
looked   50:15
  79:10 92:14
  138:14

looking   66:2
  87:3 117:15,22
  124:21 125:21
  142:13
looks   51:2
lorack   13:7
  27:24 28:23
  29:2
loses   16:19
loss   84:11,12
  89:11
lost   84:20 85:19
  87:8
lot   21:12 45:12
  55:17 61:16
  64:8 102:15,17
  122:23 156:7
lots   91:22
love   157:19
lunch   121:23
  122:1,4
lying   90:24 91:1
  91:5,6

| m |
| --- |

m   108:19 112:20
machine   159:11
mail   3:15,16,17
  3:18,19,20,22,24
  4:11 22:22
  50:11,18,23 51:9
  51:13,16 52:3
  54:4 55:12 56:5
  56:12,17,19,21
  57:6,8,8,11,13
  57:16 63:10,19
  64:4 66:3 67:18
  72:8,11,12,13,13

72:15 73:17,18
  73:21 74:9 75:6
  75:22 76:5 77:7
  77:21 78:7 79:2
  79:12,18,23
  83:15 90:1
  91:11 92:9
  94:17,21 95:1,3
  95:12,13 96:1
  108:13,16,19,21
  109:4 112:14,19
  113:3,5,9 114:13
  118:13 122:8
  129:2 135:10,10
  135:20,24 136:3
  136:7 137:3,13
  139:20 140:1
mailing   51:18
mails   24:3 55:24
  61:24 115:22
  130:12 138:2
maintain   155:9
major   20:2
  151:16,16
  157:18,22
majority   20:14
  38:15 53:10
  148:4 157:24
  158:1
making   14:10
  83:12 108:24
  132:6
man   47:7,8
march   10:4
  24:19,19 79:22
  82:23 83:14
  90:9 93:4 98:3
  108:18

**mark**  6:13 33:6
38:8 42:11 50:9
56:4 72:16 73:9
74:3 78:24
89:24 92:7
94:15 96:13
108:11 112:12
122:5,11 135:20
**marked**  6:15,18
20:18 40:7
50:11 56:6 79:2
90:2 92:10,22
94:17 96:16
97:16 99:3
108:13 112:14
122:8,14 123:2
125:1 135:24
**market**  1:19
**matter**  18:10
41:16 103:19
117:11 128:20
**mcgowan**  127:17
**mean**  9:5 16:18
17:23 31:3
35:21 44:6 53:2
54:4,12,18 55:4
55:12 59:12
66:13,21 70:21
84:21 91:17,19
94:2 104:9
112:6,8 114:15
118:3 124:5
125:8 128:23
133:6,12,20
134:5 136:23
137:7,16,23
139:16 142:6
146:23 156:19

**meaning**  6:22
53:14 55:16,17
64:17 100:19
147:17
**meaningful**
15:15 53:9
86:24 87:1
88:22
**meaningless**
85:23
**means**  17:14
55:7 109:17
128:24 156:3
**meant**  53:3,15
58:6
**meet**  113:11,18
**melvyn**  13:6
27:24 28:23
29:1
**member**  62:5
**members**  27:6
29:19 83:1
**memorize**  61:15
**memory**  10:21
41:17 101:17
**mention**  60:12
**mentioned**  22:23
**merit**  118:23
119:6
**meritorious**
149:22
**merrigan**  2:15
12:24 22:10
25:2 26:16,19
27:1,19 28:5
29:6 30:15
36:20 38:10,13
38:18 39:2,6,15

39:24 42:16
43:21 47:3,19,22
49:21 59:24
60:2 65:13,17
68:15 69:19
70:6,14 73:11,16
96:19 97:6
99:12,16,17,19
110:15 115:3,10
116:18,22
117:23 120:23
122:20 123:17
123:23 124:1,5
124:15,16,20
126:24 127:15
127:18,21 128:1
135:13,17 139:5
139:13,19
140:13 141:6,14
141:19 142:5,9
142:14 143:2,14
143:21 144:1,21
145:15,21 146:2
146:18 147:12
149:9,11 154:19
154:22 155:9,21
157:5,13 158:10
**merry**  128:16
**met**  113:20
**michael**  1:6,11
3:3 5:12 21:1
26:21 27:20
28:7 42:18
117:2 120:12
122:9 127:19
135:18 150:14
152:9

**milberg**  27:8
29:12 30:10
**miller**  2:14
**million**  18:21
23:21 33:8,17
34:10 65:6
85:12,18 86:24
87:8 89:2 101:4
101:22 102:19
106:1,2 149:24
151:22
**millions**  15:13
26:9 31:9 85:2,2
85:18,18 87:17
87:17,18 132:6
**mind**  23:5 129:7
**mine**  70:22
**minimum**  58:19
**minnesota**  21:18
**minute**  96:6,23
124:4
**minutes**  45:11
45:15 145:24
**misleading**
101:11 102:6
**missed**  89:17
**mission**  49:19
68:12
**misspeaking**
127:13
**mistake**  108:24
109:3,11
**mistaken**  73:4
151:21
**mm**  27:10
**monetary**  141:2
141:16

**[money - objections]**    Page 22

**money** 19:13,18
19:18 50:3 65:7
88:3,3,4,5,6,10
88:11,20,23
89:20 141:12
**monica** 100:7
142:22
**months** 93:21
**morning** 5:19
**motion** 3:21
96:14 97:8,9,16
98:5 99:2
**motions** 3:14
10:3 40:6 155:7
**motivation** 67:7
**motive** 69:15,18
69:23
**motives** 70:4,10
**mouth** 42:9
**move** 32:23 38:7
**multi** 10:22,24
11:8 21:16
41:20
**multiple** 13:8
16:11 50:1 51:5
69:16
**multitude** 33:9
107:18
**murphy** 27:17
**musing** 39:14,16
**musings** 40:1
**myriad** 16:18
28:1,3 107:23

**n**

**n** 79:24
**name** 7:23 8:10
11:4,5,13,16

22:4,7,23 81:1
110:12 136:24
**named** 13:15
138:18
**names** 9:7 11:8
12:13 28:9
**naming** 28:9
**nationwide**
74:13,18
**natural** 65:20
**nature** 19:24
**near** 86:14
**nearly** 115:23
**necessarily**
65:20
**necessary**
113:12 114:14
114:18,19
116:16 118:2
**need** 5:22 77:20
87:13 96:10
99:1 117:14,14
127:4 144:4,6
154:22
**needed** 129:13
134:10,24
**needs** 157:21
**nefarious** 19:16
19:17,23 53:19
65:4
**neither** 159:16
**never** 44:16,20
44:22,23 45:19
59:16 60:11
70:24 88:18
111:24 120:2
123:17 124:9

