**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**SOUTHERN DIVISION**

| | |
|---|---|
| **THE WEISER LAW FIRM, P.C. and ROBERT B. WEISER,**<br><br>**Plaintiffs,**<br><br>**v.**<br><br>**MICHAEL HARTLEIB,**<br><br>**Defendant.** | **Case No.: SACV 23-00171-CJC (JDEx)**<br><br>**ORDER GRANTING WITH FOURTEEN DAYS LEAVE TO AMEND DEFENDANT'S SPECIAL MOTION TO STRIKE PURSUANT TO CALIFORNIA CODE OF CIVIL PROCEDURE §425.16 [Dkt. 24] AND DENYING AS MOOT DEFENDANT'S MOTION TO DISMISS [Dkt. 26]** |

## I. INTRODUCTION

In this case, Plaintiffs The Weiser Law Firm, P.C. (the "Law Firm") and Robert B. Weiser allege that Defendant Michael Hartleib is a vexatious litigant who has abused the judicial process. (*See* Dkt. 1 [Complaint, hereinafter "Compl."].) Now before the Court are Defendant's special motion to strike Plaintiffs' claims under California's anti-SLAPP statute, (Dkt. 24, hereinafter "MTS"), and Defendant's motion to dismiss Plaintiffs' Complaint, (Dkt. 26, hereinafter "MTD"). For the following reasons, Defendant's anti-

SLAPP motion is **GRANTED WITH FOURTEEN DAYS LEAVE TO AMEND** and his motion to dismiss is **DENIED AS MOOT**.[1]

## II. BACKGROUND

Weiser is a founder and principal of the Law Firm, which focuses on shareholder class actions and shareholder derivative actions, among other types of cases. (Compl. ¶¶ 7–8.) Plaintiffs were first introduced to Defendant in 2008, when another attorney asked if Weiser thought there was a basis for a stockholder derivative action in an email he forwarded from Defendant regarding losses Defendant incurred in the merger between Sprint Corporation and Nextel Communications. (*Id.* ¶¶ 10–12.) The Law Firm decided not to file a derivative lawsuit at that time. (*Id.* ¶ 13.) In 2009, after several securities class action lawsuits were filed based on the merger, the Law Firm began researching and drafting a shareholder derivative complaint. (*Id.* ¶¶ 14–21.) On March 26, 2009, Defendant told Weiser on a telephone call that he gave counsel in the Sprint securities class action relevant facts and analysis and was interested in seeking appointment as lead plaintiff in that case. (*Id.* ¶¶ 26–29.) Defendant also "strongly implied his interest in sharing any attorneys' fees the Law Firm might recover if it represented [Defendant] in connection with a potential shareholder derivative action brought on Sprint's behalf." (*Id.* ¶ 30.) Based on this "extremely troubling" interest in a fee-sharing agreement, and Defendant's potential conflict given his involvement in the Sprint securities class action, the Law Firm declined to represent Defendant. (*Id.* ¶¶ 31–36.) Instead, the Law Firm represented Monica Ross-Williams in a shareholder derivative action against Sprint. (*Id.* ¶ 37.) In 2011, another firm filed a separate shareholder derivative action on Sprint's behalf, naming Defendant as the representative plaintiff. (*Id.* ¶ 38.)

---

[1] Having read and considered the papers the parties presented, the Court finds these matters appropriate for disposition without a hearing. *See* Fed. R. Civ. P. 78; Local Rule 7-15. Accordingly, the hearing set for May 22, 2023, at 1:30 p.m. is hereby vacated and taken off calendar.

In 2011, Defendant and others, acting *pro se*, filed a shareholder derivative action on behalf of Sirius XM Satellite Radio, Inc. ("Sirius XM") against Sirius XM's officers and directors in New York State Supreme Court. (*Id.* ¶¶ 39–40.) Several times, Defendant emailed and called Weiser about the Law Firm potentially representing the plaintiffs in that case. (*Id.* ¶¶ 41–47.) The Law Firm declined. (*Id.* ¶ 47.) For many years after that, Plaintiffs and Defendant had no contact.

