# JS-6

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

| | |
|---|---|
| THE WEISER LAW FIRM, P.C. and ROBERT B. WEISER,<br><br>   Plaintiffs,<br><br>  v.<br><br>MICHAEL HARTLEIB,<br><br>   Defendant. | Case No.: SACV 23-00171-CJC (JDEx)<br><br>ORDER GRANTING DEFENDANT'S SPECIAL MOTION TO STRIKE PURSUANT TO CALIFORNIA CODE OF CIVIL PROCEDURE §425.16 [Dkt. 44] AND DENYING AS MOOT DEFENDANT'S MOTION TO DISMISS [Dkt. 41] |

## I.    INTRODUCTION

In this case, Plaintiffs The Weiser Law Firm, P.C. (the "Law Firm") and Robert B. Weiser—Pennsylvania citizens—allege that Defendant Michael Hartleib—a California citizen—is a vexatious litigant who has abused the judicial process in states such as Kansas, Georgia, and Minnesota, and maliciously prosecuted a case against them in Kansas.  (*See* Dkt. 40 [First Amended Complaint, hereinafter "FAC"].)  The Court previously granted Defendant's anti-SLAPP motion as to Plaintiffs' vexatious litigant and abuse of process claims with leave to amend, concluding that Plaintiffs could not show a

probability of prevailing on their "Vexatious Litigant Order" claim because "a request that [a person] be deemed a vexatious litigant is not an independent cause of action," nor on their abuse of process claim because Defendant has a litigation privilege defense. (Dkt. 32.)  Plaintiffs then filed a First Amended Complaint reasserting their previous claims and also adding a malicious prosecution claim.  (Dkt. 40.)  Now before the Court are Defendant's special motion to strike Plaintiffs' claims in the FAC under California's anti-SLAPP statute, (Dkt. 44, hereinafter "MTS"), and his motion to dismiss Plaintiffs' FAC, (Dkt. 41, hereinafter "MTD").  For the following reasons, Defendant's anti-SLAPP motion is **GRANTED** and his motion to dismiss is **DENIED AS MOOT**.[1]

## II.    BACKGROUND

Weiser is a founder and principal of the Law Firm, which focuses on shareholder class actions and shareholder derivative actions.  (FAC ¶¶ 7–8.)  Plaintiffs were first introduced to Defendant in 2008, when another attorney asked if Weiser thought there was a basis for a stockholder derivative action in an email he forwarded from Defendant regarding losses Defendant incurred in the merger between Sprint Corporation and Nextel Communications.  (*Id.* ¶¶ 10–12.)  The Law Firm decided not to file a derivative lawsuit at that time.  (*Id.* ¶ 13.)  In 2009, after several securities class action lawsuits were filed based on the merger, the Law Firm began researching and drafting a shareholder derivative complaint.  (*Id.* ¶¶ 14–21.)  On March 26, 2009, Defendant told Weiser by phone that he gave counsel in the Sprint securities class action relevant facts and analysis and was interested in seeking appointment as lead plaintiff in that case.  (*Id.* ¶¶ 26–29.)  Defendant also "strongly implied his interest in sharing any attorneys' fees the Law Firm might recover if it represented [Defendant] in connection with a shareholder derivative

---

[1]  Having read and considered the papers the parties presented, the Court finds these matters appropriate for disposition without a hearing.  *See* Fed. R. Civ. P. 78; Local Rule 7-15.  Accordingly, the hearing set for July 10, 2023, at 1:30 p.m. is hereby vacated and taken off calendar.

action brought on Sprint's behalf." (*Id.* ¶ 30 [emphasis removed].)  Based on this "extremely troubling" interest in a fee-sharing agreement, and Defendant's potential conflict given his involvement in the Sprint securities class action, the Law Firm declined to represent Defendant. (*Id.* ¶¶ 31–36 [emphasis removed].)  Instead, the Law Firm represented Monica Ross-Williams in a shareholder derivative action against Sprint in Kansas state court. (*Id.* ¶ 37.)  In 2011, another firm filed a separate shareholder derivative action on Sprint's behalf, naming Defendant as the representative plaintiff. (*Id.* ¶ 38.)

In 2011, Defendant and others, acting *pro se*, filed a shareholder derivative action on behalf of Sirius XM Satellite Radio, Inc. ("Sirius XM") against Sirius XM's officers and directors in New York State Supreme Court. (*Id.* ¶¶ 39–40.)  Several times, Defendant emailed and called Weiser about the Law Firm potentially representing the plaintiffs in that case. (*Id.* ¶¶ 41–47.)  In 2012, he emailed Weiser, "Rob, are we going to do business together or what? You never called us back after we tried six times to reach you.  David and I need to make some money so that we can buy you a new phone!" (*Id.* ¶ 46.)  Plaintiffs believe Defendant was referring to a fee sharing agreement like the one he had proposed regarding Sprint in March 2009. (*Id.* ¶ 47.)  The Law Firm did not return Defendant's communications, and for many years, Plaintiffs and Defendant had no contact. (*Id.* ¶¶ 45, 48.)

In 2016, most of the Sprint shareholder derivative lawsuits based on the Sprint/Nextel merger, including the Law Firm's case with Ross-Williams, reached a settlement. (*Id.* ¶ 49.)  Defendant did not participate in the settlement and filed *pro se* an objection to it. (*Id.* ¶¶ 50–51.)  About a week before the final approval hearing, in a call regarding Defendant's objection, Defendant told Weiser he would "withdraw his formal objection to the Sprint Derivative Settlement if Weiser would agree to enter into a 'consulting agreement'" under which Defendant would give the Law Firm "prospective

theories for derivative actions against unspecified Defendants and without specific plaintiffs attached" in exchange for several hundred thousand dollars.  (*Id.* ¶¶ 52–55 [emphasis removed].)  The Law Firm declined.  (*Id.* ¶¶ 55–56.)  The Kansas state court approved the Sprint settlement, but awarded only about 10% of the requested attorney fees.  (*Id.* ¶ 65.)  The Law Firm and other firms appealed.  (*Id.* ¶ 66.)