**new** 49:1 64:15
93:18
**nextel** 14:6 16:1
18:6,12 22:19
24:13 25:1
31:19 32:14
34:1 52:14
77:15 82:13
85:10 86:10,17
88:1,12,13,24
104:10,19 105:6
105:12,16 106:5
106:9,12 107:8
116:17 117:2,9
117:11,18
120:20 130:4
134:12 135:1
144:19 146:9,14
146:15 147:3,6,9
148:18 149:3,8
149:13 150:12
152:7,22 154:10
155:8
**nickel** 85:24
**night** 41:8
**nominal** 89:6
**non** 23:1 81:24
93:2
**notary** 1:16
159:4,24
**note** 30:15
**noted** 160:9
**notice** 159:6
**notify** 41:6 76:21
147:19
**november** 1:8
94:22 95:2,12,24
159:21 160:6

**nuance** 102:24
**number** 34:13
48:12 86:19
92:19 126:11
140:12
**numbered** 127:1
**numbers** 123:9
**numerous** 46:7
68:20 128:12
129:20

**o**

**o** 79:24
**oath** 5:20 11:21
39:23
**object** 12:24
25:2 117:23
139:7 141:6,19
143:2 144:21
147:12 149:1,5
**objected** 150:24
151:19 153:21
**objection** 22:10
29:6 30:16
42:16 49:21
68:15 69:19
70:6,14 95:11
115:3,10 117:6
141:14 143:14
144:3 146:13
149:19,21
150:23 151:1
152:7,10,20
153:5,10 154:8
155:10,12,21
157:5,13
**objections** 5:8
147:2,5 150:15

151:18
**obligation** 86:7
107:3
**obtain** 51:24,24
**obtained** 9:7
53:10 105:24
148:2,22,24
**obviated** 73:14
117:14
**obviously**
139:24
**occasions** 46:7
50:1 62:13
69:16 129:1
**occupation**
84:18
**occurred** 29:14
34:2 58:1 77:14
116:16 129:23
129:23
**occurring** 35:16
**occurs** 49:13
**offer** 67:13
70:12
**offering** 67:7
**offhand** 40:4
**office** 80:3,16
81:3,8 82:4,5,10
82:17 98:2
**officers** 87:15
88:9
**offices** 1:12 16:9
**official** 76:10
159:20
**oftentimes** 19:20
**oh** 42:12 59:23
**okay** 7:3,5,15,21
7:24 8:5,11,16

8:19 9:4,9,18
10:1,10 11:3,10
12:4,9,19 17:2,8
19:21 20:22
22:3 23:1,14
24:2,15,18 25:10
28:11,16,24 30:8
30:24 31:23
32:23 33:16
34:19 37:17,23
38:1,7 40:5
41:14 43:12
44:10 45:18,21
46:13,20 47:1,11
47:16 48:4,15
49:8 50:20,22
51:6,9,12,17,21
52:3,11 53:18
54:7 56:24 57:6
57:19,23 58:5
59:4 60:19
61:11,12,22,23
62:3 66:2 67:4
69:4 71:9,13
72:10 73:3
74:10,18,22 76:4
76:17,20 78:2,7
78:22 79:18
80:8,12 81:7,12
81:20 82:3,22
88:15,19 89:5
90:11,23 91:14
92:15,21,23 93:4
94:13,19 95:19
95:23 96:4 97:1
98:14 99:4,5,6
100:18 102:1
103:22 104:9

105:18 106:14
107:14 108:18
109:3 110:10
111:1 112:5,19
113:6,9 114:2
120:7,8 121:15
121:22 122:19
123:2 124:3,15
124:18 125:6,18
126:4,20 128:1,4
129:1,22 130:17
131:1,2,9 132:15
132:22 134:3,17
134:20 136:3,21
137:12 139:1
140:3,8,17
145:22 146:23
150:12,22 152:1
152:16 153:2
154:18 156:14
157:11
**old** 89:21
**once** 39:20,20
45:3 49:11
53:12 70:24
93:13
**ones** 15:17 116:1
**ongoing** 108:6
**open** 100:23
**operate** 19:13,19
19:20
**operating** 31:22
**opinion** 12:2,19
12:21 13:24
20:4 26:8 37:7
59:3 107:8
116:7 119:19

**opportunity**
50:13 84:20
**opposed** 22:8
62:4 68:14
**opposition** 21:5
97:17 105:14
111:6
**oral** 1:11 113:20
**order** 76:10
114:5,24 115:7
**orders** 104:20,22
105:3 106:18
116:1 131:14,19
145:7
**original** 105:23
**ouch** 40:12
**outcome** 157:3
159:18
**outlined** 99:23
**outrage** 23:15,17
**outside** 113:22
120:5
**overall** 20:11
55:15
**overbill** 53:21
**oversaw** 16:9
**oversight** 53:5
151:2
**overture** 121:3
**overview** 99:15
**overwhelming**
38:15
**owner** 13:16

| p |
| --- |

**p.c.** 1:3 2:14
**p.m.** 51:7 56:14
57:21 72:8,16

74:10 79:23 90:12 93:21 108:19 136:4 158:13

**pa** 2:8,18 35:2 93:9

**pacer** 135:2

**packard** 129:8

**packed** 111:24

**page** 3:5,11 4:5 7:6,6,9 20:19 25:19,20 26:23 31:4 32:24,24 33:2,2 34:16,20 34:20,21,24 40:23 41:1 43:3 45:7,8,22,22 56:11,17,18 66:6 73:12 74:1,7 92:16,17 93:2 97:4,8,16,22 98:5 99:14 122:7 123:8 125:20,20 126:1 126:2 127:13 130:20 132:16 135:8 138:12 140:11 161:4