In 2016, most of the Sprint shareholder derivative lawsuits based on the Sprint/Nextel merger, including the Law Firm's case with Ross-Williams, reached a settlement. (*Id.* ¶ 48.) Defendant did not participate in the settlement and filed *pro se* an objection to it. (*Id.* ¶¶ 49–50.) About a week before the final approval hearing, in a call regarding Defendant's objection, Defendant told Weiser he would "withdraw his formal objection to the Sprint Derivative Settlement if Weiser would agree to enter into a 'consulting agreement'" under which Defendant would give the Law Firm "prospective theories for derivative actions against unspecified Defendants and without specific plaintiffs attached" in exchange for several hundred thousand dollars. (*Id.* ¶¶ 51–53.) The Law Firm declined. (*Id.* ¶ 54.) The Kansas state court approved the Sprint settlement, but awarded only about 10% of the requested attorney fees. (*Id.* ¶ 61.) The Law firm and other firms appealed. (*Id.* ¶ 68.)

In February 2017, the Law Firm discovered that a contract attorney who performed document review work on the Sprint derivative litigation and other cases, Jeffrey M. Silow, had been disbarred decades earlier. (*Id.* ¶¶ 59, 63– 64.) It turned out that Silow had used his son's name to hold himself out as an attorney in good standing, duping the firm that had vetted him on the Law Firm's behalf, Abelson Legal Search. (*Id.* ¶¶ 59–60, 64.) The Law Firm "immediately severed ties with Silow, affirmatively notified the courts sitting in every action in which Silow's hours were included as part of an 'attorney time' lodestar calculation"—including the trial and appellate courts involved in the Sprint

derivative action—"reported the incident to the Disciplinary Board of the Supreme Court of Pennsylvania, pressed criminal charges against Silow," and sued Abelson and Silow. (*Id.* ¶¶ 65, 67.) Silow later pled guilty to three criminal counts: unauthorized practice of law, unsworn falsification to authorities, and securing execution of documents by deception. (*Id.* ¶ 66.)

After all of this came to light, the Sprint settlement approval with reduced attorney fees was affirmed on appeal. (*Id.* ¶ 68.) In response, Defendant "unleashed a deluge of abuse upon the Plaintiffs," seeing this as an "opportunity to continue to harass Plaintiffs in the false-name of litigation integrity." (*Id.* ¶ 69.) In March 2017, he emailed Weiser, eleven other attorneys, and the Kansas state court's administrative assistant, writing,

> Rob, I am a little confused! . . . It seems your statements to the Appellate Court were disingenuous at best. Shocking! . . . I especially like the comment that you felt as though you had an ethical obligation to inform the Court, prior to briefing . . . Ethical obligation, what a Saint . . . Your attempts, to obfuscate your chicanery in this case is galvanizing my convictions, strengthening my resolve to expose all of the corrupt parties in this case! This lawyer driven litigation must and will cease. Your temerity, to seek leave of the Appellate Court to reinstate fees, given what I have uncovered is frankly astonishing and provoking wrath. I will take this all the way to the Kansas Supreme Court if needed, as the integrity of the judicial system is at stake!

(*Id.* ¶ 70.) That same day, without the Law Firm's permission, Defendant contacted Ross-Williams, "verbally harass[ing] and threaten[ing her] with hostile insinuations and references to [her] personal and professional life," and telling her "that the Law Firm was a 'criminal enterprise' and was not serving her interests as a Sprint shareholder." (*Id.* ¶¶ 71–73.) Although Ross-Williams asked Defendant not to contact her again, (*Id.* ¶¶ 74, 76–77, Defendant soon emailed her, copying fifteen other attorneys and the Kansas state court's administrative assistant, writing,

> Dear Ms. Williams, . . . I find it unconscionable that your attorneys failed to inform you of [the Kansas state court's] rulings or that an Appeal was filed on your behalf. I do believe that you are a unwitting victim of their fraud committed against the Court. As we discussed they have submitted millions of dollars in fraudulent billing in your case. As I informed you that this was not just my opinion, the Judge in your case came to a similar conclusion. In fact, your attorneys have now admitted to at least 1.6 million dollars in fraudulent bills submitted to the Court. Mr. Weiser has confirmed this in two separate letters. (See attached). I am no expert, but when a Firm admits criminal acts in a case I believe they are obligated to notify you as the Plaintiff. Mr. Weiser and his Firm have already contacted their Bar associations and other Courts to self-report their criminal acts. . .