In February 2017, the Law Firm discovered that a contract attorney who performed document review work in the Sprint derivative litigation and other cases, Jeffrey M. Silow, had been disbarred decades earlier.  (*Id.* ¶¶ 63, 68–69.)  It turned out that Silow had used his son's name to hold himself out as an attorney in good standing, duping the firm that had vetted him on the Law Firm's behalf, Abelson Legal Search.  (*Id.* ¶¶ 63–64, 68.)  The Law Firm "immediately severed ties with Silow, affirmatively notified the courts sitting in every action in which Silow's hours were included as part of an 'attorney time' lodestar calculation"—including the Sprint derivative action trial and appellate courts—"reported the incident to the Disciplinary Board of the Supreme Court of Pennsylvania, pressed criminal charges against Silow," and sued Abelson and Silow.  (*Id.* ¶¶ 67, 69, 71.)  Silow later pled guilty to three criminal counts: unauthorized practice of law, unsworn falsification to authorities, and securing execution of documents by deception.  (*Id.* ¶ 70.)

After all of this came to light, the Sprint settlement approval with reduced attorney fees was affirmed on appeal.  (*Id.* ¶ 72.)  In response, Defendant "unleashed a deluge of abuse upon the Plaintiffs," seeing this as an "opportunity to continue to harass Plaintiffs in the false-name of litigation integrity."  (*Id.* ¶ 73.)  In March 2017, he emailed Weiser, eleven other attorneys, and the Kansas state court's administrative assistant, writing,

> Rob, I am a little confused! . . . It seems your statements to the Appellate Court were disingenuous at best. Shocking! . . . I especially like the comment that you felt as though you had an ethical obligation to inform the

> Court, prior to briefing . . . Ethical obligation, what a Saint . . . Your
> attempts, to obfuscate your chicanery in this case is galvanizing my
> convictions, strengthening my resolve to expose all of the corrupt parties in
> this case! This lawyer driven litigation must and will cease. Your temerity,
> to seek leave of the Appellate Court to reinstate fees, given what I have
> uncovered is frankly astonishing and provoking wrath. I will take this all the
> way to the Kansas Supreme Court if needed, as the integrity of the judicial
> system is at stake!

(*Id.* ¶ 74.)  That same day, without the Law Firm's permission, Defendant contacted
Ross-Williams, "verbally harass[ing] and threaten[ing her] with hostile insinuations and
references to [her] personal and professional life," and telling her "that the Law Firm was
a 'criminal enterprise' and was not serving her interests as a Sprint shareholder."  (*Id.*
¶¶ 75–77.)  Although Ross-Williams asked Defendant not to contact her again, (*id.* ¶¶ 79,
81), Defendant soon emailed her, copying fifteen other attorneys and the Kansas state
court's administrative assistant, writing,

> Dear Ms. Williams, . . . I find it unconscionable that your attorneys failed to
> inform you of [the Kansas state court's] rulings or that an Appeal was filed
> on your behalf. I do believe that you are a unwitting victim of their fraud
> committed against the Court. As we discussed they have submitted millions
> of dollars in fraudulent billing in your case. As I informed you that this was
> not just my opinion, the Judge in your case came to a similar conclusion. In
> fact, your attorneys have now admitted to at least 1.6 million dollars in
> fraudulent bills submitted to the Court. Mr. Weiser has confirmed this in two
> separate letters. (See attached). I am no expert, but when a Firm admits
> criminal acts in a case I believe they are obligated to notify you as the
> Plaintiff. Mr. Weiser and his Firm have already contacted their Bar
> associations and other Courts to self-report their criminal acts. . .

(*Id.* ¶¶ 82–83 [emphasis removed].)

The Law Firm sent Defendant a cease-and-desist letter.  (*Id.* ¶ 85.)  Defendant
responded,

For you to characterize this as harassment is another blatant attempt to
distract and obfuscate your fraudulent acts and bastardization of the judicial
system. I caution you, that coercing your "client" to misstate facts regarding
our call will only inflict additional damage to what little credibility you have
left. You Sir, and your coconspirators are the ones that need to Cease and
Desist. Your so-called "client" is representing my interest and her attorneys
are corrupt, therefore I will neither Cease nor Desist. As far as your not so
vailed threat that Ms. Williams "reserves all of her rights", if you are
threatening legal action against me, feel free, I will be happy to waive
service to expedite said action. I find the prospects of discovery quite
compelling. Your threats do nothing but, strengthen my resolve and
galvanize my convictions. Call it a personality defect! Instead of wasting my
time, I would suggest you consult with an ethics attorney, that's right, you
already have!

(*Id.* [emphasis removed].)

On March 30, 2017, the Kansas state appellate court issued a protective order
prohibiting Defendant from directly contacting Ross-Williams. (*Id.* ¶ 86.) Defendant
twice unsuccessfully sought to have that order lifted. (*Id.* ¶¶ 87–88.)

In April 2017, Defendant mailed a letter to six Pennsylvania state court judges.
(*Id.* ¶ 95.) He circled a news headline referencing the attorney fee reduction in the Sprint
derivative settlement and wrote by hand, "What, if anything, do you intend to DO about
this!!" (*Id.* ¶ 96.) He wrote, "Judge JIMMIE VANO in Kansas, God Bless His soul,
caught the firm in the act and knocked out 90% of their billing. They claimed shock &
surprise." (*Id.* [emphases removed].) He also attached a page titled "imaginary
dialogue":

[Weiser:] "Well I get where you are going with this line of questioning. Are
you saying that we knew that he was a disbarred lawyer and we were trying
to milk the class action jackpot with his phony billing"
[Hartleib:] You said it better than I could.
[Weiser:] "Well, you can *GO F**K YOURSELF ASSHOLE. I'M OUT OF
HERE AND YOU CAN TALK TO MY LAWYER IF YOU WANT*

(*Id.* ¶ 97.)