**pages** 92:15 93:1 122:22 123:9 125:22

**paid** 27:7 29:11 45:3 46:18 63:5 87:20

**painfully** 100:8

**pales** 68:5

**parachutes** 85:3

**paragraph** 25:20 33:4 34:16,16,20 54:8 66:6 126:12,17 131:2 132:16,18,22 134:15 135:7,8 138:8,11,17 140:11

**paragraphs** 125:19 126:5 127:23 130:19 130:24 131:7

**paraphrasing** 101:17

**part** 13:23 25:20 33:13 42:23 65:4 88:2 95:2 114:12 128:3

**partake** 121:24

**participant** 83:13

**particular** 13:3 99:2,3 109:19 118:3,7 121:6 128:15 156:19

**particularly** 41:19

**parties** 5:6 9:19 12:5 16:11 27:6 27:12 28:19 32:19 41:22 52:8 116:8 132:11,24 133:21,23 134:1 134:10,18,23

**partner** 13:14,15

**partners** 11:8,20 55:4

**party** 7:7 20:12 65:6 75:18 138:18 159:16

**passed** 154:2

**patently** 101:3

**pauses** 65:18

**pay** 25:21 64:18 88:6

**payable** 83:12 83:23 84:2

**paying** 30:9 63:4 65:9

**payments** 94:6,9

**pdf** 91:18

**penitentiary** 13:8

**pennsylvania** 1:1,14,21 44:17 44:19,20,23,24 59:15,17 60:13 62:5 76:4,7,8 81:5,10,11 123:7

**people** 41:23 66:7 135:3

**percent** 14:18 38:17

**perfectly** 46:8 87:4

**period** 34:2,3,5

**perjurious** 26:11 52:22 102:7 103:9,20 104:3 104:18

**perjury** 16:17 83:3 103:23 104:24 105:2,5 105:11

**person** 21:14 82:1 113:21

**personal** 12:2 20:8 49:20 52:21 70:3

**personality** 66:8 66:19

**pertained** 130:15

**pertains** 30:21 34:17 80:20 82:12

**pertinent** 131:13

**pews** 112:7

**ph** 2:9,19

**phil** 48:16 55:22 68:7 85:11 102:23 140:12

**philadelphia** 1:21 2:18

**philip** 2:5

**phillips** 18:18,18 18:19 23:19,23 102:17

**phone** 76:8

**phrased** 116:24

**piggyback** 15:5

**place** 22:18 23:23 58:12 76:22 104:5,6,7 112:7 159:6

**plaintiff** 2:11 10:9,11,16 48:17 48:18,20,21,22 48:23,24 49:1,2 49:4,5 52:9 63:14 64:2,3,15 64:18,18,21 65:9

| | | | |
|---|---|---|---|
| 74:24 89:14 100:7,11 107:11 128:18 129:17 129:18 133:13 140:22 143:24 150:3 153:22 | **pleased** 114:23 115:7 **pled** 103:3 105:23 150:1 **plural** 46:23 48:7 | **practices** 131:5 **practicing** 71:21 81:23 108:7 **precise** 37:12 **predict** 71:19 155:17 | **privileged** 36:15 36:19 143:17 **probably** 9:21 46:24 58:7 63:3 67:21 81:9 95:4 113:4,8 114:5,9 |
| **plaintiff's** 15:18 53:13 69:12 85:5 131:4 149:21 150:5 152:1 155:3 | **pockets** 49:15 **point** 8:3,20 12:14 17:23 25:6 30:3 37:20 38:2,16 89:13,13 109:20 116:19 | **prepare** 41:7 **present** 24:4,7 144:13 **presented** 59:16 59:17 116:11 **presidential** | 133:15 137:18 **problem** 48:17 85:7 89:8 **problematic** 53:11 **problems** 22:1 |
| **plaintiffs** 20:13 27:5,8,12 28:2 28:19 29:11,23 30:9 31:6 46:18 46:19 48:19 53:21 63:22 64:9,10,14 65:1 100:19 126:7 133:1,6,9,11,23 | 118:3 121:6 137:9 138:1 156:19 157:23 **pointed** 138:5 **pointing** 138:3 **police** 81:22 **poorly** 67:1,6 **posed** 6:6 23:3 | 23:19 **presiding** 110:20 110:22 **presume** 5:21 6:7 **pretty** 15:19 **prevents** 66:8,20 67:2 | 69:10 118:24 151:14 157:18 **procedural** 118:24 119:7 **procedure** 31:22 **proceedings** 5:2 **process** 16:4,5 18:8 20:3 49:13 |
| **plan** 39:12 **platform** 16:5 **played** 14:5 **pleading** 138:2 151:15 | **position** 16:16 78:8 86:6 **positive** 154:14 **possibility** 72:2 72:4 | **previous** 73:19 103:13 **previously** 11:3 54:2 75:13,19 79:16 109:13 | 53:24 125:16 **product** 55:10 **professional** 63:14,22 64:1,3 **promptly** 42:2 |
| **pleadings** 14:16 38:23 41:23,24 83:20 103:3 115:24 131:13 131:19 138:4 139:8 143:1,23 155:7 | **possible** 95:21 109:17 **possibly** 17:6 82:24 **potential** 126:8 126:22 128:9 129:12 144:24 | 113:24 125:7 135:4 155:10 **prior** 9:14 11:17 30:6 43:17 44:2 51:15 141:4,12 141:17 149:7,10 152:6 | **properly** 86:3 106:2 151:3 156:12 **property** 151:4,5 151:7 **propounded** 160:9 **prosecuted** 29:5 |
| **please** 6:17,19 23:2 25:19 32:24 40:18 43:4,22 44:9 73:9 84:5 92:18 | **potentially** 85:18 **power** 14:20,24 15:1 **practice** 19:23 20:1 72:3,5 83:8 | **private** 120:2 **privilege** 36:21 141:8 142:19 143:7,10,12,22 144:2,3,8 | **prosenzweig** 2:10 **protect** 25:23 156:13 |

[protected - receive]                                    Page 26

**protected** 55:9
68:9 143:17
**protecting** 85:1
**protzman** 141:1
141:11,24
143:21
**prove** 45:4 54:15
**proved** 55:24
**proves** 44:16
**provide** 10:14
42:3 51:22
58:13 124:19
142:7
**provided** 28:2
61:8 115:20
131:13,15,19
132:9,10
**prussia** 1:14 2:8
**public** 1:17 55:6
106:24 143:23
159:4,24
**publication** 64:6
**published** 29:22
30:5
**publishing** 30:6
**purchase** 65:7
**purporting**
84:13
**purpose** 10:12
42:14 49:8,9
58:10 64:17
77:1 87:9 95:23
111:1 132:6
157:22 158:3
**purposeful**
40:15
**purposes** 53:22

**pursuant** 159:6
**put** 13:7 44:17
84:17 118:10
119:9 122:6
127:3
**puts** 64:20
**putting** 42:8
86:19

**q**

**qualified** 49:5
53:22 89:15
**quality** 151:10
**question** 6:2,5,6
8:1 14:3 18:1,2
18:3,23 23:2,2,4
26:17 30:17
38:3,4 39:4
42:10 43:19,22
59:21,22 63:10
65:14 70:9
75:11 97:14
105:9 116:21
117:5,7,21 120:9
128:5 134:20
139:6 141:7
144:23 145:12
145:17 146:19
154:19 155:11
156:6
**questions** 6:19
38:16,19 39:7,17
60:6 62:23 74:6
74:8 98:20,22,24
99:1 125:9,15
130:13 142:10
158:10 160:8

**quibble** 137:22
**quite** 25:5 95:21
**quote** 25:20 33:5
58:3 66:3 71:19
78:17 99:6,13
108:22

**r**

**r** 159:1
**race** 153:23
**racketeering**
19:15
**raise** 146:16
155:8
**range** 38:17
**reach** 23:23
80:12,23 104:24
108:5
**reached** 80:24
81:6 103:7,7,9
109:7 118:11
120:22,24
128:15
**reaching** 57:10
**read** 21:9 31:13
36:1 41:2,12
43:10,21,23 46:3
46:5,11 75:3
113:14 116:3,9
128:4,6 131:22
132:21 133:4
134:21 160:5
**reading** 99:13
**reads** 20:24
34:13
**ready** 6:23,24
**real** 15:8,9 20:12
20:13 88:20