(*Id.* ¶ 78.)

The Law Firm sent Defendant a cease-and-desist letter. (*Id.* ¶ 80.) Defendant responded,

> For you to characterize this as harassment is another blatant attempt to distract and obfuscate your fraudulent acts and bastardization of the judicial system. I caution you, that coercing your "client" to misstate facts regarding our call will only inflict additional damage to what little credibility you have left. You Sir, and your coconspirators are the ones that need to Cease and Desist. Your so-called "client" is representing my interest and her attorneys are corrupt, therefore I will neither Cease nor Desist. As far as your not so vailed threat that Ms. Williams "reserves all of her rights", if you are threatening legal action against me, feel free, I will be happy to waive service to expedite said action. I find the prospects of discovery quite compelling. Your threats do nothing but, strengthen my resolve and galvanize my convictions. Call it a personality defect! Instead of wasting my time, I would suggest you consult with an ethics attorney, that's right, you already have!

(*Id.*)

On March 30, 2017, the Kansas appeals court issued a protective order prohibiting Defendant from directly contacting Ross-Williams. (*Id.* ¶ 73.) Defendant twice unsuccessfully sought to have that order lifted. (*Id.* ¶¶ 82–83.)

In April 2017, Defendant mailed a letter to six judges sitting on the Court of Common Pleas of Chester County, Pennsylvania. (*Id.* ¶¶ 90, 93.) He circled a news headline referencing the attorney fee reduction in the Sprint derivative settlement and wrote by hand, "What, if anything, do you intend to DO about this!!" (*Id.* ¶ 91.) He wrote, "Judge JIMMIE VANO in Kansas, God Bless His soul, caught the firm in the act and knocked out 90% of their billing. They claimed shock & surprise." (*Id.* [emphasis removed].) He also attached a page titled "imaginary dialogue":

> [Weiser:] "Well I get where you are going with this line of questioning. Are you saying that we knew that he was a disbarred lawyer and we were trying to milk the class action jackpot with his phony billing"
> [Hartleib:] You said it better than I could.
> [Weiser:] "Well, you can *GO F**K YOURSELF ASSHOLE. I'M OUT OF HERE AND YOU CAN TALK TO MY LAWYER IF YOU WANT*

(*Id.* ¶ 92.)

Plaintiffs believe Defendant then searched for cases in which the Law Firm was involved so that he could "inject[] himself." (*Id.* ¶¶ 96–97.) On March 15, 2018, he filed in derivative litigation involving Equifax an "Amicus Curiae Brief of Concerned Citizen and Shareholder Michael Hartleib in Opposition of the Appointment of The Weiser Firm as Co-Lead Counsel" in which he expressed "extreme concern" about "troubling actions of Weiser et. al" relating to the Sprint derivative action and Silow. (*Id.* ¶¶ 102–03.) He wrote that the Law Firm "lied, misl[ed] the court," "used an unfit plaintiff," engaged "in fraudulent billing," made "false statements," employed another attorney who constituted "an utter embarrassment to the Plaintiff's Bar," operated a "criminal enterprise," and "committed criminal acts upon the Kansas Court and a multitude of others across the country," making the Law Firm either "completely corrupt, or entirely inept," and "not fit to act as lead on any representative suit." (*Id.* ¶¶ 104–05.) When the Law Firm sent Defendant a written response to his brief, Defendant responded, "Let [Weiser] know he is making a catastrophic mistake!" (*Id.* ¶ 108.) The Equifax court declined to appoint the

Law Firm as co-lead counsel. (*Id.* ¶ 110.) In response, on April 5, 2018, Defendant emailed a copy of the order to Weiser, adding, "[j]ust got home and wanted to make sure that you have this! Good to finally meet you Rob! Like I said, none of this was necessary!" (*Id.*)

On August 17, 2018, Defendant emailed Weiser asking him if he would be at an upcoming shareholder derivative suit hearing in *Witmer v. Sugarman*— a case in which Defendant was not involved and was not a shareholder—so that they could "discuss [his] concerns with L.C, A 10 and several other companies in which [he was] a shareholder," noting that "[i]t appears we will be forced to deal with each other for the foreseeable future" and "other action is eminent!" (*Id.* ¶¶ 98–99.)