Plaintiffs believe Defendant then searched for cases in which the Law Firm was involved so that he could "inject[] himself." (*Id.* ¶¶ 102–03.) On March 15, 2018, he filed in derivative litigation in Georgia federal court involving Equifax an "Amicus Curiae Brief of Concerned Citizen and Shareholder Michael Hartleib in Opposition of the Appointment of The Weiser Firm as Co-Lead Counsel" in which he expressed "extreme concern" about "troubling actions of Weiser et. al" relating to the Sprint derivative action and Silow. (*Id.* ¶¶ 108–09.) He wrote that the Law Firm "lied, misl[ed] the court," "used an unfit plaintiff," engaged "in fraudulent billing," made "false statements," employed another attorney who constituted "an utter embarrassment to the Plaintiff's Bar," operated a "criminal enterprise," and "committed criminal acts upon the Kansas Court and a multitude of others across the country," making the Law Firm either "completely corrupt, or entirely inept," and "not fit to act as lead on any representative suit." (*Id.* ¶¶ 110, 112 [emphases removed].) When the Law Firm sent Defendant a written response to his Equifax brief, Defendant responded, "Let [Weiser] know he is making a catastrophic mistake!" (*Id.* ¶ 114.) The Equifax court declined to appoint the Law Firm as co-lead counsel. (*Id.* ¶ 116.) In response, on April 5, 2018, Defendant emailed a copy of the court's order to Weiser, adding, "[j]ust got home and wanted to make sure that you have this! Good to finally meet you Rob! Like I said, none of this was necessary!" (*Id.* [emphasis removed].)

On August 17, 2018, Defendant emailed Weiser asking him if he would be at an upcoming shareholder derivative suit hearing in *Witmer v. Sugarman*—a case in California federal court in which Defendant was not involved and was not a shareholder—so that they could "discuss [his] concerns with L.C, A 10 and several other companies in which [Defendant was] a shareholder," noting that "[i]t appears we will be

forced to deal with each other for the foreseeable future" and "other action is eminent [sic]!"  (*Id.* ¶¶ 104–05.)

Defendant next involved himself in a derivative suit the Law Firm was litigating related to Big Lots in Ohio federal court.  (*Id.* ¶ 118.)  When the Big Lots judge granted final approval of a settlement on August 28, 2018, he noted that "[o]n August 24, 2018, well after the time to object and the fairness hearing took place, the Court received an email from [Defendant], a shareholder who had an interest in a different case involving [the Law Firm]," in which Defendant "raised concerns over Weiser's billing practices in this prior case and stated that he wanted to inform the Court so that it could scrutinize the fee request in this case."  (*Id.* ¶¶ 120–21.)  The court stated that Defendant did "not indicate that he [was] a shareholder in Big Lots or otherwise an interested party in this case."  (*Id.* ¶ 122.)  "[O]ut of an abundance of caution," the court reanalyzed the Law Firm's billing records and gave it a chance to respond to Defendant's allegations, ultimately concluding that it was "fully satisfied that the hours billed by Weiser were reasonable in this case."  (*Id.* ¶ 123.)

Next came a set of consolidated shareholder derivative cases in Minnesota federal court regarding Centurylink.  (*Id.* ¶ 125.)  On March 5, 2019, the day before a hearing on competing motions for appointment of lead counsel, Defendant filed an amicus brief opposing the Law Firm's appointment as lead counsel, even though the Law Firm did not seek appointment as lead counsel, and even though Defendant was not a Centurylink shareholder.  (*Id.* ¶¶ 126–27, 131.)  In the brief, Defendant sought to "inform this Court of ongoing troubling actions by the Weiser and Robbins Arroyo et.al. [sic] Firms," including that they used "deceased parties, friends and family members which lacked standing, and paid serial criminal Plaintiffs," that they "generate thousands of billable hours for illusory work, submit fraudulent time logs and seek hundreds of millions in unjust fees in cases across the country," and that Weiser "committed perjury and admitted

to billing fraud." (*Id.* ¶¶ 132–34.)  At the hearing on the competing motions, Defendant stated, among other things, that "these firms are up to no good, when they are billing illusory hours," and that the Law Firm knew about Silow's disbarment.  (*Id.* ¶ 140.)  He also stated that "if the firms would like to give me a list of their forthcoming cases in which they are seeking leave, I could be certain to notify everybody timely and I wouldn't have to prepare, stay up all night, all weekend long, to try to draft an amicus brief and get it to the court and then, you know, fly in." (*Id.* ¶ 140 [emphasis removed].)

Defendant then emailed the Sprint derivative action judge's administrative assistant and the attorney distribution list for that case, advising that his "quest to expose lawyer driven litigation and corruption rife throughout the Plaintiffs Bar continues," and postulating that "[m]aybe [the Sprint derivative action judge] would be interested in setting the record straight before the Court appoints lead Counsel in the [Centurylink] case." (*Id.* ¶ 145.)  The Centurylink court appointed Bragar Eagle & Squire, P.C. as lead counsel (whose proposed support structure included the Law Firm), noting that he had "carefully considered" Defendant's allegations and concluded that Defendant "raised no legitimate questions" regarding ethics or expertise.  (*Id.* ¶ 154 [emphasis removed].)

In 2018, Defendant's attorney sent Weiser a draft petition alleging claims for legal malpractice, breach of fiduciary duty, and violations of the Kansas Consumer Protection Act against Weiser and the Law Firm, and abuse of process and breach of fiduciary duty claims against Ross-Williams.  (*Id.* ¶ 156.)  The attorney invited Weiser to "explore avenues to an agreeable resolution to the matter before it is filed." (*Id.* ¶ 158.)  Plaintiffs' counsel responded that the petition was based on the false allegation that Defendant was the Law Firm's client in the Sprint derivative action.  (*Id.* ¶¶ 159–60.)  Each of Defendant's attorney's responses suggested "pre-suit mediation of this matter." (*Id.* ¶ 161.)