133:16
**realize** 24:1 67:5
86:7
**realized** 153:15
**really** 40:13
148:21
**reason** 51:2
54:22 63:4
87:12 124:24
140:1 161:4
**reasonable**
33:22
**reasons** 99:9,21
99:22,23 100:10
100:16 103:5
**rebuffed** 109:21
121:4
**recall** 8:18 21:19
30:4 34:3,6 35:9
37:22 38:6
41:17 51:14
57:23 58:2,8,19
58:20,22 62:7,17
69:7 72:9 73:7
80:4 81:1,16
82:8 84:7 88:14
89:4 91:7 93:12
94:10 95:5,16,20
105:3 109:5
111:9,13,19,20
119:22 120:21
121:3,7 123:20
125:6,9,11,13,14
128:13,20
136:15 151:23
152:3,5,19 153:8
**receive** 56:21
57:6 90:8

**received**   42:1
   108:23 118:13
   124:9
**receiving**   94:6,9
**recess**   96:7
   122:1 146:3
**recitation**   131:6
   131:18,23
**recognize**   129:12
**recollect**   43:1
**recollection**
   50:22 75:16
   90:20 94:2
   111:17 114:10
   114:11
**recompense**
   107:5 133:16
**record**   39:8
   43:23 46:4
   61:12 79:22
   95:9,11 97:7
   110:20 120:2
   122:4 128:6
   134:21 142:13
   154:22 155:10
   159:14
**recorded**   159:11
**records**   17:21,23
   18:7,9 101:16,20
**recoup**   88:10
**recovered**   88:11
**rectify**   66:17
**redact**   23:20
**redraft**   151:18
**redress**   145:23
**reduced**   101:23
   151:22

**refer**   17:3 52:14
   53:12 102:2,20
   116:15
**reference**   74:12
   102:4 109:6
   113:18 137:12
**referenced**   135:9
**referencing**
   71:23 76:5
   100:21 102:22
**referred**   46:14
   47:13 48:5
   79:16 92:2
   100:6 103:9
   106:12,14
**referring**   26:6
   29:13 38:18,19
   39:2,6,7 46:13
   47:2 52:17 66:4
   73:22 74:15
   78:19 93:11
   102:10 104:14
   105:21 106:17
   107:2,20 109:4
   127:1 139:8,22
**reflect**   142:13
**reflected**   75:22
**reform**   15:15
   70:2,18 133:16
   157:19,20,22
**reforms**   86:15
**refrained**   138:3
**refreshes**   75:16
**regard**   13:24
   15:18 20:11
   30:21 59:6 78:8
   96:3 104:5,8
   154:23 157:8

**regarding**   7:12
   10:3 20:3 24:23
   29:22 30:2
   31:17 32:13
   34:9 38:14
   58:15 69:13
   79:13 94:8
   126:8 129:3
   143:23
**regards**   137:2
**reinstatement**
   101:22
**reiterate**   6:8
**relate**   38:17 99:2
**related**   98:23
   144:19
**relates**   18:6
   34:21 38:4
**relationship**
   48:11
**relativity**   16:4
   16:11
**relevant**   10:15
   77:3,18 115:15
   116:1 145:1,13
   147:21
**relief**   15:15
   20:15 53:9 85:9
   85:23 86:24
   87:2 88:22
   105:24 147:24
   148:2,3,24 150:1
**remain**   8:1
**remainder**   34:20
**remarkable**
   22:24
**remember**   60:22
   61:18 86:24

   90:22 91:22
   102:24 109:10
   111:23 121:1,15
   121:17 128:15
   129:16 138:9,10
   151:15
**remind**   11:5
**reminder**   6:1
**remotely**   17:13
**removed**   74:23
   75:10,20,24
   114:8
**removing**   114:24
   115:7
**rendering**   10:15
   77:19
**repeat**   134:20
**repeated**   25:24
**repeatedly**   19:11
   157:17
**repetitive**   98:21
**replace**   151:7
**reply**   72:7,10
   90:8
**report**   93:18
**reported**   76:12
**reporter**   1:16
   43:24 95:7
   128:7 134:22
**reporting**   1:19
**represent**   39:18
   84:14,23 86:3
   124:9
**representation**
   109:15
**representative**
   49:3 77:9

**represented**
156:12
**representing**
85:6 106:3
107:10 119:14
130:1 141:22
**reprimand** 40:4
**repurchase**
151:7
**reputation**
119:12
**request** 23:21
49:20 86:22
102:19 106:2
129:19
**requested** 43:24
128:7 134:22
**requests** 147:23
**reraising** 148:18
**research** 32:16
36:8 132:11
**reserved** 5:9
**residential** 8:7
**resolution**
118:19 119:17
120:11
**resolve** 109:8
118:16
**respect** 16:1
17:22 24:24
29:10 30:9
31:17,18 36:10
76:14,15 77:15
80:14 82:7
103:22 143:12
145:10 148:16
**respective** 5:5

**respond** 57:19
63:20 73:3
90:11 93:20
**responded** 57:1
57:3 63:17 94:1
**responding** 18:2
**responds** 93:14
**response** 42:21
57:12 65:21
73:4 91:10 94:4
97:3 126:7
142:15
**responsible**
83:10 85:15
**responsive** 23:1
**restate** 56:16
97:13
**result** 87:24
**resume** 44:15
60:11 61:7,9
**retains** 151:12
**returning** 126:4
**reveal** 36:22
**revelation** 61:1
80:5
**reverse** 36:24
**review** 15:14
16:4,9 18:7 63:5
89:17,19 124:12
132:20
**reviewed** 15:13
123:19 125:6
**reviewer** 16:6
86:19 99:9
**reviewing** 85:14
**reword** 117:5
**richard** 13:6,11

**richmond** 64:7
**rife** 69:11
**rifed** 49:12
**right** 17:15 21:3
24:5,9,20 32:7
39:15 41:23
47:6 50:7 61:13
62:21 66:9,20
67:3,11 70:20
71:22 85:23
86:17 89:19
91:23,23 93:14
97:10 98:6
104:11 116:6
118:12,21 119:2
119:3 120:8
122:7 124:2
125:24 128:14
128:14 137:15
139:12,22
142:11 151:12
152:5
**righteous** 53:23
**risk** 84:18
**rob** 28:13 31:18
32:1,4,5,11
43:16 44:1
47:11,17 48:6
53:14 59:5
74:15 75:7 78:3
80:14,17,20 82:7
82:12 84:6
90:15,24 108:23
110:3 112:19
113:11,19,21
114:2 116:14
118:17 119:17
120:15,19,24