Defendant next involved himself in a derivative suit involving Big Lots in Ohio. (*Id.* ¶ 111.) When the Ohio judge granted final approval of a settlement on August 28, 2018, he noted that "[o]n August 24, 2018, well after the time to object and the fairness hearing took place, the Court received an email from [Defendant], a shareholder who had an interest in a different case involving [the Law Firm]," in which Defendant "raised concerns over Weiser's billing practices in this prior case and stated that he wanted to inform the Court so that it could scrutinize the fee request in this case." (*Id.* ¶¶ 113–14.) The court stated that Defendant did "not indicate that he is a shareholder in Big Lots or otherwise an interested party in this case." (*Id.* ¶ 115.) "[O]ut of an abundance of caution," the court re-analyzed the Law Firm's billing records and gave it a chance to respond to Defendant's allegations, ultimately concluding that it was "fully satisfied that the hours billed by Weiser were reasonable in this case." (*Id.* ¶ 116.)

Next came a set of consolidated shareholder derivative cases regarding Centurylink. (*Id.* ¶ 117.) On March 5, 2019, the day before a hearing on competing motions for appointment of lead counsel, Defendant filed an amicus brief opposing the

Law Firm's appointment as lead counsel, even though the Law Firm did not seek appointment as lead counsel, and even though Defendant was not a Centurylink shareholder. (*Id.* ¶¶ 118–19, 123.) In the brief, Defendant sought to "inform this Court of ongoing troubling actions by the Weiser and Robbins Arroyo et.al. [sic] Firms," including that they used "deceased parties, friends and family members which lacked standing, and paid serial criminal Plaintiffs," that they "generate thousands of billable hours for illusory work, submit fraudulent time logs and seek hundreds of millions in unjust fees in cases across the country," and that Weiser "committed perjury and admitted to billing fraud." (*Id.* ¶¶ 124–26.) At the hearing on the competing motions, Defendant stated, among other things, that "these firms are up to no good, when they are billing illusory hours," and that the Law Firm knew about Silow's disbarment. (*Id.* ¶¶ 130, 132.) He also stated that "if the firms would like to give me a list of their forthcoming cases in which they are seeking leave, I could be certain to notify everybody timely and I wouldn't have to prepare, stay up all night, all weekend long, to try to draft an amicus brief and get it to the court and then, you know, fly in." (*Id.* ¶ 132.)

Defendant then emailed the Sprint derivative action judge's administrative assistant and the attorney distribution list for the Sprint derivative case, advising that his "quest to expose lawyer driven litigation and corruption rife throughout the Plaintiffs Bar continues," and postulating that "[m]aybe [the judge] would be interested in setting the record straight before the Court appoints lead Counsel in the [Centurylink] case." (*Id.* ¶ 137.) The Centurylink court appointed Bragar Eagle & Squire, P.C. as lead counsel (whose proposed support structure included the Law Firm), noting that he had "carefully considered" Defendant's allegations and concluded that Defendant "raised no legitimate questions" regarding ethics or expertise. (*Id.* ¶ 145.)

In 2018, Defendant's attorney sent Weiser a draft petition alleging legal malpractice, breach of fiduciary duty, and violations of Kansas Consumer Protection Act

claims against Weiser and the Law Firm, and abuse of process and breach of fiduciary duty claims against Ross-Williams. (*Id.* ¶ 146.) The attorney invited Weiser to "explore avenues to an agreeable resolution to the matter before it is filed." (*Id.* ¶ 148.) Plaintiffs' counsel responded that the petition was based on the false allegation that Defendant was the Law Firm's client in the Sprint derivative action. (*Id.* ¶¶ 149–50.) Each of the attorney's responses suggested "pre-suit mediation of this matter." (*Id.* ¶ 151.)