On January 22, 2019, Defendant filed the draft petition in Kansas state court ("Defendant's Lawsuit"). (*Id.* ¶ 163.) Plaintiffs removed Defendant's Lawsuit to Kansas federal court, which dismissed the case on August 21, 2019 "because [Defendant] lack[ed] standing to allege some claims, and his other claims [were] either untimely or implausible." (*Id.* ¶ 164); *Hartlieb v. Weiser L. Firm, P.C.*, 2019 WL 3943064, at *10 (D. Kan. Aug. 21, 2019). The Kansas federal court denied Defendant's motion for reconsideration of the dismissal, and the Tenth Circuit affirmed on June 21, 2021. *Hartlieb v. Weiser L. Firm, P.C.*, 2020 WL 3412480, at *1 (D. Kan. June 22, 2020), *aff'd*, 861 F. App'x 714 (10th Cir. 2021).

On June 24, 2019, before the Kansas federal court dismissed Defendant's Lawsuit, Plaintiffs sued Defendant in Pennsylvania federal court for negligent misrepresentation, intentional interference with prospective contractual relations, abuse of process, tortious interference with contract, defamation, and intentional infliction of emotional distress ("IIED") (the "Pennsylvania Action"). (FAC ¶ 168.) They also sought a vexatious litigant order against Defendant. (*Id.*) On October 9, 2020, the Pennsylvania court "dismissed Plaintiffs' request for a vexatious litigant order and claims for negligent misrepresentation, intentional interference with contractual relations, and tortious interference for lack of personal jurisdiction and dismissed Plaintiffs' claim for abuse of process for improper venue." (*Id.* ¶ 169.); *Weiser L. Firm, P.C. v. Hartlieb*, No. 2:19-CV-02728-KSM, 2023 WL 2692384, at *5 (E.D. Pa. Mar. 29, 2023).

Plaintiffs then filed an amended complaint in the Pennsylvania case continuing to assert their defamation and IIED claims and also adding claims for commercial disparagement and false light invasion of privacy. *Weiser L. Firm, P.C.*, 2023 WL 2692384, at *5. On March 31, 2022, the Pennsylvania federal court denied Defendant's motion to dismiss the defamation, commercial disparagement, and false light claims as to two statements—Defendant's March 14, 2019 email to the Sprint court asking it to "set[ ]

the record straight" in the CenturyLink litigation, on which 14 attorneys were copied, and his August 24, 2018 email to the Big Lots court raising "concerns over Weiser's billing practices" in the Sprint case—and granted it as to all other statements. *Id.* Though the Pennsylvania federal court also denied Defendant's motion to dismiss Plaintiffs' IIED claim, they later withdrew that claim. *Id.*

On December 14, 2022, Defendant moved for summary judgment in Plaintiffs' Pennsylvania csae. On March 29, 2023, the Pennsylvania court denied Defendant's motion for summary judgment as to Plaintiffs' defamation and false light claims and granted it as to their commercial disparagement claim. *Id.* at *19. On April 13, 2023, Plaintiffs voluntarily dismissed the Pennsylvania case (E.D. Penn. Case No. 2:19-cv-02728-KSM, Dkts. 220–22), and on May 15, 2023, they filed a notice of appeal to the Third Circuit of the Pennsylvania court's orders on both motions to dismiss and certain motions to quash (*id.* Dkt. 223). In this case, Plaintiffs allege that Defendant "improperly utilized the federal judicial process [in the Pennsylvania case] to harass, intimidate and publicly disparage" them, including through a motion for sanctions filed on August 23, 2022 which was denied as moot (*id.* Dkts. 171, 191). (FAC ¶¶ 171–72.)

On January 27, 2023, Plaintiffs filed this case, alleging claims based on all of Defendant's conduct for "Vexatious Litigant Order" and abuse of process. (*See* Dkt. 1 [Complaint].) In the FAC filed May 22, 2023, they added a claim for malicious prosecution. (FAC.)

## III.   ANALYSIS

Defendant specially moves to strike Plaintiffs' claims under California's anti-Strategic Lawsuit Against Public Participation ("SLAPP") statute. That statute provides that a "cause of action against a person arising from any act of that person in furtherance

of the person's right of petition or free speech under the United States Constitution or the California Constitution in connection with a public issue shall be subject to a special motion to strike, unless the court determines that the plaintiff has established that there is a probability that the plaintiff will prevail on the claim."  Cal. Civ. Code § 425.16(b)(1).

Ruling on an anti-SLAPP motion is a two-step process.  First, a court determines whether the defendant has made a prima facie showing that the challenged cause of action arises from protected activity.  *People ex rel. Fire Ins. Exch. v. Anapol*, 211 Cal. App. 4th 809, 822 (2012).  The defendant meets this burden by demonstrating that the act underlying the plaintiff's cause of action fits one of the categories spelled out in section 425.16(e), which includes written or oral statements or writings made before a judicial proceeding or in connection with an issue under consideration or review by a judicial body.  Civ. Code § 425.16(e)(1)–(2).  If the defendant makes that showing, the court analyzes whether the plaintiff has shown a probability of prevailing on its claims.  *Id.* at 149–50.  Courts only proceed to the second step if the defendant meets its burden on the first step.  *Id.* at 150.

### A.      Protected Activity

In determining whether the plaintiff's claims arise from protected speech or petitioning activity, courts focus "on the principal thrust or gravamen of the causes of action, i.e., the allegedly wrongful and injury-producing conduct that provides the foundation for the claims."  *Sprengel v. Zbylut*, 241 Cal. App. 4th 140, 150 (2015), *as modified on denial of reh'g* (Oct. 29, 2015); *see Mission Beverage Co. v. Pabst Brewing Co.*, 15 Cal. App. 5th 686, 698 (2017) ("Whether a claim is based on protected activity turns on "whether the core injury-producing conduct warranting relief under the cause of action is protected.") (cleaned up).  When a claim "alleges both protected and unprotected activity," courts consider the activity protected "unless the protected conduct

is 'merely incidental' to the unprotected conduct." *Raining Data Corp. v. Barrenechea*,
175 Cal. App. 4th 1363, 1369 (2009).