126:21 128:8,15
129:24 130:12
135:10,21 136:4
136:5 140:19
141:4 144:15
146:8 147:10
148:15 150:9
154:10,13 155:2
**robbin** 25:22
**robbins** 10:18,23
11:5,6,9,12,15
11:17,18,19 12:1
12:4,7,12,14,17
12:20,21 13:2,24
14:1,1,5,11,14
14:17,19,21 15:1
15:1,7,11,16,21
16:3 19:6 21:6
21:23 22:13
24:23 33:7
45:23 46:22
48:12,14 49:10
50:4 68:23
86:23 87:3
88:21 150:6
**robert** 1:4 30:13
30:21 31:1
100:19 120:13
125:4 142:21
**robinson** 13:6,11
**robinson's** 13:19
**role** 14:5 49:3
**room** 151:9,10
**rosenzweig** 1:12
2:4,5 3:6 5:18
6:16 25:7 26:22
27:2,3 28:10
29:9 30:23 37:1

| | | | |
|---|---|---|---|
| 38:7,13,20 39:3 | ruling 25:16 | school 64:7 | self 76:12 105:20 |
| 39:13,18 40:3,8 | rulings 25:6,12 | screwed 69:16 | send 51:9 57:16 |
| 43:2 44:5 47:21 | 117:10 131:20 | scrutiny 147:22 | 79:18 108:18 |
| 47:24 48:3 50:7 | run 64:22 | seal 159:20 | 136:7 |
| 50:12 56:2,7 | 129:10 | sealing 5:6 | sending 57:18 |
| 60:4,7 65:16,22 | running 85:21 | searching 93:9 | 95:24 114:2,3 |
| 68:17 69:22 | runs 65:6 | second 46:21 | sense 146:17 |
| 70:8 73:8,13,23 | | 54:7 66:6,6 | sent 15:23 50:23 |
| 74:4 78:22 79:4 | **s** | 73:14 79:6 93:2 | 51:3,13 56:12 |
| 79:7 89:22 90:4 | | 127:24 | 57:11,13 61:7 |
| 92:6,11 94:13,18 | s 2:5 | securities 15:6 | 64:3 72:12 92:3 |
| 95:10,14 96:5,9 | sachs 129:18 | 87:13 101:2,5 | 101:18 113:3 |
| 96:17,20 97:12 | sadly 52:24 | see 15:13 23:15 | 130:12 135:9 |
| 99:14,18,20 | sailed 109:22 | 23:16,18 26:3 | sentence 26:6 |
| 100:1 108:10,14 | 118:18 | 31:11 33:11 | 137:13 |
| 110:18 112:10 | sale 120:18 | 34:11 37:24 | separate 12:16 |
| 112:15 115:5 | sanddlawyers.... | 39:10 41:10 | 14:22,23 122:6 |
| 116:12,20 117:4 | 2:10 | 43:8 45:13 52:5 | 153:1 |
| 117:8 119:1 | santa 136:17 | 56:10 66:11,18 | serial 27:7 29:11 |
| 121:22 122:3,15 | 152:4 | 72:17 75:1 | 29:23 30:9 |
| 123:1,23 124:3,8 | satisfied 117:13 | 83:14,23 90:3 | 46:18 48:23 |
| 124:18,22,23 | saturday 57:4,20 | 91:12 108:17 | 49:5 64:10,14,15 |
| 127:6,23 128:19 | 73:5 118:14 | 109:1,2 126:10 | serve 41:22 42:4 |
| 135:6,15,19 | saw 45:3 | 126:13,15,16 | served 7:13 9:18 |
| 136:2 139:11,15 | saying 42:2 53:8 | 128:22 133:2 | 24:19 41:18 |
| 139:21 140:15 | 62:20 111:16 | 138:13 144:23 | 70:4 |
| 141:9,15 142:12 | 119:3,5 | 153:20 157:19 | service 7:10,12 |
| 142:17 143:8,18 | says 9:12 34:11 | seek 31:6,9 | 9:6,16,19 12:5,6 |
| 144:11 145:5,19 | 37:14 45:1 | 107:5 133:16 | 42:1 46:8 |
| 145:22 146:5,22 | 85:22 101:19 | 145:23 150:1 | serving 157:22 |
| 147:15 149:10 | 113:9 114:13 | seeking 10:22,24 | set 64:16 113:7 |
| 149:14,16 | 125:24 | 19:3 21:22,23,24 | 127:24 151:9,10 |
| 155:18 156:1 | scapegoat 78:15 | 22:6 41:5 | sets 64:19 |
| 157:10,15 158:4 | scathing 104:21 | 144:16 155:5 | settlement 86:10 |
| ross 100:6,8,11 | 154:1 | seen 84:2 104:22 | 88:7 101:23 |
| 140:21 142:22 | scenario 157:9 | 111:15,24 116:8 | 141:16 150:16 |
| rubin 2:14 | scenes 22:21 | 123:17 | 151:3,17,18 |
| | scheduled 10:4 | | 152:11,20 153:6 |

154:8
**settlements**
  148:22,23 149:1
  149:5
**settling** 105:23
**seven** 84:11
**severe** 68:24
**shame** 114:21
**share** 15:8,10,17
  36:11,14,14
  150:3
**shareholder**
  7:19 8:7,14
  19:24 21:1 68:8
  89:2,10,12
  107:11 138:22
  139:9,18 144:14
  148:7 149:3,6
  150:17 152:11
  152:17 155:4
  156:24 157:1
**shareholders** 9:2
  20:15 25:9
  85:13,17,24 86:8
  87:7 88:22 89:7
  106:3 119:11
  132:4 133:17
  134:2
**shares** 65:8
  84:13
**sharing** 38:5
**sheet** 160:10
  161:1
**shema** 61:2,3
  101:13,19
**ship** 109:22
  118:18

**short** 108:21
  111:22 121:11
  121:14,24 146:1
**shorthand**
  159:11
**shortly** 13:13
  91:4
**shoulder** 127:22
**show** 47:7
**shows** 47:8
**side** 78:13
**signature** 7:7,11
  97:5,23 159:23
  160:16
**signed** 123:16
**silence** 55:5
**silencing** 55:7
**silow** 16:6 17:4,4
  18:7,9,13,13
  25:1,12 28:17,18
  28:21 31:19
  32:13 33:6 34:2
  34:17,22 35:1,7
  36:1,10,16,17
  37:6,10,24 38:12
  39:10,19,20,22
  40:10 43:5,17
  44:3,7,12,13,13
  44:14,14,15,20
  45:6 54:16 55:3
  58:4,16 59:6,10
  60:16 61:1 62:4
  68:9 71:14 72:1
  76:14,16 77:15
  79:14 80:18,18
  82:13,24 83:5,9
  83:24 84:3,9,10
  84:23 85:14,14