On January 22, 2019, Defendant filed the draft petition in Kansas state court. (*Id.* ¶ 153.) Plaintiffs removed to Kansas federal court, and the case was dismissed on August 21, 2019. (*Id.* ¶ 154); *Hartleib v. Weiser L. Firm, P.C.*, 2019 WL 3943064, at *5 (D. Kan. Aug. 21, 2019). The Kansas federal court denied Defendant's motion for reconsideration of the dismissal, and the Tenth Circuit affirmed on June 21, 2021. *Hartleib v. Weiser L. Firm, P.C.*, 2020 WL 3412480, at *1 (D. Kan. June 22, 2020), *aff'd*, 861 F. App'x 714 (10th Cir. 2021).

On June 24, 2019, before Defendant's Kansas case against Plaintiffs was dismissed, Plaintiffs sued Defendant in Pennsylvania federal court for negligent misrepresentation, intentional interference with prospective contractual relations, abuse of process, tortious interference with contract, defamation, and intentional infliction of emotional distress (the "Pennsylvania Action"). (Compl. ¶ 155.) They also sought a vexatious litigant order against Defendant. (*Id.*) On October 9, 2020, the Pennsylvania court concluded that it lacked jurisdiction over Plaintiffs' claims for negligent misrepresentation, intentional interference with prospective contractual relations, and tortious interference with contract, that it lacked specific personal jurisdiction over Hartleib sufficient to impose a vexatious litigant order on him in Pennsylvania, and that Pennsylvania was not the proper venue for Plaintiffs' abuse of process claim. (*Id.* ¶ 156.) Plaintiffs filed an amended complaint complying with this order. (*Id.* ¶ 157.) Plaintiffs allege that in the Pennsylvania Action, Defendant "has improperly utilized the federal

judicial process to harass, intimidate and publicly disparage Plaintiffs," including through a motion for sanctions filed on August 23, 2022. (*Id.* ¶¶ 158–59.)

On January 27, 2023, Plaintiffs filed this case, alleging claims for (1) "Vexatious Litigant Order" and (2) abuse of process.

## III. ANALYSIS

Defendant specially moves to strike Plaintiffs' claims under California's anti-Strategic Lawsuit Against Public Participation ("SLAPP") statute. That statute provides that a "cause of action against a person arising from any act of that person in furtherance of the person's right of petition or free speech under the United States Constitution or the California Constitution in connection with a public issue shall be subject to a special motion to strike, unless the court determines that the plaintiff has established that there is a probability that the plaintiff will prevail on the claim." Cal. Civ. Code § 425.16(b)(1).

Ruling on an anti-SLAPP motion is a two-step process. First, a court must determine whether the defendant has made a prima facie showing that the challenged cause of action arises from protected activity. *People ex rel. Fire Ins. Exch. v. Anapol*, 211 Cal. App. 4th 809, 822 (2012). A defendant meets this burden by demonstrating that the act underlying the plaintiff's cause of action fits one of the categories spelled out in section 425.16(e), which includes written or oral statements or writings made before a judicial proceeding or in connection with an issue under consideration or review by a judicial body. Civ. Code § 425.16(e)(1)–(2). If a defendant makes that showing, a court must determine whether the plaintiff has shown a probability of prevailing on its claims. *Id.* at 149-50. Courts only proceed to the second step if the defendant meets its burden on the first step. *Id.* at 150.

**A. Protected Activity**

In determining whether the plaintiff's claims arise from protected speech or petitioning activity, courts focus "on the principal thrust or gravamen of the causes of action, i.e., the allegedly wrongful and injury-producing conduct that provides the foundation for the claims." *Sprengel v. Zbylut*, 241 Cal. App. 4th 140, 150 (2015), *as modified on denial of reh'g* (Oct. 29, 2015); *see Mission Beverage Co. v. Pabst Brewing Co.*, 15 Cal. App. 5th 686, 698 (2017) ("Whether a claim is based on protected activity turns on "whether the core injury-producing conduct warranting relief under the cause of action is protected.") (cleaned up). When a claim "alleges both protected and unprotected activity," courts consider the activity protected "unless the protected conduct is 'merely incidental' to the unprotected conduct." *Raining Data Corp. v. Barrenechea*, 175 Cal. App. 4th 1363, 1369 (2009).