Courts generally conclude that abuse of process claims arise from protected
activity. *See Raining Data Corp.*, 175 Cal. App. 4th at 1368 (stating that abuse of
process claims "by definition" arise from protected activity); *United Tactical Sys., LLC v.
Real Action Paintball, Inc.*, 143 F. Supp. 3d 982, 1008 (N.D. Cal. 2015) (same);
*Travelers Prop. Cas. Co. of Am. v. KLA-Tencor Corp.*, 45 Cal. App. 5th 156, 165 (2020)
(noting that an abuse of process claim is "commonly understood to be premised on
actions in legal proceedings"); *Siam v. Kizilbash*, 130 Cal. App. 4th 1563, 1570 (2005)
(stating that an abuse of process claim arises from protected activity "since it arises from
the exercise of the right of petition"); *Flores v. Emerich & Fike*, 385 F. App'x 728, 732
(9th Cir. 2010) (indicating that abuse of process claims arise out of protected activity,
citing *Siam*); *see also Voltage Pictures, LLC v. Blake*, 2015 WL 9272880, at *5 (D. Or.
Dec. 17, 2015) ("A claim for abuse of process necessarily arises out of oral and written
statements made in connection with a judicial proceeding."). Indeed, "it is hard to
imagine an abuse of process claim that would not" arise from protected activity because
the "gist" of an abuse of process claim is misusing "process justified in itself for an end
other than that which it was designed to accomplish." *Booker v. Rountree*, 155 Cal. App.
4th 1366, 1370 (2007); *Lunsford v. Am. Guarantee & Liab. Ins. Co.*, 18 F.3d 653, 655
(9th Cir. 1994). Plaintiffs' claims that Defendant misused the legal system to harass them
and harm their reputations and business prospects arise out of Defendant's protected
activity of making statements in a judicial proceeding or in connection with an issue
under consideration by a judicial body. *See* Civ. Code § 425.16(e)(1)–(2).

Similarly, "[t]he plain language of the anti-SLAPP statute dictates that every claim
of malicious prosecution is a cause of action arising from protected activity because
every such claim necessarily depends upon written and oral statements in a prior judicial

proceeding." *Daniels v. Robbins*, 182 Cal. App. 4th 204, 215 (2010); *see Jarrow Formulas, Inc. v. LaMarche*, 74 P.3d 737, 741 (Cal. 2003) ("By definition, a malicious prosecution suit alleges that the defendant committed a tort by filing a lawsuit," and therefore "every Court of Appeal that has addressed the question has concluded that" such claims "fall within the purview of the anti-SLAPP statute."). Plaintiffs' claim that Defendant's Lawsuit was malicious arises from the filing of Defendant's Lawsuit in Kansas and therefore arises from protected activity.

## B.    Probability of Prevailing

"To establish a probability of prevailing, the plaintiff 'must demonstrate that the complaint is both legally sufficient and supported by a sufficient prima facie showing of facts to sustain a favorable judgment if the evidence submitted by the plaintiff is credited.'" *Pott v. Lazarin*, 47 Cal. App. 5th 141, 150 (2020), *as modified on denial of reh'g* (May 21, 2020), *review denied* (Aug. 19, 2020). This burden is relatively low, and "[t]he plaintiff need only establish that his or her claim has minimal merit." *Id.* (internal quotation omitted); *see Mindys Cosms., Inc. v. Dakar*, 611 F.3d 590, 598 (9th Cir. 2010) ("[T]he second step of the anti-SLAPP inquiry is often called the 'minimal merit' prong."). But the requirement is not meaningless. Rather, it "operates like a demurrer or motion for summary judgment in reverse, requiring the plaintiff to demonstrate that he possesses a legally sufficient claim which is substantiated, that is, supported by competent, admissible evidence." *Mindys*, 611 F.3d at 599 (quoting *Coll. Hosp. Inc. v. Sup. Ct.,* 882 P.2d 894 (Cal. 1994) (cleaned up)).

### 1.    "Vexatious Litigant Order"

As the Court explained in its prior order, Plaintiffs cannot show a probability of prevailing on their first claim, "Vexatious Litigant Order," because "a request that [a

person] be deemed a vexatious litigant is not an independent cause of action." *The Weiser Law Firm, et al. v. Hartleib*, 2023 WL 4291982, at *6 (C.D. Cal. May 8, 2023) (quoting *Dunmore v. Dunmore*, 2013 WL 876907, at *4 (E.D. Cal. Mar. 7, 2013), *report and recommendation adopted,* 2013 WL 1628140 (E.D. Cal. Apr. 15, 2013) and citing *Freezor v. California Grills, Inc.*, 2013 WL 866505, at *2 (E.D. Cal. Mar. 7, 2013) ("[T]he Court cannot find any case law that describes or states that a 'vexatious litigant' is an affirmative defense. If Defendants want the Court to declare Plaintiff a 'vexatious litigant,' Defendants may file a properly noticed motion with facts that support its claim.")). If this case were to proceed, Plaintiffs could file an appropriate motion to seek this relief, but a claim in their complaint is not the proper way to seek it.

### 2.      Abuse of Process

Plaintiffs have also still failed to show a probability of prevailing on their abuse of process claim. "The tort of abuse of process arises when one uses the court's process for a purpose other than that for which the process was designed." *Brown v. Kennard,* 94 Cal. App. 4th 40, 44 (2001). It occurs when a person "misappl[ies] process justified in itself for an end other than that which it was designed to accomplish," or uses legal process "for an end other than that of the proceeding itself." *Lunsford*, 18 F.3d at 655. The elements of an abuse of process claim are "(1) an ulterior purpose; and (2) a willful act in the use of the process not proper in the regular conduct of the proceeding." *Id.*

Plaintiffs allege that the following acts constituted an abuse of process: Defendant's (1) unsuccessful attempts to have the Ross-Williams protective order in the Sprint derivative settlement appeal lifted, (2) threats to file briefs and appear at hearings in Plaintiffs' pending cases across the country, (3) submission of amicus briefs regarding appointment of lead counsel in the Equifax and Centurylink cases, (4) email to the Big Lots court regarding the Law Firm's billing entries, (5) "unfounded and untimely lawsuit

against Plaintiffs alleging malpractice . . . after an unsuccessful attempt to extort
Plaintiffs under the guise of 'pre-suit mediation,'" and (6) illicit fee-sharing proposals.
(FAC ¶¶ 211–15.)