85:15 86:18
  89:18 90:16
  94:5 99:8 101:3
  102:11 103:16
  104:1 105:7,15
  107:22 108:6
  121:18 130:3
**silow's** 80:6 85:8
  86:1 94:8
  101:15,20 104:3
**silverang** 1:12
  2:4
**similar** 33:20
  98:24 155:11
**similarly** 67:13
**simply** 147:19
**singer** 1:16
**single** 22:22
  58:17 86:21,22
  150:3
**singular** 25:22
  79:24
**sir** 80:21 85:6
**sirius** 50:1
  130:16 149:18
  150:13 152:22
  152:23 154:14
**sit** 34:6 91:15
  101:8 112:8
  136:21 146:6
  147:14 148:1,13
  155:23 156:22
**sitting** 103:5
  128:14 138:23
  139:24
**situation** 21:16
  25:12 68:10
  76:14,16

**size** 151:19
**small** 15:19
**snide** 42:23
**software** 16:12
  16:13
**sole** 64:17 132:6
**solely** 55:18
  71:11
**somebody** 53:19
  86:4
**sorry** 72:11 79:4
  89:23 92:18
  99:12 130:9
  140:12 142:3
  146:21
**sort** 102:3
  120:10
**sought** 87:23
  101:21 131:3
  132:23 133:21
**sounds** 66:24
  136:23
**south** 2:16
**speak** 51:14 59:1
  59:2 104:20
  105:4 106:18
  110:10
**speaking** 26:13
  41:4 103:8
  111:1,23
**speaks** 106:20
  106:21
**specific** 8:8
  12:22 14:7 19:7
  24:10 31:2,23
  52:16 62:7,21
  66:3 68:21
  103:5,5 147:9

| | | | |
|---|---|---|---|
| 148:14 157:9 | 88:1,12,13,24 | **stated** 70:10 | **stop** 25:22 65:15 |
| **specifically** 8:5 | 104:10,19 105:6 | 144:22 155:10 | 129:6 |
| 10:12 32:3,8 | 105:12,16 106:5 | **statement** 17:20 | **stopped** 129:9 |
| 53:15 54:3 | 106:9,12 107:8 | 29:10 31:17,24 | **street** 1:14,19 |
| 62:17 71:4 95:5 | 109:8,22 111:22 | 32:10,19 33:3,11 | 2:7,16 |
| 100:22 102:10 | 116:17 117:2,9 | 34:9 35:19,24 | **strictly** 98:22,22 |
| 104:16 109:5,11 | 117:11,18 | 39:8 43:13,16 | 120:12 |
| 111:13 125:13 | 118:16,18 | 44:1 45:18 | **strike** 8:12 40:10 |
| 127:1 128:3 | 120:20 121:4 | 47:16,19,22 48:1 | 72:11 74:2 |
| **specificity** 17:8 | 130:4,11 134:12 | 48:4,9 55:15 | 88:12 155:1 |
| 128:14 | 135:1 144:19 | 118:1 126:6 | **strong** 36:5 |
| **speculation** | 146:9,14,15 | 145:9 | **strongly** 14:14 |
| 33:13 | 147:3,6,9 148:18 | **statements** 16:23 | 36:6 59:8 |
| **spend** 84:21 | 149:3,8,13 | 17:3 18:6,12,20 | **structure** 11:21 |
| 96:11 119:12 | 150:12 152:7,22 | 32:15 38:24 | 14:8 |
| **split** 31:5 | 154:10 155:8 | 101:9 | **structures** 12:11 |
| **splitting** 19:18 | **stamp** 98:1 | **states** 1:1 21:19 | **stuff** 68:7 |
| **spoke** 15:20 | 123:9 | 98:2 123:6 | **subject** 18:10 |
| 58:20 62:12,13 | **standard** 31:21 | 134:7,8 153:7,12 | 136:5 157:1 |
| 142:14 | **standing** 27:7 | **status** 60:9,13 | **subjected** 25:24 |
| **spoken** 39:20 | 48:23 150:4 | 62:8,9,15 63:3 | **submit** 31:8 |
| 51:12 | 159:4 | 80:6 85:8 86:2 | **submitted** 7:15 |
| **spot** 145:12 | **stare** 46:17 64:9 | 86:20 | 77:5 101:6 |
| **sprint** 14:6,8 | 64:10 | **stay** 41:7 | **submitting** 7:7 |
| 16:1 18:6,12 | **start** 6:11 46:16 | **stecker** 100:23 | **subsequent** |
| 22:2,15,19 23:18 | 46:17 56:18 | 112:20 114:3 | 117:15 124:11 |
| 24:13 25:1,14 | **started** 50:1 | 136:5 | 146:16 147:2 |
| 27:21 28:8 | **starting** 35:1 | **steps** 76:17 | **substance** 92:16 |
| 29:18 31:19 | 40:23 | **steven** 46:16 | 92:16 121:13 |
| 32:14 33:18 | **state** 21:11 27:4 | 64:9 136:11,14 | **substantial** 50:2 |
| 34:1 47:8 51:20 | 31:5 34:24 45:7 | **stick** 14:18 | 88:14 |
| 51:23 52:8,14 | 52:3 66:5 67:18 | 109:15 | **substantive** |
| 58:14 64:12 | 77:7 78:7 83:9 | **stipulated** 5:4 | 82:11 86:10 |
| 68:8 76:15 | 94:4 108:21 | **stock** 48:21 | 93:2 114:13 |
| 77:15 78:12 | 131:2,7 132:22 | 64:19 87:8 | **succeeds** 24:7 |
| 82:13 83:21 | 150:20 152:14 | 150:3 | **sue** 45:24 46:7 |
| 84:12,12 85:10 | 152:21,24 153:3 | **stole** 89:20 | **sued** 49:10 55:1 |
| 85:13 86:10,17 | 154:6 | | 55:2,3,3,4 78:3,5 |

sugarman
    136:18,23
suggesting   16:22
    117:20
suggests   39:11
suing   55:2 77:22
suit   8:14 54:20
    67:8 74:14,19
    77:9 78:9,20
    86:13 87:10,11
    87:12,15 89:15
    93:9 107:11
    110:6 150:17
    157:2,3
suite   1:13,20 2:6
    2:17
sum   33:21,22
    50:3 89:6
sunday   118:14
    118:15
superior   81:18
supervision
    159:12
supplied   77:21
support   18:21
    102:18 111:2
supporting
    23:21
supports   144:10
supposed   85:5
    119:14
supreme   153:7
    153:12
sure   18:4 23:9
    30:16 33:14
    60:11 69:9
    75:14 104:2,13
    106:10 113:10

118:8 129:4
132:23 133:22
139:14 142:11
146:2 156:2
surrounding
    150:23
surviving   145:8
suspect   13:17
    17:17,18
suspected   14:14
    36:6
swear   11:21
swearing   17:15
sworn   5:13,20
    16:7,10,19,19
    17:20 18:5,11,16
    18:18,19,20
    23:20 159:8
syllabus   25:16
    106:20 131:14
    131:20
system   16:12
    53:22 84:14

**t**

t   159:1,1
tab   6:12,13,17
    20:20 38:8 40:9
    50:8 56:3 73:8
    74:7 78:23
    89:23 92:7,19
    94:14 96:12,19
    96:21 108:11
    112:11 122:6,7
    127:15 135:22
take   20:21 23:24
    56:8 65:19
    76:17 79:8