Courts generally conclude that abuse of process claims arise from protected activity. *See Raining Data Corp. v. Barrenechea*, 175 Cal. App. 4th 1363, 1368 (2009) (stating that abuse of process claims "by definition" arise from protected activity); *United Tactical Sys., LLC v. Real Action Paintball, Inc.*, 143 F. Supp. 3d 982, 1008 (N.D. Cal. 2015) (same); *Travelers Prop. Cas. Co. of Am. v. KLA-Tencor Corp.*, 45 Cal. App. 5th 156, 165 (2020) (noting that an abuse of process claim is "commonly understood to be premised on actions in legal proceedings"); *see also Voltage Pictures, LLC v. Blake*, 2015 WL 9272880, at *5 (D. Or. Dec. 17, 2015) ("A claim for abuse of process necessarily arises out of oral and written statements made in connection with a judicial proceeding."). Indeed, "it is hard to imagine an abuse of process claim that would not" arise from protected activity because the "gist" of an abuse of process claim is misusing "process justified in itself for an end other than that which it was designed to accomplish." *Booker v. Rountree*, 155 Cal. App. 4th 1366, 1370 (2007); *Lunsford v. Am. Guarantee & Liab. Ins. Co.*, 18 F.3d 653, 655 (9th Cir. 1994). Plaintiffs' claim that Defendant misused the

legal system to harm their reputations and business prospects and harass them arises out of Defendant's protected activity of making statements in a judicial proceeding or in connection with an issue under consideration by a judicial body. Civ. Code § 425.16(e)(1)–(2).

**B. Probability of Prevailing**

"To establish a probability of prevailing, the plaintiff 'must demonstrate that the complaint is both legally sufficient and supported by a sufficient prima facie showing of facts to sustain a favorable judgment if the evidence submitted by the plaintiff is credited.'" *Pott v. Lazarin*, 47 Cal. App. 5th 141, 150 (2020), *as modified on denial of reh'g* (May 21, 2020), *review denied* (Aug. 19, 2020). This burden is relatively low, and "[t]he plaintiff need only establish that his or her claim has minimal merit." *Id.* (internal quotation omitted).

Plaintiffs cannot show a probability of prevailing on their first claim, "Vexatious Litigant Order," because **"**a request that [a person] be deemed a vexatious litigant is not an independent cause of action." *Dunmore v. Dunmore*, 2013 WL 876907, at *4 (E.D. Cal. Mar. 7, 2013), *report and recommendation adopted,* 2013 WL 1628140 (E.D. Cal. Apr. 15, 2013); *see Freezor v. California Grills, Inc.*, 2013 WL 866505, at *2 (E.D. Cal. Mar. 7, 2013) ("[T]he Court cannot find any case law that describes or states that a "vexatious litigant" is an affirmative defense. If Defendants want the Court to declare Plaintiff a 'vexatious litigant,' Defendants may file a properly noticed motion with facts that support its claim."). If the case proceeds, Plaintiffs may file an appropriate motion to seek this relief, but a claim in a complaint is not the proper way to seek this relief.

Nor can Plaintiffs show a probability of prevailing on their second claim for abuse of process. "The tort of abuse of process arises when one uses the court's process for a

purpose other than that for which the process was designed." *Brown v. Kennard,* 94 Cal. App. 4th 40, 44 (2001). Abuse of process occurs when a person "misappl[ies] process justified in itself for an end other than that which it was designed to accomplish," or uses legal process "for an end other than that of the proceeding itself." *Lunsford*, 18 F.3d at 655. The elements of an abuse of process claim are "(1) an ulterior purpose; and (2) a willful act in the use of the process not proper in the regular conduct of the proceeding." *Id.*

Plaintiffs allege that the following acts constituted an abuse of process: Defendant's (1) unsuccessful attempts to have the Ross-Williams protective order in the Sprint derivative settlement appeal lifted, (2) threats to file briefs and appear at hearings in Plaintiffs' pending cases across the country, (3) submission of amicus briefs regarding appointment of lead counsel in the Equifax and Centurylink cases, (4) email to the Big Lots court regarding the Law Firm's billing entries, and (5) "unfounded and untimely lawsuit against Plaintiffs alleging malpractice after an unsuccessful attempt to extort Plaintiffs under the guise of 'pre-suit mediation.'" (Compl. ¶ 200).