Plaintiffs cannot show a probability of prevailing on their abuse of process claim
because the litigation privilege applies to Defendant's challenged conduct.  *See Flatley v.
Mauro*, 39 Cal.4th 299, 323 (2006) (explaining that the litigation privilege is relevant in
the anti-SLAPP analysis' second step because "it may present a substantive defense a
plaintiff must overcome to demonstrate a probability of prevailing").  The litigation
privilege—which applies to all torts except malicious prosecution, including abuse of
process—covers "any communication (1) made in judicial or quasi-judicial proceedings;
(2) by litigants or other participants authorized by law; (3) to achieve the objects of the
litigation; and (4) that have some connection or logical relation to the action."  *Silberg v.
Anderson,* 50 Cal.3d 205, 212 (1990); *see* Cal. Civ. Code § 47(b); *Rusheen v. Cohen*, 37
Cal.4th 1048, 1058 (2006).  "The breadth of the litigation privilege cannot be
understated."  *Olsen v. Harbison*, 191 Cal. App. 4th 325, 333 (2010).  "Any doubt about
whether the privilege applies is resolved in favor of applying."  *Kashian v. Harriman*, 98
Cal. App. 4th 892, 913 (2002).

The litigation privilege exists "to afford litigants and witnesses free access to the
courts without fear of being harassed subsequently by derivative tort actions, to
encourage open channels of communication and zealous advocacy, to promote complete
and truthful testimony, to give finality to judgments, and to avoid unending litigation."
 *Rusheen*, 37 Cal.4th at 1063.  The privilege is broadly construed to effectuate these
purposes, even when it means litigants cannot recover damages for injurious publications
made in judicial proceedings.  *Action Apartment Assn., Inc. v. City of Santa Monica*, 41
Cal.4th 1232, 1241 (2007); *Hagberg v. Cal. Fed. Bank*, 32 Cal.4th 350, 360 (2004);
*Rusheen*, 37 Cal.4th at 1063 ("[D]espite . . . concern for the potential abolishment of the

common law tort of abuse of process, modern public policy seeks to encourage free access to the courts and finality of judgments by limiting derivative tort claims arising out of litigation-related misconduct.").[2]  Anti-SLAPP motions on abuse of process claims "are routinely granted based on the litigation privilege."  *Microsoft Corp. v. M. Media*, 2018 WL 5094969, at *7 (C.D. Cal. Mar. 13, 2018) (collecting cases).

All four elements of the litigation privilege are met here.  First, Defendant's challenged statements and actions were made in judicial or quasi-judicial proceedings. *See Silberg*, 50 Cal.3d at 212 (explaining that the privilege applies even when the "publication is made outside the courtroom and no function of the court or its officers is involved"); *Hagberg*, 32 Cal. 4th at 361 (stating that the privilege extends to statements made "prior to the filing of a lawsuit, whether in preparation for anticipated litigation or to investigate the feasibility of filing a lawsuit"); *Rubin v. Green*, 847 P.2d 1044, 1048 (Cal. 1993) (deciding litigation privilege applied to meeting and discussing with potential plaintiffs the facts and merits of the proposed lawsuit).

Second, Defendant was either a litigant or an authorized participant in those proceedings.  *See Adams v. Superior Ct.*, 2 Cal. App. 4th 521, 529 (1992) ("We see no reason why mere lack of standing should have the effect of necessarily vitiating the privilege."); *Greenway v. Blonska*, 2013 WL 12126095, at *5 (C.D. Cal. Oct. 11, 2013) (noting that "at least one Court of Appeal has held that California's litigation privilege applies" even "to statements made by a party who lacked standing").

---

[2] *See Smith v. Fireside Thrift Co.*, 2007 WL 2729329, at *5 (N.D. Cal. Sept. 18, 2007) (noting that striking an abuse of process claim based on the litigation privilege could "produce a troubling result in some situations," but determining that "the anti-SLAPP statute, together with the litigation privilege, seem to compel this result"); *Blaha v. Rightscorp, Inc.*, 2015 WL 4776888, at *3 (C.D. Cal. May 8, 2015) ("While application of the litigation privilege narrows the scope of the abuse of process tort, California courts are well-aware of this and find it consistent with the public policy of the state.").

And as to the third and fourth elements—which "[i]n practice . . . are merged into a single inquiry"—Defendant's statements had at least "some relation" to the matters the courts were considering. *Butkus v. Downtown Athletic Club of Orlando, Inc.*, 2008 WL 11338099, at *4 (C.D. Cal. Mar. 10, 2008); *Kimes v. Stone*, 84 F.3d 1121, 1126 (9th Cir. 1996) ("For well over a century, communications with 'some relation' to judicial proceedings have been absolutely immune from tort liability by the [litigation] privilege."); *see, e.g.*, *Microsoft Corp.*, 2018 WL 5094969, at *7 (rejecting argument that alleged abuse of process through public records search had no "logical connection" to a case when "Microsoft's use of the information obtained in that records search to support Microsoft's Motion to Amend was relevant to the underlying action").  It is clear that Defendant's filings had some relation to the issues before the courts because the Law Firm opposed Defendant's Equifax filing, the Equifax court permitted Defendant to speak, the Centurylink court mentioned Defendant's arguments on the record and expressly rejected them, and the Big Lots court analyzed and rejected Defendant's arguments in its written order granting final approval of the settlement.  (*See* FAC ¶¶ 113–15, 120–23, 154); *Adams*, 2 Cal. App. 4th at 530 (finding connection to judicial proceedings when, among other indicators, a court considered the information provided).