89:22 96:5,23
117:5 121:23
124:3,6 135:16
140:10 146:1
taken   23:22
    35:12 76:22
    89:10 104:4,6,7
    115:17 116:14
    129:6 159:5
talk   69:4 106:7
    109:23 118:18
    121:19
talked   69:5,9
    154:15
talking   24:4
    65:15 104:12
    120:12 139:3
    145:2
tax   45:4
ted   153:15
tell   9:9 17:8
    18:17 37:3,4
    50:13,16 53:15
    63:13,18 65:11
    65:13 66:7
    91:15 92:12
    142:23 148:1,13
    150:14,22
    155:19 156:14
    156:21 159:8
telling   61:17
    63:20,20 90:22
    135:17
tells   93:17
ten   32:16 33:7
    63:21
tens   84:18

tense   101:15
term   19:15 23:8
    54:3,18,19
    133:20 157:4
terms   98:24
    150:15
terrible   116:21
test   38:21
testified   5:13
    11:3 19:11
    31:20 39:23
    54:1 58:1 59:7
    62:20 68:20
    70:11 73:5
    75:13,19 76:18
    90:21 106:11
    109:13 113:24
    129:4 131:16
    135:5 148:6
    153:16 157:17
testifying   12:10
    24:3
testimony   16:10
    39:11 75:20
    159:5,10,15
testing   10:20
tests   39:4
thank   6:8,24
    13:12 14:2
    95:13 96:22
    99:17 105:9
    150:8 153:20
    158:9,11
thanks   142:16
    158:4
theft   83:8
thereabouts
    149:24

**[thereof - turn]** Page 33

**thereof**  159:18
**thing**  6:8 29:20
  37:4 54:5 62:21
  65:9 67:11
  106:7 121:17
**things**  19:14
  25:13 36:22
  49:6 52:19
  53:19 62:22
  91:22 111:10
  117:1,12,16
  129:22
**think**  10:7 14:2
  17:9,11 19:10,11
  19:19 20:2 25:5
  28:12 30:21
  34:7 36:4 38:24
  39:4 42:19,21,22
  53:16 55:6,17,24
  57:8 59:23
  62:12 63:9
  66:14 67:14
  68:3 71:6,6
  73:18,23,24
  75:13 77:22
  88:3 95:20
  99:21,22 100:17
  104:20 105:1,3
  106:18,19,21
  118:12 120:21
  121:13,17,18
  129:18 130:15
  137:8,9 143:7
  145:5,6 152:5,13
  152:15 154:11
  154:11,13,16,16
  156:4,17,18

**thinks**  65:18
  116:3
**third**  56:18 66:6
**thomas**  79:23
**thought**  33:21
  67:10,12 70:11
  70:16 79:5
  129:5
**thousands**  31:7
  84:16,17,17,18
  84:19
**thrash**  110:11,20
  111:2,11 114:6
  114:24
**three**  22:1 56:11
  56:17 152:19
**thursday**  1:8
**ties**  27:21,23
**time**  5:9 7:18 8:5
  9:14 10:1 11:13
  12:22 17:12,16
  20:21 24:15
  25:6,15 27:14
  29:14 30:3,11
  31:8,16 32:2,9
  34:2,3,6 35:5,11
  35:15 36:3
  37:20 39:21
  54:24 62:16
  64:22 66:7
  67:12,22 72:2
  75:14 76:3,6,21
  78:14 79:21
  80:1,4,15 84:1
  84:20 89:6
  94:11 95:6,21
  96:8,11 98:8
  100:4 102:23

  118:3,7 119:13
  120:24 121:6
  122:2 130:10,11
  132:20 137:9
  141:23 146:4
  149:20 153:13
  154:19 156:12
  156:19 157:23
  158:5 159:6
**timeframe**  77:9
**timely**  41:7
**times**  68:20
  129:11,20
**timing**  119:22
**tip**  52:24
**today**  34:6 40:2
  91:15 92:3
  101:8 103:5
  138:23 139:24
  145:17 146:6
  147:14 148:1,13
  155:23 156:22
  158:7
**told**  36:16 43:4
  58:2 76:11
  81:17,18 90:14
  93:8 125:17
  126:23 128:11
  136:24
**tongue**  66:14
**top**  72:18 74:9
  91:11 125:21
**topic**  60:20
**touched**  96:9
**trace**  12:12
**track**  61:16
**transcribed**
  159:12

**transcript**  40:20
  45:8 46:14
  47:20 48:1
  100:24 111:14
  160:6
**transcription**
  159:13 160:7
**transpired**  23:18
  25:13 51:19,23
  58:14 62:10
  70:17,24 83:20
  106:8
**trees**  122:24
**tremendous**
  119:13
**trial**  5:10
**tried**  41:22
**troubling**  18:23
  115:18
**true**  17:21 77:13
  101:16,20
  138:21 159:14
  160:7
**truly**  52:4
**trust**  107:1
**truth**  69:24
  159:8,8,9
**truthful**  17:7,10
**try**  41:8 55:4,8
  66:17 88:9
  109:14,15,16
  129:6
**trying**  40:1 60:5
  62:3 66:21
  116:22 124:1
  137:22,23
**turn**  9:15 20:23
  25:18 26:24

34:15 40:17,22
43:3 45:21 56:2
66:2 94:14
96:12 112:11
125:18 130:6,19
132:15
**turning** 6:11
**two** 22:1 27:1,2
27:22 28:1
29:16 30:13
34:4,4,7 58:19
58:20 62:13
92:15 93:1,21
97:16 104:21
107:24 108:3
152:24 153:1
**type** 64:15
**typo** 66:24

### u

**u.s.** 13:5,5,9
**ultimately** 11:18
**umeda** 11:6,16
11:17,18 12:7,12
12:21 13:2
150:6
**unabated** 50:5
**unclean** 106:15
**unconscionable**
52:4 84:22
**unconstitutional**
153:24
**uncover** 55:18
**uncovered** 50:5
**uncovering**
83:21
**underlying**
138:22

**undermine**
109:16
**understand** 6:2
6:4 12:9 18:4
22:3 24:1 30:18
40:14,16 62:3
66:21 116:23
120:6 146:18,20
146:21
**understanding**
10:17 11:14,15
14:4 16:2 19:2,8
75:5 107:21
108:4 143:11
144:5
**understood** 6:7
**unethical** 131:5
**unfit** 77:8 100:7
100:11
**unfortunate**
114:17
**unfortunately**
45:17 85:20
134:18
**uninformed**
100:9
**united** 1:1 98:2
123:6 153:7,12
**universe** 152:18
**unjust** 31:9
84:15
**unnecessary**
114:20
**unquote** 58:3
**untrue** 101:11
**unusual** 154:4
**upheld** 110:8