Defendant argues that Plaintiffs cannot show a probability of prevailing on their abuse of process claim because he has a litigation privilege defense. (MTS at 10–11); *see Flatley v. Mauro,* 39 Cal.4th 299, 323 (2006) (explaining that the litigation privilege is relevant in the anti-SLAPP analysis' second step because "it may present a substantive defense a plaintiff must overcome to demonstrate a probability of prevailing"). The litigation privilege—which applies to all torts except malicious prosecution, including abuse of process—applies to "any communication (1) made in judicial or quasi-judicial proceedings; (2) by litigants or other participants authorized by law; (3) to achieve the objects of the litigation; and (4) that have some connection or logical relation to the action." *Silberg v. Anderson,* 50 Cal.3d 205, 212 (1990); *see* Cal. Civ. Code § 47(b); *Rusheen v. Cohen*, 37 Cal.4th 1048, 1058 (2006). "The breadth of the litigation privilege

cannot be understated." *Olsen v. Harbison*, 191 Cal. App. 4th 325, 333 (2010). "Any doubt about whether the privilege applies is resolved in favor of applying." *Kashian v. Harriman*, 98 Cal. App. 4th 892, 913 (2002).

The litigation privilege exists "to afford litigants and witnesses free access to the courts without fear of being harassed subsequently by derivative tort actions, to encourage open channels of communication and zealous advocacy, to promote complete and truthful testimony, to give finality to judgments, and to avoid unending litigation." *Rusheen,* 37 Cal.4th at 1063. The privilege is absolute and is broadly construed to effectuate these purposes, even when it means litigants cannot recover damages for injurious publications made in judicial proceedings. *Action Apartment Assn., Inc. v. City of Santa Monica*, 41 Cal.4th 1232, 1241 (2007); *Hagberg v. Cal. Fed. Bank*, 32 Cal.4th 350, 360 (2004); *see Smith v. Fireside Thrift Co.*, 2007 WL 2729329, at *5 (N.D. Cal. Sept. 18, 2007) (noting that striking an abuse of process claim based on the litigation privilege could "produce a troubling result in some situations," but concluding that "the anti-SLAPP statute, together with the litigation privilege, seem to compel this result"); *Rusheen*, 37 Cal. 4th at 1063 ("[D]espite . . . concern for the potential abolishment of the common law tort of abuse of process, modern public policy seeks to encourage free access to the courts and finality of judgments by limiting derivative tort claims arising out of litigation-related misconduct."). "Anti-SLAPP motions targeting litigation activity" through abuse of process claims "are routinely granted based on the litigation privilege." *Microsoft Corp. v. M. Media*, 2018 WL 5094969, at *7 (C.D. Cal. Mar. 13, 2018) (collecting cases).

All four elements of the litigation privilege are met here. First, the statements and actions Plaintiffs allege constitute an abuse of process were made in judicial proceedings. *See Silberg*, 50 Cal.3d at 212 (explaining that the privilege applies even when the "publication is made outside the courtroom and no function of the court or its officers is

involved"). Second, Defendant was either a litigant or authorized participant in those proceedings. *See Greenway v. Blonska*, 2013 WL 12126095, at *5 (C.D. Cal. Oct. 11, 2013) (noting that "at least one Court of Appeal has held that California's litigation privilege applies" even "to statements made by a party who lacked standing"). And as to the third and fourth elements—which "[i]n practice . . . are merged into a single inquiry"—Defendant's statements had at least "some relation" to the matters the courts were considering. *Butkus v. Downtown Athletic Club of Orlando, Inc.*, 2008 WL 11338099, at *4 (C.D. Cal. Mar. 10, 2008); *Kimes v. Stone*, 84 F.3d 1121, 1126 (9th Cir. 1996) ("For well over a century, communications with 'some relation' to judicial proceedings have been absolutely immune from tort liability by the [litigation] privilege.").