Plaintiffs argue that the litigation privilege does not protect those who use the mere fact that they are speaking in the course of a judicial or quasi-judicial proceeding "as a pretext to defame persons with respect to matters which have nothing whatever to do with the question under consideration."  (MTS Opp. at 12 n.1; MTD Opp. at 16 [both quoting *Twyford v. Twyford*, 63 Cal. App. 3d 916, 925 (1976)].)  But the matters on which Defendant spoke did not "have nothing whatever to do with the question under consideration." *Twyford*, 63 Cal. App. 3d at 925.  The Equifax, Centurylink, and Big Lots courts were considering whether to appoint the Law Firm as lead counsel (or as part of proposed lead counsel's team) or award it fees, and Defendant's statements had "some relation" to those issues.  *See Kimes*, 84 F.3d at 1126; *Twyford*, 63 Cal. App. 3d at 926

(finding that "although not strictly relevant . . . the request for admissions had some direct bearing upon a potential issue in the pending hearing," and noting that any doubts as to the connection between a statement and the judicial proceeding "are to be resolved in favor of relevancy and pertinency; that is to say, the matter to which the privilege does not extend must be so palpably wanting in relation to the subject matter of the controversy that there can be no reasonable doubt of its impropriety").

Plaintiffs also argue that the privilege does not apply because "the Amended Complaint is **littered** with examples of Defendant engaging courts in myriad jurisdictions under the (purported) guise of judicial privilege, casting himself as a friend of the Court when, in reality, Defendant's objective has been solely to extort, harass, harangue, denigrate, and cause damage to Plaintiffs' business."  (MTD Opp. at 16 [emphasis in original].)  But the litigation privilege applies even when statements are made for improper purposes.  *Mogan v. Sacks, Ricketts & Case LLP*, 2022 WL 94927, at *6 (N.D. Cal. Jan. 10, 2022), *motion for relief from judgment denied,* 2022 WL 377979 (N.D. Cal. Feb. 8, 2022), and *aff'd,* 2023 WL 2983577 (9th Cir. Apr. 18, 2023), and *aff'd,* 2023 WL 2983577 (9th Cir. Apr. 18, 2023) ("Although Mogan claims they brought the motions for sanctions to threaten him and for other improper purposes, the sanctions motion was connected to the action at bar and therefore satisfies the final element required to establish the litigation privilege."); *Quidel Corp. v. Siemens Med. Sols. USA, Inc.*, 2019 WL 4747671, at *10 (S.D. Cal. Sept. 27, 2019) ("[E]ngaging in litigation is not an 'abuse' of the process, even though Siemens claims Quidel's sole purpose in doing so was to continue its ongoing disparagement scheme against Siemens.").[3]  And it applies even when the statements made are false or perjurious.  *Rusheen*, 37 Cal. 4th at 1058;

---

[3] *See also Jacob B. v. Cnty. of Shasta*, 154 P.3d 1003, 1008 (Cal. 2007) ("[The litigation privilege] is absolute and applies regardless of malice."); *Umansky v. Urquhart*, 84 Cal. App. 3d 368, 371 (Ct. App. 1978) (concluding litigation privilege barred abuse of process claim despite the plaintiff's argument that "the subject pleading was not made to achieve the objects of litigation" but rather "as part of a recommended technique to create pressure and an unfair advantage").

*Jacob B.*, 154 P.3d at 1009 ("[T]he cases are clear that the litigation privilege extends to civil actions based on perjury."); *see Holland v. Jones*, 210 Cal. App. 4th 378, 382 (2012) (explaining that tort claims based on "statements, whether true or false or made with malice or without, in" a declaration filed in judicial proceedings "fall squarely within the litigation privilege").[4]  Plaintiffs cannot show a probability of success on their abuse of process claim because the litigation privilege applies to Defendant's challenged statements and conduct.  *See, e.g.*, *Mar. v. Twin Cities Police Auth.*, 2014 WL 3725931, at *12 (N.D. Cal. July 25, 2014) (granting anti-SLAPP motion because the plaintiff failed to show a probability that he would prevail on his abuse of process claim since that claim was barred by the litigation privilege).

### 3.    Malicious Prosecution

Plaintiffs' third claim alleges malicious prosecution based on Defendant's Lawsuit. Defendant argues Plaintiffs cannot show a probability of prevailing on this claim because it is barred by Kansas' one-year statute of limitations.  (MTS at 14–15.)  Plaintiffs contend they will prevail on the malicious prosecution claim because California's two-year statute of limitations applies.  (Opp. at 18.)  The Court agrees with Defendant.

By default, California courts apply California law unless a party meets its burden to show that another state's law should apply.  *Senne v. Kansas City Royals Baseball Corp.*, 934 F.3d 918, 928 (9th Cir. 2019).  Defendant argues that Kansas law applies in

---

[4] *See also Jacob B.*, 154 P.3d at 1008 ("The resulting lack of any really effective civil remedy against perjurers is simply part of the price that is paid for witnesses who are free from intimidation by the possibility of civil liability for what they say."); *Edwards v. Centex Real Est. Corp.*, 53 Cal. App. 4th 15, 30 (1997) ("We recognize the necessarily harsh result of extending a privilege to false and fraudulent statements made in the course of a judicial proceeding. We accept that result, however, on account of the overriding importance of the competing public policy in favor of enhancing the finality of judgments and avoiding unending postjudgment derivative litigation.").

this case.  "In a diversity case, the district court must apply the choice-of-law rules of the state in which it sits."  *Coufal Abogados v. AT&T, Inc.*, 223 F.3d 932, 934 (9th Cir. 2000).  In non-contract cases like this one, California courts "analyze the governmental interests of the various jurisdictions involved to select the most appropriate law."  *Cal. Dep't of Toxic Substances Control v. Jim Dobbas, Inc.*, 54 F.4th 1078, 1089 (9th Cir. 2022).  The governmental interest analysis proceeds in three steps: (1) determination of whether the potentially affected states have different laws, (2) examination of whether each of the states has an interest in having its law applied to the case, and (3) if the laws are different and each has an interest in having its law applied (referred to as a "true" conflict), selection of which state's law to apply by comparing the nature and strength of each state's interest to determine which state's interest would be more impaired if its policy were subordinated to the policy of the other state.  *Senne*, 934 F.3d at 928; *Clothesrigger, Inc. v. GTE Corp.*, 191 Cal. App. 3d 605, 614 (Ct. App. 1987).