**upper** 125:24
**upset** 63:13
**use** 23:7 27:5,11
46:23 53:21,22
54:3 63:22
105:2 133:20
151:8 157:3
**uses** 98:24 105:1

### v

**v** 118:6
**valid** 48:22
86:13 132:5
**value** 84:12
85:19 87:2,24
151:11,12,12
**vano** 17:11,16
18:22 36:5 61:4
80:9 85:9,22
86:9 101:1,14,14
101:22,24 116:1
131:14
**vano's** 25:6,11
104:20 106:18
117:10
**variety** 29:2
151:2
**various** 11:11
12:13 18:5
38:23 77:14
148:7
**varying** 18:20
**vengeance** 69:17
**veracity** 18:23
38:22
**verbatim** 41:2
**verification**
123:16,18 124:6

124:10,17
**verified** 123:19
123:24 127:8
**verify** 123:22
124:13,14
**veritext** 1:19
**versus** 93:10
136:11,14,18
142:21
**viciously** 67:22
**victim** 49:24
50:3 86:1,2
133:1,23
**victimized** 84:9
**view** 146:14
157:12
**viewed** 68:12
**violations**
106:24
**virtually** 55:11
**virtue** 123:8
**voluminous**
103:2
**vs** 1:5

### w

**waiting** 65:11
**waive** 46:8
**waived** 5:7
**waiving** 155:12
**walked** 85:2
87:4
**want** 18:3 20:18
20:23 22:3 33:1
34:15 36:11
37:11 41:14
46:9 68:8 83:4
104:13 106:10

| | | | |
|---|---|---|---|
| 109:23 111:16 | 67:8,16,19 68:1 | 150:10 154:9,10 | 127:20 128:4 |
| 118:18 127:24 | 68:5,13,21,21 | 155:2,3 | 142:6 158:9 |
| 132:4,5 133:13 | 69:6,18 70:4,13 | **weiser's** 125:4 | 159:15,20 |
| 133:18 139:7,19 | 70:19 71:5,14 | 147:10 | **witnessed** 20:5 |
| 140:10 141:16 | 74:15,16,16 75:7 | **weiss** 13:7 27:9 | 48:19 116:7 |
| **wanted** 6:8 42:3 | 75:7,18,24 77:8 | 27:24 28:23 | **wives** 29:19 |
| 59:1 67:18 68:1 | 78:3,3,9,11 80:8 | 29:1,12 30:10 | **woodlands** 1:13 |
| 113:10 118:15 | 80:14,14,17,17 | **went** 14:15 | 2:6 |
| 130:17 139:14 | 80:20,21 82:7,7 | 98:12 148:21 | **word** 105:2 |
| **wanting** 42:14 | 82:11,12 83:1,11 | **west** 35:2 | **words** 39:22 |
| 109:7 | 84:5,6 90:14,15 | **whatsoever** 39:1 | 42:8 46:1,2,3 |
| **warrants** 156:12 | 90:15,15,24,24 | 87:3 | 90:18,19,20,22 |
| **way** 15:3,24 17:1 | 93:9 94:6,9 | **wholly** 100:9 | 105:1 |
| 26:17 40:15 | 97:18 98:9,14,18 | 104:3 | **work** 15:4,8,23 |
| 42:24 78:16 | 99:7 100:19,20 | **wide** 46:16 151:1 | 18:21 19:12 |
| 89:9 100:15 | 102:2,14,21 | **wild** 38:22 | 21:13 26:10 |
| 116:23 118:16 | 105:20 106:14 | **william** 13:7 | 31:8 32:17 54:8 |
| 126:7 131:21 | 106:24 107:17 | 27:24 28:23 | 86:23 87:3 |
| 133:10 141:11 | 108:1 110:3,3,5 | 29:2 | 88:21 |
| 153:6,7 155:24 | 111:7 112:20 | **williams** 100:6,8 | **worked** 28:22 |
| 156:3,5,23 158:1 | 113:21 114:3,8 | 100:11 140:21 | 29:1,24 33:6 |
| **ways** 16:18 | 114:24 115:8 | 142:22 | 37:6 63:21 |
| 19:19 132:14 | 116:14,14 | **willing** 83:12 | 101:2 |
| **weekend** 41:8 | 117:12,16 118:7 | 109:24 118:20 | **working** 19:16 |
| **weiser** 1:3,4 8:24 | 119:17 120:13 | **win** 78:18 | 20:4 102:5 |
| 14:9,13 19:3,9 | 120:15,18,19,24 | **window** 111:23 | 129:9 |
| 21:6,11,22 22:4 | 125:3 126:21,21 | **wise** 18:10 | **works** 53:20 |
| 22:8,13 24:23 | 128:9,9 129:24 | **wiser** 25:21 | **worst** 133:19 |
| 28:13,14 30:13 | 129:24 135:10 | **wish** 82:17 | **worth** 36:8 |
| 30:14,21 31:1,1 | 135:21 136:4,5,8 | **wishing** 128:16 | **writ** 153:17 |
| 31:17,18 32:1,1 | 136:10 140:19 | **withdraw** 70:9 | **write** 30:1 69:14 |
| 32:4,5,6,11,12 | 140:20 141:3,3,4 | 117:7 141:10 | 137:3 |
| 33:6 43:5,16,16 | 141:13,17,17,22 | **witmer** 136:11 | **written** 67:1,1,6 |
| 44:1,2,7,12,19 | 142:21,22 | 136:14,18 | 71:11 |
| 47:11,11,17,18 | 143:13,13 | **witness** 3:3 60:1 | **wrong** 66:9,21 |
| 48:6,6,8,11,13 | 144:15,15 146:8 | 60:3 73:20 79:3 | 67:3 146:9 |
| 53:14,14 54:10 | 146:8 147:10 | 79:5 90:3 | **wronged** 129:5 |
| 54:15 59:5,5 | 148:15,15 150:9 | 110:16 122:22 | |

| | |
|---|---|
| **wrongs**  66:18 | |
| 78:12 | |
| **wrote**  35:6 36:3 | |
| 61:2 67:23 | |
| 71:19 91:3 93:5 | |
| 118:17 139:16 | |
| 140:1 153:24 | |

**x**

| | |
|---|---|
| **xm**  50:2 130:16 | |
| 149:18 150:13 | |
| 152:22,24 | |

**y**

| | |
|---|---|
| **yeah**  9:3 42:19 | |
| 51:4 53:8 61:15 | |
| 66:24 69:7 | |
| 98:18 125:9 | |
| 140:9 141:24 | |
| **year**  29:24 30:6 | |
| 30:6 34:4 | |
| 130:10 | |
| **years**  20:5 32:16 | |
| 33:8 34:4,7 36:8 | |
| 48:20 63:21 | |
| 103:1,1,1 128:13 | |
| 152:17 | |
| **yesterday**  5:21 | |
| 5:23 28:6 47:4 | |
| 158:6 | |
| **york**  49:1 | |

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

EXHIBIT 38

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.

EXHIBIT 38