Plaintiffs argue that the litigation privilege does not protect those who use the mere fact that they are speaking in the course of a judicial proceeding "as a pretext to defame persons with respect to matters which have nothing whatever to do with the question under consideration." (MTS Opp. at 10 n.1 [quoting *Twyford v. Twyford*, 63 Cal. App. 3d 916, 925 (1976)].) But the matters on which Defendant spoke did not "have nothing whatever to do with the question under consideration." *Twyford*, 63 Cal. App. 3d at 925. The Equifax, Centurylink, and Big Lots courts were considering appointing the Law Firm as lead counsel (or as part of proposed lead counsel's team) or awarding it fees, and Defendant's statements had "some relation" to those issues. *See Kimes*, 84 F.3d at 1126.

Plaintiffs also argue that the privilege does not apply because "the Complaint is ***littered*** with examples of Defendant engaging courts in myriad jurisdictions under the (purported) guise of judicial privilege, casting himself as a friend of the Court when, in reality, Defendant's objective has been solely to harass, harangue, denigrate, and cause damage to Plaintiffs' business." (MTD Opp. at 15 [emphasis in original].) But the litigation privilege applies even when statements are made for improper purposes.

*Mogan v. Sacks, Ricketts & Case LLP*, 2022 WL 94927, at *6 (N.D. Cal. Jan. 10, 2022), *motion for relief from judgment denied,* 2022 WL 377979 (N.D. Cal. Feb. 8, 2022), and *aff'd,* 2023 WL 2983577 (9th Cir. Apr. 18, 2023), and *aff'd,* 2023 WL 2983577 (9th Cir. Apr. 18, 2023) ("Although Mogan claims they brought the motions for sanctions to threaten him and for other improper purposes, the sanctions motion was connected to the action at bar and therefore satisfies the final element required to establish the litigation privilege."). And it applies even when the statements made are false or perjurious. *Rusheen*, 37 Cal. 4th at 1058; *see Holland v. Jones*, 210 Cal. App. 4th 378, 382 (2012) (explaining that tort claims based on "statements, whether true or false or made with malice or without, in" a declaration filed in judicial proceedings "fall squarely within the litigation privilege."). Application of the litigation privilege therefore prevents Plaintiffs from showing a probability of success on their claims. *See, e.g.*, *Mar. v. Twin Cities Police Auth.*, 2014 WL 3725931, at *12 (N.D. Cal. July 25, 2014) (granting anti-SLAPP motion because the plaintiff failed to show a probability that he would prevail on his abuse of process claim since that claim was barred by the litigation privilege).

Plaintiffs request that if the Court dismisses the Complaint, it dismiss without prejudice. (MTD Opp. at 16–17.) Courts grant leave to amend unless the pleading could not possibly be cured by the allegation of other facts, such that granting leave to amend would be futile. *Lopez v. Smith*, 203 F.3d 1122, 1127 (9th Cir. 2000); *Doe v. United States*, 58 F.3d 494, 497 (9th Cir. 1995). Because Plaintiffs may be able to cure the deficiencies in their abuse of process claim, the Court will grant leave to amend.

## IV. CONCLUSION

For the foregoing reasons, Defendant's special motion to strike Plaintiffs' claims under California's anti-SLAPP statute is **GRANTED WITH FOURTEEN DAYS LEAVE TO AMEND** and his motion to dismiss Plaintiffs' Complaint is **DENIED AS**

**MOOT**. If Plaintiffs wish to file an amended complaint, they must do so by **May 22, 2023.** Failure to file an amended complaint by that date will result in dismissal of Plaintiffs' claims with prejudice.

DATED: May 8, 2023

CORMAC J. CARNEY
UNITED STATES DISTRICT JUDGE