The first element of the governmental interest analysis is met because California and Kansas have different statutes of limitations for malicious prosecution claims. California's is two years, *Stavropoulos v. Superior Ct.*, 141 Cal. App. 4th 190, 193 (2006), while Kansas' is one year, Kan. Stat. Ann. § 60-514.

The second element is met because California and Kansas each arguably have some interest in having their laws applied to this case.  Kansas has an interest in preventing malicious prosecution occurring in its courts.  *See McCann v. Foster Wheeler LLC*, 225 P.3d 516, 534 (Cal. 2010) ("[A] jurisdiction ordinarily has the predominant interest in regulating conduct that occurs within its borders.") (cleaned up).  And California has an interest in applying its malicious prosecution law against its residents who injure people in other jurisdictions.  *Cf. Zinser v. Accufix Research Institute, Inc.*, 253 F.3d 1180, 1187 (9th Cir. 2001) ("[E]very state has an interest in having its law applied to its resident claimants."); *Carijano v. Occidental Petroleum Corp.*, 643 F.3d

1216, 1232–33 (9th Cir. 2011) (explaining in *forum non conveniens* local interest context
that "California courts have repeatedly recognized the state's "interest in deciding actions
against resident corporations whose conduct in this state causes injury to persons in other
jurisdictions").

Because there is a true conflict, the Court must decide which state's law to apply
by comparing the nature and strength of each state's interest to determine which would be
more impaired if its policy were subordinated to the policy of the other state. *See Senne*,
934 F.3d at 928. Kansas has the stronger interest here.

"Although the situs of the injury is no longer the sole consideration in California
choice-of-law analysis, California courts have held that, with respect to regulating or
affecting conduct within its borders, the place of the wrong has the predominant interest."
*Abogados v. AT&T, Inc.*, 223 F.3d 932, 935 (9th Cir. 2000) (cleaned up) (collecting
cases); *McCann*, 225 P.3d at 534 ("[A] jurisdiction ordinarily has the predominant
interest in regulating conduct that occurs within its borders.") (cleaned up). Here, the
alleged wrong—filing a malicious lawsuit—took place in Kansas. *See Bandary v. Delta
Air Lines, Inc.*, 2018 WL 6016286, at *2 (C.D. Cal. Feb. 7, 2018) (determining that Utah
law applied even when the plaintiffs were California citizens when "[t]he alleged
malicious prosecution took place in Utah and related to events that, in part, occurred in
Utah"). And the allegedly malicious lawsuit asserted claims based on events related to
the Sprint derivative action, which occurred in Kansas. *See id.* "In a case like this, . . .
where another state's litigation process has allegedly been perverted, California's interest
is far less than if the litigation process in California were subject to misuse." *Engel v.
CBS Inc.*, 981 F.2d 1076, 1081 (9th Cir. 1992); *see* Restatement (Second) of Conflict of
Laws § 155 (1971) "The rights and liabilities of the parties for malicious prosecution or
abuse of process are determined by the local law of the state where the proceeding

-22-

complained of occurred, unless, with respect to the particular issue, some other state has a more significant relationship . . . .").

The analysis might be different if the victims of the alleged malicious prosecution were California citizens. *See, e.g.*, *Fisher Tooling Co. v. Outilliage*, 2004 WL 7338656, at *5 (C.D. Cal. Nov. 29, 2004) (applying California law over New Jersey law even though allegedly malicious prosecution was initially filed in New Jersey because, among other reasons, "if New Jersey law applies, California will be unable to either protect or provide redress to a corporation residing in and doing business in California," which "would be particularly problematic considering that the injury caused by the alleged malicious prosecution occurred in and was felt in California"). But Plaintiffs are Pennsylvania citizens. (FAC ¶¶ 1–3.) And Defendant's California residence does not produce a strong enough interest to tip the balance of interests in favor of applying California law. *See Abogados*, 223 F.3d at 936.[5] Accordingly, Kansas' one-year statute of limitations applies. Defendant's lawsuit concluded on June 21, 2021, *see Hartleib*, 861 F. App'x 714, but Plaintiffs did not file a malicious prosecution claim until May 22, 2023, (Dkt. 40). Plaintiffs therefore cannot show a probability of prevailing on their malicious prosecution claim. *See Trinity Christian Ctr. of Santa Ana, Inc. v. McVeigh*, 2013 WL 5935562, at *9 (C.D. Cal. Oct. 31, 2013), *aff'd,* 637 F. App'x 339 (9th Cir. 2016), and *aff'd,* 637 F. App'x 339 (9th Cir. 2016) (finding no probability of prevailing on malicious prosecution claim when statute of limitations had run).

//

//

---

[5] Indeed, "[t]he result of applying California law in this situation would be to benefit [ ] non-California citizen[s]"—Plaintiffs—"at the expense of a California citizen"—Defendant—"in a dispute over events that occurred in [Kansas]. California has a minimal interest in that outcome." *Bandary*, 2018 WL 6016286, at *2.

**IV.   CONCLUSION**

For the foregoing reasons, Defendant's anti-SLAPP motion is **GRANTED**, and Plaintiffs' FAC is **DISMISSED WITH PREJUDICE**.  Defendant's motion to dismiss is **DENIED AS MOOT**.


DATED:     July 6, 2023


_____

CORMAC J. CARNEY

UNITED STATES DISTRICT JUDGE